# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PATRICK BRADY, et al.,

                Plaintiffs,

        v.

AIR LINE PILOTS
ASSOCIATION,
INTERNATIONAL,

              Defendant.

Civil Action No. 02-2917 (JEI)

_____

## ALPA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERTS, AND FOR SUMMARY JUDGMENT

_____

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033-0968
(856) 795-2121

*Pro Hac Vice:*

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ............................................................................. 5

    A.    The Seniority Integration Was Intended to Preserve the Pre-Transaction Career Expectations of Both Pilot Groups ................................... 5

    B.    Salamat's Proposed Seniority Lists and Damages Calculations ................. 8

    C.    Farber's Proposed Seniority Lists ............................................................. 13

ARGUMENT ................................................................................................ 16

I.    PLAINTIFFS' EXPERT TESTIMONY IS INADMISSIBLE UNDER RULE 702 AND *DAUBERT* ................................................................... 16

    A.    LEGAL FRAMEWORK ....................................................................... 16

    B.    SALAMAT'S TESTIMONY SHOULD BE EXCLUDED ....................... 19

        1.    Salamat Is Not Qualified to Testify as a Damages Expert ...................... 19

        2.    Salamat's Negotiation Analysis Model Is Unreliable and Does Not Fit the Facts of this Case ........................................................... 23

        3.    Not One of Salamat's "But-For" Lists Is Based on a Reliable Methodology or Fits the Facts of this Case ........................................... 30

        4.    Salamat's Testimony About His Damages Calculations, if Admissible, Must Be Limited Significantly ............................................................. 42

    C.    FARBER'S TESTIMONY SHOULD BE EXCLUDED ........................... 44

        1.    Farber Lacks Specialized Qualifications To Construct His Proposed Alternative Seniority Lists ................................................................. 44

        2.    Farber's Methodology for Selecting "Comparable" Transactions Is Not Reliable ........................................................................................ 46

        3.    The Metric Farber Uses To Construct His Alternative Seniority Lists is Not Reliable ...................................................................................... 50

        4.    Farber's Conclusions Rely on Counterfactual Assumptions and Will Not Assist the Trier of Fact ................................................................. 52

II.    ALPA IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES ............................................................................................ 58

    A.    PLAINTIFFS HAVE SUFFERED NO COGNIZABLE DAMAGES AS A RESULT OF THE ALLEGED BREACH ............................................... 60

1. Plaintiffs Have Not Put Forward Admissible Expert Opinions to Support Their Claim for Damages ..........................................................................61

2. The Undisputed Record Makes Clear that ALPA's Actions Did Not Cause Plaintiffs To Suffer any Monetary Harm ......................................62

B. THE TIME PERIOD DURING WHICH ANY DAMAGES ACCRUED SHOULD BE LIMITED AS A MATTER OF LAW ...............................68

1. Damages Are Limited to the Duration of the 1997 CBA .......................69

2. Plaintiffs' Claim for Future Damages Should Be Dismissed .................72

CONCLUSION .................................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams* v. *Commc'ns Workers of Am.*,
 23 F. Supp. 2d 47 (D.D.C. 1998) ....................................................61

*Alexander* v. *Int'l Union of Operating Eng'rs*,
 624 F.2d 1235 (5th Cir. 1980)........................................................61

*Anders* v. *Puerto Rican Cars, Inc.*,
 409 F. App'x 539 (3d Cir. 2011)....................................................62

*Anderson* v. *Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).........................................................................58

*Baisden* v. *I'm Ready Prods., Inc.*,
 No. 4:08-CV-00451, 2010 WL 1855963 (S.D. Tex. May 7, 2010)...................37

*Bartek* v. *Urban Redevelopment Auth. of Pittsburgh*,
 882 F.2d 739 (3d Cir. 1989)............................................................75

*Bowen* v. *U.S. Postal Serv.*,
 459 U.S. 212 (1983).........................................................................69

*Brill* v. *Marandola*,
 540 F. Supp. 2d 563 (E.D. Pa. 2008)............................................44

*Bruen* v. *Int'l Union of Elec., Radio & Machine Workers*,
 313 F. Supp. 387 (D.N.J. 1969) ....................................................70

*Calhoun* v. *Yamaha Motor Corp., U.S.A.*,
 350 F.3d 316 (3d Cir. 2003)....................................................17, 45

*Casper* v. *SMG*,
 389 F. Supp. 2d 618 (D.N.J. 2005)................................................36

*Centrix HR, LLC* v. *On-Site Staff Mgmt., Inc.*,
 349 F. App'x 769 (3d Cir. 2009)....................................................61

*Chemipal Ltd.* v. *Slim-Fast Nutritional Foods Int'l, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004) ........................................................32, 36

*Curry* v. *Royal Oak Enters., LLC*,
    No. 11-5527, 2013 WL 3196390 (E.D. Pa. June 25, 2013) .............................45

*D&D Assocs., Inc.* v. *Bd. of Educ. of N. Plainfield*,
    No. Civ.A. 03-1026, 2006 WL 755984 (D.N.J. Mar. 20, 2006).......................23

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)...................................................................................passim

*Diaz* v. *Johnson Matthey, Inc.*,
    893 F. Supp. 358 (D.N.J. 1995) .................................................................passim

*Dunkin' Donuts Inc.* v. *Dough Boy Mgmt., Inc.*,
    No. 02-243(JLL), 2006 WL 20521 (D.N.J. Jan. 3, 2006) ..........................60, 61

*Elcock* v. *Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)................................................................18, 19, 58

*Schneider ex rel. Estate of Schneider* v. *Fried*,
    320 F.3d 396 (3d Cir. 2003)........................................................ 16, 17, 24, 52

*Foster* v. *Dravo Corp.*,
    490 F.2d 55 (3d Cir. 1973)..........................................................................70

*Furlan* v. *Schindler Elevator Corp.*,
    864 F. Supp. 2d 291 (E.D. Pa. 2012)............................................................17

*Furlan* v. *Schindler Elevator Corp.*,
    No. 12–2232, 2013 WL 1122649 (3d Cir. Mar. 19, 2013)..............................62

*Gen. Elec. Co.* v. *Joiner*,
    522 U.S. 136 (1997).....................................................................................30

*Habecker* v. *Clark Equip. Co.*,
    36 F.3d 278 (3d Cir. 1994).........................................................................58

*Hansel* v. *Pub. Serv. Co. of Colo.*,
    778 F. Supp. 1126 (D. Colo. 1991) ..............................................................74

*Heller* v. *Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir. 1999) ............................................................................33

*Holman Enters.* v. *Fidelity & Guar. Ins. Co.*,
    563 F. Supp. 2d 467 (D.N.J. 2008) ................................................................18

*Institut Pasteur* v. *Simon*,
    383 F. Supp. 2d 809 (E.D. Pa. 2005) ............................................................59

*LinkCo, Inc.* v. *Fujitsu Ltd.*,
    No. 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) .....................50

*Magistrini* v. *One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002) ................................................................49

*Major Tours, Inc.* v. *Colorel*,
    799 F. Supp. 2d 376 (D.N.J. 2011) ................................................................43

*Mansfield* v. *Lucent Techs.*, No. 04-3589 (MLC), 2006 WL 2040406
    (D.N.J. July 20, 2006) ..................................................................................58

*McCabe* v. *Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ..........................................................................58

*Meadows* v. *Anchor Longwall & Rebuild, Inc.*,
    306 F. App'x 781 (3d Cir. 2009) ....................................................................42

*Milanowicz* v. *The Raymond Corp.*,
    148 F. Supp. 2d 525 (D.N.J. 2001) ..........................................................41, 50

*In re Novatel Wireless Secs. Litig.*,
    846 F. Supp. 2d 1104 (S.D. Cal. 2012) ........................................................43

*Oddi* v. *Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) ....................................................................33, 52

*Olabode* v. *William Hecht, Inc.*,
    No. CIV. A. 95-6221, 1997 WL 805187 (E.D. Pa. Dec. 30, 1997)..................74

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)..............................................................19, 51, 52

*Pease* v. *Lycoming Engines*,
No. 4:10-CV-00843, 2011 WL 6339833 (M.D. Pa. Dec. 19, 2011) ................26

*Pineda* v. *Ford Motor Co.*,
520 F.3d 237 (3d Cir. 2008)......................................................................16, 17

*Prusky* v. *Allstate Life Ins. Co.*,
No. 09-cv-05156, 2011 WL 1934992 (E.D.Pa. May 19, 2011) .......................68

*Scully* v. *US WATS, Inc.*,
238 F.3d 497 (3d Cir. 2001)...........................................................................60

*Sivell* v. *Conwed Corp.*,
666 F. Supp. 23 (D. Conn. 1987) ...................................................................69

*Smith* v. *Gen. Elec. Co.*,
No. CIV. A. 93-5250, 1996 WL 24762 (E.D. Pa. Jan. 22, 1996).....................75

*Snodgrass* v. *Ford Motor Co.*,
No. 96-1814, 2002 WL 485688 (D.N.J. Mar. 28, 2002)..................................47

*Sparks* v. *Consol. Rail Corp.*,
No. 94-CV-1917, 1995 WL 284210 (E.D. Pa. May 8, 1995)...........................18

*Story Parchment Co.* v. *Paterson Parchment Paper Co.*,
282 U.S. 555 (1931).................................................................................59, 60

*Surace* v. *Caterpillar, Inc.*,
111 F.3d 1039 (3d Cir. 1997)....................................................................17, 21

*Trigon Ins. Co.* v. *United States*,
204 F.R.D. 277 (E.D. Va. 2001)......................................................................43

*In re UAL Corp.*,
468 F.3d 456 (7th Cir. 2006).........................................................................24

*United Steelworkers of Am.* v. *Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960).......................................................................................70

*United States* v. *Schiff*,
538 F. Supp. 2d 818 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010)............17

*United States* v. *Vaghari*,
735 F. Supp. 2d 197 (E.D. Pa. 2010)...............................................................18

*Wade-Greaux* v. *Whitehall Labs., Inc.*,
874 F. Supp. 1441 (D.V.I. 1994).....................................................................45

*Warner Chilcott Labs. Ireland Ltd.* v. *Impax Labs., Inc.*,
No. 2:08-cv-06304, 2012 WL 1551709 (D.N.J. Apr. 30, 2012) .....................51

*Wilkes-Barre Publ'g Co.* v. *Newspaper Guild of Wilkes-Barre*,
504 F. Supp. 54 (M.D. Pa. 1980) ....................................................................70

*Wolfson-Verrichia Grp., Inc.* v. *Metro Commercial Real Estate, Inc.*,
No. 5:08-cv-4997, 2013 WL 1286184 (E.D. Pa. Mar. 28, 2013).....................47

*Yarchak* v. *Trek Bicycle Corp.*,
208 F. Supp. 2d 470 (D.N.J. 2002)..................................................................33

*Zeller* v. *J.C. Penney Co.*,
No. 05-2546, 2008 WL 906350 (D.N.J. Mar. 31, 2008)..................................34

*ZF Meritor, LLC* v. *Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)....................................................................16, 18

## CONSTITUTION & RULES

Fed. R. of Evid. 403 ................................................................................ 18-19

Fed. R. of Evid. 702...................................................................................passim

U.S. Const. amend. VII.   ..................................................................................23

## OTHER AUTHORITIES

Arthur S. Goldberger, *A Course in Econometrics* 248-50 (1991) .........................52

## PRELIMINARY STATEMENT

In the liability phase of this case, a jury found that ALPA had breached its duty of fair representation and that whatever constituted that supposed breach caused injury to "some" TWA pilots.  Plaintiffs' counsel invited the jury to find injury even if it concluded the staple point should have been one pilot lower.  (Ex. 4 at 75:17-18.)[1]  At the damages phase of this case, however, Plaintiffs must prove much more.  They must prove through non-speculative evidence and to a reasonable degree of certainty that they suffered monetary damage, who suffered it, and the amount thereof.  That is no small task.  As this Court recognized, "the calculation of damages [here] is an extraordinarily difficult exercise."  (Ex. 65 at 7:20-21.)  After more than two years for discovery, Plaintiffs have come up empty.

The only evidence of monetary damage that Plaintiffs have offered to support their demands are speculative and subjective theories offered by two purported experts, Rikk Salamat and Dr. Henry Farber.  (Ex. 51; *see also* Ex. 66 at 27:7-9.)  But Salamat and Farber make counterfactual assumptions, disregard undisputed evidence, and rely on invalid methodologies to hazard guesses about what seniority lists the Allied Pilots Association ("APA") and the TWA Master Executive Council ("TWA MEC") might have negotiated absent any breach of ALPA's duty of fair representation.  By Salamat's own admission, however, these

---

[1] All references to "Ex. __" refer to exhibits to the Declaration of Daniel J. Toal, dated August 22, 2013, submitted in support of these Motions (the "Toal Decl.").

lists are nothing more than "*speculat[ion]* about what would have happened in an alternative universe."  (Salamat 1/30 Tr. 191:13-17 (emphasis added).)[2]  It is well established that opinions arrived at through such guesswork—the product of unsound methodologies and inaccurate assumptions—fall far shy of the analytical rigor required by *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Plaintiffs have thus failed to adduce any admissible evidence of damages. For each of the following reasons, the Court should grant ALPA's motion to exclude the testimony of Salamat and Farber and grant its motion for summary judgment:

  *First*, Salamat—the only proffered expert who attempts to quantify the damages Plaintiffs purportedly suffered—should be precluded from testifying. He attempts to predict the outcome of the negotiations between the TWA MEC and the APA had ALPA acted differently.  Yet, as he admits, he has no expertise in any of the disciplines upon which he supposedly relies to create his analytical framework and therefore no expertise on which to base his estimate of Plaintiffs' damages.  (Salamat 1/29 Tr. 9:14-19, 10:6-12:5, 19:1-8, 21:23-25, 145:11-15.) Salamat's damages models are also unreliable and lack an adequate connection to the facts of this case.  Among other foundational errors, Salamat inaccurately assumes that the jury found that ALPA breached its duty of fair representation by

---

[2] Excerpts from Salamat's January 29, 30, and 31, 2013 deposition testimony are attached as Exhibits 56, 57, and 58, respectively, to the Toal Declaration.

failing to pursue each and every one of ten specific actions even though, as the Court has explained, "[t]here was no finding of any particular failure." (Ex. 66 at 4:9-20.) He then arbitrarily assigns probabilities reflecting his subjective view of the impact that failure to pursue each action had on the likelihood of negotiating a particular alternative seniority list. (Salamat Rpt. 10; Salamat 1/29 Tr. 130:3-133:10; Salamat 1/30 Tr. 49:4-8.)[3] And his proposed alternative seniority lists are also inadmissible as a matter of law because they rely on impermissible speculation and assumptions that are unmoored to, and often contradicted by, the facts of this case.

*Second*, Farber's testimony also should be excluded under *Daubert*. Farber too has no relevant expertise in proposing a "but-for" integrated pilot seniority list. After compiling an incomplete list of other airline transactions, and excluding those where he had difficulty obtaining information, he subjectively and inaccurately selects supposedly "comparable" transactions based on impressionistic assessments of two criteria, out of the multitude that he acknowledges are relevant to seniority integrations. He blithely assumes that the TWA-American merged seniority list should have looked like the average of the lists from those transactions. He further compounds this error by using an unreliable summary metric that has never been used or peer-reviewed in the

---

[3] The Salamat Report, dated October 12, 2012, is attached as Exhibit 52 to the Toal Declaration.

context of a seniority integration to estimate his but-for seniority list.  But even if his method and metric had been reliable, his testimony would still be inadmissible because it rests on counterfactual assumptions.  For example, Farber's entire model rests on his demonstrably false assumption that TWA was not in danger of ceasing operations prior to the transaction.  Had he bothered to review the record, which he concededly failed to do, he would have seen uncontroverted evidence that TWA would have been forced to liquidate within days absent the transaction with American, distinguishing the deal from any mergers he considered comparable.

*Third*, ALPA is entitled to summary judgment on the issue of damages because Plaintiffs have failed to adduce a theory of damages supported by any admissible evidence.  The only evidence supporting their claim for damages is inadmissible under *Daubert*.  And the undisputed record, including testimony from all parties involved in the seniority integration negotiations, is devoid of evidence that ALPA's actions caused Plaintiffs to suffer any monetary harm.  To the contrary, the record demonstrates that nothing ALPA did would have persuaded the APA to offer the TWA pilots more favorable terms.  In addition, Plaintiffs' claimed entitlement to damages through June 2026 is untenable because ALPA's liability is limited to the duration of the 1997 American-APA collective bargaining agreement (through May 1, 2003).  Moreover, Plaintiffs cannot sustain their burden of advancing a basis for an award of future earnings.

Plaintiffs have had over a decade to develop a reliable damage theory, but have proven unable to do so.  All they have proffered are the opinions of two supposed experts whose speculation is inadmissible under *Daubert*.  Therefore, ALPA respectfully requests that the Court grant its motions to exclude Plaintiffs' experts' testimony and for summary judgment on Plaintiffs' claims for damages.

## STATEMENT OF FACTS

The liability phase of this case concluded in July 2011 with a jury verdict that ALPA breached its duty of fair representation to the TWA pilots and that this breach caused injury to "some of the TWA pilots."  (Ex. 5 at 2.)  Seeking to establish class-wide damages as a result of ALPA's breach of duty, Plaintiffs have submitted reports from two proposed experts, Rikk Salamat and Dr. Henry Farber.  Salamat and Farber both opine about the hypothetical seniority lists that they contend would have resulted from negotiations between the APA and the TWA MEC absent ALPA's breach.  As set forth below, neither expert's testimony is admissible, and there is no triable issue of fact with respect to damages.[4]

### A.    The Seniority Integration Was Intended to Preserve the Pre-Transaction Career Expectations of Both Pilot Groups

Following American Airlines' acquisition of certain assets of TWA in

_____

[4] This Statement of Facts focuses on the facts relevant to the Motion to Exclude the Testimony of Plaintiffs' Experts.  Additional facts relevant to that Motion and to the Motion for Summary Judgment are set forth in the Argument below and in the accompanying Statement of Material Facts Not in Dispute, filed pursuant to Local Civil Rule 56.1(a) (the "Statement of Material Facts").

2001 (the "Acquisition"), the two pilot groups were merged according to a seniority list known as Supplement CC.  It is undisputed that the intent of Supplement CC was to "preserve the career expectations of the members of each pilot group—the *pre-transaction* expectations at the time the transaction was entered into."  (Ex. 26 at ALPA 8755; *see also* Ex. 27 at 2 ("At our first meeting in February 2001, [the TWA MEC Merger Committee] emphasized that unity, fairness and equity, and efficiency will be served by a seniority integration which . . . preserves career expectations . . . ."); Ex. 67 at ALPA 004748 (TWA MEC Merger Committee stating that pre-transaction career expectations are "the quantifiable, reliable criteria" for seniority integrations); Ex. 22 at 85:4-19.)  With this guiding principle, the merged seniority list was organized as follows:

*First,* the top 2,596 positions on the merged seniority list were given to American pilots who were eligible to fly large wide-body aircraft.  (Ex. 26 at ALPA 8757.)  As TWA had no such aircraft in its fleet at the time of the transaction, the TWA pilots had no pre-transaction expectation of ever flying such equipment.  (Ex. 26 at ALPA 8763-64; *see also* Ex. 22 at 89:2-11.)

*Second,* the 1,095 most senior TWA pilots were merged with the remaining American pilots hired before the Acquisition closed, which resulted in a ratio of approximately one TWA pilot to every eight American pilots.  (Ex. 26 at ALPA 8757.)  This ratio was determined to preserve the expectation of the most

junior American pilot to become captain on small wide-body aircraft by a specific date, while also crediting the TWA pilots for the sustainable small wide-body captain positions they brought to the combined airline.  (*Id.* at ALPA 8762-65.)

*Third,* the remaining 1,242 TWA pilots were placed in seniority order after the most junior American pilot hired before the Acquisition closed (*id.* at ALPA 8757; Ex. 1) because TWA's narrow-body captains' pre-transaction career expectations were less favorable than those of even recently hired first officers at American, who enjoyed higher rates of pay and access to better-paying aircraft than had been available at TWA.  (Ex. 34 at ALPA 6033.)[5]

*Finally,* as the pre-transaction career expectations of both pilot groups could not be preserved purely by their respective ranks on the seniority list, Supplement CC included conditions and restrictions aimed at maintaining the pilots' respective access to opportunities, such as equipment and positions, that they had pre-Acquisition.[6]  One such feature was the St. Louis Fence, designed to "protect the TWA pilots' pre-transaction career path, including narrow-body and

---

[5] At the very bottom of the merged seniority list were the nearly 500 American pilots hired after the closing of the Acquisition.  (Ex. 26 at ALPA 8758; Ex. 1.)

[6] As the APA recognized:  "In almost any large pilot seniority integration, it is inevitable that the integrated list by itself will not assure a fair result, and that conditions and restrictions on the operation of the integrated list will be necessary to assure the protection of the pilot groups' pre-transaction expectations.  The AA/TWA integration under Supplement CC is no exception."  (Ex. 26 at ALPA 8765.)

small wide-body Captain jobs attributable to aircraft that TWA operated prior to the transaction, principally in the St. Louis domicile."  (Ex. 26 at ALPA 8765-67.)

Plaintiffs and their experts contend that, had ALPA not breached its duty of fair representation to the TWA pilots, the APA would have agreed to a seniority list that was more favorable to the TWA pilots as a class.  Salamat and Farber each put forward various alternative seniority lists that they claim would have been negotiated and agreed to "but for" ALPA's purported breach of the duty of fair representation.  Based on these hypothetical lists, Salamat purports to calculate monetary damages to the class of TWA pilots.

## B.    Salamat's Proposed Seniority Lists and Damages Calculations

Plaintiffs' principal damages expert is Rikk Salamat.  Salamat is a consultant at a litigation consulting firm, Case Lab, where he primarily provides data analysis services to parties involved in legal disputes.  (Salamat Rpt. at 1; *see also* http://www.caselab.com.)  In his expert report, Salamat attempts to describe the seniority integration that he claims would have occurred absent ALPA's alleged breach of duty and to calculate the monetary benefit that an alternative seniority list would have bestowed on the TWA pilots.  (Salamat Rpt. 2.)

Salamat begins by identifying ten actions that ALPA allegedly failed to pursue on behalf of the TWA pilots.  (*See id.* 2-11, Fig. 3 (below).)  He identified these actions based on:  (1) the trial testimony of Mike Day, the TWA

8

MEC Merger Committee Chairman, and (2) the closing argument of Plaintiffs' counsel.  (Salamat 1/29 Tr. 128:4-8.)  Salamat concedes that none of these actions was identified by the jury as a basis for its finding of liability.  (Salamat 1/29 Tr. 129:19-22.)  He nonetheless assumes the jury found ALPA was required to pursue each of these actions to fulfill its duty of fair representation, and that each inevitably would have improved the TWA pilots' bargaining position in the negotiations, and thus increased the odds of a seniority integration more favorable to the TWA pilots (and less favorable to the American pilots) than Supplement CC.

After inaccurately assuming that the jury found a breach because ALPA failed to pursue each of these actions—*when the jury could have found a breach based on failure to pursue only one of them, or some other criteria entirely*—Salamat purports to quantify the positive impact they would have had on negotiations between ALPA and the APA concerning seniority.  (*See* Salamat Rpt. 9-10, Fig. 3 (below).)  For example, Salamat asserts that if ALPA had instituted a "jump seat war" against the APA pilots, that action would have had a 5% probability of improving the APA's perception of the TWA pilots, a 3% chance of changing the importance the APA placed on certain issues in the negotiation, and a 2% chance of causing the APA to abandon certain unspecific goals.  (*Id.*)  Salamat then adds these probabilities together, and concludes that if ALPA had engaged in all ten actions he identified, there would have been a 73% probability that the

9

outcome of negotiations between ALPA and the APA would have been a "fair, negotiated list acceptable to both parties." (*Id.*)

**Salamat's Figure 3:  Linear Model of Probabilities**

| Action | Δ Importance | Δ Perception | Abandonment | Total |
|---|---|---|---|---|
| Insist on Waiving Scope | | 5% | | 5% |
| Denied April 2001 Legal Strategy: Delay Purchase | 3% | 5% | | 8% |
| Denied July 2001 Legal Strategy: Sue American and APA | 3% | 5% | 2% | 10% |
| Denied October 2001 Legal Strategy: Injunction | | 5% | | 5% |
| Denied October 2001 Legal Strategy: Case, APA Injunction | 3% | | 2% | 5% |
| Refuse to request DOT make fair process condition of purchase | 3% | 5% | 2% | 10% |
| Refuse to request AFL-CIO support | | 5% | | 5% |
| Refuse to block APA pilots from ALPA jumpseats | 3% | 5% | 2% | 10% |
| Deny TWA pilots have right to strike | | 5% | | 5% |
| Failure to Support TWA Pilots | 3% | 5% | 2% | 10% |
| **Total** | | | | **73%** |

Salamat does not know whether pursuing one of these actions would have made it impossible to pursue others and, in particular, whether the legal strategies were mutually exclusive.  (Salamat 1/30 Tr. 9:18-11:7.)  He concedes, however, that if the TWA MEC had declined to waive scope, it would make "absolutely no sense" to pursue the other actions.  (Salamat 1/29 Tr. 186:10-25.)

Salamat admits that there is no basis in the record, or anywhere else, for the probabilities he assigns to each of the hypothetical actions he says ALPA should have taken in the course of its negotiations with the APA.  (Salamat 1/29 Tr. 205:23-209:25.)  Rather, these probabilities were selected subjectively and arbitrarily.  (*Id.* at 209:6-25.)  In other words, Salamat made them up.

Salamat also admits that if one were to vary his assumptions by assigning higher probabilities to certain actions, or by adding more hypothetical actions to his list, his method of summing the probabilities assigned to each action

could lead to a greater than 100% probability of the outcome he purports to predict—a mathematical impossibility.  (Salamat 1/30 Tr. 144:21-150:16.)

Having established this arbitrary and mathematically unsound framework for estimating the probability that the TWA pilots could have negotiated a more favorable seniority list, Salamat purports to describe what that list would have looked like.  He discusses four different seniority lists he evidently considers plausible, each of which is premised on a different rationale:

1. The Salamat Damage Model, or DMODEL, list forms the basis for Salamat's primary damages estimate.  He characterizes this as "the best achievable negotiated list," and thus the list upon which damages should be based.  (Salamat Rpt. 15.)  Using the above probability table, Salamat opines that if ALPA had taken all ten actions he identified, there would have been a 73% likelihood that the TWA MEC and the APA would have agreed to a seniority list identical to the DMODEL.[7]  (*Id.* 48.)

2. The Arbitrated List is Salamat's "best guess as to what an arbitrator would have awarded."  (*Id.* 14).

3. The Marginal List is a list Salamat created by moving 200 additional TWA pilots above the Supplement CC "staple point" because he inaccurately assumed that the jury verdict required a list that was "materially, if only marginally, more favourable to the TWA pilots."  (*Id.* 15.)  Salamat does not explain the basis for this assumption.

4. The Fairness List reflects Salamat's subjective view of the composition of a "fair" seniority list integration, although he concedes that this list is not a proper basis for damages and, in all events, could not have been achieved in negotiations with the APA.  (Salamat 1/29 Tr. 162:19-163:6.)

---

[7] Salamat does not attempt to quantify the probability that any of his other lists would have been achieved in negotiations between the TWA MEC and the APA.

Based on these hypothetical lists, Salamat calculates unmitigated damages ranging from $164 million to $1.4 billion.  (Salamat Rpt. 36.)  Included in these damages estimates are:  (i) past employment damages and furlough damages for April 2002 through June 2012; (ii) future employment damages for July 2012 through June 2026; and (iii) pension damages.  These estimates reflect Salamat's decision to use averages rather than account for the individual choices pilots make about how to use seniority.  (Salamat 1/30 Tr. 153:17-24.)  He does not attempt to demonstrate how any individual TWA pilot could have increased his earnings had the TWA MEC negotiated a more favorable list.  (Salamat 1/30 Tr. 156:21-157:4.)

Although Salamat testified that he does not know how Farber's proposed alternative seniority lists (described below) were derived (Salamat 1/29 Tr. 24:2-19), he nonetheless also calculates damages based on these lists, ranging from $1.0 to $1.6 billion (Ex. 53 at 2).  Finally, Salamat calculates damages of $1.7 billion based on the so-called "Rightful Place Proposal," a seniority list created by Michael Tannen, a consultant to the TWA MEC during the seniority integration negotiations.  (Ex. 54 at 2.)  When ALPA presented this proposal to the APA during the negotiations, the APA immediately and emphatically rejected it as violative of the foundational principle that any seniority list integration must safeguard the pre-transaction career expectations of each pilot group.  (Ex. 28 at 91:4-92:11; Ex. 20 at 86:20-87:21; Ex. 22 at 86:22-87:16.)  Tannen has not

submitted an expert report or testified in this case, and Plaintiffs have stipulated that they do not intend to call him as a witness in the damages trial.  (*See* Ex. 68.)

## C.    Farber's Proposed Seniority Lists

Dr. Henry Farber is a Professor of Economics at Princeton University. (Farber Rpt. ¶ 1.)[8]  Farber was asked by Plaintiffs to "generate an estimate of a merged seniority list that would have resulted from the combination of [American and TWA] had ALPA met its duty of fair representation."  (*Id.* ¶ 8.)  He undertook this assignment notwithstanding that he has no previous experience with seniority integrations, labor arbitrations, or duty of fair representation issues.  (Farber 1/22 Tr. 18:17-24, 62:25-63:3.)[9]

Farber's methodology for constructing his proposed alternative seniority lists relies on comparing the American-TWA seniority list to those implemented in other airline combinations.  In nearly all of the transactions that Farber considered, the seniority integration of the two airlines' pilot groups was determined by arbitration, rather than negotiation.  Farber read the arbitrators' decisions and, based on them, attempted to identify a subset of transactions that he deemed comparable to the TWA-American transaction with respect to two criteria: the financial condition of the acquired airline and whether it contributed "valuable

---

[8] The Farber Report is attached as Exhibit 59 to the Toal Declaration.

[9] Excerpts from Farber's January 22 and 23, 2013 deposition testimony are attached as Exhibits 60 and 61, respectively, to the Toal Declaration.

assets" to the transaction.  (Farber Rpt. ¶ 10.)  Farber determined comparability based on his impressionistic assessments of the financial condition of the acquired airline and the assets involved, and based those assessments exclusively on the arbitral awards regarding seniority integration.  Farber conducted no analysis of the financial condition or assets of TWA or American prior to the transaction.  Nor did he conduct any independent analysis of the financial condition and assets of the carriers involved in the transactions he selected as comparables.

After selectively excluding certain airline transactions from his list—including almost all lists that resulted from negotiations—Farber classified seven as "comparable" based on his two criteria.  Farber then calculated for each of them the "proportional difference between the mean seniority rank of pilots from the acquiring airline on the merged seniority list and the mean seniority rank of pilots from the acquired airline on the merged seniority list."  (*Id.* ¶ 42.)  He used this metric to evaluate how the TWA pilots fared under the American seniority list relative to pilots of other acquired airlines in other transactions.  (*Id.*)

Farber ultimately opines that the seniority placement of the TWA pilots in Supplement CC was "unusually unfavorable, on average," when compared with the transactions he considered "comparable."  (*Id.* ¶¶ 42, 54, 56.)  In reaching this conclusion, he assumes that, but for ALPA's breach, the TWA pilots would have achieved a proportional difference in mean seniority rank equal

14

to or better than the *average* of the "comparable" transactions.  (*Id.* ¶¶ 55-56.)  On this basis, Farber proposes three merged seniority lists that he contends represent the range of alternatives that otherwise would have been achieved in negotiation:

- First, Farber proposes his "best estimate" of the "but-for" seniority list.  He constructed this list by using the average proportional difference in mean ranks of the supposedly "comparable" transactions.  This list features a bottom staple of 350 TWA pilots, with the remaining American and TWA pilots merged using a 5.81:1 ratio.  (*Id.* ¶¶ 55, 58.)

- Second, Farber constructs a list he deems the "upper bound" on what was achievable in negotiation.  Farber excludes the most favorable integration from the perspective of the pilots of the acquired airline, and instead bases this list on the proportional difference in mean rank of the *second-most favorable* integration from his group of "comparable" transactions.  It features a bottom staple of 210 TWA pilots.  (*Id.* ¶¶ 13, 60.)

- Finally, Farber presents a list he views as the "lower bound" on what the TWA pilots could have obtained.  To get this list, Farber excludes the least favorable seniority integration from the perspective of the acquired airline's pilots, and bases his list on the proportional difference in mean rank of the *second-least favorable* integration from the set of "comparable" transactions.  This list features a bottom staple of 521 TWA pilots.  (*Id.* ¶¶ 14, 60.)

None of Farber's proposed lists includes domicile fences, equipment restrictions, guaranteed positions, or any other conditions or restrictions that were features of Supplement CC, including those that favored the TWA pilots.  (*Id.* ¶ 59; Farber 1/22 Tr. 111:22-112:6.)  Nor does he take into consideration the conditions and restrictions of the other seniority integrations upon which he purports to rely.

Farber offers no damages calculation.  Rather, his opinion is limited to constructing alternative "but for" lists.  (Farber 1/22 Tr. 7:17-8:1.)  As noted above, Salamat calculates unmitigated damages which range from $1.0 billion to $1.6 billion on the basis of Farber's proposed lists.  Significantly, each of Farber's proposed seniority lists is more favorable to the TWA pilots than even Salamat's Arbitrated List, which Salamat asserted "must be considered the limit of what the APA would have agreed to."  (Salamat Rpt. 15.)

## ARGUMENT

I. **PLAINTIFFS' EXPERT TESTIMONY IS INADMISSIBLE UNDER RULE 702 AND *DAUBERT***

### A. LEGAL FRAMEWORK

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which codifies the holdings of *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.  Under Rule 702 and *Daubert*, the Court must act as a gatekeeper to ensure that expert opinions based on subjective belief or unsupported speculation do not reach a jury.  *See ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012).  The Third Circuit has identified three requirements for admission of expert testimony:  (1) the expert must be qualified; (2) the expert's methodology must be reliable; and (3) the expert's proffered testimony must fit the particular case.  *See Pineda* v. *Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (Irenas, J.); *Schneider ex rel. Estate*

*of Schneider* v. *Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  The party offering the expert testimony bears the burden of proving admissibility.  *United States* v. *Schiff*, 538 F. Supp. 2d 818, 834 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010).

The first requirement, qualification, requires that an expert possess specialized expertise relevant to the facts at issue.  *Pineda*, 520 F.3d at 244. General knowledge of subjects on which the expert seeks to testify or on which his theory hinges is insufficient to render him qualified.  *See Calhoun* v. *Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003); *Surace* v. *Caterpillar, Inc.*, 111 F.3d 1039, 1055-56 (3d Cir. 1997).  Nor may a proffered expert become qualified merely by reviewing selected literature solely for the purpose of testifying.  *See Diaz* v. *Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D.N.J. 1995) (expert not qualified where he lacked relevant experience and had "at best a limited familiarity with the small amount of literature in the field").

The second requirement, reliability, requires that the proffered testimony be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"  *Schneider*, 320 F.3d at 404.  To survive a *Daubert* motion, Plaintiffs therefore must "come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert."  *Furlan* v. *Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012).  All aspects of an expert's testimony must be reliable, including "the methodology, the facts

17

underlying the expert's opinion, [and] the link between the facts and the conclusion."  *ZF Meritor*, 696 F.3d at 291.

The third requirement, fit, mandates that a proffered opinion be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (quoting *United States* v. *Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  This requirement "demands more than simple relevance; it requires that there be a logical relationship between the proffered testimony and the factual issues involved in the litigation."  *Sparks* v. *Consol. Rail Corp.*, No. 94-CV-1917, 1995 WL 284210, at *1 (E.D. Pa. May 8, 1995). Particularly when rendering an opinion about the quantum of economic harm, "an expert should not depend on fictional or random data."  *Elcock* v. *Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000); *see also Holman Enters.* v. *Fidelity & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 471-72 (D.N.J. 2008) (Irenas, J.) ("[I]f an expert opinion is based on speculation or conjecture, it may be stricken.").

For the reasons discussed below, the expert reports of Salamat and Farber cannot satisfy these requirements and their testimony should be excluded.[10]

---

[10] Federal Rule of Evidence 403 also provides an independent basis for excluding the proposed experts' testimony.  *See United States* v. *Vaghari*, 735 F. Supp. 2d 197, 206 (E.D. Pa. 2010) ("Expert testimony that is admissible pursuant to Rule 702 and *Daubert* is nonetheless subject to balancing analysis under Rule 403."). Salamat and Farber base their respective (and contradicting) hypothetical seniority lists on a misunderstanding of this case's facts.  (*See infra* I.B.3, I.C.4.)  Thus, Rule 403 bars their testimony, as the probative value of their opinions is substantially

## B.     SALAMAT'S TESTIMONY SHOULD BE EXCLUDED

Salamat's proffered testimony is inadmissible under *Daubert* for four independent reasons:  *First,* Salamat lacks any specialized expertise to render him qualified to predict the outcome of negotiations between the APA and the TWA MEC in a but-for world, or to employ the frameworks on which his analysis depends.  *Second,* Salamat's analysis of the impact on the negotiations of certain strategies that ALPA supposedly was required to pursue is premised not on any objective methodology, but rather on subjective judgments and rank speculation.  *Third,* this analysis rests on assumptions that are not based on, and do not fit the facts of, the case.  *Fourth,* the four alternative seniority lists that Salamat presents each rests on its own flawed methodology and counterfactual assumptions.

### 1.     Salamat Is Not Qualified to Testify as a Damages Expert

The core of Salamat's opinion is a prediction about the outcome of a negotiation between the TWA MEC and the APA had circumstances been different.  But that is an area in which Salamat utterly lacks specialized expertise.

---

outweighed by a danger of unfair prejudice and juror confusion.  *See* Fed. R. Evid. 403; *Elcock*, 233 F.3d at 756 n. 13 ("Permitting [an expert] witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which Rule 403 defends."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 747 (3d Cir. 1994) (recognizing Rule 403's particular importance for expert testimony because it is "often more misleading than other evidence").

Salamat purports to apply behavioral theory; economics, including game theory; negotiation and decision analysis (also termed the analysis of persuasion); and expected utility theory in forming his opinions about the outcome of negotiations between ALPA and the APA.  (Salamat Rpt. 3-4.)  But he concededly is not an expert in any of these subjects.  (Salamat 1/29 Tr. 210:1-4; Salamat 1/30 Tr. 50:4-6, 65:25-66:6.)  Salamat is not an economist.  Indeed, he studied economics for one year as an undergraduate before deciding it "wasn't for [him]."  (Salamat 1/29 Tr. 100:11-17.)  He also acknowledges that he is not an expert in negotiation theory.  (*Id*. at 9:14-19, 145:11-15.)  He has never been qualified by a court or an arbitrator to serve as an expert on negotiations.  (*Id*. at 10:6-11.)  And he has never published any work on the subject of negotiations (or anything else).  (*Id.* at 10:12-14, 19:1-8, 21:23-25.)  That his analysis hinges on frameworks for which he has no real knowledge or experience necessarily renders him unqualified.  *Surace*, 111 F.3d at 1039, 1055-56 (rejecting testimony "on an area in which [experienced engineer] ha[d] no training and no experience").

Salamat does cite certain articles from these fields in his report, but his cursory review of technical academic literature—or in certain instances, citation of literature without actual review[11]—certainly does not qualify him to apply any of these frameworks or to give expert testimony based upon them.  *Diaz*,

---

[11] For example, Salamat discusses research on labor negotiations but did not read the work cited in his report.  (Salamat 1/30 Tr. 50:25-51:6.)

893 F. Supp. at 372-73.  To take one example, Salamat's purported application of the work of Dr. Katia Sycara—a professor at Carnegie Mellon University and the author of several academic publications on persuasive argumentation in negotiations—only confirms that he is not qualified to offer any opinion derived from negotiation theory.  Salamat references Sycara's work as the sole framework that supports his arbitrary quantification of the likelihood that certain actions, if taken by ALPA, would have resulted in agreement between the APA and the TWA MEC on seniority integration.  (Salamat Rpt. 8-11; Salamat 1/29 Tr. 66:21-67:1; Salamat 1/30 Tr. 73:11-21.)  But Sycara's model does not prescribe any means of estimating such probabilities.  (Ex. 62 at 2.)  As Sycara herself explained in an expert report submitted on behalf of ALPA, Salamat "seriously misapplied" her theory.  (*Id.* at 11.)  He did so in such a way as to not only ignore fundamental assumptions about and preconditions for the application of her model—including by failing to construct a model of the beliefs and goals of the persuadee, the APA—but also to violate principles of "basic math."[12]  (*Id.*)

---

[12] Salamat adds the arbitrary probabilities he assigns to the actions ALPA allegedly failed to pursue to calculate a total probability of 73%. (Salamat Rpt. 10.)  This aggregation methodology is not derived from any academic text or other authority. (Salamat 1/30 Tr. 150:2-16.)  Salamat admits both that it could result in a combined probability greater than 100%, and that the probability of an event occurring can never exceed 100%. (*Id.* at 145:3-147:25.)  Dr. Kevin Murphy, a Professor of Economics at the University of Chicago, explains in the expert report he submitted on behalf of ALPA in this case that even assuming that Salamat's

Nor does anything about Salamat's academic or professional experience render him qualified to predict the outcome of a hypothetical negotiation.  Salamat holds a bachelor's degree in women's studies and anthropology from York University and an MBA from the University of Toronto. (Salamat 1/29 Tr. 101:10-19, 108:7-9.)  He purports to have "general business expertise" from his MBA coursework.  (Salamat 1/29 Tr. 7:12-13, 10:15-11:6.)  He also purports to be an expert in "human relationships," based principally or exclusively on his undergraduate studies in anthropology.  (*Id.* 8:9-12, 12:6-13:15.) But Salamat has authored no academic or professional publications.  Nor has he earned any professional certifications or licenses.  (*Id.* 12:3-21, 19:6-8, 109:18-24.)

On a handful of occasions, Salamat has worked as a consultant to labor unions, including ALPA, in the context of seniority integrations.  However, that work involved data analysis tasks, such as "analyzing the financial impact of proposed contract changes, comparing compensation, and undertaking operational and economic analysis."  (Salamat Rpt. 1; Salamat 1/29 Tr. 108:22-109:5.) Salamat's work thus involves assessing the cost of seniority integration proposals designed by others, such as arbitrators or negotiators, not predicting the outcomes of negotiations concerning seniority integration or any other area.  (Salamat 1/29 Tr. 112:24-113:11, 124:18-125:3, 139:4-11.)  As a result, his prior experience with

_____

probabilities are otherwise appropriate, the combined probability is 53.3%—not 73%.  (Ex. 30 ¶ 99.)

seniority integrations is, at best, "adjacent to, but not actually encompassing, the subject matter of his testimony." *D&D Assocs., Inc.* v. *Bd. of Educ. of N. Plainfield*, No. Civ.A. 03-1026, 2006 WL 755984, at *3 (D.N.J. Mar. 20, 2006). That is not sufficient.

###           2.       Salamat's Negotiation Analysis Model Is Unreliable and Does Not Fit the Facts of this Case

The foundation of Salamat's damages model is his mistaken assumption that the jury found that ALPA was required to pursue each of ten specific actions on behalf of the TWA pilots in order to discharge its duty of fair representation. (Salamat Rpt. 2; Salamat 1/29 Tr. 130:3-133:10; Salamat 1/30 Tr. 49:4-8.) As this Court has recognized, however, "[t]here was no finding of any particular failure." (Ex. 66 at 4:9-20; *see also* Ex. 5 at 1-2.) This fundamental error in Salamat's interpretation of the liability jury's verdict is compounded by his arbitrary assignment of a probability to each action, supposedly representing the increased likelihood that the TWA MEC and the APA would have agreed upon an integrated seniority list had ALPA taken the action in question.[13] Thus, Salamat's

---

[13] Salamat's misuse of the liability verdict also invites the damages jury to revisit the first jury's findings, in violation of the Seventh Amendment. The Seventh Amendment provides that "no fact tried by a jury[] shall be otherwise reexamined in any Court of the United States." U.S. Const. amend. VII. Here, Salamat's proffered opinion would require the damages jury to reexamine and broaden the liability jury's findings as to the fact and consequences of ALPA's breach of duty. In raising the potential Seventh Amendment concerns here, ALPA does not waive any other objections it may have concerning the liability verdict, and explicitly

opinions also must be excluded because they are unreliable and do not fit the facts of this case.

**(a)    Salamat's Methodology for "Predicting" the Likelihood of a Negotiated Agreement Is Unreliable**

Reliable expert testimony is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Schneider*, 320 F.3d at 404.  At his deposition, however, Salamat readily acknowledged that "speculat[ing] about what would have happened in an alternative universe" is "exactly what I'm doing."  (Salamat 1/30 Tr. 191:13-17.)[14]

Salamat's damages opinion is premised on the assumption that if ALPA had taken the actions that Plaintiffs' counsel has argued it should have, the APA almost inevitably would have agreed to a seniority list substantially more favorable to the TWA pilots than Supplement CC.  But Salamat has failed to identify *any basis* on which a jury could rely to conclude that the alternative lists

---

reserves the right to make a more detailed submission at a later date challenging the liability verdict under the Seventh Amendment.

[14] Salamat's lack of qualifications (discussed above) is also relevant to the reliability analysis.  *See Diaz*, 893 F. Supp. at 373 (an expert's "lack of qualifications . . . is a factor tending to discredit reliability").  His qualifications are particularly suspect because he purports to determine with a 73% probability the placement of *every* pilot on the hypothetical seniority list he contends would have been agreed to in a negotiation but for ALPA's alleged breach.  (Salamat Rpt. 52.)  Even Farber has recognized that there is no reliable methodology that allows an expert to predict the likelihood of a negotiation yielding a particular outcome.  (Farber 1/22 Tr. 15:21-17:7); *see also In re UAL Corp.*, 468 F.3d 456, 459 (7th Cir. 2006) ("There would be no objective basis for calculating what the retired pilots might have received in a hypothetical negotiation. . . .").

he proposes would have resulted from negotiations between the APA and ALPA under any circumstances.  (*See infra* I.B.3.)  Salamat's opinion may offer the illusion of mathematical precision, insofar as he purports to have "calculated" that there would have been a 73% probability that the TWA MEC and the APA would have agreed to one of his alternative integrated seniority lists—the so-called DMODEL or Salamat Model—had ALPA pursued all ten strategies listed in his report, but that number is nothing more than the sum of arbitrary probabilities that he assigned to each individual action.

These probability values are critical to Salamat's analysis.  If the aggregated total were less than 50%, Salamat concedes that this would have impacted his analysis because "it would have been less probable that that would have been an outcome of a negotiated agreement."  (Salamat 1/30 Tr. 76:8-17.)  Yet, when questioned about the empirical or methodological bases for these probabilities, Salamat could not identify any.  He merely responded that, to him, they seemed "reasonable" or "more probable than not."  (Salamat 1/29 Tr. 205:12-22; Salamat 1/30 Tr. 128:19-129:5.)  Salamat's subjective and unfounded judgments about these probabilities obviously cannot be validated or even evaluated because no science, economics, or empirical evidence supports them.

(Salamat 1/29 Tr. 59:7-16, 205:23-208:4.)[15]  And, apart from his own arbitrary assumptions, he has offered no basis for opining that *any* action that ALPA might have taken would have had *any* particular impact on the outcome of negotiations with the APA—much less would have led the APA to agree to a seniority list that delivered hundreds of millions of dollars *more* in value to the TWA pilots than Supplement CC.

In short, Salamat's methodology for predicting the outcome of a hypothetical negotiation, assuming ALPA had acted differently, fails the standard for reliability under Rule 702.  It is not based on a peer-reviewed or generally accepted methodology.  It cannot be independently tested.  It has no known error rate.  And it has never been used outside this litigation.  (*Id.* 139:18-23, 144:19-23, 163:16-18, 213:7-16; Salamat 1/31 Tr. 45:8-46:6.)  Salamat has therefore failed to provide the "objective anchor for his conclusions" that *Daubert* requires "to understand and to assess the reliability of his methodology."  *Pease* v. *Lycoming Engines*, No. 4:10-CV-00843, 2011 WL 6339833, at *9 (M.D. Pa. Dec. 19, 2011).

---

[15] Salamat declined to test the reliability of his assumptions about the probability that particular actions would have influenced the likelihood that the TWA MEC and the APA would have agreed to a seniority integration because of his view that he would still be "left with a subjective proposition[,] [s]o at the end of the day, we just went with the subjective proposition."  (Salamat 1/29 Tr. 205:13-22.)

**(b)    The Assumptions Underlying Salamat's Analysis of the Likelihood of a Negotiated Integration Do Not Fit the Facts**

Salamat's proffered opinions regarding the outcome of a hypothetical negotiation between the TWA and American pilots also fail to satisfy the standards of *Daubert* because his underlying assumptions do not fit the facts of this case. Salamat's exclusive focus on the position of the TWA pilots ignores that there was another party to the negotiations—the APA—whose agreement was necessary for a seniority integration to be implemented.  (*See infra* II.A.2.)  As a result, Salamat's analysis is at odds with the record in this case.

Salamat assumes that the TWA pilots would have had a stronger negotiating position had ALPA taken the actions that he assumes constituted its breach.  As noted, Salamat's only sources for identifying these actions are the closing argument of Plaintiffs' counsel—which, of course, is not "evidence"[16]— and the trial testimony of one witness, Mike Day.  (Salamat 1/29 Tr. 192:6-193:15.)  Moreover, Salamat assumes—without any evidentiary basis and without any consideration or analysis of what the actions entailed or their likelihood of success—that all of these actions would have given the TWA pilots more negotiating leverage and would have led to a more favorable result.  (Salamat Rpt.

---

[16] As this Court repeatedly explained to the jury, closing arguments are not evidence.  (Ex. 2 at 12:15-17 ("The following things are not evidence: Statements, arguments, and questions of the lawyers for the parties in this case . . ."), *id.* 19:5-6 ("As with opening statements, closing arguments are not evidence.").)

8; Salamat 1/29 Tr. 55:20-56:18, 261:3-5.)  Uncontroverted testimony from APA,
TWA, and American Airlines witnesses makes clear that this was not the case.
(*See infra* II.A.2.)  Salamat ignores such testimony or dismisses it as irrelevant.

For example, Salamat opines that if ALPA had not encouraged the
TWA MEC to waive its scope protections—and the TWA MEC had, in fact,
refused to waive—the TWA MEC would have had increased leverage in
negotiations with the APA.  (Salamat 1/29 Tr. 180:16-182:8.)  In fact, however, the
scope waiver was an express precondition to the American Airlines/TWA
transaction under the terms of the Asset Purchase Agreement.  (Ex. 15 at § 10.2.)
Asked to consider testimony from American Airlines CEO Don Carty stating
unequivocally that American Airlines would have walked away from the
transaction had the TWA pilots refused to waive scope, Salamat dismissed Carty's
testimony because "no one, including [Carty], can say what he would have done
. . . had the [TWA] pilots not waived their scope."  (Salamat 1/29 Tr. 220:3-5.)
Curiously, however, Salamat evidently believes that *he* can say what American's
management would have done in the absence of a waiver since he, at least tacitly,
assumes that there would have been no risk of American walking away from the
transaction.  (*See id.* 220:3-10, 222:11-25.)

Salamat does not analyze the costs for the TWA pilots of a decision
by American to abandon the transaction or the likelihood of it happening.  (*See id.*)

Nor does he explain why the APA—with whom the TWA MEC was negotiating—would have felt pressure to make further concessions if the TWA MEC had refused to waive scope. (*See id.* 180:16-181:13.) There is no evidence in the record to suggest that American's threatened decision to abandon the transaction would have created fear on the part of the American pilots by making them worse off, and Salamat offers no explanation—let alone analysis—of why the strategy of refusing to waive scope would have persuaded *the APA* to support the transfer of career opportunities, compensation, and job security from its own pilots to those of TWA. (*Id.* at 183:23-24 ("I don't know what would have happened if they hadn't waived their scope.").) Indeed, as both the President of the APA and the Chairman of its seniority integration committee testified, the American pilots would have been delighted if the TWA Acquisition were called off. (Ex. 28 at 78:13-24; Ex. 20 at 22:1-17, 24:1-25:13.)

Similarly, Salamat ignores the record evidence concerning TWA's financial condition, and the TWA pilots' corresponding pre-transaction career expectations, that informed the APA's position in the negotiations. (*See* Salamat 1/29 Tr. 81:12-21.) The evidence establishes conclusively that TWA was on the verge of liquidation in early 2001 when the acquisition by American was announced. Yet Salamat bases his opinions on a contrary assumption. For example, Salamat opines that "only marginal weight could reasonably be put on"

the job security and higher pay that the TWA pilots received as a result of

Supplement CC because TWA "was still an operating airline" at the time of the

acquisition.  (Salamat Rpt. 30.)  He ignores the testimony of TWA and American

executives, the public record, and the TWA bankruptcy record, all of which

demonstrate that TWA faced imminent liquidation, so that the TWA pilots not only

gained pay and job security—they gained the difference between a guaranteed

place on a major airline's seniority list and the mere chance of a new-hire job at

another airline.

Because Salamat's analysis of the negotiations between the TWA and

American pilots is so disconnected from the factual record, "there is simply too

great an analytical gap between the data and the opinion proffered."  *Gen. Elec.

Co.* v. *Joiner*, 522 U.S. 136, 146 (1997).

### 3.    Not One of Salamat's "But-For" Lists Is Based on a Reliable Methodology or Fits the Facts of this Case

For the reasons set forth above, Salamat's opinions must be excluded

in their entirety.  But even if any part of his negotiation analysis could survive this

*Daubert* challenge, the four lists Salamat proffers are nevertheless inadmissible.

A common flaw that renders each one of the models both unreliable

and unconnected to the facts of this case is that in hypothesizing these alternative

lists—all of which purport to be potential outcomes of a hypothetical negotiation

between the APA and the TWA MEC—Salamat disregarded entirely the impact of

30

each alternative on the American pilots, without whose agreement there would have been no integration.  He conceded the obvious but central point that the American pilots would *not* have agreed to any seniority integration that would leave them worse off than they had been before the Acquisition.  (Salamat 1/29 Tr. 214:12-20.)  Yet he undertook no analyses to determine if his lists would have done precisely that, or if any of his lists preserved the pre-transaction promotional opportunities of the American pilots.  (*Id.* 213:17-21; Salamat 1/30 Tr. 92:23-93:3.)  Nor did he analyze the costs that any of his proposed ALPA strategies would have entailed for the American pilots in an absolute sense or relative to what they would have sacrificed by agreeing to any alternative list.

Additionally, each list, purportedly based on a unique objective, is the product of impermissible and unreliable speculation.  And each list relies on assumptions directly at odds with the facts of this case.  Thus, as detailed below, there are additional, independent reasons why each specific list is inadmissible.

### (a)   The Salamat Model or DMODEL Is Inadmissible

#### (i)   Salamat's Subjective Concept of "Reasonableness" is Not a Substitute for a Reliable Methodology

Although Salamat presents the Salamat Model, his favored hypothetical seniority list, as "the best achievable negotiated list" (Salamat Rpt. 15), he offers no methodology to connect this specific list to the impact of hypothetical changes in ALPA's conduct on the negotiations.  For example,

Salamat asserts that an ALPA-instituted "jump seat war" would have had a 5% probability of improving the APA's perception of the TWA pilots (Salamat Rpt. Fig. 3), but nothing in Salamat's report explains how this 5% probability would lead to the specific DMODEL list he proposes. Indeed, he has no basis on which to do so, having never before analyzed what seniority integration would have occurred if the negotiating circumstances were different and being unaware of any generally accepted methodology for doing so. (Salamat 1/29 Tr. 139:14-23.)[17]

And while Salamat claims that the DMODEL list would have resulted from negotiations if the APA and the TWA MEC were "acting reasonably" (Salamat Rpt. 15, 29), in constructing the list Salamat substitutes his subjective views of what would be "reasonable" for the views of the APA. (Salamat 1/29 Tr. 42:25-44:10; Salamat 1/31 Tr. 56:21-57:5.) Moreover, in opining on what supposedly would have been reasonable for the APA to have agreed to, as noted above, Salamat fails to quantify or even analyze how his alternative list would

_____

[17] Salamat nevertheless asserts that he is qualified to do so here because of prior experience advising pilot committees on seniority integration issues. He concedes that such a consulting role does not necessarily provide one with the requisite expertise to estimate the integration that would have occurred absent a violation of the duty of fair representation. Yet Salamat claims, without further explanation, that this experience gave him unique qualifications because he is "the one whose [sic] been there showing people what the impacts are and seeing what their reactions are." (Salamat 1/29 Tr. 139:9-11.) He is wrong. *See Chemipal Ltd.* v. *Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 594 (D. Del. 2004) (excluding opinion where expert did not "demonstrate how his general experience and 'approximate' knowledge" translated into the proffered opinion).

have affected the American pilots.  And Salamat provides no justification for his

evident assumption that it would have been "reasonable" for the APA to have

agreed to the DMODEL, which would have made the American pilots worse off

than they would have been absent the transaction with TWA, particularly when the

American pilots had the right to staple *all* TWA pilots to the bottom of the list.[18]

In short, Salamat bases the DMODEL list on nothing more than "haphazard,

intuitive inquiry," which falls far short of what *Daubert* requires.  *See Oddi* v. *Ford*

*Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).

       (ii)    A Hypothetical "Negotiated" List Constructed Without
               Regard for the Negotiation History Necessarily Lacks Fit

       Although Salamat's purported starting point for the DMODEL list is

"the basic outline of Supplement CC" (Salamat Rpt. 31), he created his list without

consideration of the overarching goal of the seniority integration:  protecting the

pre-transaction career expectations of the pilots.  While the DMODEL list includes

a top "staple" of American pilots, a merged section with both American and TWA

pilots, and a bottom staple of TWA pilots, it is not otherwise tied to proposals of

either side exchanged during the actual seniority integration negotiations and in

---

[18] As Dr. Murphy's analysis demonstrates, the Salamat Model (and, with one
exception, all other models offered by Plaintiffs' experts) would have made the
American pilots worse off than they had been *prior to the transaction*.  (Ex. 30
¶ 94.)  This untenable result further demonstrates the unreliability of Salamat's
analysis.  *See Heller* v. *Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999);
*Yarchak* v. *Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 495 (D.N.J. 2002) (Irenas, J.).

many cases ignores fundamental elements of those proposals, such as the St. Louis Fence and the need to preserve the career trajectory and opportunities of the American pilots.  (*See, e.g.,* Ex. 27.)

Expert testimony "based on factual assumptions not present in the case" can never satisfy *Daubert.  See Zeller* v. *J.C. Penney Co.*, No. 05-2546, 2008 WL 906350, at *4 (D.N.J. Mar. 31, 2008).  Here, the crux of Salamat's DMODEL list—the number of TWA pilots merged rather than bottom-stapled—is premised on assumptions bearing no relation to the negotiation history.  Salamat wrongly assumes that Supplement CC had a merged group of 940 TWA pilots because that was the number of "MD90 and B767 Captains on the TWA list,"[19] and effectively doubles that number for the DMODEL list by assuming that "given meaningful pressure" the APA would have been convinced that the TWA pilots were also entitled to credit for co-pilot positions.  (Salamat Rpt. 31-32.)  The record demonstrates the lack of connection between these assumptions and the facts.

First, Supplement CC's merged group was calculated in part to preserve the pre-transaction expectations of the American and TWA pilots to reach

---

[19] It is unclear how or why Salamat made this assumption.  The APA Summary of Supplement CC clearly explains that the APA derived the number of merged and stapled TWA pilots from an analysis undertaken to preserve the expectation of the most junior American pilot to reach small wide-body captain by a certain point in time, while ensuring that "[a]t all times, there will be at least 260 TWA pilots [the number of sustainable small wide-body Captain jobs TWA brought to the merger] in the projected small wide-body Captain seniority range."  (Ex. 26 at 8762-95.)

small wide-body captain, crediting the TWA pilots with *260* sustainable small-wide body captain positions.  Second, the APA never showed any willingness to credit TWA with first officer (or co-pilot) positions because such positions at TWA were "comparable to new-hire jobs at American" in terms of pay and equipment type and, as a result, placing these pilots higher on the seniority list would have the effect of transferring American pilots' career expectations to TWA pilots.  (*See* Ex. 27 at 6; Ex. 34 at 2.)  Salamat offers no explanation for how any of the proposed strategies would have changed the APA's steadfast opposition to any integration that transferred career expectations of its pilots to TWA's pilots.

And Salamat provides no empirical or methodological support for his assertion that the APA (or American) would have agreed to *any* integrated seniority list that would have transferred of career opportunities from American pilots to TWA pilots.  In fact, Salamat acknowledged that the APA's predominant objections to a specific seniority integration proposal made in the negotiations was that it failed to take into account the "radical differences" between the groups' respective pre-transaction career expectations, which created enormous windfalls for the TWA pilots at the expense of the American pilots' career expectations. (Salamat Rpt. 29 (quoting July 18, 2001 letter from E. White).)  And yet, in crafting his own lists, Salamat admittedly did no work to understand or model the pre-transaction career expectations of either pilot group, claiming they were

"irrelevant" to his analysis.  (Salamat 1/29 Tr. 81:12-21.)  That much is evident

from the resulting analysis.  As Salamat concedes, the DMODEL would give the

TWA pilots career opportunities that they never expected to have prior to the

transaction, such as pilot positions on large wide-body aircraft, thus transferring

career expectations from American pilots to TWA pilots.  (Salamat 1/31 Tr.

117:16-118:16.)

       As a result, the DMODEL must be excluded as the product of an

inherently unreliable methodology and assumptions that bear no reasonable

relation to the facts of this case.  *See Casper* v. *SMG*, 389 F. Supp. 2d 618, 623

(D.N.J. 2005) (Irenas, J.) (rejecting testimony where there were no "facts on which

to base [the expert's] opinion or specific methodology for arriving at a reasonable

inference"); *Chemipal*, 350 F. Supp. 2d at 594 (excluding expert's "predictions"

where they were "simply not objectively verifiable because [he] has not developed

enough of an objective basis in the record for such opinions").

      **(b)**    **Salamat's Arbitrated List Is Inadmissible**

          (i)    <u>Subjective, Unqualified Judgments Do Not Form a
Reliable Methodology</u>

       The Arbitrated List purports to reflect Salamat's "best guess as to

what an arbitrator would have awarded" in an arbitration between the TWA MEC

and the APA, although Salamat concedes that "[o]ne cannot know for certain what

any given arbitrator would have done."  (Salamat Rpt. 14-15.)  To generate this

list, Salamat reviewed portions of unrelated arbitration awards for examples where, like Supplement CC, one pilot group was given exclusive positions at the top or bottom of the list.  (*Id.* at 22.)  He then made subjective judgments about (i) whether the circumstances in those integrations were similar to the American/TWA transaction, primarily based on the arbitrators' discussion of the financial state of the carriers at the point of the transaction, and (ii) how those awards could be used to predict what an arbitrated list integrating the American and TWA pilots would look like.  (*Id.* at 21-28; Salamat 1/31 Tr. 6:20-11:25.)

Salamat is not qualified to offer expert testimony on arbitrations or to predict how an arbitrator might decide a hypothetical seniority integration arbitration involving the TWA and American pilots.  He has never served as an arbitrator or mediator in seniority integration or any other kind of dispute and has no legal training.  (Salamat 1/29 Tr. 109:25-110:7, 158:23-24.)  *See Diaz*, 893 F. Supp. at 373 (an expert's "lack of qualifications . . . is a factor tending to discredit reliability").  And the fact that Salamat's resulting analysis is inconsistent even with the views of Plaintiffs' other proposed expert, Farber, underscores the unreliability of both experts' models based on arbitrated decisions.[20]  For example,

---

[20] Salamat's analysis of arbitration awards from unrelated transactions is speculative and unreliable for many of the same reasons that Farber's analysis is unreliable.  *See infra* I.C.2; *Baisden* v. *I'm Ready Prods., Inc.*, No. 4:08-CV-00451, 2010 WL 1855963, at *6 (S.D. Tex. May 7, 2010) (rejecting damages

Salamat claims that his Arbitrated List represents the "limit of what the APA would have agreed to," whereas Farber opines that arbitrations in "comparable" transactions would have resulted in a list significantly more favorable to the TWA pilots.  (Salamat Rpt. 15; Farber Rpt. ¶¶ 54-61.)[21]

        (ii)     <u>The Arbitrated List Rests on Assumptions Inconsistent with the Factual Record</u>

The Arbitrated List also fails to fit the facts of the case.  Salamat justifies inclusion of this list on the unfounded assumption that "the APA was motivated in part by a fear of an arbitrated list" and thus "would have been better off agreeing to anything more favourable" than a likely arbitral award.  (Salamat Rpt. 14.)  But there is no evidence in the record that the APA feared arbitration.[22] To the contrary, because the APA had a contract that effectively precluded

_____

expert's comparables analysis because "that slight anchoring of [the expert's] opinions to reality will not hold them steady against a sea of speculation.").

[21] Salamat's Arbitrated List, with a bottom staple of 380 TWA pilots and a top block of 1,159 American pilots, yields unmitigated damages, pursuant to his calculations, of $1.2 billion; the list that Farber proffers based on arbitration awards in "comparable" transactions is significantly more favorable to the TWA pilots, with a smaller bottom staple of 350 TWA pilots, *no* top block for American pilots, and a total damage calculation of $1.3 billion.  (Salamat states in his report that the bottom staple for his Arbitrated List is 209 pilots.  However, his back-up data indicates that he actually stapled 380 TWA pilots for this list.)

[22] This is not to say the APA ignored the possibility that their seniority integration might be subject to evaluation and modification by a third party.  The APA Board and seniority integration committee were "keenly aware" that "virtually no pilot integration goes without challenge in the legal system.  And . . . anytime you put your fate in the hands of a third party there is a risk."  Thus, the APA devised an integration they believed would withstand litigation.  (Ex. 26 at ALPA 8749.)

arbitration, it would only have been possible if the APA had been willing to arbitrate—and the record clearly establishes that the APA was not.  (*See, e.g.,* Ex. 20 at 48:21-23 ("There was nothing that would have been done by anybody that would have had APA agree to binding arbitration."); Ex. 28 at 35:24-36:2, 38:2-6.)

Moreover, Salamat ignored completely the TWA pilots' poor pre-transaction career expectations—as well as the relatively high pre-transaction career expectations of the American pilots—in his attempt to "predict" a hypothetical arbitrated outcome, even though he acknowledged that arbitrators view the pilot groups' pre-transaction career expectations as the predominant factor in evaluating a seniority integration.  (*See* Salamat 1/29 Tr. 85:21-86:15.) For example, to determine how many TWA pilots an arbitrator would staple to the bottom of a hypothetical integrated seniority list, Salamat concludes that because "[n]o TWA pilots were on furlough at the time of the merger and it was an operating airline," "it is reasonable to assume that an arbitrated list would not have seen any TWA pilots end-tailed."  (Salamat Rpt. 27.)  But this "justification" is not a standard or methodology used by arbitrators, nor does it reflect any actual analysis of TWA's financial condition (as discussed above at subsection I.B.2) and the attendant impact on the TWA pilots' poor pre-transaction career expectations. While Salamat's Arbitrated List includes a bottom staple of some TWA pilots *only* because he was forced to acknowledge that the TWA MEC itself had proposed a

bottom staple of hundreds of TWA pilots (Salamat Rpt. 27), the arbitration awards on which he purported to rely stapled some or all of one group's pilots to the bottom of the merged seniority list because, like the TWA pilots, those pilots had relatively poor pre-transaction career expectations.[23]

Salamat's failure to consider the factors that arbitrators consider relevant and to apply those to the record of this case confirms that his Arbitrated List is unreliable and irrelevant.

### (c)    Salamat's Marginal List Is Inadmissible

Salamat contends that his Marginal List sets a floor on the range of outcomes that would have been obtained but for the alleged breach. However, he offers no discernible methodology for creating this list. Salamat merged 200 additional TWA pilots above the staple point on the Supplement CC seniority list for no reason other than, "it seems reasonable . . . in the absence of ALPA's violation [that] at least 200 additional pilots would have been merged." (*Id.* at 15, 28.) Asked directly whether he used any methodology to arrive at that number, Salamat responded: "No.  That just seemed the most probable."  (Salamat 1/31 Tr. 12:18-21.)  Testimony that employs "no defined methodology" is inherently

---

[23] The arbitrators whose decisions Salamat cites specifically held that the stapled pilots' pre-transaction career expectations differed significantly from the expectations of the other pilot group.  Pilots from carriers with poor economic prospects were stapled because, particularly as compared to the other pilot group, they had more to gain from the transaction and did not bring the same equitable interests.  (*See, e.g.*, Ex. 69 at 34; Ex. 70 at 25, 28; Ex. 71 at 50-51.)

unreliable.  *See Milanowicz* v. *The Raymond Corp.*, 148 F. Supp. 2d 525, 540 (D.N.J. 2001) (Irenas, J.).

Nor does the Marginal List fit the facts of the case because the jury verdict does not depend on or assume a list that is "materially . . . more favourable to the TWA pilots," as Salamat unjustifiably assumes.  (Salamat Rpt. 15.)  Indeed, Salamat's assumptions are directly contradicted by Plaintiffs' own arguments to the jury in the liability phase that "if you lower that staple by one pilot, that is injury."  (Ex. 4 at 75:17-18.)

(d)    <b>Salamat's Fairness List Is Inadmissible</b>

The Fairness List represents Salamat's attempt to create a list that meets his "subjective concept" of what would be "fair."  Salamat admits that he lacks the qualifications to construct such a list, as he does not "consider [him]self an expert on fairness."  (Salamat Rpt. 14; Salamat 1/29 Tr. 72:14-20.)

The Fairness List also suffers from methodological problems that render it inherently unreliable.  Recognizing that individual pilots bid seniority in different ways, Salamat constructed a rolling average of the incomes of "the 240 closest working pilots" for a given pilot in order to create a purportedly "fair" grouping of pilots by income.  (Salamat Rpt. 19.)  Salamat believes the 240 figure "provide[s] the greatest accuracy," although he does not (and cannot) explain why.

(*Id.*)  Salamat concedes that he created this metric for this litigation, and has never built this "type of optimized list" before.  (Salamat 1/31 Tr. 123:19-24.)

Salamat also has conceded that the Fairness List does not fit the facts of the case, since—according to his own theory—"[t]he damages suffered by the TWA pilots are the result of the difference between their careers under the Supplement CC list and a list *that would have been achievable* . . . not a list that was 'fair.'"  (Salamat Rpt. 14 (emphasis added).)  In fact, he testified that he did not believe the TWA MEC could have obtained the Fairness List and therefore he was not recommending it as a basis for damages in this case.  (Salamat 1/29 Tr. 162:19-163:6.)  As Salamat has conceded that the APA would not have agreed to the Fairness List, it lacks any connection to the facts of this case and must be excluded.  *See Meadows* v. *Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790-91 (3d Cir. 2009) (affirming exclusion of expert testimony where expert conceded that testimony did not fit the facts of the case).

### 4.    Salamat's Testimony About His Damages Calculations, if Admissible, Must Be Limited Significantly

Even if the rest of Salamat's opinions did not suffer from the fundamental flaws described above, any testimony on his damage calculations based on the eight alternative seniority lists presented in his report must be limited significantly as a matter of law for at least two reasons.  *First,* Salamat's methodology credits the TWA pilots with significant damages—such as Plaintiffs'

claims for future employment damages—that are not recoverable as a matter of law.  (*Infra* pp. II.B.)  Expert testimony that is inconsistent with the legal standards governing a claim is not admissible.  *See In re Novatel Wireless Secs. Litig.*, 846 F. Supp. 2d 1104, 1107-08 (S.D. Cal. 2012) (excluding testimony of loss causation expert whose analysis was premised on incorrect legal standard); *see also Major Tours, Inc.* v. *Colorel*, 799 F. Supp. 2d 376, 408-10 (D.N.J. 2011) (excluding expert testimony premised on incorrect legal standard that "fundamentally undermine[d] the reliability of [the expert's] method").

   *Second,* Salamat should not be permitted to testify that Plaintiffs are entitled to damages based on the hypothetical scenarios of the Farber lists or of the Rightful Place Proposal list, for which he calculates damages.  He admitted at his deposition that these lists do not represent his opinions, and were merely provided to him by Plaintiffs' counsel so he could run numbers.  (Salamat 1/29 Tr. 24:2-25:17, 26:10-14; Salamat 1/31 Tr. 100:24-102:14.)  He also admitted that he knows nothing about the underlying lists.  (Salamat 1/29 Tr. 24:2-25:17, 26:10-14.)  Thus, he cannot present them to a jury as lists that support an award of damages.  *See Trigon Ins. Co.* v. *United States*, 204 F.R.D. 277, 294 (E.D. Va. 2001) ("[I]f opinions expressed in an expert report are not the opinions of the expert, the expert will not be able to satisfy the requirements of Fed. R. Evid. 702 and *Daubert* that the report be based on the expert's own valid reasoning and methodology.").  At

most, Salamat could put forward his opinion as to the value of damages he recommends for these lists *if* one were to assume that the lists are "sufficiently grounded in sound methodology and reasoning to allow the [damage] conclusion [they] support to clear the reliability hurdle"—issues on which he is not qualified to testify. *See Brill* v. *Marandola*, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008).

## C.   FARBER'S TESTIMONY SHOULD BE EXCLUDED

Farber's proposed testimony does not remotely withstand *Daubert* scrutiny either. *First*, Farber lacks the expertise necessary to propose an alternative seniority integration for the TWA and American pilots. *Second*, he has no expert qualifications or recognized methodology for selecting comparable transactions, which form the basis for his proposed seniority lists. *Third*, his metric for evaluating Supplement CC and constructing alternative seniority lists is not reliable. *Fourth*, his conclusions will not assist the damages jury, as they are untethered to the factual record. Because Plaintiffs cannot satisfy their burden of demonstrating qualification, reliability, and fit, *Daubert* mandates the exclusion of Farber's testimony in its entirety.

### 1.   Farber Lacks Specialized Qualifications To Construct His Proposed Alternative Seniority Lists

Nothing in Farber's academic career or training as an economist renders him qualified to proffer an opinion about whether the American and TWA pilots would have agreed on a different integrated seniority list in the absence of

any breach of the duty of fair representation and, if so, what it would have looked like.  Significantly, the analysis that Farber proffers is not an economic analysis. And, by his own admission, Farber lacks "any expertise in assessing what would have happened in the absence of a breach of a duty of fair representation."  (Farber 1/22 Tr. 62:25-63:3.)  Indeed, before this case, Farber had never worked in the airline industry or on a seniority integration.  (*See id.* 18:17-24; Farber 1/23 Tr. 111:2-8.)

Because Farber lacks the specialized experience or knowledge required by Rule 702 and *Daubert* to propose a "but-for" integrated seniority list here, he is not qualified to testify as an expert on the subject.  *See Calhoun*, 350 F.3d at 322; *see also Curry* v. *Royal Oak Enters., LLC*, No. 11-5527, 2013 WL 3196390, at *5 (E.D. Pa. June 25, 2013) (trained chemist who had no experience regarding warning labels or the products at issue was not qualified to testify about inadequacy of their warning labels).  Nor does the fact that Farber read a number of arbitration decisions involving seniority integrations confer upon him the specialized knowledge required to render the opinions he is offering in this case. *See Wade-Greaux* v. *Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1476 (D.V.I. 1994); *Diaz*, 893 F. Supp. at 373.

## 2.   Farber's Methodology for Selecting "Comparable" Transactions Is Not Reliable

To select the mergers that he deemed comparable to the TWA-American transaction, Farber focused exclusively on two characteristics of TWA at the time of the transaction:  (1) TWA "was in a weakened financial state," but "was still flying"; and (2) "TWA provided the combined airline with a number of valuable assets."  (Farber Rpt. ¶ 55.)  As Farber testified, he identified these criteria as significant based on his reading of arbitration decisions.  (Farber 1/22 Tr. 69:22-23.)  But he conceded that arbitrators consider many other factors in merging seniority lists, all of which Farber essentially ignores in his analysis.  (*See id.* 152:11-17.)[24]  Farber chose not to consider these other factors not for any principled reason, but because he worried that including them would give his model "too many dimensions" and thus would make it difficult to identify any comparable transactions.  (*Id.* 154:12-13 (expressing concern that taking more

---

[24] In the arbitration decisions Farber reviewed, the arbitrators considered numerous factors Farber disregarded, such as the financial strength of the acquiring airline compared to the acquired airline (Ex. 70 at Farber 4651; Ex. 72 at Farber 2837), the comparative wages of the pilots (Ex. 72 at Farber 2840-41; Ex. 73 at Farber 3386), the nature of routes flown by both airlines (Ex. 72 at Farber 2841), the equipment that the airlines brought to the merged carrier (Ex. 72 at Farber 2842; Ex. 73 at Farber 3385-87), and the relative pre-transaction career expectations of the airlines' pilots (Ex. 70 at Farber 4651; Ex. 74 at Farber 3319; Ex. 75 at Farber 3940-45).  Indeed, in one merger Farber considered comparable (Flying Tiger/Seaboard), the arbitrator noted that his review of prior arbitration decisions revealed *eighteen* factors considered.  (*See* Ex. 72 at Farber 2835-36.)  Farber's disregard of all of these factors (*see* Farber 1/22 Tr. 152:11-17, 154:24-155:6) strongly suggests the arbitrariness of limiting his inquiry to two factors.

factors into account would have made it difficult to "get any matches").)  That is precisely the sort of "subjective inclusion and exclusion of data" that suggests an expert has "manipulated the data to achieve a desired result" and weighs against the reliability of his methodology.  *Snodgrass* v. *Ford Motor Co.*, No. 96-1814, 2002 WL 485688, at *12 (D.N.J. Mar. 28, 2002); *see also Wolfson-Verrichia Grp., Inc.* v. *Metro Commercial Real Estate, Inc.*, No. 5:08-cv-4997, 2013 WL 1286184, at *11 (E.D. Pa. Mar. 28, 2013) (expert's opinion deemed unreliable because the "absence of any explanation regarding his method of applying his experience to the facts" rendered it "impossible to determine whether his opinions constitute results-based judgments or are the product of a reliable methodology").

Farber's methodology is also invalid because—with one exception—he included in his analysis only seniority integrations achieved through arbitration, thus largely ignoring the data from situations where, as here, the parties negotiated regarding the terms of the integrated list.  (Farber 1/22 Tr. 61:21-24.)  Farber testified that he was aware of 41 seniority list mergers, 29 of which involved arbitration decisions.  (*Id.* 142:18-143:6.)  Farber does not and cannot claim that the 41 transactions were selected randomly or according to any defined criteria—rather, they were identified for him primarily by Plaintiffs' counsel.  (*Id.* 74:7-13.)  Moreover, because he is unaware of the basis for their selection, Farber is unable to opine that they are representative of all airline mergers.  Indeed, Farber does not

know how many transactions he failed to identify or review.  (*See id.* 150:3-24.)
Among them, however, were the previous mergers and seniority integrations in
which the *actual carriers and pilot groups at issue* here were involved—
American-Reno Air and TWA-Ozark—neither of which was considered or
addressed by Farber.  (*See id.*; Farber 1/23 Tr. 150:19-151:6.)  Ultimately, Farber
considered only 19 of the 41 mergers.  (Farber 1/22 Tr. 144:9-145:5.)  He justified
disregarding *more than half* of the known transactions—including nearly all of the
negotiated integrated seniority lists—because he purportedly lacked "enough
information on the merged seniority list" in those transactions to do his analysis.
(*Id.* 144:17-18.)  And he conducted no independent research regarding the
underlying facts of the transactions that he did consider.  (*Id.* 234:9-20.)[25]

> In reviewing these 19 transactions, Farber compounded the
methodological defects of his approach by making an entirely subjective and
standardless assessment of comparability.  Farber determined that airline
transactions were comparable if, in his view, the acquired airline bore "a crude
level" of resemblance to TWA's financial condition.  (*Id.* 75:16-18.)  As noted

---

[25] Farber presents the sale of PanAm's assets to Delta as the only "comparable" transaction that, as here, involved a *negotiated* seniority integration.  (*See* Farber Rpt. at Tbl. 1.)  But had Farber actually assessed that transaction, he would have observed that it differed significantly from the Acquisition in ways that would impact a seniority integration: Delta agreed to employ fewer than one-third of PanAm's employees (Ex. 76), and only 700 of PanAm's pilots (Ex. 77 at 72), and PanAm's pilots were hired in part to fill a need for A-310 pilots.  (Ex. 78 at Farber 2693.)

above, however, Farber undertook no analysis of the financial condition of TWA, or of any of the other airlines he deemed comparable to TWA, but instead based this determination on his review of the arbitration decision.

When asked to explain how he applied his expertise to evaluate whether airlines are comparable to one another in terms of their financial condition, Farber responded: "I'm trained as an economist. I can . . . read materials that are . . . put in front of me." (Farber 1/23 Tr. 121:24-122:2.) He admitted, however, that he lacked expertise required to distinguish between the concededly "weakened financial state" of TWA and that of carriers that he considered to be at imminent risk of liquidation. (Farber Rpt. ¶ 55; Farber 1/22 Tr. 135:11-136:4; Farber 1/23 Tr. 10:2-11:17.) Nor did Farber conduct any quantitative or empirical assessment to compare the financial condition of TWA and potential comparators. (Farber 1/22 Tr. 124:9-18, 234:4-20.)

Farber's vague suggestion that his training as an economist guided his determinations is insufficient to warrant admission of his testimony. "Where . . . elements of judgment pervade the methodology, it is essential that the expert set forth the method for weighing the evidence upon which his opinion is based." *Magistrini* v. *One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 608 (D.N.J. 2002). Farber has failed to carry that burden. Instead, he presented mere *ipse dixit*, divorced from any recognized methodology, as the basis for his

opinions.  Farber's opinions thus do not allow the Court to confirm or even assess the reliability of any conclusion he draws.  *LinkCo, Inc.* v. *Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002); *see also Milanowicz*, 148 F. Supp. 2d at 535 ("Before a court can evaluate the reliability of an expert's methodology, the expert must employ one.").

### 3.   The Metric Farber Uses To Construct His Alternative Seniority Lists is Not Reliable

Farber further exacerbates the infirmities of his methodology by using an inherently unreliable summary metric as the foundation for his opinion about the list the TWA MEC and the APA purportedly would have agreed to absent a breach of the duty of fair representation.  Only by ignoring all but 19 airline transactions and disregarding key facts—such as the existence of fences or bidding restrictions that benefitted the TWA pilots under Supplement CC—can Farber purport to fit the facts to his "proportional difference in mean ranks" metric.  (*See* Farber 1/22 Tr. 144:9-145:1.)

In applying that metric, Farber assumed that the American seniority list integration without ALPA's breach would have had a proportional difference in mean ranks that was equally or more favorable to the TWA pilots than the average difference in mean ranks of the seven supposedly comparable mergers he selected. (*See* Farber Rpt. ¶¶ 51, 56-57.)  Thus, his sole requirement for construction of his "best estimate" of the seniority list the TWA MEC and the APA would have

agreed to absent ALPA's alleged breach was that it have the same proportional difference in mean rank as the average of the "comparable" transactions.

Although Farber opines that the "proportional mean difference statistic" is a common tool in labor economics to estimate what would have happened absent a difference in treatment, he could not identify *any* peer-reviewed research advocating use of the proportional difference in mean ranks of comparable mergers in the context of seniority integration disputes. (*See* Farber 1/22 Tr. 17:8-13, 117:3-7; Farber 1/23 Tr. 13:6-10.)  Nor could he identify a single instance in which an arbitrator or expert ever constructed a seniority list using his technique.  (*See* Farber 1/22 Tr. 115:19-116:2, 116:22-117:2; Farber 1/23 Tr. 108:18-25.)  The absence of any peer-reviewed support, general acceptance, or non-judicial uses for Farber's methodology highlights its unreliability.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742; *Warner Chilcott Labs. Ireland Ltd.* v. *Impax Labs., Inc.*, No. 2:08-cv-06304, 2012 WL 1551709, at *25-26 (D.N.J. Apr. 30, 2012).  And, despite the absence of support for his methodology in literature or in practice, he did nothing to test the hypothesis that one could use the proportional difference in mean rank of unrelated transactions deemed "comparable" based on two out of more than a dozen criteria to predict the outcome of a different seniority integration.  (Farber 1/23 Tr. 129:19-23 ("I didn't do any testing.").)  This failure leads ineluctably to the conclusion that Farber's methodology is unreliable.  *See*

*Oddi*, 234 F.3d at 156 (affirming exclusion of expert who "quite candidly testified that he never tested" his hypotheses); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 (whether an expert's method has been tested is an important factor in evaluating its reliability).

Moreover, because he arbitrarily limited the mergers he considered, Farber, by his own admission, has a "micronumerosity" problem—meaning that the sample size for his model is too small.  (Farber 1/22 Tr. 220:4-7.)[26]  As a result, Farber could not "consider . . . very many different things" in evaluating whether prior transactions were comparable to or different from the American-TWA transaction.  (Farber 1/23 Tr. 112:1-8, 112:14-18.)  For the same reason, he could not control for the host of factors that could explain the differences in seniority lists beyond the two criteria he arbitrarily selected.  (*See* Farber 1/22 Tr. 152:5-13, 154:24-155:6.)  For example, he could not consider whether the proportional difference in mean ranks was correlated with differences in size or equipment between the acquiring and acquired airlines.  (*Id.* 157:11-158:4, 255:3-8.)

### 4. Farber's Conclusions Rely on Counterfactual Assumptions and Will Not Assist the Trier of Fact

Farber's analysis also is inadmissible for the independent reason that it does not fit the facts of the case.  *See Schneider*, 320 F.3d at 404.  Farber

---

[26] *See* Arthur S. Goldberger, *A Course in Econometrics* 248-50 (1991) (discussing impact of micronumerosity in statistical analysis) (attached as Ex. 82).

assumes that, but for a breach of ALPA's duty of fair representation, the APA and the TWA MEC would have come to agreement on a different merged seniority list because the APA had no unilateral ability to determine what the list would look like. Indeed, Farber conceded that if the APA had the power to unilaterally determine the seniority list integration, *there would be no damages* to the TWA pilots. (Farber 1/22 Tr. 45:9-21.) Farber's opinion also rests on his assumption that TWA was not in imminent danger of ceasing operations at the time its assets were acquired by American. (*Id.* 250:18-25; *see* Farber Rpt. ¶ 56.)[27] These assumptions lack any evidentiary basis. Indeed, they are flatly contradicted by the record—which Farber admittedly failed to consider.

*First*, Farber disregards that any alternative list would have to be acceptable to the APA, which was entitled to staple all TWA pilots to the bottom of the list and could not be compelled to arbitrate. Farber nonetheless never took into consideration the APA's negotiating position; the negotiation history between the APA and the TWA pilots; the value of TWA's assets to American; the value of the assets that American brought to the transaction; the APA's right to determine a

---

[27] Farber conceded he was not qualified to make this determination. (*See* Farber 1/22 Tr. 83:15-84:15 (no expertise to assess financial condition of acquired airline like TWA), 131:14-132:16 (no metric to analyze value of assets that acquired airline bought to merger and no expertise in evaluating value of certain assets), 135:11-136:4 (no expertise to determine whether airline is likely to cease flying); Farber 1/23 Tr. 17:2-18:4 (no protocol for determining whether airline would cease flying imminently other than his subjective judgment relying on what he read in an arbitrator's decision).)

merged seniority list without the TWA pilots' participation; or the APA's

unwillingness to arbitrate the seniority integration dispute.  (*See* Farber 1/22 Tr.

36:15-16, 85:2-13, 131:14-21, 131:25-132:16, 242:8-243:11, 251:5-8, 252:14-25.)

For example:

- Farber testified that his analysis would have been different if "God came down and gave the APA the unilateral right" to impose a seniority list (*id.* 40:24-41:1), but he ignores the record evidence that the APA *did* have this right.  Indeed, Michael Day, one of Plaintiffs' primary witnesses, admitted as much during his deposition and in his liability trial testimony.  (Ex. 79 at 62:3-6; Ex. 63 at 15:21-23, 16:7, 108:21-25 (the APA had the unilateral right to staple the TWA pilots to the bottom of the seniority list).)

- Farber claims that the negotiating history was significant to his analysis, yet he ignored the APA's belief that it "own[ed] the seniority list" and the reality that the APA never would have agreed to binding arbitration.  (*See* Farber 1/22 Tr. 96:20-22; Ex. 20 at 45:14-46:2; Ex. 22 at 101:21-102:12 ("it was pretty obvious" that the APA would never agree to arbitrate because "[t]hey'd lose control of the process").)

- Farber's proposed lists do not include features that the APA always insisted were important to maintaining their pre-merger career expectations, such as reserving the top block of the integrated list and access to certain equipment for American pilots because American flew large, wide-body aircraft that TWA did not.  (*See* Ex. 64 at 4; Ex. 27 at 3, 5-6.)

In sum, Farber entirely disregards the APA's perspective, despite purporting to

predict what the *negotiated* outcome would have been.  As a result, none of the

three alternative seniority lists that Farber proposes resembles anything that the

APA actually would have accepted—regardless of ALPA's actions.  Farber never

tested his proposed lists to assess the impact on the American pilots, let alone to analyze whether its provisions were likely to have been acceptable to them.

*Second*, Farber identified the "comparable" transactions upon which he bases his "but-for" seniority lists using an assumption about TWA's financial condition that bears no connection to the record or to reality. Farber categorized TWA's financial condition—and that of the seven acquired airlines from his "comparable" transactions—as being "in weakened financial condition, but still flying." (Farber Rpt. ¶ 56.) As such, he surmised that the TWA pilots could expect to fare better than pilots from an acquired carrier whose financial condition "was sufficiently poor that it had ceased flying or was expected to cease flying imminently absent the combination with" the acquiring airline. (*Id.* ¶ 33.) But he never analyzed TWA's financial condition to evaluate these assumptions and confirm his impression that TWA would not cease flying imminently in the absence of the American acquisition. And he has conceded he was not qualified to do so.[28] (*See* Farber 1/22 Tr. 83:15-84:15, 135:1-10.)

---

[28] Farber's only reason for believing that TWA would continue flying absent the American acquisition is a one-page article that refers to an offer by Carl Icahn to acquire TWA. (*See* Farber Rpt. ¶ 53 (citing http://mba.tuck.dartmouth.edu/ccg/ commentaries/Anatomy_TWA.html); Farber 1/22 Tr. 135:1-10.) He did not consider that the Bankruptcy Court found that American's offer presented TWA's only chance of avoiding liquidation, after it specifically rejected Icahn's offer for failure to meet the prerequisites for consideration. (Ex. 12 ¶¶ 36-43, 71-72.)

Nor did Farber even review the record evidence in this case, which confirms that TWA *was* in imminent danger of liquidation.  TWA's most senior executives confirmed that the airline "was going to liquidate within days without a deal."  (*See, e.g.*, Ex. 6 at 25:22-23.)  On January 10, 2001, TWA needed at least $10 million more than it had on hand to fund its operations the next day.  (Ex. 12 ¶ 17.)  TWA was only flying because American provided financing.  (*See* Ex. 8 at 26:5-16.)  At his deposition, Farber conceded that had he been aware of such evidence, he would have had to consider it for assessing whether TWA was expected to stop flying imminently and that he may have had to change the category of "comparables" used.  (*See* Farber 1/23 Tr. 84:25-85:7, 86:8-12, 88:4-12.)  Because Farber wrongly assumed that TWA could continue to operate as an independent carrier, he erred in selecting the transactions he deemed comparable—those in which the acquired airline was "still flying" on its own and not in imminent danger of liquidation.  (*See* Farber Rpt. ¶ 56.)  This renders his conclusions fundamentally flawed.

*Third*, Farber also errs in assuming that the only relevant measure of how favorable a seniority integration is for an acquired airline's pilots is how high they were placed on the integrated airline's seniority list.  The "other factors" he ignores—such as fences, bidding restrictions, and higher wages for an acquired airline's pilots—can exaggerate or ameliorate the impact of an acquired airline's

pilots' rank on a seniority list.[29]  Farber even *relied upon* seniority lists that

contained fences and reservation of certain positions that benefitted one group of

pilots at the expense of the other, mitigating the effects of seniority list placement.

(*See, e.g.*, Ex. 80 at 3093 (Continental-Texas International merger reserving 66

DC-10 captain positions for Continental pilots until 1986); Ex. 81 at 4882-83

(Southwest-AirTran merger reserving B717 vacancies in Atlanta to AirTran and

new hire pilots).)  But Farber made no effort to analyze or account for equipment

restrictions or fences in the arbitration awards from supposedly "comparable"

transactions or to model the St. Louis Fence or other equipment and bidding

restrictions in Supplement CC.  (Farber 1/22 Tr. 105:22-106:4.)  As a result,

Farber's "but-for" seniority list is—by his own admission—no more than "a

starting structure" because "it is quite likely that . . . other factors such as the fence

around St. Louis, and equipment, and status would result in [the TWA pilots] . . .

being put into sub-lists." (*Id.* 94:23-95:9.)  It thus admittedly is not a basis for

determining purported damages for the members of this class through common

proof.  For this reason too, Farber's analysis must be excluded.

---

[29] Class counsel has specifically pointed to the ameliorative impact of the
protective St. Louis fence in other actions involving former TWA pilots, and
conceded that it is "integral to the seniority list created by Supplement CC. . . .
Without [the fence], the 650 former TWA pilots based in St. Louis would have to
bid for routes against the other 8,000 American pilots."  (Ex. 35 ¶¶ 10-11.)

In sum, Farber ignores "the real world of" the TWA-American merger in constructing his proposed hypothetical seniority lists. *Elcock*, 233 F.3d at 756. Because his testimony relies on assumptions unmoored to the record in this case, it is inadmissible. *Daubert*, 509 U.S. at 591; *see also Habecker* v. *Clark Equip. Co.*, 36 F.3d 278, 290 (3d Cir. 1994) (finding fit requirement not satisfied where an expert's simulation of an accident involved different conditions from those existing at the time of the accident).

## II.   ALPA IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, to survive a summary judgment motion, Plaintiffs "must present *actual* evidence raising a genuine issue of material fact."  *Mansfield* v. *Lucent Techs.*, No. 04-3589 (MLC), 2006 WL 2040406, at *2 (D.N.J. July 20, 2006) (emphasis added).  "[B]are assertions, conclusory allegations or suspicions" will not suffice.  *McCabe* v. *Ernst & Young, LLP*, 494 F.3d 418, 436 (3d Cir. 2007) (internal citation omitted).

The only issue remaining in this case is whether the former TWA pilots suffered any financial harm as a result of ALPA's breach of its duty of fair representation and, if so, who suffered it, and how much.  As the Supreme Court has recognized, even in the context of the so-called "wrongdoer rule" that generally stands for the proposition that the risk of uncertainty in calculating damages should be borne by the wrongdoer, "damages may not be determined by mere speculation or guess."  *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).  Thus, in order to recover damages, Plaintiffs bear the burden of providing a jury with sufficient evidence to establish monetary damages with reasonable certainty, such that a verdict is not grounded in speculation and guesswork.  *Institut Pasteur* v. *Simon*, 383 F. Supp. 2d 809, 811-12 (E.D. Pa. 2005) (while "some uncertainty as to the precise amount of damages will be tolerated," "some uncertainty as to whether the plaintiffs sustained *any damage at all* will bar recovery") (emphasis added).  That is a burden that Plaintiffs cannot meet.  Because there is no genuine issue of material fact with respect to damages, ALPA's motion for summary judgment should be granted.

Alternatively, there are independent grounds for partial summary judgment.  The time period for which Plaintiffs claim damages—from 2002 through 2026—is inconsistent with established law.  ALPA is entitled to summary judgment with respect to any damages that Plaintiffs are seeking beyond May

2003—the date on which the APA as sole bargaining agent for the American pilots, including the former TWA pilots, negotiated a new collective bargaining agreement with American to govern the terms and rights of the pilots' employment.

## A.   PLAINTIFFS HAVE SUFFERED NO COGNIZABLE DAMAGES AS A RESULT OF THE ALLEGED BREACH

Although the jury at the liability trial found that ALPA's breach caused "injury to some of the TWA Pilots" (¶¶ 7-8),[30] the verdict does not establish to what extent, if any, Plaintiffs may recover monetary damages for that "injury," or who may recover them.  It thus falls to Plaintiffs at this stage of the litigation to demonstrate through admissible evidence, beyond "speculation or conjecture," that their injuries entitle them to monetary damages, how much, and to whom.  *See Dunkin' Donuts Inc.* v. *Dough Boy Mgmt., Inc.*, No. 02-243(JLL), 2006 WL 20521, at *8, 12 (D.N.J. Jan. 3, 2006) (granting summary judgment on damages); *see also Story Parchment*, 282 U.S. at 563 ("[T]he evidence [must] show the extent of the damages as a matter of just and reasonable inference"); *Scully* v. *US WATS, Inc.*, 238 F.3d 497, 515 (3d Cir. 2001) (a plaintiff must advance "sufficient facts . . . so that a court can arrive at an intelligent estimate [of damages] without speculation or conjecture").  Plaintiffs have no such evidence.

---

[30] All references to "¶ ___" refer to the accompanying Statement of Material Facts.

After more than two years of discovery on damages and more than a decade of litigation, the record is still bereft of admissible evidence demonstrating that Plaintiffs have suffered any monetary harm at all, let alone the massive damages claimed in their speculative and methodologically deficient expert reports. *See Dunkin' Donuts*, 2006 WL 20521, at *8. On the undisputed factual record, Plaintiffs are entitled, at most, to nominal damages. *See Centrix HR, LLC* v. *On-Site Staff Mgmt., Inc.*, 349 F. App'x 769, 775 (3d Cir. 2009) (affirming award of nominal damages in the absence of evidence to support a "reasonable estimate" of monetary damages); *Alexander* v. *Int'l Union of Operating Eng'rs*, 624 F.2d 1235, 1240-41 (5th Cir. 1980) (finding that a union breached its duty of fair representation and awarding nominal damages); *Abrams* v. *Commc'ns Workers of Am.*, 23 F. Supp. 2d 47, 54 (D.D.C. 1998) (same).

As Plaintiffs have not offered a viable theory of damages supported by any admissible evidence, summary judgment should be granted.

### 1. Plaintiffs Have Not Put Forward Admissible Expert Opinions to Support Their Claim for Damages

Following the conclusion of the liability trial, Plaintiffs stated repeatedly that they would rely on expert testimony to prove their damages. (*See, e.g.,* ¶ 96 (interrogatory responses relying on the forthcoming reports of their "damage phase experts" in response to questions about Plaintiffs' damage claims and theories).) But the only expert testimony Plaintiffs have offered to support

their damages claims—from Farber and Salamat—is *inadmissible* as a matter of law, for the reasons set forth above.  Because Plaintiffs have proffered no other evidence to support a damages claim, summary judgment is appropriate.  *See, e.g., Furlan* v. *Schindler Elevator Corp.,* No. 12–2232, 2013 WL 1122649, at *4-6 (3d Cir. Mar. 19, 2013) (affirming grant of summary judgment where expert testimony necessary to plaintiffs' claim "d[id] not satisfy the *Daubert* threshold, even under the most liberal standard"); *Anders* v. *Puerto Rican Cars, Inc.*, 409 F. App'x 539, 543 (3d Cir. 2011) (affirming grant of summary judgment where "the lack of admissible expert testimony precluded" plaintiffs from establishing an element of their claim).

### 2. The Undisputed Record Makes Clear that ALPA's Actions Did Not Cause Plaintiffs To Suffer any Monetary Harm

Even if—contrary to fact and law—some aspect of the expert testimony Plaintiffs have proffered were deemed admissible, Plaintiffs still would be unable to meet their burden of proving that they suffered monetary harm as a result of ALPA's alleged breach of duty.  Plaintiffs' damage theory focuses on two types of losses that they claim would not have been incurred had ALPA fulfilled its duty and obtained higher placement for the TWA pilots on the merged seniority list.  First, Plaintiffs contend that a number of TWA pilots would not have been furloughed from American in the wake of September 11 or would been furloughed at a later date.  Thus, they purport to have suffered damages in the form of lost

income during those furlough periods.  Second, Plaintiffs assert that they lost

income (and will lose income in the future) while actively employed by American

because they were deprived access to more lucrative flying opportunities by virtue

of their lower placement on the merged seniority list.  (Salamat Rpt. 12.)  Both

damage theories fail because there is no evidence in the record that would allow a

reasonable jury to conclude that the APA would have agreed to a more favorable

seniority integration for the TWA pilots.

The APA believed that they "own[ed]" the seniority list, as their CBA

allowed them to staple all pilots of an acquired airline (such as TWA) to the

bottom of the list.  (¶¶ 34, 48.)  And the APA understood the respective pre-

transaction career expectations of the American and TWA pilots—which the APA

considered of paramount importance—to be vastly different due to the disparate

financial condition and long-term prospects of the two carriers.  (*See* ¶¶ 49-50, 52-

56.)

The TWA pilots were flying for an airline on the verge of liquidation

that lacked any viable alternative to acquisition by American.  TWA had already

been through two bankruptcies in the 1990s, both of which necessitated significant

concessions from ALPA that resulted in diminished pay rates and work conditions.

(¶¶ 13-14.)  Throughout this period, the airline remained unprofitable, as it had

been for the prior twelve or more consecutive years.  (¶¶ 9, 17.)  And due to

systemic problems relating to TWA's business model, limited liquidity, and a dismal credit rating, there was no reasonable basis to conclude that TWA's financial condition would turn around in the foreseeable future.  (¶ 18; *see also* ¶¶ 9-17.)

TWA pursued potential corporate combinations with other airlines— including America West, Northwest, Continental, American, AirTran, and Delta— but none of the discussions turned up a willing partner or acquirer.  (¶ 22.)  Efforts to find traditional financing in an attempt to prolong TWA's viability also failed.  (¶ 23.)  And the airline's CEO, William Compton, its board of directors, and the market concluded that TWA lacked the liquidity to finance ongoing operations through a reorganization or even to emerge from bankruptcy as a stand-alone entity.  (¶ 24; *see also* ¶¶ 19-20, 26.)  By January 2001, TWA had no available sources of credit and could only finance its operations from cash provided by operating activities, external borrowing, or asset sales.  (¶ 21.)  Thus, the airline's financial condition was dire:  "TWA was . . . going to liquidate within days without a deal."  (¶ 25.)  The offer by American in January 2001 to acquire certain TWA assets out of bankruptcy thus rescued TWA from liquidation.  (¶ 27.)

By contrast, at the time of the transaction, American's financial condition was not only much stronger than TWA's, but American had established itself as one of the strongest U.S. carriers.  (¶ 53.)  As the APA president testified,

APA's view was that "[t]his is not a merger with a complete air carrier, nor is it a transaction between equals.  It is a purchase by one of the largest and most financially stable global airlines of most, but not all the assets of a much smaller, largely regional carrier, which was within hours of going out of business." (¶ 49.)

These circumstances put the TWA pilots at a distinct disadvantage in terms of bargaining power, and enabled the APA to take a firm position in the negotiations:  It would not "agree to a seniority integration that provided windfall[s] for the TWA pilots over the AA pilots." (¶ 51; *see also* ¶ 52.)  And under no circumstances would it agree to a seniority integration in which American pilots would be worse off as a result of the merger.  (¶¶ 47, 50; *see also* ¶¶ 55-57.)  As a result, the TWA pilots could not have convinced the APA that they were entitled to something more favorable than Supplement CC.  (¶ 69.)

These uncontroverted facts put the lie to Plaintiffs' claim that, if ALPA had acted differently during the seniority list negotiations, the APA would have agreed to a list that delivered hundreds of millions of dollars more in benefits to the TWA pilots.  Regardless that Plaintiffs' entire damage theory rests on this claim, by way of support Plaintiffs offer nothing more than conjecture and speculation, which is contradicted squarely by the undisputed factual record.  John Darrah, the president of the APA, testified that "there was not *any* other type of list that we would have gone probably beyond [Supplement CC] because it would have

been injurious to the . . . APA pilots." (¶ 69.)  Top executives at American likewise testified that the company was not willing to do anything additional to secure a more favorable seniority integration for TWA pilots, regardless of what actions ALPA might have taken.  (¶ 70.)  The TWA transaction came fresh on the heels of a contentious dispute with the APA in connection with American's acquisition of Reno Air, including a pilot "sick-out" that cost American over $200 million during the first quarter of 1999.  (¶ 38.)  In light of that dispute, American management "did not want to take strategic action that would further irritate the labor relations challenges that we already had."  (*Id.*)  Thus, American was unwilling to act to obtain a better result for the TWA pilots than the one they received in Supplement CC.  (¶ 61.)

And with respect to the specific strategies that Plaintiffs claim ALPA should have pursued, the undisputed factual record establishes that pursuit of these strategies would not have changed the outcome—at least not in a way that would have benefited the TWA pilots.  For example, Darrah testified that the hypothetical actions on which Salamat bases his damages opinion—such as threats of an AFL-CIO boycott, additional ALPA lobbying for the Bond legislation, or litigation to enjoin the merger—would have had no effect on the APA's bargaining position or would have made it more aggressive.  (¶¶ 58-59; *see also* ¶ 60.)  He testified that actions such as waging a "jump seat war" would have *harmed* the TWA pilots'

bargaining position—by pushing more and more APA pilots into the camp of those who wanted to staple all TWA pilots to the bottom of the seniority list."  (¶ 58.)

Nor could a list more favorable to the TWA pilots have been achieved through arbitration if the TWA pilots had refused to waive the scope and successorship provisions of their collective bargaining agreement, which otherwise would have entitled them to arbitration of seniority integrations.  All witnesses on the APA/American side testified—without exception or contradiction—that had ALPA not waived the scope and successorship provisions of its CBA, arbitration of the seniority integration would never have been an option.  If ALPA had not waived, TWA would have pressed on with the pending § 1113 motion to reject the CBA, pursuant to the terms of the Asset Purchase Agreement.  (¶¶ 31, 39-43.) Ultimately, American would have walked away from the transaction rather than to have tried to pressure the APA into agreeing to arbitration.  (*See, e.g.,* ¶ 37 (APA president testified:  "There was nothing that would have been done by anybody that would have had APA agree to binding arbitration."); ¶ 39 (American CEO confirming that American "would not have proceeded with the transaction" absent scope waiver); ¶ 40 (American VP of Employee Relations stating:  "The American transaction would not have gone forward."); *see also* ¶ 63.)

Even Plaintiffs' own witnesses do not—and cannot—claim to have any facts to support the notion that the TWA pilots could have achieved a more

favorable seniority list integration than Supplement CC, nor any evidence to establish what the APA would have done if ALPA had behaved differently. (¶¶ 66, 71.)  Michael Day, the TWA MEC Merger Committee Chairman, admitted that, as to each of the actions Plaintiffs assert ALPA should have taken, he was not aware of any facts indicating that the actions would have had any impact on the APA's negotiating position.  (¶¶ 64-66.)  Yet these proposed actions are the *entire basis* of Plaintiffs' claim for damages.

As the uncontroverted evidence establishes that none of the actions that Plaintiffs claim ALPA should have taken would have impacted the seniority list in a way that favored the TWA pilots, there is no evidentiary basis for Plaintiffs to seek compensatory damages.  As a result, the Court should grant ALPA's motion for summary judgment.

**B.    THE TIME PERIOD DURING WHICH ANY DAMAGES ACCRUED SHOULD BE LIMITED AS A MATTER OF LAW**

Plaintiffs seek damages for lost income that allegedly accrued, or will accrue, over a twenty-five year period, based on the purported effects of union representation that terminated in April 2002.  Determination of the termination date for Plaintiffs' claimed damages is a question of law, and thus can be decided on a motion for summary judgment.  *See, e.g.*, *Prusky* v. *Allstate Life Ins. Co.*, No. 09-cv-05156, 2011 WL 1934992, at *1, 4 (E.D.Pa. May 19, 2011) (granting motion for partial summary judgment where plaintiff not entitled to recover any

lost profit or other damages after a particular date); *Sivell* v. *Conwed Corp.*, 666 F. Supp. 23, 25-26 (D. Conn. 1987) (limiting damages to the period before defendant's division was sold and plaintiff would have been lawfully terminated).

For the reasons described below, summary judgment is appropriate here because Plaintiffs' claim that they are entitled to recover damages through *June 2026* is unsustainable as a matter of law.

### 1.   Damages Are Limited to the Duration of the 1997 CBA

ALPA cannot be held liable for any harm that befell Plaintiffs under the terms of collective bargaining agreements that it had no role in negotiating, signing, or administering.  As ALPA has not represented the former TWA pilots since April 2002, it lacked, and continues to lack, the power to remedy wrongs suffered under the terms of agreements *it played no part in making*.  The Railway Labor Act does not contemplate such ongoing liability beyond a union's power to take action.[31]  *See, e.g.*, *Bowen* v. *U.S. Postal Serv.*, 459 U.S. 212, 227 n.16 (1983) (a union's liability "normally will be limited and finite").

Each collective bargaining agreement represents a package of rights— including, if the parties so choose, seniority rights—that reflects the individual

---

[31] The power to remedy an ongoing wrong is a critical element of damage awards under federal labor law.  As the Supreme Court has held, where a union or an employer's conduct *increases* a plaintiff's damages, the other party is not liable for the increase because it is powerless to stop the plaintiff's ongoing harm.  *Bowen*, 459 U.S. at 223-24.  That neither the employer nor the union should be held hostage to the other's failures is thus a fundamental principle of federal labor law.

negotiating positions of the union relative to the employer.  *See, e.g.*, *United Steelworkers of Am.* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580-81 (1960).  The seniority rights bestowed by collective bargaining agreements "arise solely from the contractual arrangements of the parties."  *Bruen* v. *Int'l Union of Elec., Radio & Machine Workers*, 313 F. Supp. 387, 390 (D.N.J. 1969) (citing *Aeronautical Indus. Dist. Lodge 727* v. *Campbell*, 337 U.S. 521 (1949)); *see also Foster* v. *Dravo Corp.*, 490 F.2d 55, 62 (3d Cir. 1973) (holding, in context of Selective Service Act of 1967, that federal law did not "creat[e] a system of seniority," but rather "recogniz[ed] its operation as part of the process of collective bargaining") (quoting *Aeronautical Indus.*, 337 U.S. at 526).

As any collective bargaining agreement can only confer rights for the course of its term, the duration of the agreement may "affect the amount of damages recoverable."  *See Wilkes-Barre Publ'g Co.* v. *Newspaper Guild of Wilkes-Barre*, 504 F. Supp. 54, 76 n.30 (M.D. Pa. 1980), *rev'd on other grounds*, 647 F.2d 372 (3d Cir. 1981).  In April 2002, when the former TWA pilots became employees of American, the terms of their employment were governed by the 1997 collective bargaining agreement between American and the APA (the "1997 American-APA Agreement").  This is the agreement under which the APA operated during seniority integration negotiations with the TWA MEC in 2001, and to which Supplement CC was added.  On May 1, 2003, more than a year after

70

ALPA's role as the bargaining agent for the former TWA pilots terminated, the APA and American renegotiated the terms of the 1997 American-APA Agreement and entered into a new agreement to which ALPA was not a party.

By that time, American was facing industry-wide turmoil caused by the convergence of September 11th, the Afghanistan and Iraq Wars, and the outbreak of SARS in Asia.  (¶¶ 83-84.)  To avoid bankruptcy, American negotiated for, and won, $1.6 billion in annual concessions from its unions, including the APA, which shouldered approximately $660 million of the annual concessions. (¶ 85.)  The terms of the concessions negotiated by the APA and the new package of rights that was to govern all American pilots' employment—including pilots of the former TWA—were memorialized in a Restructuring Agreement.  (*Id.*)  The Restructuring Agreement replaced in full the CBA that governed during the acquisition and the subsequent seniority integration negotiations period in 2001 and 2002.  (*Id.*)  The Restructuring Agreement was a substantial departure from the 1997 American-APA Agreement.  For example, the APA agreed to pay cuts amounting to a 23 percent decrease in net pay and a regression to 1992 pay rates; a significant increase in employee contributions to all medical benefit plans; reduced vacation pay and sick leave; and a reduction of the amount of available flight time, which further decreased pilots' net pay.  (¶ 86.)

Because ALPA did not have an ongoing relationship with either the APA—which represented the legacy American pilots as well as the former TWA pilots—or with American, and had *no* authority or power to negotiate for the former TWA pilots, ALPA could not have been liable for any harms relating to the former TWA pilots' employment with American at least as of the time of the new CBA. To the contrary, any such liability on the part of ALPA terminated—at the latest—upon replacement of the agreement that was in effect at the time that ALPA was responsible for negotiations with the TWA pilots' employer. Plaintiffs should thus be precluded from seeking the approximately $562.8 million in damages that their primary damage model attributes to the period beginning in May 2003, after the new CBA went into effect, and extending through June 2026.[32]

## 2. Plaintiffs' Claim for Future Damages Should Be Dismissed

Even if ALPA could be held liable for some measure of damages incurred after May 2003, the damages Plaintiffs seek extend well beyond the time frame permitted by law. At the very least, ALPA is entitled to summary judgment as to Plaintiffs' claims for future damages extending through June 2026. Through their primary damages expert, Plaintiffs seek future employment damages, or "front pay," of more than $131 million (under the Salamat Model). We are aware

---

[32] As explained in Dr. Murphy's report, if Salamat's methodology was followed, but a cutoff date of May 1, 2003 were used, the total damages calculated by the DMODEL would decrease to $30.3 million (after set-offs). (Ex. 30 ¶ 148.)

of no support under existing law for the award of future employment damages as a remedy against one's former union for a breach of the duty of fair representation. Moreover, Plaintiffs have failed to adduce *any evidence* to support such an award.

Plaintiffs' front pay claim is based on income allegedly lost due to holding a lower position on the seniority list while employed by American over the next fourteen years.  The lost income estimate, as performed by Salamat, assumes that American "will continue to look as it did in June 2012 until 2026."  (Salamat Rpt. 43.)  But even Salamat concedes that assumption is "almost certainly incorrect."  (*Id.*)  Even now, barely a year after Salamat attempted to predict the future, circumstances have demonstrated the folly of his assumptions.  (¶ 95.)

Underscoring the cloudy picture in Salamat's crystal ball is his willful blindness to the fact that American entered bankruptcy on November 29, 2011. (¶ 87.)  As part of American's ongoing bankruptcy, Supplement CC—the list on which Plaintiffs premise damages—was stripped of all legal force on September 5, 2012.  (¶¶ 88-90.)  Indeed, American specifically sought release from provisions of Supplement CC that erected the St. Louis Fence, which cost American approximately $14 million annually.  (¶ 88.)  American and the APA agreed to

arbitrate a new agreement designed to protect the former TWA pilots' pre-transaction career expectations.  (¶ 91.)[33]

On July 22, 2013, an arbitration panel rejected the former TWA pilots' request to reorganize the American seniority list.  Instead, the panel devised work rules and protective provisions that replaced those imposed by Supplement CC, but left American with significant discretion with respect to implementation.  (¶ 93.)  The future impact on the former TWA pilots of the seniority list and the modified rules and provisions remains highly uncertain.  Thus, because Plaintiffs cannot satisfy their burden of advancing a "basis upon which to base an award of future earnings," they are not permitted to submit their claims for front pay to the jury.  *See Olabode* v. *William Hecht, Inc.*, No. CIV. A. 95-6221, 1997 WL 805187, at *12 (E.D. Pa. Dec. 30, 1997); *see also Hansel* v. *Pub. Serv. Co. of Colo.*, 778 F. Supp. 1126, 1135-36 (D. Colo. 1991) (holding that quantification of front pay damages requires "some basis upon which to base an award of future earnings").

---

[33] That Supplement CC is no longer in effect cannot be disputed, as is clear from *Krakowski* v. *American Airlines, Inc.*, No. 13-00838 (E.D. Mo.), a pending lawsuit by a putative class of former TWA pilots challenging American and the APA's refusal to reintegrate the Seniority List in light of Supplement CC's rejection.  In that suit, class counsel, Allen Press, challenges "the legality of the discriminatory seniority list [American] implemented in January 2013 as part of *the new collective bargaining agreement*."  (¶ 94 (emphasis added.)  The TWA Pilots Committee, which represents the interests of plaintiff class members in the arbitration, conceded that "Supplement CC was terminated" when American rejected its collective bargaining agreements, as permitted by the Bankruptcy Court.  (¶ 92.)  Plaintiffs cannot have their cake and eat it too.

Now that Supplement CC has been abrogated, American pilots will be working under a collective bargaining agreement (as they have been since May 2003, at latest) that ALPA had no role in negotiating, but even more so, they will be bidding for flight assignments based on protective provisions determined at an arbitration to which ALPA was not a party.  If Plaintiffs are permitted to seek front pay damages under these circumstances, they impermissibly would invite the jury to engage in "unreasonable" or "wild" speculation. *See Smith* v. *Gen. Elec. Co.*, No. CIV. A. 93-5250, 1996 WL 24762, at *8 (E.D. Pa. Jan. 22, 1996) (finding unreasonable speculation where a plaintiff "presented no evidence of the salary she would have received"); *Bartek* v. *Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739, 746-47 (3d Cir. 1989) (finding unreasonable speculation where an employer's financial difficulties made the assumption of future employment unwarranted).  The Court cannot sanction such guesswork.  *See id.*

## CONCLUSION

For the foregoing reasons, Defendant's motions to exclude the testimony of Plaintiffs' experts, and for summary judgment, should be granted.

Dated:  Haddonfield, NJ
       August 22, 2013

Respectfully submitted,

Theodore V. Wells, Jr., Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

  - and -

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033

By:   */s/ John C. Connell*
     John C. Connell, Esquire
     Kerri E. Chewning, Esquire

*Pro Hac Vice:*

Jay Cohen, Esquire
Daniel J. Toal, Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*