# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, *et al.,*<br><br>    Plaintiffs,<br><br>        v.<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL,<br><br>    Defendant. | Civil Action No. 02-2917 (JEI) |

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO ALPA'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERTS RIKK SALAMAT AND DR. HENRY FARBER

---

**SCHNADER HARRISON SEGAL & LEWIS LLP**
Lisa J. Rodriguez
Nicole M. Acchione
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1165
(856) 482-5222

**GREEN JACOBSON, P.C.**
Allen P. Press
Joe Jacobson
7733 Forsyth Boulevard, Suite 700
Pierre Laclede Center
St. Louis, Missouri 63105
(314) 862-6800

September 30, 2013

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ............................................................... ii

PRELIMINARY STATEMENT .........................................................1

LEGAL ARGUMENT ........................................................................3

   I.   The Reports of Salamat and Farber Meet the Requirements of Rule 702. ......3

   II.   The Expert Opinions of Rikk Salamat are Admissible. ................................6

      A.   Overview of Salamat's opinions. .............................................6

      B.   Salamat has the Necessary Expertise Through Experience to Offer Expert Opinion Testimony on his But-For Seniority List and his Other Alternative Lists. ..................................................10

      C.   Salamat's Opinions are Reliable and Fit the Issues in the Case. .............15

      D.   Salamat's Marginal List. ..........................................................18

      E.   Salamat's Arbitration List. .......................................................20

      F.   Salamat's Fairness List. ...........................................................24

      G.   Salamat's Damages List. ..........................................................26

      H.   ALPA's Other Criticisms of Salamat's Opinions are Without Merit.......30

   III.   The Expert Opinions of Dr. Henry Farber are Admissible. .........................35

      A.   Dr. Farber is Qualified .............................................................35

      B.   Dr. Farber Used a Reliable and Appropriate Methodology To Determine a Reasonable Seniority List....................................39

      C.   Dr. Farber's Methodology is Reliable and Will Assist the Trier of Fact......................................................................44

CONCLUSION ...................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aguinaga v. United Food Workers, Int'l Union,*
854 F.Supp. 757, 764 (D. Kan. 1994)........................................................17

*Calhoun v. Yamaha Motor Corp., U.S.A.,*
350 F.3d 316, 321 (3d Cir. 2003)................................................................6

*Cantor v. Perelman,*
2006 U.S.Dist. LEXIS 86329, *24 (D. Del. 2006)......................................4

*Crowley v. Chait,*
322 F. Supp.2d 530, 536 (D.N.J. 2004).....................................................5

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579, 597 (1993)................................................................. passim

*Downeast Ventures, Ltd. v. Washington County,*
2007 U.S.Dist. LEXIS 14733 (D. Me. Mar. 1 2007).............................39, 42

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.,*
546 F.Supp.2d 155, 165-66 (D.N.J. 2008)..................................................6

*Gutierrez v. Johnson & Johnson,*
2006 U.S.Dist.LEXIS 80834 (D.N.J. 2006)............................41, 42, 47, 48

*Heller v. Shaw Indus., Inc.,*
167 F.3d 146, 152 (3d Cir. 1999)...............................................................6

*Hill v. Reederei F. Laeisz G.M.B.H. Rostock,*
435 F.3d 404, 423 (3d Cir. 2006)...............................................................4

*In re Paoli Railroad Yard PCB Litig.,*
35 F.3d 717, 746 (3d Cir. 1994)................................................................3

*In re Unisys Sav. Plan Litig.,*
173 F.3d 145, 167 (3d Cir. 1999)..............................................................5

*Kannankeril v. Terminex Int'l, Inc.,*
128 F.3d 802, 806 (3d Cir. 1997)......................................................3, 6, 47

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ...........................................................................3, 4, 5, 10

*Lauria v. Natl. R.R. Passenger Corp.*,
145 F.3d 593, 598-99 (3d Cir. 1998) ...............................................................5

*Lehrman v. Gulf Oil Corp.*,
500 F.2d 659, 668 (5th Cir. 1974) ...................................................................43

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209, 1221 (Fed. Cir. 2006)........................................................ 46-47

*Masimo Corp. v. Philips Elecs. N. Am. Corp.*,
2013 U.S. Dist. LEXIS 70745 (D. Del., Apr. 2, 2013)....................................42

*Pettway v. American Case Iron Pipe Co.*,
494 F.2d 211, 261-62 (5th Cir. 1974) .............................................................43

*Smithkline Beecham Corp. v. Easter Applicators Inc.*,
2001 U.S. Dist. LEXIS 19728 at *9-10 (E.D. Pa. 2001) .........................................38

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) .....................................................................................1, 42

*United States v. Mitchell*,
365 F.3d 215, 245 (3d Cir. 2004)......................................................................5

*United States v. Schiff*,
602 F.3d 152, 172-73 (3d Cir. 2010) ..................................................... passim

*Voilas v. General Motors Corp.*,
73 F.Supp.2d 452, 461 (D.N.J. 1999) ...............................................................4

*Warren Distributing Co. v. InBev USA LLC*,
2010 U.S.Dist.LEXIS 51603 (D.N.J. May 26, 2010) ................................................38

## STATUTES AND RULES

Fed. R. Evid. 702 .......................................................................................3, 5, 6, 49

## OTHER AUTHORITIES

Hand, *Historical and Practical Considerations Regarding
    Expert Testimony*, 15 HARV. L. REV. 40, 54 (1901) ...........................................10

ABA Section of Antitrust Law, Proving Antitrust
    Damages: Legal and Economic Issues (2d Ed. 2010) ........................................47

## PRELIMINARY STATEMENT

On July 13, 2011, the jury returned a verdict for plaintiffs. The jury found against ALPA on both liability and causation. With respect to causation, the Court instructed the jury that:

> If plaintiffs prove that ALPA's conduct was arbitrary or motivated by bad faith, they must then prove a tangible injury resulting from that conduct in order to prevail. A labor union can only be held liable for breach of its duty of fair representation if its breach directly causes injury to an individual or group to whom the duty is owed. In this case, proving injury means that Plaintiffs are required to demonstrate that, but for ALPA's breach of its duty of fair representation, the overall outcome of the integration of the TWA Pilots into American would have been more favorable.

Jury Charge, Docket No. 411, p. 14

The issue left to be tried is not *whether* ALPA caused damages, but rather *how much* harm ALPA caused.  At the damage trial, Plaintiffs' burden will be to present evidence that allows a jury to reach a *reasonable estimate* of damages. *Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555 (1931). *See also* Plaintiffs' Memorandum of Law In Opposition to ALPA's Motion for Summary Judgment.

To satisfy this burden, Plaintiffs will present the expert opinion testimony of Rikk Salamat (Salamat) and Henry Farber (Farber). Salamat and Farber have independently reached expert opinions on what a fair and reasonable seniority list would have looked like if ALPA had not breached its duty of fair representation to

the TWA pilots. ALPA seeks to exclude both experts' opinions, arguing that both are too speculative. As is clear from ALPA's own expert reports and summary judgment motion, what ALPA really is saying is that Plaintiffs' experts should be excluded because they came up with a seniority list different than that established by Supplement CC. But the jury has already concluded that a seniority list "more favorable" than that established by Supplement CC would have resulted but for ALPA's breach. As a result, ALPA's fundamental premise for its arguments does not get off the ground, much less leave the gate.

Moreover, ALPA's arguments against admitting the expert opinion testimony of Salamat and Farber fail to take into account the fact that, as a consequence of ALPA's breach, no one can ever know more than approximately what seniority list would have been agreed upon absent the breach.  The law recognizes that plaintiffs can only present evidence of *a reasonable estimate* of what a fair seniority list would look like absent ALPA's breach. Plaintiffs' experts provide reasonable and justifiable alternative seniority lists that would appropriately support a judgment in this case. ALPA's criticisms all go to the weight of those opinions, not their admissibility. ALPA's motion to exclude the opinions of Salamat and Farber should be denied.

## LEGAL ARGUMENT

### I.   The Reports of Salamat and Farber Meet the Requirements of Rule 702.

The testimony and reports of Salamat and Farber are admissible because they are both "relevant" and "reliable." *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact. *In re Paoli Railroad Yard PCB Litig*., 35 F.3d 717, 746 (3d Cir. 1994). "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Kannankeril v. Terminex Int'l, Inc*., 128 F.3d 802, 806 (3d Cir. 1997). Here, Plaintiffs' experts will assist the damages jury in awarding damages consistent with the first jury's verdict that but for ALPA's misconduct, the TWA pilots would have had a more favorable seniority integration.

"Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, *i.e.*, reliability; and (3) the expert's testimony must assist the trier of fact, *i.e.*, fit." *United States v. Schiff*, 602 F.3d 152, 172-73 (3d Cir. 2010) (citations and internal brackets omitted).

> In assessing whether an expert's proposed testimony "fits," we are asking whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.… Put another way, this is a question of relevance, and Rule

> 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of fact. The standard is not that high, but is higher than bare relevance.

*Id.* (citations and internal brackets and quotations omitted).

Several principles guide the court's application of these three requirements. First, district courts are vested with considerable discretion in deciding whether to admit expert testimony. "The permissible scope of expert testimony is quite broad, and district courts are vested broad discretion in making admissibility determine-ations." *Hill v. Reederei F. Laeisz G.M.B.H. Rostock,* 435 F.3d 404, 423 (3d Cir. 2006).

In addition to broad discretion over whether to admit expert testimony, courts have broad discretion over *how* they conduct the inquiry concerning admissibility. *Kumho Tire,* 526 U.S. at 150-152 (district courts have broad leeway in how they conduct a *Daubert* analysis and are free to tailor their inquiries to the facts of the case before them). There is no bright-line test for admissibility. Nor is there any requirement that a district court apply the *Daubert* factors when they would not be helpful to the analysis. *Id.* This is particularly true when determining the admissibility of *non-scientific* expert testimony, such as the testimony offered by both Salamat and Farber. *Voilas v. General Motors Corp.,* 73 F.Supp.2d 452, 461 (D.N.J. 1999) ("the Daubert factors do not always fit neatly into or easily translate in the context of nonscientific testimony"); *Cantor v. Perelman,* 2006

U.S.Dist. LEXIS 86329, *24 (D. Del. 2006) (*Daubert* factors of little use in evaluating non-scientific expert testimony). *See also Kumho Tire,* 526 U.S. at 150 (in non-scientific cases, the Daubert factors "may or may not be pertinent").

Second, while *Daubert* requires district courts to act as "gatekeepers" to ensure that the expert testimony proffered meets the requirements of Rule 702, the court must not usurp the role of the jury in evaluating such testimony. As this Court has explained, "[t]he court's role as a gatekeeper 'is not intended to serve as a replacement for the adversary system.'" *Crowley v. Chait*, 322 F. Supp.2d 530, 536 (D.N.J. 2004), quoting Fed. R. Evid. 702, advisory committee note. A district court abuses its discretion when "it excludes testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers the most appropriate." *Lauria v. Natl. R.R. Passenger Corp.,* 145 F.3d 593, 598-99 (3d Cir. 1998) (citations omitted).

The Third Circuit frequently emphasizes the Supreme Court's admonition that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004), quoting *Daubert,* 509 U.S. at 596; *see also In re Unisys Sav.*

*Plan Litig.*, 173 F.3d 145, 167 (3d Cir. 1999); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999).

Third, courts should construe the requirements of Rule 702 liberally and generally favor admission over exclusion. "[T]he rejection of expert testimony is the exception rather than the rule." *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F.Supp.2d 155, 165-66 (D.N.J. 2008), quoting Fed.R.Evid. 702, *2000 Amendments*; s*ee also Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003); *Kannankeril*, 128 F.3d at 806 ("strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact").

The testimony and reports of Salamat and Farber are admissible under these settled principles. Both are highly-qualified experts who applied reliable methods based on the existing liability and causation verdict. Both experts' testimony will assist the jury to quantify the Class's damages.

## II.   The Expert Opinions of Rikk Salamat are Admissible.

### A.   Overview of Salamat's opinions.

Plaintiffs offer Rikk Salamat as an expert to provide testimony to resolve two distinct issues material to the amount of damages suffered by the TWA pilots. Both issues flow directly from the existing jury verdict. The first issue is what an alternative, "but-for" pilot seniority list would have looked like if ALPA had not

breached its duty of fair representation to the TWA pilots. The second issue is, given such a but-for seniority list, what are the damages suffered by the TWA pilots as a result of having their seniority set by Supplement CC rather than by that but-for list.

With respect to the first issue, Salamat is prepared to testify to a but-for seniority list, referred to in his report and deposition testimony as the "Salamat list" or the "damages list," that he opines would have more likely than not been achieved in the merger negotiations had ALPA not breached its duty of fair representation. Salamat's damages list is the Supplement CC seniority list modified in two simple but important respects. The two modifications are both based on the negotiations between the TWA pilots and the APA and, in particular, on the APA's rationale for its structuring of the Supplement CC list.

As part of his analysis of the facts, and for the purpose of developing and confirming the reasonableness of his damages list, Salamat created three additional alternative seniority lists. These lists do not represent Salamat's opinion as to damages, but mark the upper and lower boundaries of what he views as the range of possible damages, and also establish that the APA pilots would not have been worse off financially relative to their reasonable pre-merger career expectations had they agreed to a seniority merger under the Salamat damages list. Thus,

admission of all four of Salamat's alternative lists would aid the jury in its determination of damages.

With respect to the second issue, the amount of damages suffered by the TWA pilots from their failure to obtain an improved seniority list, Salamat developed a method to calculate the average income that would be earned for each pilot under any proposed seniority list, comparing that income to the income earned by each pilot under Supplement CC. Salamat uses as his primary source of data the actual income paid each month by American to the pilots holding each place on the Supplement CC seniority list. Salamat then applied to that data a series of calculations embedded in computer programs he created. Some of Salamat's computer programs were created for this case, while others go back to a program originally developed by Salamat in 2002 for ALPA's Canadian Airlines MEC for its appeal in a seniority dispute following a merger with Air Canada. The program created by Salamat in 2002 is generally known as the "ALPA Merger Tool." [1] (I:125-26). [2]

---

[1]     In addition, Salamat prepared a supplemental report that deducts from each furloughed TWA pilot's gross damages a set-off amount equal to that pilot's earnings from his or her replacement employment or self-employment, if any. The data used by Salamat for his set-off calculations come from questionnaire responses and supporting documents, including tax returns and Social Security earning reports, provided by the pilots.  Exhibit 5.

[2]     Salamat's deposition was taken over the course of four days, January 29-31, and May 29, 2013. The transcripts are referred to as I (January 29, 2013), II (January 30, 2013) and III

*…Continued*

In performing the second part of his work, calculating the damages that result from comparing an alternative seniority list to the Supplement CC seniority list, Salamat ran calculations for his damages list, his upper- and lower-bounds lists, and his baseline fairness list. He also ran calculations for Prof. Farber's three lists, discussed below, and for the proposed seniority list created at the time of the merger by Professor Michael Tannen. Salamat created separate reports for each set of calculations. *See* Exhibits 3 and 4.

ALPA has challenged Salamat's ability to give expert opinion testimony as to the first issue, his creation of alternative seniority lists. ALPA has not, however, challenged the second aspect of Salamat's proposed expert testimony, the damages Salamat has calculated from each alternative seniority list. Because Salamat's expertise and his ability to testify as to damages resulting from any particular seniority list has not been challenged, this second aspect of Salamat's proposed expert testimony will not be discussed further in this brief.[3]

---

*Continued from previous page*

(January 31, 2013). *See* Exhibits 6-8. The May deposition concerned Salamat's set-off calculations and is not cited in this brief.

[3]     ALPA does contend, however, that Salamat should have cut off the damages calculations as of the date American Airlines and the APA entered into a new collective bargaining agreement. This is not an attack on either Salamat's expertise or methods in calculating damages from a seniority list. ALPA's proposed cut-off date has no merit as the inadequate seniority list continued in existence and continued to diminish the former TWA pilots' seniority through the date that Supplement CC was eliminated in 2012 by the bankruptcy court in American's bankruptcy.

**B.    Salamat has the Necessary Expertise Through Experience to Offer Expert Opinion Testimony on his But-For Seniority List and his Other Alternative Lists.**

Reading ALPA's *Daubert* motion, it is difficult to recognize Salamat or his opinions. It is therefore important to accurately restate these matters so that the Court has a proper factual basis on which to makes its rulings.

The place to begin is with Salamat's qualifications to be an expert in this case. *Schiff*, 602 F.3d 172 ("the proffered witness must be an expert, *i.e.*, must be qualified"). Salamat's expertise is not in an academic arena or a scientific field, but in the narrow field of airline pilot seniority, enabling him to use what Judge Learned Hand called "general truths derived from … specialized experiences." *Kumho Tire*, 526 U.S. at 148-49, *quoting* Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 HARV. L. REV. 40, 54 (1901). Because ALPA's attack on Salamat's expertise consists primarily of its attempts to squeeze him into an academic box he never claimed and where he does not belong, ALPA's brief ignores Salamat's relevant, extensive, and specialized experience dealing on a daily basis with airline pilot seniority, its valuation, and the negotiations between pilot groups concerning their relative seniority. This is a set of experiences that makes Salamat almost uniquely qualified to serve as an expert

in this case. Salamat's specialized experience is described on page one of his main report,[4] in his C.V., and in his deposition testimony. Exhibits 2, 6-8.

Salamat is "an analyst of economic and financial data, particularly in regards to labor unions and professional associations … airline pilots being the vast majority of [his] practice." *Salamat Dep. Tr.* I:7. A significant part of Salamat's work since 2001 "has been in analyzing the impacts of pilot seniority mergers." Salamat "developed and programmed an application called the 'ALPA Merger Tool,'" which he has "used to analyze impacts during seniority arbitrations, to assist arbitrators in executive session and deliberation, and to produce the final seniority lists in the pilot seniority mergers of Air Canada/Canadian, US Airways/America West, Northwest/ Delta and the merged mechanic seniority list in AirTran/Southwest." *Report* at 1; s*ee also* II:108.

Salamat is frequently engaged in assisting pilot unions in negotiations, mediations, and arbitrations regarding seniority lists. *Salamat Dep*. *Tr*. I:7. Salamat has "worked in either an exprt or consultative capacity for the pilots of Canadian Airlines, Air Canada, US Airways, Northwest Airlines, Delta Air Lines, Continental and Trans World Airlines." *Report* at 1. He has testified in the U.S. and Canada "as an expert for several pilot seniority integration arbitrations, at the

---

[4]     "Damages in Brady et al vs. The Air Line Pilots Association," dated October 12, 2012 (the "Report").  Exhibit 1.

Canadian Human Rights Tribunal, US System Board of Adjustment hearings and in front of the National Mediation Board." *Id.*

In the Canadian Air case, Salamat formulated proposals, constructed integration methodologies, and developed bidding restrictions and fences. He also analyzed the impact of seniority integrations and assisted the arbitrators in doing their analyses. *Salamat Dep. Tr.* at II:109. Salamat did similar work analyzing seniority integrations for both the USAir and Northwest pilots in separate transactions. *Id.* at II:110. In each of these matters, one of Salamat's responsibilities was to determine what a likely seniority list would look like. *Id.* at II:111-12.

ALPA has employed Salamat as a costing consultant since 2008. His responsibilities in this role are analyzing the financial impact of proposed contract changes, comparing compensation, and undertaking operational and economic analyses of US Airway and its competitors. In this role, Salamat has "advised union representatives, negotiated with the employer, and … testified as an expert." *Salamat Report* at 1.

Based on these facts, showing more than a dozen years of constant effort by Salamat working with airline pilots and labor arbitrators with respect to pilot seniority, its valuation, and the resolution of disputes between merging pilot groups about their relative seniority, plaintiffs have established that Salamat is an expert in

the field of airline pilot seniority, and therefore is qualified as an expert to testify about such matters under the first part of the three-part test established in *Schiff, supra.*

ALPA challenges Salamat's qualification to be an expert on the grounds that he is not qualified as an expert on negotiation theory, applied behavioral theory, economics (including game theory), and expected utility theory. *ALPA Brief* at 19-22. Indeed, ALPA trumpets Salamat's ready acknowledgment that he is not an expert in these academic subjects. *Id.* at 20.

ALPA's statements notwithstanding, however, Salamat's alternative lists were not based on and did not result from the direct application of any of these theories, which Salamat explains only "attempt to give insight into how parties will behave in negotiation." *Salamat Report* at 4. "Behavioural theory, expected utility, game theory and the analysis of persuasion all overlap in some regards. Given the highly specific nature of the damages to the TWA pilots, none of these fields can prescribe an equally specific approach." *Id.* Indeed, Salamat expressly did not attempt to create any models under these theories because they were inherently subjective in these circumstances. *Salamat Dep. Tr.* at II:58-59.

Rather than using a theoretical approach, Salamat used his practical experience from working with pilot unions combined with his close examination of

the actual course of negotiations between the TWA pilots and the APA to form his opinions.

> I've been working with pilots for a dozen years now. Almost, you know, 90 percent of my practice is that. And so, I believe I could see in their actions how it was they [the APA] were constructing their understanding of the issue and what was important to them. And to the extent that is a — is a convenient way of describing their belief structure, I think all of the experience I've had for the last dozen years was brought to bear on understanding the APA's position.

*Salamat Dep. Tr.* at I:270. One of Salamat's bases for saying that if ALPA had employed the actions requested by the TWA pilots, then the APA would have offered a better seniority list, is his experience of having been in negotiations when other groups brought pressure to bear in the forms of litigation or sanctions or some other form of pressure. *Salamat Dep. Tr.* at I:145-46. This conclusion was supported by the APA's conduct throughout the negotiations, as the APA continually improved their settlement offer to the TWA pilots under the force of whatever pressure the TWA pilots were able to bring. *Id.* at I:150.

The specifics of Salamat's opinions and how he developed his alternative seniority lists — and what each list means — is discussed further below. In short, however, Salamat is qualified to provide his opinions based on his experience, and he did not claim to be an expert in any of the fields that ALPA now proclaims he is not an expert in.

14

### C.   Salamat's Opinions are Reliable and Fit the Issues in the Case.

Salamat's proposed testimony also satisfies both the second part of *Schiff*'s three-part test, the requirement of "reliability", to-wit: "the expert must testify about matters requiring scientific, technical or specialized knowledge", as well as the third part of the test, the requirement of "fit", to-wit: the requirement that expert testimony assist the trier of fact. 602 F.3d at 172.

Nowhere in its brief does ALPA dispute that creation of a but-for seniority list is a proper subject for expert testimony requiring specialized knowledge. That point appears to be conceded. Instead, ALPA appears to conflate the "reliability" and the "fit" issues and treat them as a single issue, arguing that Salamat's opinions are unreliable because they are based on certain contrafactual assumptions. *See ALPA Brief* at 23.

But ALPA's argument is based on a misperception of the basis of Salamat's opinions. ALPA states: "The foundation of Salamat's damage model is his mistaken assumption that the jury found that ALPA was required to pursue each of ten specific actions on behalf of the TWA pilots in order to discharge its duty of fair representation." *ALPA Brief* at 23. But Salamat does not assume that. Rather, Salamat opined (a) that each of these actions, if pursued, would have brought pressure on the APA regardless of whether such action was "successful" (*Salamat Report* at 2, 5); and that that *if* ALPA had pursued all of the strategies that

15

plaintiffs claimed it failed to pursue, *then* the jury would have not found that ALPA had breached its duty, since the claim of breach was founded on the alleged failure to pursue those actions. *Salamat Dep. Tr.* at I:176. Salamat testified:

> Q.    Well, in — in doing that, were you assuming that each of these was a predicate for the jury's verdict that there was a breach of the duty of fair representation?
>
> A.    My only assumption was that each of these actions was available to ALPA and they didn't pursue them.

*Salamat Dep*. *Tr*. I:133. Explaining further, Salamat testified:

> [T]he question, you know, is, one, what is the impact of these courses of action on the negotiation? And the other is, what role did these things have in ALPA's breach? And those are two completely different questions, you know, like the jump seat war. I mean, maybe the jury would have found that the jump seat war is not something that ALPA needed to do in order to represent its pilots fairly, but that jump seat war was a course of action available to ALPA and didn't pursue it, and had they done it, it would have had an impact on the negotiation.

*Id.* at I:134. Salamat distinguishes between the likelihood that a possible ALPA action might have been successful in achieving its immediate goal, which he is not analyzing, and the affect pursuing such an action would have had on the negotiations, which is the subject of his analysis (*id.* at I:194, 234, 259-61):

> [I]f ALPA stands up and says we are not going to waive our scope, we are going to fight this thing, we are going to fight it in bankruptcy court, they might have been miserable failures at it, but it would certainly have changed the perception of the TWA pilots in the eyes of the APA, so that's — that's my consideration, not how successful they would have been.

*Id.* at I:195. Similarly, if the TWA pilots had refused to waive scope, that would have increased the pressure on the APA to negotiate because, although the APA might have strongly believed that American would walk away from the transaction, they could not know with certainty what American would do. *Id.* at I:186. Indeed, nobody — not even the participants — can say for certain what would have happened under different circumstances. This is true for American's then-CEO Carty, former TWA labor manager Brundage, and APA then-president Darrah. In each case, each witness's prediction about what he or his organization would have done in response to any action taken by ALPA is speculation because no one can know for certain what they would have done in an alternative universe. *Id.* at I:219-22, II:190-91.[5]  *See, e.g., Aguinaga v. United Food Workers, Int'l*

---

[5]  ALPA asserts in its preliminary statement that Salamat admitted that his alternative seniority lists "are nothing more than speculation about what would have happened in an alternative universe." *ALPA Brief* at 1-2 (internal brackets, quotations, and emphasis omitted), citing *Salamat Dep. Tr.* at II:191. This misstates Salamat's testimony. Salamat is not testifying about his alternative seniority lists; he is testifying about predictions about what acts any party in the negotiations would have taken in response to ALPA bringing additional pressure in the negotiations. Beginning on the prior page, Salamat is discussing Darrah's deposition testimony that there was no action ALPA could have taken that would have caused the APA to agree to arbitrate the seniority dispute. Salamat states that "that is just one man's opinion of what … he would have done in a hypothetical circumstances," and that it is speculation for anyone, including Salamat, to say what would have happened for certain in the presence of additional pressure being brought to bear. *Salamat Dep. Tr.* at II:190-91. It was not a statement that any of the alternative seniority lists developed by Salamat were speculative.

Salamat makes it clear throughout his deposition that none of the alternative seniority lists about which he testifies were certain of being achieved — they are just more or less likely. On the high end, the likelihood that a list as good for the TWA pilots as Salamat's marginal list (Supplement CC plus 200) could have been achieved in negotiations if ALPA had not breached

*…Continued*

*Union*, 854 F.Supp. 757, 764 (D. Kan. 1994) ("The evidence presented by the Union was hypothetical and speculative… The court cannot find that Monell would have taken the same actions if it had acted lawfully as it did when it acted unlawfully").

Thus ALPA's primary criticism of Salamat's opinions, that he assumed that the jury found that ALPA had breached its fiduciary duty with respect to each action that the TWA pilots complained that ALPA did not pursue, is simply wrong. Salamat did not assume this.

ALPA makes some other criticisms of Salamat's opinions in its motion. The next sections describe how Salamat developed his alternative seniority lists and then respond to ALPA's additional criticisms.

### D.   Salamat's Marginal List.

Because it is impossible to determine with certainty the seniority list that would have resulted from negotiations that were not tainted by ALPA's breach of duty, Salamat believed that it was important to determine the least and most favorable seniority lists (from the TWA pilots' perspective) likely to result from

---

*Continued from previous page*

was close to but less than 100%. *Id.* at I:164. Salamat's damage list is only his best estimate of the seniority list that would have been achieved if ALPA had used the strategies available to it. *Id.* at I:76. Indeed, Salamat opined that it was possible that no agreement would have been reached by the TWA pilots and the APA on a seniority agreement even if ALPA had pursued all of the actions the TWA pilots claimed it should have pursued. *Salamat Report* at 9.

such negotiations. This range of seniority lists would also establish a lower and upper bounds to the class's damages.

Given the jury's finding in favor of the plaintiffs, Salamat deemed it established that the lower-bounds list had to be better in some respect to the list established by Supplement CC. He concluded that it was appropriate to use a list that was marginally albeit materially better than the Supplement CC list. The issue for Salamat's expertise was: How much better?

Salamat began with Supplement CC as his starting point. He concluded, based on his review of the history of APA's proposals, that his lower-bounds list should reduce the number of TWA pilots stapled to the bottom of the Supplement CC list by 200 and merge those pilots in with the pilots placed below the top block of American pilots.

Salamat based this change, and justifies it, on the changes made by the APA on its own initiative between its March 2, 2001 merger proposal and its imposition of Supplement CC. Between those two lists, the APA reduced the number of stapled TWA pilots by 316. *Salamat Report* at 28. Salamat explained that his move of 200 pilots off the staple for his marginal list "was largely based on the last move that the APA made having involved changing the staple point by 300-and-some odd numbers." *Salamat Dep. Tr.* at III:12.

> I assumed that in the absence of ALPA's breach … they would have
> been able to improve Supplement CC at least as much as the APA was

> willing to do on their own without any pressure. So that would have been an additional 316 pilots removed from the staple. In order to be conservative, I just took two thirds of that. I assumed 316 was the most probable, but in order to estimate damages and give some margin of error, I took 2/3 of that.

*Id.* at III:14.

Salamat refers to this list, which establishes the bottom of the damages range, as the "Marginal list" because it is marginally but materially better than the Supplement CC seniority list. *Salamat Report* at 14-15.

### E.    Salamat's Arbitration List.

Having set the bottom of the damages range, Salamat also needed to establish the top. Setting the top required Salamat to determine the best list (from the perspective of the TWA pilots) that could reasonably be expected to result from a negotiation process between the TWA pilots and the APA not tainted by ALPA's breach of fiduciary duty.

Salamat concluded that, although the APA was not required to arbitrate seniority, it had the right, if it chose, to engage in seniority arbitration. Since there was therefore some possibility, even if very small, that the parties' seniority dispute might be resolved through arbitration, and since the APA would never have a reason to agree to a seniority merger that was worse (from its perspective) than what the APA could expect from an arbitration, the maximum (albeit unlikely) top of the damages range would be set by a seniority list that might reasonably result

20

from a seniority arbitration. Salamat refers to this list as the "Arbitrated List." *Salamat Report* at. 14-15.

Salamat's damages list, discussed below, would therefore fall somewhere between the extremes of the marginal list and the arbitration list. *Report* at 7, 13-14.

Salamat developed his arbitration list using a principle that arbitrators themselves typically use in resolving disputes between parties called the "replication principle." The replication principle basically attempts to duplicate the agreement the parties themselves would have reached had they negotiated reasonably and not ended in impasse. *Salamat Report* at 13.  In addition, Salamat's "Arbitrated List" was designed to be as favorable to the APA as any list that had ever been awarded by an arbitrator, or mutually negotiated between parties. *In other words, it was the worst list the TWA pilots could expect if the seniority integration in this case had been arbitrated*. Thus the arbitrated list was strongly biased in favor of the APA. *Salamat Report* at 15.

Salamat developed his arbitrated list by examining every seniority arbitration decision between major airlines issued since deregulation in 1978. He considered, among other issues, those arbitrations in which a group of pilots from one of the airlines was placed at either the top or at the bottom of the resulting

seniority list, studying the awards for the arbitrators' justifications, if any, for stapling a pilot group at either end. *Report* at 21-22.

In reviewing these awards Salamat concluded, consistent with his own experience, that many of the facts that ALPA suggests should be factors in arranging a seniority list are given little or no weight by the arbitrators.

For example, ALPA puts a great deal of weight on the pay rate increase the TWA pilots received upon being employed by American, and contends that this increase in income would have tended to cause the TWA pilots to end up in lower-seniority positions on the merged seniority list. Salamat's report states that this is not true, and that arbitrators have held that even large differences in pay rates between the pilots in a merger "had no real effect on the composition of the list." *Salamat Report* at 16; *Salamat Dep. Tr.* at II:231.

Similarly, the premerger career expectations of the pilot groups were irrelevant, even though it was one of the factors that the APA was taking into consideration, "[b]ecause at the end of the day the premerger career expectations of pilots matters to the extent that they brought X number of jobs with them and not … what may or may not happen with … the company absent the merger. That stuff is argued. In my experience, it doesn't play any significant role in the outcome of seniority integrations." *Salamat Dep. Tr.* at I:85.

Based on history and arbitral decisions, the likelihood that an airline was going to cease operating also plays little role in seniority integrations:

> Well, for instance, when Canadian Airline and Air Canada merged, Canadian Airline was counting their cash in terms of hours. You know, the Air Canada pilots, you know, said this was proof that they had no career expectations. But at the end of the day, it mattered very little in their seniority integration.
>
> So there has been lots of situations where there was a merger between a bankrupt carrier which the other side claimed was, you know, within minutes of expiring, but yet ended up playing very little role in the actual outcome of the seniority integration.

*Salamat Dep.Tr.* at I:89, II:226.

A second example where the viability of the acquired airline was of little relevance was America West and USAirways.  America West argued that USAir, in bankruptcy, had no hope of ever flying against. "They were, you know, a doomed airline. They were a failed carrier. And, therefore, their pilots had no career expectations at all, and that this merger had saved them." *Salamat Dep. Tr.* at I:91-92. "But at the end of the day, the arbitrator just looked at the number of jobs … each pilot group brought to the merger and did the integration on that basis." *Id.* at I:92.

Other examples where pilots from the non-viable airline were integrated with pilots whose career expectations were significantly better includes Lynx, Continental, and Frontier. *Salamat Dep. Tr.* at I:93-94. In reviewing the various integration awards, Salamat saw no evidence that the financial distress of an air

carrier translated into a markedly inferior seniority integration for the pilots from that carrier. *Id.* at I:95-96.

### F.   Salamat's Fairness List.

Salamat also prepared a list he referred to as the "Fairness list" or the "Optimal list." This list was designed to give the pilots in each pilots group enough seniority to access the work that group brought into the merger. Any seniority list that was more favorable to the American pilots than the fairness list would transfer work brought into the merger by the TWA pilots to the American pilots. Similarly, any seniority list that was less favorable to the American pilots than the fairness list would transfer work brought into the merger by the American pilots to the TWA pilots. *Salamat Dep. Tr.* at II:88-92.

Salamat did not consider the two pilot groups' unmerged career expectations as relevant to his analysis,  "because here a merger is a given … in this case the two carriers did merge." *Salamat Dep. Tr.* at I:74. The American pilots did not have the power to negotiate whether American's acquisition of the TWA assets would proceed. *Id.* at I:239. Nevertheless, any reasonable model that the American pilots could have had at the time would have shown that each of Salamat's lists were better for the American pilots than their reasonable promotional expectations without a merger. *Id.* at II:92.

24

Salamat chose July 2002 as the point in time at which to measure the amount of work that the TWA pilots brought with them to American. That is because under the transition agreement between the TWA Pilots and American dated March 31, 2001, American was able to reduce the TWA fleet and adjust TWA staffing to integrate the TWA pilots into American's operations and respond to the decrease in flights following September 11, 2001. "By going a few months into the integrated workforce, it can be assumed that any jobs the TWA pilots still had could reasonably be considered ones they brought with them." *Report* at 16-17.

Salamat created his fairness list by merging the TWA pilots into the American pilots using the average income for each pilot's seniority position, "This list is the mathematically optimal one for matching pilots with those of like incomes given the constraint of not being able to reorder pilots on their own list." *Report* at 19.

Salamat prepared his fairness list even though he did not believe that the list was achievable in negotiations between the APA and the TWA pilots. Salamat viewed it as important to develop the fairness list as a reference point, since "it has to be assumed that the TWA pilots could not have achieved more than what they would have received under a fair list." *Report* at 14.

Moreover, since all of the seniority lists that Salamat developed to mark the damages range — from the marginal list to the damages list to the arbitration list

— were more favorable to the American pilots than the fairness list, the American pilots' reasonable pre-merger career expectations are fully protected by each of Salamat's lists. "[S]ince every single American Airlines pilot has superior seniority under any of the lists that I propose [compared] to the fairness list, I know absolutely that they did better than they would have." *Salamat Dep. Tr.* at II:89. Any alternative seniority list that yields damages less than those under the fairness list "is within a range that I would consider possible." *Id.* at I:161-62.

### G.    Salamat's Damages List.

Having developed the other three alternative seniority lists, setting the limits of possible damages, Salamat prepared his damages list. This list was based on the information embodied in the other three lists, his analysis of the actual bargaining between the TWA pilots and the APA, and the APA's expressed goals for the seniority integration. Salamat considered in detail the stated position of the APA in its extended response to the TWA pilots "Rightful Place Proposal" (the Tannen proposal) in July 2001. He considered each of the grounds asserted by the APA as a reason for rejecting the TWA proposal to gain insight into how the APA would react in the light of increased negotiation pressure from ALPA. *Salamat Report* at 29; *Salamat Dep. Tr.* at I:76-77.

In creating the but-for list for his damage model, Salamat sought to answer the question: "Had ALPA provided fair representation and if both parties were

acting reasonably, what is the most the APA pilots could have offered and what is the least the TWA pilots could have accepted?" Salamat described the damages list as a compromise between the marginal list and the arbitrated list in the sense that those two lists provided the limits within which the parties were negotiating absent ALPA's breach. *Report* at 15.

"This analysis, combined with my years of experience working with unions, leads me to conclude that effective representation by ALPA could have compelled the APA to move to a position that was consistent with Supplement CC, so that their position and interests were embedded in the agreement, but a position that allowed the goals and objectives of the TWA pilots to be satisfied as well." *Report* at 9.

Salamat concluded that most likely outcome of the negotiations, in the absence of ALPA's violation of its duty, was "the merged seniority list that was most favourable to the American Airline pilots, but that could be considered reasonable or fair when viewed through the lens of other mergers…" *Report* at 9.

Salamat gives little weight to APA statements that they were not going to improve their offer to the TWA pilots. "What we have is hard evidence that their negotiating position improved over time on whatever little pressure the TWA pilots were able to bring to the table…" I:199-200. With every offer they made, the APA reduced the number of TWA pilots stapled. "I don't know what anyone could have

27

said that would have made me think that they wouldn't have gone further in the negotiations than they did." *Salamat Dep. Tr.* at I:172.

In reaching his conclusions, Salamat notes that research in negotiations demonstrates that parties are more interested in fairness than is commonly believed. *Report* at 9-10. The APA said that they wanted to be fair, but the APA was "prevented from really examining their notions of fairness because of lack of pressure to do so." *Salamat Dep. Tr.* at I:150. "Well, they [the APA] believed they were being fair, and then they changed their position. They believed they were being fair again. And, you know, so at every point in time they believed they were attempting to be fair, so …" *Id.* at I:151.

Working off of Supplement CC, Salamat concluded that it was most likely that the APA would have agreed to a top block of 2494 American pilots, or 98 less than the 2592 pilots placed in the top block under Supplement CC. The justification for this reduction in the top block was that these 98 pilots flew the F100, an aircraft significantly smaller than the large, widebody jets whose pilots jobs the APA claimed to be protecting. The F100 was similar in size to planes the TWA pilots were flying. *Report* at 31; *Salamat Dep. Tr.* at III:104-06.

Salamat testified that it was more difficult to estimate the change, if any, that would be made in number of TWA pilots stapled at the bottom of the seniority list. Salamat noted that the number of TWA pilots integrated with the American pilots

was equal to the number of MD90 and B767 Captain jobs TWA brought to the merged airline after furloughs and reductions after 9/11. *Report* at 31. Salamat opined that, "given APA's recognition that TWA brought Captain positions with its fleet, further pressure and incentives on ALPA's part could have at least convinced them to recognize that the TWA fleet also required First Officers. Large commercial aircraft generally do. If APA was willing to accept that the TWA pilots were entitled to credit for captain positions, if they were acting reasonably it seems likely that given meaningful pressure they would ultimately have been convinced the TWA pilots were also entitled to the co-pilot positions." *Report* at 32.

Salamat did not calculate a bottom staple. The bottom staple number was derived from the number of captains and first officers he determined would be merged. "The 464 TWA pilots Salamat leaves at the bottom of his damages list were really a remainder rather than specifically a staple." *Salamat Dep. Tr.* at I:169. Salamat calculated the number as follows:

> The APA merged 940 TWA pilots, and the fact that there was 939 MD90 and 767 captains on the TWA list. So the APA was prepared to accept the MD90 and 767 positions were ongoing positions, what they call sustainable. And so — but they only gave them credit for captains. And so to say that under all the pressure that ALPA could have brought to bear would they have accepted the fact that FOs were also required to fly those planes, that would seem a reasonable place for them to agree. And so the number of FOs added into that — into that 939 results in 1,873 pilots being merged. The top of the list remaining roughly the same and the staple being reduced by 464.

*Salamat Dep. Tr.* at I:170.

### H.   ALPA's Other Criticisms of Salamat's Opinions are Without Merit.

ALPA asserts a number of other criticisms of Salamat's opinions. These criticisms are all without merit.

ALPA contends that Salamat's opinions are defective because he focuses solely on the TWA pilots and ignores that there was another party to the negotiations, the APA. *See ALPA Brief* at 27.

In fact, as shown above, Salamat did consider the presence of the APA in the negotiations. He noted that the APA continued to improve its offers to the TWA pilots with each offer. "Over several months in 2001, the parties had been moving closer together in their proposals. ALPA's failure to effectively represent the TWA pilots meant that the distance between the parties as of their last proposals could not be further narrowed." *Report* at 14.  "[I]n the process of negotiating fairness in pilot seniority, there is a whole education process that goes on when negotiations are intensified. And so notions of fairness are very dynamic and change quite frequently…" *Salamat Dep. Tr.* at II:68. The negotiations between the APA and the TWA pilots was shortened because of ALPA's breach, and thus the APA never reached the fair result they wanted.

Salamat noted that the APA believed that it had limits on its ability to act unilaterally in the negotiations by, for example, stapling every TWA pilot. *Salamat Report* at 13-14; *Salamat Dep. Tr.* at I:156 ("you can't really act unilaterally if you want to be fair"). Salamat also noted that the APA wanted to be fair and only believed that its last offer was fair because it had not been challenged by strong negotiations to think more deeply about fairness. *Salamat Dep. Tr.* at I:150-51.

Finally, Salamat rejects ALPA's premise that the APA was trying to get the best deal for its pilots that it could. "You would have a hard time … explaining away the fact that that list kept getting better and better for the TWA pilots…  It's much easier to start from the premise of they're trying to be rational and fair because they kept saying over, and over, and over they wanted to be fair, and my experience with pilots is they want to be fair, more than anything else. Sometimes you got to force them to do it, but that's what they want to do." *Id.* at I:200.

Given this testimony and these opinions, and given that Salamat's but-for list protects the American pilots' career expectations, it is not accurate to state, as ALPA does, that Salamat's opinions fail to take into account the role of the APA as a party to the negotiations. Salamat's opinion as to the most likely result from real negotiation in the but-for world where ALPA did not breach its duty of fair representation was a seniority list, his damages list, that advanced all of the interests the APA said it wanted to advance.

ALPA also contends that Salamat's opinions must be rejected because he does not consider what would have happened if ALPA had taken the actions the TWA pilots demanded and those actions had backfired to the TWA pilots' disadvantage. *See ALPA Brief* at 27-29.  ALPA's argument is contrary to the jury verdict that, but for ALPA's conduct, the TWA pilots would have had a more favorable seniority integration. Salamat, moreover, explained in detail in his deposition testimony, some of which is quoted above, why the potential success or failure of the strategies was not important to his analysis. In any case, this is not an argument as to admissibility; it is an argument as to weight.

ALPA contends the Salamat ignores the record evidence concerning TWA's financial condition and the TWA pilots' corresponding pre-merger career expectations. *See ALPA Brief* at 29-30. Salamat did not ignore the record evidence. Rather, he testified that, based up on his extensive experience, the issue of the acquired airline's financial condition plays at most a negligible role in seniority mergers. Thus Salamat does not "ignore" these facts. His models take these facts into account. *Salamat Dep. Tr.* at III:91-93. ALPA may not like Salamat's opinion on this issue, but that is a dispute to be settled through vigorous cross-examination, not exclusion.

Finally, although it is ALPA's main argument and it opens its brief with it, ALPA does not like Salamat's use of probability numbers. *See, e.g.*, *ALPA Brief* at

24-26. This argument is addressed here, at the end of this section rather than up front, because it was important to show the Court that Salamat's probability numbers played no part in creating any of his alternative seniority lists. The probability numbers are not, ALPA's insistence notwithstanding, "critical to Salamat's analysis." *Id.* at 25. Moreover, although ALPA seemed to have a great deal of difficulty in understanding Salamat's testimony on the issue, he did fully explain how he derived the numbers and the use to which he put them.

First, Salamat's percentage impact figures were not just pulled out of the air, as ALPA suggests. Rather, Salamat based the percentage impact of each of the proposed ALPA actions "largely on the experience of the Bond bill and the impact that it had on the negotiation.…"

> I took the Bond bill as being one action and, you know, how it would have affected the negotiation a number of ways and it moved the APA's position a certain amount, I then went backward and said if that Bond bill could have done that, then if we assume a significantly smaller impact of these other actions, what would the outcome likely have been?

*Salamat Dep. Tr.* at I:58.

> The manner in which the [percentage] numbers were arrived at was based on how much parties have moved on the negotiations … so the analysis was really in terms of how much they had moved between where they were, I guess it was in the summer, and where they moved after the Bond bill, and trying to estimate the amount of pressure that that brought to bear on the negotiation relative to these other matters.… The analysis was based on the movements that the APA had actually made over the course of a year.

*Id.* at I:208.

Second, Salamat explained how he viewed the relative percentage likelihood of the different alternative seniority list. Specifically, Salamat explained why he viewed the probability of various seniority lists as beginning at almost 100% for the Marginal list, decreasing to almost 0% for the Arbitrated list.

> Q.     And if we are looking at probabilities across the range of what you think possible agreements are, ranging from something better than Supplement CC on the low side to an arbitrated result on the other side, in probabilistic terms, the total distribution of likelihood of agreements has to add up to a hundred percent; correct?

> A.     No, I don't — I don't believe it does. You know, there — there — there is a hundred percent chance that they could have agreed to Supplement CC itself. That much we know; right? Because that's — they had already — the APA had already agreed to it. Had the TWA pilots decided to agree to it, they could have, right? So there is a one hundred percent chance that that could have been an agreement. In order to figure out what the probability of any other agreement is, you have to measure the — the distance of that agreement from Supplement CC. Primarily, I mean, the — the – the easiest measure in this case is to — to examine the size of the staple and say, you know, every time that staple gets smaller, the chances that the — the APA would agree to it gets less, unless there is sufficient pressure that they would be compelled to that position and there is sufficient reasoning for that position. So I don't think that [the sum] of the probabilities is a hundred percent. It's not — it's not — it is not a dice-throwing exercise.

*Salamat Dep. Tr.* at I:166-67.

Thus, the evidence establishes both: (a) the percentages assigned by Salamat to the impact of each proposed action was not related to the structure of any of his alternative seniority lists; (b) Salamat had a rationale explanation for how he

34

developed his percentages; and (c) ALPA is misapprehending the case as involving a series of randomized events, and therefore applying probability calculations applicable to random events, such a dice-throwing, while the negotiation process is not a randomized event. *See, e.g., Salamat Dep. Tr.* at II:149 (cannot multiple probabilities in this case because these are not random outcomes).

ALPA may not like Salamat's approach to his analysis, but that is a ground for cross-examination, not exclusion.

In summary, Salamat is an expert in this field based on his lengthy experience; his opinions are rational and based upon the evidence, particularly the course of the negotiations between the TWA pilots and the APA; his opinions deal with a specialized area alien to the experiences of the typical juror, and would be helpful to the jury. All of ALPA's complaints about Salamat's opinions go to the weight of those opinions, not their admissibility, and can be dealt with through tough cross-examination and the testimony of ALPA's own experts, Profs. Murphy and Sycara.

## III.     The Expert Opinions of Dr. Henry Farber are Admissible.

### A.     Dr. Farber is Qualified

ALPA does not quarrel with Dr. Farber's qualifications. He has served as the Hughes-Rogers Professor of Economics at Princeton University since 1991. Before that, Dr. Farber served on the faculty of the Department of Economics at the

Massachusetts Institute of Technology. MIT hired Dr. Farber as a faculty member immediately upon his receipt of his Ph.D in economics from Princeton in 1977. Dr. Farber currently teaches courses in labor economics and econometrics. He has written many scholarly articles in both of these fields and his research has been widely published in peer-reviewed journals. Dr. Farber also serves as a research associate for the National Bureau of Economic Research and as a Research Fellow of the Institute for the Study of Labor. He is a Fellow of the Econometric Society, a Fellow of the Society of Labor Economists, and a Fellow of the Labor and Employment Relations Association. Exhibit 9, *Farber Report* at 1.

In short, Dr. Farber's academic pedigree is unimpeachable.

ALPA's objection to the expert testimony of Dr. Farber rests upon its flawed characterization of Dr. Farber's opinions. ALPA claims that Dr. Farber is not qualified to opine as to "whether the American and TWA pilots *would have agreed on* a different integrated list in the absence of any breach of the duty of fair representation." Dr. Farber has not offered any opinion about what the American pilots would have agreed to. To the contrary, Dr. Farber testified that he did not consider what the pilots would have agreed to, stating that the exact course the negotiations would take is unknown.  Exhibit 10, *Farber Dep. Tr.* 31 (Jan. 22, 2013) ("it's very hard to speculate on exactly the form that the negotiations would take had ALPA not failed in its duty of fair representation"); 50 ("Because what

36

people say they are unwilling to do and what they might be unwilling to do at a point in time when negotiations proceed and they need to reach an agreement or they need to get a seniority list integrated, they might do it"). *See also Farber Dep. Tr.* 50-51.

Dr. Farber used his experience to render an opinion as to what a fair and reasonable list would have likely looked like but for ALPA's breach. He reached his opinion by applying a widely accepted economic methodology to compare the TWA-American seniority list with seniority lists resulting from other airline mergers. *Farber Rpt.* at 15, ¶ 42. The methodology used by Dr. Farber has been recognized in academic literature, *Farber Rpt.* at 15, ¶ 42, fn. 31, and he explained its wide acceptance among labor economists during his deposition:

> Okay. I'm using — I'm using a common method — in economics, and labor economics in particular, when there is — while that comes not from breach of duty of fair representation, but — but there is allegations of some difference — difference in treatment, difference in behavior, and you are saying what would have happened absent this difference of treatment.
>
> The simplest possible example is imagine sex discrimination pay. Women earn less than men. We want to know what women would earn had they had not been discriminated against in pay. The best thing you can do is to say, well, let's find either a place where women are not discriminated against and look at their pay there, or let's find men in similar jobs and ask what they are paid there, and say that's what women would have earned but for the bad act, the discrimination.
>
> So all — all I'm really doing is taking that approach of comparing outcomes here where there is some allegation of some illegal

> behavior, to another situation where there isn't, and — and looking at the difference — the differences between those two. And, you know, I've done this before. Labor economists do this in their work all the time. It is commonly accepted as a technique for understanding the — the effects of certain behaviors.

*Farber Dep. Tr.* 63:21-64:23 (Jan. 22, 2013). ALPA's expert, James Feltman, did not have an objection to Dr. Farber's approach, including his use of a coefficient to measure seniority integrations.

> I don't have a problem with the process that Mr. or Professor Farber is using in the construction of his Table 1 or the use of a coefficient, which is the column described as proportionate difference in mean ranks.

*Feltman Dep. Tr.* 198.

Dr. Farber determined that application of this method to seniority integrations was appropriate and typical of the practice of other economists, and would yield reliable results, as it does in other contexts, like discrimination cases. A sound methodology used in other contexts need not have been applied to a particular circumstance for it to be admissible. *See, e.g.*, *Smithkline Beecham Corp. v. Easter Applicators Inc.*, 2001 U.S. Dist. LEXIS 19728 at *9-10 (E.D. Pa. 2001) (methodology of proffered non-scientific testimony need not be subjected to rigorous testing or peer review such that court admitted expert testimony of experienced commercial roofers proffered as experts to calculate a competitive roofing bid was rooted in their practical experience); *Warren Distributing Co. v. InBev USA LLC*, 2010 U.S.Dist.LEXIS 51603 (D.N.J. May 26, 2010) (expressly

recognizing that "different does not mean unreliable" where economist employed less familiar methodology for calculating damages).

## B. Dr. Farber Used a Reliable and Appropriate Methodology To Determine a Reasonable Seniority List.

ALPA challenges the value of Dr. Farber's analysis because, according to ALPA, Dr. Farber's review and analysis of prior airline mergers was incomplete and placed "undue" reliance on arbitrated decisions, rather than negotiated seniority integrations. ALPA also contends that Dr. Farber's selection of comparable transactions was flawed because it was based upon an inaccurate factual assumption about TWA's financial health.

Even if ALPA's assertions were correct, which they are not, these challenges go to the *weight* of Dr. Farber's testimony and not its admissibility. *See, e.g., Downeast Ventures, Ltd. v. Washington County*, 2007 U.S.Dist. LEXIS 14733 (D. Me. Mar. 1 2007). Dr. Farber conducted extensive research to collect the universe of airline mergers since 1980. Farber Rpt. at 6. Dr. Farber reviewed 41 seniority list mergers. Among these were 29 arbitrated decisions, 11 amendments to collective bargaining agreements, and one court decision. A complete list of the mergers reviewed is attached to Dr. Farber's Report as Appendix B. *Farber Rpt.* at 9, ¶ 25. Of the 41 mergers, Dr. Farber could find sufficient information from 19 of those transactions to calculate the proportional differences in mean rank, the metric used by Dr. Farber to measure the relative placement of pilot groups on a merged

seniority list. *Farber Rpt.* at ¶ 41. "The proportional difference in means is a standard measure of disparities between groups and of changes over time in key variables. It is widely used in the academic literature." *Farber Rpt.* at ¶ 42.

If the calculation resulted in a negative proportional difference in metric, the pilots employed by the acquired airline were, on average, ranked lower than the pilots employed by the acquiring airline. A positive proportional difference reflected the opposite: pilots employed by the acquired airline ended higher ranked, on average, than the pilots employed by the acquiring airline. *Farber Rpt.* at ¶43. Of the 19 mergers for which a proportional difference could be calculated, the TWA-American merger yielded a proportional difference in mean rank of -0.636, placing it fourth from the bottom of the list and among the five mergers with proportional differences in mean rank of -0.60 or smaller. *Farber Rpt.,* Table 1. Dr. Farber concludes that "given TWA's circumstances at the time of its acquisition, the placement of its former pilots on the merged seniority list was unusually unfavorable, on average." *Farber Rpt.* at ¶ 54.

To construct his "but for" list, Dr. Farber selected those transactions from among the 19 mergers for which he calculated the mean rank that he deemed most similar to the TWA-American merger. To determine similarity, Dr. Farber focused on what he determined to be the two most important, observable characteristics: (1)

the financial status of the acquired airline, and (2) the assets or value brought by the acquired airline to the transaction.

Although ALPA criticizes Dr. Farber's selection of comparables and his focus on two factors, instead of the multitude of other available facts in his selection of comparables, it fails to identify any specific additional factor it claims Dr. Farber should have used or how such a factor, if used, would impact Dr. Farber's analysis. *See also*, Legal Argument, II (E), pp. 21-23, *supra*, discussing Salamat's use of replication principles.

ALPA also criticizes Dr. Farber for not collecting data on every airline merger that has ever happened, but cites to no case requiring such an effort from an expert. The case law is to the contrary. In *Gutierrez v. Johnson & Johnson*, 2006 U.S.Dist.LEXIS 80834 (D.N.J. 2006), for instance, the court rejected the argument that an expert report was unreliable because it omitted "key relevant variables despite the fact that such information was available in the data set."

> The Court is unpersuaded that Dr. Madden's choice of variables renders her analysis so fatally flawed that it should be stricken as a matter of law. Generally, decisions regarding what control variables to include in an expert report go to weight, not admissibility. The Supreme Court has observed: "Normally, failure to include variables will affect the analysis' probativeness, not admissibility." *P.E. Bazemore v. Friday,* 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986) (*per curiam*) (holding that an appropriate regression of salary need not include all measurable variables that have an effect on salary level to be admissible). It is only the rare case where the "regressions are so incomplete as to be irrelevant" and the expert's decisions regarding control variables are the basis to exclude the analysis. *Id.* at

399, n.10. As example, the Ninth Circuit in *Hemmings v. Tidyman's, Inc.* has held that a regression was admissible in an employment discrimination case despite the fact that it did not control for preferences, individual qualifications, or education. 285 F.3d 1174, 1189 (9th Cir. 2002). Since the expert accounted for experience and seniority within the company and tracked the employees over time, the data was not so incomplete to be rendered irrelevant and any inadequacies in the methodology could be addressed in cross-examination. *Id.*

Dr. Madden exercised professional judgment in deciding what control variables to include in her analysis.

*Gutierrez,* 2006 U.S.Dist.LEXIS 80834, *17-18; *see also Masimo Corp. v. Philips Elecs. N. Am. Corp.*, 2013 U.S. Dist. LEXIS 70745 (D. Del., Apr. 2, 2013): *Downeast Ventures, Ltd. v. Washington County*, 2007 U.S. Dist.LEXIS 14733 (D. Me., Mar. 1, 2007) (expert's decision to emphasize certain data and discount other data goes to weight; it does not render his opinion unreliable).

The methodology applied by Dr. Farber is no different than what economists do in other types of cases. Courts in antitrust cases, for instance, routinely reject defense arguments that expert opinion of a "but for" world is too uncertain to be admissible, instead adopting a lower threshold for admissibility. The general rule is that "evidence allowing the jury to make a 'just and reasonable estimate' of the 'probable' amount, although only 'approximate,' is sufficient." ABA SECTION OF ANTITRUST LAW, Proving Antitrust Damages: Legal and Economic Issues (2d Ed. 2010) at p. 55, citing *Bigelow*, 327 U.S. at 264, *Story Parchment*, 282 U.S. at 563, and *Eastman Kodak*, 273 U.S. at 379. The reason courts adopt this lower standard

of proof is the principle that a defendant who creates the uncertainty in damages

through its misconduct should not be permitted to complain about a plaintiff's

inability to be more precise in her proof. *Id*.

> Our willingness to accept a degree of uncertainly in [cases such as
> *Bigelow*] rests in part on the difficulty on ascertaining business
> damages as compared, for example, to damages resulting from a
> personal injury or from condemnation of a parcel of land. The
> vagaries of the marketplace usually deny us sure knowledge of what
> plaintiff's situation would have been in the absence of the defendant's
> antitrust violation.

*Proving Antitrust Damages* at 56, quoting *J. Truett Payne Co. v. Chrysler Motors

Corp.*, 451 U.S. 557, 566 (1981).

> Proving as a fact something that never occurred ("what the plaintiff's
> situation would have been in the absence of the defendant's antitrust
> violation") is impossible. Resort to assumptions and inferences
> supported by real-world data, evidence, and economic theory, is
> inevitable.

*Proving Antitrust Damages* at 56. Thus a plaintiff may build a "but for" world

based upon relevant data and economic theory even if the but-for world is

uncertain. *See, e.g., Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974).

The same holds true for expert testimony in the but-for world in the

employment context. *See, e.g.*, *Pettway v. American Case Iron Pipe Co.*, 494 F.2d

211, 261-62 (5th Cir. 1974) ("When the class size or the ambiguity of promotion of

hiring practices or the multiple effects of discriminatory practices or the illegal

practices continued over an extended period of time calls forth the quagmire of

hypothetical judgment discussed earlier, a class-wide approach to measure of back pay is necessitated").

ALPA's attacks on Dr. Farber's methodology are unfounded. The question is not whether the jury will ultimately accept Dr. Farber's analysis, but whether his testimony constitutes sufficiently reliable evidence upon which a reasonable juror might rely in calculating damages for the certified class. The arguments made by ALPA all go to the weight to be given to Dr. Farber's expert opinions. These are arguments that should be made to the trier of fact — the jury — whether through cross-examination or contrary evidence. The arguments do not present grounds for excluding the testimony.

### C.   Dr. Farber's Methodology is Reliable and Will Assist the Trier of Fact.

ALPA also contends that Dr. Farber made certain assumptions contrary to the record in rendering his opinion, thereby making his opinions unreliable and inadmissible. According to ALPA, his contra-factual assumptions are: (1) disregarding the APA's ability to unilaterally impose a seniority list; (2) under-stating the perilous condition of TWA's financial health; and (3) failing to consider fences or other restrictions in the creation of his "but-for" list. ALPA's arguments, however, again mischaracterize both the methodology employed and the opinions expressed by Dr. Farber.

For instance, ALPA contends that Dr. Farber assumed that the APA and TWA MEC would reach an agreement on a different merged seniority list — an assumption, according to ALPA, that is contrary to the record. *Def. Brief* at 53. Dr. Farber, however, expressly testified that he did not assume that APA would have agreed on a list. Instead, based upon the jury's verdict, he assumed that a seniority list more favorable to the TWA Pilots would have been achieved had ALPA not breached its duty.

> I don't actually specify the process by which a merged seniority list would be reached. I'm simply saying that had ALPA not shirked its duty of fair representation, the merge — the merged seniority list on average would have looked like the average of those groups, of the comparable group, however it was done. Whether it was done, you know, unilaterally with American Airlines, with TWA, with an arbitration. I don't specify the mechanism. I don't need to make an assumption like that.

*Farber Dep. Tr.* 85:17-86:1 (Jan. 22, 2013). Farber simply applied the jury's verdict that a more favorable seniority list would have resulted but for ALPA's breach.

ALPA contends that Dr. Farber made false assumptions about TWA's financial health, thereby rendering his selection of comparables incorrect. Dr Farber did not, however, make the assumptions ALPA contends he made, and his opinions were not dependent upon the fine distinctions in financial health ALPA wishes to draw. This issue was addressed in Plaintiffs' Motion to Bar the

Expert and Opinion Testimony of Defense Experts Michael Levine and James Feltman. *See* Docket No. 568.

ALPA also contends that Dr. Farber failed to factor in fences and restrict-tions, such as those found in Supplement CC, both in his merged list and in the comparable mergers he studied. Dr. Farber, in his expert opinion, disagreed that an inclusion of fences and restrictions was necessary to prepare a but-for seniority list. *Farber Dep. Tr.* 95:2-96:12 (Jan. 22, 2013). Moreover, his methodology is capable of including such modifications if desired: "if eligibility restrictions based on routes or equipment are desired, then a subset of the estimated 'but-for' seniority list can be created that maintains the ordering but consists only of pilots who are eligible for the particular route or equipment. Assignments to pilots to the restricted slots can then be made using this subset seniority list." Farber Rpt., ¶ 59.

If ALPA believes that fences and restrictions like those in Supplement CC are necessary and would materially impact overall damages, it is incumbent upon ALPA to demonstrate this through its own experts and attack the weight of Dr. Farber's opinions at trial. ALPA, however, has chosen not present an alternative approach to calculating damages, preferring instead to attack the jury's determination that there were damages at all.

When a party challenges flaws in an expert's assumptions or methods, this "goes more to the weight of the evidence than to its admissibility." *Liquid*

*Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006), citing *In re TMI Litig.*, 193 F.3d 613, 692 (3d Cir. 1999) ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process — competing expert testimony and active cross-examination — rather than excluded from jurors['] scrutiny") (quotation omitted); *see also Daubert,* 509 U.S. at 596 ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

When making a preliminary determination with respect to the admissibility of expert testimony, a court must "solely focus on the principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. "Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined… The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." *Kannankeril,* 128 F.3d at 806-7 (citation omitted).

In *Gutierrez v. Johnson & Johnson*, 2006 U.S. Dist. LEXIS 80834 (D. N.J., Nov. 6, 2006), the Plaintiffs sought class certification for alleged employment discrimination and relied upon an expert's statistical report to support their claim of commonality. Defendant moved to strike the report, arguing that it was unreliable because one of the expert's improperly aggregated data from the

defendant's companies and omitted "key relevant variables despite the fact that such information was available in the data set," such as information concerning performance, relative time in job and failure to compare similarly situated employees performing the same job and sharing the same job title. *Gutierrez*, at *14-15. Rejecting these arguments, the Court admitted the expert testimony.

> The Court is unpersuaded that Dr. Madden's choice of variables renders her analysis so fatally flawed that it should be stricken as a matter of law. Generally, decisions regarding what control variables to include in an expert report go to weight, not admissibility. The Supreme Court has observed: "Normally, failure to include variables will affect the analysis' probativeness, not admissibility." *P.E. Bazemore v. Friday,* 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986) (*per curiam*) (holding that an appropriate regression of salary need not include all measurable variables that have an effect on salary level to be admissible). It is only the rare case where the "regressions are so incomplete as to be irrelevant" and the expert's decisions regarding control variables are the basis to exclude the analysis. *Id.* at 399, n.10.

*Gutierrez,* 2006 U.S. Dist. LEXIS 80834 at * 17-18.

Here, as in *Gutierrez*, ALPA's challenges to Dr. Farber's analysis go to the weight of his opinion and not its admissibility, and "any inadequacies in the methodology [can] be addressed in cross-examination." *Gutierrez,* 2006 U.S. Dist. LEXIS 80834 at * 17, citing *Hemmings v. Tidyman*, 285 F.3d 1174, 1189 (9th Cir. 2002).

## CONCLUSION

The reports and anticipated opinion testimony of Plaintiffs' experts, Rikk Salamat and Henry Farber, are admissible expert testimony under Rule 702 of the Federal Rules of Evidence. ALPA's Motion to Strike should be denied.


SCHNADER HARRISON SEGAL & LEWIS LLP


By: _____*s/ Lisa J. Rodriguez*_____
       Lisa J. Rodriguez, Esquire
       Nicole M. Acchione, Esquire
       Woodland Falls Corporate Park
       220 Lake Drive East Suite 200
       Cherry Hill, NJ 08002-1165
       (856) 482-5222

          -and-

       Allen P. Press, Esquire (*pro hac vice*)
       Joe Jacobson, Esquire (*pro hac vice*)
       GREEN JACOBSON, P.C.
       7733 Forsyth Blvd., Suite 700
       St. Louis, MO 63105
       (314) 862-6800

       *Attorneys for Plaintiffs*