# EXHIBIT  6

# PART 1

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
    Plaintiffs,

vs.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
    Defendant.

------------------

January 29, 2013

------------------

    Oral sworn videotaped deposition of RIKK SALAMAT, Case Lab, Inc., 288 Clinton Street, Toronto, Ontario, was taken at the law office of Archer & Greiner, 1650 Market Street, Philadelphia, Pennsylvania, before Jean B. Delaney, Certified Shorthand Reporter and Notary Public of the State of New Jersey, on the above date, commencing at 9:30 a.m., there being present:

GREEN JACOBSON, P.C.
BY: JOSEPH JACOBSON, ESQUIRE
7333 Forsyth Boulevard
St. Louis, Missouri 63105
(314) 862-6800
Attorneys for Plaintiff

TRUJILLO, RODRIGUEZ & RICHARDS, LLC
BY: LISA RODRIGUEZ, ESQUIRE
258 Kings Highway East
Haddonfield, New Jersey 08033
(856) 795-9002
Attorneys for Plaintiff

**2**

1     PAUL, WEISS, RIFKIND, WHARTON & GARRISON
    LLP
2     BY: DANIEL J. TOAL, ESQUIRE
    JULIE ROMM, ESQUIRE
3     1285 Avenue of the Americas
    New York, New York 10019
4     (212) 373-3869
    Attorneys for Defendant, ALPA
5
    KATZ & RANZMAN, PC
6     BY: DANIEL M. KATZ, ESQUIRE
    4530 Wisconsin Avenue N.W., Suite 250
7     Washington, D.C. 20016
    (202) 659-4656
8     Attorneys for Defendant, ALPA
9 Also present: James Bateman, CLVS
10     Ricardo Cossa, Navigant Economics

**3**

        I N D E X

Witness                Page
RIKK SALAMAT
  By Mr. Toal          6
      E X H I B I T S

Marked for I.D.         Page
Salamat-1  Damages in Brady, et al    13
    versus the Air Line Pilots
    Association, dated October
    12, 2012
Salamat-2  Copy of Rule 26 of the Rules  14
    of Civil Procedure
Salamat-3  Supplementary Report on    23
    Damages Under the Farber
    Lists
Salamat-4  Document entitled    25
    Supplementary Report on
    Damages Under the Tannen
    List
Salamat-5  Preliminary Calculation of  26
    Mitigation of Damages in
    Brady et al versus the Air
    Line Pilot's Association
Salamat-6  Article entitled Persuasive  66

**4**

    Argumentation in Negotiation
    by Katia Sycara
Salamat-7  Deposition transcript from  218
    Don Carty
Salamat-8  Copy of testimony of Jeff  221
    Brundage
Salamat-9  Memo from Baptiste & Wilder,  248
    P.C. dated March 13, 2001
Salamat-10  August 6, 2001 memo from  256
    Clay Warner to Seth Rosen

1 (Pages 1 to 4)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

**5**

1    VIDEO SPECIALIST: Today is
2    January 29th, 2013, and we are here in Philadelphia,
3    Pennsylvania, and this is the videotaped deposition
4    of Rikk Salamat, taken by the defendant in the
5    matter of Brady, et al, filed -- versus the Air Line
6    Pilot's Association, filed in United States District
7    Court of New Jersey, Camden Vicinage, number
8    02-2917.
9         My name is Jim Bateman from Degnan &
10   Bateman, and I am the certified legal video
11   specialist. The certified court reporter is Jean
12   Delaney, also from the same firm.
13        We are now going on the record and the
14   time is 9:30.
15        Would counsel please announce their
16   appearances for the record.
17        MR. TOAL: Dan Toal with Paul, Weiss,
18   on behalf of ALPA. I'm here with my colleague,
19   Julie Romm and co-counsel, Dan Katz.
20        MS. RODRIGUEZ: Lisa Rodriguez with
21   Trujillo, Rodriguez & Richards for the plaintiffs in
22   the class.
23        VIDEO SPECIALIST: Would the court
24   reporter please swear in the witness?
25        RIKK SALAMAT, having been duly sworn,

**6**

1         was examined and testified as follows:
2         VIDEO SPECIALIST: You may proceed.
3    BY MR. TOAL:
4    Q    Good morning.
5    A    Good morning.
6    Q    Could you state your full name for the
7    record?
8    A    Rikk Salamat.
9    Q    And what were you asked to do in this
10   matter?
11   A    Well, I was asked to analyze the impact
12   of ALPA's breach of their duty of fair
13   representation to the TWA pilots.
14        MS. RODRIGUEZ: Just, before you get
15   started, there is one other person in the room.
16   Could you just introduce yourself, sir, on the
17   record?
18        MR. COSSA: Ricardo Cossa from Navigant
19   Economics.
20        MS. RODRIGUEZ: Thank you.
21   BY MR. TOAL:
22   Q    So you said you were -- you were asked
23   to analyze the impact of a breach by ALPA?
24   A    Yes.
25   Q    And you are analyzing the impact on

**7**

1    what?
2    A    The impact on the TWA pilots.
3    Q    What's -- what's your area of
4    expertise?
5    A    I am an analyst of economic and
6    financial data, particularly in regards to labor
7    unions and professional associations. Specifically,
8    airline pilots being the vast majority of my
9    practice.
10   Q    Do you have any other area of expertise
11   that's relevant to this case?
12   A    Well, I have an MBA, so I have general
13   business expertise. I have experience in
14   programming for a number of different types of
15   applications.
16   Q    And beyond that, do you have any other
17   area of expertise that you consider relevant to this
18   case?
19   A    Well, my experience in negotiations,
20   working with unions who are either in mediation,
21   negotiations, arbitrations. So as negotiation
22   support. As an advisor in economic and, you know,
23   financial issues.
24   Q    Anything else?
25   A    There must be others, but off the top

**8**

1    of my head, those are the ones that are most
2    commonly employed in my practice.
3    Q    When you reference others, what -- what
4    others do you think are relevant to this case?
5    A    Sorry, could you --
6    Q    When you reference other areas of
7    expertise that must exist, which of those do you
8    consider relevant to this case?
9    A    Well, in the negotiation and working
10   with unions requires expertise in, you know, in
11   business, and in, you know, just human
12   relationships, you know, strategy, and tactics, and
13   all of those to some degree are used in this case
14   because we are trying to estimate what might have
15   happened under a different set of circumstances, and
16   you have to draw on a broad range of, you know,
17   skills and experience in order to do that. So --
18   Q    Are -- are you seeking to be qualified
19   in this case as an expert in negotiations?
20        MS. RODRIGUEZ: Objection.
21   BY MR. TOAL:
22   Q    You can answer the question.
23        MS. RODRIGUEZ: Calls for a legal
24   conclusion. I don't know that he knows what he is
25   being proffered for. To the extent you know, you

2 (Pages 5 to 8)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

9

1  can answer it.
2      THE WITNESS: Sorry. Can you repeat
3  the question?
4  BY MR. TOAL:
5      Q   The question is, are you seeking to be
6  qualified in this case as an expert in negotiations?
7      MS. RODRIGUEZ: And again, he is not
8  seeking. His counsel will seek.
9      THE WITNESS: Yeah. Really, I don't
10  know. I mean, if you ask me if I am an expert in
11  negotiations, I might say yes depending on the
12  context. If you ask if I was --
13  BY MR. TOAL:
14      Q   Well, in the context of this case, do
15  you consider yourself an expert on negotiations?
16      A   Other people have considered me an
17  expert in negotiations. I consider myself very well
18  experienced. You know, it is really for other
19  people to say whether I am an expert or not.
20      Q   Who has -- who has considered you an
21  expert in negotiations?
22      A   Well, there is -- there is one
23  arbitrator who I speak with on some matters who
24  considers me an expert in negotiations. My clients
25  consider me an expert in negotiations, at least in

10

1  the context of their needs. So --
2      Q   Who is the arbitrator that considers
3  you an expert in negotiations?
4      A   Jim Hayes. Others may. He is the one
5  I happen to know does.
6      Q   Have you ever been qualified by a court
7  as an expert in negotiations?
8      A   I don't believe I have, no.
9      Q   Have you ever been qualified in an
10  arbitration proceeding as an expert on negotiations?
11      A   Not in negotiations, no.
12      Q   Have you ever written peer-reviewed
13  articles on negotiations?
14      A   No, I have not.
15      Q   Do you have any specialized academic
16  study in negotiations?
17      A   It is a large part of taking an MBA at
18  the University of Toronto. About -- you know,
19  difficult to sort of quantify, but there are
20  certainly about three courses exclusively on
21  negotiations, and then it touches on several others.
22  So negotiations is a large part of that program. So
23  that would -- that would be academic training.
24      Q   So as part of your MBA program, you
25  took three courses on negotiation; is that correct?

11

1      MS. RODRIGUEZ: Objection. It
2  mischaracterizes what he said. You can answer.
3  BY MR. TOAL:
4      Q   You can answer the question.
5      A   As part of the MBA, yes, there was
6  three courses on negotiation.
7      Q   And you said other courses touched on
8  the issues of negotiation?
9      A   Yeah, negotiations gets, you know,
10  involved in, you know, the study of strategy, the
11  study of marketing, the study of organizational
12  behavior, so -- labor relations, law.
13      Q   Other than those courses that you
14  referenced previously, do you have any other
15  specialized academic training in negotiations?
16      A   Yeah. I -- I mean, I did a course
17  in -- in intensive mediation and negotiation at -- I
18  can't remember the name of the center, but it was
19  with a fellow named Gary Friedman who runs training
20  in negotiation and mediation in San Francisco. That
21  was one. And then through -- through the University
22  of Toronto, there have been several lectures and
23  things like that over the years.
24      Q   And the course you mentioned, how long
25  did that course last?

12

1      A   Four days, I believe. It was a long
2  time ago.
3      Q   Do you have any certifications that
4  recognize you as an expert in negotiations?
5      A   No, I do not.
6      Q   And what qualifies you as an expert in
7  human relations?
8      A   I -- well, since I've been involved in
9  negotiations and -- and conflict for the vast
10  majority of my career, I would say I developed a
11  significant amount of experience in -- in analyzing
12  situations and --
13      Q   And other than that, anything that
14  qualifies you as an expert in human relations?
15      A   Other than training in -- in my
16  undergraduate and graduate degrees.
17      Q   Other than that, anything else?
18      A   No.
19      Q   Have you ever been certified as an
20  expert by any court in human relations?
21      A   No.
22      Q   Have you ever been recognized as an
23  expert by any arbitrator in human relations?
24      A   No, I have not.
25      Q   Do you have any specialized academic

3 (Pages 9 to 12)

DEGNAN & BATEMAN
(856) 232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

13

```
 1    training in human relations?
 2        A    By specialized, you mean -- I mean, my
 3    undergraduate was in anthropology.  The entire thing
 4    was about human relations, so is that specialized
 5    enough?  I mean, you have to really sort of be a
 6    little more specific about what you mean by
 7    specialized.
 8        Q    Did you take any courses specifically
 9    on human relations?
10        A    Every course in anthropology is on
11    human relations.
12        Q    So do you -- is it your view that
13    training in anthropology provides expertise in human
14    relations?
15        A    Some.
16            (Salamat-1  Damages in Brady, et al
17            versus the Air Line Pilots Association, dated
18            October 12, 2012 marked for identification.)
19    BY MR. TOAL:
20        Q    I show you a document that I will mark
21    as Salamat Exhibit-1, entitled Damages in Brady, et
22    al versus the Air Line Pilots Association, dated
23    October 12, 2012.
24            Do you recognize this as your report in this
25    matter?
```

14

```
 1        A    Looks like it, yeah.
 2        Q    Can you confirm that it is your report?
 3        A    I mean, I'm assuming it is a faithful,
 4    you know, reproduction of the one I produced, yes.
 5        Q    And you didn't sign this report, did
 6    you?
 7        A    I don't know whether I did or not.  No.
 8        Q    And is there a reason you didn't sign
 9    this report?
10        A    No.  No particular reason.
11            (Salamat-2  Copy of Rule 26 of the
12            Rules of Civil Procedure marked for
13            identification.)
14    BY MR. TOAL:
15        Q    I marked as Salamat Exhibit-2, a copy
16    of Rule 26 of the Federal Rules of Civil Procedure.
17            Let me know if you've seen this document
18    before.
19        A    No, I haven't.
20        Q    Take a look -- I'm using page number at
21    the top of the page, page 35 of this document.  Do
22    you see that?
23        A    Yes.
24        Q    Do you see the heading (2) Disclosure
25    of Expert Testimony?
```

15

```
 1        A    Yes.
 2        Q    And below that there is a heading (B),
 3    witnesses who must provide a written report.  Do you
 4    see that?
 5        A    Yes.
 6        Q    Do you see it says, unless otherwise
 7    stipulated or ordered by the court, this disclosure
 8    must be accompanied by a written report prepared and
 9    signed by the witness if the witness is one retained
10    or specially employed to provide expert testimony in
11    the case or one whose duties as the party's employee
12    regularly involved giving expert testimony.  Do you
13    see that?
14        A    Yes.
15        Q    Okay.  Were you aware of the
16    requirement that experts sign their reports that's
17    embedded in Rule 26 of the Rules of Federal
18    Procedure?
19        A    I assumed it had my electronic
20    signature and that I transmitted it to the attorneys
21    along with a cover letter.
22        Q    You assumed that your report had an
23    electronic signature?
24        A    I assumed that that would serve as a
25    signature.  But, no, I was not aware of this rule,
```

16

```
 1    no.
 2        Q    Okay.  And is there some electronic
 3    signature that's reflected in your report?
 4        A    The fact that it had been emailed by me
 5    to Joe, and that I could confirm that the PDF that
 6    had been created and sent to him was my report.
 7        Q    And have you submitted expert reports
 8    in US Federal Court before?
 9        A    No, I don't think so.
10        Q    Let me direct your attention to your
11    expert report after the conclusion page, on page 52.
12        A    Page 52.  Yes.
13        Q    Okay.  So --
14        A    Oh, wait, sorry.  No.  Okay.
15        Q    So the next page is a copy of your CV;
16    correct?
17        A    That's correct.
18        Q    Okay.  And the page after that is
19    entitled Rikk M.T. Salamat, Professional
20    Associations; correct?
21        A    Uh-huh.
22        Q    And do you see under here, there is a
23    listing of cases with expert testimony and/or expert
24    reports?
25        A    Yes.
```

DEGNAN & BATEMAN
(856)  232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

17

1  Q   If you go down toward the bottom of the
2  page, the third from the bottom, there is an entry
3  for US District Court for the District of Arizona,
4  and it indicates there is an expert report filed for
5  the USAirways Pilot's Association.  Do you see that?
6  A   Yes.
7  Q   Did you submit an expert report in that
8  case?
9  A   Yes, I did.
10  Q   Okay.  And that's a US Federal Court?
11  A   Well, I didn't know that that was a
12  federal court.  Sorry.  I was mistaken, if that is a
13  federal court.  I thought that was a state court.
14  Q   So other than that report, have you
15  submitted any other expert reports in any court in
16  the United States?
17  A   No, I have not.  I'm not -- I don't
18  know -- I don't know if System Board of Adjustments
19  count as a -- a court.
20  Q   The report you submitted to the
21  District Court in Arizona, did you sign that report?
22  A   I cannot recall.
23  Q   So do you see below the language we
24  read in Rule 26, it says, the report must contain --
25  A   Sorry.  What page are we on again?

18

1  Page 26?
2  Q   Page 35 of Rule 26.
3  A   Okay.
4  Q   So do you see where it says, the report
5  must contain, and then there are a listing of items?
6  A   The report must contain, yes.
7  Q   Okay.  So (i) says, a complete
8  statement of all opinions the witness will express
9  and the basis and reasons for them.  Do you see
10  that?
11  A   Uh-huh.
12  Q   Does your report contain a complete
13  statement of all opinions that you will express and
14  the basis and reasons for them?
15  A   I believe it does.
16  Q   Does your report contain the facts or
17  data considered by you in forming these opinions?
18  A   Yes.
19  Q   And does it contain all the facts and
20  data that you considered in forming your opinions?
21  A   Yes.
22  Q   Do you see number four says, the
23  witness's qualifications, including a list of all
24  publications authored in the previous ten years?
25  A   Yes.

19

1  Q   In reviewing your report, I -- I didn't
2  find any list of publications that you had reviewed
3  prior -- that you had published the prior ten years.
4  A   I haven't published anything in the
5  last ten years.
6  Q   Have you published written work at any
7  time in your professional career?
8  A   No.
9  Q   Have you done any academic research at
10  any time in your professional career?
11  A   As a student, certainly.
12  Q   And -- and from the time that you
13  graduated from school, did you conduct academic
14  research at any time thereafter?
15  A   I'm sorry.  You would have to be a
16  little more specific about what -- about what
17  constitutes academic research.  I'm continually
18  doing academic research.
19  Q   And -- and what academic research have
20  you done?
21  A   My office subscribes to, you know, a
22  handful of journals that I review.  I get -- I go to
23  lectures at the University of Toronto routinely.
24  However, I mean, it is not under the guidance of any
25  supervisor, so it is self-directed academic

20

1  research.
2  Q   My question is not whether you've read
3  research done by others, but whether you've actually
4  conducted academic research on your own.
5  **MS. RODRIGUEZ:  I object to the form.**
6  **THE WITNESS:  I'm sorry.  You would**
7  **have -- you would have to be much more specific.  I**
8  **am -- I am routinely conducting research which I**
9  **would consider academic, but it's not within the**
10  **auspices of the university or under the direction of**
11  **-- of a professor, so --**
12  BY MR. TOAL:
13  Q   And you've never done anything to
14  publish the results of any research you've done?
15  A   No.
16  Q   Have you done any original academic
17  research?
18  **MS. RODRIGUEZ:  Objection.**
19  **THE WITNESS:  Again, what do you mean**
20  **by original academic research?**
21  BY MR. TOAL:
22  Q   Something other than reading the work
23  of other people.
24  A   Yes.
25  Q   And what sort of academic research have

5  (Pages 17 to 20)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

**21**

1  you done?
2      A    I've done primary research on the
3  trends in the regional air carrier market, its
4  ownership structure, its position in North American
5  air traffic and air marketplace. I've done research
6  on pilot contracts, particularly as -- you know, in
7  terms of scope and compensation. I would consider
8  all that academic because it is of no particular
9  consulting interest.
10     Q    Were -- were those things done in
11 connection with particular engagements for clients?
12     A    No.
13     Q    And any other academic research that
14 you've done in your professional career?
15         MS. RODRIGUEZ:  Objection to the form.
16 You can answer.
17         THE WITNESS:  I think those -- those
18 two would be the most involved that I've done.
19 BY MR. TOAL:
20     Q    Can you recall any others as you sit
21 here today?
22     A    No, I can't.
23     Q    Have you ever taught on any of the
24 subjects in which you consider yourself an expert?
25     A    No.

**22**

1      Q    Do you have any plans to do any further
2  work in connection with your expert report in this
3  case?
4      A    I - I -- I can't imagine how I -- how I
5  would but -- so I would have to say no.
6      Q    You don't have any present plans, as
7  you sit here today, to do further work on your
8  expert report; is that correct?
9          MS. RODRIGUEZ:  Objection. Other than
10 the work that you know he's already done?
11         THE WITNESS:  I'm sorry, when -- when
12 you say do further work on this report, do you mean
13 continue to analyze the matter, because there is
14 still a few outstanding issues related to the
15 report, particularly as -- as, you know, regards
16 mitigation, so yeah. There is still some work to be
17 done on this report.
18 BY MR. TOAL:
19     Q    And what additional work do you plan to
20 do?
21     A    Estimate the mitigation.
22     Q    And other than estimating mitigation,
23 is there any other work that you plan to do on your
24 report?
25     A    Not -- not as I sit here today.

**23**

1      Q    Are there any other opinions that you
2  plan to offer beyond those that are reflected in
3  your report and any supplemental work you are doing
4  in connection with mitigation?
5      A    I don't -- I don't believe so, no.
6      Q    You are not aware of any as you sit
7  here today?
8      A    No.
9          (Salamat-3  Supplementary Report on
10         Damages Under the Farber Lists marked for
11         identification.)
12 BY MR. TOAL:
13     Q    I'll hand you a document that I marked
14 as Salamat Exhibit-3, which is entitled
15 Supplementary Report on Damages under the Farber
16 lists.
17     A    Uh-huh.
18     Q    Is this a document that you recognize?
19     A    Yes.
20     Q    And is this a document that you
21 prepared?
22     A    Yes.
23     Q    And what is this document?
24     A    This is a report on the results of
25 running this Farber -- these Farber lists through

**24**

1  the software we developed for this case.
2      Q    Had you reviewed Professor Farber's
3  report at the time you prepared this supplementary
4  report?
5      A    I still haven't seen his report.
6      Q    So at the time you prepared this, you
7  hadn't reviewed Professor Farber's report; correct?
8      A    The only thing I -- I had, you know,
9  were three lists which I think I provided as part of
10 this report, and -- and that's -- that's the only
11 thing I knew about the Farber report. I knew there
12 was such a report, and that he produced three lists,
13 and we ran them through the software.
14     Q    Did you know anything about the
15 methodology this Professor Farber was using?
16     A    I didn't know anything about Farber.
17     Q    And you still have not reviewed his
18 report; correct?
19     A    No.
20     Q    Did you calculate, using Professor
21 Farber's lists, a lower bound of damages than he
22 calculated?
23     A    I -- I just ran his three lists through
24 the software, and that's all I've done with Farber's
25 lists.

6 (Pages 21 to 24)

RIKK SALAMAT

25

1　　Q　Did you -- did you have an
2　understanding that one of those lists was what
3　Professor Farber identified as a lower bound on
4　damages?
5　　A　I just -- I didn't have a name for the
6　list. I just had three lists, and I think I named
7　them A, B, C, or one, two, three, or something like
8　that. I just gave them cardinal names. So I don't
9　know what they represent.
10　　Q　So -- so is the answer to my question,
11　no, that you didn't have an understanding that one
12　of his lists was designated as a lower bound on
13　damages?
14　　A　No.
15　　Q　You did not have such an understanding;
16　correct?
17　　A　I did not have such an understanding.
18　　　　(Salamat-4　Document entitled
19　　　Supplementary Report on Damages Under the
20　　　Tannen List marked for identification.)
21　BY MR. TOAL:
22　　Q　Let me mark as Salamat Exhibit-4, a
23　document entitled supplementary report on damages
24　under the Tannen list.
25　　And if you can let me know if you recognize

26

1　that document?
2　　A　I do.
3　　Q　And what is this document?
4　　A　This is the result of having run the
5　Tannen list, the rightful place proposal list,
6　through the software.
7　　Q　And this is a document you prepared;
8　correct?
9　　A　It is.
10　　Q　And why -- why did you decide to run
11　the Tannen list through your software?
12　　A　I was requested.
13　　Q　By whom?
14　　A　By, I believe, Joe Jacobson.
15　　　　(Salamat-5　Preliminary Calculation of
16　　　Mitigation of Damages in Brady et al versus
17　　　the Air Line Pilot's Association marked for
18　　　identification.)
19　BY MR. TOAL:
20　　Q　Let me mark as Salamat Exhibit-5 a
21　document entitled Preliminary Calculation of
22　Mitigation of Damages in Brady et al versus the Air
23　Line Pilot's Association.
24　　Let me know if you recognize that document.
25　　A　I do.

27

1　　Q　Is it a document that you prepared?
2　　A　It is.
3　　Q　And what were you attempting to analyze
4　in this document?
5　　A　I was attempting to analyze -- well,
6　I'm not sure analyze is the right word, but I was
7　just attempting to -- what I was doing here was just
8　stating the amounts of income that pilots had
9　claimed they had earned during periods when they
10　were on furlough, and which would, therefore, most
11　likely offset any damages that were incurred.
12　　Q　And you entitled this, preliminary
13　calculation; correct?
14　　A　That's right.
15　　Q　And why did you give it that title?
16　　A　Well, because a more thorough
17　calculation would involve actually going through
18　each pilot's, the documentation they provided, their
19　-- their W2s, their 1040s, their Social Security
20　statements, and actually doing an analysis of what
21　their income had been prior to, during, and after
22　furlough, and then determining whether we had
23　sufficient documentation to say that their income,
24　you know, was what they had claimed on the
25　questionnaire. So this is preliminary to the extent

28

1　that what we are doing is we're just taking the
2　pilot's statements about what their income was and
3　using it as it is rather than attempting to
4　substantiate those claims.
5　　Q　And do you plan to submit a final
6　calculation of mitigation of damages?
7　　A　Potentially.
8　　Q　Do you have plans to do that, as you
9　sit here today?
10　　A　I imagine we will, but it is an
11　enormous undertaking, and so it may be done by
12　somebody else, or it may be done, you know, in some
13　other fashion.
14　　Q　Are you working currently to prepare a
15　final calculation of mitigation of damages?
16　　A　No, I'm not.
17　　Q　And after doing the work that's
18　reflected in your preliminary calculation of
19　mitigation of damages, have you done any further
20　work regarding mitigation of damages?
21　　A　Yes, there is a secondary -- there is a
22　revised version of this report which will be dated
23　the 30th of January.
24　　Q　And what additional work did you do in
25　connection with that revised version of the report?

DEGNAN & BATEMAN
(856)　232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

29

1    A    We have -- we received further
2  information from pilots, and so that second -- that
3  -- that revised version of this report will reflect
4  the additional information we've received.
5    Q    You see at the first page of this
6  preliminary calculation --
7    A    Uh-huh.
8    Q    -- you indicate that you had received
9  547 responses from class members concerning
10 mitigation of damages; right?
11   A    That's correct.
12   Q    And of those 547, you indicated that
13 298 had some supporting documentation; correct?
14   A    That's correct.
15   Q    For your revised report, how many
16 responses will that report reflect?
17   A    Approximately 1,200.
18   Q    And of those, how many have supporting
19 documentation?
20   A    I -- I wouldn't be able to say off the
21 top of my head.
22   Q    What's your best recollection?
23   A    I really couldn't say off the top of my
24 head how many had supporting documentation.  It will
25 be in -- it will be in the report, but --

30

1    Q    And in connection with that revised
2  analysis, have you made any efforts to verify the
3  statements in the questionnaires against
4  documentation that was provided?
5    A    No.
6    Q    Is there a reason why you have not?
7    A    As I mentioned, it was -- it is quite a
8  large undertaking that the litigation support people
9  have taken on, and so our first objective is to get
10 all of the materials scanned and turned over to
11 ALPA's lawyers, and our second is to get everybody's
12 responses input into a database so that we can run
13 this.  So verifying their information just isn't
14 possible given the timelines that we've been given.
15   Q    And are you working on this,
16 personally?
17   A    No.
18   Q    Are people under your direction working
19 on this project?
20   A    Yes.
21   Q    How many people are working on it?
22   A    Four.
23   Q    Are those people employed by Case Lab?
24   A    They are subcontracted by Case Lab.
25   Q    Did you work with anyone to produce

31

1  your -- your report in this matter?
2    A    Sorry.  When you say work with?  I have
3  assistants.
4    Q    Did they assist you in preparing the
5  report?
6    A    Not in preparing the report, no.
7    Q    Did anyone assist you in any way in
8  producing the report?
9    A    Not in any substantial way, no.
10   Q    What support did you receive?
11   A    Well, for instance, my wife proofread
12 it for me.
13   Q    And other than that, is there anyone at
14 Case Lab, for instance, who worked with you and
15 helped you prepare the report?
16   A    No.
17   Q    Okay.  Anyone at any other organization
18 who worked with you in helping you to prepare the
19 report?
20   A    No.
21   Q    Did you receive any support with regard
22 to software that you used?
23   A    I'm sorry.  When you -- when you say
24 support for software --
25   Q    Did -- did anyone help you write

32

1  software, run software?
2    A    No.
3    Q    Did you receive any support in
4  connection with any of the calculations you
5  performed that are reflected in your report?
6    A    Support?  I would say not -- no.  I
7  would not say support.
8    Q    Did -- did you bill -- who -- who
9  retained you in this case?
10   A    I believe the retainer was signed by
11 Nicole Acchione.
12   Q    So have you been retained by counsel
13 for the class in this case?
14   A    Yes.
15   Q    And do you provide invoices to them
16 seeking compensation for the time you've spent on
17 this matter?
18   A    I do.
19   Q    On those invoices, would they reflect
20 that you've sought compensation for anyone other
21 than yourself who worked on this matter?
22   A    Other than for the litigation support,
23 preparing pilot responses, I don't believe so, no.
24   Q    And how much time have you spent in
25 connection with this matter?

8  (Pages 29 to 32)

f1d60e56-51dd-489a-a0ce-16b47e16413e

**33**

1  A  Several months.
2  Q  And in -- in terms of hours, what's
3  your best estimate of the number of hours you've
4  spent on this engagement?
5  A  300. I mean, that's a guess. I really
6  would have to go back and look at all of the
7  invoices and --
8  Q  As you sit here today, that's your --
9  your best estimate?
10  A  My best guess would be around 300
11  hours.
12  Q  And how much have you been compensated
13  in connection with this case?
14  A  Well, the firm will have billed counsel
15  somewhere, I guess, between 90 and a hundred
16  thousand dollars, I would assume, up to now.
17  Q  And do you submit invoices to counsel
18  monthly?
19  A  Monthly.
20  Q  And you didn't prepare a separate list
21  of documents that you considered in connection
22  your work; correct?
23  A  A -- a separate list of documents? No.
24  Q  In your report or any appendix to your
25  report, did you prepare a list of documents that you

**34**

1  considered in connection with your work on this
2  matter?
3  A  Other than documents that were cited in
4  the report, no.
5  Q  So my question refers to, did you
6  prepare a list anywhere of the documents that you
7  considered?
8  MS. RODRIGUEZ: Objection.
9  THE WITNESS: I think there was a few
10  lists. I mean, there was a list of arbitration
11  awards that I looked at. That's in the report.
12  There was some academic sources cited, so they
13  weren't listed but they're --
14  BY MR. TOAL:
15  Q  All I'm trying to establish is, is
16  there a list somewhere that identifies every single
17  document that you considered in connection with your
18  work on this case?
19  A  No, there is not.
20  Q  To the extent you considered a document
21  in connection with your work on this case, would it
22  be cited somewhere in your report?
23  A  No. No. There is documents that -- I
24  mean, I -- I reviewed, you know, 40 or 50 academic
25  articles all on the subject of negotiations, some of

**35**

1  which -- most of which, you know, had nothing that I
2  considered relevant to what we were doing.
3  Q  So do you remember when we were looking
4  at Rule 26 and the rule indicated that the report
5  must contain the facts or data considered by the
6  witness in forming your opinions?
7  A  Uh-huh.
8  Q  Does your report identify all the facts
9  and data that you considered in forming your
10  opinions?
11  A  It does.
12  Q  And does that include all documents
13  that you reviewed in connection with your work on
14  this case?
15  A  If I reviewed a document and it had no
16  impact on -- on my estimation or my analysis, I
17  didn't cite it.
18  Q  Would you be able to recreate a list of
19  the documents that you reviewed in connection with
20  your work on this case?
21  A  No.
22  Q  You didn't keep any records of that?
23  A  Well, for instance, one of the journals
24  I receive in the office is called The Negotiation
25  Journal. We have about four, five years of them

**36**

1  sitting on the shelf, and I pulled each one down,
2  and looked through the abstracts, and said does this
3  article have anything that might be useful in this
4  analysis? And if it -- if it didn't, I put them
5  back on the shelf. So, you know, in order to
6  produce a list of everything I considered, I would
7  have to go through all of the indexes of every
8  journal on the shelf that I picked up, and looked
9  at, and said does it have anything that can help us
10  with this matter.
11  Q  Well, did you also look, not only for
12  things that could help you in the matter, but things
13  that were contrary to --
14  A  Absolutely. Those were the things I
15  was most interested in finding.
16  Q  And what efforts did you make to find
17  articles that were contrary to any of your opinions
18  in this case?
19  A  Well, aside from the publications on
20  our shelf, you know, I went to JSTOR, which is, you
21  know, the academic journal search, and, you know,
22  did a number of keyword searches looking for
23  anything that would have relevance to negotiation,
24  you know, under pressure, negotiation under the
25  conditions of uncertainty, negotiations and

9 (Pages 33 to 36)

RIKK SALAMAT

37

1  coercion.  And anything I found that looked like it
2  could have some relevance to what we were studying,
3  I believe they all ended up in the report.
4      Q    What is JSTOR that you mentioned?
5      A    It is a journal search through the
6  University of Toronto.  I believe it is available to
7  the public, as well as through the University of
8  Toronto.
9      Q    Did you search any other databases
10 other than JSTOR.
11     A    Elsevier.  Those are the two that I
12 recall.
13     Q    What's Elsevier?
14     A    I think that's the University of
15 Chicago's journal search database.
16     Q    Did you keep a record of the keyword
17 searches that you performed?
18     A    No.
19     Q    And how much time did you spend
20 reviewing those databases?
21     A    It would be impossible to say.
22     Q    Well, of your 300 hours, what's your
23 best estimate of the amount of time you spent
24 looking for research relevant to this assignment?
25     A    Well, the difficulty is, that type of

38

1  work doesn't generally end up in the 300 hours.  I
2  would imagine several days were involved in, you
3  know, looking for journals -- journal articles.
4      Q    And how many hours on those days?
5      A    Six.
6      Q    Six hours each?
7      A    Six hours each.  So maybe 18 to 24
8  hours of reading abstracts.
9      Q    Did you consider, in connection with
10 your work on this matter, any of the bankruptcy
11 filings from the TWA bankruptcy proceeding?
12     A    No, I did not.
13     Q    Were those made available to you?
14     A    No, they were not.
15     Q    Did you -- were you interested in
16 reviewing those materials?
17     A    No.
18     Q    Did you think they would be relevant to
19 your work?
20     A    No, I didn't.
21     Q    Did you review any public filings
22 concerning TWA prior to the time of the transaction
23 with American Airlines?
24     A    No.  I don't believe I did.
25     Q    And why not?

39

1      A    I didn't consider them relevant.
2      Q    Did you consider any testimony that was
3  provided in the liability phase of the trial in this
4  case?
5      A    Some -- some testimony, yes.
6      Q    And what testimony did you consider?
7      A    The closing of -- I'm sorry.  I don't
8  know Fram's first name.
9      Q    Steve.
10     A    Steve Fram.  The closing of Allen
11 Press.  The charge to the jury.  And some parts of
12 Mike Day's testimony.
13     Q    So the -- the opening and closing
14 statements and charging the jury is not considered
15 testimony.  I was focused on witnesses who were
16 testifying under oath.
17     Did you consider any -- any such testimony
18 from the liability phase of this case, other than I
19 think you mentioned Mike Day's testimony?
20     A    Mike Day.
21     Q    And why -- why did you decide to
22 consider Mike Day's testimony and nobody else's?
23     A    I looked at Mike Day's testimony
24 specifically because he went through the history of
25 the negotiation with the APA in some detail.  He had

40

1  some relevant facts and figures about how the
2  various proposals had changed -- that had been
3  passed back and forth.  That was of interest in
4  terms of how the negotiation proceeded, so --
5      Q    So how -- how did you know what would
6  be in Mr. Day's testimony before you reviewed it?
7      A    Well, I knew he was the merger chair,
8  so --
9      Q    Did you receive any guidance from
10 anyone about what trial testimony it made sense for
11 you to review?
12     A    No.
13     Q    Did you have access to the testimony of
14 all the witnesses who testified in the liability
15 phase of the case?
16     A    I believe I did have a complete
17 transcript.
18     Q    Did you review testimony from any of
19 the congressional hearings regarding the proposed
20 TWA transaction?
21     A    No, I did not.
22     Q    Did you review any deposition testimony
23 from any of the former American Airlines executives
24 that was taken in the damages phase of this case?
25     A    No, I did not.

10  (Pages 37 to 40)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

41

1    Q    Were you aware that those depositions
2  had taken place?
3    A    You mean the damages phase of the
4  trial?
5    Q    Yes.
6    A    The one we are in right now?
7    Q    That's right.
8    A    No. I didn't -- I was not aware.
9    Q    Is that something you think would have
10  been relevant to your work?
11       MS. RODRIGUEZ:  Objection.
12       THE WITNESS:  The statement of
13  executives?
14  BY MR. TOAL:
15    Q    The testimony of American Airlines
16  executives.
17    A    No.
18    Q    Did -- did you review any of the
19  deposition testimony of former TWA executives that
20  was taken in the damages phase of this case?
21    A    No, I did not.
22    Q    Were you aware that those depositions
23  had taken place?
24    A    No.
25    Q    Is that something that may have been

42

1  relevant to your analysis?
2    A    No.
3    Q    Did you review any of the deposition
4  testimony of the former APA representatives that was
5  taken in the damages phase of this case?
6    A    No, I did not.
7    Q    Were you aware that those depositions
8  had taken place?
9    A    No.
10    Q    Is that something that might have been
11  relevant to your analysis?
12    A    No.
13    Q    Why not?
14    A    Why would it not be relevant?
15    Q    Yeah.
16    A    Well, first of all, I would have to
17  know who they were, what they were speaking about
18  and -- and a great deal more.  And that said, it's
19  still just one person's opinion.
20    Q    Well, you -- you gave a very
21  categorical answer that that testimony wouldn't be
22  relevant to your work without knowing who those
23  witnesses were and what position they held; correct?
24    A    That's correct.
25    Q    Is it your view that there is any

43

1  information regarding the APA that -- that would
2  have been relevant to your work?
3       MS. RODRIGUEZ:  Objection.
4       THE WITNESS:  You know, no, I don't --
5  I don't believe there is.
6  BY MR. TOAL:
7    Q    And why is that?
8       MS. RODRIGUEZ:  Objection.
9       THE WITNESS:  Why do I not believe
10  anything they could -- well, if -- they can't go
11  back and say what they would have done under a
12  completely alternate set of circumstances.
13  BY MR. TOAL:
14    Q    But you can?
15       MS. RODRIGUEZ:  Objection.
16       THE WITNESS:  I can only say what's
17  most probable.
18    Q    And how is it you are able to say
19  what -- what was most probably going to happen --
20       MS. RODRIGUEZ:  Objection --
21  BY MR. TOAL:
22    Q    -- in -- in the negotiation had the
23  circumstances been different?
24    A    It -- this goes to the heart of the

44

1  report where it's analyzing what effective
2  representation by ALPA would have done to the
3  dynamics of the negotiation.  We have to assume that
4  the parties to this negotiation would behave
5  under -- under pressure the same as other parties.
6  And so, given the actions available to ALPA and the
7  pressures that that would have brought, I'm left to
8  conclude that it's more probable than not that the
9  APA would have behaved the same as theory says they
10  would have.
11    Q    Have you spoken with any of the named
12  plaintiffs in this case?
13    A    I -- I don't believe I have, no.  I
14  don't know who the named plaintiffs are.  I don't
15  think I've spoken to Brady.  In -- in connection
16  with this mitigation exercise that we are going
17  through, I fielded a bunch of calls from -- from
18  pilots about what they are supposed to be sending
19  in, so it is -- it's not impossible that I've spoken
20  to one of them in connection with that, but I don't
21  recall.
22    Q    Have you talked to those pilots about
23  the substance of this case?
24    A    No.
25       MS. RODRIGUEZ:  Objection.

11 (Pages 41 to 44)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

45

1  **BY MR. TOAL:**
2  **Q**    Do you know who Ted Case is?
3  **A**    I do know who Ted Case is.
4  **Q**    And have you spoken with Mr. Case?
5  **A**    I believe he was on a conference call
6  at -- at one point, but I didn't speak directly with
7  him.
8  **Q**    Do you know who Michael Finucan is?
9  **A**    I recognize the name.
10  **Q**    Have you spoken with Mr. Finucan?
11  **A**    No, I have not.
12  **Q**    Do you know who Howard Hollander is?
13  **A**    Yes, I know his name.
14  **Q**    And have you spoken with Mr. Hollander?
15  **A**    Yes.
16  **Q**    Do you know who Sally Young is?
17  **A**    Yes.
18  **Q**    And have you spoken with Ms. Young?
19  **A**    No.
20  **Q**    Is there any information that you think
21  could be relevant to your analysis that you sought
22  but weren't able to acquire?
23  **A**    Well, crystal ball aside, I don't
24  believe so, no.
25  **Q**    And why do you say, crystal ball aside?

46

1  **A**    I say crystal ball aside being if we
2  could go back and re-live history under a different
3  set of circumstances, that would have been
4  educational.
5  **Q**    So other than that, anything that you
6  thought might be relevant to your opinions that you
7  sought but weren't able to obtain?
8  **A**    I don't -- I don't believe there was
9  anything that I asked for that wasn't -- that I
10  wasn't able to find.
11  **Q**    And you can't think of anything, as you
12  sit here today?
13  **A**    I can't think of anything.
14  **Q**    And when were you first retained in
15  this matter?
16  **A**    Well, I was retained once in order to
17  assist in negotiations, which was, of course,
18  related to this matter, but then retained a second
19  time to actually produce this report.
20  **Q**    So with respect to the first retention
21  that you mentioned, what is it you were retained to
22  do in that case?
23  **A**    Do a damage calculation.
24  **Q**    That's the first retention that you
25  referred to?

47

1  **A**    Yes.
2  **Q**    And which negotiations was that
3  retention related to?
4  **A**    I believe they were related to
5  settlement negotiations.
6  **Q**    Okay.  When -- when was that retention?
7  **A**    November of 2011.
8  **Q**    And what did you do in connection with
9  that work?
10  **A**    I estimated what the damages would be
11  under several different lists.
12  **Q**    Is any of the work you did in
13  connection with that retention reflected in your
14  expert report?
15  **A**    The software that we used to do that
16  original estimate was included with the production
17  of this report.
18  **Q**    And were any of the lists that you
19  generated in connection with that retention, do any
20  of those appear in your expert report?
21  **A**    The Supplement CC Plus 200 list may
22  have been one of the ones that we -- we used for
23  that exercise.
24  **Q**    Was the -- the list you identified as
25  the Salamat list in your expert report, one of the

48

1  lists that you prepared in connection with that
2  retention?
3  **A**    No.
4  **Q**    Then you mentioned there was a second
5  retention; correct?
6  **A**    That's correct.
7  **Q**    And when was your second retention?
8  **A**    It was in the spring of 2012.  I -- I
9  don't really remember the month.
10  **Q**    Now, have you done anything to prepare
11  for this deposition?
12  **A**    I met with Joe Jacobson to go over my
13  report.
14  **Q**    When did that happen?
15  **A**    Last week.
16  **Q**    Which day?
17  **A**    Thursday and Friday.
18  **Q**    How long were those meetings?
19  **A**    Well, we met for about five hours on
20  Thursday and maybe an hour on Friday.
21  **Q**    Other than that, have you done anything
22  to prepare for this deposition?
23  **A**    Re-read my report.  That's about it.
24  **Q**    Is there anything else?
25  **A**    Just re-read my report.

12  (Pages 45 to 48)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

49

1    Q    Did you review any of the materials
2  that you cited in your report?
3    A    In a -- in a small way, but not really,
4  no.
5    Q    And which -- which materials cited in
6  your report did you review to prepare for this
7  deposition?
8    A    I particularly went back and -- and
9  looked at -- at William McCursey's material on -- on
10  the behavioral theory on negotiation.  I went back
11  and looked at that again.  That's the only article I
12  think I pulled up.
13    Q    Now, these meetings with Mr. Jacobson,
14  was anyone else present?
15    A    No.
16    Q    You make -- do you make any assumptions
17  in connection with your expert report?
18    **MS. RODRIGUEZ: Objection.**
19    **THE WITNESS: If -- if I make any**
20  **assumptions, I -- I believe they would be stated in**
21  **the report.**
22  **BY MR. TOAL:**
23    Q    And what assumptions can you recall
24  that you made in your report, as you sit here today?
25    A    There is a lot of assumptions about age

50

1  of retirement, for instance.  I can't recall
2  specifically what age we used, but in calculating
3  future damages, we have to assume some average age
4  of retirement at which pilots are going to leave and
5  provide advancement opportunities for other pilots,
6  so there would be an assumption about that.
7    Assumption about future interest rates.
8    Those are the two that I would recall off the
9  top of my head.
10    Q    Can you recall any others, as you sit
11  here today?
12    A    I can't -- I can't recall any others.
13  I mean, as I say, if there are other assumptions,
14  I'm sure they would be mentioned in the report.
15    Q    They would be identified as assumptions
16  in the report?
17    A    Yes.
18    Q    Were you asked to make any assumptions
19  by counsel for the class?
20    A    No.
21    Q    Did you make any assumptions about
22  TWA's financial condition at the time of the
23  American Airlines transaction?
24    A    No, I didn't.
25    Q    Did you do any analysis to understand

51

1  TWA's financial condition at the time of the
2  transaction?
3    A    No, I did not.
4    Q    Did you make any assumptions about
5  TWA's viability as an air carrier in the absence of
6  the American Airlines transaction?
7    A    No, I did not.
8    Q    Did you make any assumptions in your
9  report about the operation of the St. Louis fence?
10    A    I mean, I assume there was a St. Louis
11  fence and that it had a certain impact on the TWA
12  pilots, but I think the fence is a given.  I don't
13  think there is any assumptions that need to be made
14  about it.
15    Q    And how did you form your understanding
16  of how the St. Louis fence would operate?
17    A    From the Supplement CC agreement.
18    Q    From reading the text of Supplement CC?
19    A    That's correct.
20    Q    And did you interpret Supplement CC on
21  your own with regard to how the fence would work?
22    A    Well, I mean, I had the text of
23  Supplement CC, plus I had the employment history of
24  all the TWA pilots for the last decade, so I could
25  see how it works.  I could see what base they were

52

1  in, what position they were able to hold, and how
2  that related to the entire American Airlines
3  operation.
4    Q    Did have any other sources of
5  information on how the St. Louis fence worked?
6    A    There may have been other sources
7  available in the testimony of pilots in the
8  transcripts, but the things that I relied on most
9  were the text of the agreement and the employment
10  history of the pilots.
11    Q    So you testified that the only
12  testimony that you reviewed concerning the liability
13  phase of the case was Mr. Day's testimony; correct?
14    A    Uh-huh.
15    Q    Do you have any recollection of Mr. Day
16  testifying about how the St. Louis fence would work?
17    A    I recall him testifying that there was
18  going to be a St. Louis cell, but most of my -- of
19  the information I got about the St. Louis fence was
20  from the agreement and from the employment history.
21    Q    Okay.  So if I'm trying to understand
22  all the data that you relied on regarding how the
23  St. Louis fence worked, it would be the text of
24  Supplement CC, the employment data that you had
25  access to, and is there anything else?

DEGNAN & BATEMAN
(856) 232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

---

53

1      A     Well, you mean, the data -- like
2   seniority lists being very closely related to the
3   employment history and the agreement. There --
4   there may have been some early versions of a
5   proposed fence in some of the -- some of the
6   proposals that had been passed back and forth
7   between the parties. But in terms of the fence that
8   was finally implemented, it was the agreement and
9   the employment history.
10     Q     So you referenced proposals that had
11  been passed between the parties; correct?
12     A     Yes.
13     Q     Did you review proposals that were
14  passed between the parties?
15     A     I did.
16     Q     And the proposal that you reviewed, are
17  all of those reflected in your report?
18     A     Yes.
19     Q     And to the extent there is a proposal
20  out there somewhere that's not cited in your report,
21  can I assume that's something you didn't review?
22     A     Well, I -- I -- I only had the
23  proposals that I mentioned in the report. So there
24  may have been others out there, but I only have the
25  ones that I had.

---

54

1      Q     And did you have any source of
2   information on proposals that were communicated
3   orally?
4      A     No. Unless -- unless it was mentioned
5   in Mike Day's testimony. But, you know, the
6   proposals that I based most -- the proposals that I
7   based my opinion on are the ones I had the text of
8   or some recording of.
9      Q     Did you make any assumptions in your
10  report about the pre-transaction career expectations
11  of the TWA pilots?
12     A     No.
13     Q     Did you make any assumptions in your
14  report about the pre-transaction career expectations
15  of the American Airlines pilots?
16     A     No.
17     Q     Did you make any assumptions in your
18  report about the leverage that the TWA pilots had in
19  negotiating with the APA?
20     A     Well, I -- I think the whole report is
21  about leverage that the TWA pilots could have had,
22  so you would have to be a little more specific in
23  your question.
24     Q     My -- my question is whether you made
25  any assumptions about the leverage that the TWA

---

55

1   pilots had.
2      A     That they actually had given the
3   circumstances?
4      Q     Yes.
5      A     I assume they had a small amount, but
6   I -- I really -- I'm not sure. You would have to be
7   much more specific about what type of leverage
8   you -- you would be referring to, and maybe you
9   could ask me the question in a different way. Maybe
10  I'm just --
11     Q     So I'm trying to understand -- I'm
12  trying to differentiate circumstances in which you
13  are offering an opinion or basing your -- your
14  opinions on some piece of evidence.
15     A     Uh-huh.
16     Q     And so I'm -- I'm asking about
17  assumptions that you made where you are just
18  assuming facts to be a certain way.
19     A     Uh-huh.
20     Q     And so my question was, with respect to
21  the leverage that the TWA pilots had in negotiating
22  with the APA, did you make any assumptions about the
23  amount of leverage they had in those negotiations?
24     A     I made some assumptions about the
25  amount of leverage that, for instance, the Bond bill

---

56

1   had on the negotiation.
2      Q     And what assumptions did you make?
3      A     My assumption was that by employing
4   that leverage, they were able to compel or convince
5   the APA to change their position. That, I believe,
6   is the only assumption I made in regards to the TWA
7   pilots and leverage that they had.
8      Q     Did you make any assumptions about the
9   leverage that the TWA pilots would have had, had
10  ALPA conducted itself differently?
11     A     I did.
12     Q     And what assumptions did you make in
13  that regard?
14     A     I assumed they would have had more
15  leverage.
16     Q     Did you -- did you quantify the
17  increased leverage that you thought they would have?
18     A     Yes.
19     Q     And how did you do that?
20     A     I went through -- I employed a
21  methodology for basically decomposing the effect
22  that each additional point of leverage would have
23  had on the probabilities of achieving certain
24  outcomes. So, for instance, the list that I call
25  the damage model, I estimated the extent at which

---

14  (Pages 53 to 56)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

57

1  each one of the points of leverage that ALPA could
2  have brought to bear would have had on increasing
3  the probability of that, meaning an outcome in
4  negotiations.
5        Q    So that the probabilities that you
6  associate with each ALPA action, were those the
7  product of an assumption?
8        A    Yes, they were. They were the product
9  of an assumption and the product of, you know,
10  coming up with a -- a conservative value for the
11  effect of each one of those actions.
12        Q    And the probabilities that you
13  associate with each of those actions by ALPA, was
14  that something that was measured in any way?
15        A    Yes.
16        Q    And what did you do to measure the
17  probability that those actions would have a certain
18  affect?
19        A    Well, what I did to measure the
20  probability was to analyze each of the actions and
21  -- as best as I could understand what the impact of
22  those actions would have been on the negotiation
23  process, in terms of, would it have been able to
24  shift the APA's perception of an issue, their
25  commitment to an issue, and so on. And then, for

58

1  each one of those types of impacts that the action
2  could have had on the negotiation, assigning a
3  value, a percentage, you know, one, two, three
4  percent probability that that particular action on
5  its own would have produced.
6        Q    And so my -- my question is, for each
7  of those elements of your analysis, how did you know
8  that the probability was 3 percent, versus
9  .3 percent, versus 30 percent?
10        A    Well, it was based largely on the
11  experience of the Bond bill and the impact that it
12  had on the negotiation.
13        Q    And what did the Bond bill tell you
14  about what the specific measurement of each -- each
15  action was?
16        A    Well, if I took the Bond bill at being
17  one action and, you know, how it would have affected
18  the negotiation a number of ways and it moved the
19  APA's position a certain amount, I then went
20  backward and said if that Bond bill could have done
21  that, then if we assume a significantly smaller
22  impact of these other actions, what would the
23  outcome likely have been?
24        Q    Did you have any other basis for -- for
25  assigning those probabilities other than what you

59

1  just described?
2        A    Well, there was the basis -- there is
3  the -- I -- I think the Bond bill was probably the
4  most significant actual historical event that I had.
5        Q    So -- and was there anything else?
6        A    No.
7        Q    Did you do anything to test whether
8  your probabilities were accurate?
9        A    Other than mathematically?
10        Q    Yeah. When you said that this event
11  has a 3 percent chance of influencing --
12        A    Uh-huh.
13        Q    -- perception, for example, did you do
14  anything to test whether that was right?
15        A    No. There -- there would be no way to
16  test that.
17        Q    Are you aware of any methodology that's
18  generally accepted within your field of expertise
19  that allows you to determine what those particular
20  probabilities are in -- in any given situation?
21        A    I'm -- I'm not aware of any.
22        Q    Are you aware of the methodology that
23  you used to try and quantify the likelihood of an
24  agreement being reached being used at any time in
25  the past?

60

1        A    Well, the article that I cited written
2  by -- I believe it was Katia Sycara, who has a
3  computer model developed on -- developed to assess
4  the impact of negotiation, has a framework that is
5  used, that I actually adopted her framework for
6  analyzing the impact of particular arguments on a
7  negotiation, so that's --
8        Q    Does Professor Sycara's framework
9  involve attempting to quantify the likelihood of an
10  agreement being reached under a particular set of
11  circumstances?
12        A    It does attempt to test whether
13  particular arguments will be successful in reaching
14  an agreement.
15        Q    Could you answer my question?
16        A    Okay. Well, can I ask you to ask your
17  question again?
18        Q    Sure. Does Professor Sycara's
19  framework involve an effort to quantify the
20  likelihood of an agreement being reached?
21        A    Well, I believe her work could be read
22  that way. I don't think it's what the model was
23  designed to do, but, I mean, to the extent that it
24  is attempting to assess the likelihood that a
25  particular argument is likely to be persuasive --

15  (Pages 57 to 60)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

61

1    Q    Does she assign probabilities anywhere
2  in her article to the likelihood of an agreement
3  being reached?
4    A    Well, as I understand, her model, what
5  it does is it assigns weights to different aspects
6  of persuasive arguments.
7    Q    So my question is about specifically
8  whether Professor Sycara in her article, anywhere
9  else in her work, purports to come up with a
10  framework for quantifying the likelihood of an
11  agreement being reached.
12    MS. RODRIGUEZ: Objection.
13    THE WITNESS: I think that would
14  mischaracterize her work.
15  BY MR. TOAL:
16    Q    Are -- are you aware of her doing that
17  anywhere in her work?
18    MS. RODRIGUEZ: Objection.
19    THE WITNESS: No.  No, I'm not.
20  BY MR. TOAL:
21    Q    So my question to you originally was,
22  are you aware of the methodology that you used to --
23  to attempt to quantify the likelihood of an
24  agreement being reached being used anywhere
25  previously?

62

1    MS. RODRIGUEZ: Objection.
2    THE WITNESS: No.  Other than in
3  Sycara's work, you know, and the extent to which you
4  can see the -- the persuader model that she
5  developed being similar to the exercise here.  But,
6  as I said, I think that would mischaracterize her
7  work.
8  BY MR. TOAL:
9    Q    Okay.  I thought we just established
10  that you agree that Professor Sycara had not
11  attempted to quantify anywhere in her work the
12  likelihood of an agreement being reached; is that
13  correct?
14    MS. RODRIGUEZ: Objection.
15    THE WITNESS: No.
16  BY MR. TOAL:
17    Q    That's not correct?  You --
18    A    Okay.  Let's -- let's ask the question
19  one last time so we get a clear answer.
20    Q    Yeah.  So is there anywhere in
21  Professor Sycara's article that you cited where she
22  attempts to quantify the likelihood of an agreement
23  being reached?
24    A    No.  I don't believe she does.
25    Q    Okay.  Setting aside the particular

63

1  article that you cited, are you aware of anywhere
2  else in Professor Sycara's work where she presents
3  her framework as a methodology for quantifying the
4  likelihood of an agreement being reached?
5    A    I'm not aware of any other work she's
6  done, you know, in that regard.
7    Q    So the answer would be no, you are not
8  aware --
9    A    The answer would be no.
10    Q    Do you know what Professor Sycara's
11  background is?
12    A    No, I do not.
13    Q    Do you know what her area of academic
14  specialty is?
15    A    I do not.
16    Q    Would that have been relevant to your
17  work to know the field in which she specializes?
18    A    Her article was in a peer reviewed
19  journal.  I can't recall which one.  I believed what
20  the -- what she had done with her persuader model
21  had some application here, and so --
22    Q    Did you use the persuader model?
23    MS. RODRIGUEZ: I'm going to ask -- and
24  you've -- you've done this a couple times.  You
25  interrupt him in the middle of his answer.  So I'm

64

1  going to ask you to please wait until he finishes
2  his answer before you jump in with your next
3  question.
4  BY MR. TOAL:
5    Q    I'm happy to wait.  You paused and
6  threw me off.  I thought you were done.
7    Did you have something else to add?
8    A    Let's -- let's start back with the
9  question again.
10    Q    Sure.  So the last question is, would
11  it have been relevant to your work to know the area
12  in which Professor Sycara specializes?
13    A    I mean, I believe her background is in
14  computer science, so to the extent that it's
15  relevant, I think it was considered.
16    Q    Okay.  Because I thought you told me
17  previously you didn't know what area she specialized
18  in.  Is that correct?
19    A    I mean, the article was specifically --
20  the article was focused on her work with the
21  persuader model, how it worked and what it did.  And
22  so, that being a computer program, I assume that
23  she's got some kind of computer science background.
24  But her area of specialty outside of this article, I
25  wouldn't know.

16  (Pages 61 to 64)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

65

1    Q    So is it -- is it fair to say that you
2  assumed that she had a background in computer
3  science, but that you were uncertain of what her
4  background is?
5    A    Yes.
6    Q    So you mention that Professor Sycara
7  used something called a persuader model; correct?
8    A    I believe she developed a thing called
9  a persuader model; yes.
10   Q    And that's what she describes in her
11 article; correct?
12   A    That's correct.
13   Q    And how did she describe the persuader
14 model being used in her article?
15   A    To assess the -- the strength of -- the
16 persuader model was attempted to reproduce
17 negotiations and test the strength of various forms
18 of argumentation.
19   Q    Wasn't the persuader model used in
20 order to generate arguments that a mediator could
21 use with a labor union or a company?
22   A    As well, yes.  But it had a -- it had
23 a -- it had a -- obviously, it had a library of
24 arguments that it had to draw those arguments from.
25 And so, in particular context, it had to --

67

1  correct.
2    Q    And can you show me where in this
3  article Professor -- Professor Sycara says that her
4  persuader model has anything to do with evaluating
5  the strength of arguments?
6        MS. RODRIGUEZ:  Object to form.  It
7  mischaracterizes his testimony.
8  BY MR. TOAL:
9    Q    Is that what you testified to
10 previously?
11   A    Sorry, what was the --
12   Q    Maybe I misunderstood, but did you
13 testify previously that your understanding of the
14 persuader model was that it had some connection to
15 evaluating the strength of arguments?
16   A    Yes.
17   Q    That's your understanding?
18   A    I believe I said that, and my
19 understanding was that's how the model works.
20   Q    And so can you show me where in the
21 article Professor Sycara says that the persuader
22 model can be used to asses the strength of
23 arguments?
24   A    The policy that the persuader uses to
25 generate the weakest, least convincing argument

66

1        (Salamat-6  Article entitled
2  Persuasive Argumentation in Negotiation by
3  Katia Sycara marked for identification.)
4  BY MR. TOAL:
5    Q    All right.  Let me mark as Salamat
6  Exhibit-6, a copy of an article entitled, Persuasive
7  Argumentation in Negotiation by Katia Sycara.
8        All right.  And can you let me know if you've
9  seen this document previously?
10   A    Yes.
11   Q    And is this the article that you cite
12 in your report?
13   A    Yes.
14   Q    And you rely heavily on this -- this
15 framework; correct?  Is that correct?
16        MS. RODRIGUEZ:  Objection.
17        THE WITNESS:  I think heavily would be
18 a mischaracterization, but I do rely on the
19 framework.
20 BY MR. TOAL:
21   Q    So this framework is the sole basis for
22 your attempted quantification of the likelihood of
23 an agreement being reached; correct?
24   A    Yeah.  It -- it is the only framework
25 for quantification that I used in the report, that's

68

1  first, reserving strong arrangements for situations
2  where weak ones have been rejected, the hierarchy of
3  convincing power of arguments ranks the strength of
4  an argument for the labor domain.
5        So in that statement, she is saying what she
6  is doing is assessing the strength of a particular
7  argument given the context in which the argument is
8  being presented.
9    Q    Does she say -- does she say the model
10 makes the determination about the strength of the
11 argument?
12   A    Well, what she says is the input to the
13 argumentation process is the persuadee's position on
14 the issue.  I mean, the specifics of how the -- the
15 software actually works, I don't believe is -- is --
16 is laid out in here.  But --
17   Q    Let me ask you --
18   A    -- given that what it is doing is
19 assigning an importance or a strength to a
20 particular argument, I assume it has to be able to
21 because otherwise it wouldn't be able to generate a
22 weak argument first receiving a strong argument for
23 situations where weak ones have been rejected.  It
24 has to be able to assess the arguments' strengths.
25   Q    Did you do anything to attempt to

17 (Pages 65 to 68)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

69

1  confirm your understanding about the use of the
2  persuader model to evaluate the strength of
3  arguments?
4      A    No, I did not.
5      Q    Do you know whether the hierarchy of
6  arguments, according to their persuasive power, is
7  an input to the model or an output of the model?
8      A    Well, let's go through and look -- see
9  what she says.
10     Q    Can you state for the record which page
11 you are reviewing?
12     A    Right now I'm on 226.
13         And my understanding is that these arguments
14 are all inputs into the model.
15     Q    So if your -- your understanding is
16 that these arguments are inputs to the model --
17     A    Yeah.
18     Q    -- do you have any basis for saying
19 that one of the outputs or uses of the model is to
20 evaluate the strength of arguments?
21     A    I'm sorry.  Could you -- could you
22 repeat the question?
23     Q    Yeah.  So if your understanding is that
24 the arguments are inputs to the model, do you have
25 any basis for saying that one of the uses of the

70

1  model is to evaluate the strengths -- the strength
2  of arguments?
3      A    I -- I believe that's what her software
4  does.
5      Q    As an output of the model?
6      A    I believe that that would be an output
7  of the model.
8      Q    Did you do anything to confirm that
9  understanding?
10     A    No, I did not.
11     Q    Did you use the persuader software
12 model in connection with your work?
13     A    No.  I just used the framework that she
14 outlined.
15         THE WITNESS:  Would it be okay to take
16 a break?
17         MS. RODRIGUEZ:  Sure.
18         VIDEO SPECIALIST:  The time is now
19 10:54 and this ends this number one.
20         (Brief recess.)
21         VIDEO SPECIALIST:  The time is now
22 11:07 and we are back on the video record.
23 BY MR. TOAL:
24     Q    Mr. Salamat, in your report do you make
25 assumptions about the APA's willingness to make

71

1  further compromises?
2      A    Not their willingness, but their --
3  their -- I make assumptions about what would happen
4  given more pressure.  You can never speak about
5  anybody's willingness until they're in a situation
6  where that will has expressed itself, so --
7      Q    But you do make assumptions, if
8  circumstances had been different, what the APA's
9  willingness to make further concessions would have
10 been; correct?
11     A    That's correct.
12         MS. RODRIGUEZ:  I'm sorry, can you read
13 back that last question?
14         (The court reporter read back the
15     pending question as follows:
16     "Question:  But you do make
17     assumptions, if circumstances had been
18     different, what the APA's willingness to make
19     further concessions would have been;
20     correct?")
21 BY MR. TOAL:
22     Q    And do you make assumptions in your
23 report about how the APA would have responded to any
24 of the proposed actions by ALPA that you list in
25 your report?

72

1      A    I -- I assume they would have
2  responded.
3      Q    And in what manner do you assume they
4  would respond?
5      A    I assume that given more pressure, that
6  they would have responded in a way that was more
7  fair.
8      Q    To whom?
9      A    To the TWA pilots.
10     Q    And so when you say more fair, you mean
11 more favorable to the TWA pilots; correct?
12     A    I mean more fair and more favorable to
13 the TWA pilots, yes.
14     Q    And do you consider yourself an expert
15 on fairness?
16     A    I do not consider myself an expert on
17 fairness.  I do consider myself an expert on, you
18 know, assessing whether particular seniority
19 integrations are more or less fair to a particular
20 group.
21     Q    And by virtue of what experience do you
22 have expertise on evaluating whether a particular
23 seniority integration is fair to a particular group?
24     A    I spent the last twelve years analyzing
25 seniority integrations and their impact on various

                              18 (Pages 69 to 72)

DEGNAN & BATEMAN
(856) 232-7400

RIKK SALAMAT

---

**73**

1  groups.
2      Q      And what criteria do you use to assess
3  whether a seniority integration is fair?
4      A      A variety.  Whether one group is able
5  to access the work that it brought to the merger is
6  a common one.  Whether people are able to keep their
7  jobs is generally the measure.  Everything else
8  being some form of variation of that.
9      Q      Have you seen in your work that, in
10 evaluating the fairness of seniority integration
11 lists that people look to, whether the integrated
12 list preserves the pre-transaction career
13 expectations of each pilot group?
14     A      That -- that would be common in -- in
15 mergers that people do that, yes.
16     Q      And is that one of the criteria you
17 look to in assessing whether a seniority integration
18 list is fair?
19     A      Not in this particular case, no.
20     Q      Why not in this particular case?
21     A      Because in this case, we weren't
22 looking at what people's premerger expectations
23 were.
24     Q      Why not?
25     A      Because we were looking at what the

---

**74**

1  impact would have been under different lists at
2  American Airlines, a merged carrier, and not what
3  expectations they necessarily had going into the
4  merger.  The only thing we looked at in terms of
5  that was what number of jobs they had going into the
6  merger.  We didn't do any forecasts on -- on what
7  would have happened had there not been a merger.
8  That's what you would typically do in a -- in a
9  seniority arbitration.
10     Q      And did you not think that criteria was
11 relevant in this particular case?
12     A      What the TWA pilots' un-merged career
13 expectations would have been?
14     Q      Pre-transaction career expectations of
15 each pilot group.
16     A      I didn't see how that would be
17 particularly relevant here.
18     Q      Why -- why didn't you think that would
19 be relevant here but relevant in other situations?
20     A      Well, because here the merger is a
21 given.  In other situations, not necessarily.
22     Q      What do you mean by that?
23     A      Well, in this case the two carriers did
24 merge.  They were merged under a particular
25 seniority integration, and so the exercise was to go

---

**75**

1  back and look and see what the history would have
2  been under a different seniority integration.
3      Q      Isn't it the case in any airline
4  combination that the airline pilots will be combined
5  and the question is what their pre-transaction
6  career expectations were?
7          MS. RODRIGUEZ:  Objection.
8          THE WITNESS:  If you are arguing, you
9  know, what a seniority integration should be, you
10 might.  But I wasn't arguing what a seniority
11 integration should have been.  I wasn't arguing what
12 seniority integration would have been fair.  I have
13 only argued, you know, I have only estimated what a
14 seniority integration that would have been income
15 optimal would have been, what I believe would have
16 been likely under other -- other sets of
17 circumstances.
18 BY MR. TOAL:
19     Q      I'm sorry.  You say you estimated what
20 a seniority integration would have been if it was
21 income optimal?  Is that what your testimony --
22     A      If it was income optimal.
23     Q      That's what you were estimating here?
24     A      I'm sorry?
25     Q      Is that what you were estimating here?

---

**76**

1      A      One of the things that I estimated
2  here.
3      Q      And which list reflects a list that
4  would have been income optimal?
5      A      I believe it is called the I optimal
6  list.  It might have also been referred to as the
7  fairness list.
8      Q      And what does the Salamat list
9  represent?
10     A      The Salamat list represents my best
11 estimate at what list would have been achieved in
12 negotiation had ALPA deployed all of the strategies
13 that it had available to it would have been.
14     Q      And you made that determination without
15 assessing the negotiating position of the APA; is
16 that correct?
17     A      Well, I -- I don't believe I said that,
18 but --
19     Q      Well, that's my question.  Did you make
20 that assessment -- did you take into consideration
21 the negotiating position of the APA when developing
22 the Salamat list?
23     A      I did.
24     Q      In what ways did you take into
25 consideration the negotiating position of the APA?

---

19 (Pages 73 to 76)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

77

1     **A**     The proposals that they had passed, the
2   response to the TWA's pilots proposal.
3     **Q**     And other than that, did you take into
4   consideration any other information concerning the
5   APA's position?
6     **A**     I think those would be the main things
7   I relied on. There -- there was also, you know,
8   characterizations of the APA in their negotiating
9   position that was made in -- in closing arguments in
10  the -- the trial.
11    **Q**     Anything other than that?
12    **A**     No. Just generally the record.
13    **Q**     And what characterizations of the APA
14  were you -- were you referring to that were made in
15  closing arguments?
16    **A**     Peter Fram talked about how difficult
17  it was to negotiate with the APA from the point of
18  view of the CEO of American Airlines, Compton, I
19  believe.
20        In Mike Day's testimony, he talked about how
21  they wouldn't respond to proposals that they had
22  made and were disinclined to negotiate in any
23  meaningful way during their facilitated
24  negotiations.
25    **Q**     And are you aware of any -- withdrawn.

78

1        Did you rely on any information about what the
2   APA would have done had ALPA taken any of the
3   actions that you describe in your report?
4     **A**     I don't know what information I could
5   have relied on because ALPA didn't take those
6   actions.
7     **Q**     And did you have any information on
8   what ALPA would have done or what they said they
9   would have done had any of these actions been taken?
10    **MS. RODRIGUEZ:  Objection to form.
11  ALPA?**
12  **BY MR. TOAL:**
13    **Q**     I'm sorry. Did you have any
14  information on what the APA would have done or what
15  they said they would have done had any of the ALPA
16  actions that you describe in your report been taken?
17    **MS. RODRIGUEZ:  Objection.**
18    **THE WITNESS:  I -- I don't recall
19  coming across any information saying what the APA
20  would have or would not have done given any specific
21  action by ALPA.**
22  **BY MR. TOAL:**
23    **Q**     So -- so is the answer to my question
24  that you didn't have any such information?
25    **A**     I don't believe I had any such

79

1   information.
2     **Q**     Did you make any assumptions in your
3   report about the likelihood that American Airlines
4   would decide to walk away from the proposed
5   transaction with TWA?
6     **A**     The likelihood that American Airlines
7   would have walked away from the -- no. I don't
8   believe I made any assumptions about that.
9     **Q**     Did you have any information about the
10  APA's view about TWA's financial condition at the
11  time of the transaction?
12    **A**     Yes.
13    **Q**     And what information did you have?
14    **A**     In their response to the TWA's rightful
15  place proposal, they characterized TWA's financial
16  position as -- as dismal at best.
17    **Q**     And did you have any information about
18  the APA's view of the pre-transaction career
19  expectations of the TWA's pilots?
20    **A**     I believe they didn't believe them to
21  be particularly desirable.
22    **Q**     Do you have an understanding that the
23  APA believed the TWA pilots to have poor career
24  expectations prior to the transaction?
25    **A**     Yes.

80

1     **Q**     Did you have any information suggesting
2   to you that one of the factors the APA was relying
3   upon in proposing seniority integration was what the
4   pre--- pre-transaction expectations of each pilot
5   group were?
6     **A**     Yes.
7     **Q**     Did you have an understanding that the
8   TWA MEC was also, in its proposals, relying on its
9   views of what the pre-transaction career
10  expectations of both pilot groups were?
11    **MS. RODRIGUEZ:  Objection.**
12    **THE WITNESS:  I don't believe I've seen
13  any comprehensive document where -- where the TWA
14  MEC characterized the financial condition of -- of
15  TWA.**
16  **BY MR. TOAL:**
17    **Q**     Are you aware of any information
18  suggesting that the TWA MEC agreed that any
19  integrated list should preserve the pre-transaction
20  career expectations of each pilot group?
21    **A**     Well, to the -- to the extent that the
22  MEC's point of view is reflected in the Tannen
23  proposal, I assume they believed they had premerger
24  career expectations. But other than in that form, I
25  don't -- I don't know that I've seen any documents

20  (Pages 77 to 80)

RIKK SALAMAT

81

1    that say what the MEC thought the future without an
2    American Airlines merger would have been.
3        Q    But I'm not asking you what the TWA MEC
4    thought TWA's financial condition was.  I'm asking
5    whether you have any information indicating to you
6    that the TWA MEC believed it was appropriate to take
7    into account the pre-transaction career expectations
8    of each pilot group in constructing a merged
9    seniority list.
10       A    To the extent that that is reflected in
11   the Tannen rightful place proposal, I believe it is.
12       Q    Did you do anything to test whether the
13   lists that you set forth in your report succeed in
14   preserving the pre-transaction career expectations
15   of each pilot group?
16       A    No, I did no work on the premerger
17   trans -- the un-merged expectations of either of
18   the pilot groups.
19       Q    And you considered that factor
20   irrelevant for your analysis; correct?
21       A    Yes.  I considered it irrelevant.
22       Q    And the reason you considered it
23   irrelevant was because it was a given at -- at that
24   stage that there was going to be a transaction; is
25   that right?

82

1        A    What I took as a given was how many
2    positions each pilot had at the point when the two
3    airlines were merged.  Whether they would have
4    had -- the way in which we analyze premerger
5    expectations is to assume that the future is going
6    to remain more or less the same as it is at the
7    point the two airlines are merged, and so I could
8    theoretically have compared TWA's premerger
9    expectations to their career under American Airlines
10   Supplement CC list, but I didn't really see that
11   that would tell us anything because I wasn't
12   comparing their careers at American to their career
13   at a stand-alone-TWA, or a TWA merged with another
14   airline, or a TWA under a different management.
15       Q    So what I was trying to understand
16   is --
17           MS. RODRIGUEZ:  Again, I'm going to ask
18   you -- he was not finished.  You -- you step on his
19   last words.
20           MR. TOAL:  He paused.  He threw me off.
21   So were you done with your answer?
22           THE WITNESS:  Let's just go on, yeah.
23   BY MR. TOAL:
24       Q    I was trying to understand why you
25   seemed to acknowledge that consideration of

83

1    pre-transaction career expectations is relevant in
2    other cases and why you regarded it as irrelevant in
3    this case, and I thought you testified previously
4    that in this case the merger was a foregone
5    conclusion.  Was that your testimony?
6        A    Well, in this case we were looking at
7    the pilots' seniority under a given merger versus
8    what their -- what -- what their careers would have
9    been under a different seniority list in the same
10   merger, not in an un-merged or a premerger airline
11   would have been, so --
12       Q    How does that differentiate this case
13   from any other case in which arbitrators or others
14   take into account the pre-transaction career
15   expectations of each pilot group?
16       A    How does -- how does this case differ?
17       Q    How does that aspect of this case that
18   you regarded a transaction as being a foregone
19   conclusion at the time they were discussing
20   seniority integration, how does that differentiate
21   it from any other case in which pre-transaction
22   expectations of the pilot groups are taken into
23   consideration?
24       A    Well, perhaps I misspoke when I said
25   that earlier because, I mean, I don't think that it

84

1    does actually differentiate this case from the
2    others.  What it differentiates is more of a
3    comparing.  In those other cases, you know, where --
4    where, for instance, I'm working with a -- with a
5    group that's going into a seniority arbitration, we
6    are comparing what their career under the merged
7    carrier will be to what their standalone career
8    expectations were.  So to the extent that they
9    brought X number of jobs with them, are they able to
10   continue to have access to those jobs under this
11   list in this merged airline?  That's not the
12   analysis that I'm doing in this case.  I'm not
13   comparing what -- whether their careers at American
14   are superior to or inferior to the careers that they
15   would have had at TWA as a standalone entity.
16   That's -- that's -- because I'm -- I'm -- we
17   wouldn't be arguing at an arbitration about what we
18   think the seniority integration should be.
19       Q    One of the things you are doing is
20   trying to assess whether the APA would have been
21   willing, under different circumstances, to make
22   additional concessions; correct?
23       A    That's correct.
24       Q    And you knew that the APA regarded the
25   pre-transaction career expectations as -- as a

21 (Pages 81 to 84)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

85

1  factor in determining what seniority integration
2  would be appropriate; correct?
3      A    In every merger there is one group that
4  thinks the other groups has dismal career
5  expectations.
6      Q    So why would you regard the
7  pre-transaction career expectations of the pilot
8  groups as irrelevant when it was one of the factors
9  that the APA was taking into consideration?
10     A    Because at the end of the day the
11 premerger career expectations of pilots matters to
12 the extent that they brought X number of jobs with
13 them and not typically where -- what may or may not
14 happen with, you know, the company absent the
15 merger.  That stuff is argued.  In my experience, it
16 doesn't play any significant role in the outcome of
17 seniority integrations.
18     Q    And that's based on what experience?
19     A    Well, that's based on a review of the
20 seniority awards going back some years.
21     Q    And you haven't seen seniority awards
22 in which the arbitrators analyze the pre-transaction
23 career expectations of the pilot groups on -- on a
24 standalone basis?
25     A    They do discuss it, certainly.

86

1      Q    Have you seen situations in which
2  arbitrators say that's the predominant factor in
3  evaluating a seniority arbitration?
4      A    In arbitrations where you are dealing
5  with a liquidated carrier, not a liquidated carrier,
6  but a carrier that ceased to function, I've seen
7  that.
8      Q    Have you seen it in other situations?
9      A    Where a particular amount of weight was
10 placed on what?  You would have to be more specific.
11     Q    On the pre-transaction career
12 expectations of each pilot group.
13     A    Well, they are always based on the
14 premerger -- premerger career expectations in some
15 manner.
16     Q    How -- how do you define
17 pre-transaction career expectations?  What's
18 included in that assessment?
19     A    The amount of work that the pilot group
20 brought to the merger, how old that pilot group is,
21 whether the airline had been growing or shrinking,
22 whether it had aircraft orders.
23     Q    Anything else?
24     A    The financial health of the company.
25 Whether the -- whether the company was in or out of

87

1  bankruptcy.  Whether it was or was not operating.
2      Q    Anything else?
3      A    I think those would be the most common
4  ones.
5      Q    What about the -- the equipment that
6  each airline operated?
7      A    Well, when I said the job that they
8  brought to the merger, that's what I mean.
9      Q    And what do you know about TWA's
10 financial condition at the time of the American
11 Airline transaction?
12     A    They were in bankruptcy.  It was not
13 healthy.  But as I said, I didn't -- I did not
14 investigate or analyze their financial situation.
15     Q    Is that something you have the
16 expertise to do?
17     A    To assess their financial situation?
18     Q    Yes.
19     A    No.
20     Q    Did you undertake any analysis of the
21 equipment that TWA was operating prior to the time
22 of the transaction?
23     A    Other than to see how many positions
24 they had on different pieces of equipment, no.  I
25 don't know anything about, you know, the age or make

88

1  of -- of, you know, the particular aircraft they
2  were flying.
3      Q    Did you do anything to undertake an
4  analysis of the number of pilot jobs that TWA would
5  be bringing to a merged entity?
6      A    Some.
7      Q    What did you do in that regard?
8      A    I looked at how many pilot positions on
9  those -- those pieces of equipment were left as of,
10 I guess, 18 months after the merger.
11     Q    Did you do anything else?
12     A    No.
13     Q    Did you undertake any analysis of TWA's
14 viability as a going concern on a standalone basis?
15     A    No, I did not.
16     Q    Is that something that would be
17 relevant to the pre-transaction career expectations
18 of the TWA pilots?
19     A    No.  To the extent that they were still
20 operating as of the merger, no.
21     Q    What about if they were expected to
22 stop operating within a matter of months?  Would
23 that affect their pre-transaction career
24 expectations?
25     A    Not in my opinion, no.

22  (Pages 85 to 88)

DEGNAN & BATEMAN
(856)  232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

Case 1:02-cv-02917-JEI   Document 579-7   Filed 09/30/13   Page 24 of 52 PageID: 19189

**89**

1    Q    Is -- is that something that, say, you
2  are seeking to offer as an expert opinion?
3    A    That's something I'm seeking to offer
4  as -- as what I know to be historical fact.
5    Q    Well, what is it that you know to be
6  historical fact?
7    A    Well, for instance, when Canadian
8  Airline and Air Canada merged, Canadian Airline was
9  counting their cash in terms of hours.  You know,
10  the Air Canada pilots, you know, said this was proof
11  that they had no career expectations.  But at the
12  end of the day, it mattered very little in their
13  seniority integration.
14      So there has been lots of situations where
15  there was a merger between a bankrupt carrier which
16  the other side claimed was, you know, within minutes
17  of expiring, but yet ended up playing very little
18  role in the actual outcome of the seniority
19  integration.
20    Q    Do you know in that case what the
21  arbitrator concluded with respect to the viability
22  of -- of the acquired airline?
23    MS. RODRIGUEZ:  I object to the form.
24    THE WITNESS:  Yeah, you will have to be
25  a little more specific because one arbitrator did

**90**

1  conclude that it had -- it was -- it was a
2  reasonable factor to consider and that award ended
3  up being overturned.  So I would have to say yes,
4  someone thought so, but at the end of the day they
5  were proven that putting any undue influence on --
6  on the economics of Canadian Airline was incorrect,
7  so --
8  BY MR. TOAL:
9    Q    And what court overturned that
10  arbitration award?
11    A    The Canadian Industrial Relations
12  Board.
13    Q    And on what basis was that award
14  overturned?
15    A    The played -- the arbitrator placed
16  undue influence -- placed undue weight on the
17  economics of Canadian Airlines.
18    Q    And are you aware of any situation in
19  the United States in which any arbitration award has
20  been overturned for the reliance that was placed on
21  the financial condition of the acquired carrier?
22    A    I'm not aware of any, no.
23    Q    And other than the Air Canada situation
24  that you described, are you aware of any other
25  support for your view that the viability of the

**91**

1  acquired airline is not relevant to the
2  pre-transaction career expectations of the acquired
3  pilots?
4    A    I wouldn't say it is irrelevant, but it
5  is of limited relevance.
6    Q    And other than the Air Canada case that
7  you mentioned, what other support do you have for
8  that statement?
9    MS. RODRIGUEZ:  I object to the form.
10    THE WITNESS:  Support for what
11  statement?
12  BY MR. TOAL:
13    Q    The statement that the pre- -- the
14  viability of the acquired airline is of limited
15  relevance in assessing the pre-transaction career
16  expectations of the acquired pilots.
17    A    Well, I mean, I think any -- any award
18  you look at where one of the carriers is a bankrupt
19  airline, I will now use -- use America
20  West/USAirways, USAirways argued strenuously through
21  its -- through the process that USAir -- America
22  West argued strenuously that -- that USAirways had
23  no hope of ever flying again.  They were, you know,
24  a doomed airline.  They were a failed carrier.  And,
25  therefore, their pilots had no career expectations

**92**

1  at all, and that this merger had saved them.
2  Obviously, USAirways pilots argued that no, no, no,
3  no.  Of course, we have -- we have all kinds of
4  great things that are going to happen to this
5  airline without this merger.  But at the end of the
6  day, the arbitrator just looked at the number of the
7  jobs that each carrier had -- each -- each pilot
8  group brought to the merger and did the integration
9  on that basis.  You know, did he give anyone a
10  premium because their expectations were more, you
11  know, that their expectations were better because of
12  the economic health of the company?  You know, it is
13  arguable.  But he certainly didn't appear to
14  discount anybody's seniority on the basis of
15  economics.
16    Q    But the arbitrator in that case didn't
17  agree with America West's arguments that USAir was
18  on the verge of liquidation, did he?
19    A    He did not.
20    Q    So my question is, whether you're aware
21  of any support, other than the Air Canada case that
22  you mentioned, for the proposition that the
23  viability of the acquired airline is given little
24  weight in assessing the pre-transaction career
25  expectations of the acquired pilot group?

23  (Pages 89 to 92)

f1d60e56-51dd-489a-a0ce-16b47e16413e

93

1    MS. RODRIGUEZ: Objection.
2         THE WITNESS: If we look at the
3    placement -- would it be all right if I referred to
4    my report?
5    BY MR. TOAL:
6    Q    Sure.
7    A    All right. Let's do that. I just want
8    to make sure I'm citing the right group from the
9    right merger.
10   MS. RODRIGUEZ: More water?
11        THE WITNESS: You know, I'm probably
12   drinking too much because I'm going to need another
13   break in a minute, but --
14        Yeah. It was Ichan in Republic Frontier
15   Midwest Linx that I was thinking about. And he
16   says, you know, particularly of the Linx pilots, he
17   says, their reasonable expectations for career
18   advancement were the least of the active pilot
19   groups ranking only above the Midwest
20   pre-transaction furloughees. They operated only
21   turboprop aircraft, accumulated only limited
22   seniority, flying under a startup operation that
23   went bankrupt, and on and on he goes to talk about
24   the dismal state that the Linx pilots were in, you
25   know. But yet he merged those pilots with people

94

1    whose careers expectations were, at least from an
2    economic point of view, significantly better, and
3    were flying equipment that was significantly better.
4    So there is that one.
5    BY MR. TOAL:
6    Q    Well, in that one --
7    A    I'm not actually -- I'm not actually
8    done.
9    Q    Okay. Go ahead.
10   A    I think there are a couple others we
11   might want to look at.
12        The Continental/Frontier. Again, you know,
13   Nicolau says, you know, Frontier had precious little
14   prospect of surviving as of the day before its
15   shutdown. It was shrinking, not expanding,
16   continuously losing money, badly draining its
17   corporate appearance, and on and on, a dismal
18   situation. Yet he takes all of the captains from
19   Frontier and places them just below the junior
20   captains at Continental. And so, instead of
21   stapling them as, you know, it seems like he was
22   more or less, you know, ordered to do by his terms
23   of reference, he places the Frontier pilots in their
24   group. So, you know, yes, they consider the
25   economics and the premerger expectations from the

95

1    point of view of the likelihood of the carrier
2    surviving, but does it actually translate into
3    people's placement on the seniority list? And I
4    would argue, not really. A little bit at the
5    margin, but not in the general way in which -- or
6    the general manner in which the seniority lists are
7    constructed.
8    Q    And have you done any empirical
9    analysis to support your intuition that the
10   financial condition of the carrier is not given
11   substantial weight in seniority integration?
12   A    Well, by going through all of these
13   awards and looking at each one where one carrier was
14   in distress, and what the outcome of that was, and
15   whether or not that financial distress played a
16   significant role in the construction of the list, we
17   could compare this by simply looking at, you know,
18   how one list was constructed in a bankruptcy and
19   comparing it to how a list was constructed outside
20   of bankruptcy. And if they are markedly different,
21   then you would say, yeah, okay. So, obviously,
22   there is some reason to believe that bankrupt
23   carriers, the treatment of their working pilots is
24   different under a situation of financial distress
25   than in others. And I've never seen any evidence

96

1    that that's the case.
2    Q    And have you done such an analysis to
3    try and determine if there is a correlation between
4    the financial condition of the acquired airline and
5    the placement of their --
6    A    -- working pilots, yeah.
7    Q    -- and the placement of their pilots on
8    the list?
9    A    There is different -- there is
10   different placement absolutely in terms of what
11   happened with furloughed pilots. But in terms of
12   their working pilots, not particularly. And I have
13   done -- I have looked at several merged seniority
14   lists from several different mergers. And I have
15   looked at whether there is a noticeable difference
16   in how they are constructed, whether one carrier is
17   in bankruptcy or not. And it would be my contention
18   that there is no difference.
19   Q    Have you done a quantitative analysis
20   to try and assess whether it is true that the
21   financial condition of the acquired airline affects
22   the placement of the pilots of the acquired airline
23   in a merged seniority integration list?
24   A    Have I done a quantitative analysis?
25   Yes, I would say I have where I've looked at

24  (Pages 93 to 96)

RIKK SALAMAT

97

1  the number of pilots that were merged from each
2  carrier, what their working status was, and whether
3  it differs from a merger where one group is in
4  bankruptcy to one where, like for a business. Yes,
5  I've certainly done that analysis. There is a few
6  others, as well, but they are not really as -- as
7  fun to talk about, but --
8      Q    Few other what?
9      A    Types of analysis between what mergers
10 looked like where the one carrier is in financial
11 distress and not the other.
12     Q    And what -- what other analysis do you
13 have in mind?
14         MS. RODRIGUEZ: I object to the form.
15         THE WITNESS: The number of pilots that
16 end up in the top half of the list is one type of
17 analysis that's been done.
18 BY MR. TOAL:
19     Q    And what are the others?
20     A    The number of pilots that have ended up
21 in the bottom half of the list. You know, the
22 problem with those is it is almost impossible to
23 adjust for the equipment that people are bringing,
24 and whether or not it should be included in the list
25 construction in the first place. So, in general,

98

1  you are left with just saying how many pilots were
2  merged and what was their status? And was one group
3  of working pilots left behind or predominantly left
4  off of the construction of the major pilot list in a
5  bankrupt situation versus a non-bankrupt situation.
6      Q    And have you done any written analysis
7  that you can point me to concerning the extent to
8  which the -- the financial condition of the acquired
9  airline affects the placement of pilots of the
10 acquired airline on a merged seniority list?
11     A    I have not written anything on the
12 subject that would be easy to point to.
13     Q    Whether it is easy to point to or not,
14 is there anything you've written on the subject?
15     A    I -- I don't believe I've -- I've
16 written anything on the subject.
17         THE WITNESS: Can we take a quick
18 break? I swear, it will only be, like, five
19 minutes.
20         VIDEO SPECIALIST: The time is now
21 11:45 and we are going off the video record.
22         (Brief recess.)
23         VIDEO SPECIALIST: The time is now
24 11:48 and we are back on the video record.
25 BY MR. TOAL:

99

1      Q    Mr. Salamat, you did undergraduate
2  coursework at the Ontario College of Art; correct?
3      A    That's correct.
4      Q    And what years did you study there?
5      A    '87 -- '86 and '87, I believe.
6      Q    And what did you study there?
7      A    Fine arts.
8      Q    And why did you leave the Ontario
9  College of Art?
10     A    Because I couldn't draw.
11     Q    Any other reasons?
12     A    Mostly because I couldn't draw, and in
13 order to progress in the program, you had to finish
14 your what was called foundation year where you had
15 to paint, and draw and do a whole bunch of other
16 things, and you had to be able to pass those
17 courses, so --
18     Q    So you said mostly because you couldn't
19 draw. Were there any other reasons that you decided
20 to leave there?
21     A    There was another reason, but I don't
22 know how relevant it would be.
23     Q    What was the other reason?
24     A    Well, I was seeing this girl. She
25 thought I would make a fine lawyer, so I decided I

100

1  would leave art school and go off and study
2  economics at the University of Toronto.
3      Q    Okay. So you -- you did undergraduate
4  coursework at the University of Toronto, also?
5      A    I did -- did one year of undergraduate
6  work there.
7      Q    And what did you study there?
8      A    Economics.
9      Q    Is that '87 to '88?
10     A    Yes, I believe so.
11     Q    And why did you leave the University of
12 Toronto?
13     A    Because economics wasn't for me. Or
14 more particularly, the University of Toronto wasn't
15 for me. First year in economics, the University of
16 Toronto was a sort of dismal experience, so I
17 decided to switch universities.
18     Q    And did you leave Toronto to attend
19 York University?
20     A    I did.
21     Q    And you obtained a degree from York
22 University in 1994; is that correct?
23     A    I believe that's correct, yes.
24     Q    Did you go directly from the University
25 of Toronto to York University?

25 (Pages 97 to 100)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

101

1      A     There was -- I don't -- there was
2  nothing in between.
3      Q     Were you a full-time student at York
4  University, from --
5      A     Yes.  Yeah.  I was a full-time student
6  at UFT one year and then York University the next.
7      Q     So starting in -- was it 1989 that you
8  started at York University?
9      A     Yeah.
10     Q     And so, from 1989 through 1994, you
11 were working to get your degree at York University;
12 correct?
13     A     That's correct.
14     Q     What were you studying at York
15 University?
16     A     Anthropology and women's studies.
17     Q     And what degree did you attain from
18 York University?
19     A     An honor's bachelor.
20     Q     And how is an honor's bachelor
21 different from a bachelor of arts degree?
22     A     To get an honor's bachelor, you have to
23 have two majors.
24     Q     And what did you do after you left York
25 University?

102

1      A     I worked at a number of jobs.
2      Q     So what did you do first?
3      A     Well, when I left -- when I graduated
4  from York University, I was still working for an NGO
5  called Earth Roots.  I worked for them for some
6  time, and I left and went to work for a publication
7  called Now Magazine.
8      Q     So what did you do for Earth Roots?
9      A     I was a campaign coordinator.
10     Q     What sorts of campaigns?
11     A     There was a campaign on zero emission,
12 there was the Boreal Forest Logging, Old Growth
13 Forest Protection, and those -- those were the three
14 major campaigns that I worked on.
15     Q     And what did you do in connection with
16 these campaigns?
17     A     I was working with fundraising.  I
18 wrote newsletters.  I was in charge of summer
19 students and scientists who were doing specific bits
20 of research on one of those three projects,
21 maintained databases.  You know, it was an NGO.  You
22 kind of do everything.
23     Q     And when did you leave Earth Roots?
24     A     19 -- I think it was in '94.  I stayed
25 on in some fashion for years after, but my full-time

103

1  ended in '94.
2      Q     Same year you graduated from York
3  University?
4      A     That's correct.
5      Q     And what did you do after leaving Earth
6  Roots?
7      A     I went to work for Now Magazine.  Or I
8  may have worked a couple of contracts with other
9  NGOs in between the two, but --
10     Q     And what is -- what is Now Magazine?
11     A     Now Magazine is an alternative news
12 weekly.
13     Q     What did you do for Now Magazine?
14     A     I was the system's analyst.
15     Q     What systems were you analyzing?
16     A     Well, financial systems.  Financial
17 systems, ad booking systems, publication systems.
18     Q     Were you analyzing the financial
19 systems of Now Magazine?
20     A     Yes.
21     Q     Were you analyzing any other financial
22 systems?
23     A     Just their internal finances.
24     Q     And how long did you stay at Now
25 Magazine?

104

1      A     I think I was there for about four
2  years.
3      Q     So approximately 1998, you left?
4      A     I think around '98, yeah.
5      Q     And what did you do after that?
6      A     I started a company called Web Impact.
7      Q     And what kind of company was that?
8      A     It was a -- an internet development
9  company.
10     Q     So what were you doing at Web Impact?
11     A     I had a staff that was doing internet
12 development.  So I was negotiating contracts with
13 clients, and overseeing staff, and doing some
14 development myself, particularly the -- the more
15 analytical systems that we developed for some
16 clients.
17     Q     What is internet development?
18     A     Web site.  We built -- we built web
19 sites for the most part, but we also did a lot of
20 development for intranets and things that were
21 internet enabled but never actually put on the
22 internet.
23     Q     How long did you stay at Web Impact?
24     A     I sold the company in 2000 -- 2000, I
25 think.  It was right -- right after the crash, so I

26 (Pages 101 to 104)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

105

1   guess it was 2000. I stayed on for a few months and
2   then left.
3       Q    And what did you do after selling Web
4   Impact?
5       A    I went to work for -- well, I
6   started -- I started my own consulting company where
7   we were doing demonstrable exhibits and evidence for
8   a few law firms. We -- yeah, that was -- that was
9   the majority of the work that I did, and then I went
10  and took a job at a -- a company called Oven
11  Digital.
12      Q    What is the name of the consulting
13  company that you started?
14      A    I can't remember what -- when -- at
15  some point in time it became Case Lab, but I can't
16  remember when exactly that name started, so --
17      Q    So has that company been operating
18  continuously since you -- you started it after --
19  after leaving Web Impact?
20      A    Yeah. Even while I was at Oven, I was
21  winding down my work there, but Oven promptly went
22  bankrupt, and so I continued on.
23      Q    And what year did you start this
24  consulting company?
25      A    That would have been after I sold Web

106

1   Impact, so it would have been in 2000.
2       Q    Do you work for law firms in Canada?
3       A    Yes.
4       Q    Did you work for law firms elsewhere?
5       A    Not until -- not -- not originally, no.
6       Q    And then you said you went to Oven
7   Digital?
8       A    Uh-huh.
9       Q    And how were you splitting your time
10  between the consulting company and Oven Digital when
11  you started at Oven Digital?
12      A    Well, when I took the job at Oven
13  Digital, I started transferring all my work over to
14  someone that I had -- I had done work with in the
15  past. And then Oven went under, and it all got
16  transferred back to me again, so --
17      Q    When did you start at Oven Digital?
18      A    It was in -- it was in 2000, but I -- I
19  can't remember. It was -- it was in the fall, I
20  believe.
21      Q    And when did you stop working at Oven
22  Digital?
23      A    Well, the company went bankrupt in
24  January or February of 2001. So I don't know --
25  some of the work that was in progress got taken over

107

1   by a kind of rag-tag bunch of people who had been
2   set adrift, and so kind of continued Oven Digital
3   work up until the middle of the summer of 2001. So
4   -- but when exactly I stopped being an employee of
5   Oven, I can't recall.
6       Q    What were you doing for Oven Digital?
7       A    Well, my -- my title was technical
8   strategist but, you know, my job was, you know, to
9   be the technical person involved in -- in sales and
10  also overseeing technical staff. They had design
11  staff and technical staff, and -- and I was
12  overseeing the technical staff.
13      Q    What sort of business is Oven Digital
14  in -- were they in?
15      A    They were a design company, internet
16  design.
17      Q    And what did you do after Oven Digital?
18      A    After Oven Digital, I went back to the
19  consulting work that I was doing before.
20      Q    And have you continued doing that
21  consulting work ever since?
22      A    Yes.
23      Q    Have you been employed by any other
24  businesses since the time that you went back to the
25  consulting group?

108

1       A    Well, I'm a partner in a company called
2   Cruise Wear, and so, you know, I'm technically an
3   employee of that company.
4       Q    What does that company do?
5       A    It -- it has a software -- it creates
6   software for airline scheduling.
7       Q    And you -- you obtained an MBA degree
8   from the University of Toronto in 2003; correct?
9       A    That's right.
10      Q    Were you working while you were
11  studying for your degree?
12      A    Yes.
13      Q    Were you a full-time student in the MBA
14  program?
15      A    Yes.
16      Q    When did you start -- when did you
17  start studying for your MBA?
18      A    The fall of 2001.
19      Q    Did you have any field of concentration
20  in connection with your MBA?
21      A    No.
22      Q    Now, in the first page of your report,
23  you say that you personally specialize in the
24  analysis of economic and financial data, primarily
25  for professional associations and labor unions;

27 (Pages 105 to 108)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

---

**109**

1 correct?
2     A    That's correct.
3     Q    Is that an accurate description of your
4 field of specialization?
5     A    I believe it is.
6     Q    Have you ever received any awards or
7 certifications from professional organizations?
8     A    Awards or certifications?
9 I get these plaques given to me now and again
10 that say thank you for your hard work.
11     Q    Who gives you those plaques?
12     A    Pilot groups. I mean, I've got a bunch
13 of them hanging around. I've got one from the
14 Northwest pilots. I've got one from the Canadian
15 Airline pilots. I've got one from the USAirways
16 pilots. I've got one from the Ontario Justices of
17 the Peace, I believe.
18     Q    So as -- I was more interested in any
19 sort of professional certifications, professional
20 licenses that you may have.
21     A    No.
22     Q    Have you received any awards from
23 economic groups, business groups?
24     A    No. No, I haven't.
25     Q    Have you ever served as an arbitrator

---

**110**

1 of a seniority integration dispute?
2     A    No, I have not.
3     Q    Have you served as an arbitrator for
4 any kind of dispute?
5     A    No, I have not.
6     Q    Have you served as a mediator?
7     A    No.
8     Q    I'm going to direct your attention back
9 to the list of prior expert testimony.
10     A    Uh-huh.
11     Q    Would you take a look at that page in
12 your report?
13     A    Yes.
14     Q    So the first five entries here all
15 appear to relate to an Air Canada dispute; is that
16 correct?
17     A    That's the merger of Air Canada and
18 Canadian.
19     Q    So are these all different stages of
20 the same -- same underlying dispute?
21     A    Well, they all -- they all stem from
22 the seniority integration of Canadian Airlines
23 pilots and Air Canada pilots.
24     Q    Did you submit written expert reports
25 in connection with this case?

---

**111**

1     A    Yes.
2     Q    How many?
3     A    Hmm?
4     Q    How many written expert reports did you
5 submit in that case?
6     A    For the first one, I don't think there
7 was any written. For the second one, there were
8 several reports I did for Brian Keller and -- and
9 the arbitration panel. One or two for the
10 proceeding.
11     Q    Which proceeding are you -- are you
12 referring to?
13     A    The seniority integration -- this would
14 be the second arbitration in the -- in the pilot
15 seniority dispute. The third case would have been a
16 limited reconsideration that was done. And so,
17 quite possibly all of the work that I had done in
18 the previous two was redone plus some additional
19 work.
20     Q    And just so we are clear that we are
21 talking about the same thing, that is the --
22     A    240103-C.
23     Q    So it says under that entry, expert
24 report for the Air Line Pilot's Association,
25 Canadian Airlines.

---

**112**

1     A    Uh-huh.
2     Q    Is it your recollection that you did
3 submit a report --
4     A    Yes.
5     Q    -- in connection with --
6     A    No, no. I mean, there was a report. I
7 just can't -- you know, part of that report would
8 have been everything that was done prior, so -- I
9 can't recall how much original work went into that
10 report.
11     Q    Did you submit written reports for
12 either of the two other entries related to the Air
13 Canada matter?
14     A    For the fourth one, yes. And probably
15 not for the fifth one. For the fifth one, I would
16 have just served as an expert.
17     Q    Did you testify in any of those five
18 matters?
19     A    Well, I testified in the second one. I
20 testified multiple times in front of the arbitration
21 panel.
22     Q    How about in any of the others?
23     A    No.
24     Q    In these five matters, to the extent
25 you submitted an expert report, do you have a copy

---

28 (Pages 109 to 112)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

113

1  of the report that you submitted?
2      A    I doubt it very much. It's -- it's --
3  it's very unlikely. I mean, they weren't expert
4  reports in the sense that these ones are. I mean,
5  they were reports that were specific responses to
6  specific questions posed by the arbitrator. Could
7  you tell us the impact of X? And I would do it and
8  hand it over to them. I mean, they were never --
9  they were not formal reports. The report for the
10  third one on the list, there may be a copy of that
11  one around someplace.
12      Q    Have you done anything to try and
13  locate any expert report that you submitted in any
14  of these five matters?
15      A    No.
16      Q    Do you have copies of transcripts of
17  any testimony you gave in any of these five matters?
18      A    No. They didn't have any transcripts
19  in those proceedings.
20      Q    The next matter on the list, the 2007
21  pilot seniority integration of the pilots of
22  USAirways and the pilots of America West Airlines,
23  did you submit a written expert report in that case?
24      A    Well, I submitted a report. I gave,
25  you know, testimony. Submitted volumes, and

114

1  volumes, and volumes of data. But, you know, there
2  wasn't a written report in the sense of this one
3  where a conclusion was arrived at or -- so, it is
4  not what I would have called a report. It is what I
5  would have called a submission, but -- but you would
6  probably call it a report.
7      Q    I would?
8      A    Yeah.
9      Q    Do you have a copy of the submission
10  that you made in connection with that case?
11      A    I may. I may. I don't -- I don't
12  know.
13      Q    Did you offer testimony in that case?
14      A    I did.
15      Q    Was there a transcript of those
16  proceedings?
17      A    I believe there is.
18      Q    Do you have a copy of the transcript of
19  your testimony from that proceeding?
20      A    I do not.
21      Q    Would you be able to acquire a copy of
22  the transcript of your testimony in that case?
23      A    I could request it from the -- the firm
24  that I worked with on that one. They may or may not
25  have it. They may or may not provide it. I don't

115

1  know.
2      Q    So the next -- but you haven't made
3  such a request to date; correct?
4      A    No.
5      Q    The next item on the list, 2008 inquiry
6  by the Fifth Triennial Justices of the Peace
7  Remuneration Commission, did you submit a written
8  expert report in that matter?
9      A    I did.
10      Q    Do you have a copy of that report?
11      A    Not with me, but there is one probably
12  in my office.
13      Q    Did you testify in that case?
14      A    I did.
15      Q    Was there a transcript created of your
16  testimony?
17      A    No.
18      Q    And what were you doing in that matter?
19      A    The Fifth Triennial Justices of the
20  Peace Remuneration Commission is the -- is the quasi
21  judicial body whose responsibility it is to decide
22  how much Justices of the Peace get paid, and my
23  report had to do with the costs of an agreement that
24  was reached between the government and the
25  association of the Justices of the Peace that we

116

1  negotiated.
2      Q    The next matter on this list, the 2008
3  seniority integration arbitration between the pilots
4  of Northwest and the pilots of Delta Airlines, did
5  you submit a written report in that case?
6      A    I wrote a written report for that case.
7  It was submitted by a pilot witness and not by me.
8      Q    Submitted by a pilot witness as if the
9  pilot witness had prepared the report?
10      A    No. It was presented and discussed by
11  a pilot witness rather than by me.
12      Q    Was there a report submitted under your
13  name?
14      A    I -- I cannot recall. It certainly
15  would have been well known that it was -- it
16  certainly would have been known by the arbitrators
17  and everyone in the room that it was my work.
18  Whether it had my name on it, I honestly cannot
19  recall.
20      Q    Do you have a copy of the report that
21  was submitted?
22      A    Someplace.
23      Q    Did you testify in that case?
24      A    I did not.
25      Q    The next item, the 2009 System Board of

29 (Pages 113 to 116)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

117

1    Adjustment Transition Dispute between USAirways
2    pilots and USAir, did you submit a written report, a
3    written expert report in that case?
4        A    I did.
5        Q    And do you have a copy of that report?
6        A    I -- I -- I will have a copy someplace,
7    yes.
8        Q    Did you testify in that case?
9        A    I did.
10       Q    Was a transcript created of your
11   testimony?
12       A    I believe there was.
13       Q    And do you have a copy of that
14   transcript?
15       A    I do not.
16       Q    Would you be able to obtain a copy of
17   that transcript?
18       A    I can request it.
19       Q    Next item, the 2009 US District Court
20   for the District of Arizona, did you submit a
21   written expert report in that case?
22       A    I did.
23       Q    Do you have a copy of that report?
24       A    Someplace.
25       Q    Did you testify in that case?

118

1        A    I did not.
2        Q    Did you testify even in a deposition in
3    that case?
4        A    No.
5        Q    Were you accepted by the court as an
6    expert witness?
7        A    I believe all experts were excluded
8    from the case, so whether we had -- I had been
9    accepted and then excluded or excluded before being
10   accepted, I couldn't say because I wasn't at the
11   trial.
12       Q    Do you know on what basis you were
13   excluded from the case?
14       A    All of the experts were excluded
15   because the -- the judge was not interested in
16   hearing any of that type of evidence, I understand.
17       Q    Do you have a specific understanding of
18   the reasons that your testimony was excluded?
19       A    No.  I was told that all the experts
20   that were providing reports on -- on impacts were
21   not going to be admissible.
22       Q    And what was the nature of your report
23   in that case?
24       A    There was a pilot who had done some
25   financial analysis of the impact of the USAirways

119

1    list on the America West pilots, and I was asked to
2    validate that his calculations were correct.
3        Q    So the next item on the list is a 2009
4    Canadian Human Rights Tribunal.  Do you see that?
5        A    Yes.
6        Q    Did you submit a written, expert report
7    in connection with that matter?
8        A    I did.
9        Q    What was the nature of that report?
10       A    I was testifying on the impact of a
11   proposal to change the age of retirement for Canada
12   pilots from 60 to 65.
13       Q    And did you testify in that case?
14       A    I did.
15       Q    Do you have a copy of the transcript of
16   your testimony?
17       A    I don't believe there was a transcript.
18       Q    Do you have a copy of the report that
19   you submitted in that case?
20       A    Yes.
21       Q    The 2010 System Board of Adjustment
22   transition disputes 12, 13 and 14, did you submit a
23   written expert report in connection with that
24   matter?
25       A    I did.

120

1        Q    Do you have a copy of that report?
2        A    I must, someplace.
3        Q    And did you testify in that matter?
4        A    I did.
5        Q    Is there a transcript of your
6    testimony?
7        A    Some of it.  I believe there is.
8        Q    And do you have a copy of that
9    transcript?
10       A    No, I do not.
11       Q    Next matter on your list is a 2011
12   Ontario Superior Court matter.  Do you see that?
13       A    Yes.
14       Q    And did you submit a written expert
15   report in that case?
16       A    I did.
17       Q    Do you have a copy of it?
18       A    Someplace.
19       Q    Did you testify in that case?
20       A    I did not.
21       Q    The next item is a 2011 System Board of
22   Adjustment transition dispute.  Do you see that?
23       A    Yes.
24       Q    Did you submit a written expert report
25   in that case?

30  (Pages 117 to 120)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

121

1    **A**    I did.
2    **Q**    Do you have a copy?
3    **A**    Someplace.
4    **Q**    Did you testify in that case?
5    **A**    I did.
6    **Q**    And was a transcript of your testimony
7 created?
8    **A**    I do not know.
9    **Q**    And you list a 2008 to 2011 National
10 Mediation Board.  Do you see that?
11    **A**    Yes.
12    **Q**    Did you submit a written expert report
13 in connection with that matter?
14    **A**    Several, over -- over that period.
15    **Q**    Do you have copies of those reports?
16    **A**    Most likely.
17    **Q**    Did you testify in that matter?
18    **A**    I did.
19    **Q**    Was there a transcript created of your
20 testimony?
21    **A**    No.
22    **Q**    And then you list a 2012 Collective
23 Bargaining Agreement Arbitration by Final Order
24 Selection.  Do you see that?
25    **A**    Yes.

122

1    **Q**    Did you submit a written expert report
2 in that matter?
3    **A**    I did.
4    **Q**    Do you have a copy?
5    **A**    Yes.
6    **Q**    Did you testify in that case?
7    **A**    I did not testify.
8    **Q**    So you said in a number of the matters
9 that you listed as prior expert experience, you made
10 submissions but not -- not reports that you thought
11 were similar to the report that you submitted in
12 this case.
13    **A**    Uh-huh.
14       **MS. RODRIGUEZ:  Objection.**
15 **BY MR. TOAL:**
16    **Q**    Do that you recall that testimony?
17    **A**    Yes.  I said that many of the reports
18 that I filed were not similar to this one.
19    **Q**    Have -- have you ever submitted a
20 report that is similar to the report that you
21 submitted in this case?
22    **A**    Well, this case is pretty unique, so,
23 no.
24    **Q**    Have you ever submitted a report with
25 an extensive narrative?

123

1    **A**    Yeah.  You know, the -- the Berry
2 versus Pulley had an extensive narrative.  The final
3 offer selection was largely a quantitative analysis,
4 not much on words.  Human Rights Tribunal might have
5 been a bit wordier.  I don't -- I mean, the
6 difference between a quantitative report and a
7 narrative report, maybe there is some gray area
8 there, but I believe this one would certainly be the
9 most narrative of all.
10    **Q**    And the Berry versus Pulley matter that
11 you mentioned --
12    **A**    Yes.
13    **Q**    -- which -- which one of the items on
14 your list is that?
15    **A**    That would be the first item on the
16 second page.
17    **Q**    Have you ever previously offered an
18 expert opinion on the likely result of a negotiation
19 between two parties, had circumstances been
20 different?
21    **A**    No, I've not.
22    **Q**    So you say on the first page of your
23 expert report that your practice has involved
24 analyzing the impacts of pilot seniority mergers.
25 Is that accurate?

124

1    **A**    Yes.
2    **Q**    What do you specifically do in order to
3 analyze the impacts of pilot seniority mergers?
4    **A**    Well, when you say what do I typically
5 do, I think you are going to have to be a little
6 more specific than that.
7    **Q**    How do you go about analyzing the
8 impact of seniority mergers?
9    **A**    Well, in its most general form, we
10 compare what would happen to the income of pilots
11 under one scenario versus another.
12    **Q**    And is -- is that -- does that reflect
13 the majority of the expert work you've done in the
14 matters that you've listed on your list of expert
15 testimony?
16    **A**    Does -- does what?  I'm sorry.  Maybe
17 you can ask that question a different way.
18    **Q**    In prior cases in which you've served
19 as an expert witness, are you typically making
20 assessments of the impact of two different seniority
21 integration scenarios?
22    **A**    If it's a seniority integration issue,
23 yeah.
24    **Q**    So in the seniority integration matters
25 in which you've worked on previously, is the work

31 (Pages 121 to 124)

RIKK SALAMAT

125

1  that you've done to assess the financial impact of
2  two different seniority integration proposals?
3      A     That would generally be the case.
4      Q     You refer in your report to something
5  called the ALPA merger tool?
6      A     Yes.
7      Q     When did you develop the ALPA merger
8  tool?
9      A     The ALPA merger tool was developed in
10  2002.
11      Q     What were the circumstances in which
12  you developed it?
13      A     It was developed for the Air Line
14  Pilot's Association, Canadian Airlines, for the
15  purposes of an appeal of their seniority integration
16  with Canadian Airlines -- with -- with Air Canada.
17  And having won that appeal, to prepare for and to go
18  through the arbitration, second arbitration.
19      Q     Did you use the ALPA merger tool in
20  this case?
21      A     Parts of it were -- were used, but not
22  in any great measure.
23      Q     To the extent you used the ALPA merger
24  tool in this case, how did you use it?
25      A     It had one component that made merged

126

1  seniority lists, and I used that.
2      Q     And as part of your backup, did you
3  provide the part of the ALPA merger tool that you
4  used in this case?
5      A     I don't know whether I did or not.  I
6  may not have.
7      Q     Okay.  We would request production of
8  whatever part of the ALPA merger tool was used in
9  this case.
10      A     All right.
11      Q     Was your objective in this case to try
12  and figure out what the merged seniority list --
13  what any merged seniority list between the TWA MEC
14  and the APA would have looked like in the absence of
15  a breach of a duty of fair representation by ALPA?
16          MS. RODRIGUEZ: I object to the form.
17          THE WITNESS: I'm sorry.  Can I ask you
18  to ask that question again?  I'm really not sure I
19  understood it.
20  BY MR. TOAL:
21      Q     Sure.
22          The question is whether your objective in this
23  case was to try to figure out what any merged
24  seniority list agreed upon between the TWA MEC and
25  the APA would have looked like absent any breach of

127

1  a duty of fair representation by ALPA?
2      A     No.  That was one objective of the
3  report, yes.
4      Q     And what information did you think you
5  needed in order to make that assessment?
6      A     The proposals that had been passed
7  between the parties, information on -- on what the
8  courses of action that ALPA had available to it that
9  were not undertaken, the closing arguments in the
10  trial and the instructions to the jury in the trial
11  are probably the most important things that I
12  referenced.
13      Q     Anything else that you thought was
14  necessary in order for you to conduct your analysis?
15      A     Well, lots and lots of data.  I mean,
16  first of all, which analysis are we talking about?
17  The -- the estimating of what the APA and ALPA would
18  have agreed to, or --
19      Q     Yes.
20      A     Well, I mean, in terms of data, to the
21  contributing lists that went into the merger, which
22  included people's positions, the fleet information
23  of both of the airlines.  I think I already
24  mentioned the proposals that had been passed,
25  information on the actions that ALPA did or didn't

128

1  undertake that led to the breach.  Sitting here
2  right now, I can't think of any others, but I'm --
3  I'm not saying there aren't any.
4      Q     Where did you acquire information on
5  the actions that ALPA had available to it that it
6  didn't pursue?
7      A     From the testimony of Mike Day and from
8  the closing arguments.
9      Q     Did you have any other source of
10  information on the actions that ALPA had available
11  to it that it didn't undertake?
12      A     No.  I think -- I think the most
13  comprehensive list I had of things that hadn't been
14  undertaken were the closing arguments in the trial.
15      Q     Did you have any information available
16  to you on the likelihood that any of those actions
17  that ALPA had available to it would be successful?
18      A     Peter Fram's closing.
19      Q     You mean Steve Fram?
20      A     Steve Fram.
21          I'm thinking Peter Frampton.  Okay.  Sorry.
22      Q     Did you have any other source of
23  information other than Steve Fram's closing on the
24  likelihood that any of those actions would have been
25  successful?

32 (Pages 125 to 128)

DEGNAN & BATEMAN
(856)  232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

129

1      A    No, I did not.
2      Q    And what did Steve Fram's closing tell
3  you about the likelihood that any of those actions
4  would have been successful?
5      A    Well, he -- he thought that the -- the
6  actions wouldn't have been successful.
7      Q    And that was the only source of
8  information you had about whether those actions
9  would have worked or not?
10     A    Yes.
11     Q    Now, in the second page of your report,
12 the first sentence you say, in Patrick Brady, et al,
13 versus Air Line Pilot's Association (ALPA), the jury
14 found that ALPA violated its duty of fair
15 representation to the former pilots of TransWorld
16 Air (TWA), and that this violation caused injury to
17 the TWA pilots.  Do you see that?
18     A    That's right.
19     Q    And did the jury verdict say anything
20 about how many TWA pilots were injured by the
21 alleged breach of fair duty?
22     A    It did not.
23     Q    Did the jury verdict say anything about
24 which of the actions ALPA had available to it but
25 did not undertake constituted the breach of the duty

130

1  of fair representation?
2      A    It did not.
3      Q    Did you make any assumptions in your
4  analysis about which of the options that ALPA had
5  available to it but did not pursue constituted the
6  breach of duty of fair representation?
7      A    I did not.
8      Q    You didn't make any assumptions one way
9  or the other about that?
10     A    Did I make any assumptions about -- I
11 don't believe I did, no.  I mean, I -- I started
12 from the point of view that these were actions that
13 were available, and that had they done all of them,
14 there wouldn't have been a breach.  That's the only
15 assumption I made.
16     Q    Well, you took all of the -- all of the
17 actions that you were aware of that ALPA had
18 available to it but did not pursue into account in
19 your damage analysis; correct?
20     A    Sorry?
21     Q    You -- you took all of the actions that
22 you understood ALPA had available to it but did not
23 pursue into -- into consideration in conducting your
24 damage analysis; correct?
25     A    I did.

131

1      Q    If you knew, for example, that the jury
2  thought that initiating a jump seat war was not a
3  breach of the duty of fair representation, would you
4  have taken that particular action into account in
5  your damage analysis?
6      A    If you are asking me if the jury had
7  said, if they had only done this one thing, there
8  wouldn't have been a breach?  I'm not really sure --
9  because, I mean, this is -- this is kind of
10 exceedingly hypothetical; right, so --
11     Q    If you -- if you -- if you knew that
12 the jury had concluded that pursuing a jump seat war
13 was a silly idea, it only would have antagonized the
14 APA, and that's not part of any breach, would you
15 have taken that ALPA action into consideration in
16 conducting your damage analysis?
17     MS. RODRIGUEZ:  Objection.
18     THE WITNESS:  It -- it is difficult to
19 say one way or the other because, first of all -- I
20 mean, I'm going to try and answer your question but
21 it is kind of hypothetical.  If -- it is hard to
22 imagine how exactly I would know that the jump seat
23 war, not having been pursued had no impact on the
24 jury's decision.  So if there was some way in which
25 the jury, you know, had come back and said, here are

132

1  the five things they should have done, and if they
2  had done them, we would not have found them in
3  violation.  I -- I might be able to -- you would
4  obviously have to take that into consideration.  I
5  mean, there's -- there's -- I -- I don't remember
6  the number, maybe ten things, ten or 11 things that
7  are listed that were available as potential actions.
8  If that list was only two long, you would probably
9  spend a great deal more time trying to understand
10 those two and all of their implications and why two
11 out of the 11 were selected as having -- but, you
12 know, I really -- I don't know how I can answer your
13 question in any meaningful way because it is really
14 kind of hypothetical.
15     Q    You are allowed to pose hypothetical
16 questions to expert witnesses.
17     A    Yeah, but, I mean, this one is kind of
18 hypothetical to the point where you can't really put
19 any -- any meaningful answer to it.  Right?  You
20 know, if the jury had all shown up wearing red one
21 day, would that have changed your opinion?  Well,
22 probably not, right?  You know.  If they said in
23 some way that one of these actions didn't constitute
24 the breach or one of these inactions didn't
25 constitute the breach, of course you would have to

33  (Pages 129 to 132)

RIKK SALAMAT

133

1  take that into consideration. I mean, what I took
2  into consideration were the 11 that were left in
3  Allen Press' closing that were not objected to.
4     Q   Well, in -- in doing that, were you
5  assuming that each of these was a predicate for the
6  jury's verdict that there was a breach of the duty
7  of fair representation?
8     A   My only assumption was that each of
9  these actions was available to ALPA and they didn't
10  pursue them.
11    Q   If -- if you knew because the jury was
12  provided a checklist and they were asked for each --
13  each action, check whether it is a breach of the
14  duty of fair representation or not, and the jury had
15  checked three of the boxes as -- as being breaches
16  of the duty of fair representation, would you have
17  taken the other matters into account in your damage
18  analysis?
19        MS. RODRIGUEZ:  I object to this whole
20  line of questioning because that wasn't the trial
21  below.  Go ahead, to the extent you can answer.
22        THE WITNESS:  Look, my assumption is
23  that -- that -- okay.  Well, look.  If the jury had
24  said, like, these three things, we don't think were
25  factors in the violation -- well, let me think about

134

1  this.  I'm sorry, I'm going to have to --
2  BY MR. TOAL:
3     Q   That's fine.
4     A   We are going to have to take some time
5  to think about this, because what are we saying?
6     If we have -- we have a violation on one hand,
7  and on the other we are saying I -- I -- had ALPA
8  done all of these things, the result would have been
9  X.  Now, maybe they would have done those three
10  things anyways.  I mean, of these three things --
11  the question, you know, is, one, what is the impact
12  of these courses of action on the negotiation?  And
13  the other is, what role did these things have in
14  ALPA's breach?  And those are two completely
15  different questions, you know, like the jump seat
16  war.  I mean, maybe the jury would have found that
17  the jump seat war is not something that ALPA needed
18  to do in order to represent its pilots fairly, but
19  that jump seat war was a course of action available
20  to ALPA and didn't pursue it, and had they done it,
21  it would have had an impact on the negotiation.  So
22  it is difficult to sort of take those two things and
23  say, you know, am I analyzing the breach or am I
24  analyzing, you know, the impact of -- of ALPA's
25  inaction, or am I analyzing what each one of these

135

1  courses of action, what kind of impact could it
2  theoretically have had on the negotiations?  So,
3  does that answer your question?  I mean, if --
4     Q   Not really.
5     A   Sorry.  I'm trying my best here.  I
6  really am.
7     Q   What was it that you were trying to
8  analyze here?  The -- the agreement that would have
9  resulted in the absence of a breach of the duty of
10  fair representation by ALPA?
11    A   Correct.
12    Q   So if you knew as a matter of fact that
13  with respect to seven of these ALPA actions that the
14  jury didn't view those as constituting breaches of
15  the duty of fair representation, would that have
16  changed your analysis?
17        MS. RODRIGUEZ:  Let him finish his
18  question.
19        THE WITNESS:  Yeah.  Sorry.  Now it's
20  my fault.
21        If -- if I knew that absolutely, then, of
22  course, it would have to be taken into
23  consideration.
24  BY MR. TOAL:
25    Q   And how would you have taken that into

136

1  consideration?
2     A   I would have -- how would I have taken
3  it into consideration?  Well, as a practical matter,
4  we would have had to say the agreement, rather than
5  being reached here, depending on what those three
6  actions were, there would have been less persuasive
7  force available in the negotiations.  Conceivably
8  the point of agreement would move more towards the
9  American Airlines pilots' side of the -- side of the
10  equation, a list less favorable to the TWA pilots.
11    Q   Would you have confined your analysis
12  to the three ALPA actions that the jury in this
13  hypothetical concluded constituted the breach of a
14  duty of fair representation?
15    A   I would have.
16    Q   Now when you talk in the first sentence
17  about the jury verdict, that the violation caused
18  injury to the TWA pilots, did you mean to suggest
19  the jury had concluded that all TWA pilots had been
20  injured?
21    A   That some TWA pilots had been injured,
22  at least some.
23    Q   At least some?
24    A   Yes.
25    Q   And do -- do you know what the jury

34  (Pages 133 to 136)

DEGNAN & BATEMAN
(856)  232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

137

1  thought about how many TWA pilots had been injured?
2      A    I do not.
3      Q    And your analysis, your Salamat
4  analysis, for instance, concludes that a substantial
5  number of the TWA pilots suffered no damages;
6  correct?
7      A    That's correct.
8      Q    And have you quantified how your
9  Salamat list determines what percentage of the TWA
10  pilots suffered no damages?
11      A    It does, but I -- I don't know what the
12  number is off the top of my head.
13      Q    Have you quantified that?
14      A    Yes.
15      Q    And what percentage of the TWA pilots
16  did you find sustained no damage?
17      A    I don't know off of the top of my head.
18  I would have to refer to the data lists to -- to
19  actually give you an answer to that.
20      Q    My question is, did you go back and do
21  that at some point?  Even if you can't remember now,
22  did you go and say --
23      A    Absolutely, yes.
24      Q    So at one time you knew what percentage
25  your list indicated sustained no damages?

138

1      A    At one time, I did.  A few minutes
2  later, I would have forgotten.  But there is some
3  number of pilots who were not damaged.
4      Q    Now, you say in the second paragraph on
5  page two, there are two major parts involved in
6  calculating the damages to TWA pilots as a result of
7  the Air Line Pilot Association's (ALPA) violation of
8  its dues of fair representation.  The first part of
9  the damage calculation is to estimate the
10  integration that would have occurred absent the
11  violation; correct?
12      A    That's correct.
13      Q    Now, what expertise do you have in
14  estimating the integration that would have occurred
15  absent a breach of the duty of fair representation?
16      A    Well, my experience in working with
17  pilot negotiating committees, pilot merger
18  committees.  Review of all of the awards that have
19  gone back some years to, I guess, post-deregulation.
20  But primarily as my role as an advisor pilot, merger
21  committees.
22      Q    And is it your view that anyone who
23  served as -- as an advisor to pilot merger
24  committees would have the requisite expertise to
25  determine -- at least to estimate the integration

139

1  that would have occurred absent a violation of the
2  duty of fair representation?
3      A    No.  I don't think everybody?
4      Q    Is there some particular experience
5  that you have that other advisors wouldn't have?
6      A    Well, I've done extensive analysis on
7  how lists have been merged and their impacts.  That
8  ability alone would differentiate me from a vast
9  number of people because, you know, I'm the one
10  whose been there showing people what the impacts are
11  and seeing what their reactions are, so --
12      Q    What whose reactions are?
13      A    Pilot merger committees.
14      Q    And in how many of those cases were you
15  analyzing what integration would have occurred
16  absent a breach of the duty of fair representation?
17      A    None.
18      Q    Are you aware of any generally accepted
19  methodology for estimating the seniority integration
20  list that would have been agreed to in the absence
21  of a duty -- breach of the duty of fair
22  representation?
23      A    No, I'm not.
24      Q    Have you done anything to test the
25  accuracy of the methodology that you used to attempt

140

1  to estimate the integration that would have been
2  reached in the absence of a breach?
3      A    I'm sorry.  Could I ask you to say that
4  question again?
5      Q    Yeah.  The question is whether you've
6  done anything to test the accuracy of the
7  methodology that you used to try and estimate the
8  seniority integration list that would have been
9  agreed to in the absence of a breach.
10          MS. RODRIGUEZ:  Objection.
11          THE WITNESS:  I'm going to say yes
12  because the way in which the estimation was done was
13  to compare the list -- a bunch of lists
14  systematically to lists that have been obtained from
15  other agreements and other mergers.  So the -- the
16  analysis that was done was effectively to say, is
17  this list in any manner superior to any other list,
18  given any other circumstance.  And if it was, then
19  we would assume that it might be far reaching as an
20  assumption for a negotiated agreement.  So, yeah, it
21  was -- that was the basis of the entire exercise.
22  BY MR. TOAL:
23      Q    And how did you undertake that
24  analysis?
25      A    To compare a series of different lists

35 (Pages 137 to 140)

f1d60e56-51dd-489a-a0ce-16b47e16413e

141

1    to other awards.
2      **Q**   Did you use any sort of quantitative
3    metric in doing that analysis?
4      **A**   Well, compare -- as I believe the
5    report went through some -- some pains to talk about
6    the size at the top of the list, the size of the
7    staple group, the size of the merged group. And
8    that's the primary analysis that was done, to look
9    at those three aspects of the Supplement CC list,
10   versus other lists, versus proposed lists such as
11   the plus 200 list, the damage model list, the -- the
12   optimal list and so on. So that was, in effect, the
13   -- the objective of the exercise, in estimating, was
14   to say to what extent is any given list likely to
15   have found a precedent in other situations.
16     **Q**   And what are some of the variables that
17   you are aware of that can affect what a seniority
18   integration looks like?
19     **A**   The variables that would affect what a
20   seniority integration would look like? The most
21   significant one would be the number of jobs and the
22   type of equipment that each premerger group was
23   operating.
24     **Q**   Any others that you are aware of?
25     **A**   Relative ages of the pilot groups,

142

1    relative length of service of the pilot groups. The
2    type of carriers, whether it's a major carrier or a
3    regional carrier, for instance. Those could be
4    factors. Whether it's an agreement or an
5    arbitration. I think those would be the major
6    variables.
7     **Q**   And are you excluding from your
8    analysis, the pre-transaction career expectations?
9     **A**   If by expectations you mean the
10   economics of each contributing carrier, yes. If you
11   mean by expectations, how much work did they have at
12   the time of the merger, then I wouldn't -- I
13   wouldn't exclude that. I think I said it is the
14   most important factor. I mean, to the extent that
15   your expectations are to continue flying the
16   equipment you have or to continue having access to
17   the jobs you brought, then, yes.
18     **Q**   But in terms of variables that you
19   would point to that explain prior seniority
20   integration lists, you would exclude as a factor the
21   pre-transaction career expectations of each pilot
22   group; is that correct?
23     **MS. RODRIGUEZ:** Objection to the
24   question.
25     **THE WITNESS:** I think I just said the

143

1    **opposite, which was, to the extent that people's**
2    **premerger expectations are tied to the equipment and**
3    **jobs that they brought to the merger, I would not**
4    **exclude that.**
5    **BY MR. TOAL:**
6     **Q**   Understood. But to the extent we are
7   talking in pre-transaction career expectations about
8   the prospects of the acquired airline on a
9   standalone basis, you would not identify that as a
10   factor that influenced the composition of prior
11   seniority integration lists; is that correct?
12     **A**   Only in situations where one carrier
13   had ceased to operate.
14     **Q**   So did you do anything when you were
15   analyzing prior seniority integration lists to
16   analyze these factors to try and develop a
17   comparable group of seniority integrations?
18     **A**   I used all of the seniority
19   integrations as benchmarks to say what a minimally
20   acceptable negotiated list would have had to look
21   like. And so I didn't prioritize any one type of
22   merger according to these factors to any others.
23     **THE WITNESS:** Anyone else getting
24   **hungry, because I'm feeling a little like it's lunch**
25   **time, but, you know, I will leave it up to you guys.**

144

1    **MS. RODRIGUEZ:** It is ten of 1:00 and
2   **we have been going for over three hours, so.**
3     **MR. TOAL:** We can go off the record.
4     **VIDEO SPECIALIST:** The time is now
5   **12:50 and we are going off the video record.**
6     **(Luncheon recess.)**
7     **VIDEO SPECIALIST:** The time is now 2:04
8   **and we are back on the video record.**
9    **BY MR. TOAL:**
10     **Q**   So, Mr. Salamat, before the break we
11   were talking about the methodology that you used to
12   try and estimate the integration that would have
13   occurred absent any breach of the duty of fair
14   representation. Do you remember that testimony?
15     **A**   I do.
16     **Q**   And is there a name for the methodology
17   that you used to try and make that estimate?
18     **A**   No, there isn't.
19     **Q**   Are you aware of any known error rate
20   for the methodology that you used to try and
21   estimate the integration that would have occurred?
22     **A**   I don't believe I know of any known
23   error rate.
24     **Q**   So you -- directing your attention to
25   page two of your report, in the third paragraph you

36 (Pages 141 to 144)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

145

1  say, a number of actions that ALPA failed to take in
2  representing the TWA pilots were brought out at
3  trial.  Had these actions been employed, they would
4  have brought pressure on the Allied Pilots
5  Association, APA, while they negotiated seniority
6  with the TWA pilots.  Do you see that language?
7      Q    Sorry.  Where -- where?  Oh, okay.
8  Yes.  The third paragraph.  Go ahead.
9      Q    Okay.
10     A    Yes.
11     Q    Do you consider yourself an expert on
12 negotiation theory?
13     A    I consider myself familiar with
14 negotiation theory.  I don't think I can call myself
15 an expert.
16     Q    And what's your basis for saying that
17 had -- had these actions been employed, they would
18 have brought pressure on the Allied Pilot's
19 Association and their negotiations with the TWA
20 pilots?
21     A    What's my basis for saying they would
22 have brought pressure?
23          First, and probably the most important,
24 experience of having been in negotiations when other
25 groups brought pressure to bear in the form of, you

146

1  know, litigation, or sanctions, or some other form
2  of pressure.
3          Secondary, everything I've been taught in
4  negotiation in terms of what it is that moves
5  parties from one position to another.
6          Those two areas would be the vast majority
7  of -- of my reasoning behind that statement.
8      Q    Anything else you can think of as you
9  sit here today?
10     A    Well, training, teaching, experience,
11 common sense.
12     Q    Anything else?
13     A    I -- I can't think of anything at the
14 moment.  I mean, I think those three would encompass
15 most of the -- the reasoning behind that statement.
16     Q    And when you refer to teaching, you are
17 not referring to teaching that you've done; correct?
18     A    No.  I'm -- I'm talking about training
19 in negotiation.
20     Q    Training that you've received from
21 others?
22     A    Training that I've received, yes.
23     Q    And you reference your experience in
24 which litigation has been pursued; is that correct?
25     A    Yes.

147

1      Q    And in which cases that you've been
2  involved with has one of the parties to a
3  negotiation pursued litigation?
4      A    When I was working with the Canadian
5  Air Line Pilot's Association -- Air Line Pilot's
6  Association, Canadian Airlines, that would be
7  Canadian Airlines pilots.  After having received an
8  unfavorable seniority integration under an
9  arbitrator named Mitchnick, they went through a
10 series of negotiations where they were threatening
11 to take the case to the Industrial Relations Board,
12 and negotiations were going on during that period.
13 So that was one that, you know, is memorable.
14     Q    And with respect to that situation, did
15 the threats of litigation precede an agreement in
16 negotiations between the parties?
17     A    No.  No, they did not.  They -- they
18 ultimately ended up in litigation.
19     Q    Do you have any other experiences
20 dealing with seniority integration where one of the
21 parties to a negotiation threatened litigation?
22     A    Threatened litigation?  I mean, I've
23 been involved in a few where they actually launched
24 litigation, and so presumably threats preceded the
25 launching.

148

1      Q    Okay.  So let's -- let's focus first on
2  the ones where litigation was actually pursued.
3          Other than the Canadian Airlines situation,
4  are there other situations in which litigation was
5  pursued?
6      A    Litigation was pursued in the America
7  West/USAirways merger.
8      Q    And did the pendency of litigation in
9  that case result in a negotiated agreement?
10     A    Not so far.  I mean, it's an ongoing
11 case.
12     Q    Other than the Canadian Airlines and
13 American West/USAir situations, any others that
14 you've been involved in in which litigation's been
15 pursued?
16     A    Yeah.  The connector agreement between
17 Air Canada and the feeder airlines.  There was a
18 class action that was pursued following that
19 seniority non-integration.
20          There was litigation -- well, I guess that's
21 not really necessarily stemming directly from a
22 seniority integration, but the whole age 60 case I
23 testified in -- to at the -- in a Canadian Human
24 Rights Tribunal was actually related directly to the
25 merger of Canadian Air Canada because there was two

37 (Pages 145 to 148)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

149

1  different retirement ages in the two contracts, so
2  there was that. There may be others that I'm not
3  thinking of right now. You know, the Canadian
4  Airlines case involved probably 15 different suits
5  that had been filed in various courts, all the way
6  up to the Supreme Court of Canada, so --
7      Q    And the connector litigation that you
8  mentioned, did that result in a negotiated agreement
9  between the parties concerning seniority
10 integration?
11     A    Did not.
12     Q    So with respect to threatened
13 litigation, are you aware -- have you been involved
14 in any situations in which the threat of litigation
15 has led to a negotiated agreement between parties
16 regarding seniority integration?
17     A    I am not.
18     Q    And when you talk about actions by
19 ALPA, had they been pursued, bringing pressure on
20 the APA, do you have any basis for that statement
21 linked to APA's particular circumstances?
22     A    Sorry. I'm going to have to ask you to
23 put that question some other way. I'm not sure I
24 understand.
25     Q    So when you talk about actions that

150

1  ALPA didn't pursue as something that would have
2  brought pressure on the APA, do you have any basis
3  for that statement specific to the APA itself?
4      A    Basis for that statement specific to
5  the APA itself?
6      Well, yeah, largely APA's conduct throughout
7  the negotiations, number one. They had continually
8  improved their -- their settlement offer to the TWA
9  pilots under the force of whatever pressure the TWA
10 pilots were able to bring. That's probably the main
11 thing I would refer to. There is also their own
12 statements about wanting to do what was fair. And
13 so I assume from that statement that they wanted to
14 be fair, and that they were ultimately, you know,
15 prevented from -- from really examining their own
16 notions of fairness because of lack of pressure to
17 do so, so --
18     Q    That's -- that's an assumption that you
19 make?
20     A    That's -- those -- those are the things
21 specific to the APA that I considered, yes.
22     Q    And the last one, was that an
23 assumption that you made?
24     A    It's not an assumption. It's what they
25 said. They said they wanted to be fair.

151

1      Q    Do you have any information about
2  whether the APA subjectively believed it was being
3  fair?
4      A    Well, they believed they were being
5  fair, and then they changed their position. They
6  believed they were being fair again. And, you know,
7  so at every point in time they believed they were
8  attempting to be fair, so --
9      Q    And the APA conduct that you referred
10 to where the APA was improving the offers it was --
11 it was making, isn't that a normal incident of
12 negotiation conduct?
13     A    I don't know that I would want to sort
14 of say it wasn't normal given that this was a very
15 unusual circumstance. I mean, parties certainly do
16 improve their offers when they feel like there is
17 either pressure to do so or that the possibility of
18 reaching an agreement wouldn't -- wouldn't be there
19 unless they change their offer in some -- some
20 meaningful way. But is it normal for a -- a group
21 to -- to improve their offer? Under these
22 circumstances, I -- I couldn't say because these
23 circumstances are quite unique.
24     Q    Okay. What about these circumstances
25 is unique?

152

1      A    Well, what's unique about these
2  circumstances is that the APA believed they had, to
3  some degree, the ability to act unilaterally.
4      Q    Anything else?
5      A    No. That one fact alone makes this a
6  somewhat different situation.
7      Q    In any of the other seniority
8  integrations that you've been involved with, has one
9  of the parties believed that it had a right to act
10 unilaterally with respect to seniority integration?
11     A    Yeah. Well, I mean, you could consider
12 the conduct of the America West pilots and the
13 USAirways pilots in their current situation. Both
14 parties believe they have the right to act
15 unilaterally. The America West pilots believe they
16 have a right to something known as the Nicolau list.
17 And the USAirways pilots believe they have a right
18 to the Usapa list, and both groups believe that,
19 without the consent of the other, those lists can be
20 imposed on the other, so --
21     Q    And did either of those involve
22 situations in which one union believed that it had
23 the ability to dictate what the seniority
24 integration list would be from the outset?
25     A    Canadian Airlines, Air Canada, one

38  (Pages 149 to 152)

f1d60e56-51dd-489a-a0ce-16b47e16413e

### 153

1 group believed they had the right to -- to impose a
2 list on the other.  Air Canada pilots believed they
3 had the right to determine what the seniority
4 integration of the Canadian Airline pilots would be.
5    Q    So the factor that you indicated made
6 the TWA/American Airlines situation unique is that
7 the APA believed it had a right to act unilaterally;
8 right?
9    A    In a negotiation.  Not in litigation.
10    Q    In a negotiation?
11    A    Yeah.  I mean, I'm unaware of a
12 negotiation where one party believed they had the
13 right to act unilaterally.
14    Q    Now, with respect to the specific ALPA
15 actions or inactions that you identify in your
16 report, do you have any information specific to the
17 APA about how it was likely to respond to those
18 actions?
19    A    Specific?  No.  I don't believe I have
20 any information about how they would have responded
21 specifically to any one of these things.
22    Q    Now, you say in the third paragraph on
23 page two, as the APA has some ability to act
24 unilaterally and the TWA had no automatic right to
25 have the matter decided by a neutral party, the

### 154

1 effect additional pressure would have had can be
2 considered a problem of increased uncertainty in
3 estimating how the parties as agents would have
4 responded and ultimately decided given that
5 uncertainty.  Do you see that language?
6    A    I do.
7    Q    Why do you say the APA had some ability
8 to act unilaterally?
9    A    Well, they had, in their contract, a
10 clause, and I don't know that I know the specific
11 language of the clause off the top of my head, but
12 that they had the right to staple any pilots who
13 came from an airline in an acquisition to the bottom
14 of their list.  However, they had also stated at the
15 same time that this right wasn't absolute.  So where
16 that -- whether or not they had the right, I -- I
17 don't know has ever been truly tested.
18    Q    And who from the APA said that that
19 right wasn't absolute?
20    A    There was a -- I believe it was a
21 communication between the MEC and their pilots in
22 the lead-up to the merger stating that the APA had a
23 duty of fair representation to the pilots, and that
24 ultimately the matter could be decided by a judge,
25 and so they'd stated a number of reasons why they

### 155

1 couldn't just staple all of the TWA pilots.
2    Q    And do you have any information that
3 the APA -- you are referring to notes from a meeting
4 of the APA's Boston domicile; correct?
5    A    That sounds -- I believe that's
6 correct, yes.
7    Q    And that's cited in your report?
8    A    Yes.  I think I might have cited that
9 in the report.
10    Q    Okay.  Do you have any information
11 about whether the view that the APA owed a duty of
12 fair -- withdrawn.
13      Is your understanding that the statements from
14 that meeting reflected that the APA had a duty of
15 fair representation to the pilots of TWA?
16    A    The only -- my only understanding was
17 that the right to staple the TWA pilots appeared not
18 to be absolute in their own court, so --
19    Q    And do you know whether any views
20 expressed in that meeting represented the views of
21 the APA overall?
22    A    I assumed that whoever was speaking was
23 speaking for the APA overall, but it was the MEC
24 chair, I believe, who was answering the questions,
25 so I assume he spoke for the association.

### 156

1    Q    And do you know whether that person had
2 any legal background?
3    A    I do not.
4    Q    Okay.  Are you aware of any other
5 limits on the APA's ability to act unilaterally?
6    A    Legal limits or practical limits?  I
7 mean --
8    Q    Any limits at all.
9    A    I considered the fact that they wanted
10 to do a fair integration would be a limit on their
11 ability to act unilaterally, and you can't really
12 act unilaterally if you want to be fair.  So they
13 said all throughout that they wanted a fair
14 integration of the TWA pilots.  So that would
15 presume -- in itself, would forestall acting
16 unilaterally.
17    Q    Anything else that you regard as a
18 limit on the APA's ability to act unilaterally?
19    A    No.  Primary the latter.
20    Q    And when you say primarily, it sounds
21 like you have other things in mind.  Is there
22 anything else?
23    A    The former.  They didn't believe they
24 had an absolute ability, in their own words, and
25 that they wanted to be fair.

39 (Pages 153 to 156)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

157

1     Q     So beyond what you've testified to
2  previously, is there anything else you would point
3  to as a limit on the APA's ability to act
4  unilaterally?
5     A     Not that I'm aware of.
6     Q     And when you say the -- when you say
7  that TWA had no automatic right to have the matter
8  of seniority integration decided by a mutual party,
9  isn't it -- isn't it a fact that TWA didn't have any
10 right, automatic or otherwise, to have the matter
11 decided by a neutral party?
12    A     Well, what I mean is by they had no
13 automatic right, there is nothing that would have
14 prevented the APA from agreeing to -- to have the
15 matter decided by a neutral, and then they would
16 have had the right.  So they had no automatic right
17 to end up there, but that -- that -- there is no
18 reason why that couldn't have been a negotiated
19 agreement.
20    Q     And is your -- do you have any
21 understanding that the APA agreed to arbitrate the
22 issue of seniority integration?
23    A     I'm sorry?
24    Q     Do you have any understanding that the
25 APA agreed to integrate the -- to arbitrate the

158

1  issue of seniority integration?
2     A     No, they didn't, as far as I know.
3     Q     And if the APA was unwilling to agree
4  to arbitration of seniority integration, is it your
5  understanding that TWA and its pilots would have no
6  ability to compel such an arbitration?
7     A     In the absence of -- you mean, you are
8  talking about what actually occurred, or would the
9  TWA pilots have had an ability to compel arbitration
10 given this list of -- of actions?
11    Q     My question is -- is, in the absence of
12 agreement by APA to arbitrate, are you aware of any
13 ability that the TWA pilots had to --
14    A     -- to compel?
15    Q     -- legally compel the APA to
16 participation in an arbitration?
17    A     My understanding is the history, having
18 played out as it did, they didn't.
19    Q     I understand that, as a matter of
20 history, what happened.  But are you aware of any
21 legal mechanism through which the TWA pilots could
22 have forced the APA to arbitration?
23    A     I'm -- I'm -- I'm not -- I'm not a
24 lawyer, so I, you know, I couldn't really speculate
25 on whether they had any kind of ability to compel it

159

1  by other means.  So, no.  The only way I can say
2  that they could have -- that I know they could have
3  achieved an arbitration with the APA would have been
4  to achieve that in a negotiation.
5     Q     Now, in your report at the bottom of
6  page two, you say, from the point of view of the TWA
7  pilots, there were a range of possible outcomes
8  ranging from the least desirable, a list just
9  slightly better than Supplement CC, to an upper
10 limit, which is defined as the list an arbitrator
11 would most likely have imposed.
12       Do you see that language?
13    A     I do.
14    Q     Now, why would the least desirable
15 result have been no change from supplement CC at
16 all?
17       MR. JACOBSON:  I object to the form of
18 the question.  That misstates what the report
19 language as read says.
20       THE WITNESS:  Yeah.  Can I get you to
21 ask that question differently, because I don't think
22 that's what I -- what I actually said here.
23       What I said is, there is a range of possible
24 outcomes ranging from the least desirable, a list
25 just slightly better than Supplement CC, so not

160

1  Supplement CC.
2  BY MR. TOAL:
3     Q     I understand that you are saying that
4  the bottom end of the range would be something
5  better than Supplement CC; correct?
6     A     Right.
7     Q     Is that accurate?
8     A     That's -- that's accurate, yes.
9     Q     Okay.  Now, why I -- why don't you
10 contemplate the possibility that even if ALPA had
11 taken all of these actions, that the APA would not
12 have been willing to offer a list better than
13 Supplement CC?
14    A     I -- I didn't decide that.  The jury
15 decided that.
16    Q     So is your -- is your decision to adopt
17 a lower bound of a list better than CC based on your
18 understanding of the jury verdict?
19    A     That's correct.  And the instructions
20 to the jury, and the closing arguments.
21    Q     And you define here an upper limit,
22 essentially, the best list the TWA pilots could have
23 expected of something that was equivalent to the
24 result that would have been expected in an
25 arbitration decision; correct?

40  (Pages 157 to 160)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

161

1    A    That's correct.
2    Q    But you also have something in your
3    report that you call a fairness model; correct?
4    A    Yes.
5    Q    And the damages you attribute based on
6    the fairness model are higher than those that you
7    calculate based on the arbitrated model; correct?
8    A    That's correct.
9    Q    Now, if you have established an upper
10   bound in your report on damages of what the expected
11   result would have been in an arbitration decision,
12   why do you present an even higher model based on
13   what you call the fairness list?
14   A    Well, the fairness list is a test for
15   the arbitrated list.  And one of the tests of an
16   arbitrated list is would it -- would it have been
17   considerably more fair or would it have flipped the
18   balance and been unfair to the American Airlines
19   pilots in any way?  And so the answer would be that
20   any -- any list that was better than the fairness
21   list would not reasonably be achievable in
22   arbitration, and you wouldn't want to necessarily
23   use it as a goal post.  And so the fairness list has
24   that one advantage to it.  It has that one -- that
25   one main purpose which is to test the likelihood of

162

1    an arbitrated list.  So if the damages under the
2    arbitrated list are less than they are under the
3    optimal list or the fairness list, then it is within
4    a range that I would consider possible.  Anything
5    better than that, probably not.  So that's one
6    reason for the -- for the fairness list.
7    The second is, like I mentioned, that no
8    matter what the damages end up being or what damages
9    would end up being awarded, that the fairness list
10   is the fairest way to distribute damages to
11   individuals rather than -- but not necessarily to
12   calculate what those damages are on an aggregate
13   basis.  But if pilot X was harmed by $10,000 under
14   the fairness list, out of a total pool of damages of
15   100 million, then that would be the way in which you
16   would pro rate them would be my contention.  So it
17   serves as a litmus test and a method of
18   distribution.
19   Q    So to make sure I understand what you
20   are contending in your report, is it accurate to say
21   that you are not contending that without regard to
22   what ALPA did, that the TWA pilots could have
23   achieved through negotiation a list that was as
24   favorable as the fairness list?
25   A    I don't believe they could have, no.

163

1    Q    So that's not something you are
2    presenting as a basis for measurement of damages in
3    this case; correct?
4    A    No.
5    Q    You are not doing that; correct?
6    A    I'm not doing that.
7    Q    Turning over to page three of your
8    report, at the top of that page, the first full
9    sentence, you say, my objective in this matter is to
10   estimate as accurately as possible where in that
11   range an agreement between the TWA pilots and the
12   APA would have fallen given effective representation
13   by ALPA.
14   Do you see that language?
15   A    I do.
16   Q    And do you have any statistical data
17   regarding how accurately that estimate can be made?
18   A    I do not.
19   Q    And did you try and quantify the
20   probability that the APA and the TWA MEC would have
21   agreed on the Salamat model as opposed to any other
22   point in the range?
23   A    Well, I believe I did by assigning
24   possibilities that each individual action could have
25   contributed to some change in the perception of --

164

1    of the TWA pilots by the APA or some -- affected
2    some change in the negotiating stance of the APA.
3    So I did attempt to quantify the effect that those
4    actions would have.
5    Q    My question is whether you attempted to
6    quantify the probability that had ALPA not breached
7    a duty of fair representation, that the agreement
8    that the TWA MEC and the APA would have reached
9    would have resembled the Salamat model.
10   A    I did.
11   Q    And what was the probability that you
12   determined that they would have ended up with the
13   Salamat model?
14   A    73 percent, I believe.
15   Q    Did you assign any probability to the
16   likelihood that the TWA MEC and the APA would have
17   agreed upon a seniority integration list that
18   resembled Supplement CC plus 200?
19   A    I would assume that that one would be
20   closer to a hundred but, I -- I -- I mean, I don't
21   recall what the actual probability was, but I did
22   attempt to estimate it.
23   Q    Well, I'm confused because you said
24   that you assigned the probability in the range of
25   distribution for the Salamat model at 73 percent.

41 (Pages 161 to 164)

DEGNAN & BATEMAN
(856) 232-7400

RIKK SALAMAT

165

1      A    Yes.
2      Q    So I would have thought that the
3   probability of obtaining any other list would
4   necessarily have to be a hundred minus 73 percent.
5   Is that incorrect?
6      A    No. That is incorrect.
7      Q    Why is that incorrect?
8      A    Well, if I take, for example, any one
9   individual action and I say it has got a ten percent
10  probability all on its own of having led to the
11  Salamat list, that ten percent is predicated on the
12  Salamat list being the agreement. If I said, what's
13  the probability that that particular action would
14  have resulted in a Supplement CC plus 200 list, it
15  would be higher than ten percent. So you can never
16  say for certain that something is going to be a
17  hundred percent. It might mathematically add up to
18  a hundred percent, but because you can't say for
19  certain it would approach zero, depending on if you
20  look at it one way or approach a hundred if you look
21  at it the other way, but you couldn't say with
22  absolute certainty that that would be the result.
23  You can say it is certainly near a hundred percent.
24     Q    You might be answering a question
25  that's different than the one I intended to ask.

166

1      A    It could be.
2      Q    I'm asking -- you've hypothesized a
3   situation where ALPA took additional actions;
4   correct?
5      A    That's correct.
6      Q    And then you are trying to figure out
7   that if ALPA -- if ALPA had taken those actions,
8   you're hypothesizing that some seniority integration
9   list different than Supplement CC would have
10  resulted; correct?
11     A    That's correct.
12     Q    And if we are looking at probabilities
13  across the range of what you think possible
14  agreements are, ranging from something better than
15  Supplement CC on the low side to an arbitrated
16  result on the other side, in probabilistic terms,
17  the total distribution of likelihood of agreements
18  has to add up to a hundred percent; correct?
19     A    No, I don't -- I don't believe it does.
20  You know, there -- there -- there is a hundred
21  percent chance that they could have agreed to
22  Supplement CC itself. That much we know; right?
23  Because that's -- they had already -- the APA had
24  already agreed to it. Had the TWA pilots decided to
25  agree to it, they could have, right? So there is a

167

1   hundred percent chance that that could have been an
2   agreement. In order to figure out what the
3   probability of any other agreement is, you have to
4   measure the -- the distance of that agreement from
5   Supplement CC. Primarily, I mean, the -- the -- the
6   easiest measure in this case is to -- to examine the
7   size of the staple and say, you know, every time
8   that staple gets smaller, the chances that the --
9   the APA would agree to it gets less, unless there is
10  sufficient pressure that they would be compelled to
11  that position and there is sufficient reasoning for
12  that position. So I don't think that some of the
13  probabilities is a hundred percent. It's not --
14  it's not -- it is not a dice-throwing exercise.
15  Right? So even -- even in throwing dice, it is
16  never going to be a hundred percent probability that
17  you are going to roll a six. You could roll fives
18  for a very long time. You could roll something
19  other than a six for a very long time. The
20  probability approaches zero, but it's never going to
21  be zero.
22     Q    What was the -- the top staple that you
23  used in the Salamat model?
24     A    I would -- I would have to look at the
25  report. It's -- it's the -- it's -- it's -- I'm

168

1   sorry, the top staple?
2      Q    The top staple.
3      A    The top -- I'm not sure what you mean
4   by top staple?
5      Q    Do you -- in your Salamat list, do you
6   have a certain number of American Airline pilots who
7   are at the top of the list?
8      A    The top of the list, right. I think
9   it's -- I think it's the same number that was there
10  on Supplement CC plus a handful more, like under a
11  hundred.
12     Q    Okay. So you, in your Salamat model,
13  didn't deviate significantly from Supplement CC in
14  estimating what -- how many American Airline pilots
15  would have been left at the top of the list;
16  correct?
17     A    Not significantly, no.
18     Q    What was the bottom staple that you
19  used on the Salamat list?
20     A    I would have to look at the report. I
21  don't want to pull a number out of the --
22     Q    Well, go ahead and take a look, and let
23  me know what that number is.
24     A    464.
25     Q    And how did you derive that number?

42 (Pages 165 to 168)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

169

1    A    That number was derived on a reduced
2  job count of TWA pilots, the number of captains and
3  FOs based on a reduced fleet being merged. And so
4  the 464 was really a remainder rather than
5  specifically a staple.
6    Q    Did you have any information -- what
7  information did you have about offers made by the
8  TWA MEC as to how many TWA pilots it was willing to
9  have stapled at the bottom of the list?
10   A    I -- I had the rightful place proposal,
11  which had 200-and-some-odd. And then I believe
12  there was an earlier offer that had been made with,
13  I think, roughly 400-and-some number of pilots at
14  the bottom number.
15   Q    And does your bottom staple derive from
16  what you understood the highest number of TWA pilots
17  that the TWA MEC proposed to staple?
18   A    No.
19   Q    If you had understood that the TWA MEC
20  had proposed stapling close to 600 pilots, would
21  that have affected the bottom staple that you used
22  in your Salamat model?
23   A    No. That proposal would have been made
24  in the context of ALPA's violation, so, you know,
25  I -- I wouldn't have. I would have -- the way I

170

1  constructed the list was to say what is a reasonable
2  integration, what it would have been, captains and
3  first officers based on a reduced fleet, and the
4  staple size just being derivative of that primary.
5    Q    And can you explain specifically when
6  you talk about the staple size being derivative, how
7  it -- how it ends up that you come up with that
8  remainder?
9    A    Well, let me go back to the report.
10  The APA merged 940 TWA pilots, and the fact
11  that there was 939 MD90 and 767 captains on the TWA
12  list. So the APA was prepared to accept the MD90
13  and 767 positions were ongoing positions, what they
14  call sustainable. And so -- but they only gave them
15  credit for captains. And so to say that under all
16  the pressure that ALPA could have brought to bear
17  would they have accepted the fact that FOs were also
18  required to fly those planes, that would seem a
19  reasonable place for them to agree. And so the
20  number of FOs added into that -- into that 939
21  results in 1,873 pilots being merged. The top of
22  the list remaining roughly the same and the staple
23  being reduced by 464.
24   Q    What's your understanding of the
25  smallest number of TWA pilots that the APA indicated

171

1  it was willing to have stapled at the bottom of the
2  list?
3    A    I'm sorry. I don't -- I don't know
4  that I've seen them say that there is a smallest
5  number that they were willing to have stapled.
6    Q    Well, in any --
7    A    I mean, there was -- there was
8  positions that they gave, and presumably Supplement
9  CC was the smallest one that they can -- they --
10  they were willing to go given the circumstances up
11  to that point. I mean, whether they were willing to
12  go smaller than that, who can say? I don't know. I
13  wasn't there.
14   Q    Do you have any information suggesting
15  any information particular to the APA suggesting
16  that, had circumstances been different, they would
17  have been willing to allow fewer TWA pilots to be
18  stapled than appeared in Supplement CC?
19   A    I mean, other than their desire to
20  produce fair integration, I can think of nothing
21  else that -- that they ever said. They said, well,
22  we would be willing to go down to a specific number.
23  I -- I haven't seen anything of that sort.
24   Q    Well, have you seen anything, any
25  statement by any APA representative where they said

172

1  there is any circumstance under which they would
2  have been willing to staple fewer pilots -- fewer
3  TWA pilots than appeared in Supplement CC?
4    A    I think every offer they made, the
5  number of pilots they stapled, they -- they -- they
6  said was the -- the smallest number they were going
7  to staple, and then they continued to have that
8  staple shrink over time. So, you know, I don't know
9  what anyone could have said that would have made me
10  think that they wouldn't have gone further in the
11  negotiations than they did.
12   Q    Well, for instance, there could be a
13  secret APA communication that is produced in
14  discovery where they said, we keep telling the TWA
15  MEC we are insisting on stapling at least this many
16  pilots, but our fallback position is we agree to
17  staple 200 less than that?
18   A    I'm -- I'm not aware of any such
19  secret, and I don't know that in the absence, you
20  know, in the absence of ALPA having done some of the
21  things that are talked about them having not done,
22  that it would really even be all that meaningful
23  because, again, you are talking about something --
24  some -- some -- a position that people have in the
25  absence of basically one side having manned up. So,

43 (Pages 169 to 172)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

173

1   you know, it is kind of -- it's kind of an abstract
2   question to ask.
3        Q    So whether it is abstract or not, my
4   question is, are you aware of any statement by any
5   APA representative indicating that they would have
6   been willing to accept a staple of fewer TWA pilots
7   than were stapled in Supplement CC?
8        A    I am not aware of -- of any -- any
9   internal communications or anything they had where
10  they said we were willing to staple less than we are
11  going to staple in this proposal.
12       Q    Any testimony from APA representatives
13  that -- that suggest they would have been willing to
14  staple fewer TWA pilots than were stapled in
15  Supplement CC that you are aware of?
16       A    Not -- not that I'm aware of.
17       Q    On page two of your report, you, in
18  figure one, set forth a list of ALPA actions that
19  you seemingly think ALPA had available to it that it
20  didn't pursue; correct?
21       A    This is the list of available actions
22  that were cited in Allen Press's closing.
23       Q    And -- and that's your source for
24  constructing this list?
25       A    That is my source for this list.

174

1        Q    So in the -- the first item you list
2   is, insists on waiving scope; correct?
3        A    Yes.
4        Q    And what is your understanding of what
5   ALPA failed to do with respect to insist on waiving
6   scope?
7        A    Well, perhaps that's poorly -- poorly
8   worded from the point of view of saying it failed to
9   do it. What they did was they insisted that the
10  group waive scope. It is debatable whether they had
11  to or whether they didn't. It is certainly on the
12  record that some of the TWA representatives didn't
13  want to. And so that is one action that ALPA either
14  did or didn't take, depending on how you phrase the
15  action that was cited in the closing.
16       Q    So that action -- your understanding of
17  that action is that ALPA insisted that the TWA MEC
18  waive its scope and successorship positions;
19  correct?
20       A    Yes.
21       Q    And do you view that as a component for
22  purposes of your analysis of a breach of the duty of
23  fair representation by -- by ALPA?
24       A    No. I -- I -- well, obviously, it is
25  because the jury found that there was a breach, and

175

1   this was one of the -- one of the things that was
2   brought up as having contributed to that breach. So
3   I -- you know, the jury has already decided that.
4   Not me. All I said is this is one action that, had
5   it not been done, would have changed the dynamics of
6   the negotiation.
7        Q    Well, the jury didn't say that ALPA,
8   insisting on waiving scope, constituted a breach of
9   the duty of fair representation; right?
10       A    No. But they said all of these things
11  did.
12       Q    Where did they say that?
13       A    Well, presumably all of the -- well,
14  actually, what they said was ALPA breached its duty
15  of fair representation, and these were the list of
16  things that were brought out as having constituted
17  that breach, so --
18       Q    But you don't know if the jury agreed
19  with every one of those things.
20       A    I do not know whether the jury agreed
21  with every one of these, that's true.
22       Q    So what I'm asking is, for purposes of
23  your analysis, are you assuming that the jury did
24  conclude that ALPA insisting on waiving scope was a
25  component of the breach of the duty of fair

176

1   representation?
2        A    I would -- I would not characterize it
3   that way. I would say that from the purposes of
4   analysis, I would assume that these actions would
5   have brought additional pressure on the APA. And
6   had ALPA done all of these, I can conclude that they
7   probably wouldn't have been found in -- in breach of
8   their duty by the jury. But if they had done none
9   of them, they wouldn't have been in breach -- you
10  know, since they did none of them, they were in
11  breach. If they'd done all of them, they probably
12  wouldn't have been. So --
13       Q    Well, how do -- how do you go about
14  trying to determine what the damages would have been
15  absent a breach of the duty of fair representation
16  without having an understanding of which of these
17  actions constituted part of the breach?
18       A    Well, I know that all of these actions
19  constituted the breach.
20       Q    How do you know that?
21       A    Because these are all of the actions or
22  inactions that ALPA did that led to the jury finding
23  them in breach of their duty, but -- but --
24       Q    You just testified that you don't know
25  which -- which of these the jury accepted as

44  (Pages 173 to 176)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

177

1  being --
2      A    No, no, no.  I said hypothetically --
3  sorry.  I said hypothetically, if the jury had said
4  that one or two of these things didn't constitute
5  the breach, would that have changed my analysis?  I
6  agreed to that, but I don't know that.  So I don't
7  think I ever agreed that I don't know that all of
8  these things were some part of the jury's decision.
9  If I said that, then I misstated it.
10     Q    Well, can you tell me which of these
11 the jury concluded constituted part of the breach?
12     A    All of them.
13     Q    And that's based on what?
14     A    The fact that all of them were argued
15 and the jury found that ALPA was in breach.
16     Q    And how do you know that the jury
17 accepted the arguments as to each one of these?
18     A    I have nothing that indicates that they
19 didn't.
20     Q    And you have nothing that indicates
21 that they did, either.
22     A    I have the fact that they decided --
23 that they found ALPA guilty, and these were the
24 things that they did or didn't do.
25     Q    So are you assuming then that the jury

178

1  concluded that each of these was a breach of the
2  duty of fair representation for purposes of your
3  analysis?
4      A    I believe that each of these in some
5  way contributed to the breach.
6      Q    And you are certainly trying to assess
7  damages with respect to each of these alleged
8  actions or inactions; correct?
9          MR. JACOBSON:  I object to the form of
10 the question.  Misstates his testimony.
11         THE WITNESS:  Can I ask you to ask the
12 question a different way?
13         MR. TOAL:  Can you read it back?
14         (The court reporter read back the
15 pending question as follows:
16         "Question:  And you are certainly
17 trying to assess damages with respect to each
18 of these alleged actions or inactions;
19 correct?")
20         MR. JACOBSON:  Same objection.
21         THE WITNESS:  Yeah.  I think that's the
22 same question.  So maybe if I could ask you to ask
23 the question in a slightly different way because I'm
24 not really sure I even understand what you mean,
25 so --

179

1  BY MR. TOAL:
2      Q    Well, you are attempting to estimate
3  damages in this case; correct?
4      A    That's correct.
5      Q    And your analysis of damages requires
6  you to make an assessment about what additional
7  actions ALPA should have taken; correct?
8      A    I don't know that it required me to
9  make an assessment of what ALPA should have done.
10 All I know is what ALPA didn't do or did do, okay,
11 depending on, you know, the action that we are
12 talking about.  All of them contributed to the
13 jury's decision that ALPA was in violation.  I don't
14 know which one of these ones may not have ended
15 up -- which one of these things may have been less
16 compelling to the jury in terms of demonstrating
17 that breach.  I have no information about that at
18 all.
19     Q    Now, are you assuming for purposes of
20 your analysis that TWA -- that ALPA should have
21 advised the TWA MEC not to waive its scope
22 provision?
23     A    Not for me to say what ALPA should or
24 shouldn't have done.  That's an action -- there --
25 there was a course of action there that was

180

1  available to it.  Not having pursued it is one of
2  the things that contributed to the jury's decision.
3  That's all I can say about it.
4      Q    And you say it contributed to the
5  jury's decision because it was raised and the jury
6  found a breach of the duty of fair representation;
7  correct?
8      A    It was a fact that was before them, and
9  the jury decided as the jury decides, so it is one
10 of the things that contributed to that decision.
11     Q    And that's your only basis for saying
12 that this specific action contributed to the jury's
13 decision; correct?
14     A    The fact that it was argued and that
15 they decided, yes.
16     Q    Now, did you analyze for purposes of
17 your analysis what would have happened if ALPA had
18 advised the TWA -- the TWA MEC not to waive its
19 scope provision?
20     A    Well, I examined that issue in terms of
21 if they hadn't waived scope, what the impact would
22 have been on their negotiating stance.  Would it
23 have -- so, yes.  The answer is yes.
24     Q    Okay.  And what -- what did you
25 consider among the options of what would have

45 (Pages 177 to 180)

DEGNAN & BATEMAN
(856) 232-7400

RIKK SALAMAT

181

1  happened had ALPA advised the TWA MEC not to waive
2  its scope provision?
3      A    What would the outcome of not having
4  waived scope be?
5      Q    Yeah.  What were the alternatives of
6  how things would have played out?
7      A    Only to the extent that it would have
8  increased pressure on the APA to agree to -- to
9  negotiate more intensively.  Whether that ultimately
10 would have resulted in the sky falling, I don't
11 know.  All I know is that would have increased the
12 TWA pilots' pressure on the APA pilots in
13 negotiations.
14     Q    Can you explain your view of how, had
15 the TWA MEC refused to waive its scope provision, it
16 would have applied pressure to the -- to the -- to
17 ALPA?  I'm sorry.  Withdrawn.
18     Can you explain your view of how, if the -- if
19 the -- if ALPA had advised the TWA MEC not to waive
20 its scope provision, how that would have exerted
21 pressure on the APA?
22     A    Well, now the APA would be in a
23 position where they couldn't guarantee they had a
24 right to unilaterally decide the placement of the
25 TWA pilots.  It was going to go to some other

182

1  fashion of determining whose rights trumped whose
2  rights.  So not being a lawyer, I don't know what
3  the, you know, the legal implications of that would
4  have been, had, you know, Compton -- Compton wanted
5  his airline.  If he was going to go ahead and
6  acquire TWA and have to deal with his pilots -- I
7  mean, he obviously had no fear of dealing with his
8  pilots, so, you know.  I can only speculate that --
9      Q    Why do you say that -- why do you say
10 that Compton had no fear of dealing with his pilots?
11     A    Well, Steve Fram said that he didn't
12 have any fear of dealing with his pilots, that, you
13 know, he went after them for $45 million and, you
14 know, he was a hard negotiator with his own pilots,
15 and I trusted he knows, so --
16     Q    Do you have any basis for concluding
17 that Compton had no fear of his pilots other than
18 the statement by Steve Fram?
19     A    Other than the statement by Steve Fram,
20 I think, being the most, you know, memorable example
21 I have of -- of the relationship between management
22 and the APA.
23     Q    Anything else you can point to other
24 than the statement by Steve Fram?
25     A    Well, like -- like I say, I think

183

1  that's the most memorable one.
2      Q    Right.  So you say that's the most
3  memorable.  I'm trying to understand whether you
4  have any other basis, and it sounds like you do
5  because you are talking about --
6      A    Well, my -- my understanding is that
7  they had very difficult labor relations, and a lot
8  of that I just know from -- from being around so
9  many pilots, and how people have characterized
10 various other groups, and the most concrete thing I
11 can point to in terms of why I have that impression
12 is Steve Fram's closing.
13     Q    Do you have an understanding that
14 American Airlines made waiver of the scope and
15 successor -- successorship provisions by the TWA
16 pilots a condition of any transaction with TWA?
17     A    I'm -- I'm aware that that was a
18 condition that they made, yeah.
19     Q    And do you have any reason to believe
20 that had the TWA MEC refused to waive its scope and
21 successorship provision, that the transaction would
22 have gone forward?
23     A    I don't know what would have happened
24 if they hadn't waived their scope.
25     Q    Are you aware that TWA filed a 1113

184

1  motion with the bankruptcy court?
2      A    I -- I am.
3      Q    And do you know what an 1113 motion is?
4      A    Something to do with bankruptcy.
5      Q    Do you know anything more than that?
6      A    Very little.
7      Q    Did you have an understanding that TWA
8  filed a motion to invalidate its collective
9  bargaining agreement with the TWA pilots, including
10 the scope and successorship provisions?
11     A    I know that there was a motion being
12 brought to the bankruptcy court to do that, yes.  I
13 mean, that was in the closing.
14     Q    And did you have an understanding of,
15 in the absence of a decision by the TWA pilots to
16 waive their scope and successorship provisions,
17 whether the bankruptcy court was likely to grant
18 that motion?
19     A    I have no understanding whatsoever of
20 the likelihood that the -- what the bankruptcy court
21 would have done if they argued that their scope
22 provisions shouldn't be abrogated, so --
23     Q    Do you have any understanding of the
24 APA's views about whether, in the absence of TWA's
25 pilots waiving their scope and successorship

46 (Pages 181 to 184)

DEGNAN & BATEMAN
(856) 232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

185

1  provisions, that American Airlines would walk away
2  from the transaction?
3      A    That's -- I understand their
4  contention. Again, that's what Fram said in his
5  closing they would have done. I don't know that
6  anyone can say for certain that's what would have
7  happened.
8      Q    Do you have any understanding of the
9  APA's perception of the likelihood that American
10  Airlines would walk away from the transaction in the
11  event that the TWA pilots refused to waive their
12  scope and successorship provisions?
13      A    I'm -- I'm -- I am led to believe that
14  that was their disbelief.
15      Q    So if that was their belief, how would
16  it apply pressure to the APA for the TWA pilots to
17  have refused to waive their scope and successorship
18  provision?
19      A    Well, it's one thing to have waived it
20  and -- and say, yeah, see, we were right. The
21  transaction went ahead. If they hadn't waived scope
22  and they were in a position where who knows what's
23  going to happen, they have more of an incentive to
24  negotiate.
25      Q    Why -- why would the APA have more of

186

1  an incentive to negotiate?
2      A    Because there is no way that the APA
3  could have known what American was absolutely going
4  to do if they hadn't waived scope. They could
5  speculate, they could believe, but had they not
6  waived scope, no one can say conclusively what would
7  have happened. So all that -- my only concern in
8  that whole scenario is what that would have done to
9  the dynamics of the negotiation.
10      Q    If TWA had refused to waive its scope
11  and successorship provisions, would that have
12  affected ALPA's ability to pursue any of the other
13  actions on your list?
14      A    I'm sorry. Could I ask you to just
15  repeat that question?
16      Q    Yeah. If the TWA MEC had refused to
17  waive their scope in successorship provisions, would
18  that have affected ALPA's ability to undertake any
19  of the other actions on your list?
20      A    Well, I mean, that would have set off
21  an alternative course in history, and so some of
22  these might never have come to pass. Would they
23  have been in a position to say, let's try and delay
24  the purchase with the DOT? That may have made
25  absolutely no sense if they'd waived scope.

187

1      Q    And did you assess -- on figure three,
2  you purport to present a --
3      A    I'm sorry. Which page are you on?
4      Q    Page ten. Figure three, you purport to
5  present a linear model of probabilities concerning
6  these actions or inactions by ALPA; correct?
7      A    That's correct.
8      Q    And -- and you -- you add probabilities
9  that you've assigned to each of these actions;
10  correct?
11      A    Right.
12      Q    And so were you assuming for purposes
13  of your analysis that ALPA would have had the
14  ability to pursue each and every action on this
15  list?
16      A    The assumption is yes because, you
17  know, again, none of these things were predicated on
18  success of any one of them on its own having
19  achieved what it set out to do. So the model is
20  based on -- if they hadn't waived scope, it would
21  have increased pressure. Now, if they had been
22  successful in -- in not waiving scope and, you know,
23  this 1113 business that you are talking about, not
24  having removed their scope provisions, if that had
25  been successful, who knows what would have happened?

188

1  All of this would probably not have come to pass,
2  and we wouldn't even be having this conversation,
3  right?
4      So all I'm doing is saying, if we look at each
5  one of these actions, what would its impact on the
6  negotiations have been at a marginal level, and then
7  use a linear model, add them up, and see what the
8  probabilities of all of these having been pursued,
9  and assuming all of them could have been pursued.
10  Because unless you assume that one of them
11  succeeded, you would assume that they would go onto
12  the next. So what you are talking about is more of
13  a feedback model. And with a feedback model, you do
14  have to assume that some of these have some degree
15  of success and they forced all -- you pursuing other
16  courses of action. That's not the type of model
17  that I've used here, because we cannot know how
18  successful any one of these things would have been
19  in achieving whatever it set out to do. I assume
20  they were all set out in one way or the other to
21  achieve something like an arbitration or a mutually
22  agreed upon list.
23      Q    Well, let me -- let me try and
24  understand what you are doing here. So referring to
25  figure three, the first item you list is insist on

47 (Pages 185 to 188)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

189

1  waiving scope; correct?
2      A    That's correct.
3      Q    And you have a five percent under Delta
4  perception; do you see that?
5      A    Under the change in perception of the
6  importance of -- yes.
7      Q    Okay.  So does the five percent
8  represent what you regard as an increased likelihood
9  of an agreement being reached?
10     A    The five percent is the increased
11 likelihood of an agreement being reached, that's
12 correct.
13     Q    And is it the increased likelihood,
14 specifically of this -- an agreement being reached
15 on the Salamat model?
16     A    That's correct.
17     Q    And if you are using any other model,
18 you would change these percentages?
19     A    Yes, you would have to.
20     Q    And does the five percent represent
21 that, whether the particular action was successful
22 or not, that there would be a five percent --
23     A    There is a five percent probability
24 that that action would have led to an agreement.
25 Not that it would have succeeded, that it would have

190

1  led to an agreement.
2      Q    There is a five percent likelihood that
3  whether the action was successful or not, that it
4  would have led to the Salamat model being agreed
5  upon?
6      A    Yes.
7      Q    So if -- for instance, take the first
8  one.  If ALPA had advised the TWA MEC not to waive
9  their scope, but the TWA MEC decided to do it
10 anyway, would you say in that instance there is a
11 five percent increased likelihood of an agreement
12 being reached?
13     A    Well, my understanding is -- is the TWA
14 pilots did not want to waive scope, so it is kind of
15 difficult to answer the question.  I mean, if I
16 thought -- if there was some evidence that the TWA
17 pilots were all prepared to -- to waive scope, I --
18 I -- I might have to view that one differently
19 because presumably then the TWA pilots wouldn't
20 carry that -- that scope waiver issue into the
21 negotiation with any meaningful force, so it's kind
22 of hard to answer that question.
23     Q    Do you have an understanding that there
24 were some TWA pilots who favored waiving scope?
25     A    I -- I understand that not all were

191

1  opposed to it.  At what point in time some were --
2  were in favor of it, I -- I -- I don't know that I
3  can recall.
4      Q    Do you have any information about the
5  percentages of TWA pilots who favored and opposed
6  waiving scope?
7      A    I -- I do not.
8      Q    Do you have an understanding of what
9  role, if any, ALPA's advice to the TWA MEC had on
10 the TWA MEC's decision to waive scope?
11     A    My understanding is that it tipped the
12 balance towards that being the decision.
13     Q    What's the basis for that
14 understanding?
15     A    I would have to go back and re-read
16 parts of the transcript.  But there was -- bear with
17 me for a moment.  I'm just trying to refresh my
18 memory as to which issue it was when ALPA was
19 bringing pressure to bear on the MEC.  I believe it
20 was a -- a limited number of people who ALPA -- ALPA
21 having said you should waive scope, still thought it
22 shouldn't be done and eventually were outvoted.  So
23 no, I don't know that I can give you a percentage.
24     Q    So my question was specifically what
25 gave you the understanding that any recommendation

192

1  by ALPA about waiving scope tipped the balance?
2      A    Because as I understood it, several
3  people at TWA MEC did not want to waive scope, and
4  it was only by pressure by ALPA that anyone agreed
5  to it.
6      Q    Well, I understand you are saying
7  that's your -- that's your recollection of what
8  happened.  I'm asking about the basis for that
9  belief that you have.  What source of information
10 are you relying upon?
11     A    Again, this would be the -- this would
12 be the testimony of Mike Day, and Allen Press's
13 closing, and parts of Fram's closing, as well, where
14 they all characterized what was going on on some day
15 in April of 2001, 2000.
16     Q    Okay.  So closing arguments are not
17 considered evidence.
18     A    Uh-huh.
19     Q    With respect to evidence that you are
20 relying upon, testimony, documents, the only thing
21 that you would point to as supporting your belief
22 that the -- that any recommendation by ALPA tipped
23 the scale as to whether the TWA MEC should waive
24 scope is the testimony of Mike Day; is that correct?
25     MR. JACOBSON:  I object -- I object to

48  (Pages 189 to 192)

DEGNAN & BATEMAN
(856)  232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

193

1    the form of the question.  The inclusion of the
2    statement closing arguments are not evidence may be
3    true as far as the deliberation of the jury in that
4    case.  As to what is reasonable for an expert to use
5    and rely on in reaching his opinion, that's not a
6    true statement.
7    BY MR. TOAL:
8        Q    Excluding closing arguments.
9        A    Mike Day's testimony.
10       Q    Is the only thing you relied upon for
11   that belief?
12       A    Excluding closing statements.
13       Q    Excluded closing arguments; is that
14   correct?
15       A    Mike Day's' -- Mike Day's testimony.
16       Q    Now, did you take into consideration
17   any of the negative outcomes that might have taken
18   place if the TWA MEC had refused to waive scope?
19       A    In real life, if they had failed to
20   waive scope, did I -- did I contemplate what might
21   have happened?
22       Q    In your analysis of trying to assess
23   damages, do you take into account any of the
24   negative outcomes for the TWA pilots that could have
25   occurred had the TWA MEC refused to waive scope?

194

1        A    I would have to say negative -- I mean,
2    my analysis is limited to the impact, those actions
3    on the negotiation, not on what they might have done
4    outside of the negotiations.  So strictly speaking,
5    no, I guess, because if they had waived scope and
6    American Airlines had decided not to go ahead with
7    the merger, that's -- that's not an eventuality that
8    goes into the consideration of the effect on the
9    negotiations.
10       Q    So if the TWA MEC had refused to waive
11   scope and American had walked away from the
12   transaction, there would be no seniority integration
13   left to negotiate about; correct?
14       A    That's -- that's quite possible, no.
15   If that had happened, then that would have happened.
16   But as I said, that's not what I'm analyzing here.
17   That would be an analysis of the likely success of
18   these things, you know, in achieving their goals,
19   not their effect on the negotiation.
20       Q    So with respect to insisting on waiving
21   scope, if the TWA MEC had refused to waive scope,
22   are you assuming for purposes of your analysis that
23   American Airlines does not walk away from the
24   transaction and that the bankruptcy court does not
25   invalidate the scope and successorship provisions as

195

1    a result of the 1113 motion?
2        A    Well, you know, in a practical fashion,
3    it does assume that the transaction goes on because
4    obviously there is -- there's future actions that
5    happen in the future that are still to be pursued.
6    I don't think it makes any assumptions about what
7    the bankruptcy court might have done, only what
8    impact it would have had on the negotiations.
9        Q    So if --
10       A    And more -- actually, I'm not quite
11   done.
12       Q    Uh-huh.
13       A    The perception of the TWA pilots
14   themselves in the negotiation, you know, in the
15   most -- in the most practical sense, you know, if
16   ALPA stands up and says we are not going to waive
17   our scope, we are going to fight this thing, we are
18   going to fight it in bankruptcy court, they might
19   have been miserable failures at it, but it would
20   certainly have changed the perception of the TWA
21   pilots in the eyes of the APA, so that's -- that's
22   my consideration, not how successful they would have
23   been.
24       Q    But change -- change in perception as
25   used in Sycara's work doesn't focus on changing

196

1    perception of the other party in the negotiation.
2        A    The perception of the importance of
3    stapling two thirds of them, or stapling all of them
4    I guess would be the position that they would have
5    had at that time.
6        Q    But my question, when you talk about
7    change in perception, based on Sycara's work, that's
8    not a change in your perception of the other party
9    to the negotiation?
10       A    No.  That's true.  That's very true,
11   yes.
12       Q    Now, if TWA had refused to waive scope
13   and the bankruptcy court had invalidated the scope
14   and successorship provisions in the 1113 motion,
15   does your analysis assume that there would still be
16   a five percent increased likelihood of -- of the TWA
17   MEC and the APA agreeing on the Salamat model?
18       A    It does, because the importance -- the
19   perception of the importance of the APA's position
20   will have been shifted by the fact that they have --
21   they put up a fight at that stage in the
22   negotiations.  So, yeah, I would say there is still
23   a five percent chance that they would have agreed to
24   the Salamat model.  I mean, five percent being
25   pretty low, being -- but, you know, still a five

49 (Pages 193 to 196)

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

197

1  percent chance that it would have improved the
2  negotiation between -- to the extent that they would
3  have agreed.
4      Q      So -- so your analysis assumes a five
5  percent increased likelihood of the Salamat model
6  being agreed upon without regard to whether the
7  bankruptcy court invalidates the scope and
8  successorship provisions; correct?
9      A      That's correct.
10     Q      And again, when you talked about
11  perception there, you were talking about the APA's
12  perception of the TWA pilots.
13     A      The importance of its goal of stapling
14  all of them at that point. I mean, it's very
15  difficult, you know, when you are talking about the
16  perception of an issue versus the perception of your
17  negotiating partner, right, because they are
18  intimately tied together in this case.
19     Q      Well, Sycara doesn't talk at all about
20  perception of the other party to the negotiation;
21  does she?
22     A      Well, she can't, because she is not
23  talking about pilots. She is talking about a
24  situation where you've got, you know, multiple
25  issues being considered. So, I mean, if you were in

198

1  a traditional collective bargaining situation and
2  there's 50 things on the table, it's much easier to
3  say, you know, your perception. In this case there
4  is really only one, which is, where does everybody
5  on the other side go? So the distinction is
6  between, you know, perception and importance get
7  harder to make, as I'm sure you can understand, when
8  you are dealing with basically one single issue, a
9  seniority list.
10     Q      So how would it have changed the APA's
11  perception of any of its goals if TWA, the TWA MEC
12  had refused to waive scope and the bankruptcy court
13  had invalidated the scope and successorship
14  provisions anyway?
15     A      Well, again, not changing perceptions
16  is predicated on a particular outcome of that course
17  of action. I'm not concerned so much with the --
18  you know, I mean, I'm not concerned at all with the
19  -- with the likely outcome of having done these are
20  except to the extent that it would have changed the
21  dynamics of the negotiation. So now you are
22  negotiating with someone whose -- whose national
23  union is fighting to protect their scope. So you
24  can't guarantee to your members or to your own MEC
25  that you have an absolute right to do anything,

199

1  because now there is a question about this, and so
2  your willingness to negotiate, at least in theory,
3  would improve.
4      Q      You say, in theory. Why do you add
5  that qualification?
6      A      Because occasionally people can be
7  irrational and we have to go on the assumption that
8  people are acting rationally and responsibly --
9  responsibly, and not acting like crazy people who
10  decide, oh, I'm going to burn the building down
11  because my lunch was cold. All right. So, I mean,
12  that happens, but you don't build models on that
13  assumption. You build models on the assumption that
14  people are acting rationally.
15     Q      Well, if I'm trying to build a model to
16  estimate how the APA is going to respond, shouldn't
17  I be interested in what I know about how the APA is
18  likely to respond?
19     A      If you can say definitively, perhaps.
20  If you can say, you know what they said was, if you
21  do this, I'm going to do that. Well, I mean, you
22  can't build models based on idle threats either,
23  right? You know, what we have is hard evidence that
24  their negotiating position improved over time on
25  whatever little pressure the TWA pilots were able to

200

1  bring to the table, and so that you can reasonably
2  make some conclusions from to say, well, if you guys
3  do this, then I'm going to take my stuff and go
4  home. I mean, you could build a model off of that.
5  I don't know how solid it would be.
6      Q      You could build a model based on the
7  assumption that the APA was trying to get the best
8  deal for its pilots that it could get; correct?
9      A      Well, you -- you would have a hard time
10  doing -- explaining away the fact that that list
11  kept getting better and better for the TWA pilots,
12  if what they were seeking was to get the best list
13  -- because a staple, a hundred percent staple would
14  have been the best list for their pilots, so, you
15  know, its very difficult to start from that premiss.
16  It's much easier to start from the premise of
17  they're trying to be rational and fair because they
18  kept saying over, and over, and over they wanted to
19  be fair, and my experience with pilots is they want
20  to be fair, more than anything else. Sometimes you
21  got to force them to do it, but that's what they
22  want to do.
23     Q      So if the TWA MEC had refused to waive
24  scope, and American Airlines didn't walk away from
25  the transaction, and the bankruptcy court didn't

DEGNAN & BATEMAN
(856) 232-7400

f1d60e56-51dd-489a-a0ce-16b47e16413e

RIKK SALAMAT

201

1   invalidate the scope and successorship provisions,
2   how would any of these other actions have been
3   pursued?
4       A    They may not have been necessary. But,
5   I mean, again, you are talking -- you are asking me
6   to speculate on the outcome of the action having
7   succeeded, and that's not really what my report is
8   about. I mean -- I think --
9       Q    Well, you add these probabilities of
10  different events occurring which is suggestive of
11  the fact that you think all of them could have been
12  pursued --
13      A    But if I said, okay, this is a five
14  percent chance of this having succeeded, and if it
15  actually succeeds, well, then I guess then there is
16  a zero percent chance of the other succeeding
17  because the goal has already been achieved. So if
18  they hadn't waived scope, and they said, all right,
19  fine, we are going to have an arbitration, well
20  there is a zero chance probability that any of these
21  other things would even have ended up on the list.
22  So you are asking a question that can't be answered
23  logically. So maybe there is -- there is some other
24  way we can -- we can answer your question that
25  doesn't kind of --

202

1       Q    Well -- well, even if everything goes
2   perfectly for the TWA pilots after they refuse to
3   waive scope, American Airlines doesn't walk away
4   from the transaction, the bankruptcy court doesn't
5   invalidate the scope provision, all you have in that
6   situation is a TWA collective bargaining agreement
7   that says they are entitled to arbitrate seniority
8   integration disputes, and you have an APA agreement
9   that has no obligation to arbitrate seniority
10  integration disputes; correct?
11      A    That's correct.
12      Q    And in that situation, are you taking
13  the position that any of these other actions could
14  have been pursued by ALPA?
15      A    You are asking me to speculate on, you
16  know, a -- a legal context. I don't know -- I don't
17  have any skills to speculate on to say what -- what
18  would the negotiation between the two parties and
19  American, and presumably the creditors, look like if
20  they hadn't waived scope, and American hadn't walked
21  away from the deal, and their -- their contract
22  hadn't been abrogated, at least the scope hadn't
23  been abrogated, what would the negotiation have
24  looked like? And again, that leads me to speculate
25  on what the outcome of that strategy being

203

1   successful would have been, and I can't speculate on
2   that because I don't know. It didn't happen, and I
3   don't really even have the expertise to guess what
4   the legal ramifications of that eventuality would
5   be.
6       Q    Oh, but you are presenting an analysis
7   that presuppose that all of these actions could have
8   been pursued, and I'm asking, did you undertake any
9   analysis to see if that was, in fact, true?
10      A    The model, as you said and as I said,
11  is a linear model. It assumes all of these actions
12  were available, and that if one of them succeeds in
13  achieving its objective, all the others are either
14  unavailable or redundant. So, you know, the chance,
15  as I said, there is a five percent chance that
16  waiving scope could have produced the damage model.
17  Again, if -- if that five percent translates into
18  the desired outcome, in this case the damage model,
19  then the others are redundant. Each one has a five
20  -- I mean, you do understand, you know, if your goal
21  is to roll a six, you got a one in six chance of
22  rolling it, you know, and there is a one in six
23  chance of rolling a five, and a one in six chance of
24  rolling a four. If you roll a six, you are not
25  going to roll five more times. That's, you know,

204

1   that's a linear probability problem, right? Why
2   would you roll the dice six times if you already
3   achieved your goal? Your probability is one in six.
4   You got it on the first roll. Everyone can go home.
5   That's not what the exercise here is. The exercise
6   says, if you roll that dice once, you got a one in
7   six chance of hitting a six. And if I give you two
8   rolls, you got a one in three. I give you three
9   rolls, one in two, and on and on, so that's how the
10  model works. It doesn't say that, you know, your
11  one in six chance is any different because you hit
12  it on the first roll.
13      Q    So your analysis on insisting on
14  waiving scope is that, if ALPA had advised against
15  waiving scope, that based on that action alone, the
16  TWA MEC had a one in 20 chance of negotiating the
17  Salamat agreement; is that correct?
18      A    One in 20.
19      Q    How did you -- how did you decide upon
20  this five percent or one in 20?
21      A    A lot of it was based on just
22  experience in negotiation and reading what --
23  comparing Sycara's model from what I know in the
24  real world and what other people have said.
25  Particularly, you know, a lot of the stuff that is

51 (Pages 201 to 204)

f1d60e56-51dd-489a-a0ce-16b47e16413e