# EXHIBIT  7

# PART 1

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
            Plaintiffs,
    vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
            Defendant.
    ------------------
    January 30, 2013
    ------------------
        Oral sworn continued videotaped
deposition of RIKK SALAMAT, Case Lab, Inc., 288
Clinton Street, Toronto, Ontario, was taken at the
law office of Archer & Greiner, 1650 Market Street,
Philadelphia, Pennsylvania, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:30 a.m., there being present:

    GREEN JACOBSON, P.C.
    BY: JOSEPH JACOBSON, ESQUIRE
    7333 Forsyth Boulevard
    St. Louis, Missouri  63105
    (314) 862-6800
    Attorneys for Plaintiff
    TRUJILLO, RODRIGUEZ & RICHARDS, LLC
    BY: LISA RODRIGUEZ, ESQUIRE
    258 Kings Highway East
    Haddonfield, New Jersey  08033
    (856) 795-9002
    Attorneys for Plaintiff

**2**

1       PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
2       LLP
        BY: DANIEL J. TOAL, ESQUIRE
3       JULIE ROMM, ESQUIRE
        1285 Avenue of the Americas
4       New York, New York  10019
        (212) 373-3869
5       Attorneys for Defendant, ALPA
6       KATZ & RANZMAN, PC
        BY: DANIEL M. KATZ, ESQUIRE
7       4530 Wisconsin Avenue N.W., Suite 250
        Washington, D.C.  20016
8       (202) 659-4656
        Attorneys for Defendant, ALPA
9
10      Also present:  James Bateman, CLVS
        Ricardo Cossa, Navigant Economics
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1                    I N D E X
2       Witness                         Page
3       RIKK SALAMAT
4          By Mr. Toal                    4
5            E X H I B I T S
6
7       Marked for I.D.                  Page
8       Salamat-11  Portion of deposition  20
9                   transcript of Clay Warner
10      Salamat-12  Excerpt from the ALPA   38
11                  administrative policies
12      Salamat-13  Supplement CC          178
13      Salamat-14  Deposition transcript of  188
14                  John Darrah
15      Salamat-15  Arbitration decision of   231
16                  George Nicolau
17
18
19
20
21
22
23
24
25

**4**

1           VIDEO SPECIALIST:  The time is now 9:30
2       and we are back on the record.  Would the court
3       reporter please swear in the witness.
4           RIKK SALAMAT, having been duly sworn,
5       was examined and testified as follows:
6       BY MR. TOAL:
7       Q     Good morning, Mr. Salamat.
8       A     Good morning.
9       Q     Do you have your report in front of
10      you?
11      A     No, I don't.  Okay.
12      Q     So if you go back to figure one on page
13      two of your report --
14      A     Yes.
15      Q     -- the -- the third action that you
16      list that you say ALPA had available to it is
17      something you describe as denied July 2001 legal
18      strategy. Sue American and APA.
19          Do you see that?
20      A     I do.
21      Q     What's your understanding of what that
22      legal strategy was?
23      A     My understanding was that that was a
24      strategy to bring a suit to compel American and APA
25      to have a fair integration process.

1 (Pages 1 to 4)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

5

1  Q   And what cause of action did that suit
2  involve?
3  A   I -- I -- I couldn't say.
4  Q   Do you have any understanding of the
5  likelihood of success of such a suit?
6  A   No, I don't.
7  Q   Do you have any better understanding
8  today of what was involved in the April 2001 legal
9  strategy?
10 A   No, I don't.
11 Q   You don't have a better understanding
12 than you did yesterday?
13 A   No, I don't.
14 Q   Do you know how the July 2001 legal
15 strategy relates to the April 2001 legal strategy?
16 A   As I recall, the -- the July legal
17 strategy was to compel some fair integration
18 process. Beyond that, I -- I don't know that I can
19 recall any other specifics about how that was going
20 to be done, what court it would have been brought
21 in.
22 Q   Do you know whether it would have been
23 possible to pursue both the April 2001 and the
24 July 2001 legal strategies?
25 A   Well, I don't know whether they would

6

1  have both been possible or not. Again, just as
2  it's similar to the issue we were discussing
3  yesterday, if one had succeeded, the other may have
4  been redundant.
5  Q   And even if one hadn't -- even if the
6  April 2001 legal strategy hadn't succeeded, if it
7  was implemented, do you know whether it would have
8  been possible to pursue the July 2001 legal
9  strategy?
10 A   It -- presuming it is not made
11 redundant by the first one, I have no -- I have no
12 other way of assessing whether it would have been
13 possible or not.
14 Q   And that's my question. Do you know
15 whether the July 2001 legal strategy would have been
16 made redundant?
17 A   Had the first -- had the -- had the
18 April strategy succeeded?
19 Q   Had the April 2001 strategy been
20 implemented, do you know whether that would have
21 made the July 2001 legal strategy redundant?
22 A   I do not know that.
23 Q   Are you aware of any prior situation in
24 which a legal strategy like the July 2001 legal
25 strategy had resulted in a negotiated agreement

7

1  between parties concerning seniority integration?
2  A   There may have been one. If you would
3  bear with me while I go through the report.
4  Q   Sure.
5  A   Well, sadly, I didn't make a note in
6  here. But I believe in Continental/People's
7  Express, there was a second integration process
8  after a first one resulting from a suit. How
9  similar that suit was to this July strategy, I -- I'm going
10 wouldn't know off the top of my head. So I'm going
11 to answer your question saying, no, I'm not aware of
12 one.
13 Q   Now, what's the basis for your
14 knowledge about the 2001 legal strategy?
15 A   The closing arguments. The testimony
16 of Mike Day.
17 Q   And anything beyond that?
18 A   No.
19 Q   Do you know anything about the APA's
20 perception about how threatening such a suit would
21 have been to its interests?
22 A   I do not.
23 Q   You next list a denied October 2001
24 legal strategy injunction. Do you see that?
25 A   Yes, I do.

8

1  Q   And what do you know about that legal
2  strategy?
3  A   That was a strategy to prevent the
4  transfer, I believe, of TWA assets or TWA, LLC to
5  American Airlines.
6  Q   And do you know anything about the --
7  the legal cause of action that would have been
8  brought?
9  A   No, I don't.
10 Q   Do you know anything about who would
11 have been sued as part of that legal strategy?
12 A   I believe it was American Airlines.
13 Q   Do you know anything about the
14 likelihood that such a suit would have been
15 successful?
16 A   No, I don't.
17 Q   Are you aware of any situation in the
18 past in which such a strategy had been used to try
19 and prevent a transfer of assets to an acquiring
20 airline?
21 A   No, I'm not.
22 Q   Are you aware of any situation in the
23 past in which such a strategy had succeeded in
24 producing a negotiated resolution of a seniority
25 integration dispute?

2 (Pages 5 to 8)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

**9**

1    A    No, I'm not.
2    Q    Do you know anything about whether the
3  APA perceived such a suit to threaten any of its
4  interests?
5    A    I have no direct knowledge.
6    Q    Do you have any indirect knowledge?
7    A    No, I do not.  I mean, I can -- I can
8  assume from, you know, their reactions to every
9  threat that the TWA pilots made that, you know, they
10  wouldn't have thought it in their interest for them
11  to pursue that.  I mean, that would be just common
12  sense.  That's not any direct knowledge of what they
13  thought about this particular action.
14    Q    Do you have an understanding of how the
15  October 2001 legal strategy for an injunction
16  related to the July 2001 legal strategy?
17    A    I do not.
18    Q    Do you know whether the October 2001
19  legal strategy could have been pursued had the
20  April 2001 legal strategy been implemented?
21    A    Had the April 2001 -- again, presuming
22  that it is not made redundant by that having been
23  implemented and been successful, I believe -- in
24  that case, I believe it would have been possible.  I
25  believe it was -- you know, again, presuming it's

**10**

1  not been made redundant.
2    Q    Well, my question is, do you know
3  whether the strategy would have been made redundant
4  by implementation of the April 2001 legal strategy?
5    A    I don't know, but I don't believe it
6  would have been.
7    Q    And is -- is your belief based on any
8  personal knowledge that you have?
9    A    I believe they were -- I believe they
10  were different types of actions and, again, not
11  being a lawyer, I don't know what -- what avenues of
12  -- of, you know, legal appeal or -- or what suit
13  could or could not have been brought if another one
14  had first been launched.  So, you know, it is
15  outside my realm of expertise, but my understanding
16  is that the -- the attempt to delay the purchase
17  was -- was an action, you know, targeted at American
18  Airlines, whereas the -- the second October strategy
19  was -- was one directed towards the APA.
20    Q    Well, I'm only asking you now about the
21  prior legal strategies that we discussed, the
22  April 2001 legal strategy.
23    Do you know as a matter of your personal
24  knowledge whether implementation of that strategy
25  would have rendered the October 2001 legal strategy

**11**

1  for an injunction redundant?
2    A    I have no knowledge.
3    Q    And do you know whether the
4  implementation of the July 2001 legal strategy to
5  sue American and the APA would have rendered the
6  October 2001 legal strategy redundant?
7    A    I do not know.
8    Q    And as with the other strategies on
9  this list, is your knowledge concerning those legal
10  strategies derived exclusively from closing
11  arguments and the testimony of Mike Day?
12    A    I believe that's the case, yes.
13    Q    You then list a denied October 2001
14  legal strategy:  Case, APA injunction.
15    Do you see that?
16    A    Yes.
17    Q    What does Case refer to there?
18    A    I believe it is Ted Case.
19    Q    And what relevance does Ted Case have
20  to this legal strategy?
21    A    His name was -- came up in connection
22  with devising a strategy.
23    Q    And how did his name come up?
24    A    It was mentioned by Allen Press in his
25  closing as being one of the people who -- who had

**12**

1  come up with the strategy.
2    Q    Do you know if Mr. Case is a lawyer?
3    A    I do not.
4    Q    Do you have an understanding that
5  Mr. Case is a pilot?
6    A    I do understand he is a pilot.
7    Q    Do you have any awareness that he has a
8  legal degree?
9    A    I have -- I have no -- I have no
10  knowledge of whether he has a legal degree or not.
11    Q    What's your understanding of this
12  second October 2001 legal strategy?
13    A    My understanding is that -- was a
14  strategy that would have prevented the APA from
15  implementing Supplement CC.
16    Q    Do you have any understanding about the
17  likelihood of success of this legal strategy?
18    A    I do not.
19    Q    Do you know what legal theory it was
20  proposed to be brought under?
21    A    Sorry.  Could -- could I get you to ask
22  that question again?
23    Do I have --
24    Q    Do you have any understanding under
25  what legal theory they would have sought to enjoin

3  (Pages 9 to 12)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

**13**

1  the APA from implementing Supplement CC?
2      **A**   I understand it had something to do
3  with the APA effectively usurping ALPA's bargaining
4  rights over TWA pilots.  You know, what, you know, I
5  can say beyond that, not having any legal training,
6  I can't say.
7      **Q**   Do you have any understanding of
8  whether the second October 2001 legal strategy could
9  have been implemented had the first October 2001
10  legal strategy been implemented?
11      **A**   Well, with all of these questions that
12  you are -- you are asking about, could one strategy
13  have been implemented had another one been
14  implemented, I think I'm going to have to give the
15  same answer for all of them.
16      First of all, it is assuming that the first
17  one hasn't succeeded.  And second of all, that the
18  first one, you know, hasn't concluded.
19      If, for instance, let's -- let's say, you
20  know, we are looking at the APA injunction strategy
21  in October 2001.  Now, if the prior strategy had
22  been implemented but was ongoing, had not been
23  resolved, it most likely could have.  If -- if the
24  prior one had succeeded, it would be redundant.  If
25  the prior one had succeeded and failed, then quite

**14**

1  likely it would still be an available strategy.  Not
2  having done any of the prior ones -- it's -- it's,
3  you know, a hypothetical.
4      **Q**   Do you have the legal background to
5  understand whether, for any of the prior legal
6  strategies that we discussed, if they were
7  implemented, whether this second October 2001 legal
8  strategy could have been implemented as well?
9      **A**   Well, again, I'll have to -- I'll have
10  to say it could have assuming the others had failed
11  in a timely fashion, such that it was still an
12  available strategy and not redundant.
13      **Q**   And do you know if the others had been
14  implemented and were still ongoing, whether that
15  would have affected the ability to implement the
16  second October 2001 legal strategy?
17      **A**   I'm sorry.  If the others had?
18      **Q**   Had been implemented and were still
19  ongoing, do you have an understanding of whether the
20  pendency of those actions would have affected the
21  ability to implement the second October 2001
22  strategy?
23      **A**   So you are asking, if the others had
24  been undertaken and were ongoing, had not yet been
25  resolved, presuming the -- that would not have made

**15**

1  it redundant, in -- in some cases maybe it would
2  have.  But, you know, I have no way of knowing
3  whether you would be prevented from launching one of
4  these particular suits given that another one had
5  been launched.  I don't -- I don't have the legal
6  training to answer that question.
7      **Q**   Now, are you aware of any prior
8  situation in which a strategy similar to the second
9  October 2001 strategy had resulted in a negotiated
10  resolution of a seniority integration dispute?
11      **A**   I'm not aware.
12      **Q**   Do you know anything about the APA's
13  views about whether any of its interests would have
14  been threatened by implementation of the second
15  October 2001 legal strategy?
16      **A**   I have no direct knowledge of -- of
17  what the APA would have thought of that second
18  strategy.
19      **Q**   And do you have any indirect knowledge
20  of what the APA would have thought of that legal
21  strategy?
22      **A**   Only what we can surmise given that,
23  you know, it was targeted at them directly, so --
24      **Q**   And aside from any surmise that you
25  would make, do you have any knowledge, direct or

**16**

1  indirect, about how the APA perceived such a legal
2  strategy and whether it thought it threatened any
3  interest it had?
4      **A**   I have no direct knowledge.
5      **Q**   My question wasn't limited to direct
6  knowledge, sir.  You keep answering about direct
7  knowledge.
8      Do you have any knowledge, direct or indirect,
9  but how the APA viewed this potential legal
10  strategy?
11      **A**   No.
12      **Q**   The next item on your list is something
13  described as refused to request DOT make fair
14  process a condition of purchase.  Do you see that?
15      **A**   I do.
16      **Q**   And what's your understanding of what
17  this strategy consisted of?
18      **A**   This strategy consisted of having
19  the -- putting a request to the Department of
20  Transportation to have them make the the -- a fair
21  seniority integration process a condition of the
22  purchase of TWA by American.
23      **Q**   And do you know whether ALPA made such
24  a request?
25      **A**   My understanding is they did not.

4  (Pages 13 to 16)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

17

1    Q    And what's the basis for your
2  understanding?
3    A    The closing arguments of Allen Press
4  and the testimony of Mike Day.
5    Q    Do you have any understanding about
6  whether a meeting between the TWA MEC and the
7  Department of Transportation took place?
8    A    I do not recall -- not whether -- no, I
9  don't recall.
10   Q    You don't recall or you don't know?
11   A    Hmm.
12   Q    You don't recall or you don't know?
13   A    I don't know -- no.  I don't know
14  whether that meeting took place.
15   Q    If such a meeting had taken place,
16  would that affect your analysis in any way?
17   A    Well, not having been at the meeting
18  and not knowing what was discussed at the meeting, I
19  don't know.
20   Q    Would it have the potential to affect
21  your analysis?
22   A    It -- it could.  It could.
23   Q    And how might it affect your analysis?
24   A    Well, it could affect my analysis if
25  ALPA, having undertaken this action, would have

18

1  provided no support for the TWA pilots in their
2  negotiations, would have had -- had no effect
3  whatsoever on, you know, the perception of the TWA
4  as negotiating partners.  So, again, you know, you
5  are sort of asking me to say -- like, the success or
6  failure of that particular action is not what I
7  was -- is not what I was concerned with.  What I'm
8  concerned with is what this would have done to the
9  dynamics of the negotiations.
10        So if some meeting had happened that said that
11  this -- this -- the likelihood of success was -- was
12  small, that wouldn't actually change my analysis.
13  What would change my analysis would be if there was
14  some way in which ALPA, having stepped up and
15  undertaken that action, would have had zero effect.
16  And if there was some way that I could know that
17  absolutely, then it could potentially change.
18   Q    Well, would it affect your analysis if
19  the TWA MEC and representatives from ALPA had
20  actually met with the Department of Transportation
21  and made a request that the DOT make a fair
22  integration process a condition of approval of the
23  TWA acquisition?
24        MR. JACOBSON:  I'm going to object to
25  the form of the question.  Assumes facts not in

19

1  evidence.
2        THE WITNESS:  I would need to know a
3  good deal more about the meeting, and what exactly
4  was discussed, and how well known this meeting was,
5  and how forceful the request had been made, and
6  whether, you know, a number of other -- I mean, we
7  are talking about the impact of this on the
8  negotiations, not, you know, a conversation between
9  the TWA pilots and the DOT.  So I would need to know
10  a good deal more details about that meeting, how
11  well publicized it was.
12        Because, you know, if it was a private meeting
13  between parties that the APA had no knowledge
14  whatsoever of, that the American Airlines had no
15  knowledge of whatsoever, that the TWA management at
16  the time had no knowledge of, I don't know how it
17  could have affected the negotiation at all.  So
18  it's-- it's just too hypothetical a question you are
19  asking me.  So if there is more details about a
20  meeting, I could potentially tell you whether it
21  would or would not affect my analysis.
22  BY MR. TOAL:
23   Q    Are you aware of any situation in which
24  the Department of Transportation has made
25  implementation of a certain seniority integration

20

1  process a condition of an -- of an asset
2  acquisition?
3    A    I'm not aware.
4    Q    Are you aware of any situation in which
5  a request that the DOT make a certain process a
6  condition of an asset acquisition has resulted in a
7  negotiated resolution of a seniority integration
8  dispute?
9    A    I'm not aware of any.
10       (Salamat-11  Portion of deposition
11       transcript of Clay Warner marked for
12       identification.)
13  BY MR. TOAL:
14   Q    I'll show you a document that I'll mark
15  as Salamat Exhibit-11, which is the trial transcript
16  from July 5, 2011.  This is excerpted, page -- pages
17  23 to 25.  And this is from the testimony of Roland
18  Wilder.  I'm sorry.  It is actually from the
19  testimony of Clay Warner, I believe.
20       Is that the wrong document?  Right.
21       This is the testimony of Clay Warner.  If I
22  could direct your attention to page 25 -- let me
23  start you on page 24, line 19.
24       You see it says, the question is, okay.  But
25  you were going back to the DOT in early 2001 to

5 (Pages 17 to 20)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

21

1  press for what?  Give us a sense of what you were
2  trying to get them to help you do.
3      And the answer is, March 2001, we were looking
4  to see if we could do anything to put any kind of
5  pressure on American or the Allied Pilots
6  Association in a way that would not boomerang back
7  and hurt the TWA pilots.  We were looking around at
8  rocks everywhere and picking them up to see if there
9  was anything under any rock that might possibly
10  help.  Randy Babbitt actually suggested this
11  meeting, and you know there was absolutely no
12  possibility for harm from it.  We didn't know it
13  would, if it would ever come to anything, and so we
14  went.  It was Scott Schwartz, who is the vice
15  chairman of the MEC, Matt Comlish, who is their
16  legislative affairs chairman, and I went and met
17  with three folks from DOT to see if there was
18  anything they could possibly do.  And the answer was
19  a very polite no, but we checked.
20      Do you see that?
21      A    I do.
22      Q    Is that testimony you were aware of
23  prior to preparing your report?
24          **MR. JACOBSON:  May I put an objection.**
25  **I object on improper use of trial testimony for a**

22

1  **trial whose judgment has been entered and not**
2  **appealed.**
3          **THE WITNESS:  I'm -- I'm not aware of**
4  **this testimony, no.**
5  **BY MR. TOAL:**
6      Q    And you weren't aware of it before you
7  prepared your report?
8      A    No, I was not.
9      Q    Had you been aware of this testimony,
10  would it have affected your analysis?
11          **MR. JACOBSON:  I object to the form of**
12  **the question.  It neglects the fact that there was a**
13  **jury trial in this matter in which this was a**
14  **disputed fact.**
15          **THE WITNESS:  I don't believe it would**
16  **have.  First of all, who is -- who is Mr. Warner?**
17  **BY MR. TOAL:**
18      Q    Mr. Warner was a lawyer for ALPA.
19      A    Okay.  And, you know, I'm going to go
20  back to what I said earlier, which was, I don't know
21  how -- how well known ALPA -- ALPA's pushing the DOT
22  in order to make this some part of the -- the
23  purchase was known.  I don't know if their "polite
24  no" was well known.  I don't know if ALPA
25  ever thought-- my understanding is that ALPA never

23

1  even sent a letter officially requesting this be
2  part of the sale.  I don't know if any more broad
3  meetings had ever been scheduled that, you know,
4  would have alerted the APA that this was something
5  the TWA pilots were trying to do.
6      From what I gather here, it was a meeting.  So
7  I don't know that anything that I just read in this
8  section would make me think that the possibility of
9  ALPA having fully supported this strategy wouldn't
10  have changed the dynamics of the negotiation.
11  Again, what this does tell me is that maybe there
12  was a small chance that, you know, maybe there is a
13  smaller chance that it would have been successful.
14  But, again, nothing that I read -- have written is
15  predicated on the success or failure of any
16  particular strategy.  So I don't believe this would
17  have changed my report.
18      Q    Is your analysis predicated, at least
19  in part, on the APA's perception about the likely
20  success or failure of any of these strategies?
21      A    In a small part, perhaps, but not --
22  not in any great measure.  It is predicated on the
23  APA's perception of the TWA pilots and ALPA as
24  negotiating partners, so --
25      Q    Well, why -- why does the APA's

24

1  perception of ALPA and the TWA MEC as negotiating
2  parties lead you to believe there was a greater
3  likelihood of an agreement better than CC being
4  reached on seniority integration?
5          **MR. JACOBSON:  I object to the form of**
6  **the question.  You used the word parties rather than**
7  **partners.**
8          **MR. TOAL:  Stop with the speaking**
9  **objections.  You just need to object to the form of**
10  **the question.  You are just trying to coach the**
11  **witness.  Joe, show me where you feel that in order**
12  **to preserve your objection, you need to tell the**
13  **witness what to respond to?**
14          **MR. JACOBSON:  I'm not telling him how**
15  **to respond.**
16          **MR. TOAL:  That's exactly what you're**
17  **doing.**
18          **MR. JACOBSON:  Your question was**
19  **negotiating parties.  Your question was negotiating**
20  **parties.  He used negotiating partners.  It is a**
21  **different word.  I objected to the form because you**
22  **used a different word than the word he used.  That's**
23  **the proper objection.  I give you the opportunity to**
24  **correct your answer.**
25          **THE WITNESS:  Now I forgot the**

DEGNAN & BATEMAN
(856)  232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

25

1 question.
2      MR. TOAL: Can you read it back?
3      (The court reporter read back the
4   pending question as follows:
5      "Question: Well, why -- why does the
6   APA's perception of ALPA and the TWA MEC as
7   negotiating parties lead you to believe there
8   was a greater likelihood of an agreement
9   better than CC being reached on seniority
10  integration?")
11     THE WITNESS: Can I get you to read the
12  first part of the question again?
13 BY MR. TOAL:
14     Q    I'll just restate it.
15     Why does your -- why is it your view that the
16  APA's perception of ALPA and the TWA MEC as
17  negotiating partners affects the likelihood of any
18  agreement being reached concerning seniority
19  integration?
20     A    Well, because if the TWA pilots -- if
21  ALPA is doing nothing to protect the TWA pilots, is
22  doing nothing to give them any leverage in the
23  negotiation, the APA is left, you know, with the --
24  with the reason to believe that ALPA is not going to
25  do anything to prevent them from acting

26

1   unilaterally. ALPA acting and exploiting avenues in
2   order to gain, you know, some leverage, some ability
3   to control the outcome of the negotiation is going
4   to change the perception of that negotiating
5   partner. So if you lie down, you don't do anything,
6   the other party can reasonably conclude that they
7   can do whatever they want. If you step up and you
8   fight, the chances of getting a better negotiated
9   agreement are better.
10     Q    Do you have any empirical support for
11  that view?
12     A    That if a party doesn't fight in a
13  negotiation, that the outcome is worse?
14     Q    Do you have any empirical support for
15  the proposition that if you fight in a negotiation,
16  you invariably do better?
17     A    Than if you don't fight?
18     Q    Yes.
19     A    I think if you go back to Walton and
20  McKersie from, like, the 1960s, they've been
21  demonstrating this consistently in research on
22  negotiations, that if you don't actually put up a
23  fight, the outcome is going to be worse for you.
24     Q    Now, what if ALPA had no ability to
25  give the TWA MEC any additional leverage, at least

27

1   in the APA's view?
2      A    Well, you are asking me something that
3   is inconsistent with what the jury already decided
4   in this case, which was that they didn't do these
5   things, and had they not breached their duty, there
6   would have been a better seniority list. So there
7   is no way I can actually start from the position
8   that you just gave me.
9      Q    Well, I'm just asking you a question.
10  Whatever you think of what the jury decided, if it's
11  the case that ALPA had no ability to give the TWA
12  MEC additional leverage, at least from the APA's
13  perspective, do you still think it's the case that
14  the only thing that matters is whether ALPA and the
15  TWA MEC appear as negotiating partners?
16     A    You are asking me to answer a question
17  that's completely contrary to the jury decision, so
18  I can't say anything to that. It is contrary to the
19  facts.
20     Q    Treat it as a hypothetical.
21     A    I can't treat it as a hypothetical
22  because it's contrary to facts.
23     Q    Is your -- is your testimony under oath
24  that you're incapable of answering that as a
25  hypothetical question?

28

1      A    Okay. Well, why don't you try asking
2   me a different way and we will see if we can get you
3   an answer.
4      Q    The -- the question is, if the -- if
5   ALPA had no ability to provide the TWA MEC
6   additional leverage from the perspective of the APA,
7   what difference does it make that it appears to the
8   APA that ALPA and the TWA MEC are negotiating
9   partners?
10     A    So if ALPA could provide no additional
11  leverage, why would it change the APA's perception?
12     Q    Yes.
13     A    Of -- well, I suppose -- I suppose we
14  could -- we could, you know, try and put another
15  hypothetical up against yours.
16     So if I show up in a schoolyard and some bully
17  wants to pound the tar out of me, that's one
18  situation. Now, if my big brother shows up at the
19  edge of the schoolyard, now, the bully has no reason
20  to think that it is any less likely that he can
21  pound the tar out of me, but now there is my big
22  brother standing there. So even if my big brother
23  hasn't given meany leverage, he hasn't given me any
24  strength. He hasn't said he is going to step into
25  the fight. I have to believe that schoolyard bully

7 (Pages 25 to 28)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

29

1  is going to be looking at the situation somewhat
2  differently.
3       That's about the best I can do to say, you
4  know, with your hypothetical situation, why it would
5  be that I would suddenly have a better chance of
6  coming out of the schoolyard with my jaw intact.
7       Q    Well, in your situation -- in your
8  hypothetical, your big brother has some ability to
9  harm the interest of the bully.
10      A    We don't know.  He hasn't said he would
11 or he wouldn't.  He just showed me.  He hasn't given
12 me any leverage.  He didn't hand me a baseball bat.
13 He is just there.
14      Q    Well, can you answer my hypothetical?
15      A    I think I just did.
16      Q    No.  You have given me another
17 hypothetical.
18      A    Well, it is the only way I can answer
19 your answer.  I mean, because you said something,
20 first of all, that is contrary to the facts, so you
21 are asking me to answer something that is contrary
22 to the facts as I know them, so --
23      Q    Okay.  So your -- your testimony is
24 that whether any of these strategies had the ability
25 to affect the interests of the APA is largely

30

1  irrelevant to your analysis; correct?
2       A    I don't think they are.  Well, first of
3  all, I mean, I disagree with that statement because
4  I don't think any of them were contrary to --
5       Q    So, with respect to your analysis, does
6  it make a difference whether any of these legal
7  strategies have the ability -- I'm sorry.
8  Withdrawn.
9       With respect to your analysis, does it make a
10 difference whether any of these strategies that you
11 list had the ability to affect an interest of the
12 APA?
13      A    Does it matter that they had the
14 ability to affect the interest of the APA?
15      Q    Does it matter whether they had the
16 ability to affect any interest of the APA?
17      A    Well, it -- it matters that they have
18 the ability to put pressure on the negotiation.
19      Q    And would you agree that if the APA
20 doesn't perceive its interests to be affected by any
21 of these strategies, those strategies are likely to
22 be ineffective in changing the dynamics of the
23 negotiation?
24      A    You mean if the APA assumes that they
25 will fail?

31

1       Q    If they assume that the strategies have
2  no ability to harm any interest of the APA, would
3  you agree --
4       A    That they are -- that they are separate
5  from the negotiation, that they could have no
6  relevance whatsoever in the negotiation?
7       Q    My -- my question is, if you assume
8  that the APA was of a view that none of these
9  strategies, if implemented, posed any risk to its
10 interests --
11      A    Well, maybe -- maybe I'm not -- maybe
12 you have to -- when you say the APA's interests,
13 could you expand on that a little bit and say
14 precisely what you mean?  Because I think maybe I'm
15 not understanding the question.
16      Q    If the APA had the view that none of
17 these strategies had the ability to make it worse
18 off, would you agree that any such strategy would
19 not be likely to affect the dynamic of the
20 negotiation?
21      A    Worse -- worse off in what way?
22      Q    In any way.
23      A    Well, I don't know -- I don't know that
24 I can answer that because, I mean, I -- I need some
25 more particulars about in what way.  I mean, if the

32

1  APA thought -- and I'm just going to pick a random
2  strategy.  If they thought that waiving scope -- if
3  they thought the TWA pilots refusing to waive scope
4  could have no impact on them whatsoever, that would
5  presume that they have concluded that that strategy
6  will be unsuccessful.  But, again, my analysis isn't
7  predicated on the success or failure of the
8  strategy.
9       If they said -- for them to say that that
10 could have no interest whatsoever on their
11 interests -- no impact whatsoever on their
12 interests, the only reasonable thing you can say is,
13 well, they are -- they are either disregarding the
14 risk entirely, which would be kind of irrational, or
15 it is, in fact, something completely separate from
16 the negotiation itself.  So, they are either acting
17 irrationally, or, in fact, the strategy they were
18 discussing has no effect on the negotiation
19 whatsoever.  It really is completely separate.  I
20 mean, the only thing they are negotiating through
21 this period is seniority.  So the APA's interests
22 would be intimately tied to any of these.  Because
23 if there is any possibility of them succeeding, then
24 there is the potential risk.
25      Q    Any possibility of them succeeding and

8  (Pages 29 to 32)

DEGNAN & BATEMAN
(856)  232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

33

1  doing what?
2      A    Either taking control of the situation
3  out of the direct hands of the APA and putting it in
4  someone else's, either an arbitrator's, or a
5  court's, the company's.
6      Q    Are you aware of any way in which
7  seniority integration could have been taken out of
8  the hands of the APA absent its agreement?
9      A    I -- that would presume knowledge of
10  the success of these legal strategies and what the
11  outcome of that would have been.  So I can't say.
12  You know, had the DOT made fair protest a condition
13  of purchase, that could have led to the APA having
14  to agree to do the seniority integration in some
15  other way.  Absent their agreement, they -- you
16  know, I -- I can't say whether it could have been
17  forced on them by one of these legal strategies or
18  not.
19      Q    Okay.  You refer next in your list to
20  refused to request AFL/CIO support; do you see that?
21      A    I do.
22      Q    And what's your understanding of what
23  was sought as part of that strategy?
24      A    That was a strategy to, as I understand
25  it, request a boycott of American Airlines by

34

1  AFL/CIO members.
2      Q    And do you know anything else about
3  that strategy?
4      A    I know that ALPA refused to undertake
5  it.
6      Q    And what's the basis for your
7  understanding?
8      A    The testimony of Mike Day and the
9  closing of Allen Press.
10      Q    And do you know anything about whether
11  the AFL/CIO would have agreed to a boycott of
12  American Airlines?
13      A    I -- I only know that the request
14  wasn't made.
15      Q    So the answer to my question is, no,
16  you don't know whether the AFL/CIO would have agreed
17  to a boycott?
18      A    I don't know whether they would have
19  agreed or not.
20      Q    Are you aware of any situations in
21  which the AFL/CIO, because of a seniority
22  integration dispute, has agreed to boycott the
23  airline of one of the unions?
24      A    I'm not aware of any.
25      Q    Are you aware of any situation in which

35

1  the threat of an AFL/CIO boycott against the airline
2  of one of the unions has led to a negotiated
3  resolution of a seniority integration dispute?
4      A    Not aware of any.
5      Q    If -- if ALPA had requested an AFL/CIO
6  boycott of American Airlines, what interests of the
7  APA would that have threatened?
8      A    Well, it would have put pressure on
9  American Airlines, primarily.  And through that,
10  presumably pressure would be brought to bear on the
11  APA in order to have a fair resolution process put
12  in place.
13      Q    Is that assumption you make in your
14  analysis that, if there was a boycott, that American
15  Airlines would have put pressure on the APA?
16      A    Well, no.  My analysis assumes that
17  that would have put pressure on the negotiation
18  entirely.  It would have brought American Airlines
19  into the fray and, again, we will go back to, you
20  know, the Big Brother showing up.  It brings another
21  party into the dispute.
22      Q    Do you have any -- are you aware of any
23  evidence suggesting that in the event of an AFL/CIO
24  boycott, that American Airlines would have been
25  prepared to put pressure on the APA with regard to

36

1  seniority integration?
2      A    I have no direct knowledge of whether
3  they -- they would have or wouldn't have.  All I
4  know is it would have involved them in the seniority
5  dispute more directly.
6      Q    Do -- do you have any indirect
7  knowledge that American Airlines was prepared to put
8  pressure on the APA in the event of an AFL/CIO
9  boycott?
10      A    No, I do not.
11      Q    Next item you list is, refuse to block
12  APA pilots from ALPA jump seats.  Do you see that?
13      A    I do.
14      Q    What's your understanding of this
15  strategy?
16      A    My understanding is that this was a
17  strategy that would have had ALPA members prevent
18  American Airlines pilots from basically sitting in
19  jump seats, flying -- flying on out carriers.
20      Q    And what's your understanding of when
21  this strategy was -- do you have an understanding
22  whether the TWA MEC requested that ALPA implement a
23  jump seat war?
24      A    I do not know whether it was the TWA
25  MEC that requested the jump seat war.  I know it was

DEGNAN & BATEMAN
(856)  232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

37

1   one of the TWA pilots, some group of TWA pilots who
2   wanted this.
3       Q    Do you know whether the TWA MEC agreed
4   with that proposal?
5       A    I do not know.
6       Q    Do you know when this TWA pilot made
7   this suggestion?
8       A    I do not.
9       Q    And do you know anything about when the
10  proposed jump seat war was proposed to be
11  implemented?
12      A    I do not.
13      Q    Do you have any knowledge about the
14  APA's views about whether a threatened jump seat war
15  would affect its willingness to offer a better
16  seniority integration resolution than Supplement CC?
17      A    No, I don't.
18      Q    Are you aware of any situation in which
19  an actual or threatened jump seat war has led to the
20  negotiated resolution of a dispute over seniority
21  integration?
22      A    No, I don't.
23      Q    Are you aware whether ALPA had a policy
24  in writing prohibiting institution of jump seat wars
25  in an effort to punish another union?

38

1       A    All I know is that ALPA has had a policy
2   seat restrictions on certain pilots in the past.
3   Whether they have a -- a written policy against it,
4   I'm not aware.
5           (Salamat-12  Excerpt from the ALPA
6           administrative policies marked for
7           identification.)
8   BY MR. TOAL:
9       Q    I'm going to show you a document that
10  I'll mark as Salamat Exhibit-12, which is an excerpt
11  from the ALPA administrative policies.
12          And if you could let me know if you are
13  familiar with this document.
14      A    I'm not.
15      Q    Let me direct your attention to the
16  first page of text of this document which has the
17  head section 115, jump seat policy.
18          Do you see that?
19      A    Yes.
20      Q    Okay.  Do you see the fourth paragraph?
21  It says, denial of jump seat privileges as a means
22  of punishing, coercing, or retaliating against other
23  pilot groups or individuals is not supported by
24  ALPA?
25      A    I do.

39

1       Q    Were you aware of this policy at the
2   time you prepared your analysis?
3       A    I was aware that there was some --
4   something like this.
5       Q    And is this something that you took
6   into account in your analysis?
7       A    It is.
8       Q    And how did you take into account that
9   there was a policy against jump seat wars to punish
10  other pilots or unions?
11      A    Well, how I took it into account was
12  the fact that it was still a strategy that was
13  available to ALPA because they had deployed it in
14  the past.
15      Q    And what's your knowledge about when
16  ALPA had deployed a jump seat war in the past?
17      A    Well, in -- in Allen Press's closing,
18  he went on -- he discussed the fact that a group of
19  pilots, and I can't remember the airline that they
20  were from, were denied jump seats on out-carriers by
21  ALPA pilots because they had crossed the picket line
22  at some point in the past.  And that this fact was
23  supported by the testimony of one of the ALPA
24  lawyers, who I can't remember who it was.
25      Q    And do you know whether that happened

40

1   before or after the -- ALPA implemented the jump
2   seat policy that we just read?
3       A    I do not know, no.
4       Q    Did you do anything to find out?
5       A    I did not.  I wasn't aware of this --
6   this document, so --
7       Q    And you testified previously that there
8   was a -- a -- there were a number of things about a
9   request to the Department of Transportation with
10  regard to a request for a fair merger integration
11  process that you didn't know about.  Do you recall
12  that testimony?
13      A    Sorry?
14      Q    You testified with respect to any
15  requests made of the DOT, that you didn't know what
16  happened in the meeting, you didn't know how well
17  publicized it was, you didn't know what sort of
18  requests were made, you didn't know if a letter was
19  sent.  Do you recall that testimony?
20      A    Well, I didn't -- I didn't say I didn't
21  know if a letter was sent.  I said I know a letter
22  wasn't sent.  That was -- that was stated by Allen
23  Press in his closing.  So what I said was, I didn't
24  know the context of the meeting, anything more about
25  it.

10  (Pages 37 to 40)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

41

1    Q    Did you do anything to try and find out
2  about the context of that meeting?
3    A    I -- I don't think I was aware of the
4  meeting until we discussed it today.
5    Q    Next item on your list is, deny TWA
6  pilots have right to strike.  Do you see that?
7    A    I do.
8    Q    And what's your understanding of the
9  action that ALPA had available to it here?
10   A    My understanding here was that
11 throughout the period leading up to the bankruptcy
12 filing, ALPA had been saying to the TWA pilots that
13 had their -- had -- had been arguing in the -- in
14 the bankruptcy court, that abrogating that section
15 of the TWA pilots' contract would give them the
16 right to strike.  And then, when it came time to
17 fight the 1113 motion, ALPA then turned around and
18 said to the TWA pilots, no, you would not have the
19 right to strike.  On the one hand, they were saying
20 they did have it.  But then, when it would have
21 supported them, they said they didn't, so --
22   Q    And what's the basis for your
23 understanding about ALPA's views about any right to
24 strike?
25   A    Closing arguments.

42

1    Q    What's your understanding about when
2  any such strike would have been instituted?
3    A    I have none.
4    Q    And what's your understanding as to --
5  as to whom the TWA pilots would be striking against?
6    A    They would be striking against TWA.
7    Q    And how would the TWA pilots striking
8  against TWA have affected any interest in the APA?
9    A    It would have -- well, first thing it
10 would have done is it would potentially -- well, let
11 me think about that.  I want to give you a good,
12 clear answer.
13      First of all, again, I don't want -- I don't
14 want to stray into an area where we are talking
15 about the success or failure of a particular
16 strategy.  So, you know if the -- if ALPA had
17 enforced and in some way supported the TWA pilots'
18 right to strike, I'm concerned more with what that
19 would have done to the negotiation than I am with
20 whether them striking would have had any particular
21 effect, so -- but, you know, had they had the right
22 to strike, again, this would have brought American
23 Airlines and TWA back into the negotiation in a more
24 meaningful way.  So that would directly have
25 created, you know, a stronger negotiating partner.

43

1    Q    Do you have any evidence suggesting
2  that if the TWA pilots had initiated a strike
3  against TWA, that would have brought Americans into
4  the negotiation?
5    A    Again, you are talking about what would
6  have happened if, you know, they had actually
7  struck.  So I'm not sure that I am.
8    Q    My question is, do you have any
9  information that in the event the TWA pilots had
10 initiated a strike against TWA, that American
11 Airlines would have gotten into the negotiations?
12   A    I have no direct information.  But
13 given that they were attempting to purchase TWA, it
14 would have involved them whether, you know, they
15 would have wanted to get involved or not.
16   Q    Well, it could have led them to walk
17 away from the transaction; correct?
18   A    It could have led them -- it could have
19 led them to do all kinds of things.
20   Q    And -- and my point is, you don't have
21 any information, correct me if I'm wrong, about what
22 American Airlines was prepared to do in that
23 instance; correct?
24   A    That's correct.
25   Q    And nor do you have any information

44

1  about any way in which the APA would have reacted to
2  a TWA strike against -- TWA pilot strike against
3  TWA; correct?
4    A    That's correct.
5    Q    And nor do you have any information
6  about how the APA would have responded to a
7  threatened strike by the TWA pilots against TWA;
8  correct?
9    A    No direct knowledge, that's correct.
10   Q    And you don't have any indirect
11 knowledge either; correct?
12   A    That's correct.
13   Q    Now, the next item on your list is
14 failure to support TWA pilots.  Do you see that?
15   A    Yes.
16   Q    And what's your understanding here of
17 the action that ALPA had available to it?
18   A    Well, this is a number of -- of
19 actions, involvements, which are subsumed under the
20 heading of failure to support TWA pilots.  So, you
21 know, I'm going to have to take them one at a time.
22   Q    Well, go ahead.  I'm asking for your
23 understanding of what action ALPA had available to
24 it.
25   A    Well, there are four, four actions

11 (Pages 41 to 44)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

45

1   here, the first one talking about no coordination
2   with merger committee. In the closing of Allen
3   Press, he discussed how the concessionary bargaining
4   was supposed to be done through the president's
5   office, and that didn't happen. That there was a
6   general failure to coordinate with the merger
7   committee. This came across in -- in Mike Day's
8   testimony in a number of ways in which calls weren't
9   returned and, you know, requests weren't answered;
10  so lack of coordination was one thing.
11      Lack of negotiating support. Again, this goes
12  back to, you know, the -- the -- I guess it was a
13  direction that concessionary negotiations were
14  supposed to happen through the president's office
15  and that they weren't given -- the president was not
16  directly involved in every step of the negotiation,
17  or from what it appeared, he wasn't involved in very
18  much at all.
19      Lack of funding refers to two things -- three
20  things. First of all, they've made requests for
21  funding from ALPA's major contingency fund, and that
22  wasn't made available to them when they were
23  requesting flight pay, flight pay loss from their
24  lobbying activities on Capital Hill. That was
25  denied. And there is a third one, but I can't

46

1   remember what it is off the top of my head, so we
2   will just stick with those two.
3       And the president's lack of support would
4   refer to, you know, particularly, you know, the
5   allegation that, you know, not just the allegation,
6   but as I understand, the fact that he went down to
7   meet with the APA and said the TWA pilots needed to,
8   quote, unquote, get real, undermining their
9   negotiating position.
10      So all of these sorts of actions, you know, I
11  just subsumed under one heading of failure to
12  support TWA pilots.
13      Q    And do you have any information about
14  whether the APA would have changed its negotiating
15  position regarding seniority integration if ALPA had
16  done any of those things?
17      A    I'm sorry. Can you ask the question
18  again?
19      Q    Do you have any information about
20  whether the APA would have changed its negotiating
21  position regarding seniority integration if ALPA had
22  done any of those things?
23      A    I do not.
24      Q    Okay. In your analysis, you relied
25  substantially on information you derived from the

47

1   closing argument of Allen Press; correct?
2       A    That's correct.
3       Q    And you understand that Mr. Press is a
4   lawyer; correct?
5       A    I do.
6       Q    And you understand that Mr. Press was a
7   paid advocate for the TWA pilots; correct?
8       A    I do.
9       Q    And you understood that there was an
10  entire evidentiary record creating -- created in the
11  trial; correct?
12      A    I am.
13      Q    Did you consider, as part of your
14  analysis, reviewing the evidentiary record in the
15  trial?
16      A    In -- in some instances, I did.
17      Q    The -- the only testimony you reviewed,
18  I believe you testified yesterday, was from Mr. Day;
19  correct?
20      A    The testimony -- yes. The only -- the
21  only testimony I -- I reviewed in depth was
22  Mr. Day's. You know, I may have skimmed other
23  parts, but --
24      Q    Are those reflected in your report?
25      A    Which?

48

1       Q    Any other parts of the trial record
2   that you reviewed?
3       A    Not in any substantial way, no.
4       Q    Well, did you review parts of the
5   evidentiary record that are not cited in your
6   report?
7       A    Did I review parts of the evidentiary
8   record that are not cited in the report?
9       Q    That's the question.
10      A    As I say, there is a lot of transcript
11  and, you know, if there was something that was
12  unclear from -- from Mike Day's testimony, or from
13  Allen Press's closing, or from Steve Fram's closing,
14  I may have done a word search to see if I could find
15  anything else in the record that would explain what
16  it was. But what I was looking for primarily was
17  just factual issues. So -- in -- in Allen's
18  closing, in Allen Press's closing the issues that he
19  listed I assumed were facts because they hadn't been
20  objected to.
21      Q    Whatever your assumptions were, did you
22  consider reviewing the evidentiary record in its
23  entirety?
24      A    Did I consider reviewing -- by which I
25  assume you mean read the entire transcript?

12  (Pages 45 to 48)

RIKK SALAMAT

49

1  **Q**  Among other things, did you consider
2  reading the entire transcript of the trial?
3  **A**  I did consider it.
4  **Q**  And why did you decide against that?
5  **A**  My understanding was the -- the most
6  clear synopsis of both party's positions would be
7  found in the closing arguments and in the charge to
8  the jury. So if there was any --
9  **Q**  Any other reason that you decided not
10  to review the entirety of the evidentiary record?
11  **A**  My main reason was that all the
12  relevant facts that would be in evidence would be
13  brought out in the closing.
14  **Q**  That was your assumption?
15  **A**  That's correct.
16  **Q**  You said that was your main reason.
17  Did you have any other reason for not reviewing the
18  entire evidentiary record from the trial?
19  **A**  Other than just the sheer volume, no.
20  **Q**  You -- you talk in your report,
21  starting at page three, about the various
22  theoretical frameworks that you considered in your
23  analysis. Do you recall that?
24  **A**  Yes.
25  **Q**  And one of those is what you described

50

1  as the behavioral theory of Walton and McKersie;
2  correct?
3  **A**  That's correct.
4  **Q**  Do you consider yourself an expert on
5  behavioral theory?
6  **A**  I do not.
7  **Q**  And prior to your work on this matter,
8  had you read the article by Walton and McKersie that
9  you cite in your report?
10  **A**  I believe I did in university. Walton
11  and McKersie is -- is the basis for two of the most
12  commonly used textbooks on negotiation that I'm
13  aware of. One's called, Getting to Yes, and the
14  other one called Fundamentals of Negotiation, which
15  is used fairly widely in Canada. I don't know if it
16  is here, but --
17  **Q**  So your -- do you have a recollection
18  of having read this article before --
19  **A**  Well, it's a book. It is a book, and I
20  will have certainly read some chapters from it in
21  the past. I cited it mainly to say that this is
22  their theory primarily because, you know, Tracy and
23  Peterson refer to it extensively in their article,
24  that being primarily about Walton and McKersie.
25  **Q**  In connection with your work on this

51

1  matter, did you read Walton and McKersie's book
2  on behavior theory of labor negotiations?
3  **A**  I did not re-read it.
4  **Q**  And had you ever read the book in its
5  entirety?
6  **A**  I -- I don't believe I have.
7  **Q**  Did you read, in connection with your
8  work on this matter, particular sections of Walton
9  and McKersie?
10  **A**  Only those sections that would have
11  been repeated in Tracy and Peterson.
12  **Q**  Did you go back and get Walton and
13  McKersie and look at it, or did you rely on the
14  discussion of Walton and McKersie in Tracy and
15  Peterson?
16  **A**  I relied on the discussion of Walton
17  and McKersie in Tracy and Peterson.
18  **Q**  Other than the article by Tracy and
19  Peterson, did you read anything else on behavioral
20  theory in connection with your work on this matter?
21  **A**  In connection with this matter? Well,
22  I mean, I refer frequently to Essentials of
23  Negotiation and Getting the Yes. So whether I
24  looked at those, looking for specifics that would
25  help in this matter, I can't -- I can't recall. I

52

1  read them all the time, so --
2  **Q**  You read what all the time?
3  **A**  Essentials of Negotiation. I
4  frequently pick that one up. I get a journal at the
5  office called Negotiation Journal which, you know,
6  gets -- gets reviewed frequently. Whether I was
7  reading a particular article while this -- this work
8  was ongoing, it is most likely. So, but, you know,
9  did I read it specifically with an intention of
10  using it in this? Possibly not.
11  **Q**  When I reviewed your report, I didn't
12  see any -- any other materials that you cited that
13  had to do with behavioral theory. Is there
14  something you can point me to in your report other
15  than the Tracy and Peterson article that you
16  actually read in connection with this matter that
17  concerns behavioral theory?
18  **A**  No. Just Tracy and Peterson.
19  **Q**  And how, specifically, did you use
20  behavioral theory to analyze the effect ALPA's
21  actions would have had on the seniority
22  integration -- on the seniority negotiations in this
23  case?
24  **A**  Well, the behavioral theory, you know,
25  which has its four main parts, descriptions of what

13 (Pages 49 to 52)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

53

1  occurs in negotiations. And so there is
2  distributive bargaining, integrated bargaining,
3  attitudinal structure, and intra-organizational
4  bargaining.
5      When reviewing this case, that provided the
6  useful framework for saying what would particular
7  actions have done had they been successful in -- or
8  not successful, had they been -- had they been
9  brought into the negotiation in some way. And so
10  would, for instance, you know, a jump seat war, what
11  would have that done to the dynamics of a
12  distributed bargaining situation, this one being a
13  simple, like how big a piece of the pie do you get
14  when you are in negotiations?
15      So Walton and McKersie, you know, provides,
16  you know, a structure in which to analyze what goes
17  on in negotiations. So their behavioral theory of
18  negotiation was quite useful in analyzing what would
19  have occurred in the negotiation had there been more
20  representation of the TWA pilots' interests.
21      Q    Is there any aspect of behavioral
22  theory which tells you what the result would have
23  been in negotiations had different strategies been
24  pursued?
25      A    Sorry. Can I -- can I get you to ask

54

1  that question again?
2      Q    Yeah. The question is, is there any
3  aspect of behavioral theory which tells you what the
4  result would have been in negotiations had different
5  strategies been pursued?
6      A    Well, certainly, if you mean by
7  strategies you mean just generic strategies, that's
8  what the entire work is about. I mean, if you mean
9  a particular strategy from this case, then no.
10      Q    Does behavioral theory provide any
11  mechanism for predicting what the results of a
12  negotiation would have been had the circumstances
13  been different?
14      A    Well, no. It's -- it's largely
15  descriptive.
16      Q    You also reference something you call
17  the expected utility theorem in your work; correct?
18      A    That's correct.
19      Q    And you say in your report that a
20  settlement range is determined by expected utility
21  calculations that weigh the benefits of the
22  settlement against the cost of failing to obtain an
23  agreement.
24      A    Sorry. Where -- where -- where are you
25  looking?

55

1      Q    It's on page three. Do you see the
2  second to the last paragraph on the page? You say,
3  according to Walton and McKersie, a settlement range
4  is determined by expected utility calculations that
5  weigh the benefits of the settlement against the
6  cost of failing to obtain --
7      A    Yes, I have it now. Thank you.
8      Q    And what was the cost to the APA of
9  failing to reach an agreement here?
10      A    In the absence of any of the strategies
11  available to ALPA having been pursued, there was no
12  cost.
13      Q    And what was the cost --
14      A    And had those cost -- had those
15  strategies been pursued, then the cost would have
16  been potentially litigation cost. You know, the
17  cost primarily being one of risk of the process
18  being taken out of their hands and put in some sense
19  in some others. So I would probably characterize
20  the cost more as one of risk than of, you know,
21  financial cost.
22      Q    And in a situation where the APA
23  retained the ability to make a unilateral
24  determination of seniority integration, in those
25  circumstances, what would the cost to the APA have

56

1  been of failing to reach an agreement with the --
2      A    Well, again, that's presuming the
3  success or failure of a particular strategy and not
4  whether or not -- whether pursuing that strategy
5  increases the risk to the APA that they would fail.
6      Q    Whether you think that's the right
7  inquiry or not, can you answer my question?
8      A    I think I just did. That would be the
9  increased cost, would be the increased risk.
10      Q    And what risk would there be to the APA
11  if it maintained the ability to make a unilateral
12  determination of seniority integration?
13      A    But as I said, that would be -- that
14  would be a hindsight reality. That wouldn't be a --
15  the litigation, for instance, having been brought,
16  there is now a risk there. There is no way that the
17  APA can -- cannot have a risk. So the cost is
18  there. You are talking about a strategy having
19  failed. Then it fails. The APA can do whatever
20  they want. Then there is no risk, further risk of
21  it being taken out of their hands. So -- but that's
22  not the risk in the negotiation. That's not the
23  risk while they are negotiating.
24      Q    And how did you use expected utility --
25  the expected utility theorem to analyze the effect

14  (Pages 53 to 56)

9914249b-ddc9-43a3-9047-7f58754f5217

57

1  of ALPA's actions on seniority negotiations with the
2  APA?
3       A      Primarily just in terms of the setting
4  up a range of potential outcomes. There was no
5  further attempt to try and come up with an expected
6  utility function for the APA. However, expected
7  utility theory is used frequently in -- in trying to
8  analyze bargaining situations and negotiation
9  situations. So someone mentioned Haji Mehta [sic],
10  but I didn't think it was appropriate in this
11  instance.
12       Q      You didn't think what was appropriate
13  in this instance?
14       A      Expected utility theory.
15       Q      So you didn't use it?
16       A      Well, beyond -- beyond setting up a
17  minimum and a maximum range of acceptable
18  settlement.
19       Q      Does the expected utility theorem
20  prescribe a methodology for predicting what the
21  results of a negotiation will be?
22       A      Well, that would be -- the difficulty
23  is, it doesn't.
24       Q      And you mention, in connection with the
25  expected utility theorem, something called a Nash

58

1  equilibrium; is that correct?
2       A      Correct.
3       Q      And does the Nash equilibrium assume a
4  game with repeat players?
5       A      Well, you are asking me specifics of
6  the Nash theorem that, you know, I'm not sure I can
7  answer. So I believe it is a repeated game with the
8  same players.
9       Q      And the negotiation between the APA and
10  the TWA MEC, did you view that as analogous to a
11  repeat game?
12       A      I -- I didn't view it as a game at all.
13  You know, the Nash theorem -- well, the Nash theorem
14  proves that there are optimal points within a range
15  at which parties can do no better than a settlement.
16  The problem is, is that similar to the problem with
17  expected utility, is you have to have some
18  subjective judgments about what the relative payoffs
19  are and what the relative costs would be at various
20  points.
21       And the cost at this case, as I said, is one
22  of risk more than actual cost because you don't know
23  what the outcome is going to be. And coming up with
24  a value for -- for risk is inherently subjective.
25  So my decision was to just go ahead and make those

59

1  subjective judgments and not try and bury them in a
2  model since those models don't prescribe how you
3  would assess the risk.
4       Q      And is the relevant inquiry with
5  respect to the impact of risk on the negotiations
6  the APA's perception of the risk to which it was
7  subject?
8       A      Sorry. Can I get you to ask that
9  again?
10       Q      Yeah. Is the relevant inquiry with
11  respect to how risk would affect the negotiations
12  the APA's perception of the risk to which it was
13  subject?
14       A      Their perception of the risk would be
15  meaningful, however, with some qualifications. You
16  know, if I -- if I am in a situation where, like the
17  APA, and litigation has been launched, now I may
18  think that there is no possibility it is going to
19  succeed, and so my perception of the risk is at odds
20  with the risk itself because, you know, someone else
21  may very well think it's got a hundred percent risk.
22  But the risk is there and it has to be factored in.
23  So, you know, there is -- there is lots of evidence
24  showing that people systematically have a bias to
25  underestimate or overestimate risks in litigation.

60

1       So, one, you know, you have to assume that at
2  every point that the APA would be underestimating
3  the risk, but you would have to assume that they are
4  also being rational, and they're taking it into
5  account and not dismissing it entirely. So, you
6  know, certainly that's part of the whole manner in
7  which we -- we looked at the probabilities that
8  particular actions would have moved them at all.
9       Q      So would you agree that if the APA
10  didn't perceive a risk, that it couldn't be
11  influenced by that risk?
12       A      Well, again, I have to assume they are
13  acting irrationally, and if they have underestimated
14  the risk -- we have to assume they are going to
15  underestimate the risk because people systematically
16  do, so --
17       Q      I'm not talking about underestimation
18  of risk. I'm talking about a situation in which the
19  APA doesn't perceive any risk for whatever reason.
20       Would you agree that -- would you agree that
21  its negotiation position could be influenced by a
22  risk that it doesn't perceive?
23       A      Only to the extent that that would --
24  that would run counter to rationality. If -- if
25  there is a demonstrable risk that exists and someone

15  (Pages 57 to 60)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

61

1  considers that risk to have zero impact or zero
2  importance in their negotiation, then you have to
3  consider that they are not -- they are not acting
4  rationally. And so all the models that I know of
5  assume that people are acting rationally. So -- so,
6  you know, again, this is a somewhat difficult
7  question to answer.
8     Q    Just so the transcript is clear, the
9  prior questions I've been asking whether the witness
10  would agree that if the APA didn't perceive a risk,
11  it could not be influenced by the risk, and I think
12  the question didn't -- didn't get the not. Did you
13  understand my question to be, if the APA didn't
14  perceive a risk, it could not be influenced by that
15  risk?
16     A    If the APA could not perceive the risk?
17     Q    If it did not perceive the risk.
18     A    If it was not aware of the risk.
19     Q    If it was unaware of the risk, would
20  you agree that it could not have been influenced by
21  that risk with respect to its position on seniority
22  integration?
23     A    Now, when you say unaware of the risk,
24  you mean completely unaware that it even existed,
25  that a strategy was -- was being put into place?

62

1     I mean, I would agree that if they didn't know
2  something wasn't going on, they wouldn't be
3  influenced by it. And if they systematically, as we
4  know, underestimated the importance of the risk or
5  the risk itself, I would disagree because I think,
6  as soon as someone can perceive a risk, they -- they
7  have to be behaving in accordance with the fact that
8  that risk exists.
9     Q    So I mean to encompass in my question
10  both situations where the risk wasn't perceived
11  because there was no awareness of a risk, or a
12  situation in which there is an awareness of a
13  strategy but no perception of risk attached to it.
14     A    I would agree with the former and
15  disagree with the latter.
16     Q    Okay. And did you take, what you
17  talked about as -- well, withdrawn.
18     Lowenstein, in his article, talks about the
19  concept of egocentric bias; correct?
20     A    That's correct.
21     Q    And is that what you've been referring
22  to in your prior answers?
23     A    His -- his would be one, yes. A
24  systematic bias against the likelihood of -- of
25  success in -- in litigation and conflict, yes.

63

1     Q    And -- and that's on both sides of the
2  equation; correct?
3     A    That's correct.
4     Q    So plaintiffs may systematically
5  overestimate their likelihood of success; correct?
6     A    Correct.
7     Q    And defendants may systematically
8  underestimate their likelihood of failure; correct?
9     A    Underestimate, but not ignore.
10     Q    Did you take into account in your
11  analysis the impact of egocentric bias on risk
12  perception by both sides?
13     A    I did.
14     Q    How did you do that?
15     A    In deriving the probabilities that
16  particular actions would have had on the
17  negotiation, I used values that were lower than I
18  might otherwise use -- I had not -- had I not
19  believed that that risk existed or that bias
20  existed. So, for instance, if I thought that there
21  was no systematic bias, the probability that a
22  particular action would have had on achieving the
23  damage model would have been higher. Given that
24  that systematic risk does exist, I used lower
25  values.

64

1     Q    And you did that without any actual
2  information on the APA's perception of the risks to
3  which it was subject; correct?
4     A    My -- my assumption is that the risks
5  would be considerably less than the estimation of
6  the TWA pilots of the success of particular
7  strategies, so it would be less. It would be less
8  impactful in the negotiation.
9     Q    Can you answer my question? You
10  assigned probabilities in your chart --
11     A    Lower probabilities.
12     Q    -- without the benefit of any actual
13  information about how the APA perceived the risk
14  associated with any of those strategies; correct?
15     A    That's correct.
16     Q    Now, you also reference in your
17  analysis something called negotiation decision
18  analysis. Do you recall that?
19     A    Yes.
20     Q    And what was the relevance of
21  negotiation and decision analysis for your report?
22     A    Well, many of the strategies that were
23  brought out at trial which ALPA had failed to
24  undertake would have functioned in the negotiation
25  in a way that would have involved other parties,

16 (Pages 61 to 64)

9914249b-ddc9-43a3-9047-7f58754f5217

**Page 65**

1 would have brought others into the negotiation, and
2 I needed some way in which I could evaluate the
3 importance of that.
4     Now, I know the work of Lax and Sebenius, and
5 Lax alone, have written about decision analysis and
6 the importance, or sort of the -- not the --
7 importance, I think, is the wrong word -- but the --
8 the impact of strategies that occur away from the
9 table. So in a direct negotiation where you are
10 face-to-face, the ability to create alternative
11 strategies and to bring other players into the
12 dispute have some importance. And so Lax and
13 Sebenius, in their decision analysis concept, was
14 useful for analyzing the actions that ALPA failed to
15 take.
16    Q   And does negotiation and decision
17 analysis prescribe any methodology that would allow
18 you to predict the outcome of negotiations?
19    A   Other than better or worse, no. I
20 mean, it does say that certain types of actions
21 should lead, when you are dealing with rational
22 negotiating partners, to better or worse outcomes.
23 But it doesn't prescribe, you know, particular ways
24 of quantifying that.
25    Q   Now, do you consider yourself an expert

**Page 66**

1 on the expected utility theorem?
2    A   I do not.
3    Q   Do you consider yourself an expert on
4 negotiation and decision analysis?
5    A   Familiar, but I wouldn't call myself an
6 expert.
7    Q   And prior to your work on this matter,
8 had you read this article by Lax and Sebenius?
9    A   I -- I don't know about this particular
10 article. Lax and Sebenius write frequently, so
11 their -- their decision analysis framework pops up
12 in Negotiation Journal not infrequently, so it's--
13 it's conceivable, but I don't remember the first
14 time I read it. I -- I don't think it was for this
15 particular one, this article. There are two
16 articles; one by Lax and one by Sebenius and -- I'm
17 sorry, one by just Sebenius -- so it may be the Lax
18 and Sebenius one I read for the first time here, and
19 the Sebenius one I've read prior.
20    Q   In the block quote you have on page
21 four of your report, do you see it says under --
22 when you're describing the third framework, if one
23 characterizes negotiation as an interactive process
24 by which two or more people seek jointly or
25 cooperatively than they could otherwise, then the

**Page 67**

1 otherwise becomes crucial. The party's best
2 alternatives without agreement imply the limits to
3 any agreement. For each side the basic task of any
4 proposed joint agreement is whether it offers higher
5 subjective worth than that side's best course of
6 action absent agreement.
7    Do you see that?
8    A   Yes.
9    Q   Okay. Is there some way that you can
10 conceive of here that a joint agreement between the
11 TWA MEC and the APA would have produced greater
12 value to the APA than an agreement it imposed
13 unilaterally?
14    A   Yes.
15    Q   And how would that happen?
16    A   The TWA -- the APA wanted to have a
17 fair integration. So at the end of the day, the
18 failure to negotiate an agreement resulted in one
19 that wasn't fair, that was perceived as unfair. And
20 so, in my view, a fair agreement would have been a
21 superior outcome for the APA pilots.
22    Q   And do you have an understanding of
23 what metric the APA was using to determine whether
24 its proposals were fair?
25    A   I do not.

**Page 68**

1    Q   And do you know whether they were using
2 the same metrics for fairness that you used in your
3 analysis?
4    A   Well, they -- they likely wouldn't have
5 because negotiations were truncated. I mean, in the
6 process of negotiating fairness in pilot seniority,
7 there is a whole education process that goes on when
8 negotiations are intensified. And so notions of
9 fairness are very dynamic and change quite
10 frequently, so --
11    Q   I'm not asking you to speculate on what
12 you think the APA might have used. I'm asking if
13 you know as a matter of empirical fact whether the
14 APA was using the same metrics for fairness that you
15 used in your analysis.
16    MR. JACOBSON: Objection. Asked and
17 answered.
18    THE WITNESS: They used some metrics
19 for constructing the list and had objectives for
20 why. I don't know that that actually represents the
21 metrics they used for evaluating fairness. In fact,
22 I expect they are not. So I'm going to have to say
23 I'm not aware of what metrics they did use.
24 BY MR. TOAL:
25    Q   And so I -- I take it you can't say

17 (Pages 65 to 68)

RIKK SALAMAT

69

1 whether, when you tried to come up with a list that
2 you considered fair, you used the same metrics that
3 the APA used in coming up with a list that it
4 presented as fair; correct?
5     A    That's correct.
6     Q    And in your analysis, were you taking
7 into account this language from Lax and Sebenius
8 which says, the party's best alternatives without
9 agreement imply the limits to any agreement?
10    A    Yes.
11    Q    So does your analysis place, as an
12 upper bound on any seniority list that could have
13 been obtained, what the APA's best alternatives were
14 without agreement?
15    A    Sorry. What? Does the --
16    Q    Does your analysis place as an upper
17 bound on any seniority list that could have been
18 achieved here what the APA's best alternatives were
19 without an agreement with the TWA MEC?
20    A    Well, their best alternative has to be
21 considered in two different ways. One is that
22 anyone's best alternative to -- to a negotiated
23 agreement has to be taken -- the timing of the
24 agreement has to be considered. So, in hindsight --
25 I will have to give an example.

70

1        If there is ongoing litigation and two parties
2 are trying to come to an agreement, they may agree,
3 you know, that one party that gets 60 percent of the
4 pie and one party gets 40 percent of the pie because
5 they don't really want to roll the dice on the
6 outcome of that litigation going against them. So
7 their best alternative is often to settle at a point
8 at which they think will be superior to the outcome
9 if this other litigation strategy succeeds.
10       So, you know, now if -- if you take it
11 further, you can say, well, if they agree but then
12 they find out the decision would have been
13 otherwise, in hindsight, you can say, well, we would
14 have been better off just rolling the dice because
15 now we know that we would have won the suit. But
16 when you are talking about a best alternative in
17 this context, you are saying a best alternative that
18 eliminates the risk of a particular other strategy
19 succeeding.
20       So, yeah, it is taken into account that people
21 will act rationally and say, look, if I can -- if I
22 can agree to something better than I think any
23 arbitrator would reasonably give, then I'm better
24 off agreeing to that than taking a chance that this
25 ends up in an arbitration and I end up getting worse

71

1 than that. So that's what a rational person would
2 do.
3     Q    Would you expect in this situation that
4 the APA would discount the risk associated with
5 seniority integration ending up in arbitration by
6 its perception of the likelihood of that that would
7 happen?
8     A    It is a little abstract because of the
9 -- you know, these courses of action weren't
10 followed, and so we don't really have any direct
11 information about how they would have assessed the
12 risk.
13    Q    Is that what a rational party would
14 have done, tried to assess the risk of seniority
15 integration ending up in arbitration and trying to
16 assess the outcome if that happened?
17    A    I -- I would imagine that's what
18 rational -- a rational party would do, yes.
19    Q    And did you make any sort of
20 probabilistic assessment of the likelihood of ending
21 up in arbitration and what the expected result was
22 of arbitration?
23    A    Again, that's presumed, and I made no
24 presumptions about whether a particular strategy
25 would have failed or succeeded.

72

1     Q    So did you not undertake any sort of
2 probabilistic analysis of the sort I just described?
3     A    I -- I think I said earlier that I had
4 no way of knowing what the likely outcome of
5 pursuing a strategy would have been.
6     Q    So is the answer, that's right, I
7 didn't undertake a probabilistic analysis?
8     A    That's right. No, I did not.
9        THE WITNESS: Could we take a break?
10 It's 11:00 something here.
11       MR. TOAL: Yeah. Sure. We'll go off
12 the record.
13       VIDEO SPECIALIST: It is now 11:06 and
14 we are going off the video record.
15       (Brief recess.)
16       VIDEO SPECIALIST: The time is now
17 11:33 and we are back on the video record.
18 BY MR. TOAL:
19    Q    Mr. Salamat, would the American
20 Airlines pilots have been better off under
21 Supplement CC than any of the lists that you propose
22 in your report?
23    A    By what measure?
24    Q    In terms of their seniority ranking?
25    A    Their seniority ranking under

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

73

1    Supplement CC would have been better than --
2        Q    In terms of their promotional
3    expectations, would they have been better off under
4    Supplement CC than any of the lists you propose?
5        A    Yes.
6        Q    In terms of the exposure to furlough,
7    would the American pilots have been better off under
8    Supplement CC than any of the lists that you
9    proposed?
10       A    Yes.
11       Q    Now, the fourth framework that you talk
12   about is focused on persuasion, and you say, borrows
13   from research and negotiation, decision theory and
14   law; correct?
15       A    Yes.
16       Q    And the academic support that you rely
17   upon for that framework is the work of Sycara;
18   correct?
19       A    Yes.
20       Q    Anything else?
21       A    No. Just Sycara.
22       Q    Now, at the bottom, toward the bottom
23   of page four, second to the last paragraph, you say,
24   behavioral theory, expected utility game theory.
25       A    I'm sorry. Okay, yes. I have it, yes.

74

1        Q    And the analysis of persuasion all
2    overlap in some regards. In what -- what regards do
3    these frameworks overlap?
4        A    Well, behavioral -- expected utility,
5    you know, predicated game theory, and so it is --
6    quantitative analysis of outcomes is, I think,
7    fundamental to game theory. Behavioral theory, to
8    the extent that it is decomposing the actions taken
9    in negotiations and analyzing them with a framework
10   overlaps with game theory in that, you know, it is
11   -- it's trying to analyze the importance or the
12   impact of various strategies within a negotiation.
13   So they are all concerned with analyzing the
14   situations where there is indeterminate outcomes of
15   particular courses of action, so I would say that's
16   the -- the fundamental way in which they overlap.
17       Q    Now, are you aware of any academic work
18   that identifies an intersection between behavioral
19   theory, expected utility game theory, and the
20   analysis or persuasion?
21       A    I can't, off the top of my head, think
22   of one that, you know, goes on to -- that analyzes
23   those overlaps, no.
24       Q    And did you identify one in connection
25   with your work on this matter?

75

1        A    I -- I said I can't identify one that
2    --
3        Q    I took your answer to be that you
4    couldn't identify off the top of your head as you
5    sat here today?
6        A    Yes.
7        Q    But in the course of your work, did you
8    identify any academic writings that identify an
9    intersection between these various frameworks?
10       A    Well, certainly between expected
11   utility and game theory. Between behavioral theory
12   and game theory, or behavioral theory and expected
13   utility, I can't think of one, no.
14       Q    Now do these fields, either
15   individually or collectively, prescribe a
16   methodology pursuant to which you could predict the
17   likelihood that two parties to a negotiation would
18   reach an agreement?
19       A    No.
20       Q    And do these frameworks, either
21   individually or collectively, prescribe a
22   methodology pursuant to which you could predict the
23   content of any agreement that would be reached
24   between two parties to a negotiation?
25       A    It can predict where parties would

76

1    reach an agreement if they were behaving rationally
2    and you could know everything about all the
3    potential risks. That would be -- you know, utility
4    theory and game theory would do that. But, again,
5    that's predicated on knowing the probabilities of
6    outcomes, which in this situation, can't be known.
7    So they could, but not in this situation.
8        Q    Now, if you had concluded in your
9    analysis the likelihood of an agreement being
10   reached was below 50 percent, would that have
11   affected your damage analysis in any way?
12       A    Yes.
13       Q    How would it have affected your
14   analysis?
15       A    If it had come below 50 percent, then
16   it would have been less probable that that would
17   have been an outcome of a negotiated agreement.
18       Q    Did you run any analyses of the
19   probability of an agreement being reached that used
20   numbers different than those that appear in figure
21   three?
22       A    For the -- for what I call the minimal
23   model, I did use different numbers to do an
24   assessment, but not -- I didn't use any different
25   numbers to do an assessment of the damage model,

19 (Pages 73 to 76)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

**77**

1    other than for testing purposes.
2        Q    Including for testing purposes, did you
3    ever run an analysis of the probabilities that are
4    set forth in figure three using numbers different
5    than those that appear in figure three?
6        A    Only for testing.
7        Q    And did you run that analysis using
8    numbers that were lower than those that appear in
9    figure three?
10       A    Again, only for testing.
11       Q    But you did do it for testing?
12       A    I did do it for testing, just basically
13   to make sure that -- that the numbers were being
14   added correctly and that the multipliers were
15   working correctly.
16       Q    Why did you have to test whether the
17   numbers were being added correctly?
18       A    Well, frequently what happens is you
19   have a total, 73 percent, that is missing one of the
20   component numbers.  So you change all the numbers
21   one at a time and make sure the numbers change,
22   check the formula.  It is testing.  It is not
23   anything more than that.
24       Q    Do you have Katia Sycara's article in
25   front of you?

**78**

1        A    It's always the last place you look.
2    Yes, I do.
3        Q    So let me direct your attention to page
4    217.
5        A    217, yes.
6        Q    Did you read this article in its
7    entirety?
8        A    I did.
9        Q    Okay.  And starting on 217, do you see
10   that Professor Sycara sets forth a number of
11   different categories of persuasive arguments that
12   can be made?
13       A    Yes.
14       Q    And did you analyze whether the
15   strategies that you set forth in your report that
16   you indicate ALPA had available to it fell within
17   any of these categories?
18       A    I mean, I considered these -- these
19   categories when -- when -- when reviewing the
20   actions that ALPA had taken, but I didn't use this
21   framework in any systematic way.  I did consider
22   using it in a systematic way, but they -- the
23   framework that she has further on in the article
24   seemed more appropriate.
25       Q    Now, one of the persuasive arguments

**79**

1    that list -- that's listed is number nine, threats
2    and promises.  Do you see that?
3        A    I do.
4        Q    Now, are the strategies that you list
5    that ALPA had available to it appropriately --
6    appropriately classified as threats and promises?
7        A    I don't think I would categorize them
8    that way.  They could be threats, if you threatened
9    to do it.  If you actually undertake the action, it
10   is no longer a threat.  You've taken it.
11       Q    Well, is the idea with the strategies
12   that you say ALPA had available to it, that
13   implementation of the strategy would threaten some
14   interest of the APA and thereby make it more willing
15   to compromise?
16       A    I think we are talking about two
17   different types of understandings of threat.  One is
18   a, I will do the following if you don't do X.  And
19   the other is, well, now I've done this and so there
20   is a threat, which I would more probably refer to as
21   a risk.  What it sounds like you are talking about
22   is a risk, not a threat.
23       Q    The strategies that you list that you
24   say ALPA had available to it, was the goal of those
25   strategies to affect the APA's behavior?

**80**

1        A    It was.
2        Q    Was the goal of those strategies to
3    affect the APA's belief structure?
4        A    I don't believe that's the goal of the
5    strategies.  The -- let's -- let's go back to the
6    first question again.  Maybe -- maybe I -- maybe I
7    spoke too quickly.  What was the first question?
8        Q    I'm not sure what you are referring to
9    as the first question.
10       A    The question just prior to the one that
11   you are asking now.
12       Q    Was the goal of those strategies to
13   affect the APA's behavior?
14       A    Indirectly, I'm going to have to say.
15   I mean, the goal of those strategies, some, for
16   instance, we know was to potentially affect the
17   APA's action in a indirect way but, you know, the
18   -- the legal strategy was to gain power in the
19   negotiation, not to immediately force the APA to do
20   something.  However, having gained more power in the
21   negotiation, it would have changed the perception of
22   the TWA pilots and so, by extension, it would have
23   changed the behavior of the APA.  So I think I spoke
24   a little too quickly when I said that wasn't the
25   goal of the strategy, or not all of them in any

20  (Pages 77 to 80)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

81

1   case. Something like the jump seat war certainly
2   would have been -- the goal there would have been to
3   change the behavior of the APA.
4       Q    Now how do you go about determining in
5   your analysis whether a particular action should be
6   classified as changing the importance the APA
7   attached to a goal versus changing the APA's
8   perception of the goal's value, versus causing the
9   APA to abandon the goal?
10      A    Largely subjective judgment based on
11  the action that's considered, and so this -- you
12  know, is exactly the -- the subjective element of
13  analyzing this situation that I spoke about when I
14  said that, rather than couching those kind of
15  judgments within -- within an expected utility
16  model, best just to have them as subjective
17  judgments and say these are the probabilities that
18  I, in my experience, have assigned to these
19  particular courses of action.
20      Q    Take a look at page 223 of Professor
21  Sycara's article.
22      A    Yes.
23      Q    You see a little further than halfway
24  down the page, right above the indented A and B,
25  Professor Sycara indicates two argument strategies

82

1   can be used to accomplish the first goal (change the
2   importance of an issue). Do you see that?
3       A    Yes.
4       Q    And below that she indicates that one
5   of the ways (A) is to indicate a change, increase or
6   decrease in the contribution of the present goal to
7   a higher level goal of the persuadee. Do you see
8   that?
9       A    Yes.
10      Q    And did you develop, as part of your
11  analysis, a goal hierarchy for the APA?
12      A    The only goal hierarchy I developed was
13  the objective of having a fair outcome. All --
14  anything they would contribute to that, which would
15  be an intense -- a more intensive negotiation, would
16  be the only higher level goal than I believe I would
17  have explicitly stated. So I'm not sure if that
18  answers your question, because I'm --
19      Q    Take a look at page 232 of Professor
20  Sycara's report.
21      A    232. Yes, I have it.
22      Q    Do you see the figure three, partial
23  belief structure of a union?
24      A    Yes.
25      Q    Did you create any diagram equivalent

83

1   to this intended to represent the goal structure of
2   the APA?
3       A    No, I did not.
4       Q    And so you talked about fairness as
5   being what you represented as the goal of the APA;
6   is that correct?
7       A    That's their stated goal.
8       Q    And for purposes of your analysis, you
9   were assuming that that was the only goal of the
10  APA?
11      A    I assume it was the main goal of the
12  APA.
13      Q    Did you delineate any other goals of
14  the APA?
15      A    Well, obviously, their own career
16  preservation would have been one goal. Fairness
17  would have been the other.
18      Q    Whose view of fairness are you using
19  when you discuss fairness as being a goal of the
20  APA?
21      A    It would have been their view of
22  fairness. But as I -- as I stated earlier, the view
23  of fairness changes frequently.
24      Q    So are you using some writing from the
25  APA to try to identify the APA's view of fairness?

84

1       A    Other than the changes in their
2   proposals when they started off and they thought
3   their first proposal was fair when it was markedly
4   different from subsequently proposals, clearly their
5   perception of fairness had been shifting. So I base
6   my conclusion on their actions.
7       Q    And so, with respect to your view of
8   the APA's view of fairness, were you trying to
9   extrapolate and come up with what you thought the
10  APA would have viewed as fair had ALPA done
11  additional things?
12      A    I'm sorry. Could I get you to ask
13  that -- that question a different way? I'm not sure
14  I understood it.
15      Q    What I'm trying to understand, because
16  you talked about the potential of fairness changing
17  over time --
18      A    Yes.
19      Q    -- were you using some historical
20  record of what the APA regarded as fair for purposes
21  of your analysis when you identified fairness as a
22  goal of the APA?
23      A    Their proposals and their response to
24  the TWA proposals.
25      Q    Is there anything in the APA's

21 (Pages 81 to 84)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

85

1  proposals that led you to believe that the APA would
2  have regarded as fair, a proposal that stapled only
3  494 TWA pilots to the bottom of the list?
4      A    Well, given that their goal was to
5  protect sustainable captain jobs, they had a goal to
6  protect jobs.  So, therefore, I conclude from that,
7  that preserving some of the TWA pilots' career
8  expectations was something that they considered both
9  important and fair.
10     Q    So my question is, did you have any
11 information from the APA indicating that it would
12 have viewed a proposal that stapled only 494 TWA
13 pilots as fair?
14     A    We know what they considered fair.
15 Whether some hypothetical other situation would have
16 been considered fair in a more intensive
17 negotiation, I don't have any information about
18 that.  All I can -- all I can say definitively is
19 that they were attempting to be fair.
20     Q    And do you have any information about
21 whether the APA would view -- would have viewed any
22 of your proposed alternative seniority integration
23 lists as meeting its definition of fairness?
24     A    At -- at certain points in time, I
25 believe they would have thought them not fair.

86

1      Q    And do you have any information
2  suggesting that at any other point in time they
3  would have regarded any of the proposals set forth
4  in your report as fair?
5      A    I have -- I have no information that
6  they would have, no.
7      Q    So with respect to item (A) in
8  Professor Sycara's article --
9      A    I'm sorry.  Which page are you on?
10     Q    Still on 223.
11     A    223.  Item (A).
12     Q    So for item (A), how are you defining
13 the present goal and the higher level goal of the
14 APA?
15     A    Well, the present goal is -- is going
16 to be in some way tied much closer to the actual
17 construction of the seniority list, whereas the
18 higher level goal is fairness, and labor relations,
19 peace and brotherhood.  So to the extent that
20 stapling a particular number of pilots either
21 contributes to or takes away from that goal, you
22 have to look at the extent to which, you know, that
23 -- that goal is consistent with the interests of the
24 TWA pilots.
25     And so, in the absence of any kind of

87

1  meaningful negotiation, you have to assume that
2  they've arrived at that higher level goal somewhat
3  egotistically, and so that their self-interest is
4  more likely to exert itself than it would be in an
5  intensive negotiation, so I hope that answers your
6  question.  It was kind of a long way around, but --
7      Q    You assume for purposes of your
8  analysis that the APA had an interest in protecting
9  the promotional opportunities of the American
10 Airlines pilots?
11     A    Yes.
12     Q    Do your lists protect the promotional
13 opportunities of American Airline pilots relative to
14 what they would have been absent the transaction?
15     A    I did not look at their -- their career
16 prospects absent the transaction.
17     Q    Do you have any reason to believe that
18 the APA would have agreed to any list that did not
19 preserve the promotional opportunities of the
20 American Airlines pilots relative to what they would
21 have been absent the transaction?
22     A    Do I have any reason to believe that --
23     Q    -- that the APA would have agreed to
24 any seniority integration list that failed to
25 preserve the promotional expectations of the

88

1  American Airlines pilots relative to what they would
2  have been absent the transaction?
3      A    In -- in -- it would depend on -- on
4  how they've arrived at whether or not their
5  promotional opportunities are going to be preserved.
6  So it is -- it's difficult to say.  I -- I -- I --
7  if they had been convinced that their promotional
8  opportunities would be reserved through some, you
9  know, mechanism such as bidding restrictions or
10 fences, or, you know, some other method of -- of
11 ensuring they had access to a certain number of
12 work, I don't know what they would have agreed to.
13     So, you know, you can preserve people's
14 promotional opportunities in a number of ways.
15 Sometimes that's through the list.  Sometimes that's
16 through conditions and restrictions, and, you know,
17 you can only speculate as to what they would or
18 would not have agreed to being a reasonable
19 protection of their -- their jobs.  So, you know,
20 you have to assume that they would have.  I believe
21 strongly that they wanted to be fair and that they
22 didn't want to take any jobs away from the TWA
23 pilots, but that they were denied any opportunity to
24 really negotiate intensively or -- or sincerely to
25 achieve that ultimate goal.  So --

22  (Pages 85 to 88)

9914249b-ddc9-43a3-9047-7f58754f5217

89

1  Q    If the APA had been persuaded that any
2  of the lists that you proposed would have failed to
3  protect the promotional opportunities of the
4  American Airlines pilots, do you have any reason to
5  believe that the APA would have agreed to such a
6  list?
7  A    Well, I mean, I know in hindsight that
8  none of them would have.  So I can assume that they
9  would have been able to, using some reasonable
10  forecasting model, to come to the same conclusion,
11  that they would have been better off under any of
12  these lists than they would have otherwise.  We know
13  this because we can look at the -- the so-called
14  fairness model, the income optimal model, which
15  gives pilots enough seniority to access the work
16  they brought into the merger.  And if anyone has
17  seniority superior to that, then they have
18  exceeded -- they have -- they have effectively taken
19  work away from one group and transferred it to
20  themselves.
21  And so, since every single American Airlines
22  pilot has superior seniority under any of the lists
23  that I propose to the fairness list, I know
24  absolutely that they did better than they would
25  have.  So presuming they could do that same

90

1  analysis, they wouldn't have the same information.
2  But I assume they would have -- they would have come
3  to the conclusion that their -- their premerger
4  career opportunities had been preserved.
5  Q    I'm not asking for a comparison
6  relative to the fairness list that you came up with.
7  I'm asking --
8  A    But -- but it is the same thing.  I
9  mean, this is one way you can measure whether
10  someone's premerger career opportunities were
11  preserved.
12  Q    I'm not asking about your fairness list
13  and the comparison with your fairness list.  I'm
14  asking, if the APA had been of the view that any of
15  the lists you proposed failed to preserve their
16  promotional opportunities relative to what they
17  would have been without the TWA transaction, do you
18  have any reason to believe that the APA would have
19  agreed to such a list?
20  MR. JACOBSON:  I'm going to object.  It
21  is a compound question, and puts an unreasonable
22  expectation on the expert's answer by fencing off a
23  portion of the opinion.
24  THE WITNESS:  I'm going to have to try
25  to answer this in -- in pieces.  If the APA

91

1  believed -- and by believed I mean there was an
2  actual, reasonable forecast model of what their
3  career opportunities were.  I don't mean, you know,
4  a particularly egocentric or -- or biased model
5  towards what they thought their career expectations
6  were.  So if they had a model that was done with a
7  reasonable assumption, and by that I mean they
8  didn't assume that American Airlines was going to
9  expand dramatically in its international flying, and
10  that there was going to be lots and lots of
11  promotional opportunities they would have had absent
12  the merger, but now that they have -- had a merger,
13  there is only going to be shrinkage in the future.
14  That's what I would call an opportunistic
15  model.  If they didn't have an opportunistic model,
16  if they had a genuine model that looked at what
17  their promotional opportunities would be with and
18  without the merger, I believe that would be a
19  baseline for them deciding whether any seniority
20  list would be acceptable or not.  And anything
21  better than what they would have had under that --
22  that -- in the un-merged scenario in that type of
23  model, I think they would find acceptable.  What I
24  said about the fairness list was it does the best
25  retrospective estimation you can have of what that

92

1  model would have told them.  I don't know --
2  BY MR. TOAL:
3  Q    And if the APA had been of the view
4  that any of the lists you propose made them worse
5  off in terms of their promotional expectations
6  relative to what they were prior to the transaction,
7  do you have any reason to expect the APA would have
8  agreed to such a list?
9  A    Reasonable promotional expectations is
10  the only way, you know, I could agree to that
11  statement.  And by reasonable, I mean based on a
12  model that did not have particularly opportunistic
13  or, you know, as we say, there is expectations and
14  then there is wishes.  They may wish they would all
15  be wide-body captains next year, but if they have a
16  reasonable expectation of being a wide-body captain
17  next year.  If they had such a model and one of
18  these lists proved short of that standard, then I
19  don't believe it would be acceptable.  But I know
20  from the fairness model, looking backwards, that any
21  reasonable model would have said that each one of
22  the lists was superior to that standard.
23  Q    Well, I -- I believe you testified that
24  you didn't do any analysis to determine whether the
25  promotional opportunities of the American Airlines

23  (Pages 89 to 92)

RIKK SALAMAT

93

1  pilots were preserved by any of your lists; is that
2  correct?
3      A    That's correct.
4      Q    Now --
5      A    But you can estimate it using the
6  fairness model.
7      Q    Now, directing your attention back to
8  page 223 of Sycara's article --
9      A    Yes.
10     Q    -- you see the second type of argument,
11  strategy that she identifies as potentially
12  accomplishing the first goal of changing the
13  importance of an issue is indicating a change in the
14  feasibility of the proposed goal?
15     A    Yes.
16     Q    Which of the strategies that you lay
17  out in your report that you say ALPA had available
18  to it were intended to indicate a change in the
19  feasibility of a proposed goal of the APA?
20     A    Well, if the proposed goal was to
21  staple X number of pilots, bringing additional
22  pressure and increasing the risk that the
23  negotiation could be taken out of their hands or
24  that others could be brought into the negotiation
25  would have to change the feasibility of that goal of

94

1  stapling that number of pilots.
2      Q    So for purposes of (B), are you
3  identifying the proposed goal as stapling TWA
4  pilots?
5      A    If that was a proposal -- yes.
6      Q    Do you know if that was a goal of the
7  APA, to staple TWA pilots?
8      A    I believe it was -- it was derivative
9  to their goal, which was to make a merged seniority
10  list, and that some number of TWA pilots were going
11  to be at the bottom of the list as a -- as a result
12  of their -- their thinking about how to build the
13  list. I don't know if that was actually their goal.
14     Q    And which -- which of the ALPA actions
15  do you believe changed the feasibility of whatever
16  proposed goal you are identifying here?
17     A    I believe they would have all changed
18  the feasibility of that -- the proposed goal.
19     Q    So if you look at page 224 of Sycara's
20  article, first full paragraph, you see it says, the
21  second argumentation goal that a persuader might
22  select is to change the persuadee's assessment of
23  the proposed value of an issue.
24     A    Yes.
25     Q    The second goal can be affected by

95

1  using the following strategies.  (C), recall a
2  counterexample from persuadee's past behavior.
3      Are any of the strategies that you identified
4  that ALPA had available to it intended to identify a
5  counterexample from APA's past behavior?
6      A    I -- I -- I don't think they would have
7  led to that direct result, no.
8      Q    And (D) says, recall examples of
9  similar peers that have accepted the same value for
10  the issue.
11     Are any of the ALPA strategies that you
12  identify intended to recall examples from APA peers
13  that have accepted the same value for the issue?
14     A    Well, to the extent that all of those
15  strategies would have intensified the negotiation
16  and would have brought into the negotiation what
17  happens in other mergers, all of those precedents
18  are now there.  And so, how other units have behaved
19  toward other pilots would certainly have done that.
20     Q    Well, how does -- how does the denied
21  April 2001 legal strategy of delaying purchase
22  relate to bringing in examples of similar peers that
23  have accepted the same value for the issue?
24     A    I don't know that it necessarily would
25  have directly, but we are assuming that that action

96

1  would be one of the ones that would have contributed
2  to a better seniority outcome.  One of the ways that
3  a better seniority outcome is going to be achieved
4  is by the APA having to consider what's been looked
5  at as fair and -- in other -- in other mergers.  And
6  so, this is why I talk about, you know, a more
7  intensive negotiation being an education process.
8  If what you are proposing isn't being considered
9  fair, then, you know, you were forced to consider
10  what is thought of fair in other mergers.  So I -- I
11  would say that pretty much any action would -- that
12  would intensify the negotiation would result to (D)
13  in some way or another.
14     Q    Are you aware of any instance in the
15  negotiating history between the TWA MEC and the APA
16  where either of the parties referenced the results
17  of prior seniority integrations?
18     A    I'm sure they must have, but I'm not
19  aware.
20     Q    Do you have any knowledge as you sit
21  here today that that happened?
22     A    That they looked at the circumstances
23  of any particular merger?
24     Q    Yes.
25     A    No, I'm not aware that they did that.

24  (Pages 93 to 96)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

97

1  Q    So take a look further down on page
2  224, a little after halfway through the page, it
3  says, there are two argumentation strategies that
4  can result in goal abandon on the part of the
5  persuadee.
6       Do you see that language?
7  A    I -- I do.
8  Q    Okay.  And the persuadee here would be
9  APA; correct?
10 A    Yes.
11 Q    And (E) is, promise the persuadee the
12 fulfillment of a more important goal if he abandons
13 the current goal.
14      Do you see that?
15 A    Yes.
16 Q    Are any of the strategies that you say
17 ALPA had available to it intended to promise the APA
18 fulfillment of a more important goal if they abandon
19 some other goal?
20 A    Well, if any of those strategies are
21 pursued, now there is an additional risk.  And that
22 risk wasn't there in the absence of that strategy.
23 So the more important goal would be the elimination
24 of that risk.
25 Q    So is that a promise to fulfill a more

98

1  important goal?
2  A    A  More important goal would be the
3  elimination of the risk.  The more important goal
4  would be if we don't want to take a chance that this
5  matter will get decided by someone other than us.
6  Q    Would you agree that the strategies
7  that you lay out that you say ALPA had available to
8  it are not persuasive arguments?
9  A    I -- I wouldn't -- I wouldn't
10 characterize them as arguments, no.
11 Q    And Sycara's work deals with persuasive
12 arguments, correct?
13 A    It does.
14 Q    On page 220 of Sycara's article, you
15 see the first full sentence on the page says, the
16 effectiveness of a threat (promise) --
17 A    Yes, uh-huh.
18 Q    -- hinges on the power of the persuader
19 to control the contingencies mentioned in the threat
20 (promise).
21 A    Yes.
22 Q    Now, any of the strategies -- are there
23 any strategies that you laid out that you say ALPA
24 had available to it wherein ALPA would not have the
25 ability to control the contingencies involved in the

99

1  threat?
2  A    You would have to tell me what specific
3  contingencies you were thinking of, and then I could
4  tell you whether I thought ALPA could or couldn't
5  control it.
6  Q    Well, with respect to the April 2001
7  legal strategy, did ALPA have any control over
8  whether that strategy would be successful?
9  A    Well, no, they did not have any control
10 over whether the strategy would be successful.
11 Q    And did they have control over whether
12 any of the other legal strategies would be
13 successful?
14 A    No.
15 Q    Did they have control over whether the
16 Department of Transportation would make a certain
17 seniority integration process a condition of
18 approval of the merger?
19 A    Again, you know, I think I've -- I've
20 said in a number of situations that I have not
21 estimated what the likely success of any of these
22 strategies would have been.  Whether ALPA could have
23 controlled the outcome of one of these strategies is
24 for ALPA to say, you know.
25 Q    Well, ALPA wasn't going to be making

100

1  the decision about whether the Department of
2  Transportation --
3  A    Right.
4  Q    -- decided to impose conditions on the
5  merger.
6  A    So -- so we don't know then.
7  Q    We don't know what?
8  A    We don't know whether it would have
9  been successful or not.
10 Q    But we do know that that's not
11 something ALPA controlled, whether a condition would
12 be imposed by the Department of Transportation?
13 A    No.  That's -- that's a fair statement.
14 Q    On page eight of your report, you
15 discuss the work of Lowenstein.  Do you see at the
16 bottom, under figure two, last paragraph?
17 A    Yes.
18 Q    Okay.  So you say, to satisfy these
19 competing interests, it is useful to use Lowenstein,
20 et al's observation that parties are more motivated
21 by notions of fairness than commonly thought;
22 correct?
23 A    That's correct.
24 Q    Now, was Lowenstein talking about an
25 objective notion of fairness?

25 (Pages 97 to 100)

DEGNAN & BATEMAN
(856)  232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

101

1    A    No.
2    Q    Was he talking about notions of
3  fairness that were subjective to each of the
4  parties?
5    A    Yes.
6    Q    Did Lowenstein say that considerations
7  of fairness would trump monetary considerations?
8    A    No, he did not.  Not -- well, let me --
9  let me qualify that.  If by trump you mean ignore
10  monetary fairness, then, no, he did not say anything
11  like that.  But that people would make decisions
12  that are sub-optimal from a monetary point of view
13  because it served some notion of fairness.  That's
14  what he said.  So, but to say someone would make a
15  completely -- make a decision completely with
16  disregard to the monetary impact, that's not what
17  Lowenstein said.  I mean, I think I said exactly
18  what I said here.  Parties are more motivated by
19  notions of fairness than commonly thought.  That
20  doesn't mean they are only motivated by notions of
21  fairness.  Just more so.
22    Q    And had Lowenstein conducted any
23  analysis of negotiations between units?
24    A    I'm -- I'm unaware.
25    Q    Do you recall from Lowenstein's article

102

1  that he was discussing the results of an experiment
2  involving college students?
3    A    Yes.
4    Q    Are you aware of any evidence that the
5  APA thought that the proposals that it advanced were
6  unfair subjectively?
7    A    Only in hindsight.  I believe at the
8  time that they advanced their proposals, they
9  thought them to be fair.
10    Q    And are you aware of any evidence, even
11  with the benefit of hindsight, that at the time the
12  proposals were offered, that the APA subjectively
13  regarded them as unfair?
14    A    I believe in hindsight they must have
15  looked at their earlier proposals as unfair because
16  they changed them.  The proposals --
17    Q    Didn't you testify previously that
18  notions of fairness can change over time?
19    A    I did.  This is why I say they would
20  look at their earlier proposals in hindsight as
21  being unfair.
22    Q    You think fairness is a binary
23  inquiry --
24    A    No.
25    Q    -- something that is either fair or

103

1  not?
2    A    At -- at the margin, it is, by which I
3  mean something may swing more, and more, and more
4  towards one direction or another, and at some point
5  in time you are -- you are more likely than not to
6  classify it as fair or unfair.  But it is not a
7  binary concept.
8    Q    And do you accept the proposition that
9  there could be a range of seniority integrations
10  each of which is different but each of which is
11  fair?
12    A    Yes.  You can -- you can have seniority
13  integrations that -- that are -- well, I suppose
14  they are actually finite, but they approach
15  infinite, so there is going to be several different
16  ways you could have a seniority integration that
17  would all be considered fair.
18    Q    Take a look at page five of your
19  report.
20    A    I have it.
21    Q    Okay.  You see the last sentence in the
22  first paragraph says, to mathematically or
23  statistically estimate what that agreement would,
24  however, require subjective judgments about
25  probabilities at each step.  And, therefore, my

104

1  analysis is primarily dedicated to the examination
2  and development of those judgments but applying them
3  using other frameworks.
4    Do you see that?
5    A    No.
6    Q    Last sentence in the first paragraph.
7    A    Page five.
8    Q    Page five.
9    A    Oh, sorry.  In the first sentence.
10  Okay.  Yes, I have it.
11    Q    Okay.  Why did you say here that
12  subjective judgments about probabilities were
13  required at each step?
14    A    To mathematically or statistically
15  estimate what an agreement would be, one would have
16  to say what the probability of proposing to launch a
17  suit would have on changing the outcome or changing
18  the behavior of both of the parties, would actually
19  launching the suit would do, what the suit,
20  having -- being progressed would have.  So at each
21  step of the way, if you launch a suit on day one or
22  you threaten to launch a suit on day one,
23  negotiations are continuing as that suit continues
24  to evolve, and so you have to assume that the
25  pressure is either increasing or decreasing over the

26  (Pages 101 to 104)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

105

1  course of the lifespan of that action.  And so you
2  have to assign increasing or decreasing
3  probabilities to each step in the process.  So
4  that's what I meant there.
5      Q    And those are subjective judgments that
6  you had to make in the course of your analysis?
7      A    I didn't make subjective judgments
8  about that.  I think I said you have to if you
9  wanted to -- if you wanted to use the utility
10 theory.  So, you know, what I -- what I said above
11 was, you know, to mathematically or statistically
12 estimate what the agreement would be, you would have
13 to make subjective judgments about those
14 probabilities.
15     Q    Well, didn't you attempt a mathematical
16 or statistical estimate of what any agreement
17 between the APA and the TWA MEC would have looked
18 like?
19     A    I came up with an estimate of the
20 likelihood of a particular agreement using -- using
21 probabilities less of what would have occurred each
22 step in the process, but overall as an action having
23 been pursued.
24     Q    Well, when you said in here that to
25 mathematically or statistically estimate what that

106

1  agreement would, however, require subjective
2  judgments about probabilities at each step and,
3  therefore, my analysis is primarily dedicated to
4  examination and development of those judgments, does
5  those judgments refer to subjective judgments about
6  probabilities that you reference earlier in that
7  sentence?
8      A    Yes, yes.
9      Q    And you did make subjective judgments
10 about probabilities in your analysis; correct?
11     A    I did.
12     Q    And you made those subjective judgments
13 based on what?
14     A    Based on my understanding of the issues
15 and the impact that they would have had on the
16 negotiations at step one.  But primarily, and more
17 importantly, the basic proposition that ALPA's
18 breach led to a poorer seniority list.  And so I had
19 developed some way of examining the elements of that
20 breach in the extent to which they contributed to a
21 poorer seniority list.
22     Q    So where did you derive your
23 understanding of the issues and the impact they
24 would have had on the negotiations?
25     A    From the final closing arguments and

107

1  from the testimony of Mike Day in terms of what the
2  substance of what those actions were, and then my
3  subjective estimation of how impactful those actions
4  would have been on the negotiation.
5      Q    And when you refer to the basic
6  proposition that ALPA's breach led to a poorer
7  seniority list, based on the jury verdict, were you
8  told anything about its view of how much poorer the
9  list would have been?
10     A    I -- primarily, the only thing I know
11 is what the judge -- judge's charge to the jury
12 was -- said.  That some TWA pilots have been harmed.
13 So, some.
14     Q    And you don't know if some is one or
15 any other number; correct?
16     A    No.  No, I do not know.  I don't know
17 any absolute number other than some.
18     Q    Any other basis upon which you made
19 your subjective judgments?
20     A    Just experience and reviewing the
21 transcripts.
22     Q    But your review of the transcripts was
23 limited to what you testified to previously; right?
24     A    The transcripts as I've testified to
25 them so far, yes.

108

1      Q    Transcripts referring, not to the
2  transcripts in their entirety, but the closings and
3  the testimony of Mike Day; correct?
4      A    That's correct.
5      Q    With respect to your experience, what
6  experience was relevant to the subjective judgments
7  that you made about the probabilities that were
8  reflected in your analysis?
9      A    Just the experience of analyzing
10 seniority integrations, my experience in -- in being
11 involved in seniority integrations.
12     Q    Okay.  And in what pilot seniority
13 integrations have you been involved previously?
14     A    I've been involved in the integration
15 of Canadian Airlines and Air Canada, in the
16 integration of US Airways and America West,
17 Northwest and Delta Airlines.  Other seniority
18 integrations involving flight attendants and -- and
19 machinists.  And after the fact, Air Canada and the
20 connectors, and this one.
21     Q    So -- okay.  So prior to this case
22 you've been involved in four pilot seniority
23 integrations?
24     A    In some way, yes.
25     Q    In some way.

27 (Pages 105 to 108)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

**109**

1    So in the Canadian Air case, involving Air
2  Canada, which party did you work for?
3    A    Canadian Airlines.
4    Q    And did you do anything for Canadian
5  Air other than analyze the impact of proposed
6  seniority integration lists on the Canadian Air
7  pilots?
8    A    I -- I did many things for the Canadian
9  Airlines pilots, so --
10    Q    Did you do anything other than what I
11  just described?
12    A    Yes.
13    Q    What else did you do?
14    A    We -- we formulated proposals.  We --
15  we did --
16    Q    I want to stop you because your answer
17  says we.  I want to know what you did personally.
18    A    I formulated proposals.  I constructed
19  integration methodologies.  I developed ways in
20  which bidding restrictions and -- and fences would
21  work.  All of it in some way is the -- is analyzing
22  the impact of -- of seniority integration.  But
23  beyond that, it was assisting the -- the arbitration
24  panel in doing their analysis.  To some degree, they
25  were interested in some types of impacts in the

**110**

1  seniority integration.  Some of the things they were
2  concerned with were more financial impacts of -- of
3  what had occurred in the past.  So it would be -- it
4  would be difficult to say that -- to analyzing the
5  impact and the seniority integration was the only
6  thing I did.  But at the end of the day, everything
7  kind of comes back to that, so --
8    Q    Was that the focus of your efforts, at
9  least?
10    A    That -- that would be the focus.
11    Q    For the USAir/America West transaction,
12  which party were you retained by?
13    A    US Airways.
14    Q    And what did you do for USAir?
15    A    Similar to what I did for the Canadian
16  Airlines pilots.  Analyzing seniority integration.
17    Q    And in the Northwest/Delta transaction,
18  which party retained you?
19    A    Northwest.
20    Q    What did you do for Northwest?
21    A    Similar.  Analyzing seniority
22  integration.
23    Q    And in the Air Canada and connectors
24  matter, what party retained you?
25    A    The Air Canada pilots.

**111**

1    Q    And what did you do for them?
2    A    Analyzing the impact of a
3  non-integration.
4    Q    So did that matter involve an
5  integration of two different groups of pilots?
6    A    Five different groups of pilots.
7    Q    In any of these cases did your
8  engagement involve predicting the likelihood of an
9  agreement being reached?
10    A    Not directly, no.
11    Q    Indirectly?
12    A    Well, every time we would come up with
13  an agreement, we were trying to assess the
14  likelihood that it would be acceptable to the other
15  side --
16    Q    Did you come up with any statistical --
17    A    -- or that two particular -- or -- or
18  to an arbitrator.
19    Q    Did you come up with any statistical
20  measure in any of these matters about the likelihood
21  that a certain proposal would be accepted?
22    A    I don't believe I did, no.
23    Q    And in any of these matters, did you
24  come up with any estimate of what the contents of
25  any agreement that was reached would be?

**112**

1    A    I did.  In all of them.
2    Q    And how did you do that?
3    A    Well, starting with the first, I mean,
4  the -- the agreement is to have the matter decided
5  by an arbitrator.  So we are estimating what the
6  arbitrator is going to do.  We can do that by
7  reference to what all the other agreements were.
8    Q    Did you come up with a written estimate
9  in advance of the arbitration about what you
10  expected the results of the arbitration to be?
11    A    I may well have.  At every point in
12  time, you know, at the beginning of the process, you
13  have to estimate what the arbitrator is likely to
14  do, to the extent that it's consistent with previous
15  arbitrations.  I don't -- I don't recall ever having
16  written a report saying this is what I estimate the
17  arbitrator is going to do in this case, but you
18  know, certainly I've said, if he does what he did in
19  X case, or if he does what he did in X case, or if
20  he does what's commonly done these days, this is
21  what the list is likely to look like.
22    Q    So what -- what sort of methodology did
23  you use in any of those matters to try and predict
24  the outcome of an arbitration?
25    A    To replicate what had been done in

28 (Pages 109 to 112)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

113

1    previous arbitrations.
2       Q    Did you rely on Sycara's work in your
3    efforts to do that in any of these prior matters?
4       A    No, I didn't.
5       Q    We would request production of any
6    written estimates in advance of arbitrations in any
7    of these matters that you produced.
8       A    If -- if they can be located, I will
9    certainly produce them.
10      Q    Did any of these matters result in a
11   negotiated resolution?
12      A    No, they were all arbitrated matters,
13   so they were -- they were all in arbitration.
14      Q    Were there efforts to reach a
15   negotiated resolution prior to arbitration?
16      A    Yes.
17      Q    And those efforts were unsuccessful?
18      A    Those efforts all regarded -- all ended
19   in a decision to -- to arbitrate.
20      Q    And in the Air Canada/connectors
21   matter, was your involvement limited to the
22   post-arbitration phase?
23      A    Yes.
24      Q    So in that case, you didn't develop any
25   estimate of what the arbitration result would be, I

114

1    take it?
2       A    No. As I said, it was after the fact.
3       Q    And did you conduct any assessment
4    after the fact about how accurate your estimate was
5    of the arbitration results?
6       A    No. It was after the fact. The
7    arbitration result was already there when I got
8    involved, so there would have been no point in
9    estimating what the arbitrator was going to do.
10      Q    Well, I'm not talking about the Air
11   Canada connectors' case here. I'm talking about the
12   other cases where you were involved pre-arbitration.
13      Did you conduct any assessment of the estimate
14   that you came up with for what the arbitration
15   result would be and compare to it the actual results
16   of the arbitration?
17      A    I -- I don't -- I don't believe I did.
18   I -- I -- I would have to say that in -- in
19   Northwest's and US Airways' mergers, it wasn't
20   particularly surprised by the -- by the result, but
21   I didn't compare that to what I thought it -- was
22   originally going to occur.
23      THE WITNESS:  Can we take five minutes?
24      MR. TOAL:  Sure.
25      VIDEO SPECIALIST:  The time is now

115

1    12:33 and we are going off the video record.
2       (Luncheon recess.)
3       VIDEO SPECIALIST:  The time is now 1:38
4    and we are back on the video record.
5    BY MR. TOAL:
6       Q    Mr. Salamat, before the break we were
7    talking about prior pilot seniority integrations in
8    which you had been involved.  Do you remember that
9    testimony?
10      A    Yes.
11      Q    And were any of the cases that you
12   described situations in which any of the strategies
13   outlined in your report, that you said ALPA had
14   available to it, were pursued?
15      A    Well, those -- those strategies would
16   be specific to this merger, so it's hard to say in
17   what way you would generalize from them.  There were
18   certainly mergers with the Canadian Airlines case
19   where there was lots of litigation going on around
20   that merger, so --
21      Q    Was there litigation going on during
22   the time of the negotiations between Air Canada and
23   Canadian Air?
24      A    There was.
25      Q    And in any of those cases, did any

116

1    implementation of the strategies result in a
2    negotiated resolution of the seniority arbitration?
3    I'm sorry.  In a negotiated resolution of seniority
4    integration?
5       A    It moved the parties closer together.
6    I don't -- it didn't lead to an agreement.
7       Q    And in any of the situations in which
8    you've been involved in pilot seniority integrations
9    previously, did any of the unions have a unilateral
10   right in negotiation to impose a seniority
11   integration list?
12      MR. JACOBSON:  Objection.  Asked and
13   answered yesterday.
14      THE WITNESS:  No, I don't believe so.
15   Except, as I said, in the TWA -- not the TWA.  I'm
16   sorry.  In the America West/US Airways case, both
17   groups believed they had the unilateral ability to
18   impose a seniority list on the other group.
19   BY MR. TOAL:
20      Q    Not during negotiations; correct?
21      A    Well, they had been negotiating
22   continually for the last few years about seniority,
23   so during negotiation, I -- I suppose you could say,
24   yeah.  But it is not really the same situation.
25      Q    In what respect is it different?

29 (Pages 113 to 116)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

117

1    A    Well, both groups are pursuing legal
2  strategies, so they are not negotiating in earnest.
3    Q    Take a look at page seven of your
4  report.
5    A    I have it.
6    Q    In the sentence immediately -- in the
7  paragraph immediately after the block quote, the
8  middle of that first sentence, do you see it says,
9  in order to compute the impact of ALPA's violation,
10  one must make qualitative and quantitative judgments
11  about how much influence these actions in isolation
12  and in combination would have had on where in the
13  range of possible settlements an agreement could
14  have been formed between the APA and the TWA pilots.
15    Do you see that?
16    A    Yes.
17    Q    What qualitative judgments were you
18  referring to in that sentence?
19    A    Qualitative judgments being the impact
20  the particular actions would have had on the
21  negotiating position of the TWA as outlined in the
22  -- the table on the following page.
23    Q    Is that the same as what you referred
24  to previously in your testimony as subjective
25  judgments?

118

1    A    Figure two, qualitative judgments, yes.
2    Q    And you used the term, subjective
3  judgments previously in your testimony.
4    A    Yes.
5    Q    Do you recall that?
6    A    Yes.
7    Q    And you used that language in the
8  report?
9    A    Yes.
10    Q    And when you referred to subjective
11  judgments and qualitative judgments, were you
12  referring to the same judgments?
13    A    Yes.  They were all -- they were all
14  judgments about the impact that actions would have
15  on the TWA pilots' negotiating position.
16    Q    And what were the quantitative
17  judgments that you were referring to in the
18  sentence?
19    A    The likelihood that any particular
20  action would have produced the damage model on its
21  own.
22    Q    And those quantitative judgments that
23  you are referring to, those are not things that you
24  measured in any way; correct?
25    A    No.  Those probabilities were also

119

1  subjective.
2    Q    I'm going to ask you to take a look at
3  figure three on page ten of your report.
4    A    I have it.
5    Q    Are the percentages that you list here
6  intended to represent the increased likelihood of an
7  agreement being reached between the TWA MEC and the
8  APA?
9    A    Yes.
10    Q    Is that something different in your
11  mind from whether the percentages are intended to
12  represent the overall likelihood of an agreement
13  being reached?
14    A    Sorry.  I think I will have to ask you
15  to ask the question again, because it was --
16    Q    I'm -- I'm trying to understand whether
17  these probabilities represent your estimate of the
18  likelihood of an agreement being reached had the
19  action been pursued, versus the increased likelihood
20  of an agreement had the action been pursued?
21    A    Would they be additive, is, I think,
22  what you are asking?
23    Q    It's not.  I'm trying to figure out if
24  there is a distinction in your mind between whether
25  this is a likelihood of an agreement being reached

120

1  or some sort of an increased likelihood of an
2  agreement being reached?
3    A    I -- I would say it would be an
4  increased likelihood.  I mean, if -- if by that you
5  mean would two actions have more or identical impact
6  as one, I believe two actions would have more impact
7  than one, so they would be additive.
8    Q    I'm really asking a different question.
9    Do you think there was any probability of an
10  agreement being reached without any of these actions
11  being pursued?
12    A    Is there any probability that an
13  agreement would have been reached without any of
14  these actions?
15    Q    Yes.
16    A    Well, an -- and agreement wasn't
17  reached without any of these agreements.
18    Q    I understand that --
19    A    So -- you can say --
20    Q    -- but you are looking back at with the
21  benefit of hindsight.  At the outset, at the time of
22  the negotiations, do you think there was a
23  probability of an agreement being reached without
24  any of these actions being taken?
25    A    At the outset of -- I -- it would

30 (Pages 117 to 120)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

121

1   depend on at what point in time in the negotiation
2   we were talking about, and whether the possibility
3   of these actions being brought in the future was --
4   was real or not. So I'm not really sure what --
5   what -- how to answer your question accurately.
6        Is there a possibility of an agreement without
7   any of these actions? Well, we know that there
8   wasn't an agreement without any of these actions.
9   So the seniority list that was obtained is
10  Supplement CC. With all of these actions, the
11  seniority integration would have been better. And
12  so to say -- so, you know, so actually maybe I
13  can -- going to have to ask you to ask your question
14  a -- differently because maybe I don't understand
15  it.
16       Q    Let me try to ask it in a different
17  way. I will give you a hypothetical.
18       If at the outset of these negotiations in the
19  absence of any of these actions being pursued there
20  was a ten percent chance of an agreement being
21  reached, do your -- does your probability with
22  respect to insist on waiving scope suggest in your
23  mind that had that action been pursued, there would
24  now be a 15 percent likelihood of an agreement being
25  reached?

122

1        A    If there was a ten percent chance at
2   the outset and employing an additional action would
3   have brought additional pressure, and we will
4   use the insist on waiving scope, yes -- if the
5   original probability of reaching an agreement was
6   ten percent, then that additional action would
7   increase the percentage likelihood of reaching a
8   negotiated agreement.
9        Q    And let me just make sure we are
10  understanding one another.
11       The alternative would be, if there is a ten
12  percent chance at the outset and I pursued this
13  action that you think has a five percent
14  probability, am I just increasing the ten percent
15  likelihood by 1.05?
16       **MR. JACOBSON: I object to the form of**
17  **the question. I don't understand it.**
18       **THE WITNESS: It -- it -- as I said, it**
19  **would be additive. It would go from ten percent to**
20  **15 percent. As a conservative estimate, more likely**
21  **you would -- you would assume that two actions would**
22  **have greater effect than the sum of their parts.**
23  **And so it would actually be greater than two, but,**
24  **you know, conservatively, you would say two. I mean**
25  **--**

123

1   **BY MR. TOAL:**
2        Q    Why do you assume that -- that multiple
3   actions would have a multiplier effect on the
4   likelihood of an agreement being reached?
5        A    Well, multiple actions can combine in
6   ways. They -- there's what's referred to as a
7   feedback effect, and I think right -- right above
8   here there is this quote by Watkins talking about
9   regardless of what negotiations do by slowly
10  rationing out pressure, by establishing specific
11  action forcing events, the ultimate goal is to build
12  momentum. And so, when you are talking about
13  momentum, you are talking about adding weight to
14  something already in motion. So you are, in effect,
15  talking about a multiplier effect.
16       Watkins, I believe in the same article, refers
17  to the feedback effect of bringing multiple
18  strategies to bear in the negotiation. So I haven't
19  actually -- I haven't actually used the multiplier
20  effect. I've said what multiplier effect would be
21  required in order to bring that 73 percent up to a
22  hundred percent, but that was just merely to
23  demonstrate that a very small multiplier effect
24  would increase that probability such that even if,
25  you know, you were to -- to say, okay, well, maybe

124

1   it's not five percent. Maybe it is four percent.
2   But then what kind of multiplier effect would you
3   reasonably use? If it was two percent, if it was
4   three percent. I mean, there is still a range of
5   possible ways you could assess the probabilities of
6   how these actions would work individually and in
7   combination.
8        You know, I'm -- I'm starting a game from the
9   premise that I know that all of these things, had
10  they been pursued, ALPA would not have been found in
11  breach. Simple -- simple proposition. We can
12  assume. And had all these things been pursued and
13  they not been in breach, a better seniority list
14  would have been obtained. So now we just have to
15  do -- do you need to get that or --
16       Q    No.
17       A    Okay. Sorry.
18       So now we have to say, if -- if some of them
19  had been pursued, what's a minimal chance that any
20  one of these could have produced a particular
21  result? And then what is the likelihood that the
22  two of them could have produced a particular result?
23  We know that all of them would have produced a
24  better seniority list. What better seniority list?
25  We don't know. We have to estimate. We have to --

31 (Pages 121 to 124)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

**125**

1  we have to make some reasonable guesses as to what's
2  more probable than not, so --
3      Q   And that's what you did here?
4      A   I believe that's what I did here, yes.
5      Q   Do you consider the possibility that
6  multiple actions could have diminishing marginal
7  returns?
8      A   At -- at -- at the margin, yes.
9      Q   And --
10      A   But we are not talking -- you mean, you
11  are talking about a -- fence that might be
12  happening contemporaneously.  You are talking about
13  events that you predicate that one is either
14  succeeding, because if one event is succeeding, then
15  the marginal return from another event is less -- is
16  likely to be less.  If one event is failing, then
17  pursuing a second is likely to have a greater effect
18  than it would otherwise.
19      So, I mean, that's -- that's -- that's not a
20  question that I think you can answer in the
21  abstract, right?  You have to really look at a
22  particular situation and say what the return would
23  be.  You could assume a multiplier, which I think
24  would be fair in this type of situation, a positive
25  multiplier.

**126**

1      But, as I say, in the event that something is
2  succeeding, if the TWA pilots had insisted on
3  waiving scope, and that was -- that was, you know, a
4  strategy that had been pursued, then perhaps another
5  strategy might be less.  But I don't think I would
6  want to -- I don't -- I don't think I would want to
7  make a sweeping statement about the additive or
8  subtractive nature, or whether there would be
9  diminishing returns on a particular action depending
10  on what came before it.  It is not inconceivable
11  but, again, I think it would be diminishing if that
12  other action was succeeding.  And so an overall
13  probability would be higher because now we are
14  talking about an action which is succeeding, so its
15  chances of achieving a particular outcome is higher
16  than it would have been.  So, you know, it's--
17  it's --
18      Q   And are you proposing to offer an
19  expert opinion in this case as to whether multiple
20  actions would or would not have had a multiplier
21  effect?
22      A   I don't believe I am and I don't
23  believe I have.  I think I've said that, you know,
24  it is quite likely that you would use a multiplier
25  effect and that would increase the likely outcome

**127**

1  from 73 to a higher number.  And I simply said that
2  a three percent multiplier effect would increase it
3  to a hundred.  I'm not saying that there was a
4  multiplier effect.  But if you accept that multiple
5  actions would have a larger combined effect than the
6  individual constituent actions on their own --
7      Q   In this table -- are you done?
8      A   Yes.
9      Q   In this table, you really are making
10  predictions about how the APA would have responded
11  to each particular action; correct?
12      A   I am predicting that each of these
13  actions would have led them to be more likely to
14  move towards a better seniority integration.
15      Q   And so that's a prediction about how
16  the APA would have responded to these actions;
17  correct?
18      A   Well, we can conclude, you know, from
19  the jury's verdict, that all of these actions would
20  have led to a better seniority integration.  So each
21  one of these in some way would have contributed to
22  that.  So we have to predict, yes, that we don't
23  know which ones would have resulted in what
24  particular outcomes, but I would agree that we are
25  assuming that bringing additional pressure in a

**128**

1  negotiation would have caused the APA to negotiate
2  more intensively, which would have resulted in a
3  better seniority integration.
4      Does that answer your question?
5      Q   I don't think it did.
6      With respect to the probabilities that you
7  list in figure three, do those probabilities attempt
8  to predict the increased likelihood that the APA
9  would have agreed to a seniority list different than
10  Supplement CC?
11      A   I believe that's what I said they do,
12  yes.
13      Q   Okay.  And specifically with respect to
14  these particular probabilities, these are reflective
15  of your view of the likelihood that the APA would
16  agree to the Salamat list that you proposed in your
17  report; correct?
18      A   That's correct.
19      Q   Now why, in your linear model of
20  probabilities, for every situation and every
21  strategy in which you think there is a prospect of
22  changing the APA's importance of a goal, do you
23  assign a three percent probability?
24      A   That seemed the reasonable amount to
25  use.  It seemed more probable that a three percent

32 (Pages 125 to 128)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

129

1   increase in the probability would result from the
2   strategies which I said there would be a change in
3   the importance of the goals that the APA was
4   pursuing, which, you know, we -- we could read
5   primarily in terms of, you know, the staple size.
6       Q    Why would it be the case that each of
7   these different actions has exactly the same
8   probability of changing the APA's -- the importance
9   that the APA attaches to a goal?
10      A    Well, they differ in terms of what --
11  the quality of the actions and whether it seems to
12  me that the importance of the perception of the
13  abandonment -- goal abandonment were possible
14  outcomes -- sorry, possible influences on the
15  negotiation as a result of the specific action. The
16  change in importance I overall estimated as having a
17  three percent chance of contributing to the
18  particular negotiated outcome in this case, the
19  damage model, and five percent for a change in
20  perception, and two percent for abandonment. So it
21  is the same value for each type of a change in -- in
22  perception of the issue. Not perception, but
23  characterization of the effect of the element on the
24  negotiation.
25      Q    Well, is it just coincidence that every

130

1   action that you decided had the potential to change
2   the importance that the APA attached to a goal has
3   the same percentage likelihood of resulting in -- in
4   an agreement?
5       A    Well, because three percent was the
6   value I used for any action that had the ability to
7   change the percep -- to change importance. So
8   importance and three percent go together, as do five
9   percent and perception, and two percent and
10  abandonment.
11      Q    And with respect to any action that you
12  thought ALPA had available to it that had the
13  potential to change the importance that the APA
14  attached to a goal, would you have assigned a three
15  percent probability?
16      A    That's correct.
17      Q    Did you try and make an individualized
18  assessment about the potential of each particular
19  action to change the importance that the APA
20  attached to a goal?
21      A    I don't recall doing so.
22      Q    Did -- did you consider whether some
23  actions would be more effective than others at
24  changing the importance that the APA attached to a
25  goal?

131

1       A    No, I didn't, because I -- I
2   considered -- I considered three percent a
3   reasonable value to use for a change in
4   perception -- sorry -- change in importance.
5       Q    Regardless -- regardless of the type of
6   action, as long as it had the potential to change?
7       A    If -- if it didn't -- if a particular
8   action didn't seem like it met a three percent test
9   for a likelihood for a change in action, I didn't
10  consider that it would be something that had a
11  possibility of changing the APA's importance that it
12  attached to an issue. So the way in which that was
13  taken into consideration was to just not assign a
14  three percent value to any particular action, so --
15      Q    So in your analysis with regard to
16  change and the importance that the APA attached to a
17  goal, you essentially conducted a binary analysis;
18  where, if it had the potential to change the
19  importance, you assigned three percent, and if it
20  didn't, you assigned zero percent?
21      A    That's correct.
22      Q    And why is it that for each action
23  where you decide that it had the potential to change
24  the APA's perception of the importance of a goal,
25  you assigned a five percent probability?

132

1       A    For the same reason.
2       Q    And is it the same reason with respect
3   to goal abandonment?
4       A    That's correct.
5       Q    And how did you decide that an action
6   that had the potential to change the APA's
7   perception of the importance of a goal had a greater
8   potential to result in agreement than an action that
9   had the potential to change the importance that the
10  APA attached to a goal?
11      A    Because a change in their perception
12  appeared in this case to be more influential on the
13  APA's action. Change in their perception of the
14  issue of stapling TWA pilots, if we look at their
15  conduct around the -- the time when they changed
16  their final proposal around the Bond bill seemed to
17  be most closely related to a change in their
18  perception of the issue rather than the importance
19  of the issue. And it certainly hadn't caused them
20  to abandon the issue. So it seemed a very powerful,
21  motivational driver. So five percent seemed a more
22  reasonable value to use there than a lower three or
23  two percent, which I used for the others.
24      Q    Do you have any empirical support for
25  your conclusion that -- do you have any empirical

33 (Pages 129 to 132)

9914249b-ddc9-43a3-9047-7f58754f5217

**133**

1   support for your conclusion that a change in
2   perception had a greater potential for resulting in
3   an agreement than a change in importance?
4       A    To the extent that their conduct around
5   the Bond bill seemed most likely the result of a
6   change in perception of the issue, that's the only
7   empirical evidence I have.
8       Q    Nothing -- nothing aside from that?
9       A    Nothing aside from that.
10      Q    Nothing in the academic literature?
11      A    Not that I'm aware of.
12      Q    And do you have any empirical support
13  for the notion that change in importance has a
14  greater potential to result in agreement than goal
15  abandonment?
16      A    Other than the -- the facts -- the
17  APA's conduct in this case, no.  Same -- same as the
18  previous question.
19      Q    And when you refer to the APA's
20  conduct, you are referring specifically to --
21      A    The change in their negotiating
22  position.
23      Q    Which you attribute to the Bond bill?
24      A    Which I attribute to pressure having
25  been brought in the negotiations such as it was.

**134**

1       Q    Which you identified specifically as
2   related to the Bond bill; correct?
3       A    Yes.
4       Q    And when you refer to changes by the
5   APA which you attribute to the Bond bill,
6   specifically, what changes do you have in mind?
7       A    Improvement in the seniority list.
8       Q    From what to what?
9       A    From I believe their -- their proposal
10  that they had on the table in the summer to the one
11  that was on the table in which I believe ultimately
12  ended up being Supplement CC.
13      Q    And in what way did those proposals
14  differ from -- from one to another?
15      A    The number of pilots -- well, first,
16  the position of the first move -- the first TWA
17  pilot integrated with American pilots was higher up
18  the lists, and the number of TWA pilots that was
19  going to be end-tailed was smaller.
20      Q    And how much higher was the first TWA
21  pilot who would be integrated?
22      A    I would have to refer to my report to
23  give you the exact number.
24      Q    Can you give me an estimate based on
25  your knowledge as you sit here today?

**135**

1       A    I can't recall.  I -- I believe it was,
2   you know, a significant increase in seniority for
3   the first pilot who would be integrated.
4       Q    Can you give me a quantitative estimate
5   as you sit here today?
6       A    I can give you the exact number if you
7   don't mind me --
8       Q    I don't mind.
9       A    -- looking for it.
10      Well, it was approximately 1,159 American
11  pilots at the top of the list, is what I say here,
12  and that number differs from the actual Supplement
13  CC list by less than a hundred.  So my guess is the
14  first TWA pilot was slotted in someplace around
15  number 1,200.
16      Q    Under the proposal in the summer or
17  under Supplement CC?
18      A    Under their final proposal.  The
19  proposal prior to that, I believe the number was --
20  was approximately 1,500 less.  So the first pilot
21  would have got slotted in around 3,500 or 4,000.
22      Q    And how many fewer pilots was the APA
23  proposing to end-tail between its proposal in the
24  summer and Supplement CC?
25      A    I -- I believe it was a couple of

**136**

1   hundred.
2       Q    Now, did you do anything to evaluate
3   the possibility that there was no merged integration
4   list that would have been acceptable to the TWA MEC
5   and the APA without regard to what ALPA did?
6       A    Yeah, I believe that would be the --
7   that 32 percent probability that is left over
8   after -- or the 37 percent probability that no list,
9   given all of these actions that were available to
10  ALPA, would have resulted in the -- in the Salamat
11  damage model as it is called in the report.  All of
12  these actions have been available, I believe I said,
13  would have resulted in at least as close to a
14  hundred percent as you can get in the marginal model
15  or the minimal or the -- yeah, the marginal list,
16  so --
17      Q    Did you mean 27 percent that was left
18  over after you --
19      A    27 percent.
20      Q    And did you do anything with respect to
21  the particular effects of this case to try and
22  evaluate the possibility that there was no specific
23  merged seniority list that would have been agreeable
24  to both TWA MEC and the APA?
25      MR. JACOBSON:  Objection.  I believe

34  (Pages 133 to 136)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

137

1  that was asked and answered.
2      THE WITNESS:  I'm not sure how that
3  differs from your last question.
4  BY MR. TOAL:
5      Q    Well, your response to the last
6  question talked about the probabilities in your
7  table; correct?
8      A    That's correct.
9      Q    Did you do anything to try to find out
10 whether the APA would have agreed to any of the
11 lists that you propose in your report?
12     A    No, I did not.
13     Q    Did you undertake any sort of
14 evaluation to try to determine, based on the facts
15 available in the record, whether the APA would have
16 agreed to any of the lists that you propose in your
17 report?
18     A    Well, it -- it would be impossible to
19 do that because all of that list is predicated on
20 actions that were not taken.  So, I mean, how --
21 how -- there could be no facts that would say what
22 the APA would have or would not have agreed to had
23 all of the facts been undertaken.  It is a very
24 difficult sort of problem.
25     Q    And so you didn't attempt to undertake

138

1  such an assessment; correct?
2      A    One could not be undertaken, and so I
3  did not attempt it.
4      Q    So now, in figure three you essentially
5  calculated 27 percent likelihood that no agreement
6  would have been reached even if ALPA had taken all
7  of these actions; correct?
8      A    27 percent that the damage model would
9  not have been the outcome.
10     Q    That the Salamat model would not have
11 been the outcome; correct?
12     A    Yeah.  Not a 27 percent change that no
13 agreement could have been reached had all of these
14 actions been undertaken.  That's -- that's --
15 different.  These probabilities are specifically
16 tied to the damage model and not to any agreement.
17     Q    Did you -- did you prepare a version of
18 figure three that would be associated with each of
19 the other models that you presented in your
20 analysis?
21     A    No, I did not.
22     Q    Did you prepare an analysis of the
23 likelihood of your Supp CC plus 200 model being
24 agreed to?
25     A    I did not.  It would be greater than

139

1  73 percent, in that it's closer to Supplement CC
2  than the damage model is, but I didn't quantify it,
3  no.
4      Q    Would it have been greater than a
5  hundred percent?
6      A    It -- nothing -- nothing could be --
7  theoretically be a hundred percent certain.  It
8  would approach a hundred percent.  It would be
9  nearly a hundred percent, almost a certainty.  But
10 nothing can be absolutely certain when you are
11 dealing with human beings.
12     Q    So at page 21 of your report, in figure
13 eight, you have a list of I believe it is 30 -- 30
14 airline transactions; correct?
15     A    Something like that, yeah.  30.
16     Q    And five of those you identify as
17 unilateral seniority integration lists; correct?
18     A    That's correct.
19     Q    Including the one in American/TWA;
20 correct?
21     A    Yes, it is.
22     Q    Of the other unilateral agreements, do
23 you know whether any of those involved stapling
24 substantially all of the acquired airlines' pilots
25 to the bottom of the list?

140

1      A    I believe yesterday we talked about
2  American/Reno, where that was the case.
3      Q    Uh-huh.
4      A    And I can't recall what happened in
5  Southwest/Morris Air and Piedmont/Empire.  I don't
6  recall whether those pilots were stapled or not.
7      Q    Okay.  So on this list of 30 airline
8  transactions, you identify by my count three in
9  which negotiated resolutions of seniority
10 integration were reached; correct?
11     A    I'm sorry.  By my count, five
12 situations in which --
13     Q    A negotiated agreement was reached?
14     A    Yes.  Yeah.  I'm going -- one, two,
15 three, four, five.  That's correct.  Yes.
16     Q    Okay.  So in 25 of the 30, you are
17 aware that no negotiated resolution of seniority
18 integration was reached; correct?
19     A    Well, a negotiated resolution would
20 have been to arbitrate.  I mean, if the negotiation
21 doesn't produce a merged seniority list, then it is
22 referred to an arbitrator.  So in many of these
23 cases the decision to arbitrate was negotiated, was
24 the result of the negotiation rather than the
25 specific list.  Parties, you know, they generally

35 (Pages 137 to 140)

9914249b-ddc9-43a3-9047-7f58754f5217

141

1 negotiate up to a point, and they can't agree on the
2 remaining issues, and so it is referred to an
3 arbitrator. So that arbitration is, in part, the
4 result of some of these negotiations. I don't know
5 which ones. It would be primarily the -- the ALPA
6 to non-ALPA carrier mergers. The parties agree
7 to -- agree to arbitration as the resolution, as the
8 end of their negotiation. It doesn't mean they --
9 they negotiated the final seniority list, so --
10     Q    So, in any ALPA to ALPA transaction,
11 you are aware that ALPA has a policy and a
12 requirement that the respective TWA -- or the
13 respective MEC's engage in arbitration; correct?
14     A    I am.
15     Q    And setting aside arbitration, would
16 you agree that in 25 of these 30 situations, the
17 pilot groups themselves were unable to reach an
18 agreement on any seniority list that they considered
19 mutually acceptable?
20     A    Yes.
21     Q    And yet, in the Salamat model, you
22 calculate a 73 percent likelihood that the TWA MEC
23 and the APA would have been able to agree on a
24 negotiated seniority list that was acceptable to
25 both parties; correct?

143

1 them in order to resolve the dispute. So they are
2 somewhat -- well, they are substantially different
3 from the TWA/American situation. If two parties, as
4 I was saying, can't -- can't agree to a list, they
5 can agree to go to negotiation. Or in a ALPA -- the
6 ALPA merger, they can just go straight to -- go
7 straight to an arbitration. So that is part of the
8 process.
9     And I think you find many who have been
10 involved who would say that negotiations continue on
11 during arbitrations, and so the fact that it is an
12 arbitrator who determines the final list and puts,
13 you know, his or her name on it, mostly -- mostly
14 his, I think, that doesn't mean that it's not -- you
15 know, that you can't look at it in some way as a
16 negotiated outcome, as well. So mediation continues
17 throughout -- all the arbitration, seniority merger
18 arbitrations I've been involved in, the parties in
19 some way manage to continue to move closer together
20 throughout the process. So I -- I wouldn't want to
21 make a strong distinction between an arbitrated
22 outcome and a negotiated outcome for that reason.
23     Q    In each of these cases in figure eight
24 where you list an arbitrator, did you intend to
25 signify that the decision about seniority

142

1     A    That's correct.
2     Q    And with respect to Supplement CC plus
3 200, you suggested that the likelihood of the APA
4 and the TWA MEC reaching an agreement would have
5 approached a hundred percent; correct?
6     A    In the absence of ALPA's breach; yes.
7     Q    In the absence of ALPA's breach?
8     A    Yes.
9     Q    And in the -- the items -- the
10 transactions that you list in figure eight of your
11 report --
12     A    Yes.
13     Q    -- to your knowledge, did any of those
14 involve situations in which one of the unions had
15 breached its obligation of fair representation?
16     A    I'm -- I'm not aware that any of them
17 involved a breach.
18     Q    And even in the absence of any breach,
19 the results of your chart indicate that in 25 out of
20 30 of those situations, the pilot groups were unable
21 to reach agreement between themselves; correct?
22     A    And in 25 of those 30 mergers, the
23 pilots had an automatic right to go to arbitration.
24 So they were -- they were not held to negotiate the
25 agreement. There was another mechanism available to

144

1 integration was rendered by the arbitrator?
2     A    That's correct.
3     Q    And you didn't intend to signify that
4 arbitration had been initiated when you indicated a
5 particular name for an arbitrator, did you?
6     A    Sorry. I don't -- I don't understand
7 the question.
8     Q    The question is, the fact that you list
9 an arbitrator's name doesn't signify merely that
10 arbitration proceedings were initiated; does it?
11     A    It means that the arbitrator determined
12 the final seniority integration.
13     Q    And --
14     A    They issued an award.
15     Q    And the reason it would be necessary
16 for the arbitrator to do that is because the parties
17 hadn't been able to reach an agreement between
18 themselves; correct?
19     A    Not on all issues, no. But as I said,
20 they will have agreed on some issues.
21     Q    Now, if there were more actions that
22 you could come up with in figure three that ALPA had
23 available to it, would it be possible to get to a
24 percentage likelihood of the Salamat model being
25 agreed to greater than a hundred percent?

36 (Pages 141 to 144)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

145

1    A    I don't know.  It would depend on how
2  many -- how many more and what the actions were.
3    Q    As a matter of logic, are you familiar
4  with any way in which you can have a greater than a
5  hundred percent probability of something happening?
6    A    No.  It could -- it could never exceed
7  a hundred percent.  It could never reach a hundred
8  percent.
9    Q    Do you consider yourself an expert in
10  probability?
11    A    No, I do not.
12    Q    And what experience do you have in --
13  in determining probabilities?
14    A    Basic training in math and statistics,
15  you know, up to the second or third year of
16  undergraduate level, I guess.  But I wouldn't say
17  that -- that constitutes me being an expert in
18  probability.  I'm certainly very experienced in
19  calculating probabilities for various, you know,
20  financial and operational economic reasons, but --
21    Q    Are you familiar with the proper
22  methodology for aggregating probabilities of
23  separate events?
24    A    There's -- there's several.  So you
25  would have to be more specific.

146

1    Q    Well, if you were trying to evaluate
2  the probability that multiple events, each of which
3  has a -- a possibility of leading to a certain
4  outcome, what the overall probability of that
5  outcome occurring is, do you know how to do that?
6    A    If you are talking about -- I believe
7  we were talking about this yesterday with the roll
8  of the dice, that it would -- you never would have a
9  hundred percent chance.  So your second roll of the
10  dice would increase your likelihood of eventually
11  hitting a six.  You would approach a hundred
12  percent, but you would never hit a hundred percent.
13  So --
14    Q    So --
15    A    -- I believe I'm familiar with the
16  basics of probabilities, certainly.
17    Q    Okay.  So I would like you to imagine I
18  have a -- a die that has ten sides to it, and I'm
19  trying to determine the probability of rolling a
20  ten.
21    A    I believe that's fundamentally the same
22  as we just did the six-sided dice, but sure.
23    Q    It's easier for me to calculate.
24    A    Okay.
25    Q    So what would my probability of rolling

147

1  a ten on the first roll be?
2    A    One in ten.
3    Q    Ten percent?
4    A    Ten percent.
5    Q    And what would my probability of
6  rolling a ten on the second roll be?
7    A    One in ten.
8    Q    And -- and if I wanted to determine the
9  probability that I would roll a ten on either of the
10  first two rolls, would I add those probabilities
11  together?
12    A    Two in ten.
13    Q    And so if I rolled the dice 11 times,
14  would I have a 110 percent chance of rolling a ten?
15    A    No, you would not.
16    Q    Does that suggest to you that it is not
17  the proper methodology to aggregate probabilities,
18  to add the independent probabilities?
19    A    Yeah.  I do agree.  That for the one in
20  ten chance, that you wouldn't do it that way.  If
21  you want to know your probability of rolling a ten,
22  a -- a ten on two subsequent rolls, then you've got
23  a one in ten chance times a one in ten chance.  So
24  it is actually multiplied rather than added.  You
25  are quite correct.

148

1    Q    So if I multiplied those, I would have
2  a one in a hundred chance of rolling a ten on either
3  of the first two rolls?
4    A    No.  1.1.  So you have an additional
5  ten percent chance.
6    Q    I would have a 1.1 percent chance?
7    A    You have to -- you have to -- you'd
8  actually have to calculate it the opposite way.
9  Like, there is a -- if you want to do the
10  multiplication, you have a nine in ten chance of --
11  of not rolling a ten on your first roll.
12    Q    Did you try aggregating the
13  probabilities in your chart in figure three using
14  that methodology?
15    A    By just straight -- by using a
16  multiplicative and using that form of probabilities?
17  No, I did not, because it's not a dice rolling game
18  that I'm trying to assign a probability to.  I'm not
19  trying to establish the likelihood of a random
20  event, which is what you are talking about.  This is
21  a what's-more-probable-than-not scenario, so --
22    Q    Can you point me to any source
23  indicating that the proper method of aggregating
24  probabilities in a situation like you present in
25  figure three is to add the independent

37 (Pages 145 to 148)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

149

```
 1    probabilities?
 2        A    I would have to go back and -- and take
 3    a look at some works on probabilities.  It is
 4    certainly not how you would deal with a random
 5    outcome event, but this is not a random outcome.  We
 6    are not saying that there is a random probability
 7    that something would or would not occur.  So with
 8    dice, each roll has a discrete chance of producing a
 9    -- a particular outcome or a discrete -- or has the
10    same probability of not producing the outcome.  And
11    so -- and that's different than saying what's the
12    likelihood that any one of these individual actions
13    on its own would have produced a particular outcome.
14    You can't multiply these in the same way because
15    they are not discrete random events.  These are just
16    simply ways of saying what's the probability -- if
17    we assume that all of these actions were available
18    to ALPA, and we put a -- a low value on each of them
19    in order to discount and take into account the
20    likelihood that none of these could have produced an
21    agreement on their own, or that any one of them
22    could have produced the exact same agreement, how
23    can we assess what the fact -- the fact that we have
24    a less than one hundred percent chance of knowing
25    what would have been produced.  So this was my
```

150

```
 1    method for doing that.
 2        Q    And can you point me to any
 3    authoritative text that says this is the appropriate
 4    way to aggregate probabilities in this sort of
 5    setting?
 6        A    Not in this situation, no.  No, I
 7    cannot.
 8        Q    Just for the sake of the court reporter
 9    and the record, you have to let me finish asking my
10    question before you start to answer.
11        A    My apology.
12        Q    And did you consult any authority on
13    probability before you decided on the methodology to
14    use in aggregating the probabilities on figure
15    three?
16        A    I did not.
17        Q    You indicate in figure three that what
18    you are presenting is a linear model of
19    probabilities.  What makes it linear?
20        A    The fact that the -- each -- each
21    individual item is -- is being treated as a single,
22    discrete event rather than them having combined
23    effects on each other, which would be a dynamic
24    model.
25        Q    Now, page twelve of your report on the
```

151

```
 1    top, you say, it is difficult to overstate the
 2    importance of seniority for pilots as it determines
 3    the most important aspects of their working lives,
 4    including the equipment they operate, whether they
 5    are a captain or first officer, whether they have a
 6    schedule or sit reserve, what days they work, how
 7    much time they are away from home, where they live,
 8    how many hours they work in a month, when they take
 9    their vacation, and even what meals they are served
10    on board.
11        Do you see that?
12        A    I do.
13        Q    And when you say it is difficult to
14    overstate the importance of seniority for pilots, it
15    would be equally true for American Airlines pilots,
16    wouldn't it?
17        A    It would.
18        Q    And you discuss in your report the
19    concept that seniority is a currency that's
20    available to pilots; correct?
21        A    That's correct.
22        Q    And pilots can make individual
23    decisions about what they do with that currency;
24    correct?
25        A    That's correct.
```

152

```
 1        Q    And that's among the reasons that you
 2    have sort of a variability in earnings that's
 3    reflected in your figure five; correct?
 4        A    That's correct.
 5        Q    And figure five shows that the pilots
 6    with similar seniority levels can have substantially
 7    different monthly earnings; correct?
 8        A    Yeah.  They can and do, yes.
 9        Q    And it is also the case that pilots
10    with similar earnings can be many thousands of
11    places apart on the seniority list; right?
12        A    That's correct.
13        Q    And one of the decisions that pilots
14    can make is how many hours they work; correct?
15        A    In some cases.
16        Q    And --
17        A    Not -- not in all cases.
18        Q    And do you know -- do you have an
19    understanding of what the range is for how much a
20    pilot can choose to work?
21        A    Sorry.  At -- at American Airlines,
22    or -- because it is different at every single
23    airline.
24        Q    Let's take American Airlines.
25        A    Okay.
```

38 (Pages 149 to 152)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

**153**

1  Q   Do you know what the minimum or the
2  maximum number of hours they can work would be?
3  A   I believe the maximum is -- is
4  somewhere around 78 hours a month, and the minimum,
5  I believe, is somewhere closer to 70. I don't -- I
6  don't recall the precise numbers that are in effect
7  today, but I believe that's currently what it is.
8  Q   And some pilots with high enough
9  seniority to qualify for better equipment,
10  nonetheless, decide to fly equipment that has a
11  lower pay scale attached; correct?
12  A   That's correct.
13  Q   And it is also true that some pilots
14  who have the seniority to qualify for captain choose
15  to fly as first officers; correct?
16  A   That's correct.
17  Q   Do you do anything in your analysis to
18  account for the individual choices pilots are
19  capable of making with their seniority?
20  A   Yes.
21  Q   What do you do?
22  A   We use a rolling average in order to
23  assign a monetary value for each seniority number on
24  the list.
25  Q   How does that account for the

**154**

1  individual choices that pilots can make about how to
2  use their seniority?
3  A   Well, pilots trade off lifestyle for
4  income, so there is two ways you can determine what
5  the actual maximum value or -- or the representative
6  value of any particular seniority number. Two
7  methods that are used is to -- well, three methods
8  that are used, one is to take a linear average and
9  say, on average, income goes down $50 for each
10  seniority number, for instance.
11      The other is to use what's referred to
12  sometimes as stovepipe or sometimes linear
13  seniority, which is to say, well, what each pilot
14  earned at each seniority number if every pilot bid
15  in order to maximize their earnings.
16      And the third is to use some type of average,
17  and the most common one is a rolling average. And
18  so, by doing that, you figure out the most
19  representative and true value of a particular
20  seniority number if pilots do, on average, what
21  their seniority will allow them to. So it is very
22  close to a stovepipe average.
23      And so pilots who are above that level of
24  income, we know that they've traded lifestyle for
25  income because they will be people who will have

**155**

1  less desirable schedules according to their own
2  immediate seniority group peers. Pilots who
3  earn less than that will certainly -- pilots who
4  earn less than that will have maximized lifestyle at
5  the cost of income. So by using an average, we get
6  rid of people's individual preferences and are able
7  to actually put a monetary value on a change from
8  any given number to any other given seniority
9  number.
10  Q   So you try to account for what any
11  individual pilot would do with additional seniority
12  by looking at the increased earnings on average that
13  someone with that level of increased seniority would
14  have; is that correct?
15  A   Yeah. I -- I believe that's a -- a
16  reasonable way to put it. You know --
17  Q   Is it accurate?
18  A   Well, it is not exactly how I would put
19  it.
20  Q   Is there some way in which it is
21  inaccurate?
22  A   Well, let's -- let's hear it again, and
23  I will -- I'll give you a -- just a plain old yes or
24  no.
25  Q   Okay. So the question was, so you

**156**

1  tried to account what for any individual pilot would
2  do with individual seniority by looking at the
3  increased earnings on average that someone with that
4  level of increased seniority would have; is that
5  correct?
6  A   Well, I don't try to account. I do
7  account. It does account for it.
8  Q   That's the manner in which you would
9  account; correct?
10  A   Yes, that's correct.
11  Q   And in your analysis, you try to make
12  any individualized inquiry of what a -- a given
13  pilot actually would have done if they had gotten,
14  for example, 200 additional ranking points on the
15  seniority list.
16  A   What do I -- do I -- if I understand
17  your question correctly, do I try to predict what an
18  individual pilot would actually do with an
19  additional seniority number? With a better
20  seniority number?
21  Q   Did you try to make any individualized
22  inquiry into what the pilots on the list would have
23  done had they been given a specific amount of
24  additional seniority?
25  A   So if -- if I understand your question

39 (Pages 153 to 156)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

157

1 correctly, you are asking if I gave Bob a thousand
2 more numbers, put him a thousand numbers up the
3 seniority list, what would he do with that thousand
4 numbers? No.
5     Q    Do you -- did you try -- does your
6 analysis attempt to make any inquiry into what Bob,
7 in your example, would have done if he was one
8 thousand places higher on the seniority list?
9     A    No. All -- all we can know is what the
10 value of moving up a thousand numbers is. You can
11 never know what Bob's going to do. Bob doesn't know
12 what Bob's going to do. I've actually shown that
13 pretty clearly in another analysis that I did at one
14 point. So, you know, pilots don't know what they
15 will do when their seniority number is increased.
16 They think they know, but circumstances change, so I
17 couldn't know if they can't.
18     Q    Do you have an understanding of how the
19 St. Louis fence worked?
20     A    I do.
21     Q    And what's the basis for your
22 understanding?
23     A    Supplement CC?
24     Q    So what's your understanding of how the
25 St. Louis fence worked?

158

1     A    The St. Louis fence provided a number
2 of captain jobs that would be placed in St. Louis
3 based on the number of captain positions they had on
4 certain equipment at other American Airlines bases,
5 and that those positions would only be available to
6 TWA -- former TWA pilots.
7     Q    And to your understanding, did the
8 St. Louis fence have any application to TW -- legacy
9 TWA pilots who were not captains?
10     A    I'm sorry. I don't understand your
11 question. Did it -- did it --
12     Q    Did it have any application to legacy
13 TWA pilots who weren't captains?
14     A    I -- I believe the FO positions in
15 St. Louis could only be also held by TWA pilots, but
16 I don't -- there was no guaranteed number of first
17 officer positions.
18     Q    And did you attempt in your analysis to
19 take into account the operation of the St. Louis
20 fence?
21     A    I did.
22     Q    How did you do that?
23     A    If I could turn to the report? If --
24 well, that wouldn't be the St. Louis fence, so let's
25 skip that part.

159

1     On page 43, it says, just below bidding
2 restrictions, the second sentence says, if a pilot
3 is in a protected position -- that would be one of
4 these St. Louis fence positions -- if a pilot is in
5 a protected position, then increasing his seniority
6 may not increase his income as he is already holding
7 a higher paying position than he would otherwise be
8 able to hold.
9     What this means is that the pilot has
10 basically been given an artificial seniority number
11 that gives him access to a position that he wouldn't
12 be able to hold had that St. Louis fence not been
13 there.
14     It was mentioned above that one method for --
15 employed for -- it was mentioned above that one
16 method for -- one method employed for ensuring that
17 impacts are not overstated was to use a rolling
18 income line calculated without wide-body captains.
19     An additional method used was to identify
20 pilots in protected positions and assume zero impact
21 in the month in which they were holding a position
22 out of seniority order. To determine which pilots
23 to treat as holding a protected position, the
24 seniority threshold number for being able to hold a
25 position by dint of that seniority alone was

160

1 calculated as follows. And then we get to an
2 equation, which I will just tell you what it says.
3 We can go through it in -- in detail if you want,
4 but what it says is that if I increase that pilot's
5 seniority number a thousand, say, to use an
6 arbitration number, and he is outside of the bidding
7 range for that position, then increasing his
8 seniority number wouldn't have improved his
9 situation. He wouldn't be able to hold that so he's
10 in a protected position, so, therefore, the impact
11 on him is zero.
12     So there is a formula that we use in order to
13 say what the bidding range is, and whether
14 increasing that range in order to basically
15 accommodate additional positions that would now be
16 available system-wide that were previously there in
17 St. Louis would be known. So that's -- that's
18 one -- that's the most important way we do it.
19     The other -- actually, I believe it is forward
20 in the report, is what was referred to as the
21 rolling income that's calculated as is described --
22 the last paragraph on page 41. Due to a fence
23 preventing the TWA pilots from bidding into the 777
24 and A300 captaincies until the end of 2011, a
25 different average income line was used to estimate

40 (Pages 157 to 160)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

161

1    the impacts during April 2002 to 2012.
2       So what that says is, because the TWA pilots
3    were prevented from holding these other positions,
4    we leave them out of the rolling average that we
5    calculate. And so, if moving somebody from the
6    middle of the list to the very top of the list would
7    have put them in the range, obviously, of holding
8    the best paying job, we still only use the average
9    that includes positions -- only positions that they
10   were enabled -- were allowed to hold in St. Louis,
11   so --
12      Q     Now that list restriction that you
13   talked about with the 777 and A300 captaincies,
14   that's not part of the St. Louis fence; correct?
15      A     Not specifically. It was prior to the
16   bidding restrictions.
17      Q     So what you do to try and take into
18   account the St. Louis fence is what you pointed to
19   on pages 43 and 44; correct?
20      A     That's correct.
21      Q     Is there any other way in your analysis
22   that you try to take into account the operation of
23   the St. Louis fence?
24      A     That is the -- that is the way -- using
25   a rolling average was one way in which, you know, we

162

1    attempted to account for people who are in different
2    bases, but this -- this -- this mechanism that I
3    just talked about where we expand the bidding range,
4    and if a pilot is not able to hold a position with
5    an increased seniority number, we zero the impact on
6    the pilot for the month, is the main way we
7    accounted for the functioning of the -- it is the
8    way -- it is the main way that we account for the
9    functioning of the St. Louis fence.
10      Q     So in every list that you proposed that
11   you say might have been agreed upon had ALPA done
12   different things, is it true that you maintain the
13   same relative order of the TWA pilots compared to
14   the list they had at TWA?
15      A     That's correct.
16      Q     And does Supplement CC maintain the
17   same relative order of the TWA pilots relative to
18   the order they were in at TWA?
19      A     That's correct.
20      Q     Now, if the St. Louis fence -- your
21   understanding is that it prevents American Airlines
22   pilots from bidding for positions in the St. Louis
23   domicile; correct?
24      A     That's correct.
25      Q     And is it your understanding that all

163

1    of the TWA pilots were consolidated into the
2    St. Louis domicile?
3       A     For some time, yes.
4       Q     So given that if I gave every TWA pilot
5    an additional thousand rankings on the seniority
6    list, is it true that the TWA pilots are only
7    competing against other TWA pilots within the
8    St. Louis domicile?
9       A     If that thousand number is also
10   included in the St. Louis fence as it was. I think
11   I said -- I'm pretty sure I said that I didn't
12   believe that that's what the parties would agree to.
13   So it really is apples and oranges. What I said was
14   quite different.
15      Q     My question is not about what you said.
16   My question is about, if I gave an additional
17   thousand rankings to each TWA pilot on the seniority
18   list, is it true that the TWA pilots are just
19   competing against the other TWA pilots within the
20   St. Louis domicile?
21      A     Well, if the St. Louis cell was part of
22   this alternate of seniority rank -- seniority
23   integration that you are talking about, then -- then
24   that would be true.
25      Q     Is the St. Louis fence a component of

164

1    the Salamat damage model as it appears in Supplement
2    CC?
3       A     No, it's not.
4          THE WITNESS: You want to take a quick
5    break?
6          MR. TOAL: Let me just finish this
7    line.
8          THE WITNESS: Sure.
9    BY MR. TOAL:
10      Q     With respect to the TWA pilots
11   operating under Supplement CC, would you agree that
12   for any time period during which they were employed
13   by American Airlines, the TWA pilots are not
14   sustaining damages by virtue of their position on
15   the integrated seniority list?
16      A     I'm sorry. I don't understand. I
17   don't think I agree, but maybe I don't understand
18   the question properly. I -- I know I don't
19   understand the question.
20      Q     Well, when the TWA pilots within the
21   St. Louis cell are bidding, is what's important to
22   whether they win a particular bid their absolute
23   number on the list or their number relative to the
24   other people who are bidding?
25      A     For equipment bidding under the

41 (Pages 161 to 164)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

165

1 St. Louis fence in Supplement CC?
2    Q    For any type of bidding.
3    A    Well, under the -- well, no.  Under the
4 St. Louis fence, they are only bidding against TWA
5 pilots.
6    Q    So during the period in which the
7 St. Louis fence was in operation, if the TWA pilots
8 had a lower position on the ranking relative to the
9 American Airlines pilots than you think they should
10 have had, how would that damage the TWA pilots
11 during the period that they were employed by
12 American Airlines?
13    A    Well, we'll have to go back to what I
14 originally started off with talking about how it is
15 that we value seniority in the first place given
16 people have different lifestyle choices.
17       You know, people's earnings are -- are a
18 product, first of all, of how many hours they work.
19 And you ask what contributes to how many hours they
20 work. Part of that is choice.  Part of that is
21 whether they are reserve or a line holder.  A big
22 part of that is what their base is.  The St. Louis
23 base predominantly flew much fewer hours as line
24 holders than the other bases did.  So by preventing
25 a TWA pilot from flying the exact same job but

166

1 restricting him to St. Louis meant he was going to
2 fly fewer hours than he would've had he had more
3 seniority and was able to bid system-wide, number
4 one, you know.
5       Number two, you -- you've restricted the pilot
6 to one base, and so one of the most important ways
7 that pilots exercise their seniority is to choose
8 their domicile.  And so, you know, one of the things
9 I said was, you know, pilots who are earning more
10 than the average income for their cohort are
11 sacrificing lifestyle relative to what's available
12 to the people and their cohort.  And so, by saying
13 you can only bid in one junior base where you will
14 have more seniority, you've sacrificed the value of
15 being able to choose other bases.  And so, this is
16 one of those lifestyle costs.  That means that if
17 you are above the average, as the TWA pilots were,
18 the lifestyle impact -- that is they couldn't choose
19 other bases.  They couldn't choose other schedules.
20 And they couldn't, you know, bid outside of one
21 domicile.
22       So I'm hoping this answers your question.
23    Q    And other than --
24    A    -- in terms how they were damaged.  I
25 mean, they were damaged because, you know, they

167

1 weren't able to exercise their seniority in a way
2 that might be most optimal for them individually.
3 They were told where they could work -- where they
4 could --
5    Q    Other than what you've described, can
6 you think of any other way a TWA pilot within the
7 St. Louis domicile could be damaged --
8    A    Well, damaged financially or damaged in
9 lifestyle?
10    Q    -- could be damaged during the period
11 that they were employed by American Airlines other
12 than what you testified to?
13    A    That would be from 2002 to -- until
14 today?  When you say when they were employed by
15 American Airlines?
16    Q    Yes.
17    A    Any other way they could have been
18 damaged financially or in terms of, you know,
19 compromised lifestyle?  Choices that they weren't
20 allowed to make, you know, the same as the other
21 American Airlines pilots?  Well, I mean, those are
22 financial damages and lifestyle damages, and people
23 had all kinds of, you know, other forms of harm that
24 presumably they suffered as a result of, you know,
25 having to -- having to be restricted to one base.

168

1 The only ones I'm really concerned with are the
2 financial ones, you know, lifestyle and income.  You
3 know, to the -- the fact is they're interchangeable
4 and so you always have to consider them as the same
5 thing.
6    Q    Would -- would you agree that a TWA
7 pilot in the St. Louis domicile is not going to
8 suffer damages during the operation of the St. Louis
9 fence because an American Airline pilot with a
10 higher position on the list came in and took their
11 preferred position?
12       MR. JACOBSON: I object to the form of
13 the question.  I don't understand it.
14       THE WITNESS: I'm sorry.  I don't
15 understand the question.  What -- can you ask it --
16 BY MR. TOAL:
17    Q    Can you conceive of any way during the
18 operation of the St. Louis fence that a TWA pilot
19 could be damaged by losing out in -- in the bidding
20 to an American Airline pilot?
21    A    Under Supplement CC as it actually
22 occurred?
23    Q    Yes.
24    A    Under Supplement CC, with the St. Louis
25 fence as it occurred in -- in -- in Supplement CC,

42  (Pages 165 to 168)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

169

1  no. American Airlines pilots, you know, bid outside
2  of St. Louis, so I -- I would have to say an
3  American Airlines pilot could not directly have
4  taken work from a TWA pilot.
5      Q    And did you take that fact into account
6  in your analysis?
7      A    But -- but that's -- that's not what
8  the analysis was. The analysis was to say, under
9  Supplement CC with those fences in place, versus
10 another seniority integration with a different set
11 of bidding restrictions related to but different
12 from those in Supplement CC, it is the difference
13 between those two that create the damages. Not --
14 not whether American Airlines pilots could have done
15 anything under Supplement CC.
16     So I -- I think maybe I'm a little confused
17 about what -- what type of damage you might be
18 talking about because we are talking about two
19 different things.
20     Q    Does your analysis assume that the
21 St. Louis fence would have taken a different form?
22     A    It does.
23     Q    And is that described in your report
24 somewhere?
25     A    It is.

170

1      Q    Where is that?
2      A    If you go to page 32, it goes into the
3  history of bidding restrictions.
4      Sorry. I'm sorry this does go on for some
5  time. Let me get to the punchline here.
6      Q    Let me direct your attention to page
7  35.
8      A    Sure. Yes, okay.
9      Q    Do you see in number four, you indicate
10 that TWA pilots would not have been prevented from
11 bidding outside the St. Louis base?
12     A    That's correct.
13     Q    Is that the only change that your model
14 assumes to the operation of the St. Louis fence?
15     A    Well, no. Number one and two, under
16 Supplement CC, the 30 percent figure was a -- was a
17 maximum. It was the TWA pilots who could not hold
18 any more than that number of positions. They were
19 only allowed in St. Louis, and that was the number
20 of positions that were going to be put in St. Louis.
21 What I've said is, well, that might be fine as a
22 floor, and all the reasoning behind why the TWA
23 could not agree to that as a maxima are up ahead.
24 It is different that it is a floor and not a maxima,
25 and it is different in that they are not restricted

171

1  from bidding outside of St. Louis.
2      Q    And where in Supplement CC, did you get
3  the understanding that the TWA pilots were prevented
4  from bidding outside the St. Louis base?
5      A    That was just my understanding from
6  Supplement CC. I have to go back to -- my
7  understanding is the only way -- that understanding
8  came from Supplement CC directly. My -- my only
9  way I believe that any St. Louis pilot was able to
10 get outside of St. Louis was when they returned from
11 furlough. Pilots who came back after furlough were
12 able to bid anywhere within the system, so it was
13 not until very late in 2000, somewhere around 2008,
14 you start seeing St. Louis pilots anywhere other
15 than St. Louis, except for one other pilot, which I
16 don't understand how that pilot ended up with a JFK
17 base. Maybe they were a management pilot, or maybe
18 it was a mistake. I don't know.
19     Q    Okay. Other than items one, two, and
20 four on page 35 that we just reviewed, is there any
21 other respect in which your model modifies the
22 operation of the St. Louis fence as it appears in
23 Supplement CC?
24     MR. JACOBSON: I object to form. Are
25 you meaning excluding all -- what he just testified

172

1  to in the last 20 minutes?
2      THE WITNESS: Those three -- these four
3  conditions are what I assume are the conditions that
4  the pilots would have agreed to. One, two and four
5  are different from Supplement CC. Number three is
6  different from Supplement CC only in date. There
7  was a drop-dead date for the wide-body captain or
8  the wide-body position protection that extended to
9  both captains and first officers under Supplement
10 CC. I assume they would have agreed to, you know --
11 BY MR. TOAL:
12     Q    I'm only asking about any respects in
13 which your model assumes a modification of the
14 St. Louis fence.
15     Is there anything other than items one, two
16 and four here that constitutes a modification in the
17 Salamat model to the way the St. Louis fence
18 operated?
19     A    No. By the St. Louis fence, you just
20 mean specifically that that St. Louis cell or do you
21 mean all of the bidding restrictions that were part
22 of Supplement CC? Because they were discussed
23 together.
24     Q    I just mean -- when I refer to the
25 St. Louis fence, I'm talking about the proposition

43 (Pages 169 to 172)

DEGNAN & BATEMAN
(856) 232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

173

1  that American pilots can't bid into the St. Louis
2  domicile.
3      A    Those -- those three would be
4  different, yes.
5      Q    Okay.
6      A    And I think those are the only three
7  important differences.
8      Q    To your -- to your understanding,
9  Supplement CC prevents American Airlines pilots from
10  bidding into the St. Louis domicile; correct?
11      A    That's correct.
12      Q    And your Salamat model also presumes
13  that American Airline pilots would not have the
14  ability to bid into the St. Louis domicile; correct?
15      A    No. It -- it assumes that all pilots
16  can bid anywhere within the system.
17          MR. TOAL: We can go off the record.
18          VIDEO SPECIALIST: The time is now
19  3:00 and this ends this number three.
20          (Brief recess.)
21          VIDEO SPECIALIST: The time is now 3:24
22  and we are back on the video record.
23  BY MR. TOAL:
24      Q    Mr. Salamat, before the break we were
25  talking about whether your Salamat model had some

174

1  version of a St. Louis fence. Do you recall that
2  testimony?
3      A    I do.
4      Q    And you -- you reflected in your report
5  at page 35 at number four that the TWA pilots would
6  not have been prevented from bidding outside the
7  St. Louis base; correct?
8      A    That's correct.
9      Q    And you testified that in your Salamat
10  model, American Airlines pilots would also be able
11  to bid into the St. Louis base; correct?
12      A    That's correct.
13      Q    And so that's the equivalent of not
14  having a St. Louis fence; correct?
15      A    I -- I wouldn't -- I wouldn't -- I
16  don't know if I would go that far. You know, the
17  St. Louis fence was the mechanism by which they
18  guaranteed a number of positions for the TWA pilots.
19  So the -- there is the -- there is two parts to it.
20  There is the fact that it was in St. Louis and then
21  there is the fact of the guarantee. I maintain the
22  guarantee, but just, you know, didn't -- didn't
23  have -- have it specific to the St. Louis base. So
24  the number of positions guaranteed would remain the
25  same. They just wouldn't necessarily have to be in

175

1  St. Louis.
2      Q    So in your Salamat model, I understand
3  that you have a guaranteed number of positions for
4  the TWA pilots.
5      A    Yes.
6      Q    But you don't have any sort of
7  St. Louis fence operating in either direction;
8  correct?
9      A    That's correct.
10      Q    And did you have any information
11  suggesting to you that the APA would have been
12  willing to agree to a seniority integration list
13  that didn't have a St. Louis fence?
14      A    Not specifically any information that
15  they would have been able to -- that they would have
16  been willing to that -- to that specific guarantee
17  arrangement.
18      Q    Did you generally have any information
19  to that effect?
20      A    Well, they -- they generally had
21  information in Supplement CC that they were willing
22  to protect some number of positions, so that much is
23  -- is not in contention. And they said, I believe,
24  in their first proposal even, that they were
25  prepared to guarantee the TWA pilots access to some

176

1  number of positions so they had been consistent in
2  -- in the negotiations that they were prepared to do
3  that.
4      Q    So I'm not talking about the
5  guarantees. I'm talking about the concept of a
6  fence that prevents people from bidding in or
7  bidding out.
8      A    Well, the St. Louis fence came after
9  some of their first proposals, and so I don't -- I
10  don't believe that even their first proposals where
11  they were proposing to protect some positions was
12  tied to St. Louis. I believe that particular
13  construct came later. The fact that the guaranteed
14  positions would be tied to a St. Louis fence, I
15  believe, was -- was something that came up later in
16  the negotiations and wasn't entangled to
17  their intention to protect positions. If it -- if
18  it was -- it wouldn't have been there in their -- it
19  would have been there in their first proposals.
20      Q    Is it your conclusion that had ALPA
21  pursued the strategies that you outline in your
22  report, that at the end of the day, the TWA MEC and
23  the APA would have agreed to a seniority integration
24  agreement that didn't contain a St. Louis fence?
25      A    I -- I mean, by St. Louis fence, do you

44  (Pages 173 to 176)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

177

1  mean that specific method of protecting jobs or any
2  job protections at all?
3      Q    When I refer to the St. Louis fence,
4  I'm referring specifically to the inability of
5  American Airlines pilots to bid into the St. Louis
6  domicile.
7      A    Well, the TWA pilots had proposed
8  protections that didn't restrict them to St. Louis.
9  The American Airlines pilots had proposed
10 protections for the TWA pilots that didn't include
11 the TW -- the St. Louis fence, so I have to conclude
12 that, yes, they would have been able to.
13     Q    And you're -- not -- not just that they
14 would have been able to, but your conclusion is that
15 if they had continued to negotiate and the ALPA had
16 pursued all the actions you outlined in your report,
17 that that's the structure of the agreement that the
18 parties would have reached; correct?
19     A    I think it is more probable than not.
20     Q    Do you know which side of the
21 negotiations proposed the St. Louis fence?
22     A    I do not.
23     Q    Do you know if the TWA MEC would have
24 agreed to any integration proposal that did not
25 include a provision preventing American Airlines

178

1  pilots from bidding into the St. Louis domicile?
2      A    Well, as -- as I say, the rightful
3  place proposal, which was their most comprehensive
4  position, didn't include a specific protection of
5  St. Louis. It did include protection of jobs, but
6  not necessarily specific to St. Louis.
7      Q    You said before the break that the TWA
8  pilots in St. Louis were limited to fewer hours than
9  they would have been able to fly other domiciles.
10 Do you recall that testimony?
11     A    I'm -- I'm not sure that's exactly what
12 I said, but it did appear when we went back and
13 looked at the -- the flying history, that line
14 holders in St. Louis got fewer credit hours than
15 line holders at other bases for the same equipment.
16     Q    Is that an analysis that's presented in
17 your report?
18     A    It is reflected in the manner in which
19 the average income increases as you move up the
20 seniority list and you get past the range where the
21 TWA pilots are for pilots flying essentially the
22 same position. It is the only -- it's the most
23 common reason why the income goes up at the higher
24 end once you get north of where the senior TWA pilot
25 is, is that you now find pilots who are

179

1  predominantly more line holders and flying more
2  hours.
3      Q    Have you done any analysis to compare
4  the average earnings of TWA pilots before the
5  transaction with American Airlines and after the
6  transaction with American Airlines?
7      A    I have not.
8      Q    Do you have the information necessary
9  to do that analysis?
10     A    I -- I don't know that I do.
11         (Salamat-13  Supplement CC marked for
12     identification.)
13 BY MR. TOAL:
14     Q    I'm going to mark for you a copy of the
15 document entitled Supplement CC, and if you can let
16 me know if you've seen this document before.
17         MR. JACOBSON:  Is this Exhibit 13?
18         MR. TOAL:  Yes, Salamat Exhibit-13.
19         THE WITNESS:  I believe I have.  The --
20 the -- the copy I have is not formatted the same,
21 but I have no reason to believe that it is
22 different, that the text is any different than this
23 one.
24 BY MR. TOAL:
25     Q    You testified previously that your

180

1  understanding of Supplement CC is that it contained
2  some sort of prohibition that prevented TWA pilots
3  from bidding out of the St. Louis domicile; correct?
4      A    That's -- that's my understanding.
5      Q    And can you show me where in Supplement
6  CC you derive that understanding?
7      A    Yeah.  My understanding would -- most
8  likely would have come from the trial transcript.
9  But, more particularly, it came from conversations
10 with one TWA pilot in particular, and that's the
11 historical employment history.
12     Q    Didn't you testify before the break
13 that your understanding of Supplement CC derived
14 directly from your review of the document?
15     A    Yes.
16     Q    Okay.  Are you now saying that your
17 understanding of Supplement CC derived from the
18 trial transcript and conversations with a TWA pilot?
19     A    That was after I wrote the report.
20     Q    What was after you wrote the report?
21     A    The conversation with the -- the TWA
22 pilot in question was after I wrote the report.
23     Q    Which -- which TWA pilot did you have
24 this conversation with?
25     A    His name is Robert Herbst.  Herbst.

45 (Pages 177 to 180)

DEGNAN & BATEMAN
(856)  232-7400

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

181

1    Q    So to the extent you have any
2  understanding of Supplement CC that's reflected in
3  your report, what was that derived from?
4    A    Sorry?
5    Q    To the extent --
6    A    I was looking for --
7    Q    To the extent you have understanding of
8  Supplement CC that's reflected in your report, where
9  would that understanding have been derived from?
10   A    From this document itself and from the
11 employment history of -- of all the American and TWA
12 pilots that was provided by American Airlines.
13 Yeah.  It was probably more of a subtractive issue,
14 but additional TWA pilot captain positions.
15   Q    Where are you referring to on this
16 document?
17   A    I'm on page seven.
18   Q    Where does it say that --
19   A    I'm sorry.  Just bear with me for a
20 moment.  I'm still reading it.
21 Yes.  There -- there does appear to be a
22 condition here which allows TWA pilots to hold a
23 position outside of St. Louis if the number of
24 positions in St. Louis drops below a certain number.
25 So I'm looking at section two -- two, where it says

182

1  in a contractual one in which the number of small
2  wide-body captain line positions declines, the most
3  junior TWA pilots holding such positions outside of
4  the St. Louis domicile in excess of the number of
5  positions reserved for the TWA pilots will cease to
6  be protected.
7  So that would suggest that they were able to
8  bid outside of St. Louis under some conditions.
9    Q    And you also say in your report that
10 your understanding of the number of guaranteed
11 positions attributable to the TWA pilots was both a
12 floor and -- and a ceiling; correct?
13   A    That's correct.
14   Q    So is it your understanding based on
15 Supplement CC that Supplement CC provided that TWA
16 pilots would always have exactly 30 percent of the
17 aggregate number of pilot positions at Dallas/Fort
18 Worth and Chicago?
19   A    Captains.
20   Q    Captain positions?
21   A    Captain positions.  That was the --
22 that was the guaranteed number of captain positions.
23   Q    And in what sense did it operate as a
24 maximum?
25   A    Well, that was based on my

183

1  understanding that they were prevented from holding
2  any equipment outside of St. Louis.  But if I was
3  incorrect in that, then it wouldn't have functioned
4  as a -- as a maximum.  I'm not sure that I am
5  incorrect about that, but I would have to go back and
6  re-read Supplement CC in its entirety to give a clearance to
7  that.
8    Q    Well, if you could you tell me where in
9  Supplement CC you derived your understanding that
10 the number of positions guaranteed to the TWA pilots
11 operated as a maximum?
12   A    Well, sitting here right now, I can't
13 identify it, and so I would have to go back and
14 review Supplement CC in some more detail to refresh
15 myself as to where I got that understanding from.  I
16 certainly had that understanding supported by the
17 fact there was only 30 percent of those positions
18 made -- only 30 percent of the captain positions of
19 those two bases were ever occupied by TWA pilots
20 from 2002 to 2012.  So I -- I -- I can't say
21 absolutely that that 30 percent also functioned as a
22 cap.
23   Q    Well, you said that absolutely in your
24 report; correct?
25   A    Sorry?

184

1    Q    That you said absolutely in your
2  report, didn't you?
3    A    That was my belief when I wrote the
4  report, that it was a cap.
5    Q    And as you sit here right now, you are
6  not able to point me to anywhere in Supplement CC
7  that's a source of your understanding?
8    A    Not -- not as I sit here right now.
9    Q    Okay.  Will you review Supplement CC
10 this evening after the deposition?
11   A    I will potentially do that.  This is a
12 very, very tiring exercise, and so I'm probably
13 going to need some sleep tonight, but --
14   Q    Okay.  If I can ask you the same
15 question tomorrow morning --
16   A    And I may give you the same answer, so
17 we will just see where we end up.
18   Q    Do each of your models employ the same
19 construct for how a St. Louis fence would have
20 operated?
21   A    By guaranteeing 30 percent of the
22 positions, yes.
23   Q    But not preventing American Airlines'
24 pilots from bidding into the St. Louis domicile;
25 correct?

46 (Pages 181 to 184)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

185

1      A     That's correct.
2      Q     Okay.  On page 28 of your report, you
3  present something you call a marginal list; correct?
4      A     That's correct.
5      Q     And in creating the marginal list, you
6  state in your report that a list that is only
7  marginally but materially better than Supplement CC
8  served as the model for this list; right?
9      A     That's correct.
10     Q     Why did you impose the condition in
11 your marginal list that it had to be materially
12 better than Supplement CC?
13     A     Well, there had to be harm, number one.
14 And so, as I said, the difference between adding one
15 pilot into the merged group would not have generated
16 any damages at all.  But more particularly, I had
17 to -- I had to say what is, had ALPA pursued all of
18 those actions, what is the minimum change that could
19 be expected?  And so -- as to generate damages
20 stemming directly from the breach.  So this would
21 be, as I said, adding an additional 200 pilots into
22 the merged group.
23     Q     There is nothing in the jury verdict
24 that requires any alternative list to be materially
25 better than Supplement CC; correct?

186

1      A     Just that some pilots had to be damaged
2  and so, therefore, that's material.
3      Q     You are equating some pilots with a
4  material difference?
5      A     If some pilots had not been damaged,
6  the question to the jury I believe was, were TWA
7  pilots harmed by ALPA's breach, and the answer was
8  yes, so --
9      Q     Wasn't the question whether some TWA
10 pilots were harmed?
11     A     I cannot remember the exact wording
12 right now.  Certainly wasn't were all of them.
13     Q     Did you derive your position that any
14 alternative list had to be materially better from
15 Supplement CC from the jury verdict?
16     A     Yes.
17     Q     And did the jury verdict say anything
18 about any breach by ALPA causing a material amount
19 of harm?
20     A     It simply said yes, there had been
21 harm.
22     Q     And you also look at an arbitrated
23 list; correct?
24     A     That's correct.
25     Q     And that represents your estimate of

187

1  what the results of an arbitration of the seniority
2  integration dispute between the APA and the TWA MEC
3  would have looked like; correct?
4      A     That's correct.
5      Q     And at page seven of your report, you
6  say, because -- at the bottom of the page, because
7  some of the litigation and other strategies ALPA
8  failed to employ had at least the potential of
9  compelling arbitration, an arbitrated list is a
10 outcome; correct?
11     A     That's correct.
12     Q     And is that your justification for
13 including an arbitrated list in your analysis?
14     A     Well, there are two justifications.
15 One is -- is a point of comparison to other lists,
16 in that I assume the parties would have contemplated
17 what an arbitrated list would have looked like, and
18 they are just as capable as I am going back and
19 looking at how arbitrators have merged lists in the
20 recent past to the extent that they are similar in
21 the current situation.  So that's number one.
22     And number two is, if an action by ALPA could
23 have resulted in the parties agreeing to an
24 arbitration as the resolution to the -- to the
25 seniority dispute, then the likely outcome of an

188

1  arbitration is also relevant for that reason.  So
2  for those two reasons --
3      Q     Do you have any evidence that the APA
4  contemplated what an arbitrated list would have
5  looked like?
6      A     I do not.
7      Q     And do you have any evidence you can
8  point to that suggests that the APA would have been
9  prepared to arbitrate seniority integration under
10 any circumstances?
11     A     I do not.  Not under the facts as they
12 occurred.
13     Q     And do you have any evidence that the
14 APA would have been prepared to agree to arbitration
15 of the seniority integration dispute under any set
16 of circumstances?
17     A     I have no direct or indirect evidence
18 that they would have agreed, given the specific
19 circumstances, no.  I simply say that, given
20 additional pressure being brought to bear in the
21 negotiation, there was nothing that prevented the
22 APA from negotiating to decide to arbitrate the list
23 as a -- as a resolution for the dispute.
24     Q     Do you know whether the APA had a
25 policy against arbitration of seniority integration?

47 (Pages 185 to 188)

9914249b-ddc9-43a3-9047-7f58754f5217

RIKK SALAMAT

189

1    A    I'm -- I'm not aware of any such
2  policy.
3    Q    Would it -- would it have affected your
4  analysis if the APA had a policy against arbitration
5  of seniority integration?
6    A    Policies change, so probably not.  You
7  know, parties can always say, well, this is what we
8  need to do and so we need to change the policy in
9  order to accommodate the situation at hand, so no.
10    Q    And you are not aware of any instance
11  in which the APA has arbitrated a seniority
12  integration dispute; correct?
13    A    I'm not aware of any, no.
14        (Salamat-14  Deposition transcript of
15    John Darrah marked for identification.)
16  BY MR. TOAL:
17    Q    Mr. Salamat, I'm going to show you a
18  document I've marked as Salamat Exhibit-14, which is
19  a copy of the deposition of John Darrah.
20        Do you know who Mr. Darrah is?
21    A    I do not.
22    Q    Mr. Darrah was the president of the APA
23  at the time of the TWA acquisition.
24    A    Okay.
25    Q    Let me direct your attention to page 48

190

1  of his testimony.
2    A    I only have 44 pages.  Oh, wait.
3    Q    Using the numbers on the -- on the
4  panes.
5    A    Okay.  Page 48.
6    Q    Okay.  Do you see at line 11,
7  Mr. Darrah is asked, if ALPA had threatened a
8  lawsuit to seek an injunction of the TWA
9  acquisition, would that -- would that have made the
10  APA more receptive to binding arbitration of
11  seniority integration?  And there is an objection,
12  and the answer is, yeah.  There is nothing that
13  would have been done by anybody that would have had
14  APA agree to binding arbitration.  There is no way
15  the politics at APA would have gone for that.
16        Do you see that?
17    A    Yes.
18    Q    And do you have any information to
19  dispute that?
20    A    Well, this is just one man's opinion of
21  what he would -- what he would have done in a
22  hypothetical circumstance.  It doesn't tell me
23  anything about what -- what actually would have
24  occurred had ALPA undertaken any actions that we are
25  talking about.  I mean, this is someone speculating

191

1  about what they would have done in a circumstance
2  that didn't arise.
3        So I don't think it would change my opinion at
4  all.  I mean, I'm going to assume, as I said before,
5  that additional pressure being brought to bear on
6  the negotiation would have caused the APA to move
7  their position in a way that moved towards the TWA.
8  So whether that means they would have agreed to an
9  arbitration, I can't say.  Is it impossible that
10  some set of circumstances have made that a
11  preferable outcome to continuing a seniority
12  dispute?  I can't say.  And I don't think this man
13  can say either.  He can speculate about what would
14  have happened in an alternative universe.
15    Q    And that's exactly what you are doing;
16  correct?
17    A    And that's exactly what I'm doing.
18    Q    Now, if it could be established that
19  the APA would not have agreed to arbitration of
20  seniority integration under any circumstances, would
21  that have changed your analysis of the top of the
22  range for a merged seniority integration list?
23    A    I'm not sure it would have.  I mean, I
24  believe that the top of the range would have to
25  be established by some reference to the best

192

1  possible outcome that came from previous mergers,
2  merger agreements, and not -- by that I mean not
3  unilateral.  And so the best -- the -- the -- an
4  arbitrated list most favorable to the APA as any
5  that had ever occurred would be a reasonable top end
6  of the range.  There would be no point agreeing to
7  anything better than that because at that point you
8  may as well have gone to arbitration.  So I believe
9  that's a reasonable top end of the range.
10    Q    Are you aware of any situation in which
11  a union in a seniority integration dispute that
12  believed itself to have a unilateral right to impose
13  a seniority integration list, agreed to arbitration
14  of the seniority integration dispute?
15    A    I'm not -- I'm not aware of a
16  comparable situation, no.
17    Q    Now, you also say in your report at
18  page 15, that in addition to the models that you
19  present in your report, many more lists were
20  considered; correct?
21    A    That's correct.
22    Q    And what did those lists look like?
23    A    They were different variations of -- of
24  category groupings.  They were different numbers of
25  adding and subtracting pilots from the top end, from

48  (Pages 189 to 192)

DEGNAN & BATEMAN
(856)  232-7400