# EXHIBIT 10

# PART 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,

                            Plaintiffs,

        vs.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,

                            Defendant.

                ------------------
                January 22, 2013
                ------------------

                Oral sworn deposition of HENRY
FARBER, ASHFELTER & ASHMORE, 32 Nassau Street,
Princeton, New Jersey  08540, was taken at the law
office of Archer & Greiner, 700 Alexander Park,
Princeton, New Jersey, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:43 a.m., there being present:

        GREEN JACOBSON, P.C.
        BY: ALLEN P. PRESS, ESQUIRE
        7333 Forsyth Boulevard
        St. Louis, Missouri  63105
        (314) 862-6800
        Attorneys for Plaintiff
        TRUJILLO, RODRIGUEZ & RICHARDS, LLC
        BY: LISA RODRIGUEZ, ESQUIRE
        258 Kings Highway East
        Haddonfield, New Jersey  08033
        (856) 795-9002
        Attorneys for Plaintiff

    D E G N A N & B A T E M A N,  I N C.

82109aa4-8378-4731-b7d1-08d43130cdc1

```
 1          PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
            LLP
 2          BY: DANIEL J. TOAL, ESQUIRE
            JULIE ROMM, ESQUIRE
 3          1285 Avenue of the Americas
            New York, New York  10019
 4          (212) 373-3869
            Attorneys for Defendant, ALPA
 5
            KATZ & RANZMAN, PC
 6          BY: DANIEL M. KATZ, ESQUIRE
            4530 Wisconsin Avenue N.W., Suite 250
 7          Washington, D.C.  20016
            (202) 659-4656
 8          Attorneys for Defendant, ALPA
 9   Also present:  Janet Halpern
                    James Bateman, CLVS
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25          D E G N A N  &  B A T E M A N ,  I N C.
```

82109aa4-8378-4731-b7d1-08d43130cdc1

```
                                      3
 1              I N D E X
 2    Witness                    Page
 3    HENRY FARBER
 4      By Mr. Toal                 6
 5            E X H I B I T S
 6
 7    Marked for I.D.             Page
 8    Farber-1   Expert report       6
 9    Farber-2   Report of Rikk Salamat    13
10    Faber-3    Salamat's calculation of    52
11        damages based on Farber model
12    Farber-4   Copy of the jury verdict    87
13    Farber-5   TWA pilot seniority        104
14        integration summary
15    Farber-6   Document from Tuck Business   164
16        School regarding TWA merger
17    Farber-7   Deposition transcript of John   177
18        Darrah
19    Farber-8   Testimony of Jeff Brundage    182
20    Farber-9   Deposition transcript of Don   187
21        Carty
22    Farber-10  Document regarding Flying    234
23        Tigers Airlines and Seaboard
24        World Airlines
25    Farber-11  Letter dated July 18, 2001    244
```
```
                                      4
 1        between Ed White and Michael
 2        Day
```

```
                                      5
 1           VIDEO SPECIALIST: Today is
 2    January 22nd, 2013, and we are here in Princeton,
 3    New Jersey, and this is the videotaped deposition of
 4    Henry Farber, taken by the plaintiff -- I'm sorry --
 5    the defendant, in the matter of Brady, et al. versus
 6    Air Line Pilots Association, filed in United States
 7    District Court, Court of New Jersey, Camden
 8    Vicinage, number 02-2917. My name is Jim Bateman
 9    from Degnan & Bateman, and I'm the certified legal
10    video specialist. The certified court reporter is
11    Jean Delaney, also from the same firm.
12           We are now going on the record and the
13    time is 9:43. Would counsel please announce their
14    appearances for the record.
15           MR. TOAL: Dan Toal from Paul, Weiss,
16    Rifkin, Wharton & Garrison on behalf of defendant,
17    ALPA. With me is my colleague, Julie Romm.
18           MR. KATZ: I'm Daniel Katz of the
19    Washington D.C. law firm, Katz & Ranzman,
20    representing defendant, ALPA.
21           MR. PRESS: Allen Press is here for the
22    plaintiffs.
23           MS. RODRIGUEZ: Lisa Rodriguez, also
24    for the plaintiffs.
25           VIDEO SPECIALIST: Would the court
```
```
                                      6
 1    reporter please swear in the witness.
 2           HENRY FARBER, having been duly sworn,
 3    was examined and testified as follows:
 4           VIDEO SPECIALIST: You may proceed.
 5    BY MR. TOAL:
 6       Q    Good morning, Professor Farber.
 7       A    Good morning.
 8           (Farber-1  Expert report marked for
 9        identification.)
10    BY MR. TOAL:
11       Q    I'm going to mark for you a copy of
12    your expert report you submitted in this case.
13       I'm going to mark this document as Farber
14    Exhibit-1. If you could, tell me if this is, in
15    fact, your expert report.
16       A    It appears to be my report.
17       Q    Okay. And is that your signature on
18    the bottom of page 22 of this report?
19       A    Yes.
20       Q    This -- this report contain all the
21    opinions that you intend to offer in this case?
22       A    Yes.
23       Q    Do you have any current plans to do
24    more work in connection with this case?
25       A    No current plans unless more
```

DEGNAN & BATEMAN
(856)  232-7400

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

**7**

1  information is made available that is relevant.
2      Q    And what sort of information do you
3  contemplate might be made available that would be
4  relevant?
5      A    Well, there could be information on --
6  I imagine if someone showed me a relevant
7  arbitration award that we had not seen. But I have
8  -- I have no current plan to do any further work.
9      Q    And do you have any current plans to
10  offer any opinions that are not reflected in this
11  report?
12      A    No.
13      Q    Since the time you submitted this
14  report on October 12th, 2012, have you done any
15  additional work?
16      A    No.
17      Q    Now, are you expressing in your report
18  any opinion on the quantity of damages that you
19  claim the members of the class sustained?
20      A    Quantity in dollars?
21      Q    Yes.
22      A    No.
23      Q    Do you have any opinion on the -- the
24  quantity of damages that you say members of the
25  class sustained in terms of dollars?

**8**

1      A    No.
2      Q    Do you have any opinion on what the
3  proper methodology would be for trying to quantify
4  in dollar terms the -- the damages that you say
5  members of the class sustained?
6      **MR. PRESS: I object to the form of the**
7  **question. He has no opinion on that. If you're**
8  **asking him to sit here and think about the issue and**
9  **articulate the opinion, he can't do that, and I**
10  **object to the form of the question.**
11      **THE WITNESS: I have not formulated any**
12  **opinion on that, no.**
13  **BY MR. TOAL:**
14      Q    Have you thought about what the proper
15  methodology for quantifying damages would be?
16      A    I have not done any analysis, no.
17      Q    Is there any reason that in your report
18  you don't attempt to quantify damages to the members
19  of the class?
20      A    Yes.
21      Q    And what's that reason?
22      A    I was not asked to do that.
23      Q    Were you asked not to do that?
24      A    I was -- I was -- I -- I did what I was
25  asked, and I was not asked to calculate dollar

**9**

1  damages.
2      Q    And my question to you is whether you
3  were asked not to try and quantify the damages that
4  you say were sustained by the class.
5      A    No. No.
6      Q    Is that something you believe you would
7  be able to do given your qualifications?
8      A    Yes.
9      Q    And how would you go about doing that?
10      **MR. PRESS: I object to the form of the**
11  **question.**
12      **THE WITNESS: I've not thought about**
13  **that.**
14  **BY MR. TOAL:**
15      Q    Can you think about it now?
16      A    It might take a while.
17      Q    How long do you think it would take?
18      A    I mean, that -- frankly, it could take
19  days. I just -- it's -- it's not a straightforward,
20  at least for me it wouldn't be a straightforward
21  issue. I -- I think what I did in my report is an
22  important piece of that. Ultimately I could talk to
23  you about the theory of how one calculates damages
24  in a case like this. But without further work, it
25  would be speculation.

**10**

1      Q    Well, based on -- as -- as you sit here
2  today, what thoughts, if any, do you have on how you
3  would take your report and proceed from that report
4  to attempt to quantify damages?
5      **MR. PRESS: Let me object to the form**
6  **of the question. You asked this now two or three**
7  **times, and he told you that it is a complex issue**
8  **and you're asking him to speculate.**
9      **THE WITNESS: I -- I don't have any**
10  **specific thoughts as I sit here today.**
11  **BY MR. TOAL:**
12      Q    Do you have any general thoughts as you
13  sit here today?
14      **MR. PRESS: Object to the form of these**
15  **questions. It's outside of what he was asked to do.**
16      **MR. TOAL: Counsel, you're doing**
17  **speaking objections.**
18      **MS. RODRIGUEZ: No, no, no.**
19      **MR. TOAL: You can just object to the**
20  **form of the question.**
21      **MR. PRESS: Well, I'm going to tell you**
22  **what's wrong with the form so you can ask a proper**
23  **question. I'm sorry, Dan, but that's the way that I**
24  **object, and I object to these. You are asking him**
25  **to speculate, and he's already told you that.**

4 (Pages 7 to 10)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

**11**

1    THE WITNESS:  What I would tell you in
2  general terms would not be -- would not be specific
3  to this case at all.  It would be just in general.
4  I can talk to you about how I think about damages in
5  a case.  Do you want me to do that?
6  BY MR. TOAL:
7      Q    Do you have thoughts about how you
8  would quantify damages in a case like this, whether
9  general or specific?
10     A    The only general thought I would offer
11  is that in -- in a case like this, the first order
12  of business would be to ask what would have happened
13  but for the alleged bad act, in this case, the
14  failure of duty fair representative to say what
15  would have the earnings of the pilots have been.
16  And I would start by that because seniority is such
17  an important component of their earnings in figuring
18  out what the seniority, the merged seniority list
19  would have looked like.  From that, I would have
20  used that as an important component of calculating
21  damages.
22     Q    And do you have any thoughts about how
23  you would determine if any given pilot had increased
24  seniority, what they would have done with that
25  seniority?  Is there any methodology you are aware

**12**

1  of that would allow you -- allow you to determine
2  that?
3      MR. PRESS:  I object to the form of
4  these questions.  Again, you are asking this witness
5  to speculate about things he hasn't considered.
6      THE WITNESS:  I have not thought about
7  that question.
8  BY MR. TOAL:
9      Q    Do you have any experience quantifying
10  damages in a case like this?
11     A    I can't answer that.  I -- I would
12  like -- you need to define the question better.  I
13  -- do I have any -- I have experience calculating
14  damages in cases, yes.
15     Q    And do you believe if you had
16  additional time to think about the question that you
17  would be able to develop a methodology for
18  quantifying damages in a case like this?
19     A    Yes.
20     Q    You reviewed the report submitted in
21  this case by Rikk Salamat?
22     Rikk Salamat.
23     MS. RODRIGUEZ:  S-A-L-A-M-A-T.
24     (Farber-2  Report of Rikk Salamat
25     marked for identification.)

**13**

1    MR. TOAL:  I would mark as Farber
2  Exhibit-2, a copy of the report submitted by Rikk
3  Salamat.
4  BY MR. TOAL:
5      Q    Can you tell me if you've ever seen
6  that report before?
7      A    No.
8      Q    Were you aware that there was another
9  expert that had been retained by plaintiffs in this
10  case?
11     A    I -- I learned that last week.
12     Q    Had you known that at the time you were
13  working on your report, would you have wanted to see
14  that expert's report before submitting your own?
15     A    No.
16     Q    Are you aware of any methodology in
17  economics that would allow you to quantify the
18  likelihood that if circumstances had been different,
19  that an agreement between two parties would have
20  been reached?
21     MR. PRESS:  I object to that question.
22  I'm sorry.
23     THE WITNESS:  Can you repeat the
24  question, please?
25  BY MR. TOAL:

**14**

1      Q    Did you understand the question?
2      A    No.
3      Q    Okay.  Are you aware of any methodology
4  in the field of economics that would allow you to
5  determine and quantify the likelihood that if
6  circumstances had been different, that two parties
7  who did not reach an agreement, would have reached
8  an agreement?
9      A    I can't answer that question.
10     Q    Why not?
11     A    It is too vague.  I -- I don't even
12  know if circumstances had been different.  That can
13  be different in so many ways.  I can't answer that
14  question.
15     Q    Are you aware of any methodology in the
16  field of economics that would allow you to quantify
17  the probability that any two parties would reach an
18  agreement?
19     A    It is still too vague.  Agreement about
20  what?  Where to go to dinner?  What?
21     Q    Are -- are you aware of any methodology
22  that would allow you to predict the likelihood or
23  determine the probability that an agreement would be
24  reached in any -- any field?
25     A    Yes.

5  (Pages 11 to 14)

DEGNAN & BATEMAN
(856)  232-7400

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

15

1    Q    And -- and what -- what methodologies
2    are you aware of that would allow you to do that?
3    A    Well, I've done some work myself on
4    strike activity.  For example, in the labor -- I'm a
5    labor economist, and strike activity in the labor
6    area, you can look at -- I've done -- there is work
7    done on -- in law and economics on the likelihood of
8    a case settling or going to trial.  I've done some
9    of that.  There is models -- there are bargaining
10   models in economics that speak to the question of --
11   of why there are -- why there are disputes that
12   depend on things like asymmetric information.  It
13   depends on the cost to both sides of disputing
14   relative to what they would get if there was -- if a
15   dispute was settled.
16   Q    And do those methodologies allow you to
17   quantify the probability that an agreement between
18   two parties would be reached in those fields?
19   A    With the right data available,
20   sometimes.
21   Q    Do you believe that you would be able
22   to quantify the probability that had there been no
23   alleged breach of the duty of fair representative by
24   ALPA in this case, that the TWA MEC and the Allied
25   Pilots Association would have been able to reach an

16

1    agreement on a seniority integration list?
2        MR. PRESS:  I object to the form of the
3    question.
4        THE WITNESS:  No.
5    BY MR. TOAL:
6    Q    Are you aware of any methodology in the
7    field of labor economics that would allow you to do
8    so?
9    A    Would I have unlimited time and access
10   to resources to perform such an analysis?
11   Q    You -- you would have whatever time the
12   judge allowed you to --
13   A    That's a different question.
14   Q    -- before you needed to submit your
15   expert report.
16   A    That's a different question.  If you
17   ask -- I'm not going to tell you what question to
18   ask, but -- let's just say that's a very hard
19   problem.
20   Q    Do you believe that within the context
21   of this case that you would be able to quantify the
22   probability that an agreement between the TWA MEC
23   and the Allied Pilots Association with regard to
24   seniority integration would have been reached had
25   there been no alleged breach of the duty of fair

17

1    representative?
2    A    No.
3        MR. PRESS:  I object to the form of the
4    question.
5    BY MR. TOAL:
6    Q    And your answer was?
7    A    No.
8    Q    Is there any published research that
9    you are aware of that would allow you to determine
10   the likelihood that two unions would have agreed on
11   seniority integration absent alleged breach of the
12   duty of fair representation?
13   A    No.
14   Q    Were you made aware how the results of
15   your expert report were to be used in the context of
16   this case?
17   A    Yes.
18   Q    And what were you told about that?
19   A    I was told they would be used in
20   calculating the damages.
21   Q    And did you know who would be
22   calculating those damages?
23   A    No.
24   Q    Did you know how those damages would be
25   calculated based on the work that you had done --

18

1    the work that you had done?
2    A    No.
3    Q    Were you interested to know how your
4    work was going to be used in an effort to calculate
5    damages?
6    A    Yes.
7    Q    Did you make any inquiries about how
8    that would be done?
9    A    No.
10   Q    Why not?
11   A    It wasn't what I was asked to do.
12   Q    You agree that the manner in which
13   pilots use their seniority ranking -- withdrawn.
14   Do you agree that pilots make individual
15   choices as to how to use seniority ranking?
16   A    Yes.
17   Q    Have you done any work in the airline
18   industry?
19   A    No.
20   Q    Prior to this case, you hadn't?
21   A    That's correct.
22   Q    And had you done any work concerning
23   seniority integration prior to this case?
24   A    No.
25   Q    Did you do any -- any analysis to

6 (Pages 15 to 18)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

19

1  determine how much variation there is in income of
2  pilots within similar seniority rankings?
3      A    No.
4      Q    Would it be important for you to know,
5  if you are attempting to quantify damages based on
6  an alternative seniority list, how much variation
7  there was in income among pilots with similar --
8  similar seniority levels?
9      A    I haven't thought about it.  I was not
10  asked to do that.
11      Q    And as you think about it now, is that
12  something that would be important for you to know?
13      A    I don't know.
14      Q    In your report you attempt to quantify
15  a best estimate of what an alternative seniority
16  list would have looked like in this case; correct?
17      A    Yes.
18      Q    And you also calculate something that
19  you refer to as upper and lower bounds for what
20  seniority lists in this case would have looked like;
21  correct?
22      A    Yes.
23      Q    Are you able -- are you able to say
24  what the likelihood was that in the absence of any
25  breach of the duty of fair representation, that the

20

1  list you propose as your best estimate would have
2  come about?
3      A    Can you repeat the question, please?
4      (The court reporter read back the
5  pending question as follows:
6      "Question: Are you able -- are you
7      able to say what the likelihood was that in
8      the absence of any breach of the duty of fair
9      representation, that the list you propose as
10      your best estimate would have come about?")
11      THE WITNESS: Yes.
12  BY MR. TOAL:
13      Q    And what is -- what is the likelihood
14  that the list you propose would have come about?
15      A    Well, I have to -- when you say the
16  list I propose, something -- there is thousands of
17  names on the list.  And when you say the list I
18  propose, there could be some slight variation.
19  There's also factored -- how -- I would say it is
20  quite likely that the list I proposed or something
21  quite similar would have -- would have come out.
22      Q    Okay.  Can you quantify the likelihood
23  that a list as -- such as the one you propose or one
24  that is substantially similar would have come about?
25      A    Let me -- let me reframe my answer.  I

21

1  know -- in term -- if -- if you want a precise --
2  when you say likelihood, if you want a probability
3  like .6 or .7 or .8, the answer then to my earlier
4  question should have been no, I can't do that.
5      Q    Can you quantify the probability that
6  any alternative list that was produced in this case
7  would have been somewhere between your upper and
8  lower bounds?
9      A    Without knowing what the particular
10  list was, I can't -- I couldn't know the answer to
11  that.  I -- I do not -- I don't know.  I haven't
12  seen any alternative lists.
13      Q    But you -- you developed an upper and
14  lower bound; correct?
15      A    Yes.
16      Q    And you -- you come up with, in between
17  those bounds, what you view as your best estimate of
18  what an alternative list would have looked like;
19  correct?
20      A    Yes.
21      Q    So what I'm asking is whether you can
22  quantify the likelihood that whatever alternative
23  list would have come about in the absence of a
24  breach of the duty of fair representation by ALPA
25  would have been somewhere between the upper and

22

1  lower bounds that you set out.
2      A    I can't quantify that probability.
3      Q    Can you say that it is greater than
4  50 percent, that -- that any list would have been
5  between the upper and lower bounds that you propose?
6      A    No.
7      Q    Do you know how much Mr. Salamat
8  calculated your model would yield in damages?
9      A    No.
10      Q    Let me direct your attention to Farber
11  Exhibit-2, which is Mr. Salamat's report.
12      Do you have that in front of you?
13      A    Yes.
14      Q    I will come back to that.
15      Let me direct your attention to page 10 of
16  Mr. Salamat's report.  And if I -- I could ask you
17  to take a look at figure 3, which is a -- entitled
18  linear model of probabilities.  Do you see that?
19      A    Yes.
20      Q    Do you likely see in this chart that
21  Mr. Salamat is aggregating probabilities which he
22  defines as increased probabilities that an agreement
23  would have been reached?
24      A    I don't understand his figure at all.
25  I don't know what it is.  I would have -- I don't

7 (Pages 19 to 22)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

23

1  know.
2  **Q**    So, well, I will represent to you that
3  this is Mr. Salamat's effort to aggregate the
4  increased probabilities of an agreement being
5  reached.
6  **A**    I -- I -- I don't know what that
7  phrase, aggregate the probabilities of -- aggregate
8  the increased probabilities of the agreement?  I
9  just don't know what that means.
10  **Q**    Let me ask you, do you know what the
11  proper method is to aggregate probabilities of
12  separate events?
13  **A**    I don't -- I don't understand what the
14  phrase aggregate probabilities means.
15  **Q**    So if Mr. Salamat was to say, for
16  instance, that if ALPA had not insisted that the TWA
17  pilots waive their scope of successorship
18  provisions, that there would have been an increased
19  probability of an agreement between the TWA MEC and
20  the APA of five percent --
21  **MR. PRESS:  Are you finished with your**
22  **question?**
23  **MR. TOAL:  No.**
24  **BY MR. TOAL:**
25  **Q**    -- and if the -- if ALPA had authorized

24

1  an April 2001 legal strategy seeking to delay
2  American Airlines' purchase of TWA assets, that
3  would have increased the likelihood of an agreement
4  being reached by eight percent, are you familiar
5  with the proper methodology for determining what the
6  overall probability of -- the overall increased
7  probability of an agreement being reached would be?
8  **MR. PRESS:  Let me just object to the**
9  **form of the question.  Very confusing.  You are**
10  **asking him basically to comment on a report he told**
11  **you he has not read.  It is horribly unfair, this**
12  **whole line of questioning.**
13  **THE WITNESS:  I have no way of**
14  **understanding -- I -- I don't know what he did.  So**
15  **I -- I couldn't tell you -- I can't tell you**
16  **anything about this.**
17  **BY MR. TOAL:**
18  **Q**    So I'm -- I'm not asking you to tell me
19  about this.  I'm asking you about what the
20  methodology is for taking two events that somebody
21  says would increase the likelihood an agreement
22  being reached had either been pursued in isolation,
23  how you would determine what the overall
24  probability, the overall increased probability of an
25  agreement being reached would have been.  Are you

25

1  familiar with any methodology to do that?
2  **MR. PRESS:  I object to the form of**
3  **your hypothetical.**
4  **THE WITNESS:  I know how to build**
5  **probability models.**
6  **BY MR. TOAL:**
7  **Q**    Do you know how to combine the
8  probabilities of independent events?  So if I say
9  that strategy one would have increased the
10  likelihood of an agreement being reached by five
11  percent and strategy two would have been -- would've
12  increased the likelihood of an agreement being
13  reached by eight percent, and I want to know what
14  the overall likelihood of an agreement being reached
15  if strategies one and two were pursued, is that
16  something you would know how to do?
17  **A**    Yes.
18  **Q**    And do you do that by adding those
19  probabilities together?
20  **A**    I don't know what those probabilities
21  are.
22  **Q**    The increased probability of an
23  agreement being reached under strategy one and the
24  increased probability of an agreement being reached
25  under strategy two.

26

1  **A**    I would have to know what those -- how
2  those increased probabilities had been calculated
3  before I could answer that question.
4  **Q**    Is there any situation in which the
5  proper method to try and determine the overall
6  likelihood of an agreement being reached would be
7  just to add those independent probabilities
8  together?
9  **MR. PRESS:  I object to the form of the**
10  **question.**
11  **THE WITNESS:  I would have to know how**
12  **-- I would have to know how the probabilities are**
13  **calculated.  You haven't defined for me how he**
14  **calculated those probabilities.  So without that**
15  **answer, I can't answer the question.**
16  **BY MR. TOAL:**
17  **Q**    In your analysis, do you take into
18  account the possibility that even if there had been
19  no breach of the duty of fair representation, that
20  no agreement between the TWA MEC and the Allied
21  Pilots Association would have been reached?
22  **MR. PRESS:  Again, I got lost in the**
23  **question.  Can we have it read back or restated?**
24  **BY MR. TOAL:**
25  **Q**    You can answer it if you understand the

8  (Pages 23 to 26)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

**27**

1  question.
2         MR. PRESS:  No.  I object to the form.
3  I didn't understand it, so I assumed the witness --
4         MR. TOAL:  Your objection is noted,
5  Allen.
6         THE WITNESS:  If you could read back
7  the question, that would help me.
8         (The court reporter read back the
9         pending question as follows:
10        "Question:  In your analysis, do you
11        take into account the possibility that even
12        if there had been no breach of the duty of
13        fair representation, that no agreement
14        between the TWA MEC and the Allied Pilots
15        Association would have been reached?")
16        MR. PRESS:  I object to the form of the
17  question.
18        THE WITNESS:  I would answer that yes
19  and no.
20  BY MR. TOAL:
21     Q     Okay.  Can you explain what you mean by
22  that?
23     A     Yes, I can.  Yes -- no, I did not take
24  specific account of that possibility.  But, yes, the
25  analysis the way I framed it was, however an

**28**

1  agreement was reached, absent failure -- absent
2  failing to perform the duty of fair representation,
3  whether it was through a negotiated settlement, or
4  some arbitration, or some other way, my estimate is
5  an estimate of what would have happened.
6     Q     So in your analysis, are you assuming
7  that had there been no breach of a duty of fair
8  representation, that either an agreement would have
9  been reached or there would have been an arbitrated
10  result?
11        MR. PRESS:  I -- I -- I object.  I
12  simply do not understand your question at all.  I
13  object to the form of it.
14        THE WITNESS:  I expect that a merged
15  seniority list would have resulted.  There would
16  have been a merged seniority list.  I take no stand
17  on how it would have come about, but there would
18  have been a merged seniority list.
19  BY MR. TOAL:
20     Q     And what are the -- what -- what are
21  the alternatives for how such a list might have come
22  into being?
23     A     Well, the -- the two alternatives
24  that -- of which I'm aware, which may not be the
25  only, are, one, is they would negotiate an agreement

**29**

1  or, two, they would agree to have a third party, an
2  arbitrator decide what the merged list would be.
3     Q     And are you expressing any opinion as
4  to the likelihood of either of those events
5  occurring?
6     A     No.
7     Q     Now, do you have a view on what damages
8  would be in this case if, even in the absence of a
9  breach of any duty of fair representation, that
10  there would not have been either an arbitrated
11  seniority integration list or an agreement between
12  the TWA MEC and the Allied Pilots Association
13  regarding a merged seniority integration list?
14        MR. PRESS:  I -- I object to the form
15  of the question.  I do not understand what you are
16  asking.
17        THE WITNESS:  As I said before, I
18  assumed there would be a merged seniority list.
19  That's what I assumed.
20  BY MR. TOAL:
21     Q     And in the event that no merged
22  seniority list would have come about through either
23  arbitration or agreement, how would that affect any
24  damage analysis?
25     A     For the airlines to merge, there has to

**30**

1  be a merged seniority list.  So I -- I don't
2  speculate about a world where there wasn't a merged
3  seniority list.  So if there is a merged seniority
4  list, here's what it would look like.
5     Q     But do you have an understanding in
6  this case about whether the Allied Pilots
7  Association had the ability unilaterally to decide
8  on a merged seniority integration list?
9     A     Excuse me?  Please repeat the question.
10    Q     Do you have an understanding in this
11  case about whether -- do you know what the APA is,
12  if I refer to --
13    A     Yes.
14    Q     And what do you understand the APA to
15  be?
16    A     It's -- it is the union representing
17  the airline-- the American Airlines pilots prior to
18  the merger.
19    Q     And do you have an understanding in
20  this case as to whether the APA had the ability to
21  determine unilaterally what a merged seniority
22  integration list would look like?
23    A     No.
24    Q     You don't have any understanding one
25  way or the other?

9  (Pages 27 to 30)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

31

1    **A**    I have an understanding that there was
2    language in their contract which gave them the --
3    which -- which gave them that right in the contract,
4    but how that would have played out in a -- in a --
5    in a negotiation with TWA, with the ALPA, I have no
6    way of knowing.
7        **Q**    Do you have any understanding as to
8    whether the APA believed it had the right to
9    unilaterally determine what a merged seniority list
10   would likely look like in this transaction?
11       **A**    I have no idea what the APA believed.
12       **Q**    Do you have any understanding as to the
13   APA's views on its willingness to arbitrate
14   seniority integration in this transaction?
15       **A**    No.
16       **Q**    Would that be relevant to your
17   analysis?
18       **A**    No.
19       **Q**    Why not?
20       **A**    Because it's very hard to speculate on
21   exactly the form that the negotiations would take
22   had ALPA not failed in its duty of fair
23   representation.  They -- presumably there would have
24   been a negotiation between ALPA and APA, and I
25   really can't speculate as to exactly how that would

32

1    have come out.
2        **Q**    Well, what do you mean you can't
3    speculate as to how any negotiation between the TWA
4    MEC and ALPA --
5        **A**    Let me be more specific.  I don't know
6    whether they would have reached an agreement
7    voluntarily because, after all, TWA had, in their
8    contract with ALPA, an arbitration clause.  They --
9    they may well have wound up in arbitration.  APA may
10   have said, okay, we can't agree.  We need to do this
11   merger.  We'll have an arbitration.  There might
12   have been an arbitration.  There might have been a
13   negotiated settlement.  I just don't know what shape
14   that negotiation would have taken.
15       **Q**    So let me make sure I understand your
16   testimony.  You are not expressing any opinion on
17   the likelihood that the APA would have agreed to
18   arbitrate seniority integration; is that correct?
19       **A**    Correct.
20       **Q**    And you are not expressing any opinion
21   on the likelihood that in any negotiation between
22   the APA and the TWA MEC, even in the absence of an
23   alleged breach of the duty of fair representation by
24   ALPA, that an agreement actually would have been
25   reached; correct?

33

1    **A**    That's correct.  But what I'm saying
2    is, simply again, is that a merged seniority list
3    would have come out of that process one way or the
4    other.
5        **Q**    Although, as you testified previously,
6    your understanding is that the APA had the ability
7    unilaterally under its contract to determine what
8    the seniority integration list would be in the
9    absence of an agreement; correct?
10       **A**    I don't full -- I'm not a lawyer and I
11   don't understand the full ramifications of the
12   clause in -- in the APA contract.  But I do
13   understand there was some language in there
14   suggesting that they didn't need to arbitrate.  But,
15   again, a member on the opposite side, ALPA and the
16   TWA and their contract, had an arbitration clause.
17   How that those -- some -- have to be some middle
18   ground or some give in a negotiation because they
19   would reach agreement.  When I say that I can't -- I
20   can't tell you what the probability they would --
21   they would arbitrate is or what the probability they
22   would reach a negotiated settlement is.  What I'm
23   suggesting is they'd do -- they  would do one or the
24   other.
25       **Q**    Do you have an understanding that as a

34

1    condition of American Airlines acquiring TWA's
2    assets, that it required TWA's pilots to waive the
3    arbitration provision with respect to seniority
4    integration in its collective bargaining agreement?
5        **A**    I saw some statements to that effect,
6    yes.
7        **Q**    And do you have an understanding that
8    the TWA pilots did, in fact, waive the provision in
9    their collective bargaining agreement that provided
10   for arbitration of seniority integration disputes?
11       **MR. PRESS:  I'm just going to object to
12   the form of the question.**
13       **THE WITNESS:  Yes.**
14       **MR. PRESS:  TWA pilots didn't waive
15   anything, but subject to that, you can go ahead and
16   answer.**
17   BY MR. TOAL:
18       **Q**    Your answer is yes?
19       **A**    As -- as I understand it, the ALPA, on
20   behalf of the TWA pilots did that, yes.
21       **Q**    And so your expert report is assuming
22   that a merged seniority list would have come about
23   either through an arbitration between the TWA MEC
24   and the APA or a negotiation between the TWA MEC and
25   the APA; correct?

DEGNAN & BATEMAN
(856) 232-7400

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

35

1    A    My report assumes that -- that there
2    would have been a merged seniority list. I agree
3    that the two ways I can think of sitting here to
4    reach such a merged list are a negotiated agreement
5    or an arbitration, but I am not making any
6    assumption one way or the other on that. I'm simply
7    assuming there would have been a merger of the
8    seniority lists.
9         Q    Well, didn't you agree that a merged
10   seniority list could also come about through a
11   unilateral decision by the APA?
12        A    I don't -- I don't -- I have no view of
13   that. I don't -- I don't -- my view -- my view is
14   to -- this would start out as a negotiation between
15   the APA and ALPA.
16        Q    And as between a list that is
17   unilaterally decided by the APA, a list that is
18   negotiated, or a list that is determined by
19   arbitration, are you expressing any view as to the
20   likelihood of any of those three possibilities?
21        A    My understanding of the negotiation
22   process is -- is that had ALPA performed its duty of
23   fair representation, there would have been -- the
24   process would have started with a negotiation
25   between APA and ALPA.

36

1         Q    Whether that's true or not, are you
2    expressing any view as to the likelihood of a
3    negotiated result, an arbitrated result, or a
4    unilaterally determined seniority list by the APA?
5         A    By definition, once they start
6    negotiating, if they reach an agreement, it is a
7    negotiated agreement.
8         Q    And if they negotiate and it is
9    unsuccessful, then they've got to come up with some
10   other way to determine what the seniority list is
11   going to be. So my question to you is, is whether
12   you are expressing an opinion on the likelihood of
13   any of those three possibilities for how a merged
14   seniority list could come about.
15        A    I'm suggesting that unilateral
16   imposition is not an option I'm considering.
17        Q    And why is that?
18        A    Because there is a negotiation that
19   would take place. Even -- even an arbitrated
20   solution takes place after negotiation.
21        Q    Are you aware of any reason why in this
22   case there could not have been a unilateral decision
23   by the APA with regard to the seniority integration
24   list?
25        A    I have not seen any evidence in the

37

1    industry in the -- quite a number of cases we looked
2    at where there had been a unilateral imposition.
3         Q    Do you know what Supplement CC is?
4         A    Yes.
5         Q    And what is that?
6         A    Supplement CC, as I understand it, is
7    an addendum to the -- to some agreement which
8    specifies how the seniority lists will be merged in
9    the American/TWA case.
10        Q    And how is that determined?
11        A    I don't know precisely. I -- I don't
12   know.
13        Q    Do you have an understanding that
14   Supplement CC was determined unilaterally by the
15   APA?
16        MR. PRESS:  I object to the form of the
17   question.
18        THE WITNESS:  I -- I don't know.
19   BY MR. TOAL:
20        Q    Let me direct your attention to Farber
21   Exhibit-2, which is Mr. Salamat's report.
22        A    Okay.
23        Q    And if you could take a look at page 21
24   of this report.
25        Do you see here, Mr. Salamat, figure eight,

38

1    has a list of post deregulation mergers?
2         A    Okay.
3         Q    And do you see in the last column under
4    arbitrator, he either lists an arbitrator, lists an
5    agreement or lists unilateral?
6         A    Yes.
7         Q    So as to the mergers that he designates
8    as unilateral, do you have any reason to dispute
9    that the seniority integration list in those cases
10   were determined unilaterally?
11        A    I have no idea how this was come up
12   with. I just don't know. I have no opinion.
13        Q    Okay. If you -- if you knew as a
14   matter of fact that the APA had the ability
15   unilaterally to determine what the merged seniority
16   integration list would look like, would that affect
17   your analysis in any way?
18        A    No.
19        Q    Why not?
20        A    Because in a -- I don't think you start
21   a negotiation with the assumption that the person
22   you are negotiating with has unilateral authority.
23   In no sense is that a negotiation. So I start from
24   the view that they will -- had ALPA performed its
25   duty of fair representation, there would have been a

11 (Pages 35 to 38)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

39

1  negotiation. APA may come into that negotiation
2  with the view that their contract gives them a
3  unilateral right. That doesn't necessarily give
4  them the unilateral right. I would have done
5  exactly the same. In fact, my analysis is
6  predicated -- my analysis is not predicated on, but
7  my analysis understands that APA does have this
8  clause in their contract just like TWA had a clause
9  in their contract; TWA pilots had a clause in their
10  contract. And how that would play out in
11  negotiation where both parties are ably -- ably
12  represented is something that, you know, it is hard
13  to speculate on. And the best you could do is the
14  analysis I did.
15      Q    But you have an understanding that the
16  provision in the TWA collective bargaining agreement
17  with regard to arbitration of seniority integration
18  disputes was waived; correct?
19      A    Yes.
20      Q    And I'm asking you to assume just as a
21  matter of fact that the APA had the unilateral
22  ability to determine what a seniority integration
23  list would look like. With that assumption, would
24  that affect your analysis in any way?
25      MR. PRESS: I object to the form. He's

40

1  already answered the question, and I object to your
2  incomplete hypothetical.
3      THE WITNESS: You -- you prefaced your
4  hypothetical with the statement that TWA had waived
5  the right to arbitration. And my -- I'm going to
6  proceed from the view that that was due to ALPA's
7  failure to represent -- that waiver by ALPA was a
8  big part of their failure to represent adequately
9  the TWA pilots. Therefore, I -- I can't -- I don't
10  know what to do with -- with the view that the APA
11  thought it had unilateral authority. If you want to
12  tell me as -- is your -- let me ask you a question.
13  Is your hypothetical that, forget the bargaining,
14  forget everything. God came down and gave the APA
15  the unilateral right to choose what the seniority
16  list would be? Is that --
17  BY MR. TOAL:
18      Q    Yes. Would that affect your analysis
19  in any way?
20      A    Yes. Because if I were asked to say
21  what would have happened had the APA -- had the --
22  had ALPA performed its duty of fair representation,
23  I would have said even ALPA's not more powerful than
24  God, and God came down and gave the APA the
25  unilateral right, and it would have been different,

41

1  sure.
2      Q    And in what way would it have been
3  different?
4      A    I -- I don't know.
5      Q    Well, in that event, would you have had
6  to have taken into account the possibility that no
7  negotiated agreement between the TWA MEC and the APA
8  would have been reached?
9      MR. PRESS: No, wait. Let's be clear
10  on what event you are describing because he just
11  described an event where God came down and powered
12  the union. If that's part of your hypothetical,
13  that's an okay question. If not, I object to the
14  form of it.
15      THE WITNESS: Once God gives APA the
16  power, there is no negotiation.
17  BY MR. TOAL:
18      Q    So let's say, instead of God coming
19  down, American Airlines had said, we will do this
20  transaction if, and only if, the arbitration
21  provision as to seniority integration is waived by
22  or on behalf of TWA pilots. In that event, would it
23  be necessary for you to take into account the
24  possibility that no negotiated result would have
25  been reached?

42

1      A    My analysis does take into account the
2  fact that no negotiated result would have been
3  reached.
4      Q    But the only alternative you consider
5  is that an arbitrated result would be reached;
6  correct?
7      A    That's the only one I -- I can
8  enumerate here, but I take no stand on exactly how
9  the merged seniority list would have been
10  considered -- what the process that led to the
11  merged seniority list being constructed would have
12  been. I simply say there would have been a merged
13  seniority list.
14      Q    Right, but you don't take into account
15  in your analysis the possibility that the APA could
16  unilaterally determine what the merged seniority
17  list would look like; correct?
18      A    I don't accept that as a premise,
19  that's correct.
20      Q    And if you did accept that as a
21  premise, how would your analysis change, if at all?
22      MR. PRESS: Well, how -- how would he
23  know that? I object to the form.
24      THE WITNESS: Your -- your hypothetical
25  now is the APA can impose whatever list they want.

12 (Pages 39 to 42)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

43

1    BY MR. TOAL:
2        Q    My hypothetical is there are at least
3    three options available for -- for determining what
4    a merged seniority integration list would look like.
5    One is the parties could agree to arbitrate the
6    dispute.  Two is that the parties could negotiate
7    and try and reach an agreement consensually.  And
8    three is that the APA had the ability to determine
9    what the merged list would look like.  So if all
10   three options were available, would that affect your
11   analysis?
12       MR. PRESS:  I'm just going to object.
13   You are asking incomplete hypotheticals over and
14   over again.  This one is seriously flawed.  But
15   subject to that, you can answer.
16       THE WITNESS:  I -- I honestly don't
17   know how to answer that question.  The -- I can't
18   just assume that the APA -- here is the problem.
19   Negotiation and arbitrations are part of a process.
20   It is not as if, well, you do this or you do this,
21   or there is a unilateral.  A unilateral imposition
22   is simply -- is that, again, you are back to the God
23   scenario.  So either we have the God scenario or we
24   don't.  I've told you that if we have the God
25   scenario where God can -- gives the APA power to

44

1    impose what they want, yes, that would affect my
2    analysis.
3        If they -- if I was approached to say you have
4    to accept that the APA can impose what they want,
5    and it has nothing to do with ALPA's failure to
6    fairly represent the TWA pilots, I would say, how --
7    what's there to do?  We understand that.
8        What I'm saying is, we live in a world where
9    had ALPA not failed in its duty of fair
10   representation, you have a bargaining process.  At
11   the end of the day, the bargaining process might
12   have arbitration.  Okay?  And, you know, I -- I
13   proceed from there.
14   BY MR. TOAL:
15       Q    So when you say if the APA had the
16   ability to determine what the merged seniority list
17   would look like unilaterally, what's there to do, do
18   you mean that there would be no damage in that case?
19       MR. PRESS:  Well, I object to the form
20   of the question.  He told you that they did not have
21   that power.
22       MR. TOAL:  Allen, would you stop with
23   the speaking objections and trying to coach your
24   witness?
25       MR. PRESS:  No, I'm not.  I'm trying

45

1    to -- object to the form of the question.  It is
2    only so good.
3        MR. TOAL:  All right.  We are going to
4    speak to the judge later today, so --
5        THE WITNESS:  Can you repeat the
6    question, please?
7        (The court reporter read back the
8    pending question as follows:
9        "Question:  So when you say if the APA
10       had the ability to determine what the merged
11       seniority list would look like unilaterally,
12       what's there to do, do you mean that there
13       would be no damage in that case?")
14       MR. PRESS:  I object to the form of the
15   question in that it mischaracterizes the witness's
16   prior testimony.
17       THE WITNESS:  Here is -- what I mean to
18   say is, if you assume a hypothetical where no matter
19   what ALPA did, the APA would have the right to
20   unilaterally impose what they wanted, then, indeed,
21   in that case, there would not be damages.  If --
22   BY MR. TOAL:
23       Q    And if instead of God coming down and
24   giving this power to the APA, it was a power derived
25   from the American Airline asset purchase agreement

46

1    and the law, would your answer be the same?
2        MR. PRESS:  I object to the form of the
3    question.  It mischaracterizes the evidence in the
4    prior trial.
5        THE WITNESS:  No.
6    BY MR. TOAL:
7        Q    Why not?
8        A    Because no one, in fact, we've not
9    lived in the world where TWA's pilots -- the ALPA --
10   ALPA did not waive the right to arbitration.  We
11   don't know what American, in fact, would have done.
12   We don't know whether TWA would have continued and
13   -- and continued to fly, and had other suitors,
14   other ways to get resources and so on.  So it's --
15   the hypothetical that simply says that what if we --
16   now you are closer to describing the world we live
17   in, which is American made statements that said if
18   you want to continue with this, you got to get your
19   pilots to waive their right to arbitration.  But had
20   they not waived the right to arbitration, I'm -- I'm
21   assuming that TWA would continue to fly.
22       Q    You -- you are making that assumption?
23       A    Yes.  I'm -- I'm -- I'm assuming that
24   that's not like God giving the APA power.
25       Q    So in your mind there is a difference

13  (Pages 43 to 46)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

47

1 between whether God gave the APA that power or
2 whether by -- by virtue of law it had that power;
3 correct?
4    A    By virtue of -- I'm not sure what law
5 we are talking about.
6    Q    Well, let me ask you to assume that as
7 a matter of law that the APA had the power to decide
8 on the merged seniority integration list
9 unilaterally. Is that different in your mind from a
10 situation where God gave the APA that power?
11    A    You are the lawyer. I mean, is God
12 law? I -- I -- it's -- you know, if you want to
13 tell me that something with the status of a legal --
14 you know, if the law -- if the law says that it's
15 like God coming down and saying the APA has the
16 power, then APA has the power. You know -- you
17 know, the question is, is this independent of any
18 behavior of ALPA.
19    Q    And you don't have any reason to -- to
20 dispute that any of the mergers on figure eight that
21 indicate they were decided unilaterally were, in
22 fact, decided unilaterally; do you?
23    A    I have no information.
24    Q    Okay. And you see here that the first
25 transaction that Mr. Salamat lists as being decided

48

1 unilaterally was between American and TWA; correct?
2    A    I see that on the list, yes.
3    Q    And do you have any reason to dispute
4 that?
5    A    To be honest, I don't -- I -- I -- I
6 don't -- you know, this is about Supplement CC, I
7 suppose, and I don't know enough about how
8 Supplement CC was derived. For all I know, it was
9 unilateral, or it might be that there was
10 negotiation between ALPA and APA where ALPA, you
11 know, kind of stripped TWA of their bargaining power
12 by giving up the right -- having them give up the
13 right to arbitration. And, you know, I just don't
14 know if it is unilateral or just with very unequal
15 bargaining power. I just don't know.
16    Q    And you mentioned before the
17 possibility that even if American Airlines made
18 waiver of the arbitration provision for seniority
19 integration a condition of the transaction, that it
20 might not follow through on that; correct?
21    A    I don't know.
22    Q    And do you have any evidence that you
23 can point to today to suggest that if American made
24 that a condition, that it wasn't intent on enforcing
25 that condition?

49

1    A    No.
2    Q    Do you have any understanding of the
3 APA's views regarding arbitration of seniority
4 integration?
5       MR. PRESS: Objection. It's been asked
6 and answered.
7       THE WITNESS: Can you repeat the
8 question, please?
9 BY MR. TOAL:
10    Q    Do you have any understanding of the
11 APA's views regarding seniority integration?
12    A    Well, I understand that they -- their
13 contract with American said they didn't have to do
14 that. That's all I know.
15    Q    And did you -- do you have an
16 understanding that the APA and its representatives
17 said that under no circumstances would it agree to
18 arbitration of seniority integration?
19    A    No.
20    Q    Would that make a difference to your
21 analysis if you knew that the APA was unwilling to
22 engage in arbitration?
23    A    Are you asking whether I knew they were
24 unwilling or I knew they made statements saying they
25 were unwilling?

50

1    Q    My -- my premise is if you knew that
2 the APA was unwilling to arbitrate seniority
3 integration, would that make a difference in your
4 analysis?
5    A    No.
6    Q    Why not?
7    A    Because what people say they are
8 unwilling to do and what they might be unwilling to
9 do at a point in time when negotiations proceed and
10 they need to reach an agreement or they need to get
11 a seniority list integrated, they might do it.
12    Q    So -- but my question is different.
13 I'm -- I'm not asking you to assume that they said
14 it. I'm asking you to assume that they meant it,
15 and that they were not willing to agree to
16 arbitration of seniority integration. Would that
17 affect your analysis?
18       MR. PRESS: Let me just object to the
19 form of the question. It is an incomplete
20 hypothetical and an unfair question. Subject to
21 that, you can answer.
22       THE WITNESS: If -- your hypo -- I
23 don't know how to understand your hypothetical,
24 because what people are willing to do and not
25 willing to do is a function of the circumstance they

14  (Pages 47 to 50)

DEGNAN & BATEMAN
(856) 232-7400

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

51

1  find themselves in. And what -- what's true is
2  in -- in the -- in the world -- in a world where
3  ALPA did not shirk its duty of fair representation,
4  APA would have found themselves in a very different
5  position than the position they wound up in once
6  ALPA convinced TWA to drop the merger -- I'm
7  sorry -- their arbitration clause.
8      Therefore, I don't think it is -- it is not a
9  sensible hypothetical for me to say what if they
10 were unwilling to, intransigent, they have to reach
11 an agreement somehow. You are sitting there with
12 one side with an arbitration clause, the other side
13 with a no arbitration clause, and they are
14 negotiating. I don't know what's going to give
15 there. APA may be willing to give up more in their
16 negotiations in order to avoid having to go to
17 arbitration because they don't want to go to
18 arbitration, so they give up more in negotiation.
19     So I -- basically, the idea simply is to
20 say -- you know, my plan of analysis is very
21 straightforward, very straightforward, and doesn't
22 require me to take a stand on APA's particular
23 position on arbitration.
24 BY MR. TOAL:
25     Q   So a fact-finder will make these

52

1  determinations, but I'm asking you to assume as a
2  matter of fact that the APA was actually unwilling
3  to arbitrate seniority integration, and that the APA
4  also had the ability to unilaterally determine a
5  merged seniority list. Would that change your
6  analysis if you take those -- take those as facts?
7      MR. PRESS: I object to the form of the
8  question. He just answered that question and he
9  told you why -- his testimony was what it was.
10     MR. TOAL: Allen, that's a speaking
11 objection.
12     MR. PRESS: No, I'm not.
13     MR. TOAL: You have no -- you can
14 object to the form of the question and move on. You
15 have to stop coaching the witness.
16     MR. PRESS: That -- well, that doesn't
17 preserve anything, Mr. Toal.
18     MR. TOAL: That does preserve your
19 objection. All you have to do is object to the form
20 of the question.
21     THE WITNESS: You are just bringing
22 back the God scenario. Once you put in your
23 hypothetical that the APA can unilaterally impose
24 what they want, God gave the APA power. Sure, that
25 affects the analysis.

53

1      (Farber-3  Salamat's calculation of
2      damages based on Farber model marked for
3      identification.)
4  BY MR. TOAL:
5      Q   Okay. Let me show you a document
6  marked Farber Exhibit-3, which contains
7  Mr. Salamat's calculation of damages based on your
8  model.
9      If I could direct your attention to page two
10 of this document. Do you see figure one there?
11     A   Yes. I never saw these numbers before.
12     Q   Okay. So that's what I was going to
13 ask you.
14     So Farber seniority list number one is what
15 you presented as your best estimate?
16     A   Okay.
17     Q   And do you see that he calculates
18 $1.326 billion in damages?
19     A   Yes.
20     Q   Okay. And then you understand lists
21 two and three to be the upper and lower bounds that
22 you designated?
23     A   Yes.
24     Q   Okay. And do you see for the lower
25 bound he has calculated $1.04 billion as damages?

54

1      A   Yes.
2      Q   And do you have any basis for assessing
3  whether those calculations are accurate or not as
4  you sit here today?
5      A   No, no. Except that they are in the
6  right order. This -- this -- the lower bound is
7  lower than the -- the -- my preferred estimate, and
8  -- which is, in turn, lower than the upper bound.
9      Q   Okay. So when you used the term lower
10 bound, what did you -- what did you mean by that
11 term?
12     A   Simply saying when I came up with
13 the -- the -- my preferred -- what I'll call my
14 preferred estimate, which is the 1.326 billion -- I
15 didn't come up with a number, but I came up with a
16 list, we said we understand, as in any -- any
17 analysis that we tend to do calculating damages,
18 when you are looking at a sample of other cases
19 that -- where -- that you use as benchmarks,
20 essentially, that there is random variation. And we
21 wanted just some sense of -- you say the lower --
22 for the lower bound, some sense, if we said, look,
23 we have now seven comparable situations, what would
24 be reasonable -- you know -- what -- what might be
25 reasonable lower bound on damages?

15  (Pages 51 to 54)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

55

1    We say, let's get out into the towel, we call
2 it the towel, to the extreme of our seven cases, and
3 we take -- we actually drop the most extreme, and
4 use as our lower bound the -- the -- like the six of
5 the seventh, let's say.  You know what I mean?  So
6 it is just meant to illustrate.  You know, there
7 could be some variation.  We understand that there
8 are things that we don't observe about every case,
9 and that every case is a little bit different, so we
10 take the mean and then we say, let's perturb it one
11 way or the other to give us bounds.  That's all we
12 do.  We don't mean it in a -- the sense that
13 95 percent of the time it will be below this or
14 above that.  We are not thinking like that.
15    Q    So you acknowledge the possibility that
16 there could -- there could have been an alternative
17 seniority integration list in the absence of any
18 breach of a duty of fair representation that was
19 below your lower bound; correct?
20    A    It's a possibility.
21    Q    And you can't quantify what the
22 possibility is that the -- any alternative list
23 would have been below your lower bound; correct?
24    A    I've not done that, no.
25    Q    And you can't do that; correct?

56

1    A    I'm not sure, to be honest with you.
2    Q    In any event, you haven't done it?
3    A    I have not done it.
4    Q    Now, if you take a look at the
5 conclusion --
6    A    Are we looking at the same document?
7    Q    No.  This is Farber Exhibit-2.  It's on
8 page 48.
9    Do you see the heading that says summary of
10 damages, under different lists?
11    A    Yes.
12    Q    So the bottom of the first paragraph
13 under that heading says, using a conservative
14 assumption that there was no multiplier effect when
15 employing several strategies, I estimated that there
16 is a 73 percent probability that ALPA's violation
17 has caused $887,409,179 in damages to the TWA
18 pilots, is therefore viable for $647,808,701 in
19 unmitigated damages.  Do you see that?
20    A    Yes.
21    Q    Okay.  So Mr. Salamat's estimate
22 whether you use the 887 million or the 647 million
23 falls substantially below your lower bound; correct?
24    A    I wouldn't use the word substantially.
25 They are below my lower bound.

57

1    Q    Well, your lower bound was over a
2 billion dollars; correct?
3    A    Yes.
4    Q    And certainly the 647 million is
5 substantially below your lower bound; correct?
6    A    Well, let me be clear about something.
7 This is -- this is Mr. Salamat's calculation of
8 based on my lower bound list.  It is not my lower
9 bound estimate of dollars.  I did not come up with a
10 lower bound estimate of dollars.  I came up with a
11 list, and Mr. Salamat converted that to a dollar
12 amount.  So don't -- please don't -- I'm saying
13 please don't refer to it as my lower bound dollar
14 estimate.
15    Q    His calculation based on your lower
16 bound estimate, his own estimates are substantially
17 below that -- that figure; correct?
18    A    They are below my figure, yes.
19    Q    And you don't adopt Mr. Salamat's
20 calculation of your -- your lower bound numbers or
21 any of your other models; is that correct?
22    A    What do you mean by adopt?
23    Q    Well, do you -- do you endorse them and
24 say they are correct?
25    A    I don't know anything about

58

1 Mr. Salamat's analysis.
2    Q    Okay.  So you express no opinion as to
3 whether they are correct or not?
4    A    That's correct.
5    Q    So you see in Mr. Salamat's report when
6 we looked at page ten, he calculated with his linear
7 model of probabilities, the number 73 percent?
8    A    Yes.
9    Q    And if you look at the bottom of page
10 nine, he says, as shown in figure three, by
11 assigning probabilities to each form of influence,
12 Delta importance was assigned at three percent,
13 Delta perception at five percent, and abandonment at
14 two percent.  A linear of the impact of ALPA's
15 actions would predict a 73 percent chance of
16 creating an agreement.  Do you see that?
17    A    Yes.
18    Q    And then if you go back to the page we
19 were looking at before, page 48, do you see that
20 Mr. Salamat is discounting his $887 million figure
21 by that 73 percent probability to arrive at
22 647 million?
23    A    I haven't done the arithmetic.  Are you
24 telling me that 647, et cetera, is 73 percent of
25 887?

16  (Pages 55 to 58)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

59

1  Q   That's -- when I calculated it, it was.
2  A   I have not done that calculation.
3  Q   Okay. Do you -- do you think it would
4 be appropriate to discount any quantification of
5 your model by the -- the probability that an
6 agreement would have been reached between the TWA
7 MEC and the APA?
8  A   I really have no opinion about
9 Mr. Salamat's methodology. I have not read what he
10 has done. I've not studied it. I really can't tell
11 you whether it's appropriate or not.
12  Q   I'm really asking about your
13 methodology and whether you think it would be
14 appropriate to -- to discount any quantification
15 that's derived from your model by the likelihood
16 that an agreement would have been reached.
17  A   You mean a negotiated agreement?
18  Q   A negotiated agreement.
19  A   No.
20  Q   What about by a combination of the
21 likelihood of a negotiated or an arbitrated
22 agreement?
23  A   You need to understand, again, that I
24 believe that a merged seniority list would have
25 emerged with probability one. However it was done,

60

1 there would have been a merged seniority list, so
2 there is no discounting to be done.
3  Q   Do you deny that one of the
4 possibilities for creation of a merged seniority
5 list was that the APA would determine what list to
6 implement?
7  A   What I'm saying is that my whole -- my
8 analysis is based on the idea that what would have
9 happened in this case is basically what happened on
10 average in a set of comparable cases. And,
11 therefore, I'm -- I'm -- I'm not making any
12 assumption at all about the mechanism. And as a
13 result, I'm simply calculating a list and
14 saying this is -- if we did -- not we, but if the
15 TWA/American seniority lists were merged in a way
16 that looked a lot like what happened in the
17 comparable cases on average, here is what we would
18 have gotten. I can't discount a list.
19 -- how to convert my list into a dollar
20 figure. I can't discount a list.
21  Q   My question is whether your -- in your
22 analysis, you are excluding the possibility that the
23 APA could determine unilaterally what the merged
24 seniority integration list would look like.
25  A   I'm not making an assumption about that

61

1 one way or the other.
2  Q   So if the APA could have implemented a
3 list unilaterally, doesn't that require you to
4 adjust your figure based on the possibility that no
5 arbitrated or negotiated list would have been
6 reached?
7  A   No.
8  Q   Why not?
9  A   Because what I'm saying is that in
10 the -- what I'm saying is, in a world, in the
11 hypothetical world where ALPA did not violate its
12 duty of fair representation, what would have
13 happened is what happened on average in the seven
14 cases. This is the expectation. In those
15 comparable cases, too, there was some chance that
16 there could be a unilateral imposition, and there
17 wasn't or there was, I don't know. And it's
18 simply -- I'm simply saying my estimate is an
19 estimate of the mean. I don't need to discount the
20 mean. This is what happened in comparable cases.
21  Q   But the comparable cases you look at
22 are only arbitrations; correct?
23  A   Oh, no. I think there is one case
24 that's not.
25  Q   Okay. Did you look at -- did you try

62

1 and calculate the proportional difference in means
2 from negotiated lists?
3  A   What you'll see in -- in -- in table
4 one, in my report, is a list of the cases that we
5 were able to calculate our statistic for. And I
6 know at least one of our seven comparables was
7 negotiated. I don't know -- I honestly don't know
8 about the rest --
9  Q   So --
10  A   -- as I sit here. I could find out.
11  Q   So if you had information concerning
12 negotiated lists, do you think they would be
13 appropriate for inconclusion in your analysis?
14  A   Yes.
15  Q   And if you had information for lists
16 that were determined unilaterally, would those be
17 appropriate for inclusion in your analysis?
18  A   Yes. Again, inclusion in my analysis
19 in terms of table one, would it be listed in table
20 one, yes. And the question of would it be made into
21 the comparables, that depends on the -- on the other
22 factors. But certainly whether it is arbitrated or
23 negotiated, or even imposed, that would -- that
24 ought not be a relevant factor.
25  Q   Do you have any expertise in assessing

17 (Pages 59 to 62)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

63

1  what would have happened in the absence of a breach
2  of a duty of fair representation?
3      A.   No.
4      Q.   You are not offering any expert
5  opinions on what would have happened in the absence
6  of a breach by ALPA of the duty of fair
7  representation; correct?
8      A.   No. That's not correct.
9      Q.   Are you offering opinions about what
10  would have happened?
11     A.   That's exactly what my list is. It is
12  an estimate of what would have happened absent
13  ALPA's breach of their duty of fair representation.
14     Q.   And what -- what permits you to offer
15  an expert opinion about what would have happened in
16  the absence of a breach of duty of fair
17  representation?
18     A.   You are asking what -- on what basis do
19  I do that?
20     Q.   Yeah.
21     A.   Okay. I'm using -- I'm using a common
22  method in -- in economics, and labor economics in
23  particular, when there is -- while that comes not
24  from breach of duty of fair representation, but --
25  but there is allegations of some difference --

64

1  difference in treatment, difference in behavior, and
2  you are saying what would have happened absent this
3  difference of treatment.
4      The simplest possible example is imagine sex
5  discrimination in pay. Women earn less than men.
6  We want to know what women would earn had they had
7  not been discriminated against in pay. The best
8  thing you do is to say, well, let's find either a
9  place where women are not discriminated against and
10  look at their pay there, or let's find men in
11  similar jobs and ask what they are paid there, and
12  say that's what women would have earned but for the
13  bad act, the discrimination.
14     So all -- all I'm really doing is taking that
15  approach of comparing outcomes here where there is
16  some allegation of some illegal behavior, to another
17  situation where there isn't, and -- and looking at
18  the difference -- the differences between those two.
19  And, you know, I've done this before. Labor
20  economists do this in their work all the time. It
21  is commonly accepted as a technique for
22  understanding the -- the effects of certain
23  behaviors.
24     Q.   So your sample includes arbitrated
25  results in one negotiated result; correct? Your

65

1  sample of seven?
2      A.   I believe so. I would have to
3  double-check.
4      Q.   Those are the ones that you -- those
5  are the ones that you determined to be comparable;
6  correct?
7      A.   That's correct.
8      Q.   Did you assess in which of those cases
9  the union representing the pilots of the acquiring
10  airline had the ability unilaterally to determine
11  what the seniority list would look like?
12     A.   No.
13     Q.   And do you know whether, in any of
14  those cases, the pilots of the acquiring airline had
15  a unilateral ability to determine what the seniority
16  list would look like?
17     A.   No, I don't.
18     Q.   And to the extent that in this case the
19  APA did have the unilateral ability to determine
20  what the list would look like, the seven
21  transactions in your sample would not be comparable,
22  at least in that respect; correct?
23     A.   No.
24         MR. PRESS: I object to the form of the
25  question. It's an incomplete hypothetical.

66

1          THE WITNESS: I don't accept the view
2  that the APA had the right unilaterally to impose
3  the terms. They had a contract that said they had
4  the right, but they -- they needed to engage in a
5  negotiation, which they could have well waived that
6  right. And it's -- so I -- I honestly don't
7  understand the hypothetical.
8  BY MR. TOAL:
9      Q.   Well, I -- I understand that you
10  disagree that the APA -- APA had the right to impose
11  a list unilaterally. If you assumed that they did,
12  however, then at least in that respect, the
13  American/TWA transaction would not be comparable to
14  the seven transactions that you determined to be
15  comparable on your list; correct?
16     A.   I'm -- I'm going to come back to the
17  God example. If, in fact, God gave the APA the
18  right to do whatever the heck they wanted, and they
19  didn't -- and that's the way the world was, then --
20  and there was nothing anyone could do about it, no
21  ALPA, no anyone could do anything about it, then
22  that would make it sui generis.
23     Q.   You -- you said you are assuming that
24  the APA had to participate in negotiations; is that
25  correct?

18 (Pages 63 to 66)

DEGNAN & BATEMAN
(856)  232-7400

HENRY FARBER

67

1      A    I said all I'm assuming -- all I'm
2  assuming is that had ALPA not shirked its duty of
3  fair representation, that the outcome would have
4  been similar on average -- to what happened on
5  average in these other cases. I'm not making any
6  particular assumption about process at all.
7      Q    And why do you assume that the result
8  would have been equal to the average as opposed to
9  any other point, any other particular transaction on
10 your list?
11     A    Because the average -- again, I'm --
12 I'm going to go back to the -- to the established
13 scientific basis for how we do these things, which
14 is simply we say, look, what we have to do is say,
15 what do we expect -- what do we expect to have
16 happened in this case. And the way what we expect
17 to have happened is you take the average of what
18 happened in the set of comparable situations, or
19 what do we expect this person to earn, this woman to
20 earn. It is what ten similarly situated men earned
21 for doing the same work, in the same industry, et
22 cetera. And while it is true there can be some
23 variation and this person might earn a little bit
24 more or a little bit less, I'm giving you my best
25 estimate. It is an estimate. It is not an edict

68

1  that says this is exactly what it will be, but this
2  is an estimate.
3      Q    And, indeed, even between your
4  settlement's calculations of your lower and upper
5  bounds, there is a $500 million difference between
6  the two; correct?
7      A    I would have to -- I would have to look
8  at the numbers again. Where is that?
9      Q    It's in Farber Exhibit-3, page two.
10     A    Yes. $500 million between the upper
11 bound and the lower bound.
12     Q    Now, if you turn to your report, which
13 is Farber Exhibit-1, you have an appendix B.
14     A    Yes.
15     Q    And does Exhibit-B contain all the
16 documents that you reviewed in connection with the
17 preparation of your report?
18     A    Yes. I have to -- I have to -- I
19 really have to -- let me be clear on this. I did
20 not personally review every document in this report.
21 I have people working for me who are under my
22 direction. I reviewed a lot of them, but they
23 reviewed some of these, too, and reported to me when
24 they found something that was important.
25     Q    And what -- what advice -- what

69

1  instruction did you give to them about which
2  findings should be reported to you and which need
3  not be?
4      A    Well, what we did was, you know, we
5  first thought about -- we read some background -- we
6  all read some background stuff. Basically, let's
7  see if I can find -- some of the legal documents,
8  you know, the complaint, the motions, memorandums,
9  et cetera, et cetera. And we got a feel for the
10 case, what it was about. We thought about how are
11 we going to come up with an estimate of what would
12 have happened but for the breach of duty of fair
13 representation, and we hit -- we realized that the
14 best way to do this was to look at comparable cases.
15     So we thought, where do we get information on
16 what happened when the seniority lists were merged
17 elsewhere? And arbitration awards turned out to be
18 right on point and also quite useful because
19 arbitrators tend to be fairly verbose and give a lot
20 of discussion of what's going on. So we -- I read a
21 number of them. And I said, okay, here is what we
22 want to know. What factors are arbitrators saying
23 they are considering?
24     By the way, another important document for us
25 was the ALPA merger policy which talked about the

70

1  factors that ought to be considered in -- in merging
2  seniority lists, which is a document that's not
3  directly applicable because it is about -- I believe
4  it is mostly meant to be about mergers between two
5  airlines that are both -- whose pilots are both
6  represented by ALPA, but it nonetheless lists a set
7  of factors that arbitrators seem to have adopted in
8  many cases even when both airlines are not ALPA
9  airlines.
10     And we realized our -- as I went through
11 this -- I'm giving you a long answer, I know.
12 What -- what the arbitrators were talking about is a
13 whole set of factors that led them to shade their
14 decision in favor of one airline or the other,
15 having to -- and so I asked my people, when you are
16 reading this, we need to be able to figure out
17 merger by merger, what the -- you know, where things
18 stood with regard to the two airlines on these
19 factors. You have to look for direct statements
20 about these factors.
21     Then I said, we also need to have a metric, a
22 number, so I need to get mergers where -- where I
23 have enough information on the merger process to be
24 able to calculate a summary statistic of the merged
25 lists. In other words, that's that proportional

19 (Pages 67 to 70)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

71

1    mean difference statistic.  And so -- so I tasked my
2    people with reading those reports, looking for other
3    documents that could help give us the information on
4    merger by merger of both the background and the
5    outcome.
6         Q    How much time did you personally spend
7    reviewing these documents?
8         A    Without consulting my time sheets, I
9    couldn't tell you exactly how many hours I did.
10        Q    And what's your best estimate, as you
11   sit here today?
12        A    Two or three days.
13        Q    And how long were those days?
14        A    My days are normal days, you know eight
15   hours, nine hours, ten hours sometimes.
16        Q    And how much time --
17        A    When I was younger, my days were
18   longer.
19        Q    How much time did you spend on this
20   engagement overall, personally?
21        A    This past year?
22        Q    From the time you were retained until
23   --
24        A    -- this morning.
25        Q    Until today.

72

1         A    I can tell you that it's less than ten
2    days, more than three days -- more than three days.
3         Q    And with whom did you work when you
4    referred to members of your staff?
5         A    Okay.  I work with a small firm in
6    Princeton called Ashenfelter and Ashmore, and David
7    Ashmore is a principal of that firm, and he is -- is
8    -- the way -- let me tell you how we operate.
9    Basically, I'm the expert.  He runs the day-to-day
10   under my direction, and we -- and then we have a
11   staff of three Ph.D. economists.  Actually over the
12   time period this has gone on for a while, probably
13   there were four staff economists involved who did
14   the work under my oversight, David's day-to-day
15   supervision, collecting information, you know,
16   putting it in the spreadsheet, doing the calculated
17   we wanted.  You know, I would meet with the staff
18   regularly to talk about where we were, ask
19   questions.  I'd look at documents that they thought
20   were ambiguous to help them out and so on.
21        Q    Okay.  Other than the documents listed
22   on appendix B to your report, did you consider any
23   other documents?
24        A    Not that I recall sitting here now.  I
25   mean --

73

1         Q    And --
2         A    It's hard.  You know, it wouldn't
3    surprise me that there is something that somehow I
4    looked at didn't make it on the list, but we tried
5    to be quite careful about that.
6         Q    Did you have access to other documents?
7         A    Well, we all have access to the web.
8    I'm not sure what you mean.
9         Q    Did you have other -- access to other
10   documents related to this case?
11        A    I don't -- I don't quite know how to
12   answer that.  You are asking me, do I have access to
13   things I didn't look at so they didn't make it into
14   this report?
15        Q    Yeah.
16        A    I don't know.  I assume so because I
17   presume I could have asked for some things that I
18   didn't think of, and, you know, TWA pilots'
19   attorneys might have been able to give it to me, for
20   example.  I don't know.  Maybe there is some legal
21   documents.  I just don't know.
22        Q    Well, who -- who determined the
23   documents to which you would have access?
24        A    Well, as these things generally go, TWA
25   pilots and lawyers, when they retained us, started

74

1    us off with some documents that they thought we
2    ought to look at, the complaint and so on, and the
3    jury award.  You know, as we know, TWA has already
4    been found guilty of their duty of fair
5    representation, of violating their duty of fair
6    representation.  And we then said we need these
7    arbitration awards.  As I understand it, counsel for
8    APA, or APA through counsel -- through counsel
9    provided us with arbitration awards.  I think that's
10   right.  I'm sure we got them indirectly through the
11   TWA pilot attorneys.  We say we need arbitration
12   awards, and they say, okay, we know where to get
13   those for you, and they got them.  And then we did
14   some web searching to find outcomes of some other
15   cases that -- and so on.  So --
16        Q    Did you ask for any documents that you
17   weren't able to get access to?
18        A    No.  Not that I recall, I should say.
19   Not that I recall.  This is not a case where I felt
20   very frustrated by lack of availability of things.
21        Q    And you don't have a recollection of
22   asking for any other documents?
23        A    No.  That's correct.  That's correct.
24        Q    Did you review any of the filings in
25   TWA's bankruptcy proceeding?

20  (Pages 71 to 74)

82109aa4-8378-4731-b7d1-08d43130cdc1

**75**

1    **A**    No.
2    **Q**    Did you think that would be relevant to
3 your analysis?
4    **A**    I've -- I've never seen a bankruptcy
5 filing. I'm not sure what's in them. So it's --
6 no. I don't think so, no.
7    **Q**    Was TWA's financial condition at the
8 time of the transaction with American relevant to
9 your analysis?
10    **A**    Yes.
11    **Q**    In what way?
12    **A**    A part -- one of the factors we
13 considered in choosing comparable merger lists was
14 the financial condition of the acquired carrier.
15 And as a result, in order to make them comparable,
16 we tried to find cases where -- with some, at a
17 crude level, similarity with TWA's financial
18 condition. So, of course, TWA's financial condition
19 was relevant.
20    **Q**    And if you had determined that TWA was
21 either not flying at the time of the transaction or
22 that it imminently would not be flying, would that
23 have affected your analysis?
24    **A**    Potentially.
25    **Q**    In what way?

**76**

1    **A**    I don't know. I didn't do that
2 analysis.
3    **Q**    But would it have -- have affected the
4 other transactions that you viewed as comparables?
5    **A**    Potentially, yes.
6    **Q**    Potentially or actually?
7    **A**    I would have to look at the list, but I
8 assume it would change at least some of the
9 comparables, yes.
10    **Q**    And did you make determinations in your
11 report based on which airlines either were not
12 flying or were at imminently at risk of not flying
13 on the one hand, and airlines that were in a
14 weakened financial condition but still flying and
15 expected to continue flying for the foreseeable
16 future?
17    **A**    I -- I -- I don't know what you mean by
18 foreseeable future, but were at imminently going to
19 shut down. But were -- I mean -- I don't know what
20 it means to fly for the foreseeable future, but I
21 did make distinctions like that, yes.
22    **Q**    And if you had determined that TWA was
23 at risk of imminent grounding of its planes, would
24 that have caused you to shift the group of
25 comparables from those where the -- the airlines

**77**

1 either were not flying or imminently were expected
2 not to fly?
3    **MR. PRESS: Objection. That's been**
4 **asked and answered.**
5    **MR. TOAL: I didn't finish my question.**
6 BY MR. TOAL:
7    **Q**    Would that have led you to change your
8 comparables to the group that was either not flying
9 or imminently expected not to fly?
10    **MR. PRESS: I object to form. That's**
11 **been asked and answered.**
12    **THE WITNESS: I -- I never created such**
13 **a group, but it would have certainly shifted --**
14 **would have likely shifted the set of comparables,**
15 **yes.**
16 BY MR. TOAL:
17    **Q**    Did you ever calculate what the
18 proportional difference in mean ranks was for those
19 airlines where the acquired airline was either not
20 flying or was expected imminently not to be flying?
21    **A**    Well, table one contains the
22 proportional mean difference -- the proportional --
23 the proportional mean difference for all of the
24 airlines we were able -- for which we were able to
25 calculate it, but I never grouped them in the way

**78**

1 you are suggesting.
2    **Q**    Take a look at table one of your
3 report. This is right after your signature page.
4    **A**    Yes, yes.
5    **Q**    Now, of this group, which of the
6 acquired airlines on this list fall within the
7 category of not flying at the time of the
8 acquisition or expected to stop flying imminently?
9    **A**    I -- I -- I honestly -- I want to say
10 Lynx, but beyond Lynx, I'm not sure. I don't -- I
11 haven't memorized their status.
12    **Q**    Did you ever do an analysis of how the
13 proportional difference in mean rank for the
14 American Airline/TWA transaction compared to those
15 in which the acquired airline either was not flying
16 or was expected to stop flying imminently?
17    **A**    No.
18    **Q**    As you look at this chart, are you able
19 to make a determination about how the proportional
20 mean difference in ranks for TWA/American Airlines
21 would compare to those other airlines -- those other
22 transactions?
23    **A**    No, no.
24    **Q**    Do you agree that the proportional mean
25 rank for the American/TWA transaction is roughly

21 (Pages 75 to 78)

79

1 comparable to those for the Continental/Frontier,
2 Republic/Midwest, Southwest/AirTran and
3 Republic/Lynx transactions?
4   **A**   Yes.
5   **Q**   Okay. So you said you never -- never
6 looked at the bankruptcy filings for TWA; correct?
7   **A**   Correct.
8   **Q**   Did you ever look at TWA's public
9 filings leading up to the time of its bankruptcy?
10   **A**   No.
11   **Q**   Did you ever look at any analyst
12 reports concerning TWA at or around the time of its
13 bankruptcy?
14   **A**   No.
15   **Q**   Did you ever look at any bond ratings
16 for TWA leading up to the time of its bankruptcy?
17   **A**   No.
18   Can I -- can I amend an answer?
19   **Q**   Sure.
20   **A**   Only because I'm not sure what a
21 bankruptcy filing is. You mean the papers that TWA
22 filed going into bankruptcy?
23   **Q**   Yeah. Did you look at any of those?
24   **A**   No.
25   **Q**   Did you look at any of the testimony

80

1 from the bankruptcy proceeding?
2   **A**   I looked at some. I don't know whether
3 it was testimony or reports. I don't think I looked
4 at testimony.
5   **Q**   Did you read any of the judge's rulings
6 from the bankruptcy proceeding?
7   **A**   No. Now that I think about it, I
8 didn't read any documents from the proceeding.
9   I'm sorry. I don't have anything to amend. I
10 was thinking of something different.
11   **Q**   Did you read any contemporaneous press
12 coverage concerning TWA's financial condition
13 leading up to the time of its bankruptcy?
14   **A**   No.
15   **Q**   Did you read any testimony from this
16 case concerning TWA's financial condition leading up
17 to the time of its bankruptcy?
18   **A**   No.
19   **Q**   Did -- did anyone make you aware that
20 TWA's chief executive officer was deposed in this
21 case?
22   **A**   I -- I think I learned that at
23 breakfast this morning.
24   **Q**   Okay. And what did you learn?
25   **A**   That he testified yesterday.

81

1   **Q**   Did you learn anything about the
2 substance of his testimony?
3   **A**   Not a thing.
4   **Q**   Were you made aware that TWA's chief
5 financial officer was deposed in this case?
6   **A**   No.
7   **Q**   Did you read any congressional
8 testimony concerning the proposed transaction
9 between American and TWA?
10   **A**   I had no idea there was congressional
11 testimony.
12   **Q**   So the answer is no?
13   **A**   Yes.
14   **Q**   Would any of those things have been
15 helpful to your analysis?
16   **MR. PRESS: I object to the form of the**
17 **question. How could he -- I object to the form of**
18 **the question. Calling for speculation.**
19   **THE WITNESS: Without -- without**
20 **knowing what's in them, I don't know.**
21 **BY MR. TOAL:**
22   **Q**   Is there the possibility that any of
23 those things would have been helpful to your
24 analysis?
25   **MR. PRESS: Same objection.**

82

1   **THE WITNESS: There is always a**
2 **possibility.**
3 **BY MR. TOAL:**
4   **Q**   You were trying to determine what TWA's
5 financial condition was at or around the time of the
6 bankruptcy. Do you have views about the best way to
7 do that?
8   **A**   For the purpose -- for my purposes
9 here, I think I did what I needed to do.
10   **Q**   So not for your purposes here. If --
11 if you were trying to understand, given your
12 background as an economist, what TWA's financial
13 condition was leading up to the time it declared
14 bankruptcy, do you have knowledge of the types of
15 sources that you would consult?
16   **A**   I've never studied bankruptcy. I would
17 have to know for what purpose. I honestly -- I
18 honestly don't know how to answer that question.
19   **Q**   I'm -- I'm not asking you a bankruptcy
20 question. I'm asking you if you are trying to
21 determine TWA's financial condition --
22   **A**   For what purpose?
23   **Q**   For purposes of --
24   **A**   Let me get that. I apologize --
25   **Q**   For purposes of understanding what its

22  (Pages 79 to 82)

HENRY FARBER

83

1  financial condition was prior to the American
2  Airlines transaction.
3       MR. PRESS: I object to the form of the
4  question. You haven't answered his problem with the
5  question.
6       THE WITNESS: For -- for purposes of --
7  of my analysis, I really only need an answer to a
8  very narrow question, which is, would I expect that
9  they keep flying, and I satisfied myself that they
10 were flying. And, frankly, filing for bankruptcy
11 has very little to do, if anything to do, with
12 whether you stop flying. So, no, I don't -- I
13 haven't thought about that.
14 BY MR. TOAL:
15      Q  So my question is a little bit
16 different. My question is, if you are trying to
17 understand what TWA's financial condition was, what
18 sources would you consult to do that?
19      MR. PRESS: I object to the form of the
20 question for the same reasons.
21      THE WITNESS: I would have to ask
22 somebody. I mean, in the sense that -- in terms of
23 their detail. I'm a labor economist, not a capital
24 economist. So I would -- I'm not sure what I would
25 consult to get a -- a detailed picture of TWA's

84

1  financial situation.
2  BY MR. TOAL:
3       Q  No idea as you sit here today?
4       A  Well, I probably would start, like
5  everyone does, I'd go on Google and I'd start
6  searching on TWA, on finances. I imagine if I did
7  that now, even though they haven't existed for ten
8  years, I could find something.
9       Q  Okay. But that's not something that
10 you did; correct?
11      A  That's correct.
12      Q  Do you have the expertise to assess
13 what the financial condition of a company like TWA
14 was prior to the time of the American transaction?
15      A  No.
16      VIDEO SPECIALIST: I have ten minutes
17 before I need to stop you and flip the tape over.
18 Whenever you want to take a break.
19      MR. TOAL: Okay. Why don't we go off
20 the record?
21      VIDEO SPECIALIST: The time is now
22 11:28 and this concludes tape number one.
23      (Brief recess.)
24      VIDEO SPECIALIST: The time is now
25 11:43 and we are back on the video record.

85

1  BY MR. TOAL:
2       Q  Professor Farber, when you testified
3  before the break that you were -- were excluding or
4  not accepting the possibility of a unilateral
5  determination of the seniority integration list by
6  the APA, were you also excluding the possibility
7  that the APA could determine the merge seniority
8  integration list in discussions and negotiations
9  with American Airlines?
10      A  Only American Airlines?
11      Q  Yes. Without the participation of the
12 TWA MEC.
13      A  Yes. Yes.
14      Q  You were excluding that possibility?
15      A  I was simply saying -- I was not -- let
16 me -- let me back -- let me say again. I -- I don't
17 actually -- I don't actually specify the process by
18 which a merged seniority list would be reached. I'm
19 simply saying that had ALPA not shirked its duty of
20 fair representation, the merge -- the merged
21 seniority list on average would have looked like the
22 average of those groups, of the comparable group,
23 however it was done. Whether it was done, you know,
24 unilaterally with American Airlines, with TWA, with
25 an arbitration. I don't specify the mechanism. I

86

1  don't need to make an assumption about that.
2       Q  Do you recognize that in order for any
3  such list to come into existence, that the APA
4  either would have had to have agreed to the list or
5  would have had to agree to arbitrate the list --
6       A  I -- as I said, I don't make an
7  assumption one way or the other about how that would
8  work. American Airlines could -- could have put
9  pressure on the APA. I just don't -- I just don't
10 know.
11      Q  But do -- do you have any understanding
12 of any way a merged seniority integration list could
13 come into existence without the APA either agreeing
14 to the list or agreeing to arbitrate the list?
15      A  As I sit here, I would think that
16 that's quite likely, that that would be the -- the
17 way it would happen, one of those two ways.
18      Q  And do you have any basis for saying
19 that the list that you have identified as your best
20 estimate is a list that the APA would have agreed
21 to?
22      A  Yes.
23      Q  And what is that basis?
24      A  That basis is it's the average of what
25 happened in comparable cases where presumably both

23  (Pages 83 to 86)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

87

1  sides were ably represented by their unions.
2      Q   And other than that, do you have any
3  other basis for saying that the list that you
4  identify as your best estimate is a list that the
5  APA would have agreed to?
6      A   No.
7      Q   Now, have you reviewed the jury verdict
8  in this case?
9      A   I've seen only a two-page sheet with
10  checks on it, if I recall -- if I recall correctly.
11      (Farber-4  Copy of the jury verdict
12      marked for identification.)
13  BY MR. TOAL:
14      Q   I'm going to show you a document that I
15  will mark as Farber Exhibit-4, which is a copy of
16  the jury verdict.
17      If you could, let me know if you've seen a
18  copy of that document before, please.
19      A   Yes, I have.
20      Q   And did this verdict give you insight
21  into what the jury determined the particular breach
22  of the duty of fair representation was?
23      A   No.
24      Q   Did you have any other source of
25  information as to what the jury found as the

88

1  particular breach of the duty of fair
2  representation?
3      A   Well, I -- I -- I don't have any --
4  other than this, I don't have any idea about what
5  the jury found. I do know what was alleged.
6      Q   But you don't know if the jury accepted
7  some subset of that -- those allegations or all of
8  them; correct?
9      A   As far as I can tell, this is all you
10  get from the jury, right?  You tell me.  Is there
11  more than this from the jury?
12      Q   This -- this is all I've seen.  So, is
13  it -- in response to my question, do you know
14  whether the jury agreed that everything that was
15  alleged was a breach of the duty of fair
16  representation?
17      A   No.
18      Q   Does that bear upon your analysis?
19      A   No.
20      Q   Would it affect your determination of
21  what the alternative merged seniority list would
22  have looked like through negotiation if the APA had
23  failed to do one thing that was alleged versus eight
24  things that were alleged?
25      A   No.

89

1      Q   Why not?
2      A   Because as I said, my method was simply
3  to look at a set of comparable cases, and use the
4  average of those comparable cases where presumably
5  both sides were adequately represented by their
6  unions, and say this is what would have happened but
7  for whatever it was that ALPA did or didn't do.
8      Q   But you know, as a matter of fact,
9  correct, that the APA did not agree to arbitrate the
10  dispute it had with the TWA MEC over the merged
11  seniority integration list; correct?
12      A   I know that -- yes.
13      Q   And you also know that, in fact, the
14  APA did not agree to any of the merged seniority
15  lists that the TWA MEC proposed; correct?
16      A   I do not know of any list that the APA
17  accepted.  That's correct.
18      Q   So isn't it necessary to your analysis
19  that for the alternative lists that you proposed to
20  have come into being, that something ALPA did or did
21  not do would have led the APA to either agree to
22  arbitration or agree to some list that the TWA MEC
23  was proposing?
24      A   No.
25      Q   Why not?

90

1      A   I'm understanding your question to mean
2  one of the lists that we saw -- one of the proposals
3  that I saw from the TWA MEC.  So that it might have
4  been a different list than they negotiated jointly
5  that they would have agreed to, not necessarily one
6  proposed by the TWA MEC.
7      Q   In any -- in any event, there would
8  have had to have been something that ALPA could have
9  done to persuade the APA to agree to a list that was
10  different from and better than Supplement CC;
11  correct?
12      A   Yes.
13      Q   And what is it that you think that the
14  -- that ALPA could have done to persuade the APA to
15  agree to a list that was better than Supplement CC?
16      A   I don't have an opinion on that.
17      Q   Can you point to anything that you
18  believe ALPA could have done to persuade the APA to
19  agree to a list that was more favorable to the TWA
20  pilots than Supplement CC?
21      A   I would suggest that they start by not
22  waiving their right to arbitration and perhaps --
23  and/or if they were going to waive their right to
24  arbitration, get something concrete in return rather
25  than simply a promise to use -- by American to use

24  (Pages 87 to 90)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

91

1  their best efforts to create a fair and equitable
2  merger of the lists.  That's --
3      Q      And if American Airlines presented its
4  deal with a condition that the -- that the TWA
5  pilots agree to waive the arbitration provision in
6  their collective bargaining agreement and present it
7  as a take-it-or-leave-it proposal, can you think of
8  anything that ALPA could have done to make it
9  unnecessary for the TWA pilots to waive their
10  arbitration protection?
11     A      I don't know.
12     Q      Can you think of anything, as you sit
13  here today?
14     A      That's not -- I'm not -- I've not
15  studied that question.
16     Q      Are you aware that TWA filed a motion
17  with the bankruptcy court to invalidate the TWA
18  pilots' collective bargaining agreement?
19     A      No.
20     Q      Would that affect your analysis?
21     A      No.
22     Q      Do you have an understanding of whether
23  that motion sought to invalidate the TWA pilots'
24  arbitration provision with respect to seniority
25  integration?

92

1      A      I -- I don't -- I didn't hear -- I
2  don't understand the question.
3      Q      You have an understanding that one of
4  the objectives of the motion that TWA filed was, in
5  the event that the TWA pilots refused to waive the
6  arbitration provision regarding seniority
7  integration, that the bankruptcy court would agree
8  to invalidate it.
9      A      Do I understand that?
10     Q      Do you have that understanding?
11     A      No.  I -- I don't know.  I didn't hear
12  about that.
13     Q      And if such a motion had been filed,
14  would that affect your analysis?
15     A      No.
16     Q      Other than a waiver of the arbitration
17  provision, are you aware of any other actions that
18  ALPA could have taken that would have made the APA
19  more willing to agree to a seniority integration
20  list that was better than Supplement CC?
21     A      No.
22     Q      Have you ever spoken with any of the
23  named plaintiffs in this case?
24     A      No.
25     Q      Have you ever spoken with any member of

93

1  the class in this case?
2      A      No.
3      Q      Have you spoken with any pilots at all
4  concerning this case?
5      A      No.
6      Q      Have you conducted any interviews as
7  part of your work on this case?
8      A      No.
9      Q      I would like to direct your attention
10  to page four of your report, which is Farber
11  Exhibit-1.
12        Take a look at paragraph eight of this report.
13  A sentence in the middle of that paragraph says, as
14  part of evaluating these losses, counsel for the
15  plaintiffs have asked me to analyze American's
16  acquisition of TWA and to generate an estimate of a
17  merged seniority list that would have resulted from
18  the combination of the two airlines had ALPA met its
19  duty of fair representation.  Do you see that
20  language?
21     A      Yes.
22     Q      Were you asked by counsel to estimate a
23  merged seniority list that would have resulted from
24  the combination of the airlines if ALPA had met its
25  duty of fair representation, or to estimate the list

94

1  that would have resulted?
2      A      I'm not sure how to answer that.  I
3  suppose to make the sentence grammatically correct,
4  the "A" needs to be a "the" or the "would" needs to
5  be a "could", just as a matter of grammar.  So given
6  that the merged seniority list is qualified by
7  estimate of, I would say the merged seniority list.
8      Q      And to your knowledge, was anything
9  resembling the list that you propose ever discussed
10  in negotiations between the TWA MEC and the APA?
11     A      Not to my knowledge.
12     Q      Do -- do you have any reason to
13  believe, based on the bargaining history between the
14  TWA MEC and the APA, that the list you proposed
15  would have been the end result of negotiations
16  between the parties in the absence of a breach of
17  the duty of fair representation?
18     A      Yes.
19     Q      And what's the basis for that belief?
20     A      My analysis is that, on average, in
21  cases similar to this, this is the list that would
22  have resulted.
23     Q      So is it your belief that the parties
24  would have departed from the structure of the list
25  they were discussing, and instead would have adopted

25  (Pages 91 to 94)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

95

1  the list that you proposed as your best estimate?
2      A    Let's be clear.  There is factored --
3  my list is essentially a starting structure of an
4  ultimate seniority list because it is quite likely,
5  as I mentioned in my report, that other factors such
6  as the fence around St. Louis, and equipment, and
7  status would result in the names on the list in the
8  order I put them being put into sub-lists that
9  reflect all that stuff.
10     Q    Okay.  So --
11     A    And -- and the list -- let me say --
12 let me continue.  Let me finish.  And the proposals
13 that were bandied about had a lot of discussion of
14 those -- those issues, you know, of differences of
15 equipment and so on, that I chose not to consider in
16 constructing my list with the understanding that the
17 list could be used as a starting framework to create
18 a -- a list that made -- took account of differences
19 and the status, and equipment, and domicile and so
20 on.
21     Q    Okay.  So you are not saying that the
22 list that you proposed as your best estimate is the
23 list that a negotiation in the absence of a breach
24 by ALPA would have produced; correct?
25     A    Let me say it would -- it would

96

1  probably not be the list that was written down, but
2  it -- it would be implicit in the list, in whatever,
3  you know, multipiece list they came up with would
4  essentially be derived from my list.  So it is
5  not -- you know, it is not -- it is not appropriate
6  to dismiss my list and say, well, this isn't what
7  they would have come up with.  In fact, it -- it is
8  important, even if they -- even if they don't think
9  about it that way, it is an important building block
10 that they use then to say, okay, let's take the, you
11 know, B767 pilots and -- and -- and what numbers are
12 they?  They would take them in order off of my list.
13     Q    So, for instance, your list has no top
14 staple; correct?
15     A    That's correct.
16     Q    And based on the negotiating history,
17 was even the TWA MEC taking the position that there
18 should be no top staple on the list?
19     A    I don't know.  I don't remember.
20     Q    Is that significant to your analysis,
21 what the negotiating history was?
22     A    Yes.  The fact that there is no top
23 staple was a -- I mean, and I think we say this in
24 the report, at the end of the day, the model that I
25 used gives me this one number which is the

97

1  proportional mean difference in ranks.  In order to
2  construct a list from that, you can do it in an
3  infinite number of ways.  The two that make sense
4  are a bottom staple and a ratio of the rest or a top
5  staple and the ratio of the rest.  I could have just
6  as easily come up with a staple and a ratio of the
7  rest.  But the bottom staple and a ratio of the rest
8  was conservative to the sense it would yield smaller
9  damages to the TWA pilots.  And whenever I have an
10 arbitrary choice to make, I like to try to make it
11 in a conservative way.  So the fact that there is no
12 top staple was simply a choice I made to be
13 conservative.  There could have been a top staple.
14     Q    Could you have had a top staple and a
15 bottom staple?
16     A    Absolutely.
17     Q    Why didn't you construct your list that
18 way given that -- given the negotiating history
19 between the parties?
20     A    Again, because that way would have
21 yielded larger damages to TWA, and any choice I make
22 of -- in other words, once you have a top staple and
23 a bottom staple, you have a choice of how big each
24 one is, and then how big the ratio in between them
25 is.  So that ultimately you have to make choices to

98

1  construct the list.  This is exactly why I say, you
2  know, would my list be exactly what would come out
3  person for person?  It is -- it's a little bit hard
4  to say, but what we chose to do was to say we want
5  to make this comparable in overall effect to other
6  mergers in a way that's most conservative, that
7  yields the smallest damages to TWA pilots in order
8  to protect ourselves from the criticism that we are
9  simply making assumptions that make our damages as
10 large as possible.  In fact, the assumptions I make
11 when I have an assumption to make are designed to
12 make damages as small as possible, and the fact that
13 they come out as large as they do when I make the
14 assumptions to make them as small as possible, is
15 testament to something.  I mean, so -- that's a
16 little discursive, I understand.
17     Q    Do you recognize that, based on the
18 negotiating history between TWA, the TWA MEC and the
19 APA, there is nobody in the negotiation talking
20 about a list that wouldn't have a -- a section at
21 the top reserved for American Airlines pilots?
22     A    Let me put -- if you would like me to,
23 I will go back and construct a list with a top
24 staple, if -- if my lawyers would like me to, and
25 I'll get a big -- and then we can give it to the

26  (Pages 95 to 98)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

99

1 other guy, and he will come back with a bigger
2 damage number. I can do that.
3     Q    Let -- let me ask you, if we were
4 concerned about, not just the aggregate number, but
5 determining the appropriate compensation for each
6 member of the class, it would be important to
7 construct your list in a way that reflected the
8 reality of what the parties were likely to agree to;
9 correct?
10         MR. PRESS: I object to the form of the
11 question. Until you complete your hypothetical with
12 the record in this case, it is not proper. Subject
13 to that, you can answer.
14         THE WITNESS: The hypothetical is, you
15 want to know how much each pilot is owed?
16 BY MR. TOAL:
17     Q    Correct.
18     A    Right. I would say I can think of no
19 objective way, sitting here, to -- to select among
20 the variety of top and bottom staples that would be
21 required to precisely tell you exactly how much the
22 damages to each member of the class are.
23     Q    And if I was interested in determining
24 accurately the compensation due each member of the
25 class, would you agree that your list, what you

100

1 present as your best estimate, is not going to
2 achieve that objective?
3     A    I would -- no. I would disagree with
4 that. It would do a pretty good job.
5     Q    Now, with respect to pilots at the top
6 of the list, you put TWA pilots at the top of the
7 list even though none of the parties to the
8 negotiation were proposing that; correct?
9     A    Excuse me? Say this again.
10    Q    Your list puts TWA pilots at the top of
11 the list even though none of the parties to the
12 negotiation were proposing that that happened;
13 correct?
14    A    Not at the very top of the list. In
15 fact, as I understand it, Supplement CC has a bottom
16 staple, not a top staple.
17    Q    Oh, it is your understanding that
18 Supplement CC doesn't have exclusively American
19 Airlines pilots at the top of the list?
20    A    I would have to -- I would have to read
21 it again. My recollection is that there was -- no,
22 that's right. It was a top staple. I would have to
23 look at it. Let me not speculate on it. We can
24 look at Supplement CC, but --
25    Q    Well, I will ask you to assume that

101

1 Supplement CC has spots reserved at the top of the
2 list for American Airlines pilots.
3     A    Okay.
4     Q    Because -- because American Airlines
5 had certain equipment that TWA didn't fly.
6     A    Okay. Well, again, again, what I'm
7 going to say is I fully expected that my list would
8 be used as a starting point for a status and
9 equipment merge. So if, in fact, at the end of the
10 day, let's say only American was flying, you know,
11 747s and TWA wasn't, I don't know if that's true or
12 not, and only that 747 pilots at the top of the heap
13 would be alone at the top, that would be fine. They
14 are extracted from the list and what's left goes on.
15 It doesn't change the ordering in terms of relative
16 seniority rank within equipment and status.
17 Essentially what the list provides is a framework
18 that gives you a proper accounting of relative
19 seniority rank within status and equipment.
20    Q    What would you need to do to take your
21 analysis and have it be reflective of an agreement
22 that you think would have been reached between the
23 APA and the TWA MEC?
24    A    Well, first of all, we didn't have
25 enough information -- we didn't have information

102

1 on -- on status and equipment numbers for the two
2 airlines that would enable us to do a full status
3 and equipment merge, I believe. I think I have a
4 footnote in the paper that suggests that, in the
5 report, rather. So if I had that information, it
6 would be useful to consider that in forming a list
7 that accounted for status and equipment.
8     Q    And did you ask for that information?
9     A    I believe so.
10    Q    And what were you told?
11    A    I would -- it was David Ashmore who
12 asked for it, and I don't know what he was told.
13    Q    You didn't ask him what he was told?
14    A    I said, can we get it? And he said,
15 no, we can't. It is not available. So I don't know
16 why.
17    Q    And other than -- and if you had status
18 and equipment information, how would you have used
19 that to modify your list?
20    A    In detail, I can't tell you, because
21 without the information, I didn't put in the time to
22 figure out exactly how I would use it. But in -- in
23 -- in rough terms, I read enough of these
24 arbitration awards to know that there is almost
25 always a distinction between widebody pilots and

27 (Pages 99 to 102)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

103

1  narrowbody pilots, and often a distinction between
2  pilots and first officers, and I would then do a
3  more nuanced list that took account of that, which
4  is -- but nonetheless I felt that the list we came
5  up with could be used once that information was
6  available.
7      Q    And what other information other than
8  status and equipment information would you need to
9  modify your list to be reflective of an agreement
10 that you think would have been reached between the
11 TWA MEC and the APA?
12     A    I would have to think hard but I'd want
13 to think, at least, about the domicile issue in
14 particular.  Even Supplement CC built some kind of
15 fence around St. Louis, which is meant to protect,
16 at least a little bit, the TWA pilots, though it is
17 fairly porous.
18     Q    What do you mean by fairly porous?
19     A    Well, there are situations in which
20 American pilots from outside can, I think the term
21 is, bump and flush TWA pilots out of St. Louis.
22     Q    What -- what do you understand those
23 situations to be?
24     A    A more -- I don't remember precisely.
25     Q    And what's your understanding of how

104

1  the St. Louis fence worked under Supplement CC?
2      A    I don't really have a firm
3  understanding.  Just enough -- I read enough of it
4  to know that there are cases where, if an American
5  pilot from outside had more seniority and was -- he
6  could bid on a job in -- in St. Louis.  But I
7  don't -- I don't have a nuanced understanding of
8  Supplement CC.
9          (Farber-5  TWA pilot seniority
10         integration summary marked for
11         identification.)
12 BY MR. TOAL:
13     Q    Let me mark for you as Farber Exhibit-5
14 a -- a TWA pilot seniority integration summary of
15 Supplement CC, dated December 14, 2001, and ask you
16 if you have seen this document before.
17     A    You gave me two pieces of paper here?
18     Q    The jury verdict, I think, was the
19 exhibit we marked previously.
20     A    Oh, okay.  That's your copy.  Okay.
21 Okay.
22     I don't think I -- okay.  I've not seen this
23 before.
24     Q    Okay.  Let me ask you to direct your
25 attention to page 26 of this document.  You see at

105

1  the -- the bottom of this page there is a heading
2  that says St. Louis?
3      A    Uh-huh.
4      Q    And it says, Supplement CC reserves all
5  B767-200, B767-300, B757 Captain positions in the
6  St. Louis domicile to the TWA pilots, until Morgan
7  Fisher, the last TWA pre-bankruptcy hire, and the
8  last TWA pilot hired before the American furloughs
9  in 1993 has sufficient seniority to hold a small
10 widebody Captain position somewhere in the system.
11 Do you see that?
12     A    Uh-huh.  Yes.
13     Q    Is this consistent with your
14 understanding of how the St. Louis fence was to
15 work?
16     A    Yes.
17     Q    And do you have any knowledge as to
18 whether any legacy American Airline pilot has ever
19 successfully bid into a Captain position in the
20 St. Louis domicile?
21     A    No.
22     Q    How would you -- how would you go about
23 conceptually trying to take the St. Louis fence into
24 account in modifying the best estimate seniority
25 integration list that you proposed?

106

1      A    As I sit here, I don't know right now.
2      Q    Okay.  But you haven't done that in
3  your best estimate; correct?
4      A    No.  I have not.
5      Q    Do you have the expertise to do that?
6      A    I would have to think -- I would have
7  to first study the problem and see what it involves
8  before I could answer that even.
9      Q    So as you sit here today, you can't
10 tell me whether you -- whether or not you have the
11 expertise --
12     A    That's right.
13     Q    -- to take the St. Louis fence into
14 account, in -- in -- in determining a --
15     A    I mean, let me say this.  I think I --
16 I think I have the expertise.  The question is, do I
17 have the information.
18     Q    And what information would you need?
19     A    I'm not sure.  I would have to study
20 the problem to figure out the information I needed
21 to do that.
22     Q    Okay.  So as you sit here today, you --
23 you can't tell me what information you would need in
24 order to factor the St. Louis fence?
25     A    That's correct.  I could give you a

28 (Pages 103 to 106)

DEGNAN & BATEMAN
(856)  232-7400

82109aa4-8378-4731-b7d1-08d43130cdc1

107

1  start on the information, but I couldn't tell you
2  all the information.
3      Q    So as you sit here today, what
4  information are you aware of that you would --
5      A    Well, I certainly would want to know
6  the number of planes involved. The -- the -- there
7  is also a question of are we asking the question
8  prospectively, so that sitting there in
9  January 2001, do I want to make a projection of what
10 the fence would mean? Or do I want to look
11 retrospectively from 2012 and say what did the fence
12 mean? Those are two different questions.
13     So I would want to know, for example, what do
14 I expect flights -- the numbers of planes domiciled
15 in St. Louis to be? How many will be small wide
16 bodies? How many will be other kinds of planes?
17     Interestingly, the language you had me read
18 had to do with Captains. In fact, it was that
19 portion that I was talking about was talking about
20 junior officers. So I would want to know all that
21 stuff.
22     And, you know, it would also require
23 information and opportunities elsewhere in the
24 American system to know what it meant for the -- the
25 American pilots to be able to not bid or bid into

108

1  the St. Louis domicile. Things like that.
2      Q    If -- if it turns out under the
3  St. Louis fence that the TWA pilots are competing
4  with one another with respect to their -- their
5  bids, would that affect your damage analysis in any
6  way?
7      A    If the -- if the -- can you repeat the
8  question?
9      Q    Yeah. If it turns out under the
10 St. Louis fence that the legacy TWA pilots who are
11 within the St. Louis domicile are effectively
12 competing against one another with respect to their
13 bids, would that affect your analysis in any way?
14     A    That's what the seniority list is
15 about. That -- that determines the outcome of that
16 competition.
17     Q    Just to be clear, I'm -- I'm saying
18 that they are competing only with other legacy TWA
19 pilots and not with any legacy American Airlines
20 pilots.
21     A    I understand. That's right. That's
22 right. But that's what the seniority list is about.
23 There would be a seniority list, and the names on
24 the list that would be relevant for those flights
25 are the TWA names, and they would be competing with

109

1  each other; and depending on the order on that list,
2  there might be American pilots in the middle there,
3  but they are irrelevant, I mean, because they can't
4  bid on those planes.
5      So I wouldn't have -- I -- I don't -- in doing
6  my analysis of the fence, I certainly would have to
7  think about how many TWA pilots there were in
8  St. Louis, yes.
9      Q    Well, let -- let me ask you to assume
10 that all the legacy TWA pilots are in the St. Louis
11 domicile.
12     A    There is no others.
13     Q    There are no others.
14     A    Okay.
15     Q    And so when they bid, they are only
16 bidding against other legacy TWA pilots. Would that
17 affect your damage analysis in any way?
18         MR. PRESS: I object to the form of the
19 question.
20         THE WITNESS: No. No. It -- it
21 might -- I -- I come up with a list. That's my
22 damage analysis. It's a list, and the list can be
23 used if someone wants to take my list and figure out
24 where people are domiciled, and have a fence, and
25 specify exactly how the fence works, and play the

110

1  thing out, that could be reflected in someone's use
2  of my list.
3  BY MR. TOAL:
4      Q    Would you agree that it would affect
5  the question of whether TWA pilots actually
6  sustained damage during the period that they worked
7  at American Airlines?
8          MR. PRESS: I object to the form of the
9  question.
10         THE WITNESS: I don't know.
11 BY MR. TOAL:
12     Q    Do you agree that Supplement CC
13 maintained the same relative order of TWA pilots as
14 had been in place at TWA?
15         MR. PRESS: I object to the form of the
16 question. You are completely mischaracterizing the
17 record.
18         THE WITNESS: I don't know.
19 BY MR. TOAL:
20     Q    You don't know whether Supplement CC
21 maintained the same relative order of pilots?
22     A    I -- I -- I haven't -- I haven't read
23 it carefully and I haven't read it recently. And
24 this is a -- a summary of it I have not seen before.
25     Q    If you could take a look at page 27 of

29  (Pages 107 to 110)

HENRY FARBER

111

1  this document. You see the second paragraph on this
2  page says, Supplement CC also reserves the related
3  first officer positions in St. Louis to the TWA
4  pilots, while these small widebody captain and
5  narrowbody captain fences are in effect. This is to
6  assure that the TWA pilots will continue to enjoy
7  some of the quality of life benefits they have in
8  their separate TWA operation despite their placement
9  on the integrated seniority list.
10     A     Uh-huh. Yes.
11     Q     Is that consistent with your
12  understanding of how the St. Louis fence worked?
13     A     I don't really have a clear
14  understanding about the St. Louis -- how the
15  St. Louis fence works. In fact, I would have to
16  read this carefully to get such an understanding.
17     Q     Do you know whether, when Mr. Salamat
18  took your model, he did anything to account for the
19  impact of the St. Louis fence on the damage figures
20  he calculated?
21     A     I have no idea.
22     Q     You agree that before anyone took your
23  model and attempted to quantify damages, that it
24  would be important to take into account the impact
25  of the St. Louis fence and any equipment and status

112

1  restrictions?
2     A     I -- until I do the analysis, I don't
3  know if it would be important or not.
4     Q     And you haven't done that analysis;
5  correct?
6     A     That's correct.
7     Q     Take a look at page 14 of your report,
8  which is Farber-1.
9        See the footnote 30 at the bottom. You say, I
10  do not have data on the duties of its pilots. At
11  the time the seniority lists were integrated, as a
12  result, it is not possible for me to allow for this
13  factor in this estimate. Should this information
14  become available, I may adjust my approach to take
15  advantage of these data. Do you see that language?
16     A     Yes.
17     Q     And what did you mean when you said you
18  didn't have data on the duties of pilots?
19     A     I would have to go look at the raw data
20  again, but I believe -- let me see what -- let me
21  see where that footnote is. Hold on.
22     Q     It's at the bottom of paragraph 39.
23     A     Uh-huh. I didn't -- I don't have, I
24  don't think, the assignments of the pilots to
25  particular equipment, I believe. I could be wrong

113

1  about this. I know we didn't have enough data to do
2  the full analysis. I'm not even sure I had the --
3  had the ranks. That I can't be sure of.
4     Q     So as you sit here today, can you tell
5  me what you had in mind when you talked about the
6  data on the duties of pilots?
7     A     Yeah. I wanted to know what the rank
8  was and what kind of aircraft they were assigned to.
9     Q     And did you ask for that information?
10     A     I can't be sure. I -- I -- I'm not
11  sure.
12     Q     And had you had that information, how
13  -- how would that have affected your analysis?
14     A     Well, it -- it was -- it's a decision.
15  I would of discussed it with the attorneys to decide
16  whether what they wanted from me was a list like
17  they have now, which is essentially just a rank
18  order of seniority, not taking into account status
19  or equipment, or they wanted a more fully nuanced
20  list that broke things out by category, because my
21  professional opinion was that the list I got -- had
22  I had that equipment, I would have started with the
23  same list I've got here, and then I would have then
24  simply extracted like, okay, now we are going to
25  look at wide bodies, so let's just take the subset

114

1  of our list, which is widebody Captains, let's say,
2  pull them out in the same order they appear on my
3  master list, and then assign them that way, and then
4  do that with narrowbody Captains, then with widebody
5  first officers and narrowbody first officers.
6        So I -- I don't think it would have changed
7  the first part of my analysis, which is to come up
8  with the list, but it would have enabled me to take
9  the analysis further and come up with sub-lists by
10  status and equipment and maybe my domicile, and then
11  that -- that would have been just a further output
12  of my analysis. But I basically took this analysis
13  as far as I was asked to do -- go.
14     Q     Okay. So we were looking before at
15  paragraph eight of your report where you described
16  what your assignment was. Do you recall that
17  paragraph?
18     A     I can read it.
19        MR. PRESS: Which paragraph?
20        THE WITNESS: Eight.
21        MR. TOAL: Paragraph eight.
22        THE WITNESS: Yes.
23  BY MR. TOAL:
24     Q     Okay. So this is where you said you
25  were -- you were looking to generate an estimate of

30 (Pages 111 to 114)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

115

1  a merged seniority list that would have resulted
2  from a combination of the two airlines had ALPA met
3  its duty of fair representation; correct?
4      A    Yes.
5      Q    Are you aware of any generally accepted
6  economic methodology for doing that?
7      A    Yes.
8      Q    And what methodology is that?
9      A    That's the method I used.
10     Q    And have you seen proportional
11 differences in mean ranks used in any other
12 seniority integration dispute?
13     A    What I meant was that the method is the
14 method of finding a comparison group, and -- and
15 then comparing what you see with the comparison
16 group as a -- as a measure of damages, not -- I've
17 -- I've never seen anyone do anything with regard to
18 merging of seniority lists.
19     Q    Just to be clear, so your testimony is
20 you've never seen any other expert use proportional
21 difference in mean ranks in the context of a
22 seniority integration dispute; correct?
23     A    That's correct.
24     Q    Have you ever seen any arbitrator in a
25 seniority integration dispute rely on proportional

116

1  differences in mean ranks?
2      A    No.
3      Q    Have you ever seen an arbitrator in a
4  seniority integration dispute even take that factor
5  into consideration in any way?
6      A    Yes.
7      Q    And in which arbitration?
8      A    I don't -- my -- my yes answer doesn't
9  mean they are looking at literally the proportional
10 difference in mean ranks, but many arbitrators --
11 several -- more than a few times you see
12 arbitrators, when they are evaluating the proposal
13 of one side or the other, say that it -- the
14 proposal of one side or the other would result in a
15 serious disparity in placement on the list between
16 the two airlines.
17         And, indeed, in most arbitrations, the
18 positions of the two parties result in a big
19 difference in average placement on the list.  And
20 all I did was simply figure out a summary way to
21 quantify that difference.
22     Q    So my question is more specific about
23 whether you've ever seen any arbitrator actually
24 calculate and use proportional difference in mean
25 ranks in the context of the seniority integration

117

1  dispute.
2      A    No.
3      Q    Have you ever seen any peer-reviewed
4  research advocating the use of proportional
5  difference in mean ranks in the context of
6  seniority -- seniority integration disputes?
7      A    No.
8      Q    Do you agree that in most seniority
9  integration disputes, that the unions in question
10 are not able to reach agreement on seniority
11 integration?
12     A    I can't say -- I've not done a count so
13 I don't want to say that most but I know that in
14 many cases they do not reach agreement.
15     Q    You haven't done any analysis of how
16 frequently the parties reach agreement and how
17 frequently they don't?
18     A    That's correct.
19     Q    And what's your understanding of the
20 role the APA was to play in the process of
21 determining the integrated seniority list in this
22 case?
23     A    I consider them just like any other
24 union in a -- in a merger acquisition.  They're the
25 party representing one group of employees on one

118

1  side.
2      Q    Did you undertake any analysis to
3  determine whether the best estimate list that you
4  propose would have preserved the pre-transaction
5  career expectations of the American Airlines pilots?
6      A    No.
7      Q    And you may have answered this --
8      A    Can I -- can I -- can I amend that
9  answer?
10     Q    Yeah.
11     A    Okay.  I took no direct consideration
12 of career expectations, but by choosing a list of
13 comparables in a particular way, what that does is
14 that that results in a list that's, again,
15 comparable to what would have happened with fair
16 representation, and presumably those other
17 arbitrations took account of career expectations, so
18 I would expect to get something quite reasonable in
19 the way of career expectations out of my list.
20     Q    Okay.  But my question was specific to
21 this particular case and whether you undertook any
22 analysis to determine whether the best estimate list
23 that you propose would have preserved the
24 pre-transaction career expectations of the American
25 Airlines pilots.

31  (Pages 115 to 118)

DEGNAN & BATEMAN
(856)  232-7400

HENRY FARBER

119

1   **A**   No.
2   **Q**   Are you -- as part of your work in this
3   case, are you offering an expert opinion that the
4   APA would, in fact, have agreed to the best estimate
5   list that you proposed?
6   **MR. PRESS: It's been asked and**
7   **answered.**
8   **THE WITNESS: No.**
9   **BY MR. TOAL:**
10   **Q**   Do you have an understanding of whether
11   the APA had the right to insist under its collective
12   bargaining agreement that all of the TWA pilots get
13   stapled to the bottom of the list?
14   **A**   I believe so, yeah.
15   **Q**   You believe they did have that ability?
16   **A**   I believe that it was in their
17   contract. That's different from having the ability.
18   **Q**   Okay. So you believe the APA had the
19   right under their contract to insist that all of the
20   TWA pilots be stapled to the bottom of the list;
21   correct?
22   **A**   I -- I believe so, yeah.
23   **Q**   And what did you try to do in this case
24   to understand the APA's position regarding seniority
25   integration?

120

1   **A**   I read -- I simply, as -- as you said,
2   I read their contract provision. I read a little
3   bit about the offers, and a few of the offers and
4   counteroffers that went back and forth. That's as
5   far as I went.
6   **Q**   And what -- what information did you
7   derive about the APA's views on seniority
8   integration from the materials that you reviewed?
9   **A**   They weren't giving up much.
10   **Q**   Do you have any more specific
11   recollection about what their position was?
12   **A**   No, no.
13   **Q**   Do you have any recollection of what
14   their rationale was for the positions they were
15   taking?
16   **A**   No.
17   **Q**   And do you recall from those materials
18   that you reviewed, what the APA's view of TWA's
19   financial condition was at the time of the American
20   Airlines transaction?
21   **A**   Let -- let me just preface my answer by
22   saying, whatever the APA said and whatever, frankly,
23   ALPA would say, at that stage, it is all bargaining
24   rhetoric. And whatever APA's bargaining rhetoric
25   was, TWA was in dire bargaining -- dire bargaining

121

1   rhetoric. In a negotiation, either party is just
2   making bargaining rhetoric. And they were claiming
3   that TWA's financial position was quite dire, and
4   they were imminently going to cease operation,
5   and -- it is a -- it is a self-serving statement.
6   It was in their interest to make such a statement.
7   **Q**   Whether it is self-serving or not, what
8   basis, if any, do you have for opining on whether it
9   represented APA's true views?
10   **A**   I have no basis. I don't know what
11   their true views were.
12   **Q**   You do recall, at least from the
13   materials that you reviewed, that the APA at least
14   was expressing the view that TWA was in dire
15   financial condition and was on the verge of not
16   flying; correct?
17   **A**   On the verge of declaring bankruptcy,
18   yeah.
19   **Q**   In your prior answer you said that they
20   were claiming TWA's position was quite dire and they
21   were imminently going to cease operations. Do you
22   recall saying that statement?
23   **A**   That was a misstatement. I believe --
24   I -- I -- I would have to -- let me say this. I
25   would have to go back and look at the APA's

122

1   statements. But I believe it talked more about
2   bankruptcy than ceasing flying, but I could be
3   wrong. I -- I -- I honestly -- you're asking me --
4   I should probably answer less effusively. I should
5   say I don't remember exactly what the APA said.
6   **Q**   And would it be important to your
7   analysis to get an understanding of what the APA's
8   actual views were concerning TWA's financial
9   condition?
10   **A**   No.
11   **Q**   Given that the APA would have to agree
12   to any negotiated result, why wouldn't that be
13   important to your analysis?
14   **A**   I -- I don't see why the APA would have
15   particularly valid information about TWA's financial
16   situation.
17   **Q**   Whether they had valid information or
18   not, I'm asking whether their views, their beliefs
19   concerning TWA's financial condition would be
20   important to your analysis.
21   **A**   No. We're -- no.
22   **Q**   If the APA had the committed, but even
23   mistaken view, that TWA was on the verge of ceasing
24   operations, would you expect that to affect their
25   negotiating position?

32  (Pages 119 to 122)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

123

1    A    APA's negotiating position?
2    Q    Yes.
3    A    Maybe.
4    Q    So why wouldn't it be important to take
5    into account the APA's views concerning TWA's
6    financial condition?
7    A    Because if -- if -- if ALPA were
8    adequately representing the pilots of TWA, this
9    would come out in negotiation. Either ALPA, with
10   the proper information, would convince the APA and
11   they would reach an agreement, or there wouldn't be
12   a merger, or there would be some other way that --
13   another way for it -- another way forward. Again,
14   all -- I'm doing something very straightforward. I
15   -- I simply say, here is what happened in similar
16   cases that should have happened here. That's all.
17   Q    Well, isn't -- isn't one of the
18   questions whether the cases that you relied upon are
19   actually similar or not?
20   A    Well, on average, they are similar.
21   Q    Well, you determined that they were
22   similar because of --
23   A    Yes.
24   Q    -- because of a judgment you made about
25   the financial condition of the airlines, the

124

1    acquired airlines that you included in your sample;
2    correct?
3    A    Correct.
4    Q    And if you made a different judgment,
5    and were more pessimistic about the financial
6    prospects of TWA, you might have put together a
7    different set of comparables; correct?
8    A    That's correct.
9    Q    Did you do any -- any independent
10   analysis of TWA's financial condition at the time of
11   this transaction?
12   MR. PRESS: Didn't we just go through
13   this? It's been asked and answered.
14   THE WITNESS: I read statements -- I
15   read some material. They were flying. They were
16   flying in full -- and -- you know, I -- did I do any
17   independent analysis? No, I did not go and look at
18   bankruptcy filings or any of that.
19   BY MR. TOAL:
20   Q    But your criteria is not just whether
21   the acquired airline happened to be flying at the
22   time. You also talked about whether it was going to
23   stop flying imminently; correct?
24   A    Yes.
25   Q    So what steps did you take to determine

125

1    whether TWA was expected to stop flying imminently?
2    A    I read -- as I was reading the record,
3    which was sort of the history, more of the history
4    of the case and the history of the bankruptcy, and I
5    read -- in particular, I read one paper. It's cited
6    here. I can find -- would you like me to find you
7    the reference?
8    Q    Is it the paper by a professor at the
9    Tuck Business School?
10   A    Exactly. Who -- who -- who argued, for
11   example -- you know, a key future for me was there
12   were other suitors besides American Airlines who
13   would have provided debtor-in-possession financing
14   and kept the airline operating. As a result, I
15   didn't think their shutdown was imminent.
16   Q    And which other suitors are you
17   referring to?
18   A    Carl Ichan.
19   Q    Any others?
20   A    Carl Ichan, I-C-H-A-N.
21   I would have to look at the paper again.
22   That's one -- his is a name that sticks with me.
23   Q    Is that the only one you can recall as
24   you sit here?
25   A    Yes. And they were also -- I believe

126

1    they had equipment that was worth something, and
2    there were other sources of financing that they
3    perhaps could have pursued internally, if I recall
4    correctly. But, again, I don't have it memorized.
5    Q    When were you first retained in this
6    matter?
7    A    I don't actually know, remember.
8    Q    What's your best recollection?
9    A    Must be sometime in the last two years.
10   Certainly not within the last eight months or nine
11   months, but sometime between ten months ago and two
12   years ago. I just don't -- honest to God, I just
13   don't remember. I think it must have been early
14   last year.
15   Q    Early 2012?
16   A    Could be. It might be in 2011.
17   Perhaps my attorneys -- the attorneys for TWA can
18   help you out with that.
19   Q    And how much have you been paid so far
20   in connection with this assignment?
21   A    I don't know.
22   Q    Do you have a reasonable estimate you
23   can make?
24   A    Well, as I said, I think you asked me
25   earlier if I've -- if I've worked -- if I take away

33 (Pages 123 to 126)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

127

1   what I worked now, maybe I got paid for three days.
2   So probably -- I probably -- I might have gotten
3   paid $20,000.
4       Q    How much?
5       A    $20,000 maybe. I don't know.
6       Q    And how much have Ashenfelter & Ashmore
7   been paid?
8       A    I have no idea. 20,000, by the way, is
9   only -- is only the grossest estimate. I -- I
10  honestly --
11      Q    Did you do anything to prepare for this
12  deposition?
13      A    Yes.
14      Q    What did you do?
15      A    I reread my report, both at the
16  beginning of preparation and at the end of
17  preparation. And in between, I took a look at core
18  materials including the things like the -- many --
19  not many, but a number of the arbitration awards,
20  particularly the ones -- at -- the ones related to
21  the comparison group. I read some other documents
22  that I thought were important -- I thought were
23  interesting and important including the article by
24  the guy at the Tuck School, Dartmouth. The -- I
25  tried to read Supplement CC, but I didn't have a

128

1   nice summary like you have here. Things like that.
2   Plus I spent a half a day with -- with the attorneys
3   talking about what the deposition might be about.
4       Q    And when was that meeting?
5       A    Last Thursday.
6       Q    Did you meet in person?
7       A    Yes.
8       Q    And who was present at that meeting?
9       A    The two attorneys here, me, and David
10  Ashmore. Oh, and -- I'm blanking on her name.
11      Q    Another attorney?
12      A    Another attorney. Don't tell her I
13  forgot her name. I'm terrible at that.
14      Q    It is going to be in the transcript
15  now.
16      A    What's that?
17      Q    It's going to be in the transcript.
18      A    I know, I know, I know. I'm so bad at
19  that.
20      Q    Were -- were you provided with any
21  assumptions on which to base your analysis?
22      A    No. Meaning the preparation?
23      Q    No. In the -- in the course of your
24  analysis at all, did plaintiff's counsel --
25      A    Yes, yes.

129

1       Q    -- instruct you to make any
2   assumptions?
3       A    Yes.
4       Q    And which assumptions did they direct
5   you to make?
6       A    They directed me to make the assumption
7   that ALPA had breached its duty of fair
8   representation, as that had been found by a court of
9   law.
10      Q    Anything else?
11      A    No. Not that I can recall here.
12      Q    Were you asked to make any assumptions
13  about TWA's financial condition?
14      A    No.
15      Q    Were you asked to make any assumptions
16  about the likelihood that TWA would cease flying in
17  the absence of a transaction with American Airlines?
18      A    No.
19      Q    Were you asked to make any assumptions
20  about the premerger career expectations of TWA
21  pilots?
22      A    No.
23      Q    And in putting together your list, did
24  you pay attention to the pre-transaction career
25  expectations of the TWA pilots?

130

1       A    Say that -- please repeat that.
2       Q    In your work on this assignment, did
3   you pay attention to the pre-transaction career
4   expectations of the TWA pilots?
5       A    No.
6       Q    And did you pay attention to the
7   premerger career expectations of the American
8   Airlines pilots in constructing your list?
9       A    No.
10      Q    Did you make any assumptions in your
11  work about the value of TWA's assets to American
12  Airlines?
13      A    No assumptions. I drew conclusions.
14      Q    And what conclusions did you draw?
15      A    That TWA brought assets that had real
16  value to the transaction. That was one of the
17  criterion I used -- one of the criterion I used to
18  find comparables.
19      Q    And what do you mean by real value?
20      A    I mean something that American was
21  willing to pay for.
22      Q    And isn't that the case in any of these
23  transactions that there is always something that the
24  acquiring airline is willing to pay for?
25      A    Well, the question is, is it

34 (Pages 127 to 130)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

131

1 substantial, and there was -- I relied here on a
2 presentation by American which outlined the -- the
3 assets that TWA was going to bring to the -- to the
4 merger.
5     Q     And did you identify any transactions
6 in which you felt the acquiring -- the acquired
7 airline was not bringing assets of substantial value
8 to the transaction?
9     A     I believe there were some.
10    Q     And which ones can you recall?
11    A     I don't recall which ones they were,
12 but that a reason -- that would be a reason for it
13 not to be included as a comparable transaction.
14    Q     Did you do any analysis of what the
15 value, in fact, was to American Airlines of TWA's
16 assets?
17    A     No.
18    Q     Did you develop any metric to assess
19 the value of the assets that the acquired airline
20 was bringing to a merger?
21    A     No.
22    Q     Do you have the expertise to do that?
23    A     That depends on the nature of the
24 asset.
25    Q     With respect to which assets would you

132

1 be able to assess the value of what the acquired
2 airline is bringing to the table?
3     A     Well, for example, if they own
4 equipment of particular types, there is a market for
5 equipment and I can value the equipment at market
6 value. To the extent there is markets in slots at
7 particular airports, that's a little harder, then I
8 begin to need someone with more expertise in the
9 airline industry to tell me what TWA's gates at JFK
10 were worth, for example, or what, if there are in a
11 dominant position in St. Louis, was worth. That
12 sort of thing.
13    Q     And you didn't undertake any efforts to
14 actually do that in this case; correct?
15    A     No.  I -- my -- my -- it was -- I did
16 not quantify those. That's correct.
17    Q     Were you asked to make any assumptions
18 about what leverage TWA had in the negotiations
19 concerning seniority integration?
20    A     No.
21    Q     Did you make any assessment of the
22 leverage that TWA -- the TWA MEC had on the one hand
23 and the APA had on the other hand in the
24 negotiations concerning seniority integration?
25    A     Did I -- did I make any assumptions,

133

1 you are asking me?
2     Q     Did you make any assessment?
3     A     An assessment, no.
4     Q     Would that have been relevant to your
5 analysis, what the bargaining leverage of each side
6 was?
7     A     Well, the -- the -- the -- the
8 situation was tainted by the fact that ALPA shirked
9 its duty of fair representation, so that what I
10 observed as the bargaining leverage would not be an
11 indication of something that would exist absent that
12 bad behavior.
13    Q     Did you try to make any assessment of
14 what bargaining leverage TWA, the TWA MEC would have
15 had relative to the APA in the absence of any breach
16 by ALPA?
17    A     Yes.
18    Q     And what -- how did you go about
19 conducting that assessment?
20    A     That was simply my -- my analysis. My
21 analysis showed that the TWA pilots would have done
22 much better on a merged list. That's an assessment
23 of relative bargaining power.
24    Q     So -- and my -- my question is really
25 focused on, not the outcome of the negotiations, but

134

1 whether you did any assessment of the bargaining
2 leverage that each side had in the negotiations
3 absent any breach by ALPA.
4     A     No.
5     Q     In paragraph three of your report, page
6 two, you say, at the time of the purchase, referring
7 to the American Airline asset purchase, TWA was weak
8 financially, but was still flying planes and entered
9 bankruptcy as a condition of its deal with American.
10 Do you see that?
11    A     Yes.
12    Q     Do you know whether American -- whether
13 -- withdrawn.
14        Do you know whether TWA would have entered
15 bankruptcy in the absence of any deal by American
16 Airlines?
17    A     No.
18    Q     Would that be relevant to your
19 analysis?
20    A     No.
21    Q     Why not?
22    A     Because what I was interested in was
23 whether TWA would continue to fly and not whether
24 they were -- whether they were bankrupt or not, had
25 filed for bankruptcy or not.

35 (Pages 131 to 134)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

135

1     Q     And other than -- any information you
2  had concerning proposals by Carl Ichan, did you do
3  anything else to determine whether TWA would have
4  been in a position to keep flying absent the
5  American transaction?
6     A     All I -- I read that article by the
7  economist at Tuck who argued that there were other
8  sources of cash for TWA, as well, and --
9     Q     Anything other than that?
10    A     No.
11    Q     And do you have the expertise to
12 determine whether an airline is likely to cease
13 flying within any given period of time?
14    A     If I put my mind to it, I'm sure I
15 could do that.
16    Q     And how would you do it?
17    A     I don't know.  I would have to put my
18 mind to it.
19          I would have to, you know, look at their
20 financial situation, you know, what their cash flow
21 looked like, what their revenues, fixed expenses,
22 and so on, projections for -- for passengers.  It is
23 not something I have ever done.  It would take me a
24 very long time to do, but you just asked me if I had
25 the expertise to do it and, essentially, what I'm

136

1  saying is I could develop the expertise to do that.
2     Q     As you sit here today --
3     A     I don't not have the expertise, sitting
4  here.
5     Q     What would be sufficient to persuade
6  you that, absent an American Airlines transaction,
7  that TWA was likely to cease operations?
8     A     Soon.
9     Q     Soon.
10    A     I don't know.
11    Q     Are you offering any opinion here about
12 what would have happened to TWA in the absence of a
13 transaction with American Airlines?
14    A     No.
15    Q     And are you offering any opinion about
16 what would have happened to the TWA pilots in the
17 absence of a transaction with American Airlines?
18    A     No.
19    Q     Are you able to offer any opinion about
20 whether, in the absence of a transaction with
21 American Airlines, the TWA pilots would have been
22 able to maintain their jobs as pilots?
23    A     I'm assuming in my analysis that TWA
24 would continue to fly.  I'm -- as I read -- as I
25 read the material, what I saw was that there was a

137

1  bankruptcy auction.  Had American not been there,
2  there was another purchaser who presumably would
3  have bought the assets.  The airline would have
4  flown and pilots kept their jobs.
5     Q     So my question is whether you are able
6  to offer an expert opinion as to what would've
7  happened to the TWA pilots in the absence of a
8  transaction with American Airlines.
9     A     No.  I'm relying on others' -- others'
10 views of that.  That's correct.
11    Q     Whose views?
12    A     Well, the views of that -- you know,
13 I'm basically -- as I read it, I don't know if I
14 want to call it -- quite call it an expert opinion,
15 but I concluded, reading what I read, that TWA
16 looked to me like they would -- likely going to fly,
17 and I based that on the fact that there were other
18 sources of cash for them that the fellow from Tuck
19 talked about, and that there were other suitors in
20 the bankruptcy.
21    Q     And so what I'm asking is whether you
22 are in a position to offer an expert opinion as to
23 what would have happened to the TWA pilots in the
24 absence of the American transaction.
25          MR. PRESS:  I object to the form.

138

1  that's been asked twice and he's answered it twice,
2  the same way.
3          THE WITNESS:  The same answer that I
4  said --
5  BY MR. TOAL:
6     Q     Well, I -- your answer was that you
7  read an article by a professor at the Tuck School.
8     A     Right.
9     Q     Does that give you a sufficient basis
10 to express an opinion as to what would have happened
11 to the TWA pilots in the absence of the American
12 transaction?
13    A     I'm not -- I wasn't considering -- I
14 was asked to opine on something very simple, which
15 is had ALPA performed its duty of fair
16 representation, what would the merged seniority list
17 have looked like?  Now, implicit in that, I don't
18 take a stand one way or the other on the -- what
19 would have happened to the TWA pilots had the
20 American transaction not gone through.
21    Q     So you are not offering an expert
22 opinion on that subject?
23    A     I'm not offering an opinion on that.
24 That's correct.
25    Q     If -- if it were determined that the

36  (Pages 135 to 138)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

139

1  likelihood was that TWA would have liquidated
2  shortly after January 2001 in the absence of an
3  American transaction, would that have affected your
4  analysis?
5      A    Yes.
6      Q    In what way?
7      A    I would have had to select my
8  comparables differently.
9      Q    And you are aware that the transactions
10  you categorized as having an acquired airline that
11  was either not flying or was about to stop flying
12  had proportional differences in mean rank of about
13  minus .6; correct?
14      A    I don't know.  I haven't done that
15  grouping.  You asked me that before.  I don't know.
16      Q    Look at page -- page two of your
17  report.  Paragraph five.
18      You say, seniority is an important factor in a
19  pilot's career.  It influences his or her home base,
20  his or her role in the cabin (captain/first
21  officer), et cetera.  The routes and schedules he or
22  she flies, the type of aircraft the pilot flies, and
23  also the order in which layoffs or furloughs occur.
24  Thus, a pilot's relative position on the seniority
25  list is a central determinate of the pilot's

140

1  earnings.  Do you see that?
2      A    Yes.
3      Q    What are the other determinates of a
4  pilot's earnings?
5      MR. PRESS:  Really?  Object to the form
6  of the question as being over broad.
7      THE WITNESS:  Well, their preferences
8  will affect their earnings.  What airline they work
9  for will affect their earnings, just for an example.
10  BY MR. TOAL:
11      Q    Are you aware of any determinates of
12  pilot earnings?
13      MR. PRESS:  Same objection.
14      THE WITNESS:  Conditional on their
15  being a pilot already, working for a particular
16  airline, basically their preferences are going to
17  determine what routes they choose to bid for, what
18  equipment they choose to bid for will be -- taken
19  together; that pretty much determines it.
20  BY MR. TOAL:
21      Q    What about the number of hours they
22  choose to work?
23      A    That's part of choosing, what they
24  choose to bid for.  That's what I meant, yes.
25      Q    Have you assessed the relationship

141

1  between seniority and income levels for the pilot
2  population in this case?
3      A    No.
4      Q    Do you have an understanding about
5  whether there is a difference between the pay rates
6  for TWA pilots and the pay rates for American
7  Airlines pilots?
8      A    I have no idea.
9      Q    Did you see in your review of
10  arbitration decisions that was a factor that
11  arbitrators took into consideration in assessing
12  seniority integration?
13      A    Took what into consideration?
14      Q    Differences in pay rates between the
15  acquired and acquiring airline.
16      A    Sometimes.  I saw that sometimes.
17      Q    And how -- how is that factor taken
18  into consideration when it was?
19      A    It might be a factor for -- for shading
20  the -- the integration one way or the other.  It was
21  usually just mentioned.  It was seldom one of the --
22  I can't remember if it was ever a determining
23  factor, how the integration was done.
24      Q    And your analysis does not take into
25  account whether there are differences in pay rates

142

1  between the TWA and the American pilots; correct?
2      A    That's correct.
3      Q    Isn't that a component of
4  pre-transaction career expectations?
5      A    Pre --
6      Q    Pre-transaction career expectations?
7      A    I would imagine.
8      Q    Did -- did you see in your review of
9  arbitration decisions that arbitrators universally
10  focus on preserving the pre-transaction career
11  expectations of both pilot groups?
12      A    Yes.
13      Q    And your -- your list was constructed
14  without regard to that factor; correct?
15      A    As I said, it is without direct regard
16  for it, but it is implicit in the method I use.
17      Q    Paragraph 25 of your report, page nine.
18  You say at the bottom, with the assistance of
19  my staff, I've reviewed information on 41 seniority
20  list mergers.  These include 29 arbitration
21  decisions, 11 amendments to CBAs, and one reported
22  federal decision.  Do you see that?
23      A    Yes.
24      Q    And you list all those mergers in
25  appendix B to your report; correct?

37  (Pages 139 to 142)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

143

1    **A**    Yes.
2    **Q**    Are these all the transactions between
3  airlines to which you had information on seniority
4  integration?
5    **A**    This is -- this -- yes.  I believe
6  that's correct.
7    **Q**    Did you have a temporal cutoff for
8  your -- for your analysis?
9    **A**    Not that I recall.
10    **Q**    If you take a look at Mr. Salamat's
11  report, which is Farber Exhibit-2 --
12    **A**    Yeah.
13    **Q**    You go to page 21 of that report.
14  You see he also has a list of
15  post-deregulation mergers?
16    **A**    Okay.
17    **Q**    Do you know why there are differences
18  between your list of transactions and his?
19    **A**    No.
20    **Q**    Now, in your analysis that you describe
21  in paragraph 25, how much consideration did you give
22  to the 11 instances in which there were amendments
23  to collective bargaining agreements related to
24  seniority integration?
25    **A**    How much consideration did I give?

144

1    **Q**    Yeah.
2    **A**    I -- fundamentally, I considered each
3  -- each case on its own merits.
4    **Q**    On your table one --
5    **A**    Yes.
6    **Q**    -- you include, I think it is 19
7  transactions.
8    **A**    Yes.  Uh-huh.
9    **Q**    So why out of the 41 transactions you
10  considered does your chart contain only 19?
11    **A**    It's because in -- in order to make it
12  into table one, I had to be able to calculate the
13  mean rank difference, which referred that there be
14  sufficient -- two considerations.
15    Number one, I had to be able to calculate mean
16  rank difference, and many of the documents we saw
17  for cases didn't include enough information on the
18  merged seniority list to be able to calculate that.
19    Number two, I had to be able to figure out
20  whether -- what the airline's financial condition
21  was at some -- I -- I agree rather than perfunctory
22  level.  But, nonetheless, I had to be --
23  characterize the financial condition of the airline.
24  And number two, I had to be able to have some
25  indication of whether the acquiring airline brought

145

1  value to the merger.
2    So if I had that -- those pieces -- those two
3  pieces of information plus enough information to
4  calculate the mean rank difference, they would be
5  included in table one.  Otherwise, they would not.
6    **Q**    And in that answer about whether the
7  airline brought value, did you mean to say the
8  acquired airline brought value to the transaction?
9    **A**    Yes.  The acquired.  Did I say
10  acquiring?
11    **Q**    I think so.
12    **A**    Okay.  I'm sorry.  The acquired
13  airline, yeah.
14    **Q**    So for any of the 41 transactions that
15  you considered, if it doesn't appear on table one,
16  that's because you lacked information about one of
17  these three categories that you just mentioned?
18    **A**    That's correct.
19    **Q**    Is there any other reason why a
20  transaction would be missing from list one?
21    **A**    As I sit here, not that I'm aware of.
22    **Q**    Okay.  Now, information about the
23  financial condition of the airline would be
24  something that would be publicly available; correct?
25    **A**    Could be.

146

1    **Q**    And in any of the cases where you were
2  missing financial information concerning the
3  condition of the acquired airline pre-transaction,
4  did you make any effort to acquire that information
5  from publicly available sources?
6    **A**    I want -- I want -- I want to say I
7  believe we did.  It wasn't just -- I mean, the fact
8  that they are losing money is not what I'm
9  interested in.  I'm interested in the prospects for
10  -- for continuing to fly.  So it was a little more
11  complicated than saying, yes, I can look at their
12  profit and loss statement.  I want to say we did
13  some work on that.  We tended to rely a lot on,
14  particularly in the arbitration reports, on the
15  arbitrator's reasoning, which is -- and there is
16  clearly a lot less information in the amendments to
17  collective bargaining agreements which don't give
18  reasoning.  Right?  They just tell you what they
19  decided.  But do I believe we did some work.  Like,
20  for example, in Delta/Pan Am, which is not an
21  arbitration but is a -- I think it is an amendment
22  to a collective bargaining agreement.  In that
23  particular case, we had to go outside to find some
24  of the other information.
25    **Q**    And the way you went outside was

38  (Pages 143 to 146)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

147

1  referring to two newspaper articles concerning that
2  transaction?
3      A    Yeah. Public sources.
4      Q    Did you do anything else?
5      A    No.
6      Q    And other than that particular example,
7  is there anything else you did to try and get
8  financial information?
9      A    Well, there might have -- there might
10 have been other cases where we did that. I just --
11 I didn't do that work myself. So as I sit here now,
12 I can't tell you which cases we had to go outside
13 the basic document to get information.
14     Q    And with respect to any value that the
15 acquired airline was bringing to the transaction,
16 did you explore whether that was information that
17 could have been obtained from publicly available
18 sources?
19     A    No. That was -- that's a good
20 question. I think -- I have -- I have a memory in
21 one case of one of my guys coming to me and saying,
22 look, look what they are doing. And that was fine.
23 So there was obviously some searching going on for
24 that. But my -- my best recollection is that in
25 almost every case where we saw whether there was

148

1  value or not, it was internal to the report. It was
2  a statement, for example, by an arbitrator that
3  said, you know, airline B is bringing, you know,
4  good equipment and gates at important airports.
5      Q    So for the transactions that don't
6  appear on table one, did you exhaust efforts to
7  obtain information about the financial condition of
8  the acquired airline and the value of assets they
9  brought to the transaction from publicly available
10 sources?
11     A    Exhaust efforts is pretty extreme. We
12 made some efforts. Whether we made exhaustive
13 efforts, I'm not -- I'm not going to claim that.
14     Q    Did you make efforts with respect to
15 each of the transactions for which you had
16 information that would allow you to calculate the
17 difference in means, did you make efforts for each
18 of those to assess the financial condition of the
19 airline and the value of the assets it brought to
20 the transaction from publicly available sources?
21     A    I believe so, yes.
22     Q    And who would know more about that?
23     A    David Ashmore.
24     Q    And your analysis of the fact that a
25 seniority integration resolution was agreed rather

149

1  than arbitrated sounds like it wouldn't have made a
2  difference to your analysis as long as you could get
3  information concerning the financial condition of
4  the acquired carrier and the value of the assets
5  they brought to the transaction; is that correct?
6      A    Yes.
7      Q    So even when you didn't have
8  information concerning the financial condition of
9  the acquired carrier or the value of the assets they
10 brought to the transaction, but you had information
11 that allowed you to calculate the proportional
12 difference in mean ranks, did you make that
13 calculation?
14     A    I don't think we made calculations of
15 proportional difference in mean ranks for anybody
16 who is not on this list.
17     Q    Are you aware of transactions in which
18 the acquired -- pilots of the acquired airline got
19 stapled to the bottom of the seniority list?
20     A    I think there was one transaction we
21 saw like that.
22     Q    Which transaction was that?
23     A    It might have been one of the ones
24 involving Licks or Lynx. Lynx. It was an airline
25 that was grounded, wasn't flying, had only regional

150

1  planes, et cetera. I don't remember which one it
2  was.
3      Q    So on the list put together by
4  Mr. Salamat on page 21 of his report, you see
5  reference to the American/Reno transaction?
6      A    Yes.
7      Q    Did you do any investigation into the
8  circumstances of seniority integration in the
9  American/Reno transaction?
10     A    I would have to look and see. I don't
11 even know if it is on our list of 41 transactions.
12 In other words -- in other words, it is quite likely
13 we never heard -- we never found that one. It is
14 simply because it doesn't look like it was an
15 arbitration, and we -- I don't see any document.
16     Q    You testified that you weren't
17 confining your analysis to arbitrations; correct?
18     A    That's true, and we tried to find as
19 many of these as we could, which I never -- I hope I
20 never represented that we found them all, and we
21 certainly never selected them on any systematic
22 basis in the sense of, oh, we'll look for the ones
23 that are favorable or something. I don't -- I just
24 don't think we found that one.
25     Q    Do you have a list somewhere of what

39 (Pages 147 to 150)

HENRY FARBER

151

1  the 41 transactions you considered are?
2        A     Unless it is somewhere in the backup --
3  I -- I -- there may not be -- is it in the appendix
4  here? Probably not, right?
5        Q     There is a list of --
6        A     -- of arbitration reports.
7        Q     -- agreements.
8        A     Arbitration awards and agreements,
9  right? You know, to be honest, I would have to
10 check to see whether we have a document like that.
11       Q     Okay. But for purposes of determining
12 the 41 transactions that you considered as part of
13 your universe, we should try and extract that
14 information from Exhibit B; correct?
15       A     There is also backup materials that you
16 were provided, right, and it could be in there in a
17 file. But I'm sure, if you would like such a list,
18 we can get that to you if you don't have it, if you
19 can't find it here. It is an oversight on our part.
20 It should be in there.
21       Q     You say in page -- paragraph 26 of your
22 report -- you say, arbitration decisions are a
23 particularly rich source of data for estimating the
24 but-for seniority list because, unlike amendments to
25 CBAs, arbitrators provide a written report

152

1  describing the results of their deliberations,
2  including an account of the reasons for their
3  decision. Do you see that?
4        A     Yes.
5        Q     But the only factors that you consider
6  in your analysis are whether the acquired airline
7  was not flying, or would shortly stop flying, and
8  whether it brought substantial assets -- assets of
9  substantial value to the transaction; correct?
10       A     Yes, correct.
11       Q     Now, the arbitrators themselves
12 actually consider a host of other factors; correct?
13       A     Yes.
14       Q     And did you attempt to take any of
15 those other factors into consideration in
16 constructing your list?
17       A     In general, no.
18       Q     And specifically?
19       A     And specifically, there was at least
20 one case where -- in fact, it is on -- I think it is
21 in table one. If we go to table one.
22 Republic/Frontier, which is -- it's -- I think it's
23 -- it is an unusual one because it gives a huge
24 advantage to the acquired airline's pilots. Do you
25 see that? In other words, it is the only one with a

153

1  reasonably sized positive proportional mean
2  difference.
3        So the question is, why would that be? And it
4  turns out, when you look at it, that Frontier was
5  flying big airplanes and Republic was basically
6  flying little regional jets, and it was unusual that
7  a -- a regional airline like that was acquiring,
8  essentially, a trunk carrier, or a regional trunk
9  carrier anyway, flying bigger planes.
10       And as a result, because of the status in the
11 equipment business, the Frontier guys got put near
12 the top of the list and wound up better. So we
13 tried to consider -- you know, but most -- most of
14 the -- almost all of the mergers, all of the
15 acquisitions, I should call it, the acquired airline
16 was subsidiary in some way. Subsidiary is the wrong
17 word. Small -- I will call it smaller in some way.
18       There is another example here which is Texas
19 Air/Continental. Texas International/Continental is
20 another example, which is quite interesting because
21 Continental is much bigger. This is -- I -- I guess
22 it must be -- Frank Lorenzo, right? You know, he is
23 an ambitious guy with this little airline in Texas,
24 and God dammit, he is going to buy Continental,
25 right? So he looks at that, and -- so that -- but

154

1  that, nonetheless, wound up not so good for
2  Continental. They had a lot of people stapled at
3  the bottom.
4        So we tried to consider a lot -- a lot -- this
5  is a long answer to the question, did we ever
6  consider anything else? The answer is, we read
7  these carefully. We tried to understand what was
8  going on. Ultimately, in the -- because the
9  analysis is a small numbers problem and we wanted to
10 try to find a reasonable sized set of matched
11 transactions, you can't do that on too many -- in
12 too many dimensions or else you won't get any
13 matches.
14       And what you have to do is pick the most
15 salient pieces -- portions which we felt was
16 financial viability, essentially flight viability
17 and value, and say, let's focus on those. And, on
18 average, take the average of those, and the other
19 things will average out. Some of them will be a
20 little better on some things and worse on other
21 things.
22       So I don't know if that's responsive to your
23 question, but that's what I have to say.
24       Q     So my question is, within the construct
25 of your -- your model and your alternative seniority

40  (Pages 151 to 154)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

155

1 list, did you make any efforts to take into account
2 any other --
3     A    Oh, in a formal modeling sense?
4     Q    Yeah.
5     A    No.  I guess I could have shortened
6 that answer somewhat.
7     Q    And when you go through -- you go
8 through your list, which is generally sorted by the
9 proportional difference in mean ranks; correct?
10     A    Yes.
11     Q    With one exception it looks like, at
12 the bottom -- toward the bottom of the list, the
13 American/TWA transaction actually looks like it's --
14 it's out of order based on this table.  Do you see
15 that?
16     A    Yes.  Why is that?
17     Q    Do you know why that is?
18     A    It is either a typo in -- in the .627
19 or just a misordering in the list.  One or the
20 other.  I honestly -- if someone has a calculator, I
21 can redo the calculation, but it's -- I don't have
22 an explanation for that.  I am happy to find out.
23     Q    In any event, when you go through this
24 list in rank order, the situations in which you felt
25 that the mean rank was different than what you would have

156

1 expected, and you tried to learn more about the
2 underlying transaction; correct?
3     A    Well, you know, frankly, we only really
4 did that at the end of the day for the one at the
5 very top of the list and the one at the very bottom
6 of the list partly because that Republic merger is
7 an odd one because it involved four airlines.  It
8 was really one merger.  And they merged four
9 seniority lists.
10     And -- so there were three airlines acquired
11 by Republic.  This was -- and it had a single
12 seniority merger, which is Lynx, Midwest, and
13 Frontier.  This is, I guess, what they called the
14 second Frontier.  There were two Frontier Airlines.
15 So we always -- we always considered that
16 transaction quite gingerly because it is so, so
17 different from the rest of them.  And as a result,
18 at the end of the day, it is interesting that that
19 yielded both the top number on the list and the
20 bottom number on the list, and we are not going to
21 use those for anything.
22     So, really, it was -- it wasn't so much that
23 we were looking if a number looked wrong.  That
24 wasn't what we did.  What we did is, as we were
25 reading the cases, if something struck us and said,

157

1 this is not typical of mergers in general, it set up
2 a flag for it.  So, you know, the Republic/
3 Frontier -- you know, Republic/Frontier/Midwest/
4 Lynx deal was just different from any of the others.
5     Q    Well, do you acknowledge that there are
6 factors other than the financial condition of the
7 acquired airline and the value of the assets it
8 brings to the transaction that can influence the
9 seniority integration process?
10     A    Yes.
11     Q    And what other factors would you
12 acknowledge could influence that process other than
13 those two?
14     A    It could be many things.  The skill of
15 the negotiators.  Those are -- you know, there --
16 there are things, you know, again as we talked about
17 that's implicit.  And the way I put things together
18 is career expectations of -- of people.  Those
19 are -- you know, the things that are most, you know,
20 there is -- there is the criterion -- well, it's
21 actually not characteristic of a merger, trying to
22 preserve seniority rank within a company and so on.
23     The issue of -- of -- of equipment status and
24 domicile, how those stack up.  Particularly
25 equipment differences are often very important in

158

1 mergers of lists, which is how, for example, the
2 Frontier, the Republic/Frontier wound up the way it
3 did.  That's an equipment issue really, equipment
4 and route issue.  So there are other things, sure.
5     Q    Did you ever try running a proportional
6 difference in mean rank for the American Airline/TWA
7 transaction excluding the American Airline pilots at
8 the top of the list who were flying a category of
9 equipment that TWA didn't have?
10     A    No.  Interesting idea, though.
11     Q    Is that something that you think would
12 make sense to do?
13     A    Not in isolation, no.  I would have
14 to -- I would have to look at all these.  You can't
15 just cherrypick one observation and do that.
16     Q    Do you think it would make sense to do
17 that globally?
18     A    Given the purposes of my analysis, no.
19 Because again, my analysis comes up with an overall
20 list.  And then imagine that you wanted to use it,
21 and then you took my list and used it to create
22 status and equipment specific lists.  That would
23 automatically take account of this because as soon
24 as you look at the equipment, you'd have a list that
25 only had American pilots in it, and then you would

41  (Pages 155 to 158)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

159

1  get to the rest.
2      Q    But if that next step hasn't happened
3  with your analysis, you don't know from any of your
4  comparables whether any of those included status and
5  equipment restrictions; do you?
6      A    I -- I couldn't tell you which do and
7  which didn't, as I'm sitting here.
8      Q    And you didn't differentiate on the
9  basis of whether any transactions in your comparable
10  list had status and equipment restrictions; correct?
11      A    No.  No.  We just used a list as it was
12  developed.
13      Q    Now, would you acknowledge that
14  arbitration and negotiation are -- are very
15  different processes?
16      A    Yes.
17      Q    And do you have any reason to expect
18  that the results of an arbitrated seniority
19  integration would be predictive of the results of a
20  negotiated seniority integration?
21      A    Yes.
22      Q    What reason do you have?
23      A    I've written on this.  I've published
24  papers, actually, on the question of the
25  relationship between arbitration and negotiation.

160

1  And the -- the causality runs in both directions.
2      First of all, negotiators in a world where the
3  dispute is going to be decided by -- could be
4  decided by arbitration if they don't agree, the
5  arbitration becomes a focal point in the
6  negotiation, and they negotiate to the -- to the
7  expected arbitration award.  It's -- in your terms,
8  arbitration is just like litigation, just like civil
9  litigation.  Two parties are bargaining.  If they
10  don't agree, they go to a trial and either a judge
11  or a jury decides.  So when you are doing pretrial
12  settlement negotiations, you are thinking about what
13  will happen if we go to trial?  The -- the
14  negotiators are thinking, what will happen if we go
15  to arbitration?  Okay?
16      On the other side of the coin, this isn't like
17  judges now.  This is now in arbitration.  The
18  arbitrators are professionals.  What's their goal?
19  Their goal is to get rehired in the next case.
20  They are going to get rehired in the next case, if
21  what they do this time is perceived as reasonable,
22  fair and equitable to both sides.  So they are
23  trying to cut a middle ground and do something that
24  doesn't alienate one side or the other, so they do
25  the best job they can to do that, on average, across

161

1  cases.  And that's how they get rehired in other
2  cases.
3      There is a -- there is a long literature --
4  not a long literature -- there's a literature, sort
5  of a boutique literature on this.  And as a result,
6  what's interesting is then, in a world where you
7  have arbitration as the dominant dispute resolution
8  mechanism, the negotiated outcomes and the
9  arbitrated outcomes tend to look very similar.
10      Q    Well, the -- the literature on this
11  subject acknowledges that there are difference
12  between -- differences between negotiated results
13  and arbitrated results; correct?
14      A    No.
15      Q    Isn't it influenced by things like risk
16  aversion of the parties?
17      A    Well, okay.  Yes.  If the parties are
18  differentially risk averse, you are quoting my work
19  back to me, then you would see that, on average, the
20  negotiated settlements would be a little bit to one
21  side of the arbitrated settlements one way or the
22  other.  But the arbitration is still the focal
23  point.  When you are dealing with two groups of
24  pilots, they pretty much have similar preferences.
25  They are not -- one side is not more risks averse

162

1  than the other, and I'm going to expect, in fact,
2  that the negotiated agreements are going -- you
3  know, they are going -- they are going to understand
4  that if we don't agree here, an arbitrator is going
5  to come in -- probably come in and decide for us,
6  and that really does limit how much each side can
7  push its own agenda.
8      Q    And what about a negotiation where
9  there is no right to compel arbitration?  Do you
10  acknowledge that the results of negotiations in that
11  context would be expected to differ from the results
12  in arbitrations?
13      A    Well, you have to ask -- to understand
14  any negotiation, you have to ask what will happen if
15  you fail to agree.  If you put me back in your God
16  scenario where one side gets to impose what they
17  want, sure.  Okay?  But if you now say it is just
18  going to be two guys duking it out and the last one
19  standing gets more of what they want than the other,
20  it becomes a much more -- so that, the analogue is
21  that if you don't have arbitration, what do you
22  have?  A strike?  Does one group of pilots stop
23  flying?  I don't really understand -- I don't
24  understand the leverage that pilots have if there is
25  no arbitration one way or the other.

42  (Pages 159 to 162)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

163

1    Q    Well, in this particular situation, one
2  of the alternatives would be, there would be no
3  transaction.
4    A    Okay.
5    Q    So in a situation where you don't have
6  a right to arbitration, there is a negotiation, and
7  the options are, you can either agree to something
8  in the negotiation, the APA in the absence of an
9  agreement can negotiate with American Airlines and
10  implement a list, or there can be no transaction.
11  Would you expect the results in that sort of setting
12  to differ from the results in arbitrated --
13  arbitrated resolutions --
14    A    It could.
15    Q    -- of seniority integration?
16    A    It could.  It could.  But what I expect
17  here is that, assuming ALPA did its job, that there
18  would be a negotiation that, frankly, at the end of
19  the day, might well have at least a threat of an
20  arbitration at the end of the road.
21    Q    Okay.  So that's an assumption that you
22  made in your analysis; correct?
23    A    I'm -- I'm just answering your question
24  as to what I expect in a case.  You know, if we were
25  sure there was no arbitration available, in a sense,

164

1  all bets are off.  Okay?  But, fundamentally, you
2  know, the question of what's fair and reasonable is
3  implemented -- is -- is -- how do I want to put
4  this -- is -- is revealed by the large array of
5  negotiated settlements and arbitration awards that
6  we see out there.
7    Q    Did you analyze the particular
8  transactions that you looked at to see whether there
9  is a difference in the proportional mean ranks
10  between transactions that were negotiated and
11  transactions that were arbitrated?
12    A    Almost all the ones we have here are
13  arbitrated.  I don't have enough negotiated.  In
14  fact, the only one on the list that might be
15  negotiated is Delta/Pan Am, yeah, at minus .1.
16  Yeah, so there is not enough data to do that.
17    Q    You didn't have enough data to do that?
18    A    Yes.
19    VIDEO SPECIALIST:  Dan, I have ten
20  minutes left before I have to flip the tape.
21    MR. TOAL:  Why don't we go off the
22  record?
23    VIDEO SPECIALIST:  The time is now 1:35
24  and this ends this number two.
25    (Luncheon recess.)

165

1    VIDEO SPECIALIST:  The time is now 2:37
2  and we are back on the video record.
3    (Farber-6  Document from Tuck Business
4    School regarding TWA merger marked for
5    identification.)
6  BY MR. TOAL:
7    Q    Mr. Farber, I'm going to hand you a
8  document I marked as Farber Exhibit-6.
9    Can you let me know if this is a document that
10  you've seen before?
11    A    I don't think I've seen it in this
12  version, but -- yeah.
13    Q    Is this the document you referenced
14  previously in your testimony about the commentary of
15  a professor at the Tuck School of Business
16  concerning the TWA merger?
17    A    I have to -- I remember what I read as
18  being slightly longer than this, which is the only
19  reason I'm hesitating.  I --
20    Q    Let me direct your attention to
21  footnote 39 in your expert report, which is Farber
22  Exhibit-1.
23    A    What page is that on?
24    Q    Page 19.
25    A    Okay.

166

1    Q    Do you see the internet link located in
2  footnote 39?
3    A    Yeah.  It looks like the same thing.
4  You know what?  I think what happened was, I went --
5  I went to this link and I clicked on a -- somewhere
6  there was a link on this page and said get the PDF,
7  and I got the PDF.  Must be the same thing.
8    Q    Okay.
9    A    Yeah.
10    Q    Okay.  And how did this commentary
11  affect your analysis?
12    A    Well, I -- I found it very interesting
13  that, along with, you know, this was -- the -- the
14  main thing I found interesting was that there --
15  there was another offer for, in bankruptcy, another
16  bid, and -- and I think there was -- hold on.  It
17  also -- later on, you know, later on you see the Jet
18  Acquisitions Group, Ralph Atkins was willing to
19  offer $889 million in cash.  So, you know, that --
20  that was a good part of it in here.
21    I -- I believe I saw, you know, somewhere I
22  read, and I don't know that I read it here, but that
23  an awful lot of what they owed -- owed was to Boeing
24  and aircraft leasings, and that they were working
25  with Boeing to try to restructure the payments on

43  (Pages 163 to 166)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

167

1    that. I don't remember where. I can go back and
2    look. I remember seeing something like that. And
3    it just sort of reinforced the view that TWA had
4    options.
5        Q    Have you analyzed whether any proposal
6    by Carl Ichan had contingencies attached to them?
7        A    No, I have not. I did not do any --
8    any further investigation of the nature of the
9    offer.
10       Q    And do you know if it was a firm --
11   firm offer to buy substantially all of TWA's assets?
12       A    I don't know. No.
13       Q    Do you know anything about the terms of
14   the offer?
15       A    No.
16       Q    And with respect to the TWA -- TWA
17   Acquisitions Group, do you have any information
18   concerning any offer by that group?
19       A    Say that again, please.
20       Q    Do you have any information concerning
21   any offer by the group known as the TWA Acquisitions
22   Group?
23       A    I don't know what the TWA Acquisitions
24   Group is.
25       Q    Okay. It is referenced at the bottom

168

1    of page two of this commentary.
2        A    Okay, now. Can you repeat your
3    question?
4        Q    I will withdraw the question.
5        Do you see under the heading on page two, the
6    TWA auction?
7        A    Yes.
8        Q    The second sentence in that paragraph
9    says, at that time TWA had less than 20 million to
10   cover lease payments of 150 million that were due
11   the following week.
12       A    Yes.
13       Q    Were you aware of that information at
14   the time you prepared your report?
15       A    Yes.
16       Q    And did that factor into your analysis?
17       A    No.
18       Q    Do you think that had any bearing on
19   whether TWA would be forced to stop flying in the
20   near future absent a deal with American Airlines?
21       A    I did not consider it seriously that
22   TWA would stop flying immediately at that -- at that
23   point.
24       Q    Why didn't you seriously consider that?
25       A    Well, first, you know -- I mean, first

169

1    of all, they were obviously in negotiation with
2    American. They were also in negotiation with other
3    creditors. They -- to me -- as I remember reading
4    the record, they, you know, they had aircraft on
5    order. They were not furlouging employees. In
6    fact, I think if you look at the seniority list,
7    they hired some employees quite recently. It -- it
8    wasn't the typical situation, I thought, of an
9    airline that was just about to just -- see, they had
10   options. That's my -- I read this. They were in
11   negotiation with American. It was in the heat of
12   the negotiation that there was this discussion of
13   the arbitration clause and the TWA contract. It
14   wasn't at all clear to me that that was actually
15   going to kill the agreement. I didn't know one way
16   or the other.
17       And as a result, you know, I'm simply, you
18   know, to me, filing for bankruptcy is a way to get
19   protection and -- from your creditors, and
20   ultimately airlines that file for bankruptcy, most
21   of the airlines we fly every day have been in
22   bankruptcy at one point or another it seems to me,
23   and they don't stop flying. So I didn't really take
24   very seriously that TWA was just going to stop
25   flying. Maybe that's not enough --

170

1        Q    You see the top of page three, the
2    first full paragraph, last sentence says, Judge
3    Walsh had earlier stated that he didn't see a
4    realistic prospect of a successful reorganization of
5    TWA on its own, and characterized the 1.1 billion
6    offer as a joke, referring to the offer made by the
7    TWA Acquisitions Group. Do you see that language?
8        A    Yes, yes.
9        Q    Were you aware of that at the time that
10   you drafted your report?
11       A    I had read this article.
12       Q    And so, did -- did the judge's view
13   about the offer from the TWA Acquisition Group as a
14   joke have any bearing upon your analysis?
15       A    No.
16       Q    Did it have any bearing on whether you
17   thought that TWA had options other than the
18   transaction with American Airlines?
19       A    No.
20       Q    Why not?
21       A    Well, as -- I'm -- I'm not sure why the
22   judge chose to speak out like that. He may have
23   been defending himself because he didn't accept the
24   highest bid. And it may -- whether -- but the point
25   is I don't think -- I wasn't predicating my view on

44  (Pages 167 to 170)

DEGNAN & BATEMAN
(856)  232-7400

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

171

1  the idea that if the American buyout didn't turn
2  out, that Ichan would buy the airline. That wasn't
3  my only -- as I said, there were other routes,
4  renegotiation of payments with creditors and so on.
5      It -- it -- so I, you know, I went with the
6  view that American Airlines was flying a full
7  schedule, they were not laying off workers, they
8  were buying planes. Yes, they owed a lot of money
9  and their cash flow didn't look great, but it looked
10 like, to me, that they were going to continue to
11 fly. So --
12     Q   Do you have any information about where
13 TWA would have gotten the additional money that it
14 needed to stay in business absent the American
15 Airlines transaction?
16     A   No.
17     Q   And can you say, as you sit here today,
18 one way or the other, whether any other proposal
19 would have come to fruition with regard to financing
20 for TWA?
21     A   Not specifically, no.
22     Q   And can you say generally whether any
23 of those proposals would have come to fruition?
24     A   No.
25     Q   You say at paragraph 24 of your report,

172

1  which is on page nine, you say, arbitration awards
2  regarding mergers of seniority lists and other
3  airline combinations are relevant sources of
4  information for at least two reasons. First, it is
5  possible that had ALPA met its duty of
6  representation of the TWA pilots, the merger of the
7  TWA and American seniority lists would have been
8  decided through arbitration. Do you see that?
9      A   Yes.
10     Q   Now, what was your basis for making
11 that statement?
12     A   Simply because in many, many cases
13 where the pilots are negotiating over merger of
14 seniority lists, the result is decided through
15 arbitration.
16     Q   Can you point to any document or
17 evidence in this case supporting your statement that
18 if ALPA had met its duty of fair representation,
19 that the merger of the TWA and American seniority
20 lists would have been decided through arbitration?
21     A   I didn't say it would have been. I
22 said it might have been.
23     Q   Well, you said it is possible that --
24     A   It is possible that, right.
25     Q   So can you point to any document or

173

1  evidence in this case supporting that statement?
2      A   No. Document or evidence? The only
3  document is that, in fact, TWA had an arbitration
4  clause in its contract with ALPA, and that they were
5  persuaded by ALPA to let that go. And my view is
6  had ALPA behaved differently, perhaps they wouldn't
7  have let that go, and perhaps then it would have
8  been decided by arbitration, the APA clause
9  notwithstanding.
10     Q   And my question is, can you point to
11 any documents or other evidence in this case
12 supporting the notion that the APA would have agreed
13 to arbitration of seniority integration?
14     A   No.
15     Q   Okay. In your prior answer, I think
16 you said TWA had an arbitration clause in its
17 contract with ALPA. Did you mean to say that TWA
18 had an arbitration -- that the TWA pilots had an
19 arbitration clause in their collective bargaining
20 agreement with TWA?
21     A   ALPA -- the pilots of TWA, as I
22 understand it, represented by ALPA, had a contract
23 with TWA, and I believe this is -- you know,
24 essentially, that was what TWA pilots were asked to
25 -- to waive for the arbitration to go forward. I'm

174

1  not a hundred percent sure exactly where that clause
2  sat, but that's what I was referring to.
3      Q   Of the transactions that you identified
4  as comparables on your list, did you investigate
5  whether in any of those cases the acquired -- the
6  pilots of the acquired airline had either waived any
7  right to arbitration or never had a right to
8  arbitration to begin with?
9      A   No.
10     Q   And would you agree that if the
11 decision of the TWA pilots to waive arbitration of
12 seniority integration is not attributable to any
13 breach of a duty of fair representation by ALPA,
14 that the unavailability of arbitration could have
15 affected the anticipated results in any negotiation
16 between the APA and the TWA MEC?
17     A   Wow. I -- can you repeat the question?
18     Q   Yeah. You've testified previously
19 that, I believe, but correct me if I'm wrong, that
20 if there were no right to arbitration, that the
21 results of an arbitration concerning seniority
22 integration might not be predictive of the results
23 of a negotiation; is that correct?
24     A   Half correct.
25     Q   What part is correct?

45  (Pages 171 to 174)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

175

1    A    Well, what's true -- you know, what's
2    true is, you know, what -- what matters ultimately
3    is the economic -- is the environment that they are
4    negotiating in.  And what matters is, you know,
5    essentially, what the arbitrators are trying to do
6    is -- is, in effect, come up with a fair and
7    equitable outcome that presumably reflects what the
8    parties might agree to on their own.  So I still
9    think that the arbitration awards do contain
10   information on -- on what would happen given the
11   economic environment relative to financial
12   condition, bringing value and so on.  So, you know,
13   I think that's the correct portion.
14       What's true is the formal model I described to
15   you before where, in fact, the arbitration is out
16   there as the hammer and it's going to fall in a
17   certain place, and that the parties know where it is
18   going to fall so it focuses their negotiation, if
19   there isn't going to be arbitration, that's not
20   going to really -- not going to hold.  That's true.
21       Q    So would you agree that if there is a
22   negotiation with no right to arbitration, that the
23   results of arbitration decisions concerning
24   seniority integration would not be predictive of the
25   results of negotiations in that particular context?

176

1    A    But it might tell you something about
2    what a fairly represented -- two fairly represented
3    groups would agree on in a negotiation.
4    Q    So -- but just as to my question, would
5    you agree that the results of arbitrations are not
6    predictive --
7    A    Yeah, I'm disagreeing with your
8    statement.  I'm saying it would have some predictive
9    value in any case because the arbitrations
10   necessarily tell you -- not necessarily, but what
11   they imply is what two reasonably represented
12   parties could expect to negotiate.  And whether --
13   and even if the negotiation's not there, you have
14   two reasonably represented parties.
15       In other words, it's already been found that
16   ALPA shirked their duty of fair representation, and
17   the question is what effect did that have?  And what
18   I'm saying is, it looks like an awful like what -- I
19   learn it through arbitrations mainly, but what
20   happens in similar situations.  And by similar
21   situations, similar economic situations.
22       Q    And have you undertaken any analysis to
23   determine if negotiations where there's no right to
24   arbitration produce results regarding seniority
25   integration, even according to your metric, that are

177

1    different from the results of arbitrated decisions?
2    A    No.
3    Q    Do you have the ability to conduct that
4    analysis?
5    A    No.  I don't have the data, is what I
6    mean.  If that -- if data translates to ability,
7    then I don't have the ability.
8    Q    Are you aware that arbitration of
9    seniority integration disputes was required where
10   both pilot groups were represented by the same
11   union?
12       A    I realize -- I realize that ALPA has a
13   merger policy that if they are both represented by
14   ALPA, that they go -- that it suggests they go to
15   arbitration.
16       Q    And of the transactions that you
17   identified as comparables, do you know how many of
18   those transactions were between two unions that were
19   both represented by ALPA?
20       A    No.
21       Q    Would that make a difference to your
22   analysis?
23       A    No.
24       Q    And you testified previously that you
25   -- you've not considered any testimony that was

178

1    offered in the context of this -- this suit;
2    correct?
3    A    That's correct.  I don't believe so.
4    There might be some short pieces of testimony in the
5    backup that we looked at, but I don't recall
6    specifically.  I think I read a couple of closing
7    statements.
8    Q    Do you know who John Darrah is?
9    A    No.
10       MR. TOAL:  D-A-R-R-A-H.
11       (Farber-7  Deposition transcript of
12   John Darrah marked for identification.)
13   BY MR. TOAL:
14       Q    Okay.  Mr. Darrah was the president of
15   the APA at the time of the American transaction.
16   I'm going to mark as Farber Exhibit-7, a copy
17   of his deposition in this case.
18       If I could direct your attention to page 45 of
19   this testimony.
20       A    Page 45?
21       Q    Yeah.
22       MR. PRESS:  This is what?
23       MS. RODRIGUEZ:  7.
24       MR. PRESS:  ALPA-7.
25   BY MR. TOAL:

46  (Pages 175 to 178)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

179

1    Q    Okay.  And do you see in this testimony
2  starting at line eight at page 45, the question is,
3  okay.  You see in the third paragraph of this
4  proposed memorandum of agreement, Mr. Wilder is
5  proposing binding arbitration if there is no
6  agreement reached after 30 days of mediation
7  concerning seniority integration?  And the answer
8  is, yes, sir.  Do you see that?
9    A    Yes.
10   Q    Okay.  Do you know who Mr. Wilder is?
11   A    No.
12   Q    Okay.  Mr. Wilder was counsel
13  representing the TWA MEC.
14   A    Okay.
15   Q    And the next question says, was the APA
16  amenable to binding arbitration in the event that,
17  that the APA and the TWA MEC were unable to reach an
18  agreement on seniority integration?  And the answer
19  is, no, sir, absolutely not.  And the question is,
20  why not?  And the answer is, they would never agree
21  to arbitration on a seniority list.  The question
22  is, the APA would never?  And the answer is, no.
23  And the question is, why?  And the answer is,
24  because we own the seniority list.
25        And then I ask, what do you mean by that, that

180

1  you own the seniority list?  And the answer is, the
2  contract is ours by definition, the seniority list
3  by definition of our green book that was even
4  acknowledged by Mr. Carty.  In a meeting with
5  Mr. Carty, we had discussions on that, and his
6  statement was, the seniority list integration is
7  your responsibility, you own it, and American
8  Airlines acknowledged that.  And then I asked, can
9  you conceive of anything that ALPA could have done
10  to persuade the APA to agree to binding arbitration
11  of the seniority integration, and there is some
12  objections, and then on page 47 at line eight, the
13  answer is no, I cannot.  Do you see that?
14   A    Yes.
15   Q    Okay.  And so, I take it, you were not
16  aware of this testimony when you prepared your
17  report; correct?
18   A    That's correct.
19   Q    And would this testimony have affected
20  your view on the likelihood of arbitration in the
21  absence of a negotiated agreement between the APA
22  and the TWA MEC?
23   A    No.
24   Q    Would this testimony have had any
25  bearing at all on your view of that likelihood?

181

1    A    No.
2    Q    Why not?
3    A    I already knew these facts.  I already
4  knew that the APA had this clause in their contract.
5  I knew how advantageous it was to them.  I knew they
6  wouldn't give it up easily.  But I don't know -- you
7  know, what I -- what I -- and the whole point is,
8  what I don't know is that what would have come out
9  of it had ALPA, you know, adequately represented
10  their members.  And, you know, he can say all he
11  wants that they would never give it up but we really
12  don't quite know what's going to happen in
13  negotiation.  That would be speculation.  So I
14  basically said I know this.  It certainly doesn't
15  advantage the TWA pilots, but neither does it make
16  it impossible that they would go to arbitration.
17   Q    Okay.
18        MR. TOAL:  We'll go off the record.
19        VIDEO SPECIALIST:  The time is 3:01 and
20  we are going off the video record.
21        (Brief recess.)
22        VIDEO SPECIALIST:  The time is now 3:42
23  and we are back on the video record.
24  BY MR. TOAL:
25   Q    Professor Farber, before the break we

182

1  looked at some testimony from the president of the
2  APA regarding the APA's willingness to engage in the
3  arbitration of seniority integration.  Do you
4  remember looking at that testimony?
5    A    Yes.
6    Q    I believe you said the testimony would
7  not affect your analysis in any way; correct?
8    A    Yes.
9    Q    And did you say that because you
10  disbelieved Mr. Darrah's testimony about whether the
11  APA would agree to seniority -- arbitration of
12  seniority integration?
13   A    No.
14   Q    Why did you testify that it would have
15  no impact on your analysis?
16        MR. PRESS:  Objection.  It's been asked
17  and answered.
18        THE WITNESS:  I -- it's -- it's not
19  that -- I don't believe he lied.  I believe he said
20  what he sincerely believed.  But he is also
21  testifying in a particular reality x-post, after
22  ALPA has waived the right to arbitration, the TWA
23  rights to arbitration, and I'm not sure -- I think
24  it's very difficult for him or anyone to say what
25  would have happened in an alternative -- down an

47   (Pages 179 to 182)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

183

1  alternative path.  So that while he sincerely
2  believes they would never agree to arbitration, but
3  the first rule of negotiation is never say never,
4  you know, so --
5  BY MR. TOAL:
6      Q    Okay.  Let me show you the testimony of
7  Jeff Brundage.  Do you know who that is?
8      A    No.
9      Q    Okay.  Mr. Brundage was the head of
10  labor relations for TWA at the time of the American
11  transactions.
12          MR. PRESS:  No, he wasn't.
13          (Farber-8  Testimony of Jeff Brundage
14          marked for identification.)
15  BY MR. TOAL:
16      Q    I'll mark this document as Farber
17  Exhibit-8.
18      Is this testimony that you reviewed prior to
19  preparing your report?
20      A    No.  I don't recall ever seeing this.
21      Q    Okay.  Let me direct your attention --
22      A    Not recalling it and never seeing it
23  might be two different things, but I don't recall
24  it.
25      Q    Let me direct your attention to page 25

184

1  of this transcript.
2      Do you see at line 16 on page 25 I asked, do
3  you have an understanding of what APA's position was
4  on the prospect of arbitrating seniority
5  integration?  And the answer says, they made it very
6  clear to us in all of our discussions, there is no
7  circumstance under which they would entertain the
8  idea of an arbitration.  And the question is, who
9  from the APA made that clear to you?  And the answer
10  is, Captain Darrah and Captain White, being the
11  primary two contacts that we would have dealt with
12  during that period of time.  But the board of
13  directors, the entire association, was solidly
14  behind that position.  Do you see that testimony?
15      A    Yes.
16      Q    Were you aware of that testimony at the
17  time you prepared your report?
18      A    No.
19      Q    Does that have any bearing on your view
20  about the likelihood of the arbitration in the event
21  that the TWA MEC and the APA were unable to reach a
22  negotiated agreement of seniority integration?
23      A    No.
24      Q    Why not?
25      A    For the same reason I said before.

185

1  These are reconstructions x-post of what would have
2  happened in a hypothetical situation that didn't
3  occur, and I don't -- I think it is very hard for
4  anyone to predict that.  And, frankly, I'm not in a
5  position, you know, my position is not that they
6  would have necessarily had arbitration.  I'm simply
7  saying that the merged seniority list would have
8  looked different.  How they got there, I -- I didn't
9  specify.
10      But -- but in any case, your narrow question,
11  no, it didn't affect -- it didn't affect my beliefs,
12  my analysis, and the reason is I'm not sure that
13  statements like this are informative about what
14  would have happened in some hypothetical situation.
15      Q    Do you have any information as to how
16  the APA could have been persuaded to agree to
17  arbitration of seniority integration?
18      A    No.
19      Q    And are you aware of any leverage that
20  any party had to persuade the APA to agree to
21  arbitration of seniority integration?
22      A    No.
23      Q    Do you know what the view of the
24  American Airlines pilots was with regard to the
25  proposed acquisition of TWA assets?

186

1          MR. PRESS:  All 11,000?  I object to
2  the form of the question.
3          THE WITNESS:  No.
4  BY MR. TOAL:
5      Q    Do you know whether a substantial
6  number of American Airlines pilots preferred that
7  the transaction not go through?
8      A    No.
9      Q    Is that something that you would have
10  expected to affect the negotiating position of the
11  APA?
12      A    I can't answer that question.
13      Q    Why not?
14      A    Without -- without knowing the reasons
15  why the American Airline pilots might be opposed to
16  the transaction, I don't know.
17      Q    Would you agree that's something that
18  had the potential to affect the APA's bargaining
19  position?
20      A    Yes.
21      Q    Do you have any information about what
22  American Airlines was prepared to do in the event
23  that the TWA pilots were unwilling to agree to waive
24  the arbitration provisions in its collective
25  bargaining agreement?

48  (Pages 183 to 186)

82109aa4-8378-4731-b7d1-08d43130cdc1

HENRY FARBER

187

1    A    I believe they said they would not
2    complete the transaction.
3    Q    And where have you seen that?
4    A    I don't remember.
5    Q    And do you have any views about -- have
6    you done any analysis concerning what American
7    Airlines would have done in the event that TWA
8    pilots refused to waive the arbitration provision?
9    A    No.
10   Q    Do you doubt any statements by American
11   Airlines that it would have walked away from the
12   transaction?
13   A    Again, I can't know one way or the
14   other whether that was a bargaining ploy or simply
15   -- or a statement of what they would do.  I just
16   don't know.
17   Q    You are not expressing an opinion on
18   that issue?
19   A    Exactly.  That's correct.
20   Q    Do you know who Don Carty is?
21   A    The name sounds familiar, but I can't
22   place it right now.
23   Q    Are you familiar with American
24   Airlines' experience in the acquisition of Reno Air?
25   A    No.

188

1    Q    Do you know what American Airlines did
2    to the Reno Air pilots in terms of their placement
3    on the seniority integration list?
4    A    I don't recall.  I don't know that I
5    ever -- I'm not sure.  As -- as I sit here without
6    any -- any documents in front of me, I -- I couldn't
7    tell you.
8        (Farber-9  Deposition transcript of
9         Don Carty marked for identification.)
10   BY MR. TOAL:
11   Q    I marked as Farber Exhibit-9, a copy of
12   the deposition transcript of Don Carty.
13       Let me know if you have seen this document
14   previously.
15   A    I have not.
16   Q    Okay.  And if I told you that Don Carty
17   was the chairman of American Airlines at the time of
18   the transaction involving TWA, would that be
19   consistent with your knowledge and recollection?
20   A    I have -- that's -- I have no argument
21   with that.  I --
22   Q    But that's not something that you know
23   to be the case?
24   A    No.  I don't know that to be the case.
25   Q    Okay.  Let me direct your attention to

189

1    page 25 of this transcript.
2    A    Page 25?
3    Q    Yeah.
4    A    Sorry.  Okay.
5    Q    Okay.  So the bottom of page 25, there
6    is a question that reads, now, what was -- what was
7    American Airlines planning to do if TWA was unable
8    to secure from its pilots, amendment of the
9    collective bargaining agreements concerning scope
10   and successorship.  Do you see that?
11   A    Yes.
12   Q    Okay.  Do you understand the reference
13   to scope and successorship to be encompassing the
14   provision regarding arbitration of seniority
15   integration?
16   A    Yes.
17   Q    Okay.  And then there is an objection,
18   and then the answer is, well, our intent was to
19   abandon the transaction.  And then the question is,
20   and why -- why would American Airlines have been
21   willing to abandon the transaction had those
22   provisions not been waived?  And the answer is,
23   well, because this transaction met a strategic need,
24   but it wasn't necessarily the only way for us to
25   respond strategically to what was going on in the

190

1    market.  And as I said to you earlier, we were -- we
2    were concerned about the size, and the scope, and
3    the magnitude of this acquisition, and how much risk
4    we added to our operation in doing such an
5    acquisition.  We had determined that we were not
6    going to add a labor risk, particularly in light of
7    our most recent history to the transaction.  Do you
8    see that testimony?
9    A    Yes.
10   Q    Had you read this testimony prior to
11   preparation of your report, would it have had any
12   bearing upon your analysis?
13   A    No.
14   Q    Why not?
15   A    Because, again, this is an x-post
16   statement of what he would have done in a -- in a
17   hypothetical situation.  It -- it -- what he is
18   saying is it doesn't appear to him that the
19   transaction would be as favorable, but -- and he
20   says he wouldn't have abandoned it.  I don't know
21   that he would have.  And, again, my analysis doesn't
22   depend on arbitration in the sense that -- that TWA
23   and American pilots would have definitely gone to
24   arbitration.
25   Q    Well, is your analysis influenced by

49 (Pages 187 to 190)

82109aa4-8378-4731-b7d1-08d43130cdc1