# EXHIBIT B

In the Matter of the Arbitration Between

American Airlines Inc.

     And

Allied Pilots Association
and its AA and TWA Pilot Committees

Hearings held on April 11 and 12, May 9, 10, 14 and 15, and June 24, 2013

Before the Arbitration Panel:

       Richard I. Bloch, Esq., Chair
       Stephen B. Goldberg, Esq., Member
       Ira F. Jaffe, Esq., Member

APPEARANCES:

    For American Airlines:

       Thomas E. Reinert, Jr., Esq.
       P. David Larson, Esq.
       (Morgan, Lewis & Bockius, LLP)
       Michelle A. Peak, Esq.
       (Senior Attorney, American Airlines, Inc.)

    For the Allied Pilots Association:

       Edgar N. James, Esq.
       (James & Hoffman, P.C.)

    For the APA AA Pilots Committee:

       Wesley G. Kennedy, Esq.
       (Allison, Slutsky & Kennedy, P.C.)

    For the APA TWA Pilots Committee:

       John O'B. Clarke, Jr., Esq.
       (Highsaw, Mahoney & Clarke, P.C.)

American Airlines and APA and the APA TWA Pilots Committee and
the APA AA Pilots Committee (LOA 12-05)

# OPINION

## Overview of the Dispute

In 2001, American Airlines ("American") acquired the assets of Trans World Airlines, Inc. ("TWA").[1] American and the Allied Pilots Association ("APA") negotiated a "Supplement CC" to the collective bargaining agreement between American and APA, effective May 5, 1997 (the "Green Book") that established the terms by which former TWA pilots would be integrated into the existing American pilots' System Seniority List. Among other things, Supplement CC integrated the pilots of the respective pre-transition carriers based on their April 10, 2001 seniority lists, as contrasted to the Green Book application, which would have given TWA pilots seniority dates as of the date they actually commenced service at American. The supplement also established fence provisions that gave preferential flying to AA pilots on large wide-body aircraft. TWA Pilots, on the other hand, were given preferential flying opportunities on small wide-body and narrow-body Captain positions in the St. Louis (STL) domicile. Preferential bidding rights were also afforded associated First Officer positions in the STL domicile. Supplement CC went into effect April 3, 2002[2] and remained in effect until American's bankruptcy.

In November 2011, American filed for protection under Chapter 11 of the U.S. Bankruptcy Code,[3] and, in the course of that proceeding, the Company moved to reject the Green Book, together with its other collective bargaining agreements, under § 1113 of the Bankruptcy Code.[4] The motion was granted September 4, 2012, at which time the Green Book was rejected and Supplement CC abrogated. An amended Green Book became effective January 1, 2013.

---

[1] Pending full integration of TWA, a new American affiliate, TWA Airline, LLC was formed.
[2] This was the date the National Mediation Board certified APA as the bargaining representative of the combined AA and TWA pilot craft and class in a single transportation system.
[3] *AMR Corp., et al, Case No. 11-15463 (Bktcy. S.D.N.Y.)*
[4] 11 U.S.C. § 1113.

Central to this case is LOA 12-05, included in the January 1, 2013 Green Book, which,

among other things, establishes the current arbitration process. Understanding the Arbitration

Panel's charter, as well as the restrictions on the Panel's authority, is central to an

understanding of the Award set forth herein.   For ease of reference, the LOA is set forth here in

its entirety:

## American Airlines

January 1, 2013

Keith Wilson
President
Allied Pilots Association
14600 Trinity Blvd., Suite 500
Ft. Worth, TX  76155-2512

Subject:     Letter Agreement Re:  STL and Other Base Closings

Dear President Wilson:

Pursuant to the order of the United States Bankruptcy Court for the
Southern District of New York, dated September 5, 2012, the Company has
terminated Supplement CC, but continues to apply certain terms of
Supplement CC as non-contractual employment conditions for former TWA
Pilots.  This letter confirms our agreement concerning the termination of
Supplement CC, the planned closure of the STL base, interest arbitration
related to that action, and the schedule of any other base closures.

Supplement CC established seniority placement on the Pilots' System
Seniority List for TWA pilots, as defined under Section I.D of Supplement CC,
and certain preferential flying rights to specific aircraft based at STL
associated with those seniority placements.  The Company and APA agree that
the TWA Pilots' existing seniority placements on the Pilots' System Seniority
List are final and shall continue pursuant to Section 13 of the CBA
notwithstanding the termination of Supplement CC and any preferential flying
rights associated with those seniority placements.  The Company and APA
agree that a dispute resolution procedure is necessary to determine what
alternative contractual rights should be provided to TWA Pilots as a result of
the loss of flying opportunities due to termination of Supplement CC and the
closing of the STL base.

      The Company will have the right, in its sole discretion, to decide whether to close the existing STL pilot base, and such closure and consequences thereof shall not constitute a breach of the CBA. In preparation for closure of the STL pilot base, the Company and APA will engage in final and binding interest arbitration pursuant to Section 7 of the RLA to establish certain terms of the CBA as a substitute for the loss of Supplement CC preferential flying opportunities in order to resolve all issues related to the impact on TWA Pilots of termination of Supplement CC. The interest arbitration will commence within 30 days of the effective date of this agreement and the hearing shall be completed and a final award issued within 90 days of commencement. Within 30 days of issuance of the final award, the Company and APA shall submit to the Panel contract language implementing the award and the Panel shall within 15 days thereafter issue final approval of such contract language. The Company shall defer closure of the STL base until issuance of a final award and the Company shall have the contractual and legal right to close the STL base upon issuance of and compliance with the award, from which there shall be no reconsideration motions considered and notwithstanding any legal challenges to the award.

      The interest arbitration panel shall consist of three neutral arbitrators who are members of the National Academy of Arbitrators with Richard Bloch as the principal neutral if he is available and will to serve. The arbitrators shall decide what non-economic conditions should be provided to TWA Pilots as a result of the loss of flying opportunities due to the termination of Supplement CC and the closing of the STL base, provided that training costs associated with the closure of the base shall be considered non-economic. In no event shall the arbitrators have authority to modify the Pilots' System Seniority List, require the establishment or continuation of any flight operation at any location, or impose material costs beyond training costs on the Company, and any preferential flying rights under the award shall not modify or be deemed a modification of the TWA Pilots' seniority placements on the Pilots' System Seniority List. The Company and APA shall agree to the procedures and standards governing this arbitration. Assuming he serves as the principal neutral, Richard Bloch shall have continuing jurisdiction to resolve disputes over the implementation and interpretation of the decision by the panel.

      The Company also agrees that no pilot base other than STL shall be closed prior to October 1, 2013.

                Sincerely,
                /s

                Laura Einspanier
                Vice President—Employee Relations

> Seen and Agreed:
>  /s/
> Keith Wilson          Date    1 Jan, 2013
> President
> Allied Pilots Association[5]

As reflected in the initial paragraph of the LOA, it concerns the termination of
Supplement CC, the Company's planned closure of the St. Louis base, and the dispute settlement
procedure—an "interest arbitration"[6] that will "determine what alternative contractual rights
should be provided to TWA Pilots as a result of the loss of flying opportunities due to
termination of Supplement CC and the closing of the STL base."[7]

The intended product of this arbitration is described briefly in the second and third
paragraphs of LOA 12-05. The second paragraph reflects the contracting parties' agreement that
the dispute resolution procedure should determine "what alternative contractual rights" should
be provided TWA pilots due to the loss of flying opportunities associated with terminating
Supplement CC and closing the St. Louis base. This concept is repeated in the third paragraph,
which refers to the arbitration process establishing certain contractual terms "as a substitute for
the loss" of the preferential flying. Informed by these negotiated terms, the Panel does not seek
to re-establish, reproduce or replicate Supplement CC or its customized preferences. Given the
termination of that document and the impending St. Louis base closing, that effort would be
both fruitless and contrary to the manifested intent of LOA 12-05, which is to determine
"alternative" rights and to "substitute" for the lost preferential flying opportunities.

The Panel has been given substantial (albeit not unfettered) leeway in creating
substitutes and protections for the former TWA pilots' loss of preferential flying rights at STL.
Where appropriate, the terms of Supplement CC are relevant and provide a useful guide to
inform the structure of our determination of substitute rights and protections. We decline,

---

[5] Jt. Exhibit 7.
[6] As distinguished from a "rights arbitration," which seeks to interpret and apply existing contract terms,
the product of an "interest arbitration" is new terms and conditions of employment.
[7] Id.

however, to incorporate wholesale those terms in our Award in situations in which changed

circumstances suggest that a different approach is more appropriate.

      LOA 12-05 incorporates substantial restrictions. Among these, none is more clear than

that "the TWA Pilots' existing seniority placements on the Pilots' System Seniority List are final

and shall continue..." and the related mandate that "In no event shall the arbitrators have

authority to modify the Pilots' System Seniority List...." Thus, while the TWA pilots have

vigorously urged the Panel to respond to what they characterize as inequitable and oppressive

results visited upon them by the 2001 seniority integration, the LOA unequivocally precludes

any result that would alter seniority placements on the Pilots' System Seniority List. Other

restrictions include the mandate that our newly prescribed conditions be "non-economic," such

that there be no "material costs beyond training" to the Company. Finally, LOA 12-05

incorporates the agreement that nothing in this Award shall "require the establishment or

continuation of any flight operation at any location...."[8]

      In recognition of what we regard as a unique process[9], the Arbitration Panel adopted an

interactive approach. In addition to our conducting four day-long hearings for the taking of

evidence and presentation of argument, affected pilots were invited to appear in Washington,

DC and St. Louis to describe the personal impact on them of the loss of Supplement CC and the

St. Louis base. Written submissions from a large number of pilots were also received by the

Panel. During the course of the proceedings, the Panel issued "Panel Suggestions Regarding

Post-Hearing Submissions" that contained the Panel's preliminary reactions to the evidence and

arguments submitted at the first two days of hearing. We did this in an effort to foreclose

additional presentations on positions the Panel had concluded, on the basis of the evidence and

---

[8] *Id.*

[9] For purposes of the presentations, and in recognition of starkly differing interests within the bargaining unit, APA delegated its advocacy position in this case to two committees composed of the former TWA pilots and the AA pilots, respectively. APA takes no position on the substantive positions submitted by the respective committees.

American Airlines and APA and the APA TWA Pilots Committee and                    Page 7 of 20
the APA AA Pilots Committee (LOA 12-05)

arguments, would not be compelling.[10]  The parties also participated in extensive mid-hearing

mediation sessions in an effort to narrow the scope of the disputed issues.  While those efforts

did not resolve all outstanding differences, the parties were able to modify their positions to

some extent and to present revised positions to the Panel for its ultimate review and response.

At the Panel's invitation, closing statements were submitted both orally and by written briefs,

and our final award was presented to the advocates for their review and response prior to its

release.

        The result of all of this, we believe, has been a process that has allowed us to balance, to

the best of our abilities, the competing equitable and contractual concerns of the respective pilot

groups and of the Company.  Predictably, this is a decision that will not please all affected

parties.  However, it is one that, in our judgment, best responds to the charged task of

substituting for the loss of the St. Louis preferential flying opportunities in light of the respective

needs of the parties to this dispute.

**Our Award**

        Supplement CC guaranteed flying opportunities for many former TWA pilots whose

AA system seniority was insufficient to hold a Captain (CA) position by reserving to those

---

[10] See May 24, 2013 Memo from the Panel to the advocates, which stated, in part:

        Dear Counsel:

            At the close of the May 10, 2013 hearing, we requested input from the parties by
        way of post-hearing submissions.  At that time, we also suggested that, in view of the
        compressed time frame and the expressed desire on the part of all parties for an
        expedited resolution, it would be helpful for us to indicate to you some issues on which
        we would welcome your thoughts and input.

            Consistent with our wish to receive guidance from you, we also think it
        appropriate to give you preliminary reactions to the evidence and arguments
        submitted thus far, with full recognition that final summaries are yet to come and that
        our ultimate decision will not be made until the full record has been completed and
        closed.

            In requesting that the parties focus on these issues, we do not seek to foreclose
        any and all thoughts you may have on any issues that have been presented.  Our hope,
        however, is that input by us at this stage will serve both to focus the dialogue between
        the parties and the Panel and, indeed, to inspire additional discussions among the
        parties.

American Airlines and APA and the APA TWA Pilots Committee and      Page 8 of 20
the APA AA Pilots Committee (LOA 12-05)

pilots (1) all Captain positions in the STL domicile on small wide body aircraft B-767-200/B767-300, and B-757 until TWA pilot Morgan Fischer should have sufficient seniority to hold a four-part bid status on one of those aircraft, and (2) all Captain positions in the STL domicile on narrow body aircraft MD-80, B-717, and DC-9 until Magnus Alehult should have sufficient seniority to hold a four-part bid status on any aircraft. In addition, former TWA pilots had a bidding preference in STL on First Officer (FO) positions on the same aircraft, subject to the same termination points.

Supplement CC also contained tables that provided for a minimum number of CA positions in STL for narrow body (NB) and small wide body (SWB) aircraft flown in STL. Those minimums were based upon the SWB and NB flying being performed by the Company at DFW and ORD combined. A floor was set at 30% of the combined number of airplanes in that category at those airports combined.

For many years, the operative minimums have been the 30% level and it is that level of minimum flying that was in effect at STL as of the date that Supplement CC was abrogated. There is little dispute that, as of that date and for some time prior, the Company was allocating greater amounts of flying to STL than business circumstances would otherwise have required in order to comply with its commitments under Supplement CC. The result of selecting STL as the sole domicile for fenced flying for former TWA pilots was that STL selections by Captains of lines of flying, vacations, and the like were performed wholly among former TWA pilots.

Standing alone, the abrogation of Supplement CC would have had an immediate and significant adverse impact on the former TWA pilots. A majority of the former TWA pilots flying in a CA position in STL would lack the system seniority to hold CA positions elsewhere, absent the construction of appropriate substitute protections. As part of the agreement approved by the Bankruptcy Court addressing the abrogation of Supplement CC,

the Parties agreed to this interest arbitration process to devise appropriate substitute

protections as alternatives to the lost Supplement CC flying rights.

        As noted previously, it is neither feasible nor expected that the rights provided in this

arbitration would precisely track the provisions of Supplement CC.  The movement of the

protected flying from STL to other domiciles, changes in the makeup of the fleet, the ability,

given the passage of time, of former TWA pilots to hold CA and Category IV FO positions,

and other matters require that we craft substitute arrangements that will appropriately

substitute for the lost Supplement CC rights while, at the same time complying with both the

express limitations in LOA 12-05 and the need to minimize adverse effects upon the flying

rights of AA pilots and to avoid interfering with the Company's operation of the airline.

Complicating this daunting task is the fact that Supplement CC is, in certain areas,

imprecise.  While it is not necessary for this Panel to resolve all such ambiguities, they have

been factored into our analysis as to what constitutes a reasoned and equitable substitute for

the loss of Supplement CC protections.

        In the process of fashioning substitute protections, we have addressed a variety of

questions, including the following: 1) What is the amount of protected CA and FO fenced

flying to be provided former TWA pilots?; 2) Shall the restrictions on the rights of the former

TWA pilots to bid on Large Wide Body ("LWB") flying be continued?; 3) What types of

aircraft are to be fenced?; 4) Are there new preferences for STL based flying that may exist

after the date of this Award?; 5) What is the nature of the new fences?; and 6) What should

be the duration of the protections provided by this Award?  We also address additional, less

significant, but nonetheless important, conditions.

        While these items will be addressed seriatim, it is important to note that, in

fashioning the Award in this case, all elements have been considered in their totality in the

context of the lost Supplement CC protections.  While we believe each component is fair and

equitable, some would have been provided under Supplement CC had it not been abrogated,

others are narrower than would have been the case had Supplement CC survived. Still

others mirror those that would have been provided under Supplement CC. This is

intentional since, again, it is the totality, in light of both the current and the predicted

operating environment, that is critical to our endeavors.

It also should be noted that, while only certain portions of the Parties' arguments and

proposals are referenced in this Opinion and Award, the Panel has carefully reviewed all the

record evidence provided during this proceeding prior to issuing its ruling.

1) The Amount of Protected CA and FO Flying

The presentations of the Parties have identified the following issues regarding the

amount of protected CA and FO flying: a) the initial number of protected NB and SWB CA

positions to be protected; b) whether the initial number of protected NB and SWB CA

positions are to remain fixed or are to increase or decrease in number based upon overall

flying or some other metric; c) whether FO flying is also to be protected, and if so, in what

fashion; and d) the adjustments to these numbers, if any, that are appropriate based upon

such factors as STL preferential flying, changes in the number of SWB aircraft, and LWB FO

positions or Category I CA positions that former TWA pilots bid with the use of their system

seniority.

On September 7, 2012, when Supplement CC was abrogated and the Company

advised APA it was going to close STL as a pilot base, the total number of Supplement CC

protected CA positions in STL consisted of 260 NB Captains and 86 SWB Captains. The

Company and APA agreed, as an interim measure, that the provisions of Supplement CC

would continue until issuance of this Panel's Award.

The Panel concludes that the initial number of protected NB CA positions should be

260 and the initial number of protected SWB CA positions should be 86. Continuation of

these existing numbers will best preserve the protections provided the former TWA pilots

without diminishing flying rights of AA pilots. The Panel is not persuaded these numbers

should increase if the overall amount of NB and SWB flying performed by the Company
increases.

Like Supplement CC, the Panel provides preference to the former TWA pilots to hold
FO positions in the same numbers and equipment and at the same locations as there are
fenced TWA CAs flying.  Given the nature of the fences, however, we do not link the flying to
be done by the former TWA FOs to the flying selected by the former TWA pilots who obtain
fenced CA positions.  Rather, like the former TWA pilots who hold fenced CA positions, the
former TWA pilots exercising preference to hold fenced FO positions will use their system
seniority to select flying as FOs.

### 2) Restrictions on the Ability of Former TWA Pilots to Use System Seniority to Bid Large Wide Body Positions

Supplement CC limits the ability of former TWA pilots to use their system seniority
to bid into LWB aircraft in either CA or FO positions.  The Parties disagree with respect to
allowing bids into LWB FO positions.  The TWA Pilots Committee urges that bids into LWB
FO positions be allowed unconditionally.  The AA Pilots Committee proposes that if former
TWA pilots are permitted to bid into LWB FO positions using their system seniority, then
any LWB FO positions bid by former TWA pilots be counted as a CA position since the
positions are comparable in terms of pay to a CA position.

The Panel concludes that the former TWA pilots should be permitted to use their
seniority to bid for and hold LWB FO positions, but that any such positions successfully bid
by any former TWA pilots should be counted towards the fenced NB CA guarantees.  To be
sure, the opportunity to use system seniority to bid an LWB FO position did not exist under
Supplement CC.  While the Panel's role pursuant to LOA 12-05 is to address the loss of flying
opportunities to the former TWA pilots resulting from the abrogation of Supplement CC, the
harm resulting from the abrogation of Supplement CC must be viewed *in toto* and must
include appropriate consideration by this Panel of not only benefits bestowed upon the

former TWA pilots by Supplement CC but also the elimination of certain restrictions imposed by Supplement CC.

The ability to use system seniority to bid and obtain LWB FO flying opportunities must be appropriately factored in to any equation that attempts to replace the situation resulting from the abrogation of Supplement CC. The TWA Pilots Committee asserts that it is unfair that a junior former TWA pilot may bid an LWB FO vacancy and thereby prevent a more senior TWA pilot from holding a fenced NB or SWB CA vacancy. This objection has some merit. The alternative, however, would be to allow the former TWA pilots, as a group, to enjoy both reserved CA positions in the same number and equipment types as provided by Supplement CC and also hold LWB FO positions to which they were not entitled under Supplement CC. We believe that would constitute overbroad protection of former TWA pilots at the expense of AA pilots.[11]

3) Aircraft Types to be Fenced

At STL, the fenced aircraft were specifically identified. Reserved NB aircraft consisted of the MD-80, B-717, and DC-9[12]. Reserved SWB aircraft were the B-757, B-767-200 and B-767-300. NB and SWB flying at ORD and DFW had no such restrictions. Supplement CC established no fenced flying on any other types of NB and SWB aircraft.

The record suggests that the existing fleets of MD-80, B-757 and B-767 aircraft will be significantly reduced and possibly eliminated prior to the date on which the replacement protections under this Award terminate. The provisions of Supplement CC are unclear as to what would happen in such a situation. It would be somewhat speculative, at best, to conclude that the terms of Supplement CC obligated the Company to obtain aircraft not otherwise in its fleet to satisfy the minimum aircraft requirement. Tying the definition of

---

[11] We understand that providing preferential FO status to the former TWA pilots based upon the number, location, and equipment type of actual fenced CA positions means that any LWB FO Captain equivalent positions selected by the former TWA pilots will result in lesser numbers of preferred FO positions than would otherwise be the case. Nothing herein shall be construed as requiring the displacement of an incumbent pilot.

[12] The Company fleet no longer includes B-717 or DC-9 aircraft.

fenced aircraft types to specific aircraft was intentional and at no time after the initial

negotiation of Supplement CC did the Parties expand its provisions to encompass

replacement aircraft.

We conclude, however, that some provision for replacement aircraft is essential if the

overall Award is to provide what LOA 12-05 calls for - a meaningful substitute for the loss of

flying opportunities at STL.  Given the projected changes in the composition of the American

Airlines fleet over time, it would not be possible to provide appropriate substitute

protections absent some provision for replacement aircraft.

The proposals of the Company, the AA Pilots Committee, and the TWA Pilots

Committee all recognize the propriety of providing for replacement aircraft, albeit each

would impose various conditions and limitations.  We hold that the Company's proposal

represents the most appropriate use of replacement aircraft in the context of our overall

Award.

The fenced aircraft should be limited initially to the MD-80, B-757, and B-767

aircraft to the extent such aircraft are being flown by the Company.  If there are insufficient

MD-80s to meet the NB CA fence guarantees, then the Company may provide a sufficient

number of Airbus Group II domestic CA positions to meet the overall NB CA commitment

for fenced positions.  At its option, to facilitate training and transition prior to the time at

which there are insufficient MD-80s to meet the NB  guarantees, the Company may meet the

fence guarantees with CA positions on domestic Airbus Group II aircraft prior to the

retirement of the MD-80 aircraft.

With respect to the B-757 and B-767 aircraft, the fence is initially limited to domestic

aircraft.  Virtually all of the STL based flying provided to the former TWA pilots in recent

years was domestic flying.  If insufficient domestic B-757 and B-767 flying is available to

meet the SWB fence guaranteed CA positions, the Company shall provide the affected pilots

with the choice of B-757 or B-767 international flying (to the extent still being flown by the

Company) or an NB CA position. In the latter situation, the number of SWB protected positions shall be reduced and the number of NB protected positions shall be increased accordingly so that the total of 346 CA fenced positions remains the same.

### 4) New STL Based Flying

It is uncertain whether there will continue to be a STL-based operation and, if so, what aircraft and flying will be encompassed. The Parties agree, however, that priority should be provided to former TWA pilots in connection with the performance of any STL-based flying, and agree, as well, that Group II and III CA positions at STL should count against the guarantees. They disagree as to whether Group I CA positions should count against the guarantees. The AA Pilots Committee also proposes that any STL-based flying must be administered as a contractual domicile or home base in accord with the provisions of the AA-APA Agreement.

The Panel holds that former TWA pilots should have a preference for any mainline Group II or Group III flying performed that is STL-based and that any such flying will count against the system-wide guaranteed flying. We are unpersuaded, however, that Group I flying should be so counted. Unlike the LWB FO situation, Group I CA positions are simply not comparable to either NB or SWB CA positions. Given the Panel's finding, however, that Group I CA positions in STL should not count towards satisfaction of the NB and SWB CA guarantees, the Panel declines to accord the former TWA pilots any preference to such flying. Rather, any Group I CA flying that is STL-based will be filled in accord with the provisions of the AA-APA Agreement using system seniority. We deny the request of the APA TWA Pilots Committee that we limit the administration of the flying that may be performed in STL. The terms of the AA-APA Agreement will govern whether the STL-based flying will be treated as a domicile or home base or otherwise.

American Airlines and APA and the APA TWA Pilots Committee and          Page 15 of 20
the APA AA Pilots Committee (LOA 12-05)

5) The Location and Nature of Fenced Flying

All parties accept that the former STL fences are to be replaced by fenced flying at other bases of the Company's choosing. The TWA Pilots Committee prefers that the fences be located at a "virtual" base, which would have no physical reality. The Panel, however, rejects that approach as a leap into the unknown, presenting a host of unanswered logistical and operational questions. Accordingly, we direct the parties to establish fenced flying at bases to be determined by the Company, and to provide former TWA pilots at those bases with the flying to which they are entitled under this Award.

The manner in which fenced flying at the various bases is to be administered was a matter of considerable dispute. The final position of the TWA Pilots Committee and the Company was to assign flying to each of the fenced operations at the same domicile or base in a "random" fashion, thus ensuring an unbiased allocation of flying to each side of the fence – former TWA and AA. Thereafter, separate selections from that flying would take place on each side of the fence, with selections based on system seniority. This approach would protect the "quality of life" of the former TWA pilots.

The Panel recognizes these concerns, but is ultimately not convinced the fences should extend beyond guarantees to the seat and equipment. The Panel understands that the most senior former TWA pilots were previously able to use their seniority to select more desirable trip pairings and days off when all of the fenced flying was located in STL. The movement of the fenced flying to multiple domiciles changes that equation significantly and the rights of the AA pilots militate against extending the Supplement CC guarantees beyond fenced guarantees at new locations and the ability to fly in particular equipment and seats.

The use of system seniority with respect to the selection of flying (whether under a preferential bidding system or under the more traditional scheduling system now in effect) will be simpler to implement than the various alternatives crafted by the TWA Pilots Committee or the Company and will require fewer exceptions to the provisions of the

collective bargaining agreement. Further, the ability of the former TWA pilots to obtain preferred flying opportunities, preferred days off, priority in obtaining additional flying that becomes available after the monthly schedules have been bid, and the like, at the domiciles where the Company places the fenced flying, will increase over time as the system seniority of those pilots increases.

The proposal to randomly assign flying to one side of the fence or the other would result, in our view, in a number of inequities. First, as proposed, all the FO reserve flying would be placed on the "AA" side of the fence. This would have the effect of both forcing such generally less desirable flying wholly onto the more senior AA pilots and also deprive the former TWA pilots from selecting reserve FO positions if they were desired by any individual former TWA pilot. Second, random allocation does not necessarily mean equitable allocation. Over the long run one may expect a random distribution to yield proportionate allocations of flying, but during any particular bid period the results may be inequitable. Third, an approach that requires fewer modifications to the AA-APA Agreement is preferable to one requiring greater modification. Fourth, the Award in this case will foster greater integration of the pilot groups. Not only will these pilots be flying out of the same domicile, but the selection of FO flying will be done independent of CA selection and by seniority as well, resulting in increases in the number of flights in which the CA and the FO are from different groups. Once the fences have converted to equipment and seat fences, rather than solely geographic fences, this too, is desirable. Once the fences are no longer in effect, flying will be truly merged between the two pilot groups.

6) Duration of the Fenced Flying

The alternative protections provided by this Award shall continue in effect for the same period as the current AA-APA Agreement. These protections may not be amended prior to January 1, 2019, and may be changed thereafter only in accord with the procedures

American Airlines and APA and the APA TWA Pilots Committee and          Page 17 of 20
the APA AA Pilots Committee (LOA 12-05)

for changing the terms of the AA-APA Agreement as set forth in that Agreement and the

Railway Labor Act.

The existing Duration provisions of Supplement CC, however, are also to be

continued. All guarantees and preferences related to SWB (B-757 or B-767) positions will

end as of the date Morgan Fischer has sufficient seniority to hold a four-part bid status as CA

on one of those aircraft types. All such guarantees and preferences related to the NB CA

positions (MD-80 or Airbus Category II domestic aircraft) will end as of the date that

Magnus Alehult has sufficient seniority to hold a four-part bid status as CA on "any aircraft",

including a Category I aircraft.

Summarizing, the guarantees and preferences provided for pursuant to this Award

will end upon the earlier of pilots Fischer/Alehult having sufficient seniority to hold four-

part bid status as CA in the SWB/NB (including, for the latter, Category I) aircraft

respectively or the date under which AA and APA have reached agreement to change or

eliminate those guarantees and preferences following January 1, 2019.

7) Other Items

- There will be no system flush following the date on which the guarantees and
  preferences provided for in this Award end. Rather, all openings will
  thereafter be filled in accord with the procedures contained in the applicable
  AA-APA Agreement.

- The Company shall retain the right to locate "fenced" flying based on
  operational considerations. The provisions of LOA 12-05 recognize the
  Company's rights in that regard and the Company's proposals regarding
  allocation of fenced flying to its five cornerstone bases (DFW, MIA, LAX,
  ORD, and NY (JFK/LGA)) is understood by the Panel to reflect its current
  judgment as to the most appropriate locations to place fenced flying based
  upon current operational needs.

American Airlines and APA and the APA TWA Pilots Committee and                Page 18 of 20
the APA AA Pilots Committee (LOA 12-05)

- The Parties have various proposals with respect to "seat protection" in the event that sufficient MD-80 and B-757 and B-767 aircraft are retired without sufficient replacement Airbus Category II domestic aircraft to support the guaranteed CA positions. In the event such a situation presents itself, such that AA pilots are being displaced from CA positions in those aircraft, any reductions in CA positions should be made on a proportionate basis between the affected groups of AA pilots and former TWA pilots. In the event that additional CA positions are created thereafter during the life of the guarantees and preferences directed by this Award, then until the number of guaranteed CA positions is reached, any new CA positions in eligible aircraft should also be made on a proportionate basis. All other provisions of the existing AA-APA Agreement regarding reductions in force will remain applicable.

- When the STL domicile is closed, there will be an initial bid among the former TWA pilots, based on system seniority, in which they will be permitted to select base assignment, equipment type, and seat. There will be no displacement of any AA pilots from CA or FO positions as a result of this initial assignment of former TWA pilots to any of the new bases. Thereafter, former TWA pilots will be permitted to utilize their protected rights to move to an open position in the event of an opening due to retirements or other attrition or due to changes in the numbers of fenced positions at a particular base.

- A "force majeure" provision is awarded to recognize that such circumstances may justify a temporary failure by the Company to fully meet its guarantee and preference obligations under this Award.

- The Company shall be free to utilize a limited pay protection provision for transitional situations. The Company's proposal in this regard, which would recognize its discretion to utilize pay protection, consistent with the limitations of the AA-APA Agreement, is granted. Inasmuch as this pay protection is discretionary at the option of the Company, it does not violate the limitations on this Award included in LOA 12-05.

- The Memorandum of Understanding among American Airlines, US Airways, APA, and USAPA, provides at Paragraph 10.i. that: "Nothing in this Paragraph 10 shall modify the decision of the arbitration panel in Letter of Agreement 12-05 of the 2012 CBA." Accordingly, any subsequent agreement or arbitration with respect to integration of seniority or a collective bargaining agreement covering all pilots at any merged operation will not serve to modify the alternative guarantees and preferences awarded in this matter by the Panel.

- The request that the Panel establish special provisions for resolving disputes over the interpretation and application of this Award that creates separate representational roles for the separate pilot committees is rejected. The Panel agrees, however, that both the APA TWA Pilots Committee and the APA AA Pilots Committee should be served by the Company and APA with copies of the proposed contractual language to implement the provisions of this Award and that the Pilot Committees should be permitted to provide comments to the Panel with respect to the new or revised language that AA and APA craft to implement the provisions of this Award so that the Panel may take those viewpoints into account when determining whether to approve that language as provided for in LOA 12-05. Any such comments should be filed no later than three calendar days after receipt of the proposed contractual language

so as to allow the Panel to meet the time limits applicable to the Panel's

review of and approval of any new or revised contractual language.

• The request that the Panel direct that the TWA Pilots Committee and the AA

Pilots Committee each be granted party status in any subsequent seniority

integration process that may take place following the anticipated merger of

AA and US Airways is rejected. Such request is arguably beyond the

jurisdiction of the Panel and, in any event, no persuasive reasons have been

shown in support of such a directive.

Issued this 22nd day of July 2013:

_____
RICHARD I. BLOCH, Esq.

_____
STEPHEN B. GOLDBERG, Esq.

_____
IRA F. JAFFE, Esq.