# EXHIBIT C

BEFORE THE RAILWAY LABOR ACT
BOARD OF ARBITRATION
ESTABLISHED PURSUANT TO LOA 12-05

|  |  |
|---|---|
| AMERICAN AIRLINES, INC. | ) <br> ) <br> ) **RICHARD I. BLOCH, CHAIR** |
| *and* | ) **STEPHEN GOLDBERG** <br> ) **IRA JAFFE** |
| ALLIED PILOTS ASSOCIATION | ) <br> ) <br> ) <br> ) |

POST-HEARING BRIEF OF THE
TWA PILOTS COMMITTEE

John O'B. Clarke, Jr.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
(202) 296-8500
jclarke@highsaw.com

Date: June 15, 2013                Attorney for the TWA Pilots Committee

## TABLE OF CONTENTS

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.     Supplement CC's Drafters Acknowledged That The Integrated Seniority List They Constructed "By Itself Would Not Assure A Fair Result" For TWA Pilots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.     American Abrogated Supplement CC Through Bankruptcy Code § 1113, But Did Not Reject The Integrated Seniority List Or Discontinue The STL Base Protections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.     The Parties Proposed Alternative Contractual Provisions, But Disagreed As To Whether The Substitute Provisions Should Replicate Supplement CC And Modify It Only As Necessary To Accommodate American's Closure of Its STL Base . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    I.     EQUITABLE CONSIDERATIONS THAT GOVERN THE EXERCISE OF THIS BOARD'S DISCRETION REQUIRE THAT THE BOARD REPLICATE THE PROTECTIONS SUPPLEMENT CC GAVE TWA PILOTS TO UPGRADE AND TO BID AMONGST THEMSELVES FOR FLYING RESERVED FOR THEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.     Supplement CC's List And STL Fence Protections Are Inextricably Entwined, For One May Not Exist Without The Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.     TWA Pilots Have An Equitable Right Under The RLA And Bankruptcy Principles To A Continuation Of The Essence Of The STL Protections, For The "Fair And Equitable Treatment" Of All Employees Mandates That American Not Abrogate The Protections That Made The Seniority List, Which American Has Assumed, Fair . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.     EACH OF THE TWA PILOTS COMMITTEE'S PROPOSALS REPLICATE
        THE CORE PROTECTIONS SUPPLEMENT CC'S STL FENCE
        PROVISIONS GAVE TO TWA PILOTS. THEY DO NOT AFFRONT
        LOA12-05'S LIMITATIONS, FOR THEY ARE NON-ECONOMIC; THEY
        DO NOT REQUIRE FLYING AT ANY LOCATION; AND THEY DO NOT
        MODIFY THE INTEGRATED SENIORITY LIST. THEY, THEREFORE,
        SHOULD BE AWARDED BY THIS BOARD............................ 25

        A.     The Committee's Proposed Virtual STL Crew Base
               Replicates To A Significant Degree The Upgrade And Quality
               Of Life Protections Supplement CC's STL Base Restrictions
               Gave TWA Pilots................................................. 29

        B.     The Guaranteed Number Of SWB And NB Captaincies
               Should Increase If There Is A System-Wide Increase In
               Captains Just As They Will Decrease Proportionally If There
               Is A System-Wide Decrease........................................ 31

        C.     The Replacement Protections Devised By This Board Should
               Protect The TWA Pilots' Career Path Progression And
               Quality Of Life Until Their Seniority Has Matured
               Sufficiently To Provide That Protection Without The Need
               For The Fences................................................... 32

        D.     Just As Supplement CC Had a Dispute Resolution Procedure,
               The Protections Devised By This Board Should Require An
               Adjustment Process For Disputes And, Due To APA's
               Inherent Conflict, Should Provide That The Two Pilot
               Committees Should Have Equal Party Status To Raise And
               Adjust Disputes Arising From The Protections.................... 40

        E.     The Board Should Direct The Carrier And The Pilots'
               Collective-Bargaining Representative To Grant The TWA
               Pilots Separate Party Status If American Merges With US
               Airways And Integrates Pilot Seniority Under The McCaskill
               Bond Amendment................................................... 42

CONCLUSION........................................................................ 44

List of Attachments............................................................... 46

# BEFORE THE RAILWAY LABOR ACT
## BOARD OF ARBITRATION
## ESTABLISHED PURSUANT TO LOA 12-05

| | |
|---|---|
| **AMERICAN AIRLINES, INC.** | ) |
| | ) |
| *and* | ) **RICHARD I. BLOCH, CHAIR** |
| | ) **STEPHEN GOLDBERG** |
| **ALLIED PILOTS ASSOCIATION** | ) **IRA JAFFE** |
| | ) |
| | ) |
| | ) |

### POST-HEARING BRIEF OF THE
### TWA PILOTS COMMITTEE

This Post-Hearing Brief is respectfully submitted by the TWA Pilots Committee in support

of its position that this Board of Arbitration should require American Airlines, Inc. ("American" or

"AA") and the Allied Pilots Association (APA) to devise contract language, as summarized in

Attachment A to this Brief, that will provide former TWA pilots with preferential flying rights

comparable to those they enjoyed under Supplement CC at American's pilot domicile at STL. Those

proposed contractual provisions comply with this Board's charge in LOA 12-05 to determine "what

alternative contractual conditions" should be devised to provide TWA pilots with the preferential

flying opportunities they enjoyed under Supplement CC before American abrogated that contract

(LOA 12-05 at 1 (Joint Exhibit [hereinafter, "JEx."] 4)), and do not affront the limitations which

LOA 12-05 placed upon this Board's jurisdiction. Moreover, they are compelled by the equitable

considerations that govern this Board's exercise of its discretion–*i.e.,* the requirement animating

Section 3 of the *Allegheny-Mohawk* Labor Protective Provisions (LPP), which is implicit in

Supplement CC, that seniority be integrated in a "fair and equitable" manner (which the list

constructed by Supplement CC is most assuredly not); the obligation imposed by Bankruptcy Code § 1113(b)(1)(A), 11 U.S.C. § 1113(b)(1)(A), that replacement contract provisions assure that, as relevant here, *all* employees "are treated fairly and equitably;" and the maxim applicable under the Bankruptcy Code that executory contracts must be assumed or rejected in their entirety, for debtors "may not pick and choose only favorable terms to be assumed." *In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (D. DE Bk. Ct. 2008).[1] These considerations mandate that this Board replicate to the maximum extent practicable the protections that the STL fence provisions gave to TWA pilots against the unrestricted operation of the admittedly unfair system seniority list Supplement CC imposed and this Board may not reorder.

This Board's award, the TWA Pilots Committee respectfully submits, should assure that no pilot—either pre-acquisition AA pilot or TWA pilot—is placed in a worse position with respect to terms of employment by the substitute protections than under Supplement CC, while allowing American to allocate its flying throughout its system unrestricted by Supplement CC's now abrogated STL base restrictions. The revised contract modifications proposed by the TWA Pilots Committee, which are summarized in Attachment A to this Brief, replicate in so far as practicable, considering the limitations placed upon this Board, the protections Supplement CC's STL base restrictions gave to TWA pilots, while at the same time assure fair treatment of both pilot groups. These provisions comply with the restrictions imposed by LOA 12-05 for they are non-economic; they do not require American to establish or continue flight operations at any location; and they do not modify the seniority list placements effected by Supplement CC § II. But more to the point, they provide the career advancement opportunities and quality of life protections that Supplement CC's

---

[1]      A copy of *In re Buffets* was attached to the TWA Pilots Committee's Pre-Hearing Submission of April 1, 2013 as Attachment D.

STL base restrictions gave to TWA Pilots, which, without these protections would be transferred from TWA pilots to AA pilots.

## STATEMENT OF THE CASE

This Board derives its powers from LOA 12-05 (JEx. 4), which obligated the parties–American and the APA–to create this Board of Arbitration under Section 7 of the Railway Labor Act, 45 U.S.C. § 157, with the authority to "explore 'what alternative contractual conditions' and 'what non-economic conditions' should be provided TWA pilots as a result of the loss of flying opportunities due to the termination of Supplement CC and the closing of the STL base." May 24, 2013 Board Memo. at 2. LOA 12-05, however, did not give this Board *carte blanche* to devise those alternative contractual conditions, for it imposed several limitations on this Board's jurisdiction, including the prohibition against reordering the seniority list placements effected by Supplement CC.

LOA 12-05 observed that American had terminated Supplement CC pursuant to the authorization of the United States Bankruptcy Court supervising American's reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.*, but that, notwithstanding the abrogation, American was continuing to apply "certain terms of Supplement CC as non-contractual employment conditions for former TWA pilots." JEx. 4 at 1. One employment term that American did not change, LOA 12-05 emphasized, was the seniority list constructed by Supplement CC; indeed, the parties stated that: "The Company and APA agree that the TWA Pilots' existing seniority placements on the Pilots' System Seniority List [constructed by Supplement CC] are final and shall continue pursuant to Section 13 of the CBA notwithstanding the termination of Supplement CC and any preferential flying rights associated with those seniority placements." *Id.* LOA 12-05 acknowledged that the integrated list constructed by Supplement CC did not stand alone, for, as the

-3-

LOA stated, Supplement CC established "certain preferential flying rights to specific aircraft based at STL associated with those seniority placements." *Id.* American was continuing to apply those preferential flying rights (JEx. 3), but, as LOA 12-05 stated, this arbitration was "necessary to determine what alternative contractual rights should be provided to TWA Pilots as a result of the loss of flying opportunities due to termination of Supplement CC and the closing of the STL base." *Id.*

LOA 12-05 stated that American, having abrogated Supplement CC, possesses "the right, in its sole discretion, to decide whether to close the existing STL pilot base, and such closure and consequences thereof shall not constitute a breach of the CBA." JEx. 4 at 1. LOA 12-05 then provided that: "In preparation for closure of the STL pilot base, the Company and APA will engage in final and binding interest arbitration pursuant to Section 7 of the RLA to establish certain terms of the CBA as a substitute for the loss of Supplement CC preferential flying opportunities in order to resolve all issues related to the impact on TWA pilots of termination of Supplement CC." *Id.* However, as noted above, the parties significantly limited the power of the arbitration board they were creating to devise equitable terms, for in keeping with their intention to remove a reordering of the seniority list from the mix and to permit American to obtain the savings from relocating the STL flying as it wished, LOA 12-05 imposed the following restrictions on this Board's ability to craft an effective, non-economic,[2] alternative contractual arrangement (*Id.* at 2):

> In no event shall the arbitrators have authority to modify the Pilots' System Seniority List, require the establishment or continuation of any flight operation at any location, or impose material costs on the Company, and any preferential flying rights under the award shall not modify or be deemed a modification of the TWA Pilots' seniority placements on the Pilots' System Seniority List.

---

[2]     LOA 12-05 stated that "training costs associated with the closure of the base shall be considered non-economic." JEx. 4 at 2.

LOA 12-05's commitment to create an RLA § 7 Board of Arbitration was implemented by the January 15, 2013 Agreement For STL Pilot Interest Arbitration (JEx. 2), which established this Board and its procedures. That arbitration agreement recognized that APA represented two groups of pilots who were interested in this dispute and that each had interests that were antagonistic to the other. This created a conflict for APA, which AA and APA resolved by assigning party-status to both groups–the pre-acquisition AA pilots and the TWA pilots–so that they could present their views as to the appropriate substitute protections. JEx. 2 at 2, § 1.

This Board received Pre-Hearing Submissions, exhibits, and written statements from the three parties at the hearing–American, the AA Pilots Committee and the TWA Pilots Committee–as well as an opening statement from APA. It conducted four days of hearings at which the three parties-in-interest presented their evidence, and provided two additional days during which pilots affected by this proceeding (as well as one spouse) addressed this Board. Thereafter, the Company and the TWA Pilots Committee revised their proposals in light of a memorandum this Board issued dated May 24, 2013, and those revised proposals are now being presented to this Board. The TWA Pilots Committee has been informed that the AA Pilots Committee is also revising its proposal.

## STATEMENT OF FACTS

Even though it applied to TWA pilots, Supplement CC was not the product of interest bargaining in which the TWA pilots had an equal ability to accept or reject the fruits of the negotiations. Rather, faced with the threat that American would not acquire TWA's assets–and thus not employ its pilots–unless TWA employees waived their contractual rights to a seniority integration in accordance with Sections 3 and 13 of the *Allegheny-Mohawk* LPPs, and with the very real possibility that TWA would seek to use Bankruptcy Code § 1113 to abrogate the contractual

*Allegheny-Mohawk* protections, TWA employees, including its pilots, waived their contractual rights to seniority integration. That waiver was also made with the assurance from American that it would "use its reasonable best efforts to secure a fair and equitable process for the integration of seniority" (TWA Pilots Committee Exhibit [hereinafter, "TEx."] 7), Declaration of J. Swanson dated April 9, 2013, at 2-3, ¶ 5. Although the TWA pilots had engaged in discussions with APA and American between February and the end of October 2001, in an effort to reach an integration agreement (JEx. 9 at 8-10; Swanson Dec. at 2, ¶ 4), in the end APA and American drafted the agreement, which they signed on November 8, 2001, at a time when American's wholly-owned subsidiary TWA LLC employed the TWA pilots but APA did not represent them.

**A.    Supplement CC's Drafters Acknowledged That The Integrated Seniority List They Constructed "By Itself Would Not Assure A Fair Result" For TWA Pilots.[3]**

Supplement CC integrated the seniority of the 11,532 AA pilots hired before American acquired TWA assets on April 10, 2001 (*see*, JEx. 12 at 206), with the seniority of the 2,337 TWA pilots on April 10, 2001, by a methodology which APA negotiators made clear was designed so that "the AA pilots' career expectations should be protected by the construction of the integrated list, with any necessary additional protection for the TWA pilots' expectations to be achieved through conditions and restrictions." JEx. 9 at 13. This underlying precept of protecting AA pilots through their ordering on the list resulted in a list that took TWA's 1,095 most senior pilots (approximately 280 of whom were expected to retire in the next three and a quarter years [April 11, 2013 Tr. at 351

---

[3]    JEx. 9 at 18 (Capitalization added).

(Testimony of M. Mellerski)][4] and "feathered" them on a ratio of 1 TWA pilot to each 8.1762556 AA pilots beginning with the AA pilot at No. 2596 on the list, whose date of hire was October 8, 1985 (JEx. 12 at 47), and ending with TWA pilot No.1096 (Raymond Camus, DOH 3/20/89) being placed immediately after the last AA pilot hired before April 10, 2001, B.D. White, AA No. 11532, with a date of hire of April 9, 2001. JExs. 7 at 3, § II.A; 12 at 206. Supplement CC then took the remaining 1,241 TWA pilots with dates of hire beginning at March 23, 1989 for No. 1097, Theron Clark, many of whom were Captains, and placed them in a block below the last TWA pilot "feathered," Raymond Camus, but before the approximately 410 post-acquisition AA hires. JExs. 7 at 3, § II.B; 13 at 16. This reduced the seniority the feathered TWA pilots had by approximately 20 years for the second fourth of the feathered group (see, JEx. 14 at 61 [Integrated No. 5166]) to twelve years for the end of the feathered pilots and the beginning of the stapled block. Id. at 149.

What they had wrought did not go unnoticed, for APA's drafters in a classic understatement acknowledged that "because we have insisted on constructing the integrated list to protect AA pilots from the risks of future events, the integrated list by itself might not sufficiently protect the TWA pilots' career paths or prevent the AA pilots from reaping an injurious windfall by gaining advancement opportunities that belonged to the TWA pilots prior to the transaction." JEx. 9 at 20. TWA pilots, the APA concluded, were bringing "260 small wide-body line pilot Captain jobs, and 800 narrow-body line pilot Captain jobs" to the transaction[5] (JEx. 9 at 15), and that they had a

---

[4]   By including the approximately 280 TWA pilots who were expected to retire within a few years of the integration—indeed, some did retire before the list became effective—APA effectively began the feathering 2,289 positions lower than 2596. Thus, the real feathering began at AA No. 4885, which on April 10, 2001, was B.L. Williams, DOH 8/1/1988. JEx. 12 at 88.

[5]   To put those numbers into perspective, at the time Supplement CC was implemented
(continued...)

legitimate expectation to upgrade to those positions over their careers. JEx. 9 at 20. However, the

APA drafters also acknowledged, the list itself as constructed by Supplement CC did not adequately

protect the legitimate career expectations of a significant portion of the TWA pilots. Dividing the

TWA list into three groups, the APA drafters observed that (JEx. 9 at 21):

> • In the middle of the TWA list, some pilots were slowed down by the
> integrated list, operating by itself, in their progression to small wide-
> body Captain. That deceleration was particularly dramatic for the
> TWA pilots as junior as the last TWA pilot hired before TWA's first
> bankruptcy petition in 1992 (Morgan Fischer, DOH 9/28/90). . . .

> • Similarly, the TWA First Officers in the middle portion of the TWA
> list were slowed in their anticipated progression to narrow-body
> Captain positions by the operation of the integrated seniority list
> without any restrictions. That deceleration was particularly dramatic
> for pilots as junior as TWA's last 1997 hire; Magnus Alehult, DOH
> 7/23/97. . . .

To remedy this inequity, Supplement CC's drafters included protective conditions to alter

the operation of the seniority list, for "[w]ithout those protections, the integrated list by itself would

result in the transfer of many of those TWA narrow-body and small wide-body Captain upgrades to

AA pilots, which would arguably be a windfall to the AA pilots at the TWA pilots' expense." JEx.

9 at 21. Supplement CC's drafters also recognized that the unfettered operation of the integrated

_____

[5]/(...continued)
in April 2002, American had 1,679 SWB Captains and 2,903 NB Captains in its system, excluding
the TWA pilots at STL. TEx. 11 (Excel Version) at DataQuest Tab, Rows 55-56. By April 2002,
TWA pilots were being downgraded due to cutbacks in flying, but TWA LLC still employed 233
SWB Captains and 622 NB Captains at STL. _Id._ at DataQuest Tab, Rows 35-36 and 55-56. Thus,
in April 2002, TWA Captains held 12.19% of the SWB captaincies and 17.65% of the NB
captaincies. The guarantee of 86 SWB and 260 NB captaincies proposed by AA, which the TWA
Pilots Committee has accepted as a base, gives the TWA pilots 8.86% of the SWB captaincies and
12.9% of the NB captaincies today.

seniority list needed to be conditioned for another reason as well: to protect the TWA pilots' quality of life.

To protect both the opportunity to upgrade and the pilot's quality of life, American consolidated the TWA flying into STL, around which Supplement CC erected a "fence" by providing that the NB and SWB flying at STL–both Captains and First Officers positions–would be assigned to TWA pilots in *their* seniority order. As APA explained in its 2001 summary of Supplement CC (JEx. 9 at 20):

> The [STL] fences in Supplement CC therefore recognize (1) that the flying representing the TWA pilots' pre-transaction career path is now reflected first and foremost in St. Louis, and (2) that any expectation that an American pilot had to fly aircraft of the types flown by TWA in the St. Louis domicile must acknowledge that the St. Louis domicile was part of the TWA pilots' career path. The fences are designed to preserve the TWA pilots' opportunities to upgrade within the St. Louis domicile, and to continue to have some of the quality of life (schedules, days off, vacations, etc.) that they had within the separate TWA operation, notwithstanding their relative placement on the integrated seniority list.

Supplement CC created "cells" at St. Louis by providing that all "line pilot positions in Captain bid status on . . . [enumerated SWB and NB[6/]] aircraft in STL domicile will be reserved to TWA pilots, until" a named pilot for each category "has sufficient seniority under this Supplement CC to hold a vacancy in a four-part Captain bid status on[,]" for the SWB category, the enumerated equipment (JEx. 7 at 3-4, § IV.A.1.a.(1)), and, for the NB category, "on any aircraft." JEx. 7 at 4, § IV.A.1.b.(1). To guarantee that the cells would not be eliminated or unreasonably shrunk (JEx. 9

---

[6/]    During the integration discussions in October 2001, APA expressed a willingness to have the guarantees apply to equipment categories rather than to specifically enumerated aircraft as part of an agreement. May 9, 2013 Tr. at 1035-38 (Testimony of E. White). However, when APA drafted Supplement CC with American, it did not include any of what its negotiators called "pot sweeteners." May 9, 2013 Tr. at 1038, L.6.

at 23), or grown "at the expense of the rest of the operation and the AA pilots' career paths" (*Id.* at 22), Supplement CC required that American, so long as the guarantees were in effect, make a sufficient number of captaincies available to the TWA pilots at STL so that "in any contractual month" the number of captaincies in each category "will be a minimum of 30 per cent of the combined number of small wide-body [and a similar percentage for the NB category] Captain line pilot positions in the ORD and DFW domiciles in the contractual month . . . ." JEx. 7 at 4, §§ IV.A.1.a.(2) and .b(2). While the reserved-position obligation applied only to captaincies, Supplement CC provided that TWA pilots would have a "preference to line pilot positions in First Officer bid status" on the enumerated SWB and NB aircraft in the STL domicile, and that any AA pilot at the base "will bid monthly preferences in seniority order, but subordinate to all TWA Pilots in the same bid status." JEx. 7 at 4, §§ IV.A.1.a.(3) and b.(3).

Supplement CC's drafters considered the scenario that AA could experience a reduction in its aircraft and provided that in such a case (where American's fleet fell below the "tables") "no Captain proffers on [SWB or NB] . . . aircraft will be allotted to the TWA Pilots outside of the STL domicile." JEx. 7 at 5-6, §§ IV.A.2.a.(1), and b.(1). This effectively segregated the TWA pilots to STL, for, except for the first month of Supplement CC when the tables applied, American has been below the "tables." TExs. 28(a) and 28(c) at 2.

Supplement CC's STL fences were not intended to be permanent; rather, they were tied to the point in time when "the integrated seniority list will operate to preserve both groups' career paths without the necessity of these protections for the TWA pilots." JEx. 9 at 21 (emphasis deleted). As the APA explained (JEx. 9 at 22):

-10-

> Once the protected TWA pilots have upgraded–the pre-bankruptcy hires in the case of small wide-body Captain positions [represented by Morgan Fischer], the pre-1998 hires in the case of narrow-body Captain upgrades [represented by Magnus Alchult]–the TWA pilots' system seniority on the integrated seniority list will give sufficient protection to their pre-transaction career paths. At that point, the integrated seniority list will preserve those career paths without the necessity of fences to protect the TWA pilots.

During the decade that Supplement CC was in effect, it served its purposes for AA pilots. It shielded them from a significant part of the contraction American sustained following the tragic events of September 11, 2001. *See*, TEx. 11 at Data Quest Tab, Rows 7-10, 23-24; TExs. 23-24 (53.7% of TWA pilots furloughed for an average of 7.9 years, while 9.8% of AA pilots furloughed for an average of 3.8 years; TWA furloughs reached to 10/7/88 DOH, while AA furloughs reached to 2/28/2000 DOH). In its early years, TWA's fleet was transferred to AA's FAA Operating Certificate and became the platform on which many AA pilots remained employed and enjoyed upgrades (TExs. 28(a) -28(d)) while TWA pilots, because of their seniority placements, were furloughed. Significantly, AA pilots participated in the growth at American following the contraction, for 1,250 AA First Officers on April 10, 2001, have upgraded to Captain, while 207 TWA Captains on April 10, 2001,[2] have yet to be returned to Captain. TEx. 22. Nevertheless, Supplement CC assisted the TWA pilots, for its STL base restrictions have, as its drafters anticipated, created a protective cocoon around the TWA pilots, affording them a quality of life their integrated seniority would not provide at this time, as evidenced by the fact that the most senior

---

[2]     The most junior TWA Captain on April 10, 2001, was John Lawrence, TWA Seniority No. 1297, with a January 12, 1990 date of hire. Declaration of T. Duncan, executed April 9, 2013, at 1, ¶ 2; JEx. 13 at 19.

TWA pilots could hold very few line Captain positions on the equipment to which they are assigned today. *See*, Swanson Dec. at 4-5, ¶ 10; May 15, 2013 Tr. at 2045-47 (Testimony of D. Keethler).

**B.    American Abrogated Supplement CC Through Bankruptcy Code § 1113, But Did Not Reject The Integrated Seniority List Or Discontinue The STL Base Protections.**

On November 29, 2011, AMR Corporation and its subsidiaries, including American, filed petitions with the United States Bankruptcy Court for the Southern District of New York to reorganize under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.* On March 27, 2012, American filed a motion with the Court to reject its collective-bargaining agreements (CBA) pursuant to Bankruptcy Code § 1113, 11 U.S.C. § 1113, including Supplement CC. That motion was initially denied without prejudice on August 15, 2012 (JEx. 16), but was renewed on August 17, 2012 and granted by the court orally on September 4, 2012 (JEx. 17) and by written order entered on September 5, 2012. JEx. 18. That written order provided that (JEx. 18 at 2):

> ORDERED that pursuant to section 1113 of the Bankruptcy Code, the Debtors are authorized to reject the collective bargaining agreement with the Allied Pilots Association, effective as of the date of this Order; and it is further

> ORDERED that the Debtors are authorized to take any and all actions that may be reasonably necessary or appropriate to implement and effectuate the terms of this Order . . . .

Two days later, on September 7, 2012, American informed APA that in accordance with the court's order, the CBA "(together with all supplements and related side letters of agreement and other documents, the 'Green Book') is rejected." Co. Ex. 9. However, American stated: "The Company intends to continue to apply the Green Book [which, as defined in the first paragraph of the letter, included the supplements–such as Supplement CC] as the non-contractual terms and

-12-

conditions of pilot employment, unless and until a change in working conditions has been identified

through notice to APA." *Id.* Several days later, on September 12, 2012, American gave APA notice

of "specific changes in the pilot employment terms and conditions set forth in the Green Book that

are being implemented immediately with respect to the following terms" (Co. Ex. 10 at 1), one of

which was Supplement CC. *Id.* With respect to Supplement CC, American stated (*Id.* at 2; emphasis

added):

> Eliminate Supplement CC and commence planning for closure of the
> St. Louis pilot base.

> Former TWA pilots maintain current position on the integrated Pilot
> System Seniority List.

> *Fence provisions to remain in place until further notice* (Notifications
> will be provided prior to implementation of base reductions).

That continued to be the status quo with respect to Supplement CC until American sent APA

a letter dated November 10, 2012, in which American stated that "as part of the Agreement in

Principle [with APA for a new CBA] the Company has proposed to APA an interest arbitration

process, effective upon ratification of a new collective bargaining agreement, to determine

alternative flying rights for former TWA pilots. In addition, the Company has indicated its

willingness to keep the STL pilot base open until the issuance of the arbitration award." JEx. 3 at 1.

American noted that this "presents the question of what interim conditions the Company will

implement pending such arbitration award." *Id.* It the answered its query by stating: "Until issuance

of an arbitration award, the Company will continue to staff the STL Captain positions at the level

that would have satisfied the October 2012 Supplement CC report were it still in effect." *Id.* That

level, the letter went on to state, was 83 actual and 2 pay-protected SWB Captains and 249 actual

and 9 pay-protected NB Captains. *Id.*

American's and APA's tentative agreement was ratified by APA's membership and then submitted to the Bankruptcy Court with a request that the court authorize American to enter into that agreement, including LOA 12-05. During the arguments on the Motion to Authorize on December 19, 2012, counsel for APA explained to the court LOA 12-05's intent (JEx. 19 at 31-32):

> What's happened now is the company is closing St. Louise [*sic*] as a result of the abrogation of Sup CC and we said there was protected flying that we promised those pilots back in 2001 and so we're going to go to three members of the National Academy of Arbitrators, they will decide how to replicate those protections and the debtors [a]greed with us to do that. Just take it out of our hands, say here was the intent back in 2001, let these three respected neutrals decide how to replicate those Protections.
>     . . .
> So we think that's the only fair way to try and see if we can replicate what happened in 2001.

American's motion was granted (JEx. 20) and the New CBA, including LOA 12-05, became effective January 1, 2013. JEx. 4 at 1.

APA's comments as to the intent behind LOA 12-05 (*i.e.*, to "replicate" the "intent back in 2001") do not stand alone, for American has observed in a pleading filed with the Bankruptcy Court on May 10, 2013, (Pilot Submission [hereinafter, "PSub."] 333) that the arbitration required by LOA 12-05 "should replace provisions of the collective bargaining agreement . . . that provided certain protections to former TWA pilots . . . until American abrogated those protections in accordance with this Court's Order under Section 1113 of the Bankruptcy Code." PSub. 333 at 7. American added that the "interest arbitrators here would have full authority to replicate the protections Supplement CC provided even though Supplement CC no longer exists." *Id.* at 11, n.3; *see also, Id.* at 23, n.11 ("the decision on how to replicate the Supplement CC protections the class members wanted preserved has been placed in the hands of a panel of distinguished neutral arbitrators"). It also argued

-14-

that: "Even if one could posit that *American*'s decision to terminate Supplement CC harmed the

Plaintiffs, the APA's agreement to replicate the protections of Supplement CC through interest

arbitration under LOA 12-05 maintains Plaintiffs' situation as it existed prior to bankruptcy . . . ."

*Id.* at 25.

> **C.    The Parties Proposed Alternative Contractual Provisions, But Disagreed As To Whether The Substitute Provisions Should Replicate Supplement CC And Modify It Only As Necessary To Accommodate American's Closure Of Its STL Base.**

American and the two pilot committees each submitted proposed contract provisions to this

Board. The TWA Pilots Committee's proposal proposed that Supplement CC's terms be continued

where not in conflict with the closing of the STL base (such as provisions dealing with furloughs or

displacements in § V of Supplement CC) and that the STL base provisions be replaced by a form of

preferential flying rights to allow TWA pilots to bid for and hold reserved positions throughout AA's

system. TExs 1(a)-1(e). American and the AA Pilots Committee, on the other hand, asserted that

Supplement CC had been rejected and the parties were starting from scratch. They thus proposed

replacement contractual provisions that essentially took a snapshot of the protected seats that

protected only those currently occupying those positions and sunset those protections. Co. Ex. 4; AA

Pilots Ex. 1. Following the hearings, this Board issued a Memorandum dated May 24, 2013, in which

the Board gave its preliminary impressions of the various proposals.

With respect to the TWA Pilots Committee's proposal, the Board, after explaining its

understanding of both the Date of Hire and percentile bidding methodologies advocated by the TWA

Committee, stated (May 24 Memo. at 3):

> We think either of these methodologies would, as a practical matter,
> achieve the "quality of life" and related goals by effectively modify-

ing the position of TWA pilots on the system seniority list (at least for some purposes), contrary to the explicit proscription in LOA 12-05. Nor, at this point, are we persuaded these proposed changes amount to "preferential flying rights", contrary to the APA TWA Pilots' Committee claims.

The AA Pilots Committee's proposal, this Board observed, also failed to avoid the restrictions in LOA 12-05, for its pay-protection features "amounts to an 'economic condition,' the imposition of which is foreclosed to this Panel by agreement of the parties to LOA 12-05." May 24 Memo. at 2.

Looking to the Company's proposal to transfer some of the existing STL flying to other bases and then to provide protective fences for that flying, the Board thought, "does not appear to run afoul of LOA 12-05 proscriptions." May 24 Memo. at 3. While the Board was "not convinced that the Company proposal [was] . . . necessarily in full compliance with LOA 12-05 (*Id.* at 3-4), its approach, the Board explained, "may potentially provide the broadest base for one to construct a final award that implements, to the best of this Panel's ability, the precepts set forth in the LOA." *Id.* at 3.

Following that Memorandum, the TWA Pilots Committee reevaluated its position. While it remains convinced that either its Date of Hire or percentile bidding methodology is the simplest way to replicate what the TWA pilots had under Supplement CC through its STL base restrictions, the Committee realizes that this Board must be convinced that those methodologies do not run afoul of the proscription in LOA 12-05 that this Board may not "modify the Pilots' System Seniority List" (JEx. 4 at 2) before it would award either methodology. Accordingly, the Committee has revised its proposal to attempt to accomplish the same replication of protections but through a fence arrangement. That revised proposal is attached to this Brief as Attachment A and essentially modifies the New CBA to permit American to establish a virtual crew base for the TWA pilots from which

-16-

those pilots would be assigned flying originating and terminating at any of American's five cornerstones. The Committee has designed its revised proposal to address some of the concerns American has for certainty and predictability, by agreeing to use a fixed number of guaranteed position (but subject to system increases), and to establish a fixed duration (albeit with qualifications to make sure that TWA pilots protected by Supplement CC will remain protected by the replacement protections).

Another significant change in the Committee's revised proposal is with respect to the impact of the proposed American/US Airways merger on whatever awarded protections are issued by this Board. As the Committee explains below, the restrictions in LOA 12-05, prohibiting this Board from modifying the admittedly unfair seniority list constructed by Supplement CC, precludes this Board making whatever protections are devised by this Board immune from modification by the seniority integration proceeding in that merger under the McCaskill-Bond Amendment, 49 U.S.C. § 42112, note at § (a)(2). Equitable considerations that govern this Board and the McCaskill Bond Amendment, on the other hand, require this Board to direct American (or the single carrier at the time of the integration process) and APA (or the single carrier's pilots' collective-bargaining representative) to give the TWA pilots separate party-status in that integration so that they can advocate for a modification of the integrated list constructed by Supplement CC.

## ARGUMENT

I.   **EQUITABLE CONSIDERATIONS THAT GOVERN THE EXERCISE OF THIS BOARD'S DISCRETION REQUIRE THAT THE BOARD REPLICATE THE PROTECTIONS SUPPLEMENT CC GAVE TWA PILOTS TO UPGRADE AND TO BID AMONGST THEMSELVES FOR FLYING RESERVED FOR THEM.**

Contrary to American's and the AA Pilots Committee's assertions, the protections Supplement CC gave to TWA pilots to ameliorate the deleterious effects of their inequitable

-17-

placement on the integrated seniority list constructed by Supplement CC are not irrelevant to this proceeding. Rather, the clear *intent* behind those protections–not the exact words used to implement that overall intent–forms the benchmark towards which this Board should strive in devising the alternative protections, for several reasons–all of which have equitable underpinnings.

         **A.**      **Supplement CC's List And STL Fence Protections Are Inextricably Entwined, For One May Not Exist Without The Other.**

      First, Supplement CC, as its drafters acknowledged, was intended to be fair, which the APA stated in 2001 meant that the integration "should preserve the career expectations of the members of each pilot group–the pre-transaction expectations at the time the transaction was entered into." JEx. 9 at 10 (italics deleted; underlining in original). That integration, the drafters also stated, "should avoid 'injurious windfalls'–windfalls to one pilot group at the other group's expense." *Id.* (italics deleted). These are the essential hallmarks of a "fair and equitable" integration of seniority required by Section 3 of the *Allegheny-Mohawk* LPPs.[9] But, as the APA observed, since the list Supplement CC constructed was intentionally designed "to protect the AA pilots from the risks of future events" (JEx. 9 at 20), *it did not* by itself preserve the legitimate career expectations of the TWA pilots and, unless conditioned, would provide *injurious windfalls* to the AA pilots at the

_____

    [9]     Section 3 of the *Allegheny-Mohawk* LPPs, provides that (59 C.A.B. 19, 45 (1972)):
        Insofar as the merger affects the seniority rights of the carriers' employees, provisions shall be made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with section 13.

expense of the TWA pilots. JEx. 9 at 20.[9] It was for those reasons that APA "included in Supplement CC fences to protect upgrades to narrow-body Captain and small wide-body Captain for TWA pilots." *Id.*

Those STL fences, including the restricted nature of the STL base reserving flying to be performed *only* by TWA pilots, are inextricably entwined with the list itself, for under both rules of contract construction and equitable considerations governing employee protective provisions implicitly incorporated into Supplement CC, the one cannot survive without the other. This is made clear by Section VI.C of Supplement CC, which provides that (JEx. 7 at 8-9):

> Each and every provision of this Supplement CC is integral to the modified System Seniority List constructed pursuant to Section II. above, and shall remain in full force and effect and continue to apply in the event of a future seniority list integration arising from a subsequent acquisition, merger or other transaction affecting any pilots on the integrated modified System Seniority list; provided, that, subject to the above, this provision will not limit the integration of seniority lists in the event of said acquisition, merger or other transaction.

This inextricably entwined relationship between the list and the STL fences is also evident from the underlying principles that Supplement CC's drafters professed to have been following when they drafted Supplement CC. Under the *Allegheny-Mohawk* LPPs, which were developed and date

---

[9]     As APA explained in its summary of Supplement CC (JEx. 9 at 20): In recognizing that TWA career path [that "included upgrades to narrow-body Captain positions, and culminated in the opportunity to fly as small wide-body Captains"], we must acknowledge that, because we have insisted on constructing the integrated list to protect the AA pilots from the risks of future events, the integrated list by itself might not sufficiently protect the TWA pilots' career paths or prevent the AA pilots from reaping an injurious windfall by gaining advancement opportunities that belonged to the TWA pilots prior to the transaction.

-19-

back to protections developed for the rail industry, protection of employee interests in mergers and other unifications is intended to promote the *"just and reasonable treatment of employees"* and, thus, the "maintenance of an adequate and efficient transportation system." *United States v. Lowden*, 308 U.S. 225, 234 (1939) (emphasis added).[10] This is equally true in airline seniority integration disputes, where it has long been recognized that any integration of seniority must "fairly distribute[ ] the burdens and the benefits" at issue. *Kent v. CAB*, 204 F.2d 263, 266 (2d Cir.), *cert. denied*, 346 U.S. 826 (1953).[11] That is the essence of a "fair and equitable" seniority integration.

These equitable considerations are especially applicable in this case, for during the presentation of statement from affected pilots on May 14 and 15, 2013, a common theme was one of "detrimental reliance." Many TWA pilots on furlough had to decide whether to leave gainful employment to return to service with American. For many the decision to return was "based on the protections Supplement CC provided the TWA pilots." May 15, 2013 Tr. at 2159 (Testimony of Kevon Zehner). As Mr. Zehner explained, his decision to leave or stay with American was made ten years ago. "Had I known that CC was at risk of being taken away from us I may not have chosen to endure a four-year furlough and now an additional six-year wait for a perceived return to the left seat. At 41 years of age when I was furloughed, 10 years would have gone a long way to building a

---

[10]    The Court explained in *Lowden*, a copy of which is attached hereto as Attachment B, that (308 U.S. at 234):

> One must disregard the entire history of railroad labor relations in the United States to be able to say that the just and reasonable treatment of railroad employees in mitigation of the hardship imposed on them in carrying out the national policy of railway consolidation, has no bearing on the successful prosecution of that policy and no relationship to the maintenance of an adequate and efficient transportation system.

[11]    A copy of *Kent* is attached hereto as Attachment C.

seniority at another company. But CC's protection made me feel secure in my decision to continue with American Airlines." *Id.*

Thus, equitable considerations underlying Supplement CC and the covered employees' right to rely upon it in making employment choices require that, if the integrated list remains in effect, so, too, must the conditions intended to make that list fair also remain in effect when this arbitration to replicate Supplement CC's protections is completed.

> **B.      TWA Pilots Have An Equitable Right Under The RLA And Bankruptcy Principles To A Continuation Of The Essence Of The STL Protections, For The "Fair And Equitable Treatment" Of All Employees Mandates That American Not Abrogate The Protections That Made The Seniority List, Which American Has Assumed, Fair.**

Second, while American had the authority under the Bankruptcy Code to reject Supplement CC (JEx. 18 at 2), and while it purported to exercise that authority, it did so in a way that *continued* the equitable right TWA pilots had to the STL fences provided by Supplement CC. American never terminated the fence protections Supplement CC provided, but expressly informed APA that it was continuing Supplement CC as part of the "non-contractual terms and conditions of pilot employment, unless and until a change in working conditions has been identified through notice to APA." Co. Ex. 9. Shortly after that notice of September 7, 2012, American informed APA that it was terminating Supplement CC, but once again it also stated that two essential features of Supplement CC were to remain in effect: (1) the integrated seniority list (Co. Ex. 10 at 2: "Former TWA pilots maintain current position on the integrated Pilot System Seniority List"); and (2) the STL fences (*Id.*: "Fence provisions to remain in place until further notice (Notifications will be provided prior to implementation of base reductions)"). The only subsequent notice was that of November 10, 2012,

-21-

in which American "indicated its willingness to keep the STL pilot base open until the issuance of the arbitration award" (JEx. 3 at 1), and agreed that "[u]ntil issuance of an arbitration award, the Company will continue to staff the STL Captain positions at the level that would have satisfied the October 2012 Supplement CC report were it still in effect." *Id.*

While American arguably had the right under RLA § 2 First, to unilaterally alter those employment terms (*but see, In re Northwest Airlines Corp.*, 483 F.3d 160, 174-75 (2d Cir. 2007);[12] *In re Buffets Holding, Inc.*, 387 B.R. at 119), it surrendered that right when it entered into the Agreement For STL Pilot Interest Arbitration on January 15, 2013, for in that agreement it stated that: "Pending issuance of an Award pursuant to this procedure, the Company shall, consistent with Appendix A [*i.e.*, the Letter of November 10, 2012, JEx. 3], continue to maintain the status quo with respect to monthly bidding, vacancy and displacement processes previously subject to Supp. CC, provided continued timely progress towards completion of the arbitration process specified herein." JEx. 2 at 1-2, § (B). It further provided in Section (C) of the arbitration agreement that this Board would have exclusive jurisdiction over any dispute "relating to the interim conditions related to the subjects covered by former Supp. CC as applied by the Company pending issuance of an Award." JEx. 2 at 2. Thus, Supplement CC's fence provisions are just as much a part of the contractual rights

---

[12]    A copy of *Northwest Airlines* was attached to the Committee's Pre-Hearing Statement as Attachment B. In that decision, the Second Circuit explained the relationship of RLA § 2 First, 45 U.S.C. § 152 First, to how a carrier may act once it is authorized to reject a CBA; as the court stated (483 F.3d at 174-75; footnote omitted; emphasis added):

> We thus conclude that a bankruptcy court acting pursuant to § 1113 may authorize a debtor to abrogate its CBA, effectively shielding it from a charge of breach. Such abrogation, by terminating the parties' agreed-to working conditions, also absolves them of their status quo duties under the RLA. *It does not, however, free the parties from their Section 2 (First) duty to "exert every reasonable effort" to make a new contract that would effect a new status quo. . . .*

-22-

enjoyed by TWA pilots today as the seniority list this Board may not modify; moreover, they are protected by RLA § 2 Seventh against unilateral change just as the seniority list is.

This conclusion that the STL fences remain relevant, also flows from the Bankruptcy Code, for it is axiomatic that when a debtor is authorized to assume or reject an executory contract under Bankruptcy Code § 365(a), 11 U.S.C. § 365(a)–the statute under which *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984), which lead to Congress enacting § 1113–a debtor may not assume part of an executory contract and reject other parts. As the Bankruptcy Court explained in *In re Buffets Holdings, Inc.*, 387 B.R. at 119 (citations omitted), with respect to leases:

> If the debtor decides to assume a lease, . . . it must generally assume all the terms and may not pick and choose only favorable terms to be assumed. "The [debtor] may not blow hot and cold. If he accepts the contract he accepts it cum onere. If he receives the benefits he must accept the burdens. He cannot accept one and reject the other."

*See also, Stewart Title Guaranty Co. v. Old Republic National Title Insurance Co.*, 83 F.3d 735, 741 (5th Cir. 1996)[13] ("Where an executory contract contains several agreements , the debtor may not choose to reject some agreements within the contract and not others").

These principles, while developed under § 365(a), are especially applicable here where the debtor is acting pursuant to § 1113, for that section mandates in § 1113(b)(1)(A) that the contractual modifications the debtor proposes as the foundation for a subsequent motion to reject propose only those "necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and *assures that all creditors*, the debtor *and all affected parties are treated fairly and equitably* . . . ." 11 U.S.C. § 1113(b)(1)(A) (emphasis added). Keeping the

---

[13]     *Stewart Title* was attached to the Committee's Pre-Hearing Submission as Attachment C.

-23-

integrated seniority list Supplement CC constructed, but abrogating the STL fence protections, *does not* assure that all affected employees are "treated fairly and equitably." Rather, as the extensive evidence presented to this Board by the affected pilots on May 14 and 15, 2013 shows, to reject the STL fence protections while keeping the integrated seniority list *transfers* wealth from the TWA pilots to the AA pilots. Upgrades and desirable schedules that the STL fence provisions presently provide to TWA pilots will, following that rejection, go to AA pilots. This does not save American any monies, nor does it make it more efficient. It simply constitutes what the drafters of Supplement CC defined as an "injurious windfall." JEx. 9 at 10.

Consequently, American and the AA Pilots Committee are wrong in assuming that the STL fence provisions are no longer relevant. As they were intended to do, they currently form the buffer that ameliorates some of the inequities in a blatantly unfair integrated seniority list that has been continued and has been removed from the reach of this Board. Thus, the essential aspects of those fence provisions provide the benchmark this Board should use in determining what alternative protections for TWA pilots are required in this case. Those alternative protections should protect the same TWA Pilots as Supplement CC's STL fence provisions protect and for as long as Supplement CC's drafters recognized they needed to be protected–*i.e.*, until the seniority list itself *protects* the their legitimate career paths to upgrade, which will occur when Morgan Fischer can hold a Group III captaincy and Magnus Alehult can hold a Group II captaincy on the system. JEx. 9 at 21-22. The substituted protections should also protect the TWA pilots' opportunities to upgrade and their quality of life as the STL base restrictions do today, but with the recognition that those protections have to be modified to reflect the reality that American can no longer be required to maintain a minimum level of flying *at STL*.

II.   **EACH OF THE TWA PILOTS COMMITTEE'S PROPOSALS REPLICATE THE CORE PROTECTIONS SUPPLEMENT CC'S STL FENCE PROVISIONS GAVE TO TWA PILOTS. THEY DO NOT AFFRONT LOA12-05'S LIMITATIONS, FOR THEY ARE NON-ECONOMIC; THEY DO NOT REQUIRE FLYING AT ANY LOCATION; AND THEY DO NOT MODIFY THE INTEGRATED SENIORITY LIST. THEY, THEREFORE, SHOULD BE AWARDED BY THIS BOARD.**

Supplement CC's STL fence provisions provide essentially two forms of protections for TWA pilots: (1) They provide for upgrades out of seniority order; and (2) they provide a quality of life for TWA pilots that would not be available under the integrated list. They accomplish this by consolidating the TWA pilots into St. Louis and reserving for them sufficient flying to support the minimum number of captaincies Supplement CC requires be reserved for TWA pilots. That reserved flying is available only to TWA pilots. Those conditions, which affect the operation of the integrated seniority list, are to continue in existence until the range of TWA pilots who were most adversely affected by the integration–the pre-1992 TWA bankruptcy hires for progression to Small Wide-Body Captain (represented by Morgan Fischer for the SWB trigger) and the pilots hired by TWA before American resumed hiring in 1998 (represented by Magnus Alehult for the NB trigger)–are able to achieve their career pathway to promotion through the operation of the integrated seniority list. JEx. 9 at 21-22.

Supplement CC's *intent* to provide the STL fences until the integrated seniority list adequately protects the TWA pilots' career paths cannot be disputed, for APA's drafters made this clear. As they stated (JEx. 9 at 21-22; emphases in original):

> The fences protecting TWA Captain positions are directed primarily to protecting the middle groups identified above–pilots who without those protections could argue that their career progressions were being inhibited by the integrated seniority list. Without those

-25-

protections, the integrated list by itself would result in the transfer of many of those TWA narrow-body and small wide-body Captain upgrades to AA pilots, which would arguably be a windfall to the AA pilots at the TWA pilots' expense.

**At some point, the integrated seniority list will operate to preserve both groups' career paths without the necessity of these protections for the TWA pilots.** Once the protected TWA pilots have upgraded–the pre-bankruptcy hires in the case of small wide-body Captain positions, the pre-1998 hires in the case of narrow-body Captain upgrades–the TWA pilots' system seniority on the integrated list will give sufficient protection to their pre-transaction career paths. At that point, the integrated seniority list will preserve those career paths without the necessity of fences to protect the TWA pilots.

This Board, the TWA Pilots Committee submits, is charged with devising contractual provisions *to continue* those essential protections now that the linchpin for the fences–American's obligation to maintain a minimum level of flying at STL–has been removed. As explained in Argument I, *supra*, there can be no legitimate dispute over whether this is the Board's charge, for continuation of those protections is mandated by the equitable considerations applicable here. It is also exactly what APA's and American's counsel informed the Bankruptcy Court is to occur. *E.g.*, JEx. 19 at 31 (Argument of APA counsel: "Just take it out of our hands, say [to the three arbitrators] here was the intent back in 2001, let these three respected neutrals decide how to replicate those Protection"); PSub. 333 at 23, n. 11.

Initially, the TWA Pilots Committee proposed using Supplement CC as the base, deleting those provisions that were no longer applicable and modifying only those provisions that needed to be changed to revise the protections now that American can no longer be required to maintain a minimum level of flying at STL. The centerpiece for the Committee's proposal, however, was to provide a separate *bidding* methodology for TWA pilots at the bases to which they would be

assigned. While the TWA Pilots Committee continues to maintain that its substitute bidding methodologies–either Date of Hire or percentile bidding–are consistent with LOA 12-05's safe harbor that "preferential flying rights under the award shall not modify or be deemed a modification of the TWA Pilots' seniority placements on the Pilots' System Seniority List" (JEx. 4 at 2),[14] they realize that this Board questions their reading of LOA 12-05. Since an award that exceeds this Board's jurisdiction–as defined by the limitations imposed by LOA 12-05–may be challenged by a petition to impeach, arguably under RLA § 9 Fifth, 45 U.S.C. § 159 Fifth, the Committee has concluded that it should modify its proposal to advocate a path to an award that is clearly within this Board's jurisdiction to grant.[15]

---

[14]  That language was inserted in LOA 12-05 at the request of Captain Douglas Gabel because he felt that the draft language of LOA 12-05 did not clearly allow provisions that provided substitute protections for TWA pilots. Captain Gabel feared that, under the draft language of 12-05 at that time (*see*, TEx. 31 at 3-4), "someone might make the case that any substitute protections are a defacto change in the former TWA pilots placement on the seniority list." TEx. 31 at 1. He therefore proposed that the italicized language be inserted into the proposed letter (*Id.*; emphasis in original):

> The Company and APA agree that the TWA Pilots seniority placements on the Pilots' System Seniority List shall continue pursuant to Section 13 of the CBA notwithstanding the termination of Supplement CC and any preferential flying rights, subject to the procedures of this letter. *Any substitute protections or preferential flying rights provided by the arbitration will not be considered an actual of [sic] defacto change of the former TWA pilots placement on the Pilot's System Seniority List.*

*See*, April 12, 2013 Tr. at 757-77. It is clear that Captain Gabel's concern was heard and answered. Tr. at 776 (". . . I said, 'any preferential rights shall not modify or be deemed a modification.' That was my fear and it got answered"). Since the language in question was drafted by American (TEx. 31 at 5-6), any ambiguity should be read against the drafter and the TWA Committee's DOH or percentile bidding proposal should not be "deemed" a prohibited modification to the seniority placements.

[15]  Since the percentile bidding methodology proposed by the TWA Committee is by far the simplest remedy to implement and significantly replicates what happens today, the Committee urges this Board to suggest to American and APA that they agree to modify LOA 12-05 to remove any question as to the Board's jurisdiction to devise an award requiring that form of preferential

(continued...)

Accordingly, the Committee has followed the Board's suggestion to look to the approach proposed by the Company–to provide "protective fences" for the flying assigned to TWA pilots. May 24, 2013 Memo. at 3. It has implemented that approach by devising substitute contractual provisions that continue the reserved flying for TWA pilots but no longer restricts that flying to originating and terminating at STL. Appendix A at 5-7. Rather, the Committee's proposal calls for the modification of Sections 15 and 17 of the New CBA to create a virtual STL Crew Base at which the TWA pilots would be based and in which they would bid for flying assigned to that base, but American would be relieved of the contractual obligation to begin and end segments at STL. This would permit American to move the TWA flying to any of its five "cornerstones"–DFW, MIA, LAX, ORD, and NY (JFK/LGA)–and to keep whatever flying it wants to base out of STL at STL without regard to the administrative and other requirements that the New CBA requires for Crew Bases. Thus, the geographical area from which flying allocated to the virtual base could occur would be American's system.

Various safeguards should be imposed to assure that the virtual base is operated fairly, such as provisions dealing with reserves (Appendix A at 7), the manner in which American will allocate the flying at its cornerstones (*Id.* at 6), and the assignment of International as well as Domestic flying to the cell as the SWB equipment is removed from domestic operations. *Id.* at 5. There also needs to be a form of "seat protection" that will protect the TA pilot's captaincy once the virtual base winds down as it will as TWA pilots attrite. *Id.* at 4. These and other contractual safeguards are describe in Appendix A, along with the Committee's proposal with respect to replacement aircraft, which is within the parameters of the Company's proposal.

---

[15](...continued)
bidding.

-28-

Additionally, in an effort to accommodate American's concerns for certainty and predictability, the Committee has accepted American's concept of a guaranteed number of SWB and NB captaincies based on the captain counts in American's November 10, 2012 letter. JEx. 3 at 1. But the Committee has proposed that, since it has accepted proportional reductions in those "guarantees" if there should be system-wide reductions in captaincies, the guarantees should increase in proportion to system-wide Captain increases. The Committee has also accepted American's desire for a fixed end to the guarantees, but disagrees with the termination dates American has proposed and with a termination process that deprives protected TWA pilots of their upgrade and bidding protections before their legitimate pre-acquisition career path expectations are protected by their seniority placement.

There are also other areas of disagreement, but as explained below, each of the TWA Pilots Committee's proposed substitute protections is founded on the protections Supplement CC's drafters asserted were *necessary* to make the integrated list fair. The Committee's proposal does not provide an "injurious windfall" to the TWA pilots, at the expense of the AA pilots, but rather, continues the balance of rights Supplement CC's drafters asserted Supplement CC crafted.

> A. **The Committee's Proposed Virtual STL Crew Base Replicates To A Significant Degree The Upgrade And Quality Of Life Protections Supplement CC's STL Base Restrictions Gave TWA Pilots.**

The strength of the STL fence protections provided for TWA pilots by Supplement CC lies in its consolidation of the TWA pilots into one base with the requirement that American provide that base with sufficient flying to support a guaranteed number of Captains–and, thus First Officers as well–and that this reserved flying would be available to TWA pilots only. The guaranteed captaincies and the grouping of the TWA pilots in one base gave them upgrades in their own relative order and

-29-

bidding amongst themselves. This gave them promotional opportunities and a quality of life that they would not have been able to have under the integrated seniority without those conditions.

American concluded that the STL base restrictions impeded its ability to distribute its flying among its bases so as to optimize its operations, and sought to relieve itself of that contractual obligation when it invoked the protections of the Bankruptcy Code. According to American, the requirement that it base a minimum amount of flying out of STL increased its costs for "pay and credit, hotel nights, and per diem" that it would not otherwise have to incur if it could assign that flying where operationally feasible. JExs. 22 at 1. Those extra costs, it informed the Bankruptcy Court, would cost it on average over six years, $13.8 million annually. JEx. 22 at 3. American has now been relieved of that minimum staffing obligation at STL, but being relieved of that obligation does not mean that it should be allowed to disburse TWA pilots throughout its system. Rather, as the TWA Pilots Committee proposes, American can achieve its savings by converting the STL Crew Base into a virtual base into which it will assign flying originating and terminating at its cornerstone bases for bidding by the TWA pilots. This relieves American of the necessity of artificially starting the pilot's pay at STL where, as now occurs, the flight actually begins at one of the cornerstones.

American now disagrees with the virtual base concept, and instead proposes disbursing the TWA pilots to several cornerstones and building a bidding package for the TWA pilots at each base to which they are assigned. That proposal, however, significantly narrows the quality of life protections that the STL base restrictions currently give TWA pilots, for the range of options within the bid packages would necessarily be diminished by the disbursal of the TWA pilot pool, significantly diminishing their quality of life. Thus, the equitable considerations animating this proceeding require that the TWA Committee's proposal be adopted.

-30-

The Committee's virtual base is operationally feasible and is simpler to administer than the multiple fences the Company proposes. While fences by their very nature are labor intense to administer, this proposal can be implemented. It is also much fairer to the affected pilots than separate fences at multiple bases. Any administrative difficulties are of American's own making since it is the one that abrogated the protections and, together with APA, has precluded any remedy that modifies seniority.

**B.    The Guaranteed Number Of SWB And NB Captaincies Should Increase If There Is A System-Wide Increase In Captains Just As They Will Decrease Proportionally If There Is A System-Wide Decrease.**

In its revised proposal, American has proposed to allocate to TWA pilots 260 NB captaincies and 86 Small Wide-Body captaincies, but has not provided for any increase if, as it currently anticipates, there is a system-wide increase of captains from its fleet improvements. On the other hand, it proposes that: "In the event that AA pilots are being displaced from CA positions, TWA pilots holding CA positions shall be displaced on a proportionate basis and such displacements shall not violate guaranteed positions." *See*, Attachment A at 4 (Seat Protection).[16] Thus, under American's proposal, the number of guaranteed positions could *decrease* but not *increase*. That, the TWA pilots submit, is unfair and it is not what Supplement CC provides. Supplement CC's requirement that American reserve at a minimum "30 per cent of the combined number of small wide-body [and narrow-body] Captain line pilot positions in the ORD and DFW domiciles in the contractual month" (JEx. 7 at §§ IV.A.1.a.(2) and b.(2)) provides for increases in the allocations as

---

[16]    The TWA pilots disagree with an aspect of that proposal, for they maintain that the decrease in captaincies should be the result of a reduction in force and not, as the Company's language would admit, displacements from aircraft retirements where there are vacancies created by replacement aircraft.

well as decreases. Since American wants to continue the decrease portion of Supplement CC, equity requires that it continue the increase portion as well. But again, more to the point, Supplement CC provided the TWA pilots with that protection and there is no justification for not continuing it here. American's relief from the STL base restrictions by the Bankruptcy Court provides no justification for relief from the increase aspects of Supplement CC reserved positions, for to relieve American of that obligation would simply transfer wealth from TWA pilots to AA pilots who will get the upgrades denied to TWA pilots.

> **C.** **The Replacement Protections Devised By This Board Should Protect The TWA Pilots' Career Path Progression And Quality Of Life Until Their Seniority Has Matured Sufficiently To Provide That Protection Without The Need For The Fences.**

An area of significant disagreement between the TWA Pilots Committee and American, and to a greater degree with the AA Pilots Committee, is over the scope and duration of the replacement protections. The TWA Committee maintains that the protections this Board devises should protect *all* TWA pilots who are covered by Supplement CC and, as Supplement CC intended, do so until the seniority list by itself preserves the legitimate career expectations of the TWA pilots. That point would be reached for the SWB fence when, as Supplement CC provided, Morgan Fischer has sufficient system seniority to hold a vacancy in a four-part Captain bid status on a Small Wide-Body aircraft. JEx. 7 at § IV.A.1.a.(1). And, it would be reached for the Narrow-Body fence when, as the Summary explains, Magnus Alehult could *progress* to a Narrow-Body captaincy. JEx. 9 at 22.

American and the AA Pilots Committee disagree with the TWA Committee over the duration, for they maintain that this Board should end the revised protections at an earlier date (such as 2017 in the Company's proposal for the guarantees, and 2019 for the fence). They attempt to

-32-

justify their early termination dates by arguing that Supplement CC no longer exists and that, even if it did, it would terminate at an earlier date than Morgan Fischer's or Magnus Alehult's upgrade. According to the Company's and the AA Committee's arguments, Supplement CC's protections would end with the retirement of the equipment enumerated in Supplement CC, or when a Group I aircraft comes on the property. This disagreement as to the duration also impacts the TWA pilots entitled to the fence protections because, according to the Company, TWA pilots who were stapled have no reasonable expectation of upgrading during the life of the protections and, thus, need not be covered by the replacement protections this Board devises. Those arguments are without merit.

Besides being wrong as to the continued existence of an equitable right on the TWA pilots' part to the benefits of Supplement CC's STL fence provisions (*see*, Argument I, *supra*), American and the AA Committee are wrong in asserting that this Board should base its decision on whether to set a termination date for the STL fence protections on events that have not happened, and if they were to happen, would not satisfy the criteria Supplement CC's drafters emphasized should be employed in "triggering" the end of the fences–*i.e.*, when the named pilots could realize their career *progression* to the next level. JEx. 9 at 21-22.

First, while it is clear that American's domestic B-757 and B-767 flying is disappearing, International flying on that equipment is still scheduled to be flown. There is nothing in Supplement CC's language or in its application that restricts the protected flying on the enumerated SWB equipment to domestic flying, and, indeed, until late 2009 TWA pilots used to fly those routes. *See*, May 15, 2013 Tr. at 2068 (Testimony of D. Mangold). Second, there is nothing in Supplement CC that provides for the termination of the fences once American retires the enumerated aircraft. The logical interpretation of Supplement CC is that the enumerated equipment should be replaced by

-33-

their replacement aircraft rather than allow American to end the guarantees. Indeed, the drafters of

Supplement CC recognized that "there is no easy way to measure 'replacement' aircraft . . . ." JEx.

9 at 27. As they observed in discussing the manner in which the tables were constructed that (JEx.

9 at 27):

> Going forward, these job protections [in the "tables"] are based on the
> measurement of the combined small wide-body fleet and the
> combined total fleet, not on an effort to track specific "AA" or
> "TWA" airframes into the future. The reason for this is that there is
> no easy way to measure "replacement" aircraft, or to decide whether
> an aircraft order that is placed after the transaction closed is an "AA"
> order, a "TWA" order, or an order shared by two groups. . . .

And as APA's negotiator Edwin White explained at the hearing when asked where in Supplement

CC was there "a provision . . . that does provide for what to do when you retire an aircraft type"

(May 9, 2013 Tr. at 1062-63):

> A.      Okay. As I was trying to explain, that's why we talk
> about small wide body and narrow body. The assumption is that if
> you retire an aircraft type you get a replacement aircraft.
>        We had discussions with the TWA pilots, as I indicated
> earlier. Do we track airplanes? Does the synergy give us different
> airplanes?
>        And so, the way we accommodated fleets going up or down
> or being retired or eliminated was saying that, instead of tracking
> Super 80s for the job requirements we would track narrow body
> airplanes with the assumption that those airplanes would be replace-
> ment airplanes.
>        So I would say yes, we did look forward by not looking at the
> specific aircraft types but looking at the aircraft category.

The only argument in support of the claim that the fences must end once the enumerated

SWB and NB aircraft retire is that those aircraft types, rather than categories, are used in the

guarantee provisions of Supplement CC. That argument does not carry the weight American and the

AA pilots assign to it, for Supplement CC was the product of drafting by American and APA in

-34-

which the interests of the TWA pilots were not represented. Indeed, the record shows that APA's negotiators were willing to reserve Narrow-Body and Small Wide-Body aircraft for the guarantee, rather than only the enumerated aircraft (May 9, 2013 Tr. at 1038 (Testimony of E. White)), but when it came time to draft the language they gave AA pilots every favorable drafting option. Moreover, despite their complete control over the drafting process they did not include any provision as to what occurs when the enumerated aircraft retire. This ambiguity is not a proper foundation upon which to deprive TWA pilots of protections that are needed to make the seniority integration fair and equitable, as the equitable considerations underlying this Board's jurisdiction require. Indeed, it would be the height of inequity to view the guarantees as ending once American retires its MD80s, possibly at the end of this decade, for as American's own evidence shows, the TWA MD80s were the newest in its fleet once it acquired TWA's assets (Co. Ex. 12) and those planes were used to keep AA pilots flying while TWA pilots walked the streets on furlough. TExs. 28(a)-28(d). Flying performed by those aircraft will not go away when they are retired; rather, their traffic will be carried by replacement aircraft to which the guarantees should attach.

American and the AA Pilots Committee may also argue that there is no need to continue the fences past their proposed termination dates because the fences would never last that long. They argue that, under the plain terms of Supplement CC § IV.A.1.b.(1), the narrow-body fence is to end once Magnus Alehult "has sufficient seniority under this Supplement CC to hold a vacancy in a four-part Captain bid status on *any aircraft*." JEx. 7 at 4 (emphasis added). They then argue that the fence will end once American brings Group I[17] or lower aircraft onto the property, for that plane will most

_____

[17]      Group I aircraft were added to the Green Book by the New CBA, effective January 1, 2013, which defines that Group as follows (JEx. 1 at 3-1, § 3.A.1.a):

(continued...)

likely be captained by pilots junior to Magnus Alehult. Those arguments are also without merit, for

two reasons. First, it is highly speculative, for American has *not* brought a Group I aircraft onto the

property. Whether it will ever do so is unknown and cannot equitably be used to deprive TWA pilots

of protections needed to make the inequitable list passably fair. And second, becoming a Captain on

what is essentially a regional aircraft for what is First Officer's pay is *not career progression*. It is

regression and was certainly *not* within the TWA pilots career paths when American acquired

TWA's assets.[17] One thing is quite clear here, and that is that APA drafted Supplement CC so that

---

[17]/(...continued)

> Group I: With the exception of aircraft identified in Groups II through
> V below, any aircraft configured (i.e. as operated by American
> Airlines) with greater than seventy-six (76) seats and less than one-
> hundred-eighteen (118) seats, including E190/195, CRJ-1000, MRJ-
> 100, and Bombardier CS100.

Captains on that aircraft category are to be paid the same rate as First Officers on Group II aircraft
(*compare*, JEx. 1 at 3-2, § 3.B.1, *with*, *Id*. at 3-3, § 3.C.2), which includes the MD80. *See*, JEx. 1 at
3-1, § 3.A.1.b ("Group II: Bombardier CS300, A319, A319neo, B737-700, B737-7MAX, MD80,
B737-800, B737-8MAX, B737-900, B737-9MAX, A320, A320neo, A321, A321neo"). The SWB
category as used in Supplement CC is defined as Group III in the New CBA. *Id*. at 3-1, § 3:A.1.c
("Group III: B757, B767-200, B767-300, A300")

[18]/       The AA Pilots Committee may also argue that their scope clause at the time of the
acquisition gave them all aircraft flown by American over 50 seats, and, thus, the Group I aircraft
was within their contemplation when Supplement CC was drafted. That aircraft type might have
been within their contemplation when Supplement CC was drafted, but it was certainly not within
the TWA pilots' career expectations. This is dispositive, for as APA's drafters explained in their
summary: "A fair integration should preserve the career expectations of the members of each pilot
group–the pre-transaction expectations at the time the transaction was entered into." JEx. 9 at 10
(Italics omitted, underlying in original). They then emphasized that point, stating(JEx. 9 at 10-11;
underlying in original):

> It is important to understand that the pilots' expectations are
> measured pre-transaction. What were the pilots' expectations
> immediately prior to the transaction, and what would their career
> paths have been if the transaction had not happened and the
> separate carriers had continued to exist into the future? That means that events
> after the transaction are of secondary importance in measuring

(continued...)

-36-

its STL fence provisions would remain in effect until the integrated list alone would protect the

TWA pilots' expectations to *progress* in their careers. As APA's negotiators explained (JEx. 9 at

22):

> By basing the duration of these fences on the upgrades of the
> appropriate pilots, rather than a specific time frame, we give Supple-
> ment CC the flexibility necessary to accommodate unpredictable
> future events. What is being protected by these fences is the career
> path which the TWA pilots had in place at the time of the transaction
> as they looked forward into the future–not necessarily what will
> actually happen in the future. The fences protect that expectation by
> providing for the TWA pilots' exercise of their pre-transaction
> "operational seniority" amongst themselves, until the pilots needing
> protection achieve the appropriate upgrades.

It is that intent that should prevail in determining what replacement protections are appropriate, for

holding a captaincy on a Group I aircraft is not career progression and, thus, should not be viewed

by this Board as triggering the end of the Narrow-Body protections. Moreover, this Board should

eliminate any subsequent dispute over the Group I aircraft by tying the Magnus Alehult Trigger to

Group II or above aircraft.

In an effort to narrow the differences between the parties, the TWA Pilots Committee has

agreed to a termination date for the guarantee (Appendix A at 2), but because it is apparent that all

of the TWA pilots who are entitled to upgrades under Supplement CC's fence protections (*i.e.*, those

TWA pilots senior to Magnus Alehult[19]) will most likely *not* be upgraded by the date to which the

---

[18]/(...continued)
      fairness, because the important question is what each group "brought
      to the party" at the time of the transaction.

[19]/     From its review of the seniority list, the TWA Pilots Committee estimates that as of
June 2013 there are approximately 348 TWA pilots on the property who are senior to Magnus
Alehult who are not Captains today, 67 of whom are in the "feathered" group and 281 in the stapled
                    (continued...)

Committee is willing to agree (January 1, 2019),[20] the Committee has proposed an acceleration of

the upgrades at the end of the guarantee period. *Id.* The Committee has divided the TWA First

Officers who have Captain protections into two groups for acceleration purposes, those who were

Captains or in that seniority range prior to April 10, 2001, and those who were not. At the beginning

of this month, there were 145 TWA First Officers in service with American who have not been

reinstated to Captain (63 in the feathered group and 82 in the stapled block) and 53 former Captains

who have deferred recall (11 in the feathered group and 42 in the "block"). The Committee purposes

that if the pilots in this downgraded group have not been upgraded during the "guarantee period,"

that they be offered the next Group II Captain vacancies and that they be included in the NB cell.

Appendix A at 2. Thereafter, those TWA pilots below the downgraded group should be offered the

next Group II Captain vacancies on a 2:1 ratio until AA pilot B.D. White is upgraded, and thereafter

all vacancies should go to the TWA pilots because they will be the next in seniority order to receive

those vacancies. *Id.* Any TWA pilot upgraded in this ratio group will not be placed in the NB cell,

but will bid by system seniority. *Id.* And finally, the Committee has proposed that all TWA pilots

who have deferred recall who have Supplement CC Captain protections will be given a period of at

least 45 days in which to relinquish his or her deferral and to state a willingness to accept recall to

the next class. If the pilot does this, that pilot will be eligible for the accelerated upgrade after

---

[19](...continued)
block. There are an additional 17 TWA pilots senior to Alehult who were feathered and have deferred recall, and 298 who were in the staple block who have also deferred and are senior to Alehult.

[20]      Assuming no growth in the guarantee numbers, the non-Captain TWA pilots could advance to Captain only if a senior TWA Captain retires. American estimates that a total of 79 TWA Captains will reach age 65 by the end of 2017. Co. Ex. 14.

January 1, 2019. If the pilot does not un-defer but subsequently returns to service with American, that pilot will not be considered to be a protected pilot under the revised protections. *Id.*

This proposal, the Committee submits, accommodates American's desire for certainty and predictability since it allows American to calculate the number of pilots to whom the protections flow. At the same time it avoids the pitfall of American's proposal, which is to disenfranchise the stapled block group of TWA pilots from upgrading prior to the time their seniority becomes fair.

There is a further duration dispute, and that is with respect to the duration of the cells. American proposes to terminate the cells on January 1, 2019, two years after the guarantee period would end under its proposal. That date was picked in part because it was the amendable date of the New CBA. JEx. 1 at 26-1, § 26.C. The TWA Pilots Committee disagrees with such a termination, for there is a need for the cells to gradually dissipate as the pilots within the cells attrite. This is essentially what would have happened if the STL base remained in existence when Magnus Alehult achieved a captaincy through his seniority, for non-TWA pilots could obtain positions within the cell only if vacancies occurred. And it is what should occur in this effort to replicate the STL fence protections. But again in an effort to reach a compromise, the TWA Pilots Committee has proposed (Appendix A at 7-8) that the cell provision of the agreement devised following the award not be amendable under the Railway Labor Act—*i.e.*, be subject to a moratorium period—until January 1, 2019, the current amendable date of the governing CBA. If a Section 6 notice is served on or after January 1, 2019 to change the agreement, the agreement will remain in effect until modified pursuant to the major dispute procedures of the RLA. In other words, the RLA process for changing agreements—including the Act's status quo obligation—would apply.

-39-

The one caveat to this is that the proposed seat protection contractual provisions (as contrasted with bidding rights, which outside the cell would be by system seniority) are intended to be permanent. The Committee proposes that they not be amendable (Appendix A at 8) but that they end when the occupant retires, resigns, is discharged for cause, or bids outside the cell or, if outside the cell, to a higher pay status. Appendix A at 4.

> **D.     Just As Supplement CC Had a Dispute Resolution Procedure, The Protections Devised By This Board Should Require An Adjustment Process For Disputes And, Due To APA's Inherent Conflict, Should Provide That The Two Pilot Committees Should Have Equal Party Status To Raise And Adjust Disputes Arising From The Protections.**

In its initial proposal (TEx. 1(a) at 10), the TWA Pilots Committee proposed that this Board require that the protection agreement it will order be crafted contain a dispute resolution procedure in which both the AA Pilots Committee and the TWA Pilots Committee have party status to adjust disputes arising out of the interpretation or application of the protection agreement. The Committee continues to propose the establishment of such a multi-party adjustment board. Little argument should be needed on this point.

First, Supplement CC contains a dispute resolution process and, thus, the Committee submits, it is clearly within this Board's authority to order, for it was a protection the TWA pilots had before American was authorized to reject Supplement CC to resolve disputes arising from that agreement. Moreover, Section 204 of the RLA, 45 U. S. C. § 184, imposes an obligation on American and APA to provide a dispute resolution process to resolve any dispute arising from the application or interpretation of the agreement this Board will instruct the parties to devise. But, as is evident from the inherent conflict APA has in dealing with seniority disputes involving its pre-acquisition AA

majority and the former TWA pilot minority, it is clear that both Committees need to have separate

party status on the adjustment board to bring and to adjust disputes arising from the directed

agreement. This right to participate is expressed in the RLA's notice provision, Section 3 First (j),

45 U.S.C. § 153 Fist (j),[21/] and applies to airline adjustment boards. *Steward v. Mann*, 351 F.3d 1338,

1345 (11th Cir. 2003).[22/] Consequently, whenever a dispute arises over the interpretation or

application of the protections devised by this Board, notice and a right to participate must be

provided to the pilots' representative who will be affected by a resolution of the grievance. This

implicates both the pre-acquisition TWA pilots and the pre-acquisition AA pilots, and since APA

represents both groups, it will be conflicted, as it is before this Board. This can have serious

ramifications for the TWA pilots, for ineffective enforcement of the devised agreement will most

assuredly lead to a loss of those arbitrated protections.

Accordingly, the dispute resolution requested by the TWA Pilots Committee is an essential

component of the protections this Board must replicate, and should be awarded.

_____

[21/]    RLA § 3 First (j), 45 U.S.C. § 153 First (j), provides that:
Parties may be heard either in person, by counsel, or by other
representative, as they may respectively elect, and the several
divisions of the Adjustment Board shall give due notice of all
hearings to the employee or employees and the carrier or carriers
involved in any disputes submitted to them.

[22/]    *Steward* is attached to this Brief as Attachment D. In *Steward*, the Eleventh Circuit
held that "based on the RLA's purpose of providing quick and final resolution of grievances, and on
the Supreme Court's suggestion in *International Association of Machinists* [*v. Central Airlines*, 372
U.S. 682 (1963)], we conclude that § 153 First (j)'s due notice requirement applies to proceedings
conducted by airline adjustment boards." 351 F.3d at 1345.

E.   **The Board Should Direct The Carrier And The Pilots'**
**Collective-Bargaining Representative To Grant The TWA**
**Pilots Separate Party Status If American Merges With US**
**Airways And Integrates Pilot Seniority Under The**
**McCaskill Bond Amendment.**

In its Pre-Hearing Statement, the TWA Pilots Committee noted the proposed merger of

American and US Airways and asserted that this Board must assure that whatever protective scheme

it devises must not "restrict the TWA pilots from utilizing their seniority and protective conditions

in the merged AA/US Airways system." TWA Pre-Hearing Statement at 35. Since that Statement

was filed, the Committee has been faced with the fact that its preferential bidding proposal will not

be adopted and that the pilots on whose behalf it is acting will, if either its or American's requests

are granted, be protected by a virtual base or multiple fences. How that virtual base or multiple

fences will fare in a merger is problematic. This makes the TWA pilots' seniority placement on the

list constructed by Supplement CC all the more critical when US Airways and American's pilots

engage in integration negotiations. This is even more unsettling here since the APA integration

committee is made up of some of the same pilots who are on the AA Pilots Committee in this

proceeding, which adamantly opposes the cell relief. Additionally, the APA integration committee

is represented by the same attorney who represents the AA Pilots Committee before this Board.

American's proposed resolution of the dispute before this Board complicates matters, for it

would have the Board adopt Paragraph 10.i of the four party agreement between American, APA,

US Airways and the US Airways' pilot union (*i.e.*, the "MOU," TEx. 12), which provides that:

"Nothing in this Paragraph 10 [the provision calling for the integration of seniority] shall modify the

decision of the arbitration panel in Letter of Agreement 12-05 of the 2012 CBA." TEx. 12 at 7. That

provision would effectively mean that the TWA pilots would have no voice in the seniority

-42-

integration, but would be faced with a *fait accompli* in that the inequitable seniority list constructed by Supplement CC—which resulted in Congress enacting legislation to make sure that this inequity never happened again—would be further modified by the insertion of US Airways' pilots into the list and, thus, into the bases at which the fence or fences would operate. This would occur without the TWA pilots having the ability to advocate a reordering of their placement on the list in lieu of the fences. This, the TWA pilots submit, is unfair and should not be countenanced by this Board.

      It is also contrary to the McCaskill Bond Amendment under which the seniority integration is to be conducted. Section (a) of the McCaskill Bond Amendment requires that in "any covered transaction involving two or more covered air carriers [such as the American/US Airways proposed merger] that results in the combination of craft or classes that are subject to the Railway Labor Act . . ., sections 3 and 13 [of the *Allegheny-Mohawk* LPPs] . . . shall apply to the integration of covered employees of the covered air carriers . . . ." Pub. L. No. 110-161, Div. K, Title I, § 117, 121 Stat. 2383 (2007). That amendment goes on to provide that: "the requirements of any collective bargaining agreement that may be applicable to the terms of integration involving covered employees of a covered air carrier [which arguably covers the protective agreement to be devised by this Board] shall not be affected by the requirements of this section as to the employees covered by that agreement, *so long as those provisions allow for the protections afforded by sections 3 and 13 of the Allegheny-Mohawk provisions.*" *Id.* at § (a)(2) (emphasis added). This proceeding cannot be viewed as providing the TWA pilots with "the protections afforded by sections 3 and 13 of the Allegheny-Mohawk provisions" for the simple reason that this Board is precluded from reordering the list. Since this proceeding cannot be viewed as complying with Section 3 of the *Allegheny-Mohawk* LPPs, any award issued by it cannot be viewed as satisfying the collective-bargaining agreement

exception in the McCaskill-Bond Amendment. Consequently, this Board should not allow the replacement protections it is devising to pass unexamined through a subsequent seniority integration proceeding under the McCaskill-Bond Amendment to integrate the TWA pilots unfair seniority placements on the AA seniority list with the US Airways pilots' seniority. Rather, as proposed in Attachment A at 10, this Board should provide that in the event that there is such an integration proceeding, the TWA pilots should be given full party status in that proceeding to advocate a change to their placement on the list Supplement CC devised and this Board has been precluded from modifying. The award should further provide that, if the TWA pilots are given such party status, the protections devised by this Board to replace Supplement CC's STL base restrictions would expire once the new integrated list becomes effective.

## CONCLUSION

For the reasons set forth in this Brief, the TWA Pilots Committee submits that this Board should require American and APA to negotiate an agreement which incorporates and implements the contractual provisions proposed by the Committee in Attachment A to this Brief. The Committee further requests that this Board grant both Committees the right to submit comments to this Board as to whether the contract language devised by American and APA adequately implements the Board's award.

Respectfully Submitted,

_/s/ John O'B. Clarke, Jr._____
John O'B. Clarke, Jr.
HIGHSAW, MAHONEY & CLARKE, P.C.
4142 Evergreen Drive
Fairfax, Virginia 22032-1018
(202) 296-8500
(202) 296-7143 (Fax)
jclarke@highsaw.com

Date: June 15, 2013                    Attorney for the TWA Pilots Committee

## CERTIFICATE OF SERVICE

I hereby certify that I have this 15th day of June, 2013, caused an electronic version of this Post-Hearing Brief Of The TWA Pilots Committee to be emailed to Thomas E. Reinert, Jr. (treinert@morganlewis.com), Wes Kennedy (kennedy@ask-attorneys.com), and Edgar James (ejames@jamhoff.com), along with the attachments to the Brief.

____/s/ John O'B. Clarke, Jr._____
John O'B. Clarke, Jr

**LIST OF ATTACHMENTS**

A.  Revised Proposal of TWA Pilots Committee
B.  *United States v. Lowden*, 308 U.S. 225 (1939)
C.  *Kent v. CAB*, 204 F.2d 263 (2d Cir.), *cert. denied*, 346 U.S. 826 (1953)
D.  *Steward v. Mann*, 351 F.3d 1338 (11th Cir. 2003)