# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 02-2917(JEI)

PATRICK BRADY, et al.,        :
    Plaintiff,              :
                             :
  v.                         :
                             :
AIR LINE PILOTS ASSOCIATION,  :
    Defendant.              :

Transcript of the deposition of KATIA P. SYCARA, Ph.D., called for Oral Examination in the above-captioned matter, said deposition taken by and before SILVIA P. WAGE, a Certified Shorthand Reporter, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public for the States of New York, New Jersey, Pennsylvania and Delaware, at the offices of PAUL WEISS RIFKIND WHARTON & GARRISON, LLP, 1285 Avenue of the Americas, New York, New York, on Friday, April 5, 2013, commencing at 9:13 a.m.

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911                       JOB NO. 7302

```
 1    A P P E A R A N C E S:

 2
      GREEN JACOBSON, P.C.
 3    BY:  JOE D. JACOBSON, ESQ.
      7733 Forsyth Boulevard, Suite 700
 4    Clayton, Missouri  63105
      (314) 862-6800
 5    Jacobson@stlouislaw.com
      Counsel for the Plaintiffs
 6

 7
      PAUL, WEISS, RIFKIND, WHARTON &
 8    GARRISON, LLP
      BY:  JULIE S. ROMM, ESQ.
 9    BY:  JAMES BOROD, ESQ.
      1285 Avenue of the Americas
10    New York, New York  10019
      (212) 373-3000
11    Jromm@paulweiss.com
      Jborod@paulweiss.com
12    Counsel for the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          KATIA P. SYCARA, Ph.D.

2      Q.  -- the seniority list, the but for

3  seniority list.

4      And I asked whether you agree with him

5  that if your theory was applied properly, it

6  still would not allow us to construct a but for

7  seniority list?

8      A.  I agree.

9      Q.  Alright.  Now, we talked just around

10 the edges a little bit about the paper

11 "Persuasive Argumentation Negotiation," which is

12 your 1990 paper?

13     A.  Correct.

14     Q.  And since that's the only paper that

15 I'm going to refer to here, if I refer to your

16 paper or your article, can we agree that I'm

17 referring to this 1990 paper so I don't have to

18 say the whole name every time?

19     A.  Yes.

20     Q.  Alright.  Thank you.  It saves us all

21 a lot of time here.

22     The very first sentence of your

23 introduction to your paper says, quote,

24 "Negotiation is an ill-structured and complex

25 process that to date has defied all attempts and

```
 1                KATIA P. SYCARA, Ph.D.
 2   analysis," close quote.
 3            I assume that you felt that was a true
 4   and important statement back in 1990?
 5       A.   Correct.
 6       Q.   Is it still a true statement to your
 7   view?
 8       A.   It depends on what you mean by
 9   "analysis."  And I think it is a true statement.
10       Q.   Alright.  So, while one can study
11   negotiations and that process, it still remains
12   ill-structured and complex?
13       A.   Yes.
14       Q.   And there's still isn't an analysis
15   in place that allows one to, you know, explain
16   with clarity and, I guess, perfection, what's
17   involved in negotiation?
18       A.   Various parts of negotiation could be
19   explained.  But one needs to take the particular
20   circumstances into consideration.
21       Q.   When you say --
22       A.   So --
23       Q.   I'm sorry.
24       A.   So, the particular circumstances, for
25   example, what the, you know, what the issues are
```

1           KATIA P. SYCARA, Ph.D.
2      A.   You said that.  I didn't.
3      Q.   No, I can infer from your response.
4           One of the things you said I thought was
5 interesting in your model is you create a
6 hierarchy of arguments from the least powerful
7 category to the most powerful category.  You have
8 nine categories in all, correct?
9      A.   (No response.)
10     Q.   And you say once the model -- whether
11 it's being exercised by a program or a person or
12 whatever -- generates arguments, that you should
13 use the weakest form of argument first and then
14 build your way up to the stronger argument; is
15 that correct?
16     A.   That is correct.
17     Q.   Why would one use a weaker argument
18 first using up your weaker arguments before you
19 get to your stronger arguments?
20     A.   So you don't exhaust all your
21 arguments.
22     Q.   And is there an accumulative impact
23 from arguments?
24     A.   Could be.
25     Q.   I believe -- at Page 216 through 217

1            KATIA P. SYCARA, Ph.D.

2    of your paper, you say, quote, "The following

3    ordering of persuasive power from weak to

4    strongest holds true for the labor mediation

5    domain.  We present the justifications from

6    weakest to strongest because we predict in cases

7    where more than one argument is applicable, this

8    is the order of presentation of arguments.  This

9    happens because the persuader does not want to

10   waste his strongest argument immediately but

11   wants to wear down the persuadee with cumulative

12   effective arguments that escalate a convincing

13   power," close quote.

14           A.  Right.

15           Q.  So would you agree with me that if

16   you have two arguments, that's more persuasive

17   than just having one of those two arguments?

18           A.  Well, depending on -- I mean,

19   depending on what kind of arguments they are,

20   depending on what I'm trying to influence and

21   depending, of course, on your reaction because,

22   as I say later on, some of these arguments could

23   backfire.

24           Q.  There is potential for backfire?

25           A.  Right.  So they can have the opposite

1           KATIA P. SYCARA, Ph.D.

2     effect.

3           Q.  In the initial stage, though, let's

4     say your process generates a group of ten

5     potential arguments.

6           A.  Uh-huh.

7           Q.  You would order them from the weakest

8     to the strongest?

9           A.  Uh-huh.

10          Q.  Is that right?

11          A.  Yes.

12          Q.  You have to say yes or no.  Those

13    don't get picked up.

14          A.  Yes.

15          Q.  And, then under your model, you would

16    use the weakest of those ten arguments first?

17          A.  Yes.

18          Q.  And, if that argument convinces the

19    other side to agree to what you want, then you're

20    done, right?

21          A.  Right.

22          Q.  And you never have to use the other

23    nine arguments?

24          A.  Right, uh-huh.

25          Q.  If the first one doesn't persuade,

1            KATIA P. SYCARA, Ph.D.
2    then you can roll out the second argument; is
3    that right?
4         A.   That's right.
5         Q.   And see if that has the necessary
6    impact?
7         A.   Sure.
8         Q.   And even if the argument doesn't
9    convince the other side to agree to what you
10   proposed, it may very well move their internal
11   line somewhat closer to where you are, even if it
12   hasn't reached a place where you want them to be;
13   is that a fair statement?
14        A.   That's a fair statement.
15        Q.   Because that's my understanding from
16   your paper.
17        A.   Yeah, yeah, that is a fair statement.
18        Q.   And that's what you say in your
19   paper?
20        A.   That's what I say in my paper, but
21   also you need -- what I say in my paper is you
22   also look to see what is their reaction of the
23   other, right, so it's an iterative process.  It's
24   not that just someone sits there and spews
25   arguments.

1        KATIA P. SYCARA, Ph.D.

2   longer valid because of changes in circumstances

3   and the rest of it; is that a fair statement?

4        A.   That's a fair statement.

5        Q.   Okay.  And hope is that by the time

6   you get to your last argument, your strongest

7   argument, that, at least, at that point you can

8   push them over the line to reach a settlement?

9            MS. ROMM:  Objection to form.

10       Q.   Is that a fair statement?

11       A.   That's a fair statement.

12       Q.   And if you don't, then the

13  negotiation will terminate because you have no

14  more arguments?

15       A.   Yes, it could be.  It could terminate

16  or other things could happen, but it could

17  terminate.

18       Q.   What other things could happen?

19       A.   Well, I don't know.  The other person

20  could change their mind, for example.

21       Q.   And one of the things -- you don't

22  call it an argument, I don't believe.  But one of

23  the things that one can do in a circumstance like

24  this is withdraw from negotiation for a while?

25       A.   Correct.

1                KATIA P. SYCARA, Ph.D.
2    it's...
3         Q.   In your paper, Page 226.
4         MS. ROMM:   Thank you.
5         Q.   Going back to something we talked
6    about earlier about using the weaker or less
7    convincing arguments first.
8         A.   Uh-huh.
9         Q.   You say the following and I'll just
10   read it out.  Quote, "The policy that the
11   persuader uses is to generate the weakest less
12   convincing argument first, reserving strong
13   arguments for situations where the weak ones have
14   been rejected.  The hierarchy of convincing power
15   of arguments of Section 4 ranks the strength of
16   an argument for the labor domain.  The policy of
17   presenting the weakest argument first is
18   effective because, a, the persuader has recourse
19   to other stronger arguments if the weaker ones
20   fail and, b, the cumulative effect of a series of
21   arguments may have a desired effect where single
22   even the strongest argument might have failed,"
23   close quote.
24         And if you want to see the text --
25         A.   That's fine.

```
1                KATIA P. SYCARA, Ph.D.
2         Q.   That was an accurate statement of
3    your views and theory at the time you wrote the
4    article in --
5         A.   Correct.
6         Q.   And is it still today?
7         A.   Possibly.  That would -- I would say
8    when I say accurate statement, I would say that
9    it's a reasonable statement.
10        Q.   Okay.  And I'd like to focus your
11   attention, particularly, on the last part of that
12   statement where it says that, "the cumulative
13   effect of a series of arguments may have a
14   desired effect where a single even the strongest
15   argument might have failed."
16             Can you explain why that would be?
17        A.   It is not a matter of why.  This is
18   not a causal theory.  It's -- so one could
19   believe that parties in the negotiation might be
20   influenced differentially by different arguments.
21   The others could also be -- as I said, for
22   example, threats could backfire.
23             So stronger -- so depending on the
24   situation, depending on the character of the
25   people, depending on the issues on the table,
```

1          KATIA P. SYCARA, Ph.D.

2   by the AT&T message accrued in simplistic too,"

3   close quote.

4          In the year since doing this paper, do

5   you still find this to be a true statement of the

6   world of argument?

7          A.  It could be.  I mean, this is -- for

8   some, as I said, surprisingly some of them.  So I

9   cannot say with certainty that I've read all the

10  -- since then, I've read all arguments and all

11  negotiations.  I haven't, as a matter of fact.

12         So I would say I have no particular

13  knowledge to say no or to say yes.

14         Q.  Also, elsewhere in your paper you

15  referred to the fact that an argument can be

16  persuasive even if it makes no logical sense or

17  it doesn't follow reason, it could still be

18  persuasive.

19         A.  Yeah, I mean -- yes, but I believe

20  that you are -- yeah, you have to just look at

21  political arguments.

22         Q.  You're not getting an argument from

23  me.

24         We talked briefly about threatening

25  arguments.