# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PATRICK BRADY, et al.,

                    Plaintiffs,

                 v.

AIR LINE PILOTS
ASSOCIATION,
INTERNATIONAL,

                  Defendant.

Civil Action No. 02-2917 (JEI)

───────────────────────────────────

# ALPA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO BAR OR LIMIT EXPERT OPINION TESTIMONY

───────────────────────────────────

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033-0968
(856) 795-2121

*Pro Hac Vice:*

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................ 5

    A.   The Liability Verdict ........................................................... 5

    B.   The Overarching Goal of Pilot Seniority List Integrations Is the Preservation of Pilots' Pre-Transaction Career Expectations ................ 7

    C.   ALPA's Experts Opine on Factors that Determine Possible Outcomes of the TWA-American Seniority Integration Efforts ............................ 9

          1.   Professor Michael Levine ...................................................10

          2.   James Feltman ...................................................................11

          3.   Professor Kevin Murphy .....................................................12

ARGUMENT.........................................................................................14

I.   THE SEVENTH AMENDMENT DOES NOT PROHIBIT THE EXPERT EVIDENCE PROFFERED BY PROFESSORS LEVINE AND MURPHY ..14

    A.   Professor Murphy's Opinion that Supplement CC Was Consistent with the Economics of Bargaining, Whereas Plaintiffs' Alternative Seniority Lists Were Not, Does Not Impeach the Jury Verdict ...........................17

    B.   Professor Levine's Proffered Opinions Do Not Contradict the Jury's Findings of Liability and Causation ....................................................18

II.  THE OPINIONS OF ALPA'S EXPERTS ON DAMAGES WILL AID THE JURY, AND PLAINTIFFS HAVE WAIVED ANY ARGUMENT TO THE CONTRARY ..................................................................................21

III. THE TESTIMONY OF ALPA'S EXPERTS ABOUT TWA'S VIABILITY AND FINANCIAL CONDITION IS RELEVANT AND APPROPRIATE...25

    A.   ALPA Is Entitled to Present Affirmative Evidence in Support of its Defenses to Plaintiffs' Damages Claims and Theories ..........................26

    B.   The Testimony of ALPA's Experts Concerning TWA's Financial Condition Squarely Rebuts the Opinions of Plaintiffs' Experts.............31

          1.   Dr. Farber's Report is Premised on Incorrect Assumptions About TWA's Financial Condition .........................................31

          2.   Salamat's Analyses Require Consideration of TWA's Financial Condition.................................................................34

CONCLUSION ....................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bensel* v. *Allied Pilots Association*,
387 F.3d 298 (3d Cir. 2004) ............................................................................14

*Blancha* v. *Raymark Indus.*,
972 F.2d 507 (3d Cir. 1992) ............................................................................26

*Blyden* v. *Mancusi*,
186 F.3d 252 (2d Cir. 1999) ............................................................................21

*In re the Complaint of Bankers Trust Co.*,
752 F.2d 874 (3d Cir. 1984) ............................................................................26

*Fox* v. *Cheminova, Inc.*,
No. CV 00-5145 (TCP)(ETB), 2006 WL 508087 (E.D.N.Y. Mar. 1,
2006) ................................................................................................................26

*Houseman* v. *U.S. Aviation Underwriters*,
171 F.3d 1117 (7th Cir. 1999) ........................................................................17

*Laborers' Int'l Union of N. Amer.* v. *Foster Wheeler Corp.*,
26 F.3d 375 (3d Cir. 1994) ..............................................................................24

*In re Paoli R.R. Yard PCB Litig.*,
113 F.3d 444 (3d Cir. 1997) ......................................................................15, 17

OTHER AUTHORITIES

Fed. R. Civ. P. 26 ................................................................................................20

Fed. R. Evid. 401 ................................................................................................26

U.S. Const. amend. VII ..................................................................................passim

Defendant Air Line Pilots Association, International ("ALPA") respectfully submits this brief in opposition to Plaintiffs' Motion to Bar Expert Opinion Testimony from Michael E. Levine and James S. Feltman and to Limit Expert Opinion Testimony from Kevin Murphy.

## PRELIMINARY STATEMENT

In January 2001, TWA was almost out of options.  It had been unprofitable for more than a decade and had no reasonable basis to expect things to turn around in the foreseeable future.  TWA had approached every major airline about a potential combination that might save the failing carrier.  None was interested—except American Airlines.  American's proposal to acquire TWA's assets represented the only chance for TWA's operations to continue as a going concern (under the American name), and for its employees to continue working. The American pilots understood this.  The American pilots also understood that their collective bargaining agreement with American gave them authority to staple all of the TWA pilots, as pilots of an acquired airline, to the bottom of the seniority list.  This was the context in which the ALPA unit representing the TWA pilots, the TWA Master Executive Council ("TWA MEC"), began negotiations with the union representing the American pilots, the Allied Pilots Association (the "APA").

Pre-transaction career expectations traditionally dictate the outcome of pilot seniority integrations.  As a result, the bargaining position of the TWA

pilots was unenviable.  The TWA pilots faced, at best, an uncertain future with a decimated airline that had given up its lucrative international flying routes years earlier and, through a variety of circumstances, had been reduced to a single hub in a struggling mid-size market.  At worst, and in all likelihood, the TWA pilots were looking at near-immediate unemployment.  The career prospects of the American pilots, by contrast, were promising.  They worked for a stable, thriving carrier with a significantly more expansive network of routes, a greater diversity of aircraft in its fleet, and superior career advancement opportunities.  Moreover, the APA benefited from the unequivocal statement of American's management that the APA "owned" the seniority list.  In other words, in accordance with the terms of their collective bargaining agreement, the APA was given complete control over the seniority list integration.  Accordingly, no integrated seniority list was achievable unless it was acceptable to the APA.

These facts, with supporting opinions from ALPA's experts, Professor Michael Levine, Michael Feltman, and Professor Kevin Murphy, demonstrate that, no matter what ALPA did, the TWA pilots could not have expected to achieve a *significantly* better seniority list integration than Supplement CC in any negotiations with the APA.  This is not to say that the TWA pilots could *never* have achieved a seniority list integration that was *any* better than Supplement CC—and ALPA's experts have offered no opinion to the contrary—but simply that

2

the range of outcomes that could have been achieved was limited.  That is the
conclusion that ALPA's experts have reached.  And it is this opinion, through this
motion, that Plaintiffs are seeking to prevent the damages jury from hearing.
Plaintiffs' motion should fail for the following three reasons.

     *First*, contrary to Plaintiffs' claim, the Seventh Amendment's
prohibition on a damages jury reexamining issues already decided by the liability
jury has no bearing on the testimony offered by Professors Levine and Murphy.
The sole issues decided by the liability jury were whether ALPA breached its duty
of fair representation and whether the breach caused injury to "some" of the TWA
pilots.  Professors Levine's and Murphy's opinions do not remotely "reexamine"
these issues.  Rather, both experts squarely address the issue of *how much more*
*favorable* the outcome of any seniority list integration achieved through
negotiations between the TWA MEC and the APA might have been for the TWA
pilots as a whole.  Plaintiffs mischaracterize isolated sentences from the experts'
reports and deposition testimony as purported support for their claim that
Professors Levine and Murphy have opined that *no* TWA pilots suffered damage.
Plaintiffs argue that such testimony would improperly invite the damages jury to
"reexamine" the liability verdict.  But as Professors Levine and Murphy offer no
such opinions, Plaintiffs have no basis for claiming their testimony would violate
the Seventh Amendment.

*Second*, the opinions of Professors Levine and Murphy on the range of achievable seniority integration outcomes from negotiations between the TWA MEC and the APA unquestionably are relevant and indeed necessary to enable the jury to decide damages.  Again, Plaintiffs cherry-pick and mischaracterize isolated statements from the expert reports and deposition testimony to claim that Professors Levine and Murphy have opined that Supplement CC was the best outcome for which the TWA pilots could have hoped.  But while Professors Levine and Murphy conclude from their analyses that the seniority integration would not have been *significantly* more favorable to the TWA pilot group given the overarching circumstances of the negotiations with the APA, they certainly do not rule out the possibility that the TWA pilots could have obtained a modestly more favorable seniority integration in which some small number of pilots would be better off than under Supplement CC.  Accordingly, Plaintiffs' true objection is not that the opinions of Professors Levine and Murphy will "confuse" the jury, but rather that they will lead the jury to the unavoidable conclusion that ALPA's breach caused no more than a *negligible* injury to the class of TWA pilots.  That such evidence renders Plaintiffs unable to satisfy their burden of proving the significant damages they claim plainly is not a proper basis for excluding qualified, reliable, and relevant expert testimony.

*Third*, it is indisputable that TWA's financial condition and lack of viability were major factors in determining the pre-transaction career expectations of the TWA pilots. And it is well established—in pilot seniority integrations generally and in the TWA-American pilot integration specifically—that pre-transaction career expectations of the pilot groups dictate the range of achievable integration outcomes. Thus, it is nonsensical for Plaintiffs to argue that the opinions offered by Professor Levine and Mr. Feltman concerning TWA's financial condition and viability absent the transaction with American are irrelevant to the issue of damages. Moreover, in addition to being relevant for ALPA's damage defense, such opinions constitute a direct challenge to the critical and counterfactual assumptions on which Plaintiffs' experts' work is predicated. Plaintiffs' claim to the contrary is based, again, on mischaracterization of expert opinions and testimony—this time, of their own experts. That this evidence compels the conclusion that Plaintiffs' damages are not significant does not render it irrelevant. To the contrary, this is precisely the sort of evidence that a damages jury must be allowed to hear at trial.

## STATEMENT OF FACTS

### A.    The Liability Verdict

In July 2011, the liability jury found that ALPA breached its duty of fair representation to the TWA pilots and that the breach "directly cause[d] injury

to some of the TWA Pilots." (Ex. 1 at 2.)[1] According to the jury charge, this means that the jury determined that "the overall outcome of the integration of the TWA pilots into American would have been more favorable" absent ALPA's breach. (Ex. 2 at 14.) But the jury made no finding as to what would constitute a "more favorable" outcome, nor as to the number of pilots injured. As Plaintiffs' counsel argued in his closing, a "more favorable" outcome requires nothing more than a list in which a single additional TWA pilot is placed above the staple point. (Ex. 3 at 75:17-18.)

Plaintiffs' two proffered experts—Rikk Salamat and Dr. Henry Farber—present eight alternative seniority list integrations that they speculate might have been achieved in the negotiations between the TWA MEC and the APA absent any breach by ALPA.[2] As detailed in ALPA's Brief, to construct and

---

[1] All references to "Ex. __" refer to exhibits to the accompanying Declaration of Daniel J. Toal, dated September 30, 2013 (the "Toal Declaration").

[2] ALPA incorporates by reference the discussion of Salamat and Farber's reports contained in ALPA's Memorandum of Law in Support of its Motion to Exclude the Testimony of Plaintiffs' Experts, and for Summary Judgment, ECF No. 571 ("ALPA's Brief"). The Salamat Report, dated October 12, 2012, is attached as Exhibit 7 to Plaintiffs' Brief in Support of Motion to Bar Expert Opinion Testimony from Michael E. Levine and James S. Feltman and to Limit Expert Opinion Testimony from Kevin Murphy, ECF No. 568-1 ("Plaintiffs' Brief"), and excerpts from Mr. Salamat's January 29-31, 2013 deposition testimony are attached as Exhibits 4, 5, and 6 to the Toal Declaration. The Farber Report, dated October 12, 2012, is attached as Exhibit 9 to Plaintiffs' Brief, and excerpts from Dr. Farber's January 22-23, 2013 deposition testimony are attached as Exhibits 7 and 8 to the Toal Declaration.

support these alternatives, Salamat and Farber rely on counterfactual assumptions about, among other things, the power of the American pilots' union to unilaterally determine the seniority list integration, TWA's financial condition at the time of American Airlines' acquisition of TWA assets in 2001, and the TWA pilots' resultant career expectations absent the acquisition.

**B.    The Overarching Goal of Pilot Seniority List Integrations Is the Preservation of Pilots' Pre-Transaction Career Expectations**

The overarching goal of pilot seniority list integrations is to preserve the pre-transaction career expectations of each pilot group.  This benchmark for the fairness of any seniority integration has been widely, if not universally, recognized in arbitration decisions, including those supposedly relied upon by Plaintiffs' own experts.  (*See* Farber Rpt. ¶¶ 32-36; Salamat 1/29 Tr. at 85:21-86:15 (seniority integrations decided by arbitrators "are always based on the premerger . . . career expectations in some manner"); Ex. 9 at ALPA 055724 (a "fair and equitable" seniority integration will "preserve[] the job expectations and relative bidding positions that employees held prior to the merger"); Ex. 10 at FARBER 003334 (when integrating seniority lists "to whatever extent possible the career expectations of the respective pilot groups, as those expectations existed *prior to the merger*, are to be maintained and protected" (emphasis added).)  And among the most important factors determining a pilot's pre-transaction career expectations is the financial condition of a pilot's carrier, which influences or even dictates the

7

pilot's pay, work rules, aircraft flown, future job security, and promotional possibilities.  (*See, e.g.,* Farber Rpt. ¶¶ 32-36 (explaining that if pilots "have minimal career expectations . . . absent the transaction  . . . they could expect to be placed lower on the merged seniority list than if [their airline] were in better financial health"); Ex. 11 at FARBER 002837 ("The financial condition of the carriers is considered relevant because the value of the jobs brought to the merger by the pilots of each carrier is affected by the future security of those positions."); Ex. 9 at ALPA 055729 (placing the majority of pilots of an airline "on the cusp of failure well down the road to extinction at the time of the transaction" at the bottom of the merged seniority list); Ex. 12 at FARBER 003197-98 ("discussion of [a carrier's] aircraft on order or option or rates of attrition" had "no meaning" where that carrier's financial condition prior to the transaction at issue was "starkly but realistically put . . . one of survival"); Ex. 13 at ALPA 001808.)

Following this customary practice, the APA and the TWA MEC itself acknowledged the need to preserve the pilots' pre-transaction career expectations in their negotiations over seniority list integration.  The TWA MEC generally acknowledged that "unity, fairness and equity, and efficiency will be served by a seniority integration which . . . preserves career expectations" (Ex. 13 at ALPA 001809), the "quantifiable, reliable criteria" for seniority list integrations (Ex. 14 at ALPA 004748).  The APA likewise insisted that any seniority integration list must

preserve the American pilots' career expectations, not transfer them to the TWA pilots. (*See, e.g.,* Ex. 13 at ALPA 001808-09.) As the APA repeatedly explained, the seniority list integration had to "preserve the career expectations of the members of each pilot group—the pre-transaction expectations at the time the transaction was entered into." (Ex. 15 at ALPA 008755; *see also* ALPA's Br. 5-8.)

The APA's mandate to preserve the pre-transaction career expectations of the pilots—with specific concern, of course, for its own pilots— was particularly important here given that the APA effectively had a veto over any proposed seniority list integration. Because the APA's collective bargaining agreement with American Airlines gave it the right to "staple" the pilots of any acquired airline to the bottom of the American seniority list (Ex. 16 at ALPA 013225), the APA in effect "own[ed] the seniority list." (Ex. 17 at 46:1-2; *see also* ALPA's Br. 54.) Thus, the APA's "standard mantra" during the negotiations was that "not one American pilot's career expectations can be harmed" by the seniority list integration, which set the standard for any integration to which the APA might agree. (Ex. 18 at 18:5-14, 50:2-9.)

**C.    ALPA's Experts Opine on Factors that Determine Possible Outcomes of the TWA-American Seniority Integration Efforts**

In the present motion, Plaintiffs challenge the admissibility of testimony from three experts who submitted reports supporting ALPA's defenses to Plaintiffs' damages claims:  Professor Michael Levine, James Feltman, and

Professor Kevin Murphy.  Each expert offers opinions relating to the factors that determine the range of achievable seniority list integrations involving the American and TWA pilots, including—most prominently—the pre-transaction career expectations of each pilot group.

### 1.    Professor Michael Levine

Professor Michael Levine has a vast range of experience in the airline industry, including as a senior executive at Continental, Northwest, and New York Air; as General Director, International and Domestic Aviation at the Civil Aeronautics Board; and as an academic.  (Levine Rpt. at 3.)[3]  In connection with ALPA's assessment of the TWA pilots' pre-transaction career expectations, Professor Levine evaluates how TWA's unique challenges—based on its historic struggles and positioning in the industry—impacted its financial condition and chances of surviving as a standalone entity at the time of the American acquisition. Specifically, Professor Levine opines that due to TWA's dire financial condition, single-hub structure, and increased competition in St. Louis from low-cost carrier Southwest Airlines, TWA was structurally unsound and no longer viable as a standalone airline.  (*Id.* at 9-26.)  He therefore concludes that the American transaction was TWA's only alternative to liquidation.  (*Id.*)  Given TWA's

---

[3] The Levine Report, dated March 15, 2013, is attached as Exhibit 1 to Plaintiffs' Brief.  Excerpts from Professor Levine's April 19, 2013 deposition testimony are attached as Exhibit 19 to the Toal Declaration.

desperate financial condition and inability to survive on its own, Professor Levine opines that "[i]t is virtually impossible to imagine a scenario in which the prospect of TWA's liquidation did not affect the expectations of TWA's pilots, as well as their bargaining leverage."  (*Id.* at 9.)

### 2.   James Feltman

James Feltman is a Senior Managing Director at Mesirow Financial Consulting, LLC.  Feltman, as a court-appointed Bankruptcy Examiner, Certified Public Accountant and Certified Fraud Examiner, has more than 30 years of experience in, among other things, financial analysis, valuations and damages analysis, corporate restructuring matters, and accounting.  He has worked extensively in the airline industry for nearly twenty years.  After undertaking a rigorous quantitative assessment, he opines that TWA's financial condition and its ability to meet its financial obligations were significantly impaired as a result of, among other things, TWA's insufficient revenue-generating capabilities, high operating costs, poor financial performance, and inadequate capital resources. (Feltman Rpt. at 7-25.)[4]  Based on his analysis, which included a fair market valuation of TWA's business, Feltman concludes that TWA would have liquidated absent the transaction with American.  (*Id.* at 4-5, 30-43.)

---

[4] The Feltman Report, dated March 15, 2013, is attached as Exhibit 5 to Plaintiffs' Brief.  Excerpts from Mr. Feltman's April 11, 2013 deposition are attached as Exhibit 20 to the Toal Declaration.

11

### 3.   Professor Kevin Murphy

Professor Kevin Murphy is the George J. Stigler Distinguished Service Professor of Economics at the University of Chicago.  He is a recipient of the John Bates Clark Medal, at the time awarded once every two years by the American Economic Association to an outstanding American economist under age 40, and of a MacArthur Foundation fellowship.  Professor Murphy offers an opinion on how the economics of bargaining (or bargaining theory) illustrates whether any particular seniority list integration would have been achievable for the TWA and American pilots.  (Murphy Rpt. ¶¶ 31-70.)[5]  As explained in his report, in evaluating the potential outcomes of a negotiation, it is necessary to take into account the gains the parties can obtain if they reach an agreement, the expected outcome absent an agreement (akin to pre-transaction career expectations), and the strength of each party's respective bargaining position.  (*Id.* ¶ 13.)  As part of his assessment of the pilot groups' bargaining positions, Professor Murphy relies, in part, on the analyses of TWA's financial condition performed by Mr. Feltman and Professor Levine.  (*Id.* ¶¶ 13-14, 20, 39-44, 66.)

---

[5] Because the version of the Murphy Report, dated June 7, 2013, that is attached as Exhibit 2 to Plaintiffs' Brief does not include certain corrections to the accompanying exhibits that Mr. Murphy subsequently provided, a full version of the Murphy Report and corrected exhibits is attached as Exhibit 21 to the Toal Declaration.  Excerpts from Professor Murphy's July 23, 2013 deposition testimony are attached as Exhibit 22 to the Toal Declaration.

With bargaining theory as his framework, Professor Murphy models the distribution of gains from the American/TWA transaction to the two pilot groups to assess the range of possible outcomes.  Professor Murphy concludes that because seven of the eight alternative seniority lists presented by Plaintiffs' experts made the American pilots *worse off* than they would have been without the transaction, these lists are inconsistent with the economics of bargaining and thus not achievable results of any negotiation between the TWA MEC and the APA. (Murphy Rpt. ¶¶ 54-70 & Murphy Rpt. Ex. 8.A, 8.B, 9.A, 9.B.)

The only one of Plaintiffs' "but for" seniority lists that does not expressly contradict the principles of bargaining theory is Salamat's "Marginal List."[6]  As Professor Murphy explains, however, the Marginal List is "less consistent" with the economics of bargaining than Supplement CC (or a list closer to Supplement CC) and unlikely to be achieved in bargaining because it gives a disproportionate percentage of the gains from the transaction to the TWA pilots. (*Id.* at Murphy Rpt. Ex. 9.A, 9.B; Murphy Tr. at 343:22-344:20.)  Validating the applicability of bargaining theory to the APA-TWA MEC negotiations, Professor

---

[6]  Salamat contends this list sets a *floor* on the range of outcomes that would have been obtained "but for" the alleged breach, but Professor Murphy's analysis demonstrates that it is actually much closer to a ceiling.  However, as set forth in ALPA's Brief, the Marginal List is inadmissible.  Among other reasons, Salamat offers no discernible methodology for creating this list and it does not fit the facts of this case.  (*See* ALPA's Br. 30-31, 40-41.)

Murphy finds that Supplement CC is within the range of possible outcomes of negotiation because it "reflects a distribution of the expected benefits of the transaction that is consistent with the relative bargaining positions of the two pilot groups and their relative pre-transaction expectations."  (Murphy Rpt. ¶ 16.)

## ARGUMENT

## I.   THE SEVENTH AMENDMENT DOES NOT PROHIBIT THE EXPERT EVIDENCE PROFFERED BY PROFESSORS LEVINE AND MURPHY

Plaintiffs argue that the Court should preclude certain testimony by Professors Levine and Murphy as violative of the Seventh Amendment.  Plaintiffs contend that this testimony would allow ALPA to "relitigate" the issues of "causation and injury in fact" that were decided in the liability trial and thus would compel the damages jury to reexamine the verdict of the jury that decided liability.[7] (*See* Pls' Br. 4-8.)  Not so.

The Reexamination Clause of the Seventh Amendment provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United

---

[7] Plaintiffs also argue that the Third Circuit's 2004 decision does not allow ALPA to present such evidence.  (Pls' Br. 4.)  In making this argument, Plaintiffs mischaracterize language from the Third Circuit's decision in *Bensel* v. *Allied Pilots Association*, 387 F.3d 298 (3d Cir. 2004), as a "specific holding" that "with appropriate continued representation by ALPA, a more propitious seniority agreement than Supplement CC could have been obtained for the class."  (*See* Pls' Br. 4.)  But the Third Circuit decided nothing of the sort.  To the contrary, the Third Circuit observed that "[i]t may be that ALPA properly carried out its duty of fair representation and there was nothing ALPA could realistically accomplish under difficult circumstances."  *Bensel*, 387 F.3d at 312.

14

States."  U.S. Const. amend. VII.  Accordingly, issues decided by the liability jury in this case may not be put to the damage jury.  *See In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 n.5 (3d Cir. 1997) (in a bifurcated case, the issues must be divided between separate trials "in such a way that the same issue is not reexamined by different juries") (quoting *In the Matter of Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293, 1303 (7th Cir. 1995)).  But the Reexamination Clause is not implicated here.

The jury verdict in this case established only that ALPA breached its duty of fair representation in some unspecified way and that the breach caused injury to "some" of the TWA Pilots.  (Ex. 1 at 2.)  Professors Murphy and Levine do not remotely reexamine these issues, let alone invite the damages jury to do so.

The liability jury did not take up the issues that ALPA's experts now address, including *how much more favorable* the outcome of any seniority list integration agreed to by the TWA MEC and the APA might have been.  And central to this inquiry—given the predominant importance of preserving the pre-transaction career expectations of each pilot group—is TWA's financial condition at the time of the transaction.  Professor Levine's report demonstrates that, at the time of the transaction, TWA was on the verge of liquidation and had no viable alternative to the asset acquisition by American.  As Professor Levine makes clear, "[i]t is virtually impossible to imagine a scenario in which the prospect of TWA's

liquidation did not affect the expectations of TWA's pilots, as well as their bargaining leverage."  (Levine Rpt. at 9.)  Indeed, the question of how much more favorable any alternative seniority list integration could have been to the TWA pilots as a whole cannot sensibly be analyzed without understanding both TWA's financial condition and the implications of its desperate position for the career expectations of its pilots.

Similarly, Professor Murphy's modeling of the distribution of gains of the transaction between the two pilot groups and analysis of the negotiations using the economic principles of bargaining enables him to offer a methodologically sound expert opinion regarding the range of achievable outcomes for *any* negotiation between the TWA MEC and the APA regarding seniority integration. Thus, contrary to Plaintiffs' claim, the expert opinions of Professors Levine and Murphy do not remotely constitute "opinions on causation [that] directly contradict the jury's verdict" (*see* Pls' Br. 8), and accordingly do not implicate the Reexamination Clause.

Moreover, to the extent Plaintiffs are arguing that ALPA may not present evidence of TWA's dismal financial condition to the damages jury because the liability jury heard related evidence (*see* Pls' Br. 5-6), the law is squarely to the contrary.  As the Third Circuit has observed, "the Seventh Amendment 'prohibition is not against having two juries review the same evidence, but rather

against having two juries decide the same essential issues.'" *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d at 452 n. 5 (quoting *In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986)); *see also Houseman* v. *U.S. Aviation Underwriters*, 171 F.3d 1117, 1128 (7th Cir. 1999) (that "much of the evidence presented in the first trial would have been re-examined in the second . . . alone does not raise constitutional concerns").

As discussed below, Plaintiffs' mischaracterization of isolated sentences in Professors Murphy and Levine's reports and testimony cannot transform their valid expert opinions regarding damages into an attempt to impeach the jury's verdict on liability and causation.

### A.   Professor Murphy's Opinion that Supplement CC Was Consistent with the Economics of Bargaining, Whereas Plaintiffs' Alternative Seniority Lists Were Not, Does Not Impeach the Jury Verdict

Plaintiffs make much of a brief portion of Professor Murphy's expert report—comprising less than three pages of the 58-page report (*see* Murphy Rpt. ¶¶ 71-78)—in which he explains why Supplement CC is "*consistent with* the economics of bargaining which is *consistent with* the TWA pilots suffering no damages as a result of its implementation." (Pls' Br. 4 (citing Murphy Rpt. ¶ 147 (emphases added).) Although Plaintiffs do not challenge Professor Murphy's methodology or the reliability of his analysis, they nevertheless seek to exclude this portion of his report as purportedly violative of the Seventh Amendment. But

17

this analysis is not an attack on the liability jury's verdict.  Professor Murphy never

suggests in his expert report or anywhere else that Supplement CC was the only

seniority list that would have been consistent with the economics of bargaining.

Nor does he dispute that some alternative seniority lists that also accorded with the

economics of bargaining could have been more favorable to the TWA pilots

overall.[8]  (Murphy Tr. at 84:22-85:6 ("Supplement CC is within the range of things

you might expect to come out of this bargaining situation.  It doesn't mean that

there aren't other things . . . that would also come out of the bargaining situation

that could be either more favorable or less favorable.").)

### B. Professor Levine's Proffered Opinions Do Not Contradict the Jury's Findings of Liability and Causation

Citing a single sentence from Professor Levine's report, Plaintiffs

inaccurately claim that Professor Levine's "*entire report* attempts to impeach the

---

[8] Professor Murphy's analysis of Supplement CC is no different than his analysis of Plaintiffs' alternative seniority lists.  While Professor Murphy concludes that seven of the eight lists are not plausible and achievable outcomes of bargaining because they make the American pilots *worse off* than they would have been without the acquisition of TWA's assets, he expressly opined that one of Plaintiffs' damages models—Salamat's "Marginal List"—is not foreclosed by the economics of bargaining.  As to that list, Professor Murphy opined that it was unlikely to be achieved in bargaining with the APA because it would have given a disproportionate share of the gains from the transaction to the TWA pilots, who had a much weaker bargaining position than the American pilots.  (*See* Murphy Rpt. ¶ 92, Murphy Rpt. Ex. 9.A, 9.B; Murphy Tr. at 343:22-344:20.)

jury's liability verdict" because he purportedly opines that "ALPA is not liable and did not cause damages to the Class."  (*See* Pls' Br. 1, 3 (emphasis added).)

Plaintiffs' motion to strike Professor Levine's testimony is predicated on their mischaracterization of his expert opinions.  Professor Levine's report sets forth a detailed and rigorous analysis of the financial condition and ongoing viability of TWA, which necessarily impaired the pre-transaction career expectations of the TWA pilots and undermined their bargaining position with the APA.  Based on his conclusions that TWA could not survive in the industry as a going concern and that the American transaction was TWA's only alternative to liquidation, Professor Levine opines that "[w]ith negligible bargaining leverage and a non-viable airline, [the] TWA pilots were fortunate to have secured any deviations from an arrangement that stapled all of them to the bottom of the American seniority list."  (Levine Rpt. at 36.)  It is this sentence that Plaintiffs now argue is prohibited by the Seventh Amendment, but this plainly is not an opinion on ALPA's liability or causation.[9]

_____

[9] Plaintiffs also disregard that Professor Levine offers this opinion in his report at least in part as a response to Mr. Salamat's claim "that even if the TWA bankruptcy and merger were inevitable, the TWA pilots had leverage they should have exploited by threatening to delay or disrupt the American Airlines transaction . . . or by threatening to strike."  Professor Levine's analysis demonstrates that, given TWA's perilous financial condition and the history of labor unrest at American, Mr. Salamat's claim "is simply without any basis in the real world of airline operations."  (*See* Levine Rpt. at 26.)

Moreover, contrary to Plaintiffs' claim, Professor Levine's testimony does not indicate that he has offered an expert opinion that "there was *nothing* ALPA could have done to improve the TWA pilots' seniority and, therefore, there were no resulting damages." (Pls' Br. 3-4.)  As the deposition testimony Plaintiffs cite makes clear, Levine testified that he believes that "the aggregate position of the TWA Pilots would not have been different *more or less* no matter what ALPA had done." (*See id.*, quoting Levine Tr. 21:2-18; 24:2-8) (emphasis modified).) This is just another way of saying that he would not have expected any negotiated seniority list integration to have been significantly different than Supplement CC. Professor Levine does not say, however, that no other list was possible or that some pilots could have been worse off under Supplement CC than under the alternative list.[10]  In fact, Levine specifically testified that, "[i]n [his] opinion, some individual pilots may have suffered as a result of the particular course that the negotiations took." (Levine Tr. 27:21-23; *see also id.* at 20:15-25).  As Levine's proffered testimony plainly does not "impeach" the jury's finding that ALPA

---

[10] Even if this were an accurate characterization of Professor Levine's deposition, testimony that is beyond the scope of an expert's report and in direct response to a question from opposing counsel is not grounds for excluding that expert's report. Professor Levine's report contained "a complete statement of all opinions to be expressed," as required by Rule 26.  Plaintiffs cite no authority for the proposition that, having directly inquired into an issue beyond the scope of Professor Levine's report, they can now use his responsive testimony as a basis to exclude his report.

violated its duty of fair representation and that such violation "directly cause[d] injury to *some* of the TWA Pilots" (Ex. 1 (emphasis added)), Plaintiffs' motion to exclude Levine's testimony on the grounds that it violates the Seventh Amendment must be denied.[11]

## II.   THE OPINIONS OF ALPA'S EXPERTS ON DAMAGES WILL AID THE JURY, AND PLAINTIFFS HAVE WAIVED ANY ARGUMENT TO THE CONTRARY

Plaintiffs also seek to preclude Professor Levine and Professor Murphy from testifying "that the Class has no damages and the TWA pilots were 'fortunate' to get Supplement CC." (Pls' Br. 8.)  Plaintiffs contend that such opinions are irrelevant, "will not assist the jury in determining the damages suffered by the Class," and would "only confuse the jury." (*Id.*)  But again, Plaintiffs' argument is based on a mischaracterization of the opinions offered by Professors Levine and Murphy.  As discussed above (at 17-21), neither Professor

---

[11] To the extent Seventh Amendment concerns are implicated by proffered expert testimony in this case, it is Plaintiffs' primary expert, Salamat, whose opinions are problematic. (*See* ALPA's Br. 23 n.13.)  Salamat assumes that the jury concluded that ALPA was required to take each of 10 separate actions to discharge its duty of fair representation. (*See* discussion in ALPA's Br. 8-11, 23-26.)  The liability jury made no such finding.  The verdict form never asked, and the jury never answered, which of ALPA's actions violated the duty of fair representation.  Thus, Salamat's proffered opinion would require the damages jury to reexamine and broaden the liability jury's findings of liability and causation, in violation of the Seventh Amendment. *See Blyden* v. *Mancusi*, 186 F.3d 252, 269 (2d Cir. 1999) (Seventh Amendment violated where there was "the real possibility—amounting to a probability—that acts found to be 'reprisals' by the liability jury were different from the acts found to be 'reprisals' by the damages juries").

Levine nor Professor Murphy opine that the Class has *no* damages.  Instead,

Professor Levine opines that the TWA pilots had dismal pre-transaction career

prospects, which hurt their negotiating leverage and would have made it difficult to

secure any integration list significantly better than Supplement CC.  And Professor

Murphy opines that seven of the eight damage models proposed by Plaintiffs

conflict with fundamental economic principles of bargaining since each would

have made the American pilots worse off than they would have been in the absence

of the transaction.  As to the eighth model that Plaintiffs proposed, Professor

Murphy opines that—although it is not expressly foreclosed by the economics of

bargaining—it is less defensible than Supplement CC because it would give a

disproportionate share of the benefits of the transaction to the TWA pilots,

notwithstanding their weaker bargaining position and limited fallback options.  As

a result, Professor Murphy also concludes that, even in the absence of any breach

of the duty of fair representation, any alternative seniority integration list would

not have been substantially more favorable to the TWA pilots overall.

       Plaintiffs bear the burden of proving class-wide damages.  They

attempted to satisfy this burden based on alternative seniority lists that their experts

contend could have been obtained absent ALPA's breach, all of which are

*significantly* more favorable to the majority of TWA pilots than Supplement CC.[12]

They then calculate damages purportedly attributable to ALPA's breach by

monetizing the disparity between the positions of the TWA pilots on the alternative

lists and their positions on Supplement CC.  Professors Murphy and Levine

likewise use Supplement CC as a touchstone by which to assess the degree to

which the TWA pilots could reasonably have achieved a more favorable outcome

in the negotiations between the TWA MEC and the APA.  Such testimony will

aid—not confuse—the damages jury's inquiry into the sole remaining issue:  what

the evidence establishes about how much better than Supplement CC the TWA

pilots reasonably could have done in any negotiation with the APA.

Plaintiffs offer no support for their assertion that it would be irrelevant

and unhelpful to the jury to hear the testimony of ALPA's experts that any

damages suffered by the TWA pilots—as a whole—would have been negligible.

They merely cite case law for the proposition that "[t]estimony that is generally

relevant to the question of liability rather than to the question of damages [is]

properly excluded from the damages phase of the trial."  (*See* Pls' Br. 8 (internal

---

[12] Although Plaintiffs and their experts assume that a more favorable integration
requires placing TWA pilots higher on the integrated seniority list, there were other
components to the seniority integration as well.  A more favorable integration also
could have been achieved, for example, by giving TWA pilots a greater number of
small wide-body captain positions at the St. Louis base.

quotation marks omitted).)  This uncontroversial proposition, however, is entirely inapposite to the present dispute.  For the reasons discussed above (at 10-14), testimony by Professor Levine about TWA's financial condition and its implications for the APA/TWA MEC negotiations and testimony by Professor Murphy about how bargaining theory limits the seniority integrations the TWA MEC could have achieved through negotiation with the APA are both directly relevant to the amount of damages to which Plaintiffs are entitled, not to the question of liability.  And as Plaintiffs have failed to explain the basis for their argument to the contrary, and for their more general argument that the testimony of Professors Levine and Murphy is irrelevant and will not aid the jury, they have waived these claims.  *See Laborers' Int'l Union of N. Amer.* v. *Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court." (internal quotation marks omitted)).[13]

---

[13] For the same reason, Plaintiffs have waived the argument that Levine's opinions are "unduly prejudicial," a bald assertion Plaintiffs make only in their Preliminary Statement and without any supporting explanation or argument.  (*See* Pls' Br. 2.)

### III. THE TESTIMONY OF ALPA'S EXPERTS ABOUT TWA'S VIABILITY AND FINANCIAL CONDITION IS RELEVANT AND APPROPRIATE

Plaintiffs next claim that ALPA's expert evidence regarding TWA's financial viability absent the transaction with American does not meet the "fit" requirement for expert testimony because it purportedly:  (i) "is not relevant to a determination of the Class's damages"; and (ii) does not rebut Plaintiffs' experts' opinions.  (*See* Pls' Br. 9-18.)[14]  Plaintiffs are mistaken on both counts.  First, ALPA's experts' testimony is directly relevant to its affirmative damages case because it speaks to the TWA pilots' pre-transaction career expectations, which are critical to determining the outcome of any seniority integration.  Second, contrary to Plaintiffs' claims, ALPA's expert evidence going to TWA's viability plainly and directly rebuts Plaintiffs' experts' opinions.  Indeed, the testimony of ALPA's experts about TWA's financial condition *squarely* refutes several key and counterfactual assumptions underlying Plaintiffs' experts' work and also demonstrates fundamental flaws in their analyses.

---

[14] Plaintiffs also assert, without any detail or explanation, that the experts' opinions about the prospects of TWA and its pilots absent the transaction with American are "unduly speculative and should be excluded for that reason as well."  (Pls' Br. 10.) This conclusory assertion is directly contradicted by the detailed reports submitted by ALPA's experts, which include support and rationale for each opinion offered. Plaintiffs offer nothing to support their claim to the contrary.

**A.    ALPA Is Entitled to Present Affirmative Evidence in Support of its Defenses to Plaintiffs' Damages Claims and Theories**

Plaintiffs' argument that evidence about TWA's financial condition is "not relevant to a determination of the Class's damages" because it does not conform to Plaintiffs' theory of the case (*see* Pls' Br. 10) contradicts the well-established, broad construct of "relevance" used by the federal courts.  Pursuant to Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact [of consequence for the litigation] more or less probable than it would be without the evidence."  Fed. R. Evid. 401; *see also Blancha* v. *Raymark Indus.*, 972 F.2d 507, 514 (3d Cir. 1992) (Rule 401 "giv[es] judges great freedom to admit evidence" while "diminish[ing] substantially their authority to exclude evidence as irrelevant").  To mount a meaningful defense, ALPA must be permitted to present evidence in support of its own theories, regardless of those advanced by Plaintiffs. *See In re the Complaint of Bankers Trust Co.*, 752 F.2d 874, 890 (3d Cir. 1984) ("Due process mandates that a judicial proceeding give all parties an opportunity to be heard on the critical and decisive allegations which go to the core of the parties' claim or defense and to present evidence on the contested facts") (emphasis omitted); *Fox* v. *Cheminova, Inc.*, No. CV 00-5145 (TCP)(ETB), 2006 WL 508087, at *7 (E.D.N.Y. Mar. 1, 2006) (a defendant is "entitled to . . . formulate [its] own theory on the computation of class-wide damages").  Evidence of TWA's financial condition is not only relevant but fundamental to ALPA's defense.

26

For example, as discussed above (at 15-16), the damages jury will be asked to assess what a "but-for" seniority list would look like absent ALPA's alleged breach.  ALPA therefore must be able to present evidence—expert and fact—going to the issue of whether any alternative list was achievable in any negotiations between the TWA MEC and the APA.  The financial condition and standalone viability of TWA necessarily inform this issue.  In point of fact, these factors are key components of the pre-transaction career expectations of the TWA pilots.  This is particularly true here because preserving the pre-transaction career expectations of the pilots was the explicit guiding principle of the seniority integration negotiations between the APA and the TWA MEC (*see* Ex. 15 at ALPA 008755; Ex. 14 at ALPA 004748.)

But even if this were not so clearly the predominant consideration for the negotiations between the APA and the TWA MEC, pre-transaction career expectations inevitably influence the outcome of the seniority integration process, a fact which even Plaintiffs' experts were forced to concede.  (*See, e.g.,* Farber Rpt. ¶ 33 (explaining that if pilots "have minimal career expectations . . . absent the transaction  . . . they could expect to be placed lower on the merged seniority list than if [their airline] were in better financial health"); Salamat 1/29 Tr. 73:9-15 (in evaluating the fairness of seniority integrations "people look to, whether the integrated list preserves the pre-transaction career expectations of each pilot

27

group"); *Id.* at 85:21-86:15 (seniority integrations decided by arbitrators "are always based on the premerger—premerger career expectations in some manner").)  Accordingly, evidence of TWA's financial condition is relevant and necessary for ALPA's damage defenses.

Plaintiffs nonetheless inexplicably argue that testimony concerning this issue does not "fit" with the remaining factual issue in dispute—the amount of damages—because "the first jury already heard the evidence."  (Pls' Br. 13.) Plaintiffs cite no legal support for this claim.  As noted above (at 16-17), parties are not precluded from presenting similar, or even the same, evidence to a subsequent jury where the evidence is relevant to both phases of trial, so long as the second jury is not being asked to decide the same issues as the first.  Moreover, Plaintiffs are wrong that ALPA seeks to introduce largely the same evidence at the damages phase as was presented in the liability trial.  To establish TWA's financial condition and future prospects, which determine the pilots' pre-transaction career expectations, ALPA will rely on expert testimony, which was not presented in the liability trial.[15]  Additionally, ALPA also will present testimony from

_____

[15] At trial, an issue arose as to whether certain lay witnesses could testify about TWA's financial condition.  The Court noted that such evidence "clearly requires expert testimony . . . [from someone who had] reviewed all the finances"—the same testimony Plaintiffs now claim is irrelevant.  (Ex. 23 at 7:4-8.)  Neither of the parties presented any expert testimony on this issue.

knowledgeable fact witnesses to support this crucial aspect of its defense, none of whom were heard by the liability jury.  For example, former TWA President and CEO William Compton will testify that "TWA was . . . going to liquidate within days without a deal" (Ex. 24 at 25:21-23); former TWA CFO Michael Palumbo will testify that TWA did not have the necessary funds, absent financing by American, to continue operating (Ex. 25 at 111:18-112:12); and former APA President John Darrah will testify that "[i]f you . . . took TWA in isolation and said, all right, a pilot over there, what was their future?  It was much different than a pilot would look at his future at American Airlines . . . . We looked at all of that and took it into account."  (Ex. 17 at 43:22-44:16.)

Moreover, to the extent that TWA's financial condition was discussed in the liability trial, it was discussed for a different purpose and in a different context than the expert testimony that Plaintiffs seek to challenge here.  For example, Plaintiffs claim that Richard Seltzer "who was involved in the January 2001 bankruptcy, testified extensively as to TWA's weak financial condition." (Pls' Br. 10.)  In fact, of Seltzer's more than one hundred pages of trial testimony, that supposedly "extensive" testimony about TWA's financial condition comprises approximately one page.  And no part of his testimony addressed TWA's financial condition and how it affected the structure of the pilot seniority integration, nor

any of the activities that took place after the transaction closed[16]—the precise

issues that ALPA's experts address in their reports and will testify about at trial.

Rather, Seltzer's testimony concerned ALPA's involvement in the TWA

bankruptcy proceedings that coincided with the American transaction, and focused

on American and TWA's efforts to eliminate the TWA employee unions' scope

provisions from their existing collective bargaining agreements (the Section 1113

proceedings) as it related to the decision of the TWA MEC ultimately to waive

scope. Similarly, the testimony of Steve Rautenberg cited by Plaintiffs concerning

TWA's financial condition and viability post-bankruptcy (Pls' Br. 11-12) was

elicited as a preamble to questioning about the Section 1113 proceedings and the

impact of that proceeding on the TWA MEC's decision to waive scope. Thus, as

Plaintiffs' examples demonstrate, even if—contrary to fact—the liability jury had

heard "substantial" evidence about TWA's financial condition and viability as a

standalone carrier (Pls' Br. 10), it was not for the purpose of deciding the specific

issue presented here, namely how TWA's financial condition related to the

---

[16] Plaintiffs insist that TWA's pre-transaction financial viability is irrelevant
because "[t]he transaction closed, and ALPA *thereafter* failed to protect the TWA
pilots' seniority." (Pls' Br. 12.) For the reasons discussed above, as part of its
defense, ALPA intends to demonstrate that the APA considered TWA's financial
viability in assessing the pre-transaction career expectations of the TWA pilots,
even *after* the transaction closed—and that such consideration is consistent with
standard practice during a seniority integration. Plaintiffs may disagree, but such
disagreement has no bearing on whether this evidence is relevant.

alternative integrated seniority lists that might have been obtained in negotiations between the TWA MEC and the APA but for ALPA's alleged breach.

As Plaintiffs do not, and cannot, demonstrate that evidence of TWA's financial condition is irrelevant to ALPA's defenses and theories on specific damage issues, their efforts to preclude the testimony of ALPA's experts on these issues must fail.

### B. The Testimony of ALPA's Experts Concerning TWA's Financial Condition Squarely Rebuts the Opinions of Plaintiffs' Experts

Plaintiffs assert that Professor Levine and Mr. Feltman mischaracterized Plaintiffs' experts' opinions in order to give their own reports the "guise of purported rebuttal" and to thereby elide "the obvious relevance problem inherent in any evidence of TWA's viability." (*See* Pls' Br. 13.) As demonstrated above, there is no "relevance problem." And, in all events, the opinions of ALPA's experts directly and squarely rebut the incorrect assumptions about TWA's financial condition upon which Plaintiffs' experts' reports are predicated.

### 1. Dr. Farber's Report is Premised on Incorrect Assumptions About TWA's Financial Condition

Plaintiffs assert that "[t]he only part of Dr. Farber's work that even considered TWA's financial condition was his selection of 'comparable' mergers for his analysis." (Pls' Br. 15-16.) But saying that Dr. Farber's inaccurate

31

assumptions about TWA's financial condition is "only part" of his analysis is akin to saying that an engine is "only part" of an airplane.

As detailed in ALPA's Brief, Dr. Farber's *entire methodology* for constructing his proposed alternative seniority lists is premised on the selection of "comparable" transactions, which in turn is based on Farber's views about whether the financial condition of the acquired airline in another transaction was similar to what he understood TWA's financial condition to be.  (*See* discussion in ALPA's Br. 13-14, 55-56.)  Dr. Farber concluded, without the benefit of any analysis, that "TWA was in a weakened financial state" but "still flying" at the time of the acquisition by American, and purportedly selected "comparable" transactions by identifying those that involved acquired carriers with similar characteristics.[17] (Farber Rpt. ¶ 55; *see also id.* ¶¶ 3, 10, 53, 56.)  Dr. Farber thus expressly distinguished TWA's financial condition from that of acquired carriers that faced "imminent" risk of liquidation, and so excluded from his set of "comparables" any

---

[17] Dr. Farber's only other criteria for "comparability" was whether the acquired airline of a transaction contributed "valuable assets" to the transactions—a virtually meaningless inquiry given that (i) it is difficult to conceive of scenarios in which an acquisition would occur if the acquired company did not bring something of value to the acquiring entity; and (ii) Dr. Farber conceded he did not use any metric to analyze the value of assets that an acquired airline brought to a merger and lacked the expertise to do such a valuation.  (*See* ALPA's Br. 53 n.27.)

transactions involving carriers facing imminent liquidation.  (Farber Rpt. ¶¶ 53, 56; Farber 1/22 Tr. 75:7-77:15.)

   Dr. Farber readily acknowledged at his deposition that "of course[] TWA's financial condition was relevant" in identifying comparable mergers because he was looking for acquired carriers "with some, at a crude level, similarity with TWA's financial condition."  (Farber 1/22 Tr. 75:16-19.)  He also conceded that he "would have had to select [his] comparables differently" had he concluded that TWA would have liquidated imminently in the absence of a transaction with American.  (*Id.* 138:25-139:8; *see also id.* 75:20-76:9, 76:22-77:15.)  If Dr. Farber had changed his set of comparable transactions, his proposed but-for seniority lists necessarily would have changed as well because he constructed his alternative seniority lists using the average of the seniority list integrations in the supposedly "comparable" transactions.  (*See* Farber Rpt. ¶¶ 56-58.)  Indeed, had he selected as comparables those transactions in which the acquired airline was either not flying or, like TWA, was at risk of imminent liquidation, he would have been forced to conclude that Supplement CC was within the range of these "comparables," indicating little to no damage to the TWA pilots as a result of ALPA's breach.  (*See* Murphy Rpt. ¶¶ 144-47.)

   As a result, Professor Levine's and Mr. Feltman's conclusions—such as the fact that "TWA had no prospects for continuing operation without the

acquisition" (Levine Rpt. at 9; *see also* Feltman Rpt. at 31) and that Dr. Farber

selected the wrong transactions as "comparables" (*id.* at 9; Feltman Rpt. at 3-4; *see*

*also* Feltman Tr. at 202:25-204:20)—conclusively rebut assumptions upon which

the entirety of Dr. Farber's opinions rest.[18]

### 2.   Salamat's Analyses Require Consideration of TWA's Financial Condition

Plaintiffs' claim that "[t]here are no opinions expressed in

Mr. Salamat's report about TWA's viability" (Pls' Br. 14) also disregards the

facts.[19]  Notwithstanding Plaintiffs' citation to two pieces of testimony from a

three-day deposition (*id.*), Salamat's report and deposition testimony make clear

---

[18] Plaintiffs contend—incorrectly—that in order to "rebut" Dr. Farber's assumptions about TWA's financial condition, Professor Levine and Mr. Feltman must specifically rebut his statement that TWA would have kept flying for "days, a week, a couple of weeks" without the American transaction.  (Pls' Br. 16.)  But Dr. Farber said no such thing.  Asked whether his reference to airlines expected to cease flying "imminently" meant "in a matter of days," Dr. Farber responded:

> I didn't have a specific, you know, . . . absolute time period in mind, but, you know, days, a week, couple weeks.  Yeah.  And a time period where it—it would be hard to think of any—of a scenario where they could keep flying. . . . [A]nything can happen in two days but it is not much time.  Anything can happen in two months and it is more time.  So, you know, it's in that area.

(Farber 1/23 Tr. at 41:7-15.)  Plaintiffs also mischaracterize certain fact witnesses' testimony as "consistent with" their creative rewriting of Dr. Farber's testimony. (*See* Pls' Br. 16-18.)

[19] So too does Plaintiffs' assertion that Mr. Salamat is an economist (Pls' Br. 14), in light of Mr. Salamat's testimony to the contrary.  (*See* Salamat 1/29 Tr. 210:1-4 ("I would not call myself an economist, no.").)

that his damages models depend on his assumptions concerning TWA's financial

condition.  For example:

- Salamat testified that his primary damages model, the DMODEL, takes into account "pre-transaction, long-term job security based on the carrier's financial condition."  (Salamat 1/31 Tr. 94:9-95:20.)

- TWA's financial condition, and the resulting pre-transaction career expectations of the TWA pilots, informs another of his models, the Fairness List, which reflects "[w]hether one group had superior expectations for the future [and] whether one group was about to lose all their jobs."  (Salamat Rpt. 14-15.)

- Salamat also largely based his Arbitrated List on TWA's financial condition.  To estimate an arbitrated result, Salamat had to consider this "key criteri[on]," which he deemed the "most relevant [factor] in how the awards . . . are fashioned."  (Salamat 1/31 Tr. 8:13-9:7.)

But even if—contrary to fact—Salamat had not expressed specific

opinions on or made assumptions about TWA's financial condition and viability,

the plain failure to consider these issues would nevertheless be relevant for a

rebuttal of Salamat's models and analyses.  Salamat's opinions are based on his

attempt to predict the outcome of the seniority negotiations between the TWA

MEC and the APA if ALPA had acted differently.  And, as noted above (at 7-9),

the pre-transaction career expectations of the pilot groups—a key component of

which is the financial condition and viability of the respective carriers—set the

framework within which any outcome of the seniority integration negotiations

must fit.  Salamat concedes as much.  He acknowledges that pre-transaction career

35

expectations include "[t]he financial health of the company.  Whether the . . .

company was in or out of bankruptcy.  Whether it was or was not operating."

(Salamat 1/29 Tr. 86:16 -87:1.)  And he admits that the APA considered the pre-

transaction career expectations of the TWA pilots in developing Supplement CC.

(Salamat 1/29 Tr. 79:17-80:6; Salamat 1/31 Tr. 57:20-58:7.)

Indeed, in constructing his DMODEL seniority list, Salamat recounts

the APA's objections to ALPA's Rightful Place proposal to assess whether they

were "reasonable."  He focuses on the APA's position that the Rightful Place

proposal "fails to take into account any of the radical differences between our

groups' pre-transaction career expectations . . . [and] long-term job security based

on the carriers' financial condition."  (Salamat Rpt. 29.)  Salamat discounts and

disregards the APA's objection based on his subjective and standardless

conclusion that because "TWA was still an operating airline, albeit in bankruptcy,

only marginal weight could reasonably be put on the TWA pilots' job security."

(*Id.* at 29-30.)  He contends that a carrier's financial condition is relevant only in

"exceptional circumstances," which he concludes were not present at TWA.  (*Id.*)

Professor Levine's analysis of TWA's financial condition, and his

conclusions that TWA was structurally unsound and no longer viable as a

standalone airline (Levine Rpt. at 9-26), thus directly rebut Salamat's assumptions

about the TWA pilots' pre-transaction career expectations and their impact on the

negotiations with the APA.  As Professor Levine concluded, "[i]t is virtually impossible to imagine a scenario in which the prospect of TWA's liquidation did not affect the expectations of TWA's pilots, as well as their bargaining leverage." (Levine Rpt. at 9.)  Similarly, Feltman's conclusions that: (i) TWA was balance sheet insolvent as of December 31, 2000, March 31, 2001, and June 30, 2001 based on a fair market valuation of TWA's business (Feltman Rpt. at 7-29); and (ii) that a transaction with American was TWA's *only* alternative to liquidation (Feltman Rpt. at 4-5, 30-43), refute Salamat's assumption in constructing his "but-for" seniority lists that "TWA's financial condition was not comparable to airlines that have liquidated."  (Feltman Rpt. at 3.)

Plaintiffs' attempts to rewrite their proposed experts' opinions and the circumstances surrounding the seniority integration negotiations notwithstanding, the opinions proffered by Professor Levine and Mr. Feltman directly rebut Plaintiffs' damage models.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to bar expert testimony from Michael Levine and James Feltman and to limit expert testimony from Kevin Murphy should be summarily denied.

Dated:  Haddonfield, NJ
September 30, 2013

Respectfully submitted,

Theodore V. Wells, Jr., Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

 - and -

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033

By:   */s/ John C. Connell*
    John C. Connell, Esquire
    Kerri E. Chewning, Esquire

*Pro Hac Vice:*

Jay Cohen, Esquire
Daniel J. Toal, Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*