# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICK BRADY, et al., | : | HONORABLE JOSEPH E. IRENAS |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No. 02-2917 (JEI) |
| v. | : | |
| | : | |
| | : | **JURY VERDICT** |
| AIR LINE PILOTS | : | |
| ASSOCIATION, et al. | : | |
| | : | |
| Defendants. | : | |

We, the jury, unanimously find the following by a preponderance of the evidence:

(1) Did Defendant Air Line Pilots Association violate its duty of fair representation to the TWA Pilots?

Answer: Yes ⨯ No _____

**IF YOU ANSWERED "YES" TO QUESTION (1), PROCEED TO QUESTION (2). IF YOU ANSWERED "NO" TO QUESTION (1), PLEASE STOP; YOUR DELIBERATIONS ARE OVER. THE JURY FOREPERSON MUST SIGN THE LAST PAGE OF THIS VERDICT FORM.**

1

(2) Did Defendant Air Line Pilots Association's violation of its duty of fair representation directly cause injury to some of the TWA Pilots?

Answer:  Yes  ___X___  No  _____


**PLEASE STOP; YOUR DELIBERATIONS ARE OVER.  THE JURY FOREPERSON MUST SIGN THE LAST PAGE OF THIS VERDICT FORM.**

SO SAY WE ALL, this _13_ day of July, 2011.


Foreperson _____

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICK BRADY, et al., | : | HONORABLE JOSEPH E. IRENAS |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No. 02-2917(JEI) |
| v. | : | |
| | : | **JURY CHARGE** |
| | : | |
| AIR LINE PILOTS | : | |
| ASSOCIATION, et al., | : | |
| | : | |
| Defendants. | : | |

Ladies and Gentlemen of the Jury:

## § 1   Introduction to the Final Charge--Province of the Court and of the Jury

Now that you have heard all of the evidence to be received in this trial and the arguments of counsel it becomes my duty and privilege to give you the final instructions of the Court as to the law that will guide you in your decisions.

The Plaintiffs in this matter are several individuals, Howard Hollander, Sally Young, Patrick Brady, Ted Case and Michael Finucan.  They are former pilots for TWA and TWA, LLC.  In this action, these individuals are pursuing this litigation not only on their own behalf, but they also represent a class of plaintiffs consisting of some of the approximately 2,300 individuals who were pilots of TWA as of April of 2002.

As you have heard, the defendant, the Air Line Pilots

1

fair representation" and requires a union to act in the best interests of its members in the manner I will describe to you hereafter.

The TWA Pilots claim that ALPA breached its duty of fair representation by failing to protect the TWA Pilots' seniority as part of TWA's merger with American Airlines and the subsequent merger of the two pilot groups. ALPA denies these claims and contends that it represented the TWA pilots appropriately under the difficult circumstances presented by TWA's poor financial situation.

In order to prove their case, the TWA Pilots will have to establish by a preponderance of the evidence that ALPA's representation of the TWA Pilots was either arbitrary or motivated by bad faith.

If Plaintiffs prove that ALPA's conduct was arbitrary or motivated by bad faith, they must then prove a tangible injury resulting from that conduct in order to prevail. A labor union can only be held liable for breach of its duty of fair representation if its breach directly causes injury to an individual or group to whom the duty is owed. In this case, proving injury means that Plaintiffs are required to demonstrate that, but for ALPA's breach of its duty of fair representation, the overall outcome of the integration of the TWA Pilots into American would have been more favorable.

14

# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              CIVIL 02-2917  (JEI)

 3       PATRICK BRADY, SALLY YOUNG,
         HOWARD HOLLANDER, THEODORE CASE,
 4       AND MICHAEL FINUCAN, individually
         and on behalf of all others
 5       similarly situated,
                         Plaintiffs,
 6                                        VOLUME  19
                 V.                       TRIAL TRANSCRIPT
 7
         AIR LINE PILOTS ASSOCIATION,
 8
                         Defendant.
 9
                                  CAMDEN, NEW JERSEY
10                                JULY 12, 2011

11       B E F O R E:   HONORABLE JOSEPH E. IRENAS
                        UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
            TRUJILLO, RODRIGUEZ & RICHARD
14          BY:  NICOLE M. ACCHIONE, ESQ.
                AND: LISA J. RODRIGUEZ, ESQ.
15                AND
            GREEN JACOBSON, P.C.
16          BY:  ALLEN PRESS, ESQ.  (MO. BAR)
            AND:  JOE D.  JACOBSON, ESQ.  (MO. BAR)
17          For the Plaintiffs.

18          ARCHER GREINER
            BY:  STEVEN FRAM, ESQ.
19                AND
            KATZ & RANZMAN
20          BY:  DANIEL M. KATZ, ESQ.
            FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
            ELIZABETH  GINSBURG, ESQ.
22          IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1    still obnoxious from the TWA pilots' side, but that is what

2    they did.

3            Now, what happened after that?  They go into this

4    facilitated negotiation process, all throughout the summer,

5    meeting after meeting after meeting.  I don't know how many

6    meetings.  I know it was more than ten, Mike Day testified

7    to.  And throughout that the APA does nothing.  They don't

8    come off this position one iota to out that whole process in

9    the summer.

10           And then after 9-11, a week after 9-11, they write

11   a letter to Mike Day saying we are done.  We are done talking

12   to you, we are going to go to our board, and we are going to

13   do what we want.  At that point, 14, 15, was still the offer.

14   What happened next?  The TWA pilots got involved.  They went

15   to Senator Bond, got him involved.  And Bond announces this

16   bill that would give arbitration to the TWA pilots, had it

17   passed.  That was on October first that that announcement was

18   made.

19           This is just some Senator saying hey, I got this

20   bill, I put on the floor.

21           What happened next?  American pilots come back to

22   the table on their own and say hey, we got a better deal, you

23   are going to love it.  And that better deal, it was better,

24   was Supplement CC.   The staple lowered to 1,200.  And it

25   included in this notion of fencing all the TWA pilots in St.

1    Louis, which not only kept them all in St. Louis corralled

2    there but it kept American pilots out of St. Louis, which

3    meant they couldn't bid there which was some sort of benefit

4    for the TWA guys.

5          So on the strength of the TWA pilots doing nothing

6    other than get Senator Bond to introduce some legislation,

7    the American pilots lower the staple by 250, and offer this

8    notion of a fence in St. Louis.  That was done with just the

9    leverage of maybe the senator's bill might get passed some

10   day.  That was the only leverage.  That was all that had

11   changed.   What if ALPA had gotten involved and done any of

12   the things, or all of the things, that were requested of it?

13   Litigate, boycott.  All of it.  Would there have been a

14   better deal?  A more favorable deal?  Again, that is up to

15   you to decide.  But again, you must use your common sense and

16   look at what happened.

17          If you lower that staple by one pilot, that is

18   injury.

19          Folks, I am finished.  Okay.  I am sure you have

20   heard enough.  And I am going to sit down now, and the Judge

21   is going to read some instructions to you and we will see you

22   when you get back.

23          THE COURT:  Thank you, Mr. Press.  We will take a

24   short break now.  About 15 minutes.  It is 25 of 11.  About

25   ten of 11.  Then I will read my charge of the law to you.

```
 1    And then the case is yours.  Don't discuss the case among

 2    yourselves until you have heard my charge.  All rise.

 3                (Jury leaves the courtroom)

 4                THE COURT:  Mr. Fram.

 5                MR. FRAM:  Two things.  One, I did write out a

 6    proposed insert to deal with this with this issue of witness

 7    vouching, if I can hand it up.  I indicated, your Honor,

 8    where I would request that the Court include it.  It would be

 9    on page 10, is where I was suggesting.

10                THE COURT:  Have they seen it?

11                MR. FRAM:  No, they haven't, your Honor.

12                THE COURT:  While they are looking at it, you have

13    a second point.

14                MR. FRAM:  I did, your Honor.  I thought we talked

15    about the advice in the charge that if you find by a

16    preponderance of the evidence that ALPA breached, then you

17    must.  And the converse.  I am looking, your Honor, at the

18    bottom of page 18 of the charge.

19                THE COURT:  Yes.

20                MR. FRAM:  I thought that paragraph was going to

21    move and be part of what you of this --

22                THE COURT:  Page 19, not 18.

23                MR. FRAM:  I am looking at the bottom of 18.

24                THE COURT:  Look at 19.

25                MR. FRAM:  19 is what we discussed.  I guess my
```

# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
                    Plaintiffs,
         vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
                    Defendant.

------------------
January 29, 2013
------------------
         Oral sworn videotaped deposition
of RIKK SALAMAT, Case Lab, Inc., 288 Clinton Street,
Toronto, Ontario, was taken at the law office of
Archer & Greiner, 1650 Market Street, Philadelphia,
Pennsylvania, before Jean B. Delaney, Certified
Shorthand Reporter and Notary Public of the State of
New Jersey, on the above date, commencing at 9:30
a.m., there being present:

         GREEN JACOBSON, P.C.
         BY: JOSEPH JACOBSON, ESQUIRE
         7333 Forsyth Boulevard
         St. Louis, Missouri  63105
         (314) 862-6800
         Attorneys for Plaintiff

         TRUJILLO, RODRIGUEZ & RICHARDS, LLC
         BY: LISA RODRIGUEZ, ESQUIRE
         258 Kings Highway East
         Haddonfield, New Jersey  08033
         (856) 795-9002
         Attorneys for Plaintiff

Page 2

1         PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
          LLP
2         BY: DANIEL J. TOAL, ESQUIRE
          JULIE ROMM, ESQUIRE
3         1285 Avenue of the Americas
          New York, New York  10019
4         (212) 373-3869
          Attorneys for Defendant, ALPA
5
          KATZ & RANZMAN, PC
6         BY: DANIEL M. KATZ, ESQUIRE
          4530 Wisconsin Avenue N.W., Suite 250
7         Washington, D.C.  20016
          (202) 659-4656
8         Attorneys for Defendant, ALPA
9    Also present:  James Bateman, CLVS
10   Ricardo Cossa, Navigant Economics
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2    Witness                        Page
3    RIKK SALAMAT
4        By Mr. Toal                   6
5              E X H I B I T S
6
7    Marked for I.D.                Page
8    Salamat-1  Damages in Brady, et al      13
9        versus the Air Line Pilots
10       Association, dated October
11       12, 2012
12   Salamat-2  Copy of Rule 26 of the Rules   14
13       of Civil Procedure
14   Salamat-3  Supplementary Report on      23
15       Damages Under the Farber
16       Lists
17   Salamat-4  Document entitled           25
18       Supplementary Report on
19       Damages Under the Tannen
20       List
21   Salamat-5  Preliminary Calculation of   26
22       Mitigation of Damages in
23       Brady et al versus the Air
24       Line Pilot's Association
25   Salamat-6  Article entitled Persuasive   66

Page 4

1        Argumentation in Negotiation
2        by Katia Sycara
3    Salamat-7  Deposition transcript from   218
4        Don Carty
5    Salamat-8  Copy of testimony of Jeff    221
6        Brundage
7    Salamat-9  Memo from Baptiste & Wilder,   248
8        P.C. dated March 13, 2001
9    Salamat-10  August 6, 2001 memo from    256
10       Clay Warner to Seth Rosen
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      A      Well, you mean, the data -- like
2 seniority lists being very closely related to the
3 employment history and the agreement.  There --
4 there may have been some early versions of a
5 proposed fence in some of the -- some of the
6 proposals that had been passed back and forth
7 between the parties.  But in terms of the fence that
8 was finally implemented, it was the agreement and
9 the employment history.
10     Q      So you referenced proposals that had
11 been passed between the parties; correct?
12     A      Yes.
13     Q      Did you review proposals that were
14 passed between the parties?
15     A      I did.
16     Q      And the proposal that you reviewed, are
17 all of those reflected in your report?
18     A      Yes.
19     Q      And to the extent there is a proposal
20 out there somewhere that's not cited in your report,
21 can I assume that's something you didn't review?
22     A      Well, I -- I -- I only had the
23 proposals that I mentioned in the report.  So there
24 may have been others out there, but I only have the
25 ones that I had.

1      Q      And did you have any source of
2 information on proposals that were communicated
3 orally?
4      A      No.  Unless -- unless it was mentioned
5 in Mike Day's testimony.  But, you know, the
6 proposals that I based most -- the proposals that I
7 based my opinion on are the ones I had the text of
8 or some recording of.
9      Q      Did you make any assumptions in your
10 report about the pre-transaction career expectations
11 of the TWA pilots?
12     A      No.
13     Q      Did you make any assumptions in your
14 report about the pre-transaction career expectations
15 of the American Airlines pilots?
16     A      No.
17     Q      Did you make any assumptions in your
18 report about the leverage that the TWA pilots had in
19 negotiating with the APA?
20     A      Well, I -- I think the whole report is
21 about leverage that the TWA pilots could have had,
22 so you would have to be a little more specific in
23 your question.
24     Q      My -- my question is whether you made
25 any assumptions about the leverage that the TWA

1 pilots had.
2      A      That they actually had given the
3 circumstances?
4      Q      Yes.
5      A      I assume they had a small amount, but
6 I -- I really -- I'm not sure.  You would have to be
7 much more specific about what type of leverage
8 you -- you would be referring to, and maybe you
9 could ask me the question in a different way.  Maybe
10 I'm just --
11     Q      So I'm trying to understand -- I'm
12 trying to differentiate circumstances in which you
13 are offering an opinion or basing your -- your
14 opinions on some piece of evidence.
15     A      Uh-huh.
16     Q      And so I'm -- I'm asking about
17 assumptions that you made where you are just
18 assuming facts to be a certain way.
19     A      Uh-huh.
20     Q      And so my question was, with respect to
21 the leverage that the TWA pilots had in negotiating
22 with the APA, did you make any assumptions about the
23 amount of leverage they had in those negotiations?
24     A      I made some assumptions about the
25 amount of leverage that, for instance, the Bond bill

1 had on the negotiation.
2      Q      And what assumptions did you make?
3      A      My assumption was that by employing
4 that leverage, they were able to compel or convince
5 the APA to change their position.  That, I believe,
6 is the only assumption I made in regards to the TWA
7 pilots and leverage that they had.
8      Q      Did you make any assumptions about the
9 leverage that the TWA pilots would have had, had
10 ALPA conducted itself differently?
11     A      I did.
12     Q      And what assumptions did you make in
13 that regard?
14     A      I assumed they would have had more
15 leverage.
16     Q      Did you -- did you quantify the
17 increased leverage that you thought they would have?
18     A      Yes.
19     Q      And how did you do that?
20     A      I went through -- I employed a
21 methodology for basically decomposing the effect
22 that each additional point of leverage would have
23 had on the probabilities of achieving certain
24 outcomes.  So, for instance, the list that I call
25 the damage model, I estimated the extent at which

Page 57

1   each one of the points of leverage that ALPA could
2   have brought to bear would have had on increasing
3   the probability of that, meaning an outcome in
4   negotiations.
5       Q    So that the probabilities that you
6   associate with each ALPA action, were those the
7   product of an assumption?
8       A    Yes, they were.  They were the product
9   of an assumption and the product of, you know,
10  coming up with a -- a conservative value for the
11  effect of each one of those actions.
12      Q    And the probabilities that you
13  associate with each of those actions by ALPA, was
14  that something that was measured in any way?
15      A    Yes.
16      Q    And what did you do to measure the
17  probability that those actions would have a certain
18  affect?
19      A    Well, what I did to measure the
20  probability was to analyze each of the actions and
21  -- as best as I could understand what the impact of
22  those actions would have been on the negotiation
23  process, in terms of, would it have been able to
24  shift the APA's perception of an issue, their
25  commitment to an issue, and so on.  And then, for

Page 58

1   each one of those types of impacts that the action
2   could have had on the negotiation, assigning a
3   value, a percentage, you know, one, two, three
4   percent probability that particular action on
5   its own would have produced.
6       Q    And so my -- my question is, for each
7   of those elements of your analysis, how did you know
8   that the probability was 3 percent, versus
9   .3 percent, versus 30 percent?
10      A    Well, it was based largely on the
11  experience of the Bond bill and the impact that it
12  had on the negotiation.
13      Q    And what did the Bond bill tell you
14  about what the specific measurement of each -- each
15  action was?
16      A    Well, if I took the Bond bill at being
17  one action and, you know, how it would have affected
18  the negotiation a number of ways and it moved the
19  APA's position a certain amount, I then went
20  backward and said if that Bond bill could have done
21  that, then if we assume a significantly smaller
22  impact of these other actions, what would the
23  outcome likely have been?
24      Q    Did you have any other basis for -- for
25  assigning those probabilities other than what you

Page 59

1   just described?
2       A    Well, there was the basis -- there is
3   the -- I -- I think the Bond bill was probably the
4   most significant actual historical event that I had.
5       Q    So -- and was there anything else?
6       A    No.
7       Q    Did you do anything to test whether
8   your probabilities were accurate?
9       A    Other than mathematically?
10      Q    Yeah.  When you said that this event
11  has a 3 percent chance of influencing --
12      A    Uh-huh.
13      Q    -- perception, for example, did you do
14  anything to test whether that was right?
15      A    No.  There -- there would be no way to
16  test that.
17      Q    Are you aware of any methodology that's
18  generally accepted within your field of expertise
19  that allows you to determine what those particular
20  probabilities are in -- in any given situation?
21      A    I'm -- I'm not aware of any.
22      Q    Are you aware of the methodology that
23  you used to try and quantify the likelihood of an
24  agreement being reached being used at any time in
25  the past?

Page 60

1       A    Well, the article that I cited written
2   by -- by I believe it was Katia Sycara, who has a
3   computer model developed on -- developed to assess
4   the impact of negotiation, has a framework that is
5   used, that I actually adopted her framework for
6   analyzing the impact of particular arguments on a
7   negotiation, so that's --
8       Q    Does Professor Sycara's framework
9   involve attempting to quantify the likelihood of an
10  agreement being reached under a particular set of
11  circumstances?
12      A    It does attempt to test whether
13  particular arguments will be successful in reaching
14  an agreement.
15      Q    Could you answer my question?
16      A    Okay.  Well, can I ask you to ask your
17  question again?
18      Q    Sure.  Does Professor Sycara's
19  framework involve an effort to quantify the
20  likelihood of an agreement being reached?
21      A    Well, I believe her work could be read
22  that way.  I don't think it's what the model was
23  designed to do, but, I mean, to the extent that it
24  is attempting to assess the likelihood that a
25  particular argument is likely to be persuasive --

Page 69

1   confirm your understanding about the use of the
2   persuader model to evaluate the strength of
3   arguments?
4       A    No, I did not.
5       Q    Do you know whether the hierarchy of
6   arguments, according to their persuasive power, is
7   an input to the model or an output of the model?
8       A    Well, let's go through and look -- see
9   what she says.
10      Q    Can you state for the record which page
11  you are reviewing?
12      A    Right now I'm on 226.
13      And my understanding is that these arguments
14  are all inputs into the model.
15      Q    So if your -- your understanding is
16  that these arguments are inputs to the model --
17      A    Yeah.
18      Q    -- do you have any basis for saying
19  that one of the outputs or uses of the model is to
20  evaluate the strength of arguments?
21      A    I'm sorry.  Could you -- could you
22  repeat the question?
23      Q    Yeah.  So if your understanding is that
24  the arguments are inputs to the model, do you have
25  any basis for saying that one of the uses of the

Page 70

1   model is to evaluate the strengths -- the strength
2   of arguments?
3       A    I -- I believe that's what her software
4   does.
5       Q    As an output of the model?
6       A    I believe that that would be an output
7   of the model.
8       Q    Did you do anything to confirm that
9   understanding?
10      A    No, I did not.
11      Q    Did you use the persuader software
12  model in connection with your work?
13      A    No.  I just used the framework that she
14  outlined.
15          THE WITNESS:  Would it be okay to take
16  a break?
17          MS. RODRIGUEZ:  Sure.
18          VIDEO SPECIALIST:  The time is now
19  10:54 and this ends this number one.
20          (Brief recess.)
21          VIDEO SPECIALIST:  The time is now
22  11:07 and we are back on the video record.
23  BY MR. TOAL:
24      Q    Mr. Salamat, in your report do you make
25  assumptions about the APA's willingness to make

Page 71

1   further compromises?
2       A    Not their willingness, but their --
3   their -- I make assumptions about what would happen
4   given more pressure.  You can never speak about
5   anybody's willingness until they're in a situation
6   where that will has expressed itself, so --
7       Q    But you do make assumptions, if
8   circumstances had been different, what the APA's
9   willingness to make further concessions would have
10  been; correct?
11      A    That's correct.
12          MS. RODRIGUEZ:  I'm sorry, can you read
13  back that last question?
14          (The court reporter read back the
15      pending question as follows:
16      "Question:  But you do make
17      assumptions, if circumstances had been
18      different, what the APA's willingness to make
19      further concessions would have been;
20      correct?")
21  BY MR. TOAL:
22      Q    And do you make assumptions in your
23  report about how the APA would have responded to any
24  of the proposed actions by ALPA that you list in
25  your report?

Page 72

1       A    I -- I assume they would have
2   responded.
3       Q    And in what manner do you assume they
4   would respond?
5       A    I assume that given more pressure, that
6   they would have responded in a way that was more
7   fair.
8       Q    To whom?
9       A    To the TWA pilots.
10      Q    And so when you say more fair, you mean
11  more favorable to the TWA pilots; correct?
12      A    I mean more fair and more favorable to
13  the TWA pilots, yes.
14      Q    And do you consider yourself an expert
15  on fairness?
16      A    I do not consider myself an expert on
17  fairness.  I do consider myself an expert on, you
18  know, assessing whether particular seniority
19  integrations are more or less fair to a particular
20  group.
21      Q    And by virtue of what experience do you
22  have expertise on evaluating whether a particular
23  seniority integration is fair to a particular group?
24      A    I spent the last twelve years analyzing
25  seniority integrations and their impact on various

1    groups.
2        Q    And what criteria do you use to assess
3    whether a seniority integration is fair?
4        A    A variety.  Whether one group is able
5    to access the work that it brought to the merger is
6    a common one.  Whether people are able to keep their
7    jobs is generally the measure.  Everything else
8    being some form of variation of that.
9        Q    Have you seen in your work that, in
10   evaluating the fairness of seniority integration
11   lists that people look to, whether the integrated
12   list preserves the pre-transaction career
13   expectations of each pilot group?
14       A    That -- that would be common in -- in
15   mergers that people do that, yes.
16       Q    And is that one of the criteria you
17   look to in assessing whether a seniority integration
18   list is fair?
19       A    Not in this particular case, no.
20       Q    Why not in this particular case?
21       A    Because in this case, we weren't
22   looking at what people's premerger expectations
23   were.
24       Q    Why not?
25       A    Because we were looking at what the

1    impact would have been under different lists at
2    American Airlines, a merged carrier, and not what
3    expectations they necessarily had going into the
4    merger.  The only thing we looked at in terms of
5    that was what number of jobs they had going into the
6    merger.  We didn't do any forecasts on -- on what
7    would have happened had there not been a merger.
8    That's what you would typically do in a -- in a
9    seniority arbitration.
10       Q    And did you not think that criteria was
11   relevant in this particular case?
12       A    What the TWA pilots' un-merged career
13   expectations would have been?
14       Q    Pre-transaction career expectations of
15   each pilot group?
16       A    I didn't see how that would be
17   particularly relevant here.
18       Q    Why -- why didn't you think that would
19   be relevant here but relevant in other situations?
20       A    Well, because here the merger is a
21   given.  In other situations, not necessarily.
22       Q    What do you mean by that?
23       A    Well, in this case the two carriers did
24   merge.  They were merged under a particular
25   seniority integration, and so the exercise was to go

1    back and look and see what the history would have
2    been under a different seniority integration.
3        Q    Isn't it the case in any airline
4    combination that the airline pilots will be combined
5    and the question is what their pre-transaction
6    career expectations were?
7            MS. RODRIGUEZ:  Objection.
8            THE WITNESS:  If you are arguing, you
9    know, what a seniority integration should be, you
10   might.  But I wasn't arguing what a seniority
11   integration should have been.  I wasn't arguing what
12   seniority integration would have been fair.  I have
13   only argued, you know, I have only estimated what a
14   seniority integration that would have been income
15   optimal would have been, what I believe would have
16   been likely under other -- other sets of
17   circumstances.
18   BY MR. TOAL:
19       Q    I'm sorry.  You say you estimated what
20   a seniority integration would have been if it was
21   income optimal?  Is that what your testimony --
22       A    If it was income optimal.
23       Q    That's what you were estimating here?
24       A    I'm sorry?
25       Q    Is that what you were estimating here?

1        A    One of the things that I estimated
2    here.
3        Q    And which list reflects a list that
4    would have been income optimal?
5        A    I believe it is called the I optimal
6    list.  It might have also been referred to as the
7    fairness list.
8        Q    And what does the Salamat list
9    represent?
10       A    The Salamat list represents my best
11   estimate at what list would have been achieved in
12   negotiation had ALPA deployed all of the strategies
13   that it had available to it would have been.
14       Q    And you made that determination without
15   assessing the negotiating position of the APA; is
16   that correct?
17       A    Well, I -- I don't believe I said that,
18   but --
19       Q    Well, that's my question.  Did you make
20   that assessment -- did you take into consideration
21   the negotiating position of the APA when developing
22   the Salamat list?
23       A    I did.
24       Q    In what ways did you take into
25   consideration the negotiating position of the APA?

Page 77

1    A    The proposals that they had passed, the
2  response to the TWA's pilots proposal.
3    Q    And other than that, did you take into
4  consideration any other information concerning the
5  APA's position?
6    A    I think those would be the main things
7  I relied on.  There -- there was also, you know,
8  characterizations of the APA in their negotiating
9  position that was made in -- in closing arguments in
10  the -- the trial.
11    Q    Anything other than that?
12    A    No.  Just generally the record.
13    Q    And what characterizations of the APA
14  were you -- were you referring to that were made in
15  closing arguments?
16    A    Peter Fram talked about how difficult
17  it was to negotiate with the APA from the point of
18  view of the CEO of American Airlines, Compton, I
19  believe.
20    In Mike Day's testimony, he talked about how
21  they wouldn't respond to proposals that they had
22  made and were disinclined to negotiate in any
23  meaningful way during their facilitated
24  negotiations.
25    Q    And are you aware of any -- withdrawn.

Page 78

1    Did you rely on any information about what the
2  APA would have done had ALPA taken any of the
3  actions that you describe in your report?
4    A    I don't know what information I could
5  have relied on because ALPA didn't take those
6  actions.
7    Q    And did you have any information on
8  what ALPA would have done or what they said they
9  would have done had any of these actions been taken?
10    MS. RODRIGUEZ:  Objection to form.
11  ALPA?
12  BY MR. TOAL:
13    Q    I'm sorry.  Did you have any
14  information on what the APA would have done or what
15  they said they would have done had any of the ALPA
16  actions that you describe in your report been taken?
17    MS. RODRIGUEZ:  Objection.
18    THE WITNESS:  I -- I don't recall
19  coming across any information saying what the APA
20  would have or would not have done given any specific
21  action by ALPA.
22  BY MR. TOAL:
23    Q    So -- so is the answer to my question
24  that you didn't have any such information?
25    A    I don't believe I had any such

Page 79

1  information.
2    Q    Did you make any assumptions in your
3  report about the likelihood that American Airlines
4  would decide to walk away from the proposed
5  transaction with TWA?
6    A    The likelihood that American Airlines
7  would have walked away from the -- no.  I don't
8  believe I made any assumptions about that.
9    Q    Did you have any information about the
10  APA's view about TWA's financial condition at the
11  time of the transaction?
12    A    Yes.
13    Q    And what information did you have?
14    A    In their response to the TWA's rightful
15  place proposal, they characterized TWA's financial
16  position as -- as dismal at best.
17    Q    And did you have any information about
18  the APA's view of the pre-transaction career
19  expectations of the TWA's pilots?
20    A    I believe they didn't believe them to
21  be particularly desirable.
22    Q    Do you have an understanding that the
23  APA believed the TWA pilots to have poor career
24  expectations prior to the transaction?
25    A    Yes.

Page 80

1    Q    Did you have any information suggesting
2  to you that one of the factors the APA was relying
3  upon in proposing seniority integration was what the
4  pre--- pre-transaction expectations of each pilot
5  group were?
6    A    Yes.
7    Q    Did you have an understanding that the
8  TWA MEC was also, in its proposals, relying on its
9  views of what the pre-transaction career
10  expectations of both pilot groups were?
11    MS. RODRIGUEZ:  Objection.
12    THE WITNESS:  I don't believe I've seen
13  any comprehensive document where -- where the TWA
14  MEC characterized the financial condition of -- of
15  TWA.
16  BY MR. TOAL:
17    Q    Are you aware of any information
18  suggesting that the TWA MEC agreed that any
19  integrated list should preserve the pre-transaction
20  career expectations of each pilot group?
21    A    Well, to the -- to the extent that the
22  MEC's point of view is reflected in the Tannen
23  proposal, I assume they believed they had premerger
24  career expectations.  But other than in that form, I
25  don't -- I don't know that I've seen any documents

Page 81

1    that say what the MEC thought the future without an
2    American Airlines merger would have been.
3         Q    But I'm not asking you what the TWA MEC
4    thought TWA's financial condition was.  I'm asking
5    whether you have any information indicating to you
6    that the TWA MEC believed it was appropriate to take
7    into account the pre-transaction career expectations
8    of each pilot group in constructing a merged
9    seniority list.
10        A    To the extent that that is reflected in
11   the Tannen rightful place proposal, I believe it is.
12        Q    Did you do anything to test whether the
13   lists that you set forth in your report succeed in
14   preserving the pre-transaction career expectations
15   of each pilot group?
16        A    No, I did no work on the premerger
17   trans -- the un-merged expectations of either of
18   the pilot groups.
19        Q    And you considered that factor
20   irrelevant for your analysis; correct?
21        A    Yes.  I considered it irrelevant.
22        Q    And the reason you considered it
23   irrelevant was because it was a given at -- at that
24   stage that there was going to be a transaction; is
25   that right?

Page 82

1         A    What I took as a given was how many
2    positions each pilot had at the point when the two
3    airlines were merged.  Whether they would have
4    had -- the way in which we analyze premerger
5    expectations is to assume that the future is going
6    to remain more or less the same as it is at the
7    point the two airlines are merged, and so I could
8    theoretically have compared TWA's premerger
9    expectations to their career under American Airlines
10   Supplement CC list, but I didn't really see that
11   that would tell us anything because I wasn't
12   comparing their careers at American to their careers
13   at a stand-alone-TWA, or a TWA merged with another
14   airline, or a TWA under a different management.
15        Q    So what I was trying to understand
16   is --
17             MS. RODRIGUEZ:  Again, I'm going to ask
18   you -- he was not finished.  You -- you step on his
19   last words.
20             MR. TOAL:  He paused.  He threw me off.
21   So were you done with your answer?
22             THE WITNESS:  Let's just go on, yeah.
23   BY MR. TOAL:
24        Q    I was trying to understand why you
25   seemed to acknowledge that consideration of

Page 83

1    pre-transaction career expectations is relevant in
2    other cases and why you regarded it as irrelevant in
3    this case, and I thought you testified previously
4    that in this case the merger was a foregone
5    conclusion.  Was that your testimony?
6         A    Well, in this case we were looking at
7    the pilots' seniority under a given merger versus
8    what their -- what -- what their careers would have
9    been under a different seniority list in the same
10   merger, not in an un-merged or a premerger airline
11   would have been, so --
12        Q    How does that differentiate this case
13   from any other case in which arbitrators or others
14   take into account the pre-transaction career
15   expectations of each pilot group?
16        A    How does -- how does this case differ?
17        Q    How does that aspect of this case that
18   you regarded a transaction as being a foregone
19   conclusion at the time they were discussing
20   seniority integration, how does that differentiate
21   it from any other case in which pre-transaction
22   expectations of the pilot groups are taken into
23   consideration?
24        A    Well, perhaps I misspoke when I said
25   that earlier because, I mean, I don't think that it

Page 84

1    does actually differentiate this case from the
2    others.  What it differentiates is more of a
3    comparing.  In those other cases, you know, where --
4    where, for instance, I'm working with a -- with a
5    group that's going into a seniority arbitration, we
6    are comparing what their career under the merged
7    carrier will be to what their standalone career
8    expectations were.  So to the extent that they
9    brought X number of jobs with them, are they able to
10   continue to have access to those jobs under this
11   list in this merged airline?  That's not the
12   analysis that I'm doing in this case.  I'm not
13   comparing what -- whether their careers at American
14   are superior to or inferior to the careers that they
15   would have had at TWA as a standalone entity.
16   That's -- that's -- because I'm -- I'm -- we
17   wouldn't be arguing at an arbitration about what we
18   think the seniority integration should be --
19        Q    One of the things you are doing is
20   trying to assess whether the APA would have been
21   willing, under different circumstances, to make
22   additional concessions; correct?
23        A    That's correct.
24        Q    And you knew that the APA regarded the
25   pre-transaction career expectations as -- as a

1    factor in determining what seniority integration
2    would be appropriate; correct?
3         A     In every merger there is one group that
4    thinks the other groups has dismal career
5    expectations.
6         Q     So why would you regard the
7    pre-transaction career expectations of the pilot
8    groups as irrelevant when it was one of the factors
9    that the APA was taking into consideration?
10        A     Because at the end of the day the
11   premerger career expectations of pilots matters to
12   the extent that they brought X number of jobs with
13   them and not typically where -- what may or may not
14   happen with, you know, the company absent the
15   merger.  That stuff is argued.  In my experience, it
16   doesn't play any significant role in the outcome of
17   seniority integrations.
18        Q     And that's based on what experience?
19        A     Well, that's based on a review of the
20   seniority awards going back some years.
21        Q     And you haven't seen seniority awards
22   in which the arbitrators analyze the pre-transaction
23   career expectations of the pilot groups on -- on a
24   standalone basis?
25        A     They do discuss it, certainly.

1         Q     Have you seen situations in which
2    arbitrators say that's the predominant factor in
3    evaluating a seniority arbitration?
4         A     In arbitrations where you are dealing
5    with a liquidated carrier, not a liquidated carrier,
6    but a carrier that ceased to function, I've seen
7    that.
8         Q     Have you seen it in other situations?
9         A     Where a particular amount of weight was
10   placed on what?  You would have to be more specific.
11        Q     On the pre-transaction career
12   expectations of each pilot group.
13        A     Well, they are always based on the
14   premerger -- premerger career expectations in some
15   manner.
16        Q     How -- how do you define
17   pre-transaction career expectations?  What's
18   included in that assessment?
19        A     The amount of work that the pilot group
20   brought to the merger, how old that pilot group is,
21   whether the airline had been growing or shrinking,
22   whether it had operated in different markets.
23        Q     Anything else?
24        A     The financial health of the company.
25   Whether the -- whether the company was in or out of

1    bankruptcy.  Whether it was or was not operating.
2         Q     Anything else?
3         A     I think those would be the most common
4    ones.
5         Q     What about the -- the equipment that
6    each airline operated?
7         A     Well, when I said the job that they
8    brought to the merger, that's what I mean.
9         Q     And what do you know about TWA's
10   financial condition at the time of the American
11   Airline transaction?
12        A     They were in bankruptcy.  It was not
13   healthy.  But as I said, I didn't -- I did not
14   investigate or analyze their financial situation.
15        Q     Is that something you have the
16   expertise to do?
17        A     To assess their financial situation?
18        Q     Yes.
19        A     No.
20        Q     Did you undertake any analysis of the
21   equipment that TWA was operating prior to the time
22   of the transaction?
23        A     Other than to see how many positions
24   they had on different pieces of equipment, no.  I
25   don't know anything about, you know, the age or make

1    of -- of, you know, the particular aircraft they
2    were flying.
3         Q     Did you do anything to undertake an
4    analysis of the number of pilot jobs that TWA would
5    be bringing to a merged entity?
6         A     Some.
7         Q     What did you do in that regard?
8         A     I looked at how many pilot positions on
9    those -- those pieces of equipment were left as of,
10   I guess, 18 months after the merger.
11        Q     Did you do anything else?
12        A     No.
13        Q     Did you undertake any analysis of TWA's
14   viability as a going concern on a standalone basis?
15        A     No, I did not.
16        Q     Is that something that would be
17   relevant to the pre-transaction career expectations
18   of the TWA pilots?
19        A     No.  To the extent that they were still
20   operating as of the merger, no.
21        Q     What about if they were expected to
22   stop operating within a matter of months?  Would
23   that affect their pre-transaction career
24   expectations?
25        A     Not in my opinion, no.

Page 209

1    what -- why that movement occurred, and Sycara's
2    model was helpful for at least breaking down each
3    action into individual components, and then
4    estimating what each one of these actions would have
5    had on each one of those components.
6        Q     Well, these numbers reflect your
7    subjective judgments about probabilities; correct?
8        A     They do.
9        Q     And when I asked you if there is any
10   scientific methodology that you used to arrive at
11   these numbers, there was no scientific methodology
12   that you used to arrive at any of these numbers;
13   correct?
14       A     No empirical scientific methodology.  I
15   mean, the assumption of rationality and the reason
16   why you would assign a probability to these outcomes
17   all, of course, is a -- is simple probabilities,
18   basic math.  So you can't say no.  But is there -- I
19   mean, unfortunately there isn't any specific branch
20   of science that I'm aware of that would illuminate
21   this area meaningfully, so --
22       Q     Nor is there a branch of economics that
23   would illuminate this area; correct?
24       A     I don't believe there is, as being a
25   very specific situation.

Page 210

1        Q     And you are not an -- you are not an
2    economist, are you?
3        A     I'm not -- I would not call myself an
4    economist, no.
5        Q     I was a bit confused by one of your
6    prior answers where you -- I thought you first said
7    you were looking at, in coming up with your
8    probabilities, other arbitrations.  And then, later
9    in your answer I thought you changed your answer to
10   say you were actually looking at what happened with
11   respect to this particular transaction.  Which of
12   those were you looking at?
13       A     I'm -- I'm not sure which question you
14   are talking about.  Let's take the first one.  What
15   was the question?
16       Q     With respect to these probabilities,
17   were you trying to derive them based on what
18   happened in this particular negotiation or in other
19   arbitrations?
20       A     Both.
21       Q     Now, you talked about the APA movements
22   with regard to the Bond legislation.  Do you recall
23   that testimony?
24       A     Uh-huh.
25       Q     What analysis did you undertake to try

Page 211

1    and assess what, if any, movements the APA made with
2    respect to its proposals as a result of the Bond
3    legislation?
4        A     Based on the difference of the
5    composition of the two lists as it existed before
6    and after.
7        Q     And what did you do to try and assess
8    whether any movement was caused by the Bond
9    legislation?
10       A     Well, there was movement over that
11   period of time.  The assumption I made was that it
12   was the result of the Bond legislation.  My
13   understanding of the -- of the record was that it
14   was actually surely -- it was surely after a meeting
15   with Senator Bond that a new proposal from the APA
16   was presented and that a communication from Bond's
17   office to the TWA pilots was that the APA pilots had
18   a new proposal and that they were going to be
19   pleased, I believe, was how it was put.  And so,
20   given that it was based on all of the meetings
21   around the Bond legislation, my assumption is that
22   the two were connected and could, in theory, I
23   suppose, be a complete coincidence, but that doesn't
24   seem very reasonable.
25       Q     So that's an assumption that you made

Page 212

1    that movements during that period were caused by the
2    Bond legislation?
3        A     I think any reasonable person would
4    conclude that.
5        Q     Well, whether that's the case or not,
6    that's the assumption you made; correct?
7        A     That's correct.
8        Q     Other than that assumption, do you have
9    any other basis for concluding that any movements
10   during this period were caused by the Bond
11   legislation?
12       A     No.
13       Q     Do you have any information concerning
14   the APA's views about the likelihood that the Bond
15   legislation would become law?
16       A     I'm sorry.  Can I -- can I just get you
17   to -- do I have any --
18       Q     Do you have any information about what
19   the APA's views were about the likelihood that the
20   Bond legislation would -- would become law?
21       A     I -- I don't believe I have any
22   information about their views on that.
23            THE WITNESS:  Can we take a short break
24   here?
25            MR. TOAL:  Sure.

# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
          Plaintiffs,
   vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
          Defendant.

------------------
January 30, 2013
------------------
     Oral sworn continued videotaped
deposition of RIKK SALAMAT, Case Lab, Inc., 288
Clinton Street, Toronto, Ontario, was taken at the
law office of Archer & Greiner, 1650 Market Street,
Philadelphia, Pennsylvania, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:30 a.m., there being present:

GREEN JACOBSON, P.C.
BY: JOSEPH JACOBSON, ESQUIRE
7333 Forsyth Boulevard
St. Louis, Missouri  63105
(314) 862-6800
Attorneys for Plaintiff
TRUJILLO, RODRIGUEZ & RICHARDS, LLC
BY: LISA RODRIGUEZ, ESQUIRE
258 Kings Highway East
Haddonfield, New Jersey  08033
(856) 795-9002
Attorneys for Plaintiff

Page 2

1      PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
2  LLP
      BY: DANIEL J. TOAL, ESQUIRE
3      JULIE ROMM, ESQUIRE
      1285 Avenue of the Americas
4      New York, New York  10019
      (212) 373-3869
5      Attorneys for Defendant, ALPA
6      KATZ & RANZMAN, PC
      BY: DANIEL M. KATZ, ESQUIRE
7      4530 Wisconsin Avenue N.W., Suite 250
      Washington, D.C.  20016
8      (202) 659-4656
      Attorneys for Defendant, ALPA
9
     Also present:  James Bateman, CLVS
10  Ricardo Cossa, Navigant Economics
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          I N D E X
2  Witness          Page
3  RIKK SALAMAT
4    By Mr. Toal        4
5        E X H I B I T S
6
7  Marked for I.D.       Page
8  Salamat-11  Portion of deposition    20
9        transcript of Clay Warner
10  Salamat-12  Excerpt from the ALPA    38
11        administrative policies
12  Salamat-13  Supplement CC    178
13  Salamat-14  Deposition transcript of    188
14        John Darrah
15  Salamat-15  Arbitration decision of    231
16        George Nicolau
17
18
19
20
21
22
23
24
25

Page 4

1     VIDEO SPECIALIST:  The time is now 9:30
2  and we are back on the record.  Would the court
3  reporter please swear in the witness.
4     RIKK SALAMAT, having been duly sworn,
5  was examined and testified as follows:
6  BY MR. TOAL:
7    Q   Good morning, Mr. Salamat.
8    A   Good morning.
9    Q   Do you have your report in front of
10  you?
11    A   No, I don't.  Okay.
12    Q   So if you go back to figure one on page
13  two of your report --
14    A   Yes.
15    Q   -- the -- the third action that you
16  list that you say ALPA had available to it is
17  something you describe as denied July 2001 legal
18  strategy.  Sue American and APA.
19    Do you see that?
20    A   I do.
21    Q   What's your understanding of what that
22  legal strategy was?
23    A   My understanding was that that was a
24  strategy to bring a suit to compel American and APA
25  to have a fair integration process.

Page 93

1  pilots were preserved by any of your lists; is that
2  correct?
3      A    That's correct.
4      Q    Now --
5      A    But you can estimate it using the
6  fairness model.
7      Q    Now, directing your attention back to
8  page 223 of Sycara's article --
9      A    Yes.
10     Q    -- you see the second type of argument,
11 strategy that she identifies as potentially
12 accomplishing the first goal of changing the
13 importance of an issue is indicating a change in the
14 feasibility of the proposed goal?
15     A    Yes.
16     Q    Which of the strategies that you lay
17 out in your report that you say ALPA had available
18 to it were intended to indicate a change in the
19 feasibility of a proposed goal of the APA?
20     A    Well, if the proposed goal was to
21 staple X number of pilots, bringing additional
22 pressure and increasing the risk that the
23 negotiation could be taken out of their hands or
24 that others could be brought into the negotiation
25 would have to change the feasibility of that goal of

Page 94

1  stapling that number of pilots.
2      Q    So for purposes of (B), are you
3  identifying the proposed goal as stapling TWA
4  pilots?
5      A    If that was a proposal -- yes.
6      Q    Do you know if that was a goal of the
7  APA, to staple TWA pilots?
8      A    I believe it was -- it was derivative
9  to their goal, which was to make a merged seniority
10 list, and that some number of TWA pilots were going
11 to be at the bottom of the list as a -- as a result
12 of their -- their thinking about how to build the
13 list. I don't know if that was actually their goal.
14     Q    And which -- which of the ALPA actions
15 do you believe changed the feasibility of whatever
16 proposed goal you are identifying here?
17     A    I believe they would have all changed
18 the feasibility of that -- the proposed goal.
19     Q    So if you look at page 224 of Sycara's
20 article, first full paragraph, you see it says, the
21 second argumentation goal that a persuader might
22 select is to change the persuadee's assessment of
23 the proposed value of an issue.
24     A    Yes.
25     Q    The second goal can be affected by

Page 95

1  using the following strategies. (C), recall a
2  counterexample from persuadee's past behavior.
3      Q    Are any of the strategies that you identified
4  that ALPA had available to it intended to identify a
5  counterexample from APA's past behavior?
6      A    I -- I -- I don't think they would have
7  led to that direct result, no.
8      Q    And (D) says, recall examples of
9  similar peers that have accepted the same value for
10 the issue.
11     Q    Are any of the ALPA strategies that you
12 identify intended to recall examples from APA peers
13 that have accepted the same value for the issue?
14     A    Well, to the extent that all of those
15 strategies would have intensified the negotiation
16 and would have brought into the negotiation what
17 happens in other mergers, all of those precedents
18 are now there. And so, how other units have behaved
19 toward other pilots would certainly have done that.
20     Q    Well, how does -- how does the denied
21 April 2001 legal strategy of delaying purchase
22 relate to bringing in examples of similar peers that
23 have accepted the same value for the issue?
24     A    I don't know that it necessarily would
25 have directly, but we are assuming that that action

Page 96

1  would be one of the ones that would have contributed
2  to a better seniority outcome. One of the ways that
3  a better seniority outcome is going to be achieved
4  is by the APA having to consider what's been looked
5  at as fair and -- in other -- in other mergers. And
6  so, this is why I talk about, you know, a more
7  intensive negotiation being an education process.
8  If what you are proposing isn't being considered
9  fair, then, you know, you were forced to consider
10 what is thought of fair in other mergers. So I -- I
11 would say that pretty much any action would -- that
12 would intensify the negotiation would result to (D)
13 in some way or another.
14     Q    Are you aware of any instance in the
15 negotiating history between the TWA MEC and the APA
16 where either of the parties referenced the results
17 of prior seniority integrations?
18     A    I'm sure they must have, but I'm not
19 aware.
20     Q    Do you have any knowledge as you sit
21 here today that that happened?
22     A    That they looked at the circumstances
23 of any particular merger?
24     Q    Yes.
25     A    No, I'm not aware that they did that.

# EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
                    Plaintiffs,
        vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
                    Defendant.

------------------
January 31, 2013
------------------

        Continued oral sworn videotaped
deposition of RIKK SALAMAT, Case Lab, Inc., 288
Clinton Street, Toronto, Ontario, was taken at the
law office of Archer & Greiner, 1650 Market Street,
Philadelphia, Pennsylvania, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:36 a.m., there being present:

        GREEN JACOBSON, P.C.
        BY: JOSEPH JACOBSON, ESQUIRE
        7333 Forsyth Boulevard
        St. Louis, Missouri  63105
        (314) 862-6800
        Attorneys for Plaintiff
        TRUJILLO, RODRIGUEZ & RICHARDS, LLC
        BY: LISA RODRIGUEZ, ESQUIRE
        258 Kings Highway East
        Haddonfield, New Jersey  08033
        (856) 795-9002
        Attorneys for Plaintiff

Page 2

        PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
        LLP
        BY: DANIEL J. TOAL, ESQUIRE
        JULIE ROMM, ESQUIRE
        1285 Avenue of the Americas
        New York, New York  10019
        (212) 373-3869
        Attorneys for Defendant, ALPA
        KATZ & RANZMAN, PC
        BY: DANIEL M. KATZ, ESQUIRE
        4530 Wisconsin Avenue N.W., Suite 250
        Washington, D.C.  20016
        (202) 659-4656
        Attorneys for Defendant, ALPA

Also present:  Phil Roller, CLVS
Ricardo Cossa, Navigant Economics

Page 3

              I N D E X
Witness                           Page
RIKK SALAMAT
   By Mr.  Toal                    4
           E X H I B I T S

Marked for I.D.                  Page
Salamat-16   Copy of a document entitled    24
             Preliminary Calculation of
             Mitigation of Damages
             Revised, dated January 30,
             2013
Salamat-17   TWA pilot seniority            56
             integration summary of
             Supplement CC from APA's
             mergers and acquisitions
             committee dated December
             14, 2001

Page 4

 1        VIDEO SPECIALIST:  We are back on the
 2   video record.  The time is 9:36.  Would the court
 3   reporter, Jean Delaney, please swear in the witness?
 4        RIKK SALAMAT, having been duly sworn,
 5   was examined and testified as follows:
 6   BY MR. TOAL:
 7   Q      Good morning, Mr. Salamat.
 8   A      Good morning.
 9   Q      Mr. Salamat, one of the models you
10   present in your report is what you call an
11   arbitration model; correct?
12   A      That's correct.
13   Q      Take a look at page 14 of your report.
14   A      I have it.
15   Q      Okay.  You see the second to last
16   paragraph on the page.  You say, the second outcome,
17   referring to the arbitration, model is a best guess
18   as to what an arbitrator would have awarded given
19   the facts of the case; correct?
20   A      That's what I said.
21   Q      And was that accurate?
22   A      I think best guess is probably not the
23   best choice of words to be used there.  I mean, it's
24   not really a guess.  It is an estimation based on,
25   you know, the awards that have -- that were also

Page 5

1   mentioned in -- in the report, and my experience in
2   the arbitrations that I was involved in.  So best
3   guess is -- probably mischaracterizes my attempt to
4   estimate what the arbitrated list would be.
5       Q    How did you decide the arbitrations
6   that you would include in your analysis?
7       A    I included every arbitration I had
8   access to or every decision that I had access to
9   post-deregulation.
10      Q    Did -- did you review every arbitration
11  decision?
12      A    Every one that I knew of and that I had
13  an award for.  There were -- I -- I believe I
14  mention in here there may have been arbitration
15  awards between less than major carriers that I was
16  unaware of.  But from the library awards I have,
17  which I -- I believe to be comprehensive, I reviewed
18  all of them.
19      Q    So with respect to the list set forth
20  in figure eight of your report, in each of those
21  cases where you -- you indicate there is an
22  arbitrator, did you review each and every one of
23  those awards as part of your analysis?
24      A    I did review them.
25      Q    And did you read those --

Page 6

1       A    I'm sorry, you are on page --
2       Q    It is on page 21.
3       A    Oh, 21.  Yes.
4       Q    And did you read the arbitration
5   reports for each of those matters in their entirety?
6           MR. JACOBSON:  Object to the form of
7   the question.  Refers to arbitration reports.
8           THE WITNESS:  I did -- to say I read
9   them in their entirety would probably overstate the
10  -- the case.  I reviewed them looking for specifics
11  about the condition of the -- the un-merged
12  carriers, how the list was constructed, and anything
13  that in -- in the arbitrator's decision was stated
14  as -- as relevant to how they had put the list
15  together.  But some of the awards are quite
16  extensive and go through, you know, the history of
17  the carriers, and I didn't review those in any great
18  detail.
19  BY MR. TOAL:
20      Q    So when I asked if you reviewed each of
21  those awards in their entirety, the answer is no;
22  correct?
23      A    The answer would be no.
24      Q    And if you didn't review those awards
25  in their entirety, how did you -- how did you

Page 7

1   determine which transactions would be comparable to
2   the transaction between American Airlines and TWA?
3       A    Well, I -- I don't know that there is a
4   succinct answer to that.  I mean, could you ask me
5   the question again?
6           I'm sorry, the building that I was in last
7   night was just swaying at 1:00 in the morning and
8   woke me up, so I haven't had the greatest night's
9   sleep, so I'm not as sharp today as I would like to
10  be.
11      Q    The question is, if you didn't review
12  the arbitration awards in their entirety, how did
13  you determine which of the transactions discussed in
14  the awards were comparable to the transaction
15  between American Airlines and TWA?
16      A    Well, I reviewed the awards to the
17  extent that I could understand what the -- what the
18  state of the carriers prior to the transaction was.
19  The things that I was looking for was what was the
20  financial state of both of the carriers that went
21  into the merger, what type of equipment the carriers
22  were operating, what the difference in the types of
23  equipment the carriers were operating were, the
24  length of service, if any mention was made of it --
25  of the two carriers.  You know, anything that would

Page 8

1   characterize the -- the two contributing pilot
2   groups that went into the merger I reviewed.
3           Some of that stuff, you know, things such as
4   the operating history of the airlines, and, you
5   know, it is not infrequent that an award will say
6   Airline X was started in 1912 as a -- as a -- as a
7   bush pilot operation.  Over the following years --
8   and so -- much of that stuff I did not spend any
9   time reviewing.  I was concerned with the state of
10  the carriers at the point of the merger, and I
11  believe I reviewed all of the awards sufficiently to
12  understand that.
13      Q    And why did you -- why were you
14  concerned with the financial state of the carriers
15  at the time of the transaction?
16      A    Because that's what most -- that is
17  what's most relevant in how the awards are -- are
18  fashioned.  So whether one started as a bush airline
19  has -- has yet to be mentioned as a significant
20  factor in any award.
21      Q    Did you have any objective criteria for
22  determining whether a transaction was the subject of
23  an arbitration decision was comparable to the
24  American Airline/TWA transaction?
25      A    Did I have a criteria for analyzing the

1   comparability of -- of other mergers to this one?
2       Q       The question is if you had an objective
3   criteria.
4       A       Yeah.  The objective criteria was, were
5   the airlines operating at the time of the merger and
6   was one in financial distress, were the two key
7   criteria that I looked for.
8       Q       And what metric did you use to
9   determine if a carrier were in some financial
10  distress at the time of the transaction?
11      A       Whether the arbitrator mentioned that
12  one carrier was in financial distress of some sort.
13  Either -- most particularly, were they in
14  bankruptcy.  I mean, other -- some awards mentioned
15  that, for instance, Canadian Airlines was heading
16  towards bankruptcy but was not in bankruptcy and the
17  arbitrator made mention of that in the award, so --
18      Q       Did you do any independent analysis to
19  try to determine the financial condition of the
20  carriers at the time of the transaction?
21      A       I did not.
22      Q       And did you do any independent analysis
23  to try to determine if either of the carriers was in
24  financial distress at the time of the transaction?
25      A       No.  I relied entirely on the

1   arbitrator's report -- award.
2       Q       And do you have any expertise in
3   predicting the results of arbitration decisions?
4       A       Do I have any expertise?  I would say I
5   am more experienced in -- in estimating that than --
6   than many.  I don't know how you would actually
7   qualify someone as an expert in estimating the
8   outcome.  I've been involved in several.  I've
9   worked with several arbitrators to construct their
10  awards.  So I would say I have significantly more
11  expertise than your average person.  But, again, I
12  don't know what the objective criteria for -- for
13  qualifying someone as an expert in estimating
14  seniority awards would be.
15      Q       And you said yesterday that you had
16  been involved in I believe three arbitrations
17  involving pilot seniority integration disputes;
18  correct?
19      A       Directly involved in the -- in the
20  seniority arbitration, that's correct.
21      Q       Have you been indirectly involved in
22  others?
23      A       Yes.
24      Q       In which others?
25      A       Air Canada/the connectors.  I was

1   involved in the class action suit arising from the
2   non-seniority integration of the connector pilots to
3   Air Canada.  I was indirectly involved in -- well,
4   there was this case which, of course, I'm indirectly
5   involved in the seniority integration.  I think
6   those with the -- I believe there is another but I
7   can't recall it off the top of my head.  But, again,
8   it wouldn't have been -- well, I mean, there has
9   been other seniority integrations not involving
10  pilots, I guess is --
11      Q       Those are the ones you can think of as
12  you sit here right now that involved pilots?
13      A       Yes.
14      Q       Are you offering any sort of opinion in
15  your report about TWA's financial condition at the
16  time of the transaction with American Airlines?
17      A       I am not, other than stating what I
18  believe are -- are facts that came right out of the
19  closing of -- of Allen Press, and Mike Day, and
20  what's generally known that TWA was in bankruptcy at
21  the time of the transaction.
22      Q       Did you do any independent analysis to
23  try to determine what TWA's financial condition was
24  at the time of the American Airlines transaction?
25      A       I did not.  I believe I said that a few

1   times, but --
2       Q       Another of the lists that you presented
3   in your analysis is what you called Supplement CC
4   plus 200; correct?
5       A       That's correct.
6       Q       And how did you select 200 as the
7   number to use in that list?
8       A       It was largely based on the last move
9   that the APA made having involved changing the
10  staple point by 300-and-some odd numbers.  So I
11  assumed that if that would have been their movement
12  on their own without any of the additional pressure
13  from ALPA brought to bear, that somewhat less than
14  350 would be the minimal possible move that would
15  have occurred had ALPA brought all those other forms
16  of pressure to bear on the negotiation.  So less
17  than the APA was -- had done on their own.
18      Q       Did you use any sort of methodology to
19  arrive at the 200?
20      A       No.  That just seemed the most
21  probable.
22      Q       And it seemed probable to you because
23  previously the APA had decreased the number of TWA
24  pilots it was proposing to staple by 316?
25      A       Well, I thought the most probable would

Page 53

1      A    That is one possible outcome.
2      Q    And you are not offering --
3      A    You also --
4      Q    You are not offering an expert opinion
5   that that would have happened; correct?
6      A    I am not offering an expert opinion
7   that that would necessarily have happened.
8      Q    And you -- and you are not assessing
9   any probability that negotiations would have been
10  concluded prior to September 11th, are you?
11     A    I'm not.  I'm also not offering any
12  evidence on how far the negotiation would have
13  proceeded and how many issues would have been agreed
14  to by the time 9/11 occurred.  We are talking about,
15  you know, a negotiation process that would have
16  occurred more intensively had ALPA not been in
17  breach.  Where it would have been by September 11th,
18  I cannot say.  I can't offer an opinion on that.
19     Q    Does your analysis take into account
20  any impact that the events of 9/11 and their effect
21  on the airline industry had on the negotiations
22  between the APA and the TWA MEC?
23     A    Sorry.  Can you say the question again?
24     Q    Yeah.  The question is, does your
25  analysis take into account any impact that the

Page 54

1   events of 9/11 and their effect on the airline
2   industry had on the negotiations between the APA and
3   the TWA MEC?
4      A    Well, as I said, I -- I -- I believe it
5   does.  You know, whether 9/11 would have been
6   relevant to the negotiation depends on whether the
7   negotiation was completed before 9/11 or whether
8   negotiations were in their final stage before 9/11.
9   The largest move that the APA made was after 9/11
10  so, you know, it was -- it was -- it's a reality I
11  took into consideration.
12     Q    Did you take into consideration that
13  the events of 9/11 and their aftermath made the
14  prospect of furloughs significantly more likely?
15     A    I did.
16     Q    And in your list, when you suggest that
17  fewer TWA pilots should have been stapled, you are
18  at the same time saying that more American Airlines
19  pilots should have been exposed to furlough;
20  correct?
21     A    That's correct.
22     Q    And you think that's something the APA
23  could have been persuaded to do had ALPA pursued the
24  actions you list in your report; correct?
25     A    Yes.

Page 55

1      Q    And you don't have any specific
2   information that the APA was prepared to expose more
3   American Airline pilots to furlough than it did;
4   correct?
5      A    I have only the understanding that the
6   APA wanted to be fair and reasonable.  So whether --
7      Q    So could you answer --
8      A    -- whether they would have been willing
9   to furlough more American Airlines pilots in the
10  absence of ALPA's breach, I believe they would have.
11     Q    My question is, do you have any
12  information, any evidence that you are aware of in
13  this case that the APA was willing to expose more
14  American Airlines pilots to furlough in the wake of
15  9/11?
16     A    Well, the largest move on the staple at
17  the bottom of the list was after 9/11, so I have
18  some evidence.
19     Q    My question is, do you have any
20  evidence that the APA was willing to expose more
21  American Airline pilots to furlough relative to the
22  ones that were exposed in Supplement CC?
23          MR. JACOBSON:  Objection.  Asked and
24  answered, I believe.
25          THE WITNESS:  Their largest move on the

Page 56

1   bottom staple was after 9/11, so, yes.
2   BY MR. TOAL:
3      Q    And do you have any evidence beyond
4   that?
5      A    No.
6          THE WITNESS:  Could we take five
7   minutes?
8          MR. TOAL:  Yeah.  Go off the record.
9          VIDEO SPECIALIST:  The time is 10:53.
10  Off the record.
11          (Brief recess.)
12          VIDEO SPECIALIST:  This begins tape
13  number two.  The time is 11:12 a.m.  We are back on
14  the record.
15          (Salamat-17  TWA pilot seniority
16          integration summary of Supplement CC from
17          APA's mergers and acquisitions committee
18          dated December 14, 2001 marked for
19          identification.)
20  BY MR. TOAL:
21     Q    Mr. Salamat, I show you a document
22  entitled a TWA pilot seniority integration summary
23  of Supplement CC from APA's mergers and acquisitions
24  committee dated December 14, 2001.  I mark this as
25  Salamat Exhibit-17.

Page 57

1     Let me know if this is a document you've seen
2   before.
3     A     I don't believe I have.  Give me a
4   moment.  No.  I don't believe I've ever seen this
5   document.
6     Q     Okay.  Let me direct your attention to
7   page 8754 using the pages at the bottom right.
8     A     I have it.
9     Q     Okay.  You see in the paragraph at the
10   bottom of the page it says, last sentence, at the
11   same time, the two merger committees did agree on
12   the basic guidelines for a fair integration, and
13   carrying over onto the next page, first bullet point
14   says, fair integration should preserve the career
15   expectations of the members of each pilot group, the
16   pre-transaction expectations at the time the
17   transaction was entered into.
18     Do you see that?
19     A     I do.
20     Q     If you in your analysis had used the
21   definition of reasonableness that required
22   preservation of the pre-transaction career
23   expectations of each pilot group, would that have
24   affected your analysis?
25     A     Well, I did, first of all, the

Page 58

1   pre-transaction expectations at the time the
2   transaction was entered into.  So, you know, this
3   is -- this is the issue that comes up in every
4   seniority arbitration and what people's expectations
5   were pre-transaction.  And so it's been considered
6   in all of those that I've been involved in and it
7   was considered in this one.
8     Q     Did you consider how your Salamat list
9   affected the career progression of American Airlines
10   pilots?
11     A     To the extent that I compared each
12   model I looked to to the income optimal model, yes.
13     Q     Did you compare whether the Salamat
14   damage model would have slowed the career
15   progression of American Airlines pilots relative to
16   what it would have been prior to the transaction
17   between American Airlines and TWA?
18     A     I did.
19     Q     And what assessment did you reach about
20   whether the Salamat damage model would have slowed
21   the career progression of American Airlines relative
22   to the progression they would have had at American
23   Airlines absent the transaction?
24     A     Well, the income optimal model which
25   gives pilots sufficient seniority to hold the

Page 59

1   position they have will be a -- a generally good
2   proxy for a list which optimally assigns pilot
3   seniority numbers according to their career
4   progression.
5     Now, there is a dynamic issue to this which
6   says, will pilots be able to progress as fast as
7   they would otherwise?  Given that the TWA pilots
8   were largely older than the American Airlines pilots
9   in the seniority list where they were -- were
10   grouped under the Salamat model and, in fact, all of
11   these models, except specifically for the income
12   optimal model, I know as an absolute fact that the
13   only way the TWA pilots could have slowed the
14   progression of any American Airlines pilots would,
15   for them, younger TWA pilots would have been grouped
16   ahead of older American Airlines pilots, and that
17   wasn't the case under any of the lists.
18     So I know that as a fact, that -- that none of
19   these lists would have slowed the American Airlines
20   pilots.  So we have two things we looked at, a
21   comparison to the income optimal list and just a
22   comparison of the demographics of the two lists.
23     Q     And what's the income optimal list?
24     A     That would be called the -- the
25   fairness list.

Page 60

1     Q     Do you have an understanding that the
2   most junior American Airlines pilot hired prior to
3   April of 2001 was a gentleman named B.D. White?
4     A     That name sounds familiar.
5     Q     And do you have an understanding that
6   the APA's proposals regarding seniority integration
7   were based on an assessment of the career
8   progression of B.D. White?
9     A     I -- I -- I know that their conditions
10   and restrictions were tied to that individual.
11     Q     Do you have an understanding that their
12   seniority numbers were tied to that individual?
13     A     Sorry.  I'm -- I'm -- I'm not sure what
14   you are -- you're asking me.
15     Q     Do you have an understanding that the
16   manner in which the APA constructed the list that it
17   proposed Supplement CC was based on the anticipated
18   career progression of B.D. White?
19     A     I was unaware of that fact.  It doesn't
20   surprise me, but I was -- I was not aware of that
21   fact.
22     Q     Why does it not surprise you?
23     A     Because B.D. White was tied to the
24   sunset clause for bidding restrictions.
25     Q     Did you assess whether your Salamat

Page 93

1    order to create a merged group, the American
2    Airlines Pilots.  It also picked a staple -- I'm
3    sorry -- a first insertion point at the top of the
4    list that gave the APA credit for the larger
5    equipment that they had, a transaction date.  So in
6    both of those ways I believe it was taken into
7    account.
8         Q     Any other way that you can think of as
9    you sit here today?
10        A     No.
11        Q     Also referenced in this bullet point is
12   differences based on the nature of the carrier's
13   pre-transaction operations.  Do you see that?
14        A     Yes.
15        Q     Does your Salamat damage model take
16   into account differences based on the nature of
17   TWA's and American's pre-transaction operations?
18        A     Well, the nature of their
19   pre-transaction operations, the way I understand it,
20   and the way it was factored into my model was that
21   the APA pilots were operating large wide-body
22   aircraft, and so the treatment of the top of the
23   list was consistent with that, so --
24        Q     Does it take into account those
25   differences in any other way?

Page 94

1         A     Okay.  Again, by using a discounted
2    number of positions for the TWA pilots.
3         Q     Any way other than that?
4         A     No.
5         Q     Also referenced here are differences in
6    pre-transaction pay benefits and working conditions.
7    Do you see that?
8         A     Yes.
9         Q     Does your Salamat damage model take
10   into account differences in pre-transaction pay,
11   benefits, and working conditions between the
12   American and TWA pilots?
13        A     No.  Only the number of positions that
14   they had.
15        Q     Also referenced here are differences in
16   the pre-transaction, long-term job security based on
17   the carrier's financial condition.  Do you see that?
18        A     By using the later date, having
19   rationalized the TWA fleet as the baseline for
20   counting the number of positions that TWA brought to
21   the merger, yes.
22        Q     So is it your testimony that your
23   Salamat damage model takes into account
24   pre-transaction, long-term job security based on the
25   carrier's financial condition in that way?

Page 95

1         A     Yes.
2         Q     Does it take into account those
3    differences in any other way?
4         A     No.
5         Q     Have you formed a view as between
6    American Airlines and TWA prior to the transaction,
7    which pilot group had better long-term job security?
8         A     No, I've not.
9         Q     Are you able, based on the information
10   you are aware of, to form a view about which pilot
11   group, prior to the transaction, had better
12   long-term job security?
13        A     Well, if I was a betting man, I would
14   have bet on American Airlines.  But, you know, as I
15   say, I haven't done any financial analysis of the
16   two carriers.  But the fact that TWA was in
17   bankruptcy and American Airlines wasn't would make
18   me think that the American Airlines pilots had a
19   greater chance -- had -- had greater job security
20   than the TWA pilots did.
21        Q     Do you have any basis for saying which
22   pilot group, prior to the transaction, was at
23   greater risk of furloughs?
24        A     I would have to say that the TWA pilots
25   were at greater risk of furlough.

Page 96

1         Q     Do you have any understanding of which
2    pilot group had higher pay rates?
3         A     It's my understanding that the American
4    Airlines pilots had higher pay rates.
5         Q     In the second bullet point, the APA
6    says that the TWA pilots' rightful place proposal
7    credits the TWA pilots for assets which were not
8    acquired by American and for other assets which will
9    not be deployed in the consolidated operation.
10        Do you see that?
11        A     I do.
12        Q     Did you analyze the extent to which the
13   TWA pilots' rightful place proposal credited the TWA
14   pilots for equipment that either would not be
15   accepted by American or would not be deployed in the
16   consolidated operation?
17        A     Did I analyze the rightful place
18   proposal?
19        Q     Did you analyze the extent to which the
20   rightful place proposal credited the TWA pilots for
21   equipment that American Airlines either wouldn't
22   acquire or wouldn't ultimately deploy?
23        A     Well, my understanding is that the --
24   the rightful place proposal credited the TWA pilots
25   with all of the equipment that they had as of

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)


PATRICK BRADY, et al.,

                              Plaintiffs,

          vs.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
                              Defendant.


                  ------------------

                  January 22, 2013

                  ------------------

                    Oral sworn deposition of HENRY
FARBER, ASHFELTER & ASHMORE, 32 Nassau Street,
Princeton, New Jersey  08540, was taken at the law
office of Archer & Greiner, 700 Alexander Park,
Princeton, New Jersey, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 9:43 a.m., there being present:

          GREEN JACOBSON, P.C.
          BY: ALLEN P. PRESS, ESQUIRE
          7333 Forsyth Boulevard
          St. Louis, Missouri  63105
          (314) 862-6800
          Attorneys for Plaintiff

          TRUJILLO, RODRIGUEZ & RICHARDS, LLC
          BY: LISA RODRIGUEZ, ESQUIRE
          258 Kings Highway East
          Haddonfield, New Jersey  08033
          (856) 795-9002
          Attorneys for Plaintiff


     D E G N A N  &  B A T E M A N ,  I N C.

1    mean difference statistic.  And so -- so I tasked my
2    people with reading those reports, looking for other
3    documents that could help give us the information on
4    merger by merger of both the background and the
5    outcome.
6    Q    How much time did you personally spend
7    reviewing these documents?
8    A    Without consulting my time sheets, I
9    couldn't tell you exactly how many hours I did.
10    Q    And what's your best estimate, as you
11    sit here today?
12    A    Two or three days.
13    Q    And how long were those days?
14    A    My days are normal days, you know eight
15    hours, nine hours, ten hours sometimes.
16    Q    And how much time --
17    A    When I was younger, my days were
18    longer.
19    Q    How much time did you spend on this
20    engagement overall, personally?
21    A    This past year?
22    Q    From the time you were retained until
23    --
24    A    -- this morning.
25    Q    Until today.

1    A    I can tell you that it's less than ten
2    days, more than three days -- more than three days.
3    Q    And with whom did you work when you
4    referred to members of your staff?
5    A    Okay.  I work with a small firm in
6    Princeton called Ashenfelter and Ashmore, and David
7    Ashmore is a principal of that firm, and he is -- is
8    -- the way -- let me tell you how we operate.
9    Basically, I'm the expert.  He runs the day-to-day
10    under my direction, and we -- and then we have a
11    staff of three Ph.D. economists.  Actually over the
12    time period this has gone on for a while, probably
13    there were four staff economists involved who did
14    the work under my oversight, David's day-to-day
15    supervision, collecting information, you know,
16    putting it in the spreadsheet, doing the calculated
17    we wanted.  You know, I would meet with the staff
18    regularly to talk about where we were, ask
19    questions.  I'd look at documents that they thought
20    were ambiguous to help them out and so on.
21    Q    Okay.  Other than the documents listed
22    on appendix B to your report, did you consider any
23    other documents?
24    A    Not that I recall sitting here now.  I
25    mean --

1    Q    And --
2    A    It's hard.  You know, it wouldn't
3    surprise me that there is something that somehow I
4    looked at didn't make it on the list, but we tried
5    to be quite careful about that.
6    Q    Did you have access to other documents?
7    A    Well, we all have access to the web.
8    I'm not sure what you mean.
9    Q    Did you have other -- access to other
10    documents related to this case?
11    A    I don't -- I don't quite know how to
12    answer that.  You are asking me, do I have access to
13    things I didn't look at so they didn't make it into
14    this report?
15    Q    Yeah.
16    A    I don't know.  I assume so because I
17    presume I could have asked for some things that I
18    didn't think of, and, you know, TWA pilots'
19    attorneys might have been able to give it to me, for
20    example.  I don't know.  Maybe there is some legal
21    documents.  I just don't know.
22    Q    Well, who -- who determined the
23    documents to which you would have access?
24    A    Well, as these things generally go, TWA
25    pilots and lawyers, when they retained us, started

1    us off with some documents that they thought we
2    ought to look at, the complaint and so on, and the
3    jury award.  You know, as we know, TWA has already
4    been found guilty of their duty of fair
5    representation, of violating their duty of fair
6    representation.  And we then said we need these
7    arbitration awards.  As I understand it, counsel for
8    APA, or APA through counsel -- through counsel
9    provided us with arbitration awards.  I think that's
10    right.  I'm sure we got them indirectly through the
11    TWA pilot attorneys.  We say we need arbitration
12    awards, and they say, okay, we know where to get
13    those for you, and they got them.  And then we did
14    some web searching to find outcomes of some other
15    cases that -- and so on.  So --
16    Q    Did you ask for any documents that you
17    weren't able to get access to?
18    A    No.  Not that I recall, I should say.
19    Not that I recall.  This is not a case where I felt
20    very frustrated by lack of availability of things.
21    Q    And you don't have a recollection of
22    asking for any other documents?
23    A    No.  That's correct.  That's correct.
24    Q    Did you review any of the filings in
25    TWA's bankruptcy proceeding?

Page 75

```
 1      A    No.
 2      Q    Did you think that would be relevant to
 3  your analysis?
 4      A    I've -- I've never seen a bankruptcy
 5  filing.  I'm not sure what's in them.  So it's --
 6  no.  I don't think so, no.
 7      Q    Was TWA's financial condition at the
 8  time of the transaction with American relevant to
 9  your analysis?
10      A    Yes.
11      Q    In what way?
12      A    A part -- one of the factors we
13  considered in choosing comparable merger lists was
14  the financial condition of the acquired carrier.
15  And as a result, in order to make them comparable,
16  we tried to find cases where -- with some, at a
17  crude level, similarity with TWA's financial
18  condition.  So, of course, TWA's financial condition
19  was relevant.
20      Q    And if you had determined that TWA was
21  either not flying at the time of the transaction or
22  that it imminently would not be flying, would that
23  have affected your analysis?
24      A    Potentially.
25      Q    In what way?
```

Page 76

```
 1      A    I don't know.  I didn't do that
 2  analysis.
 3      Q    But would it have -- have affected the
 4  other transactions that you viewed as comparables?
 5      A    Potentially, yes.
 6      Q    Potentially or actually?
 7      A    I would have to look at the list, but I
 8  assume it would change at least some of the
 9  comparables, yes.
10      Q    And did you make determinations in your
11  report based on which airlines either were not
12  flying or were at imminently at risk of not flying
13  on the one hand, and airlines that were in a
14  weakened financial condition but still flying and
15  expected to continue flying for the foreseeable
16  future?
17      A    I -- I -- I don't know what you mean by
18  foreseeable future, but were not imminently going to
19  shut down.  But were -- I mean -- I don't know what
20  it means to fly for the foreseeable future, but I
21  did make distinctions like that, yes.
22      Q    And if you had determined that TWA was
23  at risk of imminent grounding of its planes, would
24  that have caused you to shift the group of
25  comparables from those where the -- the airlines
```

Page 77

```
 1  either were not flying or imminently were expected
 2  not to fly?
 3           MR. PRESS:  Objection.  That's been
 4  asked and answered.
 5           MR. TOAL:  I didn't finish my question.
 6  BY MR. TOAL:
 7      Q    Would that have led you to change your
 8  comparables to the group that was either not flying
 9  or imminently expected not to fly?
10           MR. PRESS:  I object to form.  That's
11  been asked and answered.
12           THE WITNESS:  I -- I never created such
13  a group, but it would have certainly shifted --
14  would have likely shifted the set of comparables,
15  yes.
16  BY MR. TOAL:
17      Q    Did you ever calculate what the
18  proportional difference in mean ranks was for those
19  airlines where the acquired airline was either not
20  flying or was expected imminently not to be flying?
21      A    Well, table one contains the
22  proportional mean difference -- the proportional --
23  the proportional mean difference for all of the
24  airlines we were able -- for which we were able to
25  calculate it, but I never grouped them in the way
```

Page 78

```
 1  you are suggesting.
 2      Q    Take a look at table one of your
 3  report.  This is right after your signature page.
 4      A    Yes, yes.
 5      Q    Now, of this group, which of the
 6  acquired airlines on this list fall within the
 7  category of not flying at the time of the
 8  acquisition or expected to stop flying imminently?
 9      A    I -- I -- I honestly -- I want to say
10  Lynx, but beyond Lynx, I'm not sure.  I don't -- I
11  haven't memorized their status.
12      Q    Did you ever do an analysis of how the
13  proportional difference in mean rank for the
14  American Airline/TWA transaction compared to those
15  in which the acquired airline either was not flying
16  or was expected to stop flying imminently?
17      A    No.
18      Q    As you look at this chart, are you able
19  to make a determination about how the proportional
20  mean difference in ranks for TWA/American Airlines
21  would compare to those other airlines -- those other
22  transactions?
23      A    No, no.
24      Q    Do you agree that the proportional mean
25  rank for the American/TWA transaction is roughly
```

Page 131

1  substantial, and there was -- I relied here on a
2  presentation by American which outlined the -- the
3  assets that TWA was going to bring to the -- to the
4  merger.
5      Q     And did you identify any transactions
6  in which you felt the acquiring -- the acquired
7  airline was not bringing assets of substantial value
8  to the transaction?
9      A     I believe there were some.
10     Q     And which ones can you recall?
11     A     I don't recall which ones they were,
12 but that a reason -- that would be a reason for it
13 not to be included as a comparable transaction.
14     Q     Did you do any analysis of what the
15 value, in fact, was to American Airlines of TWA's
16 assets?
17     A     No.
18     Q     Did you develop any metric to assess
19 the value of the assets that the acquired airline
20 was bringing to a merger?
21     A     No.
22     Q     Do you have the expertise to do that?
23     A     That depends on the nature of the
24 asset.
25     Q     With respect to which assets would you

Page 132

1  be able to assess the value of what the acquired
2  airline is bringing to the table?
3      A     Well, for example, if they own
4  equipment of particular types, there is a market for
5  equipment and I can value the equipment at market
6  value. To the extent there is markets in slots at
7  particular airports, that's a little harder, then I
8  begin to need someone with more expertise in the
9  airline industry to tell me what TWA's gates at JFK
10 were worth, for example, or what, if there are in a
11 dominant position in St. Louis, was worth. That
12 sort of thing.
13     Q     And you didn't undertake any efforts to
14 actually do that in this case; correct?
15     A     No. I -- my -- my -- it was -- I did
16 not quantify those. That's correct.
17     Q     Were you asked to make any assumptions
18 about what leverage TWA had in the negotiations
19 concerning seniority integration?
20     A     No.
21     Q     Did you make any assessment of the
22 leverage that TWA -- the TWA MEC had on the one hand
23 and the APA had on the other hand in the
24 negotiations concerning seniority integration?
25     A     Did I -- did I make any assumptions,

Page 133

1  you are asking me?
2      Q     Did you make any assessment?
3      A     An assessment, no.
4      Q     Would that have been relevant to your
5  analysis, what the bargaining leverage of each side
6  was?
7      A     Well, the -- the -- the -- the
8  situation was tainted by the fact that ALPA shirked
9  its duty of fair representation, so that what I
10 observed as the bargaining leverage would not be an
11 indication of something that would exist absent that
12 bad behavior.
13     Q     Did you try to make any assessment of
14 what bargaining leverage TWA, the TWA MEC would have
15 had relative to the APA in the absence of any breach
16 by ALPA?
17     A     Yes.
18     Q     And what -- how did you go about
19 conducting that assessment?
20     A     That was simply my -- my analysis. My
21 analysis showed that the TWA pilots would have done
22 much better on a merged list. That's an assessment
23 of relative bargaining power.
24     Q     So -- and my -- my question is really
25 focused on, not the outcome of the negotiations, but

Page 134

1  whether you did any assessment of the bargaining
2  leverage that each side had in the negotiations
3  absent any breach by ALPA.
4      A     No.
5      Q     In paragraph three of your report, page
6  two, you say, at the time of the purchase, referring
7  to the American Airline asset purchase, TWA was weak
8  financially, but was still flying planes and entered
9  bankruptcy as a condition of its deal with American.
10 Do you see that?
11     A     Yes.
12     Q     Do you know whether American -- whether
13 -- withdrawn.
14     Do you know whether TWA would have entered
15 bankruptcy in the absence of any deal by American
16 Airlines?
17     A     No.
18     Q     Would that be relevant to your
19 analysis?
20     A     No.
21     Q     Why not?
22     A     Because what I was interested in was
23 whether TWA would continue to fly and not whether
24 they were -- whether they were bankrupt or not, had
25 filed for bankruptcy or not.

Page 135

1      Q      And other than -- any information you
2    had concerning proposals by Carl Ichan, did you do
3    anything else to determine whether TWA would have
4    been in a position to keep flying absent the
5    American transaction?
6      A      All I -- I read that article by the
7    economist at Tuck who argued that there were other
8    sources of cash for TWA, as well, and --
9      Q      Anything other than that?
10     A      No.
11     Q      And do you have the expertise to
12   determine whether an airline is likely to cease
13   flying within any given period of time?
14     A      If I put my mind to it, I'm sure I
15   could do that.
16     Q      And how would you do it?
17     A      I don't know.  I would have to put my
18   mind to it.
19            I would have to, you know, look at their
20   financial situation, you know, what their cash flow
21   looked like, what their revenues, fixed expenses,
22   and so on, projections for -- for passengers.  It is
23   not something I have ever done.  It would take me a
24   very long time to do, but you just asked me if I had
25   the expertise to do it, and, essentially, what I'm

Page 136

1    saying is I could develop the expertise to do that.
2      Q      As you sit here today --
3      A      I don't not have the expertise, sitting
4    here.
5      Q      What would be sufficient to persuade
6    you that, absent an American Airlines transaction,
7    that TWA was likely to cease operations?
8      A      Soon.
9      A      Soon.
10     A      I don't know.
11     Q      Are you offering any opinion here about
12   what would have happened to TWA in the absence of a
13   transaction with American Airlines?
14     A      No.
15     Q      And are you offering any opinion about
16   what would have happened to the TWA pilots in the
17   absence of a transaction with American Airlines?
18     A      No.
19     Q      Are you able to offer any opinion about
20   whether, in the absence of a transaction with
21   American Airlines, the TWA pilots would have been
22   able to maintain their jobs as pilots?
23     A      I'm assuming in my analysis that TWA
24   would continue to fly.  I'm -- as I read -- as I
25   read the material, what I saw was that there was a

Page 137

1    bankruptcy auction.  Had American not been there,
2    there was another purchaser who presumably would
3    have bought the assets.  The airline would have
4    flown and pilots kept their jobs.
5      Q      So my question is whether you are able
6    to offer an expert opinion as to what would've
7    happened to the TWA pilots in the absence of a
8    transaction with American Airlines.
9      A      No.  I'm relying on others' -- others'
10   views of that.  That's correct.
11     Q      Whose views?
12     A      Well, the views of that -- you know,
13   I'm basically -- as I read it, I don't know if I
14   want to call it -- quite call it an expert opinion,
15   but I concluded, reading what I read, that TWA
16   looked to me like they would -- likely going to fly,
17   and I based that on the fact that there were other
18   sources of cash for them that the fellow from Tuck
19   talked about, and that there were other suitors in
20   the bankruptcy.
21     Q      And so what I'm asking is whether you
22   are in a position to offer an expert opinion as to
23   what would have happened to the TWA pilots in the
24   absence of the American transaction.
25            MR. PRESS:  I object to the form.

Page 138

1    that's been asked twice and he's answered it twice,
2    the same way.
3            THE WITNESS:  The same answer that I
4    said --
5    BY MR. TOAL:
6      Q      Well, I -- your answer was that you
7    read an article by a professor at the Tuck School.
8      A      Right.
9      Q      Does that give you a sufficient basis
10   to express an opinion as to what would have happened
11   to the TWA pilots in the absence of the American
12   transaction?
13     A      I'm not -- I wasn't considering -- I
14   was asked to opine on something very simple, which
15   is had ALPA performed its duty of fair
16   representation, what would the merged seniority list
17   have looked like?  Now, implicit in that, I don't
18   take a stand one way or the other on the -- what
19   would have happened to the TWA pilots had the
20   American transaction not gone through.
21     Q      So you are not offering an expert
22   opinion on that subject?
23     A      I'm not offering an opinion on that.
24   That's correct.
25     Q      If -- if it were determined that the

Page 139

1    likelihood was that TWA would have liquidated
2    shortly after January 2001 in the absence of an
3    American transaction, would that have affected your
4    analysis?
5        A    Yes.
6        Q    In what way?
7        A    I would have had to select my
8    comparables differently.
9        Q    And you are aware that the transactions
10   you categorized as having an acquired airline that
11   was either not flying or was about to stop flying
12   had proportional differences in mean rank of about
13   minus .6; correct?
14       A    I don't know.  I haven't done that
15   grouping.  You asked me that before.  I don't know.
16       Q    Look at page -- page two of your
17   report.  Paragraph five.
18       You say, seniority is an important factor in a
19   pilot's career.  It influences his or her home base,
20   his or her role in the cabin (captain/first
21   officer), et cetera.  The routes and schedules he or
22   she flies, the type of aircraft the pilot flies, and
23   also the order in which layoffs or furloughs occur.
24   Thus, a pilot's relative position on the seniority
25   list is a central determinate of the pilot's

Page 140

1    earnings.  Do you see that?
2        A    Yes.
3        Q    What are the other determinates of a
4    pilot's earnings?
5        MR. PRESS:  Really?  Object to the form
6    of the question as being over broad.
7        THE WITNESS:  Well, their preferences
8    will affect their earnings.  What airline they work
9    for will affect their earnings, just for an example.
10   BY MR. TOAL:
11       Q    Are you aware of any determinates of
12   pilot earnings?
13       MR. PRESS:  Same objection.
14       THE WITNESS:  Conditional on their
15   being a pilot already, working for a particular
16   airline, basically their preferences are going to
17   determine what routes they choose to bid for, what
18   equipment they choose to bid for will be -- taken
19   together; that pretty much determines it.
20   BY MR. TOAL:
21       Q    What about the number of hours they
22   choose to work?
23       A    That's part of choosing, what they
24   choose to bid for.  That's what I meant, yes.
25       Q    Have you assessed the relationship

Page 141

1    between seniority and income levels for the pilot
2    population in this case?
3        A    No.
4        Q    Do you have an understanding about
5    whether there is a difference between the pay rates
6    for TWA pilots and the pay rates for American
7    Airlines pilots?
8        A    I have no idea.
9        Q    Did you see in your review of
10   arbitration decisions that that was a factor that
11   arbitrators took into consideration in assessing
12   seniority integration?
13       A    Took what into consideration?
14       Q    Differences in pay rates between the
15   acquired and acquiring airline.
16       A    Sometimes.  I saw that sometimes.
17       Q    And how -- how is that factor taken
18   into consideration when it was?
19       A    It might be a factor for -- for shading
20   the -- the integration one way or the other.  It was
21   usually just mentioned.  It was seldom one of the --
22   I can't remember if it was ever a determining
23   factor, how the integration was done.
24       Q    And your analysis does not take into
25   account whether there are differences in pay rates

Page 142

1    between the TWA and the American pilots; correct?
2        A    That's correct.
3        Q    Isn't that a component of
4    pre-transaction career expectations?
5        A    Pre --
6        Q    Pre-transaction career expectations?
7        A    I would imagine.
8        Q    Did -- did you see in your review of
9    arbitration decisions that arbitrators universally
10   focus on preserving the pre-transaction career
11   expectations of both pilot groups?
12       A    Yes.
13       Q    And your -- your list was constructed
14   without regard to that factor; correct?
15       A    As I said, it is without direct regard
16   for it, but it is implicit in the method I use.
17       Q    Paragraph 25 of your report, page nine.
18   You say at the bottom, with the assistance of
19   my staff, I've reviewed information on 41 seniority
20   list mergers.  These include 29 arbitration
21   decisions, 11 amendments to CBAs, and one reported
22   federal decision.  Do you see that?
23       A    Yes.
24       Q    And you list all those mergers in
25   appendix B to your report; correct?

# EXHIBIT 8

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917 (JEI)

PATRICK BRADY, et al.,
                    Plaintiffs,
        vs.
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,
                    Defendant.

------------------
January 23, 2013
------------------
        Continued oral sworn videotaped
deposition of HENRY FARBER, Ashenfelter & Ashmore,
32 Nassau Street, Princeton, New Jersey  08540 was
taken at the law office of Archer & Greiner, 700
Alexander Park, Princeton, New Jersey, before Jean
B. Delaney, Certified Shorthand Reporter and Notary
Public of the State of New Jersey, on the above
date, commencing at 9:30 a.m., there being present:

        GREEN JACOBSON, P.C.
        BY: ALLEN P. PRESS, ESQUIRE
        7333 Forsyth Boulevard
        St. Louis, Missouri  63105
        (314) 862-6800
        Attorneys for Plaintiff
        TRUJILLO, RODRIGUEZ & RICHARDS, LLC
        BY: NICOLE ACCHIONE, ESQUIRE
        258 Kings Highway East
        Haddonfield, New Jersey  08033
        (856) 795-9002
        Attorneys for Plaintiff

        PAUL, WEISS, RIFKIND, WHARTON & GARRISON,
        LLP

Page 2

 1       JULIE ROMM, ESQUIRE
 2       1285 Avenue of the Americas
         New York, New York  10019
 3       (212) 373-3869
         Attorneys for Defendant, ALPA
 4       KATZ & RANZMAN, PC
         BY: DANIEL M. KATZ, ESQUIRE
 5       4530 Wisconsin Avenue N.W., Suite 250
         Washington, D.C.  20016
 6       (202) 659-4656
         Attorneys for Defendant, ALPA
 7
         Also present:  James Bateman, CLVS
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

 1              I N D E X
 2   Witness                         Page
 3   HENRY FARBER
 4     By Mr. Toal                      4
 5            E X H I B I T S
 6
 7   Marked for I.D.                  Page
 8   Farber-12  Congressional hearing      65
 9   transcript
10   Farber-13   April 2nd, 2001 decision      75
11   from the United States Bankruptcy Court,
12   District of Delaware
13   Farber-14   Rough copy of the transcript      81
14   of Bill Compton
15   Farber-15   Copy of the arbitration      97
16   decision concerning Continental Airlines
17   and Texas International
18   Farber-16   Copy of the arbitration      99
19   decision regarding the
20   FedralExpress/Flying Tigers
21   Farber-17   July 12, 1991 article from      116
22   the New York Times entitled Pan Am
23   Agrees To Sell
24
25

Page 4

 1            VIDEO SPECIALIST:  Today is
 2   January 23rd, 2013, and this is the continued
 3   videotaped deposition of Henry Farber.  We are now
 4   going on the record and the time is 9:30.
 5            Would the court reporter please swear in
 6   the witness?
 7            HENRY FARBER, having been duly sworn,
 8       was examined and testified as follows:
 9   BY MR. TOAL:
10       Q     Good morning, Professor Farber.
11       A     Good morning.
12       Q     Professor, in this case are you
13   offering an expert opinion as to whether, in the
14   absence of a transaction with American Airlines, TWA
15   would have been able to continue to fly?
16       A     No.
17       Q     Did you do anything to analyze that
18   question?
19       A     Yes.
20       Q     So you -- you made a judgment in this
21   case that TWA should be categorized as an airline
22   that was not in danger of ceasing operations
23   imminently; correct?
24       A     Yes.
25       Q     And can you describe what your

Page 37

1   get jobs at other airlines and would be at the
2   bottom of their seniority list; correct?
3       A    No, I didn't.  Paragraph 33 doesn't say
4   cease flying and not start up again.  It just says
5   ceases flying.  Your statement -- the question said
6   ceased flying and not start up again, and that's not
7   what I say in paragraph 33.
8       Q    Well, you say in paragraph 33, since in
9   any future jobs the former airline B pilots would
10  start at the bottom of their new employer's
11  seniority lists, airline B pilots have minimal
12  career expectations at airline B as of the
13  transaction, and they could expect to be placed
14  lower on the merged seniority list than if airline B
15  were in better financial health; correct?
16      A    Correct.
17      Q    So you acknowledge in paragraph 33
18  that, to the extent an airline is either not flying
19  or is expected to cease flying imminently, that
20  their career expectations at airline B are minimal;
21  correct?
22      A    Yes.
23      Q    And they could also have minimal career
24  expectations at airline B if airline B was expected
25  to cease operations in two months; correct?

Page 38

1       A    I don't know.  A lot can happen in two
2   months.  I'm not going -- you know, again, I -- I
3   told you before what I meant by imminently.  I mean
4   very, very soon.  I don't -- no one really knows
5   what's going to happen in two months.
6       Q    Well, no -- no one knows with certainty
7   what's going to happen in two days either; correct?
8       A    That's true.  Fair enough.
9       Q    So my question is, isn't it true that,
10  if an airline is expected to cease operations in two
11  months, that the pilots at that airline would have
12  minimal career expectations at that airline?
13      A    I don't know.  They would have --
14  because more can happen in two months than can
15  happen in two days, they would have -- likely have a
16  higher -- there is a higher expectation that
17  something will come along that will help their
18  career expectations.  They would likely have better
19  career expectations than someone at an airline who
20  is expected to cease operation tomorrow.
21      Q    And they would have lower expectations
22  than pilots at an airline that was expected to -- to
23  continue flying indefinitely; correct?
24      A    Absolutely.
25      Q    And your model doesn't take into

Page 39

1   account the difference in career expectations
2   between pilots at an airline that was expected to
3   continue flying indefinitely and pilots at an
4   airline that was expected to cease operation in two
5   month's time; correct?
6       A    Absolutely incorrect.
7       Q    Why is that incorrect?
8       A    My analysis takes that into account
9   because in the airline mergers that we analyzed, in
10  the list merger that we analyzed, where the --
11  that -- expected to fly indefinitely, that's one of
12  the cases where I consider the financial condition
13  of the acquired airline to be good, not weak like
14  TWA.  And, therefore, they are not in the list of
15  comparables because they are not comparable because
16  the acquired airline is in better financial
17  condition.
18      So that's exactly why my analysis is designed
19  to make that distinction between someone who is
20  working for an airline who -- that's weakened, but
21  is still flying and doesn't expect to shut down now,
22  and in comparison with a group where an airline has
23  shut down or will shut down now, or an airline where
24  there is no expectation that the airline is in
25  trouble.  Those are -- that's why there's three

Page 40

1   categories.  You insist on focusing on the bottom
2   category.  There is the top category, too.  Those
3   guys are not comparable to the TWA group.
4       Q    So you are -- you are dividing -- you
5   are dividing the world of -- in terms of financial
6   condition of the acquired airline into three
7   categories; correct?
8       A    Correct.
9       Q    In the top category, you have acquired
10  airlines that are expected to continue flying absent
11  the transaction indefinitely; correct?
12      A    I would say so.  I didn't do -- I
13  didn't -- yes, I would say so, yeah.
14      Q    Well, it is your analysis, so you tell
15  me how you define the category in the -- in the top
16  category.
17      A    Again, remember, it comes from reading,
18  in most cases, reading the arbitration report.  And
19  if the airline is healthy, there is no sign that it
20  is -- that it is in financial -- under serious
21  financial stress.  You know, so on that basis, I
22  make the expectation that they are going to keep
23  flying, and that their pilots -- and the arbitrators
24  do the same.  Their pilots have reasonable career
25  expectations because of this.  I didn't put TWA in

1    that category.
2        Q    And then you have a category at the
3    bottom which is defined by airlines that are not
4    presently flying or that are expected to cease
5    flying imminently, which you meant in a matter of
6    days; correct?
7        A    I think so, yeah.  I mean, a day, you
8    know, yes.  I didn't have a specific, you know,
9    absolute time period in mind, but, you know, days, a
10   week, couple weeks.  Yeah.  And a time period where
11   it -- it would be hard to think of any -- of a
12   scenario where they could keep flying.  You are
13   absolutely right, anything can happen in two days
14   but it is not much time.  Anything can happen in two
15   months and it is more time.  So, you know it's in
16   that area, and many of the airlines at the bottom of
17   my list are airlines that had ceased flying already.
18       Q    And between those two categories you
19   have a category of acquired airlines that are in
20   weakened financial condition which could be anything
21   from expected to cease flying within a matter of
22   weeks to not healthy but -- but no foreseeable
23   expectation that they were going to stop flying;
24   correct?
25       A    I suppose.  I mean, I don't -- I don't

1    know a matter of some weeks, some unspecified number
2    of weeks, airlines that are not healthy and need an
3    infusion of cash.
4        Q    And outside of your analysis of the
5    categories that you divided the acquired airlines
6    into based on financial condition, are those
7    recognized categories of financial strength of an
8    airline?
9        A    I have -- I have no idea.
10       Q    Have you ever seen categories of
11   airlines based on financial strength defined in that
12   way anywhere else?
13       A    No.
14       Q    And you regard TWA, at the time of the
15   American Airlines' transaction, comparable to what
16   you describe as airline B in paragraph 33?
17       A    No.
18       Q    Now, you say, paragraph 36 of your
19   report at the bottom of page 12, it's worth noting
20   that bankruptcy, per se, is not a clear indicator
21   that an airline will cease flying.  Do you see that?
22       A    Yes.
23       Q    As of the American transaction, how
24   many times had TWA declared bankruptcy?
25       A    I don't know.

1        Q    Was that relevant to your analysis?
2        A    No.
3        Q    So if I represent to you that the
4    bankruptcy that TWA declared at the time of the
5    American Airlines transaction was its third
6    bankruptcy within about the last ten years, is that
7    something you were aware of previously?
8        A    I knew they had declared bankruptcy
9    previously.  I'm not aware of the number of times.
10       Q    And do you know whether any -- any of
11   the other acquired airlines on your table one
12   involved airlines that had declared bankruptcy three
13   times within the span of ten years?
14       A    No.
15       Q    So when you say bankruptcy is not a
16   clear indicator that an airline will cease flying,
17   what would you regard as a clear indicator that an
18   airline would cease flying?
19       A    Show up at the airport and the plane
20   didn't take off.
21       Q    And anything other than that?
22       A    No.  I don't think -- well, what we
23   tried to do, again, was, you know, reading in the
24   press, and trying to get some idea would they --
25   would they likely cease flying very, very soon.  I

1    can't tell you exactly what the indicator of that
2    would be, but I can tell you that bankruptcy is
3    clearly not an indicator that an airline is going to
4    cease flying.  You are going to be hard pressed to
5    take a flight on an airline that hasn't declared
6    bankruptcy.
7        Q    I understand you saying bankruptcy is
8    not a clear indicator.  My question is, what is a
9    clear indicator?
10       A    I don't know.  I mean -- and again,
11   very hard -- you know, in -- in the short term, as I
12   can say, an airline that is sort of hemorrhaging
13   output, canceling flights, furloughing lots of
14   employees, and, you know, there is a lot of -- there
15   is a general view of the people -- knowledgeable
16   people, which presumably makes its way into the
17   press that the airline is within a very short period
18   of ceasing flying.  But even then, very hard to say
19   that an airline is imminently -- forget the
20   imminently -- is going to cease flying.  Very hard
21   to predict.
22       Q    Did you investigate whether
23   contemporaneous commentators offered the opinion
24   that TWA was expected to cease flying at or around
25   the time of the American Airlines transaction?

# EXHIBIT 9

**In the Matter of the Seniority List Integration Arbitration**

**Under ALLEGHENY-MOHAWK Labor Protective Provisions, Section 13(b)**
**Pursuant to the Dispute Resolution Agreement Among and Between**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **---THE PILOTS OF ---** | : |
| | : |
| **REPUBLIC AIRLINE/CHAUTAUQUA AIRLINES/SHUTTLE AMERICA,** represented by International Brotherhood of Teamsters ("IBT"), | : |
| | : |
| **FRONTIER AIRLINES, represented by Frontier Airline Pilots Association ("FAPA"),** | : |
| | : |
| **MIDWEST AIRLINES, represented by Air Line Pilots Association, International ("ALPA"),** | : |
| | : |
| **LYNX AVIATION, represented by United Transportation Union ("UTU")** | : |
| | : |
| **-and-** | : |
| | : |
| **REPUBLIC AIRWAYS HOLDINGS, INC., ("RAH")** [on behalf of Itself and Its Affiliates Chautauqua Airlines, Inc., Republic Airline, Inc., Shuttle America Corp., Frontier Airlines, Inc., Midwest Airlines, Inc., and Lynx Aviation, Inc.] | : |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## APPEARANCES

| | |
|---|---|
| For UTU/Lynx Aviation Pilots: | Clinton J. Miller, III, General Counsel |
| For ALPA/Midwest Pilots: | Highsaw, Mahoney & Clark, P.C.<br>By John O'Brien Clark, Jr. |
| For FAPA/Frontier Pilots: | Allison, Slutsky and Kennedy, P.C.<br>By Wesley G. Kennedy |
| For IBT/Republic, Chautauqua,<br>Shuttle America Pilots: | Baptiste & Wilder, P.C.<br>By William R. Wilder |
| For RAH, Inc.: | Ford & Harrison, LLP<br>By Thomas J. Kassin<br>Lilia R. Bell |

| **MERGER COMMITTEE CHAIRS** | **TECHNICAL ADVISORY TEAM** |
|---|---|
| Capt. Anthony Freitas, Midwest | Capt. Anthony Freitas, Midwest |
| Capt. Mark Manausa, Lynx | Capt. Eve Grauer, Republic |
| Capt. Jeffrey Thomas, Frontier | F.O. Trevor Jenkins, Frontier |
| Capt. Daniel Sneddon, Republic | Capt. Cory Sewell, Lynx |
| | Mr. Ken Pack, RAH, Inc. |

ALPA 055696

## DISCUSSION

Arbitrators have uniformly determined that the *Allegheny-Mohawk* "fair and equitable" standard is satisfied if the integration preserves the job expectations and relative bidding positions that employees held prior to the merger.    In fleshing out that *Allegheny-Mohawk* standard in the construction of an integrated seniority list for pilots, most informed practitioners acknowledge the appropriateness of considering goals established in ALPA's experience-based Merger Policy.  In that regard, a large body of arbitral precedent has evolved around application of the "fair and equitable" standard to the integration of pilot employee seniority lists.  In one such recent decision, the arbitrators observed that the lodestar standard posits accomplishment of "the following goals, in no particular order: a. Preserve jobs; b. Avoid windfalls to [any] group at the expense of [any] other(s); c. Maintain or improve pre-merger pay and standard of living; d. Maintain or improve pre-merger pilot status; e. Minimize detrimental changes to career expectations".  Delta/Northwest, (R. Bloch, D. Eischen, F. Horowitz at 13, 2008).

In his "Expert Recommendation" regarding the integration of the "Domestic" and "Overseas" pilots of Air New Zealand, the late great David Feller observed:

> There is general agreement among those who have dealt with pilot seniority questions following airline mergers that, in the words of the late David A. Cole in the Easter-Mackey case, "The essential object of our exercise is to prevent impairment, so far as possible, of the job security and the earning and promotional opportunities which each of the pilot groups had on its own airline prior to the merger."  Much earlier, in connection with the Braniff-Mid-Continent merger, the principle was stated by the arbitrators in the following words: "It is our purpose to see that each [pilot] on the two lists would retain all they had prior to the merger, would accrue those things which they would have had without the merger, and at the same time be in a position on the integrated lists to permit them to share equitably in any promotional opportunities which will arise as a result of the merged operation. . . . Seniority is, of course, highly relevant in the achievement of the objective stated, in various forms, by almost everyone who has dealt with this question".  Seniority, however, is a relative factor.  As Professor Benjamin Aaron has said, quoting David Cole in the Pan-American case, "A seniority list (is) not determined solely by time, ... it reflects the priority of job rights and opportunities of employees as among themselves which the employer agrees to respect."

ALPA 055724

### Midwest

By any objective measure, it cannot be denied that Midwest Airlines was an air carrier on the cusp of failure well down the road to extinction at the time of the transaction. But the record plainly establishes that the pilots of Midwest do not come to this proceeding as mendicants. In all fairness, the Midwest pilots are entitled to vindication in this proceeding of both real and constructive equities they brought to the merger.

In the vernacular, the very word "seniority" is equated with length of service. Appropriate recognition of many long years of additional career development by the Midwest pilots is intuitively fair and equitable in this seniority list integration. *See e.g.,* Chautauqua-Shuttle America, at 11 (Richard R. Kasher 2005). Also, Midwest as a branded airline did not cease to exist when it was acquired by RAH. More specifically, before and after the acquisition, Midwest provided the platform for Republic pilot crews to fly 12 otherwise grounded E-170s. In addition, along with Frontier, Midwest has been a post-acquisition platform for "branded" flying of E-190 aircraft, which RAH pilots had not and could not otherwise have operated in FFD service. Even though the Midwest pilot group brought no metal, *per se*, to the table, fairness requires that the contingent of MEA pilots deemed "active" by the Bloch II SBA decision be accorded constructive equity credit in these proceedings for their share of that enhanced E-jet flying.

One can take no satisfaction in validating the hard cold fact that no reasonable interpretation of fairness and equity justifies placing the remaining pre-acquisition furloughed MEA pilots anywhere but at the bottom tier of the IMSL. There is no evidentiary basis for any expectation that they might have been recalled to active service prior to the acquisition transactions. Nor can they shelter under the protective penumbra of the Bloch II decision, because they were furloughed prior to the transactions. ALPA's theory that RAH, Inc. effectively orchestrated those pre-acquisition furloughs and the eventual demise of Midwest Airlines, by manipulating events beginning in September 2008, is not established by a preponderance of persuasive record evidence and simply cannot be sustained by innuendo and conjecture.

### Lynx

As to the Lynx pilots, their reasonable expectations for career advancement and job security were the least of the active pilot groups, ranking above only the MEA pre-transaction furloghees. However, the reduced circumstances of the Lynx pilot group proximately caused by the situation on their own ground at transaction time was exacerbated by post-transaction decisions of RAH Inc. In particular, this included liquidating turboprop aircraft Lynx pilots were flying and reallocating RAH-crewed small regional jets to service the Lynx Aviation market.

These facts establish a mixed bag of equities for the Lynx Pilots. On the one hand, they operated only turboprop aircraft, had accumulated only limited seniority while flying for a startup operation that promptly went bankrupt and flew under less favorable wages and working conditions. On the other hand, the Q400 was comparable in seating capacity and productivity to the E-170, to which most of the Lynx Aviation market flying was transferred after acquisition. Treatment of all Lynx pilots as active, with appropriate placement to give them access to that flying is fair and equitable.

ALPA 055729

# EXHIBIT 10

## SENIORITY INTEGRATION ARBITRATION BOARD

| | | |
|---|---|---|
| In the Matter of the<br>Seniority Integration Dispute | ) | |
| | ) | |
| | ) | |
| Between | ) | OPINION |
| | ) | |
| | ) | AND |
| THE PILOTS OF NORTHWEST AIRLINES | ) | |
| | ) | AWARD |
| And | ) | |
| | ) | |
| THE FORMER PILOTS OF REPUBLIC AIRLINES | ) | |
| | ) | |

## OPINION

The matter considered herein is before the present Arbitration Board composed of Captain Terrence P. O'Mahoney, Captain Kim Snider and Thomas T. Roberts, serving in the capacity of Chairman. The task of the Arbitration Board is to integrate the seniority list composed of flight deck operating crew members formerly employed by Republic Airlines with the seniority roster of the flight deck operating crew members of Northwest Airlines in a fair and equitable manner. In the fulfillment of that charge, the January 1985 Merger Policy adopted by the Air Line Pilots Association constitutes the governing document.

-1-

FARBER-003331

## ADDITIONAL CONCEPTS ADVANCED BY THE PARTIES

## OR SUGGESTED BY ALPA MERGER POLICY

A study of the record made before the Arbitration Board, as well as a review of applicable arbitral precedent, confirms that to whatever extent possible the career expectations of the respective pilot groups, as those expectations existed prior to the merger, are to be maintained and protected.  Any recognition of career expectations must include elements of individual pilot income, the nature of the flying assignments available, and pre-merger status advancement opportunities.  The Award herein seeks to protect such career expectations of the affected pilots so long as that may reasonably be accomplished on a merged airline.

The judgment to adopt the integration technique set forth herein was further influenced by considerations of the contribution of each pilot group to the merged airline.  To put it in the vernacular of the pilots, a study was made of "what it was that each pilot group brought to the merger".  In that undertaking, it was noted that Northwest Airlines and Republic Airlines were dramatically different operations prior to the merger.  Northwest flew primarily long haul and overseas routes while Republic concentrated on shorter segments.  The Northwest pilots operated mostly wide-body equipment while the Republic pilots were limited to the flight deck of narrow-body aircraft.  Certain other considerations, however, tend to soften this disparity.  Both pilot groups included trained and experienced airmen.  While at the time of the merger Republic Airlines had but recently returned to

-4-

FARBER-003334

# EXHIBIT 11

Flying Tiger Lines and Seaboard World Airlines [1981]

FARBER-002831

FLYING TIGER LINES, INC

AND

SEABOARD WORLD AIRLINES, INC.

MERGER OF SENIORITY LISTS

1981

TABLE OF CONTENTS

VOLUME II

Discussion and Opinion                                    142

Award                                                     185

Working Pilots Integrated Entitlement Chart      Appendix A

Integrated Seniority List                        Appendix B

March 16, 1981

FARBER-002832

146

On the basis of the extensive record, I consider the factors here-
inafter set forth to be relevant and pertinent to this case.

The Financial Strength of the Two Carriers

The financial condition of the carriers is considered relevant
because the value of the jobs brought to the merger by the pilots of each
carrier is affected by the future security of those positions.  A carrier's
financial condition will impact on its ability to borrow sufficient funds
to modify, replace or expand the existing fleet, and the cost of that
borrowing.  For pilots of a weak or tentative carrier, the receipt of jobs,
and job protection, with a healthy and expanding carrier represents a
significant reward which is an important factor in balancing the advantages
that each group obtained from the merger.  In this case FTL was a healthy
and expanding carrier; SWA was a carrier whose future was tentative prior
to the merger.

The FTL pilots emphasized the recent history of large operating losses
by SWA on its scheduled air transport operations as evidence of SWA's
"failing" condition.  It should be noted that the air cargo industry is
a barometer of the world economic climate.  The entire industry, including
both SWA and FTL have experienced operating losses recently.  The poor
performance of SWA may be due in part to general industry wide conditions.

However, I conclude that SWA's entire corporate operation rather
than a part of it is the appropriate focus in connection with any claims of
a lack of continued viability.  SWA's non-airline activities are all related

FARBER-002837

# EXHIBIT 12

GEORGE NICOLAU, P.C.
125 EAST 10th STREET
NEW YORK, N.Y. 10003
———
(212) 777-5032



RECEIVED

JUN 2 4 REC'D

CONTRACT ADMINISTRATION

June 15, 1987

TO:     John McGuinn, Denis Gordon, Michael Madigan,
        Rachel Suarez, Richard Wardell and John Campbell

FROM:   George Nicolau

RE:     Continental/Frontier

-------------------------------------------------------------

        Enclosed for each of you is a copy of my Opinion and
Award in the above-captioned matter.

        I appreciated your professionalism throughout the
proceeding.

        Best of luck to you all.



RECEIVED

JUL 1 8 2000

GN:rcf
Enclosure

FARBER-003155

```
-----------------------------------------x
                                         :
In the Matter of                         :
                                         :        OPINION
THE SENIORITY INTEGRATION OF             :          and
CONTINENTAL AIRLINES AND FORMER          :         AWARD
FRONTIER AIRLINE PILOTS                  :
                                         :
-----------------------------------------x
```

APPEARANCES:

 For the Continental Airline Pilots Merger Committee:

  Gordon and Barnett
   by Denis F. Gordon, Esq.

 For the Former Frontier Pilots Merger Committee:

  Porter, Wright, Morris and Arthur
   by John A. McGuinn, Esq.
     Gary L. Lieber, Esq.

 For Continental Airlines, Inc.:

  Akin, Gump, Strauss, Hauer and Feld
   by Michael J. Madigan, Esq.
     Jonathan S. Spaeth
   Rachel Suarez, Esq., Assistant General
     Counsel, Continental Airlines

    This proceeding is the result of the October 2, 1986

Frontier-Continental Job Preservation and Litigation Settlement

Agreement, known as the "JPA" (Joint Exhibit 1), and the Pro-

cedures For Seniority Integration, as subsequently agreed to by

the Company and the Frontier and Continental Pilot Merger Com-

mittees (Joint Exhibit 3). The two documents, taken together,

FARBER-003156

- 42 -

of the nature requiring protection under 3(c)(2).

It is quite true that Frontier was an operating airline
on August 23rd.  But any expectations respecting its future must
rest on its past.  Whether the cause was "deregulation mixed
with bad luck," as the Frontier pilots contend, or "conscious"
but inept choices by both management and Frontier's MEC, as
the CO pilots suggest, the fact is that Frontier had precious
little prospect of surviving as of the day before its shut-down.
It was shrinking, not expanding.  It was continuously losing
money, badly draining its corporate parent, People Express.
Most of its assets had already been sold and leased back at
less than favorable rates.  No one, on that date, could have
realistically believed that its prospects were bright or that
the promotional expectations of its pilots were high.  The
issue, starkly but realistically put, was one of survival.

By the same token, it was less than reasonable to assume
on August 23rd that the "failing" Frontier would be rescued
by United.  Though UAL did not formally pull out until four
days later, it's clear that negotiations had reached an impasse
some weeks before and that there was little prospect of shaking

FARBER-003197

- 43 -

UAL management's opposition to wage parity.  The Frontier
pilots were trapped in a battle not of their own doing, but
trapped nevertheless.  (In the event, even mediation by Congress-
man, now Senator, Wirth could not end the stalemate.)  Thus,
on August 23rd, rescue by UAL might have been a wish, but by
objective standards it was not a reasonable expectation.

In the circumstances described, any discussion of Frontier
aircraft on order or option or rates of attrition, either pre-
sumed or actual, has no meaning, for both rest on an on-going
airline.  In my view, the Frontier pilots have not demonstrated
that the Airline would have continued, either on its own or as
part of UAL.  As a consequence, they have not demonstrated that
they had promotional expectations required to be protected under
the specific provisions of 3(c)(2).

The Construction of the List

The issue here is a different one.  What is "fair" and
"equitable" in "the unique circumstances" of this case, or, to
put it another way, how should the career opportunities beyond
the protected expectations be apportioned?

FARBER-003198