# EXHIBIT 13



# ALLIED PILOTS ASSOCIATION

O'Connell Building · 14600 Trinity Boulevard, Suite 500 · Fort Worth, TX 76155-2512 · 817.302.2272 · www.alliedpilots.org

> **EXHIBIT**
> **J-323P**

July 18, 2001

**BY FACSIMILE AND OVERNIGHT DELIVERY**

Captain Michael J. Day
Chairman
TWA MEC Merger Committee
Air Line Pilots, Association, International
500 N.W. Plaza, Suite 1200
St. Ann, Missouri 63074

Dear Mike:

On June 14, 2001, the TWA Merger Committee presented its comprehensive proposal for the integration of the American and TWA pilot seniority lists, entitled "ALPA Rightful Place Proposal to APA." As you requested, the APA Mergers & Acquisitions Committee has given and continues to give your proposal very careful and detailed scrutiny. We have also carefully reviewed the concepts underlying our own seniority integration proposal in light of your Committee's presentation. We have also made sure that the proposal has been made available to the American Airlines pilot group as a whole so that they, too, could analyze it and react to it. As you can well imagine, given the critical importance of this issue, we have received a flood of commentary on the proposal from the pilots the APA represents. I have no doubt that you have received a similar wave of input from the pilots that ALPA represents.

In order that we can maximize the use of our scheduled time with facilitator Rolf Valtin commencing on July 23, I am taking this opportunity to provide you with some of the results of our deliberations, both in analyzing ALPA's proposal and in revisiting the basis for our own proposal for the integration of the lists. For many reasons, including those discussed below, our detailed review of your proposal convinces us that it is neither fair nor "rightful", and does injury to the AA Pilots:

- The proposal fails to take into account any of the radical differences between our groups' pre-transaction career expectations, differences based on the nature of the carriers' pre-transaction operations; pre-transaction pay, benefits and working conditions; and pre-transaction long-term job security based on the carriers' financial condition.

ALPA 001808

J-323(P)

Captain Michael J. Day                                                    July 18, 2001
                                                                               Page 2

- The proposal creates enormous windfalls for the TWA Pilots at the expense of the AA Pilots'
  career expectations in many respects, including crediting the TWA Pilots for assets which
  were not acquired by American, and for other assets which will not be deployed in the
  consolidated operation. The proposal thereby gives the TWA Pilots placement on the list
  beyond the value the TWA assets will add to the consolidated operation, and will permit the
  TWA Pilots – who have already reaped a windfall from the transaction – to hold positions
  which were rightfully the expectation of the AA Pilots, and to gravitate to the top of the
  positions which they hold.

- In addition to these conceptual problems, the proposal is based on a whole series of faulty
  factual premises, which increase the transfer of AA Pilots' career expectancies to the TWA
  Pilots.

The flaws in the ALPA proposal have led us again to conclude that the structure of our seniority
integration proposal is the basis for a fair resolution which gives respect to the "rightful place" of
the AA Pilots, and does as much if not more for the TWA Pilots.

At our first meeting in February 2001, your Committee emphasized that unity, fairness and
equity, and efficiency will be served by a seniority integration which preserves jobs; which does not
advantage post-acquisition pilots at the expense of pre-acquisition pilots; which optimizes
advancement opportunities; which precludes detrimental seat and equipment changes; which
preserves career expectations; and which avoids injurious windfalls. With all respect, your current
proposal hardly serves these goals, since it would inhibit the AA Pilots' pre-transaction advancement
opportunities; force detrimental seat and equipment changes on the AA Pilots; transfer AA Pilots'
career expectations to TWA Pilots; and thereby result in windfalls to the TWA Pilots injuring the
AA Pilots. As such, the proposal serves neither unity, fairness, nor efficiency.

ALPA's "Rightful Place" Proposal

In an earlier letter to your predecessor as TWA Merger Committee Chairman, I noted that
"fairness" is largely in the eye of the beholder. The same is true of the label your Committee has
created to attach to its proposal, the "rightful place." You have arrived at what you assert to be the
"rightful place" of each AA and TWA Pilot, based on the size of the aircraft in which the pilot was
flying on the date the AA-TWA transaction was announced (what you call the "neighborhood"), and
when you think that pilot could expect a single future job advancement based solely on age-60
retirements. Thus, though never explicitly stated, your proposal defines "rightful place" as if this
transaction was a full-blown corporate merger between equal carriers and pilot groups, without any
material differences in the nature of the carriers, pay and working conditions, or financial condition;
and as if every aircraft, gate, slot and other asset of the acquired carrier was going to be deployed
to the consolidated operation.

Needless to say, based on the facts and our analysis, we disagree. This is not a merger with

ALPA 001809

Captain Michael J. Day                                                    July 18, 2001
                                                                          Page 3

a complete air carrier. Nor is it a transaction between equals. It is a purchase, by one of the largest and most financially stable global airlines, of most – but not all -- of the assets of a much smaller, largely regional carrier which was within hours of going out of business. That view of the TWA Pilots' "rightful place" was certainly shared by your own CEO (and former MEC Chairman) William Compton when he said, at the time the transaction was announced, "It has actually been since 1971 that people have worried about their jobs ... You think about all these years that TWA employees had to go to bed wondering about their jobs;" by TWA's management when it represented to the Bankruptcy Court that this transaction was "the best option, indeed the only realistic option", that would allow TWA to avoid ceasing operations; and again by CEO Compton when he told the Bankruptcy Court that this transaction was the equivalent of "catching the hail-Mary pass." That view was certainly shared by the Bankruptcy Court when it agreed that this transaction was the only way to avoid the liquidation of TWA, and that, "given this debtor's history, if this court were to deny [the sale of assets]" there would be an "immediate and precipitous decline in the affairs of the debtor with a very high probability, if not certainty, of a liquidation." And, this was certainly the view of your own MEC when it stated, at the time the transaction was announced, that "we believe the American acquisition represents the best opportunity for our pilots and for all TWA employees. If for some reason this deal does not close ... then we face the probability that all 20,000 jobs at TWA will be lost and the traveling public will suffer from less competition."

        In light of all of this, where would have been the "rightful place" of the TWA Pilots absent this transaction? That is not said to disparage the TWA Pilots or their efforts to keep their airline afloat. It simply reflects the harsh realities underlying the task our Committees are facing.

        At the outset, we also note again, as we did when the proposal was presented on June 14, that this proposal results in the placement of TWA Pilots on the integrated seniority so high that they will have access to pre-transaction AA positions for which they had no expectation, and gravitate to the top of the seniority ranges in those positions; and which will thereby directly deprive the AA Pilots of their expectations, and inhibit the AA Pilots' expected career progressions. As we also made clear at the time it was presented, the June 14 proposal is a regression from your previous proposals. For instance, on March 29, 2001, your Committee presented a proposal which would have placed more than 400 TWA Pilots on the integrated list after the last AA Pilot hired on March 9, 2001. When your current proposal was presented on June 14, it was obvious that the proposal has reduced that number to only 166. While you have asserted, in your June 16 letter to the TWA Pilots, that this change is balanced by other changes and that the proposal is on the whole more generous to the AA Pilots, we do not agree that this is the case:

•       Putting aside cosmetic changes at the top of the proposed integrated list, your current proposal has radically improved the placement of TWA Pilots on the list from your earlier proposals. Thus, TWA seniority number 869 was paired with AA number 5768 in your March 29, 2001 proposal; you now propose to pair that pilot with AA seniority number 4861. TWA seniority number 1282 was first paired with AA number 7276, but is now paired with

ALPA 001810

Captain Michael J. Day                                                                July 18, 2001
                                                                                        Page 4

6776.  TWA seniority number 1915 was first paired with AA number 11389, but is now
paired with AA number 9160. Thus, TWA Pilots in the middle and lower portions of the
TWA seniority list are hundreds, if not thousands, of numbers higher than they were in your
previous proposals.

- In your original March 1, 2001 proposal, you proposed a 10-year fence on the B-777. You
  have reduced that proposed fence to five years.

- On March 28 and 29, 2001, you offered a proposed fence for A-300 Captain positions.  You
  now propose to leave that position entirely unrestricted and available immediately to the
  TWA Pilots.

- Your current proposal has added proposed domicile protections for the TWA Pilots which
  were not contemplated in your earlier proposals, including provisions imposing most of the
  pain of the rationalization of the TWA system in common bases on the AA Pilots; provisions
  guaranteeing TWA Pilots any international operation passing through St. Louis for five
  years; and provisions permitting displaced TWA Pilots to exercise the high seniority
  numbers granted them under your proposal to displace AA Pilots without regard to your
  proposed limits on the number of positions TWA Pilots may hold.

In light of this analysis, it is difficult to characterize your June 14 proposal as anything other than
a movement backward from your previous proposals.

Having made these introductory observations, let me turn to the specifics of your
presentation. We substantially agree with your statement of first principles. As your cover letter to
the proposal indicates, in approaching the seniority integration issues both of our Committees should
be vitally concerned with two major objectives: 1) the preservation, to the extent possible, of the
legitimate career expectations of both pilot groups; and 2) the avoidance, to the extent possible, of
unnecessary windfalls for one group's pre-transaction career expectations at the expense of those of
the other group.  These are similar to the objectives your Committee stated in our initial meetings.
While ALPA Merger Policy has never been used by the APA in establishing a seniority integration
system and is certainly not applicable to a situation like the one we face – which is not a merger –
we also note that ALPA Merger Policy articulates similar objectives, including the avoidance of
windfalls by one group at the expense of the other; maintaining or improving pre-merger pay and
standard of living; maintaining or improving pre-merger pilot status; and minimizing detrimental
changes to career expectations.

In your cover letter, you refer to the pilot groups' need to "put the past behind us." We
certainly agree that, for us to be effective in the long-run in dealing with management, AA and
TWA Pilots need to become a united force looking forward in protecting our shared interests and
meeting common challenges. However, to accomplish that goal we must first achieve an integrated
seniority list that meets our shared objectives by properly reflecting what each group "brings to the

ALPA 001811

Captain Michael J. Day

July 18, 2001
Page 5

party." In fact, one of our shared objectives – the preservation of career expectations – requires that
we look back at the past, to consider each group's legitimate expectations prior to the transaction.
The second objective – the avoidance of injurious windfalls – requires that we look forward to
ensure that the integrated list will properly allocate the fruits of seniority based on what we know
regarding the consolidated operation. Interestingly, your June 14 proposal applies precisely the
reverse logic – it ignores the past in assessing the groups' respective expectations, and it ignores the
present and the future in projecting the impact of the integrated seniority list. As a result, the
proposal fails to take into account our respective groups' real pre-transaction career expectations,
and would result in windfalls for the TWA Pilots at the expense of the AA Pilots.

### Legitimate Career Expectations

It is incumbent upon us to identify just what were the "legitimate career expectations" of the
pilot groups. Your proposal voices no disagreement with this point. However, we must look beyond
"goals", as you call them in your proposal, to expectations. A pilot's "goal" (something that one
hopes or wishes to achieve) is not necessarily an "expectation" – something that circumstances make
it reasonable for one to anticipate achieving. As American CEO Donald Carty stated in his May
21, 2001 speech to the St. Louis Civic Progress Board, "History ... is not destiny." In other words,
any pilot's career expectations change over time based on inevitable changes in the marketplace, in
technology, and in other factors. For instance, when I was hired by American Airlines in 1977, I
expected to finish my career as a B-747 Captain, since American operated the B-747 at the time I
was hired. Although I might still have that goal, I now no longer have that expectation, since we no
longer operate the B-747 based on technological advancement and changes in the marketplace. The
same is true for your most senior pilots since TWA once operated the B-747 but, as its financial
condition declined, TWA eliminated that aircraft type from its fleet. Accordingly, to determine what
"legitimate career expectations" must be accommodated in a fair seniority list integration, it is
necessary to determine the point in time at which the pilots' legitimate career expectations, as
opposed to hopes or wishes, should be measured.

On this point, I am afraid, your approach and ours diverge. The career expectations at issue
are the pilot groups' pre-transaction expectations. The issue is what were each group's expectations
at the point immediately prior to the transaction that triggered this entire process – i.e., American's
purchase of the assets of TWA. If we do not measure those expectations pre-purchase, we can never
hope to define the TWA pilots' career expectations as TWA pilots and the American pilots' career
expectations as American Airlines pilots.

This has always been the focus in pilot seniority integrations. Yet, ALPA's June 14 proposal
simply ignores any analysis or comparison of the respective groups' expectations absent the
transaction. Instead, the proposal apparently takes pilots' supposed "goals" and transforms them into
"expectations," without any consideration whether, under the circumstances, each group could
realistically expect to achieve. In this respect, I also believe that your approach diverges from the
approach taken by the ALPA Merger Policy, which requires that career expectations be measured

ALPA 001812

Captain Michael J. Day                                          July 18, 2001
                                                                Page 6

on the basis of the <u>pre-transaction</u> conditions of the pilot groups.

      Because you diverge from a proper focus on true pre-transaction expectations, ALPA's June 14 proposal gives no consideration to the significantly different natures of the pre-transaction carriers; their significantly different terms and conditions of employment; and their radically different financial conditions and prospects. The result is the direct transfer of pre-transaction expectancies from the AA Pilots to the TWA Pilots, to the injury of the AA Pilots:

- There is no denying the differing natures of American and TWA immediately prior to the transaction. American was one of the world's largest domestic and international carriers, with an extensive world-wide route system, and a steadily growing fleet including the most modern wide-body aircraft on the market. By contrast, while TWA obviously had a long and distinguished history in the industry, it had declined over a long period. At the time of the transaction, TWA was largely a regional carrier operating from St. Louis with a relative handful of operations in other domestic and international markets, and a fleet consisting exclusively of narrow-body and a few small wide-body aircraft.

- This was reflected in the jobs available to the two pilot groups prior to the transaction, both at the beginning of a pilot's career path and at the end. The TWA Pilots flew no aircraft larger than the B-767-300, and had no prospect of flying any larger aircraft in the future. In addition, as we have made clear in previous correspondence, at the time the transaction was announced new-hire pilots at American were holding wide-body First Officer positions – comparable, and frequently superior, to the most desirable First Officer positions in the TWA system, and with pay substantially superior to the highest First Officer positions at TWA. Thus, the First Officer jobs contributed to the consolidated operation by the TWA assets are comparable to new-hire jobs at American.

- Moreover, your proposal reduces career expectations to the simple "goals" of progressing from seat to seat and aircraft to aircraft. Career expectations include much more, including compensation, benefits, standard of living, and quality of life – as you recognize in the cover letter to your proposal, and as recognized by ALPA's Merger Policy. It cannot be denied that the pay, benefits and working conditions of the American and TWA Pilots were significantly different prior to the transaction. From the perspective of pay, other compensation factors and contractual features (including such quality of life determinants as required monthly duty hours), an American pilot had significantly greater legitimate career expectations prior to the asset purchase than did his or her TWA counterpart in the equivalent seat of the equivalent aircraft. Just a few examples suffice:

  – Under the AA "Green Book" contract, a pilot achieves the highest hourly rate on an aircraft after 12 years of service, while a TWA Pilot did so only after 15 years. Even comparing your 15-year rates with the AA Pilots' 12-year rates, the superiority of the AA rates is obvious. Indeed, our analysis of DOT Form 41 data indicates that the

ALPA 001813

Captain Michael J. Day

July 18, 2001
Page 7

average TWA Pilot will experience in excess of a $32,000 per year pay increase simply by the transition from the TWA contract to the Green Book. When Captains are considered, the average increase is on the order of $70,000 per year.

—   Retirement benefits are obviously superior at American.   While the AA Pilots enjoyed a Company-funded defined benefit plan (the "A" Plan), the TWA Pilots had given up their A Plan some years ago, and therefore had no employer-funded defined benefit plan.   In addition, our variable benefit plan (the "B" Plan) permits the contribution of more dollars than the comparable TWA plan, based on the substantial differences in pay between the two pilot groups.

—   In numerous respects, working conditions under the Green Book are superior to those in place at TWA. For instance, under the Green Book, the Company can "flex" only to 78 hours per month (to 80 hours with premium pay), while TWA was essentially unlimited except by the FARs (100 hours per month, 1000 hours per year). Additionally, an AA Pilot cannot be involuntarily assigned a trip simply because his schedule falls below his monthly contractual guarantee; the same was not true at TWA.

This list could go on indefinitely. The TWA Pilots' quality of life will now benefit, since the TWA Pilots will make significantly more money, under better work rules, working fewer days each month, with a better retirement program. These differences will become even more pronounced as the APA moves into Section 6 negotiations to achieve an industry-leading contract on the level of Delta, United and other leading carriers. Obviously, the TWA Pilots had no prospect of achieving anything resembling such a contract absent this transaction and, indeed, were likely facing the prospect of further concessions to keep their airline operating.

Beyond this, in our minds the greatest quality of life enhancement reaped by the TWA Pilots is the job security associated with secure employment. Those who, in your CEO's words, have worried since 1971 over the future of their jobs can now go to bed at night knowing that the gloom shadowing their job security at TWA is behind them.  This is a far cry from January 5, 2001 – days before the announcement of the transaction – when your MEC's hotline stated:

"The MEC and several of its key committees continue to monitor the Company's financial situation and are working with protecting pilot interests as their number one priority ... The Company is always interested in improving labor and other efficiencies, and is more so now in the face of ongoing high fuel prices and an apparently weakening economy. Should the situation arise where contract amendments might be beneficial to our pilot

ALPA 001814

Captain Michael J. Day

July 18, 2001
Page 8

> group, the MEC intends to present any suggested contract changes to the
> membership for ratification.
>
> In the meantime, we strongly encourage all pilots to take a conservative
> approach to their personal finances and to stay informed ..."

And, of course, there was no prospect prior to the transaction that these differences between the pilot groups would be narrowed, given the carriers' relative financial positions. Although there is no need here to overstate the dire prospects facing the TWA pilot group prior to the asset purchase, we would jettison any notion of fairness, equity or accuracy if we were to ignore them. As you know far better than I, when American stepped in the TWA pilots were within days, perhaps hours, of facing the dissolution of their airline and, with that catastrophic event, the daunting task of beginning their careers again as new hires at other airlines or even leaving the industry entirely. It was common knowledge that TWA was on its last breath; that, when American offered to purchase most of TWA's assets, TWA was on the verge of running out of cash and ceasing operations; and that TWA had no realistic options other than the transaction with American to remain in business. This was confirmed by the public statements of TWA's own management and pilot representatives at the time of the transaction, some of which I recited at the outset of this letter.

The first main flaw in ALPA's proposal is that it ignores all of this undisputed reality immediately prior to the transaction, reducing the pilot groups' expectations to a simple set of "goals" which fail to take into account these differences in operations; in pay, benefits, and working conditions; and in job security. Your proposal then pairs TWA Pilots with supposed "running mates", based solely on the "neighborhood" of equipment a pilot was flying at the time the transaction was announced. Yet, in light of these radical differences in expectations, a type of equipment at TWA is in the same "neighborhood" as comparably-sized American aircraft, in the same sense that K-Mart and Saks Fifth Avenue might be found in the same neighborhood.

ALPA's proposal thereby unrealistically puts the TWA Pilots' pre-transaction expectations on a par with those of the AA Pilots, and does not reflect the TWA pilots' actual career expectations pre-purchase. The proposal thus diverges from our shared analytical starting point – recognized even by ALPA's own Merger Policy – and artificially creates for TWA pilots a "career expectations" baseline far higher than that which objectively existed at the relevant, pre-purchase moment. By raising that baseline, you inevitably build into your analysis a considerable windfall in expectations and compensation for TWA pilots, which necessarily transfers career expectancies from AA Pilots to TWA Pilots, to the detriment of the AA Pilots. This would eliminate any possibility of a fair and objectively reasonable weighing of the true career expectations of the two pilot groups. We cannot begin to call that approach either "fair" or "rightful."

ALPA 001815

Captain Michael J. Day                                                July 18, 2001
                                                                     Page 9

<u>Avoidance of Windfalls</u>

      As just discussed, ALPA's proposal creates windfalls for the TWA Pilots at the expense of the AA Pilots, by failing to give any consideration to the pilot groups' real expectations absent the transaction, or to the enormous gains in pay, benefit and job security by the TWA Pilots as a result of the transaction. In addition, while expectations are measured against the past (what each group could reasonably expect before the transaction), windfalls are forward-looking — will one group gain unfairly compared with the other in the future as a result of the transaction? Thus, to evaluate whether one group may reap a windfall, one must project what is realistically expected to happen following the transaction.

      In this respect, your proposal provides a further windfall to the TWA Pilots by ignoring American's selective acquisition of TWA assets; what American has already done with the assets which it acquired; what American has announced it will continue to do with those assets; and what we anticipate, based on our own past experience with American, that American will continue to do as it consolidates the AA and TWA operations. Instead, your proposal gives credit to the TWA Pilots for every aspect of TWA's operation as of the date the transaction was announced, as if it will all become part of the consolidated operation, without any consideration of what has actually happened and which TWA assets will ultimately contribute to the consolidated operation in the long run.

      Of course, your assumption has no basis in fact, and will likely become more contrary to fact as time goes on:

- As noted above, from the beginning this was an asset purchase, not a merger — American did not purchase all of TWA's assets. In particular, of the 199 aircraft owned or leased by TWA as of the date of the announcement — which you have stated represent the fleet on which your proposal is based — only 188 were even being operated by TWA. And, of those only 173 aircraft were actually accepted by American facilities. American Airlines also did not acquire TWA's orders and options for A-318/319/320 aircraft, and has taken only 15 of TWA's orders or options for B-717 aircraft.

- Based on the provisions of the Asset Purchase Agreement and the antitrust laws, American was unable to make a comprehensive study of TWA's assets prior to the transaction to determine precisely which assets would add value to the American system. American thus had to make its best judgment at the time of the transaction, and make adjustments later. That analysis is ongoing. In fact, American is already disposing of some of the assets which it acquired, including gates, slots and other facilities. In particular, American has already formally announced its intention to retire TWA's remaining B-767-300s, and to retire TWA's entire fleet of DC-9s. Those aircraft will never be deployed in the American Airlines system. Other TWA aircraft, such as the B-717 (which are not included in American's existing narrow-body fleet) and TWA's B-757-200s (which have engines incompatible with

ALPA 001816

Captain Michael J. Day

American's fleet), also may not have a future in the consolidated operation.

American has insisted on the separate operation of the TWA LLC for a transition period, specifically to permit the rationalization of the TWA system as it is integrated into the AA system. AMR CEO Donald Carty made this clear in his May 21, 2001 speech in St. Louis:

> "One of the heaviest anchors (around TWA's management's neck) was the fact that under TWA's previous leadership, the Airline's Balance Sheet was virtually destroyed ...
>
> ...
>
> Another unfortunate legacy, or anchor, we can help TWA overcome relates to the fact that because of the reputation it had in recent years as a company in financial distress, the airline's ability to attract some of the industry's premium business — despite the fact that they were running a darn good airline — was damaged. This impact was felt not so much here in St. Louis, where much of the business community has remained very loyal, but in markets East and West of the Mississippi.
>
> ...
>
> Outside of St. Louis, it's no secret that TWA has struggled with a lot of its flying out of New York — and as you know, they have had to pull down a lot of their international service, which was unsuccessful largely because of their relatively weak market position in New York. Many of the airplanes were subsequently redeployed into the Caribbean and other destinations. This improved their results, but still left those aircraft in substantial loss positions. So it is safe to say we will be fine-tuning the schedule out of New York."

We can reasonably expect that, as American continues this rationalization of the TWA system prior to consolidating it with American's operation, additional TWA assets will be disposed of, and will ultimately not be deployed in the consolidated operation.

We at the APA know this from painful experience. In the early 1990s, American went through a "Transition Plan" to rationalize its system, for which the AA Pilots paid in route cutbacks and transfers to American Eagle (and other carriers that American effectively propped up and used as proxies), the grounding of aircraft, furloughs, and career stagnation. The result today is a healthy, vibrant airline that is steadily growing, and has now grown back to the size that it was in the early 1990s. No one helped us pay for that transition, nor did we ask anyone else to bear that pain.

ALPA 001817

Captain Michael J. Day

July 18, 2001
Page 11

• Similarly, in American's other two post-deregulation acquisitions – Air Cal and Reno – we have seen American acquire another carrier, and then dispose of the acquired carrier's entire fleet. We are thus acutely sensitive to a careful consideration of the value which assets truly add to the consolidated operation in measuring whether one side derives an unfair windfall from the integration of the seniority lists.

None of this can be seriously disputed, but the ALPA proposal gives the TWA Pilots full credit for everything in the TWA system at the time the transaction was announced, as if it will fully contribute to the consolidated operation and benefit the pre-transaction AA Pilots. It is clear that this will not happen, given the ongoing rationalization of the TWA system as described by Mr. Carty. It is equally clear, notwithstanding your pilot group's $600 million in concessions in TWA's two previous bankruptcies, that TWA lacked the financial wherewithal or operational "critical mass" to achieve such a transition to viability on its own.  That will be achieved only through the financial and market resources of American,.  By ignoring these facts, ALPA's  proposal would artificially elevate the standing of the TWA Pilots on the integrated seniority list beyond anything reflective of the value the TWA assets add to the consolidated operation. It also gives the TWA Pilots access to positions, and  superior bidding rights within those positions, which rightfully were the expectation of the AA Pilots.  The result would be a windfall to the TWA Pilots, and direct harm to the career progression of AA Pilots.  The ALPA proposal would thus shift to the AA Pilots much of the pain of rationalizing the TWA system to make it viable – something for which the AA Pilots have already paid in our own system; which TWA did not have the resources or "critical mass" to do on its own; and which is only possible due to the strength of the market and financial resources of American.

In addition, in assessing what the TWA assets will contribute to the consolidated operation – and, thus, what benefit the AA Pilots can expect to derive from those assets – one must take into account how those assets compare to what American already had absent the transaction.  As reiterated above, even the most desirable TWA First Officer jobs are comparable to jobs flown by new hires on the American system. Thus, with the exception of the sustainable Captain positions which will remain in the consolidated system, the jobs contributed to the consolidated operation by the TWA assets are substantially new-hire jobs.  To the extent that the ALPA proposal seeks placement on the integrated seniority list above newly-hired AA Pilots for pilots beyond those representing the sustainable Captain jobs contributed to the consolidated operation by the TWA assets, the TWA Pilots will achieve placement on the list beyond that to which the TWA assets would have given them a legitimate expectation.

<u>Additional Flaws in the Proposal</u>

Thus, the basic structure of ALPA's June 14, 2001 proposal meets neither the test of pre-transaction career expectations nor the test of avoiding injurious windfalls.  Beyond that, we have numerous specific disagreements with the proposal including, but not limited to, the following:

ALPA 001818

Captain Michael J. Day

July 18, 2001
Page 12

Your proposal gives AA Pilots credit for aircraft on order, but only those scheduled for delivery by the end of 2002. At the time the transaction was announced, American had additional aircraft on order scheduled for delivery in 2003 and 2004, including at least 10 more B-777s, 10 more B-767s, and 15 more B-737s. We see no reason why the AA Pilots should not be given credit for all aircraft on order at the time the transaction was announced.

Even in crediting AA Pilots for the projected growth of the AA fleet through 2002, you understate the impact of the manning of those additional aircraft on the seniority ranges. While you acknowledge in your proposal that, particularly at the bottom of each seniority range, the available jobs are spread out over many more pilots than there are jobs, you expand each AA seniority range for projected growth only on a one-for-one basis for the number of jobs added. Surely, even by your own logic, those added aircraft will expand each seniority range by many more seniority numbers than you assume. By understating the expectations of AA Pilots based on projected fleet growth, you transfer those expectations directly from the AA Pilots to the TWA Pilots, giving a windfall to the TWA Pilots to the direct injury of the AA Pilots.

We disagree with your inclusion, in a single "small wide-body" seniority range, of aircraft as widely-disparate as the B-757-200 at the low end and the A-300 at the high end. The flaw in this construction is clear from the aircraft owned or leased by the two carriers in this supposed seniority range at the time the transaction closed:

|           | AA  | TWA |
|-----------|-----|-----|
| A-300     | 35  | 0   |
| B-767     | 79  | 9   |
| B-757-200 | 102 | 27  |

Thus, American's fleet in this proposed seniority range is predominantly B-767 and A-300 aircraft, while TWA's consists primarily of B-757-200s. In its passenger and cargo payload, the A-300 is more similar to a DC-10 than the small wide-body aircraft with which you propose to group it. The TWA Pilots had no expectation of flying an aircraft such as the A-300 absent this transaction, and it is not appropriate for the TWA Pilots to parlay a small wide-body fleet made up of 75 percent B-757-200s and 25 per cent B-767s, into an expectation to fly the A-300. You yourselves recognized this in your previous proposals on March 28 and 29, 2001, when you offered to fence the TWA Pilots off of the A-300.

In your proposal, you set the bottom end of each seniority range based on the 95th percentile of the AA Pilots holding positions in that seniority range, based on your unsupported "suggestion" that the bottom five percent of the jobs in each seniority range must somehow be "less attractive." That suggestion is simply false, as your own merger counsel acknowledged in the videotape presentation of your proposal to the TWA Pilots:

ALPA 001819

Captain Michael J. Day                                       July 18, 2001
                                                                  Page 13

> "On a small carrier, where the desirable job opportunities are few, a high
> seniority number is essential to compete for these limited opportunities. On
> a large carrier, a high seniority number is less important to advancement
> because the pool of desirable job opportunities is so much larger. This is
> another way of saying that a seniority number key unlocks different job
> opportunities on different airlines."

This is, of course, precisely the case here. While a TWA Pilot had two basic choices in
Captain pay rates – narrow-body and small wide-body ($125.06 per hour and $135.63 per
hour, respectively, for a 15-year Captain) – the AA Pilot has 13 choices of Captain pay rates
(ranging from F-100 Captain at $163.73 per hour, to B-777 International Captain at $241.04
per hour for a 12-year Captain). You must also combine this with the eight choices of
domicile available at American, compared with four at TWA (including St. Louis, which
your own Committee described to us as "not the greatest place to be based"). Thus, contrary
to your suggestion, the bottom five per cent of the AA seniority ranges are spread out among
many pilots, not because the jobs are undesirable, but because there are so many desirable
choices available. As a result, the bottom five per cent of each seniority range on the TWA
side is spread out over only a few dozen pilots, while the same percentiles on the AA side
are spread over hundreds, and sometimes thousands, of pilots. The result in constructing
your seniority ranges is that your 95% assumption penalizes relatively few TWA Pilots, but
hundreds if not thousands of AA Pilots – punishing them precisely because they had more
desirable choices than the TWA Pilots absent the transaction.

Nor do we agree that, simply because both AA and TWA operated similarly-sized aircraft,
the jobs on those aircraft are directly comparable, or that pilots holding those jobs have an
equal claim to be placed in the same region of the integrated list. The reality is that the jobs
were not comparable in any respect other than the general size of the aircraft being flown,
for all of the reasons discussed above. On comparably sized aircraft, it is simply undisputed
that the AA Pilots' compensation was better; their working conditions were better; their
opportunities to upgrade to better jobs were better; and their long-term job security, based
on the financial strength of their carrier, was better. This must be taken into account in
combining the seniority ranges on an integrated list. This notion was well articulated by
your previous Merger Chairman at a meeting between our Committees in February 2001.
When we offered to leave the TWA Pilots protected in their existing system in the TWA
LLC for the duration of their careers, Captain Bensel exclaimed that it was not right to leave
the TWA Pilots in a "TWA Ghetto." As we pointed out at the time, that statement made
crystal clear that the TWA Committee's objective is to give the TWA Pilots, not their own
career expectancies, but those of the AA Pilots.

By integrating the TWA Pilots in seniority ranges with AA Pilots which are not truly
comparable, the ALPA proposal would leave the TWA Pilots in positions on the list far

ALPA 001820

Captain Michael J. Day                                      July 18, 2001
                                                           Page 14

above those necessary to accord them their legitimate pre-transaction expectations, and
allowing them to access positions to which they had no legitimate pre-transaction
expectation, and in numbers beyond those held at TWA. Moreover, those TWA Pilots would
then gravitate toward the top of those positions, giving them bidding power beyond what
they could have expected absent the transaction – all while enjoying pay and working
conditions beyond anything they could have expected at TWA.   In each respect, this
represents a direct transfer of career expectancies from AA Pilots to TWA Pilots, inhibiting
the expected career progressions of AA Pilots.

Put another way, simply by moving from TWA to American as a result of this transaction,
a TWA Pilot has reaped an enormous, unexpected windfall on all of these measures. For the
result to be fair, and for each pilot to have his "rightful place", the AA Pilots are entitled to
some consideration for the risk they are bearing to their career progressions in having pilots
from a failing carrier placed ahead of them on the integrated seniority list, to balance at least
a portion of enormous benefits delivered to the TWA Pilots.

In addition to ignoring pre-transaction expectations and differences in pay, benefits and
working conditions, your proposal reduces a pilot's "goals" to a single upgrade from one size
aircraft to another, or from First Officer to Captain. A pilot's actual expectations are longer-
term, and include an entire career path leading through several positions to retirement.  Your
proposal ignores those longer-term impacts by limiting its horizon to a single upgrade. The
devastating impact of this on the AA Pilots, and the windfall it brings to the TWA Pilots in
the long term, becomes especially clear only when you take into account the age 60
retirements projected for the two groups:

| | AA Retirements | | TWA Retirements | |
|---|---|---|---|---|
| | No. | % of List | No. | % of List |
| 2001-05 | 820 | 7.17% | 443 | 19.19% |
| 2006-10 | 1873 | 16.38% | 293 | 12.69% |
| 2011-15 | 1998 | 17.47% | 237 | 10.26% |
| 2016-20 | 3290 | 28.77% | 358 | 15.50% |
| 2021-25 | 2248 | 19.66% | 421 | 18.23% |
| 2026-30 | 1077 | 9.42% | 398 | 17.24% |
| 2031-35 | 129 | 1.13% | 153 | 6.63% |

Thus, the TWA Pilots have a large number of retirements relative to the AA Pilots over the
next few years, followed by a long period in which the reverse will be true and the AA
Pilots' attrition will be heavier. By basing your proposal solely on short-term advancement
projections during a period of heavy TWA attrition, you give TWA Pilots the benefit of their
attrition, but do not do the same for AA Pilots during their period of heavy attrition. To the
contrary, you place your pilots on the integrated list based on heavy TWA retirements, and

ALPA 001821

Captain Michael J. Day                                         July 18, 2001
                                                                    Page 15

thus position them so that they – not AA Pilots – have better access to the advancement
opportunities created by future AA attrition.  Thus, you directly transfer the Pilots' future
advancement expectations to TWA Pilots, giving the TWA Pilots a windfall at the AA
Pilots' direct expense.  Just as one example, prior to the transaction AA seniority number
10168, currently a B-767 First Officer, could reasonably expect to check out as a narrow-
body Captain in less than 10 years, as a small wide-body Captain in less than 15 years, and
as a B-777 Captain in less than 20 years.  The ALPA proposal would place 2,030 TWA Pilots
ahead of that individual; in 10 years, 1,253 of those pilots will remain; in 20 years, 698 of
those TWA Pilots would remain, still in excess of the number of large wide-body Captain
positions in the AA system.  Those TWA Pilots will be in a position to slow his progress to
Captain and deprive the pilot of any opportunity to check out as a B-777 Captain.

•   While your proposal assumes that the AA system includes some "most desirable First Officer
    positions", you nowhere take this into account in the construction of your proposed
    integrated seniority list.  Presumably, among these desirable First Officer positions are
    positions on the B-777, MD-11, and A-300 – aircraft operated only by American.  Even
    accepting your own logic, the construction of the integrated list should have included an area
    representing these First Officer positions unique to American – just as you acknowledge that
    the top portion of the integrated list should be reserved to American Pilots reflecting
    American's unique wide-body Captain positions.  You thus grant another windfall to TWA
    First Officers at the direct expense of the AA Pilots, by equating, in a common seniority
    range, TWA narrow-body and small wide-body First Officer jobs with AA large wide-body
    First Officer jobs.

•   You propose to integrate the seniority ranges for narrow-body Captains and all First Officers
    based on a projection of when each pilot would upgrade to the next seniority range.  Yet, you
    abandon that approach in the small wide-body Captain seniority range, in favor of a straight
    ratio.  The reason is obvious – TWA's small wide-body Captains had no expectation of ever
    progressing to large wide-body aircraft.  You thus place those pilots on the integrated list at
    a level far exceeding their upgrade expectations.  Indeed, for the same reason, to give any
    TWA Pilot an expectancy of achieving large wide-body Captain prior to any AA Pilot hired
    prior to the transaction – who necessarily had an expectation of flying such equipment while
    no TWA Pilot did – is unfair.  It delivers a windfall to the TWA Pilots by directly transferring
    AA promotional opportunities to TWA Pilots, thus injuring the AA Pilots by inhibiting their
    expected career progressions.

•   It is also perfectly obvious why you propose to integrate your proposed narrow-body Captain
    seniority range based on hypothetical advancement dates instead of a traditional ratio – it
    packs all of the TWA Pilots in that seniority range into the top of that area of the list.  On
    your proposed integrated list, this seniority range runs from integrated seniority number 5463
    through integrated seniority number 7828 – a range of 2365 seniority numbers, including 403
    TWA Pilots.  All 403 of those TWA Pilots are placed on the list at or above integrated

                                                            ALPA 001822

Captain Michael J. Day                                             July 18, 2001
                                                                   Page 16

seniority number 6594, after which you have placed an uninterrupted block of 1234 AA
Pilots. You have thus effectively split the narrow-body Captain seniority range into two
ranges – one in which the TWA and AA Pilots are interspersed, and a lower range consisting
entirely of AA Pilots – notwithstanding the fact that every American narrow-body Captain
job was better-paying and had better working conditions, better advancement opportunities
and better job security than any TWA narrow-body Captain position. This is a direct transfer
of positions and bidding power from AA Pilots to TWA Pilots.

• Your proposed fences do not adequately protect the pre-transaction expectations of the AA
  Pilots. As noted above, every AA Pilot hired prior to the transaction has a claim to jobs on
  the B-777, before any TWA Pilot, who had no expectation of ever flying that aircraft. The
  same is true for the other fleet-types in the AA system, including the MD-11, the A-300, the
  B-727, and the B-737. Your proposed fences do not adequately protect those superior
  expectancies.

• Your proposal to "guarantee" the TWA Pilots 355 small wide-body Captain jobs and 809
  narrow-body Captain jobs, based on the number of jobs in the TWA system on the
  announcement date, does not give any consideration to the fact, discussed above, that the
  TWA assets will never contribute that number of jobs to the consolidated operation. As we
  have repeatedly stated, we are prepared to guarantee the number of sustainable Captain jobs
  contributed by the TWA assets to the consolidated system to TWA Captains, and to a
  specified number of TWA First Officers who had a plausible anticipation when hired of
  upgrading to Captain at TWA. By guaranteeing more than that, however, we would give a
  windfall to the TWA Pilots by transferring AA promotional expectations to the TWA Pilots.

• This is compounded by the fact that your proposed guarantees are simply minimums. Your
  proposal would permit TWA Pilots to hold small wide-body and narrow-body Captain
  positions far in excess of those guarantees. Based on your proposed integrated seniority list,
  TWA pilots down to pre-transaction number 1202 could hold small wide-body Captain
  positions today, while the TWA assets realistically will contribute fewer than 300 such jobs
  to the combined operation. Similarly, TWA pilots down to number 1430 could hold narrow-
  body Captain, although the TWA assets clearly will not contribute anything approaching that
  number of Captain jobs to the consolidated operation.

• Your proposal to create a number of TWA international positions based on TWA's operation
  as of the announcement date will not accurately reflect the international jobs ultimately
  contributed to the consolidated operation by the TWA assets. As you well know, there were
  TWA international operations, such as New York-Tel Aviv, which were not assumed by
  American in the transaction. As the TWA system is rationalized, this trend will continue.
  Ultimately, the number of TWA international positions will be determined by the operational
  decisions made by TWA LLC, over which we have no control. In our meetings, you have
  recognized that international flying can be a significant lifestyle benefit. To give the TWA

ALPA 001823

Captain Michael J. Day                                          July 18, 2001
                                                                Page 17

Pilots and artificial percentage of the international flying performed in the consolidated operation, in excess of what TWA will actually contribute, would necessarily transfer that lifestyle benefit from AA Pilots to TWA Pilots.

• Particularly in light of your proposed integrated list, the most injurious item to American Airlines Pilots may be your requirement to displace pilots from common bid statuses in a ratio of AA Pilots to TWA Pilots, i.e, more than five AA displacements for each TWA displacement. As discussed above, the AA Pilots paid dearly in the early 1990s for the rationalization of our system, and thus for our current success. So, whom do you want to bear the full brunt of breathing life back into your airline? The AA Pilots. Nothing could have made TWA a viable carrier on its own, due to its financial condition and its lack of critical mass; yet, you want the AA Pilots to bear 83 per cent of the pain for the rationalization of the TWA system, while the TWA Pilots get an increase in pay, working conditions, benefits, pension, and job security.

• Similarly, you would permit displaced TWA Pilots to access jobs to which they would not otherwise be entitled under your proposed fences. In the context of your proposed list, this will permit TWA Pilots to reap the windfall of positions properly belonging to AA Pilots, particularly as the inevitable impact of rationalizing the TWA system is felt. This would obviously result in detrimental seat and equipment changes for the AA Pilots.

In the end, ALPA's June 14 proposal in many respects approaches a date-of-hire proposal for the TWA Pilots. Indeed, just as in your previous proposals, the middle and lower portions of your pre-transaction seniority list virtually get their dates-of-hire. For instance, 351 of the 404 TWA Pilots in your proposed narrow-body Captain seniority range (pre-transaction seniority numbers 833 through 1184) have been subjected to your proposed date-of-hire limitation, and thus get the equivalent of date-of-hire. In your proposed First Officer seniority range, the same is true – of the 1,147 TWA Pilots in that seniority range, every pilot from number 1431 through 1833 has been subjected to the date-of-hire limitation, and therefore gets his date-of-hire; and the vast majority of pilots from number 1864 through 2182 are subject to the limitation, indicating that the pilots in that area of the integrated list would get date-of-hire as well. Paradoxically, it is your most junior pilots – who were hired in the midst of TWA's lengthy decline; who therefore had the weakest pre-transaction expectations; and who, by virtue of their ages, have the longest horizon in which to reap the benefits of a career at American – for whom your proposed seniority list is most generous. Under your proposal, those pilots will, for many years to come, be in a position to access positions to which they had no pre-transaction expectation at the direct expense of the AA Pilots for whom those positions were part of the expected career path; and, for many years to come, will have access to superior bidding power in those positions.

We have made clear from the outset of this process that such a proposal would not be acceptable, because it does not take into account the differing financial conditions of the carriers prior to the transaction; the differences in the nature of the carriers; the pilot groups' respective pre-

ALPA 001824

Captain Michael J. Day

July 18, 2001
Page 18

transaction expectations; the differences between the groups in pre-transaction pay, benefits, working conditions, and job security; and the anticipated contributions of the TWA assets to the consolidated operation. We also made clear that the proposal will also directly injure the AA Pilots and inhibit their expected career progressions. From early on in the process, the TWA Merger Committee has assured us that it recognized that a date-based integration would not be acceptable, and that you were prepared to work toward a solution more reflective of the realities of this case. Indeed, in your video presentation your merger counsel acknowledged that date-of-hire is appropriate only in a merger of equal and comparable groups, and has not been the predominant method of seniority integration in more than a decade. Unfortunately, your June 14 proposal does not represent a significant movement away from date of hire; instead, as noted at the outset, on balance the proposal is a step backward and, for the bulk of the TWA Pilots, is the functional equivalent of date-of-hire.

## The APA Mergers & Acquisitions Committee's Proposal

Having analyzed ALPA's most recent proposal in light of our shared objectives, we have also reviewed our own approach in light of those same objectives. As we have previously stated, the APA is proposing to construct the integrated seniority list in a manner which recognizes the pilot groups' differing pre-transaction circumstances, their respective pre-transaction expectations, and the value contributed by the TWA assets to the consolidated operation.

We recognize that, prior to its lengthy decline into dire financial straits, TWA had a proud history as a major carrier in the U.S. aviation industry. We also recognize that, subject to American's continuing rationalization of the TWA system, the assets acquired by American from TWA will add value to the consolidated operation in the form of sustainable Captain jobs. We have proposed to construct the integrated list in a manner reflecting that history and those contributions, by integrating a number of TWA Pilots reflecting that number of jobs with the pre-transaction AA Pilots, with placement on the list which reflects the differences between the AA and TWA Pilots' pre-transaction expectations, and which will reflect the "buying power" commensurate with those sustainable Captain jobs over time.

We acknowledge that there are TWA Pilots holding Captain jobs today who would be placed behind the most junior pre-transaction AA Pilot under our proposal. We have therefore proposed that, regardless of where they are placed on the integrated seniority list, existing TWA Captains be protected as long as those Captain jobs remain in the system. We have also stated that we are prepared to accommodate the desire for upgrade of a specified number TWA First Officers who had a plausible anticipation of upgrading when they were hired at TWA – even though that is a prospect for which they had no real expectation at the time of the asset purchase. Indeed, we have proposed that, should American move TWA equipment within the consolidated operation, the total number of Captain jobs protected for the TWA Pilots will remain available. By the same token, we have an obligation to our own pilots to assure that their expectations of upgrading within the AA system prior to the transaction are similarly protected.

ALPA 001825

Captain Michael J. Day                                                      July 18, 2001
                                                                            Page 19

    Thus, the integrated list and fences that we have proposed are designed to protect the TWA
Pilots' legitimate pre-transaction expectations, and to reflect the contributions of the TWA assets to
the consolidated operation – on top of the enormous financial gains and increased job security
enjoyed by the TWA Pilots, which will only be enlarged by the impending Section 6 negotiations.
Our proposal does so without adversely affecting the pre-transaction career expectations of the AA
Pilots whom we represent. So long as the sustainable Captain jobs contributed by the TWA assets
remain in the consolidated system, our proposal protects the jobs of current TWA Captains, and
provides for the upgrade to Captain of a specified number of TWA First Officers, even when those
jobs are moved within the AA system. We will continue to pursue this approach as the foundation
of a fair integration of the AA and TWA seniority lists.

<u>Conclusion</u>

    To summarize, ALPA's June 14, 2001 proposal fails to take proper account of the pilot
groups' legitimate pre-transaction career expectations, based on the differing nature of the carriers;
the differences in pre-transaction pay, benefits, and working conditions; and the pilot groups' long-
term job security based on the financial condition of the two airlines. The proposal will deliver
enormous windfalls to the TWA Pilots, to the direct detriment of the AA Pilots and their expected
career progressions. This impact is compounded by the numerous specific respects in which the
proposal is based on faulty premises. By contrast, the approach which we have proposed gives effect
to the pilot groups' differing expectations, while giving the TWA Pilots credit for the value added
to the consolidated operation by the TWA assets, and protecting the TWA Pilots' expectation of
flying in those pre-transaction positions.

    In conclusion, Mike, you and your Committee have repeatedly emphasized the importance
of unity for the future. We could not agree more. However, your proposal provides the basis for
disunity, because it seeks to place TWA Pilots on the integrated list in positions allowing them to
take positions for which the AA Pilots had legitimate pre-transaction expectations; to permit the
TWA Pilots to exercise dominant bidding power within bid statuses; to harm the AA Pilots and
inhibit their pre-transaction career progressions by transferring those expectancies to the TWA
Pilots; and to impose on the AA Pilots most of the inevitable pain associated with the rationalization
of the TWA system as it is consolidated into American's operation. Our Committee has watched
your proposals move backward, and repeatedly reduce themselves to date-of-hire for the bulk of your
pre-transaction list, and particularly for those TWA Pilots with the weakest pre-transaction career
expectations. We hope that this approach has reflected negotiating tactics rather than the real
objectives of your Committee in this process, and that we can now proceed in the facilitation process
toward reaching an agreement on our groups' legitimate expectations and a fair integrated seniority
list which truly places pilots in their rightful place.

                                                                            ALPA 001826

Captain Michael J. Day                                      July 18, 2001
                                                             Page 20

        We look forward to continuing to work with you, with the assistance of Mr. Valtin, toward
the resolution of this important and difficult issue.  With that resolution achieved, <u>we can truly put
the past behind us and move forward in unity as a single pilot group</u>.

                              Fraternally,

                              *Edwin White Jr.*

                              Captain Edwin C. White, Jr. Chairman
                              APA Mergers & Acquisitions Committee

cc:     Mergers & Acquisitions Committee
        National Officers
        Board of Directors
        Edgar N. James, Esq.
        Wesley Kennedy, Esq.

ALPA 001827