# EXHIBIT 14

August 17, 2001

Captain Edwin C. White, Jr.
Chairman
Mergers & Acquisitions Committee
Allied Pilots Association
14600 Trinity Boulevard, Suite 500
Fort Worth, TX 76155-2512

Dear Ed:

This is in response to your letter of July 18, 2001, in which you comment on our Committee's proposal dated June 14, 2001. The June 14th proposal was characterized as the "Rightful Place Proposal" because it employs an empirical method based on actual jobs to arrive at an equitable integration of the AA and TWA System Seniority Lists. That method is far superior to what pilot groups have done in the past, that is, attempt to correlate conflicting, often irrelevant financial and operating data about their respective carriers in an effort to determine seniority list placement. Such imprecise tools have worked poorly in earlier integrations.

The difficulty with earlier approaches is that their criteria for ordering seniority lists cannot be reliably translated into seniority placements. Realistically, "differences based on the nature of the carriers' pre-transaction operations [or] pre-transaction pay, benefits and working conditions" of the pilot groups are useless in assigning seniority numbers to individual pilots. Similarly, the nature of the corporate transaction giving rise to operational integration tells us very little about seniority list placement. Under American Airlines' approach to integration in this transaction, it is undeniable that an **operational merger** meeting all legal, contractual and internal union policy definitions of "merger" will occur. It is the fact of **operational merger**, not a characterization of the underlying corporate transaction, that is important for pilots. The imprecision of these and other factors mentioned in your letter is why they should not weigh heavily in seniority integration proceedings.

Our proposal quantifies the actual pre-transaction career expectations of AA and TWA pilots in order to effect an integration that preserves those expectations and avoids injuring either pilot group. Your assertion that our proposal does not take into account pre-transaction career expectations is plainly incorrect; those expectations provide the quantifiable, reliable criteria upon which our proposal is built. You are correct, however, in observing that our proposal does not attempt the impossible, that is, to translate financial and operational irrelevancies into seniority placements. We take that as a compliment, not a criticism.

ALPA 004748

My disagreement with your many complaints about our proposal will be detailed below. Although we welcome debate in the interest of reaching a fair seniority integration agreement, we are frankly disappointed by your mistaken insistence that our proposal damages the career expectations of AA pilots. That view is contrary to all reliable evidence available to us. We reiterate that no AA pilot's career progression – measured against his or her actual pre-merger expectations – will be adversely affected by the integrated list we propose. To the contrary, many AA pilots will be advance more quickly under our proposal than otherwise.

### Actual Career Expectations

Your attempt to differentiate between career "goals" and career "expectations" strikes us as quibbling. To say, for example, that the career expectation of a B767 pilot is to fly a smaller piece of equipment based on his carrier's lessened financial prospect at one moment in time, is illogical and rejects airline industry experience. Nearly all air carrier transactions occur because one partner has suffered a financial reverse. In the pre-ADA regulated environment, the "failing carrier" doctrine was virtually the only basis upon which a merger of air carriers would be approved. Even after the regulatory environment changed in 1978, air carrier transactions leading to integrated operations rarely, if ever, occurred between carriers of equal financial strength. Yet no one has seriously contended that the equipment flown by pilots of the acquired carrier should not be used in defining their career expectations.

TWA pilots favored the proposal put forward by American Airlines over all competing proposals in the bankruptcy proceeding. But our enthusiasm for AA should not be taken as an acknowledgment that we had no pre-transaction career expectations. Nor is it accurate for you to argue that "TWA had no realistic options other than the transaction with American to remain in business." After exhaustive analysis, AA's management recognized that TWA was a well-run airline, whose revenue potential was limited by the Karubu Ticketing Agreement, and whose costs were bloated by costly aircraft leases. Elimination of those impediments enabled AA to realize the full value of TWA. To say that TWA's value is maximized by incorporation into a larger system does not mean that its value was unique to American. TWA's value was such as to be equally appealing to other major carriers. Our pre-transaction career expectations reflected that value.

Moreover, as the experience of the Continental pilots shows, the financial prospects of employing carriers often change due to managerial changes, transactions with other carriers, and even successful bankruptcy reorganizations. We suggest that basing career expectations on a snapshot taken at one moment in time represents an extraordinarily cramped view of this most important consideration in seniority list integration. The equipment flown before the transaction by the merging pilot groups is a far more accurate indicator from which to gauge their respective career expectations than a financial snapshot. The cute K-Mart/Saks metaphor you employ, even if K-Mart's

ALPA 004749

strong balance sheet had not confused it, cannot overcome the logic of grouping pilots by equipment and status to construct seniority ranges.

### TWA's Contributions to the Transaction

Although financial data contributes little to an understanding of the pilots' pre-merger career expectations, the contribution made by TWA to this transaction is a fair subject of inquiry. At the time of the acquisition TWA was the nation's eighth largest carrier, with 4.3 percent of the United States market. Based on its market share, TWA was about one-quarter of AA's size (*Washington Post*, February 3, 2001, p. E-1). The TWA acquisition enabled American, which had trailed United in size and was barely ahead of Delta, to move solidly into first place with over 23 percent of the U.S. market. *Id.*

As to the value of TWA assets, while AA's pilots apparently would not have bought TWA, AA management, which you characterize as providing skillful leadership, clearly thought otherwise, agreeing with the consensus judgment of the financial and management community on this issue. *Business Week* (January 22, 2001, p. 34), for example, noted that at an acquisition price of $5 billion ($700 million more than actually paid), "the acquisition looks like a bargain." The article also paraphrases Thomas I. Barkin, co-head of McKinsey & Co.'s airline practice: "positioning for the day of global consolidation among airlines may prove to be smart for American." TWA offered AA a very quick response to opportunities created by expanded route networks, especially since American and TWA overlap on only 4 percent of their passenger miles. It was presumably for this reason that, as AA Vice President (Captain Robert Kudwa) said in his Hotline Message of April 13, 2001, AA intends to maintain "ALL the capacity that TWA produces."

The TWA acquisition immediately added 19.9 percent to AA's gross revenue and 23.4 percent to AA's capacity (ASMs) based on year 2000 SEC data. An increase in capacity, of course, directly leads to more flights, employees and aircraft. Considering AA's internal growth forecast of 3 percent, the TWA transaction immediately adds seven times AA's expected growth in both revenue and ASMs. The 173 aircraft acquired from TWA enlarged AA's fleet by 27 percent. Additionally, AA acquired 138 TWA gates at nine airports and 190 slots at four key airports (JFK, LGA, DCA, ORD). With St. Louis, which AA's CEO described as the "crown jewel" of the transaction, AA also acquired a third mid-continent hub. The systemic growth enabled by the TWA acquisition may be the biggest gain for AA. Quoting an estimate by airline analyst Sal Colak, CIBC World Markets, the May 2001 issue of *CFO Magazine* stated: "once TWA is fully integrated, that part of American will grow at around 10 percent or 12 percent over three to five years – largely because of American's better credit rating and financial expertise."

Your letter attempts to minimize these contributions by presuming that any swap of existing assets for replacements will result in the loss of TWA jobs. That presumption is inaccurate. Certain B767-300 aircraft that are not compatible with AA's fleet will be replaced by as many as 15 new B767s ordered by AA after the transaction was finalized.

ALPA 004750

But the jobs brought to the transaction by the TWA pilot group are not thereby reduced because the new aircraft are destined for TWA markets. As Captain Kudwa told your pilot group on April 13th, AA plans to retain or replace all of TWA's aircraft. We recognize that the DC-9 aircraft acquired from TWA will be retired; yet the markets served by those aircraft will be serviced in the short-run by rerouting AA aircraft. Further, the orders for 15 B717-200 aircraft assumed by AA will offset the disposition of DC-9 aircraft. Those additional B717 aircraft are scheduled to enter service later this year. Thus, the flying brought to AA by the TWA acquisition will be preserved for the consolidated pilot group.

### Lack of Injurious Windfalls

Your July 18th letter reflects a basic philosophical difference between our Committees that must be confronted if we are to reach agreement over how our system seniority lists are to be integrated. In our view, pilots and other employee groups are entitled to whatever windfalls they can obtain as a result of a transaction between airlines, so long as their advantages do not come at the expense of other employees. There is no apparent reason why the benefits of air carrier transactions should be confined to management and the shareholders. Here, TWA pilots will obtain pay and certain benefit improvements when the Greenbook becomes applicable to them, while AA pilots already have gained important job protections in the Transition Agreement and for many the pace of their career advancement will quicken after operational integration. These advances are "windfalls," in the sense that they are attributable to the transaction, but they are also desirable and appropriate to the extent they do not injure either pilot group.

Our June 14th proposal was carefully designed to avoid injurious windfalls. Special care was exercised to assure that, in integrating TWA pilots, the pre-transaction expectations of AA pilots were not harmed. No benefit of the transaction gained by a TWA pilot comes at the expense of an AA pilot. Your Committee apparently has a different view of the windfall issue – one holding that any gain made by the TWA pilots should in fairness be offset by their suffering elsewhere. We hope that we are mistaken because that view is seriously flawed. There is no good reason in logic or experience why, for example, pay increases should negatively affect seniority placement. Under the injurious windfall doctrine, a pay increase not coming at the expense of other pilots cannot justify hurtful actions, which do come at the expense of other pilots. We do not object to windfalls benefiting the AA pilot group, so long as they do not harm our group, and ask that you do the same.

We also take issue with your contention that our proposal must somehow take into account speculation about what AA will or will not do with the assets it acquired from TWA as it rationalizes its network upon operational integration. As noted, AA's management has repeatedly stated that it intends to retain or replace all of TWA's aircraft and maintain its capacity in order to achieve the growth in network mass and city power that, in part, motivated AA to acquire those assets in the first place. This being so, it is equally possible that the "rationalization" you speak of could come on the AA side, especially given the older average age of the AA fleet. We say this, not to be

ALPA 004751

provocative, but to illustrate that speculation about management's intentions is an unreliable basis for ordering seniority lists.

In this connection, we note that APA and AA continue to dispute the effects of the Reno transaction on AA pilots. APA insists that all Reno equipment was disposed of and lost to the consolidated pilot group, while AA claims to have replaced every Reno aircraft with new B737 or B757 equipment, which had not been previously on order, and to have expanded West Coast flying beyond what AA and Reno had flown separately prior to the transaction. Overall, AA claims, the Reno transaction benefited AA and its pilot group. Because the current transaction is much different than Reno, it is unnecessary for us to enter into the debate between you and AA's management. The only reason for mentioning it is to underscore our objection to basing seniority integration decisions on factors as nebulous as anticipated "future network rationalization."

In short, the "Rightful Place Proposal" preserves the pre-transaction career expectations of both pilot groups and avoids injurious windfalls. We are not quite sure what to make of your suggestion that all First Officer positions at TWA are comparable to new hire positions at AA. After all, one-half of your pilot group consists of First Officers. Although we have not calculated the mean or median seniority of AA First Officers, it is quite clear that relatively few are new hires. That fact alone indicates the fallacy of your statement. We assume that the revealed preferences of AA pilots will show that some F/O positions are more desirable than others. The fact that some SWB F/O positions are held by very junior AA pilots illustrates nothing more than that. It certainly does not show, as you claim, that the F/O "jobs contributed to the consolidated operation by the TWA assets are substantially new-hire jobs."

### Response to APA's Technical/Conceptual Criticisms

1. *Impact of Aircraft Orders.* Aircraft on order at the time of the transaction through December 31, 2002 were credited to the American pilots in constructing the seniority ranges and performing the integration described in the June 14th proposal. The date was selected from SEC filings made the Company, which constituted the only reliable evidence of firm orders available to us. As indicated, we are unwilling to make seniority decisions on the basis of speculation and uncertain data. If the orders for aircraft scheduled for delivery in 2003 and 2004 are sufficiently reliable to warrant their inclusion, we will be pleased to take them into account.

2. *Extension of Seniority Ranges Due to Aircraft Orders.* The staffing implied by the additional aircraft on order appropriately extends each affected seniority range only by the number of jobs to be added. Seniority ranges are constructed by equipment and status on the basis of the revealed preferences disclosed by the bidding patterns of AA pilots. When new equipment is added, there is no basis for assuming that all of it will be flown in undesirable bid packages. This being so, pilots already within the seniority range who previously bid smaller equipment for quality of life reasons are likely to bid the desirable jobs created by the new larger equipment. Put another way, the addition of new equipment is far more likely to fill in the applicable seniority range than to spread it

**ALPA 004752**

out further. That plainly was the experience of your pilot group in both large wide-body and small wide-body positions during the period January 1 through August 15, 2001. Moreover, it appears that the large wide-body range will compact still further when additional simulator slots become available, and the Company-imposed restriction on bidding large wide-body positions by age 58 pilots is removed

3. *The A-300 Is A Small Wide-Body Aircraft.* The classification of the A-300 in the small wide-body range with the B767 is appropriate. Though configured for a slightly larger passenger load, at approximately 381,000 lbs., the A-300 is lighter than the B767 and has a shorter range. As you know, AA will soon re-deploy its A-300 equipment from Transatlantic service to shorter Caribbean routes for which it is better suited. New B767 aircraft will be used for the Transatlantic routes. Moreover, the A-300 and B767 equipment types are treated almost the same by the Greenbook. We believe that the integration issues raised in your July 18th letter are more appropriately considered in the context of conditions and restrictions than by misclassifying aircraft.

4. *Ending Seniority Ranges At the 95th Percentile Is Warranted.* As noted, seniority ranges are constructed on the basis of the revealed preferences of AA pilots. To say that an AA pilot bid a smaller, less remunerative piece of equipment because he had a wide selection of less remunerative bid choices outside the seniority range does not detract from the fact that he found his bid choices within the seniority range less desirable. The question is where to set the lower boundary of the seniority range. Our Merger Counsel did not address this issue in his videotaped remarks. Taking his accurate statement out of context does not aid your cause.

Filling the seniority ranges with many pilots who, on the basis of equipment flown, do not belong in them would seriously diminish the accuracy of the promotional expectancy integration method. Your complaint that hundreds and perhaps thousands of pilots not flying the equipment types upon which the seniority ranges are constructed were omitted from the ranges attests to the appropriateness of using the 95th percentile as the lower boundary of each seniority range.

5. *Job Comparability Complaint.* Your complaint that the jobs of AA and TWA pilots flying the same equipment were not truly comparable is irrelevant. First, viewed in the context of what the TWA pilots bring to American, the jobs are identical because they will become AA jobs and ultimately available to both pilot groups commencing with operational integration. Second, the Rightful Place Proposal does not treat TWA jobs as the exact equivalent of AA jobs. This is apparent from the construction of the small wide-body seniority range, in which the first TWA pilot appears at the 45th percentile of small wide-body pilots. In short, the concern you express is met by the fact that the seniority ranges are weighted in favor of AA pilots. This concession was bitterly opposed by many in our pilot group. We are distressed that you have ignored it.

6. *Extension of the Captain Expectancy Methodology to Future Promotions.* The accuracy of any economic method deteriorates when extended too far into the future. No one can foretell the future. That is why we hesitate to agree with your assumption that

ALPA 004753

AA pilots will be injured because our proposal does not take into account your pilot group's retirements in 2016-2025. Many factors, including accelerated early retirements, growth, additional transactions, regulatory change and productivity increases, to name just a few, could dramatically change the promotional expectations of all pilots on AA's system over a twenty-five year horizon. This is why arbitrators and courts routinely dismiss such projections as speculation. Nonetheless, in the interest of cooperation, we are considering whether the Rightful Place methodology can be extended to capture the effect of promotions beyond the next seniority range.

7. *Are Desirable First Officer Ranges Feasible?* Large wide-body First Officers are primarily grouped with Captains by our proposal. Thus, we do not believe that the absence of wide-body First Officer ranges from our proposal truly represents a flaw. Some wide-body First Officers fall below the Captains' ranges; you have expressed concern about that residual group. Although we are dubious, we will consider whether inclusion of another seniority range is warranted.

8. *Should Captains Be Grouped With Captains?* Your complaint that our proposal groups TWA's small wide-body Captains (commencing at the 45th percentile) together with AA's small wide-body Captains instead of in some inferior position, is simply unjustified. The concern you express is not a fair criticism of the seniority integration methodology. And, to the extent it is based on the patently false assumption that all 11,389 AA pilots (1-01 List) had the pre-transaction expectation of advancing to some 277 B777 positions, your concern is wildly overstated. The issue you raise should be dealt with by a suitable restriction, not by grouping our small wide-body Captains within another seniority range. We have offered a restriction to reflect the fact that TWA pilots did not have an expectation of B777 flying before the transaction. We suggest that you offer a counter-proposal.

9. *Narrow-Body Captain Seniority Integration.* The reason why TWA narrow-body Captains are not distributed evenly throughout the NB seniority range is that they had an earlier pre-transaction expectation of reaching Captain than did the AA pilots appearing lower within the seniority range. Your complaint that our proposal effectively splits the narrow-body Captain range into two ranges would apply to any seniority integration method other than a 1:6 ratio. You do not explain why application of a ratio would be any fairer or more equitable than the method we propose. Frankly, we are skeptical that any other *reasonable* method will produce fairer results. After all, every one of the AA pilots in what you describe as the "lower NB seniority range" advances to the SWB seniority range more quickly (typically well in excess of 100 days) than he would have before the transaction.

10. *Fences.* We have proposed a hard, ten-year fence during which TWA pilots will not be able to bid on B777 aircraft to be replaced by a porous fence in which the number of a TWA pilots advancing to B777 positions will be subject to a 17 percent ceiling. The fence would not fall until every AA pilot with a seniority date earlier than March 12, 2001 is able to bid a B777 captaincy. With the possible exception of those in Northwest/Republic, no fence designed to protect wide-body flying has lasted longer than

**ALPA 004754**

the one we propose. We are prepared to discuss additional fences for the A-300 and the other aircraft you identify, even though some of the latter equipment types will soon be retired.

11. *Captain Guarantees.* Our proposal for 355 wide-body and 809 narrow-body captaincies was designed to address your Committee's concern that TWA pilots would "flood" the Captains' ranges and occupy positions far in excess of what was acquired from TWA. Our proposal was meant to institute ceilings on TWA captaincies within the applicable ranges. Admittedly, the issue became somewhat confused as a result of the discussion over what you term "sustainable captaincies, and the number of captaincies in our proposal was described as being both a ceiling and a floor. The issue of Captain guarantees remains open; however, our proposal is for a condition limiting the number of wide-body and narrow-body captaincies.

12. *International Flying.* We have proposed to preserve a fair share of the international flying brought to the transaction by TWA. As many airline analysts have noted, TWA's international routes constitute a vitally important addition to American's network. All of that flying should not be captured by the AA pilots. The notion that the international flying we bring to the transaction will be rationalized away after the operational merger is fanciful. Nor do we consider the restrictions on our international flying imposed by the Transition Agreement to constitute operational "rationalization." The lifestyle benefit transfer you speak of in your July 18th letter endangers TWA pilots, not AA pilots.

13. *Displacements.* Our proposal to displace pilots from common bid statuses in a ratio of TWA to AA pilots is designed to share the "pain" as well as the "gain." A displacement from a common domicile after operational integration has absolutely nothing to do with "breathing life back into TWA" and everything to do with whether pilot domiciles on the post-transaction carrier expand or contract. True, after operational integration, some rationalization of the AA network could occur. That rationalization could affect the pre-transaction AA system instead of the pre-transaction TWA system, assuming any such distinction can be drawn, in which case our proposal would favor AA pilots. There is nothing unfair about proportionate displacements. Certainly, the rationalization American underwent in the early 1990s does not justify treating the TWA pilots as "displacement fodder," while the American pilots enjoy all the benefits of a transaction concluded nearly ten years later.

14. *Date of Hire Limitation Objections.* The TWA Merger Committee limited the promotional expectancy methodology of its June 14th proposal in one particular. That is, TWA pilots having a faster promotional expectancy but less total longevity than AA pilots with earlier American hire dates, were slotted behind the AA pilots on the proposed seniority list. We find it remarkable that a limitation imposed for the exclusive benefit of AA pilots should be objectionable to your Committee simply because it is phrased in date of hire terms. The suggestion that we should be less generous to TWA pilots who are subject to the DOH limitation is little different from contending that we should ignore their promotional expectancies altogether.

**ALPA 004755**

In conclusion, we do not believe that the criticisms of the Rightful Place Proposal made by your Committee warrant substantial change in its methodology or the seniority list produced using that methodology. Our proposal is decidedly superior to the last proposal made by your Committee under which two-thirds of our pilot group, including many Captains, would be stapled to the bottom of the consolidated seniority list, while the top one-third is to be distributed on a 1:5 ratio among AA First Officers and very junior narrow-body Captains.

We look forward to resuming negotiations on August 20, 2001.

Fraternally,

Captain Mike Day
Chairman
TWA-MEC Merger Committee

ALPA 004756

# EXHIBIT 15

# AA/TWA PILOT

## SENIORITY INTEGRATION:

## SUMMARY OF SUPPLEMENT CC

### [TO AA/APA BASIC AGREEMENT]

*From*

*APA's Mergers & Acquisitions Committee*

**December 14, 2001**

ALPA 008746

- *A fair integration should preserve the career expectations of the members of each pilot group — the <u>pre-transaction</u> expectations at the time the transaction was entered into.*

- *A fair integration should avoid "injurious windfalls" — windfalls to one pilot group at the other's expense.*

It is important to understand that the pilots' expectations are measured <u>pre-transaction.</u> What were the pilots' expectations immediately prior to the transaction, and what would their career paths have been if the transaction had not happened and the separate carriers had continued to exist into the future? That means that events <u>after</u> the transaction are of secondary importance in measuring fairness, because the important question is what each group "brought to the party" at the time of the transaction. This is a two-way street. It means that the TWA pilots cannot claim to have <u>expected</u> the improved pay, work rules, retirement and job security that they have gained from the transaction. It also means that, to some extent, we have to treat the TWA pilots as if TWA would have continued in operation, since the AA pilots cannot claim that they <u>expected</u> to have the benefit of added aircraft, jobs, and advancement opportunities that, in fact, belonged to TWA prior to the transaction. Similarly, a focus on <u>pre-transaction</u> expectations means that the fairness of the seniority integration is measured without the impact of the unexpected events of the past few months. Such events have impacted both groups, and are presumed to be temporary in any case. The integrated seniority list will be in place permanently, and therefore should reflect long-term trends and prospects.

  - **Both Committees stated that seniority integration should be based on a methodology to analyze the fairness of the result**.

  Again, although we disagreed on some of the details, the two Committees followed a common approach to analyzing each other's proposals, based on a "career path" analysis — identifying important milestones in a pilot's career path such as initial Captain upgrade, upgrade to small wide-body Captain and (for the AA pilots) upgrade to large wide-body Captain. By comparing a pilot's career path absent the transaction and under an integrated list, it is possible to quantify and analyze how a pilot's pre-transaction career progression is affected by the integration.

## III. THE TIMELINE FOR IMPLEMENTING AN INTEGRATED LIST

Throughout this process, many pilots have asked why the M&A Committee has not arrived at a solution and implemented it immediately. Aside from the complexity of the process described above,

# EXHIBIT 16

AGREEMENT

between

AMERICAN AIRLINES, INC.

and

THE AIR LINE PILOTS

in the service of

AMERICAN AIRLINES, INC.

as represented by the

ALLIED PILOTS ASSOCIATION

Effective:  May 5, 1997

title.doc

ALPA 013208

SECTION 13

SENIORITY

A.   Service with Company

Seniority as a pilot shall be based upon the length of service as a flight deck operating crew member with the Company except as otherwise provided in Sections 11 and 12 of this Agreement.

B.   Seniority Date

Seniority shall begin to accrue from the date a pilot is first assigned to air line flying duty and shall continue to accrue during such period of duty except as provided in Sections 11 and 12 of this Agreement.

C.   Retention of Seniority

A pilot once having established seniority shall not lose such seniority except as provided in this Section, nor shall his relative position on the Pilots' System Seniority List be changed, except as provided in paragraph B. of this Section.

D.   Basic Seniority Rule

Seniority shall govern all pilots in case of promotion, demotion, their retention in case of reduction in force, their recall from furlough, their assignment or reassignment due to expansion or reduction in force or schedules, and their choice of vacancies, provided that the pilot is sufficiently qualified for the conduct of the operation to which he is to be assigned, and provided further that the awarding of all third crew member flying assignments and base vacancies shall be subject to the terms of the Tripartite Agreement between American Airlines, Inc., the Allied Pilots Association and the AAL Chapter, Flight Engineers' International Association, effective December 11, 1964.   In the event a pilot is considered not to be sufficiently qualified, the Company shall promptly furnish such pilot written reasons therefor. This paragraph shall apply, provided that certain other rules in this Agreement stipulating specific methods and procedures of applying system seniority shall govern such application of system seniority only to the extent of the specific provisions of such rules.

E.   Failure to Qualify in Turn

When a junior pilot is promoted over a senior pilot, by reason of the failure of the latter to qualify in his turn, the senior pilot shall continue to retain his position on the Pilots' System Seniority List.

F.   Loss of Seniority

   1.   Resignations, Discharges

A pilot who resigns from the service of the Company, or is discharged for just cause, shall forfeit all seniority as a pilot.

   2.   Failure to Return from Furlough

When a pilot who has been furloughed is offered, by written notice from the Company, the opportunity to return to duty as a pilot and such pilot elects, by written statement to the Company, not to return to such duty, or if a recalled pilot fails to comply with the requirements of Section 17.W. of this Agreement, his seniority right of preference in re-employment shall at that time terminate, and all his seniority as a pilot shall be forfeited.

   3.   Duration of Re-employment Preference

At the end of ten (10) years from the date of furlough, a pilot who has not been re-employed by the Company shall forfeit all his seniority and shall not be entitled to preference in re-employment.

   4.   Retention of Company Benefits

Upon return from furlough, a pilot shall receive all Company benefits accruing by reason of his previous active service.

G.   System Seniority List

   1.   Seniority List Supplied by Company

13 - 1

ALPA 013225

The Company shall provide each pilot, within thirty (30) days after July 1st of each year, a Pilots' System Seniority List, effective July 1, which contains the names of all pilots arranged in the order of system seniority, whether active or inactive, and the seniority date of each pilot. Such list shall also reflect each pilot's normal retirement date.

2.  Protests

    a.  A pilot shall be permitted a period of thirty (30) days after any posting of the Pilots' System Seniority List, each year, in which to protest to the Company any omission or incorrect posting affecting his seniority.

    b.  A pilot on leave or away from his base station at the time of posting of the list shall have a period of thirty (30) days from the date of his return to his base station during which to file such protest.

    c.  Any incorrect posting or any other discrepancy which went unprotested on the annual list in which it first appeared shall not be protested on any subsequent annual posting except that typographical and clerical errors may be corrected at any time.

sec13.doc

13 - 2

ALPA 013226

# EXHIBIT 17

## Page 1

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF TEXAS

PATRICK BRADY, et al,          )
   Plaintiff            )
              ) Civil Action No.
V.      )   02-2917 (JEI) (DNJ)
              )
AIR LINE PILOTS ASSOCIATION,)
INTERNATIONAL,          )
   Defendant          )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VIDEO DEPOSITION OF JOHN DARRAH
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ANSWERS AND DEPOSITION OF JOHN DARRAH, produced as
a witness at the instance of the Defendants, taken in
the above-styled and -numbered cause on the 29th day of
November, 2012, A.D., beginning at 10:01 a.m., before
Brandy Cooper, a Certified Shorthand Reporter in and for
the State of Texas, in the offices of McKool Smith,
located at 300 Crescent Court, Suite 1500, Dallas,
Texas, in accordance with the Federal Rules of Civil
Procedure and the agreement hereinafter set forth.

## Page 2

1        A P P E A R A N C E S
2  FOR THE WITNESS:
3    MARK R. MYERS
      Allied Pilots Association
4    14600 Trinity Boulevard, Suite 500
      Fort Worth, Texas  76155-2512
5    (817) 302-2181
      mmyers@alliedpilots.org
6
    FOR THE PLAINTIFFS:
7
    JOE JACOBSON
8    Green Jacobson, P.C.
      7733 Forsyth Boulevard, Suite 700
9    Clayton, Missouri  63105
      (314) 862-6800
10    jacobson@stlouislaw.com
11  FOR THE DEFENDANTS:
12    DANIEL J. TOAL
      JOSHUA D. KAYE
13    Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.
      1285 Avenue of the Americas
14    New York, New York  10019-6064
      (212) 373-3190
15    dtoal@paulweiss.com
      jkaye@paulweiss.com
16
    ALSO PRESENT:
17
    ALICE GEORGE - Videographer
18    MARTA WAGNER - with ALPA
19  WITNESS' ADDRESS:
20    Not Given

## Page 3

1        I N D E X
2
3  Appearances . . . . . . . . . . . . . . . . . Page   2
4  Exhibit Index . . . . . . . . . . . . . . . Page   4
5  Stipulations  . . . . . . . . . . . . . . Page   7
6  Examination by Mr. Toal . . . . . . . . . . Page   8
7  Examination by Mr. Jacobson . . . . . . . . Page  158
8  Further Examination by Mr. Toal . . . . . . Page  171
9  Signature and Corrections . . . . . . . . . Page  174
10  Reporter's Certificate  . . . . . . . . . . Page  175

## Page 4

1       E X H I B I T   L I S T
2              Page
  No.   Description
3
4  1  APA Information Hotline from Mr. Darrah; 1-8-01  14
5  2  APA Information Hotline from Mr. Darrah; 1-10-01 15
6  3  Memo from Mr. Kudwa; 1-10-01       20
7  4  Letter from Mr. Bensel to Mr. White; 2-15-01   26
8  5  Letter from Mr. White to Mr. Bensel; 2-16-01   28
9  6  APA Information Hotline from Mr. Darrah; 2-16-01 30
10  7  APA Offer to TWA Pilots for American Airlines/
11    TWA Seniority List Integration; 3-1-01      33
12  8  Letter from Mr. Bensel to Mr. White; 3-2-01   37
13  9  Letter from Mr. Wilder to Mr. Kennedy; 3-6-01   44
14  10  Letter from Mr. Kennedy to Mr Wilder; 3-13-01   47
15  11  E-mail from Mr. O'Leary; 3-24-01      52
16  12  Memo from Mr. Brundage to American Airlines
17    Pilots; 3-27-01            58
18  13  Letter from Mr. Kudwa to Mr. Darrah; 3-27-01   64
19  14  Article from Dallas Morning News; 3-29-01   65
20  15  Message from President to Fellow Pilots;
21    3-30-01               70
22  16  Agreement between American Airlines and APA   71
23  17  Letter from Mr. White to Mr. Brundage; 4-12-01  74
24  18  Agreement for Engagement of Facilitator;
25    ALPA 7748-7751            77

Page 41

1    Q.   And did that affect how the APA approached the
2    seniority integration process?
3    A.   Yes.
4    Q.   In what way?
5    A.   I believe -- you know, we had to look at it in
6    different aspects, is -- one was the captain positions
7    themselves, and the other was, when you look at fair and
8    equitable, how the integration worked.  When you look at
9    it from just a standpoint of the contracts, ours was a
10   much richer contract.
11   If I recall, I remember the number $138 an
12   hour, off of memory.  I think that was about a 767
13   captain pay rate at TWA, and about 125 for a captain on
14   a narrow body.  In contrast, we were about 182 for a
15   narrow-body captain, and I want to say about 204 for a
16   767, somewhere in there.  So we're looking about a 50,
17   $60,000 a year pay raise, just right off the bat for a
18   TWA pilot captain to come across.  And obviously, the
19   co-pilot would have, percentage wise, the same type of
20   increases.
21   So when you looked at our pay rates on a
22   narrow-body FO, and I have to do the math here, we were
23   probably about 126 bucks an hour for a Super 80 FO where
24   they were 125, $126 for a captain.  So when you look at
25   the context of the contracts, our contract was much

Page 42

1    richer.  That was one part of the equation.
2    The other part of the equation was
3    expectations of obtaining those aircrafts because of the
4    size of the fleet, orders we had on the books, future
5    progression, you had to put that all together to
6    determine what was fair and equitable.  So that was one
7    piece of the puzzle that we looked at, yes.
8    Q.   And when you talk about the APA contract with
9    American Airlines being much richer, other than the --
10   the hourly rate components that you discussed, were
11   there other ways in which the APA considered its
12   contract to be richer than the TWA contract?
13   A.   Yeah.  Essentially, if you look at a contract,
14   there's five parts of it.  There's scope, there's pay,
15   there's pension, there's benefits and there's
16   scheduling.  Scheduling we -- we call quality of life,
17   essentially, as a pilot.  Our pay was significantly
18   better.
19   Our pension plan, TWA had terminated their
20   A plan in the early '90s, I believe.  They had a DAT
21   plan at that point.  I think it was 14.3 percent, which
22   was a little richer than our B plan, but they had no
23   follow-on A plan.  We had an A plan at the time and
24   11 percent B -- B plan.  So essentially they were
25   trading a 3.3 percent contribution for an A plan, which

Page 43

1    A plan is not market risk, which is a much richer plan.
2    That was the pension piece.
3    Quality of life, our quality of life was
4    one of the best contracts out there at the time.  We had
5    a 78-hour hard limit, which we had just until we were
6    abrogated a couple of months ago, where I believe TWA
7    could fly their pilots to FARs, which means more days on
8    the road.  So a typical pilot, a bid sheet at American
9    Airlines, you can only work 15 days a month.  For TWA it
10   was a lot more than that.  Quality of life was a lot
11   better.
12   Then you looked at our scope protections
13   and our protection in our scope agreement, we were much
14   tighter, which basically had job protections in them.
15   And on the benefits, I think our benefits overall were
16   probably a little bit better, but I couldn't speak to
17   those.
18   Q.   And did APA's views about job security at the
19   two airlines factor into its views on what an
20   appropriate seniority integration was here?
21   A.   Security in a broader context of expectations
22   or, you know, what we saw.  If you looked at -- you took
23   TWA in isolation and said, all right, a pilot over
24   there, what was their future?  It was much different
25   than a pilot would look at his future at American

Page 44

1    Airlines, in stand-alone units, in many respects.
2    The financial condition of the airline,
3    the future growth opportunities, the aircraft on order,
4    you just look at the time.  We were exploding in the
5    airline industry.  We were hiring 100 pilots a month at
6    American Airlines.  We had never seen that before.
7    Contracting out our training, etc.  And at that point in
8    time, you know, the expectations of upgrades were just
9    like we've never seen before.
10   So when you contrasted that, what was
11   going on on the American Airlines property to what was
12   going on on the TWA property, I believe they were
13   hiring, but it was essentially more for attrition than
14   growth, if you will, then you just look at the
15   condition.  We looked at all of that and took it into
16   account.
17   (Exhibit No. 9 was marked.)
18   Q.   (BY MR. TOAL)  I'm going to show you a document
19   that I will mark as Darrah Exhibit 9, which is a
20   March 6th, 2001 letter from Roland Wilder to Wesley
21   Kennedy.  If you'll let me know if this is a document
22   that you saw at or around the time it was sent.
23   A.   Wilder to Kennedy.  Yes.
24   Q.   Okay.  So this is a -- it's a draft memorandum
25   of agreement.  Do you see that?

Page 45

1   A.  Yes, sir.
2   Q.  And do you know who Roland Wilder is?
3   A.  I believe he was the legal representation for
4   the ALPA group at the time for seniority issues.
5   Q.  Okay.  And who is Wesley Kennedy?
6   A.  He was our representative for APA for seniority
7   integration issues.
8   Q.  Okay.  Do you see in the third paragraph of
9   this proposed memorandum of agreement, Mr. Wilder is
10  proposing binding arbitration if there's no agreement
11  reached after 30 days of mediation concerning seniority
12  integration?
13  A.  Yes, sir.
14  Q.  Was the APA amenable to binding arbitration in
15  the event that -- that the APA and the TWA MEC were
16  unable to reach an agreement on seniority integration?
17  A.  No, sir, absolutely not.
18  Q.  Why not?
19  A.  They would never agree to arbitration on the
20  seniority list.
21  Q.  The APA would never?
22  A.  Nope.
23  Q.  Why?
24  A.  Because we own the seniority list --
25      THE REPORTER:  I can't hear.

Page 46

1       THE WITNESS:  Because we own the seniority
2   list according to our contract.
3   Q.  (BY MR. TOAL)  What do you mean by that, that
4   you own the seniority list?
5   A.  The contract is ours by definition, the
6   seniority list by definition of our Green Book, and that
7   was even acknowledged by Mr. Carty.  In a meeting with
8   Mr. Carty, we had discussions on that, and his statement
9   was the seniority list integration is your
10  responsibility, you own it.  And American Airlines
11  acknowledged that.
12  Q.  Can you conceive of anything that ALPA could
13  have done to persuade the APA to agree to binding
14  arbitration of the seniority integration?
15      MR. JACOBSON:  I'm going to object to the
16  form of the question.  It calls for speculation.  It
17  leaves out facts that may be material --
18      MR. TOAL:  You can just object to the form
19  of the question instead of a speaking objection.
20      MR. JACOBSON:  I can -- I can make my full
21  objection because my objection good.  It seeks an
22  opinion without providing all the material facts that
23  are required for opinion from a witness who is not an
24  expert.  And it calls for speculation.
25  Q.  (BY MR. TOAL)  You can answer the question.

Page 47

1   A.  Okay.
2   Q.  Do you want it read back?
3   A.  Please.
4       MR. TOAL:  Can you read back the question?
5       (Requested Portion was Read.)
6   Q.  (BY MR. TOAL)  To agree to binding arbitration
7   of the seniority integration process?
8   A.  No, I cannot.
9       (Exhibit No. 10 was marked.)
10  Q.  (BY MR. TOAL)  Let me show you a document that
11  I will mark as Darrah Exhibit 10.  It's a March 13th,
12  2001 letter from Wesley Kennedy to Roland Wilder, and
13  it's copied to you, among others.
14  A.  What was the date on the previous -- so this
15  isn't in chronological order, correct?
16  Q.  That's right.  So the previous memorandum of
17  agreement we looked at was dated March 6th, 2001.
18  A.  6th.  Okay.
19  Q.  So this is a week later.
20      Is this a document you received at or
21  around the time it was sent?
22  A.  Yes, sir.
23  Q.  Is this a document that you reviewed before it
24  was sent out?
25  A.  Yes, sir.

Page 48

1   Q.  And do you -- did you approve its contents?
2   A.  Yes, sir.
3   Q.  And what was the purpose of this letter?
4   A.  The purpose of the letter was to respond to
5   Mr. Wilder's letter of the date of March 6th, I believe,
6   you just quoted.
7   Q.  And did this letter accurately state the APA's
8   view regarding whether they agreed to binding
9   arbitration of seniority arbi- -- seniority integration?
10  A.  Yes, sir.
11  Q.  If ALPA had threatened a lawsuit to seek an
12  injunction of the TWA acquisition, would that -- would
13  that have made the APA more receptive to binding
14  arbitration of seniority integration?
15      MR. JACOBSON:  I have an objection to the
16  form of the question.  It calls for speculation.  It
17  seeks an opinion from a person who's not a designated
18  witness without providing him with all of the facts and
19  material for such an opinion.
20  Q.  (BY MR. TOAL)  You can answer the question.
21  A.  Yeah.  There was nothing that would have been
22  done by anybody that would have had APA agree to binding
23  arbitration.  There is no way the politics at APA would
24  have gone for that.
25  Q.  What if ALPA had threatened a jump seat war

# EXHIBIT 18

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

PATRICK BRADY, et al.,
    Plaintiffs,
vs.
AIRLINE PILOTS ASSOCIATION, INTERNATIONAL,
    Defendant.
_____/

DEPOSITION OF:   MICHAEL J. DAY

DATE:     May 2, 2013

TIME:     10:00 a.m. - 3:00 p.m.

PLACE:     618 Second Street
     Cedar Key, Florida
REPORTED BY:     Jennifer R. Witwer, RPR, CRR
     Notary Public

APPEARANCES:
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
BY:  DANIEL J. TOAL, ESQUIRE
BY:  JOSHUA D. KAYE, ESQUIRE
1285 Avenue of the Americas
New York, New York  10019
Attorneys for the Defendants

Green Jacobson, P.C.
BY:  ALLEN P. PRESS, ESQUIRE
Suite 700, Pierre Laclede Center
7733 Forsyth Boulevard
St. Louis, Missouri  63105
Attorney for the Plaintiffs

---

Page 2

1   APPEARANCES CONTINUED:
2      Air Line Pilots Association, International
    BY:  MARTA WAGNER, SENIOR ATTORNEY
3      535 Herndon Parkway
    Herndon, Virginia  20170
4      Attorney for the Defendant
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1   I-N-D-E-X
2   Witness    Direct  Cross  Redirect  Recross
3   MICHAEL J. DAY
4     By Mr. Toal:   4
5
6
7
8
9
10   E-X-H-I-B-I-T-S
11   Defendant's for Identification:    Page
12   Exhibit Number 1 - Compton deposition transcript...10
    Exhibit Number 2 - trial transcript 6/23/11........20
13   Exhibit Number 3 - APA 3/28/01 document............55
    Exhibit Number 4 - APA 3/29/01 document............61
14   Exhibit Number 5 - Carty deposition transcript.....77
    Exhibit Number 6 - 4/18/01 letter.................82
15   Exhibit Number 7 - 4/24/01 letter.................84
    Exhibit Number 8 - 6/14/01 letter.................86
16   Exhibit Number 9 - 7/18/01 letter.................89
    Exhibit Number 10 - 8/17/01 letter................93
17   Exhibit Number 11 - APA proposal..................96
    Exhibit Number 12 - TWA MEC minutes 10/31/01.......99
18   Exhibit Number 13 - Darrah deposition transcript..111
    Exhibit Number 14 - 3/26/01 letter...............118
19   Exhibit Number 15 - White deposition transcript...122
    Exhibit Number 16 - 7/2/01 memo...................125
20
21
22
23
24
25

---

Page 4

1        P-R-O-C-E-E-D-I-N-G-S
2      THE COURT REPORTER:  Do you swear or affirm the
3   testimony you're about to give will be the truth, the
4   whole truth, and nothing but the truth?
5      THE WITNESS:  I do.
6   THEREUPON:
7        MICHAEL DAY,
8   was called as a witness and, having been first duly sworn,
9   was examined and testified as follows:
10        DIRECT EXAMINATION
11   BY MR. TOAL:
12      Q.  Good morning, Mr. Day.
13      A.  Good morning.
14      Q.  Mr. Day, did there come a time when you served as
15   ALPA's representative on the unsecured creditors committee in
16   the TWA bankruptcy?
17      A.  Yes.
18      Q.  And when was that?
19      A.  That was in February of 2001.
20      Q.  And for how long did you serve as a representative
21   on that committee?
22      A.  Approximately a month.
23      Q.  And did you form an understanding of TWA's
24   financial condition at the time that you served on the
25   unsecured creditors committee?

1   seven.  And we felt we had very little leverage and their
2   committee would kind of beat up on us every time we were in
3   there.  They kept reminding us we were getting acquired and
4   this was this, and it caused many sleepless nights.
5        As I said before, that was one of the reasons I
6   wound up moving to Cedar Key was to get away from people for
7   a while.  Ed White was an extremely bright person but he's a
8   pretty tough negotiator, too.
9        Q.   And as general manager did you find the APA's
10  merger committee to take tough positions?
11       A.   Yes.
12       Q.   And did you find them to be aggressive?
13       A.   Yes.
14       Q.   You mentioned some of the things that the APA's
15  merger committee would say to the TWA merger committee,
16  including the fact that TWA was being acquired, correct?
17       A.   Yes.
18       Q.   And do you remember other points that the APA's
19  merger committee would make in an effort to justify the
20  positions that it was taking on seniority integration?
21       A.   Well, they essentially told us we were working for
22  a bankrupt airlines and that we didn't have any career
23  expectations.
24       Q.   And do you remember any other justifications that
25  they offered for the positions they were taking?

1        A.   Well, they would try to say that their collective
2   bargaining agreement required them to staple any acquired
3   pilot group to the bottom of their list, so that's what we
4   were starting with.
5        Q.   Was it your understanding that the APA had the
6   right to insist on the pilots of any acquired airline being
7   stapled to the bottom of the list?
8        A.   It's my understanding that they felt they did.
9        Q.   Did you think they were wrong about that?
10       A.   I felt that -- I wasn't an expert on what their
11  collective bargaining agreement provided them and what kind
12  of deals they made with the company because we weren't
13  usually privy to those, but I had no reason to doubt that
14  that's what they thought they were entitled to.
15       Q.   So with respect to my question whether you thought
16  they were wrong about that, did you have a view as to whether
17  the APA was right or wrong in its position that it was
18  entitled to staple the pilots of acquired airlines to the
19  bottom of the list?
20       A.   Whether they had the right to do it is what you're
21  asking?
22       Q.   Yes.
23       A.   I felt there was some question about it.
24       Q.   And why did you think there was a question about
25  it?

1        A.   Well, dealing with Roland Wilder gave me the
2   feeling that there really wasn't a prior merger where it
3   had been quite that draconian under the same circumstances
4   and he wasn't sure that if it ever had to go to Court that
5   it would hold up, stapling the TWA pilots to the bottom of
6   their list.
7        Q.   Was that something that Roland Wilder told you,
8   that if the APA insisted on stapling the TWA pilots to the
9   bottom of the list that there was some cause of action that
10  the TWA pilots could bring?
11       A.   I don't recall him stating it in those words but I
12  recall him constantly having a plan of attack to back it up
13  with some type of legal action each step of the way.
14       Q.   And, Mr. Day, haven't you testified previously that
15  your understanding was that the APA had the right but not the
16  obligation to staple the TWA pilots to the bottom of the
17  seniority list?
18       A.   I would have to say that, yes, I think I did state
19  that.
20       Q.   And was that accurate testimony when you gave it?
21       A.   It was accurate testimony but I was --
22            MR. PRESS:  Show my objection to the form of the
23  question.  I don't know if that was an accurate
24  recitation of his testimony.  But subject to that you
25  can go ahead and answer.

1        A.   You know, I think we got into a discussion then on
2   some section of their contract acquiring carriers and so on
3   and the judge explained to me that he didn't feel that was
4   applicable in this case.  And as I said, if I said it I guess
5   I felt that they thought they had the right to.  Whether they
6   did or not I don't think we'd ever know.
7             MR. TOAL:  So let me show you a transcript of your
8   testimony.  We'll have this document marked as Day
9   Exhibit 2.  This is a copy of the trial transcript in
10  this case from June 23, 2011.
11            (Defendant's Exhibit Number 2 was marked for
12  identification.)
13       Q.   Mr. Day, do you remember testifying during the
14  liability trial in this case?
15       A.   Yes.
16       Q.   And did you offer that testimony on or around
17  June 23rd, 2011?
18       A.   Yes.
19       Q.   So let me direct your attention to Page 108 of
20  this transcript.  And if I could ask you to look starting at
21  Line 19, do you see the Court says:  So you're -- you
22  think -- let me turn that question around.  Do you agree that
23  under this agreement American could have stapled the TWA
24  pilots if this agreement was carried out?  And then it says,
25  The Witness:  I agree they had the right to do that.

1    pilot group?
2        A.   Yes.
3        Q.   And was that something that was guiding you in your
4    negotiations?
5        A.   Yes, it was.
6        Q.   And in that context what is meant by a windfall?
7        A.   Well, a windfall would have been if American takes
8    all of our airplanes, staples two-thirds of our pilots to
9    the bottom, and suddenly that many of their pilots are able
10   to fly equipment and positions that they were not able to
11   fly before, especially if they furloughed those two-thirds
12   of the pilots immediately after that.  That would be a
13   windfall.
14       Q.   And would it be a windfall to the TWA pilots if
15   they were able to fly equipment that they weren't able to fly
16   previously at TWA?
17       A.   Initially, yes.
18       Q.   What do you mean by initially?
19       A.   Well, in any merger at some point in time generally
20   these types of restrictions are ended.  Even American, which
21   was the subject of three or four mergers, had pilots now
22   flying that had no expectations of flying other airplanes.
23       Q.   And did the TWA pilots want the ability eventually
24   to fly equipment including equipment that TWA didn't have at
25   the time of the transaction?

1        A.   Eventually, yes.
2        Q.   Is that something the APA objected to?
3        A.   Yes, they did.
4        Q.   And did they explain why they were objecting to
5    that?
6        A.   Their standard mantra was not one American pilot's
7    career expectations can be harmed.  So they said until the
8    last pilot hired on this seniority list is able to hold that,
9    then no TWA pilot can do it.
10       Q.   Now, if there was a seniority integration proposal
11   in which the TWA pilots only competed against themselves, the
12   American pilots only competed against themselves with respect
13   to bidding, do you agree that's a structure that would have
14   preserved each pilot group's career expectations?
15           MR. PRESS:  Object to the form of the question.
16       A.   Not just with that by itself.
17       Q.   What else would you need?
18       A.   Well, you'd need lots of things.  You'd
19   need -- you'd need to determine how many airplanes each group
20   was going to have and how they were utilized.
21       Q.   So what if we said all the legacy TWA airplanes
22   would be available to the TWA pilots, all the legacy American
23   planes would be available to the American pilots.  Would you
24   agree that was a structure that would preserve the
25   pretransaction career expectations of each pilot group?

1            MR. PRESS:  Again I object to the form of the
2    question.
3        A.   And the same -- flying the same routes?  I'm trying
4    to think if that would be -- if it could be structured in
5    that manner and at that specific point in time, yes, but
6    going into the future there's no way of telling.
7        Q.   Do you recall that the TWA merger committee and the
8    APA merger committee exchanged proposals for the first time
9    on or around March 1st of 2001?
10       A.   That sounds about right, but I wasn't present I
11   don't think for the first round of exchanges.
12       Q.   Do you recall that the APA objected to the initial
13   proposal it got from the TWA MEC as being essentially a
14   date-of-hire proposal?
15       A.   I had heard that, yes.
16       Q.   And from the time you took over the merger
17   committee did you have any expectation that the APA would
18   agree to a date-of-hire type proposal?
19       A.   We were continuously told that they would not.
20       Q.   And did you ever have reason to believe at any time
21   that the APA would accept a date-of-hire proposal?
22       A.   They didn't give us any reason to believe it.
23       Q.   And did you have any reason to believe it from any
24   other source?
25       A.   No.

1        Q.   Isn't it true that the TWA MEC was trying to get a
2    proposal as close to date of hire as possible?
3        A.   Well, that was the original goal, I understood.
4        Q.   And was that something that you were trying to
5    achieve throughout the course of your negotiations, to get as
6    close as possible to a date-of-hire seniority integration?
7        A.   You know, we were always waiting for the Tannen
8    proposal to come forth.  We didn't know what it was going to
9    say.  That's why, you know, there was such a difficult time
10   trying to negotiate originally because we didn't want to do
11   anything to shoot ourselves in the foot later on.  And the
12   Tannen proposal was not a date-of-hire proposal, and that's
13   what our official final proposal to them was.
14       Q.   And what's your understanding of the methodology of
15   the Tannen proposal?
16       A.   It uses what they call the running mate.
17       Q.   And how under the Tannen proposal were running
18   mates established?
19       A.   Well, you took -- you divided the pilot group up.
20   First of all you started with captains and you divided them
21   up into three groups.  You took the 777 captains as Boeing
22   777 and then they also had MD-11s.  And they took that number
23   of captains, 350, for instance, and they saw how far down the
24   seniority list it went.  And they took to the 95th percentile
25   of that.  And at that point those pilots forward were called

# EXHIBIT 19

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 02-2917(JEI)
PATRICK BRADY, et al.,          :
          Plaintiff,            :
          v.                    :
                                :
AIR LINE PILOTS ASSOCIATION,  :
          Defendant.            :

          Transcript of the deposition of MICHAEL
S. LEVINE, called for Oral Examination in the
above-captioned matter, said deposition taken by
and before SILVIA P. WAGE, a Certified Shorthand
Reporter, Certified Realtime Reporter, Registered
Professional Reporter, and Notary Public for the
States of New York, New Jersey, Pennsylvania and
Delaware, at the offices of PAUL WEISS RIFKIND
WHARTON & GARRISON, LLP, 1285 Avenue of the
Americas, New York, New York, on Friday, April
19, 2013, commencing at 9:03 a.m.

HUDSON REPORTING & VIDEO, INC.
124 West 30th Street, 2nd Fl.
New York, New York 10001
Tel: 212-273-9911      JOB NO. 7303

Page 2

1  A P P E A R A N C E S :
2
3  GREEN JACOBSON, P.C.
   BY:  ALLEN P. PRESS, ESQ.
   7783 Forsyth Boulevard, Suite 700
4  Clayton, Missouri  63105
   (314) 862-6800
5  Press@stlouislaw.com
   Counsel for the Plaintiffs
6
7
   PAUL, WEISS, RIFKIND, WHARTON &
8  GARRISON, LLP
   BY:  DANIEL J. TOAL, ESQ.
9  BY:  JAMES BOROD, ESQ.
   1285 Avenue of the Americas
10 New York, New York  10019
   (212) 373-3000
11 Dtoal@paulweiss.com
   Jborod@paulweiss.com
12 Counsel for the Defendant
13
14
15 A L S O  P R E S E N T :
16
   MARTA WAGNER, ESQ.
17 AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
   AFFILIATED with AFL-CIO and CLC
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2  TESTIMONY OF:  MICHAEL S. LEVINE      PAGE
3  EXAMINATION BY MR. PRESS          5
4
5
                E X H I B I T S
6
7  Levine 1  Expert Report of Michael E.      6
             Levine
8  Levine 2  Jury Verdict            18
   Levine 3  Jury Charge            22
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              - - -
2    DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  Page Line    Page Line    Page Line    Page Line
7  None
8
9
10 Request for Production of Documents
11 Page Line    Page Line    Page Line    Page Line
12 None
13
14
15 Stipulations
16 Page Line    Page Line    Page Line    Page Line
17 None
18
19
20 Question Marked
21 Page Line    Page Line    Page Line    Page Line
22 None
23
24
25

MICHAEL S. LEVINE

1
2 A. Not at all.
3 Q. Me telling you, me saying that to you
4 right this morning, is that the first time you
5 heard that it was a five-week trial?
6 A. Yes.
7 Q. And you understand it was a jury
8 trial?
9 A. Yes.
10 Q. Do you understand how many jurors
11 there were?
12 A. No.
13 Q. There were 12.
14 A. Okay.
15 Q. Do you understand that their verdict
16 was unanimous?
17 A. No.
18 Q. Okay. Do you understand how long it
19 took them to return a verdict?
20 A. No.
21 Q. And you said you reviewed the
22 verdict, right?
23 A. Yes.
24 Q. And I just want to make sure it's the
25 same thing that I would call a verdict.

MICHAEL S. LEVINE

1
2 MR. PRESS: This will be Exhibit 2.
3 (Deposition Exhibit No. Levine 2, Jury
4 Verdict, was marked for identification.)
5 (There is a discussion off the record.)
6 Q. Exhibit 2 is this a copy of the
7 verdict that you reviewed?
8 A. Yes.
9 Q. Alright. And you'll see there were
10 two questions posed to the jury, right?
11 A. Yes.
12 Q. The first question, Did ALPA violate
13 its duty of fair representation to the TWA
14 pilots, and the answer was, yes, correct?
15 A. Yes.
16 Q. And the second answer or the second
17 question, rather, was, Did ALPA's violation of
18 its duty directly cause injury to some of the TWA
19 pilots, and the answer again was yes, correct?
20 MR. TOAL: Just to be clear, for the
21 record, you're not reading the exact text, you're
22 paraphrasing the questions.
23 MR. PRESS: Yes. The record will
24 reflect that I am paraphrasing.
25 Q. But that was -- these are the

MICHAEL S. LEVINE

1
2 questions that you understood the jury answered?
3 A. Yes.
4 Q. Do you believe the jury's verdict,
5 based upon everything you've reviewed, do you
6 believe that verdict was just?
7 MR. TOAL: Object to the form of the
8 question.
9 A. I don't, exactly, understand the
10 question.
11 Q. Do you think it was a correct
12 verdict?
13 MR. TOAL: Object to the form.
14 A. Correct -- do you mean was it correct
15 factually?
16 Q. Yes.
17 A. I have no independent basis for
18 knowing whether it was correct factually.
19 Q. And you know there were two questions
20 posed, so maybe we should break it down.
21 The question, No. 2, did ALPA's violation
22 of its duty of fair representation directly cause
23 injury to some of the TWA pilots? The answer
24 was, yes.
25 Do you have any basis to disagree with

MICHAEL S. LEVINE

1
2 that?
3 A. Yes.
4 MR. TOAL: Object to the form of the
5 question, lack of foundation.
6 A. I have -- well, the best way to
7 answer that would be to say that -- that in the
8 exact wording of the verdict, that it might have
9 directly caused injury to some of the TWA pilots,
10 I have no reason to think that that's impossible.
11 Q. You have no reason to think that it's
12 impossible?
13 A. Yes.
14 Q. Okay. Can you elaborate on that?
15 A. My belief is that in aggregate, the
16 TWA pilots were injured not at all or only
17 nominally for reasons that are laid out in my
18 report. But since hypothetically it's possible
19 that had ALPA pursued different tactics,
20 individual pilots might have been placed
21 differently on the list. Some of those
22 individual pilots might have been disadvantaged
23 just as some might have been advantaged relative
24 to the list that was produced as part of Schedule
25 CC.

MICHAEL S. LEVINE

1
2    Q. Do you agree that the overall outcome
3  of the integration of the TWA pilots into
4  American would have been more favorable had ALPA
5  fairly represented the TWA pilots?
6          MR. TOAL:  Object to the form of the
7  question.
8       A. I thought I answered your question.
9       Q. This is a different question.  This
10 is a new question.
11      A. I don't hear a very new question.
12 But I will repeat myself.
13      I believe that the aggregate position of
14 the TWA pilots would not have been different more
15 or less no matter what ALPA had done because it
16 was a function of TWA's condition and the APA's
17 legal rights and its own internal politics and
18 American's concerns.
19         MR. PRESS:  Silvia, can you read that
20 back.
21      Q. I want to make sure I'm not
22 mischaracterizing what you said.
23      A. Sure, sure, sure.
24      (Whereupon, the answer is read back as
25 follows:

MICHAEL S. LEVINE

1
2      "Answer:  I believe that the aggregate
3  position of the TWA pilots would not have been
4  different more or less no matter what ALPA had
5  done because it was a function of TWA's condition
6  and the APA's legal rights and its own internal
7  politics and American's concerns.")
8       Q. What do you mean by "aggregate
9  position"?
10      A. I mean, that if you want to look at
11 what the APA was willing to grant in terms of
12 Schedule CC, it's conceivable that in another set
13 of discussions some pilot might have changed
14 position because some detail of the integration
15 might have been changed.  But I believe overall
16 the list would have been Schedule CC as opposed
17 to the individual names of the pilots.
18      Q. I think I understand that.
19      Have you read the judge's jury
20 instructions, are you aware of them?
21      A. Yes, I did read them.
22      Q. Okay.  I brought them with me.  This
23 will be 3.
24      (Deposition Exhibit No. Levine 3, Jury
25 Charge, was marked for identification.)

MICHAEL S. LEVINE

1
2      Q. Exhibit 3, which I've handed you, is
3  a copy of the jury instructions that you
4  reviewed?
5       A. I have no reason to think it's not.
6  I don't have an independent recollection that it
7  is.
8       Q. If you go to Page 14, the last
9  paragraph, I want to focus your attention to the
10 last two sentences.  "A labor union can only be
11 held liable for breach of its duty of fair
12 representation if its breach directly causes
13 injury to an individual or group to whom the duty
14 is owed.  In this case, proving injury means that
15 Plaintiffs are required to demonstrate that but
16 for ALPA's breach of duty of fair representation,
17 the overall outcome of the integration of the TWA
18 pilots into American would have been more
19 favorable."  That was the judge's charge to the
20 jury.
21      And so my question is, do you agree that
22 the overall outcome of the integration, of the
23 TWA pilots into American, would have been more
24 favorable but for ALPA's breach?
25      A. Which question are you asking me?

MICHAEL S. LEVINE

1
2      Q. I'm asking you if you agree that the
3  overall outcome of the integration of the TWA
4  pilots into American would have been more
5  favorable but for ALPA's breach?
6          MR. TOAL:  Objection, asked and
7  answered.
8       A. Yeah, I'll repeat.  No, I do not.
9       Q. Okay.
10      A. Are you finished with this document?
11      Q. I am.
12      A. For the moment?  Okay.
13      Q. If you look at Page 36 of your
14 report, the last paragraph.
15      A. The one that starts with "negligible
16 partnering leverage"?
17      Q. Yes.
18      A. I'm sorry.
19      Q. It's your opinion reported there that
20 the TWA pilots were quote, "fortunate to have
21 secured any deviations from an arrangement that
22 stapled all of them to the bottom of the American
23 seniority list."
24      Is that your opinion?
25      A. Yes.

MICHAEL S. LEVINE

1
2       Q.  That the TWA pilots were lucky --
3       A.  Yes.
4       Q.  -- not to have been stapled?
5       A.  Yes.
6       Q.  Have you talked to any TWA pilots who
7   were subject to the integration?
8       A.  No.
9       Q.  Have you talked to any American
10  pilots that were part of the process of
11  integrating?
12      A.  No.
13      Q.  Okay.  Have you talked to any
14  executives at American Airlines?
15      A.  No.
16      Q.  Or any executives at TWA?
17      A.  No.
18      Q.  And you've not talked to anybody at
19  ALPA?
20      A.  I'm sorry, just to be absolutely
21  correct for the record, I shook hands with Mike
22  Palumbo recently at a dinner for Herb Kelleher
23  given at NYU.  We did not have a conversation
24  about the lawsuit.
25      Q.  I see.  And you've not talked to

MICHAEL S. LEVINE

1
2   anybody at ALPA about the lawsuit?
3       A.  No.
4       Q.  Alright.  If you look at Page 7 of
5   your report.  It's kind of a similarly stated
6   opinion.
7       Paragraph No. 3, you're concluding remarks
8   there.  TWA pilots have very poor prospects at
9   the time of the acquisition and the American
10  pilots knew it so there was no prospect of
11  improving them through different negotiating
12  tactics.  And the TWA pilots, therefore, have
13  little, if any, choice to accept the American
14  pilots' offer.  That's -- I read that correctly.
15      Is that still your opinion today?
16      A.  Yes.
17      Q.  In your opinion, did the TWA pilots
18  as a group suffer any damages as a result of
19  ALPA's breach?
20      A.  I think I've answered that question.
21  Individual pilots may have had a different
22  outcome had the negotiations been conducted
23  differently.  In aggregate, I believe, the TWA
24  pilots did not suffer because I think the outcome
25  was determined by the fact that the APA had,

MICHAEL S. LEVINE

1
2   essentially, absolute control of the seniority
3   list and TWA was, essentially, out of business.
4       Q.  And you've said that several times.
5   But I really want to see, in your opinion, did
6   the TWA pilots -- did any of them suffer damages
7   as a result of ALPA's breach?
8       A.  I think I've answered your question.
9       MR. TOAL:  Objection, asked and
10  answered and lack of foundation.
11      A.  I think I've answered your question.
12      Q.  I, respectfully, disagree.  I mean,
13  I'm just saying that.
14      But this is a yes or no question.
15      In your opinion, did any TWA pilots
16  suffer damages as a result of ALPA's breach
17      MR. TOAL:  Object to the form.
18      You don't have to say yes or no.
19      It's been asked and answered and lack of
20  foundation.
21      A.  In my opinion, some individual pilots
22  may have suffered as a result of the particular
23  course that the negotiations took.
24      Q.  Have you identified any of those
25  pilots?

MICHAEL S. LEVINE

1
2       A.  No.
3       Q.  Have you identified how many of them
4   there are?
5       A.  No.
6       Q.  Have you quantified these people's
7   loss?
8       MR. TOAL:  Object to the form of the
9   question, to the extent it presupposes that there
10  was a loss.
11      A.  Who does "these people" refer to in
12  your question?
13      Q.  The people that you're referring to
14  that may have had an improved position.
15      A.  I have not identified them and,
16  therefore, I could not have calculated their
17  gains or losses.
18      Q.  Okay.  At Page 8 of your report, Mr.
19  Levine, in the middle paragraph, you're talking
20  about Plaintiff's expert Mr. Salamat.  And you
21  quote from his report, "Given that the jury found
22  that ALPA's violation caused harm to the TWA
23  pilots, it must be taken as a basic truth that
24  had ALPA been effective in representing the TWA
25  pilots, a better list would have been obtained,"

# EXHIBIT 20

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 02-2917(JEI)

PATRICK BRADY, et al.,          :
        Plaintiff,              :
                                :
                                :
        v.                      :
                                :
AIR LINE PILOTS ASSOCIATION,    :
        Defendant.              :

    Transcript of the deposition of JAMES S.
FELTMAN, CPA, called for Oral Examination in the
above-captioned matter, said deposition taken by
and before SILVIA P. WAGE, a Certified Shorthand
Reporter, Certified Realtime Reporter, Registered
Professional Reporter, and Notary Public for the
States of New York, New Jersey, Pennsylvania and
Delaware, at the offices of PAUL WEISS RIFKIND
WHARTON & GARRISON, LLP, 1285 Avenue of the
Americas, New York, New York, on Thursday, April
11, 2013, commencing at 9:00 a.m.

HUDSON REPORTING & VIDEO, INC.
124 West 30th Street, 2nd Fl.
New York, New York 10001
Tel: 212-273-9911        JOB NO. 7301

Page 2

1   A P P E A R A N C E S :
2
    GREEN JACOBSON, P.C.
3   BY:  JOE D. JACOBSON, ESQ.
    7733 Forsyth Boulevard, Suite 700
4   Clayton, Missouri  63105
    (314) 862-6800
5   Jacobson@stlouislaw.com
    Counsel for the Plaintiffs
6
7
    PAUL, WEISS, RIFKIND, WHARTON &
8   GARRISON, LLP
    BY:  WILLIAM MICHAEL, ESQ.
9   BY:  JAMES BOROD, ESQ.
    1285 Avenue of the Americas
10  New York, New York  10019
    (212) 373-3000
11  Wmichael@paulweiss.com
    Jborod@paulweiss.com
12  Counsel for the Defendant
13
14
15  A L S O  P R E S E N T :
16
    MARTA WAGNER, ESQ.
17  AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
    AFFILIATED with AFL-CIO and CLC
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2   TESTIMONY OF:  JAMES S. FELTMAN, CPA     PAGE
3   EXAMINATION BY MR. JACOBSON          5
    EXAMINATION BY MR. MICHAEL           234
4
5
                E X H I B I T S
6
            (None)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              - - -
2       DEPOSITION SUPPORT INDEX
3              - - -
4
5   Direction to Witness Not to Answer
6   Page Line   Page Line   Page Line   Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line   Page Line   Page Line   Page Line
12  None
13
14
15  Stipulations
16  Page Line   Page Line   Page Line   Page Line
17  None
18
19
20  Motion to Strike
21  Page Line   Page Line   Page Line   Page Line
22  188 9
23
24
25

Page 201

JAMES S. FELTMAN, CPA

1    JAMES S. FELTMAN, CPA
2  then for purposes of establishing upper and lower
3  bound, he eliminates the highest and lowest
4  coefficient number from each of the seven to
5  eliminate a possible outlier and using the next
6  higher -- second highest as his upper bound and
7  the second lowest as his lower bound, but these
8  are the seven transactions that he uses to
9  generate his seniority list.
10       And I was just addressing -- focusing
11  your attention on that seniority list along with
12  the Table 1, which those transactions are among
13  the several transactions listed.
14       A.  Okay.  I see the seven transactions
15  in Paragraph 10 and I know where Table 1 is.
16       Q.  Okay.  I take it from your earlier
17  answer that you have some dispute with Professor
18  Farber concerning the transactions, the seven
19  transactions, listed on Page 5 at that second
20  half of Paragraph 10; is that correct?
21       A.  Yes.
22       Q.  Alright.  Which of these
23  transactions, if any, do you believe should not
24  be included in Professor Farber's evaluation of
25  the coefficient that he applies in his opinion?

Page 202

1    JAMES S. FELTMAN, CPA
2       A.  (No response.)
3       Q.  You're taking a long time to reach an
4  answer, so maybe I should ask you a foundational
5  question.
6       Looking at the seven transactions listed
7  on Page 5 there on the second half of Paragraph
8  10, are you familiar with those transactions?
9       A.  Some of them, yes.
10       Q.  Which ones are you familiar with?
11       A.  The first two, which are cargo
12  operators, not passenger operators.  And I'm
13  familiar with the Delta/Pan Am and the Texas
14  International/Continental transactions.
15       Q.  Alright.  Do you have -- is it -- let
16  me...
17       Do you have any opinion regarding the
18  transactions that you have not just listed as
19  being transactions you're familiar with, do you
20  have any opinion as to whether those are properly
21  included in this list by Professor Farber?
22       A.  I don't know because I don't know
23  enough about those transactions to say one way or
24  the other.
25       Q.  Alright.  Of the several transactions

Page 203

1    JAMES S. FELTMAN, CPA
2  you just mentioned that you are familiar with,
3  the two cargo ones and the others, are there any
4  of those transactions that you believe should not
5  be properly included in this list of transactions
6  on which Professor Farber based his composite
7  coefficient?
8       A.  I don't understand how cargo carriers
9  fit into an analysis of how passenger carrier
10  seniority lists fit together.  So I don't quite
11  understand why Professor Farber has included
12  those, which I note -- or, at least, one he
13  eliminates.
14       Q.  Alright.  How about the transactions
15  with which you are familiar, which are not cargo
16  transactions, which I believe were the Delta/Pan
17  Am and the Texas International/Continental
18  transactions, do you have any criticism to
19  Professor Farber including these two transactions
20  in his lists of combinations he used to
21  generate his composite coefficient?
22       A.  Yeah, I don't think that the Texas
23  Instruments/Continental transaction is similar in
24  characteristics to American/TWA for a number of
25  reasons.  So I'm not sure that -- I don't think

Page 204

1    JAMES S. FELTMAN, CPA
2  it fits in a comparison.  But I don't think I
3  have anything more to say about it at this point.
4       Q.  You said, "for a number of reasons."
5  What would those reasons be?
6       A.  Well, the reason that I don't think
7  this transaction fits is that Texas International
8  was, essentially, a consolidator, a financial
9  acquirer of Continental.  Continental being the
10  acquired airline was a carrier in substantially
11  different financial condition than TWA was when
12  it was acquired by American.  So I don't see much
13  in the way of similarities, other than both of
14  the acquired entities were passenger carriers.
15       Q.  They're different financially in what
16  way?
17       A.  Continental's financial condition and
18  its market position was markedly better than TWA
19  was when TWA filed for bankruptcy in January of
20  2001.
21       Q.  Was this in connection -- this
22  particular acquisition, Texas
23  International/Continental, was that in connection
24  with one of the Continental bankruptcies?
25       A.  Yes.

Page 205

JAMES S. FELTMAN, CPA

1
2    Q. And was Continental in financial
3  difficulty?
4        MR. MICHAEL:  Objection to the form.
5    A. Broadly speaking, it was.
6  Continental was -- Continental like other main
7  line carriers at that time used bankruptcy as a
8  tool to restructure either operationally or do a
9  financial restructuring.  But it was on the verge
10 of liquidation, as was TWA in January 2001.
11   Q. I'm sorry.  I take it from your
12 comments that Continental was still flying at
13 that time then?
14   A. Yes.
15   Q. Turning if you could then to Table 1,
16 there's a list of transactions listed by
17 acquiring airline filed by acquired airline and
18 the year of the merger, et cetera.
19   Are any of these transactions,
20 transactions you believe should have been
21 included by Professor Farber in his group of
22 transactions that he used to come up with his
23 composite coefficient, his proportional means, as
24 he called it?
25   A. Let me have another look at something

Page 206

JAMES S. FELTMAN, CPA

1
2  else to see if...
3    Q. Sure.  You're looking at your own
4  report?
5    A. For a moment.
6   We previously discussed my view that
7  Southwest's acquisition of Air Tran was
8  dissimilar in that --
9    Q. Dissimilar?
10   A. (Continuing.)  Dissimilar in that
11 both were LCC carriers, but Air Tran was a
12 single-hub operator who had no future given that
13 it was positioned at Hartsfield and had no
14 capability to compete against Delta.  So it was
15 just a question of time until it went out of
16 business.
17   Q. Does that mean it is or is not one
18 that you would put in the group of comparables to
19 generate a proportionate mean number?
20       MR. MICHAEL:  Objection to the form.
21   A. I think that you could exclude it for
22 the purpose of recognizing that it was one LCC
23 acquiring another but consider it for the fact
24 that it was a one-hub operator.  So I think that
25 it's kind of some of one and some of another.

Page 207

JAMES S. FELTMAN, CPA

1
2    Q. I take it from your comments with
3  respect to the list that we're looking earlier on
4  top of Page 5, that you don't have a problem with
5  Delta/Pan Am being included in the list of
6  comparables?
7        MR. MICHAEL:  Objection to the form,
8  mischaracterizes his testimony.
9    A. I told you I didn't understand how it
10 was appropriate to categorize cargo operators
11 having same characteristics as a main line
12 passenger carrier and why I thought that
13 TI/Continental transaction didn't belong here.
14   I don't recall that we -- I said I was
15 familiar with Delta/Pan Am, but I don't think we
16 discussed it.  And then I mentioned to you how
17 you could put Southwest -- in or take it out
18 depending on what you saw as the relevant
19 characteristics.
20   Q. Well, since Delta/Pan Am was one of
21 the four transactions on that list on Page 5 that
22 you indicated familiarity with and you gave
23 reasons why you felt that the other three were
24 not properly included in the composite group, I
25 concluded that erroneously that you did not have

Page 208

JAMES S. FELTMAN, CPA

1
2  an objection to including Delta/Pan Am.
3    So I guess my question is, do you think
4  that Delta/Pan Am is an appropriate comparative
5  to the American/TWA?
6        MR. MICHAEL:  Objection to the form.
7    A. I think similar to the discussion we
8  just had about Southwest/Air Tran, here we have
9  two main lines, a very large and prosperous Delta
10 are acquiring a much more smaller and financially
11 frail Pan Am.  So I think there are, certainly,
12 some similarities to the American/TWA
13 transaction.
14   Q. Is that a yes or a no?
15       MR. MICHAEL:  Objection to the form.
16   A. It's -- I think it's a qualified yes.
17   Q. Okay.  What about Republic/Frontier,
18 are you familiar with that transaction?
19   A. Yes.
20   Q. Is that one you believe is an
21 appropriate comparable to American/TWA?
22   A. I think it's a qualified yes,
23 Frontier was, I think, at time that it was
24 acquired by Republic, had either curtailed flight
25 operations or ceased flight operations and it was

# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

PATRICK BRADY, *et al.*,

                        Plaintiff,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,

                        Defendant.

Civil Action

No.  02-2917 (JEI)

# TABLE OF CONTENTS

I. CREDENTIALS...................................................................................... - 1 -

II. ASSIGNMENT AND SUMMARY OF OPINIONS ............................. - 2 -

III. BACKGROUND ...................................................................................... - 7 -

  A. TWA'S FINANCIAL HISTORY ..................................................... - 7 -

  B. AMERICAN AGREES TO ACQUIRE TWA ................................. - 8 -

  C. PILOT INTEGRATION NEGOTIATIONS AND SUPPLEMENT CC.................... - 9 -

  D. OPERATIONS OF THE MERGED AIRLINE ............................... - 12 -

IV. THE ECONOMICS OF BARGAINING IS THE PROPER ECONOMIC FRAMEWORK FOR EVALUATING PLAINTIFFS' CLAIMS AND THEIR EXPERTS' HYPOTHETICAL SENIORITY LISTS ........................... - 13 -

  A. THE ECONOMICS OF BARGAINING EXPLAINS NEGOTIATED OUTCOMES ........... - 14 -

  1. The Pilots' Fallback Payoffs .................................................. - 15 -

  2. The Value to be Shared between the Parties ........................... - 18 -

  3. The Parties' Relative Bargaining Positions ........................... - 20 -

  B. APPLYING THE ECONOMIC FRAMEWORK TO EVALUATE A PROPOSED SENIORITY LIST.................................................... - 22 -

  1. Prospective Evaluation ........................................................... - 23 -

  2. Evaluation with Hindsight ...................................................... - 25 -

  3. Methodology for Implementing the Evaluations..................... - 26 -

  C. SUMMARY ............................................................................... - 28 -

V. SUPPLEMENT CC IS A REASONABLE OUTCOME FOR THE TWA PILOTS GIVEN THE ECONOMICS OF BARGAINING ................. - 29 -

VI. MR. SALAMAT'S HYPOTHETICAL SENIORITY LISTS ARE NOT REASONABLE AND HIS ANALYSIS SUFFERS FROM A VARIETY OF OTHER FLAWS .................................................................................. - 31 -

A.  SUMMARY OF MR. SALAMAT'S OPINIONS.................................................- 31 -

B.  MR. SALAMAT'S HYPOTHETICAL SENIORITY LISTS ARE NOT REASONABLE ....- 36 -

C.  MR. SALAMAT PROVIDES NO EMPIRICAL EVIDENCE THAT ALPA'S ACTIONS WOULD HAVE AFFECTED THE SENIORITY LIST .................................- 38 -

D.  MR. SALAMAT DOES NOT APPLY ANY OF THE "THEORETICAL" FOUNDATIONS THAT HE CLAIMS UNDERLIE HIS ANALYSIS ...............................- 39 -

E.  MR. SALAMAT'S ASSUMED PROBABILITIES HAVE NO EMPIRICAL BASIS..........- 39 -

F.  MR. SALAMAT'S ASSUMED PROBABILITIES ARE COMBINED INAPPROPRIATELY ...........................................................................................- 39 -

G.  MR. SALAMAT IGNORES THE IMPACT OF AND REASON FOR THE ST. LOUIS FENCE ..........................................................................................................- 41 -

H.  MR. SALAMAT'S METHODOLOGY CANNOT DETERMINE DAMAGES OWED TO INDIVIDUAL PILOTS ................................................................................- 43 -

I.  MR. SALAMAT'S SET-OFF CALCULATION IS FLAWED .........................................- 45 -

J.  MR. SALAMAT IGNORES THE CONSTRAINT ON DAMAGES FROM THE FIXED NUMBER OF TOTAL JOBS AT AMERICAN.....................................................- 47 -

K.  MR. SALAMAT ASSUMES WITHOUT JUSTIFICATION THAT PILOTS ON VOLUNTARY FURLOUGH SUFFER DAMAGES AFTER 2012 .................................- 47 -

L.  MR. SALAMAT'S PENSION CALCULATIONS ARE FLAWED .................................- 48 -

M.  MR. SALAMAT DOES NOT DISCOUNT FUTURE COMPENSATION PROPERLY .......- 49 -

VII.  PROFESSOR FARBER'S HYPOTHETICAL SENIORITY LIST IS UNREASONABLE AND HIS METHODOLOGY IS FLAWED .....................................- 50 -

A.  SUMMARY OF PROFESSOR FARBER'S OPINIONS .................................................- 50 -

B.  PROFESSOR FARBER'S HYPOTHESIZED SENIORITY LIST IS INCONSISTENT WITH THE ECONOMICS OF BARGAINING ....................................................- 51 -

C.  ACCORDING TO HIS OWN CRITERIA, PROFESSOR FARBER USES MERGERS THAT ARE NOT COMPARABLE ........................................................................- 51 -

D.  PROFESSOR FARBER USES ARBITRATED OUTCOMES EVEN THOUGH THE TWA PILOTS HAD NO RIGHT TO ARBITRATION ...............................................- 52 -

E.  PROFESSOR FARBER USES A STATISTICAL MEASURE THAT HAS NOT BEEN

               APPLIED IN EVALUATING SENIORITY LIST INTEGRATIONS ................................. - 52 -

F.   PROFESSOR FARBER WRONGLY APPLIES HIS CHOICE OF "COMPARABLES" .... - 53 -

G.   PROFESSOR FARBER'S CONCLUSIONS ARE INCONSISTENT WITH THOSE OF
     MR. SALAMAT ...................................................................................... - 54 -

H.   PROFESSOR FARBER IMPOSES AN UNREASONABLE STRUCTURE ON HIS
     PROPOSED BUT-FOR SENIORITY LIST........................................................... - 55 -

I.   SMALL AND NECESSARY CHANGES TO PROFESSOR FARBER'S
     CALCULATIONS SHOW THAT HIS METHODOLOGY PREDICTS ALMOST NO
     DAMAGES........................................................................................... - 56 -

VIII.   IMPACT OF DATE LIMITATION ON MR. SALAMAT'S DAMAGE
       CALCULATIONS .................................................................................... - 57 -

# REPORT OF PROFESSOR KEVIN M. MURPHY

### I.    CREDENTIALS

1.     My name is Kevin M. Murphy.  I am the George J. Stigler Distinguished Service Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago, where I have taught since 1983.

2.     I earned a doctorate degree in economics from the University of Chicago in 1986.  I received my bachelor's degree, also in economics, from the University of California, Los Angeles, in 1981.

3.     At the University of Chicago, I teach economics in both the Booth School of Business and the Department of Economics.  I teach graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy issues.  In these courses, I cover a wide range of topics, including the incentives that motivate firms and individuals, the operation of markets, the determinants of market prices, and the impacts of regulation and the legal system.  Most of my teaching focuses on two things: how to use the tools of economics to understand the behavior of individuals, firms and markets; and how to apply economic analysis to data.  My focus in both research and teaching has been on integrating economic principles and empirical analysis.

4.     I have authored or co-authored more than sixty-five articles in a variety of areas in economics.  Those articles have been published in leading scholarly and professional journals, including the *American Economic Review*, the *Journal of Law and Economics*, and the *Journal of Political Economy*.

5.     I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences.  In 1997, I was awarded the John Bates Clark Medal, which the American Economic Association awarded once every two years to an outstanding American economist under the age of forty.[1]  In 2005, I was named a MacArthur Fellow, an award that provides a

---

[1] The John Bates Clark Medal was awarded biennially until 2009, but it now is awarded annually.  See, http://www.aeaweb.org/honors_awards/clark_medal.php.

five-year fellowship to individuals who show exceptional merit and promise for continued and enhanced creative work.

6.      In addition to my position at the University of Chicago, I am also a Senior Consultant at Charles River Associates ("CRA"), a consulting firm that specializes in the application of economics to law and regulatory matters.  I have consulted on a variety of antitrust, intellectual property and other matters involving economic and legal issues such as mergers, class certification, damages, labor practices, joint ventures, and allegations of anticompetitive exclusionary access, tying, price fixing, and price discrimination.  In addition, I served as an economic consultant to the National Basketball Player's Association during its negotiations with the National Basketball Association over the 2005 and 2011 Collective Bargaining Agreements.

7.      I have submitted testimony in federal courts, the U.S. Senate and to state regulatory bodies, and I have submitted expert reports in numerous cases.  I have testified on behalf of the U.S. Federal Trade Commission and I have consulted for the U.S. Department of Justice.  A list of the reports I have filed and the testimony I have given over the past four years is provided in my CV, attached as Appendix A.  CRA is being compensated at a rate of $1,250 per hour for my work on this matter.

## II.      ASSIGNMENT AND SUMMARY OF OPINIONS

8.      This litigation arises from a dispute over integration of the seniority lists of pilots for American Airlines ("American") and Trans World Airlines, Inc. ("TWA").  After TWA agreed in early 2001 to an acquisition offer from American, union representatives of the two pilot groups negotiated over several months about how to integrate the two airlines' pilots into a single seniority list.  The parties were unable to reach an agreement.  With the approval of American, the American pilots (represented by their union, the Allied Pilots Association ("APA")) decided upon and implemented a merged seniority list known as Supplement CC.

9.      A group of former TWA pilots subsequently sued the Air Line Pilots Association, International ("ALPA"), the labor union that represented the TWA pilots prior to the merger of American and TWA.  Those pilots claimed that ALPA did not discharge its duty to fairly represent them during negotiations over the merged seniority list, and that they were injured as a

result.[2]   At trial, a jury found that ALPA had "violate[d] its duty of fair representation to the TWA Pilots," a violation that "directly cause[d] injury to some of the TWA Pilots."[3]

10.   Counsel for ALPA has asked me to review expert reports that Professor Henry Farber and Mr. Rikk Salamat submitted on behalf of Plaintiffs and to evaluate the methodology and conclusions offered in those reports regarding the damages allegedly owed to Plaintiffs as a result of ALPA's violation of its duty of fair representation.[4]   Professor Farber generates hypothetical merged seniority lists, but he does not calculate damages.   His hypothetical merged seniority lists are based on comparisons he draws to other airline mergers where, unlike here, the integration of the merging parties' pilot seniority lists was decided by binding arbitration.[5]   Mr. Salamat offers several different estimates of alleged damages to TWA pilots based on various hypothetical seniority lists, including estimates based on Professor Farber's proposed seniority lists.

11.   Based on my review of Professor Farber's and Mr. Salamat's reports and deposition testimony, documents, and application of economic principles, I have concluded that neither of Plaintiffs' experts has offered a reasonable or methodologically sound estimate of damages potentially resulting from the challenged conduct.   (Appendix B is a list of the materials I considered.)   The principal opinions I offer in this report, and as to which I will testify at trial if requested to do so, are the following:[6]

---

[2] Patrick Brady, et al., Plaintiffs v. Air Line Pilots Association, et al., Defendants, Second Amended Restated Complaint, e.g., at ¶109.

[3] Jury Verdict in Patrick Brady, et al., Plaintiffs v. Air Line Pilots Association, et al., Defendants, July 13, 2011.  For purposes of the analysis I provide in this report, I assume that ALPA breached its duty of fair representation to the TWA pilots because I understand that the jury reached that conclusion.  However, I offer no opinion about whether or not the jury's conclusion is correct.

[4] *Rikk M.T. Salamat, BA, MBA, Damages in Brady et al vs. The Air Line Pilots Association, October 12, 2012* ("Salamat Original Report"); *Furlough Damages in Brady et al vs. The Airline Pilots Association After Application of Set-Off, April 30, 2013* ("Salamat Set-Off Report"); *Damages in Brady et al vs. The Air Line Pilots Association Supplementary Report on Damages Under the Farber Lists, October 12, 2012* ("Salamat Farber Report"); *Damages in Brady et al vs. The Air Line Pilots Association Supplementary Report on Damages Under the Tannen List, October 12, 2012* ("Salamat Tannen Report");*Expert Report of Henry S. Farber, October 12, 2012* ("Farber Report").

[5] Farber Report ¶56.

[6] The opinions I express here are based on the information available to me as of the date of this report.  I will continue to collect, review and analyze facts, data and information relevant to the opinions and issues I discuss in this report, and I will supplement my report as necessary to reflect such information.

12.   **Opinion One:**  Plaintiffs' basic allegation is that, but for ALPA's failure to meet its duty of fair representation, negotiations between the parties would have led to a different seniority list. Both of Plaintiffs' experts agree.[7]  Given that this alternative list would be the outcome of bargaining, any candidate list must be consistent with the economics principles of bargaining.

13.   In evaluating potential outcomes of a negotiation, economics shows that it is necessary to take into account the gains the parties can obtain if they reach an agreement, as well as each party's expected outcome absent an agreement.[8]  The economics of bargaining demonstrates that the payoff that each party will obtain will depend upon the strength of its respective bargaining position.  Accordingly, any hypothetical outcome of negotiations that fails to account for the benefits to both parties of reaching an agreement, relative to their expectations without an agreement, and fails to distribute those benefits consistent with the parties' relative bargaining positions, is inconsistent with economics.  I use the principles of bargaining theory to analyze Supplement CC, as well as the hypothetical seniority lists proposed by Professor Farber and Mr. Salamat and the resulting damages calculated by Mr. Salamat.

14.   **Opinion Two:** The economic theory of bargaining predicts that both parties would gain from the transaction and hence that each party would be better off than it would have been absent the transaction.  This is consistent with the view expressed by the parties that the integrated seniority list should improve outcomes relative to each party's pre-transaction career expectations.  Going into the transaction and the subsequent negotiations, the American pilots had much higher career expectations without an agreement than the TWA pilots had because the American pilots were working for a successful and historically profitable airline and could

---

[7] Farber Report ¶9 and Salamat Original Report at 2.

[8] *See*, for example, Nash, John F. "The bargaining problem," Econometrica, vol. 18, issue 2 (1950), pp. 155-162. The so-called "Nash bargaining solution" is for each player to get his disagreement payoff plus half of the surplus (the total available value minus the sum of disagreement payoffs).  In its recent consideration of Comcast's acquisition of NBCU (*see*, Memorandum Opinion and Order, Applications of Comcast Corporation, General Electric Company, and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees, MB Docket No. 10-56, FCC 11-4 (released Jan. 20, 2011), available at http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-11-4A1.pdf ("Comcast-NBCU Order")), the Federal Communications Commission ("FCC") adopted this framework, citing analysis that I had submitted on behalf of DIRECTV.  In particular, the FCC noted that "to determine the likely magnitude of any post-transaction price changes, we adopt a Nash bargaining model originally proposed by ACA and DIRECTV and subsequently used by the Applicants in their second filing" (footnoting "DIRECTV – Murphy June Report at 31-32; ACA – Rogerson June Report at 19-20.38") .  *See*, also, Jonathan B. Baker, "Comcast/NBCU: The FCC Provides a Roadmap for Vertical Merger Analysis," 25 *Antitrust* 36 (2011) ("Baker (2011)") ("the Nash bargaining model is nevertheless commonly thought to provide a reasonable basis for predicting the bargaining outcome").

expect continued employment, advancement and growth.  TWA, on the other hand, was financially failing and on the verge of liquidation.[9]  Its pilots had no reasonable prospects of remaining employed at TWA or a successor airline absent an acquisition by American.[10]  Thus, absent the merger, the TWA pilots could expect to be looking for work at another airline where, given prevailing industry practices, they would have been placed at the bottom of the seniority scale, assuming they could find work at all.  The disparity in career expectations created a disparity in the two parties' fallback payoffs.  That disparity between the parties was heightened by the fact that the APA's collective bargaining agreement with American effectively gave the American pilots the right to impose a seniority list and in particular to unilaterally staple the TWA pilots to the bottom of the integrated seniority list, if they decided to do so.  The ability to unilaterally set the terms of the seniority list enhanced the American pilots' bargaining power.  Given the American pilots' superior bargaining power, under bargaining theory we would expect, all else equal, that the American pilots would receive a greater share of the gains than the TWA pilots.

15.     **Opinion Three**: The TWA pilots received significant benefits from the transaction in the form of higher pay and the prospect of continued employment at an ongoing airline, irrespective of where they were placed on the merged seniority list.  In contrast, the American pilots received no direct benefits from the transaction that were independent of the seniority list adopted.  The only benefits that the American pilots stood to gain from the transaction were benefits that flowed from the prospect of TWA pilots being added to the seniority list in a way that improved the relative position of American pilots.  As a result, economics predicts that any seniority list that would emerge from bargaining would favor the American pilots (otherwise the American pilots would receive no benefits from the transaction).  Because the TWA pilots preserved their opportunities to fly TWA planes through other provisions in Supplement CC (in particular, the St. Louis fence), the American pilots did not gain additional aircraft or promotional opportunities.  Thus, the American pilots benefited only through the increased insurance against being furloughed that resulted from placing some number of TWA pilots below them on the merged seniority list.

---

[9] *Expert Report of James S. Feltman, March 15, 2013* ("Feltman Report") at 7-8, 25, 44; *Expert Report of Michael E. Levine, March 15, 2013* ("Levine Report") at 9, 24-25.
[10] Feltman Report at 33-34. Levine Report at 23-24.

16.     **Opinion Four:** The application of bargaining theory shows that Supplement CC reflects a distribution of the expected benefits of the transaction that is consistent with the relative bargaining positions of the two pilot groups and their relative pre-transaction expectations. The TWA pilots already obtained substantial benefits relative to their previous position and opportunities at TWA when discussion of the seniority list integration began, including continued employment with a more financially secure airline as well as higher pay. I estimate that, under Supplement CC, the TWA pilots received on a prospective basis about half the total gains received by the two sets of pilots from the transaction when I exclude benefits they received from the pay increase, and about 60 percent of the benefits from the transaction when their benefits from the pay increase are taken into account. On a per pilot basis, the TWA pilots fared even better, and received an even greater share of the gains than the average American Airlines pilot received.

17.     **Opinion Five:** Neither of Plaintiffs' experts applies an economic model of bargaining to produce or to evaluate the seniority lists that he posits would have resulted had ALPA not breached its duty of fair representation. Their calculations of potential damages to the TWA pilots are uninformative because they fail to account for the impact that TWA's financial distress, the other benefits received by the TWA pilots and the pre-transaction expectations of the American pilots and TWA pilots would have had on the negotiations. Indeed, they fail to even analyze the impact of their proposed lists on the American pilots. As a result, Plaintiffs' experts generate hypothetical seniority lists – on the basis of which Mr. Salamat purports to calculate damages owed to Plaintiffs – which on a prospective basis (i.e., when evaluated from the perspective of the pilot groups when they were negotiating) made the American pilots worse off than they would have been absent the transaction. This is inconsistent with bargaining theory. Even viewed with hindsight (i.e., using information about the subsequent downturn in American's demand for pilots that was not known at the time of the negotiations), the TWA pilots received the majority of the gains from the transaction, which would not be expected given the American pilots' ability under their contract to determine the seniority list unilaterally. Thus, I conclude that none of Plaintiffs' experts' hypothetical seniority lists reflects a reasonably achievable outcome of the negotiations between the TWA pilots and the American pilots over the seniority integration.

18.     **Opinion Six:**  In addition to being inconsistent with the predictions of bargaining theory, Plaintiffs' experts' opinions suffer from numerous other empirical and methodological flaws that render them unreliable.  These flaws include, among other things:  arbitrary assumptions about the probability that any hypothetical actions taken by ALPA would have affected the outcome of negotiations between the TWA and American pilots over a merged seniority list; misplaced reliance on arbitrated decisions when there was no reasonable prospect of arbitration in this case; and ignoring differences in the American and TWA fleets, which had a significant impact on the pilots' respective career expectations absent the transaction.  Plaintiffs' experts' opinions also are inconsistent with and contradict each other.

## III.     BACKGROUND

### A.   TWA's Financial History

19.     American's proposal to acquire certain TWA assets and to retain TWA's pilots, and the subsequent seniority list merger of the two airlines' pilots, occurred at a time when TWA was in dire financial condition and American was profitable and growing.[11]  TWA went through bankruptcies in 1992 and 1995.  After the 1992 bankruptcy, the TWA pilots agreed to a 15 percent reduction in pay rates, but the airline remained unprofitable.[12]  TWA undertook a financial and operational restructuring again in 1995.  Employees agreed then to a variety of productivity measures, including reduced vacation and sick time and giving up the right to "snap back" the 15 percent compensation concession provided during the first bankruptcy.[13]

20.     As explained in reports submitted in the present case on behalf of ALPA by James S. Feltman and Michael E. Levine, TWA was not a financially viable airline by the end of 2000.[14]  Rather, it was "irremediably structurally unsound and on the verge of liquidation."[15]  TWA relied on a single hub, St. Louis, which had been declining as a commercial business center.  Other problems contributing to its financial distress included its commitment to the Karabu ticket

---

[11] *Expert Report of Richard R. Kasher, Esq., March 15, 2013* ("Kasher Report"); Feltman Report at 7-8, 25, 44.  In its 2000 Annual Report, American Airlines' parent company reported net earnings of $752 million, crediting "robust demand for air travel and for air cargo services, as well as product and service enhancements, prudent capacity growth and an effective fuel-hedging program." (AMR Corp. 2000 Annual Report, at 1).

[12] Compton Dep. 1/18/2013 at 17:9-13;20:1-21:10.

[13] Compton Dep. 1/18/2013 at 21:11-22:19.

[14] Feltman Report at 4-5; Levine Report at 9, 24-25.

[15] Levine Report at 6.

program, under which it collected 45 percent less revenue than competitors for comparable fares; the lack of regional jets and thus feeder traffic to the St. Louis hub; and competition from Southwest (a low-cost carrier ("LCC")), which had a significant and growing presence in St. Louis.[16]  TWA pursued a variety of strategies to improve its financial position and stave off bankruptcy, including engaging in discussions with potential merger partners and investigating potential standalone plans.[17]  However, during 2000 and early 2001, no airline other than American expressed interest in acquiring TWA's aircraft and in providing ongoing employment for the TWA pilots.[18]  Some other airlines explored the possibility of purchasing TWA gates and landing slots.[19]  But even if these discussions had resulted in a concrete proposal, which I understand they did not, the piecemeal acquisition of such assets would not have provided ongoing employment for the TWA pilots.[20]

### B.  American Agrees to Acquire TWA

21.     On January 9, 2001, American and TWA entered into an Asset Purchase Agreement under which American agreed to purchase out of bankruptcy certain TWA assets and to provide employment for TWA's unionized employees, including its pilots, at wages and benefits comparable to those of American's unionized employees.  As required by the agreement, TWA filed for bankruptcy on January 10, 2001.  According to the bankruptcy court, "TWA's approximate cash balance on January 10, 2001 was $20-30 million and TWA needed $40 million to fund its operations the next day."[21]  American Airlines agreed to provide approximately $200 million in debtor-in-possession ("DIP") financing to address TWA's immediate liquidity crisis and allow it to operate until the transaction with American Airlines closed.  TWA's CFO Michael Palumbo stated that TWA "didn't have an ability to pay any material obligation that [the company] had" without this DIP financing.[22]

22.     On January 12, 2001, the TWA ALPA Master Executive Council ("TWA MEC") released a statement that, if the deal with American did not close for some reason, "we face the

---

[16] Palumbo Dep. 1/21/2013 at 49:12-21.
[17] Compton Dep. 1/18/2013 at 32:2-33:4; Palumbo Dep. 1/21/2013 at 96:20-99:14.
[18] Feltman Report at 33-34. Levine Report at 23-24.
[19] Compton Dep. 1/18/2013 at 32:17-33:4; 151:23-152:1. Resnick Dep. 1/16/2013 at 20:22-23:16.
[20] Compton Dep. 1/18/2013 at 151:23-152:8.
[21] April 2, 2001 letter to bankruptcy counsel from the Honorable Peter Walsh ¶17.
[22] Palumbo Dep. 1/21/2013 at 117:21-22.

probability that all 20,000 jobs at TWA will be lost."[23]  Mike Day, who was lead negotiator for the TWA MEC in its negotiations over the merged pilot seniority list with the American pilots' union, the APA, said, "[w]e were all excited about [the potential transaction with American Airlines].  We felt that American was one of the biggest carriers out there and it would be a pretty good match-up."[24]  Similarly, TWA CEO Bill Compton testified that he thought the American Airlines transaction was "the best possible outcome for the TWA employees . . . [because] if we didn't do the American deal, every TWA employee was going to lose their job.  Every TWA retiree was going to lose all their benefits."[25]

23.     As part of its agreement to acquire certain TWA assets, American Airlines required the TWA pilots to waive certain contractual protections in their collective bargaining agreement ("CBA").  In particular, Section 10.2 of the Asset Purchase Agreement required that "[p]rior to [c]losing, TWA shall amend all existing Collective Bargaining Agreements . . . to provide that . . . scope, successorship, and benefits provisions of the Collective Bargaining Agreements are not applicable to or being assumed by [American Airlines]."[26]  Jeffrey Brundage, head of labor relations at American Airlines, testified that the "transaction would not have gone forward" without the elimination of the scope clause in the TWA pilots' collective bargaining agreement,[27] and former American Airlines CEO Donald Carty likewise testified that American "would not have proceeded with the transaction" with TWA without a scope waiver.[28]

### C.  Pilot Integration Negotiations and Supplement CC

24.     Representatives of the American and TWA pilots began negotiations over the merged pilot seniority list on March 1, 2001.  The TWA MEC's Merger Committee negotiated on behalf of the TWA pilots.  The American pilots were represented by the APA's M&A Committee.

---

[23] As cited in Position Statement of APA, p. 16, at ALPA 015299. *See also* TWA MEC Communications Committee Update on January 12, 2001 at ALPA 004361.
[24] Day Dep. 5/02/2013 at 6:17-20.  Industry observers offered similar assessments of the potential transaction with American Airlines.  For example, Senator Bond noted at a 2001 hearing that "[a]lmost everyone involved with TWA looks at the acquisition . . . as the knight in shining armor riding in on his white horse rescuing the damsel in distress . . ."  Senate Hearing, *Airline Consolidation: Has It Gone Too Far?* February 7, 2001 at 4.
[25] Compton Dep. 1/18/2013 at 47:10-16.
[26] Asset Purchase Agreement, p. 41 (ALPA 013341).
[27] Brundage Dep. 10/23/12 at 39:22-40:1.
[28] Carty Dep. 10/15/2012 at 33:15-16.

25.     During the course of negotiations, the two union committees exchanged numerous proposals and counterproposals and used the services of an independent facilitator.  One principle on which they agreed was that the merged seniority list should protect the pre-transaction career expectations of both pilot groups.[29]  Both pilot groups also offered proposals in which the top positions on the merged seniority list would be reserved for American Airlines pilots who flew equipment that TWA did not operate, and some TWA pilots would be placed at the bottom of the merged seniority list (though still above any American new-hires).[30]

26.     Despite negotiations over several months, representatives of the two pilot groups did not agree on a merged seniority list.  On November 7, 2001, the APA Board of Directors unilaterally approved a merged seniority list, with conditions and restrictions, called Supplement CC, which was accepted by American Airlines.  Supplement CC, which took effect in April 2002, provided that:

a)     The top 2,596 seniority positions on the merged list would consist of American pilots who were eligible to fly large wide-body aircraft.  As TWA did not have any large wide-body aircraft in its fleet at the time of the acquisition, the TWA pilots had no prospect of flying these types of planes prior to the acquisition.

b)     Starting after American pilot number 2,596, the 1,095 most senior TWA pilots (based on seniority as of April 10, 2001) were merged into the American pilots' existing seniority list at a ratio of approximately one TWA pilot to 8.1763 American pilots.

c)     Next, the remaining 1,242 TWA pilots were placed in seniority order after the last pilot of the merged section of the list (pilot Camus, who became pilot #12,644 on the integrated seniority list).

---

[29] July 18, 2001 letter from Ed White to Mike Day, p. 2 (ALPA 001809) (noting that "[a]t our first meeting in February 2001, [the TWA MEC Merger Committee] emphasized that unity, fairness and equity, and efficiency will be served by a seniority integration which . . . preserves career expectations").

[30] August 17, 2001 letter from Mike Day to Ed White, APA (J-327) ("We have offered a restriction to reflect the fact that TWA pilots did not have an expectation of B777 flying before the transaction.").  *See also* October 23, 2001 letter from the TWA MEC to Darrah and Brundage accepting the terms of the last APA proposal on October 20, 2001 with certain additional conditions (ALPA 022075).  While this was not the final agreement, the TWA MEC did agree to a proposal that included a top staple of AA pilots and a bottom staple of TWA pilots (ALPA 008905).

    d)   Finally, pilots hired by American after April 10, 2001 who had been assigned to airline flying duty as of October 1, 2001 were placed below the most junior TWA pilot.[31]

27.    Supplement CC also provided for "two sets of 'fence' provisions…to assure that the seniority list fairly operates to reflect the AA and TWA pilots' career paths as of April 10, 2001."[32]  One fence limited the TWA pilots' ability to bid for the large wide-body aircraft that only American flew prior to the transaction and that the TWA pilots would have had no opportunity to fly while they were at TWA.[33]  The other, the St. Louis fence, prevented American pilots – who would not have had access to the opportunities in St. Louis that the TWA pilots had prior to the merger – from "reaping an injurious windfall by gaining advancement opportunities that belonged to the TWA pilots prior to the transaction."[34]  As the APA's Mergers & Acquisitions Committee stated, the "fences in Supplement CC . . . recognize  . . . that the flying representing the TWA pilots' pre-transaction career path is now reflected first and foremost in St. Louis."[35]  The Committee stated that the fences existed "to protect the TWA pilots' pre-transaction career path, including narrow-body and small wide-body Captain jobs attributable to aircraft that TWA operated prior to the transaction, principally in the St. Louis domicile."[36]  According to the Committee, the fences also "assure that the expectation of every AA pilot to fly the largest aircraft in the fleet – through the last pilot hired before April 10, 2001 – is not adversely affected by the integration of the seniority list."[37]  Further, the Committee stated that the fences "preserve[d] the TWA pilots' opportunities to upgrade within the St. Louis domicile, and to continue to have some of the quality of life . . . that they had within the separate TWA operation, notwithstanding their relative placement on the integrated seniority list."[38]

---

[31] APA's Mergers & Acquisitions Committee, "Summary of Supplement CC," December 14, 2001 (ALPA 008746-781, -757-758) ("Summary of Supplement CC").

[32] Summary of Supplement CC, at 20 (ALPA 008765).

[33] Summary of Supplement CC, at 20-21 (ALPA 008765-66).

[34] Summary of Supplement CC, at 22 (ALPA 008767).  Mr. Salamat assumes in his analysis that "the Supplement CC protections would provide a number of guaranteed captain positions.  If a pilot is in a protected position, then increasing his seniority may not increase his income….[He identified] pilots in protected positions and assume[d] zero impact in the months in which they were holding positions out of seniority order" (Salamat Original Report at 43), which likely is based on operation of the St. Louis fence.

[35] Summary of Supplement CC, at 23 (ALPA 008768).

[36] Summary of Supplement CC, at 18, 20 (ALPA 008763, 008765).

[37] Summary of Supplement CC, at 21 (ALPA 008766).

[38] Summary of Supplement CC, at 23 (ALPA 008767).

28.     American's acquisition of TWA's assets and the implementation of Supplement CC provided the TWA pilots with significant gains.  First, the TWA pilots gained job security and higher pay.  Absent the transaction, the TWA pilots would have no reasonable expectation of either, assuming that TWA was on the verge of liquidation and its pilots therefore would have lost their jobs.[39]  Second, about half of the TWA pilot group was merged on the seniority list with American pilots.  Third, even though the other half of the TWA pilots was placed below the legacy American pilot group on the seniority list, all of the TWA pilots were placed above the pilots hired by American after the transaction closed.  Fourth, Supplement CC provided for a St. Louis fence that effectively created an "airline within an airline" based in TWA's St. Louis hub. This prevented the American pilots from using their higher seniority to bid for jobs in St. Louis. Thus, the continued employment and the fence together protected career expectations of the TWA pilots in a way that they could not have anticipated without the transaction.  If TWA had ceased operations, then all of its pilots would have been forced to start at the bottom of the seniority list of any airline with which they could have obtained employment regardless of the number of years of flying experience accrued at TWA, or worse yet, be without a job.

### D.  Operations of the Merged Airline

29.     TWA contributed planes and related jobs in addition to the 2,337 pilots that TWA brought to the transaction, almost all of whom were on active duty at the time of the acquisition. Exhibit 1 shows the expected fleet composition for the merged firm as of December 31, 2001. TWA brought mostly narrow-body planes and substantially fewer small wide-body planes that American would operate after the transaction (American did not keep and operate all of the planes TWA had at the time of the transaction).[40]  TWA brought no large wide-body planes to the transaction.  As shown in the Exhibit, TWA thus disproportionately contributed smaller planes to the merged carrier.  American also planned to continue operating its existing planes and taking delivery of planes that American had on order.[41]

---

[39] Feltman Report at 33-34; Levine Report at 23-24.

[40] Hefley Merger Notes, August 20, 2001, at ALPA 004804 ("In our view, you brought 103 md80s, 9 767s, 27 757's, and 30 717's. That should equal 169. That's as of the first quarter of next year. . ." (Ed White APA M&A Committee speaking)); American Airlines Annual Report, 2001.

[41] Summary of Supplement CC, at ALPA 008758 ("American was the acquiring carrier. It was a large, global airline in sound financial condition, which was growing and had extensive orders for additional wide-body aircraft").

30.     By evaluating the fleet composition expected for the merged carrier as of December 31, 2001 and the aircraft that TWA brought to the merged company (see Exhibit 1), as well as the relevant aircraft manning rates[42] (i.e., pilots per plane) and work rules[43] (see Exhibit 2), I determined that the merged carrier initially expanded by 169 planes and 2,080 pilot jobs as a result of TWA's contributed aircraft (see Exhibits 1 and 3)[44].

### IV.   THE ECONOMICS OF BARGAINING IS THE PROPER ECONOMIC FRAMEWORK FOR EVALUATING PLAINTIFFS' CLAIMS AND THEIR EXPERTS' HYPOTHETICAL SENIORITY LISTS

31.     Economic damages from any breach by ALPA are equal to the difference between the value to the TWA pilots of (i) the transaction under Supplement CC and (ii) the value the TWA pilots would have received if ALPA had met its duty of fair representation.  In order to quantify this difference, if any, it first is necessary to evaluate how the seniority list would have differed from Supplement CC in the but-for world where ALPA did not breach its duty.  This requires economic analysis of the parties' incentives to reach a mutually beneficial agreement.  It then is necessary to quantify how much the TWA pilots would have benefited under a proposed seniority list.

32.     The natural economic framework for evaluating whether the seniority integration alternatives proposed by Plaintiffs' experts reflect reasonable potential outcomes of negotiations between the parties is the economics of bargaining.[45]  The economics of bargaining reflects the

---

[42] Supplement CC assumed average pre-transaction American manning rates.  (Summary of Supplement CC, p. 15. (ALPA 008760) Therefore, I used the same rates to determine the number of jobs TWA brought to the merged carrier.

[43] Summary of Supplement CC, at ALPA 008760; Ed White's August 20, 2001 letter to Rolf Valtin with American Airlines and TWA manning rates tables attached, ALPA 030054-59;  Hefley Merger Notes, February 22, 2001, at ALPA 024945 (according to the notes, Ed White of APA presents staffing numbers and Gary Flor, TWA MEC member, comments "We need a little time to compare ratios. The numbers can be skewed. Flying these aircraft under your workrules produces more seats").

[44] TWA is given credit for CKA/SUPV jobs in this analysis based on their plane share.

[45] As noted above, this framework recently was applied by the FCC to analyze the impact on programming costs of Comcast's acquisition of NBCU (see, Baker (2011) at 40 (discussing "Bargaining Analysis of Programming Prices"):  "The Commission assessed the likely magnitude of price increases arising from the vertical aspect of the transaction by calibrating an economic model of the bargaining between the joint venture and a rival MVPD over the price of programming.  Its analysis relied on the Nash bargaining model.  The Nash bargaining model explains the division of the gains from negotiation (the bargaining surplus) in terms of each party's best alternative to a negotiated agreement (BATNA) and the parties' relative patience or bargaining skill" (footnotes omitted).  For an application of bargaining theory to understand outcomes of negotiations over retransmission consent fees paid by multichannel video programming distributors for carriage of local broadcast stations, see Katz et al., "An Economic

constraints placed on negotiated agreements – namely that each party's expectations, the range of options available to the parties and what happens in the event the parties cannot reach agreement are important determinants of the negotiated outcome.[46]

33. Any proposed merged seniority list acceptable to both groups of pilots (and thus achievable through negotiation) must satisfy certain fundamental economic conditions of negotiated agreements.  This approach is consistent with Mr. Salamat's view that ALPA's alleged failure to take certain actions affected "the dynamics of the negotiation."[47]  He testified that "I'm not concerned at all with the – with [what] the likely outcome of having done these are except to the extent that it would have changed *the dynamics of the negotiation*.  So now you are negotiating with someone whose – whose national union is fighting to protect their scope."[48]  According to Mr. Salamat, "if ALPA is fighting for the TWA pilots and attempting to either force a situation where the APA has to negotiate or, in general, just standing behind their pilots and fighting on their behalf, that would change the APA's behavior in that they would then be dealing with a stronger negotiating partner who had other options available to them."[49]  Thus, it is appropriate – and would be appropriate even if he did not have this view – to evaluate Mr. Salamat's opinions concerning damages under the framework of the economics of negotiated agreements or bargaining.

### A. The Economics of Bargaining Explains Negotiated Outcomes

34. The incentive for two parties to reach an agreement is provided by the opportunity for both to benefit by sharing the resulting value created and saving the costs of continued negotiations.[50]  The acquisition by American of the TWA assets was expected to create net benefits for the combined pilot group by providing additional opportunities for pilots that would

---

Analysis of Consumer Harm from the Current  Retransmission Consent Regime," November 12, 2009 (a study commissioned by the National Cable & Telecommunications Association, DIRECTV, and DISH Network).

[46] *See*, for example, Max H. Bazerman and Margaret A. Neale, *Negotiating Rationally* (1992).  In the literature, a concept similar to the fallback payoff is often referred to as the Best Alternative to Negotiated Agreement ("BATNA"), a term introduced by Roger Fisher and William Ury in their book *Getting to Yes,* which was first published in 1981 (most recent edition published in 2011).

[47] Salamat Dep. 1/29/2013 at 198:20-21.

[48] Salamat Dep. 1/29/2013 at 198:18-23 (emphasis added).

[49] Salamat Dep. 1/29/2013 at 230:11-18.

[50] Nash, John F., "The bargaining problem." Econometrica, vol. 18, issue 2 (1950), pp. 155-162 and Binmore, Ken, Ariel Rubinstein and Asher Wolinsky, "The Nash Bargaining Solution in Economic Modeling," 17 RAND Journal of Economics (1986), pp. 176-188.

not have been available without the merger and by potentially improving the career expectations of both pilot groups.[51]

35.     I use principles of bargaining to evaluate alternative seniority lists proposed by Plaintiffs' experts, as well as Supplement CC.  In order to evaluate the outcome under the proposed and actual seniority lists, I examine three factors: (1) the "fallback payoffs" of each party – or each party's position if no agreement is reached; (2) the total amount of value created by agreement; and (3) the relative bargaining power or leverage of the two parties.  Economic principles dictate the bounds of any possible negotiated agreement between two parties and inform where within those bounds the parties likely would settle.

36.     I apply this framework to evaluate Plaintiffs' claims that ALPA's breach of the duty of fair representation resulted in an unreasonable seniority list.  The bargaining would have occurred, by necessity, at a time when the future of American and the airline industry was uncertain.  Economics informs us that both parties would make their best assessment of how they would do given possible future outcomes in the face of uncertainty, and they would bargain based on those expectations.  Thus, it is proper to evaluate the reasonableness of potential bargaining outcomes using information that was knowable at the time that the bargaining would have occurred, while taking into account the uncertainty facing the parties.  The reasonableness of a hypothetical bargaining outcome cannot be evaluated directly using information that the parties could not have known at the time.

### 1. The Pilots' Fallback Payoffs

37.     The fallback payoffs at the time that American was negotiating to acquire the TWA assets were based on how each would have fared if American had not acquired TWA.  This same view was expressed during bargaining over the seniority list with both sides referring to "pre-transaction career expectations" as the relevant benchmark for measuring each group's gain from the transaction.  The concept of preserving the pre-transaction career expectations or "pre-merger career paths" of both pilot groups was a guiding principle in the development of Supplement

---

[51] The AA analyst presentation states that the transaction will "create[] growth opportunities for employees" (ALPA 018772) and that "[r]evenue synergies are expected to generate $400-$500 million annually on a steady state basis"  (ALPA 018785).

CC.[52]  As the APA stated at the time:  "Throughout this entire process, the M&A Committee, under the direction of the APA Board of Directors, has operated under one central principle:  to protect the pre-merger career paths of all pilots concerned with the integration."[53]  And Plaintiffs' experts acknowledge that seniority integrations typically attempt to preserve the pre-transaction career expectations of each pilot group[54]–even though, as discussed below, both Mr. Salamat and Professor Farber propose hypothetical seniority lists that violate this principle.

38.    In early 2001, American was a successful and profitable airline.[55]  Any proposed seniority list that would make the American pilots worse off than they expected to be without the TWA asset acquisition is unreasonable and inconsistent with the economics of bargaining because the American pilots would never be expected to agree to such a list.  This is particularly true given that the TWA pilots stood to benefit substantially from the transaction, and that the American pilots had the contractual right to unilaterally staple the TWA pilots to the bottom of the merged seniority list.

---

[52] "Strictly applied, Section 13 of the Green Book would result in the TWA pilots accumulating seniority from the time they first are assigned to revenue flying duty with American, whenever that time might come."  APA Summary of Supplement CC, at ALPA 008748.  However, as Ed White testified, "[i]nstead, [the] APA strove for a seniority integration that fairly reflected each group's pre-transaction career expectations" and "[t]he seniority integration was not pulled from a hat; nor was it a thinly veiled attempt to disadvantage the TWA pilots. It was, in fact, based on extensive analysis of the two carriers and the pilot groups involved, including a complex and carefully developed 'career path' methodology - derived substantially from a methodology proposed by the TWA pilots themselves-designed to reflect accurately each group's career expectations at the time of the asset purchase" (Written Testimony of Captain Edwin C. White, Jr. Before the Committee on Health, Education, Labor and Pensions United States Senate Hearing on the TWA/American Airlines Workforce Integration June 12, 2003 ("White Testimony"), p. 4.)

[53] Summary of Supplement CC at 3 (ALPA 008748); see also discussion memorialized in Hefley notes ("Jim B: So the challenge is to construct an integrated list that does not impede a pilots progression through the list. The other part of it is how do you provide for the TWA pilots' expectancies in the process? Ed [White]: You have to look at the pre-merger expectations and take them into account") (ALPA 004902).

[54] "Differing career opportunities, however, have certainly played a role in the construction of lists. The amount of 'premium' work, such as wide-body captaincies, aircraft on order, airline growth and quality of work all play some role in virtually every merger and it is not uncommon for one party to argue that its pilots should be granted a seniority premium to reflect the 'better opportunities' they bring and that the other party will have a chance to share in" (Salamat Original Report at 30); when asked at his deposition whether he had "seen in your work that, in evaluating the fairness of seniority integration lists that people look to, whether the integrated list preserves the pre-transaction career expectations of each pilot group?" Mr. Salamat responded that "That – that would be common in – in mergers that people do that, yes" (Salamat Dep. 1/29/13 at 73:9-15); "Arbitrators commonly consider a number of factors. One constant is that they attempt to preserve the pre-transaction relative ranks of the pilots on the pre-transaction seniority lists" (Farber Report ¶27).

[55] "AMR's net earnings in 2000 were $813 million;" "AMR's net earnings in 1999 were $985 million" (AMR Corporation Form 10-K at 10).  American noted, however, that it "is cautious in its outlook for 2001. On the revenue front, the primary concern is a slowing U.S. economy. American's strong revenue performance the past several years was marked by a growing U.S. economy coupled with a modest increase in industry capacity. Our revenue performance in 2001 will be dictated by how well the industry manages that relationship going forward" (AMR 2000 10-K at 24).

39.     In contrast, TWA was in severe financial trouble when it agreed to the asset acquisition by American.  Other ALPA experts, as well as former TWA management, have opined that as of late 2000, TWA faced imminent liquidation.  It was on the verge of running out of cash to keep operating, and did not have any other acquisition offer for all or part of the airline (as an operating business) or a financing proposal that would have enabled it to remain independent.[56] It thus is reasonable to assume that, absent the transaction, TWA would have liquidated, and its pilots would have lost their jobs.  If the pilots found employment at other airlines, they likely would have earned less than at American and been at the bottom of the seniority list, because airline/union collective bargaining agreements typically required that new hires be placed at the bottom of the seniority list, regardless of prior flying experience.[57]

40.     At the time the pilot groups were negotiating the seniority integration, the TWA pilots' bargaining position also reflected the fact that they could not force the American pilots to submit to arbitration, given the APA's collective bargaining agreement with American.  (This means, as discussed below, that Professor Farber's and Mr. Salamat's focus on comparing Supplement CC to arbitrators' seniority integration decisions in other transactions is misguided.)

41.     For purposes of my analysis, I take the fallback payoff for the American pilots to be their pre-transaction career expectations.  That is the baseline from which they started the negotiations before the transaction had closed, and they had no incentive to take less than that amount after the transaction had closed.

42.     For the TWA pilots, the analysis is more complex because their fallback payoff likely evolved over time.  At the time the transaction was negotiated and agreed upon by TWA and American, and the TWA pilots agreed to waive scope as required by the Asset Purchase Agreement, the fallback payoff for the TWA pilots, like that for the American pilots, was based on their pre-transaction career expectations.  For the TWA pilots, this reflected the consequences of liquidation of their airline.  Once the transaction between American and TWA had closed and

---

[56] Feltman Report at 4-5; Levine Report at 6-7;  Compton Dep. 1/18/2013 at 25:16-23; "Effects of the American Airlines/TWA Transaction and Other Airline Industry Consolidation on Competition and the Consumer," Senate Committee on Commerce, Science and Transportation, February 1, 2001, Prepared Statement Donald Carty, Chairman, President, and CEO, American Airlines, pp. 20-22.

[57] "Virtually without exception, union contracts in the airline industry provide that a new employee, even one with considerable seniority at a prior employer, starts over at the bottom of the new employer's seniority list" (White Testimony, p. 3).

- 17 -

American had committed to doing the deal, the fallback payoff for the TWA pilots likely improved, because now their worst possible outcome was to be stapled at the bottom of the merged airline's seniority list.  That improvement in fallback payoff was obtained at the cost of agreeing to waive scope.  In contrast, the American pilots retained the protections in their CBA that effectively allowed them to determine the integrated seniority list unilaterally.

43.     For purposes of my analysis, I consider two alternatives for the TWA pilots' fallback payoff.  In one, I assume that the fallback payoff for the TWA pilots is determined by their pre-transaction career expectations.  I approximate this by using the value the TWA pilots would receive if they were stapled at the bottom of the American seniority list and did not receive the benefit of American's higher level of pay (i.e., they continue to receive the pay rates I estimate they received at TWA).[58]  In the second, I assume the same placement at the bottom of the seniority list but assume that the TWA pilots would receive American pay rates.  This more closely approximates the worst-case scenario for the TWA pilots after the transaction had closed.

44.     American's decision to go forward with the transaction, which generated the higher fallback payoff for the TWA pilots, also increased further the American pilots' bargaining power in the seniority negotiations by requiring the TWA pilots to waive scope, thereby giving the American pilots the right to impose a seniority list.

### 2.  The Value to be Shared between the Parties

45.     The second input needed to understand the likely outcome of bargaining between the two pilot groups is the amount of value available for them to share if they reach agreement.

46.     American's acquisition of TWA's assets allowed TWA's operations (including pilots) to continue,[59] which provided many benefits to the TWA pilots.  First, they were able to keep their jobs and continue flying.  Second, whether merged with the American pilots or even stapled to the bottom of American's seniority list, they maintained at least some seniority status (rather

---

[58] However, as I explain below, I do not assume that the lower pay rate would be stagnant, but instead assume that pay for TWA pilots would gradually converge to the level of the American pilots over time. I estimate the rate of convergence based on the regression to the mean observed in the average salaries of the legacy airlines between 1990 and 2010.

[59] Feltman Report at 33-34; Levine Report at 23-24.

than starting at the bottom of another airline's seniority list or being unemployed).  Third, they joined an airline that was financially healthy at the time and expected to grow.[60]

47.     The TWA pilots also benefited from the improved pay rates and benefits available at American, which were better than those at TWA and better than the pay available at many other carriers where those pilots might have sought employment.[61]  The TWA pilots moved to the American pay rates by January 1, 2002.[62]  As shown in Exhibit 4, the pay scale for American pilots was more than 40 percent higher than that of TWA for the three plane types that both carriers operated, as well as overall.  When adjusted for differences in the maximum flying hours per month under the TWA and American Collective Bargaining Agreements ("CBAs"), the difference is smaller, because the TWA pilots were permitted to fly more hours (see Exhibit 5).  Thus, TWA pilots could expect to earn approximately 30 percent more flying for American than they did at TWA.

48.     But for the American acquisition, the TWA pilots would have had to seek employment at other airlines where, if they were offered a job at all, they likely would have been at the bottom of an airline's seniority list.  And, as shown in Exhibits 6.A, 6.B and 6.C, even for comparable positions, pay rates at many other airlines were lower than those of TWA at the end of 2000 (and were also considerably lower than those of American).  In addition, the TWA pilots received higher compensation at American since they were given credit for years at TWA in the American transaction, but generally would not have received longevity credit for pay scale purposes at other airlines.[63]

---

[60] "Climbing Back to Altitude: A Commerce Magazine Conversation with American Airlines CEO Gerard Arpey," August 2004 (http://www.stlcommercemagazine.com/archives/august2004/altitude.html).

[61] For example, Captain John Darrah, APA's president, wrote on March 23, 2001 that "[b]y AMR's own numbers, the medical and dental liabilities for TWA employees and retirees [provided by AMR] total more than $509 million" (J-294 (ALPA 021052)).

[62] Letter from Don Carty, AA to Bill Compton, TWA on March 6, 2001 (D-211, Ex. G) ("TWA-LLC will utilize these pay rates and benefits until TWA-LLC transitions the employees to American pay rates and benefits, which will be effective no later than January 1, 2002."). *See also*, Hayes Dep. 1/28/2013 at 57:8-19.

[63] "Virtually without exception, union contracts in the airline industry provide that a new employee, even one with considerable seniority at a prior employer, starts over at the bottom of the new employer's seniority list" (Written Testimony of Captain Edwin C. White, Jr. Before the Committee on Health, Education, Labor and Pensions United States Senate Hearing on the TWA/American Airlines Workforce Integration June 12, 2003, p. 3).

49.     The mitigation data offered by Mr. Salamat provides confirmatory evidence (retrospective rather than prospective) about the TWA pilots' prospects in the event that the transaction with American did not occur.

50.     Thus, at the time of the transaction, the TWA pilots could expect the asset acquisition by American to provide employment for virtually all TWA pilots at wages and other benefits that were substantially better than they had been receiving at TWA.  This was conveyed by American's leadership when it announced the acquisition and explained why it was purchasing the TWA assets and offering employment to virtually all TWA employees.[64]  By the time negotiations between the pilot groups broke down and the APA and American agreed on Supplement CC, the prospects available to the TWA pilots without the acquisition by American likely were even more dire than when the negotiations began, although conditions at American likely were worse as well.[65]

### 3.  The Parties' Relative Bargaining Positions

51.     If there is no information that suggests that one party has an advantage over the other in the negotiations, then it is reasonable to assume that the parties will split the gains approximately evenly.[66]  However, when the bargaining positions of the two parties clearly are unequal, this

---

[64] American Airlines 8-K, January 10, 2001.  *See also* "Effects of the American Airlines/TWA Transaction and Other Airline Industry Consolidation on Competition and the Consumer," Senate Committee on Commerce, Science and Transportation. February 1, 2001, Prepared Statement Donald Carty, Chairman, President, and CEO, American Airlines, pp. 20-22.

[65] American also may have brought additional value that was contingent on the merger – a certain amount of furlough protection and other benefits.  In July 2001, American and the APA agreed to a Transition Agreement which included an "Agreement Prohibiting the Leveraging of TWA LLC Against the APA" (Transition Agreement between American Airlines, Inc. and Allied Pilots Association Representing The Pilots of American Airlines, Inc., July 10, 2001 at ALPA 009855).  This furlough protection was short-lived, because on September 20, 2001, American declared "force majeure" because of reduced demand caused by 9-11 (APA Information Hotline for September 20, 2001 (ALPA 009526-8)).

[66] Nash, John F. "The bargaining problem." Econometrica, vol. 18, issue 2 (1950), pp. 155-162.  *See*, also, Memorandum Opinion and Order In the Matter of Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Communications Corporation (and subsidiaries, debtors-in-possession), Assigners, to Time Warner Cable Inc. (subsidiaries), Assignees, adopted July 13, 2006, Appendix D at 8 ("[T]hroughout our analysis, we adopt a standard solution to bargaining games by assuming that the parties split the gains from trade ($\gamma 0 = \gamma 1 = 0.5$)" (i.e., equally).  *See*, also, Baker (2011): " the Commission relied on evidence from a recent academic study to conclude that the joint venture would have roughly equal bargaining skill or patience as MVPDs other than Comcast (specifically satellite and telephone company providers) when negotiating over cable programming. When the bargaining skill is even, the Nash model implies that any increase in the cost to Comcast of providing the programming to an MVPD would be expected to raise the negotiated price by half the cost increase" (at 40, citing Ali Yurukoglu, Bundling and Vertical Relationships in Multichannel Television, NYU Stern (2008) at 48, available at http://pages.stern.nyu.edu/~ayurukog/multichannel_vertical.pdf).

assumption is unreasonable.  For example, when one party has the right to set the terms and can make a take-it-or-leave-it offer to the other, then the first party will obtain a larger share, and perhaps all, of the gains absent other considerations.  This unequal distribution of bargaining positions is more consistent with the situation here, because the American pilots' contract effectively gave them the right to determine the seniority integration outcome unilaterally, and to place all TWA pilots at the bottom of the seniority list, if they chose to do so.

52.     In a letter to American pilots that accompanied the summary of Supplement CC provided by the APA's Mergers & Acquisitions Committee to the APA's membership, John Darrah, the President of the APA, explained why APA's M&A Committee and the APA Board decided not to strictly apply the terms of the APA's collective bargaining agreement to the integration of the TWA pilots and place all of the TWA pilots at the bottom of the seniority list.  The identified reasons include consideration of "sustainable" assets that TWA brought,[67] its "long history as a major domestic and international Carrier," and concerns about the future relationship with the TWA pilots[68] and the potential for costly litigation[69] if the resulting merged seniority list did not provide some benefits for the TWA pilots.  He explained that "[t]hroughout his entire process, the M&A Committee. . . has operated under one central principle: to protect the pre-merger career path of <u>all</u> pilots concerned with the integration."[70]

---

[67] Summary of Supplement CC, p. 3 (ALPA 008748) ("TWA brings to the table a large pilot base (St. Louis) and a number of aircraft and Captains positions that were not previously contemplated at a pre-transaction American").

[68] According to the Summary of Supplement CC, "Once the integration is complete, [the TWA] pilots will not be "them" but part of "us"— American Airlines pilots. These former TWA pilots will become our friends and neighbors. We will all be wearing the same uniforms, flying in the same cockpits and working toward the same goal – making American the most successful airline in the world and making the job of an American pilot the best pilot job in the world. These are obviously difficult times, and the future will present us with many difficult challenges. We must work together to face the new challenges in front of us in a changing world and a changing industry. Once the dust of the integration settles and the inevitable resentments on both sides of the house dissipate, all of us as AA pilots will need to act as a unified force" (p. 4 (ALPA 008749)).

[69] "[B]oth the M&A Committee and the APA Board have been keenly aware throughout this long process that virtually no pilot integration goes without challenge in the legal system. . . .  It would be a disservice to all of you [APA members] if we devised an integration that would give the AA pilots all of the benefits and would make you feel good now, but could be vulnerable to such a challenge.  Thus, while your representatives have worked literally thousands of hours to devise an integration method that will stand the test of time, they have also worked to devise a method that will stand the test of litigation, if necessary."  [APA Summary of Supplement CC at p. 4 (ALPA 008749)]

[70] Summary of Supplement CC, p. 3 (ALPA 008748).

53.     Economics provides a way to use the above considerations to determine whether any proposed seniority list is a reasonable outcome of negotiations between the TWA and American pilots.   In particular:

a)    Neither pilot group should be made worse off under the integrated list than it would have been if there were no agreement.

b)    The seniority list should not be designed in such a way that the TWA pilots disproportionately benefit from that list.  Given the other benefits received by the TWA pilots, in particular higher pay and continued employment, and the fact that the American pilots did not obtain other benefits from the transaction, the benefits of the seniority list integration should favor the American pilots.

c)    In evaluating the split of value between the two groups, all of the benefits provided to each party should be considered, because these considerations likely would have affected the pilots' positions on other issues.  This includes the pay rate increase and improved benefits that TWA pilots obtained through the acquisition.  Even if none of the other value of the transaction were shared with the TWA pilots, they still benefited from the merger by obtaining better pay rates, pensions and an expectation of greater job security.

### B.  Applying the Economic framework to Evaluate a Proposed Seniority List

54.     Economics predicts that, if the parties successfully reached agreement, the merged seniority list would have the following three features:

55.     First, both pilot groups would expect to be better off relative to their pre-transaction career expectations.  Here, even if all the TWA pilots were stapled at the bottom of the American seniority list, they would have expected to gain relative to their pre-transaction career path through additional compensation by being paid at the American pay rates and being employed by an ongoing airline.

56.     Second, the merged seniority list would favor the American pilots.  The American pilots expected no gain in compensation as a result of the transaction and already were part of a successful airline.  Therefore, the merged list had to preserve their pre-transaction career

- 22 -

expectations and reduce their expectations of furlough in the event of a downturn that resulted in downsizing the airline.

57.     Third, since the American pilots had a better bargaining position as pilots of the acquiring airline and through their contract protections, we would expect that, all else equal, the American pilots would gain more from the list than the TWA pilots.

58.     I now evaluate the various hypothetical seniority lists that Plaintiffs' experts propose as potential outcomes of the negotiations if ALPA had fulfilled its duty, which they claim it did not do, by applying the economics of bargaining.  I take into account the parties' reasonable expectations given the uncertainty that existed at the time of the negotiations about the future for the merged airline.  I also examine how the two pilot groups fared given the evolution of the industry and American Airlines after implementation of the seniority list.

### 1.  Prospective Evaluation

59.     Parties negotiate without knowing how they will fare in the future under a specific agreement.  They develop positions based on their expectations about the future, and they bargain over how to split the gains given expectations about their alternatives and the size of the gains that they anticipate their agreement will yield.  As I discussed above in Section IV.B, in order to understand whether a hypothetical negotiated outcome is reasonable, it must be evaluated in light of the parties' expectations at the time they negotiated (i.e., prospectively), not under the conditions known with hindsight.  Therefore, to the extent possible, I evaluate hypothetical seniority lists using data and information that was available when the two groups of pilots negotiated the integration, which I call Prospective Evaluation.  I consider how each seniority list proposed by Plaintiffs' experts, as well as Supplement CC, would be expected to affect the pilots' career path relative to their expectations without an agreement, given reasonable forecasts of future demand for pilots and flying activity at the merged carrier.  The key features of this evaluation are that it is based on information available to the parties at the time of the negotiations as well the inherent uncertainty about future outcomes.

60.     Events after American agreed to acquire the TWA assets show why it is important to take into account the uncertainty associated with the airline industry and the employment prospects for pilots when considering what agreement the pilot groups would have reached.  The outlook for American at the time of the transaction was very positive – indeed, American hired hundreds

of new pilots after April 10, 2001.[71]  However, after American decided to acquire TWA, the fortunes of American and its pilots declined.  In particular, the terrorist attacks on September 11, 2001 and the subsequent general economic downturn and reduction in demand for air travel reduced American's fleet and pilot requirements and resulted in furloughing of pilots.[72]  While there were some furloughs at the end of 2001, Exhibit 7 shows that the majority of the furloughs started in 2003 and that the number of furloughs remained high for several years.

61.    The risk of furlough was an important consideration for the two pilot groups when they were negotiating the seniority list, but the actual magnitude of future furloughs was unanticipated.  As American's former CEO, Gerard J. Arpey, later explained:

> As we started 2001, business travel was booming—so much so that we were in danger at American of maxing out our two mid-continent hubs at Dallas/Fort Worth and Chicago. Adding the St. Louis hub in that environment seemed to make sense—not just because it enabled us to grow, but because it let us expand without disrupting the overall supply and demand equilibrium in the industry.
>
> By mid 2001, however, business travel was slowing pretty dramatically. Then came 9/11 and suddenly nobody wanted to fly. We had to make thousands of tough decisions on the fly, just to stay in business. We continued the hard work of integrating TWA, because at that time we still thought an efficient connecting hub in St. Louis could be a profitable addition to our network. Our people—both at American and TWA—did a heroic job. However, the economics of our business continued to deteriorate. We barely escaped bankruptcy a year ago, and in the aftermath of that escape we had to make some even tougher decisions. One of our most difficult realizations was that—in the course of two years—a connecting hub in St. Louis had gone from something we thought we needed to something we could no longer afford.[73]

62.    The role of expectations about future adverse events is evident in the American pilots' perspective that, for them:

> seniority integration with the TWA pilots largely involves risks rather than benefits. Integrating TWA pilots into the AA seniority list will ultimately benefit the AA pilots only to the extent that the combined airline grows beyond what American could have

---

[71] FARBER-000655.

[72] *See, e.g.,* APA Information Hotline, September 19, 2001, at P06456 (discussing "briefing by [AA] CEO Don Carty regarding management's plans to reducing staffing by at least 20,000 employees"); APA Information Hotline, September 20, 2001, at ALPA 009526 ("I have the extremely unpleasant task of sharing information regarding management's intention to issue furlough notices to 386 American Airlines pilots effective October 1 [, 2001]").

[73] "Climbing Back to Altitude: A Commerce Magazine Conversation with American Airlines CEO Gerard Arpey," August 2004 (http://www.stlcommercemagazine.com/archives/august2004/altitude.html).

expected absent the transaction. The AA pilots' experience with the prior acquisitions of Air Cal and Reno have taught that this is, at best, unpredictable.

Accordingly, as the pilots of the carrier acquiring assets from a bankrupt airline, the AA pilots are entitled to expect that, to the extent that a pilot's placement on the list will impose risks based on unpredictable future events, the list will be constructed to minimize those risks for the AA pilots. The TWA pilots – whose carrier was bankrupt and nearly defunct, and who have already reaped most of the benefits of the transaction – should fairly bear much of the future risk that goes with those benefits.[74]

### 2. Evaluation with Hindsight

63.     An alternative evaluation of the gains to the two groups of pilots from a seniority list incorporates information about outcomes after the integration, and compares that outcome with an estimate of how the parties would have done if they had not reached agreement.  I refer to this approach as "Evaluation with Hindsight."  This approach is less informed by the economics of bargaining than  Prospective Evaluation, because it uses information that is not available to the parties at the time of their negotiations.  It also gives no credit to expected outcomes under different states of the world, even though parties attempt to anticipate various possible future contingencies when deciding how to trade-off contract provisions that may be valuable under some future circumstances but not under others.

64.     Given that the combined airline fared less well than was expected at the time of the transaction, Evaluation with Hindsight will tend to overestimate the expected gains received by the American pilots by making the implicit furlough protection afforded by the integration appear to be more valuable after the fact than the pilots would have expected it to be prospectively.  While 9-11 occurred before the APA Board approved Supplement CC on November 7, 2001, the substantial furloughs that started in earnest in 2003, when American was talking about the possibility of filing for bankruptcy,[75] were not anticipated at that time.  As a

---

[74] Summary of Supplement CC, p. 14 (ALPA 008759).

[75] "The three major unions at American Airlines said yesterday that they would conclude voting on concessions by this morning and try to get results to the company before 11 a.m. in Texas. That is the deadline that American, based in Fort Worth, Tex., has set to get a vote tally. If the votes are not counted by then, or if any labor group votes down concessions, then the company will file for bankruptcy-court protection ''very soon,'' said Bruce Hicks, a company spokesman" ("American Airlines Unions Vote Today on Concessions," New York Times, April 15, 2003 (http://www.nytimes.com/2003/04/15/business/american-airlines-unions-vote-today-on-concessions.html)).  In its 1Q2003 10-Q, American stated that "Even with the Modified Labor Agreements, the savings from Management Reductions and the Vendor Agreements, the Company may nonetheless need to initiate a filing under Chapter 11 of the U.S. Bankruptcy Code (a Chapter 11 filing) because its financial condition will remain weak and its prospects uncertain" (American Airlines Corporation Form 10-Q For the Quarterly Period Ended March 31, 2003 at 5).

- 25 -

result, the full extent of the furlough-related gains to the American pilots also were not anticipated at that time.

### 3.   Methodology for Implementing the Evaluations

65.     I evaluate the seniority lists at issue as follows:[76]

66.     <u>First</u>, I quantify the expected earnings (including pension) of both groups of pilots under the assumption that, if there were no agreement on a merged seniority list after the TWA assets were acquired by American, the TWA pilots would have been stapled at the bottom of the seniority list.  In my first alternative, I attempt to approximate the TWA pilots' pre-transaction career expectations.  Those expectations would reflect the fact that, absent the transaction, TWA would have liquidated.[77]  As discussed above, I approximate this outcome by stapling the TWA pilots at the bottom of the merged seniority list and assuming that they would initially receive the same pay rates as they received at TWA before the transaction, but that their pay rates would gradually converge to rates equivalent to American pay rates over time.  In my second set of calculations, I assume an alternative for the TWA pilots better than their pre-transaction career expectations – that while all the TWA pilots would still be stapled at the bottom of the seniority list, because they were employed by American, they would be entitled to the same pay rates as the American pilots.  This outcome is better than their pre-transaction career expectations, and recognizes that the asset acquisition was completed by the time that most of the negotiations occurred.  The American pilots could have stapled all the TWA pilots at the bottom of the seniority list, but I assume that, by the time Supplement CC was adopted, they could not deny the TWA pilots the American pay rates, pension and other benefits.

67.     <u>Second</u>, I evaluate the expected earnings (including pension) of both pilot groups under the two scenarios (prospective and hindsight) outlined above.  For the Prospective Evaluation, I perform computer simulations in which I "draw" from a distribution of possible outcomes for the airline's monthly growth.  I calibrate this growth distribution to have expected zero growth (i.e., the expected future size of the airline remains the same as it was in April 2002), and annual growth variance equal to the variance of the annual growth rate (in number of working pilots) of

---

[76] In my evaluations, I use inputs and assumptions from Mr. Salamat's analysis, such as his income schedules and classification of pilots as "voluntarily furloughed."
[77] Feltman Report at 33-34; Levine Report at 23-24.

the major network airlines between 1990 and 2011.[78]  I perform 500 simulations to obtain 500 separate simulated airline paths between April 2002 and December 2040.[79]  For each path, I calculate the gains for American and TWA pilots that a given scenario (e.g., Supplement CC) would give them over their respective alternative scenarios: "no acquisition" for American pilots and "all stapled" for TWA pilots (quantifying the gains for the alternative in which the TWA pilots immediately receive the American pay rates and the alternative in which they do not).  I then average the 500 outcomes and calculate the split of the expected gains.  This provides an expected split of the gains given the uncertainty about how the future would evolve for the merged carrier.  For the Evaluation with Hindsight, I calculate the split of gains implied by the list being evaluated and the actual history of American and TWA pilots until 2012.  For the period after June 2012, I use an estimate of available jobs based on airline size in June 2012.[80]

68.   Third, for each pilot group, I calculate the difference between the expected earnings under its fallback payoff and the earnings under the seniority list being evaluated.  I sum up these differences separately for the American and TWA pilots over a specified time period (through 2026 for the Evaluation with Hindsight, which is the final year included in Mr. Salamat's damages calculations, and through 2040 for the Prospective Evaluation, because this is the year that the last pilot would have had to retire).[81]  For each pilot group, I calculate the total amount of gains that would have been received under the hypothesized negotiated list relative to the "no negotiated agreement" outcome as a share of the combined gains (total gains to the American pilots plus total gains to the TWA pilots).  This shows how, under the hypothesized list, the gains from reaching a negotiated agreement would have been split between the two pilot groups.

---

[78] Research and Innovative Technology Administration Bureau of Transportation Statistics: Air Carrier Financial: Schedule P-10.  This table includes annual employee statistics by labor category.  We used 'Pilots and CoPilots' by carrier for 1990 to 2011. We included American, Continental, Delta, Northwest, TWA, United and US Airways and excluded years with major mergers.  We calculated the change in pilots from year to year as log(pilots (t-1) / pilots) and calculated the standard deviation of this growth rate.

[79] I extend the simulation to December 2040 to allow for all pilots on the Supplement CC seniority list to reach retirement.

[80] All my analyses begin with data from April 2002 (the data as compiled by Mr. Salamat), because these are the earliest data available to me.

[81] I am concerned only with the aggregate number for purposes of understanding whether a hypothetical seniority list is reasonable, so I aggregate over individual differences that may be negative.

69.     My analysis is intended to measure the pilots' expectations when they were negotiating in 2001,[82] and to evaluate Supplement CC as well as the hypothetical seniority lists proposed by Plaintiffs' experts in light of how they would affect the pilots' expected future earnings while employed at American.  Therefore, it is important to discount future earnings appropriately.  Employment at a major airline is uncertain, as the histories of TWA and American make clear, so pilots would not value $50,000 in additional nominal earnings in 2013 as much as $50,000 in additional nominal earnings in 2003.  Because I value the surplus in 2013, but am measuring the expected future earnings as of the time of the negotiations, I bring forward past earnings and discount future earnings using American's Weighted Cost of Capital ("WACC"), which reflects the riskiness of the carrier as reflected in its cost of obtaining funds.[83]  Businesses often use their WACC when analyzing the expected return (or discounted cash flows) from investments.[84]  Indeed, firms (and I understand American) commonly use WACC to evaluate the profitability of investments and make other business planning decisions.[85]

### C.  Summary

70.     The proper way to evaluate whether a hypothetical seniority list is consistent with the economics of bargaining is to take into account only the parties' expectations at the time of the negotiations, rather than rely on information that was not available to the parties when they negotiated.  This is a Prospective Evaluation.  The reasonableness of a hypothetical list depends on how, when they were negotiating, the parties would have expected to fare compared with the outcome if they did not reach agreement.  This evaluation would take into account uncertainty about how the airline would do in the future – the possibility of both good and bad outcomes.  In other words, it would reflect the values each party would receive given its expected opportunities under the variety of potential demand conditions for American's services – the benefits received if the airline expands and benefits received if the airline contracts, weighted by the likelihood that alternative scenarios will occur.  Evaluation with Hindsight is less reliable for evaluating

---

[82] As noted, I use data beginning in April 2002 for my evaluation, because earlier data were not available to me.

[83] Franklin M. Fisher and R. Craig Romaine, "Janis Joplin's Yearbook and the Theory of Damages," 5 J. Accounting, Auditing and Finance (Winter/Spring 1990), pp. 145, 149-51.  See also Lanzilloti and Esquibel, "Measuring Damages in Commercial Litigation: Present Value of Lost Opportunities," J. Accounting, Auditing & Finance (1990), pp. 125, 130, 132.

[84] Valuation and Managing the Value of Companies at p 106, Tim Koller, Marc Goedhart and David Wessels, John Wiley & Sons, Inc. at 101.

[85] See Agreement between American Airlines, Inc. and The Air Lines Pilots in the service of American Airlines, Inc. as represented by the Allied Pilots Association, May 5, 1997, pp. 1-2, 1-3, 1-7 (J-324).

whether a hypothetical seniority list would be a reasonable negotiated outcome.  Nevertheless, I have evaluated Supplement CC and the hypothetical seniority lists proposed by Plaintiffs' experts under both approaches.  This makes it easier to compare these results to those of Mr. Salamat who relied only on hindsight.

## V.   SUPPLEMENT CC IS A REASONABLE OUTCOME FOR THE TWA PILOTS GIVEN THE ECONOMICS OF BARGAINING

71.     The information available to me limits the starting point of my analysis of Supplement CC to April 2002.[86]  Based on the size of the airline that was expected at the time of the transaction – which would include American's existing planes, American planes on order, and TWA planes that were acquired with the transaction – I calculate the share of jobs attributable to TWA planes.  In April 2002, there were 10,548 working American pilots and 1,799 working TWA pilots.[87]

72.     I derive the expected outcome for American as a stand-alone company (without the transaction) by eliminating the jobs attributed to the TWA planes and eliminating the TWA pilots.  This scenario reflects the career expectations of the American pilots absent the transaction.  I approximate the no-transaction alternative for the TWA pilots by evaluating what they would have received if they were at the bottom of the list of the combined airline in my simulation without the benefit of other protections received as part of Supplement CC such as the St. Louis fence.  This essentially gives the TWA pilots property rights over the net jobs contributed to the merger by TWA by allowing them to fill these jobs rather than be furloughed.  I evaluate two alternatives – one in which I assume the TWA pilots would immediately receive American's pay rates, and another in which I assume that the TWA pilots would initially receive the same pay rates as I estimate they were receiving at TWA before the transaction and then gradually would converge to American pay rates over time.[88]

73.     In order to quantify how Supplement CC compared with the pilots' expected positions, I use the pay schedule that Mr. Salamat calculated for April 2002, restricted to pilots that were actually working as of that date.  I also use the pay schedule that Mr. Salamat calculated which

---

[86] If they were available, I would use data for the period during which the pilot groups negotiated.
[87] TWA is given credit for CKA/SUPV jobs in this analysis based on their plane share.
[88] I estimate the rate of convergence based on the regression to the mean observed in the average salaries of the legacy airlines between 1990 and 2010.

assumes that TWA pilots are able to bid for jobs flying large wide-body aircraft, but only after the last American pilot is estimated to reach that milestone.[89]

74.     I allow the size of the airline (i.e., the number of pilot jobs) to grow or shrink over time based on unpredictable events, which I derive from the distribution of annual growth rates of large U.S. airlines over the 1990-2011 period.[90]  It would have been reasonable for the parties to consider at the time they were negotiating that the economy and demand for American's services could evolve in a variety of different ways, and this uncertainty is incorporated in the Prospective Evaluation.

75.     For Evaluation with Hindsight, I follow the same general methodology, but I adjust the size of the airline to reflect the actual growth experience of the combined entity.

76.     Exhibit 8.A summarizes how Supplement CC split the gains between the two pilot groups under Prospective Evaluation and Evaluation with Hindsight.  Prospective Evaluation excluding the value to the TWA pilots of their increased pay shows that the TWA pilots received 48 percent of the total gains, or 4.5 times more than the American pilots, on a per pilot basis; the TWA pilots still received about three times more per pilot than the American pilots when evaluated under hindsight.  Prospective Evaluation including the value to the TWA pilots of their increased pay shows that the TWA pilots received roughly 60 percent of the gains.  The greater share for the TWA pilots under this second calculation (which includes the value of higher pay) reflects the fact that the gains to the American pilots are the same in the two cases, while the benefits to the TWA pilots increase by the amount of the higher pay.  These outcomes are consistent with bargaining theory; they imply that the TWA pilots were able to obtain a substantial share of the overall benefits and an even greater share of the benefits when measured on a per-pilot basis, given there were about five times as many American as TWA pilots.  The results without accounting for the higher pay imply that the American pilots received slightly

---

[89] I assume real wage growth of 1.2 percent annually based on "The Long-Range Economic Assumptions for the 2012 Trustees Report," Office of the Chief Actuary Social Security Administration, April 23, 2012, Table 3.1.

[90] I use data from Research and Innovative Technology Administration Bureau of Transportation Statistics: Air Carrier Financial: Schedule P-10. This table includes annual employee statistics by labor category. I use the category "Pilots and CoPilots." I include American, Continental, Delta, Northwest, TWA, United and US Airways and exclude years with major mergers.  I calculate the change in pilots from year to year as log(pilots (t-1) / pilots), and calculate the standard deviation of this growth rate.

more than half of the benefits from the seniority list integration. This is consistent with bargaining theory given their superior bargaining position.

77. The difference between the results for the Prospective and Hindsight Evaluations reflects the impact of 9-11 and the subsequent economic downturn that resulted in extensive furloughs at American that continued for several years. The large and extended impact on American's demand for services of pilots was not anticipated when American agreed to purchase the TWA assets, when the parties were negotiating, or even at the time that the APA developed and American approved Supplement CC.[91]

78. As a consequence of the reduction in American's operations, the American pilots benefited from the implicit furlough protection provided by the integration of the TWA pilots under Supplement CC. Many TWA pilots remained furloughed for several years, which meant that they did not benefit from the higher pay rates and other benefits that the merger provided to the working pilots. The consequence is that, when evaluated with hindsight, the American pilots obtained 58 percent of the total gains when I include the value to the TWA pilots of their increased pay, and 63 percent of the total gains when I exclude the value to the TWA pilots of their increased pay. These are larger fractions of the benefits of the merger than would have been expected when Supplement CC was developed.

## VI.   MR. SALAMAT'S HYPOTHETICAL SENIORITY LISTS ARE NOT REASONABLE AND HIS ANALYSIS SUFFERS FROM A VARIETY OF OTHER FLAWS

### A.  Summary of Mr. Salamat's Opinions

79. According to Mr. Salamat, ALPA's failure to take certain actions in representing the TWA pilots was "a problem of increased uncertainty" that requires "estimating how the parties, as agents, would have responded and ultimately decided given that uncertainty."[92] He claims that "[f]rom the point of view of the TWA pilots, there were a range of possible outcomes ranging from the least desirable, a list just slightly better than Supplement CC, to an upper limit

---

[91] Darrah Dep. 11/29/2012 at 56:8-56:16 ("And that was my honest understanding of where we were as an airline at that point because nobody could have predicted 9-11. Nobody could have predicted an economic recession that almost turned into a depression, SARS, gas prices and all those things. So to your answer, yes, we — we fully predicted our thought that this airline was going to continue to grow and this thing was going to work out great for everybody.")
[92] Salamat Original Report at 2.

which is defined as the list an arbitrator would most likely have imposed."[93]  He says that his task is to "estimate as accurately as possible where in that range an agreement between the TWA pilots and the APA would have fallen given effective representation by ALPA."[94]  Mr. Salamat's analysis has three distinct parts.

Quantifying the Probability that ALPA Actions would Achieve a Different Seniority List

80.  First, Mr. Salamat claims to develop a "theoretical framework" for "estimating the possible results of the actions ALPA did not employ in representing the TWA pilots."[95]  He identifies various actions that ALPA could have taken, the success of which he says "is for others to estimate."[96] Yet he then provides his own estimates of how they would have affected the negotiations.  To each of these hypothetical actions he assigns a percentage that he claims reflects the probability that the action, by itself, would have affected (1) the importance that APA placed on an issue, (2) the probability that it would have caused a change in the APA's "perception" of the TWA pilots, and (3) the likelihood that the APA would have abandoned a particular goal.

81.  Mr. Salamat acknowledges that he has no empirical or scientific basis for the probabilities he assigns to the various actions he claims ALPA should have taken.  Instead, he makes arbitrary and unfounded assertions about the probability that various actions by ALPA would have affected the three different aspects of the negotiation he identifies — importance, perception and goal abandonment.  These aspects are purportedly based on Professor Katia Sycara's model on persuasive argumentation, which "posits that, in order to change a persuadee's beliefs to make him/her more amenable to making concessions to reach an agreement, a persuader generates arguments to (i) change the importance of a persuadee's issue/goal, (ii) change the persuadee's perception of an issue's value, and (iii) pursue goal abandonment on the part of the persuadee via threats/promises."[97]  Despite admitting he has no

---

[93] Salamat Original Report at 2.
[94] Salamat Original Report at 3.
[95] Salamat Original Report at 5.
[96] Salamat Original Report at 5.
[97] *Expert Report of Katia P. Sycara, Ph.D., March 15, 2013* ("Sycara Report") at 4.  However, in a report submitted in this matter by Professor Sycara on behalf of ALPA, she explains that "Mr. Salamat has misapplied my theory of persuasive argumentation" ( Sycara Report at 2), and that "[h]is report and deposition show multiple points of confusion in his understanding of the underlying concepts and assumptions of my theory."  She explains that "Mr. Salamat uses the wrong estimation framework; ignores fundamental assumptions about and preconditions for the

empirical basis for selecting specific percentages, he asserts, for example, that if ALPA had instituted a "jump seat war" – blocking APA pilots from using jump seats (which are ordinarily made available as a matter of course) on airlines whose pilots are represented by ALPA[98] – that action would have had a 3% impact on importance, a 5% impact on perception and a 2% impact on goal abandonment.

82.     He then combines these empirically ungrounded probabilities by summing across the three potential impacts (on importance, perception and abandonment) and across the various actions he claims ALPA could have taken.  From these calculations, he opines that there was a "73% chance of creating an agreement" between APA and ALPA if ALPA had taken all the identified actions.[99]

83.     At his deposition, Mr. Salamat clarified that his opinion is that, if ALPA had undertaken all of the actions which Plaintiffs claim it had a duty to undertake, there is a 73% probability that the outcome of negotiations between the TWA and American pilots would have been the specific merged seniority list that he refers to as the "DMODEL," and on which he bases his preferred damages calculation.[100]  According to Mr. Salamat, this is not the probability of achieving his other alternative seniority lists that he hypothesizes.  Mr. Salamat did not provide estimates of the probability that the TWA MEC and the APA would have agreed upon any of his other alternative lists, absent any breach by ALPA.

Deriving the But-For Seniority List

84.     Second, Mr. Salamat says that he "must estimate what a merged seniority list would have been had ALPA not breached its duty of fair representation."[101]  Mr. Salamat derives four alternative seniority lists, which he describes as:

---

[98] ALPA Jumpseat Policy, at ALPA 034148 ("ALPA encourages all pilots to extend the use of their jumpseats to eligible cockpit crewmembers as a professional courtesy . . . Denial of jumpseat privileges as a means of punishing, coercing or retaliating against other pilot groups or individuals is not supported by ALPA.")

[99] Salamat Original Report at 9.

[100] Salamat Dep. 1/29/2013 at 164:11-22; Salamat Dep. 1/30/2013 at 138:22-139:3.

[101] Salamat Original Report at 12.  According to Mr. Salamat, the merger involved integration of 2,166 TWA pilots with 11,557 American pilots. However, in his preferred list he claims that there are 2,337 TWA pilots.

a)   A "fair" outcome, which he says is based on placing "likes with likes" based on income.[102] As implemented, he merged the pilots by income, implicitly assuming that a "fair" outcome would place each TWA pilot in a position where he or she would earn the same as American pilots in the same seniority "neighborhood" on the list (using "pilots' incomes as they would be if they were all paid at the maximum years of service").[103]

b)   His "best guess" as to what an arbitrator would have awarded, using his qualitative conclusions from reviewing a number of arbitrated and other seniority mergers (the "Arbitrated List").[104]

c)   A list that arbitrarily shifts 200 TWA pilots from the bottom of the seniority list into the group that was merged with the American pilots by a ratio.  According to Mr. Salamat, this list would be "marginally" better than Supplement CC and he therefore refers to it as the "Marginal List."[105]

d)   The "best achievable negotiated list," which he refers to as the Salamat Damages Model or DMODEL.[106]  He says that this list is "constructed by reference to the other three [lists]" using Supplement CC as its basis.  He characterizes it as "a compromise between the Marginal List and the Arbitrated List."[107]

85.    I focus my critique of Mr. Salamat's analysis on his proposed Salamat Damages Model, because this is the list that he considers "the likely outcome of a successfully negotiated list,"[108] and the only one for which he purports to quantify the probability that it would have been achieved through negotiations if ALPA had undertaken the actions that he claims were required to fulfill its duty of fair representation.  The major differences between the Salamat Damages Model list and Supplement CC (and thus the changes in the seniority list that Mr. Salamat claims would have been achieved if ALPA had fulfilled its duty of fair representation) are:

---

[102] Salamat Original Report at 18.
[103] Salamat Original Report at 18.
[104] Salamat Original Report at 14.
[105] Salamat Original Report at 15.
[106] Salamat Original Report at 15.  The results of this list cannot be a reasonable estimate of damages, given that this is the "best" that possibly could be achieved under a variety of unrealistic assumptions.
[107] Salamat Original Report at 15.  Mr. Salamat thus would have to concede that any better list (including his "fair" and arbitrated lists and the lists proposed by Professor Farber) could not have been achieved through negotiations.
[108] Salamat Original Report at 36.

     a)   The top staple of American pilots would be 2,494 versus 2,596 under Supplement CC;[109]

     b)   An additional 778 TWA pilots would have been moved into the merged group (expanding the number of TWA pilots merged after the top 2,494 American pilots from the 1,095 that were merged under Supplement CC to 1,873);[110]

     c)   The bottom staple of TWA pilots would be 464[111] (compared with 1,242 under Supplement CC).[112]

In deriving the DMODEL as well as his other alternative seniority lists, Mr. Salamat pays no attention to what reasonably was expected by the American pilots, or to how his proposed lists would have affected the benefits (and potentially the harms) to the American pilots.[113]  As I explain later in my report, this is a critical error.

Quantifying Damages

86.    Third, Mr. Salamat calculates the damages that he claims the TWA pilots suffered because they were not placed in the proper position on the merged seniority list.  He uses a "rolling average" method to "describ[e] the relationship between seniority and income," which he says is the relationship "at the heart of estimating damages to the TWA pilots."[114]  Mr. Salamat claims the use of this "rolling average" is necessary because "many pilots do not bid for the highest paying position they could hold, but make tradeoffs between money and lifestyle."[115]  Mr. Salamat then estimates damages for two separate time periods: (1) "but-for" income for each TWA pilot during the period for which he has data on the pilot's actual earnings (April 2002-

---

[109] Salamat Original Report, Figure 10, at 31.

[110] Salamat Original Report at 32.

[111] Salamat Original Report, Figure 11, at 32.

[112] This bottom staple is inconsistent with the TWA MEC's October offer to staple 597 TWA pilots at the bottom of the merged seniority list (Position Statement of APA, footnote 18, at ALPA 015311).

[113] He also ignores other benefits, such as higher pay, received by the TWA pilots, even though these would have factored into the negotiations.

[114] Salamat Original Report at 40.

[115] Salamat Original Report at 38.

June 2012) and (2) "future impacts" through June 2026,[116] using the rolling average for June 2012.[117]

87.    In his original report, Mr. Salamat calculated damages of $887.4 million based on the differences between Supplement CC and the hypothetical seniority list he posits under the DMODEL.  He then multiplied this amount by 0.73, assuming – as described above – that there was a 73% chance that if ALPA had not breached its duty of fair representation the parties would have adopted a merged seniority list identical to the DMODEL.  He thus concluded that ALPA is "liable for $647,808,701 in unmitigated damages."[118]

88.    In his set-off report, Mr. Salamat reduced his damages estimates "by income earned through substitute employment"[119] (mitigation or set-off) based on responses by individual pilots to requests for information about income earned while they were furloughed by American.[120]  Under the DMODEL, he estimated $593.1 million in damages after accounting for mitigation.[121]  Mr. Salamat's post-mitigation damages analysis did not include an adjustment for the supposed probability of achieving the DMODEL list (i.e., he did not multiply by 0.73).

89.    Finally, as noted above, Mr. Salamat offers three other but-for seniority lists and calculates damages based on each one.  However, he provides no estimates of the probability that any of the other hypothetical seniority lists on which he basis his alternative damages calculations would have been achieved, absent ALPA's breach.

### B. Mr. Salamat's Hypothetical Seniority Lists are Not Reasonable

90.    In deriving his hypothetical seniority lists, Mr. Salamat considers only how a seniority list would have affected the TWA pilots.  He ignores the role of the American pilots in the negotiations, how his hypothetical seniority lists would have affected them, and the dynamics of bargaining.  Thus, he effectively ignores the key factors that would have determined the outcome of negotiations between the two pilots groups, even though he claims he is trying to predict

---

[116] Salamat Original Report at 42.
[117] Mr. Salamat explains why he estimates damages through 2026 as follows: "The model runs to the end of June 2026, a point when 63% of the TWA pilots are estimated to have retired. Often these models run until all pilots have retired (2040 in this matter), but the decision in this case was to use a more conservative forecast horizon of 14 years" (Salamat Original Report at 45).
[118] Salamat Original Report at 48, 52.
[119] Salamat Original Report at 46.
[120] Salamat Set-Off Report at 1.
[121] Salamat Set-Off Report, Figure 6, at 11.

"what an agreement between the APA and the TWA pilots would have been."[122]  At his deposition, Mr. Salamat acknowledged that he had made no assumptions about the pre-transaction expectations of either the TWA or American pilots,[123] and that he ignored these expectations in developing his proposed seniority lists.[124]  As explained above, this is wrong as a matter of economics.  In order to understand whether a proposed seniority list likely, or even possibly, reflected the outcome of negotiations between the parties, one cannot ignore the parties' pre-transaction career expectations.

91.    Exhibit 8.B shows that Prospective Evaluation of the sharing of integration benefits under Mr. Salamat's DMODEL is inconsistent with economics and therefore is unreasonable. Prospective Evaluation shows that the American pilots are *harmed* by the integration, while the TWA pilots obtain far more than the total gains generated from the transaction.  Evaluation with Hindsight shows that, even viewed after the fact, the TWA pilots obtained virtually all the gains. The average gain per TWA pilot of over $300,000 is more than 50 times greater than the gain of the average American pilot (less than $6,000).  Based on my previous discussion, this is an unlikely outcome from negotiations between the pilot groups given that the American pilots had more bargaining leverage than the TWA pilots given their contractual rights.

92.    Exhibit 9 evaluates how benefits are shared between the American and TWA pilots under the other proposed seniority lists for which Mr. Salamat estimated damages.  Not surprisingly, all except Mr. Salamat's Marginal List (SuppCC200) result in losses for the American pilots relative to their positions absent the acquisition.  This result is expected since each of these lists is even more favorable for the TWA pilots than Mr. Salamat's DMODEL.  Mr. Salamat's Marginal List results in approximately equal sharing of the total benefits between the two pilot groups.  Given that American had about five times as many pilots as TWA, this results in the average TWA pilot obtaining five times the gain received by an American pilot.

---

[122] Salamat Original Report at 14.
[123] Salamat Dep. 1/29/2013 at 49:23-50: 14.
[124] Salamat Dep. 1/29/2013 at 81:4-21 ("Q:  I'm asking whether you have any information indicating to you that the TWA MEC believed it was appropriate to take into account the pre-transaction career expectations of each pilot group in constructing a merged seniority list. A: To the extent that that is reflected in the Tannen rightful place proposal, I believe it is. Q: Did you do anything to test whether the lists that you set forth in your report succeed in preserving the pre-transaction career expectations of each pilot group? A: No, I did no work on the premerger trans — the un-merged expectations of either of the pilot groups. Q: And you considered that factor irrelevant for your analysis; correct? A: Yes. I considered it irrelevant.")

93.     It is notable that these results are seen even though Evaluation with Hindsight provides a greater share of gains from the transaction to the American pilots than would have been expected at the time the parties were negotiating.  It reflects the realized, rather than expected, benefits the American pilots received from having TWA pilots below them on the seniority list.  Because of furloughs, the TWA pilots did not receive as much benefit in higher pay as they would have expected, and the American pilots received more value from the furlough protection than they would have expected.  The negotiations would not have reflected the certainty associated with this outcome, however, but only the probability that it could occur (which generally is taken into account as a possible future outcome in my Prospective Evaluation).

94.     Thus, my evaluation of Mr. Salamat's hypothesized DMODEL and the other seniority lists for which he estimates damages shows that:

    a)    Prospective Evaluation demonstrates that Mr. Salamat's DMODEL proposal is not a reasonable outcome of bargaining between the parties, because the American pilots would have expected to be made worse off than they expected without the transaction. Even using Evaluation under Hindsight,  DMODEL provided almost all the gains to the TWA pilots, an unlikely outcome given the contract rights of the American pilots;

    b)    Mr. Salamat's other proposed lists and the lists proposed by Professor Farber generally are even less reasonable and thus could not have been reached through negotiation.

### C. Mr. Salamat Provides no Empirical Evidence that ALPA's Actions Would Have Affected the Seniority List

95.     Mr. Salamat provides no empirical evidence that any of the actions that Plaintiffs claim ALPA should have taken would achieve their goal of a more favorable seniority list.  For example, while Mr. Salamat asserts that ALPA should have supported the TWA pilots in seeking an injunction in October 2001, he provides no evidence to suggest that there was any likelihood that a Court would have granted an injunction.  Nowhere in his report does he evaluate empirically whether anything ALPA might have done differently would have influenced the APA to offer seniority integration terms that, on the whole, were more favorable to the TWA pilots than the terms of Supplement CC.  Instead, Mr. Salamat simply *assumes* that each change

in ALPA's conduct would have increased the likelihood of the APA agreeing to a more favorable outcome for the TWA pilots.  This is not a substitute for empirical analysis.

### D. Mr. Salamat Does Not Apply any of the "Theoretical" Foundations that He Claims Underlie His Analysis

96.    Mr. Salamat claims that "[b]ehavioral theory, expected utility, game theory and the analysis of persuasion…attempt to give insight into how parties will behave in negotiations [and] together they form a body of work from which a reasoned and methodical estimate of damages to the TWA pilots can be drawn given the assumption that ALPA had not violated its duty."[125] However, he never develops, presents, applies or properly explains these theories and what they predict about how the specific actions that he claims comprise ALPA's breach would have affected the outcome.  I am aware of no principles in economic theory, behavioral theory, game theory or any other body of academic research and literature that support the methodology that Mr. Salamat applies to construct his hypothetical seniority lists and to calculate damages.

### E. Mr. Salamat's Assumed Probabilities Have No Empirical Basis

97.    As described above, the first step Mr. Salamat took to calculate his estimated DMODEL damages (before set-off) was to "develop[ ] a static table of probabilities that allow a methodical way to estimate the likelihood that [an individual course of action that ALPA could have pursued] could have had in isolation"[126] on reaching DMODEL.  He combined those probabilities into a joint probability of achieving the better outcome.

98.    Mr. Salamat's methodology for evaluating the impact of actions on the outcome is invalid as a matter of logic and statistics.  His probability assignments are summarized in Exhibit 10.  He offers no basis for the individual probabilities he arbitrarily assigns to each proposed ALPA action,  and he admitted at his deposition that he had no rationale for these probabilities.[127]

### F. Mr. Salamat's Assumed Probabilities Are Combined Inappropriately

99.    Exhibit 10 shows that Mr. Salamat compounds the error resulting from his arbitrarily assumed probabilities by adding them together and purporting to calculate the overall probability that the APA would have agreed to the DMODEL List if ALPA had not breached its duty.  As a

---

[125] Salamat Original Report at 4.
[126] Salamat Original Report at 9.
[127] Salamat Dep. 1/29/2013 at 205:23-206:22; 207:15-20.

matter of basic statistics, summing probabilities as Mr. Salamat does is not appropriate.
Consider each action that Mr. Salamat claims ALPA could have taken as equivalent to rolling a
dice.  Mr. Salamat appears to be asking the following:  if ALPA rolled the dice six times, what is
the likelihood that it would have succeeded in rolling a six at least once?  Mr. Salamat's
calculation yields 100% ($6*(1/6) = 1$), but the proper calculation is 66.5% ($1-(1-1/6)^6$).[128]  The
second column of Exhibit 10 shows the cumulative probability of Mr. Salamat's individual
probability assumptions if calculated properly and if each probability were independent – a
combined probability of 53.3% rather than 73%.  Accordingly, even assuming that Mr. Salamat's
probabilities are otherwise appropriate (and he admitted that they are arbitrary and without
empirical basis), the proper amount by which to discount his total damages under the DMODEL
is 53.3%, not 73%.  Correcting this error alone reduces the damages before set-off, using Mr.
Salamat's methodology, from $647.8 million to $473 million.

100.    This calculation still overestimates the likelihood that the parties would have agreed to
the DMODEL List because the likelihood of success of each of the hypothetical actions
identified by Mr. Salamat is not independent, unlike each roll of the dice.  If these actions were
taken in the sequence listed, the probability that a particular action would succeed likely would
decline after previous actions failed to achieve the TWA pilots' goal.  For example, if ALPA had
not agreed that the TWA pilots should waive scope (i.e., according to Mr. Salamat, had not failed
in its initial duty to the TWA pilots, but instead had taken actions to fight the waiver) and this
effort were unsuccessful, the likelihood that future ALPA actions would affect the negotiations
to the benefit of TWA likely would have declined given what that failure would have revealed
about the strength of the TWA pilots' position.  Pursuing futile strategies to achieve the same
goal would only confirm the TWA pilots' weak bargaining position and strengthen the APA in
its negotiations.  Thus, the second column of Exhibit 10 corrects Mr. Salamat's fundamental
statistical error, but still overestimates the probability of reaching agreement on the DMODEL
(assuming that each individual probability were accurate) because the likelihood of success of
the remaining options decreases as previous attempts fail.

---

[128] Each roll has a $5/6^{th}$ probability of failing.  The probability of rolling a six at least once is one minus the
probability that all six rolls do not result in a six).

101.    My corrected calculations also may overestimate Mr. Salamat's purported probability of reaching agreement on the DMODEL seniority list because Mr. Salamat failed to take into account that not all of the listed actions could have been pursued in combination.  Pursuing certain actions could have made it impossible to pursue others.  For example, Mr. Salamat testified that he did not consider whether the various legal strategies – which comprise four individual actions on his list – all could have been pursued in sequence.[129]  Instead, having "no [ ] way of assessing whether it would have been possible or not," Mr. Salamat simply "presum[es that the subsequent legal strategy] is not made redundant by the first one."[130]  Since pursuit of some actions could have made it impossible to pursue others, even the 53.3% likelihood of reaching the DMODEL seniority list, based on Mr. Salamat's made-up probabilities, is too high.

### G.  Mr. Salamat Ignores the Impact of and Reason for the St. Louis Fence

102.    Mr. Salamat ignores the benefits that the TWA pilots could have expected from the St. Louis fence.  He focuses exclusively on the outcome for the TWA pilots, viewed with hindsight, under Supplement CC compared with outcomes that he claims could have been achieved through negotiations absent a breach by ALPA (including DMODEL and others).  However, from a prospective view, if American had performed as expected at the time that it agreed to acquire TWA,[131] then the St. Louis fence created by Supplement CC would have resulted in TWA pilots generally flying the same aircraft and having the same or better opportunities at higher pay rates than in the past, irrespective of their position on the seniority list.  In effect, the St. Louis fence created a separate airline within the larger airline, in which bidding opportunities were reserved for the TWA pilots at the higher American pay scale.  The reduction in the value to American of operating and expanding its St. Louis hub after the transaction likely was a consequence of the unanticipated extreme and protracted downturn in air travel, especially at the legacy network carriers like American (see Exhibit 11).

---

[129] Salamat Dep. 1/30/2013 at 5:22-15:6.
[130] Salamat Dep. 1/30/2013 at 6:10-13.
[131] American's CEO in 2004 explained, "business travel was booming—so much so that we were in danger at American of maxing out our two mid-continent hubs at Dallas/Fort Worth and Chicago. Adding the St. Louis hub in that environment seemed to make sense."  "Climbing Back to Altitude: A Commerce Magazine Conversation with American Airlines CEO Gerard Arpey," August 2004 (http://www.stlcommercemagazine.com/archives/august2004/altitude.html).

103.    By ignoring the fence, Mr. Salamat wrongly attributes damages to TWA pilots whose earnings would not have been any higher in a but-for world where they had greater seniority on the merged seniority list.  Under Mr. Salamat's methodology, damages attributed to a TWA pilot are calculated from the average monthly income of pilots with similar seniority – the "average income of a pilot's seniority 'neighbourhood.'"[132]  But imputing income in this way ignores the fact that position on the merged seniority list does not determine the TWA pilot's income when the fence is operating.  Rather, earnings of TWA pilots are determined by their relative seniority within the *TWA pilots' subset of the merged seniority list*, because their opportunities are defined by options available in St. Louis.  The most senior TWA pilot would not earn more simply because he or she moves up on the merged seniority list in Mr. Salamat's but-for world.

104.    The fact that Mr. Salamat wrongly ignores the reason for the St. Louis fence is evident from his own damages calculations.  He concludes that, under his DMODEL, $258.6 million of the total $671.1 million in damages (before set-off), or 39 percent, is attributable to "employment" damages to which he claims the TWA pilots are entitled because under Supplement CC they were denied the opportunity to bid for better paying jobs consistent with the seniority that he claims they should have had.  A portion of the remaining damages, which are lost pension, also derived from reduced employment opportunities for TWA pilots during this period.  But all these gains would have been obtained at the cost of the American pilots – they represent, in effect, a transfer of the American pilots' pre-transaction expectations to fly the planes that American brought to the transaction, and to advance up their career path in the same ways as they would have done without the transaction.[133]  The St. Louis fence, which Mr. Salamat ignores, was imposed to prevent this transfer of pre-transaction career prospects from the American pilots to the TWA pilots (as well as analogous transfers in the other direction).  Mr. Salamat wrongly assumes that the protection that it offered would not have been part of any

---

[132] Salamat Original Report at 18.

[133] "Differing career opportunities, however, have certainly played a role in the construction of lists. The amount of 'premium' work, such as wide-body captaincies, aircraft on order, airline growth and quality of work all play some role in virtually every merger and it is not uncommon for one party to argue that its pilots should be granted a seniority premium to reflect the 'better opportunities' they bring and that the other party will have a chance to share in" (Salamat Original Report at 30).  When asked as his deposition whether he had "seen in your work that, in evaluating the fairness of seniority integration lists that people look to, whether the integrated list preserves the pre-transaction career expectations of each pilot group?" Mr. Salamat responded that "That -- that would be common in – in mergers that people do that, yes" (Salamat Dep. 1/29/13 at 73:9-15).

negotiated agreement on the seniority list, particularly in the case of a list, like his, that would have made such transfers of expectations likely.

### H. Mr. Salamat's Methodology Cannot Determine Damages Owed to Individual Pilots

105. According to Mr. Salamat, seniority is a "currency" that pilots use to purchase options like leisure, choice of equipment, and choice of schedule. He acknowledges that "many pilots do not bid for the highest paying position they could hold, but make tradeoffs between money and lifestyle."[134] For example, a pilot can choose to fly as a captain of a small wide-body rather than a first officer of a large wide-body, and will earn a lower hourly rate as a consequence, but may be based in a hub closer to his or her home, or have a better working schedule (e.g., fewer nights away from the base).[135] Mr. Salamat's analysis shows that seniority is related only loosely to income – because a "pilot's income is the result of both seniority and what the pilot has chosen to do with it . . ., within a small section of a seniority list, there can be a wide range in the incomes of pilots."[136]

106. This is illustrated in Mr. Salamat's Figure 5, which shows the monthly income of each American Airlines pilot in April 2002 according to his/her seniority. The average monthly income (as seen on the trend line) in the neighborhood of American pilot at seniority #6000 "is approximately $10,000 but that some pilots [in that neighborhood] are earning as little as $7,000 while some are earning as much as $15,000."[137] This means that, given a very narrow range of seniority, pilots earn very different amounts, reflecting their choice of how to use their seniority.

107. Because of this variation, Mr. Salamat uses a "rolling average" methodology to estimate the pay that an individual pilot would earn if that pilot were in a different seniority position, stating that "[u]sing an average relieves this problem and adjusts for pilots' individual choices."[138] However, this assumption causes him to eliminate the individuality in pilot choices. His methodology will attribute damages to pilots who would not have used their higher seniority

---

[134] Salamat Original Report at 38.
[135] Salamat 1/30/2013 Dep. at 154:3-4 ("pilots trade off lifestyle for income"). Similarly, the APA's explanation of Supplement CC noted that the St. Louis fence was "designed to preserve TWA pilots' opportunities . . . and to continue to have some of the quality of life (schedules, days off, vacations, etc.) that they had within the separate TWA operation . . ." (ALPA 008768) .
[136] Salamat Original Report at 17.
[137] Salamat Original Report at 17.
[138] Salamat Original Report at 18.

to earn more income, and attribute lower damages to some pilots who would have used their higher seniority to earn above the average income. Determining the proper amount of damages, if any, owed to an individual pilot requires individualized analysis of the pilot's historical choices and his or her expected choices in a different seniority rank.[139]

108.    These tradeoffs are evident in the working histories of the pilots at American after the transaction. The data on their experience between 2002 and 2012 shows that pilots often take voluntary leave (choose to be inactive) and that they choose to "bid down" and accept assignments on smaller planes and at lower pay rates than they were entitled to choose. I understand that they also may choose to be a "reserve" rather than a regular pilot.

109.    Exhibit 12 shows that pilots with sufficient seniority to be eligible to fly are often inactive. There are times during the period April 2002 through 2012 when as much as eight percent of non-furloughed pilots are inactive. Some of these likely are "inactive" because of a lifestyle choice.[140] Individual considerations about how to use seniority are ignored in Mr. Salamat's analysis, so all TWA pilots that achieve sufficient seniority to be working are assumed to be active.

110.    Exhibit 13 show the number of American pilots serving as First Officers who could have served in the higher position of Captain on the same equipment. It appears that these pilots choose to "bid down" and use their seniority for lower-paid positions.

111.    Mitigation evidence collected by Plaintiffs provides further evidence of the individuality of pilots' choices. Exhibit 14 shows the distribution of set-off earnings across pilots. These vary by year even for individual pilots. If a pilot chooses to "mitigate" by enjoying leisure one year, Mr. Salamat assumes that pilot is entitled to damages, even if his or her employment record shows that he was working before and after (and thus provides no reason to think that pilot could not have been working during the year without income).

112.    Although Plaintiffs claim to represent a class that includes all former TWA pilots, Exhibit 15 makes clear that Mr. Salamat is not claiming that all TWA pilots were harmed by the alleged

---

[139] In my evaluation of how the gains from the transaction were shared between the two pilot groups, I use Mr. Salamat's income schedule, which is based on his rolling-average methodology. My focus is on the aggregate differences in how the benefits were shared, and not the claimed damages owed to an individual pilot, so the use of the rolling average methodology is reasonable for my purpose.
[140] The exhibit excludes pilots classified as furloughed.

breach of duty.  As shown in Exhibit 15, some TWA pilots were no worse off under Supplement CC than under Mr. Salamat's but-for list and, if they were furloughed or otherwise not working at American, some earned more in their alternative employment.

113.    Thus, Mr. Salamat's damages methodology predicts that some pilots are no worse off and others harmed to various extents by the alleged conduct.  The number falling in each category differs depending on which "but-for" list is used and what assumption is made about mitigation by TWA pilots who did not provide documentation.  Thus, not all pilots are affected in a common way by ALPA's breach as presented by Mr. Salamat.

## I.   Mr. Salamat's Set-Off Calculation is Flawed

114.    On April 30, 2013, Mr. Salamat submitted a report quantifying the amount by which former TWA pilots "set-off" or mitigated the damages that he estimated resulted from furloughs during the period 2002 to June 2012.  His quantification was based on information submitted by former TWA pilots as of April 30, 2013 in response to a "TWA Pilot Questionnaire."  The documents on which Mr. Salamat relies include written responses to the questionnaire, social security earnings reports ("SSERs"), W-2s and other IRS tax records, and potentially other supporting documents.

115.    Mr. Salamat groups responses from pilots who were furloughed for at least part of a year into three broad categories.  First, some pilots submitted information that he found to be "complete" (Category A).[141]  Second, some pilots submitted partial information, but "sufficient information was provided to estimate each pilot's income while on furlough" (Category B).[142]  Third, some pilots submitted information that was so inadequate that Mr. Salamat concluded that their "responses are equivalent to non-responses because a pilots' [sic] set-off income could not be calculated" (Category C).[143]

116.    According to Mr. Salamat, "one reason pilots may not have responded to the questionnaire is the possibility that the pilots believed the damages to have been set-off."[144]  If those in Category C generally found new employment quickly and earned as much or more than

---

[141] Salamat Set-Off Report at 2.
[142] Salamat Set-Off Report at 1.
[143] Salamat Set-Off Report at 2.
[144] Salamat Set-Off Report at 5.

they would have if they were not furloughed, then the proper assumption would be that all their damages were set-off.  However, Mr. Salamat wrongly claims that a "conservative" assumption is that the nonresponders set-off their damages at the "lower of the Category A and Category B percentages of set-off to total damages."[145]  A more conservative assumption, and one that is consistent with the pilots' incentives to respond to the questionnaire, would assume that furlough damages for this group after set-off were zero – that these pilots effectively mitigated all their furlough damages and thus understood that they had nothing to gain by responding.  At a minimum, it is reasonable to assume that non-responders (who have no incentive to respond if they expect to gain more by not responding) would have a lower percentage of set-off to total damages than pilots who submitted sufficient documentation to permit calculation of set-off damages.  Mr. Salamat attributes about $19 million in "lost income" damages and $3 million in interest on those damages to these non-responders.

117.    Mr. Salamat's methodology for calculating set-off damages is to mitigate for each former TWA pilot the damages estimated for each year up to the amount of reported set-off income for that year.  However, this unreasonably limits the amount of mitigation, because the relevant question is how much each pilot was harmed by the alleged breach of duty.  If Mr. Salamat estimates that a furloughed pilot would have earned $100,000 in each of five years but for the alleged breach, and that pilot actually earns $0 in two of those years and $250,000 in set-off income in each of the other three years, Mr. Salamat calculates damages of $200,000 ($100,000 in each of the two years during which he had no income).  However, for the five years as a whole, the pilot earned $750,000, which exceeds by $250,000 the amount that he would have earned if he were not furloughed.  Thus, the proper calculation for this pilot would be set-off damages of $0.  If I correct this error in Mr. Salamat's methodology, his estimated damages decline by $35.7 million.

---

[145] Salamat Set-Off Report at 5.

### J.  Mr. Salamat Ignores the Constraint on Damages from the Fixed Number of Total Jobs at American

118.    Mr. Salamat ignores the constraint on damages resulting from the fixed number of total jobs available at American at a particular time by treating the number of seniority places above the furlough line as equivalent to the number of available pilot jobs.  At any given time, a number of pilots who have sufficient seniority to remain working (i.e., are above the furlough line) are nevertheless inactive.  To illustrate the error that Mr. Salamat makes, assume that there are 1,000 jobs and 2,000 pilots on the seniority list.  If the 1,000 most senior pilots all want to and can fly, then the most junior active pilot will be seniority #1,000, and pilots #1,001 through 2,000 will be furloughed.  In reality, however, pilots #1 through 1,000 are not all active, and whatever number are inactive corresponds to the additional number of seniority spaces that can hold active duty.  So in this example, if 100 pilots with seniority numbers between 1 and 1,000 are inactive, then pilots with seniority at least through #1,100 will be needed to fill the 1,000 available jobs, and no more than 900 pilots will be furloughed.

119.    Mr. Salamat does not take into account the implications of having inactive pilots on the American roster in his calculation of damages to the former TWA pilots who are higher on his hypothetical seniority lists than on Supplement CC.  For example, assume that Mr. Salamat's hypothetical list moves 100 TWA pilots who had seniority ranks of 1,100 to 1,200 in the actual world (and were furloughed) into positions 1,000-1,100 (ranks that were not furloughed).  If, in the actual world, 10 of the 100 pilots occupying these ranks had been inactive (on medical leave, voluntary leave, etc.), then pilots ranked 1,000-1,100 in the actual world were filling only 90 jobs—not the 100 jobs to which Mr. Salamat attributes damages.

120.    The amount by which he overestimates the total number of jobs at American is shown in Exhibit 16.  Eliminating these "extra" jobs reduces his DMODEL damages by about $57 million.

### K.  Mr. Salamat Assumes Without Justification that Pilots on Voluntary Furlough Suffer Damages after 2012

121.    According to Mr. Salamat,

> [i]f a pilot was on furlough during a given period but would not have been under an alternative list, then the impact to the pilot is the total lost income for the period. However, there are situations where pilots are either on voluntary furlough or have bypassed recall. During the historic period, pilots on voluntary furlough have no impact calculated for them. At the end of the historic period, there were pilot who had bypassed

> recall and were, therefore, on furlough by choice. It is uncertain whether these pilots will accept recall in the future or will resign. However, as these pilots still have the right to be recalled, and in that sense are the same as pilots who have not yet been offered recall, I have calculated damages for them as if they will return as soon as attrition will permit. These pilots have no damages attributed to them during the period they would remain on furlough.[146]

Thus, Mr. Salamat makes the reasonable assumption that pilots who chose voluntary furlough for the years leading up to the end of the historic period and refused a recall when it was offered suffered no damages. However, "[a]t the end of the historic period, there were pilots who had bypassed recall and were, therefore, on furlough by choice. It is uncertain whether these pilots will accept recall in the future or will resign. However, as these pilots still have the right to be recalled, and in that sense are the same as pilots who have not yet been offered recall, I have calculated damages for them *as if they will return as soon as attrition will permit*."[147] These pilots have no damages attributed to them during the period they would remain on furlough, but are assumed to return as "soon as attrition will permit," and thus suffer damages after the historic period. A more reasonable assumption is that many of these pilots have found other employment or selected leisure, and would again refuse to be recalled. Thus, the $35.2 million in discounted damages attributed to pilots on voluntary furlough likely is substantially overstated, and may even be zero.

## L.  Mr. Salamat's Pension Calculations are Flawed

122.    Mr. Salamat's calculations of damages attributable to lost pension have three flaws.

123.    First, American's pension plans were frozen in November 2012.[148] Mr. Salamat's pension calculations assume that pilots continued to accrue benefits under Plan B through 2026 as they had through 2011. This pension was frozen after Mr. Salamat submitted his original report, but he failed to take this into account when he submitted his Set-Off Report.

124.    Second, Mr. Salamat assumes that Pension Plan B grows at seven percent annually, and he discounts pension earnings at a rate of 2.5 percent.[149]  (I explain below why Mr. Salamat's

---

[146] Salamat Original Report at 44-45.

[147] Salamat Original Report at 44-45 (emphasis added).

[148] http://www.restructuringamr.com/our-people-retirement.asp. ("American froze all of its defined benefit pension plans and its pilot B Plan on Nov. 1, 2012. Following the freeze, the company terminated the pilot B Plan on Nov. 30, 2012.")

[149] Salamat Original Report at 47.

assumed discount rate is wrong.)  In addition, his assumption that pension earnings grow at a seven percent rate, while discounting those benefits at 2.5 percent, implies that each dollar of pension benefits is worth more than a dollar, with the increase in value growing with the number of years to retirement.  For example, according to Mr. Salamat's methodology, a dollar of pension contribution for a pilot that expects to retire in 30 years is worth 3.6 times as much as a dollar paid in salary.  This causes him to overestimate the contribution of pension losses to damages by about $86 million.

125.     Third, Mr. Salamat incorrectly calculates the annuity value of the retirement benefits by assuming all retirees will live with certainty until the expected age of death.  This too causes him to overstate the value of the TWA pilots' pension losses.

**M. Mr. Salamat Does Not Discount Future Compensation Properly**

126.     Mr. Salamat discounts future damages back to January 1, 2013 at a discount rate of 2.5 percent.  He does not explain why he chose this rate, but it is inconsistent with economics.  A purpose of discounting future compensation is that these income flows are risky – there is no guarantee that they will be received.  The history of both TWA and American illustrates that uncertainty and risk are important elements of employment in the airline industry.  The proper discount rate for future earnings reflects the riskiness of the employer, which is reflected in American's weighted average cost of capital ("WACC").

127.     Mr. Salamat also errs in calculating pre-judgment interest.  He uses the U.S. Department of Labor Bureau of Labor Statistics Consumer Price Index (CPI-U) rather than an interest rate. Since there is no uncertainty about past compensation losses (or realized damages), it is appropriate to use a risk-free rate when calculating interest on past damages.[150]

128.     The combined impact of (1) discounting future damages using American's WACC and (2) using the risk-free rate to calculate interest on past damages is to inflate Mr. Salamat's estimated damages under DMODEL by $47 million.

---

[150] Lanzilloti and Esquibel, "Measuring Damages in Commercial Litigation: Present Value of Lost Opportunities," J. Accounting, Auditing & Finance (1990) 125, 132-134.

## VII.  PROFESSOR FARBER'S HYPOTHETICAL SENIORITY LIST IS UNREASONABLE AND HIS METHODOLOGY IS FLAWED

### A.  Summary of Professor Farber's Opinions

129.    Professor Farber says that Plaintiffs asked him "to analyze American's acquisition of TWA and to generate an estimate of a merged seniority list that would have resulted . . . had ALPA met its duty of fair representation."[151]  His methodology is to "define a metric for measuring how well pilots fare when seniority lists are merged" – a statistic he refers to as the proportional difference in mean ranks.  He "calculate[s] this metric for those seniority list merges for which I was able to get the relevant information from arbitration awards or agreements" and for Supplement CC.

130.    He then evaluates whether the metric for Supplement CC differs from that of what he deems to be "comparable mergers."[152]  He concludes that "the placement of [TWA's] former pilots on the merged seniority list was unusually unfavorable, on average."[153]  Using seven selected "comparable mergers" and making a variety of other assumptions, he then creates a but-for merged seniority list that achieves the same value of the proportional difference in mean ranks as the average of his selected comparables.  This proposed list:

    a)   Has no top staple (i.e., no group of American pilots at the top of the list above the first merged TWA pilot);

    b)   A bottom staple of 350 TWA pilots; and

    c)   1,887 TWA pilots merged with the American pilots in a ratio of 5.81:1.[154]

131.    Professor Farber does not calculate damages based on his list, or on alternative upper and lower bound but-for lists that he provides based on the second highest and second lowest of his selected comparables (ranked by proportional difference in mean ranks).  However, Mr. Salamat

---

[151] Farber Report ¶8.

[152] Farber Report ¶55.  "Comparable mergers" are identified by Professor Farber as meeting two criteria:  (1) the acquired airline was in financial difficulty, but still flying; and (2) the acquired airline brought valuable assets to the combined company (Farber Report ¶10).

[153] Farber Report ¶54.

[154] The major differences between Professor Farber and Mr. Salamat's respective proposed lists are summarized in Exhibit 17.

estimates damages associated with Professor Farber's three but-for lists that range from $753.2 million (lower bound) to $1.08 billion (upper bound) after set-offs to account for mitigation.[155]

### B. Professor Farber's Hypothesized Seniority List is Inconsistent with the Economics of Bargaining

132.    Professor Farber's preferred but-for seniority list would result in all but 350 TWA pilots having improved seniority relative to Supplement CC.  I showed above in Exhibit 9 that his hypothetical list is inconsistent with the economics of bargaining because under this list the TWA pilots would obtain more than 100 percent of the gains from the integration, and the American pilots would be worse off with than without the integration.  Given the bargaining situation that existed, the economics of bargaining predicts that the American pilots never would have agreed to such a list.

### C. According To His Own Criteria, Professor Farber Uses Mergers that are Not Comparable

133.    Professor Farber says that he identified "comparable" seniority lists as benchmarks to evaluate the American/TWA integrated seniority list by assuming that TWA was financially viable.  However, Mr. Levine and Mr. Feltman explained that the assumption that TWA was financially viable is invalid.[156]  Professor Farber admitted at his deposition that "I would have had to select my comparables differently" if it were likely that "TWA would have liquidated shortly after January 2001 in the absence of an American transaction."[157]  He explained that "one of the factors we considered in choosing comparable merger lists was the financial condition of the acquired carrier.  And as a result, in order to make them comparable, we tried to find cases where — with some, at a crude level, similarity with TWA's financial condition.  So, of course, TWA's financial condition was relevant."[158]

134.    Thus, Professor Farber uses seniority lists from other mergers that, according to his own criteria, were not comparable to the American/TWA transaction.  In particular, he uses benchmark seniority lists where the merged party that he claims is an appropriate proxy for

---

[155] Salamat Set-Off Report, Figure 7, at 12.
[156] Levine Report at 9; Feltman Report at 4-5.
[157] Farber Dep. 1/22/2013 at 138:25-139:8.
[158] Farber Dep. 1/22/2013 at 75:12-19.

TWA was an ongoing airline and its pilots had better future prospects (even through bankruptcy and reorganization) than did the TWA pilots.

### D. Professor Farber Uses Arbitrated Outcomes Even Though the TWA Pilots Had No Right to Arbitration

135.    According to Professor Farber, it is reasonable to assume that ALPA, in its fair representation of the TWA pilots, would have been guided in its negotiations with the American pilots by the ALPA merger policy in place at the time of American's acquisition of TWA assets.[159]  Professor Farber quotes the ALPA merger policy statement that "[t]he Fundamental purpose of this policy is to provide protection for the employment rights and interests of ALPA flight deck crew members in an orderly, expeditious and equitable manner," "using arbitration if necessary."[160]  However, I am not aware of any evidence, and certainly Professor Farber presents none, that arbitration was a likely or even a possible outcome here.  Instead, I understand that the TWA pilots waived any right to arbitration, and that doing so was a condition American put on the deal because arbitration of seniority integration disputes was not consistent with the American pilots' CBA.  Thus, Professor Farber's reliance on arbitrated decisions as benchmarks for integration when the acquired party has no right to arbitration is not justified.[161]

### E. Professor Farber Uses a Statistical Measure that has Not Been Applied in Evaluating Seniority List Integrations

136.    Professor Farber asserts that the metric he uses to evaluate the reasonableness of Supplement CC— "the proportional difference between the mean seniority rank of pilots"— is "a standard measure of disparities between groups and of changes over time in key variables," and says it is widely used in academic literature.[162]  However, the literature he cites as support for use of this metric simply explains and provides examples showing that academic researchers compare means of data in their analyses.  It provides no support for the methodology Professor Farber applies here.

137.    Professor Farber has no evidence that this metric is used, or would be useful, in evaluating potential seniority list mergers of airline pilots.  The arbitrated agreements on which

---

[159] Farber Report ¶20.
[160] Farber Report ¶20.
[161] Professor Farber does not even purport to explain how any actions that ALPA might have taken would have affected negotiations with the APA.
[162] Farber Report ¶42.

he relies show the variety of considerations that arbitrators typically consider when deciding how to combine two carriers' seniority lists, including the airlines' history and differences in pilot tenure, status (captains vs. first officers), types of aircraft flown, type of service provided, etc. These considerations are unlikely to be captured in any reasonable way by a simple statistic such as proportional difference in mean rank.  I am not aware of the arbitrator in any of these mergers considering the proportional difference in mean rank between the pilots of the acquired and acquiring airline.

138.    Moreover, in devising his metric and applying it to each of the transactions in his sample, Professor Farber does not account for conditions and restrictions incorporated in the underlying seniority integrations, such as the St. Louis fence.  I understand that such conditions and restrictions are a common feature in integrated seniority lists.  As with the St. Louis fence, conditions and restrictions can affect the opportunities available to pilots, mitigating the disparities in seniority rankings between the pilot groups by altering how pilots may use their seniority.  Thus, by analyzing the seniority list without considering the full context in which it was implemented, Professor Farber's measure of "proportional difference in mean ranks" exaggerates (or, possibly in some cases, diminishes) the actual disparities between the integrated pilot groups.

### F.  Professor Farber Wrongly Applies his Choice of "Comparables"

139.    Professor Farber uses the proportional difference in mean ranks to create a but-for seniority list "that would have resulted from the combination of the two airlines had ALPA met its duty of fair representation."[163]  Yet his own analysis, even using his improperly selected "comparable" transactions, shows that Supplement CC is consistent with the result that his methodology predicts would have obtained if ALPA had met its duty of fair representation.  It is only slightly "worse" than one of his selected list of seven comparables (the Alaska/Jet America merger).  And Supplement CC is no "worse" than two other arbitrated mergers evaluated using Professor Farber's metric.  Since he uses these as benchmarks, I assume that he would agree that they were not affected by a union's failure to fulfill its duty of fair representation.[164]  Logically,

---

[163] Farber Report ¶8.

[164] Professor Farber's logic appears to be that arbitration always results in an outcome that properly weighs the value that the two parties bring to the merger, which presumably is the best that can be expected when a union fulfills its duty of fair representation.

they would represent outcomes consistent with ALPA meeting its duty of fair representation, which means that Supplement CC was within the range of such outcomes.

140.    Professor Farber wrongly claims that the but-for seniority list must have the same proportional difference in mean ranks as the *average* calculated from several "comparable" mergers (or, for his "lower bound" estimate, the merger with the second lowest proportional difference in mean ranks), even though any seniority list that falls in the range of his "comparables" is a reasonable outcome that is consistent with a process in which both negotiating parties met their duty of fair representation.  Indeed, if he had selected more appropriate comparables – those in which, as Mr. Levine explains, the acquired airline was "no longer viable as a standalone airline"[165] – he would have found that Supplement CC was well within the range of outcomes (based on his metric) that an arbitrator would have imposed (as I discuss below).[166]

### G.  Professor Farber's Conclusions are Inconsistent With Those of Mr. Salamat

141.    Mr. Salamat's opinion about the likely impact of ALPA's failure in its duty of fair representation contradicts the claims of Professor Farber.  Mr. Salamat says that his ARBITRATED list, which he derives by reviewing a variety of arbitrated agreements (a methodology similar to that used by Professor Farber), "must be considered the limit of what the APA would have agreed to."[167]   In other words, he considers this outcome the best possible outcome for the TWA pilots from negotiations if ALPA had not breached its duty.  Yet, Professor Farber's but-for seniority list gives the TWA pilots even more than they would receive under Mr. Salamat's arbitrated list ($931.5 million vs. $798.3 million, respectively).[168]  Thus, Mr. Salamat's own opinion implies that Professor Farber's proposed list is more favorable to the TWA pilots than any list to which the American pilots would have been willing to agree if ALPA had fulfilled its duty.

---

[165] Levine Report at 9.
[166] Professor Farber rejects without proper justification two potential benchmarks with a lower proportional difference in mean ranks than he calculates for the American/TWA merger:  the Republic/Lynx merger, because he claims that Lynx was able to continue flying only because of an influx of cash from Republic, even though this was effectively the same position in which TWA found itself in early 2001; and the Southwest/Air Tran merger for the unprincipled reason that "I have not been able to determine why former Airtran [sic] pilots were placed so low on their post-transaction seniority list" (Farber Report ¶51 (fn. 36)).
[167] Salamat Original Report at 15.
[168] Salamat Set-Off Report at 11-12.

142.     Mr. Salamat did not quantify the probability that the ARBITRATED List would have been achieved.  Given that it is considerably more favorable to the TWA pilots (and less favorable to the American pilots) than the DMODEL, Mr. Salamat's logic suggests that a list resembling the ARBITRATED List is less likely to be achieved than the "73%" probability of achieving DMODEL.[169]

### H. Professor Farber Imposes an Unreasonable Structure on his Proposed But-For Seniority List

143.     Professor Farber makes unsupported and counterfactual assumptions about (1) the size of the bottom staple; (2) the absence of a top staple and (3) the merge ratio.  He says that, in order to implement his proportional mean difference metric to derive a merge ratio, he must assume either a bottom or top staple, but not both.[170]  However, he contradicted this at his deposition, where he claimed (1) that the size of the bottom staple was determined by his merge ratio[171] and (2) that he could have assumed both a top and bottom staple.[172]  Professor Farber's assumed bottom staple of 350 pilots is arbitrary, and is inconsistent with Mr. Salamat's proposal to staple 464 TWA pilots[173] and with the TWA MEC's October offer to staple 597 TWA pilots at the bottom of the merged seniority list.[174]  His assumption of no top staple is inconsistent with the history of negotiations, in which both sides accepted that the TWA pilots had no pre-transaction expectation of flying large wide-body planes, and with a negotiated outcome in which the only way in which American pilots with high seniority can avoid being harmed is by maintaining their seniority rank and having TWA pilots placed below them.

---

[169] Mr. Salamat's way of adjusting his damages estimates for the probability that the identified actions would achieve his list means that the damages associated with a particular list could decline the more favorable the list to the TWA pilots.  If there is only a one percent probability of reaching the ARBITRATED list associated with each form of influence, then the methodology he applies to determine that ALPA is "liable for $647,808,701 in unmitigated damages" would result in multiplying his ARBITRATED list damages by an aggregated 20 percent probability, resulting in "unmitigated damages" considerably smaller than those associated with his preferred model.  In other words, to the extent that there is a lower probability of achieving more favorable lists, the damages associated with a list that is more favorable to the TWA pilots could be lower than damages associated with more favorable lists.

[170] At his deposition, he contradicts himself and says that he could have assumed both.  (Farber Report ¶57. ("A seniority list with a proportional difference in mean ranks of -0.15 can be prepared with either a bottom staple of former TWA pilots or a top staple of American pilots and a ratio of the remaining pilots.") Farber Dep. 1/22/2013 at 97:14-16. ("Could you have had a top staple and a bottom staple? A: Absolutely.").

[171] Farber Dep. 1/22/2013 at 225:17-24.

[172] Farber Dep. 1/22/2013 at 97:14-16.

[173] Salamat Original Report at 32.

[174] Position Statement of APA, at footnote 18, at ALPA 015311.

- 55 -

### I.   Small and Necessary Changes to Professor Farber's Calculations Show that His Methodology Predicts Almost No Damages

144.    There are two fundamental problems with Professor Farber's analysis and with Mr. Salamat's calculation of damages based on Professor Farber's proposed seniority list that easily can be corrected.  First, Professor Farber does not include a top staple, even though he admitted that he could have done so.  Second, he selected as "comparables" transactions in which the acquired airline was not in the same financial condition as TWA – i.e., was not on the verge of liquidation.

145.    There are three transactions on Professor Farber's list that he claims involved an acquired carrier that was no longer flying, or was flying only because it received financial help from the acquiring company:  Continental's acquisition of Frontier; Republic's acquisition of Midwest; and Republic's acquisition of Lynx.[175]  At the time that American agreed to acquire certain TWA assets, of the acquisition, TWA also was on the verge of ceasing operations and liquidating and was only able to fulfill its financial obligations to maintain day-to-day operations as a result of the DIP financing provided by American.[176]  Applying Mr. Farber's criteria for selecting comparable transactions, based on Mr. Levine's and Mr. Feltman's assessment of TWA's financial condition, these three are the most "comparable" to the American/TWA merger as Professor Farber defines comparability.[177]  The American/TWA transaction is within the range of these "comparables."  The average and median proportional difference in mean ranks of the three "comparables" (based on Professor Farber's calculations of that metric for these transactions) are lower than the proportional difference in mean ranks under Supplement CC.

---

[175] "There are four mergers aside from American/TWA in Table 1 with proportional differences in mean rank of - 0.60 or smaller (larger than 0.60 in absolute value): Republic/Lynx, Southwest/Airtran, Republic/Midwest and Continental/Frontier. Lynx and Midwest were so weak financially at the time of their acquisitions that each was only flying because of financial assistance from Republic.  The experience of the former pilots of the first Frontier Airlines reflects the fact that, at the time it was acquired by Continental, Frontier was grounded and all of its pilots were on furlough" (Farber Report ¶¶51-52).  As Professor Farber notes, "the seniority lists of Republic, Frontier, Midwest and Lynx were merged in a single arbitration."  (Farber Report at Table 1 note (c).)  However, as he analyzed separately the "proportional difference in mean rank" in seniority for each of the acquired airline's pilots, I have done the same in this correction of his analysis.

[176] Feltman Report at 33-34; Levine Report at 23-24.

[177] According to Professor Farber, "I chose my group of comparable mergers by looking for transactions in which the acquired airline was in weakened financial condition, but still flying, and contributed substantial assets to the combined airline. To determine which transactions met these criteria I relied primarily on statements in arbitrators' reports" (Farber Report ¶56).

This indicates (according to Professor Farber's methodology) that Supplement CC was consistent with the result one would expect if ALPA had fulfilled its duty of fair representation.

146.     Exhibit 18 shows the results from Professor Farber's methodology combined with Mr. Salamat's calculation of purported damages after correcting these errors.  I use the average of these three comparables, correct Professor Farber's mistake in ignoring the top staple, assume that the merged seniority list would have the same top staple as Supplement CC, and then determine the combination of bottom staple and merge ratio that yields a proportional difference in mean ranks equal to the average of these three mergers (-0.634).  If Supplement CC were modified according to this approach, I find that eight additional TWA pilots would have been merged with the American pilots, rather than stapled.  Using Mr. Salamat's methodology for calculating damages, these changes in the overall seniority list result in $2.8 million in purported damages.[178]

147.     For the reasons set forth above, it is my opinion that Supplement CC was consistent with the economics of bargaining which is consistent with the TWA pilots suffering no damages as a result of its implementation.  Further, I have pointed out many flaws that render Professor Farber's and Mr. Salamat's methods unreliable for calculating damages in this case. Nevertheless, if one were to accept the approach that Mr. Salamat takes to calculating damages based on Professor Farber's hypothetical seniority list – correcting only the two glaring errors described above – then Professor Farber's analysis implies that Supplement CC negatively affected the TWA pilots by a total of $2.8 million.

### VIII.    IMPACT OF DATE LIMITATION ON MR. SALAMAT'S DAMAGE CALCULATIONS

148.     My analysis shows that Supplement CC gave the TWA pilots a reasonable share of the benefits from integrating the American and TWA pilots.  Thus, there is no support in the economics of bargaining and negotiation to suggest that the TWA pilots have been damaged.

Counsel for ALPA nonetheless has asked me to calculate damages implied by Mr. Salamat's methodology through April 2003, the date on which a new Collective Bargaining Agreement

---

[178] For purposes of this exercise I have not corrected the errors in Mr. Salamat's calculations that I discussed in Section VI.

negotiated by the APA with American Airlines became effective.  As shown in Exhibit 19, damages under the Mr. Salamat's DMODEL through April 2003 (correcting Mr. Salamat's pension and interest rate calculations) are $30.3 million, or $16.2 million if adjusted by a probability factor (corrected for his arithmetical error) that is based on Mr. Salamat's unfounded assumptions about the impact that certain ALPA actions would have had on the negotiated outcome.

Kevin M. Murphy

June 7, 2013

**Exhibit 1 - Combined American and TWA Fleet as of December 31, 2001**

|                 | American | TWA | TWA Share |
|-----------------|----------|-----|-----------|
| Large Wide-body | 47       | 0   | 0.00%     |
| Small Wide-body | 239      | 36  | 13.09%    |
| Narrow-body     | 452      | 133 | 22.74%    |
| **Total**       | **738**  | **169** |       |

Sources: 2001-08-14 KPMG Report_001.pdf; Hefley Notes - 4-18-01.pdf; Hefley Notes - 8-20--30-01.pdf.

**Exhibit 2**
**American Manning Rates  (Pilots per Plane)**

|  | AMR |
|---|---|
| Large Wide-body | 23.05 |
| Small Wide-body | 15.22 |
| Narrow-body | 12.07 |

Sources:  Letter from White to Valtin, 8/20/2001 (ALPA030054); 2001-08-14 KPMG Report_001.pdf; Hefley Notes - 4-18-01.pdf; Hefley Notes - 8-20--30-01.pdf; Salamat backup materials.

Note: Manning rates employ a weighted average based on aircraft type and number of planes. The manning rate calculation considers only working line pilots and thus CKA/SUPV are not included.

**Exhibit 3 - Estimated Jobs Brought by TWA to the Merged Firm**

|  | American | TWA | Combined | TWA Share of Jobs |
|---|---|---|---|---|
| Large Wide-body | 1083 | 0 | 1083 | 0.00% |
| Small Wide-body | 3638 | 569 | 4207 | 13.52% |
| Narrow-body | 5456 | 1500 | 6956 | 21.56% |
| **Total** | **10234** | **2080** | **12314** | |

Sources:  Letter from White to Valtin, 8/20/2001 (ALPA030054); 2001-08-14 KPMG Report_001.pdf;
Hefley Notes - 4-18-01.pdf; Hefley Notes - 8-20--30-01.pdf; Salamat backup materials.

Exhibit 4

# Comparison of American and TWA
# Top of Schedule Captain Rates
# As of 8/31/00

| Company | Plane Type | # of Planes as of 2001 | Captain TOS Rate |
|---------|-----------|------------------------|------------------|
| **AMERICAN**[1] | | | |
| | | | **12 YOS As of 8/31/00**[2] |
| | Airbus A300-600R | 34 | $201.64 |
| | Boeing 727-200 | 33 | $182.72 |
| | Boeing 737-800 | 77 | $186.52 |
| | Boeing 757-200 | 117 | $195.64 |
| | Boeing 767-200 | 8 | $198.11 |
| | Boeing 767-200 Extended Range | 21 | $199.67 |
| | Boeing 767-300 Extended Range | 49 | $201.64 |
| | Fokker 100 | 74 | $168.74 |
| | MD-80 | 259 | $181.58 |
| | | **Weighted Average Rate:** | **$186.48** |
| | | | **15 YOS as of 9/1/00** |
| **TWA** | | | |
| | Boeing 717-200 | 30 | $125.06 |
| | Boeing 757-200 | 27 | $135.63 |
| | Boeing 767-300 Extended Range | 9 | $135.63 |
| | MD-80 | 103 | $125.06 |
| | | **Weighted Average Rate:** | **$127.31** |
| | | **American TOS Rate / TWA TOS Rate:** | **146%** |

Notes:   [1]Includes only American planes that are similar to TWA planes.
[2]Not adjusted for the difference in maximum hours under the CBAs at TWA and American.

Sources:   10K Filings; Hiring FAPAaero EFA Rates.xlsx; D-137.pdf

Exhibit 5

# Comparison of American and TWA
# Top of Schedule Captain Rates
# As of 8/31/00

*Rates Adjusted for Difference in Maximum Flying Hours*
*at TWA and American*

| Company | Plane Type | # of Planes as of 2001 | Captain TOS Rate |
|---|---|---|---|
| **AMERICAN**[1] | | | |
| | | | **12 YOS As of 8/31/00**[2] |
| | Airbus A300-600R | 34 | $176.36 |
| | Boeing 727-200 | 33 | $159.81 |
| | Boeing 737-800 | 77 | $163.14 |
| | Boeing 757-200 | 117 | $171.11 |
| | Boeing 767-200 | 8 | $173.27 |
| | Boeing 767-200 Extended Range | 21 | $174.64 |
| | Boeing 767-300 Extended Range | 49 | $176.36 |
| | Fokker 100 | 74 | $147.59 |
| | MD-80 | 259 | $158.82 |
| | | **Weighted Average Rate:** | **$163.10** |
| | | | |
| **TWA** | | | **15 YOS as of 9/1/00** |
| | Boeing 717-200 | 30 | $125.06 |
| | Boeing 757-200 | 27 | $135.63 |
| | Boeing 767-300 Extended Range | 9 | $135.63 |
| | MD-80 | 103 | $125.06 |
| | | **Weighted Average Rate:** | **$127.31** |
| | | | |
| | **American TOS Rate / TWA TOS Rate:** | | **128%** |

Notes:   [1]Includes only American planes that are similar to TWA planes.

  [2]Actual rates multiplied by 0.8746 to account for the difference in maximum hours
   under the CBAs at TWA and American.

Sources:   10K Filings; Hiring FAPAaero EFA Rates.xlsx; D-137.pdf

Exhibit 6.A

# Comparable Captain Top of Schedule Rates
## Across Airlines in Late 2000

## B737s

| Airline | As Of | TOS Year | Hourly Rate |
|---|---|---|---|
| AIRTRAN | 04/01/01 | 9 | 122.84 |
| TWA | 09/01/00 | 15 | 125.06 |
| AMERICA WEST | 04/29/00 | 15 | 124.07 |
| SOUTHWEST | 09/01/00 | 12 | 137.67 |
| ALASKA | 05/01/01 | 12 | 156.05 |
| CONTINENTAL | 10/01/00 | 12 | 165.05 |
| AMERICAN | 08/31/00 | 12 | 175.31 |
| DELTA | 05/01/01 | 12 | 193.86 |
| UNITED | 05/01/01 | 12 | 199.41 |

Notes:

[1] American B737 rate is averaged over B737-200, B737-300 and B737-800

[2] Delta B737 rate is averaged over B737-200 DLX, B737-300, B737-300G, B737-700DLX and B737-NG

[3] United B737 rate is averaged over B737-200 and B737-300/500

[4] Continental B737 rate is weighted 3:6 Large Narrowbody to Small Narrowbody.

[5] AirTran B737 rate is weighted 3:6 Large Narrowbody to Small Narrowbody.

[6] TWA Rate for Captains at TOS for Narrowbody aircrafts (which includes B737), as of 9/1/2000, was used (ALPA 040201).

Source: Hiring FAPAaero EFA Rates.xlsx; D-137.pdf.

Exhibit 6.B

# Comparable Captain Top of Schedule Rates
# Across Airlines in Late 2000

## B757s

| Airline | As Of | TOS Year | Hourly Rate |
|---------|-------|----------|-------------|
| ATA | 09/23/99 | 12 | 114.82 |
| AIRTRAN | 04/01/01 | 9 | 133.05 |
| AMERICA WEST | 04/29/00 | 15 | 124.07 |
| TWA | 09/01/00 | 15 | 135.63 |
| CONTINENTAL | 10/01/00 | 12 | 176.91 |
| NORTHWEST | 09/13/00 | 12 | 193.70 |
| AMERICAN | 08/31/00 | 12 | 195.64 |
| UNITED | 05/01/01 | 12 | 232.11 |
| DELTA | 05/01/01 | 12 | 234.42 |

Source: Hiring FAPAaero EFA Rates.xlsx; D-137.pdf.

Exhibit 6.C

# First Officer Year One through Year Four Schedule Rates Compared to TWA TOS Rate in Late 2000

# B737s

| Airline | As Of | Year 1 | Year 2 | Year 3 | Year 4 | Year 15 |
|---------|-------|--------|--------|--------|--------|---------|
| **TWA TOS CAPTAIN** | **09/01/00** | | | | | 125.06 |
| AIRTRAN | 04/01/01 | 35.50 | 46.95 | 50.08 | 58.88 | |
| AMERICA WEST | 04/29/00 | 34.23 | 53.71 | 59.79 | 66.01 | |
| SOUTHWEST | 09/01/00 | 36.39 | 61.40 | 68.36 | 75.47 | |
| ALASKA | 05/01/01 | 32.52 | 72.39 | 88.15 | 93.17 | |
| CONTINENTAL | 10/01/00 | N/A | 62.19 | 73.21 | 82.93 | |
| AMERICAN | 08/31/00 | 33.92 | 60.00 | 67.02 | 100.52 | |
| DELTA | 05/01/01 | 50.00 | 94.09 | 110.30 | 113.19 | |
| UNITED | 05/01/01 | 47.63 | 75.38 | 109.42 | 116.18 | |

Notes:

[1] American B737 rate is averaged over B737-200, B737-300 and B737-800

[2] Delta B737 rate is averaged over B737-200 DLX, B737-300, B737-300G, B737-700DLX and B737-NG

[3] United B737 rate is averaged over B737-200 and B737-300/500

[4] Continental B737 rate is weighted 3:6 Large Narrowbody to Small Narrowbody.

[5] AirTran B737 rate is weighted 3:6 Large Narrowbody to Small Narrowbody.

[6] TWA Rate is for top of the schedule Captain, flying B737, whereas Year 1 through 4 rates are comprable FO rates at competing airlines.

[7] TWA Rate for Captains at TOS for Narrowbody aircrafts (which includes B737), as of 9/1/2000, was used (ALPA 040201).

Source: Hiring FAPAaero EFA Rates.xlsx; D-137.pdf.

# Exhibit 7
## Furloughed Pilots as a Percentage of all Pilots at Combined Airline



Notes: Pilots with permstat = 'Deceased' or 'Retired' omitted.
Source: Salamat EMPHIST database.

**Exhibit 8.A - Sharing of Total Merger Gains**

| | (1) Supplement CC Excluding TWA Pilots' Pay Gain | | (2) Supplement CC Including TWA Pilots' Pay Gain | |
|---|---|---|---|---|
| | **Prospective Evaluation** | **Evaluation with Hindsight** | **Prospective Evaluation** | **Evaluation with Hindsight** |
| **American Gain** | $556,799,235 | $513,985,194 | $556,799,235 | $513,985,194 |
| **TWA Gain** | $507,253,709 | $297,276,828 | $824,923,629 | $375,336,991 |
| **AMR Share of Gains** | 52% | 63% | 40% | 58% |
| **TWA Share of Gains** | 48% | 37% | 60% | 42% |
| **American Gain per Pilot** | $48,216.08 | $44,508.59 | $48,216.08 | $44,508.59 |
| **TWA Gain per Pilot** | $217,053.36 | $127,204.46 | $352,984.01 | $160,606.33 |

Note: There are 11,548 American pilots and 2,337 TWA pilots on the original seniority list (11,548 excludes American pilots stapled to the bottom of the list after the last TWA pilot).

**Exhibit 8.B - Sharing of Total Merger Gains**

| | (1) Dmodel Excluding TWA Pilots' Pay Gain | | (2) Dmodel Including TWA Pilots' Pay Gain | |
|---|---|---|---|---|
| | **Prospective Evaluation** | **Evaluation with Hindsight** | **Prospective Evaluation** | **Evaluation with Hindsight** |
| **American Gain** | -$355,903,138 | $63,645,009 | -$355,903,138 | $63,645,009 |
| **TWA Gain** | $1,377,263,176 | $714,503,681 | $1,694,933,097 | $792,563,844 |
| **AMR Share of Gains** | -35% | 8% | -27% | 7% |
| **TWA Share of Gains** | 135% | 92% | 127% | 93% |
| **American Gain per Pilot** | -$30,819.46 | $5,511.34 | -$30,819.46 | $5,511.34 |
| **TWA Gain per Pilot** | $589,329.56 | $305,735.42 | $725,260.20 | $339,137.29 |

Note: There are 11,548 American pilots and 2,337 TWA pilots on the original seniority list (11,548 excludes American pilots stapled to the bottom of the list after the last TWA pilot).

**Exhibit 9.A - Sharing of Total Merger Gains Excluding TWA Pilots' Pay Gain (CORRECTED)**

|  | Prospective Evaluation | | Evaluation with Hindsight | |
|---|---|---|---|---|
|  | Share of Gains to American | Share of Gains to TWA | Share of Gains to American | Share of Gains to TWA |
| SuppCC | 52% | 48% | 63% | 37% |
| Dmodel | -35% | 135% | 8% | 92% |
| ARBModel | -72% | 172% | -15% | 115% |
| Farber1 | -100% | 200% | -32% | 132% |
| Farber2 | -132% | 232% | -49% | 149% |
| Farber3 | -67% | 167% | -13% | 113% |
| ioptimal | -119% | 219% | -43% | 143% |
| SuppCC200 | 33% | 67% | 51% | 49% |
| Tannen | -152% | 252% | -58% | 158% |

Note: There are 11,548 American pilots and 2,337 TWA pilots on the original seniority list (11,548 excludes American pilots stapled to the bottom of the list after the last TWA pilot).

**Exhibit 9.B - Sharing of Total Merger Gains Including TWA Pilots' Pay Gain (CORRECTED)**

| | Prospective Evaluation | | Evaluation with Hindsight | |
|---|---|---|---|---|
| | Share of Gains to American | Share of Gains to TWA | Share of Gains to American | Share of Gains to TWA |
| SuppCC | 40% | 60% | 58% | 42% |
| Dmodel | -27% | 127% | 7% | 93% |
| ARBModel | -54% | 154% | -13% | 113% |
| Farber1 | -75% | 175% | -29% | 129% |
| Farber2 | -98% | 198% | -44% | 144% |
| Farber3 | -50% | 150% | -12% | 112% |
| ioptimal | -88% | 188% | -38% | 138% |
| SuppCC200 | 25% | 75% | 47% | 53% |
| Tannen | -112% | 212% | -52% | 152% |

Note: There are 11,548 American pilots and 2,337 TWA pilots on the original seniority list (11,548 excludes American pilots stapled to the bottom of the list after the last TWA pilot).

**Exhibit 10**

**Salamat Figure 3 - Corrected Cumulative Probability Calculation**

| Action | Δ Importance | Δ Perception | Abandonment | Total | Cumulative Probability | |
|---|---|---|---|---|---|---|
| | | | | | Original | Revised |
| Insist on Waiving Scope | | 5% | | 5.0% | 5.0% | 5.0% |
| Denied April 2001 Legal Strategy: Delay Purchase | 3% | 5% | | 8.0% | 13.0% | 12.6% |
| Denied July 2001 Legal Strategy: Sue American and APA | 3% | 5% | 2% | 10.0% | 23.0% | 21.3% |
| Denied October 2001 Legal Strategy: Injunction | | 5% | | 5.0% | 28.0% | 25.3% |
| Denied October 2001 Legal Strategy: Case, APA Injunction | 3% | | 2% | 5.0% | 33.0% | 29.0% |
| Refuse to request DOT make fair process condition of purchase | 3% | 5% | 2% | 10.0% | 43.0% | 36.1% |
| Refuse to request AFL-CIO support | | 5% | | 5.0% | 48.0% | 39.3% |
| Refuse to block APA pilots from ALPA jumpseats | 3% | 5% | 2% | 10.0% | 58.0% | 45.4% |
| Deny TWA pilots have right to strike | | 5% | | 5.0% | 63.0% | 48.1% |
| Failure to Support TWA Pilots | 3% | 5% | 2% | 10.0% | **73.0%** | **53.3%** |

Source: Salamat Report - 2012-10-12.pdf



**Exhibit 11**
**Share of All Passenger Miles for Major Airlines**
**2000Q1 - 2012Q3**

Notes: Contains domestic and international market data reported by U.S. air carriers. American airlines includes American and TWA.
Delta includes Delta and Northwest. United includes United and Continental. US Airways includes US Airways and America West.
Source: T-100 Market Data, RITA.

# Exhibit 12
## Share of Inactive Pilots as Share of All Pilots
### American Airlines



Note: Pilots where permstat = 'Furlough', 'Deceased' or 'Retired' omitted.  Share is number of all pilots with status='NACT'
divided by the number of pilots with permstat not equal to 'Furlough', 'Deceased' or 'Retired'.
Sources: Salamat EMPHIST and PILOTDB databases.

# Exhibit 13
## Number of American FOs With Sufficient Seniority to be Captains
### Regular Line Pilots Included



Notes: Only pilots with status = 'REG' included.  Pilots with missing equipment type or position info, ssen=0, and no pcredit or credit omitted.
FOs ranked above the lowest ranking [or highest ranking in number] captain, by month, company, and exact equipment type, are considered
as choosing to remain FOs.  EIDs 00680734 and 00645064 from pilotdb were considered to be TWA.
Sources: Salamat EMPHIST and PILOTDB databases.

**EXHIBIT 14**

## Distribution of Average Annualized Mitigation Received by Pilots Who Had Furlough Damages under Salamat's Damage Model

| Average Annualized Mitigation [$] | Number of Pilots |
|:---:|:---:|
| 0 | 7 |
| > 0 to 1,000 | 8 |
| >1,000 to 10,000 | 36 |
| >10,000 to 25,000 | 49 |
| >25,000 to 50,000 | 167 |
| >50,000 to 75,000 | 236 |
| >75,000 to 100,000 | 155 |
| > 100,0000 | 117 |
| **Total Number of Pilots:** | **775** |

Sources: INCOMEDIFF, PILOTDB, and EMPHIST databases from backup to October 12, 2012 Salamat Report.
PQ_DATACHECK, PQ_MITIGATION, and AMRW2DATA databases from backup to April 30, 2013 Salamat Report.

**Exhibit 15**

# Distribution of Damages Calculated by Mr. Salamat under his DMODEL after Mitigation

| Damages Grouping [$] | Salamat Damage Model |
|---|---|
| > 0 * | 13 |
| 0 | 468 |
| < 0 to < -100 | 5 |
| -100 to < -1,000 | 36 |
| -1,000 to < -10,000 | 99 |
| -10,000 to < -50,000 | 125 |
| -50,000 to < -100,000 | 80 |
| -100,000 to < -400,000 | 650 |
| -400,000 to < -700,000 | 538 |
| -700,000 to < -1,000,000 | 132 |
| -1,000,000 to < -1,300,000 | 20 |
| **Total Number of Pilots:** | **2,166** |

Notes: Includes only TWA pilots in the employee history database as of April, 2002.  EID=00680734 omitted as incorrect AMR ID for Osterlund.

*The small number of pilots with positive damages reflects the non-monotonic rolling average that Salamat employed and acknowledges.

Sources: INCOMEDIFF, PILOTDB, and EMPHIST databases from backup to October 12, 2012 Salamat Report.  PENSION and PQ_MITIGATION databases from backup to April 30, 2013 Salamat Report.

# Exhibit 16
## Difference in the Number of Pilots Assigned Income Under Mr. Salamat's DMODEL and the Number of Pilots Assigned Income Under SUPCC



Notes: SUPCC jobs are measured as unique EIDs with positive blincome.  DMODEL jobs are measured as unique EIDs with positive modincome.
Source: Salamat INCOMEDIFF database.

**Exhibit 17 - Comparison of Plaintiffs' Experts' Preferred Hypothetical Seniority Integrations with Supplement CC**

|  | Supplement CC | Farber | Salamat DMODEL |
|---|---|---|---|
| Top Staple of American Pilots Only | 2,596 | 0 | 2,494 |
| Merge | 1,095 TWA pilots at 8.1763:1 ratio | 1,887 TWA pilots at 5.81:1 ratio | 1,873 TWA pilots at 4.74:1 ratio |
| Bottom Staple of TWA Pilots Only | 1,242 | 350 | 464 |

Sources: Expert Report of Henry S. Farber, October 12, 2012; Rikk M.T. Salamat, BA, MBA, Damages in Brady et al vs. The Air Line Pilots Association, October 12, 2012; APA's Mergers & Acquisitions Committee, Summary of Supplement CC, December 14, 2001.

**Exhibit 18**

# Estimated Damages Using Farber's Seniority List with Salamat's Methodology

|  | Farber Approach Using Corrected Comparable Transactions |
|---|---|
| **Damages** | |
| Employment April 2002 - June 2012 | (814,278) |
| Furlough | (1,869,707) |
| Employment July 2012 - June 2026 | (820,216) |
| Pension Plan A | (394,170) |
| Pension Plan B | (661,349) |
| **Total Damages** | (4,559,720) |
| **Set-Off** | |
| Furlough | 1,259,797 |
| Interest | 278,177 |
| Pension Plan A | - |
| Pension Plan B | 175,991 |
| **Total Set-Off** | 1,713,965 |
| **Total Set-Off Damages** | **(2,845,755)** |

Notes:
Damages and set-off are calculated using Salamat's method for calculating damages.
The three comparable transactions are Continental/Frontier, Republic/Midwest, and Republic/Lynx. These comparables result in merging 8 more TWA pilots than under Supplement CC.

**Exhibit 19**

**DMODEL Damages and Mitigation through April 2003**

|  | | Original | Through April 2003 |
|---|---|---|---|
| **Original Damages** | | | |
| | Employment Damages | -109.8 | -18.1 |
| | Interest | -17.8 | -3.5 |
| | Furlough Damages | -352.8 | -6.0 |
| | Interest | -59.7 | -1.1 |
| | Future - Employment Damages | -148.3 | 0.0 |
| | PV | 17.3 | 0.0 |
| | Pension Plan A | -72.8 | -1.3 |
| | Pension Plan B | -143.4 | -3.2 |
| **Total Damages** | | **-887.4** | **-33.1** |
| *Damage Probability* | *53%* | *-473.0* | *-17.7* |
| **Set-Off** | | | |
| | Furlough | 207.6 | 2.1 |
| | Interest | 31.1 | 0.4 |
| | Pension Plan A | 0.0 | 0.0 |
| | Pension Plan B | 55.6 | 0.3 |
| **Total Set-Off** | | **294.3** | **2.8** |
| **Total Set-Off Damages** | | **-593.1** | **-30.3** |
| *Damage Probability* | *53%* | *-316.1* | *-16.2* |

# Appendix A

*Curriculum Vitae*

# Kevin M. Murphy

June 2013

*Business Address:*

University of Chicago
Booth School of Business
5807 South Woodlawn Avenue
Chicago, Illinois  60637
email: kevin.murphy@chicagobooth.edu

*Home Address:*

1810 Pennington Court
New Lenox, Illinois 60451
Phone: (815)463-4756
Fax: (815)463-4758

## Current Positions

July 2005-Present: George J. Stigler Distinguished Service Professor of Economics, Department of Economics and Booth School of Business, University of Chicago

Faculty Research Associate, National Bureau of Economic Research

## Education

University of California, Los Angeles, A.B., Economics, 1981

University of Chicago, Ph.D., 1986

Thesis Topic: *Specialization and Human Capital*

## Previous Research and Academic Positions

2002-2005: George J. Stigler Professor of Economics, Department of Economics and Booth School of Business, University of Chicago

1993 – 2002: George Pratt Shultz Professor of Business Economics and Industrial Relations, University of Chicago

1989 – 1993: Professor of Business Economics and Industrial Relations, University of Chicago

1988 – 1989: Associate Professor of Business Economics and Industrial Relations, University of Chicago

1986 – 1988: Assistant Professor of Business Economics and Industrial Relations, University of Chicago

1983 – 1986: Lecturer, Booth School of Business, University of Chicago

1982 – 1983: Teaching Associate, Department of Economics, University of Chicago

1979 – 1981: Research Assistant, Unicon Research Corporation, Santa Monica, California

**Honors and Awards**

2008: John von Neumann Lecture Award, Rajk College, Corvinus University, Budapest

2007: Kenneth J. Arrow Award (with Robert H. Topel)

October 2005: Garfield Research Prize (with Robert H. Topel)

September 2005: MacArthur Foundation Fellow

1998: Elected to the American Academy of Arts & Sciences

1997: John Bates Clark Medalist

1993: Fellow of The Econometric Society

1989 – 1991: Sloan Foundation Fellowship, University of Chicago

1983 – 1984: Earhart Foundation Fellowship, University of Chicago

1981 – 1983: Fellowship, Friedman Fund, University of Chicago

1980 – 1981: Phi Beta Kappa, University of California, Los Angeles

1980 – 1981: Earhart Foundation Fellowship, University of California, Los Angeles

1979 – 1981: Department Scholar, Department of Economics, University of California, Los Angeles

**Publications**

**Books**

Social Economics: Market Behavior in a Social Environment with Gary S. Becker, Cambridge, MA: Harvard University Press (2000).

Measuring the Gains from Medical Research: An Economic Approach edited volume with Robert H. Topel, Chicago: University of Chicago Press (2003).

-84-

**Articles**

"Government Regulation of Cigarette Health Information," with Benjamin Klein and Lynne Schneider, 24 *Journal of Law and Economics* 575 (1981).

"Estimation and Inference in Two-Step Econometric Models," with Robert H. Topel, 3 *Journal of Business and Economic Statistics* 370 (1985).

"Unemployment, Risk, and Earnings: Testing for Equalizing Wage Differences in the Labor Market," with Robert H. Topel, in Unemployment and the Structure of Labor Markets, pp. 103-139, ed. Kevin Lang and Jonathan S. Leonard. London: Basil Blackwell (1987).

"The Evolution of Unemployment in the United States: 1968-1985," with Robert H. Topel, in NBER Macroeconomics Annual, pp. 11-58, ed. Stanley Fischer. Cambridge, MA: MIT Press (1987).

"Cohort Size and Earnings in the United States," with Mark Plant and Finis Welch, in Economics of Changing Age Distributions in Developed Countries, pp. 39-58, ed. Ronald D. Lee, W. Brian Arthur, and Gerry Rodgers. Oxford: Clarendon Press, (1988).

"The Family and the State," with Gary S. Becker, 31 *Journal of Law and Economics* 1 (1988).

"A Theory of Rational Addiction," with Gary S. Becker, 96 *Journal of Political Economy* 675 (1988).

"Vertical Restraints and Contract Enforcement," with Benjamin Klein, 31 *Journal of Law and Economics* 265 (1988).

"Income Distribution, Market Size, and Industrialization," with Andrei Shleifer and Robert W. Vishny, 104 *Quarterly Journal of Economics* 537 (1989).

"Wage Premiums for College Graduates: Recent Growth and Possible Explanations," with Finis Welch, 18 *Educational Researcher* 17 (1989).

"Industrialization and the Big Push," with Andrei Shleifer and Robert W. Vishny, 97 *Journal of Political Economy* 1003 (1989).

"Building Blocks of Market Clearing Business Cycle Models," with Andrei Shleifer and Robert W. Vishny, in NBER Macroeconomic Annual, pp. 247-87, ed. Olivier Jean Blanchard and Stanley Fischer. Cambridge, MA: MIT Press (1989).

"Efficiency Wages Reconsidered: Theory and Evidence," with Robert H. Topel, in Advances in the Theory and Measurement of Unemployment, pp. 204-240. ed. Yoram Weiss and Gideon Fishelson. London: Macmillan, (1990).

"Empirical Age-Earnings Profiles," with Finis Welch, 8 *Journal of Labor Economics* 202 (1990).

"Human Capital, Fertility, and Economic Growth," with Gary S. Becker and Robert F. Tamura, 98 *Journal of Political Economy*, S12 (1990).

"Accounting for the Slowdown in Black-White Wage Convergence," with Chinhui Juhn and Brooks Pierce, in Workers and Their Wages: Changing Patterns in the United States, pp. 107-143, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"The Role of International Trade in Wage Differentials," with Finis Welch, in Workers and Their Wages: Changing Patterns in the United States, pp. 39- 69, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"Why Has the Natural Rate of Unemployment Increased over Time?" with Robert H. Topel and Chinhui Juhn, 2 *Brookings Papers on Economic Activity* 75 (1991).

"The Allocation of Talent: Implications for Growth," with Andrei Shleifer and Robert W. Vishny, 106 *Quarterly Journal of Economics* 503 (1991).

"Rational Addiction and the Effect of Price on Consumption," with Gary S. Becker and Michael Grossman, 81 *American Economic Review* 237 (1991).

"Wages of College Graduates," in The Economics of American Higher Education, pp. 121-40, ed. William E. Becker and Darrell R. Lewis. Boston: Kluwer Academic Publishers (1992).

"Changes in Relative Wages, 1963-1987: Supply and Demand Factors," with Lawrence F. Katz, 107 *Quarterly Journal of Economics* 35 (1992).

"The Structure of Wages," with Finis Welch. 107 *Quarterly Journal of Economics* 285 (1992).

"The Transition to a Market Economy: Pitfalls of Partial Planning Reform," with Andrei Shleifer and Robert W. Vishny, 107 *Quarterly Journal of Economics* 889 (1992).

"The Division of Labor, Coordination Costs, and Knowledge," with Gary S. Becker, 107 *Quarterly Journal of Economics* 1137 (1992).

"Industrial Change and the Rising Importance of Skill" with Finis Welch, in Uneven Tides: Rising Inequality in America, pp. 101-132, ed. Peter Gottschalk and Sheldon Danziger. New York: Russell Sage Foundation Publications (1993).

"Wage Inequality and the Rise in Returns to Skill," with Chinhui Juhn and Brooks Pierce, 101 *Journal of Political Economy* 410 (1993).

"Occupational Change and the Demand for Skill, 1940-1990," with Finis Welch, 83 *American Economic Review* 122 (1993).

"Inequality and Relative Wages," with Finis Welch, 83 *American Economic Review* 104 (1993).

"Why Is Rent-Seeking So Costly to Growth?" with Andrei Shleifer and Robert W. Vishny, 83 *American Economic Review* 409 (1993).

"A Simple Theory of Advertising as a Good or Bad," with Gary S. Becker, 108 *Quarterly Journal of Economics* 941 (1993).

"Relative Wages and Skill Demand, 1940-1990," with Chinhui Juhn, in Labor Markets, Employment Policy, and Job Creation, pp. 343-60, ed. Lewis C. Solmon and Alec R. Levenson. The Milken Institute Series in Economics and Education. Boulder, CO: Westview Press, (1994).

"Cattle Cycles," with Sherwin Rosen and Jose A. Scheinkman, 102 *Journal of Political Economy* 468 (1994).

"An Empirical Analysis of Cigarette Addiction," with Gary S. Becker and Michael Grossman, 84 *American Economic Review* 396 (1994).

"Inequality in Labor Market Outcomes: Contrasting the 1980s and Earlier Decades," with Chinhui Juhn, 1 *Economic Policy Review* 26 (1995).

"Employment and the 1990-91 Minimum Wage Hike," with Donald R. Deere and Finis Welch, 85 *American Economic Review* 232 (1995).

"Examining the Evidence on Minimum Wages and Employment," with Donald R. Deere and Finis Welch, in The Effects of the Minimum Wage on Employment, pp. 26-54, ed. Marvin H. Kosters. Washington, D.C.: The AEI Press, (1996).

"Social Status, Education, and Growth," with Chaim Fershtman and Yoram Weissm, 104 *Journal of Political Economy* 108 (1996).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Quality and Trade," with Andrei Shleifer, 53 *Journal of Development Economics* 1 (1997).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Vertical Integration as a Self-Enforcing Contractual Arrangement," with Benjamin Klein, 87 *American Economic Review* 415 (1997).

"Unemployment and Nonemployment," with Robert H. Topel, 87 *American Economic Review* 295 (1997).

"Wages, Skills, and Technology in the United States and Canada," with W. Craig Riddell and Paul M. Romen, in General Purpose Technologies and Economic Growth, pp. 283-309, ed. Elhanan Helpman.  Cambridge, MA: M.I.T. Press, (1998).

"Perspectives on the Social Security Crisis and Proposed Solutions," with Finis Welch, 88 *American Economic Review* 142 (1998).

"Population and Economic Growth," with Gary S. Becker and Edward Glaeser, 89 *American Economic Review* 145 (1999).

"A Competitive Perspective on Internet Explorer," with Steven J. Davis, 90 *American Economic Review* 184 (2000).

"Industrial Change and the Demand for Skill" with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 263-84, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: University of Chicago Press, (2001).

"Wage Differentials in the 1990s: Is the Glass Half Full or Half Empty?" with Finis Welch, in *The Causes and Consequences of Increasing Inequality*, pp. 341-64, ed. Finis Welch. Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: University of Chicago Press, (2001).

"Economic Perspectives on Software Design: PC Operating Systems and Platforms," with Steven J. Davis and Jack MacCrisken, in Microsoft, Antitrust, and the New Economy: Selected Essays, pp. 361-420, ed. Davis S. Evans. Boston, MA: Kluwer, (2001).

"Current Unemployment, Historically Contemplated," with Robert H. Topel and Chinhui Juhn, 1 *Brookings Papers on Economic Activity* 79 (2002).

"The Economics of Copyright 'Fair Use' in A Networked World," with Andres Lerner and Benjamin Klein, 92 *American Economic Review* 205 (2002).

"The Economic Value of Medical Research" with Robert H. Topel, in Measuring the Gains from Medical Research: An Economic Approach, pp. 41-73, ed. Robert H. Topel and Kevin M. Murphy. Chicago: University of Chicago Press, (2003).

"School Performance and the Youth Labor Market," with Sam Peltzman, 22 *Journal of Labor Economics* 299 (2003).

"Entrepreneurial ability and market selection in an infant industry: evidence from the Japanese cotton spinning industry," with Atsushi Ohyama and Serguey Braguinsky, 7 *Review of Economic Dynamics* 354 (2004).

"Entry, Pricing, and Product Design in an Initially Monopolized Market," with Steven J. Davis and Robert H. Topel, 112 *Journal of Political Economy*: S188 (2004).

"Diminishing Returns: The Costs and benefits of Increased Longevity," with Robert H. Topel, 46 *Perspectives in Biology and Medicine* S108 (2004).

"Persuasion in Politics," with Andrei Shleifer, 94 *American Economic Review* 435 (May 2004).

"Black-White Differences in the Economic Value of Improving Health," with Robert H. Topel, 48 *Perspectives in Biology and Medicine* S176 (2005).

"The Equilibrium Distribution of Income and the Market for Status," with Gary S. Becker and Iván Werning, 113 *Journal of Political Economy* 282 (2005).

"The Market for Illegal Goods: The Case of Drugs," with Gary S. Becker and Michael Grossman, 114 *Journal of Political Economy* 38 (2006).

"Competition in Two Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," with Benjamin Klein, Kevin Green, and Lacey Place, 73 *Antitrust Law Journal* 571 (2006).

"The Value of Health and Longevity," with Robert H. Topel, 114 *Journal of Political Economy* 871 (2006).

"Social Value and the Speed of Innovation," with Robert H. Topel, 97 *American Economic Review* 433 (2007).

"Education and Consumption: The Effects of Education in the Household Compared to the Marketplace," with Gary S. Becker, 1 *The Journal of Human Capital* 9 (Winter 2007).

"Why Does Human Capital Need a Journal?" with Isaac Ehrlich, 1 *The Journal of Human Capital* 1 (Winter 2007).

 "Critical Loss Analysis in the *Whole Foods* Case" with Robert H. Topel, 3 (2) *GCP Magazine* (March 2008).

"Exclusive Dealing Intensifies Competition for Distribution," with Benjamin Klein, Antitrust Law Journal, Vol. 75 (October 2008).

"Fertility Decline, the Baby Boom and Economic Growth," with Curtis Simon and Robert Tamura, 2 *The Journal of Human Capital* 3 (Fall 2008).

"The Market for College Graduates and the Worldwide Boom in Higher Education of Women" with Gary S. Becker and William H. J. Hubbard, 100 *American Economic Review: Papers & Proceedings* 229 (May 2010).

"Explaining the Worldwide Boom in Higher Education of Women," with Gary S. Becker & William H. J. Hubbard," *Journal of Human Capital*, University of Chicago Press, vol. 4(3), 203 (2010).

"How Exclusivity is Used to Intensify Competition for Distribution-Reply to Zenger," with Benjamin Klein, *77 Antitrust Law Journal No. 2* (2011).

"Achieving Maximum Long-Run Growth," *Federal Reserve Bank of Kansas City Proceedings of the Annual Jackson Hole Conference 2011.*

## Selected Working Papers

"Gauging the Economic Impact of September 11th," with Gary S. Becker, Unpublished Working Paper (October 2001).

"War In Iraq Versus Containment: Weighing the Costs," with Steven J. Davis and Robert H. Topel, *NBER Working Paper No.12092* (March 2006).

"Estimating the Effect of the Crack Epidemic," with Steve Levitt and Roland Fryer, Unpublished Working Paper (September 2006).

"The Interaction of Growth in Population and Income," with Gary S. Becker, Unpublished Working Paper (2006).

"Persuasion and Indoctrination," with Gary Becker (2007).

"The Value of Life Near Its End and Terminal Care," with Gary S. Becker and Tomas Philipson (2007).

"On the Economics of Climate Policy," with Gary S. Becker and Robert H. Topel, Working Paper No. 234 (January 2010, Revised September 2010).

"The Collective Licensing of Music Performance Rights: Market Power, Competition and Direct Licensing" (March 2013).

"Competitive Discounts and Antitrust Policy," with Edward Snyder and Robert Topel (March 2013).

## Selected Comments

Comment on "Causes of Changing Earnings Equality," by Robert Z. Lawrence. Federal Reserve Bank of Kansas City (1998).

"Comment: Asking the Right Questions in the Medicare Reform Debate," <u>Medicare Reform: Issues and Answers</u>, pp. 175-81, ed. Andrew J. Rettenmaier and Thomas R. Saving. Chicago: University of Chicago Press (2000).

Comment on "Social Security and Demographic Uncertainty," by Henning Bohn in <u>Risk Aspects of Investment-Based Social Security Reform,</u> ed. John Y. Campbell and Martin Feldstein. Chicago: University of Chicago Press (2001.)

Comment on "High Technology Industries and Market Structure," by Hal R. Varian. Federal Reserve Bank of Kansas City (2001).

## Popular Press Articles

"The Education Gap Rap," *The American Enterprise,* (March-April 1990), pp. 62.

"Rethinking Antitrust," with Gary S. Becker, *Wall Street Journal*, (February 26, 2001) pp. pA22.

"Prosperity Will Rise Out of the Ashes," with Gary S. Becker, *Wall Street Journal*, (October 29, 2001) pp. pA22.

"The Economics of NFL Team Ownership" with Robert H. Topel, report prepared at the request of the National Football League Players' Association. (January 2009).

## Articles About Murphy

"Higher Learning Clearly Means Higher Earning," by Carol Kleiman. *Chicago Tribune*, March 12, 1989, Jobs Section pp. 1. Long article about "The Structure of Wages" with picture of Murphy.

"Why the Middle Class Is Anxious," by Louis S. Richman. *Fortune*, May 21, 1990, pp. 106. Extensive reference to Murphy's work on returns to education.

"Unequal Pay Widespread in U.S.," by Louis Uchitelle., *New York Times,* August 14, 1990, Business Day section pp. 1. Long piece on income inequality.

"One Study's Rags to Riches Is Another's Rut of Poverty," by Sylvia Nasar, *New York Times*, June 17, 1992, Business Section pp. 1. Long piece on the income inequality research.

"Nobels Pile Up for Chicago, but Is the Glory Gone?" by Sylvia Nasar, *New York Times* November 4, 1993, Business Section pp. 1. Long piece on Chicago School of economics. Featured a photo of five of the "brightest stars on the economics faculty" (including Murphy) and a paragraph about Murphy's research.

"This Sin Tax is Win-Win," by Christopher Farrell. *Business Week*, April 11, 1994, pp. 30. Commentary section refers to Murphy, Becker, and Grossman's work on rational addiction.

"Growing inequality and the economics of fragmentation," by David Warsh, *Boston Sunday Globe*, August 21, 1994, pp. A1. Two-page article with picture and biographical details about Murphy and his research; part of a series about "how the new generation replaced the old in economics."

"A Pay Raise's Impact," by Louis Uchitelle. *New York Times*, January 12, 1995, Business Section pp. 1. Article about consequences of proposed increase in the minimum wage. Articles featuring Murphy's comments on the minimum wage appeared in numerous other publications, including the *Chicago Tribune*; in addition, Murphy was interviewed on CNN (January 26, 1995).

"The Undereducated American," *Wall Street Journal*, August 19, 1996, pp. A12. Changes in the rate of returns to education.

"In Honor of Kevin M. Murphy: Winner of the John Bates Clark Medal," by Finis Welch, 14 *Journal of Economic Perspectives* 193 (2000).

## Testimony, Reports, and Depositions (Last 4 Years)

Final Submission of Kevin M. Murphy, January 16, 2009, in the 2006 MSA Adjustment Proceeding.

Expert Report of Kevin M. Murphy, January 23, 2009, in the Matter of City of New York v. Amerada Hess Corp., et al., The United States District Court for the Southern District of New York. Report submitted on behalf of Citgo Petroleum Corporation.

Declaration of Kevin M. Murphy, January 29, 2009, in the Matter of Insignia Systems, Inc. v. News America Marketing In-Store, Inc., The United States District Court for the District of Minnesota.

Deposition of Kevin M. Murphy, February 10, 2009, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC., The United States Third Circuit Court of Michigan Detroit Division. Case No. 07-706645.

Expert Report of Kevin M. Murphy, February 13, 2009, in the Matter of City of New York v. Amerada Hess Corp., et al., The United States District Court for the Southern District of New York. Report submitted on behalf of Citgo Petroleum Corporation regarding Citgo's share of total RFG supply at the New York Harbor.

Expert Report of Kevin M. Murphy, March 3, 2009, in the Matter of St. Francis Medical Center, on behalf of itself and all others similarly situated vs. C.R. Bard, Inc., The United States District Court for the Eastern District of Missouri Southeastern Division.

Deposition of Kevin M. Murphy, March 6, 2009, in the Matter of St. Francis Medical Center, on behalf of itself and all others similarly situated vs. C.R. Bard, Inc., The United States District Court for the Eastern District of Missouri Southeastern Division.

Expert Report of Kevin M. Murphy, March 17, 2009, in the Matter of ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation., The United States District Court of Delaware. Case No. 06-CV-623.

Deposition of Kevin M. Murphy, April 6, 2009, in the Matter of ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation., The United States District Court of Delaware. Case No. 06-CV-623.

Declaration of Kevin M. Murphy, April 16, 2009, in the Matter of Sun Microsystems, Inc., a California corporation v. Hynix Semiconductor Inc., et al., The United States District Court Northern District of California San Francisco Division.

Declaration of Kevin M. Murphy, April 23, 2009, in the Matter of Sun Microsystems, Inc., a California corporation v. Hynix Semiconductor Inc., a Korean corporation,  Hynix Semiconductor America Inc., a California corporation, et al., The United States District Court Northern District of California San Francisco Division.

Expert Report of Kevin M. Murphy, May 11, 2009, in the Matter of Jim Hood, Attorney General ex rel State of Mississippi v. Microsoft Corporation., The Chancery Court of Hinds County First Judicial District.

Expert Report of Professor Kevin M. Murphy, June 12, 2009, in the Matter of CITGO Petroleum Corporation v. Ranger Enterprises, Inc., The United States District Court for the Western District of Wisconsin.

Expert Report of Kevin M. Murphy, June 24, 2009, in the Matter of Novell, Incorporated v. Microsoft Corporation., The United States District Court Northern District of Maryland.

Trial Testimony of Kevin M. Murphy, July 16, 2009, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC., The United States Third Circuit Court of Michigan Detroit Division. Case No. 07-706645.

Declaration of Kevin M. Murphy, August 14, 2009, in the Matter of EBay Seller Antitrust Litigation, The United States District Court for the Northern District of California. Declaration submitted in support of defendant Ebay Inc.'s motion for summary judgment.

Expert Report of Kevin M. Murphy, August 21, 2009, in the Matter of Go Computer, Inc., and S. Jerrold Kaplan v. Microsoft Corporation., The Superior Court for the State of California for the City and County of San Francisco.

Deposition of Kevin M. Murphy, September 16, 2009, in the Matter of Novell, Incorporated v. Microsoft Corporation., The United States District Court Northern District of Maryland.

Deposition of Kevin M. Murphy, September 21, 2009, in the Matter of Ebay Seller Antitrust Litigation, The United States District Court for the Northern District of California. Deposition in support of defendant Ebay Inc.'s motion for summary judgment.

Expert Report of Kevin M. Murphy, September 29, 2009, in the Matter of Motor Fuel Temperature Sales Litigation, The United States District Court of Kansas.

Trial Testimony of Kevin M. Murphy, October 1, 2009, in the Matter of ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation., The United States District Court of Delaware. Case No. 06-CV-623.

Declaration of Kevin M. Murphy, October 16, 2009, in the Matter of Ebay Seller Antitrust Litigation, The United States District Court for the Northern District of California. Declaration in further support of defendant Ebay Inc.'s motion for summary judgment.

Expert Report of Kevin M. Murphy, October 20, 2009, in the Matter of Advanced Micro Devices, Inc., and AMD International Sales & Service, LTD v. Intel Corporation and Intel Kabushiki Kaisha., The United States District Court for the District of Delaware.

Deposition of Kevin M. Murphy, October 24, 2009, in the Matter of Go Computer, Inc., and S. Jerrold Kaplan v. Microsoft Corporation., The Superior Court for the State of California for the City and County of San Francisco.

Deposition of Kevin M. Murphy, October 26, 2009, in the Matter of Motor Fuel Temperature Sales Litigation, The United States District Court of Kansas.

Expert Report of Kevin M. Murphy, December 14, 2009, in the Matter of Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, The United States District Court for the Eastern District of New York.

Supplemental Expert Report of Kevin M. Murphy, December 21, 2009, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC., The United States Third Circuit Court of Michigan Detroit Division. Case No. 07-706645.

Trial Testimony of Kevin M. Murphy, January 11, 2010, in the Matter of Go Computer, Inc., and S. Jerrold Kaplan v. Microsoft Corporation., The Superior Court for the State of California for the City and County of San Francisco.

Supplemental Rebuttal Expert Report of Kevin M. Murphy, January 14, 2010, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC., The United States Third Circuit Court of Michigan Detroit Division. Case No. 07-706645.

Deposition of Kevin M. Murphy, January 26, 2010, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC., The United States Third Circuit Court of Michigan Detroit Division. Case No. 07-706645.

Declaration of Kevin M. Murphy, January 28, 2010, in the Matter of Automobile Antitrust Cases I and II., The United States Superior Court of the State of California for the County of San Francisco.

Declaration of Kevin M. Murphy, April 2, 2010, in the Matter of the Application for the Determination of Interim License Fees for The Cromwell Group, Inc. and Affiliates, et al., The United States District Court Southern District of New York.

Deposition of Kevin M. Murphy, April 13-14, 2010, in the Matter of Payment Card Interchange Fee and Merchant Discount Antitrust Litigation., The United States District Court for the Eastern District of New York.

Supplemental Expert Report of Kevin M. Murphy, June 1, 2010, in the Matter of Insignia Systems, Inc. v. News America Marketing In-Store, Inc. (corrected June 8, 2010)., The United States District Court for the District of Minnesota.

Expert Report of Kevin M. Murphy, June 21, 2010, in the Matter of Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc., for Consent to Assign Licenses or Transfer Control of Licensees., Federal Communications Commission.

Supplement to Expert Report of Kevin M. Murphy, June 24, 2010, in the Matter of Payment Card Interchange Fee and Merchant Discount Antitrust Litigation., The United States District Court for the Eastern District of New York.

Second Supplemental Expert Report of Kevin M. Murphy, July 6, 2010, in the Matter of Insignia Systems, Inc. v. News America Marketing In-Store, Inc., The United States District Court for the District of Minnesota.

Deposition of Kevin M. Murphy, July 8, 2010, in the Matter of Insignia Systems, Inc. v. News America Marketing In-Store, Inc., The United States District Court for the District of Minnesota.

Expert Report of Kevin M. Murphy, July 28, 2010, in the Matter of Commonwealth of Pennsylvania by Thomas W. Corbett, Jr., in his capacity as Attorney General of the Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al.,  in the Commonwealth Court of Pennsylvania, No. 212 MD 2004.

Response of Kevin M. Murphy to Reply Report of Mark Israel and Michael Katz, August 19, 2010, in the Matter of Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc., for Consent to Assign Licenses or Transfer Control of Licensees., Federal Communications Commission.

Expert Report of Kevin M. Murphy, September 14, 2010, in the Matter of City of St. Louis, et al. v. American Tobacco Co., et al., The Circuit Court of the City of St. Louis State of Missouri.

Deposition of Kevin M. Murphy, September 24, 2010, in the Matter of City of St. Louis, et al. v. American Tobacco Co., et al., The Circuit Court of the City of St. Louis State of Missouri.

Supplemental Expert Report of Kevin M. Murphy, September 30, 2010, in the Matter of Commonwealth of Pennsylvania by Thomas W. Corbett, Jr., in his capacity as Attorney General of the Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al.,  in the Commonwealth Court of Pennsylvania, No. 212 MD 2004.

Expert Report of Kevin M. Murphy, October 1, 2010, in the Matter of State of New Hampshire v. Hess Corporation, et al., The State of New Hampshire Superior Court.

Expert Report of Kevin M. Murphy, October 4, 2010, in the Matter of the Arbitration between Cordis Corporation and Abbott Vascular., CPR International Institute for Conflict Prevention & Resolution.

Deposition of Kevin M. Murphy, October 7, 2010, in the Matter of the Arbitration between Cordis Corporation and Abbott Vascular., CPR International Institute for Conflict Prevention & Resolution.

Trial Testimony of Kevin M. Murphy, November 8, 2010, in the Matter of the Arbitration between Cordis Corporation and Abbott Vascular., CPR International Institute for Conflict Prevention & Resolution.

Declaration of Kevin M. Murphy, November 12, 2010, in the Matter of RWJ Management Company, Inc. v. BP Products North America, Inc., The United States District Court for the Northern District of Illinois Eastern Division.

Expert Report of Kevin M. Murphy, November 15, 2010, in the Matter of RWJ Management Company, Inc. v. BP Products North America, Inc., The United States District Court for the Northern District of Illinois Eastern Division.

Expert Report of Kevin M. Murphy, November 19, 2010, in the Matter of Craft, et al., v. Philip Morris Companies, Inc., a corporation, and Philip Morris Incorporated, a corporation, Missouri Circuit Court, Twenty-Second Judicial District (City of St. Louis), Case No. 002-00406-02.

Economic Analysis of Kevin M. Murphy to Guide Interpretation of Provisions of the Dodd-Frank Act Regarding Regulation of Debit Interchange Fees, November 23, 2010, submission on behalf of Bank of America Corporation.

Comments of Kevin M. Murphy on the November 10, 2010 Report of Drs. Mark Israel and Michael L. Katz, November 24, 2010, in the Matter of Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc., for Consent to Assign Licenses or Transfer Control of Licensees., Federal Communications Commission.

Expert Report of Kevin M. Murphy, November 29, 2010, in the Matter of Reggie White, et al., v. NFL: Lockout Insurance & Lockout Loans., The United States District Court District of Minnesota.

Deposition of Kevin M. Murphy, December 3, 2010, in the Matter of Reggie White, et al., v. NFL: Lockout Insurance & Lockout Loans., The United States District Court District of Minnesota.

Deposition of Kevin M. Murphy, December 13, 2010, in the Matter of RWJ Management Company, Inc. v. BP Products North America, Inc., The United States District Court for the Northern District of Illinois Eastern Division.

Deposition of Kevin M. Murphy, January 17-18, 2011, in the Matter of Craft, et al., v. Philip Morris Companies, Inc., a corporation, and Philip Morris Incorporated, a corporation, Missouri Circuit Court, Twenty-Second Judicial District (City of St. Louis), Case No. 002-00406-02.

Report of Kevin M. Murphy, February 15, 2011, submitted by TCF Financial Corporation on February 16, 2011 to the Subcommittee on Financial Institutions and Consumer Credit of the Committee on Financial Services of the U.S. House of Representatives.

Declaration of Kevin M. Murphy, March 2, 2011, in the Matter of TCF National Bank v. Ben S. Bernanke, Janet L. Yellen, Kevin M. Warsh, Elizabeth A. Duke, Daniel K. Tarullo and Sarah Bloom Raskin, the Board of Governors of the Federal Reserve System, in their official capacities; and John Walsh, Comptroller of the Currency, in his official capacity.

Expert Report of Kevin M. Murphy, April 11, 2011, in the Matter of Datel Holdings, LTD., and Datel Design & Development, Inc., v. Microsoft Corporation., The United States District Court Northern District of California.

Declaration of Kevin M. Murphy, May 26, 2011, filed with the National Labor Relations Board on behalf of the National Basketball Players Association.

Deposition of Kevin M. Murphy, June 14, 2011, in the Matter of Datel Holdings, LTD., and Datel Design & Development, Inc., v. Microsoft Corporation., The United States District Court Northern District of California.

Expert Report of Kevin M. Murphy, July 1, 2011, in the Matter of Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof., The United States International Trade Commission.

Expert Report of Kevin M. Murphy, August 17, 2011, in the Matter of American Airlines, Inc. v. Sabre Inc., et al., The Judicial District of Tarrant County, Texas 67th Judicial District.

Expert Report of Kevin M. Murphy, August 19, 2011, in the Matter of Motor Fuel Temperature Sales Litigation, The United States District Court for the District of Kansas.

Deposition of Kevin M. Murphy, September 6, 2011, in the Matter of Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof., The United States International Trade Commission.

Expert Report of Kevin M. Murphy, September 9, 2011, in the Matter of State of New York v. Intel Corporation, The United States District Court for the District of Delaware.

Deposition of Kevin M. Murphy, September 14, 2011, in the Matter of Motor Fuel Temperature Sales Litigation, The United States District Court for the District of Kansas.

Direct Testimony of Kevin M. Murphy, September 27, 2011, in the Matter of Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof., The United States International Trade Commission.

Deposition of Kevin M. Murphy, October 8-10, 2011, in the Matter of State of New York v. Intel Corporation, The United States District Court for the District of Delaware.

Report of Kevin M. Murphy, October 10, 2011, in connection with dispute between NRLC and railroad employees, National Mediation Board Case Nos. A-13569; A-13570; A-13572; A-13573; A-13574; A-13575; A-13592, before Emergency Board No. 243.

Hearing Testimony of Kevin M. Murphy, October 13, 2011, in connection with dispute between NRLC and railroad employees, National Mediation Board Case Nos. A-13569; A-13570; A-13572; A-13573; A-13574; A-13575; A-13592, before Emergency Board No. 243.

Expert Report of Kevin M. Murphy, October 17, 2011, in the Matter of State of New Hampshire v. Hess Corporation, et al., The State of New Hampshire Superior Court.

Declaration of Kevin M. Murphy, December 1, 2011, the Matter of Motor Fuel Temperature Sales Litigation, The United States District Court for the District of Kansas.

Expert Report of Kevin M. Murphy, December 5, 2011, in the Matter of Retractable Technologies, Inc. and Thomas Shaw v. Becton, Dickinson and Company, The United States District Court for the Eastern District of Texas Marshall Division.

Trial Testimony of Kevin M. Murphy, December 7-8, 2011, in the Matter of Novell, Incorporated v. Microsoft Corporation., The United States District Court Northern District of Maryland.

Trial Testimony of Kevin M. Murphy, December 29, 2011, in the Matter of RWJ Management Company, Inc. v. BP Products North America, Inc., The United States District Court for the Northern District of Illinois Eastern Division.

Supplemental Expert Report of Kevin M. Murphy, January 15, 2012, in the Matter of Retractable Technologies, Inc. and Thomas Shaw v. Becton, Dickinson and Company, The United States District Court for the Eastern District of Texas Marshall Division.

Trial Testimony of Kevin M. Murphy, January 18, 2012, in the Matter of Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof., The United States International Trade Commission.

Supplemental Expert Report of Kevin M. Murphy, February 23, 2012, in the Matter of State of New Hampshire v. Hess Corporation, et al., The State of New Hampshire Superior Court.

Affidavit of Kevin M. Murphy, March 12, 2012, in the Matter of Sharon Price and Michael Fruth, Individually and on Behalf of Others Similarly Situated vs. Philip Morris Incorporated, The United States Circuit Court, Third Judicial Court, Madison County, Illinois.

Declaration of Kevin M. Murphy, May 3, 2012, in the Matter of Retractable Technologies, Inc. and Thomas Shaw v. Becton, Dickinson and Company, The United States District Court for the Eastern District of Texas Marshall Division.

Comments of Kevin M. Murphy of DirecTV, LLC, June 22, 2012, in the Matter of Revision of the Commission's Program Access Rules;  News Corporation and the DIRECTV Group, Inc., Transferors, and Liberty Media Corporation, Transferee, for Authority to Transfer Control; Applications for Consent to the Assignment and/or Transfer of Control of Licenses, Adelphia Communications Corporation (and Subsidiaries, Debtors-in-Possession), Assignors, to Time Warner Cable, Inc. (Subsidiaries), Assignees, et al., Federal Communications Commission.

Expert Report of Kevin M. Murphy, July 20, 2012, in the Matter of American Airlines v. Sabre, Inc., Sabre Holdings Corp., and Sabre Travel International Ltd., The United States Judicial District Tarrant County, Texas 67th Judicial District.

Declaration of Kevin M. Murphy, July 21, 2012, in the Matter of Kirk Dahl v. Bain Capital Partners, LLC., The United States District Court District of Massachusetts.

Expert Report of Kevin M. Murphy, July 23, 2012, in the Matter of Kirk Dahl v. Bain Capital Partners, LLC., The United States District Court District of Massachusetts.

Expert Report of Kevin M. Murphy, July 24, 2012, in the Matter of Microsoft Corporation v. Motorola, Inc., The United States District Court Western District of Washington at Seattle.

Deposition of Kevin M. Murphy, August 22, 2012, in the Matter of Microsoft Corporation v. Motorola, Inc., The United States District Court Western District of Washington at Seattle.

"Economic Analysis of the Impact on DIRECTV's Subscribership of Carrying an RSN: Evidence from San Diego," August 31, 2012, submitted in the Matter of Revision of the Commission's Program Access Rules;  News Corporation and the DIRECTV Group, Inc., Transferors, and Liberty Media Corporation, Transferee, for  Authority to Transfer Control; Applications for Consent to the Assignment and/or Transfer of Control of Licenses, Adelphia Communications Corporation (and Subsidiaries, Debtors-in-Possession), Assignors, to Time Warner Cable, Inc. (Subsidiaries), Assignees, et al., Federal Communications Commission.)

Expert Report of Kevin M. Murphy, September 7, 2102, in the Matter of Willard R. Brown, et al. v. The American Tobacco Co., Inc., et al., Superior Court for the State of California for the County of San Diego.

Deposition of Kevin M. Murphy, September 14, 2012, in the Matter of Willard R. Brown, et al. v. The American Tobacco Co., Inc., et al., Superior Court for the State of California for the County of San Diego.

Deposition of Kevin M. Murphy, September 24, 2012, in the Matter of American Airlines Inc.  v Sabre, Inc., Sabre Holdings Corp., and Sabre Travel International  Ltd. for the State of Texas for the Judicial District of Tarrant County.

Expert Report of Kevin M. Murphy, October 10, 2012, in the Matter of Avery Dennison Corporation v. 3M Innovative Properties and 3M Company, The United States District Court for the District of Minnesota.

Expert Report of Kevin M. Murphy, November 12, 2012, in the Matter of Re High-Tech Employee Antitrust Litigation, The United States District Court Northern District of California San Jose Division.

Trial Testimony of Kevin M. Murphy, November 13, 2012, in the Matter of Microsoft Corporation v. Motorola INC, The United States District Court Western District of Washington at Seattle.

Expert Report of Kevin M. Murphy, November 15, 2012, in the Matter of New Jersey Dep't of Envtl. Prot., et al. v. Atlantic Richfield Co., et al., The United States District Court Southern District of New York.

Deposition of Kevin M. Murphy, December 3, 2012, in the Matter of Re High-Tech Employee Antitrust Litigation, The United States District Court Northern District of California San Jose Division

Expert Report of Kevin M. Murphy, December 21, 2012, in re: Titanium Dioxide Antitrust Litigation, The United States District Court for the District of Maryland.

Deposition of Kevin Murphy, January 16, 2013, in the Matter of Avery Dennison Corporation v. 3M Innovative Properties and 3M Company, The United States District Court for the District of Minnesota.

Amended Expert Report of Kevin M. Murphy, February 8, 2013, in the Matter of New Jersey Dep't of Envtl. Prot., et al. v. Atlantic Richfield Co., et al, The United States District Court Southern District of New York.

Expert Report of Professor Kevin M. Murphy, February 8, 2013, in United States of America v. Apple Inc., et al., The United States District Court Southern District of New York.

Declaration of Kevin M. Murphy, February 22, 2013, in the Matter of Willard R. Brown, et al. v. The American Tobacco Co., Inc., et al., Superior Court for the State of California for the County of San Diego.

Rebuttal Expert Report of Kevin M. Murphy, March 1, 2013, in United States of America v. Apple Inc., et al., The United States District Court Southern District of New York.

Second Supplemental Expert Report of Kevin M. Murphy, March 8, 2013, in the Matter of Retractable Technologies, Inc. and Thomas Shaw v. Becton, Dickinson and Company, The United States District Court for the Eastern District of Texas Marshall Division.

Direct Testimony of Kevin M. Murphy, April 26, 2013, in United States of America v. Apple Inc., et al., The United States District Court Southern District of New York (revised and resubmitted on May 29, 2013).

Declaration of Kevin M. Murphy, May 13, 2013, in the Matter of Brenda Blakeman v National Milk Producers Federation, et al., The United States District Court for the Southern District of Illinois.

Expert Report of Kevin M. Murphy, May 29, 2013, in the Matter of Microsoft Corporation v. Motorola, Inc., et al., The United States District Court Western District of Washington at Seattle.

Declaration of Kevin Murphy, June 6, 2013, in the Matter of WNET, Thirteen, Fox Television Stations, Inc.; Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc.; The Univision Network Limited Partnership, and Public Broadcasting Service v. Aereo, Inc. f/k/a Bamboom Labs, Inc., The United States Court for the Southern District of New York.

# Appendix B

## Documents Considered

| Court Documents |
| --- |
| Bankruptcy Order from the Honorable Peter Walsh, April 2, 2001 |
| Jury Verdict in Patrick Brady, et al., Plaintiffs v. Air Line Pilots Association, et al., Defendants, July 13, 2011 |
| Position Statement of Allied Pilots Association In the Matter of Application of Allied Pilots Association, alleging representation dispute pursuant to Section 2, Ninth of the Railway Labor Act, involving employees of TWA Airlines, LLC and American Airlines, Inc. |
| Second Amended Restated Complaint in LEROY "BUD" BENSEL, JAMES ARTHUR, PATRICK BRADY, THEODORE A. CASE, MATTHEW J. COMLISH, DARSHANPRTT S. DHILLON, LEMUEL A. DOUGHERTY, .MICHAEL V. FINUCAN, JOHN S. HEFLEY, HOWARD B. HOLLANDER, ROBERT A. PASTORE AND SALLY YOUNG Plaintiffs, v. ALLIED PILOTS ASSOCIATION, AIR LINE PILOTS ASSOCIATION, AMERICAN AIRLINES, INC., and TWA AIRLINES, LLC Defendants, January 27, 2003 |
| D-119 |
| D-137 |
| D-139 |
| D-141 |
| D-142 |
| D-143 |
| D-182 |
| D-183 |
| D-184 |
| D-211 |
| D-307 |
| D-309 |
| D-312 |
| D-313 |
| J-010 |
| J-208 |
| J-209 |
| J-279 |
| J-280 |
| J-283 |
| J-284 |
| J-285 |
| J-291 |
| J-294 |
| J-302 |
| J-309 |
| J-310 |

| |
|---|
| J-317 |
| J-322 |
| J-323(P) |
| J-324 |
| J-327 |
| J-329 |
| J-352 |
| J-365 |
| P-297 |
| P-326 |
| P-343 |
| P-344 |
| P-345 |
| P-351 |
| **Deposition Transcripts** |
| Deposition of William Compton, January 18, 2013 |
| Deposition of David Resnick, January 16, 2013 |
| Deposition of Donald Carty, October 15, 2012 |
| Deposition of Henry Farber, January 22, 2013 |
| Deposition of Henry Farber, January 23, 2013 |
| Deposition of Jeffrey Brundage, October 23, 2012 |
| Deposition of John Darrah, November 29, 2012 |
| Deposition of Michael Day, May 2, 2013 |
| Deposition of Michael Palumbo, January 21, 2013 |
| Deposition of Rikk Salamat, January 29, 2013 |
| Deposition of Rikk Salamat, January 30, 2013 |
| Deposition of Rikk Salamat, January 31, 2013 |
| Deposition of Rikk Salamat, May 29, 2013 |
| Deposition of Terry Hayes, January 28, 2013 |
| **Expert Reports** |
| Rikk M.T. Salamat, BA, MBA, Damages in Brady et al vs. The Air Line Pilots Association, Report and Backup, October 12, 2012 |
| Furlough Damages in Brady et al vs. The Airline Pilots Association After Application of Set-Off, Report and Backup, April 30, 2013 |
| Damages in Brady et al vs. The Air Line Pilots Association Supplementary Report on Damages Under the Farber Lists, Report and Backup, October 12, 2012 |
| Damages in Brady et al vs. The Air Line Pilots Association Supplementary Report on Damages Under the Tannen List, Report and Backup, October 12, 2012 |
| Expert Report of Henry S. Farber, Report and Backup, October 12, 2012 |
| Expert Report of Richard R. Kasher, Esq., March 15, 2013 |
| Expert Report of James S. Feltman, CPA, March 15, 2013 |

| |
|---|
| Expert Report of Michael E. Levine, March 15, 2013 |
| Expert Report of Katia P. Sycara, PhD, March 15, 2013 |
| **Bates Stamped Documents** |
| AA 0071 |
| AA 0247 |
| AA 0269 |
| ALPA 001159 |
| ALPA 001159 |
| ALPA 001573 |
| ALPA 004359 |
| ALPA 004745 |
| ALPA 004805 |
| ALPA 004879 |
| ALPA 005326 |
| ALPA 007587 |
| ALPA 007673 |
| ALPA 008746 |
| ALPA 008899 |
| ALPA 008905 |
| ALPA 009490 |
| ALPA 009494 |
| ALPA 009504 |
| ALPA 009512 |
| ALPA 009518 |
| ALPA 009526 |
| ALPA 009536 |
| ALPA 009538 |
| ALPA 009540 |
| ALPA 009542 |
| ALPA 009544 |
| ALPA 009549 |
| ALPA 009550 |
| ALPA 009553 |
| ALPA 009557 |
| ALPA 009558 |
| ALPA 009574 |
| ALPA 013296 |
| ALPA 015311 |
| ALPA 018771 |
| ALPA 020152 |
| ALPA 021021 |

| |
|---|
| ALPA 024943 |
| ALPA 027957 |
| ALPA 028088 |
| ALPA 028154 |
| ALPA 028482 |
| ALPA 029193 |
| ALPA 029494 |
| ALPA 029632 |
| ALPA 029680 |
| ALPA 029940 |
| ALPA 029993 |
| ALPA 030000 |
| ALPA 030054 |
| ALPA 034147 |
| APA 00230 |
| APA 00455 |
| P00300 |
| P01556 |
| P01726 |
| P03234 |
| P03242 |
| P03247 |
| P03249 |
| P03255 |
| P03523 |
| P03580 |
| P06392 |
| P06402 |
| P06456 |
| P06464 |
| P06485 |
| P06503 |
| P06543 |
| P06549 |
| P06569 |
| P06651 |
| P06659 |
| P06668 |
| P06670 |
| P06690 |
| **SEC Filings** |

| American Airlines Corporation Annual Report for the Year Ending December 31, 1998 |
|---|
| American Airlines Corporation 8-K January 10, 2001 |
| American Airlines Corporation Annual Report for the Year Ending December 31, 2000 |
| American Airlines Corporation Annual Report for the Year Ending December 31, 2001 |
| American Airlines Corporation Form 10-Q For the Quarterly Period Ending March 31, 2003 |
| **Academic Sources** |
| Baker, Jonathan B. "Comcast/NBCU: The FCC Provides a Roadmap for Vertical Merger Analysis," 25 Antitrust 36 (2011) |
| Bazerman, Max H. and Margaret A. Neale, Negotiating Rationally (1992) |
| Binmore, Ken et al., "The Nash bargaining solution in economic modeling," RAND Journal of Economics, 17, (1986), |
| Fisher, Roger and William Ury, Getting to Yes (1981), most recent edition 2011 |
| Franklin M. Fisher and R. Craig Romaine, "Janis Joplin's Yearbook and the Theory of Damages," 5 J. Accounting, Auditing and Finance (Winter/Spring 1990) |
| Katz et al., "An Economic Analysis of Consumer Harm from the Current  Retransmission Consent Regime," November 12, 2009. |
| Lanzilloti and Esquibel, "Measuring Damages in Commercial Litigation: Present Value of Lost Opportunities," J. Accounting, Auditing & Finance (1990) |
| Nash, John F. "The bargaining problem." Econometrica, 18, (1950), pp. 155-162. |
| Tim Koller, Marc Goedhart and David Wessels. Valuation and Managing the Value of Companies, John Wiley & Sons |
| Yurukoglu, Ali, "Bundling and Vertical Relationships in Multichannel Television," NYU Stern (2008) |
| **Public Sources** |
| http://www.restructuringamr.com/our-people-retirement.asp |
| http://www.transtats.bts.gov/Fields.asp?Table_ID=310 |
| "Airline Consolidation: Has it Gone Too Far?," Senate Committee on the Judiciary. February 7, 2001 |
| "Effects of the American Airlines/TWA Transaction and Other Airline Industry Consolidation on Competition and the Consumer," Senate Committee on Commerce, Science and Transportation. February 1, 2001 |
| "The Long-Range Economic Assumptions for the 2012 Trustees Report," Office of the Chief Actuary Social Security Administration, April 23, 2012 |
| "American Airlines Unions Vote Today on Concessions," New York Times, April 15, 2003 |
| "Climbing Back to Altitude: A Commerce Magazine Conversation with American Airlines CEO Gerard Arpey," August 2004 (http://www.stlcommercemagazine.com/archives/august2004/altitude.html) |
| Economic Analysis of the Impact of the Proposed Comcast/NBCU Transaction on the Cost to MCVDs of Obtaining Access to NBCU Programming, Kevin M., Murphy, June 21, 2010 |
| Memorandum Opinion and Order, Applications of Comcast Corporation, General Electric Company, and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees, MB Docket No. 10-56, FCC 11-4 (released Jan. 20, 2011) |
| Proposed Revisions to Program Access Rules to Better Address the Potential Competitive Harms Created by Cable-Affiliated Programmers, William P. Rogerson,  June 22, 2012 |

| |
|---|
| Research and Innovative Technology Administration Bureau of Transportation Statistics: Air Carrier Financial |
| Response of Professor Kevin M. Murphy to Reply Report of Mark Israel and Michael L. Katz, August 19, 2010 |
| Written Testimony of Captain Edwin C. White, Jr. Before the Committee on Health, Education, Labor and Pensions United States Senate Hearing on the TWA/American Airlines Workforce Integration June 12, 2003 |
| **Other Sources** |
| FAPA.aero Pay Rate Data |

**Errata for Expert Report of Kevin M. Murphy**

| Location | Current Text | Corrected Text |
|---|---|---|
| Paragraph 30 | the merged carrier initially expanded by 169 planes and 2,080 pilot jobs | the merged carrier initially expanded by 169 planes and 2,069 pilot jobs |
| Footnote 8 | (footnoting "DIRECTV – Murphy June Report at 31-32; ACA – Rogerson June Report at 19-20.38") | (footnoting "ACA – Rogerson June Report at 27-29; DIRECTV – Murphy June Report at ¶30") |
| Footnote 36 | Summary of Supplement CC, at 18, 20 (ALPA 008763, 008765). | Summary of Supplement CC, at 20 (ALPA 008765). |
| Footnote 43 | Ed White's August 20, 2001 letter to Rolf Valtin with American Airlines and TWA manning rates tables attached, ALPA 030054-59 | Ed White's August 20, 2001 letter to Rolf Valtin with American Airlines and TWA manning rates tables attached, ALPA 030054-56 |
| Footnote 55 | "AMR's net earnings in 2000 were $813 million;" "AMR's net earnings in 1999 were $985 million" (AMR Corporation Form 10-K at 10). American noted, however, that it "is cautious in its outlook for 2001. On the revenue front, the primary concern is a slowing U.S. economy. American's strong revenue performance the past several years was marked by a growing U.S. economy coupled with a modest increase in industry capacity. Our revenue performance in 2001 will be dictated by how well the industry manages that relationship going forward" (AMR 2000 10-K at 24). | "AMR's net earnings in 2000 were $813 million;" "AMR's net earnings in 1999 were $985 million" (AMR Corporation 2000 Form 10-K at 20). American noted, however, that it "is cautious in its outlook for 2001. On the revenue front, the primary concern is a slowing U.S. economy. American's strong revenue performance the past several years was marked by a growing U.S. economy coupled with a modest increase in industry capacity. Our revenue performance in 2001 will be dictated by how well the industry manages that relationship going forward" (AMR Corporation 2000 Form 10-K at 25). |
| Footnote 66 | *See*, also, Baker (2011): " the Commission relied on evidence from a recent academic study to conclude that the joint venture would have roughly equal bargaining skill or patience as MVPDs other than Comcast | *See*, also, Baker (2011): " the Commission relied on evidence from a recent academic study to conclude that the joint venture would have roughly equal bargaining skill or patience as MVPDs other than Comcast |

| | | |
|---|---|---|
| | (specifically satellite and telephone company providers) when negotiating over cable programming. When the bargaining skill is even, the Nash model implies that any increase in the cost to Comcast of providing the programming to an MVPD would be expected to raise the negotiated price by half the cost increase" (at 40, citing Ali Yurukoglu, Bundling and Vertical Relationships in Multichannel Television, NYU Stern (2008) at 48, available at http://pages.stern.nyu.edu/~ayuruko g/multichannel_vertical.pdf). | (specifically satellite and telephone company providers) when negotiating over cable programming. When the bargaining skill is even, the Nash model implies that any increase in the cost to Comcast of providing the programming to an MVPD would be expected to raise the negotiated price by half the cost increase" (citing Comcast/NBCU Order at App. B, ¶40, which cites Ali Yurukoglu, Bundling and Vertical Relationships in Multichannel Television, NYU Stern (2008) at 48, available at http://pages.stern.nyu.edu/~ayuruko g/multichannel_vertical.pdf). |
| Footnote 67 | Summary of Supplement CC, p. 3 (ALPA 008748) ("TWA brings to the table a large pilot base (St. Louis) and a number of aircraft and Captains positions that were not previously contemplated at a pre-transaction American"). | Summary of Supplement CC, at 3-4 (ALPA 008748-49) ("TWA brings to the table a large pilot base (St. Louis) and a number of aircraft and Captains positions that were not previously contemplated at a pre-transaction American"). |
| Footnote 84 | Valuation and Managing the Value of Companies at p 106, Tim Koller, Marc Goedhart and David Wessels, John Wiley & Sons, Inc. at 101. | Valuation and Managing the Value of Companies, Tim Koller, Marc Goedhart and David Wessels, John Wiley & Sons, Inc. at 101. |
| Exhibit 3 | Total: 10234, 2080, 12314 | Total: 10177, 2069, 12246 |
| Exhibits 4, 5, and 6 | "Top of Schedule" | "Top of Scale" |

Kevin M. Murphy
July 18, 2013

# EXHIBIT 22

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK BRADY, et al.,          )
        Plaintiffs,  )
    -vs-              ) Civil Action
AIR LINE PILOTS ASSOCIATION,   ) No. 02-2917
INTERNATIONAL,              )
        Defendant.  )

    The deposition of KEVIN M. MURPHY,
called as a witness herein for examination, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before ROSANNE M.
NUZZO, a Notary Public within and for the County of
Will, State of Illinois, and a Certified Shorthand
Reporter of said state, at the offices of Esquire
Deposition Solutions, Suite 1200, 311 West Monroe
Street, Chicago, Illinois on Tuesday, July 23,
2013, at approximately 8:56 a.m.

Page 2

1    PRESENT:
2
3    GREEN JACOBSON, P.C.
        (7733 Forsyth Boulevard, Suite 700,
4    St. Louis (Clayton), Missouri  63105,
        314-862-6800), by:
5    MR. JOE D. JACOBSON,
        jacobson@stlouislaw.com, and
6    MR. ALLEN P. PRESS,
        press@stlouislaw.com,
7
        appeared on behalf of the Plaintiffs;
8
9
    PAUL, WEISS, RIFKIND,
10    WHARTON & GARRISON LLP,
        (1285 Avenue of the Americas,
11    New York, New York  10019-6064,
        212-373-3648), by:
12    MR. WILLIAM B. MICHAEL,
        wmichael@paulweiss.com, and
13    MR. JAMES H. BOROD,
        jborod@paulweiss.com,
14
        appeared on behalf of the Defendants.
15
16
17    ALSO PRESENT:
18    MS. MARTA WAGNER, Senior Attorney,
        Air Line Pilots Association, Int'l.
19
20
21
22    REPORTED BY:  ROSANNE M. NUZZO, CRR, RPR,
        CSR License No. 84-1388.
23
24

Page 3

1         (WHEREUPON, the witness was duly
2    sworn.)
3         THE COURT REPORTER:  Thank you.
4         KEVIN M. MURPHY,
5    called as a witness herein, having been first duly
6    sworn, was examined and testified as follows:
7         EXAMINATION
8    BY MR. JACOBSON:
9    Q.    Good morning, Professor Murphy.
10    A.    Good morning.
11    Q.    Could you please state your full name
12    for the record.
13    A.    Kevin M. Murphy.
14    Q.    And, Professor Murphy, where are you
15    employed?
16    A.    I'm employed at the University of
17    Chicago.
18    Q.    Are you employed anywhere else?
19    A.    No.  That's my only employment.
20    Q.    Do you have any other professional
21    business relationships that are competitive in
22    nature?
23    A.    Yes.  I'm affiliated with
24    CRA International, which is a consulting firm that

Page 4

1    does economic consulting.
2    Q.    Is CRA the company that was once called
3    Cambridge Research Associates?
4    A.    It's Charles Rivers.
5    Q.    Charles Rivers?
6    A.    Rivers Associates, yes.
7    Q.    Charles Rivers Associates.
8         I'd like to ask you first some
9    background questions about your participation in
10    this case and your report before we actually go
11    into the meat of the report itself, okay?
12         How did you first get contacted about
13    possibly serving as an expert in this case?
14    A.    I believe I was contacted by Paul Weiss
15    regarding whether I would be available to serve as
16    an expert in economics for this case.
17    Q.    All right.  When was that, if you can
18    recall?
19    A.    I don't remember.  I think -- I think
20    it would have been in 2012 sometime, if
21    I recall -- if I recall correctly.  I don't --
22    I don't really have a good recollection of the
23    date.
24    Q.    Was it at a time when there was

Page 81

1  natural part of the business, so we tried to
2  respect them in terms of the way we did it.  We
3  tried not to create additional jobs when we moved
4  people in, so we didn't put people into those
5  slots.
6      Q.  Um-hum.  How many -- how many
7  additional jobs did you say Mr. Salamat created?
8      A.  It varied over time.  We have a chart.
9  It's -- it's -- it's towards the back here.  It's
10  Exhibit 16, I think.
11      Q.  16?
12      A.  Those are the additional jobs that he
13  created.
14      MR. MICHAEL:  I'm just noticing that Exhibit 1
15  is in black and white, and some of Mr. Murphy's
16  exhibits are in color.
17          If you need to see them in color at any
18  point, just let us know.  We have color copies.
19      THE WITNESS:  Okay.  That would be more of a
20  problem for some of the other charts, but this
21  only has one line so I can --
22      MR. MICHAEL:  Right.
23      THE WITNESS:  -- I can do without the color.
24

Page 82

1  BY THE WITNESS:
2      A.  But, yeah, this is the actual number
3  over time.  It's the number of people that he
4  slots into slots where people aren't working and
5  assigns them income.
6  BY MR. JACOBSON:
7      Q.  So to make sure I understand what
8  you're saying, so let's say there's a group of
9  pilots, American Airline pilots, and one of the
10  pilots in that group -- let's say it's a group of
11  five.  And one of those pilots is on inactive
12  status, whether he is on medical leave or he is
13  out in the military service, whatever reason that
14  is.
15          And when the TWA pilots are moved into
16  that group under Mr. Salamat's thing, although
17  there are five pilots in that group, only four of
18  them working, but he has all five pilots working?
19      A.  That's correct.
20      Q.  All right.  Did you check to see
21  whether at the tail end of the list, that there
22  are people who weren't working now who would have
23  been working otherwise?
24      A.  My understanding is that he did not

Page 83

1  make the correction for that.
2      Q.  All right.  Do you have -- in your
3  list, do you have pilots set aside for reserves?
4  Did you make things for reserves and line holders
5  and that type of stuff?
6      A.  We tried to take account of the people
7  who were working but not assigned to an aircraft,
8  both the check airmen and the supervisors, and we
9  do allow for those positions as well --
10      Q.  Okay.
11      A.  -- in a proportional basis with the
12  actual people assigned to particular aircraft.
13      Q.  Okay.  I wasn't clear in looking at it,
14  so I wanted to make sure.
15          Based on your work as a whole that
16  you've done on this case, do you believe that
17  ALPA's breach of its duty of fair representation
18  caused any injury to the TWA pilots either as a
19  group or individually?
20      MR. MICHAEL:  Objection to the form --
21  BY THE WITNESS:
22      A.  I guess I would say --
23      MR. MICHAEL:  -- calls for legal conclusion.
24

Page 84

1  BY THE WITNESS:
2      A.  My understanding is that that was what
3  was found in the liability phase.  It was that
4  there was an impact on at least some TWA pilots.
5  I don't recall the precise wording.  I think
6  that's consistent with my analysis.  I think --
7  so my analysis wouldn't contradict that.
8  BY MR. JACOBSON:
9      Q.  All right.  So you find that there was
10  an impact on at least some of the TWA pilots?
11      A.  I know --
12      MR. MICHAEL:  Objection, mischaracterizes his
13  testimony.
14  BY THE WITNESS:
15      A.  I don't think that's what I said.
16  I said --
17  BY MR. JACOBSON:
18      Q.  Okay.
19      A.  (Continuing) -- mine is consistent with
20  that.  Mine -- you know, I don't think you could
21  say my results would disprove that that occurred.
22          I think, you know, you would say that
23  based on my results, that Supplement CC is within
24  the range of things you might expect to come out

Page 85

1　of this bargaining situation.  It doesn't mean
2　that there aren't other things in the neighborhood
3　of that that would also come out of the bargaining
4　situation that could be either more favorable or
5　less favorable.  So it would be consistent with
6　there being some impact.
7　　Q.   When you say "in the neighborhood," how
8　big is the neighborhood you are referring to?
9　　A.   I don't know.  I don't think there are
10　bright lines.  I think you definitely can't
11　support things of the type put forward by
12　Mr. Salamat in his DMODEL or the Farber model or
13　many of the other models that Professor -- that
14　Mr. Salamat puts forward.
15　　Q.   What about the Salamat Plus 200 Model?
16　　A.   I would say -- I don't think there's
17　any evidence that that's more consistent than
18　Supplement CC.  If anything, you might think it's
19　a little less favorable.
20　　I think you could say plus 200/minus 200
21　would be in the range of -- of what you might
22　expect to see, so I don't -- I would say there's
23　no evidence to say that's a better model than
24　Supplement CC in the sense of what we would expect

Page 86

1　to see.  And I think that's what I can say.
2　　I think the ones we can strongly rule
3　out are the DMODEL and Professor Farber's model
4　and models like that.  I think that -- I don't
5　think there's any evidence that would say the
6　DMODEL -- the Plus 200 Model is more consistent
7　than Supplement CC was.  I think, you know,
8　whether he said it was plus 50, minus 50, I don't
9　think we have that degree of precision.
10　　Q.   You refer a lot in your report to what
11　you call the economics principles of bargaining --
12　or the economic principles of bargaining.  Now,
13　what are those principles?
14　　A.   I think in general that, you know,
15　people are going to look for -- take advantage of
16　mutual gains; that, you know, in order to take
17　advantage of mutual gains, you're going to want to
18　allow each party to do better than their next best
19　alternative.  That's what's going to encourage
20　people to participate.  I think that where within
21　the range of outcomes that benefit both parties
22　you end up is going to depend on the bargaining
23　process and the bargaining strength of the two
24　parties.

Page 87

1　　You know, I think, first and foremost,
2　probably the most fundamental violation of
3　principle that I saw here was that you have got to
4　look at both parties if you want to think about
5　outcomes of the negotiation or outcomes of the
6　bargaining.  And, you know, both Mr. Salamat and
7　Professor Farber didn't really address how the
8　proposed list would affect the American pilots,
9　which I don't see is at all consistent with any
10　notion of bargaining because bargaining inherently
11　has both parties involved.
12　　I think the importance of -- call them
13　fallback options, call them in this context
14　pre-transaction expectations, that's an important
15　guide as to where you think outcomes are going to
16　end up.  And that's part of what you get out of
17　bargaining theory, but it's even more importantly
18　part of the reality of the negotiating process in
19　this particular case and, in my understanding, the
20　seniority options weren't -- and seniority
21　integrations more generally.  So those would be
22　the key.
23　　Q.   Are there any other economic principles
24　of bargaining that --

Page 88

1　　A.   I'm sure --
2　　Q.   -- that you can think of right now?
3　　A.   I'm sure there are.  I just -- those
4　are the main ones, I mean.
5　　Q.   All right.  If another one comes to
6　mind while we're talking with you, let me know
7　because, obviously, this is key to your report, in
8　my view, that the candidate list must be
9　consistent with the economic principles of
10　bargaining, as you put it in paragraph 12 and many
11　other places.
12　　A.   Okay.
13　　Q.   Thank you.
14　　So the first one is to take advantage
15　of mutual gains.  And you've talked, if I
16　understand correctly, that a large part of the
17　mutual gains come out of what you refer to as
18　round 1, so getting the TWA pilots to agree to
19　waive their scope and, therefore, allow the
20　transaction to go forward.  Is that accurate?
21　　A.   Yeah, but it also is critical that it
22　sets up a consistent set of negotiations in
23　round 2.  That is, you don't want to have a system
24　that at round 2 would allow outcomes to come out

1    Why wouldn't -- under your theory, why
2  wouldn't the APA take in substantially more of the
3  surplus as you've calculated it?
4    A.   I think partly because of that whole
5  process that we talked about of how we got to this
6  point.  I mean, the -- some of those gains were
7  associated with gains that the TWA pilots got from
8  having the continued employment and -- and, you
9  know, if you're using the 60 percent, includes the
10  pay increase figure.
11    Also, I think there was -- there was a
12  negotiation process there.  I mean, the APA did
13  have the right to impose a list, but that's --
14  that doesn't mean that that's going to be the
15  necessary outcome.  They still had people that
16  they were going to work with in the future, that
17  they still were dealing with -- I don't know,
18  American Airlines was in the background there.
19  They had to approve the list, all them.
20    It wasn't necessarily in their
21  independent interest to impose the most severe
22  list they could.  They were going to have to --
23  you know, I think we talked about it in here.
24  I have a discussion about some of the factors.

1  I just want to make sure I mention them all.
2    The -- you know, I think -- I don't see
3  it right now but, you know, I think it mostly has
4  to do with those kinds of things.  They were going
5  to be their future colleagues.  This was, you
6  know, a -- this wasn't their last rodeo in which
7  they were going to deal with people.
8    I think they had an interest in taking
9  account of both parties' career expectations
10  coming in.  I think that's what they said from the
11  very beginning.  I think that fit into it as well.
12  I think that was all part of the bargaining
13  process.  So I think that -- I think that is part
14  of it.
15    And so, you know, part of that
16  bargaining dynamic is the fact that -- that, you
17  know, the distribution in the gains does matter.
18  And I don't think it was in their interests to
19  grab every last penny off the table they could for
20  dealing with people they're going to deal with in
21  the future.  They had to continue to deal with
22  American Airlines.
23    But that meant they had the upper hand.
24  It doesn't mean it was, you know, carte blanche.

1  I think it meant they had the upper hand.
2    MR. JACOBSON:  I think I've asked all the
3  questions I want to ask.
4    Bill, I am going to need the output
5  files.
6    MR. MICHAEL:  Okay.  I don't think -- I mean,
7  you have had his report and the backup for over,
8  what, six weeks now.  I don't think we have gotten
9  a request for that.
10    MR. JACOBSON:  No, you didn't get a request.
11    MR. MICHAEL:  If you want to make a request
12  for it, that's fine.  We'll take it under
13  advisement.  We'll see -- go back to what was
14  produced and see, you know, if there is anything
15  else.  I think we made a full production of the
16  backup.  But I understand what you're looking for
17  or what you think you're missing.
18    I have just a couple of questions for
19  Professor Murphy.
20    EXAMINATION
21  BY MR. MICHAEL:
22    Q.   Professor Murphy, Mr. Jacobson asked
23  you some questions about Supplement CC plus 200
24  earlier in the deposition.  Do you remember that?

1    A.   Yes, I do.
2    Q.   And that's one of the alternative lists
3  that Mr. Salamat put forward?
4    A.   Yes, it is.
5    Q.   Do you have any opinion beyond what
6  you've discussed today about the way in which
7  Mr. Salamat constructed that Supplement CC
8  plus 200 list?
9    A.   Well, I think, as I tried to say
10  before, I mean, he doesn't really have a basis for
11  considering Supplement CC plus 200 versus plus 50,
12  plus 100, minus 50.  I mean, he doesn't really
13  have a basis for why 200 was a number.
14    As I said earlier, if you look at my
15  analysis, it's not like 200 is -- plus 200 is more
16  consistent with the bargaining theory than is
17  Supplement CC itself.  If anything, you might say
18  it's less consistent.  So I don't really see an
19  economic basis for Supplement CC plus 200 over
20  Supplement CC.
21    MR. MICHAEL:  That's all I have.
22    MR. JACOBSON:  You have the right to read the
23  transcript since you're an expert, and you
24  probably want to exercise that right.  Just let

# EXHIBIT 23

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE DISTRICT  OF NEW JERSEY
 2                   CIVIL 02-2917  (JEI)

 3         THEODORE A. CASE, SALLY YOUNG,
           HOWARD HOLLANDER, PATRICK BRADY
 4         AND MICHAEL FINUCAN, individually
           and on behalf of all others
 5         similarly situated,
                              Plaintiffs,
 6                                                VOLUME 3
                 V.                               TRIAL TRANSCRIPT
 7
           AIR LINE PILOTS ASSOCIATION,
 8
                              Defendant.
 9
                                         CAMDEN, NEW JERSEY
10                                       JUNE 9, 2011

11         B E F O R E:   HONORABLE JOSEPH E. IRENAS
                          UNITED STATES DISTRICT JUDGE
12
                         A P P E A R A N C E S:
13
               TRUJILLO, RODRIGUEZ & RICHARD
14             BY:  NICOLE M. ACCHIONE, ESQ.
                    AND: LISA J. RODRIGUEZ, ESQ.
15                      AND
               GREEN JACOBSON, P.C.
16             BY:  ALLEN PRESS, ESQ.  (MO. BAR)
               AND:  JOE D.  JACOBSON, ESQ.  (MO. BAR)
17             For the Plaintiffs.

18             ARCHER GREINER
               BY:  STEVEN FRAM, ESQ.
19                   AND
               KATZ & RANZMAN
20             BY:  DANIEL M. KATZ, ESQ.
               FOR THE DEFENDANT AIR LINE PILOTS ASSOCIATION.
21
               ELIZABETH GINSBERG, ESQ.
22             IN-HOUSE COUNSEL FOR ALPA.

23

24

25
```

1  weren't objected to.  I find the whole testimony is full of

2  conjecture, the part about trophies.  Who in American said

3  that?  Was it done, I think, a person said, although I have

4  no way of knowing, an equal inference is that it was a joke,

5  and what they were really doing is mocking TWA's inflated

6  sense of its own self worth.  And they were using it

7  mockingly.

8        Did one person use it?  Did everybody use it?  I

9  can't tell if she heard it directly from American people or

10  whether she heard it from other people who told her that is

11  what they were doing.  It has nothing to do with her

12  testimony, but she keeps throwing that in very cleverly.

13        This was not, I don't know there, why, you if you

14  want to have her testimony come by tape.  It should have been

15  done by a proper de bene esse, where you question him, they,

16  you do direct, they come in and cross.  This was purportedly

17  a discovery deposition but it was an odd one because she is

18  clearly sympathetic to the pilots, to the union.  She is a

19  union officer.  She was head of her union.  Her testimony is

20  totally sympathetic.  It seems to me, I mean her

21  unavailability, she may technically be unavailable because

22  she is outside the subpoena scope, under 100 miles for

23  subpoenas.

24        But it is pretty clear that the decision not to

25  bring her to court is a tactical one, not one that she is  a

```
1    unwilling to testify.  I mean this thing cries for cross

2    examination.  You can't cross examine her obviously if she is

3    not here.

4         Also, the question of whether TWA could have

5    survived the stand alone entity at that point clearly

6    requires expert testimony.  You know, from an accountant,

7    somebody, who viewed all, had expertise in that area, and in

8    the airline industry particularly, reviewed all the finances.

9    Here she says we were going to get so many millions of

10   dollars from the union in concessions.  First of all,

11   although they were negotiating to some degree, everything

12   would have had to have gone to the membership.  And it didn't

13   go, nothing to my knowledge, went to the membership.

14         MR. KATZ:  They were still negotiating on it.

15         THE COURT:  What?

16         MR. KATZ:  They were still negotiating on that.

17         THE COURT:  Doesn't make any difference.  Even if

18   they reached it, they had to go to the union, she said that,

19   it had to go to the union for ratification.  Then we talk

20   about there had to be investment bankers coming in.  Telling

21   me that George Soros showed interest in it, or that G E

22   Capital or other people interest.  Yeah, so did Carl Icahn.

23   And who knows what kind of interest, what terms, what

24   conditions, they would have had.  I mean it is speculation as

25   to whether, what they would have put in or not.
```

1          The bottom line is, I don't want to sit here and

2     argue for the next two hours over it.  I am not going to eat

3     into the jury's time.  Don't put this on today.  At 2:15 we

4     will have a hearing.  I will give everybody a chance.  I

5     wanted to say what I wanted to say.  I wanted you to know

6     where I am coming from.

7          Very troublesome very troublesome she is not here.

8     It is hard to believe that she wouldn't come.  It has the

9     smell of a tactical decision rather than a true

10    unavailability.

11         MR. PRESS:  Judge.  Miss Rodriguez had the contact

12    with Ms. Cooper.  I think if she was here.

13         MS. RODRIGUEZ:  I am here.

14         MR. PRESS:  Can you address the unavailability

15    issue?

16         THE COURT:  You have one minute.  I am going to

17    deal with that this afternoon.

18         MS. RODRIGUEZ:  I just know that she was.

19         THE COURT:  She is a friend.

20         MR. PRESS:  No, she is not.

21         MS. RODRIGUEZ:  She was not particularly, there are

22    reasons that she is not particularly --

23         THE COURT:  You think this testimony is not

24    friendly testimony.

25         MS. RODRIGUEZ:  She is not a friend of the pilots,

1    your Honor.  There shall issues -- she certainly is an

2    advocate for our position.  There are issues that --

3              THE COURT:  You better believe she is an advocate

4    for your position.

5              MS. RODRIGUEZ:  There are issues that make her not

6    available for us to bring her into court that are not

7    tactical issues to bar her from coming in to court and not

8    being subjected to cross examine.

9              THE COURT:  Why wasn't it done as a de bene esse.

10   We do that all the time in this Court.  We have doctors that

11   don't want to show up because just because they are doctors.

12   We take a de bene esse.  Direct is on port.

13             MR. JACOBSON: Your Honor, she was cross examined at

14   the deposition.  Federal Rules only  provide for one type of

15   deposition.  She was deposed.  They cross examined.

16             THE COURT:  You make a valid point.  I actually

17   submitted a proposal to the rules committee to distinguish

18   twin de bene esse depositions and discovery depositions, they

19   are different animals, have different considerations.  I

20   wrote a whole long report which was taken up by the poobahs,

21   but since most of them don't know anything about trying

22   cases, they turned it /OUPB down.

23             But I don't want to eat into the jury's time with

24   argument.  A six-week trial, she can go on the next day or

25   the day after if I allow it.

# EXHIBIT 24

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL ACTION NO. 02-2917-JEI

PATRICK BRADY, ET AL.,
    PLAINTIFFS,
VS.
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,,
    DEFENDANT.
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /

200 S. BISCAYNE BOULEVARD
SUITE 3500
MIAMI, FLORIDA
FRIDAY, JANUARY 18, 2013
1:53 P.M. - 5:27 P.M.

VIDEOTAPE
DEPOSITION OF WILLIAM COMPTON

TAKEN VIDEO DEPOSITION OF WILLIAM COMPTON WAS
TAKEN ON FRIDAY, JANUARY 18, 2013, AT THE LAW OFFICES
OF MORGAN, LEWIS & BOCKLUS, LLP, 200 S. BISCAYNE
BOULEVARD, SUITE 5300, MIAMI, FLORIDA, BEFORE CAROL
HILL WILLIAMS, FPR, RMR, CRR, CMRS, CPE, CRI, COURT
REPORTER AND A NOTARY PUBLIC IN AND FOR THE STATE OF
FLORIDA AT LARGE.

## Page 2

1  APPEARANCES:
2  ON BEHALF OF PLAINTIFFS:
   JOE JACOBSON, ESQ.
3  GREEN JACOBSON, P.C.
   PIERRE LACLEDGE CENTER
4  7733 FORSYTH BOULEVARD
   SUITE 700
5  ST. LOUIS (CLAYTON), MO  6305
   JACOBSON@STLOUISLAW.COM
6  314.862.6800
7  ON BEHALF OF DEFENDANT:
   WILLIAM MICHAEL, ESQ.
8  JULIAN BURNS, ESQ.
   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
9  1285 AVENUE OF THE AMERICAS
   NEW YORK, NY  10019
10 212.373.3869
   WMICHAEL@PAULWEISS.COM
11 JBURNS@PAULWEISS.COM
12 ON BEHALF OF THE WITNESS:
   DONALD L. HAVERMANN, ESQ.
13 MORGAN, LEWIS & BOCKLUS, LLP
   1111 PENNSYLVANIA AVENUE, NW
14 WASHINGTON, D.C.  20004
   202.739.5072
15 DHAVERMANN@MORGANLEWIS.COM
16 ALSO PRESENT:  MARTA WAGNER - AIRLINE PILOTS ASSOC.
17        MICHAEL HOLLAR, VIDEOGRAPHER
18
19
20
21
22
23
24
25

## Page 3

                        INDEX
WITNESS                              PAGE
WILLIAM COMPTON
  DIRECT EXAMINATION BY MR. MICHAEL        6
  CROSS EXAMINATION BY MR. JACOBSON       83
  REDIRECT EXAMINATION BY MR. MICHAEL    144
  CERTIFICATE OF OATH OF WITNESS         155
  LETTER TO WITNESS FOR READING          157

              EXHIBITS
NUMBER    DESCRIPTION                    PAGE
Exhibit 1  TRANSCRIPT OF HEARING BEFORE     49
           THE COMMITTEE ON COMMERCE,
           SCIENCE AND TRANSPORTATION OF
           THE UNITED STATES SENATE,
           FEBRUARY 1, 2001
Exhibit 2  TRANSCRIPT FROM THE UNITED       57
           STATES BANKRUPTCY COURT FROM
           THE DISTRICT OF DELAWARE, DATED
           SATURDAY, MARCH 10, 2001,
           BEFORE THE HONORABLE PETER
           WALSH

Exhibit 3  ASSET PURCHASE AGREEMENT         63
           BETWEEN AMERICAN AIRLINES AND
           TRANS WORLD AIRLINES,
           JANUARY 9, 2001
Exhibit 4  MARCH 6, 2001 LETTER FROM DON    68
           CARTY

Exhibit 5  MARCH 5, 2001 LETTER             73

Exhibit 6  MOTION BY TRANS WORLD AIRLINES   78

Exhibit 7  SEPTEMBER 20, 2000 MEMO        111

Exhibit 8  DOCUMENTS                      113

## Page 4

              EXHIBITS
NUMBER      DESCRIPTION                    PAGE
Exhibit 9  DOCUMENT                        117
Exhibit 10  E-MAILS                        120
Exhibit 11  DECEMBER 19, 2000 LETTER       121
Exhibit 12  DOCUMENT                       124
Exhibit 13  DECEMBER 4, 2000 FINANCE       138
            COMMITTEE MEETING MINUTES

Exhibit 14  DOCUMENT                       140

Page 21

1   DECIDED TO DO A PREPACKAGED BANKRUPTCY.  I SAY "WE"     02:19:49
2   MEANING TWA.  AND AS PART OF THAT, INSTEAD OF THE     02:19:52
3   EMPLOYEES NOW MAKING -- TAKING WAGE CUTS, IT WAS     02:19:55
4   BASICALLY THE EMPLOYEES CONTRIBUTING TO IMPROVED     02:19:59
5   PRODUCTIVITY ENDEAVORS AND GETTING AIRCRAFT LESSORS TO   02:20:03
6   REDUCE RENTS ON SPECIFIC AIRCRAFT.     02:20:08
7       SO THE PREPACKAGED BANKRUPTCY REALLY -- THE     02:20:14
8   BANKRUPTCY ITSELF ONLY TOOK PLACE, I BELIEVE, IN     02:20:17
9   30 DAYS OR SOMETHING LIKE THAT.  THE PROCESS WENT VERY  02:20:21
10  QUICKLY.     02:20:25
11  Q.   WHEN YOU SAY THAT THE "EMPLOYEES CONTRIBUTED   02:20:26
12  TO IMPROVED PRODUCTIVITY MEASURES," WHAT DO YOU MEAN BY  02:20:28
13  THAT?     02:20:31
14  A.   WELL, THERE WERE A VARIETY OF CHANGES MADE.   02:20:31
15  I DON'T REMEMBER THE SPECIFICS.  BUT PEOPLE MAY HAVE   02:20:39
16  REDUCED VACATION TIME, MAY HAVE REDUCED SICK TIME.  I   02:20:42
17  DON'T REMEMBER EXACTLY WHAT THEY WERE, BUT THEY WERE   02:20:48
18  INITIATIVES TO IMPROVE THE PRODUCTIVITY OF THE     02:20:50
19  WORKFORCE.     02:20:53
20  Q.   WAS THAT ANOTHER FORM OF CONCESSION GIVEN BY   02:20:54
21  THE TWA EMPLOYEES?     02:20:56
22  A.   IT WAS.  BUT THE PRIMARY CONCESSION IN THAT   02:20:57
23  FIRST BANKRUPTCY -- EXCUSE ME, THE SECOND     02:21:00
24  BANKRUPTCY -- COMING OUT OF THE FIRST BANKRUPTCY, I   02:21:04
25  INDICATED TO YOU THE 15 PERCENT PAY CUT FOR VIRTUALLY   02:21:07

Page 22

1   ALL THE EMPLOYEES.  AND I'M TRYING TO REMEMBER THIS NOW  02:21:11
2   BECAUSE WE'RE 12, 13 YEARS LATER.  I'M TRYING TO     02:21:15
3   REMEMBER THIS.     02:21:19
4       BUT I BELIEVE THE EMPLOYEES HAD WHAT WE CALL   02:21:19
5   THE "SNAP BACK" IN THOSE PAY GIVE-UPS THAT THEY HAD   02:21:23
6   MADE.  IN OTHER WORDS, THE 15 PERCENT AT SOME POINT   02:21:32
7   THERE WAS A SNAP BACK WHERE YOU WOULD GET THE     02:21:35
8   15 PERCENT BACK.  AND THAT -- ONCE AGAIN, I'M SAYING I   02:21:37
9   MIGHT BE OFF A LITTLE BIT OFF ON THE DATES, BUT     02:21:42
10  EVERYBODY UNDERSTOOD THE SNAP BACKS COULDN'T HAPPEN   02:21:45
11  BECAUSE TWA WAS STILL IN TROUBLE.     02:21:50
12      SO THE UNION LEADERS FROM ALL THE     02:21:53
13  AIRLINES -- I MEAN, ALL THE DIFFERENT UNION GROUPS AT   02:21:56
14  TWA UNDERSTOOD, HEY, WE WOULD LOVE TO HAVE THOSE SNAP   02:21:59
15  BACKS, BUT THE COMPANY CAN'T AFFORD IT.  IT WOULD GO   02:22:03
16  OUT OF BUSINESS.     02:22:06
17      SO WHAT HAPPENED WAS, THE BIGGEST CONCESSION   02:22:07
18  ON THE PART OF THE EMPLOYEES IN THAT SECOND BANKRUPTCY  02:22:09
19  WAS GIVING UP THOSE SNAP BACKS.     02:22:11
20  Q.   AND AGAIN, THAT WOULD INCLUDE THE PILOTS   02:22:13
21  UNION?     02:22:16
22  A.   YES.     02:22:17
23  Q.   ARE YOU FAMILIAR WITH SOMETHING CALLED THE   02:22:18
24  "KARABU TICKET PROGRAM"?     02:22:19
25  A.   I AM.     02:22:22

Page 23

1   Q.   WHAT IS IT?     02:22:22
2   A.   THAT WAS AN AGREEMENT BETWEEN TWA AND CARL   02:22:23
3   ICAHN.  KARABU IS A COMPANY AFFILIATED OR OWNED BY CARL  02:22:35
4   ICAHN.  AND I BELIEVE IT WAS AROUND THAT 1995 TIME   02:22:44
5   FRAME ICAHN WAS ABLE TO NEGOTIATE AGAINST -- TWA TO GET A  02:22:50
6   WITH -- HOWEVER YOU WANT TO TERM THAT -- TWA TO GET A   02:22:58
7   TICKET PROGRAM THAT ALLOWED HIM TO PURCHASE     02:23:03
8   TICKETS -- TWA TICKETS AT A 45 PERCENT DISCOUNT FROM   02:23:08
9   THE LOWEST PUBLISHED FARE.     02:23:18
10  Q.   AND WHAT DID HE DO WITH THOSE TICKETS THAT HE  02:23:26
11  PURCHASED?     02:23:28
12  A.   WHAT HE WOULD DO IS, HE WOULD -- HE DEVELOPED  02:23:31
13  A COMPANY CALLED "LOWESTFARE.COM."  AND HE WOULD PUT   02:23:36
14  THOSE -- PUT TWA TICKETS UP FOR SALE ON LOWESTFARE.COM.  02:23:42
15  SO LET'S SAY THAT FOR AN EXAMPLE, TWA WAS -- EVERYBODY  02:23:47
16  IN THE INDUSTRY JUST FLY A PACIFIC TRIP FROM A TO B,   02:23:51
17  THE TICKET WAS GOING TO BE $100.  LET'S SAY EVERY   02:23:55
18  AIRLINE.  AND USUALLY THE AIRLINES MATCH FARES.  SO   02:23:59
19  EVERYBODY IS CHARGING $100 FOR THAT TICKET FROM A TO B.  02:24:01
20      THE PROBLEM THAT TWA HAD WITH THE KARABU   02:24:06
21  AGREEMENT IS:  CARL ICAHN GETS TO BUY THAT TWA FOR $55.  02:24:09
22  AND THEN HE SELLS IT TO SOMEBODY IN THE PUBLIC FOR   02:24:15
23  SOMEPLACE IN THE DIFFERENCE BETWEEN 55 AND $100.  THE   02:24:18
24  PROBLEM IS:  ALL YOUR COMPETITORS ARE GETTING $100, AND  02:24:22
25  YOU'RE GETTING $55.  SO IT'S MATHEMATICALLY IMPOSSIBLE  02:24:25

Page 24

1   FOR TWA TO MAKE ANY MONEY.     02:24:32
2       SO EVERYBODY -- YOU HAVE A FARE SALE.     02:24:35
3   EVERYBODY IN THE INDUSTRY DOES A FARE SALE.  WELL,   02:24:38
4   TWA'S FARE SALE IS GOING TO BE -- TO ITS CUSTOMERS, THE  02:24:40
5   FARE SALE IS THE SAME ACROSS ALL CARRIERS.  BUT AS FAR  02:24:45
6   AS TWA IS CONCERNED, WE'RE GAINING 45 PERCENT LESS   02:24:49
7   REVENUE THAN ALL OF OUR COMPETITORS.     02:24:53
8   Q.   IN YOUR UNDERSTANDING, DID THE KARABU TICKET   02:24:56
9   PROGRAM HAVE AN IMPACT ON TWA'S FINANCIAL CONDITION?   02:24:58
10  A.   IT HELPED KILL TWA.     02:25:01
11  Q.   CAN YOU EXPLAIN THAT.     02:25:03
12  A.   WHEN YOU'RE COLLECTING 45 PERCENT LESS     02:25:06
13  REVENUE THAN YOUR COMPETITORS, IT'S HARD TO STAY IN   02:25:08
14  BUSINESS, ESPECIALLY WHEN YOUR COSTS ARE SIMILAR OR   02:25:12
15  YOUR COSTS PERHAPS ARE EVEN MORE EXPENSIVE THAN YOUR   02:25:16
16  COMPETITORS, OR YOUR COSTS ARE MORE EXPENSIVE THAN YOUR  02:25:20
17  COMPETITORS' AND YOUR REVENUE IS 45 PERCENT LESS THAN   02:25:22
18  YOUR COMPETITORS, GUESS WHAT?  IT DOESN'T WORK.     02:25:25
19  Q.   HOW LONG DID THE KARABU TICKET PROGRAM REMAIN  02:25:28
20  IN PLACE?     02:25:32
21  A.   UNTIL THE DAY WE SOLD IT -- SOLD TWA'S ASSETS  02:25:33
22  TO AMERICAN AIRLINES.     02:25:36
23  Q.   TO YOUR KNOWLEDGE WAS THERE EVER ANY ANALYSIS  02:25:38
24  DONE TO DETERMINE HOW MUCH THE KARABU TICKET AGREEMENT  02:25:41
25  COST TWA IN REVENUE?     02:25:45

Page 25

1    A. THERE WAS QUITE A BIT OF THAT DONE.          02:25:46
2    Q. WHO PERFORMED THOSE ANALYSES?                02:25:49
3    A. PRIMARILY -- PRIMARILY, I BELIEVE, IT WAS    02:25:52
4  JACK STELZER WHO WAS OUR SENIOR VICE-PRESIDENT OF     02:25:57
5  PLANNING AND REVENUE MANAGEMENT. NOW, MIKE PALUMBO WHO  02:26:02
6  WAS THE CFO MAY HAVE HAD A PLACE IN THAT AS WELL.   02:26:05
7    Q. DO YOU RECALL WHAT THE IMPACT ON REVENUE WAS?  02:26:11
8    A. SPECIFICALLY TO GIVE YOU A DOLLAR AMOUNT? I  02:26:14
9  DON'T KNOW. I JUST KNOW IT WAS A BIG NUMBER.      02:26:16
10    Q. ORDER OF MAGNITUDE?                         02:26:18
11    A. I WOULD HATE TO GUESS AT THIS POINT; IT'S   02:26:22
12  13 YEARS LATER.                                  02:26:24
13    Q. YOU SAID THAT TWA'S THIRD BANKRUPTCY FILING 02:26:35
14  WAS IN JANUARY OF 2001; IS THAT RIGHT?           02:26:37
15    A. YES.                                        02:26:43
16    Q. AND AS CEO DID YOU HAVE AN UNDERSTANDING OF 02:26:45
17  TWA'S FINANCIAL CONDITION AT THE TIME OF THE THIRD  02:26:48
18  BANKRUPTCY FILING?                               02:26:51
19    A. I DID.                                      02:26:52
20    Q. HOW WOULD YOU DESCRIBE IT?                  02:26:53
21    A. IT WAS WORSE THAN NOT GOOD. IT WAS BAD. TWA 02:26:59
22  WAS -- TWA WAS GOING TO LIQUIDATE WITHIN DAYS WITHOUT A  02:27:04
23  DEAL.                                            02:27:12
24    Q. AND WHAT IS THE BASIS FOR YOUR UNDERSTANDING 02:27:15
25  THAT TWA WAS GOING TO LIQUIDATE WITHIN DAYS WITHOUT A  02:27:19

Page 26

1  DEAL?                                            02:27:23
2    A. A MAJOR ISSUE WAS THAT WE HAD AN ACCOUNTS   02:27:24
3  RECEIVABLE FUNDING COMING DUE THAT I BELIEVE -- I COULD  02:27:26
4  BE OFF BY A WEEK -- BUT I BELIEVE IT WAS DUE ON  02:27:32
5  JANUARY 10, 2001, AND THAT WAS A $100 MILLION BILL THAT  02:27:35
6  WE OWED.                                         02:27:41
7      AND IN EARLY JANUARY TWA'S TOTAL CASH, TOTAL 02:27:45
8  AVAILABLE CASH WAS $20 MILLION. AND TO PUT THAT IN  02:27:49
9  PERSPECTIVE, TWA WAS A COMPANY THAT ON AVERAGE HAD  02:27:56
10  EXPENDITURES OF $10 MILLION A DAY. AND SOME DAYS IT  02:28:02
11  WAS -- OF COURSE, THAT'S AN AVERAGE -- I MEAN, SOME  02:28:09
12  DAYS IT COULD BE 30 MILLION IN A DAY AND THE NEXT DAY  02:28:11
13  IT COULD BE 1 MILLION. BUT ON AVERAGE IT WAS A COMPANY  02:28:14
14  THAT SPENT $10 MILLION A DAY IN EXPENSES.        02:28:17
15      SO TWA HAD APPROXIMATELY $20 MILLION IN CASH. 02:28:20
16  WE OWED $100 MILLION, AND WE HAD NEGATIVE CASH FLOW.  02:28:24
17  SO IT WAS NOT A GOOD SITUATION.                  02:28:29
18    Q. I WANT TO TAKE YOU BACK TO THE BEGINNING OF 02:28:37
19  2000, SO A YEAR PRIOR TO THE THIRD BANKRUPTCY FILING.  02:28:42
20  AT THAT POINT WAS TWA OPERATING AT A PROFIT OR A LOSS?  02:28:44
21    A. NO. AS I MENTIONED EARLIER, TWA HADN'T      02:28:48
22  EARNED A PROFIT IN THE PREVIOUS 12 YEARS.        02:28:50
23    Q. ALL RIGHT. AND WHAT WAS YOUR VIEW OF THE    02:28:53
24  COMPANY'S FINANCIAL CONDITION AT THE BEGINNING OF 2000?  02:28:54
25    A. IT WAS BAD.                                 02:28:58

Page 27

1    Q. DID YOU TAKE ANY STEPS DURING THE COURSE OF 02:29:02
2  THAT YEAR TO TRY TO ADDRESS THE FINANCIAL CHALLENGES  02:29:04
3  THAT TWA WAS FACING?                             02:29:07
4    A. WE TRIED TO DO A LOT OF DIFFERENT THINGS.   02:29:08
5  TWA EMPLOYEES PARTICIPATED IN LARGE DEGREE. AND I  02:29:12
6  WOULD SAY -- YOU -- YOU KNOW, YOU SAID IN 2000, BUT  02:29:16
7  ACTUALLY THE TWA EMPLOYEES MADE HUGE EFFORTS IN A LOT  02:29:18
8  OF DIFFERENT AREAS IN 1997, 1998, 1999, 2000. BUT,  02:29:24
9  UNFORTUNATELY, THAT WASN'T ENOUGH TO MAKE IT WORK.  02:29:35
10      YOU ASKED ABOUT 2000. ONE OF THE THINGS THAT 02:29:38
11  TWA DID WAS WE TRIED TO DIVERSIFY OUT OF THAT ONE-HUB  02:29:40
12  SYSTEM THAT YOU WERE TALKING ABOUT EARLIER AND TRYING  02:29:44
13  TO DEVELOP WHAT WE CALLED "MINI HUBS." AND WE DID  02:29:47
14  ACTUALLY OPEN ONE IN SAN JUAN, PUERTO RICO. WE OPENED  02:29:51
15  ONE IN LOS ANGELES. AND THE PLAN WAS TO OPEN ONE A  02:29:57
16  YEAR TO TRY TO DIVERSIFY OUT OF THAT ONE-HUB ISSUE.  02:30:00
17      WE ALSO WERE ABLE TO -- TWA HAD ONE OF THE   02:30:06
18  OLDEST FLEETS IN THE INDUSTRY. WE WERE ABLE TO   02:30:09
19  NEGOTIATE LEASES FOR NEW AIRCRAFT FROM BOEING AND  02:30:14
20  AIRBUS; ALTHOUGH, WE NEVER TOOK DELIVERY OF THE AIRBUS  02:30:20
21  AIRPLANES BUT -- FROM BOEING. SO WE WERE ABLE TO  02:30:23
22  MODERNIZE THE FLEET, WHICH REDUCED MAINTENANCE   02:30:28
23  EXPENSES, WHICH REDUCED FUEL EXPENSES, WHICH MADE A  02:30:30
24  BETTER PRODUCT FOR THE CUSTOMER, ET CETERA.      02:30:36
25      ONE OF THE PROBLEMS, THOUGH, THAT TWA HAD WAS  02:30:39

Page 28

1  BECAUSE OF THE WEAK FINANCIAL CONDITION, WE COULDN'T  02:30:41
2  BUY THESE AIRPLANES BECAUSE WE HAD NO MONEY. SO TWA  02:30:44
3  LEASED THESE AIRCRAFT. AND BECAUSE OF TWA'S FINANCIAL  02:30:48
4  STANDING, WE HAD TO PAY A LOT MORE FOR OUR AIRCRAFT  02:30:53
5  THAN COMPETITORS DID.                            02:30:57
6      TWA, FOR EXAMPLE, WITH AN MD80 YOU MIGHT      02:30:58
7  SPEND $250,000 A MONTH LEASING AN MD80 WHERE YOUR  02:31:02
8  COMPETITOR IS LEASING AN MD80 FOR 100,000 OR $125,000 A  02:31:08
9  MONTH. SO ALTHOUGH YOU'RE GETTING THE BENEFITS FOR THE  02:31:13
10  CUSTOMER AND FOR MAINTENANCE AND FOR FUEL, YOU'RE  02:31:16
11  GETTING HIT ON THE COST SIDE.                    02:31:18
12      SO THOSE WERE A FEW THINGS THAT WERE DONE IN  02:31:20
13  2000. WE WERE ALSO ABLE -- I DON'T KNOW IF WE DID IT  02:31:23
14  IN 2000 OR '99, BUT WE HAD A NEW CONTRACT WITH ALPA  02:31:27
15  THAT WAS BENEFICIAL TO THE PILOTS AND BENEFICIAL TO THE  02:31:34
16  COMPANY AS WELL.                                 02:31:37
17      WE HAD A CONTRACT EXTENSION WITH THE IAM      02:31:39
18  ALSO, BUT THAT WASN'T AS BENEFICIAL AS THE CONTRACT  02:31:43
19  THAT WE RECEIVED WITH ALPA.                      02:31:48
20    Q. ONE OF THE THINGS THAT YOU MENTIONED YOU    02:31:53
21  TRIED TO DO WAS TO DEVELOP THESE MINI HUBS. WAS THAT  02:31:55
22  SUCCESSFUL?                                      02:31:59
23    A. RELATIVELY SUCCESSFUL. I MEAN, HE HAD JUST  02:32:00
24  GOTTEN SUCCESSFUL WITH SAN JUAN. SAN JUAN WAS DOING  02:32:02
25  WELL. IN LOS ANGELES WE HAD JUST STARTED, SO YOU  02:32:06

# EXHIBIT 25

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
--------------------------------------X
PATRICK BRADY, et al,
          Plaintiffs,
     - against -
AIR LINE PILOTS ASSOCIATION
INTERNATIONAL,

          Defendant.

Civil Action No. 02-2917 (JEI)
--------------------------------------X

          1285 Avenue of the Americas
          New York, New York

          January 21, 2013
          1:55 p.m.

     Videotaped Deposition of Non-Party Witness
MICHAEL PALUMBO, before Rita Persichetty, a Notary
Public of the State of New York.

Page 3

1   A P P E A R A N C E S: (Cont'd)
2
3   MORGAN, LEWIS & BOCKIUS LLP
4   Attorneys for the Witness
5      1111 Pennsylvania Avenue, NW
6      Washington, DC 20004
7   BY:  DONALD L. HAVERMANN, ESQ.
8      PHONE:  202.739.5072
9      FAX:  202.739.3001
10     EMAIL:  Dhavermann@morganlewis.com
11
12
13  ALSO PRESENT:  MARTA WAGNER, ALPA
14  NATE ARMSTRONG, Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 2

1   A P P E A R A N C E S:
2
3   TRUJILLO RODRIGUEZ & RICHARDS, LLC
4   Attorney for Plaintiffs
5      285 Kings Highway East
6      Haddonfield, New Jersey 08033
7   BY:  LISA J. RODRIGUEZ, ESQ.
8      - and -
9      NICOLE ACCHIONE, ESQ.
10     PHONE:  856.795.9002
11     FAX:  856.795.9887
12
13
14  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
15  Attorneys for Defendant
16     1285 Avenue of the Americas
17     New York, New York 10019-6064
18  BY:  WILLIAM MICHAEL, ESQ.
19     - and -
20     JULIAN BURNS, Admission pending
21     PHONE:  212.373.3669
22     FAX:  212.492.0869
23     EMAIL:  Dtoal@paulweiss.com
24
25

Page 4

1   ------------------ I N D E X ------------------
2   WITNESS        EXAMINATION BY        PAGE
3   MICHAEL PALUMBO    MR. MICHAEL        7
4        MS. RODRIGUEZ        130
5
6
7   ---------------- E X H I B I T S ----------------
8   PALUMBO      DESCRIPTION        FOR I.D.
9   Exhibit 1    Affidavit of Mr. Palumbo    35
10  Exhibit 2    Transcript of hearing      62
11     dated 1/10/01
12  Exhibit 3    Transcript from hearing      90
13     dated 1/27/01
14  Exhibit 4    A document        121
15
16
17     (Exhibits to be produced)
18
19
20
21
22
23
24
25

Page 109

1  contractural details, but those were the bright
2  light items that were of vital import and in
3  need of agreement.
4     Q   In the context of those discussions
5  around the end of 2000, beginning of 2001, did
6  you have any understanding as to whether
7  American was proposing to hire any TWA pilots?
8     A   One of the attractive things from our
9  standpoint as a fiduciary matter was that they
10  were proposing to hire essentially all of TWA's
11  operating employees, which would have included
12  the pilots, the mechanics, the flight
13  attendants.  Their plan was to acquire
14  materially all of the operating personnel.
15     Q   What, if any, reaction do you recall
16  having when American came forward with this
17  plan that would have included hiring all of the
18  TWA pilots?
19     A   We were very encouraged and were very
20  pleasantly, in some ways, surprised that they
21  saw a strategic value in preserving the flying
22  franchise, and against the alternatives that
23  the TWA management saw at the time, it was a
24  not perfect solution, you know, from a overall
25  creditor standpoint, but it was a -- it was by

Page 110

1  far the best alternative for all of the major
2  constituents attached to the TWA franchise.
3     Q   You say it was the best alternative.
4  What were the other alternatives to TWA?
5     A   There were none, you're quite right.
6        I say that -- even if there were,
7  American would have -- the American transaction
8  would likely have been very attractive for a
9  number of reasons, but there -- as a practical
10  matter, there were no alternatives.
11     Q   So to your knowledge, was there any
12  other airline than American at that time that
13  was willing to come forward with a proposal
14  that would hire all of the TWA pilots?
15     A   No, and as further evidence of that,
16  no one came forward in the auction process to
17  make a proposal.
18        I mean, I think we suspected there
19  would be no one, there certainly was no one
20  before the auction process commenced, and as an
21  actual matter, as an actual fact, there was no
22  one in terms of a strategic solution partner
23  that showed themselves as available by virtue
24  of the auction process.
25     Q   Was there any other airline at that

Page 111

1  time that you were aware of that would have
2  preserved TWA's flying franchise, as you put
3  it?
4     A   Not in the -- not to the level that
5  American was talking about and not to any level
6  that I was aware of.
7        MR. MICHAEL:  I think we need to take
8  a break to change the videotape.
9        THE VIDEOGRAPHER:  This marks the end
10  of Tape 2.  The time is 4:18 p.m. on
11  January 21, 2013.  We are now off the
12  record.
13        (Recess taken.)
14        THE VIDEOGRAPHER:  This is Tape 3 in
15  the deposition of Michael Palumbo.  Time
16  is 4:28 p.m. on January 21, 2013.  We are
17  now back on the record.  You may proceed.
18     Q   Mr. Palumbo, at the time of TWA's
19  third bankruptcy filing, did you have any
20  expectation as to what would happen to TWA if
21  the transaction with American that we've been
22  discussing did not go through?
23     A   I wasn't aware of any solution that
24  would have led to anything other than a likely
25  liquidation of the airline.

Page 112

1     Q   What was that understanding based on?
2     A   Based on the to date indications of
3  strategic interests by any other party other
4  than American Airlines, based on our liquidity
5  position and potential for enhancement to that
6  liquidity position, and the uncertainties of
7  both the winter and, you know, the resolution
8  of the accounts receivable securitization.
9     Q   Did that understanding change at any
10  time prior to the closing of the American
11  transaction?
12     A   No.
13     Q   You're familiar with the term "debtor
14  in possession financing"?
15     A   I am.
16     Q   I believe you referred to it earlier
17  as debt --
18     A   Yes.
19     Q   Is it okay with you that that's how
20  we refer to it here?
21     A   Of course.
22     Q   Can you explain what DIP financing
23  is?
24     A   It's a very high priority in terms of
25  bankruptcy ranking of liabilities financing.