UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICK BRADY, *et al.*, | : | |
| | : | Civil Acton No. 02-2917 (JEI) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| AIR LINE PILOTS ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### DECLARATION OF LISA J. RODRIGUEZ

I, Lisa J. Rodriguez, certify as follows:

1.      I am a partner with the law firm Schnader Harrison Segal & Lewis LLP, co-Class Counsel for Plaintiffs in this certified class action. I submit this Declaration in Support of Plaintiffs' Reply in Further Support of their Motion to Bar the Expert Testimony of Feltman and Levine and to Limit the Expert Testimony of Murphy. I am fully familiar with the facts set forth herein.

2.      Attached hereto as **Exhibit A** is a true and correct copy of *In the Matter of an Arbitration Between Transport Workers Union of America and International Ass'n of Machinists and Aerospace Workers and American Airlines* (R. R. Kasher, April 29, 2002), marked as Exhibit 5 at the July 22, 2013 deposition of Richard R. Kasher.

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:  October 18, 2013                    *s/ Lisa J. Rodriguez*
                                                            Lisa J. Rodriguez

# EXHIBIT A

**ARBITRATION OPINION AND AWARD**
**RICHARD R. KASHER, ARBITRATOR**
**APRIL 29, 2002**

In the Matter of an Arbitration Between

**TRANSPORT WORKERS UNION OF AMERICA**

And

**INTERNATIONAL ASSOCIATION OF**
**MACHINISTS AND AEROSPACE WORKERS**

And

**AMERICAN AIRLINES**

Involving the Integration of Seniority Lists
Of the Mechanics and Related Employees,
Fleet Service Employees, Stock Clerks and
Flight Simulator Technicians

## Introduction and Jurisdiction

During the first quarter of 2001 the Transport Workers Union of
America (hereinafter the "TWU") became aware of American Airlines'
(hereinafter "American", "AA" or the "Carrier") proposal to acquire the
majority of the assets of Trans World Airlines, Inc. (hereinafter "TWA" or
"TWA-LLC") and to offer employment at American to TWA's represented
employees.

During this same period of time the TWU and American were
engaged in contract negotiations pursuant to Section 6 of the Railway
Labor Act.  As part of those negotiations and in consideration of the



EXHIBIT
*Kasher 5*
*dch 7-22-13*
PENGAD 800-631-6989

closing of the TWA transaction on April 10, 2001 the TWU proposed and the parties agreed to modifications of the Scope language in their basic working agreement.   This new language was tentatively agreed to in June, 2002, and ratified in September, 2002.   As will be more fully discussed below, the new language provides that in the event of a merger, purchase or acquisition of another company by American, the integration of employees will be governed by the agreement and will be subject to the provisions of Sections 3 and 13 of Allegheny-Mohawk, 59 CAB 22 (1972).

Following ratification of the American-TWU agreement, the parties engaged in good faith negotiations at which time they discussed issues concerning the integration of the TWA employees represented by the International Association of Machinists and Aerospace Workers (hereinafter the "IAM") into American's workforce whose employees were represented by the TWU.

The American-TWU collective bargaining agreement was the only agreement on the property which contained language providing for seniority integration using the Allegheny-Mohawk provisions.

As a result of this agreement, the TWU and the IAM met in an effort to reach agreement regarding merged seniority lists for the four (4) crafts or classes they represented, those being the Mechanics and Related Employees, Fleet Service Employees, Stock Clerks and Flight

Simulator Technicians.    When these meetings/negotiations proved
unsuccessful the integration process was submitted to arbitration in
accordance with Sections 3 and 13 of Allegheny-Mohawk.

The below-signed Arbitrator was designated to take evidence and
consider the parties' respective positions, and to confine the Opinion and
Award to the single question at issue, that is:

> How the system seniority lists of each of the respective
> employee groups shall be integrated for purposes of
> occupational seniority in light of the applicable provisions of
> the AA-TWU collective bargaining agreements?

The parties further agreed that the arbitration "shall be organized
and conducted pursuant to Article 1(h) of the Mechanics and Related
collective bargaining agreement, Article 1(e) of the Fleet Service collective
bargaining agreement, Article 1(f) of the Stock Clerk collective bargaining
agreement and Article 1(e) of the Flight Simulator Technician collective
bargaining agreement, and the standards and procedures respectively of
Sections 3 and 13 of Allegheny-Mohawk, 59 CAB 22 (1972)." The above-
cited articles in the four (4) American-TWU collective bargaining
agreements provide as follows:

> (1)   The integration of seniority lists of the respective
> employee groups will be governed by the provisions of
> Sections 3 & 13 of Allegheny-Mohawk, 59 CAB 22 (1972),
> provided that no employee on the master seniority list will be
> adversely impacted in rates of pay, hours, or working
> conditions by the integration.

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 4

> (2) The rates of pay, rules, and working conditions contained in the Basic Agreement, as amended, will not be open for collective bargaining in the event of a merger nor will the TWU or the Company have any obligation to bargain upon changes thereto except as provided in Article 47 – Duration of the Basic Agreement.

Arbitration hearings were conducted on February 27 and 28, March 1 and March 11, 2002 at the Wyndham Franklin Plaza in Philadelphia, Pennsylvania. The hearings were transcribed, and the three parties, represented by counsel, were afforded a full and fair opportunity to present all relevant evidence through the testimony of witnesses and in documentary proofs. Counsel provided the Arbitrator with post-hearing briefs in support of their respective positions concerning the question at issue. The record was held open in accordance with Paragraph No. 13 of the agreement to arbitrate in order that the Arbitrator could "contact any of the parties for the purpose of clarifying their respective positions or otherwise gathering information which he deemed pertinent", which he did.

## Appearances

> Arthur M. Luby, Esquire
> Richard S. Edelman, Esquire
> O'Donnell, Schwartz & Anderson
> for the TWU
>
> Robert S. Clayman, Esquire
> Guerrieri, Edmond & Clayman
> for the IAM
>
> Thomas E. Reinert, Jr., Esquire
> Morgan, Lewis & Bockius
> For American

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 5

## Witnesses:

### For the TWU:

Arthur Luby, Esquire
Mr. James Little, International Vice President
Mr. Dave Davis, Consultant, Organizational Concepts
Mr. Gary Peterson, President, Local 567

### For the IAM:

Mr. Stephen Sleigh, Director of Strategic Resources
Mr. Al Calhoun, General Chairman, District 142
Mr. Sito Pantoja, Grand Lodge Representative
Mr. Thomas Stalnaker, Principal, Eclat Consulting

### For American:

Mr. James Weel, Managing Director, Employee Policy
and Relations

## Background Facts

Many of the facts recited herein are the product of stipulations by
counsel.

The TWU, as noted above, is the representative of American's
Mechanics and Related Employees, Fleet Service Employees, Stock
Clerks and Flight Simulator Technicians.

The IAM is the representative of TWA-LLC's Mechanics and Related
Employees, Fleet Service Employees, Stock Clerks and Flight Simulator
Technicians.

Through bankruptcy proceedings, American purchased certain
assets of TWA.  On April 10, 2001, a new company, TWA-LLC, was

formed to hold the purchased assets of TWA.  TWA-LLC is a subsidiary of American and the assets and employees of TWA-LLC are being integrated into American's operations.  American will be the surviving carrier in the transaction.  (American Airlines, Inc./Trans World Airlines, LLC, March 27, 2002, 29 NMB 240 at 243)

On December 12, 2001, the TWU filed an application with the National Mediation Board (hereinafter the "NMB") seeking a finding of single carrier status of American and TWA-LLC for the crafts and classes of Mechanics and Related Employees, Fleet Service Employees, Dispatchers, Stock Clerks and Stores Employees, Instructors, Simulator Technicians and Technical Specialists. (TWU Ex. 5.)

The approximate number of employees covered by this seniority integration case are as follows:

**Mechanics and Related:  AA – 13,229, TWA-LLC – 3,272**
**Fleet Service:  AA – 13,206, TWA-LLC – 3,082**
**Stock Clerks:  AA – 1,382, TWA-LLC – 316**
**Simulator Technicians:  AA – 108, TWA-LLC – 20**

(Jt. Ex. 6 at 2; American Airlines, Inc./Trans World Airlines, LLC 29 NMB 240 at 245.)

On March 27, 2002, the NMB issued its determination that American and TWA-LLC operate as a single transportation system for representation of the Mechanics and Related Employees, Fleet Service

Employees, Stock and Stores Employees, Dispatchers and Meteorologists. Flight Simulator Technicians were determined to be included in the class of Mechanics and Related Employees. In finding American/TWA-LLC to be a single transportation system for representation purposes for the Mechanics and Related, Fleet Service and Stock and Stores Employees, the NMB granted the IAM 30 days to file representation applications. Pursuant to the agreement to arbitrate, the IAM's participation in this arbitration is not affected by the NMB's decision.

The collective bargaining agreements between American and the TWU for the four (4) crafts and classes include identical provisions concerning procedures and standards for seniority integration.

These four collective bargaining agreements were dated March 1, 2001, were agreed to between late June, 2001 and August, 2001 and were ratified in October, 2001.

The identical provisions in these agreements provide as follows:

> **(h) Merger, Purchase, or Acquisition of Another Company:** In the event of a merger, purchase, or acquisition of another company, involving that entire company or a substantial portion of that company, by the Company, the TWU and the Company will meet to discuss the merger, purchase, or acquisition. The Company will provide the TWU with information concerning the proposed merger, purchase, or acquisition at the earliest feasible time to allow for the Union to prepare for those discussions. Those discussions will include the impact of the merger, purchase, or acquisition upon the TWU represented employees.

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 8

(1)   The integration of the seniority lists of the respective employee groups will be governed by the provisions of Sections 3 & 13 of the <u>Allegheny-Mohawk</u> provided that no employee on the master seniority list will be adversely impacted in the rates of pay, hours, or working conditions by the integration.

(2)  The rates of pay, rules, and working conditions contained in the Basic Agreement, as amended, will not be open for collective bargaining in the event of a merger nor will the TWU or the Company have any obligation to bargain upon changes thereto, except as provided in Article 47 – Duration of the Basic Agreement.

(3)   The parties agree to submit to final and binding arbitration by an arbitrator approved by the National Mediation Board all disputes between the TWU and the Company which are not settled in the meetings provided above within six (6) months of the effective date of the merger.  The costs of the arbitration will be shared equally by the parties and there will be only one such arbitration proceeding which will be the sole and exclusive remedy for all such disputes.

(4)  It is understood that the provisions of Article 1(b)(1), (2) and (3) will not apply to the Company's purchase of assets of another airline which does not result in the integration of employees.

Sections 3 and 13 of the <u>Allegheny-Mohawk</u> Provisions read as follows:

3.  Insofar as the merger affects the seniority rights of the carriers' employees, provisions shall be made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected in the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with section 13.

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 9

> **13.(a)** In the event that any dispute or controversy (except as to matters arising under section 9) arises with respect to the protections provided herein which cannot be settled by the parties within 20 days after the controversy arises, it may be refereed by any party to an arbitrator selected from a panel of seven names furnished by the National Mediation Board for consideration and determination. The parties shall select the arbitrator from such panel by alternatively striking names until only one remains, and he shall serve as arbitrator. Expedited hearings and decisions will be expected, and a decision shall be rendered within 90 days after the controversy arises, unless an extension of time is mutually agreeable to all parties. The salary and expenses of the arbitrator shall be borne equally by the carrier and (i) the organization or organizations representing the employee or employees or (ii) if unrepresented, the employee, or employees or group or groups of employees. The decision of the arbitrator shall be final and binding on the parties.
>
> **(b)** The above condition shall not apply if the parties by mutual agreement determine that an alternative method for dispute settlement or an alternative procedure for selection of an arbitrator is appropriate in their particular dispute. No party shall be excused from complying with the above condition by reason of having suggested an alternative method or procedure unless and until that alternative method or procedure unless and until that alternative method or procedure shall have been agreed to by all the parties.

The four collective bargaining agreements provide that in a seniority integration, no TWU-represented employee on the seniority list "will be adversely impacted in rates of pay, hours, or working conditions by the integration." These "no adverse impact" clauses in the collective bargaining agreements were intended to "hold harmless" the TWU membership in a seniority integration with an acquired carrier.

This "no adverse impact" provision was included in the collective bargaining agreements specifically as a result of American's acquisition

of TWA, based upon concerns expressed by the TWU membership and to ensure that TWU seniority list employees were not put in a worse position than the position they were in prior to seniority integration with a group of employees from an acquired carrier.

The principal focus of the TWU bargaining committee in proposing the language regarding a seniority integration "was not on the condition of TWA itself but rather on what the impact [of this merger with TWA] was going to be on their members."

TWU believes that there are methods other than establishing an April 10, 2001 seniority date for all TWA employees that can satisfy the requirements of the seniority integration provision of the American-TWU collective bargaining agreements.

Effective January 1, 2002, TWA-LLC employees were transitioned to American classifications for pay purposes. This required American to "map" TWA-LLC positions to comparable American positions. Soon after the American acquisition of TWA was finalized, American's Employee Policy and Relations Department analyzed how job classifications at TWA-LLC matched up to those at American. Job descriptions from the relevant collective bargaining agreements were used in this task.

In November, 2001 TWA-LLC employees were notified of how their positions "mapped" to American positions for purposes of determining appropriate pay rates. Because some TWA-LLC positions do not exist in

the American structure for those positions, the TWA-LLC positions were mapped to the nearest equivalent function performed by American employees. Pay scales for each position were included, indicating the pay scale changes that were planned for implementation in 2002, in order to bring TWA-LLC employees up to American pay rates. Notification of the mapping for pay purposes of TWA-LLC Mechanics mapped to the American's Overhaul Support Mechanics (hereinafter "OSM") position was provided in subsequent documentation.

TWA-LLC Lead Systems Technicians are equivalent, for purposes of seniority integration, to American's Technical Crew Chiefs. In general, these employees provide technical guidance to maintenance personnel; analyze repair issues and coordinate with crew and maintenance personnel.

TWA-LLC Crew Chiefs are equivalent, for purposes of seniority integration, to American Crew Chiefs. Crew Chiefs are responsible for leading, directing and assigning work to employees and have the overall responsibility for the performance of their crews, including ensuring that work is completed in a timely and satisfactory manner through proper and efficient crew utilization.

TWA-LLC Flight Simulator Technicians are equivalent, for purposes of seniority integration, to American Flight Simulator Technicians. The responsibilities for these employees include the

maintenance, modification and enhancement of visual flight crew training devices as well as other related mechanical equipment.

TWA-LLC Inspectors are equivalent, for purposes of seniority integration, to American's Inspectors. This position is responsible for the overall inspection of all mechanical operations of the aircraft and power plant.

TWA-LLC Mechanics are equivalent, for purposes of seniority integration, to American's Mechanics. This category covers all work generally recognized as mechanic work in Carrier shops, maintenance or overhaul bases and other buildings.

TWA-LLC Stores Clerks are equivalent, for purposes of seniority integration, to American's Stores Clerks. Employees in this position are responsible for all general storeroom and stockroom tasks and other related duties.

TWA-LLC Fire Inspector duties are being incorporated into the broader job category of American's Plant Maintenance Man position for purposes of seniority integration. The job responsibilities of the TWA-LLC Fire Inspector, including testing, inspection, operation and training of fire prevention and control equipment will be incorporated within the existing job duties of American's Plant Maintenance Man position, which include semi-skilled to moderately-complex facilities and automotive equipment work, including clean up, storage and removal duties.

TWA-LLC Ramp Service employees are equivalent, for purposes of seniority integration, to American's Fleet Service Clerk positions. Employees in these positions are responsible for airport operations related to transportation and loading/unloading of cargo and supplies.

TWA-LLC Mechanic Helpers are equivalent, for purposes of seniority integration, to American's Parts Washers. Responsibilities of these positions generally include moving and cleaning of airplane parts and equipment.

Because American contracts out its security function work, there are no American positions equivalent to TWA-LLC's Guard position, which is responsible for guarding of gates, patrolling of certain areas and other passenger screening issues.

TWA-LLC Fleet Service Helpers are equivalent, for purposes of seniority integration, to American's Aircraft Cleaners and, in some cases, American Fleet Service employees. Employees in these positions are responsible for cleaning of aircraft, including certain automotive equipment.

TWA-LLC Janitors are equivalent, for purposes of seniority integration, to American's Building Cleaners. These positions are responsible for cleaning buildings of all types as well as limited outdoor responsibilities such as lawn mowing and sweeping.

TWA-LLC Mechanics who do not possess an A or P license were mapped to American OSMs. This action has been protested by both the TWU and the IAM. All TWA-LLC Mechanics mapped to the American OSM position are to be assessed in early 2002; some will continue to perform OSM work and others will be assigned as Aircraft Maintenance Technicians. Pending resolution of that issue, TWA-LLC Mechanics without A or P licenses will be treated as both Mechanics and OSMs for purposes of seniority integration.

TWA, Inc. suffered long term financial problems, including prior bankruptcies.

As early as March, 2000, TWA and the IAM began making efforts to determine ways in which TWA and its finances could be restructured that would keep the company "afloat".

Starting in mid-June, 2000 the IAM periodically had meetings with TWA's officials and investment bankers to consider possible methods of refinancing TWA.

In Fall 2000, TWA presented a proposed "turnaround plan" to the IAM for their review.

By December, 2000 TWA was no longer a viable carrier and bankruptcy was not far off.

While the IAM never finalized a restructuring model or plan that it presented to TWA, it engaged in discussions with stakeholders of the

airlines, including the Air Line Pilots Association and determined that, as a form of protection from going into liquidation, TWA would have to go into some form of bankruptcy over the next couple of months.

In December, 2001 the IAM presented a "Restructuring Process Term Sheet" drafted with the assistance of Jay Alix and Associates, to the President and Chief Executive Officer of TWA, William Compton.

This Restructuring Process Term Sheet included commitments by the Company's Board of Directors, the IAM, the Air Line Pilots Association, the Company and its lessors, refinancing and restructuring commitments and other provisions concerning the overall restructuring of TWA.

The finalized restructuring plan was presented to TWA's Board of Directors for a vote on January 5, 2002, but the plan was not voted on prior to the announcement that American had agreed to enter an agreement to purchase certain assets from TWA.

Despite the IAM's efforts to assist TWA in finding a financial alternative for remaining independent, TWA determined that it had no viable alternative to a sale of certain of its assets to American through bankruptcy.

In January, 2001 TWA again filed for bankruptcy. American is a financially secure carrier.

Case 1:02-cv-02917-JEI   Document 586-1   Filed 10/18/13   Page 18 of 58 PageID: 20232

**TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 16**

During the course of the bankruptcy proceedings, TWA and the IAM entered into an agreement for TWA-LLC to recognize the IAM and to continue the IAM collective bargaining agreement with certain revisions. The resulting agreement between TWA and the IAM is embodied in the Transition Agreement executed between these two parties, dated April 4, 2001. The Transition Agreement removed scope and successorship provisions that required application of the Allegheny-Mohawk seniority integration procedures in the event of a merger or acquisition.

On March 13, 2001 TWA sent a letter to the IAM explaining American's plans and intentions concerning American's acquisition of TWA's assets. That letter stated that TWA-LLC would adopt the rates of pay in the then-current TWA labor contracts, that American would transition the TWA-LLC employees to American pay rates and benefits no later than January 1, 2002, that work rules would be revised to make them compatible with American's work rules and that all of TWA's U.S.-based represented employees who meet the qualifications described in the Asset Purchase Agreement would become American employees as quickly as possible.

The parties did not negotiate or adopt a no-furlough clause as part of either the Transition Agreement or the collective bargaining agreements applicable to TWA-LLC employees. As of April 3, 2001 TWA and the IAM recognized that, while American had undertaken to use its

"reasonable best efforts to assist TWA-LLC" to provide employment, in fact, there could be furloughed TWA-LLC employees as of the date of the American/TWA-LLC integrations. The parties expressly provided that the furloughed TWA-LLC employees would be included in the integration process.

On April 9, 2001 American acquired certain assets of TWA, Inc. pursuant to an Asset Purchase Agreement approved by the Bankruptcy Court. This acquisition was completed on April 10, 2001.

The assets purchased by American from TWA, Inc. were received by American and its wholly-owned subsidiary, TWA-LLC, which was certified by the Federal Aviation Administration (hereinafter the "FAA") and the Department of Transportation (hereinafter "DOT") as a Part 121 direct air carrier pursuant to 14.C.F.R. Part 119.

It has always been American's publicly stated intention to combine TWA-LLC into American. Since December 2, 2001 the two systems have been held out to the flying public as a single carrier.

Effective January 1, 2002 TWA-LLC employees began to receive pay and benefits equivalent to American pay rates and benefits.

American was motivated to purchase TWA in order to maintain market position through acquisition, specifically in reaction to a pending United Airlines-U.S. Airways transaction.

TWA's St. Louis hub was value brought to American by TWA. This hub provided a substantial portion of the market share increase in the form of a mid-Continent hub to supplement American's Dallas-Fort-Worth and Chicago, O'Hare hubs, and opened up St. Louis, one of the big markets in the U.S. with a number of corporate headquarters.

TWA's Kansas City maintenance/overhaul base provided an additional large maintenance facility with a skilled workforce for American.

During the Summer of 1999, the IAM was instrumental in funding the Kansas City maintenance/overhaul base by successfully lobbying Kansas City residents to approve a proposal to issue a bond to finance improvements for the TWA maintenance facility.

At the time American purchased TWA's assets, only 5 or 6 of 14 bays were being used by TWA at the Kansas City facility. The IAM has estimated that by 2005 approximately 8 of the bays would be in use and that by 2010 approximately 11 of the bays would be in use.

Although American had planned to expand its Alliance Fort-Worth maintenance base and facility by the addition of 3 hangar bays, these growth plans were deferred as a result of American's acquisition of TWA and the added capacity provided by the Kansas City maintenance facility.

As a part of the transaction, American acquired a 26% interest in Worldspan, 171 slots at four restricted airports worth approximately $194 million and 138 gates at key airports valued at $73 million.

American decided to close TWA's JFK operation, including the termination of routes and closing of a maintenance facility.

American took over the operation of many of the routes and frequencies TWA had operated at JFK.

Other portions of the TWA operation have been pared back by American to those operations which American believes will constitute the best operational synergies with the Carrier, including the elimination of duplicative routes.

American/TWU and TWA/IAM employees differed in the types of seniority and methods of seniority accrual.  American/TWU employees accrue occupational, classification and company seniority;  TWA/IAM employees accrued only classification and company seniority.

This arbitration addresses only integration of occupational seniority.

American/TWU occupational seniority reflects time spent in a classification of work within a Title Group starting from the first day an employee reports to that Title Group.  Occupational seniority is used for reductions-in-force, all facets of promotion and demotions and transfers.

TWA/IAM classification seniority is the length of service for which an employee receives credit, regardless of location, in any of the classifications covered by the agreement.  Classification seniority applies to reductions-in-force, preference of shift, days off, vacation period selection, bidding for vacancies or new jobs and promotions, demotions or transfers.

TWA/IAM company seniority is defined as the date of hire and is used for credited service for pension benefit calculations and also as a classification Seniority tiebreaker.  Unlike TWA/IAM company seniority, company seniority at American is adjusted for specific periods of time when an employee is not on the active payroll (primarily furloughs and leaves of absences).  Because of these differences in seniority, in the process of converting TWA/IAM employees to American/TWU employees, TWA/IAM employees' company seniority was adjusted to reflect American policies.  American company seniority is used, and will continue to be used, for purposes of vacation accrual and selection, eligibility for certain benefits, retirement eligibility, vesting, length of service awards and service-charge-waived travel.

April 10, 2001 has been used for seniority integration purposes by other groups on American property, specifically including pilots, flight attendants and agents.

On November 8, 2001 the Allied Pilots Association and American entered an agreement awarding TWA-LLC pilots American seniority dates retroactive to April 10, 2001. The agreement also held that: (1) American and TWA pilot seniority lists were to be integrated on a basis of approximately 1 TWA pilot to every 8.17 American pilots until only TWA pilots remain and (2) that the small group of American pilots who have a seniority date of later than April 10, 2001 would follow all TWA-LLC pilots on the combined American seniority list. Special provisions were adopted for St. Louis-based positions.

On December 17, 2001 the Association of Professional Flight Attendants and American entered an agreement granting all TWA-LLC flight attendants an occupational seniority date at American of April 10, 2001. Later seniority dates would be granted to TWA-LLC employees who had not completed training or who had not commenced flying as of the April 9, 2001. The American seniority list shall be combined with the revised TWA-LLC seniority list. Special provisions were adopted for St. Louis-based flight attendants.

On August 9, 2001 American announced its plan for combining the work forces of American's and TWA's reservation agents and passenger service representatives. American's agents and passenger service representatives are not represented by a labor organization. American determined that the occupational seniority date for TWA's agents and

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 22

passenger service representatives would be April 10, 2001. Company seniority will not be altered, other than the revisions required to comply with American policies concerning company seniority. Additionally, TWA agents and passenger service representatives will be moved up to the American pay scale.

As of April, 2001 American had 13,679,000 available seat miles (hereinafter "ASMs") compared to TWA's 2,919,000 ASMs. TWA's ASMs represent 21% of American's total ASMs. ASMs represent the relative size of each carrier, as measured by seats available for revenue passengers multiplied by miles in a flight.

TWA/IAM employees were paid less than the average of what comparable employees at other major airline carriers were paid.

Effective January 1, 2002 TWA-LLC employees began to receive pay and benefits equivalent to American pay rates and benefits, and American work rules became applicable to TWA-LLC employees. The details of the increased pay scales applicable to TWA-LLC employees effective January 1, 2002 were provided to those employees in late 2001. These pay increases were applied to approximately 90% of the TWA-LLC employees.

American's conversion of TWA-LLC employees to American pay scales translated to substantial percentage hourly pay increases for Store Clerks, Fleet Service Clerks and Mechanics and Related Employees.

American has assumed an incremental cost of $104.6 million for calendar year 2002 as a result of its decision to implement pay increases in order to bring TWA-LLC employees up to American pay rates.

Between 1992 and American's acquisition, TWA incurred an operating loss of over $1.7 billion.

Without the cash provided by American in connection with the acquisition, TWA lacked the liquidity necessary to meet its immediate obligations of approximately $40 million. Paying these obligations would have placed TWA in a cash balance deficit of $20 million.

In its purchase of TWA, American made a total purchase commitment of $2.825 billion. This total is comprised of $313 million paid in cash for assets, $312 million expended as debtor-in-possession financing, for an immediate, upfront cash cost of $626 million. American also assumed $2.2 billion in aircraft lease obligations.

Over the next five years, American will incur additional costs as a result of integration and labor costs. The integration costs will consist of fleet modifications, facility integration and updates, training, systems conversion and severance/relocation. The labor costs, estimated to be $260 million per year, will consist of the application of American wage rates and work rules to the TWA-LLC workforce. Together, these two costs will total over $2 billion through 2005.

A significant portion of the increase in labor costs is attributable to the increase in the wage rates for the IAM-represented TWA employees. For example, the wage rate increase for mechanics will be 44% (from $20.04/hour to $28.85/hour) and 33% for ramp servicemen (from $16.59/hour to $22.05/hour). These wage rate increases do not include subsequent increases that took effect on March 1, 2002.

Additional integration costs have not been quantified, but are anticipated; such costs will include those associated with merging technology systems and databases, merging back office processes, addressing customer loyalty issues and the downgrading of American and AMR debt that occurred as a result of this merger.

Revenue synergy refers to incremental revenue that will be realized by the resulting company that would not have been realized by either company on a stand-alone basis. Revenue synergies from the integration of TWA into American will result from share shift/city presence enhancement, yield improvement, scheduling efficiencies, the elimination of the Karabu ticketing agreement, the creation of a stronger frequent flyer program and the expansion of the alliance with foreign flag airlines. One of the most critical revenue synergies will result from the additional route connections associated with combining the two carriers' networks. The combination of TWA's and American's networks will add 1,910 new markets and 16.7 million more passengers to the merged airline.

The TWU's estimate of annual revenue synergies, not adjusted for the September 11 effect (which would reduce the synergies), ranges from $400 million to $500 million.   The IAM estimates that the annual revenue synergies, not adjusted for the September 11 effects, will exceed $700 million.  These synergies would not be automatic, but rather would be phased in over time.

Mr. Stalnaker testified that TWA as a stand-alone carrier will provide approximately $2.4 billion in revenue to American Airlines;  and, combined with the $700 million generated by the network synergies, TWA will add approximately $3.1 billion in revenue to American, which represents a 33% increase to American's revenue.

Cost synergies are additional savings available to the combined entity that would not otherwise be available to either carrier on a stand-alone basis.   In American's acquisition of TWA, cost synergies mainly result from reductions in TWA's cost structure and are expected to range from $250 million to $400 million per year through 2005.  These cost savings are made up of operating cost savings and lower lease rates resulting from American's better credit rating and stronger purchasing power.   The operating cost savings include elimination of duplicative overhead and facilities, lease obligations and utilization of American purchasing power and fuel hedging programs, amounting to approximately $150 million in annual savings.  The reduction in lease

rates, due to American's superior credit rating and purchasing leverage, is estimated to translate to an annual savings of approximately $200 million.

In July, 2001 the IAM received its first notice of furloughs of IAM-represented employees. These furloughs were to be effective September 2 and October 6, 2001.

American closed TWA's JFK operations because they had been reduced to the point that they were no longer economical. The decision was made to close JFK because, based on the downturn in the air industry in general, it was determined that there was no need for dual operations, that is, services provided by both American and TWA, at that location. This decision resulted in the ceasing of services as well as the closing of facilities, including the TWA hangar and terminal at JFK. The impact from the JFK closing accounts for somewhat less than half of the total TWA furloughs.

Between April 10 and September 11, 2001, TWA-LLC employees were furloughed as a result of work rule changes being imposed as well as a result of the closing of TWA's JFK operations. In addition, according to the testimony of Mr. Calhoun, American subcontracted or transferred all or a portion of the work TWA employees had been performing at 27 different locations to American.

Mr. Stalnaker testified that American also transferred or removed work from the combined networks in 101 markets in which TWA had operated flights.

During this time, no American employees were furloughed. Following September 11, additional furloughs were made, to both the American and TWA-LLC workforces as a result of the changes in the airline industry due to the impact of September 11. On the TWA side, additional furloughs were made based on marketing route and aircraft utilization decisions.

On September 27, 2001 American and TWA-LLC layoffs were announced, effective September 28, 2001.

Additional layoffs were announced in February 2002, affecting 84 TWA-LLC/IAM employees.

As of March 4, 2002 the following was the most current furlough and recall data for American TWU-represented and TWA-LLC employees overall:

**3,542 American TWU-represented employees had been furloughed compared to 1,627 TWA employees, for a total of 5,169 furloughs. These furlough figures include those employees who were subsequently recalled.**

**1,272 American-TWA-represented employees had been recalled compared to 12 TWA employees, for a total of 1,284 recalls.**

The recall numbers are a result of gradually rebuilding the operation and schedule.

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 28

To iterate, the single issue for the Arbitrator to determine is "How the system seniority lists of each of the respective employee groups shall be integrated for purposes of occupational seniority in light of the applicable provisions of the American-TWU collective bargaining agreements?"

## Position of the Carrier

The Carrier submits that there should be no dispute concerning TWA's financial condition and the transaction that gave rise to this seniority integration proceeding. The Carrier asserts that TWA suffered long term financial problems, including prior bankruptcies. The Carrier asserts that TWA had no alternative to a sale of certain assets to American, and that the Carrier, as a "white knight", through the asset purchase, provided the best hope for continued employment for TWA's IAM-represented employees.

The Carrier contends that the American-TWA transaction was "not a marriage of equals". The Carrier maintains that American was the substantially larger and much more financially secure carrier.

The Carrier contends that TWA did, however, contribute valuable assets to the transaction. The Carrier asserts that two assets of TWA are of particular value: (1) the St. Louis hub, which provided a substantial portion of the market share increase and a mid-Continent hub to

supplement American's Dallas-Fort Worth and Chicago O'Hare hubs; and (2) the Kansas City maintenance base, which provided an additional large maintenance facility with a skilled workforce.

However, the Carrier contends that other TWA assets were not of particular value to American, and points to American's decision to close TWA's JFK operation, to terminate certain routes and to close a maintenance facility. The Carrier maintains that, additionally, it pared back other portions of the TWA operation. The Carrier submits that these decisions of American management resulted in the furloughing of certain IAM-represented TWA employees.

The Carrier maintains that, while the TWA transaction brought value to American, the value must be assessed realistically in terms of those specific operations and employees which are being integrated into American's operations.

In the context of the collective bargaining agreements, the Carrier points out that there are identical agreement provisions which adopt the Allegheny-Mohawk Provisions, and which establish a substantive requirement that no TWU-represented employee "will be adversely impacted in rates of pay, hours, or working conditions by the integration". The Carrier further points out that the instant proceeding is an interest arbitration type of process, limited to the one issue recited above.

The Carrier maintains that there is no dispute regarding the intent of the controlling contractual provisions. The Carrier points out that TWU Counsel Arthur Luby and American Representative James Weel testified that the contract clauses were intended to "hold harmless" the TWU membership in a seniority integration with an acquired carrier. The Carrier submits that, while the procedures of selected paragraphs of Allegheny-Mohawk have been adopted, those paragraphs are only relevant to the extent they can be applied while holding harmless TWU-represented employees from any adverse impact. Accordingly, the Carrier contends that the only way in which TWA employees' seniority may be addressed is in a manner that does not adversely impact the rates of pay, hours or working conditions of American's seniority list employees.

The Carrier submits that it is not an advocate for any specific seniority integration method, and suggests that there could be "range of approaches" which would meet the contractual standard and the parties' interests.

The Carrier states that its interest in the seniority integration arbitration is that the outcome "be issued immediately", and that the resolution be (1) reasonable, understandable, practical and acceptable, (2) crafted so as to minimize the operational and cost impact of

integrating the workforces and (3) structured so as to avoid unnecessary morale problems among employees.

The Carrier submits that it is difficult to understand how "dovetailing" the TWU and IAM seniority lists, as the IAM has proposed, could be implemented consistent with the contractual requirement of no adverse impact upon the TWU-represented employees. Additionally, the Carrier suggests that one could argue that, under traditional Allegheny-Mohawk standards, TWA was a "failed carrier", and thus dovetailing of seniority lists would be an inappropriate seniority integration methodology.

The Carrier points out that the TWU has argued for a April 10, 2001 seniority date for all TWA employees, as that was the date of American's acquisition of TWA assets. The Carrier further points out that April 10, 2001 has been the date used in integrating the seniority of other groups on American's property, and thus would appear to be consistent with the contractual standard to "hold harmless" TWU employees.

The Carrier maintains that a April 10, 2001 date may be appropriate, and posits that special provisions should be made to protect seniority expectations of TWA employees concerning the St. Louis hub and the Kansas City maintenance facility. The Carrier submits that it is necessary for some mechanism to be in place which would minimize the

impact of integration upon TWA employees at those facilities.  American suggests that such protections are justified as a matter of equity, given the particular contribution to the transaction made by the workforces at those two facilities, and in view of the fact that American's presence prior to the acquisition at both locations has been very modest.  The Carrier also states that it has an interest in maintaining continuity of operations and avoiding excessive costs at those facilities by insulating TWA employees from the adverse impact of seniority integration at those two locations.

In conclusion, the Carrier suggests that there should be a range of solutions that would protect TWU-represented employees from adverse impact, protect IAM-represented employees at the St. Louis hub and at the Kansas City maintenance facility from displacement by American employees with relatively less experience at those unique locations and provide a workable and acceptable method for integrating the two workforces.

## Position of the IAM

The IAM submits that "date of entry" into the classification or "length of service" is the seniority integration method which achieves a fair and equitable resolution, and satisfies the specific terms of the applicable collective bargaining agreements.

The IAM contends that Date of Entry is intrinsically fair, since it credits each employee for every year he has worked in his job without regard to whom his employer may have been. The IAM argues that treating each year of service the same is the only method that gives full recognition to the fundamental principle, as stated by a TWU witness, that "seniority is a cornerstone" for all unionized employees. The IAM asserts that anything less than using a Date of Entry methodology would result in a portion of an individual's tenure being nullified. The IAM submits that, since an arbitral ruling cannot extinguish an employee's work experience, the methodology established in this case should not cause an employee to lose the primary benefit of that service or experience. The IAM maintains that if the TWU's proposal is accepted then virtually all of the seniority accrued by more than 6,000 TWA employees would be erased.

The IAM contends that, if it is necessary to look beyond the equities inherent in a Date of Entry methodology, the facts and circumstances unique to this case require that the seniority lists be integrated using such methodology. The IAM submits that the value which TWA has provided will redound to American's benefit in terms of assets, a trained and experienced workforce, increased revenues and, most importantly insofar as TWU-represented employees are concerned, additional job opportunities.

The IAM points out that the TWU-American collective bargaining agreements, cited above, provide for the integration of seniority lists to be accomplished through the governing principles of the Allegheny-Mohawk Provisions. The IAM further points out that Allegheny-Mohawk provides that the method for integrating seniority lists shall be "fair and equitable". Citing the seniority integration decision involving the flight attendants of Pan American World Airways and National Airlines, the IAM points out that arbitrators have uniformly determined that the fair and equitable standard is satisfied if the integration preserves the job expectations and relative bidding positions that employees held prior to the merger or acquisition. The IAM asserts that a TWU witness acknowledged that this objective is equivalent to the contractual requirement that "no employee on the master seniority list will be adversely impacted . . . by the integration."

The IAM maintains that the beneficial effects of the merger, both to American and its employees, require that Date of Entry be used to integrate the seniority lists. The IAM submits that those effects have, in large part, already been realized, since American has devoted the past year to rationalizing the networks and operations of the two airlines. The IAM points out that its expert witness, Mr. Thomas Stalnaker, testified that American has changed the level of flight operations performed by

TWA or American at 113 different markets.  Therefore, the IAM submits that, as of today, the two airlines overlap on only two city-pairs.

The IAM contends that American, beginning on April 10, 2001, undertook a process that has resulted not only in a shift of flights but in an equally, if not more extensive, transfer of work between the two carriers.  The IAM points out that IAM Representative Al Calhoun testified that American has transferred substantial amounts of work from TWA either to itself or to a third-party contractor at 29 different stations. The IAM contends that the magnitude of this reallocation of job assignments is expressed by the number of employees currently furloughed at each carrier.  The IAM submits that the record reflects that six months after September 11, 2001 all but 8% of American's employees are at work, while 24% of TWA's employees are still furloughed.  The IAM submits that this discrepancy is explained, at least in part, by the fact that American has taken jobs away from TWA employees and transferred them to American workers.

The IAM asserts that, as a result of American's year-long rationalization process, TWA today provides the Carrier with $2.4 billion in new revenue and has added 4,848 positions to the job classifications here under consideration.  The IAM also contends that TWA's benefit to American is not limited to its current contributions, but extends to the projected effects of the merger.  The IAM points out that Mr. Stalnaker

testified that, once the two operations are fully integrated, American will realize an additional $700 million in revenue and $350 million in cost reductions. The IAM further points out that American will have the opportunity to fully exploit all of the hard assets it acquired, including the valuable Kansas City overhaul base, a facility the IAM was instrumental in saving through its legislative/political efforts.

The IAM submits that this transaction, unlike other mergers and acquisitions, involves a situation where at the point of the actual integration the purchaser, American, will have stripped the acquired carrier of all routes and employees it considers to be surplus, and will have retained only those assets it deems essential to a merged operation. The IAM submits that, as a result, every additional job TWA brings to American is of incremental value to the Carrier; and, by causing the pool of job opportunities to expand, the merger has the concomitant effect of preserving the relative bidding position that each employee held prior to the integration.

In conclusion, the IAM argues that Date of Entry is the methodology that should be adopted based upon its inherent equities and the overwhelming evidence that this merger has created new job opportunities which will ensure the preservation of an individual's bidding position. The IAM maintains that Date of Entry satisfies both

the fair and equitable standard of <u>Allegheny-Mohawk</u> as well as the requirements of the applicable collective bargaining agreements.

## Position of the TWU

The TWU submits that, in contrast to most arbitrations, there is no dispute between the parties regarding the meaning of Article 1(h) of the Mechanics and Related collective bargaining agreement or the companion provisions in the other TWU contracts. The TWU points out that witness Arthur Luby testified that these contract clauses represent "hold harmless" provisions, which specify that TWU-represented employees are not to be placed in a "worse position" or deprived of what they would have "legitimately expected" if there had been no merger and no seniority integration.

The TWU points out that Mr. James Weel, American's Chief Spokesperson involved in the negotiation of the above-referenced provisions, corroborated Mr. Luby's testimony concerning the meaning and intent of Article 1(h) and the companion provisions.

The TWU further points out that TWU International Vice President and Airline Director James Little testified that the TWU had several practical reasons for seeking protection from adverse impact in the seniority integration process. The TWU points out that Mr. Little testified that the TWU was concerned that TWA employees were senior, and such

circumstance could lead to the displacements of large numbers of less senior TWU-represented employees, particularly if the transaction turned out to be less advantageous than American had hoped. The TWU submits that such concern was justified because American was acquiring a "chronically, indeed terminally, ill carrier that could be a drag" on American.

Insofar as the "equities" are concerned, the TWU submits that the IAM had specifically waived the successorship and merger protection provisions in its collective bargaining agreement with TWA in order to obtain certain other rights with TWA post-bankruptcy; and that TWA employees had gained substantial benefits as a result of their becoming American employees. The TWU points out that Vice President Little testified regarding TWU's concern that American would forego its plans to expand the Alliance-Fort Worth repair facility, and would transfer work from that facility to TWA's Kansas City maintenance base, which had excess capacity for the repair and maintenance of aircraft. The TWU submits that it was justifiably concerned that TWU-represented employees at Alliance-Fort Worth would be disadvantaged by an inability to follow their work to Kansas City because of the comparatively greater seniority of the IAM-represented workforce at Kansas City.

The TWU submits that, based upon these considerations, the TWU has proposed that incoming TWA employees be provided an April 10,

Case 1:02-cv-02917-JEI Document 586-1 Filed 10/18/13 Page 41 of 58 PageID: 20255

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 39

2001 seniority date, "a position mirroring the final settlements made by other unions on the property". The TWU submits that, while the contract does not dictate such a result, the TWU is "open" to any resolution which protects the interests of the IAM workforce, *provided that the contractual "hold harmless" guarantee to TWU workers is respected*. (Emphasis by the TWU)

The TWU submits that the IAM demanded that the Arbitrator ignore the above-cited contractual standard, and argued that a dovetailing arrangement would be appropriate because TWA purportedly brought enhanced work opportunities "to the table", and that the IAM otherwise had an equitable right to such an arrangement. The TWU argues that the IAM never explained how its seniority integration plan could be implemented without adversely affecting American employees in violation of the collective bargaining agreements. The TWU contends that the IAM, rather than presenting argument regarding this issue, attempted to demonstrate that dovetailing by date of entry should be adopted as the integration methodology because TWA purportedly had a realistic chance of survival on its own, and because American's acquisition of TWA allegedly created cost reductions, revenue opportunities and great growth potential for American.

The TWU contends that the "painful truth" is that TWA had no future, and would have been liquidated if not for the American

acquisition. The TWU submits that the record establishes that TWA was on the verge of declaring bankruptcy, for a third time, and that TWA had not been profitable between 1994 and 2001. The TWU points out that the IAM's witness, Mr. Sleigh, who testified concerning alternative arrangements TWA may have entered into, acknowledged that such alternative arrangements would have been conditioned upon substantial concessions by the IAM, including a possible sale of TWA's Kansas City heavy overhaul facility. The TWU points out that, in lieu of such an arrangement, TWA's employees are far better off at American, especially because of the massive improvements they are beneficiaries of in terms of pay and benefits.

The TWU contends that the notion that TWA brought great opportunities and synergies to American "falls under the weight of the actual evidence." The TWU submits that Mr. Stalnaker, on cross-examination, acknowledged that many of the cost savings he had attributed to the acquisition by American were actually reductions in high overhead and other costs "of TWA alone", and that such cost reductions were accomplished solely because of American's size and credit-worthiness. The TWU also points out that Mr. Stalnaker conceded that the main value obtained by American was largely due to the Carrier's acquisition of TWA's St. Louis hub.

The TWU submits that its expert economic witness, Mr. Davis, demonstrated that TWA had been in chronic fiscal distress for over a decade with three bankruptcy filings; that TWA was "bleeding cash" as of 2001; and that American not only paid $313 million to acquire TWA, but also assumed $312 million in "debtor-in-possession financing" and assumed aircraft lease obligations of $2.2 billion.

The TWU further points out that Mr. Davis testified that the pay increases given to TWA employees, as a result of the application of the American-TWU collective bargaining agreements cost American approximately $260 million per year. The TWU argues that Mr. Davis' testimony establishes that Mr. Stalnaker overestimated the possible increased revenue synergies when compared to American's own estimates, and that the only real value obtained by American in the form of revenue synergies will occur as a result of the acquisition of the St. Louis hub and the Kansas City maintenance facility.

The TWU submits that American concurred entirely with the TWU regarding the bargaining history and the purpose of the seniority integration provisions in the TWU-American collective bargaining agreements. The TWU iterates that TWA employees received very significant pay increases just by becoming American employees, and that the primary value gained from the TWA acquisition was the St. Louis hub and the Kansas City maintenance facility.

In conclusion, the TWU submits that providing an April 10, 2001 occupational seniority date for incoming TWA employees is the only result which guarantees that American employees will be held harmless. The TWU contends that whatever occupational seniority rights are provided to ex-TWA employees through the seniority integration process must be consistent with the fundamental promise to TWU-represented workers on the American master seniority lists that they will not be adversely impacted in rates of pay, hours and working conditions.

## Findings and Opinion

After reviewing the entirety of the evidentiary record, it is clear that there are certain, critical, undisputed facts that have a controlling effect upon the Award in this case.

First, and most importantly, this Arbitrator's jurisdiction is limited by the collective bargaining agreement provisions cited above, in which American and the TWU agreed that "no [American] employee on the master seniority list[s] will be adversely impacted in rates of pay, hours, or working conditions by the [seniority] integration[s]." The provisions in the four (4) collective bargaining agreements applicable to Mechanics and Related Employees, Fleet Service Employees, Stock Clerks/Stores Employees and Flight Simulator Technicians are identical insofar as the "no adverse impact" principle is concerned.

When these provisions were incorporated in the tri-partite Arbitration Agreement, Joint Exhibit No. 1, this Arbitrator's jurisdiction was severely limited. Thus, while the Arbitration Agreement also calls for the application of Sections 3 and 13 of Allegheny-Mohawk, which make provision for a fair and equitable seniority integration, this Arbitrator's flexibility in divining a "fair and equitable" methodology for establishing occupational seniority for TWA employees is limited.

As a matter of arbitral notice, seniority integration proceedings in the airline industry were, for many years, initiated as the result of labor protective provisions which were imposed by the Civil Aeronautics Board (hereinafter the "CAB") when air carriers sought approval to merge, coordinate, purchase assets one from another or to enter other similar transactions. These provisions were imposed and a seniority integration and arbitration process was provided, because it was recognized that there would be a melding of employees' seniority with the probability that a number of employees would be adversely affected and would likely "lose" some of the seniority they had acquired on their respective carriers. The labor protective provisions imposed by the CAB, beginning with the United-Capital merger, 33 CAB 307 (1961), and then updated by the provisions imposed by the CAB in the Allegheny-Mohawk transaction, reaffirmed the principle, earlier established under the Interstate Commerce Act by the Interstate Commerce Commission, that

the integration of seniority lists in such transactions should be effected in a "fair and equitable" manner. The parties here have adopted that principle, albeit constrained by the no adverse impact condition referred to above.

This Arbitrator also takes arbitral notice of the fact that in typical airline seniority integration proceedings the "competing" groups of employees place in evidence the "equities" which they allege they have brought to the transaction. These equities are ordinarily presented in terms of the financial condition, assets, route structures and other characteristics possessed by the carriers involved in the transaction. When the weighing and balancing is completed and one set of equities is found to be more significant than the other, the employees who have brought the greater equities to the transaction ordinarily find that their seniority is less adversely affected/impacted than the seniority of the employees from the carrier that was less endowed in terms of financial condition, fleet size, modernity of the fleet, route structure and the other indicia of viability ordinarily considered by airline analysts and Wall Street in the context of bond ratings, present profitability status and the likelihood of future profitability.

The second significant, uncontroverted fact is that TWA, at the time of the acquisition of its assets on or about April 10, 2001, was in financial extremis. TWA was on the verge of declaring its third

bankruptcy in less than a decade, it ranked in the lower half of the major carriers in the industry in terms of financial viability and the prospects for its survival were, at best, bleak.

While this Arbitrator is not prepared to adopt American's characterization of itself as a "white knight", nevertheless it is clear that American's offer to purchase TWA's assets saved the careers of TWA's employees. American made a broad offer of employment to virtually all TWA's employees, and most of those employees who were able to retain employment reaped significant advantages in terms of increased rates of pay and benefits.

In this context it must be recognized that TWA's IAM-represented employees were, in the main, "granted new life", as their careers were "saved" by the acquisition. In contrast to the broad-based offer of employment by American to TWA's employees, this Arbitrator takes arbitral notice of the circumstances that were extant with the demise of the other great United States international air carrier, Pan American World Airways, Inc. (hereinafter "Pan Am").

Not unlike TWA, Pan Am suffered greatly from the effects of deregulation. Unlike TWA, Pan Am was not able to survive. Valuable pieces of Pan Am, such as its Pacific routes and its London routes, were sold off; eventually the entire remaining valuable assets were also sold; and while some small numbers of Pan Am flight crew and cockpit crew

employees were able to obtain employment with the acquiring carriers, albeit with substantially reduced seniority, Pan Am's TWU-represented Mechanics and Related Employees and employees in other associated crafts or classes, also represented by the TWU, acquired no benefit from those transactions as thousands received no offers of employment.

The third significant, uncontroverted fact is that TWA brought two valuable physical assets to the transaction;  the St. Louis hub and the Kansas City maintenance base.

Both of those assets are providing and should continue to provide a substantial benefit for all of American's employees in terms of expansion of the Carrier's route system as well as the increased capacity to maintain and repair aircraft for the Carrier.  TWA also brought to the transaction a group of highly-skilled employees in the crafts or classes whose seniority is being determined in this proceeding.

This Arbitrator served as chairman of the TWA-IAM System Board of Adjustment, and heard several cases which concerned aspects of the concessions made by the IAM during TWA's two prior bankruptcies.  It is clear that but for the IAM's leadership it is not likely that TWA would have survived as an operating air carrier into the year 2001.  The commitment by the IAM's leadership and its legislative efforts, testified to by IAM Vice President Calhoun, not only provided American with the opportunity to acquire valuable assets but also contributed substantially

to the preservation of the vast majority of jobs now held by former TWA employees on the American system.

With these facts in mind, it is clear that the TWU recognized its responsibility, as a labor organization long involved in transactions that effected the seniority of employees, to provide some credit for TWA service in terms of occupational seniority.

The issue for this Arbitrator is the extent to which TWA service will count for purposes of occupational seniority for former TWA employees, represented by the IAM, who are working under various American/TWU collective bargaining agreements.

In order to resolve this issue, as noted above, this Arbitrator is required by the Arbitration Agreement to apply the merger, purchase and acquisition provisions of the applicable American-TWU collective bargaining agreements. Thus, while striving to fashion a "fair and equitable award", insofar as incoming TWA employees are concerned, this Arbitrator must respect the contractual condition that the TWU-represented workforce will not be adversely impacted in rates of pay, hours and working conditions by the integration of the seniority lists.

The provision in the American-TWU collective bargaining agreements, referred to above, has been correctly characterized by the TWU and American as a "hold harmless" clause.

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 48

Initially, it must be observed that the "hold harmless" clause requires, at the very least, that upon integration TWU-represented American employees cannot be displaced from the positions they now hold by TWA employees.

As a corollary, equity requires that IAM-represented employees also have rights to retain the positions they held, unless displacement is necessary to comply with the no "adverse impact" clause.

The enabling language of the American-TWU collective bargaining agreements requires that the seniority integration award provide protection against harm, but it does not guarantee increased seniority benefits as a result of the integration process. Nor does the "hold harmless" provision protect employees from the adverse consequences of downturns in the economy or catastrophic events, such as the terrorist attacks of September 11, 2001.

Therefore, while this Arbitrator recognizes that there are some TWU-represented American employees on furlough or otherwise displaced, these adverse developments occurred as a result of the contraction of the airline industry after September 11, 2001, and not as a result of this seniority integration proceeding.

Accordingly, this Arbitrator finds no contractual justification for permitting American employees displaced as a result of the ramifications of September 11, 2001 to displace TWA employees from the positions

they now hold performing the work they brought with them. To permit such displacement by American employees would be particularly unfair and inequitable, in view of the fact that TWA employees were laid off in significantly greater proportions since September 11, 2001 than were their American counterparts.

The record evidence indicates that, beyond the initial integration, American and TWU, in their collective bargaining agreements, intended to protect the legitimate expectations of American's TWU-represented employees in terms of bidding and advancement, and to ensure that the acquisition and seniority integration process did not deprive American's TWU-represented employees of work opportunities they could legitimately expect.

However, as noted above, the contractual language and the bargaining history does not disclose that there was any guarantee for American's TWU-represented employees that there would be additional work opportunities created for them by the acquisition and integration, nor does the language dictate that American's TWU-represented employees benefit at the expense of the IAM-represented workforce.

The "fair and equitable" standard is, by necessity, a subjective one. As past seniority integration awards in the airline industry have demonstrated, there are a variety of methods that may be used to achieve a "fair and equitable" result; and, clearly, what is "fair and equitable" in

the eyes of one employee will not, necessarily, be "fair and equitable" to another.

In many merger, acquisition, consolidation and other similar transactions, both in the transportation and non-transportation industries, seniority lists are often merged using the "Date of Entry" methodology advocated here by the IAM.

In a perfect world, that is if two merging airlines were nearly identical in terms of financial condition, fleet sizes, aircraft types, route structures, ASMs and other indicia and characteristics of the carriers' operations, then date of entry might be considered the most fair and equitable methodology for integrating the seniority lists. Date of entry might also be considered a fair and equitable methodology where the equities were arguably comparable, or where there was general agreement by the competing groups of employees that their service with their respective carriers was of equal value.

However, in the instant case, even if American and TWA brought with them identical values to the acquisition, the terms of the Agreement to Arbitrate would restrict this Arbitrator from adopting a date of entry methodology for integrating the seniority lists, because it is clear that doing so could not avoid adversely impacting American's TWU-represented employees in terms of rates of pay, hours and working conditions.

This Arbitrator has also considered the possibility of adopting a pure ratio system for integrating the seniority lists of the American and TWA employees involved in this proceeding. So that, for example, if a three to one ratio was adopted, after the first three "slots" were filled by American's TWU-represented mechanics then the next "slot" would be filled by a TWA IAM-represented mechanic, and "so forth" down the list.

Such a methodology for integrating seniority lists has been used in the past when crafts or classes of employees have been merged by agreement of the parties or as the result of an arbitration award. While the ratio methodology of integrating seniority lists may be implemented and applied in a reasonably simplistic manner, it is difficult to conceive how a ratio methodology in this case could, under any circumstance, avoid violating the collective bargaining agreements' prohibition concerning adverse impact upon American's TWU-represented employees.

As noted above, TWA did bring certain valuable assets to the transaction. However, the record reflects that TWA had virtually no presence in and brought no work to the vast bulk of American's system; specifically American's major bases and hubs in Tulsa, Alliance Fort Worth, Dallas, Chicago and Miami.

Accordingly, it is this Arbitrator's opinion that, to the extent TWA employees are permitted to use their TWA seniority to bid on positions in

locations such as those referenced in the above paragraph, it is more than likely they would secure such work opportunities at the expense of American's TWU-represented employees on the master seniority lists.

On the other hand, American had no presence at TWA's overhaul facility in Kansas City and a very limited presence in St. Louis.   As discussed above, the record reflects a general agreement that the St. Louis hub and the Kansas City overhaul facility were valuable assets which American assessed would contribute to the Carrier's growth, and were the assets "at the heart" of American's decision to acquire TWA.

This Arbitrator is also persuaded that no American TWU-represented employees, except for a few with recall rights in St. Louis, could have legitimately expected job opportunities in either of these two locations if not for the acquisition by American.

Accordingly, this Arbitrator finds that there is no basis to conclude that any American TWU-represented employee will be harmed by providing that TWA seniority will be fully honored in both of these locations.   Likewise, it is clear that limiting TWA IAM-represented employees their rights to exercise their full seniority in St. Louis and Kansas City would be inequitable, and would fail to recognize the substantial contribution made by TWA to the acquisition.

St. Louis and Kansas City represent the vast majority of TWA IAM-represented positions brought to the acquisition by TWA IAM-

represented employees. However, there are a number of stations at which both American and TWA conducted operations in competition with each other prior to the acquisition on April 10, 2001.

The TWU has contended that at these stations TWA's operations were *de minimis*, and that few, if any, of those stations would have been staffed under the American agreements, and that those stations which were legitimately staffed were largely duplicative. The IAM has argued that, in many of these stations, American employment is presently at levels which would never have existed absent the new "synergy" with TWA, as the result of TWA's contribution of gates, aircraft and TWA traffic, and that it would be inequitable to reserve such opportunities exclusively to American's TWU-represented workforce.

It is this Arbitrator's finding that there is some merit in both of these claims.

It is this Arbitrator's opinion that a reasonably accurate benchmark for determining a carrier's "contribution" to a city or station, where two or more carriers compete, is the percentage of either carrier's ASMs compared to the whole.

Based upon a review of the economic and operational data in the record, and in view of TWA's concentration of operations in St. Louis and Kansas City, it is this Arbitrator's finding that TWA's contribution will be considered more than *de minimis* only where the contribution of TWA in

terms of ASMs is greater than ten percent (10%) of the total ASMs at any city or station as of April 9, 2001.   At such city/stations TWA IAM-represented employees will be provided with a seniority date that represents twenty-five percent (25%) of their acquired TWA seniority.

This twenty-five percent (25%) calculation is based upon this Arbitrator's finding that as of April, 2001 American had 13,679,000 ASMs as compared to TWA's 2,919,000 ASMs.  TWA's ASMs represent 21% of American's total ASMs.  This Arbitrator has also factored in an additional four percent (4%) credit to be given to TWA employees in view of the additional job opportunities that should be provided to American employees by the synergies referred to in the facts recounted above at the cities/stations where TWA's ASMs meet or exceed the *de minimis* benchmark.

If the ten percent (10%) benchmark at any city/station is reached or exceeded, then once all American employees have been recalled, TWA employees will have the right to exercise their seniority, as adjusted above, to available positions at such city/station.  These positions will be reserved for bid by TWA employees with recall rights, and they shall be permitted to use twenty-five percent (25%) of their TWA seniority.

At cities/stations where TWA's ASMs contribution is less than ten percent (10%) based upon the above-referenced calculation and where there are resident American TWU-represented employees in the same

craft(s) or class(es) as the TWA-IAM represented employees, TWA's contribution will be deemed *de minimis*, and such TWA-IAM-represented employees will acquire an April 10, 2001 seniority date.

In conclusion, this Arbitrator recognizes that the TWU was the only organization on American's property which determined that its counterpart union representing TWA employees in the Mechanics and Related Employees, Fleet Service Employees, Stock Clerks and Flight Simulator Technicians crafts or classes should be afforded the opportunity to present arguments in an arbitration process as to what it considered to be fair and equitable in terms of seniority integration.

While the above rationale does not adopt either of the unions' positions, it does represent, in this Arbitrator's opinion, a fair and equitable result that at the same time recognizes the requirement to ensure that no American employees on the master seniority lists will be adversely impacted in rates of pay, hours or working conditions.

In a dispute of this type, where the seniority of nearly 35,000 employees is being addressed, it is not unlikely that there may be future claim(s) by an employee(s) that the Award is not being properly implemented or applied. Accordingly, this Arbitrator directs the parties to establish a Dispute Resolution Committee for the purpose of resolving any such future disputes. The Committee shall be chaired by a single arbitrator, selected through the processes of the NMB or otherwise.

TWU, IAM and AA
Seniority Integration Arbitration
Mechanics and Related, et al.
Page 56

Award:

1.    In the implementation of the above principles, no TWU-represented American employee will be adversely impacted in rates of pay, hours or working conditions by this seniority integration.

2.    At TWA's St. Louis hub and Kansas City maintenance facility, TWA employees shall be permitted to exercise their full TWA seniority.

3.    At a city/station where TWA's ASM contribution was ten percent (10%) or more when compared to the combined ASMs TWA and American had at that station as of April 9, 2001, TWA employees will be awarded twenty-five percent (25%) of their acquired seniority for purposes of bidding and advancement.

4.    At a city/station where TWA's ASM contribution was less than ten percent (10%) when compared to the combined ASMs TWA and American had at that station as of April 9, 2001, TWA employees will be awarded a April 10, 2001 seniority date for purposes of bidding and advancement.

5.    As a result of the initial implementation of this Award, there will be no "system flush", that is, displacement of presently working employees in the crafts or classes here under consideration.

6.    A Dispute Resolution Committee will be established for purposes of hearing and resolving any disputes regarding the proper interpretation and implementation of this Award.

This Award was signed this 29th day of April, 2002.

Richard R. Kasher, Arbitrator