# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

PATRICK BRADY, et al.,

               Plaintiffs,

        v.

AIR LINE PILOTS
ASSOCIATION,
INTERNATIONAL,

              Defendant.

Civil Action No. 02-2917 (JEI)

---

## ALPA'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTIONS TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERTS, AND FOR SUMMARY JUDGMENT

---

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033-0968
(856) 795-2121

*Pro Hac Vice:*

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT ......................................................................................................... 5

I.  THE TESTIMONY OF PLAINTIFFS' EXPERTS FAILS TO MEET THE REQUIREMENTS OF RULE 702 AND *DAUBERT* ..................................... 5

    A.  Expert Testimony Must Satisfy *Daubert* Before Reaching a Jury .......... 5

    B.  Salamat's Testimony Should Be Excluded ............................................ 7

        1.  Salamat Is Not Qualified to Offer an Expert Opinion on the Expected Outcome of Pilot Seniority Integration Negotiations ..... 7

        2.  Salamat's Analysis Is Unreliable and Lacks Fit Because It Is Based on Speculation and Counterfactual Assumptions ......................... 9

        3.  Each One of Salamat's Alternative Seniority Lists Is Inadmissible for Failure to Meet the *Daubert* Standards ................................... 19

    C.  Farber's Testimony Should Be Excluded ............................................. 31

        1.  Farber's Expertise in Economics Does Not Qualify Him to Testify About the Non-Economic Analysis He Performed ...................... 31

        2.  Farber's Selection of Comparable Transactions Lacks a Reliable Methodology ............................................................................. 33

        3.  Farber's Metric for Estimating Seniority Lists is Not Reliable ..... 37

        4.  Farber's Alternative Seniority Lists Fail to Account for Key Features of the Seniority Integration and to Provide a Basis for Individual Damages, and Thus Do Not Fit the Case .................... 39

II.  ALPA IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES ................................................................................................. 42

    A.  The Liability Verdict Does Not Relieve Plaintiffs of Their Burden of Proving Damages with Reasonable Certainty ...................................... 43

        1.  The "Wrongdoer Rule" Relaxes, But Does Not Eliminate, Plaintiffs' Burden of Proving Damages ...................................... 44

        2.  Testimony of Fact Witnesses with Knowledge is Relevant to the Factual Determination of Damages ........................................... 46

    B.  Plaintiffs Have Not Met Their Burden of Proving Any Damages ........ 46

1.   There Is No Evidence That the APA Would Have Accepted the Rightful Place Proposal.................................................................47

2.   It Is Too Late for Plaintiffs to Change Their Theory of Damages 49

3.   Professor Sycara's Testimony Does Not Support Plaintiffs' New Argument About the Rightful Place Proposal .............................51

C.   Damages Should Be Limited As a Matter of Law to the Duration of the 1997 CBA...............................................................................53

CONCLUSION ...............................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguinaga* v. *United Food and Com. Workers, Int'l Union*,
    854 F. Supp. 757 (D. Kan. 1994) ............................................................. 18, 46

*Bigelow* v. *RKO Radio Pictures*,
    327 U.S. 251 (1946 ) ................................................................................. 36

*Bowen* v. *U.S. Postal Serv.*,
    459 U.S. 212 (1983) .................................................................................. 54

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Boston*,
    853 F. Supp. 2d 181 (D. Mass. 2012) ..................................................... 34, 41

*Burton* v. *General Motors Corp.*,
    No. 1:95-cv-1054-DFH-TAB, 2008 WL 3853329 (S.D. Ind. Aug. 15, 2008) ...................................................................................................... 45

*Carnegie Mellon Univ.* v. *Marvell Tech. Grp., Ltd.*,
    No. 09-290, 2013 WL 1767970 (W.D. Pa. Apr. 24, 2013) ...................... 46

*Clark* v. *Prudential Ins. Co.*,
    No. 08-6197 (DRD), 2013 WL 1694451 (D.N.J. Apr. 18, 2013) ............ 42

*Comcast Corp.* v. *Behrend*,
    133 S. Ct. 1426 (2013) ............................................................................. 53

*Crowley* v. *Chait*,
    322 F. Supp. 2d 530 (D.N.J. 2004) ........................................................ 28, 35

*Curtis* v. *Besam Group*,
    No. 05-CV-2807, 2008 WL 1732958 (D.N.J. Apr. 10, 2008) ................ 6, 23

*D&D Assocs., Inc.* v. *Bd. of Educ. of N. Plainfield*,
    No. Civ.A. 03-1026, 2006 WL 755984 (D.N.J. Mar. 20, 2006) ............. 8

*Donlin* v. *Philips Lighting N. Am. Corp.*,
    581 F.3d 73 (3d Cir. 2009) ...................................................................... 46

*Elcock* v. *Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)............................................................................19

*Schneider ex rel. Estate of Schneider* v. *Fried*,
    320 F.3d 396 (3d Cir. 2003)..............................................................................6

*Floorgraphics, Inc.* v. *News Am. Mktg. In-Store Servs., Inc.*,
    546 F. Supp. 2d 155 (D.N.J. 2008)..................................................................16

*Furlan* v. *Schindler Elevator Corp.*,
    864 F. Supp. 2d 291 (E.D. Pa. 2012)...............................................................38

*Gen. Elec. Co.* v. *Joiner*,
    522 U.S. 136 (1997)..........................................................................................21

*Gutierrez* v. *Johnson & Johnson*,
    No. 01-5302 (WHW), 2006 WL 3246605 (D.N.J. Nov. 6, 2006)....................34

*Iams Co.* v. *Nutro Prods.*,
    No. 3:00-CV-566, 2004 WL 5496244 (S.D. Ohio June 30, 2004)...................41

*Lehrman* v. *Gulf Oil Corp.*,
    500 F.2d 659 (5th Cir. 1974)...........................................................................36

*Locklin* v. *Day-Glo Color Corporation*, 429 F.2d 873 (7th Cir. 1970) ................45

*Lucente* v. *IBM*,
    146 F. Supp. 2d 298 (S.D.N.Y. 2001) .............................................................44

*Malletier* v. *Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................................32

*Mooring Capital Fund, LLC* v. *Phoenix Cent., Inc.*,
    No. CIV-06-0006-HE, 2009 WL 4263359 (W.D. Okla. Feb. 12, 2009) ..........21

*Munoz* v. *Orr*,
    200 F.3d 291 (5th Cir. 2000)......................................................................34, 41

*New Forum Publishers, Inc.* v. *Nat'l Org. for Children, Inc.*,
    No. Civ. A. 02-1737, 2003 WL 22016941 (E.D. Pa. July 1, 2003)..................44

*Oddi* v. *Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)............................................................................28

*Palmer* v. *Conn. Railway & Lighting Co.*,
 311 U.S. 544 (1941)........................................................................45

*Pettway* v. *Am. Cast Iron Pipe Co.*,
 494 F.2d 211 (5th Cir. 1994)........................................................45

*Smithkline Beecham Corp.* v. *E. Applicators, Inc.*,
 No. 99-CV-6552, 2001 WL 1526273 (E.D. Pa. Nov. 29, 2001) ......................39

*Starceski* v. *Westinghouse Elec. Corp.*,
 54 F.3d 1089 (3d Cir. 1995)........................................................45

*State Farm Fire & Cas. Co.* v. *Steffen*,
 No. 09-4965, 2013 WL 1721678 (E.D. Pa. Apr. 19, 2013) .............................6

*Story Parchment Co.* v. *Paterson Parchment Paper Co.*,
 282 U.S. 555 (1931)............................................................ 11, 36, 44

*Surace* v. *Caterpillar, Inc.*,
 111 F.3d 1039 (3d Cir. 1997)........................................................32

*Toscano* v. *Case*,
 CIV.A. 11-4121 FSH, 2013 WL 5333206 (D.N.J. Sept. 20, 2013)....................9

*USS-POSCO Indus* v. *Contra Costa Cty. Bldg. & Const. Trades Council,
AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994) ........................................49

*Viking Yacht Co.* v. *Composites One LLC*,
 610 F. Supp. 2d 333 (D.N.J. 2009) (Irenas, J.) ................................16

*Wal-Mart Stores, Inc.* v. *Dukes*,
 131 S. Ct. 2541 (2011)........................................................53

*Warren Distrib. Co.* v. *InBev USA L.L.C.*,
 No. 07-1053 (RBK/JS), 2010 WL 2179167 (D.N.J. May 28, 2010)................39

## OTHER AUTHORITIES

Richard E. Walton and Robert B. McKersie, *A Behavioral Theory of Labor
Negotiations* (1965) ..............................................................17

Robert H. Mnookin, *Strategic Barriers to Dispute Resolution: A Comparison of Bilateral and Multilateral Negotiations*, 8 Harv. Negot. L. Rev. 1 (2003) ...................................................................................................13

## PRELIMINARY STATEMENT

To prove damages, Plaintiffs must establish that, absent any breach by ALPA, negotiations between the TWA Master Executive Council ("TWA MEC") and the Allied Pilots Association (the "APA") would have resulted in a seniority integration more favorable to the TWA pilots than Supplement CC. Plaintiffs thus bear the burden of demonstrating that the APA would have accepted such an integration. They have not remotely done so. Plaintiffs instead assume—contrary to logic and the record evidence in this case—that had ALPA done things differently, the APA would have ignored *its* duty to fairly represent the *American* pilots and bestowed upon the TWA pilots an integrated seniority list significantly more favorable to them than Supplement CC, even if such a list left the American pilots *worse off* than if there had been no transaction at all. This untenable premise underlies all of Plaintiffs' damage theories and precludes their admissibility.

As demonstrated in ALPA's opening brief, Plaintiffs' damage theories are also flawed and inadmissible for numerous other reasons. Indeed, in their opposition brief, Plaintiffs effectively abandon large parts of their experts' opinions and claimed methodological foundations, presumably because they properly, if belatedly, recognized them as indefensible. What remains, however, only underscores Plaintiffs' failure to come up with *any* non-speculative evidence—expert or fact—that they suffered monetary damage. Plaintiffs thus

unquestionably have failed to satisfy their burden of proving the amount or magnitude of the damages purportedly suffered by each member of the class. As a result, their damages claims should be dismissed as a matter of law for each of the following reasons.

*First,* the proffered testimony of Plaintiffs' primary damages expert, Rikk Salamat, fails to meet *Daubert*'s standards of qualification, reliability, and fit. Salamat premises his opinions on his supposed ability to "predict" that, had ALPA acted differently, there would have been a 73% chance that the TWA MEC and the APA would have agreed on his preferred seniority integration list. Plaintiffs now concede, however, that Salamat lacks *any* academic background or technical knowledge sufficient to offer this opinion. They instead claim that Salamat's purported "practical experience" provides a sufficient basis both to qualify him as an expert and to validate his supposed methodology. But this argument does not solve Plaintiffs' problem. The fact remains that Salamat has never before predicted the outcome of seniority integration negotiations or seemingly had *any* direct role in such negotiations. As a result, Salamat plainly lacks the qualifications to reliably predict the outcome of hypothetical pilot seniority integration negotiations. Nor does Plaintiffs' reliance on Salamat's purported practical experience relieve him of the obligation to come forward with a valid,

verifiable rationale for the conclusions he reached or to establish that his testimony fits the facts of the case.

Salamat's idea of a methodology is to substitute his views of what the American pilots, through the APA, *should* have done in the seniority integration negotiations for the uncontroverted record evidence establishing what the APA *would* have done.  In an effort to establish that Salamat had some rationale for his opinions beyond intuition and groundless speculation, Plaintiffs merely recite Salamat's counterfactual assumptions, defend his disregard of the uncontroverted record, and baldly claim—contrary to Salamat's own testimony—that he somehow took into account the APA's negotiating position and the impact his lists would have had on the American pilots.  This does not remotely satisfy *Daubert* and requires exclusion of Salamat's opinions about alternative lists to which the APA supposedly would have agreed.

*Second,* the testimony of Plaintiffs' other expert, Dr. Henry Farber, also is inadmissible for its failure to satisfy *Daubert*'s requirements.  Farber has no expertise relevant to the task of determining the integrated seniority list that the TWA pilots supposedly would have achieved "but for" ALPA's breach.  Plaintiffs' claim that Farber's credentials as an economist are "unimpeachable" does not respond to ALPA's basic criticism that Farber's estimation of alternative seniority lists has *no* basis in economics.  And though Farber bases his "but-for" seniority

lists on the average of lists from transactions he subjectively deems "comparable," he lacks any qualifications or reliable methodology to determine comparability. He also relies on counterfactual assumptions about TWA's true financial condition—the only criterion he actually uses to assess comparability—and ignores the undeniable reality that for any list to be achievable, it would have to have been acceptable to the APA.  Plaintiffs offer no substantive response to the many methodological and fit critiques ALPA set forth in its moving brief.  Instead, they mischaracterize ALPA's arguments in an effort to obscure their inability to rebut them.  And Plaintiffs utterly ignore that the seniority list resulting from Farber's flawed analysis, characterized by Farber as nothing more than a "starting structure," cannot fit the facts of the case because it fails reliably to calculate damages for each member of the class.  It is well established that opinions premised on unsound methodologies and inaccurate assumptions, as here, do not satisfy *Daubert*.

*Third,* faced with the inadmissibility of their experts' testimony, Plaintiffs now advance a new, but equally unavailing, theory of damages.  They claim that a proposal ALPA and the TWA MEC made to the APA during the seniority integration negotiations, the so-called "Rightful Place Proposal," supports a claim for damages.  Uncontroverted evidence and Plaintiffs' own experts' admissions confirm, however, that the APA *never* would have agreed to this

proposed seniority integration.  Plaintiffs thus still have not put forward any *admissible* evidence to support their claim of monetary damages.  Moreover, as a matter of law, Plaintiffs are unable to demonstrate that they are entitled to any damages attributable to collective bargaining agreements that were negotiated long after ALPA ceased to serve as the former-TWA pilots' bargaining agent.  A claim to the contrary ignores the foundations of federal labor law and cannot be reconciled with Plaintiffs' argument before the Third Circuit that the *APA*—not ALPA—bore responsibility for such actions.

Plaintiffs thus have failed to shoulder their burden of proving monetary damages.  For each of these reasons, and those detailed in ALPA's opening brief, the Court should grant ALPA's motion to exclude the testimony of Plaintiffs' experts and grant its motion for summary judgment.

## ARGUMENT

### I.   THE TESTIMONY OF PLAINTIFFS' EXPERTS FAILS TO MEET THE REQUIREMENTS OF RULE 702 AND *DAUBERT*

#### A.   Expert Testimony Must Satisfy *Daubert* Before Reaching a Jury

ALPA demonstrated in its moving brief that the testimony of Plaintiffs' proposed experts is inadmissible because it fails to satisfy the standards of Rule 702 and *Daubert*.[1]  In response, Plaintiffs attempt to recast *Daubert* as an

---

[1] Unless otherwise indicated, citations to "Ex. __" refer to the exhibits to the Declarations of Daniel J. Toal, dated August 22, 2013 (attaching Exs. 1-82) and the Declaration of Daniel J. Toal, dated October 18, 2013 (attaching Exs. 83-107).

optional inquiry and mistakenly claim that there is not "any requirement that a district court apply the *Daubert* factors" before a jury hears proffered expert testimony.  (*See, e.g.*, Pls. Br. 2, 4, 32, 35, 46, 48.)[2]  The law is uniformly to the contrary.  *Daubert*'s requirements of qualification, reliability and fit are absolute prerequisites for the admissibility of expert testimony:  an expert witness *must* possess specialized expertise; he *must* have "good grounds" for his opinion based on "methods and procedures"; and his testimony *must* "be relevant for the purposes of the case" and "assist the trier of fact."  *See Schneider ex rel. Estate of Schneider* v. *Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *State Farm Fire & Cas. Co.* v. *Steffen*, No. 09-4965, 2013 WL 1721678, at *5 (E.D. Pa. Apr. 19, 2013).

Nor does Plaintiffs' abrupt disavowal of any scientific or technical basis for their proposed alternative seniority lists somehow exempt their experts from the requirements of *Daubert*.  Regardless of whether an expert testifies based on "science" or his practical experience, "[t]he admissibility decision focuses on the expert's methodology, reasoning, foundation of documents and data"—the very subjects of the criticisms ALPA detailed in its opening brief.  *See Curtis* v. *Besam Group*, No. 05-CV-2807, 2008 WL 1732958, at *6 (D.N.J. Apr. 10, 2008).  Thus, contrary to Plaintiffs' insistence that ALPA's critiques merely go to the weight of Salamat and Farber's proffered testimony, ALPA has established that Plaintiffs'

---

[2] All citations herein to "Pls. Br." refer to Plaintiffs' brief in opposition to ALPA's motion to exclude the testimony of their experts (Dkt. No. 579).

experts are not qualified to offer the opinions they advance, that their analyses do not derive from any reliable methodology, and that their opinions lack any fit to the facts of this case.  As a result, the proffered testimony of Salamat and Farber is inadmissible as a matter of law under both Rule 702 and *Daubert*.

## B.    Salamat's Testimony Should Be Excluded

### 1.    Salamat Is Not Qualified to Offer an Expert Opinion on the Expected Outcome of Pilot Seniority Integration Negotiations

As ALPA established in its moving brief, Salamat is not qualified to predict the results of a hypothetical negotiation between the TWA MEC and the APA, which is what he purports to do in his expert report.  (*See* ALPA Br. 23-42.)

Salamat initially portrayed himself as qualified to apply a number of "theoretical frameworks" that he purportedly "*considered and used* in order to analyze the effect ALPA's actions would have had" on hypothetical negotiations between the TWA MEC and the APA.  (Salamat Rpt. 3 (emphasis added).)[3] Indeed, Salamat wrote it was "the methods and techniques of [these] theoretical frameworks" that allowed him to arrive at his conclusions "to a reasonable degree of certainty."  (Salamat Rpt. 52.)  Plaintiffs now concede that Salamat is not qualified to apply any of these frameworks, but they nonetheless claim that "[r]ather than using a theoretical approach, Salamat used his practical experience from working with pilot unions" to form his opinions.  (Pls. Br. 13.)

---

[3] The Salamat Report is attached as Exhibit 52 to the Toal Declaration.

Even were it true, however, that Salamat intended to rely on his supposed "practical experience" rather than any established methodology, he still lacks *any* specialized experience to predict the results of hypothetical negotiations between the TWA MEC and the APA.  The fact of the matter is that Salamat has *never* negotiated a seniority integration, let alone predicted the result of such a negotiation.  (Salamat 1/30 Tr. 111:7-10.)[4]  He has worked on only four pilot seniority integrations, in which his role generally was limited to "assisting the arbitration panel" and was "focus[ed]" on analyzing the "financial impacts of . . . what had occurred in the past."  (Salamat 1/30 Tr. 108:21-24, 109:16-110:7.)  *None* of these seniority integrations resulted in a negotiated agreement or seemingly involved *any* negotiations in which Salamat played a direct role.  (Salamat 1/30 Tr. 113:10-19.)[5]  At best, this is the epitome of experience that is "adjacent to, but not actually encompassing, the subject matter of [an expert's] testimony," rendering the proffered testimony inadmissible.  *D&D Assocs., Inc.* v. *Bd. of Educ. of N. Plainfield*, No. Civ.A. 03-1026, 2006 WL 755984, at *3 (D.N.J. Mar. 20, 2006);

---

[4] Transcripts of Salamat's January 29-31, 2013 deposition testimony are attached as Exhibits 6, 7, and 8 to Plaintiffs' opposition brief (Dkt. Nos. 579-7–579-11).

[5]  Three of the four seniority integrations in which Salamat was involved were subject to mandatory arbitration.  (*See* Ex. 83 at FARBER 004626-25; Ex. 84 at FARBER 004505-08; Ex. 85 at FARBER 003363.)  And in one of those arbitrations, his role was limited to support for litigation *after* the seniority integration had been implemented.  (*See* Salamat 1/30 Tr. 113:20-114:2; Salamat 1/31 Tr. 10:24-11:3.)

*accord, e.g., Toscano* v. *Case*, CIV.A. 11-4121 FSH, 2013 WL 5333206 at *8 (D.N.J. Sept. 20, 2013).

### 2. Salamat's Analysis Is Unreliable and Lacks Fit Because It Is Based on Speculation and Counterfactual Assumptions

Whether Salamat purports to derive his opinions from the theoretical frameworks or his supposed "practical experience," he offers no reliable basis for his analysis of how the negotiations would have proceeded absent ALPA's breach, and his conclusions are contradicted by the uncontroverted record. (ALPA Br. 23-42.) As a result, Salamat's opinions must be excluded for these reasons as well.

### (a) *Assignment of Arbitrary Probabilities of Reaching Agreement Does Not Constitute a Reliable Methodology or Fit the Facts*

Salamat's "methodology" of assigning arbitrary probabilities to each of ten actions he claims ALPA should have taken on behalf of the TWA pilots in order to "calculate" the likelihood that the APA would have agreed to the so-called Salamat Model is nothing more than rank speculation. (ALPA Br. 24-28.) Unable to defend this analysis, Plaintiffs now insist that Salamat's "probability numbers played no part in creating his alternative seniority lists." (Pls. Br. 33.)[6] Salamat testified, however, that each of his alternative lists had some probability of resulting from negotiations absent any breach by ALPA. (Salamat 1/29 Tr. 164:5-

---

[6] Nor do Plaintiffs offer any response to the argument that Salamat misapplied the work of Dr. Katia Sycara, the only supposed methodological basis for his probability analysis. (ALPA Br. 21)

166:11.)  His damages analysis thus plainly depends on his arbitrary probability framework:

> *First*, as detailed in ALPA's opening brief, Salamat's principal damages number is premised on the idea that, had ALPA taken each of ten specified actions, there would have been a 73% probability that the TWA MEC and the APA would have agreed upon the seniority integration list reflected in Salamat's DMODEL.  (ALPA Br. 8-10.)  Plaintiffs now dispute that Salamat is assuming that these actions—independently or together—constituted the breach.  (Pls. Br. 15-16.)  To the contrary, they claim that Salamat took no position as to which actions constituted ALPA's claimed breach, but only identified these as actions that were available to ALPA.[7]  (Pls' Br. 15-18.)  But this attempted reformulation of Salamat's approach does not solve Plaintiffs' problem, it merely creates a new one.  Because Plaintiffs now argue that Salamat analyzed the impact of each of the ten actions merely because they were *available* to ALPA, they concede that Salamat does not purport to calculate the damages flowing from ALPA's breach.  Plaintiffs thus have acknowledged that Salamat's testimony does not fit the facts of the case.

---

[7] In Salamat's own words, he "started from the point of view that these were actions that were available, and that had [ALPA] done all of them, there wouldn't have been a breach."  (Salamat 1/29 Tr. 130:8-15.)

*Second*, Salamat's arbitrary probabilities are inextricably linked to the DMODEL list.  Without them, Salamat cannot demonstrate by a preponderance of the evidence that his desired list—or any of his hypothetical lists—would have been achieved in negotiations.  Plaintiffs thus cannot meet their burden of showing a reasonable estimate of damages instead of "mere speculation or guess."  *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).  While Plaintiffs claim that the DMODEL list "would have more likely than not been achieved in the merger negotiations" (Pls. Br. 7), if Salamat's arbitrary numbers had been slightly lower, the aggregated probabilities would not have supported a damages claim.  (*See* Salamat 1/30 Tr. 76:8-17 (conceding that if the total is less than 50%, the DMODEL "would have been less probable . . . [as the outcome] of a negotiated agreement")).  Indeed, Salamat ties his ability to opine on damages "to a reasonable degree of certainty" to his assignment of "probabilities [totaling 73%] that ALPA's actions could have produced . . . the Salamat Damage Model."  (Salamat Rpt. 52.)

Moreover, nothing in Plaintiffs' opposition brief demonstrates that Salamat's made-up numbers derive from *any* sort of reliable methodology.  Though Plaintiffs assert that the probability values "were not just pulled out of the air" (Pls. Br. 33), Salamat acknowledged that these numbers were arbitrary and not based on any "empirical scientific methodology."  (Salamat 1/29 Tr. 209:6-25.)

11

Plaintiffs ignore this testimony, citing only Salamat's explanation that "he based the percentage impact of each of the proposed ALPA actions 'largely on the experience of the Bond [B]ill and the impact that it had on the negotiation.'" (Pls. Br. 33.) To the extent Plaintiffs contend that Salamat used his experience to determine the probabilities, this argument misses the mark. Salamat concededly has no expertise determining how different courses of action would have influenced the likelihood that parties would have agreed on a particular alternative seniority integration.[8] (Salamat 1/29 Tr. 58:6-59:6, 59:17:21.)

Nor can Plaintiffs defend these percentages based on Salamat's assumption that the APA would continue to make concessions because it supposedly had made concessions in the past due to the Bond Bill. As an initial matter, no authority supports Salamat's belief that if a party has made concessions in supposed response to "pressure" from a counterparty in negotiations, further pressure invariably will result in further concessions. To the contrary, basic negotiation theory establishes precisely the reverse: at some point, a party will find the absence of a deal preferable to reaching a deal with additional

---

[8] Salamat also assumes that ALPA could have simultaneously pursued all ten actions, notwithstanding that many of them were mutually exclusive. (ALPA Br. 10, 27-28.) Plaintiffs ignore this significant methodological defect in Salamat's analysis.

concessions.[9]  That is particularly true here since the APA exercised control over the seniority list and had no need to make concessions that would have prejudiced its members, such as agreeing to any list that would have left its members worse off than they would have been absent any deal between American and TWA.

And, in all events, Salamat's purported explanation fails to clarify *how* his (inaccurate) understanding of the APA's response to the Bond Bill is tied to the specific percentages he used.  (*Id.*; *see also* Salamat 1/29 Tr. 205:8-22 ("at the end of the day, we just went with the subjective proposition that five percent seems more probable than not").)  Salamat does not explain how he determined that *any* prior movement by the APA was attributable to the Bond legislation.  He simply assumes that because "there was movement over that [Bond Bill] period of time," the two events must have been "connected."  (*Id.* at 211:10-24.)[10]  In actuality, the undisputed evidence indicates that the improvement in the APA's proposal that Salamat points to was entirely unrelated to the Bond Bill.[11]  But even

_____

[9] *See, e.g.,* Robert H. Mnookin, *Strategic Barriers to Dispute Resolution:  A Comparison of Bilateral and Multilateral Negotiations*, 8 Harv. Negot. L. Rev. 1, 12 (2003) ("By definition, whenever there is a negotiated agreement in a two-party negotiation both parties must believe that a negotiated outcome leaves them at least as well off as they would have been if there were no agreement.").

[10] Salamat makes this assumption despite acknowledging that these two events could be "a complete coincidence."  (Salamat 1/29 Tr. 211:10-24.)

[11] Contemporaneous documents indicate that the rationale and structure of Supplement CC was finalized in August 2001 during the APA/TWA MEC facilitated negotiations.  The Bond Bill was not introduced until October 2001.

if—contrary to fact—there had been any connection, neither Salamat nor Plaintiffs even attempt to explain how Salamat used his (mis)understanding of prior events to determine the supposed increased likelihood that, had ALPA acted differently thereafter, the APA would have been prepared to make additional and different concessions to the TWA pilots.

Thus, notwithstanding Plaintiffs' attempt to marginalize and then justify Salamat's probability analysis, it is without question both a crucial component of his opinions and the product of impermissible guesswork.

> **(b)** *Salamat's Negotiation Analysis Relies on a Counterfactual, Unprincipled View of the APA's Position*

As ALPA has demonstrated, a negotiation analysis that ignores available and uncontroverted evidence necessarily fails *Daubert*'s reliability and fit prongs.  (*See* ALPA Br. 28.)  Salamat ignores the uncontroverted evidence that: (1) none of the proposed ALPA actions would have affected the APA's willingness to make further concessions to the TWA pilots; and (2) the APA would not have accepted any list *substantially* more favorable to the TWA pilots than Supplement CC, and certainly none that would have made the American pilots worse off than

---

(*See* Ex. 86 at ALPA 004859 (discussing APA proposal closely tracking Supplement CC); Ex. 87.)  Nor is there any evidence indicating that the Bond Bill affected the APA's negotiating posture.  (*See, e.g.*, Ex. 88 at 147:24-148:4 (Ed White noting that the Bond Bill had "no impact on the negotiation position [the APA] took"); Ex. 89 at 107:13-21 (John Darrah testifying that the Bond Bill did not "change the [APA's negotiating] position at all.").)

they would have been absent the transaction.  In so doing, Salamat improperly attempts to substitute his subjective views about what a hypothetical entity in the positions of the APA or American *should* have done for the undisputed evidence of what the APA and American actually *would* have done.  Plaintiffs argue that this was proper because Salamat was guided by his "practical experience . . . combined with his close examination of the actual course of negotiations between the TWA pilots and the APA."  (Pls. Br. 13-14.)  But neither remotely supports his opinions.

*First,* the undisputed record makes clear that Salamat came to his conclusions only by disregarding the APA's contemporaneous statements of its position.  Salamat replaces the APA's *stated* position in the seniority integration negotiations with his own unreliable judgment of what the APA's position *should* have been based on his personal and idiosyncratic notions of what would be "reasonable" and "fair."[12]  Plaintiffs present this as Salamat "considering" the views of the APA and "interpreting" them based on his experience.  (Pls. Br. 13-

---

[12] Salamat presumes that the APA would have agreed to his preferred list, the so-called Salamat Model, if it were acting "reasonably."  But there is no evidence that the APA shared Salamat's definitions of "fair" and "reasonable;" Salamat testified that he had no idea what the APA viewed as "fair" and "reasonable" (Salamat 1/30 Tr. 67:22-69:5); and Salamat points to nothing obligating the APA to behave fairly or reasonably toward the TWA pilots.  Similarly, Salamat's bare assertion that "the APA never reached the fair result they wanted" has no basis in the record.  As the APA explained in its contemporaneous summary of Supplement CC—which Salamat never reviewed—the APA believed that the Supplement CC seniority list was "fair to all, and will stand the test of time."  (*See* Ex. 26 at ALPA 008749.)

15

14, 30-35.)  However, even when qualified by experience, an expert must still apply a reliable methodology.  Thus, Plaintiffs' contention that Salamat's analysis flows from his experience is insufficient to justify its admissibility absent a showing of "*how* that experience leads to the conclusion reached, *why* that experience is a sufficient basis for an opinion, and *how* that experience is reliably applied to the facts."  *See Floorgraphics, Inc.* v. *News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 165 (D.N.J. 2008) (emphasis added); *see also Viking Yacht Co.* v. *Composites One LLC*, 610 F. Supp. 2d 333, 336-37 (D.N.J. 2009) (Irenas, J.) (experience-based testimony excluded where record does not reveal any methods employed by the experts in reaching their opinions).

Salamat has not made—and cannot make—the requisite showing.  For example, Plaintiffs argue that Salamat's basis for opining that the APA would have offered a better seniority list if ALPA had taken certain actions "is his experience of having been in negotiations when other groups brought pressure to bear in the forms of litigation."  (Pls. Br. 14.)  But in his deposition, Salamat was forced to concede he was never involved "in *any* situations in which the threat of litigation has led to a negotiated agreement" regarding seniority integration.  (Salamat 1/29 Tr. 147:1-149:17 (emphasis added).)[13]  And, in all events, neither Plaintiffs nor

---

[13] The only claimed empirical support for Salamat's assumption that negotiating parties invariably do better if they "fight" is a text that Salamat cited *but did not read*.  (Salamat 1/30 Tr. 26:10-23, 50:25-51:6; Pls. Br. 10.)  This text actually

Salamat point to anything about that supposed experience that would have enabled him to determine the likelihood that the APA would have made any additional concessions, let alone the magnitude and form of any such concessions.

*Second*, Plaintiffs argue that "Salamat gives little weight to APA statements that they were not going to improve their offer to the TWA pilots" because of "hard evidence that their negotiating position improved over time on whatever little pressure the TWA pilots were able to bring to the table." (Pls. Br. 27.) As Salamat admittedly failed to analyze how any of his proposed seniority lists would have impacted the APA, however, he cannot say—with any verifiable or supportable bases—that they *ever* would have moved as far as his lists require. And, as discussed above (at 13), there is no "hard evidence" linking improvement of the APA's proposals to any specific pressure from the TWA pilots, nor has Salamat undertaken any analysis to support a causal link. (*Supra* Section I.B.2(a).)

*Third,* Salamat clearly testified that his opinions on what would have happened in the negotiations absent ALPA's breach are based on "nothing more than specul[ation] about what would have happened in an alternative universe." (Salamat 1/30 Tr. 191:13-17.) Plaintiffs try to blunt the impact of this concession by claiming that *any* "predictions about what acts any party in the negotiations

---

indicates, contrary to Salamat's assumptions, that aggressive tactics in negotiations can backfire. *See* Richard E. Walton and Robert B. McKersie, *A Behavioral Theory of Labor Negotiations* 14 (1965), *attached as* Ex. 90.

would have taken in response to ALPA bringing additional pressure in the negotiations" are inherently speculative.  (Pls. Br. 17 n.5.)  And while Plaintiffs are entirely comfortable with Salamat basing his opinions on speculation, they nevertheless contend that Salamat appropriately disregarded uncontroverted testimony from the *actual participants* in the negotiations that contradicts his guesswork.  (*Id.* at 17-18 & n.5.)

The sole authority Plaintiffs cite to support this hypocrisy, *Aguinaga* v. *United Food and Com. Workers, Int'l Union*, 854 F. Supp. 757 (D. Kan. 1994), condemns Plaintiffs' approach.  The court in *Aguinaga* rejected a union's arguments about what would have happened absent a breach of its duty of fair representation.  It did so, however, not because the union had relied on the testimony of relevant decision-makers about what they would have done absent the breach, but because it failed to present such evidence.  854 F. Supp. at 764.  This is precisely the evidence that Salamat improperly fails to consider.  For example, the APA's then-president testified that the strategies Salamat asserts would have led the APA to agree to a more favorable seniority integration instead would have *backfired* and made the APA *less* willing to offer an integration even as favorable as Supplement CC.  In particular, he testified that such hostile actions would have strengthened the resolve of the APA members who wanted to staple all of the TWA pilots.  (*See* ALPA Br. 66-67.)

18

As nothing about Salamat's experience or his impressionistic "observations" about the negotiations justifies his disregard of the uncontroverted record of the APA's actual positions, his negotiation analysis is not reliable and does not fit the facts of the case. *See Elcock* v. *Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000) (expert testimony that does not fit the facts of a case is an inadmissible "castle made of sand" (internal citation omitted)).

### 3.    Each One of Salamat's Alternative Seniority Lists Is Inadmissible for Failure to Meet the *Daubert* Standards

In its opening brief, ALPA demonstrated that each of Salamat's hypothetical seniority lists is inadmissible because it ignores the role of the APA, whose agreement was necessary for the implementation of *any* integration, and which flatly refused to agree to any integrated seniority list that failed to protect its pilots' pre-transaction career expectations. (*See* ALPA Br. 27-30.)[14]  Plaintiffs' only response is to claim that Salamat's Fairness List somehow "fully protected" the pre-transaction career expectations of the American pilots, and thus so do Salamat's other lists, all of which are more favorable to the American pilots than

---

[14] Plaintiffs claim that ALPA did not challenge Salamat's "expertise and . . . ability to testify as to damages resulting from any particular seniority list." (Pl's Br. 9.) In fact, ALPA has extensively criticized Salamat's damage calculations (*see, e.g.,* Ex. 91 ¶¶ 102-128), but did not raise these issues in its *Daubert* motion because they do not concern admissibility.  For the motion, ALPA limited its critique of Salamat's damage calculations to his inability to testify about alternative seniority lists he did not construct, including the Farber lists and the Rightful Place Proposal. (*See* ALPA Br. 42-44.)  Plaintiffs do not respond to and thereby effectively concede these points.

19

the Fairness List.  (Pls. Br. 24, 26.)  As detailed below, however, the Fairness List does no such thing and neither do any of Salamat's other proposed lists.

>              (a)      *The Fairness List is Inadmissible as Irrelevant to Damages*

ALPA demonstrated in its opening brief that the Fairness List, Salamat's "subjective concept" of a "fair" integrated seniority list, is inadmissible on the grounds that: (1) Salamat lacks the qualifications to construct it; (2) it suffers from methodological problems that render it inherently unreliable; and (3) it is utterly irrelevant because it concededly was *not* achievable in negotiations between the APA and the TWA MEC and Salamat does not advance it as a basis for damages.  (ALPA Br. 41-42.)  Plaintiffs offer no response to the qualification and reliability critiques, but now provide an alternative rationale for relevance. Plaintiffs now claim that the Fairness List is needed to "establish that the APA pilots would not have been worse off financially relative to their reasonable pre-merger career expectations had they agreed to" Salamat's preferred damages list, the DMODEL.  (Pls. Br. 7, 25-26.)  But Plaintiffs have absolutely no basis to make this claim.  Indeed, Salamat's report does not even mention pre-transaction career expectations anywhere in its entire discussion of the Fairness List.  (*See* Salamat Rpt. 16-20.)

The APA viewed career opportunities and long-term career progression as crucial components of pre-transaction career expectations.  (*See,*

20

*e.g.,* Ex. 27 at ALPA 001821 (noting that a pilot's career expectations consist of not only an initial assignment, but "an entire career path leading through several positions to retirement").) Thus, Plaintiffs' argument that Salamat's Fairness List "fully protected" the American pilots' pre-transaction career expectations is disingenuous in light of his express acknowledgment that he "did *not* look at the . . . career prospects [of the American pilots] absent the transaction," and that he "didn't do *any* analysis to determine whether the promotional opportunities of the American . . . pilots were preserved by *any* of [his hypothetical seniority] lists." (Salamat 1/30 Tr. 87:7-16, 92:23-93:3 (emphases added).)

Plaintiffs' representation that the Fairness List "fully protected" the American pilots' pre-transaction career expectations is based *solely* on conclusory statements Salamat made in his deposition, where he claimed that the American pilots would have been better off under his seniority lists than they were under Supplement CC. (Pls. Br. 24, 26.) But Salamat's say-so cannot cure the absence of analysis supporting this demonstrably false claim. *See Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Mooring Capital Fund, LLC* v. *Phoenix Cent., Inc.*, No. CIV-06-0006-HE, 2009 WL 4263359, at *5 (W.D. Okla.

21

Feb. 12, 2009) ("[A]n expert's opinions are not admissible merely because the expert says, in effect, 'trust me, I know.'").[15]

Further, Salamat's statements are belied by the Fairness List itself. For example, the Fairness List includes no "top staple" of American pilots. Even the integrated seniority lists that the TWA MEC proposed at the time reserved the top portion of the list for hundreds of American pilots in recognition of the fact that, prior to the transaction, *only* American pilots had any expectation of flying large wide-body aircraft. (*See* ALPA Br. 39-40.) The Fairness List, however, would have allowed TWA pilots to displace American pilots from these desirable positions, or at least secure them ahead of American pilots. Thereby it effectively would have transferred the pre-transaction career expectations of the American pilots to the pilots of TWA. (*See* Ex. 92 at 4; Ex. 93 at 88:17-89:9.)

As a result, Salamat's Fairness List has no relevance to Plaintiffs' damage claims. It concededly could not have been achieved in negotiations between the TWA MEC and the APA. Even Plaintiffs do not advance it as a basis for damages. And there is not a shred of evidence that the Fairness List preserves the pre-transaction career expectations of the American pilots, which doubtless

---

[15] In contrast, Dr. Kevin Murphy, performed a rigorous analysis of the impact of Salamat's hypothetical seniority lists on the American pilots and concluded that three of his four lists could not have been obtained by the TWA MEC through bargaining with the APA because they made the American pilots *worse off* than they would have been absent the TWA transaction. (*See* Ex. 91 at 9.A, 9.B.)

explains why Salamat made no such claim in his expert report.  Indeed, the

uncontroverted evidence demonstrates that the Fairness List would transfer pre-

transaction career opportunities of the American pilots to the pilots of TWA.  As a

result, the Fairness List must be excluded.

> (b)   *The Arbitrated List Rests on Counterfactual Assumptions and Speculative Judgments That Salamat Is Not Qualified to Offer*

ALPA established in its moving brief that Salamat's Arbitrated List—

the supposed "top" of the damages range—is inadmissible because it represents

nothing more than Salamat's "best *guess* as to what an arbitrator would have

awarded."  (ALPA Br. 36-38 (quoting Salamat Rpt. 14).)  Expert testimony based

on "mere guess or conjecture" inadmissible.  *See, e.g., Curtis*, 2008 WL 1732956,

at *6.  Moreover, Salamat certainly is not qualified to predict how an *arbitrator*

would have decided the TWA/American seniority list integration because he has

never served as an arbitrator and has no specialized expertise in arbitration.  (*See*

ALPA Br. 37.)  Nor is Salamat qualified for this exercise based on his cursory

review of arbitration decisions, particularly since he proved unable to differentiate

between what arbitrators themselves find important, and what parties urge them to

consider.  For example, Salamat claimed that pay disparities—such as the one

between the TWA and American pilots prior to the transaction—"had no real

effect" on seniority integrations.  At his deposition, however, he was forced to

concede that the portion of the arbitration decision he relied on as authority for this

23

statement was the *position of one party*, which the arbitrator ultimately rejected. (*See* Salamat 1/30 Tr. 231:20-234:12.)  Even more disturbing is Plaintiffs' repetition of this conceded error to the Court as purported support for Salamat's analysis.  (Pls. Br. 22.)

Plaintiffs offer no response regarding Salamat's speculation and lack of qualifications.  Instead, they seemingly rely once more on his purported experience in negotiations.  They argue that Salamat developed his Arbitrated List according to the Replication Principle (Pls. Br. 21), an approach in which arbitrators seek to "replicate what the parties, acting reasonably would have agreed to" in negotiations.[16]  (Salamat Rpt. 13.)  But, this does not give the Arbitrated List the reliable foundation it otherwise lacks (*see* ALPA Br. 38-40) for at least four reasons:  *First*, the Replication Principle describes an objective—*not* a methodology—that Salamat pursues based solely on his subjective and amateur judgment.  *Second,* the Replication Principle, a product of *Canadian* labor law, cannot form a reliable basis for predicting the results of a *U.S.* arbitration.  (*See* Salamat 1/30 Tr. 222:17-223:21 (Salamat is not aware of its ever having been used in the United States).)  *Third*, reliance on the Replication Principle renders Salamat's Arbitrated List unreliable because, as with his negotiation analysis,

---

[16] Highlighting the inconsistencies between Salamat's seniority lists, the Arbitrated List and the DMODEL List both purport to be the "reasonable" result of negotiations, yet are vastly different and yield damages over $100 million apart.

Salamat improperly substitutes his subjective views about what the APA *should* have done for uncontroverted evidence about what the APA *would* have done to promote the interests of the American pilots.  (*Supra* Section I.B.2(b).)  *Fourth*, Salamat's invocation of the Replication Principle does not excuse his failure to consider factors that arbitrators routinely consider determinative of seniority integrations, including pre-transaction career expectations of the pilot groups.  (*See* ALPA Br. 36-38.)[17]

Finally, the Arbitrated List also is inadmissible because it does not fit the facts of this case.  In order for the Arbitrated List to be relevant, it would have to be the case that the APA either would have agreed to it in negotiations or would have agreed to arbitrate the issue of seniority integration.  The evidence establishes conclusively that neither was possible here.  Salamat himself has acknowledged that there was a low likelihood of the APA agreeing to the Arbitrated List in negotiations.  (Salamat 1/30 Tr. 188:3-12.)  And Plaintiffs have no response to the

---

[17] Plaintiffs' suggestion that Salamat's experience validates the view that pre-merger career expectations "play[] at most a negligible role" in seniority integrations (Pls. Br. 32) is inconsistent with not only the arbitration decisions on which he supposedly relied, but also Farber's testimony.  (*See, e.g.,* ALPA Opp. to Mot. to Bar Expert Testimony 7-9 (Dkt. No. 581); Ex. 83 at FARBER 004647 ("Of considerable importance is the question of career expectations."); Ex. 85 at FARBER 003362-63 (arbitration was explicitly designed to "minimize changes to career potential" and "avoid windfall gains to either group at the expense of the other"; Ex. 95 at FARBER 004347 (noting importance of preserving pre-transaction career expectations).)

undisputed evidence—including direct testimony from APA witnesses—that the APA *never* would have agreed to arbitrate seniority integration.  (*See* ALPA Br. 67.)  Plaintiffs nonetheless argue that because the APA *could* have chosen to arbitrate, there was " some possibility, even if very small" of arbitration.  (Pls. Br. 20.)  This falls far short of satisfying Plaintiffs' burden of proving damages using a list that, by a preponderance of the evidence, *would* have been the outcome of negotiations between the APA and the TWA MEC in the absence of any breach.[18]

> (c)   *The Salamat Damages List Is Not Based on Any Discernible Methodology or the Factual Record*

The Salamat Damages List, or the DMODEL, is Salamat's estimate of the "best achievable negotiated list," absent ALPA's breach, if the APA and the TWA MEC "had . . . been acting reasonably."  (Salamat Rpt. 15, 29.)  As detailed in ALPA's opening brief, the DMODEL is inadmissible for at least three independent reasons establishing the lack of reliability or fit:  (1) Salamat offers no methodology to connect the DMODEL list to the impact of hypothetical changes in ALPA's conduct in the negotiations; (2) he bases the list on his own speculation about what APA would have done if acting "reasonably" when pressured by

---

[18] Plaintiffs' unsupported claim that the Arbitrated List was "strongly biased in favor of the APA" (Pls. Br. 21) similarly does not fit the record.  Because the Arbitrated List has no fences or equipment restrictions, senior TWA pilots would have access to equipment they had no expectation of flying at TWA.

ALPA, not on the APA's actual views[19]; and (3) Salamat purports to use the basic outline of Supplement CC as a foundation, but fails to consider the overarching goal of the seniority integration, preservation of the pilot groups' pre-transaction career expectations.  (ALPA Br. 31-36.)

Tellingly, Plaintiffs' defense of the DMODEL does not once refer to ALPA's arguments.  (*See* Pls. Br. 26-29.)  Instead, Plaintiffs reiterate Salamat's false claim that the DMODEL is based on "the negotiations between TWA pilots and the APA and, in particular, on the APA's rationale for" Supplement CC.  (*Id.* at 7.)  Like Salamat, Plaintiffs misstate the negotiations and the APA's rationale.

*First,* Salamat provides no justification for his assumption that it would have been "reasonable" for the APA to have agreed to the DMODEL, particularly given that he concededly did not analyze the manner in which this (or any) list would have affected the American pilots over the remainder of their careers.  (Salamat 1/30 Tr. 81:10-19; 87:7-16; 92:23-93:3.)  Nor did he assess whether the actions that Plaintiffs contend ALPA should have taken would have injured or even affected any interest of the APA, let alone the magnitude of any

---

[19] Plaintiffs claim Salamat "gain[ed] insight into how the APA would react in the light of increased negotiation pressure" by "consider[ing] each of the grounds asserted by the APA as a reason for rejecting [the Rightful Place Proposal]" (Pls. Br. 26), but fail to address ALPA's argument that this "consideration" was nothing more than Salamat making subjective judgments about whether, in his view, the APA's objections were "reasonable."  (ALPA Br. 31-33.)

such threatened injury relative to the aggregate costs of the concession in his proposed alternative seniority lists.  (*See, e.g.,* Salamat 1/30 Tr. 261:18-21 (Salamat testifying that his analysis is not predicated on the APA's perception of the likelihood that the actions would harm its position).)  As a result, Salamat's assumptions are nothing more than his own say-so, which fails to satisfy *Daubert*. *See Oddi* v. *Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000) ("haphazard, intuitive inquiry" is not a basis for expert testimony).

> *Second*, Plaintiffs' claim that Salamat "close[ly] examin[ed] the actual course of negotiations between the TWA pilots and the APA" (Pls. Br. 13-14) is belied by Salamat's testimony that he disregarded the vast majority of the factual record in the case, including documents in which the APA explained Supplement CC's rationale (Salamat 1/31 Tr. 56:21-57:5).[20]  Salamat's failure to review the record is evident from his explanation of how Supplement CC informed his DMODEL.

> The foundation for the DMODEL is two assumptions at odds with the undisputed record.  First, Salamat assumes that the inclusion of 940 TWA pilots in

---

[20] Salamat testified that to understand the strategies purportedly available to ALPA, he reviewed only the testimony of one trial witness and the closing arguments of Plaintiffs' counsel, which are not evidence.  (ALPA Br. 27 & n.16.)  His selective review of the record based on information provided by counsel is itself a factor discrediting the reliability of his analysis.  (ALPA Br. 27-30.)  *See also Crowley* v. *Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004).

the ratioed group was based on the APA's recognition that "the MD90 and 767 positions were ongoing positions." (Pls. Br. 29.) To the contrary, contemporaneous documents clearly state that the APA derived the number of TWA pilots to merge from an analysis undertaken to preserve the expectation of the most junior American pilot to reach small wide-body captain by a certain point in time, while ensuring that "[a]t all times, there will be at least 260 TWA pilots in the projected small wide-body Captain seniority range."[21] (See ALPA Br. 34 n.19.) Second, he assumes that the APA, if acting "reasonably" and pressured by ALPA, would have agreed to double the number of TWA pilots in this portion of the list because it "would have accepted the fact that [first officers] were also required to fly those planes" and credited the TWA MEC with first officer positions for seniority integration purposes. (See ALPA Br. 33-36.) But the record demonstrates that, on multiple occasions, the APA *rejected* the TWA MEC's efforts to incorporate first officer positions into the merged portion of the list because such positions at TWA were comparable to new hire positions at American in terms of pay and access to equipment. (ALPA Br. 34-35 & n.19.)[22]

---

[21] This represented the number of sustainable small wide-body captain jobs TWA brought to the merger.

[22] Similarly, his other change to the Supplement CC list for the DMODEL is a reduction in the "top staple" by 98 American pilots on the assumption that the APA could have been convinced to remove F100 pilots from this part of the list because it is a smaller aircraft than others in American's fleet. (Pls. Br. 28.) As

Because Salamat does not understand the rationale for Supplement CC, his proposed modifications lack a reliable basis and do not fit the facts.

### (d)    The Marginal List Sets an Inflated "Floor" on Plaintiffs' Damages Without any Reliable Foundation

ALPA demonstrated that Salamat's Marginal List—essentially the Supplement CC seniority list with an additional 200 TWA pilots moved above the staple point—is inadmissible for two reasons:  (1) it does not fit the facts of the case because it rests on the counterfactual assumption that the jury verdict requires a "material" improvement to Supplement CC;[23] and (2) Salamat used no methodology or expertise in creating this list.  (*See* ALPA Br. 40-41.)  Plaintiffs' only response is to recast the Marginal List with an after-the-fact explanation that it was based on Salamat's view of the Bond Bill's impact on the negotiations.  (*See* Pls. Br. 19-20.)  Salamat, however, testified that he moved 200 pilots because that number "just seemed the most probable."  (Salamat 1/31 Tr. 12:18-21.)  The deposition testimony Plaintiffs cite—in which Salamat explains that he "assumed" the APA would have continued to make concessions and took an arbitrary two-

---

the record shows, however, the top of the Supplement CC list *did not include* F100 pilots.  (*See* Ex. 26 at ALPA 008763-65.)

[23] Continuing to present the Marginal List as "the lower-bounds list [that] had to be better in some respect to the list established by Supplement CC" (Pls. Br. 19), Plaintiffs ignore this critique entirely, and fail to address how it is at all consistent with Plaintiffs' own theory of injury, which requires moving a *single* pilot, not a "materially" better list.  (ALPA Br. 41.)

thirds of a previous change in their proposals as a "conservative" estimate of additional concessions that the APA would have been prepared to make—does not show that Salamat had a valid methodological basis.  It confirms that he did not.

## C.     Farber's Testimony Should Be Excluded

ALPA established in its opening brief that Farber's proffered testimony does not satisfy *any* of *Daubert*'s requirements.  (ALPA Br. 44-58.) Plaintiffs only response is to skirt or mischaracterize ALPA's arguments.  In particular, Plaintiffs claim that ALPA's arguments "all go to the weight to be given to Dr. Farber's expert's opinions" and "do not present grounds for excluding the testimony."  (Pls. Br. 44.)  Not so.

### 1.     Farber's Expertise in Economics Does Not Qualify Him to Testify About the Non-Economic Analysis He Performed

Plaintiffs inexplicably and inaccurately claim that ALPA does not challenge Farber's qualifications.  (*See* Pls. Br. 35.)  Nothing could be further from the truth.  ALPA argued:  "Nothing in Farber's academic career or training as an economist renders him qualified to proffer an opinion about whether the American and TWA pilots would have agreed on a different integrated seniority list in the absence of any breach of the duty of fair representation and, if so, what it would have looked like."  (ALPA Br. 44-45.)  Plaintiffs nonetheless attempt to defend Farber's qualifications by relying on the same credentials that ALPA established to

be insufficient.  (Pls. Br. 36.)  In so doing, they ignore ALPA's primary criticism that Farber did not perform an *economic* analysis here.  (ALPA Br. 45.)

Plaintiffs attempt to portray Farber's testimony as economics by pointing to Farber's use of a mathematical metric in his analysis—the calculation of the proportional difference in mean ranks in "comparable" mergers—and his supposed experience with this metric as an "economic tool."  (Pls. Br. 37-39)  But performing a calculation that economists sometimes use does not give Farber's analysis an economics foundation.  *See Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("While [an expert] may have used statistics in his work (as most people do to one extent or another) this does not mean that he is sufficiently qualified to testify to the statistical significance of a common choice of colors.").  Plaintiffs' claim that Farber is qualified because he used his "experience" to estimate his "but-for" seniority list (Pls. Br. 37-38) fares no better, as Plaintiffs fail to elucidate *any* qualifying experience to rebut ALPA's showing that Farber lacks expertise to construct such a list (ALPA Br. 44-45).  His testimony thus fails to satisfy *Daubert*.  *See Surace* v. *Caterpillar, Inc.*, 111 F.3d 1039, 1055-56 (3d Cir. 1997) (engineer not qualified where testimony hinged on an area in which he had no training or experience).

### 2.   Farber's Selection of Comparable Transactions Lacks a Reliable Methodology

Farber's selection of "comparable" airline transactions is the cornerstone of his "but-for" list construction, yet he has no reliable methodology for determining comparability.  Plaintiffs claim that "ALPA challenges the value of Dr. Farber's [comparability] analysis because . . . [his] review and analysis of prior airline mergers was incomplete and placed 'undue' reliance on arbitrated decisions, rather than negotiated seniority integrations."  (Pls. Br.  39.)  But that is not actually the argument ALPA made.  Instead, ALPA challenged the *reliability* of Farber's methodology for selecting "comparable" mergers on multiple grounds that Plaintiffs do not address, let alone refute.

*First,* having no experience with seniority integrations, Farber reviewed arbitration decisions to determine what factors arbitrators consider significant.  In selecting "comparable" transactions on which to base his "but-for" seniority lists, he focused exclusively on two considerations:  (i) TWA "was in a weakened financial state," but "was still flying"; and (ii) TWA contributed "valuable assets" to the combined airline.  ALPA established that *no* principled reasons underlie Farber's choice to consider these criteria, at the exclusion of numerous others that arbitrators identify as significant in their seniority integration decisions.  This is the sort of subjective inclusion and exclusion of data that courts

33

have found weighs against the reliability of the method.  (ALPA Br. 46-49.)[24]  *See also Munoz* v. *Orr*, 200 F.3d 291, 301-302 (5th Cir. 2000) (expert testimony is unreliable where it failed to consider variables that could explain an observed discrepancy and expert did not perform a multiple regression analysis to account for them); *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Boston*, 853 F. Supp. 2d 181, 191 (D. Mass. 2012) (excluding expert's event study for failing to control for explanatory variables in regression analysis).  Plaintiffs offer nothing to the contrary.[25]

      *Second*, ALPA offered a number of reasons why the universe of 41 transactions from which Farber identified comparators, and the manner in which he further limited that universe, raised reliability issues.  (ALPA Br. 48-49.)  For example, because these transactions were identified for him primarily by Plaintiffs'

---

[24]  Plaintiffs' claim that Farber exercised his professional judgment to determine what data to consider (Pls. Br. 37) is unavailing.  Before this case, Farber had never worked in the airline industry, on a seniority integration, or as an arbitrator. (Farber 1/22 Tr. 18:17-24; Farber 1/23 Tr. 111:2-8.)  And Plaintiffs' reliance on *Gutierrez* v. *Johnson & Johnson*, No. 01-5302 (WHW), 2006 WL 3246605, *6 (D.N.J. Nov. 6, 2006) is misplaced because the expert there "exercised professional judgment in deciding what control variables to include in h[er] analysis," whereas Farber controlled for nothing.  (*See, e.g.,* Farber 1/22 Tr. 218:18-220:16 (discussing failure to control for factors due to small sample size).)

[25]  Plaintiffs' only attempt at a response is to assert that ALPA never identified factors that Farber should have considered or explained how such factors would impact his analysis.  (Pls. Br. 41.)  This is not only inapposite since Plaintiffs bear the burden of proving damages, but incorrect.  (*See* ALPA Br. 46 n.24 (identifying from arbitration decisions Farber reviewed a host of relevant factors arbitrators considered that Farber arbitrarily disregarded).)

counsel, Farber could not say if they were selected randomly or according to any defined criteria, or if they were representative of all airline mergers.[26]   (*Id.*)  And he disregarded *more than half* of these transactions—including almost all seniority integrations achieved through negotiations—because he purportedly lacked sufficient information on those integrations to do his analysis.  (*Id.*)[27]   These grounds alone—not countered by Plaintiffs—render Farber's analysis unreliable.  *See Crowley*, 322 F. Supp. 2d at 542 ("selective furnishing of information by counsel to an expert" must be considered for *Daubert* purposes).

   *Third,* Farber made an entirely subjective and standardless assessment of comparability.  Relying only on what he read in arbitration decisions—not a quantitative, empirical, or other specialized analysis of any airline's financial condition—Farber designated a transaction "comparable" if, in his view, the acquired airline bore "a crude level" of resemblance to TWA's financial condition.  (ALPA Br. 46-49.)  Again, Plaintiffs offer no defense of this methodology.

---

[26] Indeed, Farber did not have in his universe of known mergers the previous mergers and seniority integrations in which the actual carriers and pilot groups at issue here were involved.  (*See* ALPA Br. 48.)  And while Plaintiffs claim that Farber "conducted extensive research" to collect these mergers, Farber himself testified that they were primarily provided by counsel.  (Farber 1/22 Tr. 74:7-13.)

[27] Plaintiffs' only response is to mischaracterize ALPA's argument as criticism of Farber "for not collecting data on every airline merger that ever happened."  (Pls. Br. 41.)  This is inaccurate and does nothing to cure the reliability problems.  (*See* ALPA Br. 46-50.)

In the end, Plaintiffs' only detailed attempt to bolster the legitimacy of Farber's methodology is the suggestion that his approach "is no different than what economists do in other types of cases."  In making this claim, Plaintiffs do not suggest that this specific methodology has been used in other cases, but only that economists sometimes offer opinions about "but for" worlds that necessarily involve some degree of uncertainty.  (Pls. Br. 42-43.)  But ALPA never argued that Farber's testimony is inadmissible because it is *uncertain*, it argued that Farber's testimony is inadmissible because it is *unreliable*.  Plaintiffs cannot prove otherwise, so they instead contend that Farber's testimony is somehow subject to a lower threshold for admissibility than what *Daubert* requires.  (*See id.*)  None of the authorities Plaintiffs cite—all of which predate *Daubert*—support this argument.  If anything, they emphasize Plaintiffs' failure to meet their burden of proving damages.  *See, e.g., Bigelow* v. *RKO Radio Pictures*, 327 U.S. 251, 264 (1946 ) ("[E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork."); *Story Parchment*, 282 U.S. at 563 (damages "may not be determined by mere speculation or guess"); *Lehrman* v. *Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974) (damages cannot be based on mere speculation or guess, and estimates based on assumptions must "rest on adequate data").

By running from *Daubert*'s requirements, Plaintiffs all but concede that Farber's proffered opinions fail to satisfy them.

### 3.   Farber's Metric for Estimating Seniority Lists is Not Reliable

As demonstrated in ALPA's opening brief, Farber's metric—the proportional difference in mean ranks—cannot reliably estimate the seniority list that would have been obtained "but for" ALPA's actions.  Among other reasons:

- Farber could not identify any peer-reviewed support, general acceptance, or non-judicial uses for his metric in this context;

- Farber could not identify a single example where an arbitrator or expert ever constructed a seniority list using this metric;

- Farber had never tested the hypothesis that this metric could predict the outcome of seniority integrations;

- Farber did not attempt to control for the host of factors that account for differences in seniority lists beyond his two arbitrarily selected criteria;

- Farber could only fit the facts of this case to his metric by ignoring more than half of the airline transactions and disregarding key facts, such as the existence of fences or bidding restrictions.

(*See* ALPA Br. 50-52.)  Plaintiffs offer no direct response to *any* of these criticisms.  Rather, they make three inaccurate or inapposite arguments:

*First*, Plaintiffs characterize Farber's use of the proportional difference in mean rank metric here as the application of a "widely accepted economic methodology" that has been "recognized in academic literature."  For this claim, Plaintiffs cite Farber, who cites literature that simply shows that academic researchers compare means of data in their analyses.  But those

37

authorities contain no support for the specific methodology Farber applies here. (*See* Ex. 91 ¶ 136.)  Moreover, regardless of whether this metric is sometimes used in economics, Farber's use of it here—for this purpose and in this manner—is not consistent with its accepted uses, as is evident from the studies he cites, including his own prior work.[28]

   *Second,* Plaintiffs rely on Farber's own determination that applying his metric to seniority integrations "was appropriate and typical of the practice of other economists, and would yield reliable results, as it does in other contexts, like discrimination cases."  (Pls. Br. 38.)  Even if Farber had said this—and Plaintiffs cite nothing to indicate he did—an expert's opinion that his analysis is reliable carries no weight.  *See Furlan* v. *Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012) (Plaintiffs must "come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert") (citation omitted).  Moreover, as Plaintiffs' own cases explain, a metric's proven reliability in other contexts does not obviate the need for a showing of reliability in the case

---

[28] Unlike those studies, Farber presents his calculation without any adjustments for variables that could explain differences in the phenomenon observed (*i.e.*, different seniority lists), such as the presence of fences and differences in pay and airline equipment, and without any estimation of standard deviation or error rate to indicate reliability.  *See, e.g.*, Ex. 96 at 694 (studies of the male-female wage differential adjusted for factors like differences in annual hours worked, fringe benefits, absenteeism, education, and experience); Ex. 97 at Tbl. 5 (listing standard deviation and estimated standard error); Ex. 98 at 344 Tbl. 2 (identifying standard errors); Ex. 99 at 28 (listing standard deviations).

at hand.  *See Warren Distrib. Co.* v. *InBev USA L.L.C.*, No. 07-1053 (RBK/JS), 2010 WL 2179167, at *4 (D.N.J. May 28, 2010) ("Merely because a method is reliable [as a general matter] does not mean it applies in all cases."); *Smithkline Beecham Corp.* v. *E. Applicators, Inc.*, No. 99-CV-6552, 2001 WL 1526273, at *3 (E.D. Pa. Nov. 29, 2001) (expert testimony must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field") (citation omitted).

*Third*, Plaintiffs excerpt a sentence from the deposition testimony of James Feltman, ALPA's restructuring expert, to suggest inaccurately that he somehow endorsed Farber's approach.  (*See* Pls. Br. 38.)  He did not.  To the contrary, he testified that, given the scope of his expertise and retention, he had no "view one way or the other about the process or methodology that [Farber] employed."  (Ex. 100 at 199:25-200:3.)  He did, however, opine that Farber incorrectly selected his "comparable" transactions.  (*Id.* at 198:22-199:5.)

### 4. Farber's Alternative Seniority Lists Fail to Account for Key Features of the Seniority Integration and to Provide a Basis for Individual Damages, and Thus Do Not Fit the Case

Farber's alternative seniority lists also should be excluded because they do not fit the facts of the case.  (*See* ALPA Br. 52-57.)[29]  Among other defects, Farber disregarded the APA's right to staple all TWA pilots and refuse

---

[29] Transcripts for Farber's January 22-23, 2013 deposition testimony are attached as Exhibits 10 and 11 to Plaintiffs' opposition brief (Dkt. Nos. 579-13–579-15).

arbitration; TWA's financial status as a failed airline facing imminent liquidation;[30] and the importance of factors other than seniority rank—such as fences and other conditions and restrictions—in evaluating whether and to what extent a merged seniority list favors one pilot group over the other.  (*Id.*)  Plaintiffs' responses prove the merits of ALPA's critique.

      *First,* Plaintiffs claim that ALPA argued that "Farber assumed that the APA and TWA MEC would reach an agreement on a different merged seniority list," and then purport to "rebut" that argument by insisting that Farber "did not assume that APA would have agreed on a list."  (Pls. Br. 45.)  But because the APA could unilaterally staple all of the TWA pilots and refuse arbitration, *only* a list that was acceptable to the APA was achievable.  (*See* ALPA Br. 53-54.)  That Farber did not consider by what means the integration would be determined explains why his "but-for" lists do not remotely resemble anything that the APA would have accepted (*id.*), and only underscores that his testimony does not fit the facts.

---

[30] Plaintiffs' only response to this point is the conclusory assertion that Farber did not make the assumptions about TWA's financial health that ALPA contends, which Plaintiffs claim was addressed generally in their Motion to Bar the Expert and Opinion Testimony of ALPA's experts.  (Pls. Br. 45-46.)  ALPA incorporates by reference the arguments it made in its opposition to that motion (Dkt. No. 581) at pages 31-34, which detail the assumptions made by Farber about TWA's financial condition that Plaintiffs disregard or misrepresent, his reliance on those assumptions, and the fact that they are conclusively rebutted by the record evidence.

*Second,* Plaintiffs claim that Farber did not "fail" to factor in fences and restrictions, such as those found in Supplement CC and in the integrations of his "comparable" transactions, but rather "in his expert opinion, [he] disagreed that inclusion of fences was necessary to prepare a but-for seniority list." (Pls. Br. 46.) Even the testimony Plaintiffs point to, however, makes clear that Farber did not believe such features were *unnecessary*. Rather, he "chose not to consider [them] in constructing [his] list with the understanding that the list could be used as a *starting framework* to create" a list that would take such things into account. (Farber 1/22 Tr. 94:23-95:20.)[31]

Farber's concession that the specific lists he proposes are just a "starting structure of an ultimate seniority list" and "would probably *not* be the list that was written down" is fatal to his analysis. These concessions confirm that Farber's "but-for" lists do not provide a method of common proof from which to determine any particular class member's damages, as required to maintain the

---

[31] Even if Farber viewed fences and restrictions as unnecessary, it is indisputable that they drastically affect the impact of seniority list ranks on pilots' careers. (*See* ALPA Br. 56-57.) Thus, Farber's failure to control for these critical variables remains a fatal methodological error. *See Munoz*, 200 F.3d at 301-302; *Bricklayers*, 853 F. Supp. 2d at 191; *Iams Co.* v. *Nutro Prods.*, No. 3:00-CV-566, 2004 WL 5496244, at *6 (S.D. Ohio June 30, 2004) (excluding expert testimony that "omitted several important potentially explanatory variables").

damages phase of the case as a class action.[32]  *Clark* v. *Prudential Ins. Co.*, No. 08-6197 (DRD), 2013 WL 1694451, at *5 (D.N.J. Apr. 18, 2013) (class damages must be capable of measurement using common proof).  Thus, his testimony will not assist a jury tasked with determining damages in a class action.

## II.   ALPA IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES

In opposing ALPA's motion for summary judgment, Plaintiffs argue that the liability verdict should relieve them of their burden of proving damages. But the jury did not find that Plaintiffs suffered damages in any amount and the verdict alone does not entitle Plaintiffs to the damages they now seek.  It is Plaintiffs' burden at this stage of the case to offer non-speculative proof that they are entitled to damages.  They have failed to carry that load.

As discussed above, the hypothetical integrated seniority lists advanced by Plaintiffs' experts, at best, invite the jury impermissibly to guess at damages.  Plaintiffs' new strategy of offering the "Rightful Place Proposal" as an alternative "but-for" seniority list does not provide a permissible basis for a jury to find damages either.  There is no evidence permitting any jury to conclude that a

---

[32] Farber's lists also are inadmissible as bases for class damages because the only requirement for his lists is that they fit the "average" proportional difference in mean rank that he deems appropriate.  He admits that a list with a given proportional difference in mean ranks could be constructed in an almost infinite number of ways.  As a result, Farber's approach does not determine the placement of individual TWA pilots on the list in any reasonably precise fashion.  (*See* Ex. 59 ¶¶ 57-59; Farber 1/22 Tr. 85:18-23.)

proposal *flatly rejected* by the APA during the negotiations—and that even Salamat deems unachievable—would have been the final seniority list had ALPA acted differently.  Because Plaintiffs have failed to adduce admissible evidence on which a jury could award damages with reasonable certainty, ALPA's motion for summary judgment should be granted.

### A.   The Liability Verdict Does Not Relieve Plaintiffs of Their Burden of Proving Damages with Reasonable Certainty

Plaintiffs argue that the liability verdict obviates their need to show that class members suffered monetary harm at the damages phase.  (Pls. SJ Br. 4.)[33] But the liability jury found only "injury to some of the TWA Pilots."  (Ex. 5 at 2.) According to the jury charge, this means that "the overall outcome of the integration of the TWA pilots into American would have been more favorable" absent ALPA's breach.  (Ex. 101 at 14.)  Indeed, Plaintiffs' counsel argued to the jury that, to find liability, they need only conclude that "one pilot" was moved above the staple point.  (Ex. 4 at 75:17-18.)  The liability jury thus made no findings of how many TWA pilots were impacted by the alleged breach and suffered injury of any kind.  And their verdict says *nothing* about whether any pilot injured by ALPA's breach suffered any monetary damage.  Indeed, there are many scenarios in which pilots could have moved on the seniority list without

---

[33] All citations herein to "Pls. SJ Br." refer to Plaintiffs' brief in opposition to ALPA's motion for summary judgment (Dkt. No. 580).

experiencing any adverse impact on their incomes or career opportunities.  This would be so, for example, for pilots with high seniority placement, pilots with seniority placement so low that they would have been furloughed under any possible list, or pilots based in St. Louis who maintained their relative seniorities by operation of the St. Louis Fence.[34]

Thus, the amount of monetary damages, if any, remains an open question, the answer to which Plaintiffs must prove by a preponderance of the evidence.  *See New Forum Publishers, Inc.* v. *Nat'l Org. for Children, Inc.*, No. Civ. A. 02-1737, 2003 WL 22016941, at *5 (E.D. Pa. July 1, 2003).[35]

### 1.    The "Wrongdoer Rule" Relaxes, But Does Not Eliminate, Plaintiffs' Burden of Proving Damages

Plaintiffs purport to rely on the so-called "wrongdoer rule" to eliminate their burden of proving the amount of monetary damages.  Such reliance is misplaced.  While courts in some circumstances relax plaintiffs' obligation to prove the amount of damages with mathematical certainty, it remains the case that "damages may not be determined by mere speculation or guess."  *Story*

---

[34] *See* Ex. 102 at 4:15-20; Ex. 103 at 14:18-19; Ex. 104 at 98:15-17; Salamat Rpt. 42; Ex. 26 at ALPA 8767.

[35] *Lucente*  v. *IBM*, 146 F. Supp. 2d 298, 302 (S.D.N.Y. 2001), does not support Plaintiffs' argument that the first verdict relieved them of the burden of proving damages.  *Lucente* merely discusses calculation of damages by a jury following a finding of liability on summary judgment.  ALPA does not dispute that the calculation of damages is "a factual determination."  (Pls. Br. 4.)

*Parchment*, 282 U.S. at 563.  The cases Plaintiffs cite underscore this point.  (*See* Pls. SJ Br. 11-14.)  They make clear that while *absolute* certainty is not required, plaintiffs cannot shirk their burden of adducing evidence sufficient to allow a jury rationally to arrive at a damages figure.  *See Palmer* v. *Conn. Railway & Lighting Co.*, 311 U.S. 544, 561-62 (1941) (requiring "a basis for a reasoned conclusion" for amount of damages); *Starceski* v. *Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100-01 (3d Cir. 1995) (upholding damages award on basis of district court's determination that it could have been "rationally arrived at").[36]  *Locklin* v. *Day-Glo Color Corporation*, 429 F.2d 873 (7th Cir. 1970), is particularly instructive.  In *Locklin*, the court emphasized that "[d]amages may not be awarded on the basis of conjecture and speculation"; the plaintiff has the burden of proving the amount of damages "by a preponderance of the evidence"; and "the admitted fact of damage is insufficient to prove the amount of damage."  *Id.* at 879.  Indeed, the *Locklin* court cautioned that, even when a defendant "by his own wrong has precluded a more precise computation of damages"—which Plaintiffs do not assert here—"[a] plaintiff may not shift the burden of proving the amount of damage."  *Id.*

---

[36]  *See also Pettway* v. *Am. Cast Iron Pipe Co.*, 494 F.2d 211, 260 (5th Cir. 1994) (while "[u]nrealistic exactitude is not required," damages could be approved only when "reasonably calculated to compensate the discriminatees for their losses"); *Burton* v. *General Motors Corp.*, No. 1:95-cv-1054-DFH-TAB, 2008 WL 3853329, at *24-25 (S.D. Ind. Aug. 15, 2008) (requiring "adequate basis in the record for an award of damages").

The case law is thus clear that, notwithstanding the liability verdict, Plaintiffs are still required to present evidence sufficient to allow a jury rationally to arrive at a damages figure.  Plaintiffs have failed to do so.

### 2.    Testimony of Fact Witnesses with Knowledge is Relevant to the Factual Determination of Damages

Because Plaintiffs' argument about the significance of the first jury verdict is wrong, so too is their contention—offered without authority—that testimony from fact witnesses with personal knowledge of the negotiations is "no longer" relevant.  (Pls. SJ Br. 16.)  To the contrary, testimony from witnesses with personal knowledge of what would have happened "but for" ALPA's breach is critical at this phase of the case.  *See Aguinagua*, 854 F. Supp. at 764.[37]  Plaintiffs cannot dismiss the testimony developed during discovery in this case as "irrelevant" just because they cannot rebut it.

### B.    Plaintiffs Have Not Met Their Burden of Proving Any Damages

Plaintiffs have adduced *no* admissible evidence showing monetary damages to any class member.  Until now, Plaintiffs have purported to rely solely

---

[37] *See also Donlin* v. *Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) (lay testimony regarding future projections of a business or operation is admissible if it "come[s] from someone who has intimate and thorough knowledge of the business gathered from either a lengthy tenure or a position of authority"); *Carnegie Mellon Univ.* v. *Marvell Tech. Grp., Ltd.*, No. 09-290, 2013 WL 1767970, at *2 (W.D. Pa. Apr. 24, 2013) (lay witness can offer "future predictions or opinions on what would have occurred under certain circumstances, as long as these opinions are based on personal knowledge").

on the evidence of their two experts to prove damages.  (*See, e.g.*, Pls. Br. at 1 ("To

satisfy this burden [of proving damages], Plaintiffs will present the expert opinion

testimony of" Salamat and Farber.); Ex. 51 at 4-11.)  With the fatal deficiencies of

their experts' opinions now laid bare, Plaintiffs take a dramatically new approach.

They now claim that their experts' testimony is not needed because a jury could

rely upon the so-called "Rightful Place Proposal" to award damages.  (Pls. SJ Br.

6-7; Ex. 105 (adding Rightful Place Proposal as basis for calculation of damages);

*see also* Ex. 94.)  Plaintiffs, however, fail to explain how a jury could rely on this

proposal as a reasonable measure of damages when the uncontroverted record

shows that it was never a probable—or even possible—outcome of the

negotiations, regardless of ALPA's conduct.

### 1.   There Is No Evidence That the APA Would Have Accepted the Rightful Place Proposal

Plaintiffs' sole "evidence" for their claim that the Rightful Place

Proposal is a reasonable basis for a determination of damages are statements—

made by Duane Woerth, ALPA's then president; Roland Wilder, the TWA MEC's

attorney; and Michael Tannen, a consultant hired to create the proposal—from a

"promotional video" that ALPA made to persuade the APA of the proposal's

fairness.  (Pls. SJ Br. 7-11.)  But it does not matter whether ALPA or its

consultants argued that the Rightful Place Proposal was fair or should be accepted

by the APA.  What would be relevant to a jury's determination of damages is any

47

evidence that the APA would have accepted this proposal, absent a breach by ALPA. The record is uncontroverted that they would not have.

Testimony about the APA's response to the Rightful Place Proposal is clear. The APA rejected it unequivocally. The president of the APA testified that the Rightful Place Proposal was "unrealistic" because "it went way and above and beyond fair and equitable and what we would classify as what their legitimate career expectations were." (Ex. 89 at 87:9-15.) He also testified that the Rightful Place Proposal was perceived by the APA membership as "the TWA pilots . . . being unreasonable," thereby making APA members more inclined to staple TWA pilots, not accede to their demands. *Id.* at 91:4-10; *see also id.* at 90:23-91:10 (American pilots' reaction to Rightful Place Proposal was "very hostile"); Ex. 88 at 91:10-92:10 (APA's reaction to the Rightful Place Proposal was "outrage"); Ex. 27 (20-page letter detailing APA's objections to Rightful Place Proposal).)

The APA's response surprised no one. Plaintiffs' and APA witnesses alike testified that the Rightful Place Proposal would have usurped American pilots' pre-transaction career expectations. (*See* Ex. 89 at 93:13-24 (the Rightful Place Proposal would have "negatively affected [American pilots] in their career progression," such as by allowing TWA pilots to "get[] into our large wide-body aircraft and types of aircraft that TWA didn't have at the time"); Ex. 93 at 88:21-89:1 ("the idea that TWA pilots would be able to fly 777s and MD-11s within five

48

years" under the Rightful Place Proposal was a "transfer of a career expectation that once belonged to the American pilots to TWA pilots"); Ex. 89 at 87:13-21; Ex. 88 at 91:18-92:8; Ex. 106 at 22:6-9; Ex. 107 at 144:9-13; Ex. 93 at 92:21-93:4.)

Even Plaintiffs' principal expert, Salamat, concedes that the Rightful Place Proposal could not have been achieved.[38]  In his report, Salamat studied the APA's objections to the Rightful Place Proposal and was "unconvinced that the Rightful Place Proposal could have formed the basis for an agreement between the TWA pilots and the APA."  (Salamat Rpt. 29-31.)  Salamat likewise testified at his deposition that he "do[es]n't think that list construction method would have formed the basis for an agreement," and that "in order to—to think that that would be an appropriate method for calculating the damages, . . . I would need to be convinced that in the absence of ALPA's breach, that's the list that would have been obtained. And as I say here, I'm unconvinced."  (Salamat 1/31 Tr. at 100:24-102:14.)

### 2.    It Is Too Late for Plaintiffs to Change Their Theory of Damages

The Rightful Place Proposal is not a damages model, nor did Plaintiffs purport to offer it as one until October 2, 2013—*after* all expert reports in this case had been filed, *after* all experts were deposed, and even *after* Plaintiffs had filed

---

[38] This is one of Salamat's few assessments that is consistent with the record.  *See USS-POSCO Indus* v. *Contra Costa Cty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994) ("even a broken clock is right twice a day").

49

their opposition to ALPA's motion for summary judgment.  (Ex. 105 (adding

Rightful Place Proposal as basis for calculation of damages).)  Plaintiffs have not

proffered Professor Tannen, creator of the proposal, as an expert.  Nor have the

experts actually advanced by Plaintiffs opined on either the methodology used to

create the proposal or its validity as a basis for calculating damages.[39]  Indeed,

Tannen's testimony is not even being offered to establish a factual basis for what

the Rightful Place Proposal is.  And Tannen has not been deposed in this case

because after ALPA expressed an interest in doing so, Plaintiffs asserted that a

deposition was unnecessary because they would (and did) stipulate that they had

no intention to call him as a witness at trial.  (Ex. 68 at 2.)  ALPA agreed because,

at that time, the Rightful Place Proposal was not being offered as part of Plaintiffs'

affirmative theory of damages.

      In lieu of a proper expert or factual foundation, Plaintiffs intend to

offer a video in which Tannen "explains the proposal."  (*See id.*; Pls. SJ Br. 9.)

Tannen's videotaped explanation is not an acceptable substitute for admissible

expert testimony describing a non-speculative methodology for assessing damages,

or even fact testimony explaining its substance.  Because his "explanation" was

given in the context of offering the Rightful Place Proposal during negotiations

---

[39] Although Salamat calculates damages on the basis of the Rightful Place
Proposal, he testified that he "do[es]n't think it . . . would be an appropriate way to
calculate the damages."  (Salamat 1/31 Tr. at 102:13-14.)

with the APA, Tannen had every incentive to describe his proposal as "fair" and none to disclose any shortcomings of his methodology, to the extent he relied upon one, or any respects in which it disadvantaged the American pilots.  Plaintiffs cannot rely on a damages model that has not been advanced, let alone explained, by any of their expert witnesses.

### 3.   Professor Sycara's Testimony Does Not Support Plaintiffs' New Argument About the Rightful Place Proposal

Plaintiffs argue that ALPA's expert Professor Katya Sycara somehow supports their theory that the Rightful Place Proposal (or any of Plaintiffs' other proposed lists) could provide a proper basis upon which the jury could find damages.  This argument is as audacious as it is misguided.  Having disavowed Salamat's reliance on anything other than his own experience—including Professor Sycara's work—Plaintiffs now cite Professor Sycara's general testimony about negotiations as support for their claims.  (*See* Pls. SJ Br. 16-18.)  But Professor Sycara is not an expert in negotiations.  She is a computer scientist whose appearance in this case was necessitated to correct Salamat's misuse of her computer model as to how persuasive argumentation impacts negotiations.  (*See* Declaration of Lisa Rodriguez, dated Sept. 30, 2013 (Dkt. No. 580-1) ("Rodriguez Decl."), Ex. E at 1-2.)  Undeterred, Plaintiffs cite statements by Sycara about negotiations generally and suggest that they support their contentions about the

51

impact of various actions on the negotiation process in this particular case.  (Pls. SJ Br. 16-18.)  They plainly do not.

Professor Sycara was clear.  Her theories of persuasive argumentation are premised on a "fine-grained understanding" of the beliefs of *both parties* in negotiation.  (Rodriguez Decl., Ex. E at 7.)  Yet Plaintiffs argue, contrary to both Professor Sycara's testimony and reason, that her theories apply to arguments that "make[] no logical sense or do[] not follow reason."  (*See* Pls. SJ Br. 17.)  But Professor Sycara's theories presuppose that the arguments being advanced have the potential to persuade.  Her theory thus requires an understanding of whether arguments are likely to "backfire" and whether they are "credible," meaning that "the persuader has the means to bring about the threatened effect."  (Rodriguez Decl., Ex. E at 9.)  As Plaintiffs made no effort to assess the efficacy of any threats they believe ALPA should have made, Professor Sycara's model of persuasive argumentation does not support, but instead undermines, their theory of damages.

Because Plaintiffs have failed to present any admissible evidence of monetary damages to any class member, they have failed to meet their burden of proving damages and summary judgment should be granted in favor of ALPA.[40]

---

[40] Even if Plaintiffs had been able to adduce any proof of damages, Plaintiffs also failed to satisfy their burden of proving that damages can be determined by class-wide proof.  "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [plaintiffs' liability] theory. . . .  If the model does not even attempt to do that, it cannot possibly

## C.   Damages Should Be Limited As a Matter of Law to the Duration of the 1997 CBA

In their opposition, Plaintiffs concede for the first time that "damages through 2026 are no longer appropriate" in light of "the bankruptcy court's Section 1113 Order setting aside American's collective bargaining agreement with the APA on September 5, 2012," which "breaks the causal connection between ALPA's breach of its duty of fair representation and the TWA pilots' diminished income and employment prospects." (Pls. SJ Br. 18-19.) Inexplicably, however, Plaintiffs continue to claim that ALPA is liable for damages accrued under the Restructuring Agreement effective as of May 1, 2003, which replaced the CBA that governed during the acquisition and the subsequent seniority integration negotiations period in 2001 and 2002. (*See* Pls. SJ Br. 19-22; Ex. 40.) The Restructuring Agreement—negotiated, signed, and implemented more than a year *after* ALPA's role as the bargaining agent for the former TWA pilots ended— broke the causal connection no less than the 2012 Bankruptcy Court order that rejected the then-current CBA.

---

establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1433 (2013); *see also Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2551-52 (2011). Accordingly, if summary judgment is denied, ALPA reserves the right to move for the decertification of the class because of Plaintiffs' failure to offer common proof of damages.

As support for their contrary position, Plaintiffs cite only the general principle that an award of back pay is an appropriate "make whole" remedy.  (*Id.* at 19-20.)  ALPA does not disagree that back pay is an acceptable remedy.  Rather, ALPA argues that it cannot be held liable for harm that befell Plaintiffs under the terms of a CBA negotiated by the APA in response to a different set of circumstances, with no involvement by ALPA, and which represented a substantial departure from the 1997 American-APA Agreement.  (*See* Exs. 37, 40.)[41]  Indeed, Plaintiffs, in their initial allegations, asserted that the *APA* was liable for events occurring after their certification by the National Mediation Board as the collective bargaining agent for the former TWA pilots on April 3, 2002.  (*See* Second Am. Restated Compl. ¶ 125.)  In particular, Plaintiffs argued to the Court of Appeals:

> Despite owing a DFR to the Class . . . APA failed to maintain the status quo as to the Class' working conditions (including seniority) and instead implemented Supplement CC.  After April 3, APA and AA did not negotiate, mediate, arbitrate or take any other legitimate steps at all to change the *status quo ante*; they simply imposed

---

[41] Plaintiffs misunderstand the significance of *Bowen* v. *U.S. Postal Serv.*, 459 U.S. 212, 223-24, 227 n.16 (1983), to this argument.  *Bowen* stands for the proposition that "[t]he power to remedy an ongoing wrong is a critical element of damage awards under federal labor law" such that, "where a union or an employer's conduct *increases* a plaintiff's damages, the other party is not liable for the increase because it is powerless to stop the plaintiff's ongoing harm."  (Defs.' Br. 69 n.31.)  Once the APA was certified as the collective bargaining agent for the former TWA pilots, ALPA no longer had the power to remedy any ongoing wrong, and thus should not be liable for damages for this time period.  It is of no moment that *Bowen*, in particular, related to the apportionment of damages between the union and the employer—the underlying holding of the case is no less valid.

> Supplement CC on the Class. The result was the Class' loss of
> seniority and ultimately, the furlough of more than 1,200 of
> Appellants.

Pls.' App. Br., *available at* 2003 WL 25295650 (3d Cir. 2003).  According to

Plaintiffs, it was the APA—*not ALPA*—that had the ability to " negotiate, mediate,

arbitrate or take any other legitimate steps at all to change the *status quo ante*."

*See id.*

   ALPA's liability terminated no later than when the APA assumed the

obligation and had the opportunity to change the *status quo ante*.  That happened

no later than May 2003, when the APA (as the bargaining representative for the

former TWA pilots) and American implemented the Restructuring Agreement and

replaced the CBA that supposedly had resulted from ALPA's claimed breach.  As

a result, Plaintiffs should be precluded from seeking damages for the period

beginning in May 2003.

## CONCLUSION

   For the foregoing reasons and those set forth in ALPA's opening

brief, Defendant's motions to exclude the testimony of Plaintiffs' experts, and for

summary judgment, should be granted.

Dated:  Haddonfield, New Jersey
        October 18, 2013

Respectfully submitted,

Theodore V. Wells, Jr., Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

 - and -

Archer & Greiner
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033

By:   _/s/ John C. Connell_
     John C. Connell, Esquire
     Kerri E. Chewning, Esquire

*Pro Hac Vice:*

Jay Cohen, Esquire
Daniel J. Toal, Esquire
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
4530 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 659-4656

*Attorneys for Defendant Air Line Pilots Association, International*

56