# EXHIBIT 96



## WILEY-BLACKWELL

**Economics Department of the University of Pennsylvania**

**Institute of Social and Economic Research -- Osaka University**

Male-Female Wage Differentials in Urban Labor Markets
Author(s): Ronald Oaxaca
Source: *International Economic Review*, Vol. 14, No. 3 (Oct., 1973), pp. 693-709
Published by: Blackwell Publishing for the Economics Department of the University of
Pennsylvania and Institute of Social and Economic Research -- Osaka University
Stable URL: http://www.jstor.org/stable/2525981
Accessed: 04/12/2009 09:56

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp. JSTOR's Terms and Conditions of Use provides, in part, that unless
you have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and you
may use content in the JSTOR archive only for your personal, non-commercial use.

Please contact the publisher regarding any further use of this work. Publisher contact information may be obtained at
http://www.jstor.org/action/showPublisher?publisherCode=black.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or printed
page of such transmission.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of
content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms
of scholarship. For more information about JSTOR, please contact support@jstor.org.



*Economics Department of the University of Pennsylvania, Blackwell Publishing, Institute of Social and
Economic Research -- Osaka University* are collaborating with JSTOR to digitize, preserve and extend access
to *International Economic Review.*

http://www.jstor.org

694                                    RONALD OAXACA

after adjustments for color, schooling, age, city size, marital status, class of worker, and length of trip to work. This adjusted ratio implies a residual differential of .51, which is 77% of the original differential. From the results of his regressions of hourly earnings across occupations, Fuchs concluded that nearly all of the wage differential could be explained away if one chooses sufficiently narrow occupational categories. As Fuchs observed, this merely casts the problem in terms of why occupational distributions are so different between males and females.

In Cohen's study of sex differentials [5], an annual difference of $5,000 for full-time employed males and females was calculated from a 1969 working conditions survey. Cohen adjusted the difference in pay by excluding those under the age of 22 and over 64, the self-employed, persons without a steady job, and professionals. He also adjusted for differences in annual hours worked, fringe benefits, absenteeism, seniority, education, and unionization. The income difference was reduced to $2,550 or 51% of the original difference. Cohen attributed this large residual to the concentration of women in lower paying jobs.

The Malkiels' study [9] of professional workers revealed male-female wage differentials that ranged from .48 to .51 for the years 1966, 1969–1971. Adjustment for differences in schooling and experience yielded residual differentials varying between 37% to 49% of the original wage differentials. For one of the years the unexplained residual was reduced to only 3% of the original wage difference by adjusting for differences in schooling, experience, job level, critical area of study, and publications. This clearly indicates that unequal pay for equal work is not a significant source of discrimination. The problem of discrimination centers around the assignment of job levels. The Malkiels found that 53% of the male-female difference in job levels could not be explained by differences in personal characteristics.

## 2. A MEASURE OF DISCRIMINATION

Discrimination against females can be said to exist whenever the relative wage of males exceeds the relative wage that would have prevailed if males and females were paid according to the same criteria. We can formalize this notion by proposing the concept of a discrimination coefficient ($D$) as a measure of discrimination:

( 1 ) $$D = \frac{W_m/W_f - (W_m/W_f)^0}{(W_m/W_f)^0} ;$$

where

$(W_m/W_f) =$ the observed male-female wage ratio;

and

$(W_m/W_f)^0 =$ the male-female wage ratio in the absence of discrimination.

An equivalent expression in natural logarithms is

FARBER−000103

# EXHIBIT 97

WORKING PAPER #270
INDUSTRIAL RELATIONS SECTION
PRINCETON UNIVERSITY
SEPTEMBER 1990

# Lawyers as Agents of the Devil in a Prisoner's Dilemma Game

Orley Ashenfelter[1]
Princeton University


David Bloom
Columbia University

The nickname Prisoner's Dilemma, attributed to A.W. Tucker, derives from the original anecdote used to illustrate the game. Two prisoners, held incommunicado, are charged with the same crime. They can be convicted only if either confesses. Further, if only one confesses, he is set free for having turned state's evidence and is given a reward to boot. The prisoner who has held out is convicted on the strength of the other's testimony and is given a more severe sentence than if he had also confessed. It is in the interest of each to confess whatever the other does. But it is in their collective interest to hold out. Rapoport and Chammah (1965)

[1] This paper was written while Ashenfelter was a Fellow at the Center for Advanced Study in the Behavioral Sciences and was supported by The John M. Olin Program for the Study of Economic Organization and Public Policy. The authors are also grateful to the Russell Sage and Alfred P. Sloan Foundations for financial support.

FARBER-000069

Table 5

Estimates of the Parameters of the Distribution of Arbitrators (Preferred)
Wage Change Awards, 1981-1984

(Estimated Standard Errors in Parentheses)

|  | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|
| Mean (u) | 6.4% <br> (.65) | 8.0% <br> (.27) | 7.4% <br> (.29) | 7.9% <br> (.35) |
| Standard Deviation(s) | 1.5% <br> (.37) | .76% <br> (.14) | 1.02% <br> (.24) | 1.00% <br> (.23) |
| Effect of Employer Having Lawyer on Mean Award | -1.9% <br> (.65) | -1.6% <br> (.29) | -.34% <br> (.35) | -1.0% <br> (.31) |
| Effect of Union Having Lawyer on Mean Award | 2.3% <br> (.72) | .54% <br> (.31) | 1.4% <br> (.45) | .46% <br> (.25) |

FARBER-000087

# EXHIBIT 98



Cornell University
ILR School

**ILRReview**

Volume 58 | Number 3                                                                 Article 2

2005

# Nonunion Wage Rates and the Threat of Unionization

Henry S. Farber
*Princeton University*

*Table 2.* Probability of Unionization—Private Sector, Selected Years

| Variable | Normalized Probit Estimates | | | | |
|---|---|---|---|---|---|
| | *1977–81* | *1987* | *1992* | *1997* | *2002* |
| ED < 12 Years | 0.026 | −0.008 | −0.014 | −0.013 | −0.018 |
| | (0.003) | (0.003) | (0.003) | (0.003) | (0.003) |
| ED 13–15 Years | −0.057 | −0.034 | −0.024 | −0.012 | −0.012 |
| | (0.003) | (0.003) | (0.003) | (0.003) | (0.002) |
| ED ≥ 16 Years | −0.193 | −0.105 | −0.085 | −0.060 | −0.042 |
| | (0.004) | (0.004) | (0.004) | (0.003) | (0.003) |
| Age | 0.011 | 0.011 | 0.008 | 0.005 | 0.003 |
| | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) |
| Age Squared | −0.000 | −0.000 | −0.000 | −0.000 | −0.000 |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Female | −0.081 | −0.036 | −0.033 | −0.023 | −0.017 |
| | (0.004) | (0.004) | (0.004) | (0.003) | (0.003) |
| Married | 0.024 | 0.013 | 0.015 | 0.008 | 0.006 |
| | (0.003) | (0.003) | (0.003) | (0.003) | (0.002) |
| Married*Female | −0.036 | −0.033 | −0.017 | −0.014 | −0.018 |
| | (0.005) | (0.005) | (0.004) | (0.004) | (0.004) |
| Nonwhite | 0.086 | 0.053 | 0.058 | 0.033 | 0.027 |
| | (0.004) | (0.003) | (0.003) | (0.003) | (0.002) |
| Hispanic | 0.027 | 0.017 | 0.013 | 0.012 | −0.003 |
| | (0.005) | (0.005) | (0.004) | (0.004) | (0.003) |
| 3-Digit Industry FEs | yes | yes | yes | yes | yes |
| State FEs | yes | yes | yes | yes | yes |
| U | 0.234 | 0.156 | 0.132 | 0.112 | 0.100 |
| N | 118,044 | 66,561 | 64,750 | 55,249 | 65,300 |
| Log-L | −47,192.2 | −21,758.9 | −19,173.9 | −15,358.4 | −16,849.0 |

*Notes:* All estimates are weighted by CPS final sampling weights. The coefficients are normalized to represent the derivative of the probability of unionization with respect to a change in the explanatory variable. This is computed as $\phi(\bar{X}\hat{\beta})\hat{\beta}$, where $\hat{\beta}$ is the vector of estimated parameters of the probit model, $\bar{X}$ is the vector of means of the explanatory variables, and $\phi$ is the standard normal probability density function. The numbers in parentheses are standard errors. The base group consists of white non-Hispanic single men with 12 years of education.

the gap declined over time. Women were substantially less likely than men to be unionized in the early years, with the male-female gap being 8.1 percentage points for single workers and 11.9 percentage points for married workers in 1977–81. These differences fell to 1.7 percentage points for single workers and 3.5 percentage points for married workers by 2002. Nonwhites were statistically significantly more likely than whites to be unionized, with a racial gap of 8.6 percentage points in 1977–81, declining to 2.7 percentage points in 2002. The gap by ethnicity was substantial in the early years, with Hispanics 2.7% more likely

than non-Hispanics to be unionized in 1977–81. However, by 2002 there was not a statistically significant relationship between Hispanic ethnicity and unionization rates.

While I do not present the results, there is substantial persistent variation across industries in union density by industry and state. For example, average union density in 1977–81 in states without RTW laws was 27.0%, but it was only 14.2% in states with RTW laws. This gap remained substantial in 2002, with union density of 12.3% in states without RTW laws and only 5.0% in states with RTW laws. Similarly, average

# EXHIBIT 99

NBER WORKING PAPER SERIES

# IS THERE MONOPSONY IN THE
# LABOR MARKET?  EVIDENCE
# FROM A NATURAL EXPERIMENT

Douglas Staiger
Joanne Spetz
Ciaran Phibbs

Working Paper 7258
http://www.nber.org/papers/w7258

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
July 1999

This project was supported by the Department of Veterans Affairs, Veterans Health Administration, Health Services Research and Development Service, project IIR # 91-148.  The authors thank Paul Cameron, Yvonne Moody, Rona Flanger, and Susan Wheeler for their help in compiling and understanding data from the V.A.  We also thank seminar participants at various universities and conferences for helpful comments. The views expressed herein are those of the authors and not necessarily those of the National Bureau of Economic Research.

© 1999 by Douglas Staiger, Joanne Spetz, and Ciaran Phibbs.  All rights reserved.  Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including ©

Table 1:  Summary statistics for RN wages and employment, 1990-1992
Means and standard deviations (in parentheses)

| | All | VA | Non-VA |
|---|---|---|---|
| Wage gap at nearest VA in 1990 [log(market wage)–log(VA wage)] | .013 (.081) | .019 (.079) | .012 (.081) |
| Nearest VA wage below market in 1990? | 53.0% | 58.7% | 50.0% |
| Change in log wage (90-92) | .102 (.073) | .125 (.088) | .099 (.070) |
| Change in log wage (90-92) at the nearest VA | .122 (.093) | .125 (.088) | .122 (.094) |
| Change in average log wage (90-92) At two nearest competitors | .102 (.056) | .101 (.058) | .102 (.056) |
| Change in RN FTEs, (90-92) | .059 (.212) | .083 (.088) | .056 (.223) |
| VA hospital? | 11.6% | 100% | 0% |
| Distance to nearest VA (miles) | 20.3 (18.2) | 0 (0) | 23.0 (17.7) |
| More than 15 miles to nearest VA? | 50.4% | 0% | 57.0% |
| More than 30 miles to nearest VA? | 30.4% | 0% | 34.4% |
| # hospitals within 15 miles | 11.6 (17.3) | 10.9 (15.6) | 11.7 (17.5) |
| # observations in sample | 1334 | 155 | 1179 |

28

FARBER-000147

# EXHIBIT 100

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 02-2917(JEI)
PATRICK BRADY, et al.,        :
    Plaintiff,        :
                  :
    v.        :
                  :
AIR LINE PILOTS ASSOCIATION,  :
    Defendant.        :

Transcript of the deposition of JAMES S. FELTMAN, CPA, called for Oral Examination in the above-captioned matter, said deposition taken by and before SILVIA P. WAGE, a Certified Shorthand Reporter, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public for the States of New York, New Jersey, Pennsylvania and Delaware, at the offices of PAUL WEISS RIFKIND WHARTON & GARRISON, LLP, 1285 Avenue of the Americas, New York, New York, on Thursday, April 11, 2013, commencing at 9:00 a.m.

HUDSON REPORTING & VIDEO, INC.
124 West 30th Street, 2nd Fl.
New York, New York 10001
Tel:  212-273-9911        JOB NO. 7301

---

Page 2

1   A P P E A R A N C E S :
2
3   GREEN JACOBSON, P.C.
    BY:  JOE D. JACOBSON, ESQ.
    7733 Forsyth Boulevard, Suite 700
4   Clayton, Missouri  63105
    (314) 862-6800
5   Jacobson@stlouislaw.com
    Counsel for the Plaintiffs
6
7
    PAUL, WEISS, RIFKIND, WHARTON &
8   GARRISON, LLP
    BY:  WILLIAM MICHAEL, ESQ.
9   BY:  JAMES BOROD, ESQ.
    1285 Avenue of the Americas
10   New York, New York  10019
    (212) 373-3000
11   Wmichael@paulweiss.com
    Jborod@paulweiss.com
12   Counsel for the Defendant
13
14
15   A L S O   P R E S E N T :
16
    MARTA WAGNER, ESQ.
17   AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
    AFFILIATED with AFL-CIO and CLC
18
19
20
21
22
23
24
25

---

Page 3

1         I N D E X
2   TESTIMONY OF:  JAMES S. FELTMAN, CPA     PAGE
3   EXAMINATION BY MR. JACOBSON      5
    EXAMINATION BY MR. MICHAEL      234
4
5
        E X H I B I T S
6
        (None)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1         - - -
2     DEPOSITION SUPPORT INDEX
3         - - -
4
5   Direction to Witness Not to Answer
6   Page Line    Page Line    Page Line    Page Line
7   None
8
9
10   Request for Production of Documents
11   Page Line    Page Line    Page Line    Page Line
12   None
13
14
15   Stipulations
16   Page Line    Page Line    Page Line    Page Line
17   None
18
19
20   Motion to Strike
21   Page Line    Page Line    Page Line    Page Line
22   188  9
23
24
25

JAMES S. FELTMAN, CPA

1    JAMES S. FELTMAN, CPA
2  American?
3      A. No, I am not familiar with the term
4  mini-hub. I'm familiar with secondary or
5  tertiary hubs but not mini hubs.
6      Q. Have you reviewed any documents
7  relating to TWA's min-hub strategy and the
8  implementation of that strategy in the three
9  years prior to the transaction with American?
10     A. I don't recall having seen that.
11     MR. MICHAEL: Let's take a short
12  break.
13     MR. JACOBSON: Alrightee.
14     (Recess taken 2:33 to 2:43 p.m.)
15     Q. Mr. Feltman, I would like to turn, if
16  I could, for a minute to the expert report of
17  Professor Farber. You should have it there in
18  front of you.
19     A. Okay.
20     Q. In his report, Dr. Farber talks about
21  a measure he developed called a proportionate
22  mean. Do you recall seeing that?
23     A. I did.
24     Q. Alright. Is that a measure that
25  you've seen before?

1    JAMES S. FELTMAN, CPA
2      A. It's not with those words but,
3  essentially, it's a coefficient, which is a way
4  to measure one thing to another. So I'm familiar
5  with the concept.
6      Q. Alright. Do you have any difficulty
7  with the concept? Do you believe that an
8  inappropriate way to compare the seniority
9  placements of pilots from two different seniority
10  lists?
11     MR. MICHAEL: Objection to the form.
12     A. Just give me a moment.
13     Q. Sure. He begins the finding on Page
14  14 of his report.
15     A. That's helpful.
16     I don't have a problem with the process
17  that Mr. or Professor Farber is using in the
18  construction of his Table 1 or the use of a
19  coefficient, which is the column described as
20  proportional difference in mean rights.
21     Q. Alright.
22     A. But I do have --
23     Q. That's my next question.
24     A. -- concerns or challenges about how
25  he selects the transactions that are identified

1    JAMES S. FELTMAN, CPA
2  on his Table 1 and where he makes observations
3  about what is or isn't similar for the reasons
4  we've been discussing throughout my deposition
5  today concerning financial condition.
6      Q. Alright. I'd like to break that up
7  now, if I could, in two different questions and
8  answers, so I have my question followed by your
9  answer, followed by my next question, followed by
10  your next answer, alright, and the next question
11  involves the methodology.
12     Without concerning his selection of which
13  airlines may or may not be comparable to the
14  merger -- to the transaction at issue here but
15  just talking about the methodology he used using
16  the proportionate mean, do you have any disputes
17  with the use of that methodology for providing a
18  coefficient, a measure of how two seniority lists
19  are integrated?
20     MR. MICHAEL: Objection to the form.
21     A. I haven't been retained to provide a
22  damage calculation or rebuttal to the damage
23  calculation in this case. But I have taken a
24  look at Professor Farber's information for
25  purposes that I described to you so -- and I

1    JAMES S. FELTMAN, CPA
2  don't have a view one way or the other about the
3  process or methodology that he employed. I was
4  referring in my earlier response to you to the
5  existence of the use of a coefficient as a means
6  to measure a certain attribute in connection to
7  other similar examples.
8      Q. Okay. Looking at Table 1, I guess,
9  immediately following the signature page of his
10  report, which is a comparison of mean ranks of
11  pilots and post-merger seniority lists, he in his
12  opinion at Page 5, Paragraph -- continuation of
13  Paragraph 10 lists 7 transactions that he uses as
14  a composite to come up with the particular ratio
15  he applies in his opinion.
16     Do you see those transactions?
17     A. You said Page 5 at Paragraph 10?
18     Q. Yes, the bottom part of Paragraph 10,
19  which begins on the prior page.
20     A. I think here Professor Farber
21  identifies seven transactions and later
22  eliminates two of them. So is that the five
23  you're referring to?
24     Q. No. He lists seven transactions for
25  use in reaching his but for seniority list. And

Page 201

JAMES S. FELTMAN, CPA

1    then for purposes of establishing upper and lower
2    bound, he eliminates the highest and lowest
3    coefficient number from each of the seven to
4    eliminate a possible outlier and using the next
5    higher -- second highest as his upper bound and
6    the second lowest as his lower bound, but these
7    are the seven transactions that he uses to
8    generate his seniority list.
9          And I was just addressing -- focusing
10   your attention on that seniority list along with
11   the Table 1, which those transactions are among
12   the several transactions listed.
13         A.  Okay.  I see the seven transactions
14   in Paragraph 10 and I know where Table 1 is.
15         Q.  Okay.  I take it from your earlier
16   answer that you have some dispute with Professor
17   Farber concerning the transactions, the seven
18   transactions, listed on Page 5 at that second
19   half of Paragraph 10; is that correct?
20         A.  Yes.
21         Q.  Alright.  Which of these
22   transactions, if any, do you believe should not
23   be included in Professor Farber's evaluation of
24   the coefficient that he applies in his opinion?

Page 202

JAMES S. FELTMAN, CPA

1          A.  (No response.)
2          Q.  You're taking a long time to reach an
3    answer, so maybe I should ask you a foundational
4    question.
5          Looking at the seven transactions listed
6    on Page 5 there on the second half of Paragraph
7    10, are you familiar with those transactions?
8          A.  Some of them, yes.
9          Q.  Which ones are you familiar with?
10         A.  The first two, which are cargo
11   operators, not passenger operators.  And I'm
12   familiar with the Delta/Pan Am and the Texas
13   International/Continental transactions.
14         Q.  Alright.  Do you have -- is it -- let
15   me...
16         Do you have any opinion regarding the
17   transactions that you have not just listed as
18   being transactions you're familiar with, do you
19   have any opinion as to whether those are properly
20   included in this list by Professor Farber?
21         A.  I don't know because I don't know
22   enough about those transactions to say one way or
23   the other.
24         Q.  Alright.  Of the several transactions

Page 203

JAMES S. FELTMAN, CPA

1    you just mentioned that you are familiar with,
2    the two cargo ones and the others, are there any
3    of those transactions that you believe should not
4    be properly included in this list of transactions
5    on which Professor Farber based his composite
6    coefficient?
7          A.  I don't understand how cargo carriers
8    fit into an analysis of how passenger carrier
9    seniority lists fit together.  So I don't quite
10   understand why Professor Farber has included
11   those, which I note -- or, at least, one he
12   eliminates.
13         Q.  Alright.  How about the transactions
14   with which you are familiar, which are not cargo
15   transactions, which I believe were the Delta/Pan
16   Am and the Texas International/Continental
17   transactions, do you have any criticism to
18   Professor Farber including these two transactions
19   in his lists of combinations he used to
20   generate his composite coefficient?
21         A.  Yeah, I don't think that the Texas
22   Instruments/Continental transaction is similar in
23   characteristics to American/TWA for a number of
24   reasons.  So I'm not sure that -- I don't think

Page 204

JAMES S. FELTMAN, CPA

1    it fits in a comparison.  But I don't think I
2    have anything more to say about it at this point.
3          Q.  You said, "for a number of reasons."
4    What would those reasons be?
5          A.  Well, the reason that I don't think
6    this transaction fits is that Texas International
7    was, essentially, a consolidator, a financial
8    acquirer of Continental.  Continental being the
9    acquired airline was a carrier in substantially
10   different financial condition than TWA when
11   it was acquired by American.  So I don't see much
12   in the way of similarities, other than both of
13   the acquired entities were passenger carriers.
14         Q.  They're different financially in what
15   way?
16         A.  Continental's financial condition and
17   its market position was markedly better than TWA
18   was when TWA filed for bankruptcy in January of
19   2001.
20         Q.  Was this in connection -- this
21   particular acquisition, Texas
22   International/Continental, was that in connection
23   with one of the Continental bankruptcies?
24         A.  Yes.

# EXHIBIT 101

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PATRICK BRADY, et al.,                    :        HONORABLE JOSEPH E. IRENAS
                                          :
                  Plaintiffs,             :
                                          :    Civil Action No. 02-2917(JEI)
        v.                                :
                                          :           **JURY CHARGE**
                                          :
AIR LINE PILOTS                           :
ASSOCIATION, et al.,                      :
                                          :
                  Defendants.             :
_____:


Ladies and Gentlemen of the Jury:

## § 1  Introduction to the Final Charge--Province of the Court and of the Jury

Now that you have heard all of the evidence to be received

in this trial and the arguments of counsel it becomes my duty and

privilege to give you the final instructions of the Court as to

the law that will guide you in your decisions.

The Plaintiffs in this matter are several individuals,

Howard Hollander, Sally Young, Patrick Brady, Ted Case and

Michael Finucan.  They are former pilots for TWA and TWA, LLC.

In this action, these individuals are pursuing this litigation

not only on their own behalf, but they also represent a class of

plaintiffs consisting of some of the approximately 2,300

individuals who were pilots of TWA as of April of 2002.

As you have heard, the defendant, the Air Line Pilots

1

fair representation" and requires a union to act in the best interests of its members in the manner I will describe to you hereafter.

The TWA Pilots claim that ALPA breached its duty of fair representation by failing to protect the TWA Pilots' seniority as part of TWA's merger with American Airlines and the subsequent merger of the two pilot groups. ALPA denies these claims and contends that it represented the TWA pilots appropriately under the difficult circumstances presented by TWA's poor financial situation.

In order to prove their case, the TWA Pilots will have to establish by a preponderance of the evidence that ALPA's representation of the TWA Pilots was either arbitrary or motivated by bad faith.

If Plaintiffs prove that ALPA's conduct was arbitrary or motivated by bad faith, they must then prove a tangible injury resulting from that conduct in order to prevail. A labor union can only be held liable for breach of its duty of fair representation if its breach directly causes injury to an individual or group to whom the duty is owed. In this case, proving injury means that Plaintiffs are required to demonstrate that, but for ALPA's breach of its duty of fair representation, the overall outcome of the integration of the TWA Pilots into American would have been more favorable.

14

# EXHIBIT 102

1          **UNITED STATES DISTRICT COURT**
           **FOR THE DISTRICT OF NEW JERSEY**
2    _____

3    PATRICK BRADY, et al.,
                                    **CIVIL ACTION NUMBER:**
4              Plaintiffs,
                                    **02-2917 (JEI)**
5               -vs-
                                    **TELECONFERENCE**
6    AIR LINE PILOTS ASSOCIATION,
     INTERNATIONAL, et al.,
7
               Defendants.
8    _____
           Mitchell H. Cohen United States Courthouse
9          One John F. Gerry Plaza
           Camden, New Jersey 08101
10         September 18, 2012

11   **B E F O R E:**           THE HONORABLE JOSEPH E. IRENAS
                                UNITED STATES DISTRICT JUDGE
12
     **A P P E A R A N C E S:**
13   GREEN JACOBSON
     BY: JOE D. JACOBSON, ESQUIRE
14   BY:  ALLEN P. PRESS, ESQUIRE
     ATTORNEYS FOR PLAINTIFFS
15
     TRUJILLO RODRIGUEZ & RICHARDS
16   BY: NICOLE M. ACCHIONE, ESQUIRE
     ATTORNEYS FOR PLAINTIFFS
17
     ARCHER & GREINER
18   BY: STEVEN J. FRAM, ESQUIRE
     BY: JOHN C. CONNELL, ESQUIRE
19   ATTORNEYS FOR DEFENDANT, AIR LINE PILOTS ASSOCIATION

20   BY:  MARTA WAGNER, ESQUIRE
     BY:  ELIZABETH A. GINSBURG, ESQUIRE
21   ATTORNEY FOR DEFENDANT, AIR LINE PILOTS ASSOCIATION

22   KATZ & RANZMAN
     BY: DANIEL M. KATZ, ESQUIRE
23   ATTORNEYS FOR DEFENDANT

24    Certified as true and correct as required by Title 28,
      U.S.C., Section 753.
25
                         /S/ Carol A. Farrell, CCR, CRR, RMR, CCP

```
                    ┌─────── Teleconference ───────┐
```

 1              (Teleconference in chambers with all counsel

 2    appearing telephonically, commencing at 4:00 p.m.)

 3              THE COURT:  Hello?  Hello?

 4              UNIDENTIFIED SPEAKER:  Your Honor, good afternoon.

 5              THE COURT:  This is Judge Irenas.  Who else is there?

 6              UNIDENTIFIED SPEAKER:  Your Honor, Joe Jacobson,

 7    Allen Press, Michael --

 8              THE COURT:  All right.  Let's start over again.  I

 9    have a court reporter here.  Okay.  Just announce who the

10    lawyers are and who you represent.

11              UNIDENTIFIED SPEAKER:  For the plaintiff, Allen Press

12    and Joe Jacobson here in St. Louis.

13              MS. ACCHIONE:  Nicole Acchione from Trujillo,

14    Rodriguez & Richards for plaintiff.

15              THE COURT:  Okay.  Who else?

16              UNIDENTIFIED SPEAKER:  John Connell and Steve Fram,

17    Archer Greiner, for the defendant.  And Dan Katz, as well.

18              THE COURT:  From Washington?

19              UNIDENTIFIED SPEAKER:  That's correct, Your Honor.

20              THE COURT:  Right.  Okay.  That's everybody?

21              UNIDENTIFIED SPEAKER:  Your Honor, I believe Betty

22    Ginsberg.

23              THE COURT:  Oh, she's in-house counsel.

24              UNIDENTIFIED SPEAKER:  Yes.  And Marta Wagner is also

25    with Mr. Connell and Mr. Press in St. Louis, I believe.

─Teleconference─

1          UNIDENTIFIED SPEAKER:  That's right.  Thank you, Your

2    Honor.

3          THE COURT:  Okay.  And that's ALPA's general counsel,

4    right?

5          UNIDENTIFIED SPEAKER:  In-house counsel.

6          UNIDENTIFIED SPEAKER:  In-house.

7          THE COURT:  In-house general counsel.  Okay.

8          This morning, I came in early to get ready to pick a

9    jury this morning, which I have done, but I'm handed papers

10   from Archer Greiner, I guess Mr. Fram and/or is that from --

11   oh, it's John Connell's letterhead.  John, they got you doing

12   something.

13         UNIDENTIFIED SPEAKER:  Imagine that, Judge.

14         THE COURT:  Are things slow?  What's going on?

15         It's not from Mr. Fram.  It's from John Connell.  And

16   then a short, really, in effect, a one-page response from Lisa

17   Rodriguez.  The dispute appears to be discovery.

18         I did -- to go back, I read the interrogatories, the

19   unanswered interrogatories.  And it's very clear that most of

20   those answers, as a practical matter, couldn't really be

21   given.

22         But Mr. Connell, if you're going to speak, tell me

23   what it is you want.

24         MR. CONNER:  Well, Judge --

25         THE COURT:  It's, in effect, your application.  So --

─Teleconference─

1           MR. CONNER:  Effectively, Judge, you had said some

2    time ago and have said repeatedly since then that, you know,

3    you're wondering how plaintiffs are going to prove this case

4    with damages, and we are, too.  And one of the most effective

5    ways they're going to do it is through documentation of

6    exactly what their economic loss was.  But --

7           THE COURT:  Yeah, but I don't think --

8           MR. CONNER:  So on --

9           THE COURT:  I don't know.  Maybe -- well, it's hard

10   for me to envision that I'm going to take thousands of pilots

11   and -- or however many there were, even though there were a

12   lot less than American pilots, there are still a fair number

13   of them.  Weren't there over a thousand pilots?

14           MR. CONNER:  2,300.

15           THE COURT:  2,300.  And, you know, hold a trial as to

16   what -- you know, if you look at the interrogatories and think

17   you can answer those interrogatories for all 2300, and then

18   try to figure out who had a loss of who didn't.  We know that

19   a certain number didn't, the ones that were above the staple

20   didn't.  But they're a minority.  I mean, most of them

21   probably were claim losses.

22           And so what do you want me to do?  Tell me what it is

23   you would like me to do, Mr. Connell.  What do you want me to

24   do?

25           MR. CONNELL:  The order that Your Honor entered on

──────Teleconference──────

1   September 7th required not production of all documents

2   responsive to the 14 document requests of May 31 for 2,300

3   pilots but, rather, only for five class representatives.

4          THE COURT:  Right.

5          MR. CONNELL:  And we've only gotten a smattering of

6   those documents, and that was, by the way, in preparation for

7   the depositions of the class reps, which has been accelerated

8   to a date before the production of plaintiffs' expert report.

9          THE COURT:  What's the date now -- I just didn't get

10  a chance because I was on trial all day.  What is the date for

11  the expert reports?  Plaintiffs' expert reports?

12         UNIDENTIFIED SPEAKER:  The 28th.

13         THE COURT:  The 28th of September?

14         UNIDENTIFIED SPEAKER:  Correct.

15         THE COURT:  So we're almost there.

16         UNIDENTIFIED SPEAKER:  We're almost there.

17         THE COURT:  Today is the 18th.  So we're -- we're

18  just ten days away.

19         What do we have from the five class reps?

20         MR. PRESS:  Judge, this is Allen Press.  The

21  depositions you ordered are beginning.  We're in the middle of

22  one right now.  And they will all be concluded this week.  We

23  have produced in advance of the depositions all of the -- all

24  the class reps' wage -- W-2 data --

25         THE COURT:  Well, there would be -- you'd have W-2s,

Teleconference

 1   you'd have 1099s, you could have K-1s.

 2           MR. PRESS:  Right.

 3           THE COURT:  I mean, there may be other things, but

 4   those are the three that occur to me.

 5           MR. PRESS:  And then ALPA's lawyers last week said

 6   they'd also like to see the tax returns so we're collecting

 7   all that now and producing those in advance of each

 8   deposition, Judge.  So we've complied and --

 9           THE COURT:  Well, let me ask you this.  The one --

10   the depositions you're in the middle of is who?

11           MR. PRESS:  It's Mike Finucan.  And, Judge, just so

12   you know, he's in the room right now, listening in.

13           THE COURT:  Well, that's okay.  Nothing secret here.

14           Have his tax returns been produced?

15           UNIDENTIFIED SPEAKER:  They were just produced at the

16   very beginning of this deposition today, Judge.

17           I understand the Hollander's tax returns were

18   e-mailed to our Haddonfield office, but we don't have any of

19   the tax returns of the other people, but we're even missing

20   some tax returns from Mr. Finucan.  The fact of the matter is

21   all of this information was supposed to be produced on

22   September 11 in preparation for the depositions.  I'm

23   receiving this stuff for the first time today.

24           THE COURT:  What's missing with Finucan?

25           MR. JACOBSON:  Your Honor, this is Joe Jacobson.  I'm

—Teleconference—

1  defending Mr. Finucan's deposition.

2         THE COURT:  Yes.

3         MR. JACOBSON:  The tax returns that he had, he could

4  not locate a tax return for the year 2000, the year 2002,

5  2004, so he did not produce those.  He can't produce documents

6  that he can't find.  Each tax return is a two-page document

7  for the first of two pages.  They have the same data as far as

8  income that the W-2s, 1099s had.  There is not more than five

9  minutes of scanning to see if there is anything that's

10  different, and that was done at the beginning of the

11  deposition.  We haven't had any questions on these tax returns

12  yet.  I anticipate they'll be coming up soon.

13         UNIDENTIFIED SPEAKER:  But the fact of the matter is,

14  Your Honor, as you had pointed out before, this information

15  has been available to plaintiffs for years, not to mention

16  since May 31st, and I just don't understand why we're getting

17  it, you know, when I walk into a deposition today.

18         THE COURT:  Well, that's water over the dam.  I mean,

19  what Mr. Finucan has produced, he's produced.  Whether the

20  absence of those three years will have some significance --

21  does he have W-2s for those years?

22         UNIDENTIFIED SPEAKER:  Yes.

23         UNIDENTIFIED SPEAKER:  For some of them, yes.

24         THE COURT:  Because those years, he was -- was he

25  flying for the airline those years?

─Teleconference─

```
 1              UNIDENTIFIED SPEAKER:  Yes.

 2              THE COURT:  Well then, he would have -- then

 3     presumably, he would have W-2s for those, or he would have

 4     copies of them.

 5              All right.  Mr. Connell, what is -- again, I'm trying

 6     to figure out, have -- the W-2s, I gather, have been produced

 7     already, right?

 8              MR. CONNELL:  Some of them have been.  Not all of

 9     them have been.  There is one of the class reps that we only

10     have Social Security information on.  We do not have W-2s.

11     Okay?  We don't have a complete set of furlough notices,

12     recall notices, furlough communication.

13              THE COURT:  Yeah, but -- do they exist?  I mean --

14              MR. CONNELL:  We don't have that stuff.  The fact of

15     the matter is what we do have is a smattering of documents,

16     and a responsive -- an answer from the plaintiffs that

17     basically objects to each of the categories of document

18     production.  If they don't have them, then they should be put

19     to the task of saying "We don't have this information for the

20     following of the five class reps."  But they haven't done

21     that.  They've just said, "We object."

22              THE COURT:  Mr. Jacobson?

23              MR. JACOBSON:  The requests were made to the class as

24     a whole, not simply the five class reps.

25              THE COURT:  No, I know, but it's effectively, for the
```

──────────Teleconference──────────

1  moment, been limited to the class five -- the five class reps.

2        MR. JACOBSON:  That's correct.  The class reps have

3  produced what they have.  We can't produce what they don't

4  have.  And the objections were asserted, just for the record,

5  because it was a class-wide request.  But we're not --

6        THE COURT:  Well, I want to make it clear right now,

7  that I consider the class-wide requests premature.  But I do

8  think that the five class reps should produce that material,

9  to the extent they have it.  I mean, it could well be that

10 for -- I don't know whether you would keep furlough -- you

11 know, I mean, some of the -- when I read the requests this

12 morning, my reaction to some of it was that they just might

13 not keep that stuff.  I mean, just, you know, they just might

14 not have it.

15        MR. FRAM:  Your Honor, it's Steve Fram.

16        There is one other category of documents that we

17 think we know exists that haven't been produced for at least

18 one plaintiff.  Sally Young we have reason to believe was

19 disciplined in some way and was not permitted to fly for about

20 six months in 2011.  So we had asked, for all the pilots, and

21 obviously --

22        THE COURT:  Yeah, I saw that question.

23        MR. FRAM:  Yeah.  So we want to see any materials

24 relating to any discipline that would have prevented the pilot

25 from flying, medical disability and the like.  That, as I

—Teleconference—

 1  understand it, has not been produced.

 2          The other thing I would note, Your Honor, is that the

 3  plaintiffs just filed within the last hour a notice for

 4  motion, a notice for -- a motion for notice to the class,

 5  asking the members of the class, or at least some of them, to

 6  produce a broad range of information, many of the same types

 7  of documents that we're talking about.  We happen to think

 8  that's premature.  We thought that was an issue that Your

 9  Honor was going to discuss with counsel --

10          THE COURT:  Well, I just -- I mean, maybe I'm -- I

11  just thought that we would get a -- I never believed that it

12  would be September -- close to September 28th and we still

13  didn't have a theory of plaintiffs' damages.  But it just

14  struck me that real extensive and nitty-gritty discovery would

15  be better done if we knew the theory, if we knew -- if we knew

16  the framework for the claims.

17          UNIDENTIFIED SPEAKER:  Judge, I think that's exactly

18  right and, in fact, I think even plaintiffs' counsel agrees

19  with that proposition.

20          THE COURT:  I think so.  I mean, I'm not soliciting

21  approval of my view, but my view is that once we have a

22  framework, we can begin to fine-tune maybe a little bit the

23  discovery requests or demands for documents or even from the

24  plaintiffs to their own class.

25          UNIDENTIFIED SPEAKER:  Well, Your Honor, that's my

––Teleconference––

 1  point, is that the notice that they're proposing to send asks

 2  for information from the class members that has not been

 3  produced in --

 4          THE COURT:  Why is that being filed with the Court?

 5          UNIDENTIFIED SPEAKER:  Beg your pardon, Your Honor?

 6          THE COURT:  Why -- maybe I should address this to

 7  Mr. Jacobson.  Why is the -- is that request to your class

 8  being filed with the Court?

 9          MS. ACCHIONE:  Your Honor, this is Nicole Acchione.

10  I can address that.

11          When we were in front of Your Honor in July of this

12  year, I believe Mr. Rodriguez raised the issue with the Court,

13  because it was a notice to the class, because a class member's

14  failure to produce documents could result perhaps in the

15  inability of a class member to obtain a monetary judgment, if

16  we were successful.  We wanted the Court to approve the notice

17  that was going to the class, since the Court is the fiduciary

18  as well to the class, and so we wanted to have it -- the form

19  of the notice approved by the Court and, also, the manner that

20  we intended to disseminate the notice to the class reviewed

21  and approved by the Court.

22          THE COURT:  And you want me to do this before we have

23  the expert's report?

24          UNIDENTIFIED SPEAKER:  That's our concern, Your

25  Honor.  We think it's premature.  We don't know --

─Teleconference─

1        THE COURT:  Well, let me say, notwithstanding the

2   theory that I'm a fiduciary for the class -- I mean, I don't

3   know that I'm -- I guess maybe in one sense I am, but I owe

4   duties to both parties here, to the defense and to the

5   plaintiff, and I don't think of myself necessarily as a

6   fiduciary for the -- you may be technically correct, don't get

7   me wrong, but I don't think of myself in that regard.  I think

8   of you in that regard -- plaintiffs' counsel I certainly

9   consider fiduciaries for the class.  And I consider the five

10  named plaintiffs to -- the steering committee to be

11  fiduciaries for the class.  I just don't think of myself as a

12  fiduciary for the class.

13       I mean, I'm trying to figure out why I should

14  approve -- if you're trying to solicit information from the

15  class, I mean documents and, you know, W-2s, tax returns,

16  K-1s, 1099s, furlough notices, you know, there is a whole --

17  if you read the interrogatories or the demand for documents,

18  there is even a lot of other things in there, as well.

19       What kind of decision does plaintiff think I'm going

20  to make?  I mean, how do I judge whether it's fair or not

21  fair?  I mean, I don't give legal advice.  I mean, do I think

22  that maybe it's too much or not enough?

23       MS. ACCHIONE:  Well, Your Honor, to be honest, we

24  were not a hundred percent certain whether the Court's

25  approval of the notice was required.  We decided to proceed

Teleconference

1   with an abundance of caution and seek the Court's approval of

2   the form of notice.

3        We also suspected that there would be information

4   that -- in addition to what we requested, there may be

5   additional information that ALPA would request of the class

6   members, as well, and to the extent it made sense to reach out

7   to the class members one and only one time, through a notice

8   that was approved by the Court and ALPA had a chance to weigh

9   in on, we thought it made sense to go that route.  We filed it

10  in advance of the October 2nd hearing.  It's not returnable

11  until after our expert reports are due, but we wanted the

12  opportunity to discuss it, have it on record and on the

13  docket, and have the opportunity to discuss the form of the

14  notice at the October 2nd hearing with Your Honor.

15       THE COURT:  Well, again, I find it a little difficult

16  to see myself approving what you strategically think you need

17  from your clients to help prove your case.  I mean, that's a

18  decision you have to make.  You know, maybe you'll decide that

19  everyone who's eaten at a Greek restaurant in the last 20

20  years has to give the menu, you know, because you think that

21  will help your case.  But, I mean, I -- those are the kind of

22  decisions that I don't normally get into.  You --

23       MS. ACCHIONE:  Okay.

24       THE COURT:  You decide what it is you think you need

25  to prove your case.  You're working with your experts,

—Teleconference—

1    presumably -- presumably, they would give you guidance, and

2    they'd say, look, this is our theory and this is what we think

3    we need to "prove" in our theory.  But I don't normally get

4    involved in -- in that decision.  I mean, I -- you decide what

5    it is you think you need to prove your case, which is

6    dependent on how you're going to go about doing it.  And, you

7    know, I don't see myself, say, approving this is what you

8    should be asking for.

9            MS. ACCHIONE:  Okay.

10           THE COURT:  Because maybe next week you'll decide

11   there are some more things you should ask for, and the week

12   after that, there are some more things.  I -- or, conversely,

13   if there are things asked for you don't really need.  That

14   could be looked at another way, you know.  But -- I don't

15   know.

16           Right now, I was concerned only with the five

17   steering committee members, the plaintiffs, the now -- the

18   now-named plaintiffs.  Bud Bensel, where are you when we need

19   you?  And that they produce --

20           UNIDENTIFIED SPEAKER:  You're getting a rise out of

21   this end of the phone call.

22           THE COURT:  What did you say?

23           UNIDENTIFIED SPEAKER:  You're getting a rise on this

24   end of the phone call.

25           THE COURT:  Who is?  Oh, Bud?  Well, maybe.  He's

———— Teleconference ————

1    probably listening in and we don't even know it.

2              THE COURT REPORTER:  Your Honor, they're not

3    identifying themselves when they speak.

4              THE COURT:  Oh yeah.  When you speak, please identify

5    yourselves so my court reporter can get the right person.

6              UNIDENTIFIED SPEAKER:  That was John Connell.

7              THE COURT:  Okay.  I want the information -- I don't

8    think it should be doled out.  I mean, I think it should be

9    produced right away.  Because I think at this point we're

10   going to have the tax returns, the W-2s, the 1099s, the K-1s.

11   If there is furlough notices of one kind -- or I assume you

12   have a recall notice, you have a notice of putting you on

13   furlough, and they must have some kind of notice where they

14   recall you.  Don't they?

15             UNIDENTIFIED SPEAKER:  Yes, they do.

16             THE COURT:  Yeah.  If they recall you, you know, you

17   have some kind of notice.  You know, whatever could be

18   produced of what's asked for, if it exists.  I mean, I have no

19   problem, if it's truthful, for somebody to say we looked and

20   Pilot X just doesn't have this information.  Sally Young

21   doesn't have it.  There is no such -- we don't have this.

22   Maybe it existed once but we don't have it now.  Okay.  As the

23   plaintiffs have pointed out, nothing I can do about that,

24   unless there is some kind of proof that somebody, you know,

25   was deliberately deep-sixing documents.  But, you know, this

—Teleconference—

```
 1   is stuff from ten years ago, more than ten years ago.

 2           So could we do that?  Can we get the stuff for those

 3   five people, completely?  Why is there such silence?

 4           MR. FRAM:  Your Honor, Steve Fram.  You already

 5   directed --

 6           THE COURT:  Well, can I direct it again?

 7           MR. FRAM:  Absolutely.  You're the judge.  You can do

 8   that.  Do you want to give a deadline or --

 9           THE COURT:  Well, I can't figure it out.  These

10   depositions were scheduled some time ago.  I don't like the

11   idea, just conceptually, of producing documents on the morn of

12   deposition.  I mean, you ought to give at least a couple of

13   days, you know.  So, you know, at least a little time.

14           What's left, Mr. Jacobson or Mr. Press, what's left

15   to produce that is produceable, that we do have, that just

16   hasn't yet been produced?  Is there anything that's going to

17   be produced as to these five people that has not yet been

18   produced and is not lost?

19           MR. CONNELL:  Judge, this is John Connell.  We're

20   back.  We got cut off, for mechanical reasons here, for about

21   probably two-and-a-half minutes.

22           UNIDENTIFIED SPEAKER:  Two-and-a-half minutes.

23           MR. CONNELL:  The last thing that I think we heard

24   from Your Honor was about -- shortly after Bud Bensel.

25           THE COURT:  Well, let me -- I'll go back.
```

─────Teleconference─────

1        I don't quite understand -- I've already limited, for

2   the moment, the discovery in those document requests to the

3   five named plaintiffs -- now named plaintiffs.  Okay.  So

4   let's start with that.  We're not talking about 1500 or

5   whatever number of pilots would be involved.  We're just

6   talking about five.

7        Is there any reason -- well, let me ask you.  Is

8   there any material relating to those five that you have, in

9   other words, that will not be claimed to be lost, but exists

10  and is yet to be produced?

11        UNIDENTIFIED SPEAKER:  Yes.  Just --

12        THE COURT:  Then why can't we get it all out right

13  now?  We're only talking about five people.

14        UNIDENTIFIED SPEAKER:  Yes, and some of those

15  documents are on planes on the way here for a deposition

16  tomorrow.  It's all going to be provided before the

17  depositions begin, Judge.

18        UNIDENTIFIED SPEAKER:  But, Judge, that's the point.

19  I mean, this was supposed to be in preparation for the

20  depositions of September 11th and Mr. Finucan, who is being

21  deposed today, is a very accommodating and very forthcoming

22  witness, has said that some of this documentation he provided

23  to his prior counsel, and for some reason it hasn't made its

24  way to current counsel.

25        THE COURT:  Prior counsel meaning Cureton?

—Teleconference—

 1          UNIDENTIFIED SPEAKER:  I'm not -- he didn't identify

 2   which one.  But.

 3          UNIDENTIFIED SPEAKER:  Judge --

 4          UNIDENTIFIED SPEAKER:  I had told you that I had

 5   forwarded everything that I had to previous counsel.

 6          THE COURT:  That's --

 7          MR. PRESS:  Judge -- this is Mr. Press.

 8          UNIDENTIFIED SPEAKER:  I did not say that.

 9          MR. PRESS:  All we're talking about is the tax

10   returns, Judge, and --

11          THE COURT:  Then let me start.  I mean, getting

12   information out of you guys is like doing root canal.

13          Other than tax returns, other than tax returns, has

14   all available information relating to just the five class

15   members, the five class representatives, been produced?  To

16   the extent you can find that it exists.

17          UNIDENTIFIED SPEAKER:  Yes, it's an affirmative.

18          THE COURT:  Okay.

19          MR. CONNELL:  Well, the question is -- it's simply

20   out there.  The fact of the matter is -- this is John Connell,

21   Judge.

22          The fact of the matter is there are documents that

23   the witnesses are going to have to go back and check on

24   because they haven't -- they haven't been able to

25   affirmatively tell me that they do not have these documents.

─Teleconference─

1           THE COURT:  Well, he just told it to you.

2           MR. JACOBSON:  Your Honor, this is Joe Jacobson.

3           I would say that is a mischaracterization of the

4    testimony today.  This witness was asked about --

5           THE COURT:  Well, I'm not asking about this witness.

6           MR. JACOBSON:  Your Honor, we have produced -- my

7    understanding is we produced everything that our five

8    witnesses have that are responsive to the document requests.

9           THE COURT:  And you're also affirming that you cannot

10   find the other -- other things they asked for that you haven't

11   produced?

12          MR. JACOBSON:  Right.  They have searched their

13   records and they've looked through their documents and

14   everything that they had in response, they provided to us.

15   There was a misunderstanding on our part regarding the tax

16   returns only.  That's why those were not produced initially.

17   There was communication between Mr. Fram and Mr. Press on the

18   tax returns.  We've gathered the tax returns.  We've produced

19   some of them.  The others will be produced before those

20   respective witnesses' depositions.  They are one documents --

21   they are one small group of documents each, not going to

22   interfere with their preparation for the depositions.

23   Everything else that our clients have, to the best of my

24   knowledge, that's responsive, has been located and produced.

25          THE COURT:  Okay.  The witness you have there, what's

——————Teleconference——————

1  his name?

2          MR. JACOBSON:  Mike Finucan.

3          THE COURT:  Mike Finucan.  Mr. Finucan, can you hear

4  me?

5          MR. FINUCAN:  I can, Your Honor.

6          THE COURT:  Mr. Finucan, did you receive a copy of

7  the demand for documents?  Do you know what was demanded?

8          MR. FINUCAN:  I do know what was demanded of me, what

9  was requested of me.

10          THE COURT:  That's what I mean, requested.  I mean,

11  did you actually look at the demand for documents?  The

12  document in which --

13          MR. FINUCAN:  No, I actually spoke to Mr. Connell

14  about that.  He presented me with one specific document, and

15  it wasn't -- I don't recall reading that document, Your Honor,

16  but I do recall counsel asking me for every -- every facet of

17  documentation that was --

18          THE COURT:  Well, okay.  Thank you, sir.

19          Defendants, one of the things you can do, if you have

20  any doubt, is question the witness, say you have -- what is

21  it -- 14 categories of documents asked for?

22          UNIDENTIFIED SPEAKER:  Correct.

23          THE COURT:  You just go through and say, "Did you

24  search for all these?  Have you produced all that you could

25  find?"  It's just five minutes of questioning.  And you can

─Teleconference─

```
 1   verify whether, in fact, he has produced every document that
 2   he has in those categories or not, leaving aside the tax
 3   returns for the moment.  What's the problem with that?
 4              UNIDENTIFIED SPEAKER:  Judge, I understand that.  And
 5   we have done that to a certain degree so far.  The fact of the
 6   matter is this information was ordered to be produced a long
 7   time ago.  Why are we getting tax returns at the beginning of
 8   each deponent's respective deposition?  Why can't we have that
 9   in preparation --
10              THE COURT:  Let me get the tax returns -- but you
11   understand, you can -- it's proper questioning for you to ask,
12   you know, look at Number 7.  Whatever -- I don't even know
13   what number 7 is.  But whatever -- well, it's attached to the
14   papers.  It's Tab -- it's Tab 1.  And just show the witness,
15   say, "Okay, did you produce all of that category of document?"
16   The witness will say "yes" or "no" or "I've looked for them
17   but I can't find them" or "I can find only some of them."
18   Whatever he's going to say, he'll say.
19              And as to the tax returns, Mr. Jacobson, why has --
20   why -- those, in a way, would be the documents most likely to
21   be available.  People, I think, would tend to save tax returns
22   more than other kinds of documents.  You know, some of the
23   things you ask for, I can understand why somebody would not
24   necessarily retain them.  But tax returns, people, I think,
25   are more likely to retain than not.
```

———Teleconference———

1          UNIDENTIFIED SPEAKER:  With Mr. Finucan, he had most

2   of the tax returns.

3          THE COURT:  I have my tax returns back to law school,

4   when it was a card.  The whole tax return was one card, not

5   even a whole sheet of paper.  It was a card you could fill out

6   and send in.  And I believe I have them all the way back to

7   law school.  But those are the kind of things that you are

8   likely to keep.

9          So why -- just give me an explanation of why we're

10  getting them so belatedly.

11         MR. JACOBSON:  Your Honor, as I said earlier, there

12  was -- my understanding, from talking to Allen Press, more

13  directly because he was involved in that, a misunderstanding

14  between Allen and the other side about --

15         THE COURT:  This is Joe Jacobson.

16         MR. JACOBSON:  -- about the tax returns are part --

17         THE COURT:  Joe Jacobson.

18         MR. JACOBSON:  -- or if they had been listed, he

19  would have -- if he had realized it, that during that argument

20  you had, he would have argued that that wasn't relevant

21  because it contained additional information that should be

22  privileged on the wife, includes income that's not in any

23  way -- wasn't related, and that all of the information --

24         THE COURT:  But with five people, if you thought

25  there was some kind of privileged information or information

─────Teleconference─────

1   that could be subject to confidentiality, that could be

2   redacted.

3           MR. JACOBSON:  Yes, and we have done that.  Your

4   Honor, what -- during that time, he didn't realize the tax

5   returns were called for.  When we produced the documents, it

6   did not include tax returns.  The other side contacted us,

7   there was an exchange of letters, and then we said okay, and

8   we went and started getting tax returns to produce it.  So it

9   was a misapprehension or oversight on our part.  It's been

10  corrected.  And the process of correction is in the process of

11  being completed.  And, frankly, they don't contain information

12  that's going to be relevant, for example, the W-2s and the

13  1099s, but they want it, we've redacted out Social Security

14  numbers of the spouses and the children, and we're producing

15  the documents.

16          THE COURT:  Well, nobody is objecting -- I don't

17  think anybody is objecting to you redacting out the wives' and

18  children's Social Security numbers.

19          MR. CONNELL:  No, Judge.  John Connell.  We're not

20  objecting to that.  But the fact is, with all due respect --

21          THE COURT:  All due respect to whom?

22          MR. CONNELL:  To the plaintiffs' counsel.

23          THE COURT:  Not to me?

24          MR. CONNELL:  Oh, no, not to you.

25          THE COURT:  Because I don't like that phrase --

─Teleconference─

1          MR. CONNELL:  No, Judge --

2          THE COURT:  Because the phrase "with all due respect"

3     really means we have none and that's what you're going to get.

4          MR. CONNELL:  The fact of the matter is plaintiffs'

5     counsel said, and we quoted this in our letter to the Court,

6     that they would be identifying the W-2s and the tax returns.

7     Tax returns.  Tax returns for damaged class members.  This was

8     on July 31.  What's the misunderstanding?  We should have this

9     stuff long before now.

10         THE COURT:  Mr. Press or Mr. Jacobson, when are the

11    tax returns for the five class members going to be completely

12    produced?

13         UNIDENTIFIED SPEAKER:  Sally Young's depo is tomorrow

14    morning at 9.  She is bringing them with her.

15         THE COURT:  Okay.  So --

16         UNIDENTIFIED SPEAKER:  -- deposition tomorrow at 1.

17    He is on a plane bringing them with him.  Ted Case's

18    deposition is the following afternoon and he will have them

19    produced before then.  So it's all going to happen this week,

20    Judge.

21         They're going -- they're going to take the

22    depositions.  They'll have the tax returns.  They've had the

23    wage data since September 7th.  There is absolutely no impact

24    on their ability to take these depositions.  They're going to

25    go forward and get completed, just as you ordered.

─Teleconference─

 1            THE COURT:  Okay.  As a practical matter, Mr. Connell

 2   or Mr. Fram --

 3            UNIDENTIFIED SPEAKER:  Judge --

 4            THE COURT:  -- what would you ask me to do?

 5            UNIDENTIFIED SPEAKER:  Well, I also need the furlough

 6   information, all the written documentation related --

 7            THE COURT:  But they've said they don't have it.

 8            UNIDENTIFIED SPEAKER:  They have not said that they

 9   don't have it.

10            THE COURT:  Well then, question them.  You have a guy

11   there.  Ask him a question.  He's under oath.

12            UNIDENTIFIED SPEAKER:  Judge, I will do that, but the

13   fact is this Court ordered them to produce that information --

14            THE COURT:  But we don't know -- it doesn't stretch

15   the imagination that a lot of this stuff may not just exist in

16   their files.  I mean, maybe they're lurking in the company

17   files somewhere, but, you know, I don't know that -- if they

18   got a furlough notice or a recall notice --

19            UNIDENTIFIED SPEAKER:  Judge --

20            THE COURT:  -- you know, eight years go, that they

21   still have it.

22            MR. PRESS:  It's Allen, Judge.  We produced the data

23   they requested for the five classes.

24            THE COURT:  I know.  I mean, you guys are just

25   talking over each other's heads.  I mean, you say you produced

─Teleconference─

```
 1   everything you could find, and they say you haven't, implying
 2   that there is stuff you could find but just haven't produced.
 3   The only way I know, you have the guy under oath in front of
 4   you.  Ask him if, you know -- furlough notices, have you
 5   produced all your furlough notices?  You know?
 6            MR. FRAM:  Your Honor, Steve Fram.
 7            With respect to Sally Young, are we going to receive
 8   the materials that I referred to before about this period
 9   where she had to take off because of some type of disciplinary
10   issue?  I don't think Mr. Press or Mr. Jacobson have addressed
11   that.
12            THE COURT:  Why don't you -- you'll have her under
13   oath.  Ask her.
14            MR. FRAM:  Okay.  The other thing, Your Honor --
15            THE COURT:  That's why we're taking the depositions.
16   And, you know, look, depositions cover all the time, not just
17   in this case, the whereabouts of documents.  I mean, there are
18   depositions of commercial cases where days are spent
19   questioning a witness, not about the facts of a case, but just
20   about where documents are and where they might be found and
21   who has them and where they are being stored.  I mean, days of
22   depositions are -- can sometimes include that.  I mean, that's
23   nothing -- you know, and I wouldn't -- and I don't -- I don't
24   think that's improper in this case.  You know, and if she was
25   incapable of flying because of some -- some health reason or
```

─Teleconference─

1   disciplinary reason or combination of both, the -- well then,

2   she can be questioned about that.

3          UNIDENTIFIED SPEAKER:  Your Honor, these depositions

4   were limited to four hours each.  If we need --

5          THE COURT:  You know, give me a call.  I'm here all

6   the time.  I mean, you know, the -- I mean, ask the question.

7   See how long it takes.  I mean, you have 14 categories of

8   documents.  It just can't be that long.

9          MR. JACOBSON:  Your Honor, this is Joe Jacobson.

10         THE COURT:  Yeah.

11         MR. JACOBSON:  I point out that at this deposition,

12  Mr. Finucan was asked questions about that, and he was able to

13  describe the two periods of time when he was not flying

14  because of medical reasons, and I think the questions answered

15  together took less than five minutes.

16         THE COURT:  You know, again, I wasn't there.

17  Mr. Finucan sounds like he's being responsive, which is a good

18  thing.  But ask him.  If it turns out it takes more than four

19  hours, fine, we'll add an hour.  I mean I -- I don't consider

20  it to be rigid.  I was just trying to set some reasonable

21  framework.  But there is nothing in this case, nothing unusual

22  about inquiring into a witness, not about the facts of a case,

23  but to where documents are, if that witness knows where one

24  might find documents of a particular description.  And I

25  believe that if one of the five class -- class reps was

———Teleconference———

 1   disciplined or for health reasons barred from flying for a

 2   particular period of time, that's -- A, that's proper

 3   discovery; and, B, if there are documents that back that up,

 4   you're entitled to know where they are.  I agree with all

 5   that.

 6           But these generalized, you know, whines that you

 7   don't have the documents aren't getting us anywhere.  What can

 8   I do?  I'm not -- am I going to dismiss the case?  No, I'm not

 9   going to do that.  So why don't we take what we have, we have

10   the witnesses coming in in the next four -- the next few days,

11   apparently, they're all going to be in.  I heard four -- at

12   least four of them are.  Is the fifth going to be in, too?

13           UNIDENTIFIED SPEAKER:  Yes, Your Honor.  All this

14   week.

15           THE COURT:  They are all going to be in.  Question

16   them.  You know, ask questions.

17           By the way, I will even give you my cell phone number

18   and so if I'm -- because I will be out of the office for

19   tomorrow, but you can reach me on my cell phone.  And I'll

20   tell -- if you have some question, you want an extra half hour

21   or an extra hour, we'll work on it.  My number is 856 -- no.

22   It's 908.  908.  908-227-6076.  All right?  If you can't reach

23   me here at the office.  And --

24           MR. FRAM:  Could I just go back quickly to the motion

25   for notice to the class?

Teleconference

```
 1              THE DEPUTY CLERK:  It's Mr. Fram.

 2              MR. FRAM:  It wasn't filed today.  It's been made

 3    returnable October 15 --

 4              THE COURT:  When you say made returnable, is it a

 5    motion for me to approve it?  Is that what it is?

 6              MR. FRAM:  It is, Your Honor.  And our problem is

 7    that we're not going to see the expert reports, as you know,

 8    until the 28th and we're not even having a conference that

 9    Your Honor set until October the 2nd --

10              THE COURT:  Okay.

11              MR. FRAM:  -- and we thought this whole issue of

12    notice would be a topic for discussion at that conference.

13    So --

14              THE COURT:  Okay.  The only thing you can do to help

15    me -- if you want.  I won't even order you to do it.  But it

16    would be helpful if you could, in that mighty machine that is

17    Archer Greiner, do just a bit of research as to whether a

18    class representative giving notice to a class, seeking proofs,

19    documents to prove an aspect of the case, requires Court

20    approval.  I'm just not familiar with that concept.  I mean,

21    class-action lawyers are gathering information to support

22    their claim usually starting before the complaint is ever

23    filed and continuing on probably until the afternoon of trial.

24              UNIDENTIFIED SPEAKER:  Your Honor, we're fairly

25    confident that they're not required to --
```

─Teleconference─

```
 1              THE COURT:  I mean, I just -- I am not familiar
 2    with -- with the notion that when class counsel or class
 3    representatives seek information from members of the class to
 4    support their claim, particularly in this kind of case, where
 5    it's a finite class and we're not dealing with 50,000 people,
 6    you know, who bought unleaded gasoline and they claimed you
 7    would get rich if you bought it, and there is a lawsuit over
 8    it, you know.  I mean, this is a very finite class, very
 9    specific theory.  I just don't know where that would come
10    from.  Why the class lawyers -- I'm not even sure they need to
11    deal with the class -- you know, I mean, they want to
12    coordinate with the class reps, just to make sure, you know,
13    get the information from them.  But I don't even know if they
14    need -- why they can't go out to the class and say, "Look,
15    we'd like this information, this information, this
16    information.  It's going to help us prove our case."  Why not?
17    Unless I'm missing something, I don't understand why not.
18              MR. FRAM:  Your Honor, we'll submit something.  I
19    think we may want to wait until we've seen their expert --
20              THE COURT:  Yeah, I'm not -- you may do that.  I
21    mean, I'm not ordering you to do this.
22              MR. FRAM:  It would be helpful, Your Honor, if we
23    could agree now, though, that the return date of the motion is
24    put off for one motion cycle.
25              THE COURT:  When is it now returnable?
```

─────────Teleconference─────────

1              MR. FRAM:  It's returnable on the 15th.

2              THE COURT:  Of October.

3              MR. FRAM:  Of October.  That means our opposition

4  would be due on October 1 which is before we have the

5  conference on October 2.

6              THE COURT:  Do you want to push everything off two

7  weeks?

8              MR. FRAM:  Yeah, if we could do that, I think it

9  would be helpful.

10             THE COURT:  Any objection, Mr. Jacobson, Mr. Press?

11             UNIDENTIFIED SPEAKER:  No.

12             UNIDENTIFIED SPEAKER:  No objection.

13             THE COURT:  Okay.  I'll make the return date -- make

14  sure you notice that.  We'll make the return date the 29th,

15  and your response will be due the 15th.

16             UNIDENTIFIED SPEAKER:  Yes, Your Honor.

17             THE COURT:  Right?

18             UNIDENTIFIED SPEAKER:  Thank you.

19             THE COURT:  Your response is due the 15th.  But don't

20  give me a thousand pages.  I would be happy with three or four

21  case cites, each with a little blurb.

22             UNIDENTIFIED SPEAKER:  Yes, Your Honor.

23             THE COURT:  I mean, I don't need a magnum opus to get

24  anywhere.  Keep Egan away from the file.

25             (Laughter.)

─Teleconference─

```
 1            UNIDENTIFIED SPEAKER:  I'll pass that comment along.

 2            THE COURT:  Pass that along.  I don't want him

 3   anywhere near this ALPA file.

 4            They came in with seven motions.  I brought them into

 5   the library and showed them six trans files filled with

 6   documents which constituted the motions.  And I said, who do

 7   you expect -- thousands of pages in each one, and highly

 8   technical.  I said, "Who do you expect to read this stuff?"

 9            UNIDENTIFIED SPEAKER:  Your Honor, we'll set up a

10   firewall between this file and Mr. Egan.

11            THE COURT:  Yes.  And, you know, like "The Tell-Tale

12   Heart."  Can't we put Mr. Egan and block him into someplace

13   and then put plaster and brick over it so he doesn't have

14   access to a computer?

15            UNIDENTIFIED SPEAKER:  That didn't restrain the

16   heart, Judge.

17            THE COURT:  Oh, I know.  The heart kept beating.

18   That was -- that's right.  That was the whole purpose of the

19   Poe story, "The Tell-Tale Heart."  So -- that's right.  The

20   heart kept beating.

21            All right.  Anything else?

22            UNIDENTIFIED SPEAKER:  I think that covers it.

23            UNIDENTIFIED SPEAKER:  Nothing here, Judge.

24            UNIDENTIFIED SPEAKER:  Thank you.

25            THE COURT:  Anything from the plaintiffs?
```

─Teleconference─

1           UNIDENTIFIED SPEAKER:  No, Your Honor.  Thank you.

2           THE COURT:  Okay.  You have a deposition, you have

3    witnesses coming in, use it.  And, again, remember, there is

4    nothing improper about questioning a witness about the

5    whereabouts of documents.  That's routine in heavy-duty

6    commercial litigation.  Routine.  And with E-discovery, it's

7    even become more routine, because now it's not where they are

8    physically located, but where they are -- in the cloud, where

9    they are located.  And, you know, so it's perfectly proper

10   questioning.

11          And so -- all right.  We will -- I will see you soon

12   enough.  Have a good weekend.  And, oh, it's only Monday --

13   only Tuesday.  Well, have a good weekend, anyhow.

14          (Laughter.)

15          UNIDENTIFIED SPEAKER:  Thank you, Judge.

16          THE COURT:  Okay.  Bye-bye.

17          UNIDENTIFIED SPEAKER:  Bye.

18          UNIDENTIFIED SPEAKER:  Bye.

19          UNIDENTIFIED SPEAKER:  Bye.

20          (The proceedings concluded at 4:45 p.m.)

21

22                              *   *   *

23

24

25

1                          <u>CERTIFICATE OF REPORTER</u>

2

3      I certify that the foregoing is a correct transcript of the

4      record of proceedings in the above-entitled matter.

5

8      _____
       Carol Farrell, CCR, CRR, RMR, CCP
9      Realtime Systems Administrator
       United States Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 103

1                **UNITED STATES DISTRICT COURT**
                **FOR THE DISTRICT OF NEW JERSEY**
2

3    _____

**PATRICK BRADY, et al.,**
4
            **Plaintiffs,**              **CIVIL ACTION NUMBER:**
5
            **-vs-**                     **NO. 02-2917 (JEI)**
6
**AIR LINE PILOTS ASSOCIATION,**              **MOTION**
7 **INTERNATIONAL,**

8            **Defendant.**
     _____
9        Mitchell H. Cohen United States Courthouse
         One John F. Gerry Plaza
10       Camden, New Jersey 08101
         Friday, January 4, 2013
11
**B E F O R E:**              **THE HONORABLE JOSEPH E. IRENAS**
12                            **UNITED STATES DISTRICT JUDGE**

13 **A P P E A R A N C E S:**

14 TRUJILLO, RODRIGUEZ & RICHARDS, LLC
   BY:  LISA J. RODRIGUEZ, ESQUIRE
15       NICOLE M. ACCHIONE, ESQUIRE
            Counsel for Plaintiffs
16
   GREEN JACOBSON, P.C.
17 BY:  ALAN P. PRESS, ESQUIRE
            Counsel for Plaintiffs
18
   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
19 BY:  JAY COHEN, ESQUIRE
         DANIEL J. TOAL, ESQUIRE
20          Counsel for Defendant

21 ARCHER & GREINER, P.C.
   BY:  JOHN C. CONNELL, ESQUIRE
22          Counsel for Defendant
   (Appearances continued on Page 2)
23
    Certified as true and correct as required by Title 28,
24 U.S.C., Section 753.

25                      /S/ Karen Friedlander, CCR, RMR

                *United States District Court*
                  *Camden, New Jersey*

1        MR. COHEN:  Right.

2        THE COURT:  -- would -- even if they're not a good

3    record keeper, would have memory of some of those efforts.  Go

4    back 11 years ago or ten years ago or nine years ago or eight

5    years ago, sometimes they might not have that kind of

6    information.

7        MR. COHEN:  The information may not be perfect.  The

8    information they're collecting is not going to be perfect.

9    You know, they've received information on wages from only a

10   couple hundred people, so far.  Half the people sent in

11   documents, half the people didn't send in documents.  We're

12   going to have data issues no matter what.

13       But respectfully, what I would say, Your Honor, is,

14   that's not a reason to not allow us to pursue a defense, which

15   we think is firmly grounded in the law, will make all of these

16   arguments about whether or not they should have done it or

17   shouldn't have done it, our merits arguments.  They are

18   certainly not whether we should be able to assert a defense.

19       And we are not suggesting 2300 depositions, obviously,

20   or even 230 or even 23, to find out what people did.  What

21   we're saying is, we are entitled to basic information.

22       It would have been efficient if the plaintiffs had

23   agreed to just tack it onto their questionnaire.  They didn't,

24   so we'll do it, if Your Honor permits.  But, you know, to

25   deprive us of a defense, which is a fundamental damages

1   defense because, you know, it may be complicated.  We don't

2   think it's that complicated.  How we will present it at trial

3   is a real issue, Your Honor.  We will have to grapple with

4   that.  But what we would say is, that's not a reason to deny

5   us the discovery.

6        You ultimately may decide that there's no efficient

7   way, that the information is not, you know, is not

8   sufficiently reliable to be introduced.  We are a long way

9   away from that.  But rather than talk at all of the problems

10  might be, let us just get the information and -- you know,

11  it's the same 2300 recipients -- it's really fewer but a bunch

12  of them are actually not damage -- don't have damages.

13        THE COURT:  Yeah, but a small number because of the

14  way the stapling was --

15        MR. COHEN:  600.

16        THE COURT:  Because of the way the stapling was done.

17        MR. COHEN:  I think it's about 600, Your Honor.

18        THE COURT:  At some point there are pilots who really

19  didn't suffer.

20        MR. COHEN:  Yeah, I think that's what it says.

21        THE COURT:  But I don't know what the -- I don't know

22  what the number is.

23        MR. COHEN:  I think their expert said it's a quarter

24  of the class.  Let's just take that as proxy.

25        THE COURT:  I don't know.

**1**      MR. COHEN:  Yeah.  So what I'm saying is, for those

**2**  1500 or so folks for whom they are collecting setoff

**3**  information, we can collect information about what they did to

**4**  try to look for work, and I think the information will suggest

**5**  a pattern when we get it.

**6**      I think that will be very hard for us to prove in the

**7**  context of a class action, that somebody who was out looking

**8**  for work should have tried harder but, for example, one of the

**9**  named plaintiffs, Sally Young, you know, we've given Your

**10**  Honor her testimony.

**11**      THE COURT:  Well, she's flying now, isn't she?

**12**      MR. COHEN:  I don't know what she's doing now.  But

**13**  there was a period of time --

**14**      THE COURT:  At some point she did go back flying.  I

**15**  can't remember whether it was for American or somebody else,

**16**  but I know she went -- she did go back as a pilot at some

**17**  point.

**18**      MR. COHEN:  But we are going to find some folks who

**19**  simply dropped out of the workforce, and you know, there are

**20**  going to be some reasonably bright lines in this information,

**21**  and we will have to confront how we deal with the lines that

**22**  are not so bright.  But I think it's premature to worry about

**23**  the presentation for us at trial.

**24**      We are mindful of it.  We understand that we are going

**25**  to have to introduce in a way that allows you to try a case

# EXHIBIT 104

Page 1

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF NEW JERSEY

3      - - - - - - - - - - - - - - - -

4      PATRICK BRADY, et al.,              )

5                         Plaintiffs,      )

6      V.                                  )   CASE NO.

7                                          )   02-2917-JEI

8      AIR LINE PILOTS ASSOCIATION,        )

9      INTERNATIONAL,                      )

10                       Defendant.        )

11     - - - - - - - - - - - - - - - -

12

13          VIDEOTAPED DEPOSITION OF SCOTT SCHWARTZ

14                 FRIDAY, JANUARY 25, 2013

15

16

17

18

19

20

21

22

23

24

25

1   today?

2        A.   Yes.

3        Q.   In 2002, when the seniority integration was

4   complete, where were you on the merge list?

5        A.   I have no idea.

6        Q.   Do you recall generally where you were?

7        A.   I think I was around 8,000 out of 12,000.

8   Something like that.

9        Q.   Okay.  Do you recall whether you were part

10  of the bottom staple or whether you were more

11  integrated within American pilots?

12       A.   I was part of the middle group --

13       Q.   Okay.

14       A.   -- which was given some levels of seniority.

15  And since I was an MD80 captain at the time at TWA, I

16  was still an MD80 captain at American, so I suffered

17  no injury.

18       Q.   Okay.  Do you know where you are on the

19  seniority list today?

20       A.   Roughly.

21       Q.   Did you say earlier that you still fly an

22  MD80?

23       A.   I did, and I do.

24       Q.   Okay.  Can you tell me how, generally,

25  pilots use their seniority in the context of what do

# EXHIBIT 105

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK BRADY, *et al*,.<br><br>Plaintiffs,<br><br>v.<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL,<br><br>Defendant. | Civil Action No. 02-2917 (JEI) |

**PLAINTIFFS' AMENDED RESPONSE TO DEFENDANT AIR LINE PILOTS ASSOCIATION, INTERNATIONAL'S FIRST SET OF DAMAGE INTERROGATORIES**

1.     Do you contend that the merged seniority list of American Airlines that was created based upon Supplement CC would have been different if ALPA had taken any of the actions that Plaintiffs claimed it should have taken during the liability trial?  If so, for each of the issues noted in (a) through (h) below, state in detail how you contend the merged seniority list would have been different; describe with particularity all facts, and identify all documents, upon which you rely in contending that the list would have been different; and identify every individual you believe has knowledge of such facts and is competent to testify concerning how the list would have been different:

  a.     ALPA's allegedly improper statements to the TWA Merger Committee concerning the committee's seniority list integration proposal to be made during negotiations with the APA Mergers and Acquisitions Committee on March 29, 2001;

  b.     ALPA's allegedly improper statements to the TWA MEC with regard to that body's meeting on April 2, 2001;

c.      ALPA's failure to approve Roland Wilder's proposed federal district court injunction case outlined n his letter to Duane Woerth dated March 26, 2001;

d.      ALPA's failure to approve the filing of Roland Wilder's proposed federal district court case against the APA and American outlined in his memo dated July 2, 2001;

e.      ALPA's failure to approve the filing of Roland Wilder's federal district court injunction case aimed at enjoining the implementation of Supplement CC, outlined in his memo dated August 8, 2001;

f.      Duane Woerth's alleged statement to the APA Board of Director's on April 5, 2001, that he had previously told representatives of the TWA pilots that they had to "get real" with respect to their negotiations with representatives of the American pilots regarding the seniority list integration;

g.      ALPA's decision not to engage in a jumpseat boycott against the American pilots, as suggested by then TWA Merger Committee Chairman Mike Day; and

h.      ALPA's alleged failure to lobby for the Bond Bill in the fall of 2001.

**AMENDED ANSWER**: Plaintiffs incorporate the previous Answer and Objections to Damage Interrogatory No. 1 and supplement as follows.

Plaintiffs further contend that Professor Michael Tannen's Rightful Place Proposal, endorsed and adopted by ALPA, is a fair and reasonable seniority list upon which the damages jury can calculate the Class's damages.  Plaintiffs intend to rely upon the video presentation prepared by ALPA, featuring ALPA's then President Duane Woerth, Roland Wilder and Michael Tannen himself, introduced as evidence during the liability trial as Exhibit P-428.

Plaintiffs' will also rely upon the Rightful Place Proposal itself, introduced as evidence during the liability trial as Exhibit P-318.

Plaintiffs identify Duane Woerth as someone with knowledge of the facts and will rely on his testimony introduced during the liability phase in which he introduced and adopted Professor Tannen's Rightful Place Proposal as a reasoned and scientific approach that considered the career expectations of both the TWA and American pilots that it was compelling and persuasive.

Plaintiffs also identify Michael Day as persons with knowledge of the facts as they relate to the Rightful Place Proposal, the terms of the proposal and how its implementation would impact the pilots' seniority placement on the merged lists.

2.      State in detail precisely what you claim the merged seniority list of American Airlines would have been as of April 10, 2002, but for ALPA's alleged breach of the duty of fair representation.  In your answer, please identify, by seniority number, where you claim each former TWA pilot would have been on the combined list, and the number of places higher that he or she would have been on the action list.  Describe with particularity all facts, and identify all documents, which support your contention.

**AMENDED ANSWER**:  Plaintiffs incorporate the previous Answer and Objections to Damage Interrogatory No. 2 and supplement as follows.

Plaintiffs also rely on the Rightful Place Proposal endorsed and adopted by ALPA as a reasoned and scientific proposal that considered the career expectations of both pilot groups and was compelling and persuasive.

3 – 18. Plaintiffs incorporate the previous Answers and Objections to Interrogatories Nos. 3 through 18 and do not supplement at this time.

DATED:     October 2, 2013

By: _____
Lisa J. Rodriguez
Schnader Harrison Segal & Lewis LLP
220 Lake Drive East, Suite 200
Cherry Hill, N.J. 08002
(856) 482-5222

Joe Jacobson
Allen P. Press
Green Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Pierre Laclede Center
St. Louis, Missouri 63105
(314) 862-6800

# EXHIBIT 106

COPY

## In The Matter Of:

*Leroy "Bud" Bensel, et al*
*v.*
*Air Line Pilots Association, et al*

---

*JAMES BAEHLER*
*December 18, 2006*

---

## *REPORTING ASSOCIATES, LLC*

*Certified & Registered Professional Reporters*

*Cherry Hill   --   Philadelphia   --   Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

JAMES BAEHLER

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
--------------------------------------x
LEROY "BUD" BENSEL, et al,
       Plaintiffs,
                        Cause No.
   -against-        02-2917-JEI-AMD
AIRLINE PILOTS ASSOCIATION,
       Defendant.
--------------------------------------x
DEPOSITION OF JAMES BAEHLER
       New York, New York
       Monday, December 18, 2006

Reported by:
Judith A. Frost
Job No.: 163435

December 18, 2006 11:07 a.m.

Deposition of JAMES BAEHLER, held at the
offices of Whelan & Tusa, 90 Park Avenue, New York,
New York, pursuant to notice, before Judith A.
Frost, a Shorthand Reporter and Notary Public of the
State of New York.

3

```
 1              I N D E X
 2   WITNESS                      PAGE
 3   JAMES BAEHLER
 4   Ms. Rodriguez               5, 100
 5   Mr. Katz                    44, 105
 6
 7
 8
 9           E X H I B I T S
10
11   NUMBER      DESCRIPTION       PAGE
12   ALPA 97     Jim Baehler's fees    51
13   ALPA 98     Handwritten note      62
14   ALPA 99     Newsletter            66
15   ALPA 100    Letter dated 10/26/01   69
16
17
18
19
20
21
22
23
24
25
```

2

```
 1   A P P E A R A N C E S :
 2
 3      TRUJILLO RODRIGUEZ & RICHARDS, LLC
 4      Attorneys for Plaintiffs
 5         8 Kings Highway West
 6         Haddonfield, New Jersey 08033
 7         856-795-9002
 8      BY:  LISA RODRIGUEZ, ESQ.
 9         and
10      GREEN JACOBSON & BUTSCH, P.C.
11         Suite 700, Pierre Laclede Center
12         7733 Forsyth Boulevard
13         St. Louis, Missouri 63105
14         314-862-6800
15      BY:  ALLEN P. PRESS, ESQ.
16
17      KATZ & RANZMAN, P.C.
18      Attorneys for Defendants
19         5028 Wisconsin Avenue, N.W.
20         Washington, DC 20016
21         202-659-1799
22      BY:  DANIEL M. KATZ, ESQ.
23
24
25
```

4

```
 1              IT IS HEREBY STIPULATED AND AGREED
 2   by and between the attorneys for the
 3   respective parties herein, that filing and
 4   sealing be the same and are hereby waived.
 5              IT IS FURTHER STIPULATED AND AGREED
 6   that all objections, except as to the form
 7   are reserved until the time of the trial.
 8              IT IS FURTHER STIPULATED AND AGREED
 9   that the within deposition may be sworn to
10   and signed before any officer authorized to
11   administer as oath, with the same force
12   and effect as it signed and sworn to
13   before the Court.
14   J A M E S   B A E H L E R,     called as a
15       witness, having been duly sworn by a
16       Notary Public, was examined and testified
17       as follows:
18          THE VIDEOGRAPHER:  This is the
19       videotape deposition of James R. Baehler in
20       the matter of Leroy "Bud" Bensel, et al,
21       versus Airline Pilots Association.
22          This is in the U.S. District Court of
23       New Jersey.  Cause number 02-2917.  This
24       deposition is being held at the law offices
25       of Whelan & Tusa in New York City on the
```

## JAMES BAEHLER

21

1       The problem was that, as I recall it,
2   at one point Mickey Malerski, one of the APA pilots,
3   said no matter how you slice it, talking about
4   Tannen's proposal, I will end up with some 800 TWA
5   pilots ahead of me which meant everybody below
6   Mickey on the list would have some 800 pilots below
7   them.
8       But I said you will still progress to
9   captain, wide body and so on at the same time rate.
10  It doesn't change that I still have 800 guys ahead
11  of me and I think that was the crux of the whole
12  thing.
13      Both sides had a problem in that they,
14  whatever deal was agreed upon was going to have to
15  be approved by all the pilots on either side. I
16  know in our negotiations we spent quite a bit of
17  time trying to make sure that whatever deal we were
18  proposing would be acceptable to the pilots as a
19  group, and I am sure the same thing was happening on
20  the APA side.
21      Professor Tannen's proposal could have
22  served as a justification that would have been used
23  to sell the deal to both sides because it was
24  authoritative, it was impartial, it was analytical
25  and it was quantitative, and it was a deal that

22

1   could be supported in that it wasn't produced by one
2   side or the other. It was impartial and it was
3   analytical and quantitative so that everyone could
4   look at it and say yes that makes sense.
5       The problem is that again going back
6   to Mickey's statement, no matter how you sliced it
7   there was going to be a TWA pilot put ahead of some
8   of the American pilots and they couldn't accept
9   that.
10      Q    How was Professor Tannen's report
11  presented to APA?
12      A    It was a PowerPoint presentation that
13  he had prepared and that was thrown on the screen
14  and analyzed in great detail at a number of
15  meetings.
16      In fact, afterwards there was a hiatus
17  while American aviators looked at it, analyzed it
18  and produced a very detailed dissection of it and
19  the conclusion was that it wouldn't work and they
20  rejected it.
21      Q    Who was present when the Tannen report
22  was presented?
23      A    Both negotiating committees.
24      Q    By both committees, you mean TWA and
25  the American negotiating committees?

23

1       A    Yes.
2       Q    Were there representatives from ALPA
3   there when the proposal was presented?
4       A    No.
5       Q    Representatives from APA?
6       A    Yes, the whole negotiating team was
7   there.
8       Q    What was the response to the Tannen
9   proposal?
10      A    Well, they asked a lot of questions
11  and they went through almost line-by-line and tried
12  to understand exactly what it was. I'll give them
13  credit for that. They didn't just slough it off.
14  They looked at it very, very carefully.
15      The sense I have is that APA was
16  trying to find a solution that would be acceptable
17  to both sides. They were really to find that. I
18  don't think they came in thinking about trying to
19  just cram down some kind of a proposal that wasn't
20  acceptable. I don't think it was that at all. They
21  were trying to find something acceptable.
22      It came up against that stumbling
23  block that there were going to be TWA pilots put the
24  senior list ahead of those from American even though
25  Professor Tannen showed it would not effect their

24

1   promotion expectations.
2       Q    When was the Tannen report presented?
3       A    Sometime in the summer of 2001.
4       Q    What was the next thing that happened
5   during the negotiations?
6       A    I'm not sure about the sequence, but
7   there was a facilitator brought in, a fellow named
8   Rolf Valtin, who was paid by American.
9       As I understand it, I think the
10  suggestion was made by TWA that we share the cost,
11  APA pay half and I think ALPA refused. That's my
12  recollection. That's my understanding, ALPA
13  refused, and American paid for the facilitator and
14  they hired him and found him. TWA people had
15  nothing to say about him.
16      His contribution was not to me very
17  effective, and one of the -- there was an
18  interesting slip, I don't know if you would call it
19  a slip, that at one point he referred to the Tannen
20  report, are you going to talk about the Tannen
21  mythology, and we were whoa. Well, then there was
22  some joking was this a Freudian slip and so on. I
23  think he meant to say methodology, I am not sure but
24  it came out mythology, and I think that was his
25  attitude, his real attitude toward the Tannen report

# EXHIBIT 107



# Compressed Transcript of the Testimony of
# **SINGER, DAVID B.**

**Case:** Air Line Pilots Association - Alpa - Brady

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 141

1   bankruptcy law, I realize I'm -- I'm getting more
2   involved now in the bankruptcy process.  I'm sitting
3   there in -- in the back of the room listening to
4   people like the Israeli ground crew that were losing
5   all their -- all their pensions and everything and
6   realizing here -- you know, here -- here I'm getting
7   more involved as -- as a pilot if -- if that
8   opportunity were to -- were to present itself.
9       Q.   Who were the ALPA representatives to the
10  Bankruptcy Court Unsecured Creditor's Committee, who
11  were the people ahead of you, if you will?
12      A.   I believe it was Mike Day, I believe he
13  was the only one.  Well, I was the first alternate.
14  I may be wrong on that, but I believe it was Mike
15  Day.
16      Q.   Just your best recollection.  Is Mike Day
17  the fellow who was also a lawyer?
18      A.   I don't recall whether or not he was a
19  lawyer.
20      Q.   Was --
21      A.   Yeah, yeah, I think he was, but I -- I
22  can't be sure.
23      Q.   Do you recall anybody else within the MEC
24  having law degrees?
25      A.   Within the MEC?

Page 142

1       Q.   Yeah.
2       A.   No, not at MEC --
3       Q.   The pilot, I mean, not -- not the outside
4   advisors.  Do you recall any other pilots?
5       A.   No, no.  Not -- not of the six of us, not
6   of -- not of the officers.
7       Q.   But you recall that Mike Day might have
8   been a lawyer?
9       A.   I believe Mike Day was a lawyer.
10      Q.   Do you recall any discussion at the
11  meeting on April the 2nd about Mike Day going and
12  testifying at the 1113 hearing?
13      A.   I don't recall the discussion.
14      Q.   Do you recall on April 2nd any of the
15  advisors pressuring the members of the MEC to vote
16  on April the 2nd?
17      A.   I don't believe so.  I wasn't pressured,
18  let me put it that way.
19      Q.   Was there any reason you can think of that
20  the MEC had to vote on April 2nd as opposed to on,
21  you know, April the 3rd or 4th or some other date?
22      A.   Well, we know the hearing was set for
23  April the 6th, that didn't give us much time.  And I
24  believe there may have also been some discussion
25  with the company as far as getting that contract

Page 143

1   approved.
2       Q.   But do you recall April 2 as being the
3   date by which the MEC had to vote?
4       A.   That's when our meeting was.  And, I mean,
5   I could go back to the calendar, but it could very
6   well have been towards the end of the week.
7       Q.   All right.  Let's work our way through
8   some other documents.  And to try to move this ahead
9   a little bit more quickly, what I'm going to do is
10  to hand you a stack of documents and then walk
11  through them in order.  All right.  So let's take
12  them one at a time.
13      The first one, which is marked as P-318,
14  is ALPA's Rightful Place Proposal to the APA,
15  June 14, 2001.  Thanks.
16      All right.  My first question is:  Do you
17  recall -- do you recall that document, the Rightful
18  Place Proposal?
19      A.   I do.
20      Q.   Did you have any role in drafting it or
21  reviewing it before it was sent to the APA?
22      A.   Not a direct role, but I -- I certainly
23  had a role as a member of the MEC to know about it,
24  approve -- approve what the merger committee had --
25  had -- had come up with.

Page 144

1       Q.   So was the Rightful Place Proposal a
2   document that the MEC as a whole was asked to
3   approve?
4       A.   I believe so.  It could have gone to the
5   APA without -- without approval of the MEC.
6       Q.   Do you recall having a reaction in terms
7   of whether it was likely to be accepted or rejected
8   by the APA?
9       A.   I think it was likely to be rejected, that
10  was my feeling about it.  And some of the pilots,
11  TWA pilots, thought it didn't go far enough.  I
12  thought it was our -- our best shot, but I didn't
13  think there was much of a shot anyway.
14      Q.   Did you mention before that you knew some
15  of the American pilots, some of the people within
16  the APA?
17      A.   No.  I didn't know them at the time of the
18  merger.
19      Q.   Okay.
20      A.   I knew them subsequently.
21      Q.   All right.  Next document -- and I'm
22  jumping around a little bit.  But the next document
23  we should actually mark.  May I see it real quick?
24  Some of these have numbers on them as trial exhibits
25  and some don't.